Dennis F. Dunne
Thomas J. Matz
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
(212) 530-5000

*Counsel to FTI Consulting Canada Inc., as Foreign Representative*
*of Canadian Proceeding of Sino-Forest Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| SINO-FOREST CORPORATION, | ) Case No. 13-10361 (__) |
| | ) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF CHAPTER 15 PETITION**
**FOR RECOGNITION OF FOREIGN PROCEEDING AND RELATED RELIEF**

## TABLE OF CONTENTS

JURISDICTION AND VENUE ........................................................................................ 1

PRELIMINARY STATEMENT ........................................................................................ 2

BACKGROUND ................................................................................................................ 3

ARGUMENT ...................................................................................................................... 4

    I.  The Canadian Proceeding Is Entitled  to Recognition as a Foreign Main Proceeding ................... 4

        A.  This Case Concerns a "Foreign Proceeding" ................................................ 5

        B.  The Canadian Proceeding Is a "Foreign Main Proceeding" ......................... 6

        C.  This Case Was Commenced by a "Foreign Representative" ........................ 12

        D.  This Case was Properly Commenced Under Chapter 15 ............................. 14

        E.  The Monitor Is Entitled to an Order Granting Recognition of the Canadian Proceeding as a Foreign Main Proceeding ................................................... 14

    II.  The Monitor Is Entitled to an Order  Enforcing the Canadian Orders ....................................... 16

        A.  Principles of Comity Embodied in Chapter 15 Strongly Favor Enforcement of Canadian Orders ................................................................................... 20

        B.  Enforcement of Canadian Orders Is Authorized and Warranted Under 11 U.S.C. §§ 105(a), 1507, and 1521 ............................................................. 24

        C.  The Requested Relief Is Not Manifestly Contrary to the Public Policy of the United States ............................................................................................... 32

CONCLUSION ................................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Caddel v. Clairton Corp.*,
105 B.R. 366 (N.D. Tex. 1989).............................................................................. 6

*Canada S. Ry. Co. v. Gebhard*,
109 U.S. 527 (1883)..................................................................................... 10, 21

*Collins v. Oilsands Quest, Inc.*,
No. 12-10476, 2012 U.S. Dist. LEXIS 182647 (S.D.N.Y. Dec. 27, 2012) ................. 5, 13, 25

*Cornfeld v. Investors Overseas Servs. Ltd.*,
471 F. Supp. 1255 (S.D.N.Y. 1979), *aff'd*, 614 F.2d 1286 (2d Cir. 1979) ............................ 6

*Cunard S.S. Co., Ltd. v. Salen Reefer Services AB*,
773 F.2d 452 (2d Cir. 1985)................................................................................ 21

*Hertz Corp. v. Friend*,
130 S. Ct. 1181 (2010)....................................................................................... 8

*Hilton v. Guyot*,
159 U.S. 113, 16 S. Ct. 139 (1895)....................................................................... 20

*In re A.H. Robins Co.*,
88 B.R. 742 (E.D. Va. 1988), *aff'd*, 880 F.2d 694 (4th Cir. 1989)........................................ 33

*In re Adelphia Commc'ns Corp.*,
298 B.R. 49 (S.D.N.Y. 2003)................................................................................ 26

*In re Angiotech Pharmaceuticals, Inc., et al.*,
No. 11-10269 ................................................................................................. 25

*In re Atlas Shipping A/S*,
404 B.R. 726 (Bankr. S.D.N.Y. 2009) .................................................................... 21

*In re Bd. of Directors of Telecom Argentina S.A.*,
No. 05-17811 (BRL), 2006 WL 686867 (Bankr. S.D.N.Y. Feb. 24, 2006), *aff'd sub nom.*
*Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentine, S.A. (In re Bd. of Dirs. of Telecom*
*Argentina, S.A.)*, 528 F.3d 162 (2d Cir. 2008)...................................................... 29

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd., Inc.*,
238 B.R. 25 (Bankr. S.D.N.Y. 1999), *aff'd*, 238 B.R. 699 (S.D.N.Y. 2002)........................ 22

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*,
374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008)...................... 14

*In re Betcorp Ltd.*,
    400 B.R. 266 (Bankr. D. Nev. 2009) .................................................................................. 7

*In re Canwest Global Communications Corp., et al.*,
    No. 09-15994 (Bankr. S.D.N.Y. November 3, 2009) .................................................. 5, 13, 25

*In re Cozumel Caribe, S.A. de C.V.*,
    482 B.R. 96 (Bankr. S.D.N.Y. 2012) ................................................................................ 27

*In re Davis*,
    191 B.R. 577 (Bankr. S.D.N.Y. 1996) ............................................................................... 6

*In re Dow Corning Corp.*,
    280 F.3d 648 (6th Cir. 2002) ........................................................................................... 33

*In re Drexel Burnham Lambert Grp., Inc.*,
    960 F.2d 285 (2d Cir. 1992) ............................................................................................ 33

*In re Ephedra Prods. Liab. Litig.*,
    349 B.R. 333 (S.D.N.Y. 2006) ........................................................................................ 32

*In re Fairfield Sentry Ltd.*,
    440 B.R. 60 (Bankr. S.D.N.Y.), *aff'd* No. 10 Civ. 7311(GBD), 2011 WL 4357421
    (S.D.N.Y. Sept. 16, 2011) ................................................................................................. 7

*In re Fairfield Sentry Ltd.*,
    No. 10-13164, 2011 U.S. Dist. LEXIS 105770 (S.D.N.Y. Sept. 15, 2011) ............................ 12

*In re Fairfield Sentry Ltd.*,
    No. 10-13164, 2013 Bankr. LEXIS 136 (Bankr. S.D.N.Y. Jan. 10, 2013) ............................ 22

*In re Gerova Fin. Group, Ltd.*,
    482 B.R. 86 (Bankr. S.D.N.Y. 2012) ............................................................................. 6, 7

*In re MAAX Corporation*,
    No. 08-11443 ................................................................................................................ 25

*In re Metcalfe & Mansfield Alternative Investments, et al.*,
    No. 09-16709 (Bankr. S.D.N.Y. January 5, 2010) ..................................................... 5, 13, 29

*In re Metcalfe & Mansfield Alternative Invs.*,
    421 B.R. 685 (Bankr. S.D.N.Y. 2010) ..................................................................... 28, 30, 32

*In re Millennium Global Emerging Credit Master Fund Ltd.*,
    458 B.R. 63 (Bankr. S.D.N.Y. 2011), *aff'd* 474 B.R. 88 (S.D.N.Y. 2012) .......................... 6, 7

*In re Muscletech Research and Development Inc. et al.*,
    Nos. 06 CIV 538 and 539 (S.D.N.Y. March 2, 2006) .................................................. 5, 13, 25

*In re Nortel Networks Corp.*,
  No. 09-10164 (Bankr. D. Del. Feb. 27. 2009) ............................................ 5, 13, 25

*In re Petition of Garcia Avila*,
  296 B.R. 95 (Bankr. S.D.N.Y. 2003) ..................................................... 30

*In re Quebecor World Inc.*,
  No. 08-13814 (Bankr. S.D.N.Y. July 1, 2009) ..................................... 5, 13

*In re Specialty Equip. Cos., Inc.*,
  3 F.3d 1043 (7th Cir. 1993) ............................................................. 33

*In re Vitro S.A.B. de CV*,
  No. 12-10542, 2012 WL 5935630 (5th Cir. Nov. 28, 2012) ........................... passim

*Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re SPhinX, Ltd.)*,
  371 B.R. 10 (S.D.N.Y. 2007) ........................................................ 6, 7

*Licensing by Paolo v. Sinatra (In re Gucci)*,
  126 F.3d 380 (2d Cir. 1997) ......................................................... 26

*Queenie, Ltd. v. Nygard Int'l*,
  321 F.3d 282 (2d Cir. 2003) ......................................................... 26

*Schimmelpenninck v. Byrne (In re Schimmelpenninck)*,
  183 F.3d 347 (5th Cir. 1999) ......................................................... 33

*Smith v. Dominion Bridge Corp.*,
  No. 96-7580, 1999 WL 111465 (E.D. Pa. March 2, 1999) .............................. 6

*Victrix S.S., Co., S.A. v. Salen Dry Cargo A.B.*,
  825 F.2d 709 (2d Cir. 1987) ......................................................... 20


