**<u>Exhibit A</u>**
**<u>Thirteenth Report of the Monitor dated November 22, 2012</u>**

Court File No. CV-12-9667-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
SINO-FOREST CORPORATION

**THIRTEENTH REPORT TO THE COURT**
**SUBMITTED BY FTI CONSULTING CANADA INC.,**
**IN ITS CAPACITY AS MONITOR**

**INTRODUCTION**

1.      On March 30, 2012 (the "**Filing Date**"), Sino-Forest Corporation (the "**Company**" or "**SFC**") filed for and obtained protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**").  Pursuant to the Order of this Honourable Court dated March 30, 2012 (the "**Initial Order**"), FTI Consulting Canada Inc. was appointed as the Monitor of the Company (the "**Monitor**") in the CCAA proceedings.  By Order of this Court dated April 20, 2012, the powers of the Monitor were expanded in order to, among other things, provide the Monitor with access to information concerning the Company's subsidiaries.  Pursuant to an Order of this Court made on October 9, 2012, this Court extended the Stay Period to December 3, 2012.  The Company has now filed a motion returnable November 23, 2012 to seek a further extension of the Stay Period to February 1, 2013. The proceedings commenced by the Company under the CCAA will be referred to herein as the "**CCAA Proceedings**".

2.      On the Filing Date, the Court also issued an Order authorizing the Company to conduct a sale process (the "**Sale Process Order**").



3.      The following appendices have been attached to this Thirteenth Report:

(a)      Appendix A – The Plan

(b)      Appendix B – Blackline of the August 14 Draft Plan compared against the Plan

(c)      Appendix C – The Information Statement (without appendices)

(d)      Appendix D – Blackline of the August 15 Draft Information Circular compared against the Information Statement

(e)      Appendix E - Plan Supplement

(f)      Appendix F - the Initial Order Affidavit

(g)      Appendix G  - the Pre-Filing Report

(h)      Appendix H - the Sixth Report (without appendices)

(i)      Appendix I - the Tenth Report (without appendices)

(j)      Appendix J - the Claims Procedure Order

(k)      Appendix K - the Equity Claims Decision

(l)      Appendix L - the Meeting Order

(m)      Appendix M- the Seventh Report (without appendices)

(n)      Appendix N - Voting Procedures

(o)      Appendix O - Globic's Mailing Certificate (Meeting Materials)

(p)      Appendix P – Globic's Mailing Certificate (Plan Supplement and Voting Procedures)

4.      The purpose of this Thirteenth Report is:

(a)      to report on:



     (i)      the status of the CCAA Proceedings;

     (ii)      the Claims Process;

     (iii)     the Plan, including amendments and supplements thereto;

     (iv)     the Reserves;

     (v)      Notice and Mailing of the Plan;

     (vi)     the proposed Meeting; and

(b)     to provide the Monitor's recommendation that the Court grant the Sanction Order (defined below).

5.     In preparing this Thirteenth Report, the Monitor has relied upon unaudited financial information of Sino-Forest, Sino-Forest's books and records, certain financial information prepared by Sino-Forest, the Reports of the Independent Committee of the Company's Board of Directors (the "**Independent Committee**") dated August 10, 2011 (the "**First IC Report**"), November 13, 2011 (the "**Second IC Report**"), and January 31, 2012 (the "**Final IC Report**" and together, the "**IC Reports**"), and discussions with Sino-Forest's management.  The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information.  In addition, the Monitor notes that on January 10, 2012, the Company issued a press release cautioning that the Company's historic financial statements and related audit reports should not be relied upon.  Accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Thirteenth Report or relied on in its preparation. Future oriented financial information reported or relied on in preparing this Thirteenth Report is based on management's assumptions regarding future events; actual results may vary from forecast and such variations may be material.

6.     Unless otherwise stated, all monetary amounts referred to herein are expressed in CDN Dollars.

7.      The term "**Sino-Forest**" refers to the global enterprise as a whole but does not include references to the Greenheart Group (as defined in the Pre-Filing Report).  "**Sino-Forest Subsidiaries**" refers to all of the direct and indirect subsidiaries of the Company, but does not include references to the Greenheart Group.

## GENERAL BACKGROUND

*Sino-Forest Business*

8.      Sino-Forest conducts business as a forest plantation operator in the People's Republic of China ("**PRC**").  Its principal businesses include ownership and management of forest plantation trees, the sale of standing timber and wood logs, and complementary manufacturing of downstream engineered-wood products.

9.      The Company is a public holding company whose common shares were listed on the Toronto Stock Exchange ("**TSX**").  Prior to August 26, 2011 (the date of the Cease Trade Order, as defined in the Pre-Filing Report), the Company had 246,095,926 common shares issued and outstanding and trading under the trading symbol "TRE" on the TSX. Effective May 9, 2012, the common shares were delisted from the TSX.

10.     On June 2, 2011, Muddy Waters, LLC ("**MW**"), which held a short position on the Company's shares, issued a report (the "**MW Report**") alleging, among other things, that Sino-Forest is a "ponzi-scheme" and a "near total fraud".  The MW Report was issued publicly and immediately caught the attention of the media on a world-wide basis.

11.     Subsequent to the issuance of the MW Report, the Company devoted extensive time and resources to investigate and address the allegations in the MW Report as well as responding to additional inquiries from, among others, the Ontario Securities Commission ("**OSC**"), the Royal Canadian Mounted Police and the Hong Kong Securities and Futures Commission.

12.     The Monitor's pre-filing report dated March 30, 2012 (the "**Pre-Filing Report**")[1] and the Initial Order Affidavit of Judson Martin sworn March 30, 2012 (the "**Initial Order**

---

[1] See Appendix G for a copy of the Pre-Filing Report (without appendices).



**Affidavit**")[2] provide a detailed outline of Sino-Forest's corporate structure, business, reported assets and financial information as well as a detailed chronology of the Company and its actions since the issuance of the MW Report in June 2011.

## STATUS OF THE CCAA PROCEEDINGS

*Background on the Sino-Forest Business*

13.    The Initial Order Affidavit and the Pre-Filing Report detailed the background on the Company's business and the events leading to the need for the commencement of the CCAA Proceedings.

14.    Included in the Initial Order Affidavit was a summary of the Company's current debt, consisting principally of approximately of debt in connection with the Notes (defined below) in the principal amount of $1.8 billion.  The Initial Order Affidavit noted that the Company does not have any other significant levels of normal course payables but that many of the Sino-Forest Subsidiaries have their own distinct banking facilities including lending facilities.

15.    The Initial Order Affidavit also outlined a number of other key issues including:

(a)     the release of the MW Report;

(b)     the establishment of the Independent Committee and the IC Reports;

(c)     the commencement of class actions (the "**Class Actions**") in Canada and the United States and an investigation by the OSC;

(d)     the Company's failure to release audited financial statements for Q3 2011;

(e)     defaults under the Company's Notes; and

(f)      the difficulties being experienced by Sino-Forest on its business (the "**Sino-Forest Business**") in the PRC.

---

[2] See Appendix F for a copy of the Initial Order Affidavit (without exhibits).

**FTI** CONSULTING

16.     In light of all of the difficulties being experienced by the Company and Sino-Forest, the Company commenced the CCAA Proceedings with a view to implementing a restructuring plan that would provide a path for the resolution of claims and allow ownership of the Sino-Forest Business to be separated from the Company and allowed to continue without the uncertainty and claims associated with the Company.

17.     Shortly after the commencement of the CCAA Proceedings, the Court granted an Order (the "**Expansion of Powers Order**") expanding the powers of the Monitor to specifically provide the Monitor with access to and supervisory powers over the Sino-Forest Subsidiaries.

18.     Throughout the course of the CCAA Proceedings, the Monitor (either directly or through FTI Consulting (Hong Kong) Limited) has monitored not only the Company but also the Sino-Forest Subsidiaries in accordance with the Expansion of Powers Order. The Monitor has issued its Sixth Report dated August 10, 2012 (the "**Sixth Report**")[3] and Tenth Report dated October 18, 2012 (the "**Tenth Report**")[4] both of which provided a report on the Sino-Forest Business and the Sino-Forest Subsidiaries.

19.     Some of the areas of focus of the Sixth Report and the Tenth Report include:

    (a)     report on the cash position of the Sino-Forest Subsidiaries;

    (b)     status of accounts receivable and payable, including significant issues relating to the collection of receivables and the deregistration of authorized intermediaries owing approximately US$504 million in receivables to Sino-Forest;

    (c)     status of disbursements of the Sino-Forest Subsidiaries;

    (d)     issues related to cooperation and deregistration of suppliers of Sino-Forest (and the deterioration of relationships with key parties generally);

    (e)     status on business operations including the freezing of Sino-Forest's primary business, BVI standing timber; and

---

[3] See Appendix H for a copy of the Sixth Report (without appendices).
[4] See Appendix I for a copy of the Tenth Report (without appendices).



(f)     issues surrounding efforts on asset verification, including an inability to obtain forestry bureau maps.

20.     Since the outset of the CCAA Proceedings, the Monitor has also advised the Court, the Company and others that there is a finite amount of funds available for the CCAA Proceedings.   The Monitor has advised on the Company's cash flow throughout the CCAA Proceedings and noted the negative cash flow due to disbursements relating primarily to professional fees with no source of income for the Company.

21.     The Company and the Monitor have also indicated ongoing issues arising from the termination of several members of senior management (who received enforcement notices from the OSC) and the fact that these individuals have not been replaced.

22.     The Company has consistently expressed the view that the lack of resolution within the CCAA Proceedings has had an ongoing negative impact on the operations and financial status of the Sino-Forest Subsidiaries.

*The RSA and the Sale Process[5]*

23.     As part of the relief sought on the Filing Date, the Company announced that it had entered into a restructuring support agreement (the "**RSA**") with certain initial consenting Noteholders (as defined in the Plan) (the "**ICNs**") which provided for a framework for a resolution and restructuring transaction acceptable to the ICNs.

24.     In connection with the RSA and the CCAA Proceedings, the Company sought approval of a sale process for the marketing of the Sino-Forest Business (the "**Sale Process**") to be conducted by the Company's financial advisor, Houlihan Lokey ("**HL**").   The Sale Process set out the procedures pursuant to which bids for the Company would be solicited in a multi-stage process.   During Phase 1, letters of intent were solicited, which letters of intent were required to provide for consideration in an amount equal to 85% of the aggregate principal amount of the Notes, plus all accrued and unpaid interest on the

---

[5] Capitalized terms used in this subsection and not otherwise defined have the meaning given to them in the Sale Process Order.



Notes at the regular rates provided in each respective note indenture up to March 30, 2012 (the "**Qualified Consideration**").

25.     Subsequent to the Filing Date, the Company, through HL, canvassed the market for a potential buyer or buyers of the Sino-Forest Business.  On the Phase I Bid Deadline (as defined in the Sale Process Order), a number of letters of intent were received.  However, none of those letters of intent met the criteria of being a "Qualified Letter of Intent" due to their failure to provide for the Qualified Consideration.  The Sale Process was thereafter terminated by the Company (in consultation with the Monitor).  More details regarding the Sale Process are set out in the Monitor's Fourth Report dated July 10, 2012. Subsequent to the termination of the Sale Process and as set out in the Monitor's eighth report dated September 25, 2012, the Monitor was informed by the Company and the ICNs that there was some continued interest expressed by parties in purchasing the Company's assets. To date, no such transaction has been successfully negotiated or completed.

26.     Concurrently with the conduct of the Sale Process, the Company also sought further support for the restructuring transaction contemplated by the RSA.  In accordance with the terms of the RSA, on or before May 15, 2012 (the "**Early Consent Deadline**"), Noteholders representing approximately 72% of the outstanding noteholder debt (including ICNs) (with more than 66.67% of the principal amount of each of the four (4) series of Notes) agreed to support the Plan.

*Claims, the Class Actions and the Mediation*[6]

27.     From the outset of the CCAA Proceedings, it was apparent that addressing the claims against Sino-Forest would be important given the extent of the litigation against the Company and resulting indemnification claims from others named in the Class Actions. To further that process, on May 14, 2012, the Company obtained a claims procedure

---

[6] Capitalized terms used in this subsection and not otherwise defined have the meaning given to them in the Claims Procedure Order.



order (the "**Claims Procedure Order**"),[7] which provided for the calling of claims against the Company, its directors and officers and its subsidiaries.

28.    Notably, the Claims Procedure Order did not provide a specific mechanism for the resolution of Claims.  This was largely in recognition of the relatively unique nature of the claims that were anticipated to be asserted in the claims process.  As set out above, as a holding company, unlike many CCAA debtors, the Company does not have many, if any, trade creditors.  Instead, aside from the claims in respect of the Notes, it was anticipated that most or all of the remaining claims filed would be in connection with the Class Actions either directly by the plaintiffs in the Class Actions (the "**Plaintiffs**") or indemnity claims from the Third Party Defendants (defined below).  Details regarding the Claims, D&O Claims and D&O Indemnity Claims filed in connection with the claims process is set out below in the section entitled "The Claims Process".

29.    On June 26, 2012, the Company brought a motion seeking a direction that Claims by the Plaintiffs in respect of the purchase of securities and resulting indemnification claims by the Third Party Defendants constituted "equity claims" pursuant to section 2(1) of the CCAA.  On July 27, 2012, the Court issued its decision determining that such claims did constitute "equity claims" under section 2(1) of the CCAA (the "**Equity Claims Decision**").  The Equity Claims Decision was appealed by Ernst & Young LLP ("**EY**"), BDO Limited ("**BDO**") and the underwriters group (the "**Underwriters**").  The appeal was heard by the Court of Appeal on November 13, 2012.  As of the date of this Thirteenth Report, the Court of Appeal's decision has not been released.[8]

30.    As the process continued, it became apparent to the Monitor that the nature, complexity and number of parties involved in the litigation claims surrounding the Company had the potential to cause extensive delay and additional costs in the CCAA Proceedings.  As such, it was the view of the Monitor (with the agreement of the Company) that there was merit in a global resolution of not only the Plaintiffs' claims against the Company, but

---

[7] See Appendix J for a copy of the Claims Procedure Order.
[8] See Appendix K for a copy of the Equity Claims Decision



also against the other defendants named in the Class Actions other than Pöyry Beijing (the "**Third Party Defendants**").[9]

31.    On July 25, 2012 the Court granted an order (the "**Mediation Order**"), directing a mediation (the "**Mediation**") of the class action claims against the Company and the Third Party Defendants (as defined in the Mediation Order).    The Mediation was conducted on September 4 and 5, 2012 but was unsuccessful.    Notwithstanding the fact that the Mediation was not successful, the Monitor is aware that many of the Third Party Defendants have remained focused on determining whether a resolution within the CCAA Proceedings is possible.

*The OSC Investigation and the Enforcement Notices*

32.    In addition to facing the litigation claims asserted against the Company, the Company has also faced an ongoing investigation by the OSC.    As set out in the Initial Order Affidavit, after the release of the MW Report, the OSC launched an investigation on the Company which led to the granting of a temporary cease trade order issued on August 26, 2011 (which has since been extended).

33.    On April 9, 2012, the Company announced that it had received an enforcement notice from the OSC and was aware that certain current and former officers (the "**Individual Respondents**")[10] of the Company had also received enforcement notices. On May 23, 2012, the Company announced that it had learned that the OSC had commenced proceedings against the Company and the Individual Respondents and issued a statement of allegations dated May 22, 2012. On September 26, 2012, the Company announced that it had received a second enforcement notice from the OSC.

34.    As of the date of the Report, the OSC investigation and enforcement proceedings are ongoing.

*The Plan and the Plan Filing and Meeting Order*

---

[9] The Third Party Defendants are: EY, BDO, the Underwriters, Allen Chan, Judson Martin, Kai Kit Poon, David Horsley, William Ardell, James Bowland, James Hyde, Edmund Mak, Simon Murray, Peter Wang and Garry West.
[10] The Individual Respondents are Allen Chan, Albert Ip, Alfred Hung, George Ho, Simon Yeung and David Horsley.



**11**

- 11 -

35.     On August 14, 2012, the Company announced that it had filed a draft plan of compromise and reorganization (the "**August 14 Draft Plan**") with the Court.[11]  On August 15, 2012, the Company filed a draft information circular with the Court (the "**August 15 Draft Information Circular**").

36.     In connection with the filing of the August 14 Draft Plan, the Company also brought a motion seeking approval of a plan filing and meeting order (the "**Meeting Order**")[12] which, among other things, provided for the calling of a meeting of creditors (the "**Meeting**").  It was agreed that the Meeting Date would be subsequent to the completion of the Mediation.

37.     The motion for the Meeting Order was returnable on August 28, 2012.  Due to concerns raised by certain of the Third Party Defendants, the motion was postponed to determine whether the parties could agree to changes that would result in a mutually satisfactory proposed order, which was ultimately achieved.  On August 31, 2012, the Court granted the Meeting Order.

38.     At the request of certain of the Third Party Defendants, the Meeting Order was granted on the express understanding that there had been no determination of: (a) the test for approval of the plan including (i) the jurisdiction of the Court to approve the plan in its then current form; (ii) whether the plan complied with the CCAA; and (iii) whether any aspect of the plan was fair and reasonable; (b) the validity or quantum of claims; and (c) the classification of creditors for voting purposes.  The Company advised the Monitor that this reservation was acceptable to the Company given that it anticipated that many of these matters would be appropriately addressed at a sanction hearing.

*Current Status of the CCAA Proceedings*

39.     On October 19, 2012, the Company filed a revised plan of compromise and reorganization (the "**Plan**")[13] and information statement (the "**Information**

---

[11] A further draft of the Plan dated August 27, 2012 was filed prior to the return of the motion for the Meeting Order.
[12] See Appendix L for a copy of the Meeting Order.
[13] See Appendices A and B for a copy of the Plan and the Blackline of the Plan to the August 14 Draft Plan.



**Statement**")[14] in contemplation of the Meeting to be held on November 29, 2012 at 10am at the offices of Bennett Jones LLP.  The Company is focused on moving forward with its Plan to seek approval by the Required Majority (as defined in the Plan) and, if that is achieved, to move before the Court for the sanctioning of the Plan.  The ICNs have similarly expressed their desire and priority of moving forward with the Plan.

40.     In that regard, the Company has made significant progress with various parties within the CCAA Proceedings. The current Plan is acceptable not only to the Company and the ICNs, but due to lengthy arms' length negotiations, the revised terms of the Plan are also acceptable to the Ontario Plaintiffs and the Quebec Plaintiffs (as both terms are defined in the Claims Procedure Order).

41.     The Ontario Plaintiffs and the Quebec Plaintiffs have continued to express a desire to move forward with their actions against EY, BDO, the Underwriters, Allen Chan, David Horsely and Kai Kit Poon (the "**Specified Defendants**").   In that regard, in late September, the Ontario Plaintiffs and Quebec Plaintiffs served a number of motions within these proceedings for, among other things, (a) representation and voting rights within the CCAA Proceedings; (b) certain document production; and (c) a lift stay against the Company and the Third Party Defendants (the "**Lift Stay Motion**").

42.     Ultimately, due to an agreed upon resolution between the Company and the Ontario Plaintiffs and Quebec Plaintiffs, on October 29, 2012, the Ontario Plaintiffs and Quebec Plaintiffs did not proceed with their first two motions and brought their Lift Stay Motion against only the Specified Defendants.  The Lift Stay Motion was not opposed by the Company, the Monitor or the ICNs.

43.     On November 6, 2012, the Court issued its decision, upholding the stay as against the Specified Defendants for a limited period of time while the Meeting and the Sanction Hearing were pending, but acknowledged that, failing a resolution, the Class Actions against these parties would proceed, the only question was when.  The Court further directed that the issue be re-evaluated no later than December 10, 2012.

---

[14] See Appendices C and D for a copy of the Information Statement and a blackline of the Information Statement to the August 15 Draft Information Circular.


F T I
CONSULTING

## THE CLAIMS PROCESS[15]

44.   As set out above, on May 14, 2012, the Court granted the Claims Procedure Order.  The Claims Procedure Order established claims bar dates for the filing of Claims, D&O Claims and D&O Indemnity Claims (the "**Claims Process**"). Pursuant to the Claims Procedure Order, claimants were also requested to list whether they intended to assert claims against any or all of the Sino-Forest Subsidiaries based in whole or in part on facts, underlying transactions, causes of action or events relating to a Claim made against the Company. The primary Claims Bar Date was set as June 20, 2012.

45.   The Sixth Report previously reported that on or about the Claims Bar Date, the Company received 228 claims with a face value in excess of $112 billion.  This includes duplicative claims filed against the Company and its directors, officers and subsidiaries and does not account for marker and/or contingent claims filed.   Since the Claims Bar Date, the Company has received a further four (4) claims with a face value in excess of approximately $23,000 and one Restructuring Claim in the amount of $485,000. Additionally, 151 D&O Indemnity Claims filed in respect of the D&O Claims that named Directors and Officers have been filed.

*Nature of Claims Filed*

46.   As anticipated, other than with respect to three (3) trade Claims filed against the Company, the balance of the Claims, D&O Claims and D&O Indemnity Claims filed pursuant to the Claims Procedure Order can be categorized as follows:

(a)   Claims filed by the Note Indenture Trustees in respect of the Notes (the "**Noteholder Claims**");[16]

(b)   Claims by plaintiffs in the Ontario, Quebec and US Class Actions relating to damages relating to share purchases and note purchases;

---

[15] Capitalized terms used in this section and not otherwise defined have the meaning given to them in the Claims Procedure Order.

[16] As permitted by the Claims Procedure Order, claims filed by individual noteholders in respect of the Notes have been disregarded by the Monitor.



(c)     Equity Claims filed by individuals;

(d)     Class Action Indemnity Claims filed by the Third Party Defendants;

(e)     D&O Indemnity Claims filed by Directors and Officers for indemnity; and

(f)     Various individual claims which provided no information as to the nature of the claimant's claim (the "**Bare Claims**").

47.     Additionally, pursuant to the Meeting Order, the OSC was required to indicate whether it intended to assert any OSC Monetary Claims (defined below) against the Company and/or the Officers and Directors.   Details regarding the OSC Monetary Claims are discussed in further detail below in the sub-section entitled "OSC Monetary Claims".

*The Noteholder Claims*

48.     As set out in the Initial Order Affidavit, the Company has issued four (4) series of Notes which remain outstanding:

(a)     two series of senior notes (the "**Senior Notes**") which have guarantees from sixty of the Sino-Forest Subsidiaries and share pledges from ten of the Sino-Forest Subsidiaries; and

(b)     two series of unsecured convertible notes (the "**Convertible Notes**" and together with the Senior Notes, the "**Notes**") which have guarantees from sixty-four Sino-Forest Subsidiaries.

49.     The Monitor's legal counsel has reviewed legal opinions (the "**Note Opinions**") regarding the validity and enforceability of the indentures and guarantees entered into in connection with the Senior Notes and Convertible Notes and the share pledges entered into in connection with the Senior Notes.   The Monitor's legal counsel has concluded that the Note Opinions are generally satisfactory in form and scope for transactions of this nature and contain the customary assumptions and qualifications for such opinions. Where, in the view of the Monitor's legal counsel, the Note Opinions were not phrased in customary terms or did not address matters customarily the subject of comparable

opinions, legal opinions were obtained from independent local counsel addressing these matters.

50.     The Noteholder Claims have been accepted as Voting Claims (as defined in the Plan) by the Monitor for the purposes of the Meeting and the Meeting Order.

*Impact of the Equity Claims Decision on Claims*

51.     Each of the Third Party Defendants has filed potentially significant, contingent Claims. In particular, each of EY, BDO and the Underwriters filed contingent Claims each in the billions of dollars.

52.     The Equity Claims Decision held that claims against the Company resulting from the ownership, purchase or sale of equity interests in the Company, including claims on behalf of current or former shareholders ("**Shareholder Claims**") and indemnity claims arising from Shareholder Claims ("**Share Purchase Indemnity Claims**"), are "equity claims" under section 2(1) of the CCAA.  In coming to this decision, the Court noted that although the legal basis for the indemnity claims may be different from the Shareholder Claims, the substance of the underlying claims related to the Shareholder Claims and were therefore "equity claims".  The potential exception to this classification is or was claims by the defendants for "defence costs" ("**Defence Costs Claims**") which, the Court noted, might not be equity claims (although no definitive decision was reached).

53.     The Equity Claims Decision left it open for the Company to bring a motion for declarations relating to claims in respect of the purchase of securities other than shares (i.e. Claims by former noteholders).  To date, no such motion has been brought.  In the meantime, the Company has agreed to the Noteholder Class Action Limit (as defined in the Plan) of $150 million, which limits the maximum liability of all of the Third Party Defendants in respect of those claims (discussed in more detail below in the sections entitled "The Plan" and "The Reserves").  However, the right to bring a motion as contemplated above has been reserved by the Company.

54.     As set out above, on November 13, 2012, the Court of Appeal heard the appeal of the Equity Claims Decision but has not yet released its decision.



*Status of Claims Resolution*

55.     As set out above, the Claims Procedure Order did not set out a pre-determined process for the resolution of Claims.  Other than with respect to the Bare Claims, for which there was no information provided as to the nature or characterization of the Claim, no notices of disallowance have been issued.

56.     Instead, as set out in the sections entitled "The Plan", "The Meeting of the Affected Creditors Class" and "Sanction of the Plan" below, the Company has addressed the Claims, D&O Claims and D&O Indemnity Claims in the context of the Plan. Specifically, section 4.7 of the Plan provides that, the Claims of the Third Party Defendants are categorized as follows:

(a)     Claims against Sino-Forest Subsidiaries, which are released;

(b)     Class Action Indemnity Claims in respect of Indemnified Noteholder Class Action Claims, which are limited to the Indemnified Noteholder Class Action Limit (as such terms are defined in the Plan), which are treated as Unresolved Claims and which will be accounted for in the Unresolved Claims Reserve;

(c)     Defence Costs Claims, which are treated as Unresolved Claims and will be accounted for in the Unresolved Claims Reserve; and

(d)     Equity Claims (as defined in the Plan), which are released.

57.     Given:

(a)     the fact that other than the Claims in respect of the Notes, the overwhelming balance of the Claims and D&O Claims filed in the Claims Process were contingent Claims and D&O Claims by the Plaintiffs for their Class Actions and by the Third Party Defendants (and others) for indemnification (which only crystallize upon claims being successfully made against such parties and which are then found to be properly indemnifiable by the Company); and

(b)    the subsequent categorization of the Third Party Defendants' Claims as set out above and particularly in light of the Equity Claims Decision; and

(c)    the establishment of the Unresolved Claims Reserve (discussed in greater detail below in the section entitled "Reserves") to provide for Unresolved Claims which may ultimately become Proven Claims (as defined in the Plan),

the Monitor is of the view that it was not necessary to go through a separate dispute and resolution process through the issuance of Notices of Disallowance prior to a vote on the Plan. Third Party Defendants who object to the classification and treatment of their Claims under the Plan will have the opportunity to object to such treatment at the Sanction Hearing (defined below). The issuance of Notices of Disallowance in these circumstances would be duplicative of the other efforts that have been taken to date and would have the potential for increased delay and additional costs to the process.

*OSC Monetary Claims*

58.    The Claims Procedure Order excluded any claims of the OSC against the Company or the Directors and Officers.   Subsequently, as part of the Meeting Order, the OSC was required to advise the Company and the Monitor whether it intended to pursue any monetary claims against the Company or any Officers and Directors ("**OSC Monetary Claims**") on or prior to September 13, 2012 and, if so, the quantum of any such OSC Monetary Claims.