STATUTES

11 U.S.C. § 101(23) .................................................................. 4, 5, 6

11 U.S.C. § 101(24) ............................................................. 4, 12, 13, 14

11 U.S.C. § 101(41) ..................................................................... 4

11 U.S.C. § 105 ................................................................ 2, 3, 24, 26

11 U.S.C. § 362 ...................................................................... 16, 26

11 U.S.C. § 510(b) ...................................................................... 31

11 U.S.C. § 1107 ..................................................................... 16, 26

11 U.S.C. § 1108 .................................................................................................... 16, 27

11 U.S.C. § 1501 ........................................................................................... 4, 21, 24, 33

11 U.S.C. § 1502 ................................................................................................... 4, 6, 14

11 U.S.C. § 1504 ................................................................................................. 4, 14, 22

11 U.S.C. § 1506 ........................................................................................ 15, 25, 32, 33

11 H.R.S.C. § 1508 ........................................................................................................ 33

11 U.S.C. § 1507 ................................................................................................... passim

11 U.S.C. § 1509 ................................................................................................. 4, 14, 22

11 U.S.C. § 1515 ........................................................................................... 2, 3, 4, 14

11 U.S.C. § 1516 ................................................................................................... 6, 8, 13

11 U.S.C. §1517 .................................................................................................... passim

11 U.S.C. § 1520 ................................................................................................... 16, 26

11 U.S.C. § 1521 .................................................................................................... passim

11 U.S.C. § 1522 ............................................................................................................ 28

11 U.S.C. § 1525 ............................................................................................................ 22

11 U.S.C. § 1527 ............................................................................................................ 22

28 U.S.C. § 157 ........................................................................................................... 1, 2

28 U.S.C. § 1334 ............................................................................................................. 1

28 U.S.C. § 1410 ............................................................................................................. 2

## OTHER AUTHORITIES

Amended Standing Order of Reference Re: Title 11of the United States District Court for the
    Southern District of New York (Preska, C.J.) dated January 31, 2012 ..................................... 1

American Law Institute's *Principles of Cooperation Among the NAFTA Countries* (2003) ....... 23

H.R. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 115-116 (2005), *reprinted in* 2005 U.S.C.C.A.N.
    88 .................................................................................................................... 15, 24

J. L. Westbrook, *Chapter 15 and Discharge*, 13 Am. Bankr. Inst. L. Rev. 503 (2005) ......... 21, 23

J. L. Westbrook, *Chapter 15 At Last*, 79 Am. Bankr. L.J. 713, 714 (2005) ................................. 23

J. L. Westbrook, *Multinational Enterprises in General Default:  Chapter 15, the ALI Principles, and the EU Insolvency Regulation*, 79 Am. Bankr. L.J. 1, 4 (2002) ...................................... 23

FTI Consulting Canada Inc. (the "**Monitor**") is the court-appointed monitor and authorized foreign representative of the proceeding (the "**Canadian Proceeding**") of Sino-Forest Corporation ("**SFC**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as amended, the "**CCAA**") pending before the Ontario Superior Court of Justice (Commercial List) (the "**Ontario Court**").  The Monitor has commenced this chapter 15 case ancillary to the Canadian Proceeding by filing a *Verified Petition for Recognition of Foreign Proceeding and Related Relief* (the "**Chapter 15 Petition**") seeking the entry of an order (a) recognizing the Canadian Proceeding as a "foreign main proceeding" or, in the alternative, a "foreign nonmain proceeding" pursuant to sections 1515 and 1517 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") and (b) giving full force and effect in the United States to (i) the Initial Order of the Ontario Court dated March 30, 2012, including any extensions or amendments thereof (the "**Initial Order**") and (ii) the Plan Sanction Order of the Ontario Court dated December 10, 2012, including any extensions or amendments thereof (the "**Plan Sanction Order**," and together with the Initial Order, the "**Canadian Orders**") sanctioning SFC's plan of compromise and reorganization dated December 3, 2012 (as the same may be amended, revised or supplemented in accordance with its terms, the "**Plan**") pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.

The Monitor respectfully files this Memorandum of Law in support of the Chapter 15 Petition.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the "Amended Standing Order of Reference Re: Title 11" of the United States District Court for the Southern District of New York (Preska, C.J.) dated January 31, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

2.        Venue is proper in this District pursuant to 28 U.S.C. §§ 1410(2) and (3).

3.        The statutory predicates for the relief requested herein are sections 105(a),
1507, 1515, 1517, and 1521 of the Bankruptcy Code.

## PRELIMINARY STATEMENT

4.        SFC is a Canadian holding company that began encountering operational
and legal difficulties in 2011 after a short seller of its shares published a report accusing the
company of being a "near total fraud" and a "Ponzi scheme."  Further, the allegations in the
report caused SFC to miss its quarterly financial reporting obligations for the third quarter of
2011, thereby resulting in a default under note indentures governing approximately $1.8 billion[1]
in debt issued by SFC and guaranteed by many of its subsidiaries.  The Canadian Proceeding was
commenced in order to provide SFC with the protection needed to restructure its operations and,
through a plan of compromise and reorganization under the CCAA, to enforce the terms of a
consensual restructuring negotiated between SFC and its creditors.  Such Plan received the
overwhelming approval of creditors and was sanctioned by the Ontario Court on December 10,
2012.  The Plan became effective on January 30, 2013.

5.        Chapter 15 authorizes this Court to, among other things, (i) recognize a
foreign proceeding upon a foreign representative's proper commencement of a case under
chapter 15 and (ii) once recognition is granted, provide further assistance in the United States to
such foreign representative with respect to the foreign proceeding consistent with longstanding
principles of comity and the statutory purposes of chapter 15 to facilitate and foster cooperation
in cross-border insolvency proceedings by, among other things, enforcing in the United States
orders entered in the foreign proceeding.

---

[1]        Unless otherwise noted, currency references in this Memorandum of Law are to United States Dollars.

6.      As set forth below, the Canadian Proceeding is entitled to recognition and relief requested by the foreign representative under chapter 15.  First, the Chapter 15 Petition satisfies all of the requirements set forth in section 1515 and 1517 of the Bankruptcy Code, as the Canadian Proceeding is a CCAA proceeding before the Ontario Court involving a company incorporated and operating in Canada, and the Monitor has been duly authorized by the Ontario Court to seek recognition of the Canadian Proceeding and enforcement of the Canadian Orders in the United States under chapter 15 of the Bankruptcy Code.  Second, following recognition of the Canadian Proceeding, enforcement of the Canadian Orders in the United States is authorized and warranted under sections 105(a), 1507, and 1521 of the Bankruptcy Code.  The Monitor is informed and believes that granting the relief sought herein will best assure the fair and efficient administration of the Canadian Proceeding and the implementation of the Plan in accordance with the principles underlying chapter 15 of the Bankruptcy Code.  Moreover, such relief is consistent with the relief afforded by United States courts in other ancillary chapter 15 cases involving proceedings under the CCAA.

## BACKGROUND

7.      For a more complete description of SFC's business, corporate organization, capital structure, and circumstances leading to the Canadian Proceeding and the entry of the Plan Sanction Order, the court is respectfully referred to the Chapter 15 Petition and the documents cited therein, which are annexed without exhibits or appendices (unless otherwise stated) as exhibits to the Declaration of Jeremy C. Hollembeak dated February 4, 2013 filed contemporaneously herewith (the "**Hollembeak Declaration**").  Additionally, these and other documents relating to the Canadian Proceeding are available on the Monitor's website at http://cfcanada.fticonsulting.com/sfc/default.htm.

3

## **ARGUMENT**

### I.  THE CANADIAN PROCEEDING IS ENTITLED
### TO RECOGNITION AS A FOREIGN MAIN PROCEEDING

8.      Chapter 15 of the Bankruptcy Code applies when a foreign representative seeks the assistance of a United States bankruptcy court in connection with a foreign proceeding. *See* 11 U.S.C. § 1501(b)(l).  The Canadian Proceeding is entitled to recognition as a "foreign main proceeding" under section 1517 of the Bankruptcy Code because:

(A)      the Canadian Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code

(B)      the Canadian Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code because the Canadian Proceeding is pending in the location of the center of main interests for SFC;

(C)      the Monitor is a "person" within the meaning of section 101(41) of the Bankruptcy Code and a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code;

(D)      the Chapter 15 Petition meets the requirements of sections 1504, 1509, and 1515 of the Bankruptcy Code; and

(E)      granting recognition of the Canadian Proceeding as a foreign main proceeding would not be manifestly contrary to a public policy of the United States, and is therefore required pursuant to section 1517 of the Bankruptcy Code.