59.    The OSC has advised the Company and the Monitor that in light of the substantial losses that stakeholders would potentially suffer, the OSC did not intend to assert any OSC Monetary Claims against the Company.   Through various correspondence, the OSC has further confirmed that it has not yet determined whether it will pursue OSC Monetary Claims against any of the Officers and Directors.   However, with a view to being helpful and to facilitate the Plan process, and as disclosed in the "Risk Factors" set out in the Information Statement the OSC initially confirmed that any OSC Monetary Claims against the Officers and Directors would be limited to an aggregate amount of no more than $100 million.   Subsequent to its initial confirmation, the OSC confirmed that it did

not intend to seek OSC Monetary Claims against Officers and Directors in excess of an aggregate amount of $84 million. The OSC has further confirmed that of the OSC Monetary Claims which may be asserted against Officers and Directors, $7 million to $72 million could relate to fraud.[17]

60.     The Monitor is aware that discussions between the Company and the OSC with respect to the potential OSC Monetary Claims against Officers and Directors is ongoing.

## THE PLAN[18]

*Overview of the Plan and Changes from the August 14 Draft Plan*

61.     A summary of the August 14 Draft Plan was set out in the Affidavit of Judson Martin sworn August 14, 2012 and the Monitor's Seventh Report dated August 17, 2012 (the "**Seventh Report**")[19] and is therefore not repeated herein.   A brief overview of the Plan is as follows: [20]

    (a)     The Plan contemplates that a new company ("**Newco**") will be incorporated and organized under the laws of the Cayman Islands and the Company will transfer substantially all of its assets to Newco.   For information relating to the governance of Newco, reference should be made to the Information Statement and the Plan Supplement (defined below).

    (b)     Affected Creditors with Proven Claims will receive their pro rata share of:

        (i)     92.5% of the Newco Shares;

        (ii)     100% of the Newco Notes; and

        (iii)     75% of the Litigation Trust Interests.

---

[17] The Monitor notes that the issue of whether any OSC Monetary Claims against Directors and Officers are released by operation of the Plan has not been resolved.

[18] Capitalized terms used in this section and not otherwise defined have the meaning given to them in the Plan.

[19] See Appendix M for a copy of the Seventh Report (without appendices).

[20] The summary provided herein is for informational purposes only.   In the event of any inconsistency between the summary set out in this Report and the Plan, the Plan shall govern.



(c) On the Plan Implementation Date, all of the Litigation Trust Claims[21] and Litigation Trust Assets (as defined in the Plan Supplement) will be transferred to the Litigation Trustee.

(d) The remaining 7.5% of the Newco Shares will constitute the Early Consent Equity Sub-Pool and will be issued and distributed to the Early Consent Noteholders. The remaining 25% of the Litigation Trust Interests will be allocated to the Noteholder Class Action Claimants (subject to the caveats in the Plan).

(e) All Affected Creditors will constitute a single class for the purpose of voting on and considering the Plan. Equity Claimants will constitute a separate class, but will have no right to attend the Meeting or vote on the Plan (in such capacities). Further information regarding the classification of creditors voting at the Meeting is discussed below in the section entitled "Meeting of the Affected Creditors Class".

(f) All Affected Claims will be compromised and released under the Plan (further information regarding the releases and also those claims which are specifically not released under the Plan are summarized below).

(g) The Claims of Third Party Defendants (also discussed in further detail below) are categorized as follows:[22]

(i) claims against the Sino-Forest Subsidiaries, which will be released;

---

[21] "Litigation Trust Claims" means any and all claims, actions, causes of action, demands, suits, rights, entitlements, litigation, arbitration, proceeding, hearing or complaint, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring before or after the Filing Date that have been or may be asserted by or on behalf of: (i) SFC against any and all third parties; or (ii) the Trustees, the Noteholders or any representative of the Noteholders against any and all Persons in connection with the Notes issued by SFC; provided, however, that in no event shall the Litigation Trust Claims include any claim, right or cause of action against any Person that is released pursuant to Article 7 of the Plan.  For greater certainty: (i) the claims being advanced or that are subsequently advanced in the Class Actions are not being transferred to the Litigation Trust; and (ii) the claims transferred to the Litigation Trust shall not be advanced in the Class Actions.

[22] See also paragraph 56 of this Thirteenth Report for the impact of the characterization of the Third Party Defendants' Claims.



(ii)    Defence Costs Claims;

(iii)   Class Action Indemnity Claims relating to Indemnified Noteholder Class Action Claims, which are limited to an aggregate of $150 million, being the Indemnified Noteholder Class Action Limit (discussed in further detail below); and

(iv)    Equity Claims.

(h)   The Plan contemplates specific mechanics for implementation of the restructuring transaction including the distribution of Newco Shares and Newco Notes and the incorporation of SFC Escrow Co. which will be formed to hold Newco Shares and Newco Notes in the Unresolved Claims Reserve and to act as the Unresolved Claims Escrow Agent.

(i)   The Plan remains subject to several conditions precedent including, among other things:

(i)    approval of the Plan by the Required Majority at the Meeting;

(ii)   the granting of the Sanction Order;

(iii)  all filings under Applicable Laws that are required shall have been made and any regulatory consents or approvals required shall have been obtained including, without limitation (A) any required filings and consents of the securities regulatory authorities in Canada (B) a consultation with the Executive of the Hong Kong Securities and Futures Commission; (C) the submission by the Company and each applicable Sino-Forest Subsidiary of a Circular 698 tax filing with all appropriate tax authorities in the PRC within the requisite time prior to the Plan Implementation Date; and (D) if notification is necessary or desirable under the *Antimonopoly Law of the People's Republic of China* and its implementation rules, the submission of such filings and the acceptance and/or approval thereof by the competent Chinese authority; and

(iv)    the completion of satisfactory due diligence by the ICNs prior to the Sanction Hearing.

62.    The Plan filed on October 19, 2012 contained a number of changes to the August 14 Draft Plan.   Reference should be made to the Plan and the Information Statement for the details of the Plan.  Briefly, a summary of some of the significant changes is as follows:[23]

(a)    Insurance

(i)    A number of changes to section 2.4 of the Plan were made in consultation with various constituencies including counsel to the Ontario and Quebec Plaintiffs as well as the Company's insurers.

(b)    Section 5.1(2) D&O Claims and Conspiracy Claims.

(i)    References previously to "Retained D&O Claims" now refer to Section 5.1(2) D&O Claims and Conspiracy Claims.[24]

(c)    Mechanics of Distribution.

(i)    A number of changes regarding the mechanics of distribution were made to the Plan following consultation with the Monitor and representatives of the Trustees.  The Monitor is further entitled to seek directions from the Court with respect to any matter relating to the implementation of the Plan, including with respect to the distribution mechanics provided for under the Plan.

(d)    SFC Escrow Co.

---

[23] The summary provided herein is for informational purposes only.  In the event of any inconsistency between the summary set out in this Report and the Plan, the Plan shall govern.
[24] "Section 5.1(2) D&O Claim" means any D&O Claim that is not permitted to be compromised pursuant to section 5.1(2) of the CCAA, but only to the extent not so permitted, provided that any D&O Claim that qualifies as a Non-Released D&O Claim or a Continuing Other D&O Claim shall not constitute a Section 5.1(2) D&O Claim. "Conspiracy Claim" means any D&O Claim alleging that the applicable Director or Officer committed the tort of civil conspiracy, as defined under Canadian common law.



(i)     SFC Escrow Co. shall be incorporated prior to the Plan Implementation Date under the laws of the Cayman Islands or such other jurisdiction as may be agreed to by SFC, the Monitor and the ICNs.  SFC Escrow Co. shall be incorporated for the purpose of holding, in escrow, the Unresolved Claims Reserve.

(e)    Releases.  Significant changes were made to the Plan releases.  The Plan now contemplates that the following will be specifically released:

(i)     all Affected Claims, including all Affected Creditor Claims, Equity Claims, D&O Claims (other than Section 5.1(2) D&O Claims, Conspiracy Claims, Continuing Other D&O Claims and Non-Released D&O Claims), D&O Indemnity Claims (except as set forth in section 7.1(d) of the Plan) and Noteholder Class Action Claims (other than the Continuing Noteholder Class Action Claims);

(ii)    all Claims of the Ontario Securities Commission or any other Governmental Entity that have or could give rise to a monetary liability, including fines, awards, penalties, costs, claims for reimbursement or other claims having a monetary value;

(iii)   all Class Action Claims (including the Noteholder Class Action Claims) against SFC, the Subsidiaries or the Named Directors or Officers of SFC or the Subsidiaries (other than Class Action Claims that are Section 5.1(2) D&O Claims, Conspiracy Claims or Non-Released D&O Claims);

(iv)    all Class Action Indemnity Claims (including related D&O Indemnity Claims), other than any Class Action Indemnity Claim by the Third Party Defendants against SFC in respect of the Indemnified Noteholder Class Action Claims (including any D&O Indemnity Claim in that respect), which shall be limited to the Indemnified Noteholder Class Action Limit pursuant to the releases set out in section 7.l(f) of the Plan and the injunctions set out in section 7.3 of the Plan;

(v)     any portion or amount of or liability of the Third Party Defendants for the Indemnified Noteholder Class Action Claims (on a collective, aggregate basis in reference to all Indemnified Noteholder Class Action Claims together) that exceeds the Indemnified Noteholder Class Action Limit;

(vi)    any portion or amount of, or liability of SFC for, any Class Action Indemnity Claims by the Third Party Defendants against SFC in respect of the Indemnified Noteholder Class Action Claims to the extent that such Class Action Indemnity Claims exceed the Indemnified Noteholder Class Action Limit;

(vii)   any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, against Newco, the directors and officers of Newco, the Noteholders, members of the ad hoc committee of Noteholders, the Trustees, the Transfer Agent, the Monitor, FTI Consulting Canada Inc., FTI HK, counsel for the current Directors of SFC, counsel for the Monitor, counsel for the Trustees, the SFC Advisors, the Noteholder Advisors, and each and every member (including members of any committee or governance council), partner or employee of any of the foregoing, for or in connection with or in any way relating to: any Claims (including, notwithstanding anything to the contrary herein, any Unaffected Claims); Affected Claims; Section 5.1(2) D&O Claims; Conspiracy Claims; Continuing Other D&O Claims; Non-Released D&O Claims; Class Action Claims; Class Action Indemnity Claims; any right or claim in connection with or liability for the Notes or the Note Indentures; any guarantees, indemnities, claims for contribution,

share pledges or Encumbrances related to the Notes or the Note Indentures; any right or claim in connection with or liability for the Existing Shares, Equity Interests or any other securities of SFC; any rights or claims of the Third Party Defendants relating to SFC or the Subsidiaries;

(viii)  any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, against Newco, the directors and officers of Newco, the Noteholders, members of the ad hoc committee of Noteholders, the Trustees, the Transfer Agent, the Monitor, FTI Consulting Canada Inc., FTI HK, the Named Directors and Officers, counsel for the current Directors of SFC, counsel for the Monitor, counsel for the Trustees, the SFC Advisors, the Noteholder Advisors, and each and every member (including members of any committee or governance council), partner or employee of any of the foregoing, based in whole or in part on any act, omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing or other occurrence existing or taking place on or prior to the Plan Implementation Date (or, with respect to actions taken pursuant to the Plan after the Plan Implementation Date, the date of such actions) in any way relating to, arising out of, leading up to, for, or in connection with the CCAA Proceeding, RSA, the Restructuring Transaction, the Plan, any proceedings commenced with respect to or in connection with the Plan, or the transactions contemplated by the RSA and the Plan, including the creation of Newco and the creation, issuance or distribution of the Newco Shares, the Newco Notes, the Litigation Trust or the Litigation Trust

Interests, provided that nothing in this paragraph shall release or discharge any of the Persons listed in this paragraph from or in respect of any obligations any of them may have under or in respect of the RSA, the Plan or under or in respect of any of Newco, the Newco Shares, the Newco Notes, the Litigation Trust or the Litigation Trust Interests, as the case may be;

(ix)    any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, against the Subsidiaries for or in connection with any Claim (including, notwithstanding anything to the contrary herein, any Unaffected Claim); any Affected Claim (including any Affected Creditor Claim, Equity Claim, D&O Claim, D&O Indemnity Claim and Noteholder Class Action Claim); any Section 5.1(2) D&O Claim; any Conspiracy Claim; any Continuing Other D&O Claim; any Non-Released D&O Claim; any Class Action Claim; any Class Action Indemnity Claim; any right or claim in connection with or liability for the Notes or the Note Indentures; any guarantees, indemnities, share pledges or Encumbrances relating to the Notes or the Note Indentures; any right or claim in connection with or liability for the Existing Shares, Equity Interests or any other securities of SFC; any rights or claims of the Third Party Defendants relating to SFC or the Subsidiaries; any right or claim in connection with or liability for the RSA, the Plan, the CCAA Proceedings, the Restructuring Transaction, the Litigation Trust, the business and affairs of SFC and the Subsidiaries (whenever or however conducted), the administration and/or management of SFC and the Subsidiaries, or any public filings, statements, disclosures

or press releases relating to SFC; any right or claim in connection with or liability for any indemnification obligation to Directors or Officers of SFC or the Subsidiaries pertaining to SFC, the Notes, the Note Indentures, the Existing Shares, the Equity Interests, any other securities of SFC or any other right, claim or liability for or in connection with the RSA, the Plan, the CCAA Proceedings, the Restructuring Transaction, the Litigation Trust, the business and affairs of SFC (whenever or however conducted), the administration and/or management of SFC, or any public filings, statements, disclosures or press releases relating to SFC; any right or claim in connection with or liability for any guaranty, indemnity or claim for contribution in respect of any of the foregoing; and any Encumbrance in respect of the foregoing; and

(x)     all Subsidiary Intercompany Claims as against SFC (which are assumed by Newco pursuant to the Plan).

(f)    Claims Not Released.  The following are specifically not released under the Plan:

(i)     SFC of its obligations under the Plan and the Sanction Order;

(ii)    SFC from or in respect of any Unaffected Claims (provided that recourse against SFC in respect of Unaffected Claims shall be limited in the manner set out in section 4.2 of the Plan);

(iii)   any Directors or Officers of SFC or the Subsidiaries from any Non-Released D&O Claims, Conspiracy Claims or any Section 5.1(2) D&O Claims, provided that recourse against the Named Directors or Officers of SFC in respect of any Section 5.1(2) D&O Claims and any Conspiracy Claims shall be limited in the manner set out in 4.9(e) of the Plan;

(iv)    any Other Directors and/or Officers from any Continuing Other D&O Claims, provided that recourse against the Other Directors and/or Officers in respect of the Indemnified Noteholder Class Action Claims shall be limited in the manner set out in 4.4(b)(i) of the Plan;

(v)     the Third Party Defendants from any claim, liability or obligation of whatever nature for or in connection with the Class Action Claims, provided that the maximum aggregate liability of the Third Party Defendants collectively in respect of the Indemnified Noteholder Class Action Claims shall be limited to the Indemnified Noteholder Class Action Limit pursuant to section 4.4(b)(i) of the Plan and the releases set out in section 7.1(e) of the Plan and the injunctions set out in section 7.3 of the Plan;

(vi)    Newco from any liability to the applicable Subsidiaries in respect of the Subsidiary Intercompany Claims assumed by Newco pursuant to section 6.4(n) of the Plan;

(vii)   the Subsidiaries from any liability to Newco in respect of the SFC Intercompany Claims conveyed to Newco pursuant to section 6.4(m) of the Plan;

(viii)  SFC of or from any investigations by or non-monetary remedies of the Ontario Securities Commission, provided that, for greater certainty, all monetary rights, claims or remedies of the Ontario Securities Commission against SFC shall be treated as Affected Creditor Claims in the manner described in section 4.1 of the Plan and released pursuant to section 7.1(b) of the Plan;

(ix)    the Subsidiaries from their respective indemnification obligations (if any) to Directors or Officers of the Subsidiaries that relate to the ordinary course operations of the Subsidiaries and that have no connection with any of the matters listed in section 7.1(g) of the Plan;

(x)     SFC or the Directors and Officers from any Insured Claims, provided that recovery for Insured Claims shall be irrevocably limited to recovery solely from the proceeds of Insurance Policies paid or payable on behalf of SFC

or its Directors and Officers in the manner set forth in section 2.4 of the Plan;

(xi)    insurers from their obligations under insurance policies; and

(xii)   any Released Party for fraud or criminal conduct.

(g)    Sanction Order.   In addition to the previously enumerated items set out in the August 14 Draft Plan, the Plan now contemplates that the Sanction Order shall:

(i)    Confirm that the Court was satisfied that (A) the hearing of the Sanction Order was open to all of the Affected Creditors and all other Persons with an interest in SFC and that such Affected Creditors and other Persons were permitted to be heard at the hearing in respect of the Sanction order; (B) prior to the hearing, all of the Affected Creditors and all other Persons on the service list were given adequate notice thereof;

(ii)    Declare that in no circumstance will the Monitor have any liability for any of SFC's tax liability regardless of how or when such liability may have arisen;

(iii)    Declare that, subject to the due performance of its obligations as set forth in the Plan and subject to its compliance with any written directions or instructions of the Monitor and/or directions of the Court in the manner set forth in the Plan, SFC Escrow Co. shall have no liabilities whatsoever arising from the performance of its obligations under the Plan.

Additionally, as set out in paragraph 46 of the draft Sanction Order contained in the Plan Supplement (defined below), the Sanction Order now provides that any Unresolved Claims in excess of $1 million shall not be accepted or resolved without further Order of the Court.   Further, the Sanction Order also provides that all parties with Unresolved Claims shall have standing in any proceeding with respect to the determination or status of any other Unresolved Claim.

(h)    Alternative Sale Transaction.



(i)     The Plan provides that, at any time prior to the implementation of the Plan, SFC may, with the consent of the ICNs, complete a sale of all or substantially all of the SFC Assets on terms that are acceptable to the ICNs (an "**Alternative Sale Transaction**"), provided that any such Alternative Sale Transaction has been approved by the Court pursuant to section 36 of the CCAA on notice to the service list;

(ii)    In the event that an Alternative Sale Transaction is completed, the terms and conditions of the Plan would continue to apply subject to certain conditions identified in the Plan.

(i)     Expense Reimbursement.  The Plan provides that the "Expense Reimbursement" shall now also include a work fee of up to $5 million to the ICNs.

*The Plan Supplement[25]*

63.    On November 21, 2012, the Company issued its plan supplement (the "**Plan Supplement**").[26]    Details regarding the publication and distribution of the Plan Supplement are set out below in the section entitled "Notice of the Plan".

64.    The Plan Supplement provides further detail regarding the Plan including:

(a)     a summary of the terms of the Litigation Trust;

(b)     a draft copy of the Litigation Trust Agreement;

(c)     a draft of the Sanction Order;

(d)     a summary of certain information concerning Newco, including information relating to Newco's governance and management and a summary of the terms of the Newco Shares;

(e)     a description of the terms of the Newco Notes;

---

[25] The summary provided herein is for informational purposes only.  In the event of any inconsistency between the summary set out in this Report and the Plan Supplement, the Plan Supplement shall govern.
[26] See Appendix E for a copy of the Plan Supplement.



(f)      a summary of the constitution and governance of SFC Escrow Co.; and

(g)      information concerning certain of the Reserves.

*The Litigation Trust*

65.      The Litigation Trust will be created pursuant to the Plan on the Plan Implementation Date.  Pursuant to the Litigation Trust Agreement, the Litigation Trustee will hold the Litigation Trust Claims and the other Litigation Trust Assets for the benefit of Affected Creditors with Proven Claims and the Noteholder Class Action Claimants entitled to receive Litigation Trust Interests under the Plan.

66.      On the Plan Implementation Date, the Litigation Trust Claims will be transferred to the Litigation Trustee. Upon the creation of the Litigation Trust, the Company will transfer the Litigation Funding Amount to the Litigation Trustee to finance the operations of the Litigation Trust.  The amount of the Litigation Funding Amount is subject to ongoing discussion.

67.      The Litigation Trustee will be determined by the Company and the ICNs (with the consent of the Monitor) prior to the Plan Implementation Date.  The litigation trust board (the "**Litigation Trust Board**") will be established and consist of three (3) persons and will make decisions based on a majority vote of the Litigation Trust Board members. The Litigation Trust Board will have the right to direct and remove the Litigation Trustee in accordance with the Litigation Trust Agreement and will have the right to operate and manage the Litigation Trust in a manner not inconsistent with the Litigation Trust Agreement.  The parties have not yet determined who will serve as the members of the Litigation Trust Board.

68.      Subject to the terms of the Litigation Trust Agreement, the Litigation Trustee, upon the direction of the Litigation Trust Board, will prosecute the Litigation Trust Claims and preserve and enhance the value of the Litigation Trust Assets.

*Information Regarding Newco*

69.      As set out in the Plan, the Information Statement and the Plan Supplement:



(a)     Newco will be incorporated as an exempt company under the laws of the Cayman Islands.

(b)     Newco will have share capital consisting of a single class of voting shares, being Newco Shares.  Newco Shares may be divided into different classes subject to requisite shareholder approvals.  Also with requisite shareholder approvals, Newco may issue equity securities having a preference over Newco Shares.

(c)     Newco is not and will not be, following the Plan Implementation Date, a reporting issuer in any jurisdiction and the Newco Shares will not be listed on any stock exchange or quotation service on the Plan Implementation Date.

(d)     Subject to preferences for receipt of dividends that may be accorded to holders of other classes of shares of Newco, dividends may be declared by the board from time to time in equal amounts per share on the Newco Shares.

(e)     Newco will hold its first annual general meeting of shareholders no earlier than 12 months following the Plan Implementation Date, with subsequent annual general meetings to be held annually thereafter.

(f)     The board of Newco will initially consist of up to five (5) directors, who will be satisfactory to the ICNs.  The ad hoc committee of Noteholders and its advisors are reviewing potential candidates for appointment to the Newco board of directors and senior management.  It is intended that the directors and senior management of Newco will be appointed on or prior to the Plan Implementation Date.

(g)     Newco will deliver to each shareholder (i) copies of Newco's annual financial statements within 180 days of each fiscal year end; and (b) copies of Newco's semi-annual financial statements within 90 days of the end of each financial half-year.  The board of directors will have the discretion to determine whether or not to obtain an audit of the annual financial statements.



(h)     Prior to the Plan Implementation Date, it is intended that Newco will organize a wholly-owned subsidiary as an exempt company under the laws of the Cayman Islands ("**Newco II**") for the purposes of acquiring from Newco the SFC Assets to be transferred by the Company to Newco on the implementation of the Plan.  The transfer of the SFC Assets to Newco II is intended to facilitate the resolution of any tax, jurisdictional or other issues that may arise out of a subsequent sale of all or substantially all of Newco's assets.

(i)     Newco will be named "Evergreen China Holdings Ltd." and Newco II will be named "Evergreen China Holdings II Ltd."

*Description of Newco Notes*

70.     As set out in the Plan, the Information Statement and the Plan Supplement:

(a)     The principal aggregate amount of the Newco Notes will be $300 million.

(b)     The Newco Notes will:

(i)     constitute general obligations of Newco;

(ii)    mature on the date that is seven (7) years after the Original Issue Date (as defined in the Plan Supplement) unless redeemed earlier pursuant to the terms of the Newco Notes indenture;

(iii)   be subject to interest on the Newco Notes which will be payable in cash or, at Newco's election, partially in cash and partially in kind notes or entirely in PIK Notes (as defined in the Plan Supplement);

(iv)    be subject to guarantees and pledges granted by various of the Sino-Forest Subsidiaries on terms similar to the guarantees and pledges granted on the existing Notes; and

(v)     be subject to several terms and conditions that are similar to the terms of the existing Note indentures.



*Information regarding SFC Escrow Co.*

71.    SFC Escrow Co. will be incorporated prior to the Plan Implementation Date under the laws of the Cayman Islands or such other jurisdiction as may be agreed by the Company, the Monitor and the ICNs.  SFC Escrow Co. will be a wholly-owned subsidiary of the Company and the sole director of SFC Escrow Co. will be Codan Services (Cayman) Limited or such other person as may be agreed by the Company, the Monitor and the ICNs.

72.    SFC Escrow Co. is being formed to serve as the Unresolved Claims Escrow Agent and to facilitate the implementation of the Plan as the holder of the assets in the Unresolved Claims Reserve.  SFC Escrow Co. will also administer the Undeliverable Distributions in accordance with the Plan.

*Information and other Amounts relating to the Plan*

73.    The Plan Supplement contains information regarding the Reserves (defined below). Notably, the Indemnified Noteholder Class Action Limit has been established at $150 million.  The Indemnified Noteholder Class Action Limit has been agreed to by the Ontario Plaintiffs and the Quebec Plaintiffs and it means that no Third Party Defendant can have liability to the Plaintiffs in the Class Actions for Indemnified Noteholder Class Action Claims beyond that limit.  As such, the maximum liability of the Company in respect of any Class Action Indemnity Claims asserted by the Third Party Defendants against the Company is similarly limited.

74.    The balance of the Reserves is discussed in the section below entitled "Reserves".

## THE RESERVES[27]

*The Cash Reserves*

75.    The terms of the Plan provide for the creation of a number of cash reserves upon Plan Implementation.  Those cash reserves are as follows (the "**Cash Reserves**"):

---

[27] Capitalized terms used in this section and not otherwise defined have the meaning given to them in the Plan.



(a)  Administration Charge Reserve – The Administration Charge Reserve is intended to cover any claims which are covered by the Administration Charge (as defined in and established by the Initial Order).  The beneficiaries of the Initial Order include the Monitor, HL, and counsel for the Company, the Monitor, the board and the ICNs.  It is anticipated that most or all of outstanding fees of these advisors will be paid prior to or upon the Plan Implementation Date.  As such, it is not anticipated that much or any of the amount of the Administration Charge Reserve will be required to satisfy any outstanding claims.  The amount for funding the Administration Charge, if any, is subject to ongoing discussion.

(b)  Directors' Charge Reserve[28] – The Directors' Charge Reserve is intended to cover any claims of the directors for amounts covered by the directors' indemnity contained in the Initial Order.  The amount, if any, of the Directors' Charge Reserve is subject to ongoing discussion.

(c)  Unaffected Claims Reserve – The Unaffected Claims Reserve is intended to provide for payment of Unaffected Claims under the Plan. The amount of the Unaffected Claims Reserve will be calculated based on the Company's and the Monitor's estimate of the Unaffected Claims which may not be paid upon the Plan implementation or which are not otherwise accounted for in the other Cash Reserves.  The calculation of the Unaffected Claims Reserve is subject to ongoing discussion.

(d)  Monitor's Post-Implementation Reserve – After implementation of the Plan, it is anticipated that there will be ongoing items to be addressed within the CCAA Proceedings including the administration of the SFC estate and the claims procedure.  The Monitor's Post-Implementation Reserve is intended to provide funds to carry out these items.  The amount of the Monitor's Post-Implementation Reserve is subject to ongoing discussion.

76.  As set out above, the appropriate amounts for the Cash Reserves is subject to ongoing discussion.  As set out in the Plan, the amounts of the Cash Reserves are to be confirmed

---

[28] Pursuant to the Initial Order, the amount of the Directors' Charge is $3.2 million.



as part of the Sanction Order. The Monitor intends to provide further information prior to the Sanction Hearing with respect to the calculation and proposed amounts of the Cash Reserves.

77. Pursuant to the Plan, the Monitor will hold and administer the monies used to fund the Cash Reserves. Pursuant to section 5.7 of the Plan, excess funds in the Administration Charge Reserve, the Directors' Charge Reserve and the Unaffected Claims Reserve will be transferred to the Monitor's Post-Implementation Reserve.

78. The Monitor may, at any time and from time to time in its sole discretion, release amounts from the Monitor's Post-Implementation Reserve to Newco. Once the Monitor has determined that the cash remaining in the Monitor's Post-Implementation Reserve is no longer necessary for administering the Company or the Claims Procedure, the Monitor shall forthwith transfer any such remaining cash to Newco.

*The Unresolved Claims Reserve*

79. In addition to the Cash Reserves, the Plan also contemplates the establishment of an Unresolved Claims Reserve (together with the Cash Reserves, the "**Reserves**"), constituting Newco Shares and Newco Notes (and any distributed Litigation Trust Interests) which will be held in escrow by SFC Escrow Co. pending the resolution of Unresolved Claims. The proposed amount of the Unresolved Claims Reserve will be Newco Shares and Newco Notes sufficient to satisfy distributions on a pro rata basis in respect of the Unresolved Claims (the "**Unresolved Claims Reserve Consideration**"). The Unresolved Claims Reserve Consideration will be held by SFC Escrow Co. and will be released out of the Unresolved Claims Reserve in accordance with the Plan if and when any such Unresolved Claims become Proven Claims.