4

A.      This Case Concerns a "Foreign Proceeding"

            9.      The Canadian Proceeding is a "foreign proceeding" within the meaning of

section 101(23) of the Bankruptcy Code.  That section provides as follows:

> The term "foreign proceeding" means a collective judicial
> or administrative proceeding in a foreign country, including
> an interim proceeding, under a law relating to insolvency or
> adjustment of debt in which proceeding the assets and
> affairs of the debtor are subject to control or supervision by
> a foreign court, for the purpose of reorganization or
> liquidation.

11 U.S.C. § 101(23).  Here, the Canadian Proceeding is an insolvency proceeding brought under

the CCAA, which provides a statutory means for applicants thereunder to reorganize their affairs

subject to the supervision of a court.  SFC applied for protection under the CCAA in order to

restructure its operations and maximize creditor value under the supervision of the Ontario Court

and, as such, the Canadian Proceeding falls squarely within the definition contained in section

101(23).  Indeed, since the passage of chapter 15, Canadian proceedings under the CCAA have

routinely been granted recognition by courts in the United States and, in particular, this District.

*See*, *e.g.*, *Collins v. Oilsands Quest, Inc.*, No. 12-10476, 2012 U.S. Dist. LEXIS 182647

(S.D.N.Y. Dec. 27, 2012);[2] *In re Metcalfe & Mansfield Alternative Investments, et al.*, No. 09-

16709 (Bankr. S.D.N.Y. January 5, 2010); *In re Canwest Global Communications Corp., et al.*,

No. 09-15994 (Bankr. S.D.N.Y. November 3, 2009); *In re Quebecor World Inc.*, No. 08-13814

(Bankr. S.D.N.Y. July 1, 2009); *In re Nortel Networks Corp.*, No. 09-10164 (Bankr. D. Del. Feb.

27. 2009); *In re Muscletech Research and Development Inc. et al.,* Nos. 06 CIV 538 and 539

---

[2]      Copies of unpublished decisions and orders referred to herein are attached for the Court's convenience as
Exhibits K(1)-K(14) to the Hollembeak Declaration.

(S.D.N.Y. March 2, 2006). Accordingly, this chapter 15 case concerns a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.[3]

B.    The Canadian Proceeding is a "Foreign Main Proceeding"

10.    The Canadian Proceeding is a "foreign main proceeding," as defined in section 1502(4) of the Bankruptcy Code. 11 U.S.C. § 1502(4). The Bankruptcy Code provides that a "foreign proceeding" that is the subject of a chapter 15 petition must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its "center of . . . main interests," or "**COMI**". 11 U.S.C. § 1517(b)(1). While chapter 15 does not define this concept, section 1516 of the Bankruptcy Code establishes a presumption that a corporate debtor's COMI is its registered office "[i]n the absence of evidence to the contrary." 11 U.S.C. § 1516(c). However, "[w]here evidence is presented to the contrary, the court cannot rely solely upon the presumption but rather must consider all of the relevant facts." *In re Gerova Fin. Group, Ltd.,* 482 B.R. 86, 91 (Bankr. S.D.N.Y. 2012). Relevant factors considered by courts in determining the location of the debtor's COMI include "'the location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.'" *In re Millennium Global Emerging Credit Master Fund Ltd.*, 474 B.R. 88, 92 (S.D.N.Y. 2012) (*quoting In re SPhinX*, 351 B.R. 103, 117 (Bankr. S.D.N.Y.2006), *aff'd* 371 B.R. 10 (S.D.N.Y. 2007)).

---

[3]    Further, under former section 304 of the Bankruptcy Code, the statutory predecessor to chapter 15, Canadian proceedings, including insolvency proceedings, were regularly granted comity. *See, e.g., Smith v. Dominion Bridge Corp.,* No. 96-7580, 1999 WL 111465, at *3 (E.D. Pa. March 2, 1999) ("As a sister common law jurisdiction, courts have consistently extended comity to Canadian Bankruptcy proceedings."); *In re Davis*, 191 B.R. 577, 587 (Bankr. S.D.N.Y. 1996) ("Courts in the United States uniformly grant comity to Canadian proceedings"); *Cornfeld v. Investors Overseas Servs. Ltd.,* 471 F. Supp. 1255, 1260-62 (S.D.N.Y. 1979), *aff'd,* 614 F.2d 1286 (2d Cir. 1979); *Caddel v. Clairton Corp.*, 105 B.R. 366 (N.D. Tex. 1989).

11.     Courts also "take into consideration the expectations of creditors and other interested third parties," as a company's COMI must be "reasonably ascertainable to third parties." *Millennium*, 458 B.R. 63, 93 (Bankr. S.D.N.Y. 2011) , *aff'd* 474 B.R. 88 (S.D.N.Y. 2012). *See also Gerova*, 482 B.R. at 91 (calling the expectations of third parties "an important factor in the COMI determination"); *In re Betcorp Ltd.*, 400 B.R. 266, 291 (Bankr. D. Nev. 2009) ("[I]t is important that the debtor's COMI be ascertainable by third parties . . . The presumption is that creditors will look to the law of the jurisdiction in which they perceive the debtor to be operating to resolve any difficulties they have with that debtor, regardless of whether such resolution is informal, administrative or judicial."); *Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re SPhinX, Ltd.)*, 371 B.R. 10, 19 (S.D.N.Y. 2007) (noting that "the COMI must be identified based on criteria that are: (1) objective; and (2) ascertainable by third parties").   Further, the operative date for analyzing COMI is the date the foreign proceeding was commenced. *Gerova*, 482 B.R. at 91.

12.     Notably, the analysis of a foreign debtor's COMI is a flexible one, as "courts do not apply any rigid formula or consistently find one factor dispositive." *Betcorp Ltd.*, 400 B.R. at 290.  When applying this totality of the circumstances test, courts "generally equate[] [COMI] with the concept of a 'principal place of business' under United States law." *See, e.g., In re Millennium Global Emerging Credit Master Fund Ltd.*, 458 B.R. at 72 (noting that "plain English" meaning of "center of main interests" in American jurisprudence is "principal place of business" and that courts have used such terms "interchangeably"); *In re Fairfield Sentry Ltd.*, 440 B.R. 60, 64 (Bankr. S.D.N.Y.), *aff'd* No. 10 Civ. 7311(GBD), 2011 WL 4357421, at *7 (S.D.N.Y. Sept. 16, 2011) (finding that British Virgin Islands were debtor's COMI where "[a]lthough the Debtors' assets and investors are international, the facts before the Court suggest that the Debtors' most feasible administrative 'nerve center' has existed for some time in the

BVI").   Under United States law, "principal place of business" refers to "the place where the corporation's high level officers direct, control, and coordinate the corporation's activities" – *i.e.*, the corporation's "nerve center."   *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1186 (2010) (noting that, typically, a corporation's principal place of business, or nerve center, will be "found at a corporation's headquarters").

13.     The following circumstances regarding SFC indicate that its COMI is in Canada and, therefore, the Canadian Proceeding should be recognized as a "foreign main proceeding."

14.     *Headquarters.*  SFC was a company formed under the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, with its registered office in Mississauga, Ontario, Canada, and its COMI is therefore presumptively Canada under section 1516(c) of the Bankruptcy Code.   Although SFC had an executive office in Hong Kong, the 1516(c) presumption is supported by the manner in which SFC historically represented itself to creditors and stakeholders and the nature of SFC's operations immediately prior to, and at the commencement of, the Canadian Proceeding.  As noted below, SFC's two most senior finance executives, including its chief financial officer, operated out of its offices in Mississauga and Toronto, Canada.  Additionally, SFC maintained some of its corporate and business records in Canada, including general corporate, public financing and annual and quarterly reporting documents, accounting, and corporate and harmonized sales tax ("**HST**") tax records.

15.     *Property and Assets.*  SFC was a holding company that was the ultimate owner of 136 subsidiaries (the "**Subsidiaries**," and collectively with SFC, "**Sino-Forest**"). Accordingly, SFC's principal assets were equity interests in its six direct subsidiaries, which are incorporated in Canada, Barbados, Hong Kong, and the British Virgin Islands.  None of Sino-Forest's Subsidiaries conducted business in the United States.  In addition, SFC maintained

accounts receivable due from its Subsidiaries and cash.  SFC had bank accounts in both Canada

and Hong Kong, with the majority of its funds located in the Canadian bank accounts.

Approximately 89% of total funds were located in Canada as of the commencement of the

Canadian Proceeding.