80. The anticipated Unresolved Claims that will have recourse to the Unresolved Claims Reserve in accordance with the Plan are primarily:

(a) Indemnity Claims by the Third Party Defendants in respect of Noteholder Class Action Indemnity Claims up $150 million, being the Indemnified Noteholder Class Action Limit;



(b)     Indemnity Claims by Directors and Officers in respect OSC Monetary Claims; and

(c)     Defence Costs Claims (as defined in the Meeting Order).

81.     The appropriate amount of the Unresolved Claims Reserve as it relates to OSC Monetary Claims and Defence Costs Claims is subject to ongoing discussion.  The Monitor is of the view that the fact that reserve amounts for OSC Monetary Claims and Defence Costs Claims have not yet been determined does not affect the exercise of any voting rights of potential beneficiaries of the Unresolved Claims Reserve from voting on the Plan because the reserve amount is not, in itself tied to the amounts that persons will be entitled to vote.  Instead, the proposed calculation and treatment of these Claims for voting purposes is discussed below in the section entitled "Meeting of the Affected Creditor Class".   The Monitor does intend to provide a further report with respect to the amount of the Unresolved Claims Reserve in advance of the Sanction Hearing.

## NOTICE AND MAILING OF THE PLAN[29]

82.     The Meeting Order contemplated a process for the declaration of a Mailing Date and providing notice and mailing of the Meeting Materials to Noteholders and Ordinary Affected Creditors.

83.     The original outside date for the Mailing Date was September 20, 2012 provided that such date could be extended by the Monitor with the consent of the Company and the ICNs. In accordance with the Meeting Order, the outside date for the Mailing Date was extended a number of times with the consent of the Company and the ICNs.  The Mailing Date was ultimately set as October 24, 2012.

84.     The Monitor, in consultation with the Company and the ICNs, also determined that the originally proposed process for the mailing of the Noteholder Meeting Materials was not the most efficient process for mailing.  In that regard, on October 24, 2012, the Monitor sought and obtained an Order (the "**Revised Noteholder Mailing Process Order**")

---

[29] Capitalized terms used in this section and not otherwise defined have the meaning given to them in the Meeting Order.



providing for the approval of a revised noteholder mailing process as set out in its Eleventh Report dated October 24, 2012 (the "**Eleventh Report**").

85.   In accordance with the Meeting Order and the Revised Noteholder Mailing Process Order, the Notice of the Creditors' Meeting was provided as follows:

(a)   An electronic copy of the Notice to Affected Creditors, the Plan and the Information Circular (in the form provided by the Company as at the date of the Meeting Order) were posted on the Monitor's website on September 5, 2012;

(b)   The Ordinary Affected Creditor Meeting Materials were delivered by courier or email to each of the Ordinary Affected Creditors with a Voting Claim and/or an Unresolved Claim on October 24, 2012;

(c)   The Ordinary Affected Creditor Meeting Materials were also delivered by email to the service list in the CCAA Proceedings on October 24, 2012;

(d)   The Noteholder Meeting Materials were delivered by courier or email to the Trustees (as defined in the Plan) and DTC on October 24, 2012; and

(e)   The Noteholder Meeting Materials were delivered to Registered Noteholders via Globic Advisors ("**Globic**") on October 24, 2012 and as described further in the Eleventh Report.[30]

86.   On November 21, 2012, the Plan Supplement and the Voting Procedures (defined below) were distributed as follows:

(a)   An electronic copy of the Plan Supplement and the Voting Procedures were posted on the Monitor's website on November 21, 2012;

(b)   The Plan Supplement and the Voting Procedures were delivered by email to each of the Ordinary Affected Creditors with a Voting Claim and/or an Unresolved Claim on November 21, 2012;

---

[30] See Appendix O  for a copy of Globic's Mailing Certificate (Mailing Materials).



(c)    The Plan Supplement and the Voting Procedures were also delivered by email to the service list in the CCAA Proceedings on November 21, 2012;

(d)    The Plan Supplement and the Voting Procedures were delivered by email to the Trustees and DTC on November 21, 2012; and

(e)    The Plan Supplement and the Voting Procedures were delivered to Registered Noteholders via Globic on November 21, 2012. [31]

87.    To the extent there are any amendments, restatements, modifications and/or supplements to the Plan Supplement, subject to the terms of the Plan:

(a)    The Monitor, the Company or the Chair shall communicate the details of any such amendments, restatements, modifications and/or supplements to Affected Creditors present at the Meeting prior to any vote being taken;

(b)    The Monitor shall post an electronic copy of any such amendments, restatements, modifications and/or supplements on the Website forthwith and in any event prior to the Sanction Hearing.

## MEETING OF THE AFFECTED CREDITORS CLASS[32]

*Meeting Date*

88.    The Meeting has been scheduled for November 29, 2012 at the offices of Bennett Jones LLP.  In the event that the Court of Appeal decision is not released prior to November 29, 2012, the Meeting will be adjourned in accordance with the direction of the Court of Appeal.

---

[31] See Appendix P for a copy of Globic's Mailing Certificate (Plan Supplement and Voting Procedures).
[32] Capitalized terms used in this section and not otherwise defined have the meaning given to them in the Plan or Meeting Order, as applicable.



*Voting of Claims*

89.　The determination as to which Persons will have Voting Claims and/or Unresolved Claims to vote at the Meeting has been determined with regard to the provisions of the Meeting Order and the classification and treatment of Persons under the Plan.

90.　Pursuant to paragraph 39 of the Meeting Order, the only Persons entitled to vote at the Meeting are:

(a)　Beneficial Noteholders with Voting Claims that have beneficial ownership of one or more Notes as at the Voting Record Date;[33] and

(b)　Ordinary Affected Creditors with Voting Claims as at the Voting Record Date.

91.　The Meeting Order also provides that:

(a)　any Affected Creditor with an Unresolved Claim (including Defence Costs Claims) as at the Voting Record Date is entitled to attend the Meeting and shall be entitled to one vote at the Meeting in respect of such Unresolved Claim.  Votes cast in respect of Unresolved Claims will be recorded separately by the Monitor and the Monitor will provide a report on the votes cast in respect of Unresolved Claims at the Sanction Hearing; and

(b)　each of the Third Party Defendants will be entitled to one vote as a member of the Affected Creditors Class in respect of any Class Action Indemnity Claim that it has properly filed in respect of the Indemnified Noteholder Class Action Claims, provided that the aggregate value of all such Class Action Indemnity Claims shall, for voting purposes, be deemed to be limited to the amount of the Indemnified Noteholder Class Action Limit.[34]

92.　Pursuant to paragraph 54 of the Meeting Order, the following Persons are not entitled to vote at the Meeting:

---

[33] The Voting Record Date is August 31, 2012.

[34] As set out in the Plan Supplement the Indemnified Noteholder Class Action Limit is $150 million.



(a)     Unaffected Creditors;

(b)     Noteholder Class Action Claimants;

(c)     Equity Claimants;

(d)     Any Person with a D&O Claim;

(e)     Any Person with a D&O Indemnity Claim (other than a D&O Indemnity Claim in respect of Defence Costs Claims or in respect of Class Action Indemnity Claims related to Indemnified Noteholder Class Action Claims;

(f)     Any Person with a Subsidiary Intercompany Claim; and

(g)     Any other Person asserting Claims against the Company whose Claims do not constitute Affected Creditor Claims on the Voting Record Date.

93.    As set out above, the Plan further provides that the Claims of the Third Party Defendants other than Class Action Indemnity Claims related to Indemnified Noteholder Class Action Claims and Defence Costs Claims, are Equity Claims**.**

94.    On November 21, 2012 , the Monitor issued a notice of voting procedures (the "**Voting Procedures**")[35] setting out the guidelines for tabulating and recording votes of Voting Claims and Unresolved Claims at the Meeting.  A summary of the Voting Procedures is as follows:

(a)     Pursuant to paragraph 39 of the Meeting Order, persons entitled to vote at the Meeting (whether in person or by proxy) are as follows:

(i)     Beneficial Noteholders with Voting Claims as at the Voting Record Date; and

(ii)     Ordinary Affected Creditors with Voting Claims as at the Voting Record Date.

(b)     Pursuant to paragraph 54 of the Meeting Order, persons not entitled to vote at the

---

[35] See Appendix N for a copy of the Voting Procedures.



Meeting include:

(i)     Unaffected Creditors;

(ii)    Noteholder Class Action Claimants;

(iii)   Equity Claimants;

(iv)    Any Person with a D&O Claim;

(v)     Any Person with a D&O Indemnity Claim (other than a D&O Indemnity Claim in respect of Defence Costs Claims or in respect of Indemnified Noteholder Class Action Claims);

(vi)    Any Person with a Subsidiary Intercompany Claim; and

(vii)   Any other Person asserting Claims against the Company whose Claims do not constitute Affected Creditor Claims on the Voting Record Date.

(c)    Unless specifically provided for in the Plan and/or the Meeting Order, place holder Claims will not be entitled to a vote.

(d)    Third Party Defendants with Class Action Indemnity Claims in respect of Indemnified Noteholder Class Action Claims will be entitled to vote such Claims in accordance with paragraph 51 of the Meeting Order and votes cast in respect of such Claims will be recorded and reported on in accordance with paragraph 51 of the Meeting Order.  The aggregate value of all such Class Action Indemnity Claims will, for voting purposes, be limited to the amount of the Indemnified Noteholder Class Action Limit.

(e)    Persons with Defence Costs Claims will be entitled to vote such Defence Costs Claims to the extent that such Claim or D&O Indemnity Claim, as the case may be, set out a specified amount of defence costs incurred up to the Claims Bar Date, and votes cast in respect of such Defence Costs Claims will be recorded and reported on as Unresolved Claims in accordance with paragraph 53 of the Meeting Order.

(f)    For greater certainty, the Claims of the Third Party Defendants will be treated in accordance with section 4.7 of the Plan, as follows:



(i)      Class Action Indemnity Claims in respect of Indemnified Noteholder Class Action Claims will be entitled to vote as set out above;

(ii)     Defence Costs Claims will be entitled to vote as set out above; and

(iii)    the balance of the Third Party Defendants' Claims are Equity Claims and not entitled to vote.

95.    As such, the Third Party Defendants will be permitted to vote their Defence Costs Claims and Indemnified Noteholder Class Action Claims as contemplated by the Meeting Order. The result of those votes will be recorded by the Monitor and reported on at the Sanction Hearing. The balance of the Third Party Defendants' Claims are classified as Equity Claims and therefore not entitled to vote.

96.    To the extent that Persons believe that the classification and tabulation of their votes has been incorrectly or unfairly tabulated by the Monitor, such Persons are entitled to appear and make such objections at the Sanction Hearing.

## SANCTION OF THE PLAN[36]

97.    To the extent that the Plan is approved by the Required Majority at the Meeting, the Company intends to seek an Order (the "**Sanction Order**")[37] sanctioning of the Plan at a motion scheduled for December 7 and 10, 2012 (the "**Sanction Hearing**").   The following sections set out the Monitor's analysis on the Plan and the basis for its recommendation that the Plan be approved by creditors and sanctioned by the Court.

*Alternatives to the Plan*

98.    In arriving at its recommendation, the Monitor has considered the possible alternatives to the Plan.

99.    The RSA was negotiated to provide a restructuring solution acceptable to the Company and the ICNs.  Further support was then solicited and approximately 72% (with more than 66.67% of the principal amount of each of the four (4) series of Notes) of the

---

[36] Capitalized terms used in this section and not otherwise defined have the meaning given to them in the Plan.
[37] See Exhibit G to the Plan Supplement (Appendix E to this Thirteenth Report) for a draft Sanction Order.



Noteholders (including the ICNs) provided their support through the execution of joinder agreements.  However, alternatives to the restructuring transaction contemplated by the RSA were explored.  Specifically, a court-approved sale process was undertaken to determine whether the Sino-Forest business could be sold.  The baseline Qualified Consideration was less than the full amount of the principal outstanding amount of the Notes.  As set out above, no interested party provided a letter of intent indicating such interest.

100.  The Monitor believes that the canvassing of the market during the Sale Process was thorough.  The Company has now been in the CCAA Proceedings for almost eight (8) months and no other viable alternatives have been proposed by any interested party willing to participate in the CCAA process.  At the same time, the Sino-Forest Business in the PRC is effectively frozen and the Company continues to burn through its remaining cash and cannot afford to continue with this process for much longer.

101.  Given the failure of the Sale Process and the lack of other viable alternative proposals, the Monitor has concluded that, other than the Plan, the only possible alternative for the Company is liquidation (discussed in the next section).

*Liquidation or Bankruptcy*

102.  The core of the issues facing the Company and Sino-Forest relate to the existence, ownership and value of the Sino-Forest assets (primarily standing timber located in the PRC).  The MW Report called these items into question as have the Class Actions and the investigation by the OSC.  Significant time and resources have been spent investigating these issues.

103.  The Company itself is a holding company with little or no assets other than cash on hand and its interests in its direct and indirect subsidiaries.  Any bankruptcy or liquidation of assets would have to take place under the laws of the jurisdiction of the Sino-Forest Subsidiaries and/or the location of the assets (i.e. such as the BVI, Hong Kong and the PRC).

104.    Although the Monitor is not an expert in the liquidation of BVI, HK or PRC entities, the Monitor has previously disclosed various issues regarding the Sino-Forest Business and the Sino-Forest Subsidiaries in the Sixth Report and the Tenth Report and it is apparent that the issues in a liquidation of Sino-Forest would include, among others:

(a)    The collectability of receivables;

(b)    Difficulties in accessing standing timber absent cooperation from suppliers;

(c)    Difficulties in establishing title to standing timber where intermediaries have deregistered or are uncooperative;

(d)    Difficulty in dealing with the claims against the Sino-Forest Subsidiaries which have been identified in the Claims Process; and

(e)    Legal difficulties in exporting cash out of the PRC.

105.    In the event of a liquidation or bankruptcy of the Sino-Forest Subsidiaries, it is unlikely that any value would be realized by the Company on account of its equity interest in the Sino-Forest Subsidiaries.

*The Scope of Releases*

106.    As set out above, section 7.1 of the Plan contemplates a number of specific plan releases. The Monitor has reviewed the releases and believes that they are fair and reasonable in the circumstances.  Specifically, the Monitor notes the following:

(a)    Claims, and D&O Indemnity Claims against the Company are released, which is standard for a CCAA plan;

(b)    The Claims of the Noteholders and the Third Party Defendants against the Sino-Forest Subsidiaries are released (the "**Subsidiary Releases**");

(c)    Unaffected claims and claims which cannot be compromised pursuant to the CCAA are not compromised or released under the Plan;



(d)     Class Action Indemnity Claims in respect of Indemnified Noteholder Class Action Claims against the Company are released beyond the Noteholder Class Action Limit, however, the liability of the Third Party Defendants for any such Indemnified Noteholder Class Action Claims is also limited to a maximum amount of the Noteholder Class Action Limit;

(e)     Except as set out below, D&O Claims are released against only the Named Directors and Officers (as set out in the Plan);

(f)     D&O Claims against any other Directors and Officers (other than the Named Directors and Officers) are not released;

(g)     D&O Claims which cannot be released pursuant to section 5.1(2) of the CCAA (i.e. Section 5.1(2) D&O Claims) are not released against any Directors and Officers (although recovery against Named Directors and Officers is limited to insurance proceeds);

(h)     Conspiracy Claims are not released against any Directors and Officers (although recovery against Named Directors and Officers is limited to insurance proceeds); and

(i)     Non-monetary claims of the OSC are not released.

107.    In addition to the foregoing, Class Action Claims and Claims of the Third Party Defendants against the Sino-Forest Subsidiaries are compromised and released pursuant to the Plan.

108.    The Monitor has reviewed and discussed the proposed releases with the Company at length and believes them to be fair and reasonable in the circumstances.  In coming to this conclusion the Monitor has taken many factors into account including:

(a)     The standard for releases relating to CCAA debtors and professionals in CCAA plans generally;



(b)      The impact of the Equity Claims Decision on the Claims and D&O Indemnity Claims;

(c)      The non-opposition of the Plaintiffs to the Plan, including the treatment of their Claims, D&O Claims, the amount of the Indemnified Noteholder Class Action Limit and the releases;

(d)      The benefit of the imposition of the Indemnified Noteholder Class Action Limit to the Third Party Defendants inasmuch as it is effectively a partial release for the Indemnified Noteholder Class Action Claims;

(e)      The fact that the releases related to D&O Claims do not purport to provide releases which are prohibited by the CCAA;

(f)      The fact that the releases related to D&O Claims extend only to Named Directors and Officers;

(g)      The Subsidiary Releases are necessary in order to achieve the goal of allowing the Sino-Forest Business to continue free of the cloud of uncertainty caused by the litigation claims and is required by the ICNs as a condition to the Plan. Further, the assets of the Sino-Forest Subsidiaries are effectively being contributed to the assets available for transfer to Newco to satisfy their obligations under the guarantees of the Notes – this will benefit not only the Noteholders but also any other creditor who is ultimately determined to have a *pari passu* claim against the Company; and

(h)      The impact of liquidation if the Plan is not approved.

*Statutory Compliance of the Plan*

109.    The Monitor is not aware of any Claims that are being compromised under the Plan which are prohibited from being compromised pursuant to the CCAA.



## RECOMMENDATION AND CONCLUSIONS

110.    The Monitor's Twelfth Report dated November 16, 2012 attaches the Company's proposed cash flow forecast (the "**November 3 Forecast**") for its stay extension request to February 1, 2013.  The November 3 Forecast projects that the Company will have sufficient funds to the proposed stay extension date.  However, as set out above and is further evidenced by the November 3 Forecast, the Company continues to burn cash and cannot afford to remain in a CCAA process for much longer.

111.    At this time, the only alternative to liquidation is the Plan.  The Plan is acceptable to the ICNs (and those Noteholders that signed joinder agreements) who, in total, consist of the vast majority of the Company's funded debt.  The Plan further provides actual and tangible benefits to the Third Party Defendants (such as the imposition of the Indemnified Noteholder Class Action Limit) and the Plaintiffs have indicated the Plan is acceptable to them.  All of these factors and those set out in the above sections inform the Monitor's conclusion that the Plan provides the best viable alternative to the Company's creditors.

112.    Accordingly, the Monitor respectfully recommends that this Honourable Court grant the Company's request for sanction of the Plan.

Dated this 22nd day of November, 2012.

FTI Consulting Canada Inc.
In its capacity as Monitor of
Sino-Forest Corporation, and not in its personal capacity

Greg Watson
Senior Managing Director

Jodi Porepa
Managing Director

F T I
CONSULTING

## APPENDIX C - THE INFORMATION STATEMENT
## (WITHOUT APPENDICES)

*(See Attached)*





**NOTICE OF MEETING**

**AND**

**MEETING INFORMATION STATEMENT**

**relating to a proposed**

**PLAN OF COMPROMISE AND REORGANIZATION**

**under the**

*COMPANIES' CREDITORS ARRANGEMENT ACT* (CANADA)
**and the**
*CANADA BUSINESS CORPORATIONS ACT*

**concerning, affecting and involving**

**SINO-FOREST CORPORATION**

**October 20, 2012**

**This meeting information statement is being distributed to creditors of Sino-Forest Corporation in connection with the meeting called to consider the plan of compromise and reorganization proposed by Sino-Forest Corporation which is scheduled to be held at 10:00 a.m. (Toronto time) on November 29, 2012 at the offices of Bennett Jones LLP, 3400 One First Canadian Place, Toronto, Ontario.**

*These materials require your immediate attention. You should consult your legal, financial, tax or other professional advisors in connection with the contents of these documents.*

# TABLE OF CONTENTS

Page

IMPORTANT DISCLAIMERS .................................................................................................... 2

IMPORTANT INFORMATION ................................................................................................... 2

INFORMATION FOR UNITED STATES CREDITORS ............................................................ 4

CAUTIONARY NOTICE REGARDING FORWARD LOOKING INFORMATION ................ 4

EXCHANGE RATES ................................................................................................................... 5

GLOSSARY OF TERMS ............................................................................................................. 5

SUMMARY INFORMATION ................................................................................................... 23

INFORMATION REGARDING SINO-FOREST ...................................................................... 30

    Business of Sino-Forest ....................................................................................................... 30

    Corporate Structure ............................................................................................................. 30

    Capital Structure .................................................................................................................. 30

    Business Model .................................................................................................................... 31

CCAA PROCEEDINGS AND OTHER MATTERS ................................................................. 35

    Events Leading to the Commencement of CCAA Proceedings .......................................... 35

    Commencement of CCAA Proceedings .............................................................................. 40

    Resignation of External Auditor ......................................................................................... 40

    OSC Proceedings ................................................................................................................ 41

    Sale Solicitation Process ..................................................................................................... 42

    Effects of MW Report, OSC Allegations and Related Events ............................................ 42

    Asset Verification Process ................................................................................................... 44

    Equity Claims Motion ......................................................................................................... 45

DESCRIPTION OF THE PLAN ................................................................................................ 45

    Purpose of the Plan ............................................................................................................. 45

    Impact of the Plan ............................................................................................................... 46

    Classification of Creditors .................................................................................................. 46

    Treatment of Affected Parties Pursuant to the Plan ........................................................... 46

    Releases to be Given under the Plan .................................................................................... 52

    Injunctions .......................................................................................................................... 55

    Alternative Sale Transaction ............................................................................................... 55

    Effect of the Plan ................................................................................................................ 56

INFORMATION REGARDING NEWCO ................................................................................. 56

DESCRIPTION OF LITIGATION TRUST ............................................................................... 59

REQUIRED APPROVALS UNDER THE CCAA  AND OTHER CONDITIONS TO
IMPLEMENTATION ................................................................................................................ 59

    Creditor Approval ............................................................................................................... 59

    Court Approval of the Plan under the CCAA ...................................................................... 59

    Conditions to Implementation of Plan ................................................................................ 62

    Regulatory Approvals ......................................................................................................... 66

IMPLEMENTATION OF THE PLAN ....................................................................................... 68

    Timing of Implementation .................................................................................................. 68

    Implementation Steps ......................................................................................................... 68

    Distributions under the Plan ............................................................................................... 72

LIQUIDATION ASSESSMENT ............................................................................................... 78

STATUS OF CLAIMS PROCESS ............................................................................................. 78

MONITOR ................................................................................................................................. 78

## TABLE OF CONTENTS
(continued)

Page

RECOMMENDATION OF THE BOARD OF DIRECTORS .................................................................... 78

SUPPORT OF THE NOTEHOLDERS .......................................................................................................... 80

MEETING AND VOTING .................................................................................................................................. 80

    Meeting Order ........................................................................................................................................... 80

    Procedure for the Meeting ................................................................................................................... 80

    Classification of Creditors ................................................................................................................... 81

    Entitlement to Vote ................................................................................................................................ 81

    Solicitation of Proxies .......................................................................................................................... 82

    Appointment of Proxyholders and Voting ..................................................................................... 82

    Revocation of Proxies ........................................................................................................................... 83

    Advice to Beneficial Holders ............................................................................................................. 83

CERTAIN CANADIAN FEDERAL INCOME TAX CONSIDERATIONS ......................................... 84

    Residents of Canada .............................................................................................................................. 85

    Noteholders ............................................................................................................................................... 85

CERTAIN REGULATORY MATTERS RELATING TO THE PLAN ................................................... 87

    Canada ........................................................................................................................................................ 87

    United States ............................................................................................................................................. 87

RISK FACTORS ...................................................................................................................................................... 88

    Risks Relating to Non-Implementation of the Plan .................................................................... 88

    Risks Relating to the Plan and its Implementation ..................................................................... 88

    Risks Related to Securities of Newco .............................................................................................. 91

    Risk Factors Related To Muddy Waters' and OSC Allegations .............................................. 92

    Risks Related To Our Business .......................................................................................................... 93

    Risks Related to the PRC .................................................................................................................... 103

DOCUMENTS INCORPORATED BY REFERENCE ............................................................................. 107

SCHEDULE 'A' – FORM OF RESOLUTION

SCHEDULE 'B' – MEETING ORDER AND ENDORSEMENT

SCHEDULE 'C' – PLAN OF COMPROMISE AND REORGANIZATION

SCHEDULE 'D' – CLAIMS PROCEDURE ORDER

SCHEDULE 'E' – RESTRUCTURING SUPPORT AGREEMENT



## NOTICE TO AFFECTED CREDITORS OF SINO-FOREST CORPORATION

**NOTICE IS HEREBY GIVEN** that a plan of compromise and reorganization (as amended from time to time, the "**Plan**") has been filed with the Ontario Superior Court of Justice (Commercial List) (the "**Court**") in respect of Sino-Forest Corporation (the "**Applicant**") pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**").

A copy of the Plan is set out as a schedule to the meeting information statement dated October 20, 2012 (the "**Information Statement**") for the Meeting (as defined below).

**NOTICE IS ALSO HEREBY GIVEN** that a meeting of Affected Creditors (the "**Meeting**") will be held at 10:00 a.m. on November 29, 2012 (or such other date as may be set and announced in accordance with the Meeting Order) at the offices of Bennett Jones LLP, 3400 One First Canadian Place, Toronto, Ontario, for the purpose of considering and, if thought advisable, passing, with or without variation, a resolution to approve the Plan (the full text of which resolution is set out as a schedule to the Information Statement) and to transact such other business as may properly come before the Meeting (or any adjournment thereof). The Meeting is being held pursuant to the Order of the Court made on August 31, 2012 (the "**Meeting Order**"). A copy of the Meeting Order is set out as a schedule to the Information Statement. Capitalized terms used but not otherwise defined in this notice have the meaning ascribed to them in the Meeting Order.

The Plan must receive an affirmative vote of the Required Majority in order to be approved by the Affected Creditors. The Required Majority is a majority in number of Affected Creditors with Voting Claims, and two-thirds in value of the Voting Claims held by such Affected Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting. The Plan must also be sanctioned by a final order of the Court (the "**Sanction Order**") pursuant to the CCAA. Notice is also hereby given that, if the Plan is approved by the Required Majority at the Meeting, the Sanction Order will be sought in an application before the Court at 10:00 a.m. on December 7, 2012 and December 10, 2012 (or such other date after the Meeting as may be set by the Court), to seek approval of the Plan. If the Plan is approved by the Required Majority and sanctioned by the Court, then, subject to the satisfaction or waiver of the conditions to implementation of the Plan, all Persons referred to in the Plan (including the Affected Creditors) will receive the treatment set out in the Plan.

## AMENDMENTS TO THE PLAN

The Applicant may, at any time and from time to time prior to or at the Meeting, amend, restate, modify and/or supplement the Plan, subject to the terms of the Plan, provided that: (i) the Monitor, the Applicant or the Chair shall communicate the details of any such amendment, restatement and/or supplement to all Affected Creditors present at the Meeting prior to any vote being taken at the Meeting; (ii) the Applicant shall provide notice to the service list of any such amendment, restatement and/or supplement and shall file a copy thereof with this Court forthwith and in any event prior to the Sanction Hearing; and (iii) the Monitor shall post an electronic copy of any such amendment, restatement and/or supplement on its website forthwith and in any event prior to the hearing for the Sanction Order.

## COMPLETION OF PROXIES

Any Affected Creditor who is entitled to vote at the Meeting and that wishes to vote at the Meeting must complete, sign and return the applicable form of proxy enclosed with the Information Statement in the return envelope provided or by fax at the fax number below or by email in PDF format at the email address below. In order to be effective, a proxy must be deposited with the Monitor, at the address, fax or email below, at any time prior to 5:00 p.m. on the third Business Day before the Meeting (or any adjournment thereof).