16.      *Creditors and Stakeholders.*  Creditors and other stakeholders of SFC

would perceive Canada to be the company's COMI.  As a holding company, SFC had little or no

trade debt and its principal direct creditors were therefore the holders (the "**Noteholders**") of

four series of notes aggregating approximately $1.8 billion in principal amount (the "**SFC**

**Notes**").  The Noteholders purchased their SFC Notes through public note issuances and,

therefore, knew or should have know from extensive public filings that SFC consistently

represented itself as a Canadian corporation based in Mississauga, Ontario, Canada.  SFC's

stakeholders other than the Noteholders were its shareholders.  Until becoming the subject of a

cease trade order by the Ontario Securities Commission (the "**OSC**") on August 26, 2011 and

being delisted on May 9, 2012, SFC shares were listed and traded on the Toronto Stock

Exchange.  Accordingly, both shareholders and Noteholders were likely to look to SFC's offices

in Ontario and perceive Canada as SFC's principal place of business.

17.      *Governing Law of Disputes.*  SFC was a Canadian holding company with

few direct contractual relationships.  As noted above, SFC's stakeholders consisted almost

entirely of its shareholders and Noteholders.  SFC shares were previously listed and traded on the

Toronto Stock Exchange and, therefore, any disputes related to SFC shares were governed by

Canadian securities laws.  The Noteholders purchased their SFC Notes through public note

issuances and, therefore, knew or should have known from extensive public disclosure that SFC

consistently represented itself as a Canadian corporation based in Mississauga, Ontario, Canada.

As the United States Supreme Court long ago explained, in enforcing a Canadian restructuring of

bonds issued in and governed by the laws of New York over the objections of U.S. bondholders, "every person who deals with a foreign corporation impliedly subjects himself to [the] laws of the foreign government[, and] anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere." *Canada S. Ry. Co. v. Gebhard*, 109 U.S. 527, 537 (1883).  As such, although the indentures governing the SFC Notes provided that disputes thereunder were governed by New York law, they did not preclude such disputes from being adjudicated in Canadian courts or prevent the restructuring of the SFC Notes under the insolvency laws of Canada, SFC's legal home.

18.     In fact, when SFC's stakeholders did take legal action with respect to their shares or SFC Notes, they recognized the primacy of Canadian law in such disputes and proceedings.  All but one of the class actions commenced against SFC (the "**Class Actions**") — the plaintiffs of which include both Noteholders and shareholders — have been filed in Canada (the other action having been filed in New York).  Further, although both the SFC Notes and the agreements to waive SFC's initial default thereunder were governed by New York law, and the waiver agreements further included the consent of the parties thereto to jurisdiction in New York, the Restructuring Support Agreement (the "**RSA**") — with respect to which joinder agreements were executed by 40% of Noteholders as of the commencement of the Canadian Proceeding and 72% of Noteholders as of the application for the Plan Sanction Order — was governed by Ontario law, and, by its terms, the parties thereto submitted to the non-exclusive jurisdiction of the courts of the Province of Ontario.  Moreover, the RSA explicitly required the commencement of a proceeding under the CCAA.  SFC's shareholders and creditors therefore demonstrably looked to Canadian law for the adjudication of their rights and invoked the jurisdiction of the Canadian courts prior to the commencement of the Canadian Proceeding. Thereafter, the majority of these parties not only appeared in the Canadian Proceeding and filed

Proofs of Claim — thereby submitting to the jurisdiction of the Canadian Court —  but also did not object to the Plan.

19.    *Management and Operations.*  As of the commencement of the Canadian Proceeding, SFC had 3 employees all of which were residents of Canada.  SFC's two most senior finance executives, including the company's chief financial officer, operated out of its offices in Mississauga and Toronto, Ontario, Canada.  In the ordinary course of business, these employees performed numerous functions in Canada on behalf of SFC, including corporate administration, financing, and accounting.

20.    Furthermore, following the release of an investor report in 2011, SFC's board of directors (the "**Board**"), assumed a more active role in the affairs of the company.  In particular, the Board immediately appointed a three-member Independent Committee (the "**IC**") to investigate the allegations contained in the report.  In addition, considerable resources were devoted to the retention of independent professionals and review of data concerning Sino-Forest's assets and business relationships.  A majority of the members of the Board were predominantly based in Canada, and the members of the IC — and therefore the administration of the investigation — were all based in Canada.  Also, prior to the commencement of the Canadian Proceeding, SFC was primarily involved in (i) the defense of the Class Actions, all but one of which were filed in Canada, (ii) inquiries from the Ontario Securities Commission, and (iii) negotiating a consensual restructuring framework in Canada and Hong Kong with an *ad hoc* group of Noteholders.  In particular, the last of these culminated in the RSA which was governed by Ontario law and which mandated the commencement of a proceeding under the CCAA, further demonstrating that all relevant parties recognized the primacy of Canadian law in disputes and proceedings regarding SFC.

21.     Thus, the totality of the circumstances support a finding that SFC's COMI was in Canada. In comparison to SFC's substantial connections with Canada, its connections with other jurisdictions were minimal and insufficient to support a finding of COMI elsewhere. For example, a finding that SFC's COMI was in the United States would not be supportable. SFC had no assets or employees in the United States and, while SFC's principal creditors held SFC Notes issued under New York indentures, the majority of the Noteholders clearly viewed Canada as its principal place of business as evidenced by the Class Actions filed in Canada and the terms of the RSA requiring the filing of the Canadian Proceeding in Canada. Accordingly, the Canadian Proceeding is therefore pending where SFC had its COMI, and the proceeding constitutes a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.

22.     Alternatively, if SFC is not found to have had its COMI in Canada, then the Canadian Proceeding constitutes a "foreign nonmain proceeding" within the meaning of section 1502(5) of the Bankruptcy Code because it is pending in a jurisdiction where SFC had an "establishment," a place where it has carried out "nontransitory economic activity." 11 U.S.C. § 1502(2), (5). *See In re Fairfield Sentry Ltd.*, No. 10-13164, 2011 U.S. Dist. LEXIS 105770 at *29 n.8 (S.D.N.Y. Sept. 15, 2011) (noting that debtor had "as an establishment . . . for the conduct of nontransitory economic activity, i.e. a local place of business."). SFC not only had offices in Mississauga and Toronto, Ontario, Canada, but it also retained local professionals and counsel located in Toronto and performed, among other things, negotiations and investigatory activities in Toronto, Canada prior to the commencement of the Canadian Proceeding.

C.     This Case was Commenced by a "Foreign Representative"

23.     This chapter 15 case was commenced by the Monitor, the duly-authorized, court-appointed "foreign representative" of SFC within the meaning of section 101(24) of the Bankruptcy Code. That section defines a "foreign representative," in pertinent

part, as a "person or body…authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). The Initial Order provides that "the Monitor is hereby authorized and empowered to act as the foreign representative in respect of the within proceeding for the purpose of having these proceedings recognized in a jurisdiction outside Canada." Initial Order ¶ 47. Similarly, the Plan Sanction Order further confirms that the Monitor is authorized and appointed to act as the foreign representative, and in fact explicitly directs the Monitor, "as the foreign representative of SFC," to commence a proceeding in the United States seeking recognition of the Plan and the Plan Sanction Order. Plan Sanction Order ¶¶ 58-59. Under section 1516(a) of the Bankruptcy Code, the Court is entitled to presume that the representative identified in the Canadian Orders is a "foreign representative."

24.     Moreover, courts in this district have consistently granted chapter 15 recognition of Canadian proceedings in which the monitor appointed in such proceeding acted as its foreign representative in the United States. *See*, *e.g.*, *Collins v. Oilsands Quest, Inc.*, No. 12-10476, 2012 U.S. Dist. LEXIS 182647 (S.D.N.Y. Dec. 27, 2012); *In re Metcalfe & Mansfield Alternative Investments, et al.*, No. 09-16709 (Bankr. S.D.N.Y. January 5, 2010); *In re Canwest Global Communications Corp., et al.*, No. 09-15994 (Bankr. S.D.N.Y. November 3, 2009); *In re Quebecor World Inc.*, No. 08-13814 (Bankr. S.D.N.Y. July 1, 2009); *In re Nortel Networks Corp.*, No. 09-10164 (Bankr. D. Del. Feb. 27. 2009); *In re Muscletech Research and Development Inc. et al.,* Nos. 06 CIV 538 and 539 (S.D.N.Y. March 2, 2006). Accordingly, the Monitor is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

D.        This Case was Properly Commenced under Chapter 15

25.        The Monitor duly and properly commenced the chapter 15 case, as required by sections 1504 and 1509 of the Bankruptcy Code, by filing the Chapter 15 Petition for recognition of a foreign proceeding under section 1515(a), accompanied by all documents and information required by section 1515(b) and (c).  *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) ("A case under chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under section 1515 of the Bankruptcy Code."). Specifically, the Foreign Representative has provided the Court with (i) copies of the Canadian Orders which both affirm the existence of the Canadian Proceeding and appoint the Monitor to act as its foreign representative in satisfaction of section 1515(b)(2) and/or (3), and (ii) a statement verifying that the Foreign Representative is not aware of any foreign proceedings with respect to SFC other than the Canadian Proceeding in satisfaction of section 1515(c).  *See* Chapter 15 Petition ¶ 4.