The Monitor's contact information for the purpose of filing forms of proxy and for obtaining any additional information or materials related to the Meeting is:

FTI Consulting Canada Inc.
TD Waterhouse Tower

79 Wellington Street West, Suite 2010
P.O. Box 104
Toronto, Ontario  M5K 1G8

Attention: Jodi Porepa
Email: sfc@fticonsulting.com
Tel: (416) 649-8094

This notice is given by the Monitor pursuant to the Meeting Order.

You can also view copies of documents relating to this process on the following website http://cfcanada.fticonsulting.com/sfc/.

Dated at Toronto, Ontario this 20th day of October, 2012.



# MEETING INFORMATION STATEMENT

**relating to a proposed**

# PLAN OF COMPROMISE AND REORGANIZATION

**under the**

# *COMPANIES' CREDITORS ARRANGEMENT ACT* (CANADA)
**and the**
*CANADA BUSINESS CORPORATIONS ACT*

**concerning, affecting and involving**

# SINO-FOREST CORPORATION

# October 20, 2012

## IMPORTANT DISCLAIMERS

READERS ARE CAUTIONED THAT INFORMATION CONTAINED IN THIS INFORMATION STATEMENT MAY NOT BE RELIABLE. ON NOVEMBER 15, 2011, THE COMPANY ANNOUNCED THAT IT WAS DEFERRING THE RELEASE OF ITS INTERIM FINANCIAL STATEMENTS FOR THE THREE AND NINE MONTHS ENDED SEPTEMBER 30, 2011, BECAUSE CERTAIN ISSUES IDENTIFIED DURING THE REVIEW OF ITS INDEPENDENT COMMITTEE (AS DESCRIBED IN THE REPORTS OF THE INDEPENDENT COMMITTEE), WHICH WAS FORMED TO EXAMINE THE ALLEGATIONS CONTAINED IN THE MW REPORT, COULD NOT BE RESOLVED. ON JANUARY 10, 2012, THE COMPANY ISSUED A PRESS RELEASE CAUTIONING THAT ITS HISTORICAL FINANCIAL STATEMENTS AND RELATED AUDIT REPORTS COULD NOT BE RELIED UPON. ON APRIL 4, 2012, THE COMPANY'S AUDITOR RESIGNED AND A SUCCESSOR AUDITOR HAS NOT BEEN APPOINTED. ON MAY 22, 2012, STAFF OF THE OSC COMMENCED PROCEEDINGS BEFORE THE OSC AGAINST THE COMPANY AND SIX OF ITS FORMER OFFICERS. OSC STAFF ALLEGE THAT THE COMPANY BREACHED ONTARIO SECURITIES LAWS AND ACTED IN A MANNER THAT IS CONTRARY TO THE PUBLIC INTEREST BY PROVIDING INFORMATION TO THE PUBLIC IN DOCUMENTS REQUIRED TO BE FILED OR FURNISHED UNDER ONTARIO SECURITIES LAWS WHICH WAS FALSE OR MISLEADING IN A MATERIAL RESPECT CONTRARY TO SECTION 122 OF THE SECURITIES ACT AND BY ENGAGING OR PARTICIPATING IN ACTS, PRACTICES OR A COURSE OF CONDUCT RELATED TO ITS SECURITIES WHICH IT KNOWS OR REASONABLY OUGHT TO KNOW PERPETUATE A FRAUD ON ANY PERSON OR COMPANY CONTRARY TO SECTION 126.1 OF THE SECURITIES ACT. ON SEPTEMBER 26, 2012, SINO-FOREST ANNOUNCED THAT THE COMPANY HAD RECEIVED A SECOND ENFORCEMENT NOTICE FROM STAFF OF THE OSC, WHICH ADDED A FURTHER ALLEGATION SIMILAR IN NATURE TO THE ALLEGATIONS IN THE STATEMENT OF ALLEGATIONS IN RELATION TO THE COMPANY AND OTHERS POSTED ON THE OSC'S WEBSITE ON MAY 22, 2012. BASED ON THE CONTENTS OF OSC STAFF'S ENFORCEMENT NOTICES AND STATEMENT OF ALLEGATIONS, THE EVIDENCE DISCLOSED BY OSC STAFF, AND ALL OF THE EVIDENCE NOW KNOWN TO THE COMPANY, THERE MAY BE MERIT TO SOME OF THE ALLEGATIONS MADE AGAINST THE SIX FORMER OFFICERS OF THE COMPANY. THAT, IN TURN, COULD IMPACT THE INTEGRITY OF THE COMPANY'S HISTORICAL FINANCIAL AND OTHER DISCLOSURES.

THIS INFORMATION STATEMENT HAS BEEN PREPARED BASED ON THE INFORMATION AVAILABLE TO THE COMPANY AS AT THE DATE HEREOF. GIVEN THE ISSUES IDENTIFIED BY THE INDEPENDENT COMMITTEE WHICH HAVE NOT BEEN RESOLVED AND GIVEN THE SERIOUS NATURE OF THE ALLEGATIONS MADE BY OSC STAFF AND ALL OF THE EVIDENCE NOW KNOWN TO THE COMPANY, NO ASSURANCE CAN BE GIVEN THAT THIS INFORMATION STATEMENT DOES NOT CONTAIN A MISREPRESENTATION OR THAT IT CONTAINS FULL, TRUE AND PLAIN DISCLOSURE OF ALL MATERIAL FACTS RELATING TO THE COMPANY AND ITS SUBSIDIARIES.

THE INFORMATION CONCERNING NEWCO CONTAINED HEREIN IS BASED UPON INFORMATION PROVIDED BY THE NOTEHOLDER ADVISORS. ALTHOUGH THE COMPANY HAS NO KNOWLEDGE THAT WOULD INDICATE THAT ANY STATEMENTS CONTAINED HEREIN RELATING TO NEWCO ARE UNTRUE OR INCOMPLETE, THE COMPANY AND ITS DIRECTORS OR OFFICERS DISCLAIM ANY RESPONSIBILITY FOR THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION, OR FOR ANY FAILURE BY THE COMPANY TO DISCLOSE EVENTS OR FACTS THAT MAY HAVE OCCURRED OR WHICH MAY AFFECT THE SIGNIFICANCE OR ACCURACY OF ANY SUCH INFORMATION, BUT WHICH ARE UNKNOWN TO THE COMPANY.

## IMPORTANT INFORMATION

SUBJECT TO THE FOREGOING, THIS INFORMATION STATEMENT CONTAINS IMPORTANT INFORMATION THAT SHOULD BE READ BY AFFECTED CREDITORS BEFORE ANY DECISION IS MADE WITH RESPECT TO THE MATTERS REFERRED TO HEREIN.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION IN CONNECTION WITH THE MATTERS TO BE CONSIDERED AT THE MEETING

OTHER THAN THOSE CONTAINED IN THIS INFORMATION STATEMENT AND IF GIVEN OR MADE, ANY SUCH INFORMATION OR REPRESENTATION SHOULD BE CONSIDERED AS NOT HAVING BEEN AUTHORIZED AND MUST NOT BE RELIED UPON. THIS INFORMATION STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO PURCHASE, THE SECURITIES DESCRIBED IN THIS INFORMATION STATEMENT, OR THE SOLICITATION OF A PROXY, IN ANY JURISDICTION, TO OR FROM ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER, SOLICITATION OF AN OFFER OR PROXY SOLICITATION IN SUCH JURISDICTION. NEITHER THE DELIVERY OF THIS INFORMATION STATEMENT NOR ANY DISTRIBUTION OF THE SECURITIES PURSUANT TO THE PLAN REFERRED TO IN THIS INFORMATION STATEMENT SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THIS INFORMATION STATEMENT.

Affected Creditors should not construe the contents of this Information Statement as investment, legal or tax advice. An Affected Creditor should consult its own legal, financial, tax or other professional advisors with respect to the legal, tax, business, financial and related consequences of the Plan for such Affected Creditor. In making a decision regarding the Plan, Affected Creditors must rely on their own examination of the SFC Companies and the advice of their own advisors. Affected Creditors should seek advice from their own advisors concerning the income tax consequences of the Plan.

The solicitation presented in this Information Statement does not extend to Affected Creditors residing in jurisdictions where solicitations for proxies under this Information Statement are unlawful, or to Affected Creditors to whom it is unlawful to direct these types of activities. The solicitation for proxies for the implementation of the Plan is being made on the basis of this Information Statement and is subject to the terms and conditions described herein.

Each Affected Creditor must comply with all applicable laws and regulations in force in any jurisdiction in which it participates in the solicitation for proxies for the Resolution approving the Plan, or in which it possesses or distributes this Information Statement, and must obtain any consent, approval or permission required by it for participation in the solicitation for proxies for the Resolution approving the Plan under the laws and regulations in force in any jurisdiction to which it is subject, and none of the SFC Companies or the Monitor nor any of their respective representatives shall have any responsibility therefor.

The information contained in this Information Statement is given as of October 20, 2012, unless otherwise specifically stated, and is subject to change or amendment without notice. Any statement contained in this Information Statement, a document incorporated by reference or referred to in this Information Statement, or any amendment hereof or supplement hereto, is to be considered modified or replaced to the extent that a statement contained herein or in any amendment or supplement or any subsequently filed document modifies or replaces such statement. Any statement so modified or replaced is not to be considered, except as so modified or replaced, to be a part of this Information Statement.

All summaries of and references to certain documents in this Information Statement, including the summary of the Plan in this Information Statement, are qualified in their entirety by reference to the complete text of each of those documents. Copies of documents referred to herein are either attached as Schedules hereto or will be made available to Affected Creditors upon request to the Monitor. Affected Creditors are urged to carefully read the full text of the Plan attached hereto as Schedule C. Copies of all Court documents are posted on the Website.

Affected Creditors are urged to carefully read the "*Risk Factors*" section of this Information Statement before making any decision regarding the Plan.

THE ISSUANCE OF THE PLAN SECURITIES PURSUANT TO THE PLAN WILL BE EXEMPT FROM THE PROSPECTUS REQUIREMENTS UNDER APPLICABLE CANADIAN SECURITIES LEGISLATION. AS A CONSEQUENCE OF THESE EXEMPTIONS, CERTAIN PROTECTIONS, RIGHTS AND REMEDIES PROVIDED BY CANADIAN SECURITIES LEGISLATION, INCLUDING STATUTORY RIGHTS OF RESCISSION OR DAMAGES, WILL NOT BE AVAILABLE IN RESPECT OF THE NEW SECURITIES TO BE ISSUED IN CONNECTION WITH THE PLAN. THE NEW SECURITIES TO BE ISSUED IN CONNECTION

**212**

WITH THE PLAN WILL BE SUBJECT TO RESTRICTIONS ON TRANSFER. SEE "CERTAIN REGULATORY MATTERS RELATING TO THE RESTRUCTURING."

All references to this Information Statement shall be deemed to include the Schedules attached hereto.

### INFORMATION FOR UNITED STATES CREDITORS

Sino-Forest is a corporation governed by the laws of Canada. The proxy solicitation rules under the United States 1934 Act are not applicable to Sino-Forest or this solicitation, and, accordingly, this solicitation is not being effected in accordance with such rules. Affected Creditors in the United States should be aware that disclosure requirements in proxy statements under Canadian securities laws are different from requirements under United States federal securities laws.

**NEITHER THE PLAN NOR THE NEW SECURITIES ISSUABLE IN CONNECTION WITH THE PLAN HAVE BEEN APPROVED OR DISAPPROVED BY THE SEC, ANY U.S. STATE SECURITIES REGULATORY AUTHORITY OR ANY U.S. BANKRUPTCY COURT, NOR HAS THE SEC, ANY U.S. SECURITIES REGULATORY AUTHORITY OR ANY U.S. BANKRUPTCY COURT PASSED UPON THE FAIRNESS OR MERITS OF THE PLAN OR UPON THE ADEQUACY, COMPLETENESS OR ACCURACY OF THE INFORMATION CONTAINED IN THIS INFORMATION STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE.**

This Information Statement does not discuss any United States federal or state tax consequences of the Restructuring. Certain information concerning Canadian federal income tax consequences of the Restructuring for Securityholders who are not resident in Canada is set forth under the heading "*Certain Canadian Federal Income Tax Considerations*". Securityholders resident in the United States should be aware that the transactions contemplated herein may have tax consequences both in Canada and the United States. Such consequences are not described herein. Securityholders should consult with their own tax advisors with respect to their particular circumstances and the tax considerations applicable to them.

The Plan Securities to be delivered pursuant to the Plan have not been registered under the United States 1933 Act or the securities laws of any state of the United States and are being delivered in reliance on the exemption from registration set forth in Section 3(a)(10) of the United States 1933 Act on the basis of the approval of the Court, which will consider, among other things, the fairness of the Plan to the persons affected. See "Certain Regulatory Matters relating to the Restructuring".

The enforcement by Affected Creditors of civil liabilities under the United States federal securities laws may be affected adversely by the fact that all of the SFC Companies are incorporated or organized outside the United States, that none of their officers or directors are residents of the United States, that all or a substantial portion of the assets of the SFC Companies and of their officers and directors are located outside the United States and that the experts named in this Information Statement are not residents of the United States. Affected Creditors may not be able to sue a corporation governed by the laws of Canada in a Canadian court for violations of the United States federal securities laws and it may be difficult to compel the foregoing persons to subject themselves to a judgment by a United States court.

### CAUTIONARY NOTICE REGARDING FORWARD LOOKING INFORMATION

This Information Statement contains forward-looking information within the meaning of applicable Canadian provincial securities laws ("forward-looking statements"), including forward-looking statements relating to: the Company's belief that the successful transition of assets from a BVI model to a WFOE model has many merits; the Company's expectations with respect to the costs in connection with any "on-shoring" process undertaken by Sino-Forest; the Company's expectations regarding the proposed Plan involving the Company and the expected terms of, treatment of claims under and consideration payable pursuant to such Plan; the Company's expectations with respect to timing of the meeting of Affected Creditors to consider the Plan; and Sino-Forest's intentions with respect to the timing of completion of the Plan. The forward looking statements expressed or implied by this Information Statement are subject to important risks and uncertainties. When used in this Information Statement, the words

"expect", "anticipate", "may", "will", "should", "intend", "believe", "plan" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such words. Forward-looking statements are based on estimates and assumptions made by the Company in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors that the Company believes are appropriate in the circumstances. The results or events predicted in these statements may differ materially from actual results or events and are not guarantees of future performance of Sino-Forest. Factors which could cause results or events to differ from current expectations include, among other things: the Company's ability to complete the Plan in the time period contemplated, if at all, which is dependent on its ability to comply with the closing conditions to the Plan, many of which are significant and beyond the control of Sino-Forest, including the approval of the Court, the Company's creditors and securities and other regulatory authorities; orders of the Court in the CCAA Proceedings; actions taken against the Company by governmental agencies and securities and other regulators; actions taken by the Company's Noteholders, lenders, creditors, shareholders, and other stakeholders to enforce their rights; the outcome of examinations and proceedings currently underway by law enforcement and securities regulatory authorities; the outcome of class action or other proceedings which have been or may in future be initiated against the Company; the accuracy and outcome of the results of tree asset verification testing undertaken by the Company; the Company's reliance on key employees; the Company's ability to acquire rights to additional standing timber; the cyclical nature of the forest products industry and price fluctuation in and the demand and supply of logs; the Company's reliance on the relationship with local plantation land owners and/or plantation land use rights holders, authorized intermediaries, key customers, suppliers and third party service providers; the Company's ability to operate its production facilities on a profitable basis; changes in currency exchange rates and interest rates; the evaluation of the Company's provision for income and related taxes; economic, political and social conditions and government policy in the PRC, the Republic of Suriname and New Zealand; the risks identified in the "*Risk Factors*" section of this Information Statement; and other factors not currently viewed as material that could cause actual results to differ materially from those described in the forwarding-looking statements. The Company disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## EXCHANGE RATES

In this Information Statement, unless otherwise specified, all references to "dollars" or "$" are to Canadian dollars and all references to "U.S. dollars" or to "U.S.$" are to United States dollars. Unless specifically provided for in the Plan or the Sanction Order, all payments and distributions to be made in cash shall be made in Canadian dollars.

Any Claims or other amounts denominated in a foreign currency shall be converted to Canadian dollars at the Reuters closing rate on the Filing Date, being March 30, 2012. On March 30, 2012, Reuters closing rate in Canadian dollars was $0.9978 for each U.S.$1.00.

## GLOSSARY OF TERMS

Unless the context otherwise requires, when used in this Information Statement the following terms shall have the meanings set forth below. Words importing the singular shall include the plural and vice versa, and words importing any gender shall include all genders.

"**2011 Results**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Events Leading to the Commencement of CCAA Proceedings – Restructuring Support Agreements with Noteholders*".

"**2013 Note Indenture**" means the indenture dated as of July 23, 2008, by and between SFC, the entities listed as subsidiary guarantors therein, and The Bank of New York Mellon, as trustee, as amended, modified or supplemented.

"**2014 Note Indenture**" means the indenture dated as of July 27, 2009, by and between SFC, the entities listed as subsidiary guarantors therein, and Law Debenture Trust Company of New York, as trustee, as amended, modified or supplemented.

"**2016 Note Indenture**" means the indenture dated as of December 17, 2009, by and between SFC, the entities listed as subsidiary guarantors therein, and The Bank of New York Mellon, as trustee, as amended, modified or supplemented.

"**2017 Note Indenture**" means the indenture dated as of October 21, 2010, by and between SFC, the entities listed as subsidiary guarantors therein, and Law Debenture Trust Company of New York, as trustee, as amended, modified or supplemented.

"**2013 Notes**" means the aggregate principal amount of U.S.$345,000,000 of 5.00% Convertible Senior Notes Due 2013 issued pursuant to the 2013 Note Indenture.

"**2014 Notes**" means the aggregate principal amount of U.S.$399,517,000 of 10.25% Guaranteed Senior Notes Due 2014 issued pursuant to the 2014 Note Indenture.

"**2016 Notes**" means the aggregate principal amount of U.S.$460,000,000 of 4.25% Convertible Senior Notes Due 2016 issued pursuant to the 2016 Note Indenture.

"**2017 Notes**" means the aggregate principal amount of U.S.$600,000,000 of 6.25% Guaranteed Senior Notes Due 2017 issued pursuant to the 2017 Note Indenture.

"**Accrued Interest**" means, in respect of any series of Notes, all accrued and unpaid interest on such Notes, at the regular rates provided in the applicable Note Indentures, up to and including the Filing Date.

"**Administration Charge**" means the administration charge granted pursuant to the Initial Order pursuant to which the Monitor, counsel to the Monitor, counsel to SFC, counsel to the directors of SFC, Houlihan, FTI HK, and the Noteholder Advisors were granted a charge not exceeding an aggregate amount of $15,000,000 on the property of SFC (other than certain excluded property), as security for their professional fees and disbursements incurred at their respective standard rates and charges in respect of such services, both before and after the making of the Interim Order.

"**Administration Charge Reserve**" means the cash reserve to be established by SFC on the Plan Implementation Date in an amount acceptable to the Persons secured by the Administration Charge (having regard to, among other things, any retainers held by Persons secured by the Administration Charge), which cash reserve: (i) shall be maintained and administered by the Monitor, in trust, for the purpose of paying any amounts secured by the Administration Charge; and (ii) upon the termination of the Administration Charge pursuant to the Plan, shall stand in place of the Administration Charge as security for the payment of any amounts secured by the Administration Charge.

"**Affected Claim**" means any Claim, D&O Claim or D&O Indemnity Claim that is not: an Unaffected Claim; a Section 5.1(2) D&O Claim; a Conspiracy Claim; a Continuing Other D&O Claim; a Non-Released D&O Claim; or a Subsidiary Intercompany Claim, and "Affected Claim" includes any Class Action Indemnity Claim.  For greater certainty, all of the following are Affected Claims: Affected Creditor Claims; Equity Claims; Noteholder Class Action Claims (other than the Continuing Noteholder Class Action Claims); and Class Action Indemnity Claims.

"**Affected Creditor**" means a Person with an Affected Creditor Claim, but only with respect to and to the extent of such Affected Creditor Claim.

"**Affected Creditor Claim**" means any Ordinary Affected Creditor Claim or Noteholder Claim.

"**Affected Creditors Class**" has the meaning given in this Information Statement under the heading "*Description of the Plan – Classification of Creditors*".

"**Affected Creditors Equity Sub-Pool**" means an amount of Newco Shares representing 92.5% of the Newco Equity Pool.

"**AIs**" has the meaning given in this Information Statement under the heading "*Information Regarding Sino Forest - Business Model – The BVI Model*".

"**AI Agreements**" has the meaning given in this Information Statement under the heading "*Risk Factors – Risks Related to Our Business*".

"**Alternative Sale Transaction**" has the meaning given in this Information Statement under the heading "*Description of the Plan – Alternative Sale Transaction*".

"**Alternative Sale Transaction Consideration**" has the meaning given in this Information Statement under the heading "*Description of the Plan – Alternative Sale Transaction*".

"**AML**" has the meaning given in this Information Statement under the heading "*Required Approvals Under the CCAA and Other Conditions to Implementation – Regulatory Approvals – PRC Antimonopoly Law Approval*".

"**Applicable Law**" means any applicable law, statute, order, decree, consent decree, judgment, rule, regulation, ordinance or other pronouncement having the effect of law whether in Canada, the United States, Hong Kong, the PRC or any other country, or any domestic or foreign state, county, province, city or other political subdivision or of any Governmental Entity.

"**Auditors**" means the former auditors of SFC that are named as defendants to the Class Actions Claims, including for greater certainty Ernst & Young LLP and BDO Limited.

"**Authorized Sales Activities**" has the meaning given in this Information Statement under the heading "*Risk Factors – Risks Related to Our Business*".

"**Barbados Loans**" means the aggregate amount outstanding at the date hereof pursuant to three loans made by SFC Barbados to SFC in the amounts of U.S.$65,997,468.10 on February 1, 2011, U.S.$59,000,000 on June 7, 2011 and U.S.$176,000,000 on June 7, 2011.

"**Barbados Property**" has the meaning given in this Information Statement under the heading "*Implementation of the Plan – Implementation Steps*".

"**Beneficial Noteholder**" means a beneficial owner of any Notes as at the Voting Record Date (or, if applicable, an investment advisor, manager or representative with voting discretion over the Notes owned by such beneficial owners), regardless of whether such beneficial owner is a Registered Noteholder or an Unregistered Noteholder.

"**BIA**" means the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended.

"**Board**" or "**Board of Directors**" means the board of directors of SFC.

"**Business Day**" means a day, other than Saturday, Sunday or a statutory holiday, on which banks are generally open for business in Toronto, Ontario.

"**BVI**" means the British Virgin Islands.

"**BVI Entities**" has the meaning given in this Information Statement under the heading "*Information Regarding Sino Forest - Business Model - Plantation / Timber Rights in the PRC*".

"**Canadian Holders**" has the meaning given in this Information Statement under the heading "*Certain Canadian Federal Income Tax Considerations – Residents of Canada*".

"**Canadian Tax Act**" means the *Income Tax Act* (Canada) and the Income Tax Regulations, in each case as amended from time to time.

"**CBCA**" means the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, as amended.

"**CCAA**" means the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended.

"**CCAA Proceedings**" means the proceedings commenced by SFC under the CCAA on the Filing Date in the Ontario Superior Court of Justice (Commercial List) under court file number CV-12-9667-00CL.

"**Chair**" has the meaning given in this Information Statement under the heading "*Meeting and Voting – Procedure for the Meeting*".

"**Charges**" means the Administration Charge and the Directors' Charge.

"**CJV**" means a Sino-foreign cooperative joint venture enterprise with limited liability established in the PRC under the relevant PRC laws and regulations which provides, among other things, that the distribution of profit or loss and the control of the joint venture company is entirely based on the joint venture contract and not on the joint venture parties' contributions to the registered capital of the joint venture.

"**Claim**" means any right or claim of any Person that may be asserted or made against SFC, in whole or in part, whether or not asserted or made, in connection with any indebtedness, liability or obligation of any kind whatsoever, and any interest accrued thereon or costs payable in respect thereof, including by reason of the commission of a tort (intentional or unintentional), by reason of any breach of contract or other agreement (oral or written), by reason of any breach of duty (including any legal, statutory, equitable or fiduciary duty) or by reason of any right of ownership of or title to property or assets or right to a trust or deemed trust (statutory, express, implied, resulting, constructive or otherwise), and whether or not any indebtedness, liability or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, present or future, known or unknown, by guarantee, surety or otherwise, and whether or not any right or claim is executory or anticipatory in nature, including any right or ability of any Person (including any Directors or Officers of SFC or any of the Subsidiaries) to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation, and any interest accrued thereon or costs payable in respect thereof (A) is based in whole or in part on facts prior to the Filing Date, (B) relates to a time period prior to the Filing Date, or (C) is a right or claim of any kind that would be a claim provable against SFC in bankruptcy within the meaning of the BIA had SFC become bankrupt on the Filing Date, or is an Equity Claim, a Noteholder Class Action Claim against SFC, a Class Action Indemnity Claim against SFC, a Restructuring Claim or a Lien Claim, provided, however, that "Claim" shall not include a D&O Claim or a D&O Indemnity Claim.

"**Claims Bar Date**" has the meaning ascribed thereto in the Claims Procedure Order.

"**Claims Procedure**" means the procedure established for determining the amount and status of Claims, D&O Claims and D&O Indemnity Claims, including in each case any such claims that are Unresolved Claims, pursuant to the Claims Procedure Order.

"**Claims Procedure Order**" means the Order under the CCAA of the Honourable Justice Morawetz dated May 14, 2012, establishing, among other things, a claims procedure in respect of SFC and calling for claims in respect of the Subsidiaries, as such Order may be amended, restated or varied from time to time.

"**Class Action Claims**" means, collectively, any rights or claims of any kind advanced or which may subsequently be advanced in the Class Actions or in any other similar proceeding, whether a class action proceeding or otherwise and, for greater certainty includes any Noteholder Class Action Claims.

"**Class Actions**" means, collectively, the following proceedings: (i) *Trustees of the Labourers' Pension Fund of Central and Eastern Canada et al v. Sino-Forest Corporation et al.* (Ontario Superior Court of Justice, Court File No. CV-11-431153-00CP); (ii) *Guining Liu v. Sino-Forest Corporation et al.* (Quebec Superior Court, Court File No. 200-06-000132-111); (iii) *Allan Haigh v. Sino-Forest Corporation et al.* (Saskatchewan Court of Queen's

Bench, Court File No. 2288 of 2011); and (iv) *David Leapard et al. v. Allen T.Y. Chan et al.* (District Court of the Southern District of New York, Court File No. 650258/2012).

"**Class Action Court**" means, with respect to the Class Action Claims, the court of competent jurisdiction that is responsible for administering the applicable Class Action Claim.

"**Class Action Indemnity Claim**" means any right or claim of any Person that may be asserted or made in whole or in part against SFC and/or any Subsidiary for indemnity, contribution, reimbursement or otherwise from or in connection with any Class Action Claim asserted against such Person. For greater certainty, Class Action Indemnity Claims are distinct from and do not include Class Action Claims.

"**Common Shares**" means common shares in the capital of SFC.

"**Consent Date**" means May 15, 2012.

"**Conspiracy Claim**" means any D&O Claim alleging that the applicable Director or Officer committed the tort of civil conspiracy, as defined under Canadian common law.

"**Consultants**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Asset Verification Process*".

"**Continuing Noteholder Class Action Claim**" means any Noteholder Class Action Claim that is: (i) a Section 5.1(2) D&O Claim; (ii) a Conspiracy Claim; (iii) a Non-Released D&O Claim; (iv) a Continuing Other D&O Claim; (v) a Noteholder Class Action Claim asserted against one or more Third Party Defendants that is not an Indemnified Noteholder Class Action Claim; (vi) the portion of an Indemnified Noteholder Class Action Claim that is permitted to continue against the Third Party Defendants, subject to the Indemnified Noteholder Class Action Limit, pursuant to section 4.4(b)(i) of the Plan.