E.        The Monitor is Entitled to an Order Granting Recognition of the Canadian Proceeding as a Foreign Main Proceeding

26.        As previously discussed, the Canadian Proceeding is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code, the Monitor applying for recognition is a "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code, and the Chapter 15 Petition meets the requirements of section 1515 of the Bankruptcy Code.  Section 1517(a) of the Bankruptcy Code provides, in pertinent part, that "[s]ubject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; (2) the foreign

representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. §1517(a). *See also* H.R. Rep. 109-31(I), 109 Cong., Sess. 2005, *reprinted in* 2005 U.S.C.C.A.N. 88, 169 at 175 (noting, in enacting chapter 15, that the "decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by section 304(c) of the Bankruptcy Code. The requirements of this section, which incorporates the definitions in section 1502 and sections 101(23) and (24), are all that must be fulfilled to attain recognition"). As explained above, the Monitor has satisfied subsections 1517(a)(1), (2), and (3) of the Bankruptcy Code.

27.     Finally, in compliance with the introductory language of section 1517, granting recognition of the Canadian Proceeding would not be an action "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. As noted above, since the passage of chapter 15, Canadian proceedings under the CCAA have routinely been granted recognition by courts in the United States and, in particular, this District. *See infra* ¶ 9 (citing cases). Therefore, there is no basis for the Court to refuse recognition pursuant to section 1506 of the Bankruptcy Code.

28.     Accordingly, the Monitor respectfully submits that the Court enter an order recognizing the Canadian Proceeding as a "foreign main proceeding" pursuant to section 1517 of the Bankruptcy Code. In the alternative, if the Court finds that SFC's COMI is not located in Canada, the Monitor respectfully submits that the Court enter an order recognizing the Canadian Proceeding as a "foreign nonmain proceeding" under section 1517 of the Bankruptcy Code.

## II.  THE MONITOR IS ENTITLED TO AN ORDER
## ENFORCING THE CANADIAN ORDERS

29.     In connection with the recognition of the Canadian Proceeding, the Monitor seeks enforcement in the United States of the Initial Order and the Plan Sanction Order of the Ontario Court.

30.     The Initial Order provided SFC with relief that is similar to and consistent with the relief that is available automatically under sections 362, 1107, and 1108 of the Bankruptcy Code to debtors upon filing a chapter 11 petition and to foreign representatives and/or debtors upon the court granting chapter 15 recognition of the debtor's foreign proceeding as a "foreign main proceeding" under section 1520 of the Bankruptcy Code, such as, *inter alia*:

- stay relief to protect its business and property;

- the authority to remain in possession and control of its assets and operate its business;

- the authority to restructure its business by downsizing or shutting down any operations, selling any assets, terminating employees or repudiating leases, with the consequences thereof dealt with in a plan of arrangement or compromise or on further order of the Ontario Court; and

- the authority to file a plan of compromise or arrangement under the CCAA.

In addition, the Initial Order prohibited the commencement or continuation by any noteholder, indenture trustee, or security trustee of actions against certain of SFC's Subsidiaries in connection with the SFC Notes.  The Initial Order also contemplated the continued oversight authority of the Ontario Court in that it provided, among other things, that: (i) SFC's authority to carry on its business under the Initial Order in a manner consistent with the preservation of its business was subject to further order of the Ontario Court, (ii) SFC and the Monitor could, from time to time, apply to the Ontario Court for advice and directions in the discharge of their powers

16

and duties thereunder, and (iii) application to the Ontario Court was periodically required to extend the stay under the Initial Order, which, by its terms, is of limited duration.

31.     The Plan Sanction Order provided SFC with relief that is similar to and consistent with the relief that is available under the Bankruptcy Code and routinely approved in connection with confirmation of a chapter 11 plan.   Specifically, the Plan Sanction Order approved the terms of SFC's Plan, which, as described in greater detail in the Chapter 15 Petition, generally provides for, among other things:

- the transfer of SFC's assets to Emerald Plantation Holdings Limited ("**Newco**"), a new, creditor-owned entity organized under Cayman law and the further transfer of such assets to a new, wholly-owned subsidiary of Newco named Emerald Plantation Group Limited;

- the distribution of Newco's shares to creditors of SFC;

- Newco's issuance of new notes in an aggregate principal amount of CDN $300 million, to be distributed to creditors of SFC;

- the creation of a litigation trust to retain certain claims that have been or may be asserted by or on behalf of SFC or the trustees or holders of SFC Notes, except to the extent such claims are released under the Plan, and the distribution of the interests in such litigation trust to creditors and former Noteholders who have brought Class Action claims;

- a CDN $150 million aggregate cap on (i) validly indemnified Class Action claims asserted by former Noteholders against certain third parties and (ii) the indemnification claims that might be asserted by such third parties against SFC;

- the creation of a cash reserve for future payment of various types of approved administrative expenses and currently unresolved claims;

- the release of all claims against SFC and cancellation of all debentures, indentures, notes — including the SFC Notes —

certificates, agreements, invoices, and other instruments evidencing such claims;[4]

- the release of certain claims against the Subsidiaries, solely with respect to claims against them arising from or related to claims against SFC on account of the SFC Notes;

- the release of claims against certain named current or former directors and officers of SFC, excluding therefrom (i) conduct of the type specified under section 5.1(2) of the CCAA, such as misrepresentation or wrongful or oppressive conduct, (ii) the tort of conspiracy, (iii) fraud or criminal conduct, and (iv) non-monetary remedies of the Ontario Securities Commission; *provided, however* that releases are not provided for any directors or officers not named in the Plan, except as they relate to the Indemnified Noteholder Class Action Limit, as discussed below; and

- the release and exculpation of the Monitor, Newco, and Newco II.

32.    The rights of parties to pursue claims against "**Third Party Defendants**" — that is, any defendants in the Class Actions other than SFC, the Subsidiaries, the indenture trustees for the SFC Notes, or certain former officers and directors specifically identified in the Plan as "**Named Directors and Officers**" — were generally preserved under the Plan. However, as described more fully in the Chapter 15 Petition, the Plan provides that Third Party Defendants forgo their right to receive any distribution on account of valid indemnity claims they may have against SFC in respect of any of the Class Actions in exchange for all claims on behalf of noteholders against them in the Class Actions becoming subject to an aggregate cap of up to CDN $150 million (*i.e.*, the Indemnified Noteholder Class Action Limit).   *See* Chapter 15 Petition ¶ 51.   Additionally, Article 11 provides a mechanism through which Ernst & Young LLP and certain named Third Party Defendants that enter into settlement agreements with the plaintiffs in the Class Actions (as Ernst & Young LLP has) will obtain the benefit of global releases and injunctions under the Plan.   However, Article 11 did not itself approve any such

---

[4]    However, the indentures governing the SFC Notes will remain in place solely for the purposes of making distributions under the Plan.

settlement, and the application of this mechanism is subject to, among other things, (i) any such settlement being approved by order of the relevant court, (ii) all of the conditions precedent to such settlement being satisfied or waived, and (iii) any settlement funds being paid and received.[5]  *See* Chapter 15 Petition ¶ 52.  The Ernst & Young Settlement and the Ernst & Young Release, as defined in the Plan are before the Canadian Court for approval for February 4, 2013.

      33.     Other terms of the Plan Sanction Order included, among others:

- authorization of SFC and the Monitor to take all steps and actions necessary or appropriate to implement the Plan, including a declaration that neither party shall incur any liability as a result of acting in accordance with the terms of the Plan and the Plan Sanction Order;[6]

- specific terms related to the compromise and releases of Affected Claims as set out in the Plan (and described in more detail above);

- a permanent stay and injunction related to all claims released under the Plan;

- a temporary stay of proceedings against Ernst & Young LLP until the Ernst & Young Settlement and release of Ernst & Young Claims become effective, or such other date as may be ordered by the Ontario Court;

- the terms on which the Ernst & Young Settlement and release of Ernst & Young Claims may become effective;

- the appointment of the Monitor as the foreign representative of SFC;

- the creation of the reserves;

- provisions relating to document preservations; and

- a request for foreign aid and recognition from other courts.