"**Continuing Other D&O Claim**" has the meaning given in this Information Statement under the heading "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan – D&O Claims*".

"**Court**" means the Ontario Superior Court of Justice (Commercial List).

"**CRA**" means the Canada Revenue Agency, and any successor agency thereto.

"**D&O Claim**" means (i) any right or claim of any Person that may be asserted or made in whole or in part against one or more Directors or Officers of SFC that relates to a Claim for which such Directors or Officers are by law liable to pay in their capacity as Directors or Officers of SFC, or (ii) any right or claim of any Person that may be asserted or made in whole or in part against one or more Directors or Officers of SFC, in that capacity, whether or not asserted or made, in connection with any indebtedness, liability or obligation of any kind whatsoever, and any interest accrued thereon or costs payable in respect thereof, including by reason of the commission of a tort (intentional or unintentional), by reason of any breach of contract or other agreement (oral or written), by reason of any breach of duty (including any legal, statutory, equitable or fiduciary duty and including, for greater certainty, any monetary administrative or other monetary penalty or claim for costs asserted against any Officer or Director of SFC by any Government Entity) or by reason of any right of ownership of or title to property or assets or right to a trust or deemed trust (statutory, express, implied, resulting, constructive or otherwise), and whether or not any indebtedness, liability or obligation, and any interest accrued thereon or costs payable in respect thereof, is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, present or future, known or unknown, by guarantee, surety or otherwise, and whether or not any right or claim is executory or anticipatory in nature, including any right or ability of any Person to advance a claim for contribution or indemnity from any such Directors or Officers of SFC or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation, and any interest accrued thereon or costs payable in respect thereof (A) is based in whole or in part on facts prior to the Filing Date, or (B) relates to a time period prior to the Filing Date.

"**D&O Indemnity Claim**" means any existing or future right of any Director or Officer of SFC against SFC that arose or arises as a result of any Person filing a D&O Proof of Claim (as defined in the Claims Procedure Order) in respect of such Director or Officer of SFC for which such Director or Officer of SFC is entitled to be indemnified by SFC.

"**Defence Costs**" has the meaning given in this Information Statement under the heading "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan – Defence Costs*".

"**Direct Subsidiaries**" means, collectively, Sino-Panel Holdings Limited, Sino-Global Holdings Inc., Sino-Panel Corporation, Sino-Capital Global Inc., SFC Barbados, Sino-Forest Resources Inc. Sino-Wood Partners, Limited.

"**Direct Subsidiary Shares**" has the meaning given in this Information Statement under the heading "*Implementation of the Plan – Implementation Steps*".

"**Director**" means, with respect to SFC or any Subsidiary, anyone who is or was, or may be deemed to be or have been, whether by statute, operation of law or otherwise, a director or *de facto* director of such SFC Company.

"**Directors' Charge**" means the directors' charge granted pursuant to the Initial Order, pursuant to which the directors and officers of SFC were granted a charge not exceeding an aggregate amount of $3,200,000 on the property of SFC (other than certain excluded property), as security for the indemnity provided for in the Initial Order.

"**Directors' Charge Reserve**" means the cash reserve to be established by SFC on the Plan Implementation Date in an amount acceptable to SFC, the Monitor, Osler Hoskin & Harcourt LLP and the Initial Consenting Noteholders, which cash reserve: (i) shall be maintained by the Monitor, in trust, for the purpose of paying any amounts secured by the Directors' Charge; and (ii) upon the termination of the Directors' Charge pursuant to the Plan, shall stand in place of the Directors' Charge as security for the payment of any amounts secured by the Directors' Charge.

"**Distribution Date**" means the date or dates from time to time set in accordance with the provisions of the Plan to effect distributions in respect of the Proven Claims, excluding the Initial Distribution Date.

"**Distribution Escrow Position**" has the meaning given in this Circular under the heading "*Implementation of the Plan – Distributions Under the Plan – Distribution Mechanics with respect to Newco Shares and Newco Notes*".

"**Distribution Record Date**" means the Plan Implementation Date, or such other date as SFC, the Monitor and the Initial Consenting Noteholders may agree.

"**Direct Registration Account**" means, if applicable, a direct registration account administered by the Transfer Agent in which those Persons entitled to receive Newco Shares and/or Newco Notes pursuant to the Plan will hold such Newco Shares and/or Newco Notes in registered form.

"**Direct Registration Transaction Advice**" means, if applicable, a statement delivered by the Monitor, the Trustees, the Transfer Agent or any such Person's agent to any Person entitled to receive Newco Shares or Newco Notes pursuant to the Plan on the Initial Distribution Date and each subsequent Distribution Date, as applicable, indicating the number of Newco Shares and/or Newco Notes registered in the name of or as directed by the applicable Person in a Direct Registration Account.

"**DTC**" means The Depository Trust Company, or any successor thereof.

"**E&Y**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Events Leading to the Commencement of CCAA Proceedings – Gating Issues to an Audit*".

"**Early Consent Equity Sub-Pool**" means an amount of Newco Shares representing 7.5% of the Newco Equity Pool.

"**Early Consent Noteholder**" means any Noteholder that: (a) (i) as confirmed by the Monitor on June 12, 2012, executed the (A) Support Agreement, (B) a support agreement with SFC and the Direct Subsidiaries in the form of the Support Agreement or (C) a joinder agreement in the form attached as Schedule C to the Support Agreement; (ii) provided evidence satisfactory to the Monitor in accordance with section 2(a) of the Support Agreement of the Notes held by such Noteholder as at the Consent Date (the "**Early Consent Notes**"), as such list of Noteholders and Notes held has been verified and is maintained by the Monitor on a confidential basis; and (iii) continues to hold such Early Consent Notes as at the Distribution Record Date; or (b) (i) has acquired Early Consent Notes; (ii) has signed the necessary transfer and joinder documentation as required by the Support Agreement and has otherwise acquired such Early Consent Notes in compliance with the Support Agreement; and (iii) continues to hold such Early Consent Notes as at the Distribution Record Date.

"**Effective Time**" means 8:00 a.m. (Toronto time) on the Plan Implementation Date or such other time on such date as SFC, the Monitor and the Initial Consenting Noteholders may agree.

"**Employee Priority Claims**" means the following Claims of employees and former employees of SFC: (a) Claims equal to the amounts that such employees and former employees would have been qualified to receive under paragraph 136(1)(d) of the BIA if SFC had become bankrupt on the Filing Date; and (b) Claims for wages, salaries, commissions or compensation for services rendered by them after the Filing Date and on or before the Plan Implementation Date.

"**Encumbrance**" means any security interest (whether contractual, statutory, or otherwise), hypothec, mortgage, trust or deemed trust (whether contractual, statutory, or otherwise), lien, execution, levy, charge, demand, action, liability or other claim, action, demand or liability of any kind whatsoever, whether proprietary, financial or monetary, and whether or not it has attached or been perfected, registered or filed and whether secured, unsecured or otherwise, including: (i) any of the Charges; and (ii) any charge, security interest or claim evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system.

"**Enforcement Notices**" means the enforcement notices delivered by OSC staff to SFC and the Individual Respondents.

"**Equity Cancellation Date**" means the date that is the first Business Day at least 31 days after the Plan Implementation Date, or such other date as may be agreed to by SFC, the Monitor and the Initial Consenting Noteholders.

"**Equity Claim**" means a Claim that meets the definition of "equity claim" in section 2(1) of the CCAA and, for greater certainty, includes any of the following: (a) any claim against SFC resulting from the ownership, purchase or sale of an equity interest in SFC, including the claims by or on behalf of current or former shareholders asserted in the Class Actions; (b) any indemnification claim against SFC related to or arising from the claims described in sub-paragraph (a), including any such indemnification claims against SFC by or on behalf of any and all of the Third Party Defendants (other than for Defence Costs, unless any such claims for Defence Costs have been determined to be Equity Claims subsequent to the date of the Equity Claims Order); and (c) any other claim that has been determined to be an Equity Claim pursuant to an Order of the Court.

"**Equity Claimant**" means any Person having an Equity Claim, but only with respect to and to the extent of such Equity Claim.

"**Equity Claims Order**" means the Order under the CCAA of the Honourable Justice Morawetz dated July 27, 2012, in respect of Shareholder Claims and Related Indemnity Claims against SFC, as such terms are defined therein.

"**Equity Interest**" has the meaning set forth in section 2(1) of the CCAA.

"**Excluded SFC Assets**" means (i) the rights of SFC to be transferred to the Litigation Trust in accordance with the Plan; (ii) any entitlement to insurance proceeds in respect of insured Claims, Section 5.1(2) D&O Claims and/or Conspiracy Claims; (iii) any secured property of SFC that is to be returned in satisfaction of a Lien Claim pursuant

to the Plan; (iv) any input tax credits or other refunds received by SFC after the Effective Time; and (v) cash in the aggregate amount of (and for the purpose of): (A) the Litigation Funding Amount; (B) the Unaffected Claims Reserve; (C) the Administration Charge Reserve; (D) the Directors' Charge Reserve; (E) the Expense Reimbursement; (F) any amounts in respect of Lien Claims to be paid in accordance with the Plan; (G) the Monitor's Post-Implementation Reserve; (vi) any office space, office furniture or other office equipment owned or leased by SFC in Canada;  (vii) the SFC Escrow Co. Share; (viii) Newco Promissory Note 1; and (ix) Newco Promissory Note 2.

"**Existing Shares**" means all existing shares in the equity of SFC issued and outstanding immediately prior to the Effective Time and all warrants, options or other rights to acquire such shares, whether or not exercised as at the Effective Time.

"**Expense Reimbursement**" means the aggregate amount of (i) the reasonable and documented fees and expenses of the Noteholder Advisors, pursuant to their respective engagement letters with SFC, and other advisors as may be agreed to by SFC and the Initial Consenting Noteholders and (ii) the reasonable fees and expenses of the Initial Consenting Noteholders incurred in connection with the negotiation and development of the Support Agreement and the Plan, including in each case an estimated amount for any such fees and expenses expected to be incurred in connection with the implementation of the Plan, and in the case of (ii) above, including an aggregate work fee of up to $5 million (which work fee may, at the request of the Monitor, be paid by any of the Subsidiaries instead of SFC).

"**Filing Date**" means March 30, 2012.

"**Final Report**" has the meaning given in this Information Statement under the heading "*Documents Incorporated by Reference*".

"**First Interim Report**" has the meaning given in this Information Statement under the heading "*Documents Incorporated by Reference*".

"**FTI HK**" means FTI Consulting (Hong Kong) Limited.

"**Government Priority Claims**" means all Claims of Governmental Entities in respect of amounts that were outstanding as of the Plan Implementation Date and that are of a kind that could be subject to a demand under: (a) subsections 224(1.2) of the Canadian Tax Act; (b) any provision of the *Canada Pension Plan* or the *Employment Insurance Act* (Canada) that refers to subsection 224(1.2) of the Canadian Tax Act and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or employee's premium or employer's premium as defined in the *Employment Insurance Act* (Canada), or a premium under Part VII.1 of that Act, and of any related interest, penalties or other amounts; or (c) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the Canadian Tax Act, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum: (i)  has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the Canadian Tax Act; or (ii) is of the same nature as a contribution under the Canada Pension Plan if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

"**Governmental Entity**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity: (a) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them; or (b) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**Greenheart**" means Greenheart Group Limited, a company established under the laws of Bermuda.

"**Greenheart Group**" means Greenheart and its subsidiaries.

"**HKSFC**" means the Hong Kong Securities and Futures Commission.

"**Houlihan**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Commencement of CCAA Proceedings*".

"**Indemnified Noteholder Class Action Claims**" has the meaning given in this Information Statement under the heading "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan – Noteholder Class Action Claimants*".

"**Indemnified Noteholder Class Action Limit**" an amount agreed to by SFC, the Monitor, the Initial Consenting Noteholders and counsel to the Ontario Class Action Plaintiffs, or such other amount as is determined by the Court.

"**Independent Committee**" means the committee formed by the Board to examine the allegations contained in the MW Report, consisting entirely of directors independent from management of Sino-Forest.

"**Independent Committee Reports**" means the First Interim Report, the Second Interim Report and the Final Report.

"**Individual Respondents**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – OSC Proceedings*".

"**Indufor**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Asset Verification Process*".

"**Information Statement**" means this meeting information statement of SFC, including the notice of meeting and all schedules hereto.

"**Initial Consenting Noteholders**" means the Noteholders that executed the Support Agreement on March 30, 2012.

"**Initial Distribution Date**" means a date no more than ten Business Days after the Plan Implementation Date or such other date as SFC, the Monitor and the Initial Consenting Noteholders may agree.

"**Initial Newco Shareholder**" means a Person to be determined by the Initial Consenting Noteholders prior to the Effective Time, with the consent of SFC and the Monitor, to serve as the initial sole shareholder of Newco pursuant to the Plan.

"**Initial Order**" means the initial Order granted on the Filing Date by the Honourable Justice Morawetz of the Court in respect of SFC pursuant to the CCAA, as amended, restated or varied from time to time.

"**Insurance Policies**" means, collectively, the following insurance policies, as well as any other insurance policy pursuant to which SFC or any Director or Officer is insured: ACE INA Insurance Policy Number DO024464; Chubb Insurance Company of Canada Policy Number 8209-4449; Lloyds of London, England Policy Number XTFF0420; Lloyds of London, England Policy Number XTFF0373; and Travelers Guarantee Company of Canada Policy Number 10181108, and "**Insurance Policy**" means any one of the Insurance Policies.

"**Insured Claim**" means all or that portion of any Claim for which SFC is insured and all or that portion of any D&O Claim for which the applicable Director or Officer is insured, in each case pursuant to any of the Insurance Policies.

"**Intellectual Property**" means: (i) patents, and applications for patents, including divisional and continuation patents; (ii) registered and unregistered trade-marks, logos and other indicia of origin, pending trade-mark registration applications, and proposed use application or similar reservations of marks, and all goodwill associated therewith; (iii) registered and unregistered copyrights, including all copyright in and to computer software programs, and applications for and registration of such copyright (including all copyright in and to the SFC Companies' websites); (iv) world wide web addresses and internet domain names, applications and reservations for world wide

web addresses and internet domain names, uniform resource locators and the corresponding internet sites; (v) industrial designs; and (vi) trade secrets and proprietary information not otherwise listed in (i) through (v) above, including all inventions (whether or not patentable), invention disclosures, moral and economic rights of authors and inventors (however denominated), confidential information, technical data, customer lists, corporate and business names, trade names, trade dress, brand names, know-how, formulae, methods (whether or not patentable), designs, processes, procedures, technology, business methods, source codes, object codes, computer software programs (in either source code or object code form), databases, data collections and other proprietary information or material of any type, and all derivatives, improvements and refinements thereof, howsoever recorded, or unrecorded.

"**Letter of Instruction**" means a form, to be completed by each Ordinary Affected Creditor and each Early Consent Noteholder, and that is to be delivered to the Monitor in accordance with the Plan, which form shall set out: (a) the registration details for the Newco Shares and, if applicable, Newco Notes to be distributed to such Ordinary Affected Creditor or Early Consent Noteholder in accordance with the Plan; and (b) the address to which such Affected Creditor's or Early Consent Noteholder's Direct Registration Transaction Advice or its Newco Share Certificates and Newco Note Certificates, as applicable, are to be delivered.

"**Lien Claim**" means any Proven Claim of a Person indicated as a secured creditor in Schedule "B" to the Initial Order (other than the Trustees) that is secured by a lien or encumbrance on any property of SFC, which lien is valid, perfected and enforceable pursuant to Applicable Law, provided that the Charges and any Claims in respect of Notes shall not constitute "Lien Claims".

"**Lien Claimant**" means a Person having a Lien Claim, other than any Noteholder or Trustee in respect of any Noteholder Claim.

"**LOIs**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Sale Solicitation Process*".

"**Litigation Funding Amount**" means a cash amount to be contributed by SFC to the Litigation Trustee for purposes of funding the Litigation Trust on the Plan Implementation Date in accordance with the Plan.

"**Litigation Trust**" means the trust to be established on the Plan Implementation Date at the time specified in the Plan in accordance with the Litigation Trust Agreement pursuant to the laws of a jurisdiction that is acceptable to SFC and the Initial Consenting Noteholders, which trust will acquire the Litigation Trust Claims and the Litigation Funding Amount in accordance with the Plan.

"**Litigation Trust Agreement**" means the trust agreement dated as of the Plan Implementation Date, between SFC and the Litigation Trustee, establishing the Litigation Trust.

"**Litigation Trust Claims**" means any and all claims, actions, causes of action, demands, suits, rights, entitlements, litigation, arbitration, proceeding, hearing or complaint, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring before or after the Filing Date that have been or may be asserted by or on behalf of: (i) SFC against any and all third parties; or (ii) the Trustees, the Noteholders or any representative of the Noteholders against any and all Persons in connection with the Notes issued by SFC; provided, however, that the Litigation Trust Claims do not include any claim, right or cause of action against any Person that is released pursuant to Article 7 of the Plan.  The claims being advanced or that are subsequently advanced in the Class Actions are not being transferred to the Litigation Trust and the claims transferred to the Litigation Trust will not be advanced in the Class Actions.

"**Litigation Trust Interests**" means the beneficial interests in the Litigation Trust to be created on the Plan Implementation Date.

"**Litigation Trustee**" means a Person to be determined by SFC and the Initial Consenting Noteholders prior to the Effective Time, with the consent of the Monitor, to serve as trustee of the Litigation Trust pursuant to and in accordance with the terms thereof.

"**Material**" means a fact, circumstance, change, effect, matter, action, condition, event, occurrence or development that, individually or in the aggregate, is, or would reasonably be expected to be, material to the business, affairs, results of operations or financial condition of the SFC Companies (taken as a whole).

"**Material Adverse Effect**" means a fact, event, change, occurrence, circumstance or condition that, individually or together with any other event, change or occurrence, has or would reasonably be expected to have a material adverse impact on the assets, condition (financial or otherwise), business, liabilities, obligations (whether absolute, accrued, conditional or otherwise) or operations of the SFC Companies (taken as a whole); provided, however, that a Material Adverse Effect shall not include and shall be deemed to exclude the impact of any fact, event, change, occurrence, circumstance or condition resulting from or relating to: (A) changes in Applicable Laws of general applicability or interpretations thereof by courts or Governmental Entities or regulatory authorities, which changes do not have a Material disproportionate effect on the SFC Companies (taken as a whole), (B) any change in the forestry industry generally, which does not have a Material disproportionate effect on the SFC Companies (taken as a whole) (relative to other industry participants operating primarily in the PRC), (C) actions and omissions of any of the SFC Companies required pursuant to the Support Agreement or the Plan or taken with the prior written consent of the Initial Consenting Noteholders, (D) the effects of compliance with the Support Agreement or the Plan, including on the operating performance of the SFC Companies, (E) the negotiation, execution, delivery, performance, consummation, potential consummation or public announcement of the Support Agreement or the Plan or the transactions contemplated thereby or hereby, (F) any change in U.S. or Canadian interest rates or currency exchange rates unless such change has a Material disproportionate effect on the SFC Companies (taken as a whole), and (G) general political, economic or financial conditions in Canada, the United States, Hong Kong or the PRC, which changes do not have a Material disproportionate effect on the SFC Companies (taken as a whole).

"**Meeting**" means the meeting of Affected Creditors, and any adjournment or extension thereof, that is called and conducted in accordance with the Meeting Order for the purpose of considering and voting on the Plan.

"**Meeting Order**" means the Order of the Court dated August 31, 2012 that, among other things, provides for the calling and holding of the Meeting and establishes the procedures for voting on the Plan, as such Order may be amended, restated or varied from time to time.

"**Monitor**" means FTI Consulting Canada Inc., in its capacity as Court-appointed Monitor of SFC in the CCAA Proceedings.

"**Monitor's Post-Implementation Reserve**" means the cash reserve to be established by SFC on the Plan Implementation Date in an amount acceptable to SFC, the Monitor, and the Initial Consenting Noteholders, which cash reserve shall be maintained and administered by the Monitor for the purpose of administering SFC and the Claims Procedure, as necessary, from and after the Plan Implementation Date.

"**Muddy Waters**" means Muddy Waters, LLC.

"**MW Report**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Events Leading to the Commencement of CCAA Proceedings – Muddy Waters Report*".

"**Named Directors and Officers**" means Andrew Agnew, William E. Ardell, James Bowland, Leslie Chan, Michael Cheng, Lawrence Hon, James M.E. Hyde, Richard M. Kimel, R. John (Jack) Lawrence, Jay A. Lefton, Edmund Mak, Tom Maradin, Judson Martin, Simon Murray, James F. O'Donnell, William P. Rosenfeld, Peter Donghong Wang, Garry West and Kee Y. Wong, in their respective capacities as Directors or Officers, and "Named Director or Officer" means any one of them.

"**Newco**" means the new corporation to be incorporated pursuant to the Plan under the laws of the Cayman Islands or such other jurisdiction as agreed to by SFC, the Monitor and the Initial Consenting Noteholders.

"**Newco Equity Pool**" means all of the Newco Shares to be issued by Newco on the Plan Implementation Date pursuant to the Plan. The number of Newco Shares to be issued on the Plan Implementation Date shall be agreed by SFC, the Monitor and the Initial Consenting Noteholders prior to the Plan Implementation Date.

"**Newco Note Certificate**" means a certificate evidencing Newco Notes.

"**Newco Notes**" means the new notes to be issued by Newco on the Plan Implementation Date pursuant to the Plan in the aggregate principal amount of $300 million, on such terms and conditions as are satisfactory to the Initial Consenting Noteholders and SFC, acting reasonably.

"**Newco Promissory Note 1**", "**Newco Promissory Note 2**", "**Newco Promissory Note 3**" and "**Newco Promissory Notes**" have the meanings given in this Information Statement under the heading "*Implementation of the Plan – Implementation Steps*".

"**Newco Share Certificate**" means a certificate evidencing Newco Shares.

"**Newco Shares**" means the shares in the capital of Newco.

"**Non-Released D&O Claims**" has the meaning given in this Information Statement under the heading "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan – D&O Claims*".

"**Non-Resident Holder**" has the meaning given in this Information Statement under the heading "*Certain Canadian Federal Income Tax Considerations – Non-Residents of Canada*".

"**Noteholder Advisors**" means Goodmans LLP, Hogan Lovells US LLP and Conyers, Dill & Pearman LLP in their capacity as legal advisors to the Initial Consenting Noteholders, and Moelis & Company LLC and Moelis and Company Asia Limited, in their capacity as the financial advisors to the Initial Consenting Noteholders.

"**Noteholder Claim**" means any Claim by a Noteholder (or a Trustee or other representative on the Noteholder's behalf) in respect of or in relation to the Notes owned or held by such Noteholder, including all principal and Accrued Interest payable to such Noteholder pursuant to such Notes or the Note Indentures, but for greater certainty does not include any Noteholder Class Action Claim.

"**Noteholder Class Action Claim**" means any Class Action Claim, or any part thereof, against SFC, any of the Subsidiaries, any of the Directors and Officers of SFC or the Subsidiaries, any of the Auditors, any of the Underwriters and/or any other defendant to the Class Action Claims that relates to the purchase, sale or ownership of Notes, but for greater certainty does not include a Noteholder Claim.

"**Noteholder Class Action Claimant**" means any Person having or asserting a Noteholder Class Action Claim.

"**Noteholder Class Action Representative**" means an individual to be appointed by counsel to the Ontario Class Action Plaintiffs.

"**Noteholders**" means, collectively, the beneficial owners of Notes as of the Distribution Record Date and, as the context requires, the registered holders of Notes as of the Distribution Record Date, and "**Noteholder**" means any one of the Noteholders.

"**Noteholders' Proxy**" means a proxy substantially in the form of Schedule "F" to the Meeting Order, to be submitted to the Monitor by any Beneficial Noteholder that wishes to vote by proxy at the Meeting.

"**Note Indentures**" means, collectively, the 2013 Note Indenture, the 2014 Note Indenture, the 2016 Note Indenture and the 2017 Note Indenture.

"**Notes**" means, collectively, the 2013 Notes, the 2014 Notes, the 2016 Notes, and the 2017 Notes.

"**Officer**" means, with respect to SFC or any Subsidiary, anyone who is or was, or may be deemed to be or have been, whether by statute, operation of law or otherwise, an officer or *de facto* officer of such SFC Company.

"**Ontario Class Action Plaintiffs**" means the plaintiffs in the Ontario class action case styled as *Trustees of the Labourers' Pension Fund of Central and Eastern Canada et al v. Sino-Forest Corporation et al.* (Ontario Superior Court of Justice, Court File No. CV-11-431153-00CP).

"**Order**" means any order of the Court made in connection with the CCAA Proceedings or the Plan.

"**Ordinary Affected Creditor**" means a Person with an Ordinary Affected Creditor Claim.

"**Ordinary Affected Creditor Claim**" means a Claim that is not an Unaffected Claim, a Noteholder Claim, an Equity Claim, a Subsidiary Intercompany Claim, a Noteholder Class Action Claim, or a Class Action Indemnity Claim (other than a Class Action Indemnity Claim by any of the Third Party Defendants in respect of the Indemnified Noteholder Class Action Claims).

"**Ordinary Affected Creditors' Proxy**" means a proxy substantially in the form attached the Meeting Order, to be submitted to the Monitor by any Ordinary Affected Creditor who wishes to vote by proxy at the Meeting.

"**Other Directors and/or Officers**" means any Directors and/or Officers other than the Named Directors and Officers.

"**OSC**" means the Ontario Securities Commission.

"**Outside Date**" means January 15, 2013.

"**Participant Holder**" means a Person whose name appears on any of the Participant Holders Lists as at the Voting Record Date but who is not a Beneficial Noteholder.

"**Participant Holders Lists**" means the lists of DTC participant holders of Notes as at the Voting Record Date to be provided to the Monitor by DTC or any similar depository or trust company with respect to each series of Notes in accordance with the Meeting Order.

"**Person**" means any individual, sole proprietorship, limited or unlimited liability corporation, partnership, unincorporated association, unincorporated syndicate, unincorporated organization, body corporate, joint venture, trust, pension fund, union, Governmental Entity, and a natural person including in such person's capacity as trustee, heir, beneficiary, executor, administrator or other legal representative.

"**Phase I Bid Deadline**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Sale Solicitation Process*".

"**Plan**" means the Plan of Compromise and Reorganization filed by SFC pursuant to the CCAA and the CBCA, as such Plan may be amended, supplemented or restated from time to time in accordance with the terms of the Plan or an Order.

"**Plan Implementation Date**" means the Business Day on which the Plan becomes effective, which shall be the Business Day on which the Monitor has filed with the Court the certificate contemplated in the Plan, or such other date as SFC, the Monitor and the Initial Consenting Noteholders may agree.

"**Plan Securities**" means Newco Shares, Newco Notes, and to the extent they are deemed to be securities, the Litigation Trust Interests.

"**Plan Supplement**" means the supplement(s) to the Plan, which shall contain draft copies of the Litigation Trust Agreement, relevant documents concerning Newco (including the terms of the Newco Shares and the Newco Notes)

and such other documents as the Applicant and the Monitor may consider appropriate or necessary for purposes of the Meeting and voting on the Plan.

"**Plantation Rights Certificates**" has the meaning given in this Information Statement under the heading "*Risk Factors – Risks Related to the PRC*".

"**Pöyry**" means Pöyry Forest Industries Pre. Ltd

"**Pöyry Reports**" has the meaning given in this Information Statement under the heading "*Risk Factors – Risks Related to Our Business*".

"**PRC**" means the People's Republic of China.

"**Proof of Claim**" means the "Proof of Claim" referred to in the Claims Procedure Order, substantially in the form attached to the Claims Procedure Order.