---

[5]     One such settlement, involving Ernst & Young LLP, SFC's former auditor, has already been reached and is pending approval from the Ontario Court which, if granted, would result in the release of claims against Ernst & Young LLP.  For the avoidance of doubt, the Court is not currently being asked to enforce such settlement or the concomitant releases in favor of Ernst & Young LLP at this time.  *See* Chapter 15 Petition ¶ 53.

[6]     Plan Sanction Order at ¶ 10.

A.      Principles of Comity Embodied In Chapter 15 Strongly Favor Enforcement of Canadian Orders

34.      Upon recognition of the Canadian Proceeding as a "foreign main proceeding," longstanding principles of international comity embodied in chapter 15 heavily weigh in favor of enforcing the Canadian Orders in the United States.  "American courts have long recognized the need to extend comity to foreign bankruptcy proceedings." *Victrix S.S., Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987).  The classic definition of comity comes from a Supreme Court case granting enforcement to a judgment obtained by a foreign bankruptcy trustee:

> "Comity" . . . is recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 163-164, 16 S. Ct. 139 (1895).  Accordingly, granting comity to judgments in foreign proceedings is appropriate as long as parties are provided the fundamental protections assured to litigants in the United States.  *See id.* at 202-03 (applying comity analysis to French judgment obtained by foreign liquidator against U.S. citizens, and finding it was "satisfied that [] there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries . . . .").

35.      Furthermore, the importance of granting comity is heightened in the insolvency context because the collective nature of insolvency proceedings requires that "the assets of a debtor are dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic, or piecemeal fashion.  Consequently, American courts have consistently

recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities." *Cunard S.S. Co., Ltd. v. Salen Reefer Services AB*, 773 F.2d 452, 456-58 (2d Cir. 1985) (citing *Hilton*). Accordingly, in considering judgments rendered by foreign courts in insolvency matters, comity may be withheld only if its extension would cause American creditors to be "treated in some manner inimical to this country's policy of equality." *Id.* at 459 (citation omitted).

36.     For more than 100 years prior to the enactment of the Bankruptcy Code, courts respected principles of comity as a matter of common law, enforcing foreign insolvency decisions in the United States if the foreign proceeding afforded due process and our most fundamental public policies were not undermined. *See, e.g., Canada S. Ry. Co. v. Gebhard*, 109 U.S. at 537 (enforcing Canadian restructuring of bonds over objection of United States bondholders, explaining that "every person who deals with a foreign corporation impliedly subjects himself to [the] laws of the foreign government[, and] anything done at the legal home of the corporation, under the authority of such laws, which discharges it from liability there, discharges it everywhere.").[7] With the enactment of the Bankruptcy Code in 1978, Congress provided bankruptcy courts with statutory authority to extend comity to foreign decisions in cross-border insolvency cases under former section 304 of the Bankruptcy Code, which Congress then repealed and replaced with chapter 15 in 2005.

37.     The purpose of chapter 15 is to continue and enhance the United States' long history of granting comity in cross-border insolvency proceedings. *See* 11 U.S.C. §1501; *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009) (Chapter 15 "specifically contemplates that the court should be guided by principles of comity and cooperation with

---

[7]     *Gebhard* has been described as the "most important of the American cases" ever to address the issue of respecting discharges in foreign reorganization cases. J.L. Westbrook, *Chapter 15 and Discharge*, 13 Am. Bankr. Inst. L. Rev. 503, 507 (2005).

foreign courts in deciding whether to grant the foreign representative additional post-recognition relief.").  As this Court recently explained, "Chapter 15 emanates from and was designed around this central concept of comity, as evidenced by its primary purpose and deferential framework for international judicial cooperation."  *In re Fairfield Sentry Ltd.*, No. 10-13164, 2013 Bankr. LEXIS 136 at *31 (Bankr. S.D.N.Y. Jan. 10, 2013) (citing 11 U.S.C. § 1501(a) (specifying Chapter 15's "most basic objective is to foster the orderly administration of cross-border restructurings"); 11 U.S.C. § 1504 (indicating that "any case commenced under Chapter 15 is 'ancillary' to a foreign proceeding pending elsewhere"); 11 U.S.C. § 1525 ("[T]he [ancillary] court shall cooperate to the *maximum extent possible* with a foreign court") (emphasis added); 11 U.S.C. § 1527 (stating cooperation "may be implemented *by any appropriate means*") (emphasis added)); see also 11 U.S.C. § 1509(b) ("If the court grants recognition under section 1517, and subject to limitations that the court may impose consistent with the policy of this chapter … (3) a court in the United States **shall** grant comity or cooperation to the foreign representative.") (emphasis added).  "All in all, 'Chapter 15 provides courts with broad, flexible rules to fashion relief appropriate for effectuating its objectives in accordance with comity.'  In fashioning such relief, courts must 'take into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law.'"  *Id.* (quoting *In re Vitro S.A.B. de CV,* No. 12-10542, 2012 WL 5935630, at *16 (5th Cir. Nov. 28, 2012)).

38.    Moreover, comity is all the more appropriate here because the orders sought to be enforced were issued by a court of competent jurisdiction in Canada.  United States courts consistently noted that orders emanating from a common law jurisdiction akin to that of the United States are particularly deserving of comity.  *See, e.g., In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd., Inc.*, 238 B.R. 25, 67 (Bankr. S.D.N.Y. 1999), *aff'd*, 238 B.R. 699 (S.D.N.Y.

2002) ("[W]hen the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings." (internal quotations and citations omitted)).

39.     Furthermore, the close relationship between the United States and Canada, our immediate neighbor to the North and fellow member of NAFTA, warrants even greater respect for the Canadian Orders.  This concept was embodied in the American Law Institute's *Principles of Cooperation Among the NAFTA Countries* (2003) (hereinafter, "**ALI Principles**"), which were developed by experts in insolvency law from all three NAFTA countries — Canada, Mexico, and the United States — as "principles and methods of cooperation that would assist in multinational bankruptcy cases within NAFTA, ***by giving bench and bar a workable baseline of agreed approaches to such cases***."  J. L. Westbrook, *Multinational Enterprises in General Default: Chapter 15, the ALI Principles, and the EU Insolvency Regulation*, 76 Am. Bankr. L.J. 1, 4 (2002).  "[T]he [ALI] Principles were drafted with Chapter 15 in mind and provide authority for resolution of a number of issues not fully addressed by Chapter 15 or addressed only in part."  *See* J. L. Westbrook, *Chapter 15 At Last*, 79 Am. Bankr. L.J. 713, 714 (2005).  Two of the ALI Principles directly address the enforcement in one NAFTA country of a reorganization plan approved in another.  First, Procedural Principle 26 "would make a reorganization plan binding on any party that participates in the proceeding or accepts its fruits."  J. L. Westbrook*, Chapter 15 and Discharge*, 13 Am. Bankr. Inst. L. Rev. 503, 515 (2005).  Second, Procedural Principle 27 "would bind to a reorganization plan unsecured creditors who did not participate in the bankruptcy proceeding in the foreign jurisdiction."  *Id.*  Thus, ALI Procedural Principles 26 and 27, which were drafted for the specific purpose of guiding courts in a NAFTA country asked by a foreign representative to enforce a reorganization

plan approved in another NAFTA country, clearly suggest that the Plan should be fully enforced in the United States in this case.

40.     Accordingly, the principles of international comity embodied in Chapter 15 weigh strongly in favor of enforcement of the Canadian Orders.

B.     Enforcement of Canadian Orders is Authorized and Warranted Under 11 U.S.C. §§ 105(a), 1507, and 1521

41.     Two provisions of chapter 15 that embody the principles of comity and provide a statutory basis for providing a foreign representative with discretionary relief, including the enforcement of orders issued by the foreign court staying legal actions or confirming a reorganization plan, are sections 1507 and 1521 of the Bankruptcy Code.[8]  Section 1507 of the Bankruptcy Code provides that a court "may provide additional assistance to a foreign representative under this title or under other laws of the United States."  11 U.S.C. § 1507.  Additionally, Section 1521 of the Bankruptcy Code provides a general grant of authority that "[u]pon recognition of a foreign proceeding … where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of any creditors, the court may grant any appropriate relief,"  11 U.S.C. § 1521(a), and also sets forth a non-exhaustive list of specific types of relief the court may grant a foreign representative.  *See, e.g.*, 11 U.S.C. § 1521(a)(1) (staying commencement or continuation of actions); § 1521(a)(2) (staying execution against debtor's assets); § 1521(a)(5) (entrusting administration or realization of debtor's assets within United States); § 1521(a)(7) (any additional relief); § 1521(b) (turnover of

---

[8]     Additionally, section 105(a) empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" which, in a chapter 15 case, include the purposes explicitly set forth in section 1501 of the Bankruptcy Code including fostering cooperation, greater legal certainty, fair and efficient administration, maximization of stakeholder value, and the rescue of financially distressed businesses in the context of cross-border insolvency cases.  11 U.S.C. § 105(a), 1501(a)(1).  Legislative history indicates that section 1521 is not intended to "expand or reduce the scope of relief currently available in ancillary cases under sections 105 or 304 …."  H.R. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 115-116 (2005).

debtor's assets).   In considering the relationship between these two sections of the Bankruptcy Code, the 5th Circuit has concluded that while section 1521 of the Bankruptcy Code allows the grant of relief either previously available under old section 304 of the Bankruptcy Code or currently available under United States law, section 1507 of the Bankruptcy Code allows a court to grant relief beyond section 1521, subject to a more stringent standard.  *See Vitro*, 2012 WL 5935630 at \*19.  Once it is determined that the relief requested is available and warranted under one of these provisions, the court should grant the relief unless doing so would be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.