"**Pro-Rata**" means: (a) with respect to any Noteholder in relation to all Noteholders, the proportion of (i) the principal amount of Notes beneficially owned by such Noteholder as of the Distribution Record Date plus the Accrued Interest owing on such Notes as of the Filing Date, in relation to (ii) the aggregate principal amount of all Notes outstanding as of the Distribution Record Date plus the aggregate of all Accrued Interest owing on all Notes as of the Filing Date; (b) with respect to any Early Consent Noteholder in relation to all Early Consent Noteholders, the proportion of the principal amount of Early Consent Notes beneficially owned by such Early Consent Noteholder as of the Distribution Record Date in relation to the aggregate principal amount of Early Consent Notes held by all Early Consent Noteholders as of the Distribution Record Date; and (c) with respect to any Affected Creditor in relation to all Affected Creditors, the proportion of such Affected Creditor's Affected Creditor Claim as at any relevant time in relation to the aggregate of all Proven Claims and Unresolved Claims of Affected Creditors as at that time.

"**Proven Claim**" means an Affected Creditor Claim to the extent that such Affected Creditor Claim is finally determined and valued in accordance with the provisions of the Claims Procedure Order, the Meeting Order or any other Order, as applicable.

"**Q2 Results**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Events Leading to the Commencement of CCAA Proceedings – Second Quarter 2011 Financial Results*".

"**Q3 Results**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Events Leading to the Commencement of CCAA Proceedings – Failure to Release Q3 and Default Under the Notes*".

"**RCMP**" means the Royal Canadian Mounted Police.

"**Registered Noteholder**" means a Noteholder who is the legal owner or holder of one or more Notes and whose name appears on any Registered Noteholder List.

"**Registered Noteholder List**" means each list of Registered Noteholders as at the Voting Record Date provided by the Trustees to the Monitor in accordance with the Meeting Order.

"**Released Claims**" means all of the rights, claims and liabilities of any kind released pursuant to Article 7 of the Plan.

"**Released Parties**" means, collectively, those Persons released pursuant to Article 7 of the Plan, but only to the extent so released, and each such Person is referred to individually as a "**Released Party**".

"**Remaining Post-Implementation Reserve Amount**" has the meaning given in this Circular under the heading "*Implementation of the Plan – Distributions under the Plan – Final Distributions from the Reserves*".

"**Required Majority**" means a majority in number of Affected Creditors with Proven Claims, and two-thirds in value of the Proven Claims held by such Affected Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting.

"**Resolution**" means the resolution substantially in the form attached as Schedule A to this Information Statement providing for the approval of the Plan by Affected Creditors.

"**Restructuring Claim**" means any right or claim of any Person that may be asserted or made in whole or in part against SFC, whether or not asserted or made, in connection with any indebtedness, liability or obligation of any kind arising out of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation on or after the Filing Date and whether such restructuring, termination, repudiation or disclaimer took place or takes place before or after the date of the Claims Procedure Order.

"**Restructuring Committee**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Events Leading to the Commencement of CCAA Proceedings – Failure to Release Q3 and Default Under the Notes*".

"**Restructuring Transaction**" or "**Restructuring**" means the transactions contemplated by the Plan (including any Alternative Sale Transaction that may occur pursuant to the Plan).

"**RMB**" means the Renminbi, the lawful currency of the PRC.

"**SAFE**" has the meaning given in this Information Statement under the heading "*Risk Factors – Risks Relating to our Business*".

"**Sale Solicitation Process**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Commencement of CCAA Proceedings*".

"**Sanction Hearing**" means the hearing on the Sanction Hearing Date (or such other date as may be set by the Court) for the Sanction Order.

"**Sanction Hearing Date**" means the date to be selected by the Monitor for the Sanction Hearing (in consultation with SFC and counsel to the Initial Consenting Noteholders), which date shall be within three Business Days of the Meeting Date (or such other date on or after the Meeting Date as may be set by the Monitor or the Court).

"**Sanction Order**" means the Order of the Court sanctioning and approving the Plan.

"**SCG**" means Sino-Capital Global Inc.

"**SEC**" means the United States Securities and Exchange Commission.

"**Second Interim Report**" has the meaning given in this Information Statement under the heading "*Documents Incorporated by Reference*".

"**Section 5.1(2) D&O Claim**" means any D&O Claim that is not permitted to be compromised pursuant to section 5.1(2) of the CCAA, but only to the extent not so permitted, provided that any D&O Claim that qualifies as a Non-Released D&O Claim or a Continuing Other D&O Claim shall not constitute a Section 5.1(2) D&O Claim.

"**Securities Act**" means the *Securities Act* (Ontario).

"**Securityholder**" has the meaning given in this Information Statement under the heading "*Certain Canadian Federal Income Tax Considerations*".

"**SFC**" or the "**Company**" means Sino-Forest Corporation.

"**SFC Advisors**" means Bennett Jones LLP, Appleby Global Group, King & Wood Mallesons and Linklaters LLP, in their respective capacities as legal advisors to SFC, and Houlihan Lokey Howard & Zukin Capital, Inc., in its capacity as financial advisor to SFC.

"**SFC Assets**" means all of SFC's right, title and interest in and to all of SFC's properties, assets and rights of every kind and description (including all restricted and unrestricted cash, contracts, real property, receivables or other debts owed to SFC, Intellectual Property, SFC's corporate name and all related marks, all of SFC's ownership interests in the Subsidiaries (including all of the shares of the Direct Subsidiaries and any other Subsidiaries that are directly owned by SFC immediately prior to the Effective Time), all of SFC's ownership interest in Greenheart and its subsidiaries, all SFC Intercompany Claims and a right to the Remaining Post-Implementation Reserve Amount), other than the Excluded SFC Assets.

"**SFC Barbados**" means Sino-Forest International (Barbados) Corporation, a wholly-owned subsidiary of SFC established under the laws of Barbados.

"**SFC Business**" means the business operated by the SFC Companies.

"**SFC Continuing Shareholder**" means the Litigation Trustee or such other Person as may be agreed to by the Monitor and the Initial Consenting Noteholders.

"**SFC Companies**" or "**Sino-Forest**" means, collectively, SFC and all of the Subsidiaries.

"**SFC Escrow Co.**" means the company to be incorporated as a wholly-owned subsidiary of SFC pursuant to the Plan under the laws of the Cayman Islands or such other jurisdiction as agreed to by SFC, the Monitor and the Initial Consenting Noteholders.

"**SFC Escrow Co. Share**" means the one share to be issued by SFC Escrow Co. at the time that SFC Escrow Co. is incorporated to SFC, as the sole shareholder of SFC Escrow Co., in accordance with the Plan.

"**SFC Intercompany Claim**" means any amount owing to SFC by any Subsidiary or Greenheart and any claim by SFC against any Subsidiary or Greenheart.

"**SPP**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Sale Solicitation Process*".

"**Statement of Allegations**" means the statement of allegations of staff of the OSC dated May 22, 2012, concerning SFC and the Individual Respondents.

"**Stewart Murray**" has the meaning given in this Information Statement under the heading "*CCAA Proceedings and Other Proceedings – Asset Verification Process*".

"**Subsidiaries**" means all direct and indirect subsidiaries of SFC, other than (i) Greenheart and its direct and indirect subsidiaries and (ii) SFC Escrow Co., and "**Subsidiary**" means any one of the Subsidiaries.

"**Subsidiary Intercompany Claim**" means any Claim by any Subsidiary or Greenheart against SFC.

"**Support Agreement**" means the Restructuring Support Agreement executed as of March 30, 2012 by SFC, the Direct Subsidiaries and the Initial Consenting Noteholders, and subsequently executed or otherwise agreed to by the Early Consent Noteholders, as such Restructuring Support Agreement may be amended, restated and varied from time to time in accordance with its terms.

"**Tax**" or "**Taxes**" means any and all federal, provincial, municipal, local and foreign taxes, assessments, reassessments and other governmental charges, duties, impositions and liabilities including for greater certainty

**229**

taxes based upon or measured by reference to income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, withholding, business, franchising, property, development, occupancy, employer health, payroll, employment, health, social services, education and social security taxes, all surtaxes, all customs duties and import and export taxes, all licence, franchise and registration fees and all employment insurance, health insurance and government pension plan premiums or contributions, together with all interest, penalties, fines and additions with respect to such amounts.

"**Tax Shield**" has the meaning given in this Information Statement under the heading "*Certain Canadian Federal Income Tax Considerations – Consequences to the Company*".

"**taxable capital gain**" has the meaning given in this Information Statement under the heading "*Certain Canadian Federal Income Tax Considerations – Shareholders – Taxation of Capital Gains and Capital Losses*".

"**Taxing Authorities**" means any one of Her Majesty the Queen, Her Majesty the Queen in right of Canada, Her Majesty the Queen in right of any province or territory of Canada, the Canada Revenue Agency, any similar revenue or taxing authority of Canada and each and every province or territory of Canada and any political subdivision thereof, any similar revenue or taxing authority of the United States, the PRC, Hong Kong or other foreign state and any political subdivision thereof, and any Canadian, United States, Hong Kong, PRC or other government, regulatory authority, government department, agency, commission, bureau, minister, court, tribunal or body or regulation-making entity exercising taxing authority or power, and "**Taxing Authority**" means any one of the Taxing Authorities.

"**Third Party Defendants**" means any defendants to the Class Action Claims (present or future) other than SFC, the Subsidiaries, the Named Directors and Officers or the Trustees.

"**Transfer Agent**" means Computershare Investor Services (or a subsidiary or affiliate thereof) or such other transfer agent as Newco may appoint, with the prior written consent of the Monitor and the Initial Consenting Noteholders.

"**Trustee Claims**" means any rights or claims of the Trustees against SFC under the Note Indentures for compensation, fees, expenses, disbursements or advances, including reasonable legal fees and expenses, incurred or made by or on behalf of the Trustees before or after the Plan Implementation Date in connection with the performance of their respective duties under the Note Indentures or the Plan.

"**Trustees**" means, collectively, The Bank of New York Mellon in its capacity as trustee for the 2013 Notes and the 2016 Notes, and Law Debenture Trust Company of New York in its capacity as trustee for the 2014 Notes and the 2017 Notes, and "**Trustee**" means either one of them.

"**U.S.**" means the United States of America.

"**Unaffected Claim**" means any: (a) Claim secured by any of the Charges (provided that, following  the discharge of the Charges on the Plan Implementation Date, such Claims shall be paid from and limited to recovery as against the Administration Charge Reserve or the Directors' Charge Reserve, as applicable, in accordance with the Plan); (b) Government Priority Claim; (c) Employee Priority Claim; (d) Lien Claim; (e) other Claim of any employee, former employee, Director or Officer of SFC in respect of wages, vacation pay, bonuses, termination pay, severance pay or other remuneration payable to such Person by SFC; (f) Trustee Claims; and (g) any trade payables that were incurred by SFC (i) after the Filing Date but before the Plan Implementation Date; and (ii) in compliance with the Initial Order or other Order issued in the CCAA Proceeding.

"**Unaffected Claims Reserve**" means the cash reserve to be established by SFC on the Plan Implementation Date and maintained by the Monitor, in escrow, for the purpose of paying certain Unaffected Claims in accordance with the Plan.

"**Unaffected Creditor**" means a Person who has an Unaffected Claim, but only in respect of and to the extent of such Unaffected Claim.

"**Underwriters**" means any underwriters of SFC that are named as defendants in the Class Action Claims, including for greater certainty Credit Suisse Securities (Canada), Inc., TD Securities Inc., Dundee Securities Corporation, RBC Dominion Securities Inc., Scotia Capital Inc., CIBC World Markets Inc., Merrill Lynch Canada Inc., Canaccord Financial Ltd., Maison Placements Canada Inc., Credit Suisse Securities (USA) LLC and Merrill Lynch, Pierce, Fenner & Smith Incorporated (successor by merger to Banc of America Securities LLC).

"**United States 1933 Act**" means the United States *Securities Act of 1933*, as amended.

"**United States 1934 Act**" means the United States *Securities Exchange Act of 1934*, as amended.

"**Unregistered Noteholder**" means a Noteholder whose name does not appear on any Registered Noteholder List.

"**Unresolved Claim**" means an Affected Creditor Claim in respect of which a Proof of Claim has been filed in a proper and timely manner in accordance with the Claims Procedure Order but that, as at any applicable time, has not been finally (i) determined to be a Proven Claim or (ii) disallowed in accordance with the Claims Procedure Order, the Meeting Order or any other Order.

"**Unresolved Claims Escrow Agent**" means SFC Escrow Co. or such other Person as may be agreed by SFC, the Monitor and the Initial Consenting Noteholders.

"**Unresolved Claims Reserve**" means the reserve of Newco Shares, Newco Notes and Litigation Trust Interests, if any, to be established pursuant to the Plan in respect of Unresolved Claims as at the Plan Implementation Date, which reserve shall be held and maintained by the Unresolved Claims Escrow Agent, in escrow, for distribution in accordance with the Plan.

"**Voting Claim**" means an Affected Creditor Claim to the extent that such Affected Creditor Claim has been accepted by the Monitor solely for purpose of voting on the Plan (which acceptance for the purpose of voting shall have no effect on whether such Claim is a Proven Claim for purposes of the Plan), in each case in accordance with the provisions of the Claims Procedure Order, the Meeting Order or any other Order, as applicable.

"**Voting Record Date**" means August 31, 2012.

"**Website**" means the website maintained by the Monitor in respect of the CCAA Proceedings pursuant to the Initial Order at the following web address: http://cfcanada.fticonsulting.com/sfc.

"**WFOEs**" has the meaning given in this Information Statement under the heading "*Information Regarding Sino Forest - Business Model-Plantation / Timber Rights in the PRC*".

"**WTO**" means World Trade Organization.

## SUMMARY INFORMATION

*The following is a summary of certain information contained elsewhere in this Information Statement, including the Schedules hereto and is qualified in its entirety by reference to the more detailed disclaimers and information contained or referred to elsewhere in this Information Statement or the Schedules hereto.  Terms with initial capital letters used in this summary are defined in the "Glossary of Terms".*

| | |
|---|---|
| **Important Disclaimers** | The information contained in this Information Statement may not be reliable.  See "*Important Disclaimers*". |
| **Meeting** | Pursuant to the Meeting Order, the Meeting has been called for the purpose of having Affected Creditors with Voting Claims consider and, if deemed advisable, adopt, with or without variation, the Resolution to approve the Plan. The Meeting is scheduled to be held at 10:00 a.m. (Toronto time) on November 29, 2012 at the offices of Bennett Jones LLP, 3400 One First Canadian Place, Toronto, Ontario. |
| | The Meeting shall be held in accordance with the Plan, the Meeting Order and any further Order of the Court.  The only Persons entitled to attend and vote on the Plan at the Meeting are those specified in the Meeting Order. |
| | The quorum required at the Meeting has been set by the Meeting Order as one Affected Creditor with a Voting Claim present at the Meeting (in person or by proxy). |
| | See "*Meeting and Voting – Procedure for the Meeting*". |
| **Entitlement to Vote** | The only Persons entitled to vote at the Meeting (whether in person or by proxy) are: (i) Beneficial Noteholders with Voting Claims that have beneficial ownership of one or more Notes as at the Voting Record Date (or any such Beneficial Noteholder's validly appointed holder of its Noteholders' Proxy); and (ii) Ordinary Affected Creditors with Voting Claims as at the Voting Record Date (which, for greater certainty, includes any transferee of an Ordinary Affected Creditor Claim that is a Voting Claim, provided that such transferee has been recognized as an Ordinary Affected Creditor in respect of such transferred Ordinary Affected Creditor Claim) (or any such Ordinary Affected Creditor's validly appointed holder of its Ordinary Affected Creditors' Proxy). |
| | Each Beneficial Noteholder with a Voting Claim shall be entitled to one vote as a member of the Affected Creditors' Class, which vote shall have a value equal to the principal and Accrued Interest owing under the Notes owned by such Beneficial Noteholder as at the Voting Record Date. |
| | Each Ordinary Affected Creditor with a Voting Claim shall be entitled to one vote as a member of the Affected Creditors Class, which vote shall have a value equal to the dollar value of such Ordinary Affected Creditor's Voting Claim. |
| | Each Affected Creditor with an Unresolved Claim as at the Voting Record Date shall be entitled to attend the Meeting and shall be entitled to one vote at the Meeting in respect of such Unresolved Claim.  Any vote cast in respect of an Unresolved Claim shall be dealt with as described in the Meeting Order unless and until (and then only to the extent that) such Unresolved Claim is ultimately determined to be (i) a Voting Claim, in which case such vote shall have the dollar value attributable to such Voting Claim or (ii) disallowed, in which case such vote shall not be counted for any purpose. |
| | Each of the Third Party Defendants will be entitled to one vote as a member of the Affected Creditors Class in respect of any Class Action Indemnity Claim that it has properly filed in respect of the Indemnified Noteholder Class Action Claims, provided |

23

that the aggregate value of all such Class Action Indemnity Claims shall, for voting purposes, be deemed to be equal to the amount of the Indemnified Noteholder Class Action Limit.

See "*Meeting and Voting – Entitlement to Vote*".

| | |
|---|---|
| **Appointment of Proxyholders and Voting** | <u>In Person</u>. Any Ordinary Affected Creditor or Beneficial Noteholder that is entitled to vote at the Meeting and that wishes to vote at the Meeting in person must: (i) duly complete and sign an Ordinary Creditors' Proxy or a Noteholders' Proxy, as applicable; (ii) identify itself in the Ordinary Creditors' Proxy or a Noteholders' Proxy, as applicable, as the Person with the power to attend and vote at the Meeting on behalf of such Ordinary Affected Creditor or Beneficial Noteholder, as the case may be; and (iii) deliver such Ordinary Affected Creditors' Proxy or Noteholders' Proxy, as the case may be, to the Monitor so that it is received on or before 5:00 p.m. on the third Business Day before the Meeting (or any adjournment thereof), and such delivery must be made in accordance with the instructions accompanying such Ordinary Affected Creditors' Proxy or Noteholders' Proxy. |

<u>By Proxy</u>. Any Ordinary Affected Creditor or Beneficial Noteholder that is entitled to vote at the Meeting and that wishes to appoint a nominee to vote on its behalf at the Meeting must: (i) duly complete and sign an Ordinary Creditors' Proxy or a Noteholders' Proxy, as applicable; (ii) identify its desired nominee in the Ordinary Creditors' Proxy or a Noteholders' Proxy, as applicable, as the Person with the power to attend and vote at the Meeting on behalf of such Ordinary Affected Creditor or Beneficial Noteholder, as the case may be; and (iii) deliver such Ordinary Affected Creditors' Proxy or Noteholders' Proxy, as the case may be, to the Monitor so that it is received on or before 5:00 p.m. on the third Business Day before the Meeting (or any adjournment thereof), and such delivery must be made in accordance with the instructions accompanying such Ordinary Affected Creditors' Proxy or Noteholders' Proxy.

See "*Meeting and Voting – Appointment of Proxyholders and Voting*".

| | |
|---|---|
| **Purpose of the Plan** | The purpose of the Plan is to: (i) effect a full, final and irrevocable compromise, release, discharge, cancellation and bar of all Affected Claims; (ii) effect the distribution of the consideration provided for herein in respect of Proven Claims; (iii) transfer ownership of the SFC Business to Newco, free and clear of all claims against SFC and certain related claims against the Subsidiaries, so as to enable the SFC Business to continue on a viable, going concern basis; and (iv) allow Affected Creditors and Noteholder Class Action Claimants to benefit from contingent value that may be derived from litigation claims to be advanced by the Litigation Trustee. |

The Plan is put forward in the expectation that the Persons with an economic interest in SFC, when considered as a whole, will derive a greater benefit from the implementation of the Plan and the continuation of the SFC Business as a going concern than would result from a bankruptcy or liquidation of SFC.

| | |
|---|---|
| **Classification and Voting** | The Plan provides for one class of Affected Creditors for the purpose of considering and voting on the Plan. |
| **Treatment of Affected Parties** | Generally, the Plan provides for treatment of claims as follows: |

*Claims of Current Noteholders and Other Affected Creditors*. Noteholders and other Affected Creditors with Proven Claims will receive their pro rata share of 92.5% of the outstanding Newco Shares, 100% of $300 million principal amount of Newco Notes

(the general terms of which are described herein and the specific terms of which will be described in a Plan Supplement to be issued in advance of the Meeting in accordance with the terms of the Meeting Order) and a 75% interest in the Litigation Trust (described below). Noteholders that became parties to the Support Agreement on or before the Consent Date of May 15, 2012 (or their assignees) will receive the remaining 7.5% of the outstanding Newco Shares (including the Unresolved Claims Reserve).

Shareholder and Shareholder Class Action Claims.  The Plan does not provide for any recovery for current shareholders of SFC in their capacity as such.  However, to the extent that current shareholders of SFC are within the class of claimants in the shareholder Class Actions involving the Company, the Plan preserves their ability to continue their claims against Third Party Defendants. Sino-Forest's Existing Shares will be cancelled as part of the Plan for no consideration.

Indemnity Claims against Sino-Forest in respect of Shareholder Class Action Claims. All Class Action Indemnity Claims in respect of shareholder Class Action Claims (including indemnity claims against the Company by auditors, underwriters and directors and officers) will be released and will receive no recovery.

Claims of Former Noteholders. Class Action Claims of former noteholders of Sino-Forest against Sino-Forest and certain directors and officers will be released. Claims of former noteholders against certain third parties will be allowed to proceed subject to a limited claim amount that can be asserted in respect of any such claims that are validly indemnified by Sino-Forest, which amount shall be acceptable to the Company, the Initial Consenting Noteholders, the Monitor and counsel to the Class Action plaintiffs. The Noteholder Class Action Claimants will be collectively entitled to receive 25% of the Litigation Trust Interests, subject to certain conditions.

Indemnity Claims against Sino-Forest in respect of Class Action Claims by Former Noteholders.  Class Action Indemnity Claims in respect of Indemnified Noteholder Class Action Claims will be allowed on a contingent basis, subject to the same limit as the claims of former Noteholders. However, nothing in the Plan impairs the ability of the Company, the Monitor and the Initial Consenting Noteholders from seeking a Court order that would cause such indemnity claims to be released without recovery in the same manner as indemnity claims in respect of shareholder Class Action Claims or otherwise.

Unaffected Claims. Certain other claims are "unaffected claims", and holders of those unaffected claims will not be entitled to vote on the Plan.  Holders of unaffected claims will be paid in full. Unaffected claims include: certain government priority claims relating to taxes, if any; certain employee priority and other employee claims, if any; and trade payables incurred by Sino-Forest after March 30, 2012.

Unresolved Claims.  Distributions of Newco Notes, Newco Shares and Litigation Trust Interests in respect of Unresolved Claims will be maintained in the Unresolved Claims Reserve until such claims become Proven Claims or are disallowed or subordinated. All Claims against SFC for indemnification in respect of Indemnified Noteholder Class Action Claims or Defence Costs will be treated as Unresolved Claims for purposes of the Plan unless and until determined to be a Proven Claim or disallowed. To the extent that any distributions are made after the Plan Implementation Date in respect of any Unresolved Claims that have become Proven Claims, these distributions will have the effect of diluting the distributions (or recoveries) received by the Affected Creditors with Proven Claims as at the Plan Implementation Date.

Directors and Officers. The Plan provides for releases in favour of the Named Directors, being the current directors and officers of SFC as well as certain former

directors or officers. However, certain types of claims will not be released pursuant to the Plan, including: (a) claims not permitted to be released by section 5.1(2) of the CCAA (b) claims for the tort of conspiracy; and (c) claims for fraud or criminal conduct. As noted above, the Third Party Defendants to the Class Action Claims that are proceeding would not be released under the Plan, other than the Named Directors to the extent noted above.

See "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan*".

| | |
|---|---|
| **Creditor Approval of Plan** | In order for the Plan to be approved pursuant to the CCAA, the Plan must be approved by a majority in number of Affected Creditors with Proven Claims, and two-thirds in value of the Proven Claims held by Affected Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting. If such approvals are obtained, in order to make the Plan effective, the Sanction Order must be obtained.<br><br>See "*Required Approvals Under the CCAA and Other Conditions to Implementation – Creditor Approval*". |
| **Court Approval under the CCAA** | If the Plan is approved by the Required Majority, SFC shall apply for the Sanction Order. The hearing in respect of the Sanction Order is scheduled to take place on or about December 7, 2012 and December 10, 2012 at 10:00 a.m. (Toronto time) at the Court at 330 University Avenue, Toronto, Ontario, Canada.<br><br>See "*Required Approvals Under the CCAA and Other Conditions to Implementation – Court Approval of the Plan Under the CCAA*". |
| **Conditions to Implementation of the Plan** | The implementation of the Plan is conditional upon satisfaction of, among others, the following conditions prior to or at the Effective Time: |

(i) the Plan shall have been approved by the Required Majority and the Court, and in each case the Plan shall have been approved in a form consistent with the Support Agreement or otherwise acceptable to SFC and the Initial Consenting Noteholders, each acting reasonably;

(ii) the Sanction Order shall have been made and shall be in full force and effect prior to December 17, 2012, and the Plan Implementation Date shall have occurred no later than January 15, 2013;

(iii) certain elements of the Restructuring Transaction and the Plan and matters relating to Newco shall be acceptable to the Initial Consenting Noteholders (as provided in greater detail in the Plan);

(iv) the aggregate amounts of each of the: Indemnified Noteholder Class Action Limit, Proven Claims held by Ordinary Affected Creditors, Unaffected Claims Reserve, Administration Charge Reserve, Directors' Charge Reserve, Monitor's Post-Implementation Reserve, Litigation Funding Amount, Lien Claims to be satisfied by the return to the applicable Lien Claimants of the applicable secured property, Lien Claims to be repaid in cash, Unaffected Claims and each category of Unaffected Claims, Unresolved Claims and the Unresolved Claims Reserve, shall be acceptable to SFC, the Monitor and Initial Consenting Noteholders;

(v) the Initial Consenting Noteholders shall have completed due diligence in respect of SFC and the Subsidiaries and the results of such due diligence shall be acceptable to the Initial Consenting Noteholders prior to the date of the

hearing of the Sanction Order; and

(vi)    Certain regulatory approvals in the PRC and Canada.

*(The foregoing is a brief summary of certain of the conditions precedent to the implementation of the Plan. A comprehensive list of conditions precedent is provided in Section 9.1 of the Plan. See "Required Approvals Under the CCAA and Other Conditions to Implementation – Conditions to Implementation of the Plan".)*

| | |
|---|---|
| **Timing of Plan Implementation** | It is anticipated that the Plan will be implemented in accordance with the following timetable: |

No later than November 29, 2012    -        Meeting

No later than December 17, 2012    -        Sanction Order

No later than January 15, 2013        -        Implementation of the Plan

| | |
|---|---|
| **Monitor** | The Monitor and its counsel have been involved throughout the course of negotiations regarding the Plan and the Monitor supports the Company's request to convene the meeting to consider the Plan. |
| **Recommendations of the Board of Directors** | For the reasons set out in "*Recommendation of the Board of Directors*", the Board of Directors recommends that Affected Creditors vote for the Resolution to approve the Plan. |
| **Support of Noteholders** | Noteholders representing an aggregate of over 72% of the outstanding principal amount of the Notes as at the Consent Date as at the date hereof, have agreed to vote in favour of and to support the Restructuring and the Plan, in accordance with the terms and conditions of the Support Agreement. See "*Support of the Noteholders*". |
| **Certain Canadian Federal Income Tax Considerations** | Certain tax considerations relating to the Plan are described in "Certain Canadian Federal Income Tax Considerations". Affected Creditors should consult their own tax advisors with respect to their individual circumstances. |

See "*Certain Canadian Federal Income Tax Considerations*".

| | |
|---|---|
| **Risk Factors** | Affected Creditors should carefully consider certain risk factors relating, among other things, to the non-implementation of the Plan, the Plan and its implementation, the securities of Newco, the Muddy Waters and OSC allegations, the SFC Business, and the PRC. |

See "*Risk Factors*".

| | |
|---|---|
| **Newco** | Newco is expected to be incorporated as an exempt company under the laws of the Cayman Islands (or such other jurisdiction as is acceptable to SFC and the Initial Consenting Noteholders) pursuant to the Plan with share capital consisting of a single class of voting shares, being the Newco Shares. Holders of Newco Shares will be entitled to certain voting, information, pre-emptive and approval rights as provided in Newco's articles of association. See "*Information Regarding Newco – Newco Shares*". |

Newco will also issue U.S.$300 million principal amount of Newco Notes pursuant to the Plan. The Newco Notes will be senior debt obligations of Newco and will be secured, subject to permitted liens, on a first-priority basis with share pledges from certain Subsidiaries in a manner substantially similar to the pledges currently in place

for the 2014 Notes and 2017 Notes and will have guarantees from certain Subsidiaries in a manner substantially similar to the guarantees currently in place for the 2013 Notes and 2016 Notes.  Interest on the Newco Notes will be payable in cash or in kind, at Newco's option, at a rate of 6% per annum if paid in cash, or 8% if paid in kind. Other terms of the Newco Notes are expected to be substantially similar to the 2014 Notes and 2017 Notes, with appropriate adjustments to reflect to size and structure of the business operated by Newco following the Plan Implementation Date See *"Information Regarding Newco – Newco Notes"*.