*i.*      *The Initial Order Should Be Enforced*

42.      The Initial Order provided relief that is a standard feature of proceedings under the CCAA and has routinely been enforced in full in the United States upon recognition of a CCAA proceeding through chapter 15.  *See*, *e.g.*, *Oilsands Quest, Inc.*, No. 12-10476, 2012 U.S. Dist. LEXIS 182647 (enforcing similar initial order in full in United States); *In re Angiotech Pharmaceuticals, Inc., et al.*, No. 11-10269 (same); *In re Nortel Networks Corp.*, No. 09-10164 (same); *In re MAAX Corporation,* No. 08-11443 (same); *In re Muscletech Research and Development Inc. et al.,* Nos. 06 CIV 538 and 539 (same).  *Cf. In re Canwest Global Communications Corp., et al.*, No. 09-15994 (Bankr. S.D.N.Y. November 3, 2009) (refusing to enforce stay provisions of Initial Order due to absence of pending litigation in United States). Further, since the commencement of the Canadian Proceeding on March 30, 2012, substantially all major creditors and stakeholders of SFC, including Class Action plaintiffs in Canada and the United States, have filed Proofs of Claim in the Canadian Proceeding, appeared before the Ontario Court, and otherwise complied with the terms of the Initial Order.

43.      As discussed above, the protections and authority provided in the Initial Order were similar to, and consistent with, the relief that is available under the Bankruptcy Code

25

to chapter 11 debtors automatically upon filing a petition.  *See, e.g.,* 11 U.S.C. §§ 362, 1107 and 1108.  In ancillary cases under chapter 15, upon recognition of the debtor's foreign proceeding as a "foreign main proceeding," section 1520 of the Bankruptcy Code automatically provides this same relief to foreign representatives and/or chapter 15 debtors.  *See* 11 U.S.C. § 1520.  Accordingly, much of the relief provided in the Initial Order will be enforced in the United States automatically if the Court grants recognition of the Canadian Proceeding as a foreign main proceeding.

44.     Moreover, to the extent provisions of the Initial Order provided relief beyond that which may automatically be provided under section 1520 of the Bankruptcy Code, such relief is available and warranted under sections 105, 1521 and/or 1507.  Specifically, the prohibition on the commencement or continuation by any noteholder, indenture trustee, or security trustee of actions against certain of SFC's Subsidiaries is consistent with relief that this and other courts have authorized in the context of U.S. bankruptcy cases.  *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003) ("It is well settled that bankruptcy courts, under [section 105], may extend the automatic stay to 'enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts.'" (internal citations omitted)); *Licensing by Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 392 (2d Cir. 1997) ("[A]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the [debtor's] estate must be barred by the automatic stay provision." (citing *48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987)); *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003) (automatic stay may be extended to bar proceedings against non-debtors where "a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.").

45.     Even if the provisions of the Initial Order protecting SFC's non-debtor Subsidiaries exceeded relief available in a plenary case under the Bankruptcy Code, that does and should not preclude enforcement of the Initial Order under chapter 15. "Given Chapter 15's heavy emphasis on comity, it is not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law." *Vitro*, 2012 WL 5935630, at *16 (citing *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010)). This Court recently found that enforcement of non-debtor protections similar to those in the Initial Order was available and warranted under section 1521(a)(7). *See In re Cozumel Caribe, S.A. de C.V.*, 482 B.R. 96, 111 (Bankr. S.D.N.Y. 2012) (explaining protection of non-debtors under chapter 15 is "available, if at all, under sections 1507 and 1521(a)(7). Because section 1521 would permit the relief … it is unnecessary to look to section 1507 for such authority."). Given the respect afforded decisions by Canadian courts under principles of comity and the overwhelming creditor support for the restructuring now embodied in SFC's approved Plan, the Monitor respectfully submits that enforcement of the non-debtor protections in the Initial Order is warranted under sections 1521 and/or 1507 of the Bankruptcy Code.

ii.     *Plan Sanction Order Should Be Enforced*

46.     Similarly, consistent with the principles of comity, the Plan Sanction Order should enforced under sections 1521 and 1507 of the Bankruptcy Code. Most, if not all, of the relief provided in the Plan Sanction Order is available under section 1521 of the Bankruptcy Code. For example, the transfer of SFC's assets into Newco and the distribution of Newco's shares to creditors of SFC is clearly relief available under sections 1521(a)(5) (entrusting administration and realization of debtor's United States assets to foreign representative) and 1521(b) (entrusting distribution of debtor's United States assets to foreign representative) of the Bankruptcy Code. Additionally, such transfers, as well as the issuance of

new notes and the creation of a litigation trust and cash reserve, are forms of relief plainly available and commonly approved in chapter 11 cases. Accordingly, to the extent certain terms of the Plan Sanction Order do not fall under a specific subsection of section 1521 of the Bankruptcy Code, they are nevertheless authorized under the general grant of authority under section 1521(a).[9]

47.     Finally, to the extent any relief provided in the Plan Sanction Order is not available under section 1521 of the Bankruptcy Code, including the provisions of the Plan Sanction Order releasing or limiting the liability of certain third parties, such relief is authorized under section 1507 of the Bankruptcy Code. *See Vitro*, 2012 WL 5935630, at *22 (concluding enforcement of non-debtor releases in foreign plan is authorized by section 1507 but not section 1521[10]) (citing *In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010)). Courts in this District have previously enforced CCAA plans containing third party non-debtor release and injunction provisions far broader than those in the Plan. *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010). In *Metcalfe*, this Court enforced a CCAA plan containing non-debtor releases protecting participants in the Canadian commercial paper market that had been approved by the Canadian court as appropriate under applicable Canadian law. *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 698-700. By contrast, the release provisions under SFC's Plan are more limited in scope. As an initial matter, the third party releases under the Plan extend primarily to SFC's Subsidiaries, and to a named subset of directors of officers, with respect to Class Action claims and claims relating to,

---

[9]     Furthermore, under section 1522(a) of the Bankruptcy Code, a court may grant relief under section 1519 and 1521 as long as "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." See 11 U.S.C. § 1522(a). In light of their overwhelming support for it received from SFC's creditors and other interested parties, including SFC, the Plan clearly provides "sufficient protection" of the interests of those parties in satisfaction of section 1522(a).

[10]     We note that the 5th Circuit's conclusion with regards to 1521 was based on controlling 5th Circuit precedent prohibiting the grant of third party releases in plenary bankruptcy cases. Such precedent does not control in the instant matter.

among other things, SFC, the SFC Notes, the Canadian Proceeding, and the Plan.  None of the

creditors or stakeholders in the Canadian Proceeding that might otherwise have asserted claims

against these parties, including the Class Action plaintiffs, objected to this aspect of the Plan.

Further, the releases for Named Third Party Defendants and Ernst & Young LLP contemplated

by the Plan are not absolute and are contingent on the satisfaction of numerous conditions,

including the final settlement of claims asserted against them by the Class Action plaintiffs and

further approval of such settlement by the Ontario Court.  Indeed, in dismissing the lone

objection to the Plan, the Ontario Court recognized that this feature of the Plan did not provide a

current release for either the Named Third Party Defendants or Ernst & Young LLP, and was

only a mechanism through which a release might eventually be enforced.  In either case, the

enforcement of non-debtor releases under section 1507 of the Bankruptcy Code is all the more

appropriate where, as here, the plan containing such releases received near unanimous approval

by affected creditors in the debtor's main proceeding.  *Cf. Vitro*, 2012 WL 5935630, at *28-29

(distinguishing *Metcalfe* as a case involving "near unanimous approval" and refusing to enforce

non-debtor releases in Mexican plan upon finding majority of affected creditors did not support

plan).