Additional information regarding Newco, including information relating to Newco's governance and management and information relating to the Newco Shares and Newco Notes, will be provided in the Plan Supplement to be issued in accordance with the terms of the Meeting Order.

**Litigation Trust**

A description of the Litigation Trust, including the Litigation Funding Amount, will be provided in the Plan Supplement to be issued in advance of the Meeting in accordance with the terms of the Meeting Order.

**Alternative Sale Transaction**

The Plan provides that, at any time prior to the implementation of the Plan, SFC may, with the consent of the Initial Consenting Noteholders, complete a sale of all or substantially all of the SFC Assets on terms that are acceptable to the Initial Consenting Noteholders (an "**Alternative Sale Transaction**"), provided that any such Alternative Sale Transaction has been approved by the Court pursuant to section 36 of the CCAA on notice to the service list.  In the event that an Alternative Sale Transaction is completed, the terms and conditions of the Plan would continue to apply, subject to the following:

(a)     The Newco Shares and Newco Notes would not be distributed under the Plan (given that Newco would not need to be formed in the context of any such asset sale).  Instead, the consideration paid or payable to SFC pursuant to the Alternative Sale Transaction (the "**Alternative Sale Transaction Consideration**") would be distributed to the Persons entitled to receive Newco Shares under the Plan in the same proportions (and subject to the same terms and conditions) as are applicable to the distribution of Newco Shares under the Plan.

(b)     All provisions in the Plan that address Newco would be deemed ineffective given that Newco would not need to be formed in connection with an Alternative Sale Transaction.

(c)     All provisions in the Plan that address the creation and issuance of the Newco Shares and Newco Notes would be deemed ineffective given that the Newco Shares and the Newco Notes would not be issued in connection with an Alternative Sale Transaction.

(d)     All provisions relating to the entitlement of Affected Creditors to receive Newco Shares, and the amount of Newco Shares any given Affected Creditor is entitled to receive under the Plan, would continue to apply so as to govern the distribution of the Alternative Sale Transaction Consideration in place of the Newco Shares, and in the same proportions among the Affected Creditors.

(e)     SFC, with the written consent of the Monitor and the Initial Consenting Noteholders, shall be permitted to make any such other amendments, modifications and supplements to the terms and

conditions of the Plan as may be necessary to: (i) facilitate the Alternative Sale Transaction; (ii) cause the Alternative Sale Transaction Consideration to be distributed in the same proportions and subject to the same terms and conditions as are subject to the distribution of Newco Shares under the Plan; and (iii) complete the Alternative Sale Transaction and distribute the Alternative Sale Transaction Proceeds in a manner that is tax efficient for SFC and the Affected Creditors with Proven Claims, provided in each case that (A) a copy of such amendments, modifications or supplements is filed with the Court and served upon the service list; and (B) the Monitor is satisfied that such amendments, modifications or supplements do not materially alter the proportionate entitlements of the Affected Creditors, as among themselves, to the consideration distributed pursuant to the Plan.

Except for the requirements to obtain (i) the prior written consent of the Initial Consenting Noteholders for an Alternative Sale Transaction and (ii) the approval of the Alternative Sale Transaction by the Court pursuant to section 36 of the CCAA (on notice to the service list), once the Plan has been approved by the Required Majority of Affected Creditors, no further meeting, vote or approval of the Affected Creditors would be required to enable SFC to complete an Alternative Sale Transaction.

## INFORMATION REGARDING SINO-FOREST

**Business of Sino-Forest**

SFC is a corporation continued under the CBCA. It is an integrated forest plantation operator and forest products company, with assets predominantly located in the PRC. Its principal businesses include the ownership and management of forest plantation trees, the sale of standing timber, wood logs and wood products, and the complementary manufacturing of downstream engineered-wood products.

In addition, SFC holds an indirect majority interest in Greenheart, a Hong Kong listed investment holding company, which, together with the Greenheart Group, owns certain rights and manages hardwood forest concessions in the Republic of Suriname and a radiata pine plantation on freehold land in New Zealand. While Greenheart is an indirect Subsidiary of SFC, it has its own distinct operations and financing arrangements and is not party to or a guarantor of the Notes, which are described below. Greenheart Group and SFC operate out of separate office buildings in Hong Kong. Greenheart Group was not implicated in the allegations made against Sino-Forest by Muddy Waters on June 2, 2011, which are described further below.

**Corporate Structure**

SFC is a holding company. Its principal assets are the shares it holds in the Direct Subsidiaries, some cash and the SFC Intercompany Claims. It operates its business through 136 Subsidiaries, six of which are directly wholly-owned by it being Sino-Panel Holdings Limited (incorporated in the BVI), Sino-Global Holdings Inc. (incorporated in the BVI), Sino-Panel Corporation (incorporated in Canada), Sino-Wood Partners, Limited (incorporated in Hong Kong), Sino-Capital Global Inc. (incorporated in the BVI), and SFC Barbados. SFC also holds all of the preference shares of Sino-Forest Resources Inc. (incorporated in the BVI). The 136 Subsidiaries are comprised of 67 PRC incorporated corporations (with 11 branch companies), 58 BVI incorporated corporations, seven Hong Kong incorporated corporations, one Canadian corporation and three corporations incorporated in other jurisdictions. The Greenheart Group is not included in the foregoing.

**Capital Structure**

*Equity*

As at the date of this Information Statement, approximately 246 million Common Shares are issued and outstanding. No other classes of shares of SFC are outstanding.

*Debt*

SFC has issued four series of Notes which remain outstanding. In addition to the four series of Notes issued by SFC, many of the Subsidiaries (and the Greenheart Group) have their own banking facilities aggregating approximately $43.2 million in principal amount as at September 29, 2012, including lending facilities, which are not intended to be affected by the Plan.

*2017 Senior Notes*

On October 21, 2010, SFC issued the 2017 Notes in the principal amount of U.S. $600 million. The 2017 Notes mature on October 21, 2017, and interest is payable semi-annually, on April 21 and October 21, at a rate of 6.25% per annum. The 2017 Notes are listed but do not trade on the Singapore Stock Exchange and are supported by guarantees from 60 Subsidiaries and share pledges from 10 of those same Subsidiaries.

*2016 Convertible Notes*

On December 17, 2009, SFC issued the 2016 Notes in the principal amount of U.S. $460 million. The 2016 Notes mature on December 15, 2016, and interest is payable semi-annually, on June 15 and December 15, at a rate of 4.25% per annum. The 2016 Notes are supported by guarantees from 64 Subsidiaries.

*2014 Senior Notes*

On July 27, 2009, SFC issued by way of exchange offer the 2014 Notes in the principal amount of U.S. $399,517,000. The 2014 Notes mature on July 28, 2014, and interest is payable semi-annually, on January 26 and July 26, at a rate of 10.25% per annum. The 2014 Notes are listed but do not trade on the Singapore Stock Exchange and are supported by guarantees from 60 Subsidiaries and share pledges from 10 of those same Subsidiaries.

*2013 Convertible Notes*

On July 17, 2008 and August 6, 2008, SFC issued the 2013 Notes in the aggregate principal amount of U.S. $345 million. The 2013 Notes mature on August 1, 2013, and interest is payable semi-annually, on February 1 and August 1, at a rate of 5% per annum. The 2013 Notes are supported by guarantees from 64 Subsidiaries.

**Business Model**

***Plantation / Timber Rights in the PRC***

There are four types of rights associated with timber plantations in the PRC: (i) plantation land ownership; (ii) plantation land use rights; (iii) timber ownership; and (iv) timber use rights. All of these are separate rights and can be separately owned by different parties.

Private enterprises cannot own plantation land in the PRC but may hold plantation land use rights for a specified duration (up to 70 years but typically 30 to 50 years), timber ownership and timber use rights. Foreign enterprises are not prohibited by law from acquiring timber ownership or timber use rights.

The various rights associated with timber plantations in the PRC and the limitations on which entities can hold such rights were one of management's stated reasons for Sino-Forest's complex business models described below.

For its timber business in the PRC, Sino-Forest utilizes two models, one involving BVI entities ("**BVI Entities**"), and the other involving Subsidiaries incorporated in the PRC as wholly foreign owned enterprises ("**WFOEs**").

***The BVI Model***

Due to restrictions on wholly foreign-owned enterprises from engaging in the commodity distribution industry in the PRC until 2004, Sino-Forest uses BVI Entities to carry on its forestry business in the PRC.

Under the BVI model, the Sino-Forest BVI Entities involved in the standing timber business acquire standing timber from suppliers. The suppliers are usually aggregators who acquire the standing timber and, typically, plantation land use rights from other suppliers or from original timber owners, such as villagers or collectives, or from smaller aggregators. As non-PRC companies, the BVI Entities could not and did not acquire plantation land use rights in the PRC, and instead only acquired the rights to timber in the PRC pursuant to the relevant standing timber purchase contracts.

The BVI model does not involve the Sino-Forest BVI Entities concurrently acquiring the plantation land use rights or leases of the underlying plantation land with the purchase of standing timber, as the BVI Entities cannot legally acquire plantation land use rights. However, the BVI Entities' supply contracts typically contain a right of first refusal for the BVI Entities to acquire, or nominate an affiliate to acquire, the plantation land use rights after the timber has been harvested. Despite such common contractual provisions, such right has rarely, if ever, been exercised by the Sino-Forest BVI Entities.

Due to restrictions under PRC laws, the Sino-Forest BVI Entities do not sell standing timber directly to customers. Instead, they conduct the sale of standing timber through "authorized intermediaries" ("**AIs**", which are also called "entrusted sales agents" in the BVI model) pursuant to "entrusted sales agreements". Under the BVI model, the AIs serve as Sino-Forest's customers of its standing timber business.

**240**

Pursuant to the entrusted sales agreements entered into with the AIs, the AIs are obliged to deduct and remit on behalf of Sino-Forest all of the applicable taxes payable to the PRC government in connection with the ultimate sale of the timber by the AIs.  Sino-Forest is not, however, in a position to know whether or not the AIs have in fact remitted applicable taxes on behalf of Sino-Forest.

Under PRC law, BVI Entities are not allowed to have bank accounts in the PRC and money flowing in and out of the PRC is strictly controlled through foreign exchange controls.  As a result, the Sino-Forest BVI Entities do not directly pay the suppliers or receive payments from the AIs.  Instead, the AIs are instructed by Sino-Forest to make set-off payments. Pursuant to the instructions of Sino-Forest, AIs make payments directly or indirectly to Sino-Forest's suppliers for amounts owed by Sino-Forest BVI Entities to those suppliers.  As a result, no cash actually flows directly through the BVI Entities.  SFC then receives confirmations from the AIs and suppliers that payments have been made and received, respectively.

The nature of the BVI model means that Sino-Forest cannot obtain cash from its BVI model operations or monetize its BVI model assets without engaging in the complicated "on-shoring" process which is discussed further below or by using other more costly methods than the "on-shoring" process.  Furthermore, the set-off payment system necessitated by the BVI model impaired the Independent Committee's ability to verify the flow of funds during its investigation.  The Independent Committee was also unable to confirm whether a number of suppliers and AIs were unrelated to Sino-Forest.

Sino-Forest has established 58 BVI Entities, 55 of which are guarantors of at least certain of the Notes.  Not all of these BVI Entities are involved in the BVI model or standing timber business.  Of the 58, there are 20 involved in the BVI standing timber business while the remaining BVI Entities are either holding companies or used in Sino-Forest's log trading business.

Sino-Forest has historically reported that its revenues and profits were primarily generated from the BVI model.

### The WFOE Model

Commencing in 2004, the PRC's Ministry of Commerce permitted foreign investors to invest in PRC-incorporated trading companies and to participate in most areas of the commodity distribution industry, including the purchase and sale of standing timber throughout the PRC.  Prior to this time, WFOEs were prohibited from engaging in the commodity distribution industry.

Management of the Company has informed the Board that since 2006 almost all of Sino-Forest's new cash capital invested in timber assets has been employed through the WFOE model (as opposed to the BVI model).

Unlike BVI Entities, WFOEs can acquire land use rights or land leases as well as standing timber rights, and can have bank accounts in the PRC.  Because of the WFOEs' direct presence in the PRC, they are also eligible to obtain financing from PRC banks to finance their operations. WFOEs can log the timber and sell both logs and standing timber to end customers, which means they do not need (and do not use) AIs.  The WFOEs generally pay the suppliers directly for the standing timber and generally directly receive payment from end customers instead of utilizing the set-off arrangement used by Sino-Forest's BVI Entities in the BVI model.

None of Sino-Forest's WFOEs are guarantors of the Notes, nor have their shares been pledged by their BVI parents.

### On-shoring

Given the inherent problems with the BVI model and the relative advantages of the WFOE model, Sino-Forest has explored various methods of migrating or "on-shoring" its BVI model timber assets into the WFOE model.  SFC believes that the successful transition of assets from a BVI model to a WFOE model has many merits, including providing the foreign parent an ability to have direct access to the cash generated from the sale of timber assets to customers.

SFC has been investigating alternative on-shoring structures. The Board understands that there are a number of alternatives available; however, any alternative that is ultimately chosen is expected to be a multi-year process due to (i) the volume of assets that need to be moved into the WFOE model, (ii) the large number of different locations in which Sino-Forest has BVI model timber assets in the PRC, (iii) the likely multiple rounds of negotiations required with the various stakeholders in each location, and (iv) SFC's currently limited resources. Sino-Forest expects to incur substantial costs in connection with any "on-shoring" process it undertakes. There can be no assurance that any on-shoring process will be successful, or if successful, the costs or timing thereof.

### *Operations*

Sino-Forest's operations are comprised of three core business segments.  Wood fibre operations and log trading have historically been the primary revenue contributors, while manufacturing and other operations enhance the value of the fibre operations by producing downstream products.

### *Wood Fibre Operations*

Sino-Forest's wood fibre operations consist of acquiring, cultivating and selling standing timber or logs from purchased and planted plantations in nine provinces across the PRC.

Sino-Forest generates the majority of its revenue from the sale of standing timber and logs.  Most of the standing timber and logs sold by Sino-Forest come from Sino-Forest's tree plantations, located primarily in the southern and eastern regions of the PRC.

Sino-Forest operates plantations for the wood fibre operations using two principal plantation models: purchased and planted, each of which is explained in greater detail below.  The purchased plantation model operates through two legal structures: the BVI model and, to a lesser extent, the WFOE model. The planted plantation model is operated exclusively through the WFOE model, although the WFOEs themselves are typically held indirectly through a BVI Entity.

#### A.  Purchased Plantation Model

The purchased plantation model under the BVI model only involves the purchase and sale of standing timber.

WFOEs are also engaged in the purchase and sale of standing timber. When conducted through a WFOE, purchases of standing timber are sometimes accompanied by concurrently obtaining plantation land use rights or leases.

In both the BVI and WFOE models, the purchase price of the trees takes into account a variety of factors such as the trees' species, age, size, quality and location.  Other considerations include soil and weather conditions for replanting, log prices, and regional market location and demand.  Sino-Forest does not typically need to conduct extensive plantation management work with respect to the trees growing on the purchased plantations, but does take measures to ensure that the trees are protected from pests, disease and theft.

Sino-Forest's approach is to purchase plantations in remote parts of the PRC that the PRC government has identified in its five year plans as being areas for future development.  As a result, physical access to the plantations is often very challenging.

The purchased plantations under Sino-Forest management in the PRC consist of a diverse mix of tree species, predominantly Chinese fir and pine.  Purchasing trees allows Sino-Forest to quickly expand its plantation portfolio geographically, as well as its inventory of harvestable fibre and leasable land.

#### B.  Planted Plantation Model

The planted plantation model is conducted by WFOEs, and involves obtaining plantation land use rights, sometimes with standing timber and sometimes as bare land suitable for planting.  Sales from these planted plantations do not utilize AIs but rather generally involve direct fund transfers to and from the WFOEs' suppliers and customers.

Sino-Forest leases suitable land on a long-term basis, typically 30 to 50 years, and applies scientifically advanced seedling technology and silviculture techniques that management believes improves tree growth. The mature trees are sold as standing timber or as harvested logs, and then Sino-Forest replants the land with seedlings.

Sino-Forest's operating model allows for the sale of fibre either as standing timber or harvested logs, depending on its customers' preferences and market demand.

Sino-Forest's planted plantations consist primarily of eucalyptus trees, a fast-growing high yielding species.

The goal of Sino-Forest's R&D efforts has been to improve tree plantation yields and the quality of the trees grown on Sino-Forest's plantations.

*Log Trading Operations*

Sino-Forest's operations in the trading of wood logs included the sourcing of wood logs and wood-based products mainly globally, and selling them in the domestic PRC market.

These wood-based products consist primarily of large diameter logs, sawn timber, veneers and other wood-based products sourced from Thailand, Suriname, Papua New Guinea, Brazil, Vietnam, Russia and New Zealand. In these transactions, Sino-Forest purchases wood-based products that correspond to the requirements of wood dealers, and sells directly to these dealers.  Sino-Forest's customers in these transactions are primarily wood dealers in the PRC. Given its current financial challenges, Sino-Forest has substantially ceased any new log trading initiatives.

*Manufacturing and Other Operations*

Sino-Forest currently has manufacturing operations in six provinces in the PRC that produce various wood-based products. In addition, Sino-Forest has greenery and nursery operations based in Jiangsu Province, which were established to source, supply and manage landscaping products for property developers and other organizations.

*Location of Sales*

Substantially all of Sino-Forest's sales (including the sales of Greenheart Group) are generated in the PRC.

*Suppliers*

Standing timber is sourced primarily from local suppliers in the PRC. As described above, the PRC-based suppliers are usually aggregators who acquire standing timber and/or land use rights from other suppliers or from original timber owners such as villagers or collectives.

Logs and wood-based products supplied through Sino-Forest's trading activities are sourced primarily from suppliers outside the PRC, primarily from Thailand, Suriname, Papua New Guinea, Brazil, Vietnam, Russia and New Zealand.

*Customers*

As described above, the AIs serve as Sino-Forest's customers under the BVI model of its standing timber business. WFOEs, on the other hand, can log the timber and sell both logs and standing timber to end customers, which means they do not need (and do not use) AIs.

*Employees*

SFC currently has two employees, one of which is based in Canada.  As at September 30, 2012, collectively, the SFC Companies employ a total of approximately 3,203 employees, with approximately 3,129 located in the PRC and approximately 72 located in Hong Kong. In addition, the Greenheart Group employs approximately 436 employees as at August 31, 2012.

*Reporting Issuer Status & Stock Exchange Listings*

SFC is a reporting issuer under Canadian securities laws and its Common Shares previously traded on the Toronto Stock Exchange.  Currently, SFC is in default of its reporting obligations under Canadian securities laws, its securities are subject to a cease trade order issued by the OSC and its Common Shares were delisted from the Toronto Stock Exchange in May, 2012.  The 2017 Notes and the 2014 Notes are listed but do not trade on the Singapore Stock Exchange.

## CCAA PROCEEDINGS AND OTHER MATTERS

### Events Leading to the Commencement of CCAA Proceedings

*Muddy Waters Report*

On June 2, 2011, Muddy Waters, which held a short position on SFC's shares, published a report (the "**MW Report**") alleging that Sino-Forest, among other things, was a "near total fraud" and a "Ponzi scheme." Among other things, the MW Report alleged that Sino-Forest does not hold the full amount of timber assets that it reports, that the timber assets actually held by Sino-Forest have been overstated, and that Sino-Forest overstated its revenue. In addition, the MW Report alleged that Sino-Forest has engaged in unreported related-party transactions.

*The Independent Committee, Ontario Securities Commission, Royal Canadian Mounted Police  and Hong Kong Securities and Futures Commission  Investigations*

On June 2, 2011, the same day that the MW Report was released, the Board appointed the Independent Committee, a Board committee consisting exclusively of directors independent of management of the Company, which in turn retained independent legal and financial advisors in Canada, Hong Kong and the PRC, to investigate the allegations set out in the MW Report.

On June 8, 2011, the OSC publicly announced that it was investigating matters related to SFC.

Later in June 2011, the HKSFC commenced an investigation into Greenheart Group.  As a company listed on the Hong Kong Stock Exchange and headquartered in Hong Kong, the HKSFC is Greenheart's primary securities regulator.  In addition to its investigation of Greenheart Group, the HKSFC has been assisting the OSC with its investigation pursuant to standing reciprocal agreements between the HKSFC and OSC.

In late August 2011, counsel for the Independent Committee received an inquiry from the RCMP requesting cooperation from the Independent Committee in connection with an investigation into the allegations in the MW Report.  Representatives of the Independent Committee met with and provided information to the RCMP from time to time.  The RCMP also has made information requests of the Independent Committee from time to time.

In connection with the OSC, HKSFC and RCMP investigations, Sino-Forest made extensive production of documents, in particular to the OSC, including documents sourced from jurisdictions outside of the OSC's power to compel production.  Sino-Forest also has facilitated interviews by the OSC with Sino-Forest personnel.  In addition, Sino-Forest has responded to extensive inquiries, the most far-reaching coming from the OSC, and has provided periodic oral briefings to OSC staff.  The Independent Committee Reports were provided to OSC staff on an unredacted basis, as described below.

*First Interim Report*

On August 10, 2011, the Independent Committee delivered the First Interim Report. SFC has publicly disclosed on SEDAR and on its website redacted versions of the First Interim Report and the two subsequent reports of the Independent Committee.  The three reports have been redacted to protect information that the Board believes is commercially sensitive, the disclosure of which could be harmful to Sino-Forest's business and operations, especially in the PRC.  Each of the three reports has been produced without redactions to OSC staff pursuant to a

compelled process designed to allow OSC staff to receive information relevant to its investigation, while at the same time protecting SFC's sensitive information.

The First Interim Report was the result of the Independent Committee and its advisors assembling and organizing significant data from Sino-Forest's records, and reviewing Sino-Forest's cash holdings, revenue and relationships. In the First Interim Report, while the Independent Committee did not determine that there was any validity to the allegations in the MW Report, its findings were limited as the investigation was still ongoing.

Also in its First Interim Report, the Independent Committee's accounting advisors confirmed Sino-Forest's cash balances in specific accounts as at June 13, 2011, for accounts located inside and outside of the PRC. A total of 293 accounts controlled by Sino-Forest in Hong Kong were confirmed, representing 100% of the expected cash position in Hong Kong. However, Sino-Forest had 267 accounts in the PRC with respect to which the logistics and requirements of in-person/in-branch verification in the PRC led the Independent Committee advisors to confirm 28 accounts, representing approximately 81% of the expected cash position in the PRC. The Independent Committee was satisfied based on this verification that Sino-Forest's expected cash position in the PRC existed as at the date of confirmation.

### Second Quarter 2011 Financial Results

The First Interim Report was delivered to the Board shortly before the Board was asked to authorize the release of SFC's 2011 interim financial statements for the second quarter ended June 30, 2011 (the **"Q2 Results"**). The Q2 Results were released on August 15, 2011.

Almost immediately after the Q2 Results were released, the Independent Committee's advisors identified and brought to the attention of the Independent Committee approximately 60 documents, some of which raised potential conduct issues and others of which raised questions as to whether Sino-Forest's relationships with some of its AIs and suppliers were conducted at arm's length.

On August 26, 2011, Allen Chan resigned as Chairman, Chief Executive Officer and as a director of SFC pending the completion of the review by the Independent Committee of the allegations in the MW Report. He was appointed Founding Chairman Emeritus and Mr. Judson Martin was appointed as Chief Executive Officer. Sino-Forest also placed three employees on administrative leave, and a fourth senior employee was requested to act solely on the instructions of Mr. Martin.

Also on August 26, 2011, the OSC issued a cease trade order with respect to the securities of SFC and with respect to certain senior management personnel. The cease trade order continues in force to date.

### Second Interim Report

On November 13, 2011, the Independent Committee delivered its Second Interim Report to the Board. Subject to the limitations described therein, the Second Interim Report confirmed registered title or contractual or other rights to Sino-Forest's stated timber assets, reconciled the book value of the BVI timber assets and Sino-Forest WFOE standing timber assets as set out in SFC's 2010 annual financial statements to the purchase prices for such assets as set out in the BVI and WFOE standing timber purchase contracts reviewed by the Independent Committee advisors and reconciled reported total revenue to sales contracts. Subject to the scope limitations described in the Second Interim Report, the Independent Committee confirmed to its satisfaction that the Company has registered title to approximately 151,000 hectares of plantations, being 17.9% of its disclosed timber holdings by area as at December 31, 2010, and additional contractual rights to approximately 683,000 hectares of plantations, being 81.3% of its disclosed timber holdings by area as at December 31, 2010. The Independent Committee reported that it or its advisors had reviewed originals or copies of purchase contracts for the acquisition by Sino-Forest of virtually all of its disclosed timber holdings as at December 31, 2010.

The Independent Committee noted a number of challenges that it had encountered in conducting its investigation including the following:

(a)     The PRC legal regime for forestry did not permit title to standing timber, when not held in conjunction with a land use right, to be definitively proven by reference to a government maintained register.

(b)     Obtaining information from third parties outside the control of the Independent Committee was very difficult.

(c)     Sino-Forest had a small management team which was stretched by the demands of the Independent Committee investigation, the OSC investigation and the auditors' review, as well as the management changes described above, among other reasons.

(d)     Cultural, language and geographic issues including that most of the Company's documents are in Chinese and most of its Asia-based management's first language is Chinese; the importance of personal relationships in the PRC; business practices with respect to documentation of contractual arrangements is not as comprehensive as would be typical in Western jurisdictions; and the wide geographic scope of the Company's operations within China.

(e)     Corporate governance and operational weaknesses arising from the fact that a small group of management are integral to maintaining relationships and negotiating contracts; operational and administrative systems are not sophisticated having regard to the size and complexity of the Company's business; no internal audit function; and use of personal email for Company business.

(f)     Complexity, lack of visibility and limitations of BVI model.

(g)     Lack of full cooperation/openness in the Independent Committee's examination from certain members of management.

(h)     Lack of independence of the Independent Committee process due to reliance on management.

For the full list of challenges and a more extensive description of them, refer to the Second Interim Report.

### *Failure to Release Third Quarter 2011 Financial Results and Default Under the Notes*

Subsequent to August 26, 2011, the Independent Committee's advisors identified additional documents that raised issues meriting comment and explanation from SFC's management.  SFC's external counsel, in responding to requests from the OSC, also identified documents of a similar nature.  Further documents meriting comment and explanation were identified by SFC's external auditors and in interviews conducted by OSC staff.

As SFC reached the November 15, 2011 deadline to release its 2011 third quarter financial statements for the period ended September 30, 2011 (the "**Q3 Results**"), the Audit Committee recommended and the Board agreed that SFC should defer the release of the Q3 Results until certain issues could be resolved to the satisfaction of the Board and SFC's then external auditor.  The issues included (i) determining the nature and scope of the relationships between Sino-Forest and certain of its AIs and suppliers, as discussed in the Second Interim Report, and (ii) the satisfactory explanation and resolution of issues raised by certain documents identified by the Independent Committee's advisors, SFC's counsel, SFC's external auditors, and/or by OSC staff.