48.     Moreover, just as in *Metcalfe*, SFC's Plan satisfied all of the factors that

must be considered when granting relief under section 1507 of the Bankruptcy Code.  First, it is

important to note that Congress elevated comity to the overarching factor when it incorporated

former section 304 of the Bankruptcy Code into section 1507.  *See, e.g.*, *In re Bd. of Directors of

Telecom Argentina S.A.*, No. 05-17811 (BRL), 2006 WL 686867, at *23 (Bankr. S.D.N.Y. Feb.

24, 2006) ("The importance of comity is well noted in the newly enacted chapter 15 . . . the

major difference [from section 304 is] that comity is elevated as the prime consideration for the

grant of ancillary relief to a foreign representative."), *aff'd sub nom. Argo Fund Ltd. v. Bd. of*

*Dirs. of Telecom Argentine, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.)*, 528 F.3d 162, 171 (2d Cir. 2008) (describing comity as "ultimate consideration" under former section 304); *In re Petition of Garcia Avila*, 296 B.R. 95, 108 n.14 (Bankr. S.D.N.Y. 2003) (noting that draft proposals of chapter 15 eliminated comity as individual factor in lieu of including it in preamble of statute to emphasize its importance as primary consideration when granting additional assistance to foreign insolvency proceeding).   Thus, when considering whether a foreign representative's request for relief is authorized under section 1507 of the Bankruptcy Code, a court must consider whether, consistent with the principles of international comity, granting such relief will reasonably ensure the: (1) just treatment of all holders of claims against or interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.  11 U.S.C. § 1507(b).

49.     As in *Metcalfe*, the Plan was the product of extensive negotiation between SFC and its creditors, ultimately receiving overwhelming approval from 99% of Noteholders and over 99% of the principal amount of the SFC Notes which comprise SFC's principal debt. Further, prior to its application for the entry of the Plan Sanction Order, SFC obtained the support or non-opposition of many of the other major parties in the Canadian Proceeding, including an *ad hoc* group representing the interests of shareholders and former Noteholders who have asserted Class Action claims against SFC.  Similarly, the Plan was supported by SFC's former auditors and underwriters, who are defendants in the Class Actions and have asserted indemnity claims against SFC.  Moreover, there is no suggestion that United States claim holders

suffered prejudice or inconvenience in processing their claims in the Canadian Proceeding; plaintiffs in the Class Action in New York filed a Proof of Claim in the Canadian Proceeding, appeared before the Ontario Court, and did not object to the Plan.    There is similarly no suggestion by any party that the Plan facilitates a preferential or fraudulent disposition of SFC's property, and indeed SFC's property is being distributed precisely where it might in a plenary case under the Bankruptcy Code — to its creditors.    *Cf. Vitro*, 2012 WL 5935630, at \*28-30 (denying enforcement of Mexican reorganization plan under section 1507, noting fact that plan did not provide distribution in full to creditors while equity retained substantial value weighed against grant of comity).    The Equity Claims Decision of the Ontario Court confirmed that the treatment of claims arising from the purchase or sale of the debtor's equity under the CCAA is entirely consistent with section 510(b) of the Bankruptcy Code.[11]    Finally, the purpose of the Canadian Proceeding was to accomplish a fresh start for the Sino-Forest enterprise by separating the business from the uncertainty and claims at the SFC level.    The Plan accomplished this by transferring SFC's assets to a new, creditor-owned entity, and releasing claims against the operative Subsidiaries that relate to claims against SFC.

50.    Given the process by which the Plan was developed and the degree of support it has received, it can hardly be contended that the entry of the Plan Sanction Order was other than fair and impartial.    Moreover, the Ontario Court has expressly directed the Monitor to commence a proceeding in the United States seeking recognition of the Plan and the Plan Sanction Order in order to confirm that both are binding and effective in the United States.    The Monitor thus respectfully submits that the Court should enter an order giving full force and effect

---

[11]    In a plenary bankruptcy proceeding in the United States, section 510(b) of the Bankruptcy Code provides for the subordination of claims for (i) rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, (ii) damages arising from the purchase or sale of such security, and (iii) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of any such claims.  11 U.S.C. § 510(b).  These types of claims are subordinated to all claims and interests that are senior or equal to the claim or interest represented by the security that gave rise to the claim.  *Id.*

not only to the Initial Order but also the Plan Sanction Order, and thus the Plan, in the United States.  Doing so is entirely consistent with long standing principles of international comity and cooperation, and neither of the Canadian Orders was entered in circumstances that could be considered fundamentally unfair.

C.    The Requested Relief is not Manifestly Contrary to the Public Policy of the United States

51.    Finally, the primary limitation on relief under chapter 15 is section 1506 of the Bankruptcy Code, which provides that a court may refuse to take an action governed by chapter 15 if such "action would be manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  The legislative history of section 1506 of the Bankruptcy Code makes clear that the public policy exception should be "narrowly interpreted" and is restricted to "the most fundamental policies of the United States."  *In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006) (citing H.R. REP. NO. 109-31(I), at 109, *as reprinted in* 2005 U.S.C.C.A.N. 88, 172).  Accordingly, consistent with longstanding comity caselaw in the United States, courts have held that the public policy exception "should be interpreted restrictively" and that "a foreign judgment should generally be accorded comity if its proceedings are . . . fair and impartial."  *In re Ephedra*, 349 B.R. at 90-91 (internal citations omitted) (affirming foreign judgment issued in the absence of a jury trial).

52.    Analyzing section 1506 of the Bankruptcy Code in the context of a foreign representative's request to enforce a CCAA plan containing non-debtor releases, the court in *Metcalfe* explicitly found that enforcing such releases was not manifestly contrary to a fundamental policy of the United States.  *See Metcalfe*, 421 B.R. 685 at 697 (noting that "this public policy exception is narrowly construed" and enforcing third-party releases in CCAA

plan).[12]  This Court should reach the same conclusion here.  Moreover, because the non-debtor

protections were provided in circumstances that are comparable, if not identical, to relief that

could be granted in a United States bankruptcy case, enforcing the Initial Order is not precluded

by section 1506 of the Bankruptcy Code. [13]  *See, e.g.,* *Schimmelpenninck v. Byrne (In re*

*Schimmelpenninck)*, 183 F.3d 347, 365 (5th Cir. 1999) (comity does ***not*** require foreign laws

"[to] be identical to their counterparts under the laws of the United States; ***they merely must not***

***be repugnant to our laws and policies***") (emphasis added).

      53.     Given the circumstances in which the Canadian Orders were entered, and

in particular the overwhelming creditor approval of the Plan and support for the entry of the Plan

Sanction Order, it cannot be said that the Canadian Proceeding was procedurally unfair in a

manner that runs afoul of section 1506 of the Bankruptcy Code.  Indeed, granting the requested

relief furthers the United States public policy respecting foreign proceedings as articulated,

among other ways, through the objectives set forth in sections 1501(a) and 1508 of the

Bankruptcy Code.

---

[12]    *Cf. Vitro*, 2012 WL 5935630, at *31 (although not deciding issue, casting serious doubt on whether bankruptcy court properly refused to enforce plan on alternative ground that non-debtor releases in plan were manifestly contrary to fundamental U.S. policy).

[13]    *See, e.g., In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002) (holding that court has authority to confirm chapter 11 plan releasing and enjoining actions against non-debtor third parties where facts adequately support such  injunction); *In re Specialty Equip. Cos., Inc.*, 3 F.3d 1043, 1044-49 (7th Cir. 1993) (affirming confirmation of plan releasing various non-debtors from liability arising out of relationship with debtors); *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285 (2d Cir. 1992) (affirming confirmation of plan releasing non-debtor directors and officers); *In re A.H. Robins Co.*, 88 B.R. 742, 754-55 (E.D. Va. 1988) (confirming plan of reorganization releasing various non-debtors parties from certain tort claims and future litigation), *aff'd*, 880 F.2d 694 (4th Cir. 1989).

## **<u>CONCLUSION</u>**

WHEREFORE, the Monitor respectfully requests that this Court grant the relief requested in the Chapter 15 Petition, and such other and further relief as may be just and proper.

Dated: New York, New York
       February 4, 2013

MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP

By: /s/ Jeremy C. Hollembeak
Dennis F. Dunne
Thomas J. Matz
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

*Counsel to FTI Consulting Canada Inc., as Foreign Representative of Canadian Proceeding of Sino-Forest Corporation*