On November 15, 2011, the date upon which SFC's Q3 Results were due, SFC issued a press release announcing that the Independent Committee had delivered its Second Interim Report to the Board.  The November 15, 2011 press release also stated that the Board had concluded that, as a result of ongoing work arising from the allegations raised in the MW Report, it was not in a position to authorize the release of the Q3 Results at that time.  The release stated that SFC would try to release the Q3 Results within 30 days.

SFC's failure to file the Q3 Results and provide a copy of the Q3 Results to the Trustees and to its Noteholders under the Note Indentures on or before November 15, 2011 constituted a default under those Note Indentures.  Pursuant to the Note Indentures, an event of default would have occurred if SFC failed to cure that default within 30 days in the

**246**

case of the senior Notes, and 60 days in the case of the convertible Notes, after having received written notice of such default from the relevant Trustee or the holders of 25% or more in aggregate principal amount of a given series of Notes.

While SFC worked diligently to try to resolve the outstanding issues, it became clear that SFC was not going to be able to release the Q3 Results within that time frame. On December 12, 2011, SFC issued a press release announcing that it would not be able to release the Q3 Results within the 30-day period originally indicated in the November 15, 2011 press release.

Moreover, in the press release, SFC announced that, in the circumstances, there was no assurance that it would be able to release the Q3 Results, or, if able, as to when such release would occur.  In the December 12, 2011 press release, SFC also announced that the Board had determined not to make the $9.775 million interest payment on the 2016 Notes that was due on December 15, 2011.

As disclosed in the December 12, 2011 press release, the circumstances that caused SFC to be unable to release the Q3 Results also could impact the reliability of SFC's historical financial statements and related audit reports.

SFC's failure to make the $9.775 million interest payment on the 2016 Notes when due on December 15, 2011 constituted a default under the 2016 Note Indenture.  Under the terms of that Note Indenture, SFC had 30 days to cure its default and make the required interest payment in order to prevent an event of default from occurring, which could have resulted in the acceleration and enforcement of the approximately $1.8 billion in Notes which have been issued by SFC and guaranteed by many of its Subsidiaries outside of the PRC.

On December 18, 2011, SFC announced that it had received written notices of default dated December 16, 2011, in respect of its 2014 Notes and its 2017 Notes.  The notices, which were sent by the Trustees under the relevant Note Indentures, referenced SFC's previously-disclosed failure to release the Q3 Results on a timely basis.  SFC reiterated in the December 18, 2011 press release that it did not expect to be able to file the Q3 Results and cure the default within the 30-day cure period.

In response to the receipt of the notices of default, among other considerations, on December 16, 2011, the Board established a Special Restructuring Committee of the Board (the "**Restructuring Committee**") comprised exclusively of directors independent of management of SFC, for the purpose of supervising, analyzing and managing strategic options available to SFC.  The members of the Restructuring Committee are William Ardell, Chair of the Board, who is also Chair of the Restructuring Committee, and Garry West.  James Hyde, Chair of the Audit Committee and an independent director, while not a member of the Restructuring Committee, has attended meetings of the Restructuring Committee and participated fully in its deliberations.

Following discussions with its external auditors, on January 10, 2012, SFC issued a press release cautioning that its historical financial statements and related audit reports should not be relied upon.

*The Waiver Agreements*

On January 12, 2012, SFC announced that following extensive discussions with an ad hoc committee of Noteholders, holders of a majority in principal amount of SFC's 2014 Notes and its 2017 Notes had agreed to waive the default arising from SFC's failure to release the Q3 Results on a timely basis.

Pursuant to the waiver agreements, SFC agreed, among other things, to make the $9.775 million interest payment on its 2016 Notes that was due on December 15, 2011, curing the default under the 2016 Note Indenture.  That payment was made in accordance with the waiver agreements.

*The Independent Committee's Final Report*

On January 31, 2012, SFC publicly released a redacted version of the Final Report of the Independent Committee. The Final Report set out the activities undertaken by the Independent Committee since mid-November 2011, the findings from such activities and the Independent Committee's conclusions regarding its examination and review.

The Independent Committee concluded that notwithstanding that there remained issues which had not been fully answered, the work of the Independent Committee was at the point of diminishing returns because much of the information which it was seeking lay with non-compellable third parties, might not exist or was apparently not retrievable from the records of the Company.

In its January 31, 2012 press release announcing the release of the Final Report, SFC also disclosed the results of a "proof of concept" tree asset verification process undertaken to determine if the standing timber referenced in particular purchase contracts could be located and quantified by an independent forestry expert engaged to undertake the exercise. The exercise was undertaken to address the issue raised in the Second Interim Report regarding the absence of maps in the possession of SFC's BVI Subsidiaries to show the precise location of the timber subject to plantation purchase contracts.

Subsequent to January 31, 2012, Sino-Forest has taken steps to apply the tree asset verification process over a statistically relevant sampling of Sino-Forest's forest assets. The results of the proof of concept exercise and the process undertaken since the release of the Final Report are described below in "*CCAA Proceedings and Other Matters – Asset Verification Process*".

Following the delivery of the Final Report, and in accordance with the waiver agreements, the Board adopted a resolution instructing the Independent Committee to cease its investigative, review and oversight activities. Any issues within the authority of the Independent Committee that remained outstanding were referred to SFC's Audit Committee or Restructuring Committee.

### *Gating Issues to an Audit*

SFC worked diligently to address issues identified by SFC's Audit Committee, the Independent Committee and by its then external auditor, Ernst & Young LLP ("**E&Y**"), as requiring resolution in order for SFC to be in a position to obtain an audit opinion in relation to the 2011 Results. Many of the same issues also impact SFC's ability to release the Q3 Results.

As SFC has publicly disclosed in its press releases, the gating issues to the release of the Q3 Results and to obtaining an audit of the 2011 Results include (i) determining the nature and scope of the relationships between Sino-Forest and certain of its AIs and suppliers, and (ii) the satisfactory explanation and resolution of issues raised by certain documents identified by the Independent Committee's advisors, SFC's counsel, SFC's auditors, and/or by OSC staff.

The "relationship issues" described above are discussed extensively in the Second Interim Report and in the Final Report of the Independent Committee. Relationship issues were prominent in the approximately 60 documents provided to OSC staff, and SFC remains unable to resolve them.

### *Restructuring Support Agreement with Noteholders*

While the waiver agreements prevented the Trustees under the relevant Note Indentures from accelerating and enforcing the Note indebtedness as a result of SFC's failure to file its Q3 Results, those waiver agreements would have expired on the earlier of April 30, 2012 and any earlier termination of the waiver agreements in accordance with their terms. In addition, SFC's pending failure to file its audited financial statements for its fiscal year ended December 31, 2011 (the "**2011 Results**") by March 30, 2012, would have again put the Trustees in a position to accelerate and enforce the Note indebtedness, creating additional uncertainty around the SFC Business.

Following extensive arm's length negotiations between SFC and an ad hoc committee of Noteholders, the parties agreed on the framework for a consensual resolution of SFC's defaults and the restructuring of its business, and entered into the Support Agreement on March 30, 2012, which was initially executed by holders of SFC's Notes holding approximately 40% of the aggregate principal amount of the Notes. As at the Consent Date, holders of over 72% of the aggregate principal amount of the Notes have agreed to be parties to the Support Agreement.

From a commercial perspective, the restructuring contemplated by the Support Agreement was intended to accomplish the following objectives:

(a)    the separation of Sino-Forest's business operations from the problems facing SFC outside of the PRC by transferring the intermediate holding companies which own the SFC Business and SFC's intercompany claims against its Subsidiaries (which include the entire substantive operations of the SFC Companies) to the Noteholders and Other Affected Creditors (as defined in the Support Agreement) in compromise of their claims against SFC (if the Sale Solicitation Process did not generate a superior transaction, as described below);

(b)    the Sale Solicitation Process being undertaken to determine if any person or group of persons would purchase Sino-Forest's business operations pursuant to a CCAA plan for an amount in excess of a threshold amount of consideration, with the potential for excess above such threshold amount being directed to shareholders and other stakeholders subordinate to the Noteholders.  The Sale Solicitation Process was intended to ensure that SFC pursued all avenues available to it to maximize value for its stakeholders;

(c)    a structure (including funding) that would enable litigation claims to be pursued for the benefit of SFC's stakeholders in accordance with the Support Agreement against a number of potential defendants; and

(d)    if the Sale Solicitation Process did not result in a sale, constituents subordinate to the Noteholders recovering some "upside" in the form of a profit participation if Sino-Forest's business operations acquired by the Noteholders were monetized within seven years from the date of the implementation of the Plan at a profit, as further described in the Support Agreement.

The decision to enter into the Support Agreement was given careful consideration by the Board. But for the negotiation and execution of the Support Agreement, SFC would have been unable to prevent the acceleration and enforcement of the rights of the Noteholders as soon as April 30, 2012, in which case SFC would have been unable to continue as a going concern.

The Support Agreement provided that SFC would make an application under the CCAA, and if necessary under the CBCA, in order to implement the Plan.  The Plan as described in this Information Statement contains certain terms that differ materially from the terms of the Support Agreement as entered into on March 31, 2012.

The Support Agreement was amended effective as of August 14, 2012 and October 19, 2012, to extend certain dates and conform the Support Agreement to the terms ultimately agreed to in the Plan.

**Commencement of CCAA Proceedings**

On March 30, 2012, SFC announced that it had entered into the Support Agreement and that it had obtained the Initial Order from the Court for creditor protection pursuant to the provisions of the CCAA.  Under the terms of the Initial Order, FTI Consulting Canada Inc. was appointed as Monitor.

On March 30, 2012, SFC also obtained an order from the Court approving a sale solicitation process (the "**Sale Solicitation Process**") pursuant to which SFC's financial advisor, Houlihan Lokey ("**Houlihan**") would solicit from prospective strategic or financial parties offers to purchase substantially all of SFC's assets (other than certain excluded assets).

**Resignation of External Auditor**

On April 5, 2012, SFC announced that E&Y had notified SFC that it has resigned as SFC's auditor effective April 4, 2012. In its resignation letter to the Company, E&Y noted that SFC had not prepared December 31, 2011 consolidated financial statements for audit and that, in SFC's March 30, 2012 filing under the CCAA, SFC said that it remained unable to satisfactorily address outstanding issues in relation to its 2011 Results.

**OSC Proceedings**

On April 5, 2012, the Company announced that it had received an "Enforcement Notice" from staff of the OSC. The Company also learned that Enforcement Notices were received that day by six of its former officers, Allen Chan, Albert Ip, Alfred Hung, George Ho, Simon Yeung and David Horsley.

Following review of the Enforcement Notice directed at the Company, further discussions with staff of the OSC, together with examination of issues identified in the Enforcement Notice received by the Company, on April 17, 2012, SFC announced that it had terminated the employment of Messrs. Hung, Ho and Yeung, each of whom had previously been placed on administrative leave from the Company, and that Mr. Ip, who had previously resigned as an officer of the Company, would no longer serve as a consultant to the Company. The Company also announced that Mr. Chan, who had previously resigned as Chairman, Chief Executive Officer and Director but continued with the Company as Founding Chairman Emeritus, had resigned from the Company and that Mr. Horsley had resigned as the Company's Chief Financial Officer but would continue as an officer and employee of the Company, to assist with the Company's restructuring efforts. Following discussions with the Monitor, the Company obtained an Order of the Court to enhance the powers of the Monitor in order to, among other things, facilitate the Monitor providing additional assistance and oversight to the Company in light of the personnel changes identified above.

On May 22, 2012, the OSC commenced proceedings before the OSC against the Company and Messrs. Chan, Ip, Hung, Ho, Yeung and Horsley (collectively, the "Individual Respondents"). In the notice of hearing and statement of allegations, OSC staff allege that the Company breached Ontario securities laws and acted in a manner that is contrary to the public interest by (i) providing information to the public in documents required to be filed or furnished under Ontario securities laws which was false or misleading in a material respect contrary to section 122 of the Securities Act and (ii) engaging or participating in acts, practices or a course of conduct related to its securities which it knows or reasonably ought to know perpetuate a fraud on any person or company contrary to section 126.1 of the Act. The alleged breaches of Ontario securities laws relate, among other things, to the following allegations:

(a) the Company had undisclosed control over suppliers, AIs and other nominee companies within the BVI model employed by the Company to buy and sell standing timber in the PRC through its BVI Subsidiaries;

(b) the Company had an undisclosed dishonest process of creating deceitful purchase contracts and sales contracts and their key attachments to buy and sell standing timber to inflate assets and revenue; and

(c) the Company had undisclosed internal control weaknesses/deficiencies that facilitated and concealed the fraudulent conduct of its BVI Subsidiaries, suppliers, AIs and other companies who bought and sold assets in the BVI model, and the dishonest creation of purchase contracts and sales contracts, including their key attachments.

OSC staff has made allegations against the Individual Respondents, other than Mr. Horsley, consistent with those noted above. In addition, OSC staff has made certain additional allegations against each of the Individual Respondents, including Mr. Horsley.

On September 26, 2012, SFC announced that the Company had received a second enforcement notice from staff of the OSC. The second enforcement notice added a further allegation similar in nature to the allegations in the statement of allegations issued on May 22, 2012.

On September 27, 2012, SFC announced that Mr. Horsley had ceased to be employed by Sino-Forest.

In its notice of hearing dated May 22, 2012, OSC staff asked the OSC to consider whether it would be in the public interest to impose various monetary and non-monetary sanctions against the Company and against the Individual Respondents.

OSC staff has reserved the right to claim up to $100 million as against the Directors and Officers of SFC.

As part of the OSC proceeding, OSC staff is required to make disclosure to SFC and to the Individual Respondents of evidence collected by OSC staff, including evidence on which OSC staff will attempt to prove the allegations in the Statement of Allegations. This includes evidence not previously known to SFC. Based on the contents of the Enforcement Notices, the Statement of Allegations, the evidence disclosed by OSC Staff, and all of the evidence now known to SFC, there may be merit to some of the allegations made against the Individual Respondents. That, in turn, could impact the integrity of SFC's historical financial and other disclosures, and could impact some of the operational issues being experienced by SFC.

**Sale Solicitation Process**

In connection with the commencement of the CCAA Proceedings, and as contemplated by the Support Agreement, the Company obtained the Sale Process Order which provided for the implementation of the Sale Solicitation Process in accordance with Court-approved Sale Process Procedures (the "**SPP**").

The purpose of the Sale Solicitation Process was to determine whether any parties were willing to purchase substantially all of Sino-Forest's business operations for an amount equal to at least 85% of the amount owing under the Notes. Under the terms of the Sale Process Order, the Company's financial advisor, Houlihan, conducted the Sale Solicitation Process in consultation with the Company and the Monitor.

Houlihan, in consultation with the Monitor and the Company, selected a group of eighty-five strategic and financial buyers (comprised of buyers who had either contacted Houlihan or the Company or were otherwise chosen to be in the group) and provided those potentially interested parties with copies of a "teaser" letter containing a brief description of the business of Sino-Forest.

The Company negotiated fourteen confidentiality agreements with those parties who indicated an interest in the Sino-Forest business and provided such parties with access to a data room containing certain limited corporate and other information regarding Sino-Forest. Certain of these bidders were ultimately deemed to be "Phase I Qualified Bidders" in accordance with the SPP requirements.

On or about June 28, 2012 (the "**Phase I Bid Deadline**"), a number of non-binding letters of intent (the "**LOIs**") were received by the Company.

Pursuant to the SPP, upon receipt of the LOIs the Company, in consultation with Houlihan and the Monitor, was required to determine whether any such LOIs constituted "Qualified Letters of Intent" and to notify parties as to whether their LOI constituted a Qualified Letter of Intent within seven business days of the Phase 1 Bid Deadline.

The Company, in consultation with the Monitor and Houlihan, determined that none of the LOIs constituted a Qualified Letter of Intent as provided for under the SPP, and on July 10, 2012, the Company issued a press release announcing the termination of the Sale Solicitation Process. The Company also announced that it intended to proceed with the Restructuring Transaction as contemplated by the Support Agreement.

**Effects of MW Report, OSC Allegations and Related Events**

The uncertainty concerning Sino-Forest's business practices, created by the allegations set forth in the MW Report, the allegations set out in the OSC's Statement of Allegations and other events discussed below among other things, continue to have significant negative effects on the reputation and business of Sino-Forest, as described below.

***Effects on Operations (including Accounts Receivable)***

Sino-Forest's timber and trading businesses have effectively frozen and ground to a halt. Since January 2012, in order to conserve cash, Sino-Forest has only completed cash purchases which were previously committed to and has not made any new commitments in the WFOE model. Sino-Forest has therefore not grown its asset base since the release of the MW Report.

Also, the SFC Companies have had an extremely difficult time collecting outstanding receivables as a result of, among other things, the perceived uncertainty surrounding the SFC Companies in the PRC.  On March 30, 2012, the date SFC obtained the Initial Order, Sino-Forest's counsel in the PRC had sent legal demand letters to 12 BVI trading companies for accounts receivable totaling approximately U.S.$126 million and five WFOE companies totaling approximately RMB 224.5 million. Additional legal demand letters for smaller accounts were also in process, and other accounts receivable were being negotiated.  The Company has also sent a legal demand letter to a supplier of logs who has failed to deliver on time in connection with a U.S.$47 million purchase which the Company paid in advance.

Subsequent to March 30, 2012, SFC has continued efforts through its PRC counsel and otherwise to collect receivables owing to its WFOE Subsidiaries and to preserve receivables owing to SFC's BVI Subsidiaries held by AIs and other PRC and BVI domiciled corporate customers. In taking these steps, SFC has learned that certain of the entities with receivables owing to the Subsidiaries have recently deregistered under PRC law. Deregistration has the effect of terminating the existence of the entity. Of the U.S.$887.4 million SFC's records show as owed to BVI Subsidiaries from AIs, approximately U.S.$504.8 million is owed by three AIs that SFC has learned have been deregistered. Of the U.S.$126.2 million the Company's records show as owed to other BVI Subsidiaries from certain PRC and BVI domiciled corporate customers, approximately U.S.$63.8 million is owed by six PRC corporate customers that SFC has learned have been deregistered. One of these six companies also is one of the three AIs that deregistered. SFC believes, based on advice from its PRC counsel, that the deregistrations were improper under PRC law, and that remedies are available to it as a result of the actions taken.

At the same time that the SFC Companies are having a difficult time collecting outstanding receivables, they are receiving increased demands on their payables. Certain of Sino-Forest's creditors in the PRC have taken aggressive collection tactics in the PRC, including filing court claims in an effort to be paid amounts owed to them by Sino-Forest. If the uncertainty related to Sino-Forest's business operations continues, SFC expects increasing legal actions from other creditors in respect of the Subsidiaries.

Sino-Forest has not been able to secure or renew certain existing onshore banking facilities and has been unable to obtain offshore letters of credit to facilitate Sino-Forest's trading business.  All offshore banking facilities have been repaid and frozen, or cancelled. Since June 2, 2011, all Hong Kong banks have asked for voluntary repayment of outstanding loans.  Banking facilities with a total credit amount of U.S.$67.9 million were terminated by four banks between June 10, 2011 and August 29, 2011.  Facilities of U.S.$152.3 million were frozen upon full repayment. In the PRC, facilities totaling RMB 159.6 million were asking for voluntary repayments.  For the PRC banks providing facilities, Sino-Forest was requested to increase its cash deposits so as to demonstrate financial strength. This has led to substantial damage in Sino-Forest's operations, and affects Sino-Forest's ability to complete obligations under existing contracts, resulting in losses potentially in excess of U.S.$100 million.

Certain PRC governmental agencies and authorities are expressing increased concern over SFC and are becoming less inclined to be supportive of Sino-Forest, making the ability to obtain legal documents more difficult.  For example, a certain PRC governmental authority has withheld cutting licenses resulting in lower harvesting volumes. Relationships with certain local government and local plantation suppliers have also become strained, resulting in many difficulties and obstacles in Sino-Forest's operations including an inability to complete certain acquisitions of plantations. For example, in the Anqing, Anhui area in the PRC, the local government no longer showed support to Sino-Forest and the plantation land owner refused to honour the plantation purchase contracts.

*Fees and Expenses*

SFC has and will continue to incur a substantial amount of fees and expenses in connection with the CCAA Proceedings, the prosecution by the OSC, and the Class Actions. Further, pursuant to indemnification agreements between SFC and its directors and certain officers as well as with auditors, underwriters and other parties, SFC may be obligated to indemnify such individuals and firms for additional legal and other expenses pursuant to such proceedings. The aggregate of SFC's fees and expenses to date is substantial and has had an adverse effect on Sino-Forest's operating results.

**Asset Verification Process**

Subsequent to the release of the Second Interim Report, the Independent Committee requested that an independent forestry expert undertake a proof of concept exercise to determine if two compartments in particular purchase contracts could be located and quantified by such forestry expert. A "compartment" is a forestry term used to indicate an area of trees, usually contiguous. The Company retained Stewart Murray (Singapore) Pte. Ltd. ("**Stewart Murray**") and Indufor Asia Pacific Limited ("**Indufor**") as third-party consultants (collectively, the "**Consultants**"). The proof of concept exercise was confined to two compartments. The selection criteria limited the sample to purchased timber assets located in Yunnan province. The candidate assets were acquired prior to the allegations in the MW Report. They were listed as being held by BVI Entities and not by WFOE entities. At the Independent Committee's request, the Consultants selected a shortlist of 10 possible compartments meeting the criteria above, avoiding any prospect that the sampling involved personnel from the Company. Multiple county forestry bureaus were represented in the shortlist, and the Independent Committee made the final selection of compartments to ensure more than one county forestry bureau was represented.

Within the proof of concept exercise, the maps of the two compartments were provided by the Company to Indufor. Such maps were borrowed by the contracted survey company from forestry bureaus. These showed the extent of each compartment's boundary that corresponded to those in surveys related to the purchase contracts. The Consultants then geo-referenced and digitized these boundaries, and entered them into a Geographic Information System. The Consultants located and physically inspected the two forest compartments. The inspection procedure included documenting certain qualitative characteristics of each compartment. The Consultants confirmed that the compartments were forested, but did not undertake an assessment of standing timber volume. The geo-referenced compartment boundaries were superimposed on recent high resolution satellite imagery and this allowed measurement of each compartment's forest cover. This process allowed the removal of areas lacking forest cover from the assessment of compartment net stocked area.  The Consultants compared the net stocked area of forest cover that they assessed for each compartment with that stated in the Sino-Forest purchase contracts and forest survey reports. The Consultants found that the net stocked area of forest cover in each compartment was within six percent of that stated in the relevant purchase contracts and forest survey reports. The analysis and findings from the area verification test were limited solely to the two compartments that were the subject of the proof of concept exercise.   These findings were publicly announced in a news release issued by the Company January 31, 2012.

As the proof of concept exercise was successful, the area verification test process was implemented on a broader scale.  As of October 15, 2012, Indufor reported that it had obtained access to the compartment maps for BVI purchase contracts and WFOE plantation rights certificates that cover 158,735 hectares representing close to 20% of the 806,685 hectares of Sino-Forest's reported estate as at December 31, 2011.  Indufor has subsequently confirmed the compartment locations of 88,885 hectares of these purchase contracts and plantation rights certificates representing close to 11% of the reported Sino-Forest estate as at December 31, 2011.

The total area of the compartments assessed by Indufor using the satellite based verification process is comprised of 83,139 hectares of WFOE plantations and 5,746 hectares of BVI plantations. This represents a difference of 944 hectares (+1.1%) when compared to the equivalent measurement of area as detailed in the Company's BVI purchase contracts and WFOE plantation rights certificates for these same compartments.  Indufor has assessed the productive area of these compartments as being 86,332 hectares and this has been determined by removing areas that cannot contain forest cover.  The Company understands this to be standard industry practice and represents the removal of non-productive areas such as swamps, rivers and permanent roads from the total area of each compartment.  Indufor has assessed the area of stocked forest cover within these compartments to be 76,276 hectares.

The 10,057 hectare difference between the productive area and the area of stocked forest cover is accounted for by operational roads and landings used for forest management (3,139 hectares) and unstocked areas (6,918 hectares) where harvesting has recently occurred or where the status of the forest cover cannot be determined using the satellite images.

As previously disclosed, including in the reports of the Independent Committee and the affidavit for the Initial Order, asset verification to any degree of certainty may be difficult in this situation given many factors including, the nature of the assets, geographical impediments, political impediments and financial resources available. Analysis and findings of  the Indufor reports are limited solely to the area that has been verified.  No extrapolations

44

of findings to the wider Sino-Forest estate are possible or implied, and conclusions as to forest yield cannot be made based on the results of the stocked forest cover assessment.  Forest inspection visits are required to confirm the quality and yield of the area assessed as stocked forest cover. To date inspection of the forest cover has not been conducted and the interpretation of stocked forest area may therefore be subject to change as a result of any future forest inspections.

The asset verification testing does not establish title to or value of the assets.

The area verification exercise undertaken by Indufor is a lengthy and expensive process that requires the dedication of long-term resources. In October, 2012, at the request of the Initial Consenting Noteholders, Sino-Forest has agreed to wind down the existing asset verification process in order to conserve resources and focus on implementation of the Restructuring.

## Equity Claims Motion

On June 26, 2012, the Company brought a motion for a direction from the Court that certain claims against the Company that result from the ownership, purchase or sale of an equity interest in the Company and resulting indemnity claims are "equity claims" as defined in the section 2 of the CCAA.    On July 27, 2012, the Court issued its decision. The Court found, among other things, that certain shareholder claims and related indemnity claims are "equity claims" as defined in section 2 of the CCAA, which would be subordinated to any impaired debt claims in a CCAA proceeding.  With respect to the claims of SFC's former auditors, E&Y, BDO Limited, and SFC's former underwriters for indemnification in respect of the shareholder claims that have been made against them as defendants in the Class Actions, the Court concluded that the most significant aspect of those claims constitute subordinated "equity claims". However, the Court did not make a determination as to whether defence costs incurred in defending the Class Action Claims were "equity claims". The Court's decision was without prejudice to the Company's right to apply for a similar order with respect to (i) any claims made in the Class Actions or otherwise that are in respect of securities other than shares (such as notes) and (ii) any indemnification claims against the Company related thereto. The foregoing description is qualified in its entirety by the full text of the Court's decision, a copy of which is available on the Website.

On October 10, 2012, the Ontario Court of Appeal granted leave to E&Y, BDO Limited and the underwriters involved in the CCAA Proceedings to appeal the Court's decision. The appeal is scheduled to be heard on November 13, 2012.

## DESCRIPTION OF THE PLAN

*The following is a summary only of certain material terms of the Plan. Creditors are urged to read the Plan in its entirety.  A copy of the Plan is attached as Schedule C to this Information Statement.*

## Purpose of the Plan

The purpose of the Plan is: (a) to effect a full, final and irrevocable compromise, release, discharge, cancellation and bar of all Affected Claims; (b) to effect the distribution of the consideration provided for in the Plan in respect of Proven Claims; (c) to transfer ownership of the SFC Business to Newco, free and clear of all claims against SFC and certain related claims against the Subsidiaries, so as to enable the SFC Business to continue on a viable, going concern basis; and (d) to allow Affected Creditors and Noteholder Class Action Claimants to benefit from contingent value that may be derived from litigation claims to be advanced by the Litigation Trustee.

The Plan is put forward in the expectation that the Persons with an economic interest in SFC, when considered as a whole, will derive a greater benefit from the implementation of the Plan and the continuation of the SFC Business as a going concern than would result from a bankruptcy or liquidation of SFC.  The Plan was negotiated with counsel to the Initial Consenting Noteholders. As at the Consent Date under the Support Agreement, Noteholders holding over 72% of the aggregate principal amount of the Notes have become parties to the Support Agreement, pursuant to which they have agreed to vote in favour of the Plan in accordance with the terms of the Support Agreement.