**Impact of the Plan**

The Plan provides for, among other things, the final and irrevocable settlement, compromise, discharge and release of Affected Claims and effectuates the restructuring of SFC.

**Classification of Creditors**

For the purposes of considering and voting on the Plan, the Affected Creditors will constitute a single class (the "**Affected Creditors Class**").  The Equity Claimants will constitute a single class separate from the Affected Creditors Class, but will have no right to attend the Meeting or vote on the Plan in such capacity.

**Treatment of Affected Parties Pursuant to the Plan**

*Affected Creditors*

All Affected Creditor Claims will be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date.  Each Affected Creditor that has a Proven Claim will be entitled to receive the following in accordance with the Plan:

(a)     such Affected Creditor's Pro-Rata number of the Newco Shares to be issued by Newco from the Affected Creditors Equity Sub-Pool in accordance with the Plan;

(b)     such Affected Creditor's Pro-Rata amount of the Newco Notes to be issued by Newco in accordance with the Plan; and

(c)     such Affected Creditor's Pro-Rata share of the Litigation Trust Interests to be allocated to the Affected Creditors in accordance the Plan and the terms of the Litigation Trust.

From and after the Plan Implementation Date, each Affected Creditor, in such capacity, will have no rights as against SFC in respect of its Affected Creditor Claim.

*Early Consent Noteholders*

As additional consideration for the compromise, release, discharge, cancellation and bar of the Affected Creditor Claims in respect of its Notes, each Early Consent Noteholder will receive its Pro-Rata number of the Newco Shares to be issued by Newco from the Early Consent Equity Sub-Pool in accordance with the Plan.

*Unaffected Claims*

Any amounts properly owing by SFC in respect of Unaffected Claims will be satisfied in accordance with the Plan. Nothing in the Plan will affect SFC's rights and defences, both legal and equitable, with respect to any Unaffected Claims, including all rights with respect to legal and equitable defences or entitlements to set-offs or recoupments against such Unaffected Claims.

In accordance with the Plan, each Unaffected Claim that is finally determined as such, as to status and amount, and that is finally determined to be valid and enforceable against SFC, in each case in accordance with the Claims Procedure Order or other Order (i) except for Claims secured by the Administration Charge or the Directors' Charge and Lien Claims as described in subparagraphs (ii) and (iii) below, will be paid in full from the Unaffected Claims Reserve and limited to recovery against the Unaffected Claims Reserve, and Persons with Unaffected Claims will have no right to make any claim or seek any recoveries from any Person in respect of Unaffected Claims, other than enforcing such Person's right against SFC to be paid from the Unaffected Claims Reserve; (ii) in the case of Claims secured by the Administration Charge or the Directors' Charge, will, if billed or invoiced sufficiently prior to the Plan Implementation Date, be paid prior to the Effective Time and, if billed or invoiced to SFC after the Plan Implementation Date, be paid in the ordinary course from the Administration Charge Reserve (in the case of claims secured by the Administration Charge) or the Directors' Charge Reserve (in the case of claims secured by the

Directors' Charge), and all Claims secured by the Administration Charge will be limited to recovery against the Administration Charge Reserve and all Claims secured by the Directors' Charge will be limited to recovery against the Directors' Charge Reserve, and Persons with Claims secured by the Administration Charge or the Directors' Charge will have no right to make any claim or seek any recoveries from any Person in respect of such Claims, other than enforcing such Person's right against the Administration Charge Reserve or the Directors' Charge Reserve, respectively; and (iii) in the case of Lien Claims: (a) at the election of the Initial Consenting Noteholders, and with the consent of the Monitor, SFC will satisfy such Lien Claim by the return of the applicable property of SFC that is secured as collateral for such Lien Claim, and the applicable Lien Claimant will be limited to its recovery against such secured property in respect of such Lien Claim, (b) if the Initial Consenting Noteholders do not elect to satisfy such Lien Claim by the return of the applicable secured property: (A) SFC shall repay the Lien Claim in full in cash on the Plan Implementation Date; and (B) the security held by the applicable Lien Claimant over the property of SFC shall be fully, finally, irrevocably and forever released, discharged, cancelled and barred, and (c) upon the satisfaction of a Lien Claim in accordance with the foregoing, such Lien Claims shall be fully, finally, irrevocably and forever released, discharged, cancelled and barred.

### Noteholder Class Action Claimants

Pursuant to the Plan, all Noteholder Class Action Claims against SFC, the Subsidiaries or the Named Directors or Officers (other than any Noteholder Class Action Claims against the Named Directors or Officers that are Section 5.1(2) D&O Claims, Conspiracy Claims or Non-Released D&O Claims) will be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred without consideration as against all said Persons on the Plan Implementation Date.  Noteholder Class Action Claimants will not receive any consideration or distributions under the Plan in respect of their Noteholder Class Action Claims, except that each Noteholder Class Action Claimant will be entitled to receive its share of the Litigation Trust Interests to be allocated to Noteholder Class Action Claimants in accordance with the terms of the Litigation Trust and the Plan, as such Noteholder Class Action Claimant's share is determined by the applicable Class Action Court.

Pursuant to the Plan, Noteholder Class Action Claims as against the Third Party Defendants are not compromised, discharged, released, cancelled or barred, and will be permitted to continue as against the Third Party Defendants and will not be limited or restricted by the Plan in any manner as to quantum or otherwise (including any collection or recovery for such Noteholder Class Action Claims that relates to any liability of the Third Party Defendants for any alleged liability of SFC), provided that:

(a)     in accordance with the releases set forth in Article 7 of the Plan, the collective aggregate amount of all rights and claims asserted or that may be asserted against the Third Party Defendants in respect of any such Noteholder Class Action Claims for which any such Persons in each case have a valid and enforceable Class Action Indemnity Claim against SFC (the "**Indemnified Noteholder Class Action Claims**") will not exceed, in the aggregate, the Indemnified Noteholder Class Action Limit, and in accordance with section 7.3 of the Plan, all Persons will be permanently and forever barred, estopped, stayed and enjoined, on and after the Effective Time, from seeking to enforce any liability in respect of the Indemnified Noteholder Class Action Claims that exceeds the Indemnified Noteholder Class Action Limit; and

(b)     any Class Action Indemnity Claims against SFC by the Third Party Defendants in respect of the Indemnified Noteholder Class Action Claims will be treated as Affected Creditor Claims against SFC, but only to the extent that any such Class Action Indemnity Claims are determined to be properly indemnified by SFC, enforceable against SFC and are not barred, extinguished or subordinated by the Claims Procedure Order or otherwise, and further provided that the aggregate liability of SFC in respect of all such Class Action Indemnity Claims will be limited to the lesser of: (x) the actual aggregate liability of the Third Party Defendants pursuant to any final judgment, settlement or other binding resolution in respect of the Indemnified Noteholder Class Action Claims (inclusive of any defence costs incurred by the Third Party Defendants in their defence of the Indemnified Noteholder Class Action Claims to the extent that SFC owes a valid and enforceable indemnification obligation to any such Persons in respect of such defence costs); and (y) the Indemnified Noteholder Class Action Limit.

Nothing in the Plan impairs, affects or limits in any way the ability of SFC, the Monitor or the Initial Consenting Noteholders to seek or obtain an Order, whether before or after the Plan Implementation Date, directing that Class Action Indemnity Claims in respect of Noteholder Class Action Claims or any other Claims of the Third Party Defendants should receive the same or similar treatment as is afforded to Class Action Indemnity Claims in respect of Equity Claims under the terms of the Plan.

### Equity Claimants

Pursuant to the Plan, all Equity Claims will be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Equity Cancellation Date. Equity Claimants will not receive any consideration or distributions under the Plan and will not be entitled to vote on the Plan at the Meeting.

Holders of Existing Shares and Equity Interests will not receive any consideration or distributions under the Plan in respect thereof and will not be entitled to vote on the Plan at the Meeting. Unless otherwise agreed between the Monitor, SFC and the Initial Consenting Noteholders, all Existing Shares and Equity Interests shall be fully, finally and irrevocably cancelled on the Equity Cancellation Date.

### Equity Class Action Claims Against the Third Party Defendants

Notwithstanding anything to the contrary in the Plan, any Class Action Claim against the Third Party Defendants that relates to the purchase, sale or ownership of Existing Shares or Equity Interests: (a) is unaffected by the Plan; (b) is not discharged, released, cancelled or barred pursuant to the Plan; (c) will be permitted to continue as against the Third Party Defendants; (d) will not be limited or restricted by the Plan in any manner as to quantum or otherwise (including any collection or recovery for any such Class Action Claim that relates to any liability of the Third Party Defendants for any alleged liability of SFC); and (e) does not constitute an Equity Claim or an Affected Claim under the Plan.

### Claims of the Trustees and Noteholders

Pursuant to the Plan, all claims filed by the Trustees in respect of the Noteholder Claims (other than any Trustee Claims) will be treated as Affected Creditor Claims and the Trustees and the Noteholders will have no other entitlements in respect of the guarantees and share pledges that have been provided by the Subsidiaries, or any of them, all of which will be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date as against the Subsidiaries pursuant to the Plan.

### Claims of the Third Party Defendants

Pursuant to the Plan, all claims filed by the Third Party Defendants against SFC and/or any of its Subsidiaries will be treated as follows:

    (a)    all such claims against the Subsidiaries will be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date in accordance with the Plan;

    (b)    all such claims against SFC that are Class Action Indemnity Claims in respect of Indemnified Noteholder Class Action Claims shall be treated as described in "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan – Noteholder Class Action Claimants*";

    (c)    all such claims against SFC for indemnification of Defence Costs will be treated as described in "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan – Defence Costs*"; and

    (d)    all other claims will be treated as Equity Claims.

*Defence Costs*

Pursuant to the Plan, all Claims against SFC for indemnification of defence costs incurred by any Person in connection with defending against Shareholder Claims (as defined in the Equity Claims Order), Noteholder Class Action Claims or any other claims of any kind relating to SFC or the Subsidiaries ("**Defence Costs**") will be treated as follows:

(a) as Equity Claims to the extent they are determined to be Equity Claims under any Order; and

(b) as Affected Creditor Claims to the extent that they are not determined to be Equity Claims under any Order, provided that:

(i) if such Defence Costs were incurred in respect of a claim against the applicable Person that has been successfully defended and the Claim for such Defence Costs is otherwise valid and enforceable against SFC, the Claim for such Defence Costs will be treated as a Proven Claim; provided that if such Claim for Defence Costs is a Class Action Indemnity Claim of a Third Party Defendant against SFC in respect of any Indemnified Noteholder Class Action Claim, such Claim for Defence Costs shall be treated in the manner described in "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan – Noteholder Class Action Claimants*";

(ii) if such Defence Costs were incurred in respect of a claim against the applicable Person that has not been successfully defended or such Defence Costs are determined not to be valid and enforceable against SFC, the Claim for such Defence Costs will be disallowed and no consideration will be payable in respect thereof under the Plan; and

(iii) until any such Claim for Defence Costs is determined to be a Claim within section subparagraphs (i) or (ii) above, such Claim shall be treated as an Unresolved Claim.

Nothing in the Plan impairs, affects or limits in any way the ability of SFC, the Monitor or the Initial Consenting Noteholders to seek an Order that Claims against SFC for indemnification of any Defence Costs should receive the same or similar treatment as is afforded to Equity Claims under the terms of the Plan.

*D&O Claims & D&O Indemnity Claims*

Pursuant to the Plan, all D&O Claims against the Named Directors and Officers (other than Section 5.1(2) D&O Claims, Conspiracy Claims and Non-Released D&O Claims) will be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred without consideration on the Plan Implementation Date. All D&O Indemnity Claims and any other rights or claims for indemnification held by the Named Directors and Officers will be deemed to have no value and will be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred without consideration on the Plan Implementation Date except that any such D&O Indemnity Claims for Defence Costs shall be treated as described in "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan – Defence Costs*" and any claims for indemnification held by the Named Directors and Officers properly the subject of the Directors' Charge, if any, shall be limited to the Directors' Charge Reserve.

Pursuant to the Plan, all D&O Claims against the Other Directors and/or Officers will not be compromised, released, discharged, cancelled or barred by the Plan and will be permitted to continue as against the applicable Other Directors and/or Officers (the "**Continuing Other D&O Claims**"), provided that any Indemnified Noteholder Class Action Claims against the Other Directors and/or Officers will be limited as described in "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan – Noteholder Class Action Claimants*".  All D&O Indemnity Claims and any other rights or claims for indemnification held by the Other Directors and/or Officers will be deemed to have no value and will be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred without consideration on the Plan Implementation Date, except that (i) any such D&O Indemnity Claims for Defence Costs shall be treated as described in "*Description of the Plan – Treatment of*

*Affected Parties Pursuant to the Plan – Defence Costs*"; and (ii)  any Class Action Indemnity Claim of an Other Director and/or Officer against SFC in respect of the Indemnified Noteholder Class Action Claims will be treated as described in "*Description of the Plan – Treatment of Affected Parties Pursuant to the Plan – Noteholder Class Action Claimants*".

The Plan provides that all Section 5.1(2) D&O Claims and all Conspiracy Claims will not be compromised, released, discharged, cancelled or barred by the Plan, provided that any Section 5.1(2) D&O Claims against Named Directors and Officers and any Conspiracy Claims against Named Directors and Officers shall be limited to recovery from any insurance proceeds payable in respect of such Section 5.1(2) D&O Claims or Conspiracy Claims, as applicable, pursuant to the Insurance Policies, and Persons with any such Section 5.1(2) D&O Claims against Named Directors and Officers or Conspiracy Claims against Named Directors and Officers will have no right to, and will not, make any claim or seek any recoveries from any Person (including SFC, any of the Subsidiaries or Newco), other than enforcing such Persons' rights to be paid from the proceeds of an Insurance Policy by the applicable insurer(s). The Plan also provides that all D&O Claims against the Directors and Officers of SFC or the Subsidiaries for fraud or criminal conduct will not be compromised, discharged, released, cancelled or barred by the Plan and will be permitted to continue as against all applicable Directors and Officers ("**Non-Released D&O Claims**").

The Plan provides that, from and after the Plan Implementation Date, a Person may only commence an action for a Non-Released D&O Claim against a Named Director or Officer if such Person has first obtained (i) the consent of the Monitor or (ii) leave of the Court on notice to the applicable Directors and Officers, SFC, the Monitor, the Initial Consenting Noteholders and any applicable insurers.  The foregoing requirement for the consent of the Monitor or leave of the Court does not apply to any Non-Released D&O Claim that is asserted against an Other Director and/or Officer.

### Intercompany Claims

Pursuant to the Plan, unless set off or transferred under the Plan, all SFC Intercompany Claims will be assigned by SFC to Newco on the Plan Implementation Date.  Newco will assume the obligations of SFC to the applicable Subsidiaries and Greenheart in respect of all Subsidiary Intercompany Claims (other than those set off pursuant to the Plan) assigned to it on the Plan Implementation Date pursuant to the Plan. Newco will be liable to the applicable Subsidiaries and Greenheart for such Subsidiary Intercompany Claims and SFC shall be released from such Subsidiary Intercompany Claims from and after the Plan Implementation Date, and the applicable Subsidiaries and Greenheart will be liable to Newco for such SFC Intercompany Claims from and after the Plan Implementation Date.  Nothing in the Plan affects any rights or claims as between any of the Subsidiaries, Greenheart and Greenheart's direct and indirect subsidiaries.

### Entitlement to Litigation Trust Interests

The Litigation Trust Interests to be created in accordance with the Plan and the Litigation Trust will be allocated as follows:

(a)      the Affected Creditors will be collectively entitled to 75% of such Litigation Trust Interests; and

(b)      the Noteholder Class Action Claimants will be collectively entitled to 25% of such Litigation Trust Interests.

Notwithstanding the foregoing, if any of the Noteholder Class Action Claims against any of the Third Party Defendants are finally resolved (whether by final judgment, settlement or any other binding means of resolution) within two years of the Plan Implementation Date, then the Litigation Trust Interests to which the applicable Noteholder Class Action Claimants would otherwise have been entitled in respect of such Noteholder Class Action Claims (based on the amount of such resolved Noteholder Class Action Claims in proportion to all Noteholder Class Action Claims in existence as of the Claims Bar Date) will instead be fully, finally, irrevocably and forever cancelled.

*Multiple Affected Claims*

On the Plan Implementation Date, any and all liabilities for and guarantees and indemnities of the payment or performance of any Affected Claim, Unaffected Claim, Section 5.1(2) D&O Claim, Conspiracy Claim, Continuing Other D&O Claim or Non-Released D&O Claim by any of the Subsidiaries, and any purported liability for the payment or performance of such Affected Claim, Unaffected Claim, Section 5.1(2) D&O Claim, Conspiracy Claim, Continuing Other D&O Claim or Non-Released D&O Claim by Newco, will be deemed eliminated and cancelled, and no Person will have any rights whatsoever to pursue or enforce any such liabilities for or guarantees or indemnities of the payment or performance of any such Affected Claim, Unaffected Claim, Section 5.1(2) D&O Claim, Conspiracy Claim, Continuing Other D&O Claim or Non-Released D&O Claim against any Subsidiary or Newco.

*Unresolved Claims*

An Affected Creditor that has asserted an Unresolved Claim will not be entitled to receive a distribution under the Plan in respect of such Unresolved Claim or any portion thereof unless and until such Unresolved Claim becomes a Proven Claim. Distributions in respect of any Unresolved Claim in existence at the Plan Implementation Date will be held in escrow by the Unresolved Claims Escrow Agent in the Unresolved Claims Reserve until settlement or final determination of the Unresolved Claim in accordance with the Claims Procedure Order, the Meeting Order, the Plan or otherwise, as applicable.  All Claims against SFC for indemnification in respect of the Indemnified Noteholder Class Action Claims or Defence Costs shall be treated as Unresolved Claims for purposes of the Plan. To the extent that any distributions are made after the Plan Implementation Date in respect of any Unresolved Claims that have become Proven Claims, these distributions will have the effect of diluting the distributions (or recoveries) received by the Affected Creditors with Proven Claims as at the Plan Implementation Date.

SFC Escrow Co. will not exercise any voting rights (including any right to vote at a meeting of shareholders or creditors held or in any written resolution) in respect of Newco Shares or Newco Notes held in the Unresolved Claims Reserve.

*Canadian Tax Exempt Plans*

If an Affected Creditor is a trust governed by a plan which is exempt from tax under Part I of the Canadian Tax Act (including, for example, a registered retirement savings plan), such Affected Creditor may make arrangements with Newco (if Newco so agrees) and the Litigation Trustee (if the Litigation Trustee so agrees) to have the Newco Shares, Newco Notes and Litigation Trust Interests to which it is entitled under the Plan directed to (or in the case of Litigation Trust Interests, registered in the name of ) an affiliate of such Affected Creditor or the annuitant or controlling person of the governing tax-deferred plan.

*Insurance*

Except as described below, nothing in the Plan will prejudice, compromise, release, discharge, cancel, bar or otherwise affect any right, entitlement or claim of any Person against SFC or any Director or Officer, or any insurer, in respect of an Insurance Policy or the proceeds thereof.  Nothing in the Plan will prejudice, compromise, release or otherwise affect any right or defence of any such insurer in respect of any such Insurance Policy.  Furthermore, nothing in the Plan will prejudice, compromise, release or otherwise affect (i) any right of subrogation any such insurer may have against any Person, including against any Director or Officer in the event of a determination of fraud against SFC or any Director or Officer in respect of whom such a determination is specifically made, and /or (ii)  the ability of such insurer to claim repayment of Defense Costs (as defined in any such policy) from SFC and/or any Director or Officer in the event that the party from whom repayment is sought is  not  entitled to coverage under the terms and conditions of any such Insurance Policy.  Notwithstanding anything in the Plan (including section 2.4(b) of the Plan and the releases and injunctions set forth in Article 7 of the Plan), but subject to section 2.4(d) of the Plan, all Insured Claims will be deemed to remain outstanding and are not released following the Plan Implementation Date, but recovery as against SFC and the Named Directors and Officers is limited only to proceeds of Insurance Policies that are available to pay such Insured Claims, either by way of judgment or settlement. Pursuant to the Plan, SFC and the Directors or Officers are required to make all reasonable efforts to meet all obligations under the Insurance Policies.  The Plan provides that the insurers agree and acknowledge that they will

be obliged to pay any Loss payable pursuant to the terms and conditions of their respective Insurance Policies notwithstanding the releases granted to SFC and the Named Directors and Officers under the Plan, and that they will not rely on any provisions of the Insurance Policies to argue, or otherwise assert, that such releases excuse them from, or relieve them of, the obligation to pay Loss that otherwise would be payable under the terms of the Insurance Policies. For greater certainty, the Plan provides that the insurers agree and consent to a direct right of action against the insurers, or any of them, in favour of any plaintiff who or which has (a) negotiated a settlement of any Claim covered under any of the Insurance Policies, which settlement has been consented to in writing by the insurers or such of them as may be required or (b) obtained a final judgment against one or more of SFC and/or the Directors or Officers which such plaintiff asserts, in whole or in part, represents Loss covered under the Insurance Policies, notwithstanding that such plaintiff is not a named insured under the Insurance Policies and that neither SFC nor the Directors or Officers are parties to such action.

Notwithstanding the foregoing, from and after the Plan Implementation Date, any Person having an Insured Claim will, as against SFC and the Named Directors and Officers, be irrevocably limited to recovery solely from the proceeds of the Insurance Policies paid or payable on behalf of SFC or its Directors or Officers, and Persons with any Insured Claims will have no right to, and will not, directly or indirectly, make any claim or seek any recoveries from SFC, any of the Named Directors and Officers, any of the Subsidiaries or Newco, other than enforcing such Person's rights to be paid from the proceeds of an Insurance Policy by the applicable insurer(s).

**Releases to be Given under the Plan**

The Plan provides that, subject to section 7.2 of the Plan (which is described in the following paragraph), all of the following shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date:

(a)     all Affected Claims, including all Affected Creditor Claims, Equity Claims, D&O Claims (other than Section 5.1(2) D&O Claims, Conspiracy Claims, Continuing Other D&O Claims and Non-Released D&O Claims), D&O Indemnity Claims (except as set forth in section 7.1(d) of the Plan) and Noteholder Class Action Claims (other than the Continuing Noteholder Class Action Claims);

(b)     all Claims of the OSC or any other Governmental Entity that have or could give rise to a monetary liability, including fines, awards, penalties, costs, claims for reimbursement or other claims having a monetary value;

(c)     all Class Action Claims (including the Noteholder Class Action Claims) against SFC, the Subsidiaries or the Named Directors or Officers of SFC or the Subsidiaries (other than Class Action Claims that are Section 5.1(2) D&O Claims, Conspiracy Claims or Non-Released D&O Claims);

(d)     all Class Action Indemnity Claims (including related D&O Indemnity Claims), other than any Class Action Indemnity Claim by the Third Party Defendants against SFC in respect of the Indemnified Noteholder Class Action Claims (including any D&O Indemnity Claim in that respect), which shall be limited to the Indemnified Noteholder Class Action Limit pursuant to the releases set out in section 7.1(f) of the Plan and the injunctions set out in section 7.3 of the Plan;

(e)     any portion or amount of or liability of the Third Party Defendants for the Indemnified Noteholder Class Action Claims (on a collective, aggregate basis in reference to all Indemnified Noteholder Class Action Claims together) that exceeds the Indemnified Noteholder Class Action Limit;

(f)     any portion or amount of, or liability of SFC for, any Class Action Indemnity Claims by the Third Party Defendants against SFC in respect of the Indemnified Noteholder Class Action Claims to the extent that such Class Action Indemnity Claims exceed the Indemnified Noteholder Class Action Limit;

(g)     any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, against Newco, the directors and officers of Newco, the Noteholders, members of the ad hoc committee of Noteholders, the Trustees, the Transfer Agent, the Monitor, FTI Consulting Canada Inc., FTI HK, counsel for the current Directors of SFC, counsel for the Monitor, counsel for the Trustees, the SFC Advisors, the Noteholder Advisors, and each and every member (including members of any committee or governance council), partner or employee of any of the foregoing, for or in connection with or in any way relating to: any Claims (including, notwithstanding anything to the contrary herein, any Unaffected Claims); Affected Claims; Section 5.1(2) D&O Claims; Conspiracy Claims; Continuing Other D&O Claims; Non-Released D&O Claims; Class Action Claims; Class Action Indemnity Claims; any right or claim in connection with or liability for the Notes or the Note Indentures; any guarantees, indemnities, claims for contribution, share pledges or Encumbrances related to the Notes or the Note Indentures; any right or claim in connection with or liability for the Existing Shares, Equity Interests or any other securities of SFC; any rights or claims of the Third Party Defendants relating to SFC or the Subsidiaries;

(h)     any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, against Newco, the directors and officers of Newco, the Noteholders, members of the ad hoc committee of Noteholders, the Trustees, the Transfer Agent, the Monitor, FTI Consulting Canada Inc., FTI HK, the Named Directors and Officers, counsel for the current Directors of SFC, counsel for the Monitor, counsel for the Trustees, the SFC Advisors, the Noteholder Advisors, and each and every member (including members of any committee or governance council), partner or employee of any of the foregoing, based in whole or in part on any act, omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing or other occurrence existing or taking place on or prior to the Plan Implementation Date (or, with respect to actions taken pursuant to the Plan after the Plan Implementation Date, the date of such actions) in any way relating to, arising out of, leading up to, for, or in connection with the CCAA Proceeding, Support Agreement, the Restructuring Transaction, the Plan, any proceedings commenced with respect to or in connection with the Plan, or the transactions contemplated by the Support Agreement and the Plan, including the creation of Newco and the creation, issuance or distribution of the Newco Shares, the Newco Notes, the Litigation Trust or the Litigation Trust Interests, provided that nothing in this paragraph will release or discharge any of the Persons listed in this paragraph from or in respect of any obligations any of them may have under or in respect of the Support Agreement, the Plan or under or in respect of any of Newco, the Newco Shares, the Newco Notes, the Litigation Trust or the Litigation Trust Interests, as the case may be;

(i)     any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, against the Subsidiaries for or in connection with any Claim (including, notwithstanding anything to the contrary herein, any Unaffected Claim); any Affected Claim (including any Affected Creditor Claim, Equity Claim, D&O Claim, D&O Indemnity Claim and Noteholder Class Action Claim); any Section 5.1(2) D&O Claim; any Conspiracy Claim; any Continuing Other D&O Claim; any Non-Released D&O Claim; any Class Action Claim; any Class Action Indemnity Claim; any right or claim in

connection with or liability for the Notes or the Note Indentures; any guarantees, indemnities, share pledges or Encumbrances relating to the Notes or the Note Indentures; any right or claim in connection with or liability for the Existing Shares, Equity Interests or any other securities of SFC; any rights or claims of the Third Party Defendants relating to SFC or the Subsidiaries; any right or claim in connection with or liability for the Support Agreement, the Plan, the CCAA Proceedings, the Restructuring Transaction, the Litigation Trust, the business and affairs of SFC and the Subsidiaries (whenever or however conducted), the administration and/or management of SFC and the Subsidiaries, or any public filings, statements, disclosures or press releases relating to SFC; any right or claim in connection with or liability for any indemnification obligation to Directors or Officers of SFC or the Subsidiaries pertaining to SFC, the Notes, the Note Indentures, the Existing Shares, the Equity Interests, any other securities of SFC or any other right, claim or liability for or in connection with the Support Agreement, the Plan, the CCAA Proceedings, the Restructuring Transaction, the Litigation Trust, the business and affairs of SFC (whenever or however conducted), the administration and/or management of SFC, or any public filings, statements, disclosures or press releases relating to SFC; any right or claim in connection with or liability for any guaranty, indemnity or claim for contribution in respect of any of the foregoing; and any Encumbrance in respect of the foregoing; and

(j)      all Subsidiary Intercompany Claims as against SFC (which are assumed by Newco pursuant to the Plan).

Notwithstanding the foregoing, nothing in the Plan will waive, compromise, release, discharge, cancel or bar any of the following:

(a)      SFC of its obligations under the Plan and the Sanction Order;

(b)      SFC from or in respect of any Unaffected Claims (provided that recourse against SFC in respect of Unaffected Claims will be limited in the manner set out in section 4.2 of the Plan);

(c)      any Directors or Officers of SFC or the Subsidiaries from any Non-Released D&O Claims, Conspiracy Claims or any Section 5.1(2) D&O Claims, provided that recourse against the Named Directors or Officers of SFC in respect of any Section 5.1(2) D&O Claims and any Conspiracy Claims will be limited in the manner set out in section 4.9(e) of the Plan;

(d)      any Other Directors and/or Officers from any Continuing Other D&O Claims, provided that recourse against the Other Directors and/or Officers in respect of the Indemnified Noteholder Class Action Claims will be limited in the manner set out in section 4.4(b)(i) of the Plan;

(e)      the Third Party Defendants from any claim, liability or obligation of whatever nature for or in connection with the Class Action Claims, provided that the maximum aggregate liability of the Third Party Defendants collectively in respect of the Indemnified Noteholder Class Action Claims will be limited to the Indemnified Noteholder Class Action Limit pursuant to section 4.4(b)(i) of the Plan and the releases set out in section 7.1(e) of the Plan and the injunctions set out in section 7.3 of the Plan;

(f)      Newco from any liability to the applicable Subsidiaries in respect of the Subsidiary Intercompany Claims assumed by Newco pursuant to section 6.4(n) of the Plan;

(g)      the Subsidiaries from any liability to Newco in respect of the SFC Intercompany Claims conveyed to Newco pursuant to section 6.4(m) of the Plan;

(h)      SFC of or from any investigations by or non-monetary remedies of the OSC, provided that, for greater certainty, all monetary rights, claims or remedies of the OSC against SFC will be treated as Affected Creditor Claims in the manner described in section 4.1 of the Plan and released pursuant to section 7.1(b) of the Plan;

    (i)      the Subsidiaries from their respective indemnification obligations (if any) to Directors or Officers of the Subsidiaries that relate to the ordinary course operations of the Subsidiaries and that have no connection with any of the matters listed in section 7.1(g) of the Plan;

    (j)      SFC or the Directors and Officers from any Insured Claims, provided that recovery for Insured Claims will be irrevocably limited to recovery solely from the proceeds of Insurance Policies paid or payable on behalf of SFC or its Directors and Officers in the manner set forth in section 2.4 of the Plan;

    (k)      insurers from their obligations under insurance policies; and

    (l)      any Released Party for fraud or criminal conduct.

**Injunctions**

Pursuant to the Plan, all Persons will be permanently and forever barred, estopped, stayed and enjoined, on and after the Effective Time, with respect to any and all Released Claims, from (i) commencing, conducting or continuing in any manner, directly or indirectly, any action, suits, demands or other proceedings of any nature or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the Released Parties or their property; (iii) commencing, conducting or continuing in any manner, directly or indirectly, any action, suits or demands, including without limitation, by way of contribution or indemnity or other relief, in common law, or in equity, breach of trust or breach of fiduciary duty or under the provisions of any statute or regulation, or other proceedings of any nature or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes such a claim or might reasonably be expected to make such a claim, in any manner or forum, against one or more of the Released Parties; (iv) creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or encumbrance of any kind against the Released Parties or their property; or (v) taking any actions to interfere with the implementation or consummation of the Plan; provided, however, that the foregoing will not apply to the enforcement of any obligations under the Plan.

**Alternative Sale Transaction**

The Plan provides that, at any time prior to the implementation of the Plan, SFC may, with the consent of the Initial Consenting Noteholders, complete a sale of all or substantially all of the SFC Assets on terms that are acceptable to the Initial Consenting Noteholders (an "**Alternative Sale Transaction**"), provided that any such Alternative Sale Transaction has been approved by the Court pursuant to section 36 of the CCAA on notice to the service list.  In the event that an Alternative Sale Transaction is completed, the terms and conditions of the Plan would continue to apply, subject to the following:

    (a)      The Newco Shares and Newco Notes would not be distributed under the Plan given that Newco would not need to be formed in the context of any such asset sale).  Instead, the consideration paid or payable to SFC pursuant to the Alternative Sale Transaction (the "**Alternative Sale Transaction Consideration**") would be distributed to the Persons entitled to receive Newco Shares under the Plan in the same proportions (and subject to the same terms and conditions) as are applicable to the distribution of Newco Shares under the Plan.

    (b)      All provisions in the Plan that address Newco would be deemed ineffective given that Newco would not need to be formed in connection with an Alternative Sale Transaction.

    (c)      All provisions in the Plan that address the creation and issuance of the Newco Shares and Newco Notes would be deemed ineffective given that the Newco Shares and the Newco Notes would not be issued in connection with an Alternative Sale Transaction.

(d)     All provisions relating to the entitlement of Affected Creditors to receive Newco Shares, and the amount of Newco Shares any given Affected Creditors is entitled to receive under the Plan, would continue to apply so as to govern the distribution of the Alternative Sale Transaction Consideration in place of the Newco Shares, and in the same proportions among the Affected Creditors.

(e)     SFC, with the written consent of the Monitor and the Initial Consenting Noteholders, shall be permitted to make any such other amendments, modifications and supplements to the terms and conditions of the Plan as may be necessary to: (i) facilitate the Alternative Sale Transaction; (ii) cause the Alternative Sale Transaction Consideration to be distributed in the same proportions and subject to the same terms and conditions as are subject to the distribution of Newco Shares under the Plan; and (iii) complete the Alternative Sale Transaction and distribute the Alternative Sale Transaction Proceeds in a manner that is tax efficient for SFC and the Affected Creditors with Proven Claims, provided in each case that (y) a copy of such amendments, modifications or supplements is filed with the Court and served upon the service list; and (z) the Monitor is satisfied that such amendments, modifications or supplements do not materially alter the proportionate entitlements of the Affected Creditors, as amongst themselves, to the consideration distributed pursuant to the Plan.

Except for the requirements to obtain (i) the prior written consent of the Initial Consenting Noteholders for an Alternative Sale Transaction and (ii) the approval of the Alternative Sale Transaction by the Court pursuant to section 36 of the CCAA (on notice to the service list), once the Plan has been approved by the Required Majority of Affected Creditors, no further meeting, vote or approval of the Affected Creditors would be required to enable SFC to complete an Alternative Sale Transaction.

**Effect of the Plan**

If the Plan is approved, on the Plan Implementation Date the Plan will be final and binding in accordance with its terms for all purposes on all Persons named or referred to in, or subject to, the Plan and their respective heirs, executors, administrators and other legal representatives, successors and assigns. In addition, each Person named or referred to in, or subject to, the Plan will be deemed to have consented and agreed to all of the provisions of the Plan, in its entirety and will be deemed to have executed and delivered all consents, releases, assignments and waivers, statutory or otherwise, required to implement and carry out the Plan in its entirety.

## INFORMATION REGARDING NEWCO

*The information concerning Newco contained herein is based upon information provided by the Noteholder Advisors. Although the Company has no knowledge that would indicate that any statements contained herein relating to Newco are untrue or incomplete, the Company and its directors or officers disclaim any responsibility for the accuracy or completeness of such information, or for any failure by the Company to disclose events or facts that may have occurred or which may affect the significance or accuracy of any such information, but which are unknown to the Company.*

Newco is expected to be incorporated as an exempt company under the laws of the Cayman Islands (or such other jurisdiction as is acceptable to SFC and the Initial Consenting Noteholders) pursuant to the Plan.  Newco will be formed and organized in a manner acceptable to the Initial Consenting Noteholders and in form and substance satisfactory to SFC.  To date, Newco has not been created.

**Newco Shares**

Newco will have share capital consisting of a single class of voting shares, being the Newco Shares.  Newco is not, and will not be following the Plan Implementation Date, a reporting issuer (or equivalent) in any jurisdiction and the Newco Shares will not be listed on any stock exchange or quotation service on the Plan Implementation Date.

*Shareholder Meetings*

Newco will hold its first annual general meeting of shareholders not earlier than 12 months following the Plan Implementation Date, with subsequent annual general meetings to be held annually thereafter.  At any time after the expiry of the first 12-month period following the Plan Implementation Date, an extraordinary general meeting may be requisitioned by Newco shareholders holding 10% or more of the Newco Shares outstanding.

*Board of Directors*

The board of directors of Newco is expected to initially consist of up to five directors, who will be satisfactory to the Initial Consenting Noteholders, and may be expanded to include up to ten directors commencing with the first annual general meeting of Newco shareholders following the Plan Implementation Date. Commencing at that first annual general meeting, any beneficial shareholder that (i) was an Initial Consenting Noteholder and (ii) has held 10% or more of the Newco Shares outstanding (excluding any Newco Shares held by the Unresolved Claims Escrow Agent) continuously since the Plan Implementation Date (each a "**10%+ Shareholder**") shall be entitled to appoint one director to the board.  The remaining directors shall be elected by the Newco shareholders as a group. Unaffiliated beneficial shareholders will not be permitted to aggregate their respective shareholdings for purposes of constituting a 10%+ Shareholder.

A 10%+ Shareholder's board appointment right shall be transferable only in connection with its sale of 10% or more of the Newco Shares outstanding (excluding any Newco Shares held by SFC Escrow Co.) (a "10%+ Position") to another person.  No person that acquires a 10%+ Position after the Plan Implementation Date, other than in connection with an acquisition of a 10%+ Position from a 10%+ Shareholder, shall be entitled to appoint a director to the Newco board.

Directors (other than any director appointed by a 10%+ Shareholder) will be elected by shareholders on an annual basis at the Newco annual general meeting.  Any director appointed by a 10%+ Shareholder may only be removed by that 10%+ Shareholder and a 10%+ Shareholder shall be entitled to appoint another director in his place.

Prior to the first annual general meeting, a director may only be removed by shareholders holding 66-2/3% or more of the Newco Shares present and voting at the meeting.  On or following the first annual general meeting, a director (other than a director appointed by a 10%+ Shareholder) may be removed by shareholders holding more than 50% of the Newco Shares present and voting at the meeting.

In the event a 10%+ Shareholder ceases to own a 10%+ Position, the director appointed by it shall resign and such 10%+ Shareholder will lose its right to appoint a director to the Newco board.

*Information Rights*

Newco will deliver to each shareholder: (a) copies of Newco's annual financial statements within 90 days of each fiscal year end; and (b) copies of Newco's semi-annual financial statements within 60 days of the end of each financial half-year.  The board of directors of Newco will have the discretion whether or not to obtain an audit of the annual financial statements. Upon reasonable request, Newco will also deliver to any shareholder, at the cost and expense of such shareholder, such tax-related information, reports and statements relating to Newco and its subsidiaries as are reasonably necessary for the filing of any tax return or the making or implementing of any election related to taxes.

*Pre-emptive Rights*

If Newco wishes to issue equity securities (or any securities convertible into or exchangeable for equity securities of Newco, including convertible debt) other than (a) pursuant to an initial public offering, or (b) equity incentive awards to directors, officers or employees of Newco, which awards represent in the aggregate less than 10% of the outstanding Newco Shares (or such higher limit as may be approved by shareholders), it shall offer such securities to each shareholder pro rata in proportion to the number of Newco Shares held by such shareholder at the time of the offer prior to selling such securities to non-shareholders.

*Redemption*

Newco may only redeem Newco Shares on a pro rata basis.

*Drag-Along Rights*

In the event holders of at least 66-2/3% of the outstanding Newco Shares wish to sell all of their Newco Shares to a third party, they will have the right to force the other shareholders to sell all of their Newco Shares on the same terms, thereby enabling a sale of the entire company.

*Shareholder Approval Rights*

In addition to certain other matters requiring approval by special resolution under applicable law (including amendment of Newco's memorandum or articles and a winding-up of Newco), Newco may not undertake any of the following fundamental actions without the prior approval of shareholders holding at least 66-2/3% of the Newco Shares present and voting at the meeting:

- any reorganization, recapitalization, amalgamation, merger or consolidation of or involving Newco;
- issuance of (i) any equity securities having a preference over the Newco Shares, or (ii) equity incentive awards to directors, officers or employees, which awards represent in the aggregate in excess of 10% of the outstanding Newco Shares;
- the sale of all or substantially all of Newco's assets (on a consolidated basis);
- any material change in the nature of Newco's business;
- affiliated/related party transactions (other than transactions between Newco and its wholly-owned subsidiaries);
- a voluntary liquidation, dissolution or winding up of Newco or any of its material Subsidiaries (other than in connection with an internal restructuring); and
- any amendment to the articles or memorandum of association of Newco that would amend any of the provisions outlined in this summary.

## Newco Notes

Newco will also issue U.S.$300 million principal amount of Newco Notes pursuant to the Plan.

*Security*

The Newco Notes will be senior debt obligations of Newco and will be secured, subject to permitted liens, on a first-priority basis with share pledges from SFC's Subsidiaries in a manner substantially similar to the pledges currently in place for the 2014 Notes and 2017 Notes and will have guarantees from SFC's Subsidiaries in a manner substantially similar to the guarantees currently in place for the 2013 Notes and 2016 Notes.

*Interest*

Interest on the Newco Notes will be payable in cash or in kind, at Newco's option, at a rate of 6% per annum if paid in cash, or 8% if paid in kind.

*Ranking*

The Newco Notes will be Newco's general senior secured obligations and will rank equally in right of payment with all of Newco's existing and future senior indebtedness and, together with any other secured obligations, will effectively rank senior in right of payment to Newco's existing and future unsecured obligations; provided that Newco will be permitted to issue up to $200 million principal amount of indebtedness having prior ranking security over the collateral to the security granted for the benefit of the holders of the Newco Notes.  In addition, Newco will be permitted to issue up to an additional $100 million of Newco Notes.

*Other*

Other terms of the Newco Notes are expected to be substantially similar to the 2014 Notes and 2017 Notes, with appropriate adjustments to reflect to size and structure of the business operated by Newco following the Plan Implementation Date.

Additional information regarding Newco, including additional information relating to Newco's governance and management and information relating to the Newco Shares and Newco Notes, will be provided in the Plan Supplement to be issued in accordance with the terms of the Meeting Order.

## DESCRIPTION OF LITIGATION TRUST

The Plan provides that the Litigation Trust is to be established on the Plan Implementation Date to which will be contributed the Litigation Funding Amount by SFC for the purpose of funding any claims by the Litigation Trust against third parties. Each Affected Creditor is entitled to receive its pro rata share of 75% of the Litigation Trust Interests and each Noteholder Class Action Claimant is entitled to receive its pro rata share of 25% of the Litigation Trust Interests, subject to certain exceptions provided in the Plan. A description of the Litigation Trust, including the Litigation Funding Amount, will be provided in the Plan Supplement to be issued in accordance with the terms of the Meeting Order.

## REQUIRED APPROVALS UNDER THE CCAA
## AND OTHER CONDITIONS TO IMPLEMENTATION

**Creditor Approval**

In order to be approved and binding in accordance with the CCAA, the Resolution must receive the affirmative vote of the Required Majority of the Affected Creditor Class, being a majority in number of Affected Creditors with Proven Claims, and two-thirds in value of the Proven Claims held by such Affected Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting.

**Court Approval of the Plan under the CCAA**

Prior to the mailing of this Information Statement, SFC obtained the Meeting Order providing for, among other things, the calling and holding of the Meeting, acceptance of filing the Plan with the Court, mailing of this Information Statement and other related procedural matters.

A copy of the Meeting Order is attached as Schedule B to this Information Statement. Prior to the Plan becoming effective, the CCAA requires that the Plan be approved by the Court if it is approved by Affected Creditors at the Meeting.

Subject to the approval of the Resolution in respect of the Plan by the Affected Creditors, the hearing in respect of the Sanction Order is scheduled to take place on or about December 7, 2012 and December 10, 2012 at 10:00 a.m. (Toronto time) at the Court at 330 University Avenue, Toronto, Ontario, Canada. Any Person who wishes to oppose the Sanction Hearing must serve on SFC, the Monitor and the service list a notice setting out the basis for such opposition and a copy of the materials to be used to oppose the Sanction Hearing at least four days before the date set for the Sanction Hearing.

Interested parties should consult their legal advisors with respect to the legal rights available to them in relation to the Plan and the Sanction Hearing. If the date of the Court hearing is postponed, adjourned or otherwise rescheduled, SFC will provide notice of the new date by issuance of a news release. Persons who wish to receive individual notification of the date of any adjourned, postponed or otherwise rescheduled Court hearing by facsimile or electronic mail should contact the Monitor at FTI Consulting Canada Inc., as Court-appointed Monitor of SFC, at TD Waterhouse Tower, 79 Wellington Street West, Suite 2010, P.O. Box 104, Toronto, Ontario M5K 1G8 (Attention: the Monitor of Sino-Forest Corporation), telephone number: 416-649-8094 or email: sfc@fticonsulting.com, and provide a facsimile number or an e-mail address. The authority and discretion of the

Court is very broad under the CCAA. The Company's legal counsel has advised SFC that the Court will consider, among other things, the fairness and reasonableness of the terms and conditions of the Plan. The Court must issue the Sanction Order before the Plan can be implemented. If the Court grants the Sanction Order, the Plan will become binding on SFC, the Affected Creditors and all Persons named or referred to in, or subject to, the Plan.

The Plan provides that the Sanction Order will be effective at the Effective Time. The Plan states that the Sanction Order will, among other things:

(a)     declare that: (i) the Plan has been approved by the Required Majority in conformity with the CCAA; (ii) the activities of SFC have been in reasonable compliance with the provisions of the CCAA and the Orders of the Court made in this CCAA Proceeding in all respects; (iii) the Court is satisfied that SFC has not done or purported to do anything that is not authorized by the CCAA; and (iv) the Plan and the transactions contemplated thereby are fair and reasonable;

(b)     declare that the Plan and all associated steps, compromises, releases, discharges, cancellations, transactions, arrangements and reorganizations effected thereby are approved, binding and effective as set out in the Plan as of the Plan Implementation Date;

(c)     confirm the amount of each of the Unaffected Claims Reserve, the Administration Charge Reserve, the Directors' Charge Reserve and the Monitor's Post-Implementation Reserve;

(d)     declare that, on the Plan Implementation Date, all Affected Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred, subject only to the right of the applicable Persons to receive the distributions to which they are entitled pursuant to the Plan;

(e)     declare that, on the Plan Implementation Date, the ability of any Person to proceed against SFC or the Subsidiaries in respect of any Released Claims shall be forever discharged and restrained, and all proceedings with respect to, in connection with or relating to any such matter shall  be permanently stayed;

(f)     declare that the steps to be taken, the matters that are deemed to occur and the compromises and releases to be effective on the Plan Implementation Date are deemed to occur and be effected in the sequential order contemplated by the Plan on the Plan Implementation Date, beginning at the Effective Time;

(g)     declare that, as at the Effective Time, the SFC Assets vest absolutely in Newco in accordance with the Plan;

(h)     confirm that the Court was satisfied that: (i) the hearing of the Sanction Order was open to all of the Affected Creditors and all other Persons with an interest in SFC and that such Affected Creditors and other Persons were permitted to be heard at the hearing in respect of the Sanction Order; (ii) prior to the hearing, all of the Affected Creditors and all other Persons on the service list in respect of the CCAA Proceeding were given adequate notice thereof;

(i)     provide that the Court was advised prior to the hearing in respect of the Sanction Order that the Sanction Order will be relied upon by SFC and Newco as an approval of the Plan for the purpose of relying on the exemption from the registration requirements of the United States Securities Act of 1933, as amended, pursuant to Section 3(a)(10) thereof for the issuance of the Newco Shares, Newco Notes and, to the extent they may be deemed to be securities, the Litigation Trust Interests, and any other securities to be issued pursuant to the Plan;

(j)     declare that all obligations, agreements or leases to which (i) SFC remains a party on the Plan Implementation Date, or (ii) Newco becomes a party as a result of the conveyance of the SFC Assets to Newco on the Plan Implementation Date, shall be and remain in full force and effect,

unamended, as at the Plan Implementation Date and no party to any such obligation or agreement shall on or following the Plan Implementation Date, accelerate, terminate, refuse to renew, rescind, refuse to perform or otherwise disclaim or resiliate its obligations thereunder, or enforce or exercise (or purport to enforce or exercise) any right or remedy under or in respect of any such obligation or agreement, by reason:

(i)      of any event which occurred prior to, and not continuing after, the Plan Implementation Date, or which is or continues to be suspended or waived under the Plan, which would have entitled any other party thereto to enforce those rights or remedies;

(ii)     that SFC sought or obtained relief or has taken steps as part of the Plan or under the CCAA;

(iii)    of any default or event of default arising as a result of the financial condition or insolvency of SFC;

(iv)    of the completion of any of the transactions contemplated under the Plan, including the transfer, conveyance and assignment of the SFC Assets to Newco; or

(v)     of any compromises, settlements, restructurings, recapitalizations or reorganizations effected pursuant to the Plan;

(k)     stay the commencing, taking, applying for or issuing or continuing any and all steps or proceedings, including without limitation, administrative hearings and orders, declarations or assessments, commenced, taken or proceeded with or that may be commenced, taken or proceed with to advance any Released Claims;

(l)     declare that in no circumstances will the Monitor have any liability for any of SFC's tax liability regardless of how or when such liability may have arisen;

(m)    authorize the Monitor to perform its functions and fulfil its obligations under the Plan to facilitate the implementation of the Plan;

(n)     direct and deem the Trustees to release, discharge and cancel any guarantees, indemnities, Encumbrances or other obligations owing by or in respect of any Subsidiary relating to the Notes or the Note Indentures;

(o)     declare that upon completion by the Monitor of its duties in respect of SFC pursuant to the CCAA and the Orders, the Monitor may file with the Court a certificate of Plan Implementation stating that all of its duties in respect of SFC pursuant to the CCAA and the Orders have been completed and thereupon, FTI Consulting Canada Inc. shall be deemed to be discharged from its duties as Monitor and released of all claims relating to its activities as Monitor;

(p)     declare that, on the Plan Implementation Date, each of the Charges shall be discharged, released and cancelled, and that any obligations secured thereby shall satisfied pursuant to the Plan, and that from and after the Plan Implementation Date: (i) the Administration Charge Reserve shall stand in place of the Administration Charge as security for the payment of any amounts secured by the Administration Charge and; (ii) the Directors' Charge Reserve shall stand in place of the Directors' Charge as security for the payment of any amounts secured by the Directors' Charge;

(q)     declare that SFC and the Monitor may apply to the Court for advice and direction in respect of any matters arising from or under the Plan;

(r)     declare that, subject to the due performance of its obligations as set forth in the Plan and subject to its compliance with any written directions or instructions of the Monitor and/or directions of the

Court in the manner set forth in the Plan, SFC Escrow Co. will have no liabilities whatsoever arising from the performance of its obligations under the Plan;

(s)     order that releases and injunctions set forth in the Plan are effective on the Plan Implementation Date at the time or times and in the manner set forth in the Plan; and

(t)     declare that section 95 to 101 of the BIA shall not apply to any of the transactions implemented pursuant to the Plan.

**Conditions to Implementation of Plan**

The implementation of the Plan is conditional upon satisfaction or waiver of the following conditions prior to or at the Effective Time, each of which is for the benefit of SFC and the Initial Consenting Noteholders and may be waived only by SFC and the Initial Consenting Noteholders collectively; provided, however, that the conditions in sub-paragraphs (g), (h), (y), (ee), (ff), (ll), (kk) and (mm) are only for the benefit of the Initial Consenting Noteholders and, if not satisfied on or prior to the Effective Time, may be waived only by the Initial Consenting Noteholders; and provided further that such conditions will not be enforceable by SFC if any failure to satisfy such conditions results from an action, error, omission by or within the control of SFC and such conditions will not be enforceable by the Initial Consenting Noteholders if any failure to satisfy such conditions results from an action, error, omission by or within the control of the Initial Consenting Noteholders:

(a)     the Plan shall have been approved by the Required Majority and the Court, and in each case the Plan shall have been approved in a form consistent with the Support Agreement or otherwise acceptable to SFC and the Initial Consenting Noteholders, each acting reasonably;

(b)     the Sanction Order shall have been made and shall be in full force and effect prior to December 17, 2012 (or such later date as may be consented to by SFC and the Initial Consenting Noteholders), and all applicable appeal periods in respect thereof shall have expired and any appeals therefrom shall have been disposed of by the applicable appellate court;

(c)     the Sanction Order shall be in a form consistent with the Plan or otherwise acceptable to SFC and the Initial Consenting Noteholders, each acting reasonably;

(d)     all filings under Applicable Laws that are required in connection with the Restructuring Transaction shall have been made and any regulatory consents or approvals that are required in connection with the Restructuring Transaction shall have been obtained and, in the case of waiting or suspensory periods, such waiting or suspensory periods shall have expired or been terminated; without limiting the generality of the foregoing, such filings and regulatory consents or approvals include:

(i)     any required filings, consents and approvals of securities regulatory authorities in Canada;

(ii)     a consultation with the Executive of the HKSFC that is satisfactory to SFC, the Monitor and the Initial Consenting Noteholders confirming that implementation of the Restructuring Transaction will not result in an obligation arising for Newco, its shareholders or any Subsidiary to make a mandatory offer to acquire shares of Greenheart;

(iii)     the submission by SFC and each applicable Subsidiary of a Circular 698 tax filing with all appropriate tax authorities in the PRC within the requisite time prior to the Plan Implementation Date, such filings to be in form and substance satisfactory to the Initial Consenting Noteholders; and

(iv) if notification is necessary or desirable under the AML and its implementation rules, the submission of all antitrust filings considered necessary or prudent by the Initial Consenting Noteholders and the acceptance and (to the extent required) approval thereof by the competent PRC authority, each such filing to be in form and substance satisfactory to the Initial Consenting Noteholders;

(e) there shall not be in effect any preliminary or final decision, order or decree by a Governmental Entity, no application shall have been made to any Governmental Entity, and no action or investigation shall have been announced, threatened or commenced by any Governmental Entity, in consequence of or in connection with the Restructuring Transaction that restrains, impedes or prohibits (or if granted could reasonably be expected to restrain, impede or prohibit) the Restructuring Transaction or any material part thereof or requires or purports to require a variation of the Restructuring Transaction, and SFC shall have provided the Initial Consenting Noteholders with a certificate signed by an officer of SFC, without personal liability on the part of such officer, certifying compliance with the foregoing as of the Plan Implementation Date;

(f) the organization, incorporating documents, articles, by-laws and other constating documents of Newco (including any shareholders agreement, shareholder rights plan and classes of shares (voting and non-voting)) and any affiliated or related entities formed in connection with the Restructuring Transaction or the Plan, and all definitive legal documentation in connection with all of the foregoing, shall be acceptable to the Initial Consenting Noteholders and in form and in substance reasonably satisfactory to SFC;

(g) the composition of the board of directors of Newco and the senior management and officers of Newco that will assume office, or that will continue in office, as applicable, on the Plan Implementation Date shall be acceptable to the Initial Consenting Noteholders;

(h) the terms of employment of the senior management and officers of Newco shall be acceptable to the Initial Consenting Noteholders;

(i) except as expressly set out in the Plan, Newco shall not have: (i) issued or authorized the issuance of any shares, notes, options, warrants or other securities of any kind, (ii) become subject to any Encumbrance with respect to its assets or property; (iii) become liable to pay any indebtedness or liability of any kind other than as expressly set out in the Plan; or (iv) entered into any Material agreement;

(j) any securities that are formed in connection with the Plan, including the Newco Shares and the Newco Notes, when issued and delivered pursuant to the Plan, shall be duly authorized, validly issued and fully paid and non-assessable and the issuance and distribution thereof shall be exempt from all prospectus and registration requirements of any applicable securities, corporate or other law, statute, order, decree, consent decree, judgment, rule, regulation, ordinance, notice, policy or other pronouncement having the effect of law applicable in the provinces of Canada;

(k) Newco shall not be a reporting issuer (or equivalent) in any province of Canada or any other jurisdiction;

(l) all of the steps, terms, transactions and documents relating to the conveyance of the SFC Assets to Newco in accordance with the Plan shall be in form and in substance acceptable to SFC and the Initial Consenting Noteholders;

(m) all of the following shall be in form and in substance acceptable to the Initial Consenting Noteholders and reasonably satisfactory to SFC: (i) the Newco Shares; (ii) the Newco Notes (including the aggregate principal amount of the Newco Notes); (iii) any trust indenture or other document governing the terms of the Newco Notes; and (iv) the number of Newco Shares and Newco Notes to be issued in accordance with the Plan;

(n)      the Indemnified Noteholder Class Action Limit shall be acceptable to SFC, the Monitor and the Initial Consenting Noteholders;

(o)      the aggregate amount of Proven Claims held by Ordinary Affected Creditors shall be acceptable to SFC, the Monitor and the Initial Consenting Noteholders;

(p)      the amount of each of the Unaffected Claims Reserve, the Administration Charge Reserve, the Directors' Charge Reserve and the Monitor's Post-Implementation Reserve shall, in each case, be acceptable to SFC, the Monitor and the Initial Consenting Noteholders;

(q)      the Litigation Funding Amount shall be acceptable to SFC, the Monitor and the Initial Consenting Noteholders;

(r)      the amount of each of the following shall be acceptable to SFC, the Monitor and the Initial Consenting Noteholders: (i) the aggregate amount of Lien Claims to be satisfied by the return to the applicable Lien Claimants of the applicable secured property in accordance with the Plan; and (ii) the aggregate amount of Lien Claims to be repaid in cash on the Plan Implementation Date in accordance with the Plan;

(s)      the aggregate amount of Unaffected Claims, and the aggregate amount of the Claims listed in each subparagraph of the definition of "Unaffected Claims" shall, in each case, be acceptable to SFC, the Monitor and the Initial Consenting Noteholders;

(t)      the aggregate amount of Unresolved Claims and the amount of the Unresolved Claims Reserve shall, in each case, be acceptable to the Initial Consenting Noteholders;

(u)      the Litigation Trust and  the Litigation Trust Agreement shall be in form and in substance acceptable to SFC and the Initial Consenting Noteholders, each acting reasonably, and the Litigation Trust shall be established in a jurisdiction that is acceptable to the Initial Consenting Noteholders and SFC, each acting reasonably;

(v)      SFC, the Monitor and the Initial Consenting Noteholders, each acting reasonably, shall be satisfied with the proposed use of proceeds and payments relating to all aspects of the Restructuring Transaction and the Plan, including, without limitation, any change of control payments, consent fees, transaction fees, third party fees or termination or severance payments, in the aggregate of $500,000 or more, payable by SFC or any Subsidiary to any Person (other than a Governmental Entity) in respect of or in connection with the Restructuring Transaction or the Plan, including without limitation, pursuant to any employment agreement or incentive plan of SFC or any Subsidiary;

(w)      SFC, the Monitor and the Initial Consenting Noteholders, each acting reasonably, shall be satisfied with the status and composition of all liabilities, indebtedness and obligations of the Subsidiaries and all releases of the Subsidiaries provided for in the Plan and the Sanction Order shall be binding and effective as of the Plan Implementation Date;

(x)      the steps required to complete and implement the Plan shall be in form and in substance satisfactory to SFC and the Initial Consenting Noteholders;

(y)      the Noteholders and the Early Consent Noteholders shall receive, on the Plan Implementation Date, all of the consideration to be distributed to them pursuant to the Plan;

(z)      all of the following shall be in form and in substance satisfactory to SFC and the Initial Consenting Noteholders: (i) all materials filed by SFC with the Court or any court of competent jurisdiction in the United States, Canada, Hong Kong, the PRC or any other jurisdiction that relates to the Restructuring Transaction; (ii) the terms of any court-imposed charges on any of the

assets, property or undertaking of any of SFC, including without limitation any of the Charges; (iii) the Initial Order; (iv) the Claims Procedure Order; (v) the Meeting Order; (vi) the Sanction Order; (vii) any other Order granted in connection with the CCAA Proceedings or the Restructuring Transaction by the Court or any other court of competent jurisdiction in Canada, the United States, Hong Kong, the PRC or any other jurisdiction; and (viii) the Plan (as it is approved by the Required Majority and the Sanction Order);

(aa)     any and all court-imposed charges on any assets, property or undertaking of SFC, including the Charges, shall be discharged on the Plan Implementation Date on terms acceptable to the Initial Consenting Noteholders and SFC, each acting reasonably;

(bb)     SFC shall have paid, in full, the Expense Reimbursement and all fees and costs owing to the SFC Advisors on the Plan Implementation Date, and Newco shall have no liability for any fees or expenses due to the SFC Advisors or the Noteholder Advisors either as at or following the Plan Implementation Date;

(cc)     SFC or the Subsidiaries shall have paid, in full all fees owing to each of Chandler Fraser Keating Limited and Spencer Stuart on the Plan Implementation Date, and Newco shall have no liability for any fees or expenses due to either Chandler Fraser Keating Limited and Spencer Stuart as at or following the Plan Implementation Date;

(dd)     SFC shall have paid all Trustee Claims that are outstanding as of the Plan Implementation Date, and the Initial Consenting Noteholders shall be satisfied that SFC has made adequate provision in the Unaffected Claims Reserve for the payment of all Trustee Claims to be incurred by the Trustees after the Plan Implementation Date in connection with the performance of their respective duties under the Note Indentures or the Plan;

(ee)     there shall not exist or have occurred any Material Adverse Effect, and SFC shall have provided the Initial Consenting Noteholders with a certificate signed by an officer of the Company, without personal liability on the part of such officer, certifying compliance with the foregoing as of the Plan Implementation Date;

(ff)     there shall have been no breach of the Noteholder Confidentiality Agreements (as defined in the Support Agreement) by the Company or any of the Sino-Forest Representatives (as defined therein) in respect of the applicable Initial Consenting Noteholder;

(gg)     the Plan Implementation Date shall have occurred no later than January 15, 2013 (or such later date as may be consented to by SFC and the Initial Consenting Noteholders);

(hh)     all conditions set out in sections 6 and 7 of the Support Agreement shall have been satisfied or waived in accordance with the terms of the Support Agreement;

(ii)     the Support Agreement shall not have been terminated;

(jj)     the organization, incorporating documents, articles, by-laws and other constating documents of SFC Escrow Co. and all definitive legal documentation in connection with SFC Escrow Co., shall be acceptable to the Initial Consenting Noteholders and the Monitor and in form and in substance reasonably satisfactory to SFC;

(kk)     except as expressly set out in the Plan, SFC Escrow Co. shall not have: (i) issued or authorized the issuance of any shares, notes, options, warrants or other securities of any kind, (ii) become subject to any Encumbrance with respect to its assets or property; (iii) acquired any assets or become liable to pay any indebtedness or liability of any kind (other than as expressly set out in the Plan); or (iv) entered into any agreement;

(ll)     the Initial Consenting Noteholders shall have completed due diligence in respect of SFC and the Subsidiaries and the results of such due diligence shall be acceptable to the Initial Consenting Noteholders prior to the date of the hearing of the Sanction Order;

(mm)    if so requested by the Initial Consenting Noteholders, the Sanction Order shall have been recognized and confirmed as binding and effective pursuant to an order of a court of competent jurisdiction in Canada, the United States, and any other jurisdiction requested by the Initial Consenting Noteholders, and all applicable appeal periods in respect of any such recognition order shall have expired and any appeals therefrom shall have been disposed of by the applicable appellate court;

(nn)    all press releases, disclosure documents and definitive agreements in respect of the Restructuring Transaction or the Plan shall be in form and substance satisfactory to SFC and the Initial Consenting Noteholders, each acting reasonably; and

(oo)    Newco and SFC shall have entered into arrangements reasonably satisfactory to SFC and the Initial Consenting Noteholders for ongoing preservation and access to the books and records of SFC and the Subsidiaries in existence as at the Plan Implementation Date, as such access may be reasonably requested by SFC or any Director or Officer in the future in connection with any administrative or legal proceeding, in each such case at the expense of the Person making such request.

**Regulatory Approvals**

The Plan is subject to the condition that any regulatory consents or approvals required in connection with the Restructuring Transaction, including the consents and approvals described below, shall have been obtained and, in the case of waiting or suspensory periods, such waiting or suspensory periods shall have expired or been terminated. See "*Required Approvals under the CCAA and Other Conditions to Implementation – Conditional to Implementation of the Plan*".

*PRC Antimonopoly Law Approval*

The indirect transfer of Sino-Forest's PRC subsidiaries to Newco may be subject to the merger control review under the Antimonopoly Law of the PRC (the "**AML**").

Under the AML, a transaction needs to obtain the merger control review approval before implementation, if it constitutes a "concentration of operators" and the turnover thresholds are triggered.  An "operator" under the AML means a legal person, natural person or other organization that engages in the manufacturing or sale of products and/or the provision of services.

Article 20 of the AML provides that a concentration of operators could occur through the following: (i) a merger of the operators; (ii) the acquisition by an operator, whether by purchase of securities or assets, of control of another operator; or (iii) the acquisition, by contact or any other means, of control of another operator or the possibility to exercise decisive influence on another operator.

The turnover thresholds would be triggered, if either of the following conditions is satisfied: (1) the total revenue worldwide of all the "entities involved in the concentration" exceeds RMB 10 billion in the previous financial year, and at least two of the entities involved in the concentration each have a revenue of more than RMB 400 million in the PRC in the previous financial year; or (2) the total revenue in China of all the entities involved in the concentration exceeds RMB 2 billion in the previous financial year, and at least two of the entities involved in the concentration each have a revenue of more than RMB 400 million in the PRC in the previous financial year. "Entities involved in the concentration" refer to the buyer and all its affiliates in a relationship of control, as well as the target and all its affiliates in a relationship of control, but does not include the entities and assets of the seller's group which are not transferred to Newco (i.e., in this transaction, the revenue of Newco and all its affiliates in a relationship of control including parent companies, and the revenue generated by Sino-Forest's PRC subsidiaries to

be transferred must be taken into account when examining whether the thresholds are met.) The parties are still evaluating whether the turnover thresholds would be triggered and thus the Plan is notifiable under the AML.

The review period provided under the AML is from 30 days to 180 days in length. In practice, it cannot be excluded that the relevant PRC regulatory authority may take an even longer period of time to conduct the review work. Before obtaining the approval granted by the regulatory authority, the Plan cannot be implemented or, if implemented, can be voided post-closing. The implementation of the Plan is subject to the condition that if notification is necessary or desirable under the AML, the acceptance of all antitrust filings considered necessary or prudent by the Initial Consenting Noteholders and (to the extent required) approval thereof by the competent Chinese authority shall have been obtained. See "*Required Approvals Under the CCAA and Other Conditions to Implementation – Conditions to Implementation" and "Risk Factors – Risks Relating to the Plan*".

*Potential application of chain principle by the Takeovers Executive of the HKSFC*

Sino-Forest owns approximately 65% of Greenheart through Sino-Capital Global Inc. ("**SCG**"). Greenheart is a company which is incorporated in Bermuda and listed on the Main Board of the Hong Kong Stock Exchange. Under the Hong Kong Takeovers Code, if a person or group of persons acting in concert (the "**Acquiror**") obtains statutory control of a company (the "**First Company**") and thereby acquires or consolidates control (as defined in the Hong Kong Takeovers Code) of another company (the "**Second Company**") because the First Company itself holds, either directly or indirectly through intermediate companies, 30% or more of the voting rights of the Second Company or holds voting rights which, when aggregated with those already held by the Acquiror, secure or consolidate control of the Second Company, the chain principle may apply meaning that the Acquiror may be required to make an offer to acquire all the shares in the Second Company not already owned by it and the First Company. The chain principle would only apply with the Takeovers Executive (the part of the HKSFC which administers the Hong Kong Takeovers Code) requiring such an offer in these circumstances where: (A) the holding in Second Company is significant (determined based on a number of factors, including, as appropriate, the assets and profits of the respective companies, with relative values of 60% or more normally being regarded as significant) in relation to the First Company; or (B) one of the main purposes of the Acquiror acquiring control of the First Company was to secure control of the Second Company.

If the Takeovers Executive determines that Greenheart is significant relative to Sino-Forest, the Takeovers Executive could require Newco to make an offer to acquire all of the shares of Greenheart not already owned by SCG. Even if the Takeovers Executive determines that Greenheart is not significant relative to Sino-Forest, the Takeovers Executive could impose a mandatory offer obligation if it determines that one of the main purposes of Newco acquiring SCG is to secure control of Greenheart. Accordingly, Newco intends to consult with the Takeovers Executive as to the application of the Hong Kong Takeovers Code in the present circumstances to consider whether it is necessary to seek a ruling under the Hong Kong Takeovers Code that it is not necessary to make an offer for all of the outstanding shares of Greenheart not already owned by SCG. The implementation of the Plan is subject to the condition that implementation of the Restructuring will not result in an obligation arising for Newco, its shareholders or any Subsidiary to make a mandatory offer to acquire shares of Greenheart. See "*Required Approvals Under the CCAA and Other Conditions to Implementation – Conditions to Implementation" and "Risk Factors – Risks Relating to the Plan*".

*Exemptive Relief from Canadian Securities Administrators*

The Company is at the date hereof in default in its reporting obligations under Canadian securities laws and its securities are subject to a cease trade order issued by the OSC. The Company will require an exemption or variation order in respect of the cease trade order and other exemptive relief from the Canadian Securities Administrators to implement the Plan in its current form.

*Application to Cease to be a Reporting Issuer*

SFC has applied to cease to be a reporting issuer under the securities laws of each province of Canada in which it is a reporting issuer effective immediately prior to the Effective Time on the Plan Implementation Date.

## IMPLEMENTATION OF THE PLAN

**Timing of Implementation**

In accordance with the Support Agreement, SFC and the Direct Subsidiaries have agreed to effect the following timeline to complete the Restructuring:

|  |  |  |
|---|---|---|
| No later than November 29, 2012 | - | Meeting |
| No later than December 17, 2012 | - | Sanction Order |
| No later than January 15, 2013 | - | Implementation of the Plan |

The Plan will become effective at the Effective Time on the Plan Implementation Date, other than such matters occurring on the Equity Cancellation Date (if the Equity Cancellation Date does not occur on the Plan Implementation Date) which will occur and be effective on such date, and the Plan will be binding on and enure to the benefit of SFC, the Subsidiaries, Newco, SFC Escrow Co., any Person having an Affected Claim, the Directors and Officers of SFC and all other Persons named or referred to in, or subject to, the Plan, as and to the extent provided for in the Plan.

**Implementation Steps**

*The following is a summary only of certain material terms of the Plan. Creditors are urged to read the Plan in its entirety. A copy of the Plan is attached as Schedule C to this Information Statement.*

In accordance with the Plan, the following steps and compromises and releases to be effected will occur, and be deemed to have occurred in the following manner and order (sequentially, each step occurring five minutes apart, except that within such order steps (a) to (g) will occur simultaneously and steps (u) to (x) will occur simultaneously) without any further act or formality, on the Plan Implementation Date (except that step (y) will occur on the Equity Cancellation Date) beginning at the Effective Time (or in such other manner or order or at such other time or times as SFC, the Monitor and the Initial Consenting Noteholders may agree):

(a)     SFC will pay required funds to the Monitor for the purpose of funding the Unaffected Claims Reserve, and the Monitor will hold and administer such funds in trust for the purpose of paying the Unaffected Claims pursuant to the Plan.

(b)     SFC will pay the required funds to the Monitor for the purpose of funding the Administration Charge Reserve, and the Monitor will hold and administer such funds in trust for the purpose of paying Unaffected Claims secured by Administration Charge.

(c)     SFC will pay the required funds to the Monitor for the purpose of funding the Directors' Charge Reserve, and the Monitor will hold and administer such funds in trust for the purpose of paying the Unaffected Claims secured by the Directors' Charge.

(d)     SFC will pay the required funds to the Monitor for the purpose of funding the Monitor's Post-Implementation Reserve, and the Monitor will hold and administer such funds in trust for the purpose of administering SFC, as necessary, from and after the Plan Implementation Date.

(e)     SFC will pay to the Noteholder Advisors and the Initial Consenting Noteholders, as applicable, each such Person's respective portion of the Expense Reimbursement.

(f)     SFC will pay all fees and expenses owing to each of the SFC Advisors, the advisors to the current Board of Directors of SFC, Chandler Fraser Keating Limited and Spencer Stuart and SFC or any of the Subsidiaries shall pay all fees and expenses owing to each of Indufor Asia Pacific Limited and Stewart Murray (Singapore) Pte. Ltd.

(g)     The Lien Claims will be satisfied in accordance with the Plan.

(h)     All accrued and unpaid interest owing on, or in respect of, or as part of, Affected Creditor Claims (including any Accrued Interest on the Notes and any interest accruing on the Notes or any Ordinary Affected Creditor Claim after the Filing Date) will be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred for no consideration, and from and after the occurrence of this step, no Person will have any entitlement to any such accrued and unpaid interest.

(i)     All of the Affected Creditors shall be deemed to assign, transfer and convey to Newco all of their Affected Creditor Claims, and from and after the occurrence of this step, Newco will be the legal and beneficial owner of all Affected Creditor Claims.  In exchange for the assignment, transfer and conveyance of the Affected Creditor Claims to Newco:

    (i)     with respect to Affected Creditor Claims that are Proven Claims at the Effective Time:

        (A)   Newco will issue to each applicable Affected Creditor the number of Newco Shares that each such Affected Creditor is entitled to receive in accordance with the Plan;

        (B)   Newco will issue to each applicable Affected Creditor the amount of Newco Notes that each such Affected Creditor is entitled to receive in accordance with the Plan;

        (C)   Newco will issue to each of the Early Consent Noteholders the number of Newco Shares that each such Early Consent Noteholder is entitled to receive pursuant to the Plan;

        (D)   such Affected Creditors will be entitled to receive the Litigation Trust Interests to be acquired by Newco in accordance with the Plan, following the establishment of the Litigation Trust;

        (E)   such Affected Creditors will be entitled to receive, at the time or times contemplated in the Plan, the Newco Shares, Newco Notes and Litigation Trust Interests that are subsequently distributed to (or in the case of Litigation Trust Interests registered for the benefit of) Affected Creditors with Proven Claims pursuant to the Plan (if any),

     and all such Newco Shares and Newco Notes shall be distributed in the manner described in the Plan; and

    (ii)    with respect to Affected Creditor Claims that are Unresolved Claims as at the Effective Time, Newco will issue in the name of the Unresolved Claims Escrow Agent, for the benefit of the Persons entitled thereto under the Plan, the Newco Shares and the Newco Notes that would have been distributed to the applicable Affected Creditors in respect of such Unresolved Claims if such Unresolved Claims had been Proven Claims at the Effective Time; such Newco Shares, Newco Notes and the Litigation Trust Interests acquired by Newco and assigned to and registered in the name of the Unresolved Claims Escrow Agent in accordance with the Plan will comprise part of the Unresolved Claims Reserve and the Unresolved Claims Escrow Agent will hold all such Newco Shares, Newco Notes and Litigation Trust Interests in escrow for the benefit of those Persons entitled to receive distributions thereof pursuant to the Plan.

(j)     The initial Newco Share in the capital of Newco held by the Initial Newco Shareholder will be redeemed and cancelled for no consideration.

(k)     SFC will be deemed to assign, transfer and convey to SFC Barbados those SFC Intercompany Claims and/or Equity Interests in one or more Direct Subsidiaries as agreed to by SFC and the

Initial Consenting Noteholders prior to the Plan Implementation Date (the "**Barbados Property**") first in full repayment of the Barbados Loans and second, to the extent the fair market value of the Barbados Property exceeds the amount owing under the Barbados Loans, as a contribution to the capital of SFC Barbados by SFC.  Immediately after the time of such assignment, transfer and conveyance, the Barbados Loans will be considered to be fully paid by SFC and no longer outstanding.

(l)     SFC will be deemed to assign, transfer and convey to Newco all shares and other Equity Interests (other than the Barbados Property) in the capital of (i) the Direct Subsidiaries and (ii) any other Subsidiaries that are directly owned by SFC immediately prior to the Effective Time other than SFC Escrow Co. (all such shares and other equity interests being the "**Direct Subsidiary Shares**") for a purchase price equal to the fair market value of the Direct Subsidiary Shares and, in consideration therefor, Newco will be deemed to pay to SFC consideration equal to the fair market value of the Direct Subsidiary Shares, which consideration will be comprised of a U.S. dollar denominated demand non-interest-bearing promissory note issued to SFC by Newco in having a principal amount equal to the fair market value of the Direct Subsidiary Shares (the "**Newco Promissory Note 1**").  At the time of such assignment, transfer and conveyance, all prior rights that Newco had to acquire the Direct Subsidiary Shares, under the Plan or otherwise, will cease to be outstanding. For greater certainty, SFC will not assign, transfer or convey the SFC Escrow Co. Share, and the SFC Escrow Co. Share shall remain the property of SFC. SFC will not assign, transfer or convey the SFC Escrow Co. Share, and the SFC Escrow Co. Share shall remain the property of SFC.

(m)    If the Initial Consenting Noteholders and SFC agree prior to the Plan Implementation Date, there will be a set-off of any SFC Intercompany Claim so agreed against a Subsidiary Intercompany Claim owing between SFC and the same Subsidiary.  In such case, the amounts will be set-off in repayment of both claims to the extent of the lesser of the two amounts, and the excess (if any) will continue as an SFC Intercompany Claim or a Subsidiary Intercompany Claim, as applicable.

(n)     SFC will be deemed to assign, transfer and convey to Newco all SFC Intercompany Claims (other than those SFC Intercompany Claims transferred to SFC Barbados or set-off pursuant to the Plan) for a purchase price equal to the fair market value of such SFC Intercompany Claims and, in consideration therefor, Newco will be deemed to pay SFC consideration equal to the fair market value of the SFC Intercompany Claims, which consideration will be comprised of the following: (i) the assumption by Newco of all of SFC's obligations to the Subsidiaries in respect of Subsidiary Intercompany Claims (other than the Subsidiary Intercompany Claims set-off pursuant to the Plan); and (ii) if the fair market value of the transferred SFC Intercompany Claims exceeds the fair market value of the assumed Subsidiary Intercompany Claims, Newco will issue to SFC a U.S. dollar denominated demand non-interest-bearing promissory note in having a principal amount equal to such excess (the "**Newco Promissory Note 2**").

(o)     SFC will be deemed to assign, transfer and convey to Newco all other SFC Assets (namely, all SFC Assets other than the Direct Subsidiary Shares and the SFC Intercompany Claims (which shall have already been transferred to Newco in accordance with the Plan), for a purchase price equal to the fair market value of such other SFC Assets and, in consideration therefor, Newco will be deemed to pay to SFC consideration equal to the fair market value of such other SFC Assets, which consideration will be comprised of a U.S. dollar denominated demand non-interest-bearing promissory note issued to SFC by Newco having a principal amount equal to the fair market value of such other SFC Assets (the "**Newco Promissory Note 3**").

(p)     SFC will establish the Litigation Trust and will contribute the Litigation Funding Amount to the Litigation Trustee for the benefit of the Litigation Trust.  Immediately thereafter, SFC, the Subsidiaries and the Trustees (on behalf of the Noteholders) will be deemed to convey, transfer and assign to the Litigation Trustee all of their respective rights, title and interest in and to the Litigation Trust Claims.  The Litigation Funding Amount and Litigation Trust Claims will be

managed by the Litigation Trustee in accordance with the terms and conditions of the Litigation Trust Agreement.

(q)     The Litigation Trust will be deemed to be effective from the time that it is established in accordance with the Plan.  Initially, all of the Litigation Trust Interests will be held by SFC. Immediately thereafter, SFC will assign, convey and transfer a portion of the Litigation Trust Interests to the Noteholder Class Action Claimants in accordance with the allocation set forth in the Plan.

(r)     SFC will settle and discharge the Affected Creditor Claims by assigning Newco Promissory Note 1, Newco Promissory Note 2 and Newco Promissory Note 3 (collectively, the "**Newco Promissory Notes**") and the remaining Litigation Trust Interests held by SFC to Newco.  Such assignment will constitute payment, by set-off, of the full principal amount of the Newco Promissory Notes and of a portion of the Affected Creditor Claims equal to the aggregate principal amount of the Newco Promissory Notes and the fair market value of the Litigation Trust Interests so transferred (with such payment being allocated first to the Noteholder Claims and then to the Ordinary Affected Creditor Claims).  As a consequence thereof:

(i)     Newco will be deemed to discharge and release SFC of and from all of SFC's obligations to Newco in respect of the Affected Creditor Claims, and all of Newco's rights against SFC of any kind in respect of the Affected Creditor Claims will thereupon be fully, finally, irrevocably and forever compromised, released, discharged and cancelled; and

(ii)    SFC will be deemed to discharge and release Newco of and from all of Newco's obligations to SFC in respect of the Newco Promissory Notes, and the Newco Promissory Notes and all of SFC's rights against Newco in respect thereof shall thereupon be fully, finally, irrevocably and forever released, discharged and cancelled.

(s)     Newco will cause a portion of the Litigation Trust Interests it acquired in accordance with the Plan to be assigned to and registered in the name of the Affected Creditors with Proven Claims as contemplated in the Plan, and with respect to any Affected Creditor Claims that are Unresolved Claims as at the Effective Time, the remaining Litigation Trust Interests held by Newco that would have been allocated to the applicable Affected Creditors in respect of such Unresolved Claims if such Unresolved Claims had been Proven Claims at the Effective Time will be assigned and registered by the Litigation Trustee to the Unresolved Claims Escrow Agent and in the name of the Unresolved Claims Escrow Agent, in escrow for the benefit of Persons entitled thereto, and such Litigation Trust Interests will comprise part of the Unresolved Claims Reserve.  The Litigation Trustee will record entitlements to the Litigation Trust Interests in the manner set forth in the Plan.

(t)     Subject to section 5.9 of the Plan, all debentures, indentures, notes, certificates, agreements, invoices, guarantees, pledges and other instruments evidencing Affected Claims, including the Notes and the Note Indentures, will not entitle any holder thereof to any compensation or participation other than as expressly provided for in the Plan and will be cancelled and will thereupon be null and void.  The Trustees will be directed and will be deemed to have released, discharged and cancelled any guarantees, indemnities, Encumbrances or other obligations owing by or in respect of any Subsidiary relating to the Notes or the Note Indentures.

(u)     Newco will be deemed to have no liability or obligation of any kind whatsoever for: any Claim (including, notwithstanding anything to the contrary herein, any Unaffected Claim); any Affected Claim (including any Affected Creditor Claim, Equity Claim, D&O Claim, D&O Indemnity Claim and Noteholder Class Action Claim); any Section 5.1(2) D&O Claim; any Conspiracy Claim; any Continuing Other D&O Claim; any Non-Released D&O Claim; any Class Action Claim; any Class Action Indemnity Claim; any right or claim in connection with or liability for the Notes or the Note Indentures; any guarantees, indemnities, share pledges or Encumbrances relating to the Notes or the Note Indentures; any right or claim in connection with or liability for the Existing

Shares or other Equity Interests or any other securities of SFC; any rights or claims of the Third Party Defendants relating to SFC or the Subsidiaries; any right or claim in connection with or liability for the Support Agreement, the Plan, the CCAA Proceedings, the Restructuring Transaction, the Litigation Trust, the business and affairs of SFC and the Subsidiaries (whenever or however conducted), the administration and/or management of SFC and the Subsidiaries, or any public filings, statements, disclosures or press releases relating to SFC; any right or claim in connection with or liability for any guaranty, indemnity or claim for contribution in respect of any of the foregoing; and any Encumbrance in respect of the foregoing, provided only that Newco will assume SFC's obligations to the applicable Subsidiaries in respect of the Subsidiary Intercompany Claims.

(v)     Each of the Charges will be discharged, released and cancelled.

(w)     The releases and injunctions referred to in Article 7 of the Plan will become effective in accordance with the Plan.

(x)     Any contract defaults arising as a result of the CCAA Proceedings and/or the implementation of the Plan (including, notwithstanding anything to the contrary in the Plan, any such contract defaults in respect of the Unaffected Claims) will be deemed to be cured.

(y)     On the Equity Cancellation Date, all Existing Shares and Equity Interests shall be cancelled in accordance with the steps set out in section 6.5 of the Plan.

Unless otherwise agreed by SFC, the Monitor and the Initial Consenting Noteholders or as otherwise directed by Order of the Court, SFC will maintain its corporate existence at all times from and after the Plan Implementation Date until the later of the date: (i) on which SFC Escrow Co. has completed all of its obligations as Unresolved Claims Escrow Agent under this Plan; (ii) on which SFC Escrow Co. no longer holds any Undeliverable Distributions delivered to it in accordance with the Plan; and (iii) as determined by the Litigation Trustee.

**Distributions under the Plan**

*Letters of Instruction*

In order to issue Newco Shares and Newco Notes to Ordinary Affected Creditors and Newco Shares to Early Consent Noteholders, the steps set out below will be taken.

With respect to Ordinary Affected Creditors with Proven Claims or Unresolved Claims, on the next Business Day following the Distribution Record Date, the Monitor will send blank Letters of Instruction by prepaid first class mail, courier, email or facsimile to each such Ordinary Affected Creditor to the address of each such Ordinary Affected Creditor (as specified in the applicable Proof of Claim) as of the Distribution Record Date, or as evidenced by any assignment or transfer in accordance with the Plan. Each such Ordinary Affected Creditor must deliver to the Monitor a duly completed and executed Letter of Instruction that must be received by the Monitor on or before the date that is seven Business Days after the Distribution Record Date or such other date as the Monitor may determine. Any such Ordinary Affected Creditor that does not return a Letter of Instruction to the Monitor in accordance with the Plan will be deemed to have requested that such Ordinary Affected Creditor's Newco Shares and Newco Notes be registered or distributed, as applicable, in accordance with the information set out in such Ordinary Affected Creditor's Proof of Claim.

With respect to Early Consent Noteholders, on the next Business Day following the Distribution Record Date the Monitor will send blank Letters of Instruction by prepaid first class mail, courier, email or facsimile to each Early Consent Noteholder to the address of each such Early Consent Noteholder as confirmed by the Monitor on or before the Distribution Record Date. Each Early Consent Noteholder will deliver to the Monitor a duly completed and executed Letter of Instruction that must be received by the Monitor on or before the date that is seven Business Days after the Distribution Record Date or such other date as the Monitor may determine. Any such Early Consent Noteholder that does not return a Letter of Instruction to the Monitor in accordance with the Plan will be deemed to

have requested that such Early Consent Noteholder's Newco Shares be distributed or registered, as applicable, in accordance with information confirmed by the Monitor on or before the Distribution Record Date.

***Distribution Mechanics with respect to Newco Shares and Newco Notes***

To effect distributions of Newco Shares and Newco Notes, the Monitor will deliver a direction at least two Business Days prior to the Initial Distribution Date to Newco or its agent, as applicable, directing Newco or its agent, as applicable, to issue on such Initial Distribution Date or subsequent Distribution Date:

    (a)    in respect of the Ordinary Affected Creditors with Proven Claims:

        (i)    the number of Newco Shares that each such Ordinary Affected Creditor is entitled to receive in accordance with the Plan; and

        (ii)    the number of Newco Notes that each such Ordinary Affected Creditor is entitled to receive in accordance with the Plan;

    all of which Newco Shares and Newco Notes will be issued to such Ordinary Affected Creditors and distributed as described below;

    (b)    in respect of the Ordinary Affected Creditors with Unresolved Claims:

        (i)    the number of Newco Shares that each such Ordinary Affected Creditor would have been entitled to receive in accordance with the Plan had such Ordinary Affected Creditor's Unresolved Claim been a Proven Claim on the Plan Implementation Date; and

        (ii)    the amount of Newco Notes that each such Ordinary Affected Creditor would have been entitled to receive in accordance with the Plan had such Ordinary Affected Creditor's Unresolved Claim been a Proven Claim on the Plan Implementation Date,

    all of which Newco Shares and Newco Notes will be issued in the name of the Unresolved Claims Escrow Agent for the benefit of the Persons entitled thereto under the Plan, which Newco Shares and Newco Notes will comprise part of the Unresolved Claims Reserve and will be held in escrow by the Unresolved Claims Escrow Agent until released and distributed as described below;

    (c)    in respect of the Noteholders:

        (i)    the number of Newco Shares that the Trustees are collectively required to receive such that, upon distribution to the Noteholders in accordance with the Plan, each individual Noteholder receives the number of Newco Shares to which it is entitled in accordance with the Plan; and

        (ii)    the amount of Newco Notes that the Trustees are collectively required to receive such that, upon distribution to the Noteholders in accordance with the Plan, each individual Noteholder receives the amount of Newco Notes to which it is entitled in accordance with the Plan;

    all of which Newco Shares and Newco Notes will be issued to such Noteholders and distributed as described below; and

    (d)    in respect of Early Consent Noteholders, the number of Newco Shares that each such Early Consent Noteholder is entitled to receive in accordance with the Plan, all of which Newco Shares will be issued to such Early Consent Noteholders and distributed as described below.

If the registers for the Newco Shares and/or Newco Notes are maintained by the Transfer Agent in a direct registration system (without certificates), the Monitor and/or Newco and/or the Unresolved Claims Escrow Agent as applicable, will, on the Initial Distribution Date or any subsequent Distribution Date, as applicable, (i) instruct the Transfer Agent to record, and the Transfer Agent will record, in the Direct Registration Account of each applicable Ordinary Affected Creditor and each Early Consent Noteholder the number of Newco Shares and, in the case of Ordinary Affected Creditors, the amount of Newco Notes that are to be distributed to each such Person, and the Monitor and/or Newco and/or the Unresolved Claims Escrow Agent, as applicable, will send or cause to be sent to each such Ordinary Affected Creditor and Early Consent Noteholder a Direct Registration Transaction Advice, and (ii) with respect to the distribution of Newco Shares and/or Newco Notes to Noteholders: (A) if the Newco Shares and/or Newco Notes are DTC eligible, the Monitor and/or Newco and/or the Unresolved Claims Escrow Agent, as applicable, will instruct the Transfer Agent to register, and the Transfer Agent will register, the applicable Newco Shares and/or Newco Notes in the name of DTC (or its nominee) for the benefit of the Noteholders, and the Trustees will provide their consent to DTC to the distribution of such Newco Shares and Newco Notes to the applicable Noteholders, in the applicable amounts, through the facilities of DTC in accordance with customary practices and procedures; and (B) if the Newco Shares and/or Newco Notes are not DTC eligible, the Monitor and/or Newco and/or the Unresolved Claims Escrow Agent, as applicable, will instruct the Transfer Agent to register the applicable Newco Shares and/or Newco Notes in the Direct Registration Accounts of the applicable Noteholders pursuant to the registration instructions obtained through DTC and the DTC participants (by way of a letter of transmittal process or such other process as agreed by SFC, the Monitor, the Trustees and the Initial Consenting Noteholders), and the Transfer Agent will (A) register such Newco Shares and/or Newco Notes, in the applicable amounts, in the Direct Registration Accounts of the applicable Noteholders; and (B) send or cause to be sent to each Noteholder a Direct Registration Transaction Advice in accordance with customary practices and procedures; provided that the Transfer Agent will not be permitted to effect the foregoing registrations without the prior written consent of the Trustees.

If the registers for the Newco Shares and/or Newco Notes are not maintained by the Transfer Agent in a direct registration system, Newco will prepare and deliver to the Monitor and/or the Unresolved Claims Escrow Agent, as applicable, and the Monitor and/or the Unresolved Claims Escrow Agent, as applicable, will promptly thereafter, on the Initial Distribution Date or any subsequent Distribution Date, as applicable (i) deliver to each Ordinary Affected Creditor and each Early Consent Noteholder Newco Share Certificates and, in the case of Ordinary Affected Creditors, Newco Note Certificates representing the applicable number of Newco Shares and the applicable amount of Newco Notes that are to be distributed to each such Person; and (ii) with respect to the distribution of Newco Shares and/or Newco Notes to Noteholders: (A) if the Newco Shares and/or Newco Notes are DTC eligible, the Monitor and/or Newco and/or the Unresolved Claims Escrow Agent, as applicable, will distribute to DTC (or its nominee), for the benefit of the Noteholders, Newco Share Certificates and/or Newco Note Certificates representing the aggregate of all Newco Shares and Newco Notes to be distributed to the Noteholders on such Distribution Date, and the Trustees will provide their consent to DTC to the distribution of such Newco Shares and Newco Notes to the applicable Noteholders, in the applicable amounts, through the facilities of DTC in accordance with customary practices and procedures; and (B) if the Newco Shares and/or Newco Notes are not DTC eligible, the Monitor and/or Newco and/or the Unresolved Claims Escrow Agent, as applicable, will distribute to the applicable Trustees, Newco Share Certificates and/or Newco Note Certificates representing the aggregate of all Newco Shares and/or Newco Notes to be distributed to the Noteholders on such Distribution Date, and the Trustees will make delivery of such Newco Share Certificates and Newco Note Certificates, in the applicable amounts, directly to the applicable Noteholders pursuant to the delivery instructions obtained through DTC and the DTC participants (by way of a letter of transmittal process or such other process as agreed by SFC, the Monitor, the Trustees and the Initial Consenting Noteholders), all of which will occur in accordance with customary practices and procedures. Upon receipt of and in accordance with written instructions from the Monitor, the Trustees will instruct DTC to and DTC will: (i) set up an escrow position representing the respective positions of the Noteholders as of the Distribution Record Date for the purpose of making distributions on the Initial Distribution Date and any subsequent Distribution Dates (the "**Distribution Escrow Position**"); and (ii) block any further trading of the Notes, effective as of the close of business on the day immediately preceding the Plan Implementation Date, all in accordance with DTC's customary practices and procedures.

The Monitor, Newco, the Trustees, SFC, the Named Directors and Officers and the Transfer Agent will have no liability or obligation in respect of deliveries by DTC (or its nominee) to the DTC participants or the Noteholders pursuant to the Plan.

*Distribution of Litigation Trust Rights*

The Litigation Trustee will administer the Litigation Trust Claims and the Litigation Funding Amount for the benefit of the Persons that are entitled to the Litigation Trust Interests and will maintain a registry of such Persons as follows:

(a)     with respect to Affected Creditors, (i) the Litigation Trustee will maintain a record of the amount of Litigation Trust Interests that each Ordinary Affected Creditor is entitled to receive in accordance with the Plan; (ii) the Litigation Trustee will maintain a record of the aggregate amount of all Litigation Trust Interests to which the Noteholders are collectively entitled in accordance with the Plan, and if cash is distributed from the Litigation Trust to Persons with Litigation Trust Interests, the amount of such cash that is payable to the Noteholders will be distributed through the Distribution Escrow Position (such that each beneficial Noteholder will receive a percentage of such cash distribution that is equal to its entitlement to Litigation Trust Interests (as set forth in the Plan) as a percentage of all Litigation Trust Interests); and (iii) with respect to any Litigation Trust Interests to be allocated in respect of the Unresolved Claims Reserve, the Litigation Trustee will record such Litigation Trust Interests in the name of the Unresolved Claims Escrow Agent, for the benefit of the Persons entitled thereto in accordance with the Plan, which will be held by the Unresolved Claims Escrow Agent in escrow until released and distributed unless and until otherwise directed by the Monitor in accordance with the Plan; and

(b)     with respect to the Noteholder Class Action Claimants, the Litigation Trustee will maintain a record of the aggregate of all Litigation Trust Interests that the Noteholder Class Action Claimants are entitled to receive pursuant to the Plan, provided that such record shall be maintained in the name of the Noteholder Class Action Representative, to be allocated to individual Noteholder Class Action Claimants in any manner ordered by the applicable Class Action Court, and provided further that if any such Litigation Trust Interests are cancelled in accordance with the Plan, the Litigation Trustee shall record such cancellation in its registry of Litigation Trust Interests.

*Treatment of Undeliverable Distributions*

If any distribution pursuant to the Plan of Newco Shares, Newco Notes and/or Litigation Trust Interests is undeliverable (that is, for greater certainty, that it cannot be properly registered or delivered to the Applicable Affected Creditor because of inadequate or incorrect registration or delivery information or otherwise) (an "**Undeliverable Distribution**"), it will be delivered to SFC Escrow Co., which will hold such Undeliverable Distribution in escrow and administer it in accordance with the Plan.  No further distributions in respect of an Undeliverable Distribution will be made unless and until SFC and the Monitor are notified by the applicable Person of its current address and/or registration information, as applicable, at which time the Monitor will direct SFC Escrow Co. to make all such distributions to such Person, and SFC Escrow Co. will make all such distributions to such Person.  All claims for Undeliverable Distributions must be made on or before the date that is six months following the final Distribution Date, after which date the right to receive distributions under the Plan in respect of such Undeliverable Distributions shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred, without any compensation therefore, notwithstanding any federal, state or provincial laws to the contrary, at which time any such Undeliverable Distributions held by SFC Escrow Co. will be deemed to have been gifted by the owner of the Undeliverable Distribution to Newco or the Litigation Trust, as applicable, without consideration, and, in the case of Newco Shares, Newco Notes and Litigation Trust Interests, will be cancelled by Newco and the Litigation Trustee, as applicable.  Nothing contained in the Plan will require SFC, the Monitor, SFC Escrow Co. or any other Person to attempt to locate any owner of an Undeliverable Distribution.  No interest is payable in respect of an Undeliverable Distribution.  Any distribution under the Plan on account of the Notes, other than any distributions in respect of Litigation Trust Interests, will be deemed made when delivered to DTC or the applicable Trustee, as applicable, for subsequent distribution to the applicable Noteholders in accordance with the Plan.

***Distribution Mechanics with respect to Unresolved Claims***

An Affected Creditor that has asserted an Unresolved Claim will not be entitled to receive a distribution under the Plan in respect of such Unresolved Claim or any portion thereof unless and until such Unresolved Claim becomes a proven claim.

Distributions in respect of any Unresolved Claim in existence at the Plan Implementation Date will be held in escrow by the Unresolved Claims Escrow Agent in the Unresolved Claims Reserve until settlement or final determination of the Unresolved Claim in accordance with the Claims Procedure Order, the Meeting Order or the Plan, as applicable.

To the extent that Unresolved Claims become Proven Claims or are finally disallowed, the Unresolved Claims Escrow Agent shall release from escrow and deliver (or in the case of Litigation Trust Interests, cause to be registered) the following from the Unresolved Claims Reserve (on the next Distribution Date, as determined by the Monitor with the consent of SFC and the Initial Consenting Noteholders):

(a) in the case of Affected Creditors whose Unresolved Claims are ultimately determined, in whole or in part to be Proven Claims, the Unresolved Claims Escrow Agent will release from escrow and deliver to such Affected Creditor that number of Newco Shares, Newco Notes and Litigation Trust Interests (and any income or proceeds therefrom) that such Affected Creditor is entitled to receive in respect of its Proven Claim pursuant to the Plan;

(b) in the case of Affected Creditors whose Unresolved Claims are ultimately determined, in whole or in part to be disallowed, the Unresolved Claims Escrow Agent will release from escrow and deliver to all Affected Creditors with Proven Claims the number of Newco Shares, Newco Notes and Litigation Trust Interests (and any income or proceeds therefrom) that had been reserved in the Unresolved Claims Reserve for such Affected Creditor whose Unresolved Claims has been disallowed, such that, following such delivery, all of the Affected Creditors with Proven Claims have received the amount of Newco Shares, Newco Notes and Litigation Trust Interests that they are entitled to receive pursuant to the Plan.

As soon as practicable following the date that all Unresolved Claims have been finally resolved and any required distributions contemplated by the Plan have been made, the Unresolved Claims Escrow Agent will distribute (or in the case of Litigation Trust Interests, cause to be registered) any Litigation Trust Interests, Newco Shares and Newco Notes (and any income or proceeds therefrom), as applicable, remaining in the Unresolved Claims Reserve to the Affected Creditors with Proven Claims such that after giving effect to such distributions each such Affected Creditor has received the amount of Litigation Trust Interests, Newco Shares and Newco Notes that it is entitled to receive pursuant to the Plan.

During the time that Newco Shares, Newco Notes and/or Litigation Trust Interests are held in escrow in the Unresolved Claims Reserve, any income or proceeds received therefrom or accruing thereon shall be added to the Unresolved Claims Reserve by the Unresolved Claims Escrow Agent and no Person will have any right to such income or proceeds until such Newco Shares, Newco Notes or Litigation Trust Interests, as applicable, are distributed (or in the case of Litigation Trust Interests, registered) in accordance with the Plan, at which time the recipient thereof will be entitled to any applicable income or proceeds therefrom.

The Unresolved Claims Escrow Agent will have no beneficial interest or right in the Unresolved Claims Reserve. The Unresolved Claims Escrow Agent shall not take any step or action with respect to the Unresolved Claims Reserve or any other matter without the consent or direction of the Monitor or the direction of the Court. The Unresolved Claims Escrow Agent shall forthwith, upon receipt of an Order of the Court or instruction of the Monitor directing the release of any Newco Shares, Newco Notes and/or Litigation Trust Interests from the Unresolved Claims Reserve, comply with any such Order or instruction.

Nothing in the Plan impairs, affects or limits in any way the ability of SFC, the Monitor or the Initial Consenting Noteholders to seek or obtain an Order, whether before or after the Plan Implementation Date, directing that any

Unresolved Claims should be disallowed in whole or in part or that such Unresolved Claims should receive the same or similar treatment as is afforded to Equity Claims under the terms of the Plan.

### Final Distributions from Reserves

If there is any cash remaining in: (i) the Unaffected Claims Reserve on the date that all Unaffected Claims have been finally paid or otherwise discharged; (ii) the Administration Charge Reserve on the date that all Claims secured by the Administration Charge have been finally paid or otherwise discharged; and/ or (iii) the Directors' Charge Reserve on the date that all Claims secured by the Directors' Charge have been finally paid or otherwise discharged, the Monitor will, in each case, forthwith transfer all such remaining cash to the Monitor's Post-Implementation Reserve.

The Monitor will not terminate the Monitor's Post-Implementation Reserve prior to the termination of each of the Unaffected Claims Reserve, the Administration Charge Reserve and the Directors' Charge Reserve. The Monitor may, at any time, from time to time and at its sole discretion, release amounts from the Monitor's Post-Implementation Reserve to Newco. Once the Monitor has determined that the cash remaining in the Monitor's Post-Implementation Reserve is no longer necessary for administering SFC or the Claims Procedure, the Monitor will forthwith transfer any such remaining cash (the "**Remaining Post-Implementation Reserve Amount**") to Newco.

### Assignment of Claims for Distribution Purposes

#### Assignment of Claims by Ordinary Affected Creditors

Subject to any restrictions contained in Applicable Laws, an Ordinary Affected Creditor may transfer or assign the whole of its Affected Claim after the Meeting provided that neither SFC nor Newco nor the Monitor nor the Unresolved Claims Escrow Agent will be obliged to make distributions to any such transferee or assignee or otherwise deal with such transferee or assignee as an Ordinary Affected Creditor in respect thereof unless and until actual notice of the transfer or assignment, together with satisfactory evidence of such transfer or assignment and such other documentation as SFC and the Monitor may reasonably require, has been received by SFC and the Monitor on or before the Plan Implementation Date, or such other date as SFC and the Monitor may agree, failing which the original transferor will have all applicable rights as the "Ordinary Affected Creditor" with respect to such Affected Claim as if no transfer of the Affected Claim had occurred. Thereafter, such transferee or assignee will, for all purposes in accordance with the Plan, constitute an Ordinary Affected Creditor and will be bound by any and all notices previously given to the transferor or assignor in respect of such Claim. Partial transfers or assignments of Claims will not be recognized.

#### Assignment of Notes

Only those Noteholders who have beneficial ownership of one or more Notes as at the Distribution Record Date will be entitled to receive a distribution under the Plan on the Initial Distribution Date or any Distribution Date. Noteholders who have beneficial ownership of Notes will not be restricted from transferring or assigning such Notes prior to or after the Distribution Record Date (unless the Distribution Record Date is the Plan Implementation Date), provided that if such transfer or assignment occurs after the Distribution Record Date, neither SFC nor Newco nor the Monitor nor the Unresolved Claims Escrow Agent will have any obligation to make distributions to any such transferee or assignee of Notes in respect of the Claims associated therewith, or otherwise deal with such transferee or assignee as an Affected Creditor in respect thereof. Noteholders who assign or acquire Notes after the Distribution Record Date will be wholly responsible for ensuring that Plan distributions in respect of the Claims associated with such Notes are in fact delivered to the assignee, and the Trustees will have no liability in connection therewith.

### Withholding Rights

SFC, Newco, the Monitor, the Litigation Trustee, the Unresolved Claims Escrow Agent and/or any other Person making a payment contemplated herein will be entitled to deduct and withhold from any consideration payable to any Person such amounts as it is required to deduct and withhold with respect to such payment under the Canadian

Tax Act, the United States Internal Revenue Code of 1986 or any provision of federal, provincial, territorial, state, local or foreign Tax laws, in each case, as amended. To the extent that amounts are so withheld or deducted, such withheld or deducted amounts will be treated for all purposes hereof as having been paid to the Person in respect of which such withholding was made, provided that such amounts are actually remitted to the appropriate Taxing Authority. To the extent that the amounts so required or permitted to be deducted or withheld from any payment to a Person exceed the cash portion of the consideration otherwise payable to that Person: (i) the payor is authorized to sell or otherwise dispose of such portion of the consideration as is necessary to provide sufficient funds to enable it to comply with such deduction or withholding requirement or entitlement, and the payor will notify the applicable Person thereof and remit to such Person any unapplied balance of the net proceeds of such sale; or (ii) if such sale is not reasonably possible, the payor will not be required to make such excess payment until the Person has directly satisfied any such withholding obligation and provides evidence thereof to the payor.

*Fractional Interests*

No fractional interests of Newco Shares or Newco Notes (**"Fractional Interests"**) will be issued under the Plan. For purposes of calculating the number of Newco Shares and Newco Notes to be issued by Newco pursuant to the Plan, recipients of Newco Shares or Newco Notes will have their entitlements adjusted downwards to the nearest whole number of Newco Shares or Newco Notes, as applicable, to eliminate any such Fractional Interests and no compensation will be given for the Fractional Interests.

## LIQUIDATION ASSESSMENT

At the date hereof, the Company believes that a liquidation of the Company's assets appears to be the likely result in the event the Plan is not implemented. Based on the results of the Sale Solicitation Process, the Company believes that a liquidation of SFC would not provide equivalent value to Affected Creditors compared to the consideration to be received by Affected Creditors pursuant to the Plan.

## STATUS OF CLAIMS PROCESS

On May 14, 2012, the Court granted the Claims Procedure Order establishing a process for the identification and determination of claims against the Company and its current and former directors and officers. Under the Claims Procedure Order, the Claims Bar Date was June 20, 2012. The Company and the Monitor are continuing with the process of reviewing, reconciling and determining the quantum and the nature of all claims against SFC. The Monitor provided a summary regarding this issue in the Sixth Report of the Monitor which is available on the Website.

## MONITOR

The Monitor and its counsel have been involved throughout the course of negotiations regarding the Plan and the Monitor supports the Company's request to convene meetings to consider the Plan.

## RECOMMENDATION OF THE BOARD OF DIRECTORS

The Board of Directors appointed the Restructuring Committee, comprised exclusively of directors independent of management of the Company, for the purpose of reviewing and analyzing all strategic options available to the Company, including, without limitation, the recapitalization or restructuring of the Company or the sale of some or all of its business, or any similar transaction, or any alternatives to the aforementioned transactions and to do any other such things as the Restructuring Committee deemed necessary or advisable and in the best interests of the Company in connection with the foregoing.

The Restructuring Committee and the Board's advisors, together with the Company's advisors and the Monitor, met frequently to consider the alternatives available to Company, including the terms of the Restructuring, to consider and approve the terms of the Support Agreement with Initial Consenting Noteholders, and to consider and approve the Plan for filing with the Court.

The following is a summary of certain factors, among others, which the Board of Directors and the Restructuring Committee reviewed and considered in relation to the approval of the Plan:

- the continued overall challenges facing Sino-Forest arising out of the allegations contained in the MW Report, the OSC proceedings, investigations by the RCMP and HKSFC and related events;

- the Sale Solicitation Process conducted by the Company to provide a "market test" by which third parties could propose to acquire Sino-Forest's business operations through a CCAA plan (in a manner that would under certain scenarios potentially allow shareholders and other stakeholders subordinate to the Noteholders to share in the proceeds of a sale even though the Noteholders may not be paid in full) as an alternative to the Restructuring;

- the risk factors described in this Information Statement, including issues associated with liquidation in the PRC and risks relating to SAFE and potential tax liabilities;

- the challenges faced by Sino-Forest to meet its expected cash requirements, including to service and repay its existing debt;

- the impact on the SFC Companies and their stakeholders including employees, creditors, shareholders and suppliers of possible alternatives to the Restructuring, including the sale of assets or liquidation of the Company, and the risks associated with such alternatives, including the timing and uncertainties associated with successfully completing such alternatives;

- the impact of the Restructuring on the SFC Companies and their stakeholders including employees, creditors, shareholders and suppliers;

- the findings, conclusions and observations of the Independent Committee as reported in the reports of the Independent Committee;

- the uncertainties and costs also associated with "on-shoring" of the assets of the BVI Entities involved in the BVI model;

- the fact that Noteholders representing an aggregate of over 72% of the outstanding principal amount of the Notes as at the date hereof, have agreed to vote in favour of and to support the Restructuring and the Plan, in accordance with the terms of the Support Agreement;

- the fact that Monitor and its counsel were involved throughout the course of negotiations regarding the Plan and that the Monitor supports the Company's request to convene meetings to consider the Plan;

- the fact that if the Restructuring is not completed, there would be no assurance that SFC would be able to complete a restructuring of its businesses or that any such restructuring will be on terms that provide equivalent value to Affected Creditors compared to the consideration to be received by Affected Creditors pursuant to the Restructuring and the Plan;

- the fact that (i) the Company believes that a liquidation of the Company's assets appears to be the likely result in the event the Plan is not implemented, and (ii) based on the results of the Sale Solicitation Process, the Company believes that a liquidation of SFC would not provide equivalent value to Affected Creditors compared to the consideration to be received by Affected Creditors pursuant to the Plan; and

- the required approvals of the Restructuring by the Affected Creditors, the Court and regulatory authorities.

The foregoing discussion of the information and factors considered by the Board of Directors and the Restructuring Committee is not intended to be exhaustive, but includes the material factors considered by the Board of Directors and the Restructuring Committee. In view of the variety of factors considered in connection with its evaluation of the Recapitalization Transaction, the Board of Directors and the Restructuring Committee did not find it practicable to, and did not, quantify or otherwise assign relative weights to the specific factors considered in reaching their recommendations. In addition, individual members of the Board of Directors and the Restructuring Committee may have given differing weights to the different factors. After careful consideration of all relevant factors relating to the Restructuring and the Plan, and after receiving the advice of its advisors, the Company's management and advisors and having regard to the views of the Monitor, the Board of Directors has determined, in its business judgment, that the transactions contemplated by the Restructuring are in the best interests of the Company and recommends that Affected Creditors approve the Restructuring.

## SUPPORT OF THE NOTEHOLDERS

Noteholders representing an aggregate of over 72% of the outstanding principal amount of the Notes as at the date hereof, have agreed to vote in favour of and to support the Restructuring and the Plan, in accordance with the terms of the Support Agreement. The Noteholders' agreement to vote in favour of and to support the Restructuring of the Plan under the terms of the Support Agreement is subject to certain terms, conditions and conditions precedent, as set forth in the Support Agreement, a copy of which is attached as Schedule E to this Information Statement. See also "*Required Approvals under the CCAA and Other Conditions to Implementation – Conditions to Implementation of the Plan*."

## MEETING AND VOTING

### Meeting Order

The endorsement for the Meeting Order provides that the Meeting Order was made on the basis that there has been no determination of (a) the test for approval of the Plan, including (i) the jurisdiction to approve the Plan in its current form; (ii) whether the Plan complies with the CCAA; and (iii) whether any aspect or term of the Plan is fair and reasonable, (b) the validity or quantum of any claims, and (c) the classification of creditors for voting purposes.

### Procedure for the Meeting

Pursuant to the Meeting Order, the Meeting has been called for the purpose of having Affected Creditors with Voting Claims consider and, if deemed advisable, adopt, with or without variation, the Resolution to approve the Plan. The Meeting is scheduled to be held at 10:00 a.m. (Toronto time) on November 29, 2012 at the offices of Bennett Jones LLP, 3400 One First Canadian Place, Toronto, Ontario.

A representative of the Monitor, designated by the Monitor, shall preside as the chair of the Meeting (the "**Chair**") and, subject to this Meeting Order or any further Order of the Court, shall decide all matters relating to the conduct of the Meeting.

The quorum required at the Meeting has been set by the Meeting Order as one Affected Creditor with a Voting Claim present at the Meeting (in person or by proxy). The only Persons entitled to attend and speak at the Meeting are: (i) the Affected Creditors entitled to vote at the Meeting (or, if applicable, any Person holding a valid Ordinary Creditors' Proxy or Noteholders' Proxy on behalf of one or more such Affected Creditors) and any such Affected Creditor's or valid proxyholder's legal counsel and financial advisors; (ii) the Chair, the Scrutineers and the Secretary; (iii) one or more representatives of the Monitor and the Monitor's legal counsel; (iv) one or more representatives of the current board of directors and/or senior management of SFC, as selected by SFC, SFC's legal counsel and financial advisors; (v) counsel to the directors and officers of SFC; (vi) one or more representatives of the Initial Consenting Noteholders and the Initial Consenting Noteholders' legal counsel and financial advisors; and (vii) the Trustees and their respective legal counsel. Any other person may be admitted to the Meeting on invitation of the Chair.

In order for the Resolution to be approved, the Resolution must receive the affirmative vote of the Required Majority of the Affected Creditors Class, being a majority in number of Affected Creditors with Voting Claims, and two-thirds in value of the Voting Claims held by such Affected Creditors, in each case who vote (in person or by proxy) on the Plan at the Meeting.

For the purpose of calculating the two-thirds majority in value of Voting Claims, the aggregate amount of Voting Claims held by all Affected Creditors that vote in favour of the Plan (in person or by proxy) shall be divided by the aggregate amount of all Voting Claims held by all Affected Creditors that vote on the Plan (in person or by proxy). For the purpose of calculating a majority in number of Affected Creditors voting on the Plan, (i) each Ordinary Affected Creditor that votes on the Plan (in person or by proxy) shall only be counted once, without duplication; and (ii) each individual Beneficial Noteholder that votes on the Plan (in person or by proxy) shall only be counted once, without duplication, even if that Beneficial Noteholder holds Notes through more than one Registered Noteholder or Participant Holder.

## Classification of Creditors

For the purposes of considering and voting on the Resolution, the Affected Creditors shall constitute a single class, who are referred to as the 'Affected Creditors Class'.

## Entitlement to Vote

The only Persons entitled to vote at the Meeting (whether in person or by proxy) are: (i) Beneficial Noteholders with Voting Claims that have beneficial ownership of one or more Notes as at the Voting Record Date (or any such Beneficial Noteholder's validly appointed holder of its Noteholders' Proxy); and (ii) Ordinary Affected Creditors with Voting Claims as at the Voting Record Date (which, for greater certainty, includes any transferee of an Ordinary Affected Creditor Claim that is a Voting Claim, provided that such transferee has been recognized as an Ordinary Affected Creditor in respect of such transferred Ordinary Affected Creditor Claim) (or any such Ordinary Affected Creditor's validly appointed holder of its Ordinary Affected Creditors' Proxy).

*Beneficial Noteholders*

Each Beneficial Noteholder with a Voting Claim shall be entitled to one vote as a member of the Affected Creditors' Class, which vote shall have a value equal to the principal and Accrued Interest owing under the Notes owned by such Beneficial Noteholder as at the Voting Record Date.  For greater certainty, with respect to voting by Beneficial Noteholders, only the Beneficial Noteholders, and not Registered Noteholders or Participant Holders (unless any such Registered Noteholder or Participant Noteholder is itself a Beneficial Noteholder), shall be entitled to vote on the Plan as provided for in this Meeting Order.

*Ordinary Affected Creditors*

Each Ordinary Affected Creditor with a Voting Claim shall be entitled to one vote as a member of the Affected Creditors Class, which vote shall have a value equal to the dollar value of such Ordinary Affected Creditor's Voting Claim.

Subject to any restrictions contained in Applicable Laws, an Ordinary Affected Creditor may transfer or assign the whole of its Ordinary Affected Creditor Claim prior to the Meeting (or any adjournment thereof), provided that neither SFC nor the Monitor shall be obliged to deal with any transferee or assignee thereof as an Ordinary Affected Creditor in respect of such Ordinary Affected Creditor Claim, including allowing such transferee or assignee to attend or vote at the Meeting, unless and until actual notice of the transfer or assignment, together with satisfactory evidence of such transfer or assignment, has been received and acknowledged by SFC and the Monitor, which receipt and acknowledgment must have occurred on or before 5:00 p.m. (Toronto time) on the date that is seven days prior to the date of the Meeting (or any adjournment thereof), failing which the original transferor shall have all applicable rights as the 'Ordinary Affected Creditor' with respect to such Ordinary Affected Creditor Claim as if no transfer of the Ordinary Affected Creditor Claim had occurred.

If such receipt and acknowledgment by the Applicant and the Monitor have occurred on or before 5:00 p.m. (Toronto time) on the date that is seven days prior to the date of the Meeting (or any adjournment thereof): (i) the transferor of the applicable Ordinary Affected Creditor Claim shall no longer constitute an Ordinary Affected Creditor in respect of such Ordinary Affected Creditor Claim; and (ii) the transferee or assignee of the applicable Ordinary Affected Creditor Claim shall, for all purposes in accordance with this Meeting Order, constitute an Ordinary Affected Creditor in respect of such Ordinary Affected Creditor Claim and shall be bound by any and all notices previously given to the transferor or assignor in respect thereof and shall be bound by any Ordinary Creditors' Proxy duly submitted to the Monitor in accordance with this Meeting Order.  For greater certainty, the Applicant and the Monitor shall not recognize partial transfers or assignments of Ordinary Affected Creditor Claims.

*Affected Creditors with Unresolved Claims*

Each Affected Creditor with an Unresolved Claim as at the Voting Record Date shall be entitled to attend the Meeting and shall be entitled to one vote at the Meeting in respect of such Unresolved Claim.  Any vote cast in respect of an Unresolved Claim shall be dealt with as provided in the following sentence unless and until (and then only to the extent that) such Unresolved Claim is ultimately determined to be (i) a Voting Claim, in which case such vote shall have the dollar value attributable to such Voting Claim or (ii) disallowed, in which case such vote shall not be counted for any purpose. The Monitor shall keep a separate record of votes cast by Affected Creditors with Unresolved Claims and shall report to the Court with respect thereto at the Sanction Hearing.  If approval or non-approval of the Plan by Affected Creditors would be altered by the votes cast in respect of Unresolved Claims: (i) such result shall be reported to the Court as soon as reasonably practicable after the Meeting; (ii) if a deferral of the Sanction Hearing is deemed to be necessary or advisable by the Monitor (in consultation with SFC and counsel to the Initial Consenting Noteholders), the Monitor shall request an appropriate deferral of the Sanction Hearing; and (iii) the Monitor may make a request to the Court for directions.

*Third Party Defendants*

Each of the Third Party Defendants will be entitled to one vote as a member of the Affected Creditors Class in respect of any Class Action Indemnity Claim that it has properly filed in respect of the Indemnified Noteholder Class Action Claims, provided that the aggregate value of all such Class Action Indemnity Claims shall, for voting purposes, be deemed to be equal to the amount of the Indemnified Noteholder Class Action Limit.  The Monitor will keep a separate record of votes cast by the Third Party Defendants in respect of such Class Action Indemnity Claims, and the Monitor will report to the Court with respect thereto at the Sanction Hearing, including as to whether or not a vote in favour of the Plan or against the Plan in the amount of the Indemnified Noteholder Class Action Limit would have had any effect on the approval of the Plan by the Required Majority.

**Solicitation of Proxies**

Solicitation of proxies will be primarily by mail and the costs of such solicitation will be borne by SFC as a cost of the CCAA Proceedings.

**Appointment of Proxyholders and Voting**

*In Person*

Any Ordinary Affected Creditor or Beneficial Noteholder that is entitled to vote at the Meeting and that wishes to vote at the Meeting in person must: (i) duly complete and sign an Ordinary Creditors' Proxy or a Noteholders' Proxy, as applicable; (ii) identify itself in the Ordinary Creditors' Proxy or a Noteholders' Proxy, as applicable, as the Person with the power to attend and vote at the Meeting on behalf of such Ordinary Affected Creditor or Beneficial Noteholder, as the case may be; and (iii) deliver such Ordinary Affected Creditors' Proxy or Noteholders' Proxy, as the case may be, to the Monitor so that it is received on or before 5:00 p.m. on the third Business Day before the Meeting (or any adjournment thereof), and such delivery must be made in accordance with the instructions accompanying such Ordinary Affected Creditors' Proxy or Noteholders' Proxy.

*By Proxy*

Any Ordinary Affected Creditor or Beneficial Noteholder that is entitled to vote at the Meeting and that wishes to appoint a nominee to vote on its behalf at the Meeting must: (i) duly complete and sign an Ordinary Creditors' Proxy or a Noteholders' Proxy, as applicable; (ii) identify its desired nominee in the Ordinary Creditors' Proxy or a Noteholders' Proxy, as applicable, as the Person with the power to attend and vote at the Meeting on behalf of such Ordinary Affected Creditor or Beneficial Noteholder, as the case may be; and (iii) deliver such Ordinary Affected Creditors' Proxy or Noteholders' Proxy, as the case may be, to the Monitor so that it is received on or before 5:00 p.m. on the third Business Day before the Meeting (or any adjournment thereof), and such delivery must be made in accordance with the instructions accompanying such Ordinary Affected Creditors' Proxy or Noteholders' Proxy.

In order to be effective, any Noteholders' Proxy must clearly state the name and contain the signature of the applicable Participant Holder, the applicable account number or numbers of the account or accounts maintained by the applicable Beneficial Noteholder with such Participant Holder, and the principal amount of Notes (excluding any pre-or post-filing interest) that such Beneficial Noteholder holds in each such account or accounts.  Where a Beneficial Noteholder holds Notes through more than one Participant Holder, its Noteholders' Proxy is required to be executed by only one of those Participant Holders, provided that the Beneficial Noteholder shall provide the information required in its Noteholders' Proxy with respect to its Notes held with all Participant Holders to allow the Monitor to verify the aggregate amount of Notes held by such Beneficial Noteholder for the purposes of voting on the Plan.

Notwithstanding any minor error or omission in any Ordinary Affected Creditors' Proxy or Noteholders' Proxy that is submitted to the Monitor, the Chair shall have the discretion to accept for voting purposes any Ordinary Affected Creditors' Proxy or Noteholders' Proxy submitted to the Monitor in accordance with the Meeting Order.

**Revocation of Proxies**

In addition to any other manner permitted by law, an Affected Creditor may revoke a proxy by depositing a valid proxy bearing or deemed to bear a later date.

**Advice to Beneficial Holders**

The information set forth in this section is of significant importance to Beneficial Noteholders. The Notes are registered under the name of DTC, which acts as nominee for many U.S. brokerage firms. As such, Beneficial Noteholders do not hold Notes registered in their own name, but rather, hold Notes that are held in the name of a Participant Holder, such as an investment dealer, broker, bank, trust company, trustee, custodian or other nominee, or a clearing agency in which the Participant Holder participates.

The Meeting Order requires each Participant Holder, within five days of such Participant Holder's receipt of the Noteholder meeting materials from the Monitor pursuant, to: (i) complete and sign the applicable section of the Noteholders' Proxy relating to Participant Holders for each Unregistered Noteholder that has an account (directly or through an agent or custodian) with such Participant Holder; and (ii) deliver by courier or personal delivery to each such Unregistered Noteholder the Noteholders' Proxy as so completed and signed together with one copy of the Noteholder meeting materials.  Each Participant Holder shall take any other action reasonably required to enable any Unregistered Noteholder that has an account (directly or through an agent or custodian) with such Participant Holder to provide a Noteholders' Proxy to the Monitor with respect to the Notes owned by or held for the benefit of such Unregistered Noteholder.

However, the Meeting Order provides that where: (i) a Participant Holder or its agent has a standard practice for distribution of meeting materials to Unregistered Noteholders and for the gathering of information and proxies or voting instructions from Unregistered Noteholders; (ii) the Participant Holder has discussed such standard practice in advance with SFC, the Monitor and counsel to the Initial Consenting Noteholders; and (iii) such standard practice is acceptable to SFC, the Monitor and counsel to the Initial Consenting Noteholders, such Participant Holder or its agent may, in lieu of following the procedure set out above, follow such standard practice provided that all

applicable proxies or voting instructions are received by the Monitor no later than 5:00 P.M. on the third Business Day before the Meeting.

**Each Beneficial Noteholder should contact his, her, or its broker or other nominee and carefully follow the voting instructions provided by such broker or nominee.**

## CERTAIN CANADIAN FEDERAL INCOME TAX CONSIDERATIONS

*The following summary is of a general nature only and is not intended to be, nor should it be construed to be, legal or tax advice to any particular holder of Common Shares or Notes. Consequently, Securityholders are urged to consult their own tax advisors for advice as to the tax considerations in respect of the Restructuring having regard to their particular circumstances. This Information Statement does not discuss any United States federal or state tax consequences of the Restructuring or the tax consequences of the Restructuring under the laws of any other jurisdiction. Securityholders resident in a jurisdiction other than Canada should be aware that the Restructuring may have tax consequences both in Canada and in such jurisdiction. Such consequences are not described herein. Securityholders should consult with their own tax advisors with respect to their particular circumstances and the tax considerations applicable to them.*

The following is a summary of the principal Canadian federal income tax consequences, pursuant to the Canadian Tax Act, of the Restructuring to holders of Common Shares and to holders of Notes (each a "**Securityholder**") who deal at arm's length with and are not affiliated with the Company or Newco, who hold their Notes and Common Shares, as the case may be, as capital property, and who dispose, or are deemed to have disposed, of their Common Shares or Notes, as applicable, pursuant to the Restructuring. The Notes and Common Shares, as the case may be, will generally be considered to be capital property for this purpose to a holder of Notes or Common Shares, as the case may be, unless such Securityholder holds such securities in the course of carrying on a business, or the Securityholder acquired such securities in a transaction or transactions considered to be an adventure or concern in the nature of trade.

This summary is not applicable to a Securityholder: (i) that is a "financial institution" (as defined in the Canadian Tax Act) for purposes of the mark-to-market rules, (ii) that is a "specified financial institution" (as defined in the Canadian Tax Act), (iii) a Securityholder who makes or has made a "functional currency" reporting election under the Canadian Tax Act, (iv) that is exempt from tax under Part I of the Canadian Tax Act (which includes a trust governed by a registered retirement savings plan ("**RRSP**"), registered retirement income fund ("**RRIF**"), tax-free savings account ("**TFSA**") registered education savings plan, deferred profit sharing plan or registered disability savings plan (collectively, "**Deferred Plans**")), or (v) an interest in which is a "tax shelter investment" (as defined in the Canadian Tax Act). This summary does not address the Canadian federal income tax consequences to any other person, including any Noteholder Class Action Claimant. **Such Securityholders should consult with their own tax advisors to determine the particular Canadian federal income tax consequences to them of the Restructuring. The Restructuring may have adverse Canadian federal income tax consequences to a Securityholder that is a Deferred Plan and, in particular that is an RRSP, RRIF, or TFSA and such holders, if any, are strongly encouraged to consult their own tax advisors.**

This summary is based upon the current provisions of the Canadian Tax Act, the current regulations thereto and the current published administrative practices and policies of the CRA. This summary assumes that all specific proposals to amend the Canadian Tax Act which have been publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date of this document will be enacted as proposed, although there can be no assurance that any tax proposals will be implemented in their current form or at all. This summary does not otherwise take into account or anticipate any changes in law, whether by way of legislative, judicial or administrative action or interpretation, nor does it address any provincial, territorial or foreign tax considerations.

This summary is intended for general information purposes only, and does not purport to address all of the Canadian federal income tax considerations that may be relevant to the particular circumstances of a Securityholder. This summary is not intended to be, nor should it be construed to be legal or tax advice to any particular holder or Notes or Common Shares. **Holders of Notes or Common Shares are urged to consult their own tax advisors concerning the tax consequences to them of the Restructuring.**

All amounts, including the cost of, interest or dividends, received and accrued on, and proceeds of disposition from, the Notes and Common Shares must be determined in Canadian dollars at applicable exchange rates for the purposes of the Canadian Tax Act. Any amount denominated in U.S. dollars must be converted into Canadian dollars, generally at the exchange rate quoted by the Bank of Canada as its noon rate on the date the amount first arose. The amount of interest and any capital gain or capital loss of a holder of Notes or Common Shares may be affected by fluctuations in Canadian dollar exchange rates.

The Canadian federal income tax consequences of any Alternative Transaction are not discussed herein.

### Residents of Canada

The following discussion applies to Securityholders who, for the purposes of the Canadian Tax Act and any applicable income tax treaty or convention, and at all relevant times, are residents of Canada ("**Canadian Holders**"). Certain Canadian Holders whose Notes or Common Shares, as the case may be, might not otherwise qualify as capital property may, in certain circumstances, treat such Notes or Common Shares as capital property by making an irrevocable election pursuant to subsection 39(4) of the Canadian Tax Act.

### Noteholders

#### *Transfer of Noteholder Claims*

A Canadian Holder will be considered to have disposed of Notes upon the transfer of such Canadian Noteholder Claims to Newco. A Canadian Holder that is a corporation, partnership, unit trust or any trust of which a corporation or partnership is a beneficiary will generally be required to include in income the amount of interest accrued or deemed to accrue on the Notes up to the Effective Date or that became receivable or was received on or before the Effective Date, to the extent that such amounts have not otherwise been included in the Canadian Holder's income for the year or a preceding taxation year. Any other Canadian Holder, including an individual, will be required to include in income for a taxation year any interest on the Notes received or receivable by such Canadian Holder in the year (depending upon the method regularly followed by the Canadian Holder in computing income) except to the extent that such amount was otherwise included in its income for the year or a preceding taxation year. Where a Canadian Holder is required to include an amount in income on account of interest on the Notes that accrues in respect of the period between the date of the last interest payment and the Effective Date, the Canadian Holder should be entitled to a deduction of an equivalent amount in computing income.

In general, a Canadian Holder will realize a capital gain (or capital loss) on the transfer of the Noteholder Claims equal to the amount by which the proceeds of disposition exceed (or are exceeded by) the adjusted cost base to the Canadian Holder of the Notes, plus any reasonable costs of disposition. The tax treatment of any such capital gain (or capital loss) is the same as described below under "*Certain Canadian Federal Income Tax Considerations – Taxation of Capital Gains and Capital Losses*". A Canadian Holder's proceeds of disposition of the Notes upon the transfer of the Noteholder Claims to Newco will be an amount equal to the fair market value (at the time of the exchange) of the Newco Shares, Newco Notes and Litigation Trust Interests received in exchange therefor. Canadian Holders should consult their own advisors.

#### *Holding and Disposition of Newco Shares, Newco Notes and Litigation Trust Interests*

Canadian Holders of Notes should consult their own advisors concerning the consequences to them of acquiring, holding and/or disposing of Newco Shares, Newco Notes and Litigation Trust Interests, including the receipt of dividends, interest or distributions thereon.

#### *Additional Refundable Tax*

A Canadian Holder of Notes that is a "Canadian-controlled private corporation" (as defined in the Canadian Tax Act) may be liable to pay an additional refundable tax of 6⅔% on certain investment income including amounts in respect of interest and taxable capital gains.

**Shareholders**

*Cancellation of Shares*

A Canadian Holder will realize a capital loss on the cancellation of the Common Shares pursuant to the Restructuring for nil consideration equal to the adjusted cost base to the Canadian Holder of such Common Shares, plus any reasonable costs of disposition.  The tax treatment of any such capital loss is the same as described below in respect of capital losses under "Income Tax Taxation of Capital Gains and Capital Losses".

A deemed dividend will not arise on the cancellation of the Common Shares.

*Taxation of Capital Gains and Capital Losses*

In general, one-half of any capital gain (a "**taxable capital gain**") realized by a Canadian Holder of Common Shares in a taxation year will be included in the Canadian Holder's income in the year and one-half of the amount of any capital loss realized by a Canadian Holder in a taxation year may be deducted from net taxable capital gains realized by the Canadian Holder in the year and any of the three preceding taxation years or in any subsequent year, to the extent and under the circumstances described in the Canadian Tax Act.  The amount of any capital loss realized by a holder that is a corporation on the disposition of a share may be reduced by the amount of dividends received or deemed to be received by it on such share (or on a share for which the share has been substituted) to the extent and under the circumstances prescribed by the Canadian Tax Act.  Similar rules may apply where a corporation is a member of a partnership or a beneficiary of a trust that owns shares, directly or indirectly through a partnership or a trust.

**Non-Residents of Canada**

The following discussion applies to a Securityholder who, for the purposes of the Canadian Tax Act and any applicable income tax treaty or convention, and at all relevant times, is not resident in, and is not deemed to be resident in, Canada and does not use or hold the Notes or the Common Shares, as the case may be, in carrying on a business in Canada (a "**Non-Resident Holder**").  In addition, this discussion does not apply to an insurer who carries on an insurance business in Canada and elsewhere or an authorized foreign bank that carries on a Canadian banking business. The following discussion assumes that the Notes do not constitute "taxable Canadian property" (within the meaning of the Canadian Tax Act) to any particular Non-Resident Holder.

**Noteholders**

*Transfer Noteholder Claims*

No taxes will be payable under the Canadian Tax Act by a Non-Resident Holder upon the transfer of Noteholder Claims to Newco.

*Holding and Disposition of Newco Shares, Newco Notes and Litigation Trust Interests*

Non-Resident Holders should consult their own advisors concerning the consequences to them of acquiring, holding and/or disposing of Newco Shares, Newco Notes and Litigation Trust Interests, including the receipt of dividends, interest or distributions thereon.

**Shareholders**

*Cancellation of Shares*

A Non-Resident Holder of Common Shares will not be subject to Canadian federal income tax in respect of the cancellation of such Common Shares for nil consideration pursuant to the Restructuring.

**Consequences to the Company**

The Restructuring will result in the settlement or extinguishment of the Notes. The "forgiven amount", as defined in the Canadian Tax Act, arising from the Restructuring will reduce, in prescribed order, certain tax attributes of the Company, including non-capital losses, net capital losses, undepreciated capital cost of depreciable property, cumulative eligible capital, and the adjusted cost base of certain capital property (the "**Tax Shield**").  Generally, one half of the amount by which the forgiven amount exceeds the Tax Shield will be required to be included in the Company's income for the taxation year in which the Plan Implementation Date takes place, subject to a potential off-setting deduction for insolvent corporations.

## CERTAIN REGULATORY MATTERS RELATING TO THE PLAN

**Canada**

The issuance of Plan Securities pursuant to the Plan will be exempt from the prospectus and registration requirements under applicable Canadian securities legislation. As a consequence of these exemptions, certain protections, rights and remedies provided by Canadian securities legislation, including statutory rights of rescission or damages, will not be available in respect of such new securities to be issued in connection with the Plan.

The Newco Shares and Newco Notes will be subject to restrictions on transfer in Canada. Newco is not, and will not be following the Plan Implementation Date, a reporting issuer (or equivalent) in any province or territory of Canada and Newco's securities will not be listed on any stock exchange in Canada and have not been and will not be qualified for sale to the public under any applicable Canadian securities laws. Any resale of the Newco Shares or Newco Notes in Canada must be made in accordance with applicable securities laws, which will vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority.

**United States**

The Plan Securities to be received by eligible Affected Creditors in the United States pursuant to the Plan are not required to be, and will not be, registered under the United States 1933 Act or the securities law of any state of the United States.  Such Plan Securities will be issued in reliance upon the exemption provided by Section 3(a)(10) of the United States 1933 Act.  Section 3(a)(10) exempts from the registration requirements of the United States 1933 Act securities issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by a court or by a governmental authority expressly authorized by law to grant such approval.  In accordance with the requirements of the SEC. SFC will advise the Court prior to the hearing in respect of the Order  that the Plan Securities will not be registered under the United States 1933 Act in reliance upon the Section 3(a)(10) exemption and that such reliance will be based on the Court's approval of the Plan.  The Court will conduct a hearing to determine the fairness of the terms and conditions of the Plan, including the proposed issuance of the Plan Securities.  Accordingly, SFC believes that the Order will, if granted, constitute a basis for the exemption from the registration requirements of the United States 1933 Act with respect to Plan Securities issued in connection with the Plan.

Pursuant to the rules of the SEC in effect on the date hereof, all Plan Securities received by eligible Affected Creditors pursuant to the Plan will be freely transferrable, except by persons who are deemed to be "affiliates" of Newco, as that term is defined in Rule 144 under the United States 1933 Act, or have been "affiliates" of Newco within 90 days of the Plan Implementation Date, who will be subject to transfer restrictions under the United States 1933 Act.

This document does not constitute a registration statement covering resales of Plan Securities by persons who are restricted from selling their Plan Securities pursuant to any rule under the United States 1933 Act.

The foregoing discussion is only a general overview of the requirements of the U.S. securities laws that may be applicable to the resale of Plan Securities received pursuant to the Plan.  Recipients of Plan Securities are urged to obtain legal advice to ensure that the resale of such securities complies with applicable U.S. securities laws.

## RISK FACTORS

*In evaluating the Plan and determining whether to vote for the Resolution, Affected Creditors should read and consider carefully the risk factors set forth below. These risk factors should not, however, be regarded as the only risks associated with the SFC Companies, Newco and the Plan.  Additional risks and uncertainties not currently known to the SFC Companies or that the SFC Companies do not view as material may impair the SFC Companies' business operations. As well, SFC has no knowledge of the manner in which Newco intends to operate the SFC Business following the Plan Implementation Date and therefore has no knowledge of any additional risks that may arise therefrom. If any of the following risks actually occur, the SFC Companies' business, results of operations and financial condition of Newco or the SFC Companies could be harmed. You should carefully consider information about these risks and uncertainties, together with all of the other information contained within this document.*

### Risks Relating to Non-Implementation of the Plan

#### *Failure to Implement the Plan*

If the Plan is not implemented before the Outside Date or an Alternative Sale Transaction is not completed and another plan is not proposed that meets the approval requirements of the Court, SFC may remain under CCAA protection for an indefinite period of time and its businesses could continue to substantially erode, or an insolvency proceeding involving the liquidation of the assets of SFC could result.

If the Restructuring is not completed, there is no assurance that SFC will be able to complete a restructuring of its businesses or that any such restructuring will be on terms that provide equivalent value to Affected Creditors compared to the consideration to be received by Affected Creditors pursuant to the Restructuring and the Plan.

Pursuant to the terms of the Support Agreement, if the Restructuring is not implemented on or before the Outside Date, the Support Agreement may be terminated by Initial Consenting Noteholders holding at least two-thirds of the principal amount of Relevant Notes (as defined in the Support Agreement).

If the Support Agreement is terminated and the Plan is not consummated, the SFC Companies will have an immediate need to pursue other alternatives to manage their liquidity needs, including potentially filing under the insolvency laws of various jurisdictions. There can be no assurance as to the value, if any, that would be available to Affected Creditors, including holders of the Notes, in the case of any such insolvency filing.

### Risks Relating to the Plan and its Implementation

#### *Consummation of the CCAA Plan is subject to Affected Creditors' acceptance and Court approval*

Before the Plan can be consummated, it must have been approved by the Required Majority and sanctioned, after notice and a hearing on any objection, by the Court. There can be no assurance that the Plan will be approved by the Required Majority, and that even if approved, the Court will sanction the Plan. The failure of any of these conditions will delay or prevent the consummation of the Plan.  The Third Party Defendants have raised numerous objections in the CCAA proceedings to the Plan, claiming that the Plan does not adequately address their claims against SFC. Copies of materials filed by the Third Party Defendants in the CCAA Proceedings are available on the Website.

#### *There is no assurance that the parties will receive merger control approval under the AML in the time period contemplated or at all*

As noted above, the implementation of the Plan is subject to the condition that if notification is necessary or desirable under the AML, the acceptance of all antitrust filings considered necessary or prudent by the Initial Consenting Noteholders and (to the extent required) approval thereof by the competent PRC authority shall have

been obtained.  The review period provided under the legislation is 30 to 180 days and at the date hereof, no application has been made.  There can be no assurance that the merger control approval under the AML will be obtained on terms acceptable to Newco, or at all, or that any such approval will be obtained prior to the Outside Date, the date by which the Restructuring must be completed in accordance with the terms of the Support Agreement, unless such date is extended in accordance with the terms of the Support Agreement.

***There is no assurance that Newco will obtain an exemption from the Takeovers Executive under the Hong Kong Takeovers Code***

As noted above, Newco intends to consult with the Takeovers Executive regarding the application of the Hong Kong Takeovers Code in the present circumstances and, if necessary, apply to the Takeovers Executive for an exemption from the obligation under the Hong Kong Takeovers Code to make an offer for all of the outstanding shares of Greenheart not already owned by SCG.  The implementation of the Plan is subject to the condition that implementation of the Restructuring will not result in an obligation arising for Newco, its shareholders or any Subsidiary to make a mandatory offer to acquire shares of Greenheart.  There can be no assurance that the Takeovers Executive will grant such exemption on terms acceptable to Newco or at all or that such exemption will be granted prior to the Outside Date, the date by which the Restructuring must be completed in accordance with the terms of the Support Agreement, unless such date is extended in accordance with the terms of the Support Agreement.

***The Implementation of the Plan is subject to a number of other significant conditions***

Implementation of the Plan is subject to numerous other conditions, which must be satisfied (or waived, if applicable) prior to implementation and effectiveness of the Plan. As of the date hereof, there can be no assurance that any or all of the conditions in the Plan or in the Support Agreement, will be satisfied (or waived, if applicable). Accordingly, there can be no assurance that the Plan will be consummated even if approved by the Affected Creditors and sanctioned by the Court. See "*Required Approvals under the CCAA and Other Conditions to Implementation*".

***If any of the conditions to consummation are not satisfied or an alternative plan is not approved, SFC may be forced to liquidate***

If any of the conditions precedent as described in the Plan, including Court sanction and the satisfaction of the implementation conditions, are not satisfied (or waived, if applicable) and the Plan is not consummated or an Alternative Sale Transaction is not completed, or an alternative plan is not approved, there can be no assurance that the CCAA Proceedings will continue, or that an alternative plan of compromise and reorganization, if any, would be on comparable terms for the Affected Creditors. The most likely alternative to a continuation of the CCAA Proceedings, which itself could be protracted, is liquidation. For more information on the potential risks involved in a protracted reorganization, see "*Undue delay in confirmation may significantly disrupt the operations of the SFC Companies*" below. Based on the results of the Sale Solicitation Process, the Company believes that a liquidation would not provide equivalent value to Affected Creditors compared to the consideration to be received by Affected Creditors pursuant to the Plan.

***The actual amount of Proven Claims may differ from the estimated Affected Claims and adversely affect the percentage recovery of each individual Affected Creditor***

Affected Creditors that have Unresolved Claims will not be entitled to receive a distribution under the Plan in respect of such Unresolved Claim or any portion thereof unless and until such Unresolved Claim becomes a Proven Claim.  Distributions in respect of any Unresolved Claims in existence at the Plan Implementation Date will be held in escrow by the Unresolved Claims Escrow Agent in the Unresolved Claims Reserve until settlement or final determination of the Unresolved Claim. To the extent that Unresolved Claims become Proven Claims or are finally disallowed, such Unresolved Claims that become Proven Claims may materially adversely affect the percentage recovery of each individual Affected Creditor.

Unresolved Claims that could cause dilution of Affected Creditors' recoveries following the Plan Implementation Date (to the extent that any such Unresolved Claims become Proven Claims) could potentially include, but are not limited to, claims for indemnification by Third Party Defendants (i) up to the Indemnified Noteholder Class Action Limit, (ii) in respect of OSC claims or penalties against Third Party Defendants (e.g. the OSC has reserved the right to claim up to $100 million as against the Directors and Officers of SFC), and (iii) Defence Costs. As discussed, all rights and defences to any such indemnification claims have been reserved.

***Certain claims against the Subsidiaries of SFC will not be affected by the Plan***

Any claims against the Subsidiaries of SFC that are not released or compromised under the Plan will continue following the Plan Implementation Date and such claims may be material to the SFC Business.

***Undue delay in implementation of the Restructuring may continue to significantly disrupt the operations of the SFC Companies***

SFC has incurred significant costs and expenses to date in connection with its ongoing restructuring efforts. Even if the Restructuring is completed, it may not be completed on the schedule described in this Information Statement or on or prior to the Outside Date. Accordingly, Affected Creditors participating in the Restructuring may have to wait longer than expected to receive consideration, if any, for their Affected Claims. In addition, if the Restructuring is not completed on the schedule described in this Information Statement, SFC may incur additional expenses.

Although the Plan is designed to minimize the length of the CCAA Proceedings, it is not possible to predict the amount of time the Company may spend in the CCAA Proceedings or to provide any assurance as to whether or not the Plan will be confirmed or sanctioned. The continuation of the CCAA Proceedings, particularly if the Plan is not approved or confirmed in the time frame currently contemplated, could materially and adversely affect the SFC Companies' operations and relationships with its authorized intermediaries, suppliers, customers, employees, regulators and PRC governmental agencies and authorities. Also, transactions outside the ordinary course of business are subject to the prior approval of the Court, which may limit the Company's ability to respond timely to certain events or take advantage of certain opportunities. Prolonged CCAA Proceedings may also make it more difficult to retain and attract management and other key personnel, and would require senior management to continue to spend a significant amount of time and effort dealing with the Company's restructuring instead of focusing on the operation of the SFC Business.

***The tax authorities of the PRC may levy a 10% withholding tax on a capital gain realized or deemed to be realized for PRC tax purposes on the indirect disposition of PRC entities***

The tax authorities of the PRC may levy a 10% withholding tax on a capital gain realized or deemed to be realized for PRC tax purposes on the indirect disposition of PRC entities. The transfer of the SFC Assets by SFC to Newco pursuant to the Plan may be deemed to constitute an indirect disposition of Sino-Forest's subsidiaries in the PRC. For PRC tax purposes, as a general principle, a capital gain is calculated as equity transfer proceeds minus original investment cost. Nevertheless, there are no explicit guidance rules as to the mechanism according to which the PRC tax authorities may calculate the capital gain in the indirect disposition of a group of PRC entities, and it is subject to the assessment and confirmation of the competent tax authorities on a case by case basis, consequently, the exposure for such PRC withholding tax is not known.

***Canada Revenue Agency may treat a portion of Noteholders' consideration as income for Canadian tax purposes***

The Canadian federal income tax considerations described above under "Certain Canadian Federal Income Tax Considerations" are applicable on the basis that all of the Newco Shares, Newco Notes and Litigation Trust Interests received by Noteholders constitute consideration for the disposition of the Notes by Noteholders to Newco.  No assurances can be given that CRA will concur with such position. If the CRA does not concur, the Canadian federal income tax considerations relevant to Noteholders may be different than set out  under the heading "*Certain Canadian Federal Income Tax Considerations*" and a portion of the value of the Newco Shares, Newco  Notes, and/or Litigation Trust Interests received by Noteholders, may be treated as income for Canadian tax purposes. In particular, a portion of the value of the Newco Shares received by an Early Consent Noteholder that is a Canadian

Holder may be included in the income of such Canadian Holder. Noteholders are advised to consult their own tax advisors regarding the potential consequences.

## Risks Related to Securities of Newco

### *If SFC completes the Restructuring, the Newco Shares and Newco Notes may be concentrated in a few holders*

Under the Plan, the Affected Creditors will receive their pro rata share of 92.5% of the Newco Shares and 100% of the Newco Notes (and Early Consent Noteholders will also receive their pro rata share of 7.5% of the Newco Shares) to be issued and outstanding on the Plan Implementation Date. The Company believes that a substantial majority of the Affected Claims are held by a few Affected Creditors. Consequently, these Affected Creditors individually will hold high concentrations of the Newco Shares and Newco Notes immediately after the consummation of the Plan which may make some transactions more difficult or impossible to complete without the support of these securityholders.

### *Certain fundamental changes relating to Newco will require supermajority approval by Newco shareholders*

Certain fundamental changes relating to Newco, including a merger, a sale of all or substantially all of Newco's assets, a material change in Newco's business and a voluntary liquidation of Newco, will require the approval of shareholders holding at least 66-2/3% of the Newco Shares present and voting at the meeting. See "*Information Regarding Newco – Shareholder Approval Rights*". Accordingly, shareholders holding more than one-third of the Newco Shares present at a meeting will be able to veto any of these fundamental changes, even if such changes are otherwise supported by a substantial majority of Newco shareholders. In addition, Newco shareholders may be forced to sell their Newco Shares in the event holders of at least 66-2/3% of the outstanding Newco Shares wish to sell all of their Newco Shares to a third party. See "*Information Regarding Newco – Drag-Along Rights*".

### *The Newco Shares will be junior to all of Newco's other securities, including the Newco Notes and any existing and future indebtedness*

The Newco Shares will be the most junior of all of Newco's securities. As a result, Newco's existing and future indebtedness and other non-equity claims, as well as any preferred stock Newco may issue, will rank senior to the Newco Shares as to rights upon any foreclosure, dissolution, winding-up, liquidation or reorganization, or other bankruptcy proceeding relating to Newco. In the event of any distribution or payment of Newco's assets in any foreclosure, dissolution, winding-up, liquidation or reorganization, or other bankruptcy proceeding, Newco's creditors will have a superior claim and interest, as applicable, to the interests of holders of Newco Shares. If any of the foregoing events occur, there may not be sufficient assets for distribution in respect of the Newco Shares.

### *Newco will be incorporated under the laws of a jurisdiction other than Canada and the rights and remedies of holders of Newco Shares may be different from the rights and remedies of holders of shares of a Canadian corporation*

Newco will be incorporated under the laws of a jurisdiction other than Canada. The rights and remedies of holders of securities of a non-Canadian company may differ from the rights and remedies of holders of securities of a Canadian corporation and those differences may be material. Newco will have no assets, operations or management in Canada.

### *There is currently no public market for Newco Shares or Newco Notes and no public market is expected to develop*

There is currently no public market for the Newco Shares or Newco Notes, and no public market for the Newco Shares or Newco Notes is expected to develop after such securities are issued. Accordingly, the liquidity of the Newco Shares and Newco Notes may be limited and the value of the Newco Shares and Newco Notes may be significantly negatively affected.

***The capital available to Newco and the SFC Companies upon completion of the Restructuring may be insufficient to fund their continuing operations and service the Newco Notes and they may need to raise additional capital to fund the businesses of the SFC Companies***

As described above under "*There is uncertainty regarding the financial condition of SFC Business*", the SFC Companies' financial condition and ability to conduct their operations in the normal course of business has been materially affected.  The capital available to Newco and the Subsidiaries upon completion of the Restructuring may be insufficient to fund their continuing operations, including interest payable on the Newco Notes and principal payments upon maturity of the Newco Notes. If the on-shoring process is undertaken, Newco and the Subsidiaries will face increased demands for additional capital in respect of such process. The SFC Companies have been unable to access capital markets since the MW Report was released and there can be no assurance that Newco and the SFC Companies will be able to access capital markets if the Restructuring is complete. Accordingly, Newco may be required to raise additional capital from its existing investors or otherwise through the issuance of equity or debt in order to continue to operate the businesses of the SFC Companies.  There is no assurance such capital will be available on acceptable terms or at all.

## Risk Factors Related To Muddy Waters' and OSC Allegations

***The allegations set forth in the MW Report and the allegations made by the OSC may be wholly or substantially true***

The allegations set forth in the MW Report and the allegations made by the OSC may be wholly or substantially true. If those allegations are wholly or substantially true, the value of Sino-Forest's assets could be materially less than the value recorded in the financial statements of SFC. In addition, the ability to operate the SFC Business in such circumstances through Newco, and even under new management, could be materially and adversely impaired.

***The allegations set forth in the MW Report and the OSC's Statement of Allegations have had significant negative effects on the reputation and business of Sino-Forest***

The allegations set forth in the MW Report and the OSC's Statement of Allegations have had significant negative effects on the reputation and business of Sino-Forest.  These effects are continuing. As a result, Sino-Forest's ability to conduct its operations in the normal course of business has been materially affected. For example: creditors are increasing legal demands with respect to accounts payable; at the same time, collections of accounts receivables is increasingly difficult; sales in the WFOE model have also slowed substantially in response to views on accounts receivable payments; cash flow issues have resulted in a cessation of any expansion or modernization; the inability to fund purchases of raw materials has caused a slowdown in production or, in many cases, a shutdown; certain timber assets have been frozen as Sino-Forest has been unable to keep current with payments; certain deposits put down on standing timber purchases by WFOEs may be unrealizable due to an inability to generate cash to pay off outstanding payables under those contracts; offshore banking facilities have been repaid and frozen or cancelled, leading to substantial damage in Sino-Forest's trading business; relationships with local governments and plantation land owners have become strained; Sino-Forest is unable to complete various projects, contracts and acquisitions; and certain PRC governmental agencies and authorities are expressing increased concern over SFC and are becoming less inclined to be supportive of Sino-Forest, making the ability to obtain legal documents for Sino-Forest's operations increasingly difficult.

Following the implementation of the Plan, there can be no assurance that negative publicity will not adversely affect Sino-Forest's results from operations or have a long-term negative effect on the SFC Business. Such uncertainty may adversely affect the SFC Companies relationships with their authorized intermediaries, suppliers and customers. Following the implementation of the Plan, authorized intermediaries, suppliers and customers may continue to be concerned about the financial condition of the SFC Business and, as a result, they may demand faster payment terms or not extend normal trade credit, both of which could adversely affect the SFC Companies. The SFC Companies may not be successful in obtaining alternative authorized intermediaries, suppliers and customers if the need arises and this would adversely affect the SFC Companies' results from operations and their ability to conduct the SFC Business.

*The investigations conducted by the OSC and the RCMP and the Class Action Claims against the Company have and may continue to require significant resources to be expended by the directors, officers and employees of the Company and SFC has and may continue to incur a substantial amount of fees and expenses in connection with these investigations and lawsuits*

The investigations conducted by the OSC and the RCMP and the class action lawsuits against the Company have and may continue to require significant resources to be expended by the directors, officers and employees of Sino-Forest.  As a result, the diversion of such resources has had an adverse effect on the ability of Sino-Forest to conduct its operations in the normal course of business. Management expects that, if the Plan is implemented, certain of these matters will be resolved by the consummation of the Restructuring.

In addition, SFC has and may continue to incur a substantial amount of fees and expenses in connection with the investigations by the OSC and the RCMP and the Class Action Claims.  Further, pursuant to indemnification agreements between SFC and its directors and certain officers as well as with auditors, underwriters and other parties, SFC may be obligated to indemnify such individuals for additional legal and other expenses pursuant to such proceedings. The aggregate of SFC's fees and expenses to date is substantial and has had a negative effect on Sino-Forest's operating results.

*The Company may be unable to obtain additional financing on acceptable terms or at all*

The Company is at the date hereof in default in its reporting obligations under Canadian securities laws, its securities are subject to a cease trade order issued by the OSC and its Common Shares were delisted from the Toronto Stock Exchange in May, 2012.  If the Plan is not implemented, in the future the Company may require additional financing to operate its business.  The Company may be unable to obtain such additional financing on acceptable terms or at all, particularly if the cease trade order remains in place.

### Risks Related To Our Business

*Certain of the following risks relate to the SFC Business as it was historically operated by SFC.  While these risks are material to the SFC Business as at the date hereof, the SFC Business will be conducted by Newco under a new governance structure and with new management, and, as a result, some of these risk factors may not be material to the SFC Business following the Plan Implementation Date. SFC has no knowledge of the manner in which Newco intends to operate the SFC Business following the Plan Implementation Date and therefore has no knowledge of any additional risks that may arise therefrom. If any of the following risks actually occur, the business, results of operations and financial condition of Newco or the Subsidiaries could be harmed. You should carefully consider information about these risks and uncertainties, together with all of the other information contained within this document.*

*The Company's historical financial statements may not be reliable*

On November 15, 2011, the Company announced that it was deferring the release of its interim financial statements for the three and nine months ended September 30, 2011, because certain issues identified during the review of its Independent Committee (as described in the Reports of the Independent Committee), which was formed to examine the allegations contained in the MW Report, could not be resolved to the satisfaction of its Board of Directors.  On January 10, 2012, the Company issued a press release cautioning that its historical financial statements and related audit reports could not be relied upon.  On April 4, 2012, the Company's auditor resigned and a successor auditor has not been appointed.  On May 22, 2012, Staff of the OSC commenced proceedings before the OSC against the Company and six of its former officers.  OSC staff allege that the Company breached Ontario securities laws and acted in a manner that is contrary to the public interest by providing information to the public in documents required to be filed or furnished under Ontario securities laws which was false or misleading in a material respect contrary to Section 122 of the Securities Act and by engaging or participating in acts, practices or a course of conduct related to its securities which it knows or reasonably ought to know perpetuate a fraud on any person or Company contrary to Section 126.1 of the Securities Act.  Given the issues identified by the Independent Committee which have not been resolved to the satisfaction of the Board of Directors and given the serious allegations made by the OSC, no assurance can be given that the Company's historical financial statement do not contain a misrepresentation or that any other financial information concerning the Company is accurate.  See also "*CCAA Proceedings and Other*

*Matters - Effects of MW Report, OSC Allegations and Related Events - Effects on Operations (including Accounts Receivable)*" for a discussion relating to issues surrounding the Company's accounts receivables.

***Sino-Forest may be liable for income and other taxes on its business and operations, particularly its BVI Subsidiaries, in amounts materially greater than the amounts that it has estimated and for which it has provisioned***

Sino-Forest has operations in various countries (mainly in the PRC, Canada and Hong Kong) that have different tax laws and rates and that are subject to audit by all relevant tax authorities. The effective tax rate may change from year to year based on the mix of income among the different tax jurisdictions, changes in tax laws and administrative practice in these jurisdictions, and changes in tax treaties between various tax jurisdictions in which Sino-Forest operates. It is possible that profits already taxed by one tax jurisdiction could be taxed by another tax jurisdiction or multiple jurisdictions.

In particular, Sino-Forest's principal operating subsidiaries incorporated in the BVI are engaged in the sale of standing timber and logs and in earning income ("**Authorized Sales Activities**") in the PRC through AIs that are domestic enterprises of the PRC. In accordance with the current PRC laws and regulations relating to PRC enterprise income tax, foreign companies such as the BVI Subsidiaries, deriving income from sources in the PRC, are more-likely-than-not subject to enterprise income tax on a deemed profit basis based on a deemed profit rate and are more-likely-than-not expected to be taxed on this basis for the current year end plus three prior years instead of current year plus five prior years.

Under the terms of our long-term master agreements, relevant sales and purchase contracts and commission agreements ("**AI Agreements**") made with the AIs, the AIs are responsible for withholding and remitting relevant PRC taxes that arise from the Authorized Sales Activities for the BVI Subsidiaries. Sino-Forest is not, however, in a position to know whether or not the AIs have in fact remitted applicable taxes on behalf of Sino-Forest. It is a question of fact whether the PRC tax authorities may be successful in establishing that the BVI Subsidiaries are directly subject to enterprise income tax because of the Authorized Sales Activities. Should the PRC tax authorities recover income tax, business tax and value-added tax directly from the BVI Subsidiaries, they might do so together with related tax surcharges and tax penalties on applicable income or profits of the Authorized Sales Activities for up to a period from four to six years in practice (including the current year). Under prevailing PRC tax rules, the tax surcharge is calculated at 0.05% per day on the tax amount overdue while the tax penalties can range from 50% to 500% of taxes underpaid. Under the Hong Kong tax regulations, assessments are open for up to six years in practice and tax penalties can be up to triple the amount of the tax underpaid.

The PRC tax authorities issued Information Statement 19 in February 2010 stating that the deemed profit percentage for certain activities should be a minimum of 15%. The activities subject to this minimum percentage appear to include sales of plantation fibre.

Management is unable to determine with any certainty the appropriate amount of tax related liabilities, and contingencies for such liabilities, to be recognized and disclosed in the Company's financial statements. Sino-Forest may be liable for taxes and penalties in amounts materially greater than SFC had estimated and for which it had provisioned in SFC's annual financial statements for the year ended December 31, 2010.

***Sino-Forest has lost many of its key personnel, which has and may continue to adversely affect its business, financial condition and operations***

Sino-Forest was heavily dependent upon its senior management and their expertise in the forestry industry, R&D, forest plantation management practices and wood-based products manufacturing production processes, and their relationships cultivated with various PRC governmental agencies and authorities and Sino-Forest's major customers, suppliers and other business partners and stakeholders. As described above, each of the Individual Respondents, each of whom was a member of senior management of Sino-Forest, is no longer employed by the Company. In some cases, their responsibilities have been assumed by other Sino-Forest personnel but in other cases their responsibilities have not been assumed and are not currently being performed by any Sino-Forest personnel. The departure of these key members of senior management has adversely affected Sino-Forest's business, financial condition and operations and may continue to do so in the future.

*Failure to continue with certain initiatives could harm relations within the PRC and could have significant adverse affects on Sino-Forest*

While the Company has historically generated most of its revenue and profits from the sale of standing timber and logs, the Company has invested throughout the PRC in manufacturing plants and offices that create jobs within the PRC. It has also conducted research and development ("R&D") intended to improve yields of planted plantations and help the PRC address its wood fibre deficit issues. The manufacturing plants, offices and R&D initiatives are not currently profitable but the Company believes they are important in establishing and maintaining good relations with local governments and communities in the PRC in which the Company conducts business. Failure to maintain good relations with all levels of the PRC government and local PRC communities could have significant adverse affects on the Company's ability to do business in the PRC, including its ability to acquire plantations and obtain plantation rights certificates as well as permits to harvest and transport logs.

*The cyclical nature of the forest products industry and price fluctuations could adversely affect our results of operations*

Sino-Forest's results of operations are, and will continue to be, affected by the cyclical nature of the forest products industry. Market prices and demand for standing timber, wood logs and wood products have been, and in the future are expected to be, subject to cyclical fluctuations, which have a significant effect on the SFC Business, results of operations and financial condition. PRC product pricing in forestry markets is affected by the prices of the ultimate wood products produced from logs, including furniture, construction materials, interior decoration materials and pulp and paper products. The prices of wood products are also affected by the availability of wood substitutes. The markets for wood products are sensitive to changes in industry capacity and output levels, general timber industry conditions and cyclical changes in the world and PRC economies, any of which can have a significant impact on market prices of wood products. The demand for wood products is also substantially affected by the level of new construction activity, which is subject to fluctuations that may or may not correspond to overall economic trends. Decreases in the level of construction activity generally reduce demand for wood products. The demand for wood products is also affected by the level of interior decoration activity. These activities are, in turn, subject to fluctuations due to, among other factors:

- changes in domestic and international economic conditions;

- changes in market prices of commodities;

- government regulations and policies;

- interest rates;

- population growth and mobility and changing demographics; and

- seasonal weather cycles (such as dry or hot summers, wet or cold winters, flooding and other factors affecting tree growth).

Cyclical changes in the forest products industry, including changes in demand and pricing for our products and the other factors described above, could have a material adverse effect on our business, financial condition and results of operations.

*Expanding Sino-Forest's tree plantations and manufacturing operations requires substantial future capital expenditures and Sino-Forest may be unable to obtain adequate financing to fund capital and other requirements*

Expanding Sino-Forest's tree plantations and manufacturing operations requires intensive capital investment. In recent years, Sino-Forest has expanded manufacturing operations through investments in an engineered-wood flooring plant in Jiangsu, a block board facility in Hunan, a wood and composite flooring facility in Guangxi, plywood facilities in Guangxi, engineered veneer facilities in Jiangsu and Guangdong, block board and finger-joint board facilities in Hunan and sawn timber facilities in Yunnan. We have financed our expansion of tree plantations

and manufacturing operations primarily from internal cash flows and debt and equity financing. If Sino-Forest requires additional debt or equity financing for future capital expenditures, Sino-Forest has no assurance that such financing will be available in the future on attractive terms or at all. If Sino-Forest is not able to obtain financing for expanding its tree plantations and/or manufacturing operations and/or other capital requirements, Sino-Forest's business, financial condition and results of operations may be materially and adversely affected.

***Sino-Forest's decisions and ability to develop and operate future tree plantations are subject to various factors and uncertainties, and there is no assurance that Sino-Forest will continuously develop and operate the amount of tree plantations where it has certain contractual rights***

Sino-Forest's ability to further expand and develop its tree plantations and successfully implement its tree plantation models depends on, among other things, its ability to purchase trees with respect to which it has certain contractual rights and to lease the underlying plantation land on which it owns trees or to find other suitable plantation land. Under the purchase agreements for most of Sino-Forest's purchased plantations, it has a pre-emptive right to lease the underlying plantation land for a maximum period of up to 30 to 50 years, subject to negotiation of the definitive land use right transfer agreement, obtaining the requisite governmental approval and completing the requisite registration procedures. Sino-Forest's decision and ability to purchase the trees and exercise its contractual rights with respect to its tree plantations will depend on, among other factors, its business strategy and the availability of future financing, its ability to negotiate a suitable final price, whether the area is desirable for tree plantations, and the availability of tree plantations for expansion.

Should Sino-Forest be unable to purchase the trees, exercise its right to acquire the underlying plantation land use rights or obtain the requisite governmental approval and registration procedures, or should Sino-Forest be unable to locate available and suitable plantation land for expansion, Sino-Forest's business, financial condition and results of operations could be materially and adversely affected.

***Sino-Forest may be unable to continue acquiring standing timber under the long term acquisition agreements***

Sino-Forest may be unable to continue acquiring standing timber under long-term acquisition agreements due to factors such as: (i) risks of disagreement with counterparties and/or original plantation rights holders regarding entering into specific agreements for the implementation of our plantation acquisition plan, (ii) the failure of any such counterparty to obtain any requisite consents from the original plantation rights holders, (iii) risks of the counterparties failing to coordinate with Sino-Forest to obtain the requisite governmental approvals and complete the related registration procedures, and (iv) lack of available capital.

***Sino-Forest's expansion into new regions may pose certain implementation risks***

Sino-Forest is exposed to certain risks related to its ability to successfully expand its plantation operations into new regions such as Suriname and New Zealand and new provinces such as Anhui and Guizhou Provinces, primarily because Sino-Forest has no operating history in such regions or provinces, and also because Sino-Forest does not have extensive experience interacting with local governments, business counterparties and original plantation rights holders in these regions or provinces. With respect to Greenheart Group's operations in Suriname, forest concessions in Suriname do not convey exclusive rights to the land and it is therefore possible to have geographically overlapping rights to different resources with a resulting potential for future land use conflict. In addition, Greenheart Group's concession rights may be adversely affected by changes in policies of the Suriname government.

***Sino-Forest's plantations are susceptible to weather conditions, changes in climate, timber growth cycles and natural disasters outside of our control***

Sino-Forest's business, financial condition and results of operations depend to a significant extent on its ability to harvest trees or engage in trading activities at adequate levels. The following factors, which are outside of our control, may affect the prices of logs and wood-based products, and our ability to harvest the trees on our tree plantations or engage in our trading activities:

- unfavourable local and global weather conditions, such as prolonged drought, flooding, hailstorms, windstorms, typhoons, frost and winter freezing; and

- the occurrence of natural disasters, such as damage by fire, insect infestation, crop pests, and earthquakes.

In recent years, certain areas of the PRC have been adversely affected by severe earthquakes, flooding, droughts and landslides. For example, the heavy rainfall in the second quarter of 2010 caused severe flooding in many provinces across China, which affected the ability of certain of Sino-Forest's customers to harvest plantation trees that Sino-Forest sold to them. In addition, the southern coastal areas of the PRC suffer a number of typhoons each season, which occasionally results in significant damage. Further, there have been several incidences of forest fires in Guangdong Province. Similar conditions may recur in the future.

Sino-Forest also holds a majority interest in Greenheart Group, which owns certain rights and manages hardwood forest concessions in Suriname. Suriname is located south of the hurricane belt which affects the southern part of the United States and the Caribbean. While the risks of major catastrophic damage are therefore lower than in some other tropical areas, losses due to storms may still occur. In addition, although the risk of damage caused by fire exists, it is somewhat mitigated by the high levels of rainfall in Suriname. Our operations are also subject to long term periodic climate events, such as weather patterns affected by the El Niño and La Niña weather pattern, and could be adversely affected by other climate changes. The occurrence of these or other natural disasters may disrupt or reduce the supply of trees available for harvesting in the areas of the PRC, Suriname or New Zealand where our tree plantations or certain rights of hardwood forest concessions are located, or otherwise disrupt our trading activities, which may adversely affect our business, financial condition and results of operations.

### *Sino-Forest may not be able to meet its expectations for the yields of our tree plantations*

The success of Sino-Forest's business depends on the productivity of its tree plantations and its ability to realize yields at attractive levels. Tree plantation yields depend on a number of factors, many of which may be beyond Sino-Forest's control. These include climate and soil conditions, as well as damage due to disease, pests and other natural problems and threats. Sino-Forest's ability to maintain its yields will depend on these factors, and environmental conditions at additional tree plantations that Sino-Forest may acquire or manage in the future.

Sino-Forest's ability to improve or maintain its yields depends on the factors described above as well as its ability to develop genetic improvements in planting materials, to grow improved species of eucalyptus trees, and to implement improved silvicultural practices. As a result, Sino-Forest cannot provide any assurance that it will be able to realize the historical or future yields we expect. If Sino-Forest cannot achieve yields at expected levels, its business, financial condition and results of operations would be materially and adversely affected.

### *Sino-Forest may not be able to effectively manage its tree plantations if we do not hire additional employees and improve our management systems and internal controls*

As of the date of this Information Statement, Sino-Forest had approximately 3,203 permanent employees and an additional approximately 436 employees from the Greenheart Group based primarily in Hong Kong, PRC and Suriname to manage its operations. Sino-Forest also engages third parties to perform the day-to-day operations of its tree plantations. If Sino-Forest expands its portfolio of our tree plantations, it will have to hire additional staff and management employees, strengthen its management processes, and develop a plantation resources information system in order to effectively manage its tree plantations. There is no assurance that Sino-Forest will be able to do this in a timely manner, or at all. Sino-Forest also believes that it is necessary to improve its internal controls and corporate governance. Should Sino-Forest fail to take these measures, it may not be able to implement its strategy, and its business, financial condition and results of operations could be materially and adversely affected.

### *The forest products industry is highly competitive*

Sino-Forest's industry is highly competitive in terms of raw material sourcing and product pricing and quality. Wood products are subject to increasing competition from a variety of substitute products, including non-wood and

engineered-wood products. Lumber and log suppliers in the PRC experience competition from worldwide suppliers. With respect to Sino-Forest's tree plantations and standing timber and wood-based products trading activities, Sino-Forest is subject to increasing competition from other large domestic and foreign owned tree plantation operators in the PRC, as well as from wood dealers and local forestry companies that sell logs and wood-based products in the PRC. Sino-Forest also competes indirectly with many foreign forestry companies which import logs and wood-based products into the PRC.

Sino-Forest's manufacturing plants face competition from other large domestic and foreign owned wood panel manufacturers in the PRC, as well as from manufacturers in other countries importing into the PRC. In this regard, other manufacturers of wood panels are currently constructing new mills in the PRC that will substantially increase the production capacity of wood panels. Sino-Forest may not be able to compete effectively against these and other potential competitors. If Sino-Forest is not able to compete effectively in its various business lines, or if competition significantly increases, Sino-Forest's business, results of operations and financial results could be materially and adversely affected.

***Sino-Forest relies on its relationships with local plantation landowners and/or plantation land use rights holders***

Sino-Forest's transition from using the CJV legal structure for its planted plantations to the WFOE legal structure was completed in the fourth quarter of 2007 and after the conversion, one of the converted WFOEs merged with another WFOE and was deregistered. Negotiations with local farmers, collective organizations or other land use rights holders for entering into new plantation land use agreements are in progress for the remaining WFOEs. There can be no assurance that through the WFOEs Sino-Forest will be able to secure all the plantation land use rights that it would expect to secure, or secure such rights on satisfactory terms, from the farmers, collective organizations or other land use rights holders, or that it will be able to enter into any plantation land use agreements with relevant farmers, collective organizations or other land use rights holders to maintain the use of the tree plantations originally operated by its former CJVs or to obtain additional tree plantations.

In addition, Sino-Forest relies on our relationships with local plantation landowners and/or plantation land use rights holders to enter into any plantation land use agreements on commercially acceptable terms for our purchased plantations. Sino-Forest cannot give any assurance that we will be able to enter into any such agreements on commercially acceptable terms.

Sino-Forest's deteriorating relationships with its suppliers, as further described below, further impedes the Company's ability to communicate and have a relationship with land owners.

***Certain of Sino-Forest's major customers have been deregistered under PRC laws and the loss of business from these customers or any additional major customers could materially adversely reduce Sino-Forest's sales and harm its business and prospects***

A few large customers account for a significant percentage of Sino-Forest's total revenue. These major customers are all wood dealers and AIs, who sell logs and wood-based products to end-user customers of these products. Dependence on a limited number of customers exposes Sino-Forest to the risk that a reduction of business volume from any one customer could have a material adverse effect on our business, financial condition and results of operations. As described above, SFC has learned that certain of these entities with receivables owing to the SFC's Subsidiaries have recently deregistered under PRC law. The Company has been advised that deregistration has the effect of terminating the existence of the entity. The accounts receivable owing by these deregistered entities is significant. If Sino-Forest is unable to collect these accounts receivable the SFC Business will be materially affected.  The loss of these customers on a going forward basis could materially adversely reduce Sino-Forest's sales and harm its business and prospects.

***Disruptions in Sino-Forest's supply of raw timber could adversely affect the its business***

A few large suppliers account for a significant percentage of Sino-Forest's timber supply. These major suppliers are all plantation suppliers or agents. Dependence on a limited number of suppliers exposes us to the risk that any

significant interruption in the supply of raw timber could have a material adverse effect on our business, financial condition and results of operations.

### Sino-Forest depends on services provided by third party service providers

Sino-Forest relies to a significant extent on third party service providers for day-to-day operation of its tree plantations. The operations performed by third party service providers include: site preparation, planting, plantation management, fertilization and harvesting. Sino-Forest occasionally experiences seasonal labour shortages in May and September as farmers become fully engaged in the planting and harvesting of food crops. If Sino-Forest is unable to obtain services from these and other third party service providers, at economical rates or at all, or if any of the services they provide are inadequately performed, its business, financial condition and results of operations would be materially adversely affected.

### Many of our manufacturing plants are in an early stage of development and have a short operating history; some plants may not be profitable or successful

Sino-Forest's manufacturing plants are subject to the risks inherent in establishing a new business, including competitive pressures. Sino-Forest's ability to operate and expand its manufacturing plants successfully depends upon our ability to, among other things:

- produce and develop high-quality, wood-based products that are needed by customers;

- recruit and retain technical and management personnel with requisite expertise and experience in the wood-based products manufacturing industry; and

- raise working capital and fund capital expenditures for the expansion of the manufacturing plants.

Sino-Forest can give no assurance that these facilities will operate at their planned operating capacity.

### Sino-Forest's ability to invest in and operate state-owned plantation entities in the PRC is subject to various factors and uncertainties, and no assurance can be given that Sino-Forest will actually do so at all or successfully or without significant delays

In June 2010, the State Forestry Administration announced plan to reform state-owned forest farms, as part of China's 12th Five Year Plan, by sponsoring studies and identifying five provinces for pilot reform. The objectives of the state-owned plantation farms ("**SOP**") reform were to develop the economic value of these farms by introducing modern plantation management know-how and practices while improving the country's ecosystems.

Sino-Forest has been exploring opportunities to expand its forestry operations in the PRC. Sino-Forest hopes to form Co-op entities with SOPs, however, as the pilot reform has been extended with no concrete timetable, at this current time, no agreements nor structure in respect to the Co-op entities have been put in place.  Sino-Forest's ability to successfully develop and operate these forestry investments in cooperation with SOPs depends on various factors and uncertainties, including the time required for the PRC government to formalize a forestry commercialization policy, Sino-Forest's limited operating history with SOPs, implementing a capital and ownership structure for the investments with the SOPs that permits Sino-Forest to exercise the requisite level of control and oversight, availability of additional debt or equity funding as necessary on acceptable terms to make these investments, and receipt of requisite government approvals. Sino-Forest has not previously entered into such arrangements with SOPs, and there can be no assurance that it will actually develop and operate such entities successfully or at all or without significant delays. In addition, the reputational and other damage arising following the public announcement of the allegations contained in the MW Report could adversely affect Sino-Forest's ability to participate in forestry investments with SOPs.

*Sino-Forest's insurance coverage may be in insufficient to cover unexpected losses*

Consistent with PRC forestry industry practice, Sino-Forest has a policy of obtaining external insurance coverage for key insurable risks relating to our tree plantations and the operation of our manufacturing facilities. As a general matter, most of Sino-Forest's insurance policies include a coverage limit that applies either per claim, or, per claim and per year, in particular for the purchased plantations.

Sino-Forest insures its planted and purchased plantations in many locations in the PRC against certain accident and disaster related losses such as fires, lightning, explosion, flooding and windstorm. Sino-Forest does not, however, insure its plantations against losses from all natural and other disasters, such as tsunami and disease, and does not carry business interruption insurance. As a result, Sino-Forest's insurance coverage may be insufficient to cover losses that we may incur at our tree plantations. If Sino-Forest were to suffer an uninsured loss or a loss in excess of its insurance coverage to the tree plantations, its business, financial condition and results of operations could be materially and adversely affected. Sino-Forest also maintains property all risk and public liability insurance policies for its manufacturing facilities. Sino-Forest maintains a level of fire insurance in amounts that it considers to be appropriate for such risks. Such insurance is subject to deductibles that Sino-Forest considers reasonable and not excessive given the current insurance market environment. The occurrence of a loss at Sino-Forest's manufacturing facilities that Sino-Forest is not fully insured or indemnified against, or the failure of a party to meet its indemnification obligations, could materially and adversely affect Sino-Forest's business, financial condition and results of operations.

*Sino-Forest's manufacturing plants are subject to operational risks for which it may not be adequately insured*

The operation of manufacturing plants involves many risks and hazards, including the breakdown, failure or substandard performance of equipment, the improper installation or operation of equipment, labour disturbances, natural disasters, environmental hazards, and industrial accidents. In addition, the costs of repairing or replacing its production equipment and the associated downtime of the affected production line may not be totally reimbursed, or the level of insurance may not be adequate. The occurrence of material operational problems could have a material adverse effect on its business, financial condition and results of operations.

*Increases in the export tax on logs in Russia may have an impact on Sino-Forest's business of importing logs*

The Russian government significantly increased its export tariffs on logs from 6.5% to 25% (or a minimum of €15 per cubic metre for softwood logs) in April 2008.  Originally, Russia intended to increase log export tariffs to 80% (or a minimum of €50 per cubic metre).  In December 2011, Russia was accepted into the World Trade Organisation (**"WTO"**) and one of the requirements for the entry into the organization was that the country would have to reduce its export tariffs on forest products for certain log species from 25% to 15%.  However, a formal proposal for the amendment for the Russian log export tariff system has not been announced and there is no assurance that Russia will lower the log export tariff.

*Sino-Forest's tree plantations and wood-based products trading activities are subject to numerous laws and regulations in the PRC and other jurisdictions in which we operate*

Sino-Forest's operations are subject to a variety of PRC national and local laws and regulations, including, among others, the PRC Forestry Law and its Implementation Regulations, the Forest Tree and Forestry Land Ownership and Use Rights Registration Administrative Measures, the Environmental Protection Law of the PRC and various rules and regulations enforced by local governmental authorities. Sino-Forest is also subject to such other laws and regulations as may be applicable to it in other jurisdictions in which it operates, including Suriname and New Zealand. Violations of any of these laws and regulations, including environmental policies and programs that apply to Sino-Forest's tree plantations, could result in civil and criminal penalties, including the revocation of licenses required for its business. We engage in the following activities that are subject to regulation:

- tree plantation activities, including planting, plantation use and maintenance, logging and transportation of logs;

- map usage and forest inventory surveying;

- marketing, sales and trading of standing timber, logs and wood-based products; and

- timber processing and manufacturing and sale of wood panels.

For further details on these regulations and risks relating to them with respect to the PRC specifically, see "Risks Related to the PRC."

***The Pöyry Reports for Sino-Forest are subject to significant assumptions and limitations and actual values realized by us may differ materially***

We engaged Pöyry Forest Industry Pte. Ltd. ("**Pöyry**") to prepare reports that regarding the value of our plantation forest crop assets as at December 31, 2006, 2007, 2008, 2009 and 2010 (the "Pöyry Reports"). The Pöyry Reports contain a discussion of the principal assumptions, limitations and other considerations utilized in their preparation, which prospective investors should review carefully, including, without limitation that:

- Pöyry assumes that the forests visited by them in field inspection represent the full range of conditions that exist for the species seen,

- for species not assessed as part of the valuation, Pöyry has applied yield estimates that it has previously derived and,

- Pöyry made assumptions with respect to future costs and market prices.

As a result of the foregoing and other limitations to the Pöyry Reports, actual conditions of our forestry plantations may be substantially different than those set forth in the Pöyry Reports, and, as a result, investors should not place undue reliance on the reports. Accordingly, the valuations set forth in the Pöyry Reports are not necessarily indicative of the actual values that can be realized by Sino-Forest. If actual values realized by us are less favourable than those shown in the Pöyry Reports, or the assumptions used in deriving the valuation included in the Pöyry Reports prove to be incorrect, our business, financial condition or results of operation could be adversely affected.

Based on an internal risk assessment conducted through Pöyry's management consulting business group in 2010, Pöyry has changed its disclosure policy such that clients, including Sino-Forest, are no longer allowed to make its detailed valuation reports publicly available.

***SFC's subsidiaries are subject to restrictions on the payment of dividends and the repayment of intercompany loans or advances to SFC and its subsidiaries***

As a holding company, SFC currently depends upon the repayment of intercompany loans and interest or advances from its subsidiaries and affiliates to satisfy its obligations. The ability of SFC's direct and indirect subsidiaries to pay dividends and repay intercompany loans or advances to their shareholders (including SFC) is subject to, among other things, distributable earnings, cash flow conditions, restrictions contained in the articles of association of SFC subsidiaries, applicable laws, foreign exchange restrictions and restrictions contained in debt instruments of such subsidiaries. Covenants in the debt instruments of certain of SFC's direct and indirect subsidiaries limit their ability to pay dividends. In addition, if any of SFC subsidiaries raises capital by issuing equity securities to third parties, dividends declared and paid with respect to such shares would not be available to SFC to make payments on the debt obligations. These restrictions could reduce the amounts that SFC receives from its subsidiaries, which could restrict its ability to meet our payment under the debt obligations. SFC's ability to utilize cash resources from its subsidiaries to finance the needs of other subsidiaries, to a significant extent, is subject to the same restrictions. These same restrictions may also affect Newco following the Plan Implementation Date.

According to relevant PRC laws and regulations, including the tax and foreign exchange regulations, the BVI subsidiaries´ ability to remit foreign currency outside the PRC is limited. As a result, in order to provide accessible cash to cover any of Sino-Forest's holding companies´ obligations, including debt obligations, Sino-Forest currently

does not rely upon the repatriation of earnings of the BVI subsidiaries. Sino-Forest has expanded its investments in the PRC through WFOEs.  As the plantations held by Sino-Forest WFOEs are sold, income generated and associated cash flow is expected to be available for repatriation from the PRC, subject to relevant procedures for approval from State Administration of Foreign Exchange ("**SAFE**") and other relevant requirements being satisfied.

In addition, for Sino-Forest's PRC subsidiaries, PRC regulations permit payment of dividends only out of accumulated profits as determined in accordance with PRC accounting standards and regulations including tax and foreign exchange regulations. Sino-Forest's WFOEs are also required to set aside a portion of their after-tax profits according to PRC accounting standards and regulations to fund certain reserve funds that are not distributable as cash dividends. Furthermore, under prevailing PRC income tax laws, there is a 10% withholding tax imposed on dividend payments made by our WFOEs to a foreign-invested holding company. If the foreign investor is a Hong Kong resident who holds more than 25% equity interest in the PRC subsidiaries and is the beneficial owner of the dividend, such withholding tax rate, after obtaining approval from the competent tax authorities, may be lowered to 5% pursuant to the tax arrangement between Hong Kong and the PRC.

Under their articles of association adopted by each WFOE in accordance with PRC regulations, WFOEs are only allowed to declare dividends once a year at the end of each financial year although such dividends may be distributed multiple times each year. As a result of such limitations, there could be timing limitations on payments from Sino-Forest's WFOEs to meet its payment obligations under the debt obligations and there could be restrictions on payments required to pay off the debt obligations at maturity or upon conversion or for repurchase or redemption.

Furthermore, in practice, the market interest rate that Sino-Forest's WFOEs can pay with respect to offshore loans generally may not exceed comparable interest rates in the international finance markets. Sino-Forest's WFOEs are also required to pay a 10% (which may be lowered to 7% after obtaining approval from the competent tax authorities, if the interest is paid to a Hong Kong resident and if it is the beneficial owner of the interest) withholding tax as well as a 5% business tax on Sino-Forest's behalf on the interest paid under any shareholders' loans. Prior to payment of interest and principal on such shareholder loan, the WFOEs must present evidence of payment of the required withholding tax on the interest payable under any such shareholder loan and evidence of registration with SAFE, as well as any other documents that SAFE or its local branch may require.

As a result of the foregoing, there can be no assurance that Sino-Forest will have sufficient cash flow from dividends or payments on intercompany loans or advances from our WFOEs to satisfy its debt obligations.

*Sino-Forest is subject to risks associated with fluctuations in foreign currency exchange rates.*

Since 1994, the conversion of Renminbi into U.S. dollars has been based on rates set by the People's Bank of China ("**PBOC**"), which are set daily based on the previous day's PRC interbank foreign exchange market rate and current exchange rates on the world's financial markets. The relative value and rate of exchange of the Renminbi against the U.S. dollar is affected by, among other things, changes in the PRC's political and economic conditions. On July 21, 2005, the PRC government changed its decade-old policy of pegging the value of the Renminbi to the U.S. dollar. Under the new policy, the Renminbi is permitted to fluctuate within a narrow and managed range against a basket of certain foreign currencies. On May 18, 2007, the PBOC enlarged the floating range for the trading prices in the inter-bank foreign exchange market of the Renminbi against the U.S. dollar from 0.3% to 0.5% above or below the central parity rate, effective on May 21, 2007. This allows the Renminbi to fluctuate against the U.S. dollar by up to 0.5% above or below the central parity rate published by the PBOC. On June 19, 2010, the PBOC announced its intention to proceed with the reform of the Renminbi exchange rate regime and increase the Chinese currency's exchange rate flexibility, which has resulted in an appreciation of the Renminbi against the U.S. dollar. The PRC government may decide to further liberalize its currency policy in the future, which could result in a further and more significant appreciation or depreciation of the Renminbi against the U.S. dollar.  Any significant fluctuation in the exchange rates between the Renminbi and other currencies, such as the U.S. dollar, Canadian dollar, New Zealand dollar, Euro and H.K. dollar, or in the U.S. dollar against the Renminbi, Canadian dollar, New Zealand dollar, Euro or H.K. dollar, may have an adverse impact on Sino-Forest's results of operations and its ability to satisfy any debt obligations denominated in a currency other than Renminbi.

## Risks Related to the PRC

### *PRC economic, political and social conditions as well as government policies could adversely affect Sino-Forest's business*

Sino-Forest's tree plantations are primarily located in the PRC. The PRC economy differs from the economies of most developed countries in many respects, including structure, government involvement, level of development, economic growth rate, government control of foreign exchange, allocation of resources and balance of payment position.

The PRC economy has been transitioning from a planned economy to a more market oriented economy. For the past two decades the PRC government has implemented economic reform measures emphasizing utilization of market forces in the development of the PRC economy. Some of these measures will benefit the overall PRC economy, but may have a negative effect on us.

Sino-Forest's business, financial condition and results of operations may be adversely affected by:

- changes in PRC political, economic and social conditions;

- changes in policies of the PRC government, including changes in policies affecting the forestry industry and downstream industries;

- changes in laws and regulations or the interpretation of laws and regulations;

- measures which may be introduced to control inflation or deflation;

- changes in the rate or method of taxation;

- changes in interpretation of tax laws and regulations by provincial or regional tax authorities in the PRC;

- imposition of additional restrictions on currency conversion and remittances abroad; and

- reduction in tariff protection and other import restrictions.

In addition, the level of demand in the PRC for forestry products depends heavily on economic growth. Growth in the PRC has been uneven both geographically and among various sectors of the economy. From time to time, the central government of the PRC has taken corrective measures and actions to stabilize the country's economy and any possible social unrest, and has implemented various measures in strengthening and improving macroeconomic regulation. However, there is no assurance that it will do so in the future.

### *Sino-Forest's operations are subject to the uncertainty of the PRC legal system*

The PRC legal system is based on written statutes. Prior court decisions may be cited for reference but have limited precedential value. Since 1979, the PRC government has been developing a comprehensive system of commercial laws, and considerable progress has been made in introducing laws and regulations dealing with economic matters such as foreign investment, corporate organization and governance, commerce, taxation and trade. However, as these laws and regulations are relatively new, interpretation of many laws, regulations and rules has not always been uniform, and enforcement of these laws and regulations involve significant uncertainties, which may limit or otherwise adversely affect legal protections available to Sino-Forest. Moreover, the PRC legal system is based partly on government policies and internal rules (some of which are not published on a timely basis or at all) that may have a retroactive effect. As a result, Sino-Forest may not be aware of any violation of these policies or rules until sometime after such violation. In addition, litigation in the PRC may be protracted and may result in substantial costs and diversion of resources and management attention. Sino-Forest cannot predict the effect of future

developments in the PRC legal system, including the promulgation of new laws, changes to existing laws or the interpretation or enforcement thereof, or the pre-emption of local regulations by national laws.

Furthermore, the administration of PRC laws and regulations may be subject to a certain degree of discretion by the executive authorities. This may result in the outcome of dispute resolutions not being as consistent or predictable as compared with more developed jurisdictions. In addition, it may be difficult to obtain a swift and equitable enforcement of laws in the PRC, or the enforcement of judgments by a court of another jurisdiction.

At present, the legal framework for the tree plantation industry in the PRC is at an early stage of development. For example, the laws and regulations relating to the ownership, licensing and rights over forestry areas are not well developed. As these laws and regulations may not be comprehensive, and due to the limited volume of published cases and judicial interpretations and the non-binding nature of prior court decisions, the interpretation and enforcement of these laws, regulations and legal requirements involve a certain extent of uncertainty. Such uncertainty may make it difficult for us to enforce our plantation land use rights and other rights. As the PRC legal system develops together with the PRC forestry industry, we cannot be certain that changes in such laws and regulations, or in their interpretation or enforcement, will not have a material adverse effect on our business, financial condition and results of operations.

In recent years, the reform of the collectively owned plantation rights system has been ongoing in the PRC in order to enhance the rural land contract relationship and ensure that farmers have proper legal plantation rights. Farmers and rural collective organizations are currently permitted to transfer their plantation rights to third parties pursuant to existing PRC laws and regulations by means of bidding, public auction or competitive negotiation, as recognized by certain local practices. We cannot assure that the PRC government may or may not promulgate new rules and regulations that may be more detailed and complex than existing ones for regulating the transfer of plantation rights. Such rules may restrict or delay the acquisition of any new plantation rights from original plantation rights holders. Moreover, Sino-Forest cannot assure that the enforcement of such rules and regulations will not have a material adverse effect on our business, financial condition and results of operations. The RMB has a fixed conversion rate into United States dollars.

***Restrictions on foreign currency exchange may limit our ability to obtain foreign currency or to utilize our revenue effectively***

Sino-Forest receives most of its revenues in RMB. As a result, any restrictions on currency exchange may limit its ability to use revenue generated in RMB to:

- purchase timber imported from other countries;

- fund other business activities outside the PRC, such as the purchase of equipment for our manufacturing plants;

- service and repay its indebtedness; and

- pay out dividends to its shareholders.

Sino-Forest's WFOEs in the PRC do not require prior approval from SAFE before undertaking current account foreign exchange transactions. Current account transactions refer to those international revenue and expenditure dealings that occur on a current basis, including revenues and expenditures in trade and labour services, and the declaration of and payment of dividends out of after tax retained earnings. Foreign exchange for current account transactions may be obtained by producing commercial documents evidencing such transactions, provided that the transactions must be processed through banks in the PRC licensed to engage in foreign exchange.

Foreign exchange transactions under the capital account, however, will be subject to the registration requirements and approval of SAFE. Capital account transactions refer to international revenues and expenditures, that, being inflows and outflows of capital, produce increases or reductions in debt and equity, including direct investment, various types of borrowings and investment in securities. In addition, for either current or capital account

transactions, Sino-Forest's WFOEs must purchase foreign currency from one of the PRC banks licensed to conduct foreign exchange.

Sino-Forest cannot assure that sufficient amounts of foreign currency will always be available to enable Sino-Forest to meet its foreign currency obligations, whether to service or repay indebtedness not denominated in Renminbi, or to remit profits out of the PRC. In addition, Sino-Forest's subsidiaries incorporated in the PRC may not be able to obtain sufficient foreign currency to pay dividends, repay intercompany loans or to satisfy their other foreign currency requirements. Sino-Forest's capital is subject to PRC foreign currency exchange controls which may limit the ability to repatriate funds. Since foreign exchange transactions under the capital account are still subject to limitations and require approval from SAFE, this could affect Sino-Forest's subsidiaries' ability to obtain foreign currency through debt or equity financing, including by means of loans or capital contributions from us. Sino-Forest also cannot provide assurance that the PRC government will not impose further restrictions on the convertibility of the Renminbi.

Sino-Forest's BVI Subsidiaries' retained earnings and equity are subject to PRC foreign currency exchange controls, which may limit their ability to repatriate funds. Should Sino-Forest decide to repatriate earnings of the BVI Subsidiaries out of the PRC, there may be a significant amount of cash tax payable. Since foreign exchange transactions are subject to limitations and require approval from SAFE, this affects the BVI Subsidiaries´ ability to obtain foreign exchange from PRC operations which could be used to satisfy Sino-Forest's obligations. In addition, there is no assurance that the PRC government will not impose further restrictions on the convertibility of the Renminbi.

***Certain PRC regulations governing PRC companies are less developed than those applicable to companies incorporated in more developed countries***

Sino-Forest's WFOEs are subject to PRC laws and regulations applicable to foreign investment companies, and other applicable laws and regulations in the PRC. These laws and regulations may not afford investors the same legal protections available to them in the United States, Canada or elsewhere, and may be less developed than those applicable to companies incorporated in the United States, Canada and other developed countries or regions.

*Implementation and Issuance of New Form of Plantation Rights Certificates*

Since 2000, the PRC has been improving its system of registering plantation land ownership, plantation land use rights and plantation ownership and use rights and of issuing certificates to the persons having such plantation rights (the "Plantation Rights Certificates"). In April 2000, the PRC State Forestry Administration issued a notice, which provided that a new form of Plantation Rights Certificate was to be used from the date of the notice. The PRC government is in the process of gradually implementing the issuance of the new form of certificates on a nationwide scale. However, the registration and issuance of the new form plantation rights certificates by the PRC State Forestry Administration have not been fully implemented in a timely manner in certain parts of the PRC. Sino-Forest has obtained the plantation rights certificates or requisite approvals for acquiring the relevant plantation rights for most of the purchased plantations and planted plantations currently under its management, and it is in the process of applying for the plantation rights certificates for those plantations for which we have not obtained such certificates.

Sino-Forest can give no assurance when the official Plantation Rights Certificates will be issued by the relevant local PRC governments to all the purchased plantations and planted plantations acquired and under Sino-Forest's management and cultivation. Until official new form Plantation Rights Certificates are issued, there can be no assurance that Sino-Forest's rights to its tree plantations will not be subject to dispute or challenge. If such certificates are not issued, or are not issued in a timely manner, or if Sino-Forest's rights to any of our tree plantation lands are subject to dispute or challenge, Sino-Forest's business, financial condition and results of operations could be materially adversely affected.

*Operational Licenses and Permits*

Currently, PRC laws and regulations require tree plantation companies to obtain licenses and permits to operate tree plantations, harvest logs on the tree plantations and transport the logs out of the forest areas. The tree plantation

companies must apply to the relevant Administration for Industry and Commerce of the PRC for the business license, and must apply to the local forestry bureaus for the logging permits and transportation permits for plantations that are to be harvested. Sino-Forest currently has the relevant business licenses for its subsidiaries in the PRC to engage in forestry activities and has received the requisite logging permits and transportation permits for its completed logging and transportation activities. In this regard, the PRC State Council reviews and approves the annual logging quota every five years. This annual logging quota is allocated by the local forestry bureaus within their administrative regions. For foreign invested plantations, the logging quota is allocated separately by the provincial forestry department within the annual logging quota approved by the PRC State Council. There is no assurance that Sino-Forest will continue to maintain the business licenses and obtain the relevant permits for its future logging and transportation activities, or that the PRC government will not enact laws and regulations that would add requirements for tree plantation companies to conduct these activities in the PRC.

Further, PRC laws and regulations require manufacturers to obtain licenses and permits to operate timber manufacturing plants. The timber manufacturing companies must apply to the relevant Administration for Industry and Commerce of the PRC for a business license, and those established in the forestry areas must apply for the Timber Operation (Processing) Permit required by the relevant forestry regulatory authorities in the PRC. Sino-Forest currently has the requisite business licenses and the Timber Operation (Processing) Permits for our subsidiary companies in the PRC to engage in timber manufacturing activities. However, there is no assurance that Sino-Forest will continue to maintain the business licenses or the Timber Operation (Processing) Permits for its manufacturing plants, or that the PRC government will not pass laws and regulations that would place additional requirements on companies conducting these activities in the PRC.

### Environmental Regulations

Laws and regulations protecting the environment have generally become stricter in the PRC in recent years and could become more stringent in the future. On December 26, 1989, the Standing Committee of the National People's Congress of the PRC adopted the Environmental Protection Law of the PRC. This law contains, and future legislation with respect to protection of the environment, whether relating to forests, protected animal species, or water conservation, could contain, restrictions on tree planting, timber harvesting, and other forest practices. Sino-Forest's tree plantations and manufacturing plants will also be subject to environmental laws and regulations, particularly with respect to air emissions and discharges of wastewater and other pollutants into land, water and air, and the use, disposal and remediation of hazardous substances and contaminants. Sino-Forest may be required to incur significant expenditures to comply with applicable environmental laws and regulations. Moreover, some or all of the environmental laws and regulations to which Sino-Forest is subject in its tree plantations and manufacturing plants could become more stringent in the future, which could affect its production costs and results of operations. For example, international standards in wood-based products manufacturing currently require that wood panels satisfy specified maximum levels of formaldehyde emissions, as well as providing for other environmental protection measures. Any failure by us to comply with applicable environmental laws and regulations could result in civil or criminal fines or penalties or enforcement actions, including a requirement to install pollution control equipment or other mandated actions. As a result, environmental laws and regulations may adversely affect Sino-Forest's business, financial condition and results of operations.

### Agricultural Taxes and Other Related Forestry Fees

Prior to February 2006, agricultural taxes on forestry companies were levied by the PRC government and generally amounted to approximately 8% of the selling prices or government standardized prices, depending upon the entity and the province in which it operates. The agricultural taxes and other forestry related fees are levied at the time trees are harvested or sold. In certain provinces where Sino-Forest's tree plantations are located, the agricultural taxes have been exempted or reduced. On February 17, 2006, the agricultural taxes were abolished by the PRC State Council. The forestry related fees include the reforestation fund and maintenance fees, which are generally charged at 10% to 20% of sales and, under a new rule effective from July 1, 2009, the reforestation fund shall be charged at no more than 10% of sales, but the fees actually charged vary from place to place. There is also a forest protection fee of RMB 5 per cubic metre of wood harvested, which has been cancelled by a notice issued by the Ministry of Finance, the National Development and Reform Commission and the PRC State Forestry Administration on August 4, 2003. However, the cancellation of the forestry protection fee has not yet been fully implemented in the provinces

where Sino-Forest's tree plantations are located. No assurance can be given that other forestry related taxes will not be levied and such forestry related fees will not be increased in the future.

## DOCUMENTS INCORPORATED BY REFERENCE

The following documents, which have been filed with securities commissions or other similar authorities in Canada, are specifically incorporated by reference into and form an integral part of this Information Statement:

(a)     The Redacted First Interim Report of the Independent Committee of the Board of Directors of Sino-Forest Corporation dated August 10, 2011 (the "**First Interim Report**");

(b)     The Redacted Second Interim Report of the Independent Committee of the Board of Directors of Sino-Forest Corporation dated November 13, 2011 (the "**Second Interim Report**"); and

(c)     The Redacted Final Report of the Independent Committee of the Board of Directors of Sino-Forest Corporation dated January 31, 2012 (the "**Final Report**").

Any material change reports (excluding confidential material change reports) and any news release issued by the Company that specifically states that it is intended to be incorporated by reference in this Information Statement and subsequently filed by the Company with a securities commission or similar authority in any province or territory of Canada subsequent to the date of this Information Statement shall be deemed to be incorporated by reference into this Information Statement.

Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Information Statement to the extent that a statement contained herein or any other subsequently filed document that also is or is deemed to be incorporated by reference herein modifies or supersedes that statement. The modifying or superseding statement need not state that it has modified or superseded a prior statement or include any other information set forth in the document that it modifies or supersedes. The making of a modifying or superseding statement shall not be deemed an admission for any purposes that the modified or superseded statement, when made, constituted a misrepresentation, an untrue statement of a material fact or an omission to state a material fact that is required to be stated or that is necessary to make a statement not misleading in light of the circumstances in which it was made. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Information Statement.

**316**

## SCHEDULE 'A'

## FORM OF RESOLUTION

**BE IT RESOLVED THAT:**

1. The plan of compromise and reorganization (the "CCAA Plan") under the *Companies' Creditors Arrangement Act* (Canada) and the *Canada Business Corporations Act* concerning, affecting and involving Sino-Forest Corporation ("SFC"), substantially in the form attached as Schedule C to the notice of meeting and meeting information statement of SFC dated October 20, 2012 (the "Information Statement") (as such CCAA Plan may be amended, varied or supplemented by SFC from time to time in accordance with its terms) and the transactions contemplated therein be and it is hereby accepted, approved, agreed to and authorized;

2. Notwithstanding the passing of this resolution by each Affected Creditor Class (as defined in the Information Statement) or the passing of similar resolutions or approval of the Ontario Superior Court of Justice (the "Court"), the board of directors of SFC, without further notice to, or approval of, the Affected Creditors (as defined in the Information Statement), subject to the terms of the CCAA Plan, may decide not to proceed with the CCAA Plan or may revoke this resolution at any time prior to the CCAA Plan becoming effective, provided that any such decision after the issuance of a sanction order shall require the approval of the Monitor and the Court; and

3. Any director or officer of SFC be and is hereby authorized, for and on behalf of SFC, to execute and deliver, or cause to be executed and delivered, any and all documents and instruments and to take or cause to be taken such other actions as he or she may deem necessary or desirable to implement this resolution and the matters authorized hereby, including the transactions required by the CCAA Plan, such determination to be conclusively evidenced by the execution and delivery of such documents or other instruments or taking of any such actions.

## SCHEDULE 'B'

## MEETING ORDER AND ENDORSEMENT

## APPENDIX E – PLAN SUPPLEMENT

*(See Attached)*



Sino-Forest Corporation

**Court File No. CV-12-9667-00CL**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE AND ARRANGEMENT OF  SINO-FOREST CORPORATION

# PLAN SUPPLEMENT

to the

PLAN OF COMPROMISE AND REORGANIZATION DATED OCTOBER 19, 2012

pursuant to the *Companies' Creditors Arrangement Act*
and the *Canada Business Corporations Act*
concerning, affecting and involving

**SINO-FOREST CORPORATION**

**November 21, 2012**

## NOTICE OF FILING OF PLAN SUPPLEMENT

**PLEASE TAKE NOTICE** that, pursuant to a Plan Filing and Meeting Order of the Ontario Superior Court of Justice dated August 31, 2012 (the "Meeting Order") relating to a meeting (the "Meeting") to consider a Plan of Compromise and Reorganization dated October 19, 2012 (as such Plan may be modified, amended, varied or supplemented in accordance with its terms, the "Plan") filed by Sino-Forest Corporation (the "Applicant") pursuant to the provisions of the *Companies' Creditors Arrangement Act* (Canada) and Section 191 of the *Canada Business Corporations Act* and as set forth in the Meeting Information Statement dated October 20, 2012 pertaining to the Plan (the "Information Statement"), the Applicant must serve and file this Plan supplement (as such Plan supplement may be thereafter modified, amended, varied or supplemented in accordance with the Plan, this "Plan Supplement"), and the Monitor must post the Plan Supplement on the Website, no later than seven (7) days prior to the Meeting. All capitalized terms not otherwise defined in this Plan Supplement shall have the meanings ascribed to them in the Plan.

**PLEASE TAKE FURTHER NOTICE** that this Plan Supplement supplements the Plan with (A) a summary of the terms of the Litigation Trust, (B) a draft of the Litigation Trust Agreement, (C) a summary of certain information concerning Newco, including information relating to Newco's governance and management and a summary of the terms of the Newco Shares, (D) a description of the terms of the Newco Notes, (E) a summary of the constitution and governance of SFC Escrow Co., (F) information concerning certain reserves and other amounts relating to the Plan, and (G) a draft of the Plan Sanction Order, each of which is attached hereto as Exhibit A, B, C, D, E, F and G, respectively.

**PLEASE TAKE FURTHER NOTICE** that you are advised and encouraged to read this Plan Supplement in conjunction with the Information Statement, the Plan and the Meeting Order.

**PLEASE TAKE FURTHER NOTICE** that a true and complete copy of the Plan Supplement is attached hereto.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan Supplement as well as the Plan, the Information Statement and the Meeting Order may be obtained from the Monitor's website at http://cfcanada.fticonsulting.com/sfc/.

# EXHIBIT A

## SUMMARY OF TERMS OF LITIGATION TRUST

### *Overview*

The Litigation Trust will be created pursuant to the Plan on the Plan Implementation Date. Pursuant to the agreement governing the Litigation Trust, a draft form of which is attached as Exhibit B to the Plan Supplement (the "**Litigation Trust Agreement**"), the Litigation Trustee will hold the Litigation Trust Claims and the other Litigation Trust Assets for the benefit of the Affected Creditors with Proven Claims and the Noteholder Class Action Claimants entitled to receive Litigation Trust Interests under the Plan (the "**Litigation Trust Beneficiaries**"). Capitalized terms used in this Exhibit A but not otherwise defined herein have the meaning ascribed to such terms in the Litigation Trust Agreement.

### *Transfer of Assets and Rights to Litigation Trust*

On the Plan Implementation Date, each of the Litigation Trust Claims will be transferred to the Litigation Trustee.   The "Litigation Trust Claims" to be held by the Litigation Trustee pursuant to the Litigation Trust Agreement are defined in the Litigation Trust Agreement as any and all claims, actions, causes of action, demands, suits, rights, entitlements, litigation, arbitration, proceeding, hearing or complaint, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring at any time, whether before, on or after March 30, 2012, which may be asserted, by or on behalf of (i) SFC against any and all third parties; or (ii) the Noteholders or any representative thereof (including the Trustee) against any and all third parties in connection with any the Notes issued by SFC, other than Noteholder Class Action Claims. However, the Litigation Trust Claims will not include any claim or cause of action that is released pursuant to Sections 7.1 of the Plan.   The Litigation Trust Agreement defines "Litigation Trust Assets" as the Litigation Trust Claims, the Litigation Funding Amount, and any other assets acquired by the Litigation Trust on or after the Plan Implementation Date pursuant to the Litigation Trust Agreement or the Plan.

Upon the creation of the Litigation Trust, SFC will transfer the Litigation Funding Amount to the Litigation Trustee to finance the operations of the Litigation Trust.   The Litigation Funding Amount is a cash amount acceptable to SFC, the Monitor and the Initial Consenting Noteholders to be contributed by SFC to the Litigation Trustee for purposes of funding the Litigation Trust on the Plan Implementation Date.   The parties have not yet determined the amount of the Litigation Funding Amount.

### *Duties of Litigation Trustee*

Subject to the terms of the Litigation Trust Agreement, the Litigation Trustee, upon direction of the Litigation Trust Board (whose decisions, approvals or other actions shall require a majority

vote), in the exercise of its reasonable business judgment, will, in an efficient and responsible manner, prosecute the Litigation Trust Claims and preserve and enhance the value of the Litigation Trust Assets.  The efficient and responsible prosecution of the Litigation Trust Claims may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action, or otherwise, as determined by the Litigation Trustee and the Litigation Trustee Board in accordance with the terms of the Litigation Trust Agreement and the exercise of their collective reasonable best judgement.  The Litigation Trustee, upon direction by the Litigation Trust Board, and except as set forth in the Litigation Trust Agreement, will have the absolute right to pursue, settle and compromise or not pursue any and all Litigation Trust Claims as it determines is in the best interests of the Litigation Trust Beneficiaries, and consistent with the purposes of the Litigation Trust, and the Litigation Trustee will have no liability for the outcome of any such decision except for any damages caused by its gross negligence, bad faith, wilful misconduct or knowing violation of law.

### Litigation Trustee

The Litigation Trustee will be determined by SFC and the Initial Consenting Noteholders prior to the Plan Implementation Date, with the consent of the Monitor, to serve as trustee of the Litigation Trust pursuant to and in accordance with the terms thereof.  The Litigation Trustee will be appointed as trustee of the Litigation Trust effective as of the Plan Implementation Date.  The parties have not yet determined who will serve as Litigation Trustee.

### Litigation Trust Board

A litigation trust board (the "**Litigation Trust Board**") will be established and consist of three Persons.  The three members of the Litigation Trust Board will be appointed to serve in such capacity pursuant to the Sanction Order.  The members of the Litigation Trust Board will have the right to direct and remove the Litigation Trustee in accordance with the Litigation Trust Agreement, and will have the right to operate and manage the Litigation Trust in a manner that is not inconsistent with the terms of the Litigation Trust Agreement.  No holder of Litigation Trust Interests (except to the extent such holder is a member of the Litigation Trust Board) will have any consultation or approval rights whatsoever in respect of management and operation of the Litigation Trust.  The parties have not yet determined who will serve as members of the Litigation Trust Board.

### Interests of Holders of Litigation Trust Interests

The ownership of a Litigation Trust Interest will not entitle any holder of Litigation Trust Interests to any title in or to the assets of the Litigation Trust or to any right to call for a partition or division of the assets of the Litigation Trust or to require an accounting.  The entitlements of the holders of Litigation Trust Interests (and the beneficial interests therein) will not be represented by certificates, securities, receipts or in any other form or manner whatsoever, except as maintained on the books and records of the Litigation Trust by the Litigation Trustee or the Registrar.  No transfer, sale assignment, distribution, exchange, pledge, hypothecation, mortgage or other disposition (each, a "Transfer") of a Litigation Trust Interest may be effected or made.

However, Transfers of a Litigation Trust Interest may be made pursuant to the Plan or by operation of law or by will or the laws of descent and distribution.

***Canada Federal Income Tax Matters Relating to Litigation Trust Interests***

The treatment for Canadian federal income tax purposes, pursuant to the Tax Act, of the Litigation Trust and of a Holder's Litigation Trust Interest, including the holding and disposition thereof and the receipt of distributions is unclear and will depend, in part, on the residence of the Litigation Trust.  The residence of the Litigation Trust for purposes of the Tax Act will depend on a number of factors, including the location where the Litigation Trust is managed and controlled.  Pursuant to the Tax Proposals, where the management and control of the Litigation Trust is located outside Canada, the Litigation Trust may still be deemed, for certain purposes of the Tax Act, to be resident in Canada.

To the extent the Litigation Trust is, or is deemed to be, a resident of Canada for purposes of the Tax Act, and realizes any income or capital gain with respect to the Litigation Trust Claims transferred to the Litigation Trust, the Litigation Trust may be liable for Canadian federal income tax thereon.  Where the Litigation Trust is subject to Canadian federal income tax and is a resident of Canada solely by virtue of being deemed a resident, Canadian Holders of beneficial interests in the Litigation Trust have, jointly and severally, or solidarily, with the Litigation Trust and with each other, the rights and obligations of the Litigation Trust under Divisions I and J of the Tax Act, including in respect of the filing of returns and the payment of income tax payable by the Litigation Trust, and may be subject to administration and enforcement proceedings under Part XV of the Tax Act in respect of those rights and obligations, subject to the recovery limit rules in proposed section 94 of the Tax Act.  To the extent that the income or gains of the Litigation Trust are paid or made payable to the beneficiaries of the Litigation Trust in a particular taxation year, the beneficiaries may be liable for Canadian federal income tax in respect of such amounts paid or made payable and a deduction in computing income may be available to the Litigation Trust.

To the extent the Litigation Trust is, or is deemed to be, a resident of Canada for Canadian income tax purposes, net income of the Litigation Trust distributed to non-residents of Canada will be subject to withholding tax under the Canadian Tax Act at a 25% rate, subject to potential reduction under an applicable tax treaty between Canada and the beneficiary's jurisdiction of residence.

**Holders who will receive an interest in the Litigation Trust should consult their own tax advisors with respect to both Canadian and foreign income tax considerations.**

**444**

**EXHIBIT B**

# DRAFT OF LITIGATION TRUST AGREEMENT

**SINO-FOREST LITIGATION TRUST AGREEMENT**

# TABLE OF CONTENTS

Page

**ARTICLE 1 ESTABLISHMENT OF THE LITIGATION TRUST**................................................2

1.1    Settling the Litigation Trust and Funding Expenses of the Litigation Trust...............2
1.2    Establishment of Litigation Trust and Appointment of the Litigation Trustee..........2
1.3    Transfer of Assets and Rights to the Litigation Trustee.............................................3
1.4    Title to Litigation Trust Assets.................................................................................4
1.5    Nature and Purpose of the Litigation Trust...............................................................5
1.6    Incorporation of Plan...............................................................................................6

**ARTICLE 2 LITIGATION TRUST INTERESTS**..........................................................................6

2.1    Allocation of Litigation Trust Interests....................................................................6
2.2    Interests Beneficial Only.........................................................................................7
2.3    Evidence of Beneficial Interests..............................................................................7
2.4    Securities Law Registration.....................................................................................7
2.5    No Transfers.............................................................................................................7
2.6    Absolute Owners......................................................................................................8

**ARTICLE 3 THE LITIGATION TRUSTEE**.................................................................................8

3.1    Litigation Trust Proceeds.........................................................................................8
3.2    Collection of Litigation Trust Proceeds...................................................................8
3.3    Payment of Litigation Trust Expenses.....................................................................8
3.4    Distributions............................................................................................................9
3.5    Tenure, Removal, and Replacement of the Litigation Trustee..................................9
3.6    Acceptance of Appointment by Successor Trustee.................................................11
3.7    Regular Meetings of the Litigation Trustee and the Litigation Trust Board.............11
3.8    Special Meetings of the Litigation Trustee and the Litigation Trust Board.............11
3.9    Notice of, and Waiver of Notice for Litigation Trustee and Litigation Trust Board
       Meeting..................................................................................................................11
3.10   Manner of Acting...................................................................................................12
3.11   Role of the Litigation Trustee.................................................................................12
3.12   Authority of Litigation Trustee...............................................................................12
3.13   Limitation of Litigation Trustee's Authority...........................................................14
3.14   Books and Records.................................................................................................15
3.15   Inquiries into Trustee's Authority...........................................................................15
3.16   Compliance with Laws...........................................................................................15
3.17   Compensation of the Litigation Trustee.................................................................15
3.18   Reliance by Litigation Trustee................................................................................16
3.19   Investment and Safekeeping of Litigation Trust Assets..........................................16
3.20   Standard of Care; Exculpation................................................................................16

**ARTICLE 4 LITIGATION TRUST BOARD**................................................................................17

4.1    Litigation Trust Board............................................................................................17
4.2    Authority of the Litigation Trust Board..................................................................17
4.3    Regular Meetings of the Litigation Trust Board......................................................17

( i )

4.4      Special Meetings of the Litigation Trust Board ........................................................17
4.5      Manner of Acting. ....................................................................................................17
4.6      Litigation Trust Board's Action Without a Meeting ................................................18
4.7      Notice of, and Waiver of Notice for Litigation Trust Board Meetings ....................19
4.8      Telephonic Communications.....................................................................................19
4.9      Tenure, Removal and Replacement of the Members of the Litigation Trust Board .19
4.10    Compensation of the Litigation Trust Board.............................................................20
4.11    Standard of Care; Exculpation...................................................................................21

**ARTICLE 5 TAX MATTERS ..............................................................................................21**
5.1      [Federal Income Tax Treatment of the Litigation Trust...........................................21
5.2      Allocations of Litigation Trust Taxable Income ......................................................23
5.3      Canadian Tax Treatment of Distributions by Litigation Trustee .............................23

**ARTICLE 6 DISTRIBUTIONS.............................................................................................23**
6.1      Distributions; Withholding .......................................................................................23
6.2      Manner of Payment or Distribution..........................................................................24
6.3      Cash Distributions ....................................................................................................24

**ARTICLE 7 INDEMNIFICATION ........................................................................................24**
7.1      Indemnification of Litigation Trustee and the Litigation Trust Board.....................24

**ARTICLE 8 REPORTING OBLIGATIONS OF LITIGATION TRUSTEE.........................25**
8.1      Reports.......................................................................................................................25

**ARTICLE 9 TERM; TERMINATION OF THE LITIGATION TRUST ..............................26**
9.1      Term; Termination of the Litigation Trust ...............................................................26
9.2      Continuance of Trust for Winding Up.......................................................................26

**ARTICLE 10 AMENDMENT AND WAIVER .......................................................................27**
10.1    Amendment and Waiver ............................................................................................27

**ARTICLE 11 MISCELLANEOUS PROVISIONS .................................................................27**
11.1    Intention of Parties to Establish the Litigation Trust................................................27
11.2    Laws as to Construction ............................................................................................27
11.3    Jurisdiction ................................................................................................................27
11.4    Severability................................................................................................................28
11.5    Notices.......................................................................................................................28
11.6    Fiscal Year.................................................................................................................29
11.7    Construction; Usage ..................................................................................................29
11.8    Counterparts; Facsimile; PDF ..................................................................................30
11.9    Confidentiality...........................................................................................................30
11.10  Entire Agreement.......................................................................................................31
11.11  No Bond.....................................................................................................................31
11.12  Effectiveness..............................................................................................................31
11.13  Successor and Assigns...............................................................................................31
11.14  No Execution .............................................................................................................31
11.15  Irrevocability .............................................................................................................32

( ii )

DRAFT

**THIS LITIGATION TRUST AGREEMENT** (this "**Agreement**"), dated as of the Effective Date, is entered into by and among:

1.      Sino-Forest Corporation ("**SFC**"); and

2.      [●], as trustee of the Litigation Trust (the "**Litigation Trustee**").

## PRELIMINARY STATEMENT

SFC has filed that certain Plan of Compromise and Arrangement dated ●, 2012 in the Ontario Superior Court of Justice (the "**CCAA Court**") pursuant to the provisions of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**") (Case No. CV-12-9667-CL) (together with any supplement to such Plan and the exhibits and schedules thereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms thereof, the "**Plan**").

On March 30, 2012 (the "**Filing Date**"), SFC commenced reorganization proceedings under the CCAA before the CCAA Court.

On ●, 2012, the CCAA Court entered the Sanction Order approving the Plan.

The Litigation Trust is created in accordance with the laws of Ontario.

The Litigation Trust is created pursuant to this Agreement in order to effectuate certain provisions of the Plan and the Sanction Order and, in accordance therewith, the Litigation Trustee will hold the Litigation Trust Claims and the other Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries.

In this Agreement, "**Litigation Trust Claims**" means any and all claims, actions, causes of action, demands, suits, rights, entitlements, litigation, arbitration, proceeding, hearing or complaint, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring at any time, whether before, on or after the Filing Date (the "**Causes of Action**") which may be asserted, by or on behalf of (i) SFC against any and all third parties; or (ii) the Noteholders or any representative thereof (including the Trustees) against any and all third parties in connection with any of the Notes issued by SFC, other than Noteholder Class Action Claims; provided, however, that in no event shall Litigation Trust Claims include any Claim or Cause of Action that is released pursuant to Sections 7.1 of the Plan.

In this Agreement, "**Litigation Trust Assets**" means the Litigation Trust Claims, the Litigation Funding Amount, and any other assets acquired by the Litigation Trust on or after the Effective Date pursuant to this Agreement or the Plan.

- 2 -                                                                DRAFT

The Litigation Trust is established for the sole purpose of liquidating and distributing the Litigation Trust Assets pursuant to the Plan and this Agreement with no objective to continue or engage in the conduct of a trade or business.

The Litigation Trust is established for the (i) benefit of the Affected Creditors with Proven Claims and the Noteholder Class Action Claimants entitled to receive Litigation Trust Interests under the Plan (individually, a "**Litigation Trust Beneficiary**" and collectively, the "**Litigation Trust Beneficiaries**") and (ii) pursuit of all Litigation Trust Claims.

The Litigation Trustee has been duly appointed pursuant to the Sanction Order and Section 1.2(b) of this Agreement.

Unless the context otherwise requires, capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Plan.  Schedule A to this Agreement sets forth an index of terms that are defined in this Agreement.

**AGREEMENT**

**NOW, THEREFORE**, in consideration of the promises and the mutual covenants and agreements contained herein and in the Plan, SFC, the Litigation Trustee and the Litigation Trust Board, intending to be legally bound, agree as follows:

**ARTICLE 1**
**ESTABLISHMENT OF THE LITIGATION TRUST**

**1.1      Settling the Litigation Trust and Funding Expenses of the Litigation Trust**

SFC shall settle the Litigation Trust and shall transfer the Litigation Funding Amount to the Litigation Trustee by way of a loan or otherwise to finance the operations of the Litigation Trust. The Litigation Trust Claims Transferors shall have no other funding obligations with respect to the Litigation Trust.

**1.2      Establishment of Litigation Trust and Appointment of the Litigation Trustee**

(a)      Pursuant to the Plan, the Litigation Trust is hereby established on the date and at the time set out in section 6.4 of the Plan, and shall be known as the "**Sino-Forest Litigation Trust**" on behalf of and for the benefit of the Litigation Trust Beneficiaries.

(b)      The Litigation Trustee is hereby appointed as trustee of the Litigation Trust effective as of the Plan Implementation Date (the "**Effective Date**") and agrees to accept and hold the Litigation Trust Assets in trust for the Litigation Trust Beneficiaries, subject to the terms of this Agreement.  The Litigation Trustee (and each successor trustee thereto serving from time to time hereunder) shall have all the rights, powers and duties set forth herein and pursuant to applicable law for accomplishing the purposes of the Litigation Trust.

- 3 -                                                                    DRAFT

**1.3     Transfer of Assets and Rights to the Litigation Trustee**

(a)     On the Effective Date, pursuant to the Plan and the Sanction Order each of the Litigation Trust Claims shall be deemed to be irrevocably transferred, assigned and delivered to the Litigation Trustee (i) rights, title and interests in and to the Litigation Trust Claims (and with respect to the Indenture Trustees, all of the rights, title and interests of the Noteholders in and to the Litigation Trust Claims on behalf of the Noteholders), free and clear of any and all liens, claims (other than claims in the nature of setoff or recoupment), encumbrances or interests of any kind in such property of any other Person, and (ii) all respective rights, title and interests in and to any lawyer-client privilege, work product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Litigation Trust Claims (collectively, the "**Privileges**") (and with respect to the Indenture Trustees, all of the rights, title and interests of the Noteholders in and to the Privileges on behalf of the Noteholders), all of which shall, and shall be deemed to, vest in the Litigation Trustee for the benefit of the Litigation Trust Beneficiaries.  In no event shall any part of the Litigation Trust Claims revert to or be distributed to SFC or the Noteholders (or any representative thereof (including the Trustees).  None of the foregoing transfers to the Litigation Trustee shall constitute a merger or consolidation of the respective Litigation Trust Claims, each of which shall retain its separateness following the transfer for all purposes relevant to the prosecution thereof.  The Litigation Trustee's receipt of the Privileges shall be without waiver in recognition of the joint and/or successor interest in prosecuting claims on behalf of the Litigation Trust Claims Transferors.

(b)     Subject to Section 1.3(c), after the Effective Date, SFC shall (i) deliver or cause to be delivered to the Litigation Trustee, documents reasonably requested and related to the Litigation Trust Claims (including those maintained in electronic format), whether held by SFC or its employees, agents, advisors, counsel, accountants, or other professionals and (ii) provide reasonable access to such employees, agents, advisors, counsel, accountants or other professionals with knowledge of matters relevant to the Litigation Trust Claims.  Where original documents are required, SFC will make reasonable efforts to make such original documents available.  For the avoidance of doubt, the rights of the Litigation Trustee pursuant to this Section 1.3(b) shall include the right to demand or compel the production of copies of any such documents or information from any party, committee or person who may have produced such documents for or on behalf of SFC or any committee appointed by SFC or its board of directors.

(c)     Any documents or information delivered by SFC to the Litigation Trustee pursuant to Section 1.3(b) (i) shall be used strictly for the purposes of advancing the Litigation Trust Claims and for no other purpose, (ii) shall not, except as may be required by law, be used for any purpose in relation to any regulatory proceedings involving the Named Directors and Officers, and (iii) shall be subject to the continuation of any privilege attaching to such documents, including but

DRAFT

not limited to lawyer-client privilege, litigation privilege, and common interest privilege, which privileges the Litigation Trustee agrees to maintain and uphold.

(d)     Where documents, information and/or access is requested of third party agents, advisors, lawyers, accountants or other professionals ("Third Party Disclosers"), the Litigation Trustee shall pay such reasonable fees and costs of such Third Party Disclosers as are necessary for them to comply with the requests of the Litigation Trustee.

(e)     SFC hereby agrees at any time and from time to time on and after the Effective Date, (i) at the reasonable request of the Litigation Trustee, to execute and/or deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), (ii) to take, or cause to be taken, all such further actions as the Litigation Trustee may reasonably request in order to evidence or effectuate the transfer of the Litigation Trust Claims and the Privileges to the Litigation Trustee contemplated hereby and by the Plan and to otherwise carry out the intent of the parties hereunder, and (iii) to cooperate with the Litigation Trustee in the prosecution of Litigation Trust Claims to the extent reasonable.

(f)     The Litigation Trustee agrees that it will accommodate reasonable requests by Named Directors and Officers (and their agents, advisors, lawyers, accountants or other professionals) to access, at their expense, copies or originals of any documents obtained by the Litigation Trustee pursuant to the terms of this Agreement, for the purposes of defending any civil, regulatory or other proceedings involving the Named Directors and Officers or in connection with their financial affairs.

## 1.4    Title to Litigation Trust Assets

(a)     Upon the transfer of the Litigation Trust Claims to the Litigation Trust pursuant to the Plan, the Sanction Order and this Agreement, SFC and any other holders of the Litigation Trust Claims (the "**Litigation Trust Claims Transferors**") shall have no interest in or with respect to the Litigation Trust Assets, and the Litigation Trustee shall succeed to all of the Litigation Trust Claims Transferors' rights, title and interests in and to the Litigation Trust Claims.

(b)     Notwithstanding anything in the Plan or in this Agreement to the contrary, the transfer of the Litigation Trust Claims to the Litigation Trustee does not diminish, and fully preserves, any defences or privileges a defendant would have if such Litigation Trust Claims had been retained by the Litigation Trust Claims Transferors.

(c)     To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trustee because of a restriction on transferability under applicable non-bankruptcy law, such Litigation Trust Assets shall be deemed to have been retained by the applicable Litigation Trust Claims Transferors, and the Litigation Trustee shall be deemed to have been designated as a representative of such

- 5 -                                                                     DRAFT

Litigation Trust Claims Transferors to enforce and pursue such Litigation Trust Assets on behalf of such Litigation Trust Claims Transferors, and all proceeds, income and recoveries on account of any such Litigation Trust Assets shall be assets of the Litigation Trust and paid over thereto immediately upon receipt by the Litigation Trust Claims Transferors, or any other Person.  Notwithstanding the foregoing, but subject to Sections 1.1 and 3.4 of this Agreement, all net proceeds, income, and recoveries of or on account of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed to the holders of the Litigation Trust Interests consistent with the terms of this Agreement.

## 1.5    Nature and Purpose of the Litigation Trust

(a)    <u>Purpose</u>.  The Litigation Trust is organized and established as a trust pursuant to which the Litigation Trustee, subject to the terms and conditions contained herein, is to (i) hold the assets of the Litigation Trust and (ii) oversee the efficient prosecution of the Litigation Trust Claims, on the terms and conditions set forth herein.

(b)    <u>Actions of the Litigation Trustee</u>.  Subject to the terms of this Agreement, the Litigation Trustee, upon direction of the Litigation Trust Board, and the exercise of their collective reasonable business judgment, shall, in an efficient and responsible manner prosecute the Litigation Trust Claims and preserve and enhance the value of the Litigation Trust Assets.  The efficient and responsible prosecution of the Litigation Trust Claims may be accomplished either through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action, or otherwise, as determined by the Litigation Trustee and the Litigation Trustee Board in accordance with the terms of this Agreement and the exercise of their collective reasonable best judgement.  The Litigation Trustee, upon direction by the Litigation Trust Board, and except as set forth in Section 3.12 herein, shall have the absolute right to pursue, settle and compromise or not pursue any and all Litigation Trust Claims as it determines is in the best interests of the Litigation Trust Beneficiaries, and consistent with the purposes of the Litigation Trust, and the Litigation Trustee shall have no liability for the outcome of any such decision except for any damages caused by gross negligence, bad faith, wilful misconduct or knowing violation of law.

(c)    <u>Limitation on Actions Against Named Directors and Officers</u>.  From and after the Plan Implementation Date, to the extent that the Litigation Trust Claims include rights of action against a Named Director or Officer, (a) the Litigation Trustee may only commence or prosecute an action for a Non-Released D&O Claim against a Named Director or Officer if the Litigation Trustee has first obtained (i) the consent of the Monitor or (ii) leave of the Court on notice to the applicable Directors and Officers, SFC, the Monitor, the Initial Consenting Noteholders and any applicable insurers; and (b) in connection with any action brought or prosecuted by the Litigation Trustee against a Named Director or Officer asserting a Section 5.1(2) D&O Claim or a Conspiracy Claim, the Litigation Trustee shall, as against the Named Directors and Officers, in relation to such claims, be irrevocably limited to recovery solely from the proceeds of the

- 6 -                                    DRAFT

Insurance Policies paid or payable on behalf of SFC or its Directors or Officers, and shall have no right to, and shall not, directly or indirectly, make any claim or seek any recoveries from any of the Named Directors and Officers other than enforcing the Litigation Trustee's rights to be paid from the proceeds of an Insurance Policy by the applicable insurer(s). Any defined term used in this subparagraph not defined in this Agreement shall be as defined in the Plan.

(d) <u>Relationship</u>. This Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust. The Litigation Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Trustee, or the Litigation Trust Board (or any of its members or *ex officio* members), or the Litigation Trust Beneficiaries, or any of them, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers. The relationship of the Litigation Trust Beneficiaries, on the one hand, to the Litigation Trustee and the Litigation Trust Board, on the other, shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Agreement.

(e) <u>No Waiver of Claims</u>. The Litigation Trustee may enforce all rights to commence and pursue, as appropriate, any and all Litigation Trust Claims after the Effective Date. The Litigation Trustee shall have, retain, reserve, and be entitled to assert all such Litigation Trust Claims, rights of setoff, and other legal or equitable defences which the Litigation Trust Claims Transferors had on the Effective Date fully as if the Litigation Trust Claims had not been transferred to the Litigation Trustee in accordance with the Plan, the Sanction Order and this Agreement, and all of the Litigation Trust Claims Transferors' legal and equitable rights - may be asserted after the Effective Date. Nothing in this Agreement shall be construed in a manner that is inconsistent with the Plan, the Sanction Order or any other orders made by the CCAA Court.

**1.6    Incorporation of Plan**

The Plan and the Sanction Order are each hereby incorporated into this Agreement and made a part hereof by this reference; provided, however, to the extent that there is conflict between the provisions of this Agreement, the provisions of the Plan, and/or the Sanction Order, each such document shall have controlling effect in the following rank order: (1) the Sanction Order; (2) the Plan; and (3) this Agreement.

**ARTICLE 2
LITIGATION TRUST INTERESTS**

**2.1    Allocation of Litigation Trust Interests**

The Litigation Trust Interests shall be allocated pursuant to the Plan.

## 2.2    Interests Beneficial Only

The ownership of a Litigation Trust Interest shall not entitle any holder of Litigation Trust Interests to any title in or to the assets of the Litigation Trust as such (which title shall be vested in the Litigation Trustee) or to any right to call for a partition or division of the assets of the Litigation Trust or to require an accounting.

## 2.3    Evidence of Beneficial Interests

The entitlements of the holders of Litigation Trust Interests (and the beneficial interests therein) will not be represented by certificates, securities, receipts or in any other form or manner whatsoever, except as maintained on the books and records of the Litigation Trust by the Litigation Trustee or the Registrar.  The death, incapacity or bankruptcy of any Litigation Trust Beneficiary during the term of the Litigation Trust shall not (i) operate to terminate the Litigation Trust, (ii) entitle the representatives or creditors of the deceased party to an accounting, (iii) entitle the representatives or creditors of the deceased party to take any action in the CCAA Court or elsewhere for the distribution of the Litigation Trust Assets or for a partition thereof or (iv) otherwise affect the rights and obligations of any of the Litigation Trust Beneficiaries hereunder.

## 2.4    Securities Law Registration

It is intended that the Litigation Trust Interests shall not constitute "securities."  To the extent the Litigation Trust Interests are deemed to be "securities," the issuance of Litigation Trust Interests to Litigation Trust Beneficiaries hereunder or under the Plan (and any redistribution of any of the foregoing pursuant to the Plan or otherwise) shall be exempt from the prospectus and registration requirements of any applicable provincial laws pursuant to section 2.11 of National Instrument 45-106 – Prospectus and Registration Exemptions.  If the Litigation Trustee determines, with the advice of counsel, that the Litigation Trust is required to comply with registration and/or reporting requirements of any applicable securities laws, then the Litigation Trustee shall, after consultation with the Litigation Trust Board, take any and all actions to comply with such registration and reporting requirements, if any, to the extent required by applicable law. Notwithstanding the foregoing, nothing herein shall be deemed to preclude the Litigation Trust Board and the Litigation Trustee from amending this Agreement to make such changes as are deemed necessary or appropriate by the Litigation Trustee, with the advice of counsel, to ensure that the Litigation Trust is not subject to any such registration and/or reporting requirements.

## 2.5    No Transfers

(a)    No transfer, sale assignment, distribution, exchange, pledge, hypothecation, mortgage or other disposition (each, a "**Transfer**") of a Litigation Trust Interest may be effected or made; provided, that, Transfers of a Litigation Trust Interest may be made by operation of law or by will or the laws of descent and distribution.

(b)    The Litigation Trustee shall appoint a registrar, which may be the Litigation Trustee (the "**Registrar**"), for the purpose of recording entitlement to the Litigation Trust Interests as provided for in this Agreement.  The Registrar, if

- 8 -                                                    DRAFT

other than the Litigation Trustee, may be such other institution acceptable to the Litigation Trust Board.  For its services hereunder, the Registrar, unless it is the Litigation Trustee, shall be entitled to receive reasonable compensation from the Litigation Trust as approved by the Litigation Trust Board, as an expense of the Litigation Trust.

(c)     The Litigation Trustee shall cause to be kept at the office of the Registrar, or at such other place or places as shall be designated by the Litigation Trustee from time to time, a registry of the holders of Litigation Trust Interests (the "**Trust Register**") which shall be maintained on a strictly confidential basis by the Registrar.  The identity and extent of the Litigation Trust Interests of any Litigation Trust Beneficiary shall not be disclosed to any third party (other than the Litigation Trustee, the Litigation Trust Board and the Registrar, each of them shall maintain any such information in strict confidence), without the prior written consent of such Litigation Trust Beneficiary in each case.

## 2.6    Absolute Owners

The Litigation Trustee may deem and treat the holder of a Litigation Trust Interest of record in the Trust Register as the absolute owner of such Litigation Trust Interests for the purpose of receiving distributions and payment thereon or on account thereof and for all other purposes whatsoever and the Litigation Trustee shall not be charged with having received notice of any claim or demand to such Litigation Trust Interests or the interest therein of any other Person.

## ARTICLE 3
## THE LITIGATION TRUSTEE

### 3.1     Litigation Trust Proceeds

Any and all proceeds, income and/or recoveries obtained on account of or from the Litigation Trust Assets shall be added to the assets of the Litigation Trust (the "**Litigation Trust Proceeds**", which, for greater certainty, shall not include the Litigation Funding Amount), held as a part thereof and dealt with in accordance with the terms of this Agreement.

### 3.2     Collection of Litigation Trust Proceeds

The Litigation Trustee shall collect all Litigation Trust Proceeds and title therein shall be vested in the Litigation Trustee, in trust for the benefit of the Litigation Trust Beneficiaries, to be dealt with in accordance with the terms of this Agreement.

### 3.3     Payment of Litigation Trust Expenses

Subject to Section 3.12 of this Agreement and the obligations of the Litigation Trustee under Sections 1.1 and 3.4 of this Agreement, the Litigation Trustee shall maintain the Litigation Funding Amount, and expend the Litigation Funding Amount (i) as is reasonably necessary to pay reasonable and necessary administrative expenses (including but not limited to, the reasonable costs and expenses of the Litigation Trustee (including reasonable fees, costs, and expenses of professionals retained thereby) and the compensation and the reasonable costs and

- 9 -                                                    DRAFT

expenses of the members of the Litigation Trust Board as contemplated by Section and 4.10 hereof (including the fees of professionals retained by such members as contemplated by Sections 4.2 hereof), any taxes imposed on the Litigation Trust or in respect of the Litigation Trust Assets and reasonable fees and expenses in connection with, arising out of, or related to, the Litigation Trust Assets and litigations associated therewith), (ii) to pay the costs and expenses of the valuations of the Litigation Trust Assets incurred by the Litigation Trust Board and/or the Litigation Trustee in accordance with Section 5.1(c) of this Agreement, (iii) to pay or reimburse amounts in accordance with Article 7 hereof and (iv) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets of the Litigation Trust are otherwise subject) in accordance with this Agreement.

**3.4     Distributions**

The Litigation Trustee shall make distributions of Litigation Trust Proceeds in accordance with the provisions of Article 6 of this Agreement.

**3.5     Tenure, Removal, and Replacement of the Litigation Trustee**

(a)     Each Litigation Trustee will serve until the earliest of (i) the completion of all the Litigation Trustee's duties, responsibilities and obligations under this Agreement, (ii) the Litigation Trustee's resignation and the appointment of a successor pursuant to Section 3.5(b) of this Agreement, (iii) the Litigation Trustee's removal pursuant to Section 3.5(c) of this Agreement, (iv) the Litigation Trustee's death (if applicable) and (v) the termination of the Litigation Trust in accordance with this Agreement.

(b)     The Litigation Trustee may resign by giving not less than 90 days' prior written notice to the Litigation Trust Board.  Such resignation will become effective on the later to occur of: (i) the day specified in such written notice and (ii) the appointment of a successor trustee as provided herein and the acceptance by such successor trustee of such appointment in accordance with Section 3.6 of this Agreement.  If a successor trustee is not appointed or does not accept its appointment within 90 days following delivery of notice of resignation, the Litigation Trustee may file a motion with the CCAA Court, upon notice and hearing, for the appointment of a successor trustee.

(c)     The Litigation Trustee may be removed for any reason by majority vote of the members of the Litigation Trust Board.

(d)     In the event of a vacancy in the position of the Litigation Trustee (whether by removal, resignation, or death, if applicable), the vacancy will be filled by the appointment of a successor trustee by (i) majority vote of the members of the Litigation Trust Board, and by the acceptance of the Litigation Trust by the successor trustee in accordance with Section 3.6 of this Agreement or (ii) an order of the CCAA Court after an opportunity for a hearing (provided, however, that only the Litigation Trust Board shall have standing to seek such an order (and the Litigation Trust Board shall only seek such an order upon a majority vote of the members of the Litigation Trust Board, except as provided in Section 3.5(b) of

this Agreement).  If a successor trustee is appointed as provided in clause (i) or (ii) of the preceding sentence, and such appointment is accepted by the successor trustee in accordance with Section 3.6 of this Agreement, the Litigation Trust Board shall provide notice of such appointment to the holders of the Litigation Trust Interests, which notice will include the name, address, and telephone number of the successor trustee provided, however, that, the provision of such notice shall not be a condition precedent to the vesting in the successor Litigation Trustee of all the estates, properties, rights, powers, trusts, and duties of its predecessor.

(e)     Immediately upon the appointment of any successor trustee, all rights, powers, duties, authority, and privileges of the predecessor Litigation Trustee hereunder will be vested in and undertaken by the successor trustee without any further act; and the successor trustee will not be liable personally for any act or omission of the predecessor Litigation Trustee.  A successor trustee shall have all the rights, privileges, powers, and duties of its predecessor under this Agreement.

(f)     Upon the appointment of a successor trustee, the predecessor Litigation Trustee (or the duly appointed legal representative of a deceased Litigation Trustee) shall, if applicable, when requested in writing by the successor trustee or the CCAA Court, execute and deliver an instrument or instruments conveying and transferring to such successor trustee upon the trust herein expressed all the estates, properties, rights, powers and trusts of such predecessor Litigation Trustee, and shall duly assign, transfer, and deliver to such successor trustee all property and money held hereunder, and all other assets, documents, instruments, records and other writings relating to the Litigation Trust, the Litigation Trust Assets, the Litigation Trust Proceeds, the Litigation Funding Amount, and the Litigation Trust Interests, then in its possession and held hereunder, and shall execute and deliver such documents, instruments and other writings as may be requested by the successor trustee or the CCAA Court to effect the termination of such predecessor Litigation Trustee's capacity under the Litigation Trust, this Agreement and the Plan and otherwise assist and cooperate, without cost or expense to the predecessor Litigation Trustee, in effectuating the assumption of its obligations and functions by the successor trustee.

(g)     During any period in which there is a vacancy in the position of Litigation Trustee, the Litigation Trust Board shall appoint one of its members to serve as interim Litigation Trustee (the "**Interim Trustee**").  The Interim Trustee shall be subject to all the terms and conditions applicable to a Litigation Trustee hereunder.  Such Interim Trustee shall not be limited in any manner from exercising any rights or powers as a member of the Litigation Trust Board merely by its appointment as Interim Trustee.

(h)     The death, resignation or removal of the Litigation Trustee shall not terminate the Litigation Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Litigation Trustee.

### 3.6     Acceptance of Appointment by Successor Trustee

Any successor trustee appointed hereunder shall execute an instrument accepting such appointment and assuming all of the obligations of the predecessor Litigation Trustee hereunder and accepting the terms of this Agreement and agreeing that the provisions of this Agreement shall be binding upon and inure to the benefit of the successor trustee and all of its heirs, and legal and personal representatives, successors and assigns, and thereupon the successor trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts, and duties of its predecessor Litigation Trustee in the Litigation Trust hereunder with like effect as if originally named herein.

### 3.7     Regular Meetings of the Litigation Trustee and the Litigation Trust Board

Meetings of the Litigation Trustee, on one hand, and the Litigation Trust Board, on the other, are to be held with such frequency and at such place as the Litigation Trust Board may determine in its sole discretion, but in no event shall such meetings be held less frequently than one time during each quarter of each calendar year.

### 3.8     Special Meetings of the Litigation Trustee and the Litigation Trust Board

Special meetings of the Litigation Trustee on the one hand, and the Litigation Trust Board, on the other, may be held whenever and wherever called for either by the Litigation Trustee or at least two members of the Litigation Trust Board.

### 3.9     Notice of, and Waiver of Notice for Litigation Trustee and Litigation Trust Board Meeting

Notice of the time and place (but not necessarily the purpose or all of the purposes) of any regular or special meeting of the Litigation Trust Board will be given to the Litigation Trustee and the members of the Litigation Trust Board in person or by telephone, or via mail, electronic mail, or facsimile transmission.   Notice to the Litigation Trustee and the members of the Litigation Trust Board of any such special meeting of the Litigation Trust Board will be deemed given sufficiently in advance when (i) if given by mail, the same is deposited in the mail at least ten calendar days before the meeting date, with postage thereon prepaid, (ii) if given by electronic mail or facsimile transmission, the same is transmitted at least one Business Day prior to the convening of the meeting, or (iii) if personally delivered (including by overnight courier) or given by telephone, the same is handed, or the substance thereof is communicated over the telephone, to the Litigation Trustee and the members of the Litigation Trust Board or to an adult member of his/her office staff or household, at least one Business Day prior to the convening of the meeting.   The Litigation Trustee and any member of the Litigation Trust Board may waive notice of any meeting of the Litigation Trust Board and any adjournment thereof at any time before, during, or after it is held, subject to applicable law.   Except as provided in the next sentence below, the waiver must be in writing, signed by the Litigation Trustee or the applicable member or members of the Litigation Trust Board entitled to the notice, and filed with the minutes or records of the Litigation Trust.   The attendance of the Litigation Trustee or a member of the Litigation Trust Board at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning

- 12 -                                                        DRAFT

of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

### 3.10    Manner of Acting

The Litigation Trustee or any member of the Litigation Trust Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.  The Litigation Trustee or any member of the Litigation Trust Board participating in a meeting by this means is deemed to be present in person at the meeting.

### 3.11    Role of the Litigation Trustee

In furtherance of and consistent with the purpose of the Litigation Trust, the Litigation Trustee, subject to the terms and conditions contained herein, shall have the power to (i) prosecute, compromise and settle, abandon or dismiss for the benefit of the Litigation Trust Beneficiaries all Litigation Trust Claims transferred to the Litigation Trust (whether such suits are brought in the name of the Litigation Trust, the Litigation Trustee or otherwise), and (ii) otherwise perform the functions and take the actions provided for or permitted in this Agreement.   In all circumstances, the Litigation Trustee shall act in the best interests of the Litigation Trust Beneficiaries and in furtherance of the purpose of the Litigation Trust.

### 3.12    Authority of Litigation Trustee

Subject to any limitations contained herein (including Article 4 hereof and Sections 1.1 and 3.4 of this Agreement) or in the Plan, but in addition to the other powers and authorities granted to the Litigation Trustee and set forth in this Agreement, the Litigation Trustee shall have the following powers and authorities:

(a)    to hold legal title to any and all rights of the holders of Litigation Trust Interests in or arising from the Litigation Trust Assets, including collecting, receiving any and all money and other property belonging to the Litigation Trust (including any Litigation Trust Proceeds) and, subject to the approval of the Litigation Trust Board, the right to vote any claim or interest relating to a Litigation Trust Claim in any proceeding and receive any distribution thereon;

(b)    in consultation with and subject to the approval of the Litigation Trust Board, to perform the duties, exercise the powers, and assert the rights of a trustee, including commencing, prosecuting or settling causes of action, enforcing contracts or asserting claims, defenses, offsets and privileges;

(c)    in consultation with and subject to the approval of the Litigation Trust Board, to protect and enforce the rights to the Litigation Trust Claims by any method deemed appropriate including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

- 13 -                                                                    DRAFT

(d)     in consultation with and subject to the approval of the Litigation Trust Board, to obtain reasonable insurance coverage with respect to the liabilities and obligations of the Litigation Trustee and the Litigation Trust Board under this Agreement (in the form of any errors and omissions policy or otherwise);

(e)     in consultation with and subject to the approval of the Litigation Trust Board, to obtain insurance coverage with respect to real and personal property that may become assets of the Litigation Trust, if any;

(f)     in consultation with and subject to the approval of the Litigation Trust Board, to retain and pay such counsel and other professionals, including any professionals previously retained by the ad hoc committee of Noteholders (the "**Ad Hoc Committee**") or SFC, as the Litigation Trustee shall select to assist the Litigation Trustee in its duties, on such terms as the Litigation Trustee and the Litigation Trust Board deem reasonable and appropriate, without CCAA Court approval; and subject to the approval of the Litigation Trust Board, the Litigation Trustee may commit the Litigation Trust to and shall pay such counsel and other professionals reasonable compensation for services rendered (including on an hourly, contingency, or modified contingency basis) and reasonable and documented out-of-pocket expenses incurred;

(g)     in consultation with and subject to the approval of the Litigation Trust Board, to retain and pay an accounting firm to perform such reviews and/or audits of the financial books and records of the Litigation Trust as may be required by applicable laws (including, if applicable, securities laws) and/or this Agreement, and to prepare and file any tax returns, informational returns or periodic and current reports for the Litigation Trust as required by applicable laws (including, if applicable, securities laws) and/or by this Agreement; subject to the approval of the Litigation Trust Board, the Litigation Trustee may commit the Litigation Trust to and shall pay such accounting firm reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred;

(h)     in consultation with and subject to the approval of the Litigation Trust Board, to retain, enter into fee arrangements with and pay such third parties to assist the Litigation Trustee in carrying out its powers, authorities and duties under this Agreement; subject to the approval of the Litigation Trust Board, the Litigation Trustee may commit the Litigation Trust to and shall pay all such Persons reasonable compensation for services rendered and reasonable and documented out-of-pocket expenses incurred, as well as commit the Litigation Trust to indemnify any such Persons in connection with the performance of services (provided that such indemnity shall not cover any losses, costs, damages, expenses or liabilities that result from the gross negligence, bad faith, wilful misconduct or knowing violation of law by such Persons);

(i)     in consultation with and subject to the approval of the Litigation Trust Board, to waive any privilege (including the Privileges) or any defence on behalf of the Litigation Trust or, with respect to the Litigation Trust Claims;

- 14 -                                                    DRAFT

(j)      in consultation with and subject to the approval of the Litigation Trust Board, to investigate, analyze, compromise, adjust, arbitrate, mediate, sue on or defend, pursue; prosecute, abandon, dismiss, exercise rights, powers, and privileges with respect to, or otherwise deal with and settle, in accordance with the terms set forth herein, all causes of action in favour of or against the Litigation Trust;

(k)      in consultation with and subject to the approval of the Litigation Trust Board, and solely with respect to Litigation Trust Claims, to avoid and recover transfers of SFC's property as may be permitted by applicable law;

(l)      to invest any moneys held as part of the Litigation Trust in accordance with the terms of Section 3.19 of this Agreement;

(m)      in consultation with and subject to the approval of the Litigation Trust Board, to request any appropriate tax determination with respect to the Litigation Trust;

(n)      subject to applicable securities and other laws, if any, to establish and maintain a website for the purpose of providing notice of Litigation Trust activities in lieu of sending written notice to the holders of the Litigation Trust Interests and other such Persons entitled thereto, subject to providing notice of such website to such holders and other Persons;

(o)      in consultation with and subject to the approval of the Litigation Trust Board, to seek the examination of any Person, subject to the provisions of any applicable laws or rules;

(p)      to make distributions in accordance with Article 6 of this Agreement; and

(q)      to take or refrain from taking any and all other actions that the Litigation Trustee, upon consultation with and subject to the approval of the Litigation Trust Board, reasonably deems necessary or convenient for the continuation, protection and maximization of the Litigation Trust Claims or to carry out the purposes hereof, provided, however, that the Litigation Trustee shall not be required to consult with or obtain approval of the Litigation Trust Board, to the extent such actions are purely ministerial in nature.

## 3.13    Limitation of Litigation Trustee's Authority

(a)      Notwithstanding anything herein to the contrary, the Litigation Trustee shall not (i) be authorized to engage in any trade or business or (ii) take any such actions as would be inconsistent with the purposes of this Agreement, the preservation of the assets of the Litigation Trust and the best interests of the Litigation Trust Beneficiaries.

(b)      [The Litigation Trust shall not hold 50% or more of the stock (in either vote or value) of any Person that is treated as a corporation for federal income tax purposes, nor be the sole member of a limited liability company, nor have any interest in a Person that is treated as a partnership for federal income tax purposes,

- 15 -                                                      DRAFT

unless such stock, membership interest, or partnership interest was obtained involuntarily or as a matter of practical economic necessity in order to preserve the value of the Litigation Trust Assets.]

**3.14    Books and Records**

    (a)    The Litigation Trustee shall maintain books and records relating to the Litigation Trust Assets and the Litigation Trust Proceeds and the payment of expenses of, liabilities of, and claims against or assumed by, the Litigation Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof.  Such books and records shall be maintained on a modified cash or other comprehensive basis of accounting necessary to facilitate compliance with the tax reporting and securities law requirements, if any, of the Litigation Trust as well as the reporting requirements set forth in Article 8 and elsewhere in this Agreement.  Nothing in this Agreement requires the Litigation Trustee to file any accounting or seek approval of any court with respect to the administration of the Litigation Trust, or as a condition for managing any payment or distribution out of the assets of the Litigation Trust.

    (b)    Holders of the Litigation Trust Interests and their duly authorized representatives shall have the right, upon reasonable prior written notice to the Litigation Trustee, and in accordance with the reasonable regulations prescribed by the Litigation Trustee, to inspect and, at the sole expense of such holder seeking the same, make copies of the books and records relating to the Litigation Trust on any Business Day and as often as may be reasonably be desired, in each case for a purpose reasonably related to such holder's Litigation Trust Interests and subject to the confidentiality restrictions set forth in Section 2.5(c) and any other confidentiality restrictions as the Litigation Trustee or the Litigation Trust Board many deem appropriate.

**3.15    Inquiries into Trustee's Authority**

Except as otherwise set forth in this Agreement or the Plan, no Person dealing with the Litigation Trust shall be obligated to inquire into the authority of the Litigation Trustee in connection with the protection, conservation or disposition of the Litigation Trust Claims.

**3.16    Compliance with Laws**

Any and all distributions of assets of the Litigation Trust shall be in compliance with applicable laws, including applicable provincial securities laws.

**3.17    Compensation of the Litigation Trustee**

Notwithstanding anything to the contrary contained herein, the Litigation Trustee shall be compensated for its services, and reimbursed for its expenses, in accordance with, and pursuant to the terms of, a separate agreement to be negotiated and executed by the Litigation Trust Board, which agreement shall not be subject to any third-party notice or approval.

- 16 -                                          DRAFT

**3.18    Reliance by Litigation Trustee**

Except as otherwise provided herein:

(a)    the Litigation Trustee may rely on, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably believed by the Litigation Trustee to be genuine and to have been signed or presented by the proper party or parties; and

(b)    Persons dealing with the Litigation Trustee shall look only to the assets of the Litigation Trust to satisfy any liability incurred by the Litigation Trustee to such Person in carrying out the terms of this Agreement, and neither the Litigation Trustee nor any member of the Litigation Trust Board shall have any personal obligation to satisfy any such liability.

**3.19    Investment and Safekeeping of Litigation Trust Assets**

Subject to Sections 1.1 and 3.4 of this Agreement, the Litigation Trustee shall invest all Litigation Trust Assets (other than Litigation Trust Claims), all Litigation Trust Proceeds, the Litigation Funding Amount and all income earned by the Litigation Trust (pending distribution in accordance with Article 6 of this Agreement) only in cash and government securities, and the Litigation Trustee may retain any Litigation Trust Proceeds received that are not cash only for so long as may be required for the prompt and orderly liquidation of such assets into cash.

**3.20    Standard of Care; Exculpation**

Neither the Litigation Trustee nor any of its duly designated agents or representatives or professionals shall be liable for any act or omission taken or omitted to be taken by the Litigation Trustee in good faith, other than (i) acts or omissions resulting from the Litigation Trustee's or any such agent's, representative's or professional's gross negligence, bad faith, wilful misconduct or knowing violation of law or (ii) acts or omissions from which the Litigation Trustee or any such agent, representative or professional derived an improper personal benefit. The Litigation Trustee may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its counsel, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons.    Notwithstanding such authority, the Litigation Trustee shall be under no obligation to consult with its counsel, accountants, financial advisors or agents, and its good faith determination not to do so shall not result in the imposition of liability on the Litigation Trustee, unless such determination is based on gross negligence, bad faith, wilful misconduct or knowing violation of law.  No amendment, modification or repeal of this Section 3.20 shall adversely affect any right or protection of the Litigation Trustee or any of its agents, representatives or professionals that exists at the time of such amendment, modification or repeal.

- 17 -                                         DRAFT

# ARTICLE 4
# LITIGATION TRUST BOARD

## 4.1    Litigation Trust Board

A litigation trust board (the "**Litigation Trust Board**") shall be established and consist of three Persons.  The initial Litigation Trust Board members shall consist of the three Persons appointed to serve in such capacity pursuant to the Sanction Order.  The members of the Litigation Trust Board shall have the right to direct and remove the Litigation Trustee in accordance with Section 3.5(c) of this Agreement, and shall have such other rights to operate and manage the Litigation Trust as are not inconsistent with the terms of this Agreement.  No holder of Litigation Trust Interests (except to the extent such holder is a member of the Litigation Trust Board) shall have any consultation or approval rights whatsoever in respect of management and operation of the Litigation Trust.

## 4.2    Authority of the Litigation Trust Board

The Litigation Trust Board shall have the authority and responsibility to oversee, review, and guide the activities and performance of the Litigation Trustee and shall have the authority to remove the Litigation Trustee in accordance with Section 3.5(c) of this Agreement.   The Litigation Trustee shall consult with and provide information to the Litigation Trust Board in accordance with and pursuant to the terms of this Agreement and the Plan.  The Litigation Trust Board shall have the authority to select and engage such Persons, and select and engage such professional advisors, including any professional previously retained by the Ad Hoc Committee or SFC, in accordance with the terms of this Agreement, as the Litigation Trust Board deems necessary and desirable to assist the Litigation Trust Board in fulfilling its obligations under this Agreement.  The Litigation Trustee shall pay the reasonable fees of such Persons and firms (including on an hourly, contingency, or modified contingency basis) and reimburse such Persons for their reasonable and documented out-of-pocket costs and expenses consistent with the terms of this Agreement.

## 4.3    Regular Meetings of the Litigation Trust Board

Meetings of the Litigation Trust Board are to be held with such frequency and at such place as the Litigation Trustee and the members of the Litigation Trust Board may determine in their reasonable discretion, but in no event shall such meetings be held less frequently than one time during each quarter of each calendar year.

## 4.4    Special Meetings of the Litigation Trust Board

Special meetings of the Litigation Trust Board may be held whenever and wherever called for by the Litigation Trustee or any two members of the Litigation Trust Board.

## 4.5    Manner of Acting

(a)    A majority of the total number of members of the Litigation Trust Board then in office shall constitute a quorum for the transaction of business at any meeting of the Litigation Trust Board; provided, however, that all decisions or approvals or

other actions of the Litigation Trust Board shall require the affirmative vote of a majority of all of the members of the Litigation Trust Board, and such an affirmative vote obtained as to any particular matter, decision, approval or other action at a meeting at which a quorum is present shall be the act of the Litigation Trust Board, except as otherwise required by law or as provided in this Agreement.

(b)     Voting may, if approved by the majority of all of the members of the Litigation Trust Board, be conducted by electronic mail or individual communications by the Litigation Trustee and each member of the Litigation Trust Board.

(c)     Any member of the Litigation Trust Board who is present and entitled to vote at a meeting of the Litigation Trust Board (including any meeting of the Litigation Trustee and the Litigation Trust Board) when action is taken is deemed to have assented to the action taken, subject to the requisite vote of the Litigation Trust Board unless: (i) such member of the Litigation Trust Board objects at the beginning of the meeting (or promptly upon his/her arrival) to holding it or transacting business at the meeting; or (ii) his/her dissent or abstention from the action taken is entered in the minutes of the meeting; or (iii) he/she delivers written notice (including by electronic or facsimile transmission) of his/her dissent or abstention to the Litigation Trust Board before its adjournment.  The right of dissent or abstention is not available to any member of the Litigation Trust Board who votes in favour of the action taken.

(d)     Prior to the taking of a vote on any matter or issue or the taking of any action with respect to any matter or issue, each member of the Litigation Trust Board shall report to the Litigation Trust Board any conflict of interest such member has or may have with respect to the matter or issue at hand and fully disclose the nature of such conflict or potential conflict (including disclosing any and all financial or other pecuniary interests that such member might have with respect to or in connection with such matter or issue, other than solely as a holder of a Litigation Trust Interest).  A member who has or who may have a conflict of interest shall be deemed to be a "conflicted member" who shall not be entitled to vote or take part in any action with respect to such matter or issue (provided, however, such member shall be counted for purposes of determining the existence of a quorum); the vote or action with respect to such matter or issue shall be undertaken only by members of the Litigation Trust Board who are not "conflicted members" and, notwithstanding anything contained herein to the contrary, the affirmative vote of only a majority of the members of the Litigation Trust Board who are not "conflicted members" shall be required to approve of such matter or issue and the same shall be the act of the Litigation Trust Board.

## 4.6     Litigation Trust Board's Action Without a Meeting

Any action required or permitted to be taken by the Litigation Trust Board at a meeting of the Litigation Trust Board may be taken without a meeting if the action is taken by unanimous written consent of the Litigation Trust Board as evidenced by one or more written consents

describing the action taken, signed by all members of the Litigation Trust Board and recorded in the minutes or other transcript of proceedings of the Litigation Trust Board.

**4.7    Notice of, and Waiver of Notice for Litigation Trust Board Meetings**

Notice of the time and place (but not necessarily the purpose or all of the purposes) of any regular or special meeting of the Litigation Trust Board will be given to the members of the Litigation Trust Board in person or by telephone, or via mail, electronic mail, or facsimile transmission.  Notice to the members of the Litigation Trust Board of any such special meeting will be deemed given sufficiently in advance when (i) if given by mail, the same is deposited in the United States mail at least ten calendar days before the meeting date, with postage thereon prepaid, (ii) if given by electronic mail or facsimile transmission, the same is transmitted at least one Business Day prior to the convening of the meeting, or (iii) if personally delivered (including by overnight courier) or given by telephone, the same is handed, or the substance thereof is communicated over the telephone to the members of the Litigation Trust Board or to an adult member of his/her office staff or household, at least one Business Day prior to the convening of the meeting.  Any member of the Litigation Trust Board may waive notice of any meeting and any adjournment thereof at any time before, during, or after it is held, subject to applicable law.  Except as provided in the next sentence below, the waiver must be in writing, signed by the applicable member or members of the Litigation Trust Board entitled to the notice.  The attendance of a member of the Litigation Trust Board at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

**4.8    Telephonic Communications**

Any member of the Litigation Trust Board may participate in a regular or special meeting of the Litigation Trust Board by, or conduct the meeting through the use of, conference telephone, or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.  Any member of the Litigation Trust Board participating in a meeting by this means is deemed to be present in person at the meeting.

**4.9    Tenure, Removal and Replacement of the Members of the Litigation Trust Board**

The authority of the members of the Litigation Trust Board will be effective as of the Effective Date and will remain and continue in full force and effect until the Litigation Trust is terminated in accordance with Section 8.1 hereof.  The service of the members of the Litigation Trust Board will be subject to the following:

(a)    The members of the Litigation Trust Board will serve until death or resignation pursuant to Section 4.9(b) of this Agreement, or removal pursuant to Section 4.9(c) of this Agreement.

(b)    A member of the Litigation Trust Board may resign at any time by providing a written notice of resignation to the remaining members of the Litigation Trust

DRAFT

Board.  Such resignation will be effective upon the date received by the Litigation Trust Board or such later date specified in the written notice.

(c)      A member of the Litigation Trust Board may be removed by the majority vote of the other members of the Litigation Trust Board, written resolution of which shall be delivered to the removed Litigation Trust Board member; provided, however, that such removal may only be made for Cause.   For purposes of this Section 4.9(c), "**Cause**" shall be defined as: (i) such Litigation Trust Board member's theft or embezzlement or attempted theft or embezzlement of money or tangible or intangible assets or property; (ii) such Litigation Trust Board member's violation of any law (whether foreign or domestic), which results in an indictable offence or similar judicial proceeding; (iii) such Litigation Trust Board member's gross negligence, bad faith, wilful misconduct or knowing violation of law, in the performance of his or her duties as a member of the Litigation Trust Board; or (iv) such Litigation Trust Board member's failure to perform any of his or her other material duties under this Agreement (including the regular attendance at meetings of the Litigation Trust Board and of the Litigation Trustee and the Litigation Trust Board); provided, however, that such Litigation Trust Board member shall have been given a reasonable period to cure any alleged Cause under clauses (iii) (other than bad faith, wilful misconduct or knowing violation of law) and (iv).

(d)      In the event of a vacancy on the Litigation Trust Board (whether by removal, death or resignation), the remaining members of the Litigation Trust Board shall appoint a new member to fill such position.  In the event that there are no members of the Litigation Trust Board selected or appointed in accordance with the preceding sentence, appointments to fill such vacancies that would have been made in accordance with the preceding sentence shall be made by the Litigation Trustee, following consultation with, and with the consent of, the Monitor.  Upon any such appointment of a successor member of the Litigation Trust Board, Litigation Trustee shall provide the holders of the Litigation Trust Interests with notice of the name of the new member of the Litigation Trust Board, provided, however, that the provision of such notice shall not be a condition precedent to the rights and power of the new member of the Litigation Trust Board to act in such capacity.

(e)      Immediately upon the appointment of any successor member of the Litigation Trust Board all rights, powers, duties, authority, and privileges of the predecessor member of the Litigation Trust Board hereunder will be vested in and undertaken by the successor member of the Litigation Trust Board without any further act; and the successor member of the Litigation Trust Board will not be liable personally for any act or omission of the predecessor member of the Litigation Trust Board.

## 4.10    Compensation of the Litigation Trust Board

Each member of the Litigation Trust Board shall be paid by the Litigation Trust the amount of [$●] annually as compensation for his or her services hereunder as a member of the Litigation

- 21 -                                                                                    DRAFT

Trust Board.  In addition, each member of the Litigation Trust Board shall be entitled to be reimbursed from the Litigation Trust for his or her reasonable and documented out-of-pocket expenses incurred in connection with the performance of his or her duties hereunder by the Litigation Trust upon demand for payment thereof.

**4.11    Standard of Care; Exculpation**

None of the Litigation Trust Board, its respective members, designees, professionals, or duly designated agents or representatives, shall be liable for the act or omission of any other member, designee, professional, agent, or representative of the Litigation Trust Board, nor shall any member of the Litigation Trust Board be liable for any act or omission taken or omitted to be taken by the Litigation Trust Board in good faith, other than for (i) acts or omissions resulting from the Litigation Trust Board's or any such member's, designee's, professional's, agent's or representative's gross negligence, bad faith, wilful misconduct or knowing violation of law or (ii) acts or omissions from which the Litigation Trust Board or such member, designee, professional, agent or representative derived an improper personal benefit.  The Litigation Trust Board may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with the Litigation Trust Board's counsel, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in good faith in accordance with advice or opinions rendered by such Persons.  Notwithstanding such authority, none of the Litigation Trust Board or any of its members shall be under any obligation to consult with the Litigation Trust Board's counsel, accountants, financial advisors or agents, and their good faith determination not to do so shall not result in the imposition of liability on the Litigation Trust Board or, as applicable, any of its members, designees, professionals, agents or representatives, unless such determination is based on gross negligence, bad faith, wilful misconduct or knowing violation of law.  No amendment modification or repeal of this Section 4.11 shall adversely affect any right or protection of the Litigation Trust Board, its members, designees, professional agents or representatives that exists at the time of such amendment, modification or repeal.

**ARTICLE 5**
**TAX MATTERS**

**5.1    [Federal Income Tax Treatment of the Litigation Trust**

(a)    For all federal income tax purposes, all parties (including SFC and the other Litigation Trust Claims Transferors, the Litigation Trustee, the Litigation Trust Board and the Litigation Trust Beneficiaries) shall treat the transfer of the Litigation Trust Assets to the Litigation Trustee for the benefit of the Litigation Trust Beneficiaries as (a) a transfer of the Litigation Trust Assets directly to those Litigation Trust Beneficiaries receiving Litigation Trust Interests (other than to the extent allocable to Unresolved Claims), followed by (b) the transfer by such Litigation Trust Beneficiaries to the Litigation Trustee of the Litigation Trust Assets in exchange for the Litigation Trust Interests (and in respect of the Litigation Trust Assets allocable to the Unresolved Claims, as a transfer to the Unresolved Claims Reserve by the Litigation Trust Claim Transferors). Accordingly, those Litigation Trust Beneficiaries receiving Litigation Trust Interests shall be treated for federal income tax purposes as the grantors and

- 22 -                                                    DRAFT

owners of their respective shares of the Litigation Trust Assets.  The foregoing treatment also shall apply, to the extent permitted by applicable law, for provincial and local income tax purposes.]

(b)    [Subject to definitive guidance from the ● or a court of competent jurisdiction to the contrary (including receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests one, or the receipt of an adverse determination by the ●, upon audit, or otherwise if not contested by the Litigation Trustee), the Litigation Trustee shall file returns for the Litigation Trust as a grantor trust pursuant to [Treasury Regulation section 1.671-4(a)] and in accordance with this Article 5.  The Litigation Trustee shall also annually send to each holder of a Litigation Trust Interest a separate statement setting forth such holder's share of items of income, gain, loss, deduction, or credit and will instruct all such holders and parties to report such items on their federal income tax returns.  The Litigation Trustee also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Litigation Trust that are required by any governmental unit.]

(c)    [As soon as possible after the creation of the Litigation Trust, but in no event later than 60 days thereafter, the Litigation Trust Board shall inform, in writing, the Litigation Trustee of the fair market value of the Litigation Trust Assets transferred to the Litigation Trust based on the good faith determination of the Litigation Trust Board, and the Litigation Trustee shall apprise, in writing, the Litigation Trust Beneficiaries of such valuation.  The valuation shall be used consistently by all parties (including SFC and the other Litigation Trust Claim Transferors, the Litigation Trustee, the Litigation Trust Board and the Litigation Trust Beneficiaries) for all federal income tax purposes.  As soon as possible after the Effective Date, the Litigation Trustee shall make such valuation prepared by the Litigation Trust Board available from time to time, to the extent relevant, and such valuation shall be used consistently by all parties (including SFC and the other Litigation Trust Claim Transferors, the Litigation Trustee, the Litigation Trust Board and the Litigation Trust Beneficiaries) for all federal income tax purposes.  In connection with the preparation of the valuation contemplated hereby, the Litigation Trust Board shall be entitled to retain such professionals and advisers as the Litigation Trust Board shall determine to be appropriate or necessary, and the Litigation Trust Board shall take such other actions in connection therewith as it determines to be appropriate or necessary in connection therewith.  The Litigation Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any Persons retained by the Litigation Trust Board in connection therewith.]

(d)    [The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust for all returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.]

- 23 -                                                  DRAFT

(e)    [The Litigation Trustee shall be responsible for payments, out of the Litigation Trust Assets and Litigation Trust Proceeds, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets.]

(f)    [The Litigation Trustee may require any of the Litigation Trust Beneficiaries to furnish to the Litigation Trustee its Employer or Taxpayer Identification Number as assigned by the ● and the Litigation Trustee may condition any distribution or payment to any of them upon receipt of such identification number.]

## 5.2    Allocations of Litigation Trust Taxable Income

[Allocations of Litigation Trust taxable income among the holders of the Litigation Trust Interests shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on distributions described herein) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all of its other assets (valued at their tax book value) to the holders of the Litigation Trust Interests, in each case up to the tax book value of the assets treated as contributed by such holders, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust (including all distributions held in escrow pending the resolution of Unresolved Claims).  Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Assets.  The tax book value of the Litigation Trust Assets for this purpose shall equal their fair market value on the Effective Date as determined under Section 5.1(c) above, adjusted in either case in accordance with tax accounting principles prescribed by the [Tax Code], and applicable tax regulations, and other applicable administrative and judicial authorities and pronouncements.]

## 5.3    Canadian Tax Treatment of Distributions by Litigation Trustee

Amounts distributed by the Litigation Trustee shall be treated as distributions of income or capital for Canadian federal income tax purposes, as determined by the Litigation Trustee. The Litigation Trustee shall be entitled to file any election for tax purposes which it considers desirable or appropriate. The Litigation Trustee may create a legally enforceable right of Litigation Trust Beneficiaries in respect of any particular distribution to enforce payment of that distribution on or before December 31 of the relevant taxation year of the Litigation Trust.

## ARTICLE 6
## DISTRIBUTIONS

## 6.1    Distributions; Withholding

Subject to Sections 1.1 and 3.4 of this Agreement, the Litigation Trustee shall distribute, in accordance with this Article 6, to the holders of the Litigation Trust Interests the Litigation Trust Proceeds (including, without limitation, all net cash income plus all net cash proceeds from the liquidation of Litigation Trust Assets (including as cash, for this purpose, all cash equivalents), but excluding, for greater certainty, the Litigation Funding Amount or any remaining portion

thereof); provided, however, that the Litigation Trust may retain and not distribute to holders of the Litigation Trust Interests such amounts as determined by the Litigation Trust Board (i) as are reasonably necessary to meet contingent liabilities of the Litigation Trust during liquidation and (ii) to pay reasonable and necessary administrative expenses incurred in connection with liquidation and any taxes imposed on the Litigation Trust or in respect of the Litigation Trust Assets, and provided further that prior to any distribution of Litigation Trust Proceeds to the holders of the Litigation Trust Interests, the Litigation Trustee shall first pay to Newco an amount in cash equivalent to the Litigation Funding Amount. All distributions and/or payments to be made to the holders of the Litigation Trust Interests pursuant to this Agreement shall be made to the holders of the Litigation Trust Interests pro rata based on the amount of Litigation Trust Interests held by a holder compared with the aggregate amount of the Litigation Trust Interests outstanding, subject, in each case, to the terms of the Plan and this Agreement. The Litigation Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

**6.2      Manner of Payment or Distribution**

All distributions to be made by the Litigation Trustee hereunder to the holders of the Litigation Trust Interests shall be made to a disbursing agent acceptable to the Litigation Trust Board for further distribution to the holders of the Litigation Trust Interests and shall be payable to the holders of Litigation Trust Interests of record as of the 20th day prior to the date scheduled for the distribution, unless such day is not a Business Day, then such day shall be the following Business Day. If the distribution shall be in cash, the Litigation Trustee shall distribute such cash by wire, check, or such other method as the Litigation Trustee deems appropriate under the circumstances.

**6.3      Cash Distributions**

No cash distributions shall be required to be made to any holders of a Litigation Trust Interest in an amount less than $100.00. Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions. Notwithstanding the foregoing, all cash shall be distributed in the final distribution of the Litigation Trust.

**ARTICLE 7**
**INDEMNIFICATION**

**7.1      Indemnification of Litigation Trustee and the Litigation Trust Board**

(a)      To the fullest extent permitted by law, the Litigation Trust, to the extent of its assets legally available for that purpose, shall indemnify and hold harmless the Litigation Trustee, each of the members of the Litigation Trust Board and each of their respective directors, members, shareholders, partners, officers, agents, employees, counsel and other professionals (collectively, the "**Indemnified Persons**") from and against any and all losses, costs, damages, reasonable and documented out-of-pocket expenses (including reasonable fees and expenses of counsel and other advisors and any court costs incurred by any Indemnified Person) or liability by reason of anything any Indemnified Person did, does, or

- 25 -                                    DRAFT

refrains from doing for the business or affairs of the Litigation Trust, except to the extent that the loss, cost, damage, expense or liability resulted (x) from the Indemnified Person's gross negligence, bad faith, wilful misconduct or knowing violation of law or (y) from an act or omission from which the Indemnified Person derived an improper personal benefit. To the extent reasonable, the Litigation Trust shall pay in advance or reimburse reasonable and documented out-of-pocket expenses (including advancing reasonable costs of defence) incurred by the Indemnified Person who is or is threatened to be named or made a defendant or a respondent in a proceeding concerning the business and affairs of the Litigation Trust. The indemnification provided under this Section 7.1 shall survive the death, dissolution, resignation or removal, as may be applicable, of the Litigation Trustee, the Litigation Trust Board, any Litigation Trust Board member and/or any other Indemnified Person, and shall inure to the benefit of the Litigation Trustee's, each Litigation Trust Board member's and each other Indemnified Person's heirs, successors and assigns.

(b)     Any Indemnified Person may waive the benefits of indemnification under this Section 7.1, but only by an instrument in writing executed by such Indemnified Person.

(c)     The rights to indemnification under this Section 7.1 are not exclusive of other rights which any Indemnified Person may otherwise have at law or in equity, including without limitation common law rights to indemnification or contribution. Nothing in this Section 7.1 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under this Agreement, or any other agreement or instrument to which that Person is a party.

## ARTICLE 8
## REPORTING OBLIGATIONS OF LITIGATION TRUSTEE

**8.1     Reports**

(a)     The Litigation Trustee shall prepare such reports as the Litigation Trust Board shall request from time to time and shall distribute such reports to the Litigation Trust Board and, if directed by the Litigation Trust Board, to all holders of the Litigation Trust Interests as provided in this Article 8. For the avoidance of doubt, the holders of the Litigation Trust Interests shall not be entitled to any report, financial or otherwise, unless determined by the Litigation Trust Board in its sole discretion.

(b)     Without limiting the foregoing, the Litigation Trustee shall timely (i) prepare, file and distribute such statements, reports, tax returns and forms, and submissions as may be necessary to cause the Litigation Trust and the Litigation Trustee to be in compliance with all applicable laws (including any quarterly and annual reports to the extent required by applicable law or in order to gain an exemption from compliance with applicable law) and (ii) prepare and file with the CCAA Court such reports and submissions as may be required by the CCAA Court.

- 26 -                                                    DRAFT

(c)     Any report to be given to the holders of the Litigation Trust Interests at their addresses set forth in the Trust Register and filed with the CCAA Court; provided that the Litigation Trustee may post any report required to be provided to such Persons under this Section 8.1 on a web site maintained by the Litigation Trustee in lieu of actual notice, subject to providing notice of such postings to the Persons listed in Section 11.5 herein and, if required by the Litigation Trust Board in its sole discretion, to the holders of the holders of Litigation Trust Interests.

## ARTICLE 9
## TERM; TERMINATION OF THE LITIGATION TRUST

**9.1     Term; Termination of the Litigation Trust**

(a)     The Litigation Trust shall commence on the date hereof and terminate no later than the fifth anniversary of the Effective Date; provided, however, that, on or prior to the date that is 90 days prior to such termination, the Litigation Trust Board may extend the term of the Litigation Trust if it is necessary to the efficient and proper administration of the Litigation Trust Assets in accordance with the purposes and terms of this Agreement.  Notwithstanding the foregoing, multiple extensions can be obtained so long as each extension is obtained not less than 90 days prior to the expiration of each extended term; and provided, further, that neither this Agreement nor the continued existence of the Litigation Trust shall prevent SFC from terminating the CCAA Proceeding.

(b)     The Litigation Trust may be terminated earlier than its scheduled termination if: (i) the Litigation Trustee has administered all Litigation Trust Assets and performed all other duties required by this Agreement and the Litigation Trust; or (ii) if the Litigation Trustee, in consultation with and subject to the approval of the Litigation Trust Board, determines that it is not in the best interests of the Litigation Trust Beneficiaries to continue pursuing the Litigation Trust Claims. Upon termination of the Litigation Trust pursuant to subsection (ii) hereof, any and all remaining portion of the Litigation Funding Amount shall be paid to Newco in cash by wire, check, or such other method as agreed to by the Litigation Trustee and Newco.

**9.2     Continuance of Trust for Winding Up**

After the termination of the Litigation Trust and for the purpose of liquidating and winding up the affairs of the Litigation Trust, the Litigation Trustee shall continue to act as such until its duties have been fully performed.  Prior to the final distribution of all of the remaining assets of the Litigation Trust and upon approval of the Litigation Trust Board, the Litigation Trustee shall be entitled to reserve from such assets any and all amounts required to provide for its own reasonable costs and expenses, in accordance with Section 3.17, until such time as the winding up of the Litigation Trust is completed.  Upon termination of the Litigation Trust, the Litigation Trustee shall retain for a period of two years the books, records, lists of the holders of the Litigation Trust Interests, the Trust Register, and other documents and files that have been delivered to or created by the Litigation Trustee.  At the Litigation Trustee's discretion, all of such records and documents may, but need not, be destroyed at any time after two years from the

- 27 -                                                                      DRAFT

completion and winding up of the affairs of the Litigation Trust.  Except as otherwise specifically provided herein, upon the termination of the Litigation Trust, the Litigation Trustee shall have no further duties or obligations hereunder.

# ARTICLE 10
# AMENDMENT AND WAIVER

## 10.1    Amendment and Waiver

The Litigation Trustee, with the prior approval of the majority of the members of the Litigation Trust Board, may amend, supplement or waive any provision of, this Agreement, without notice to or the consent of the holders of the Litigation Trust Interests or the approval of the CCAA Court; provided, that such amendment, supplement or waiver shall not adversely affect the payments and/or distributions to be made under this Agreement to (or on behalf or for the account of) any of the holders of the Litigation Trust Interests: (i) to cure any ambiguity, omission, defect or inconsistency in this Agreement; (ii) to comply with any requirements in connection with the tax status of the Litigation Trust; (iii) to comply with any requirements in connection with maintaining that the Litigation Trust is not subject to registration or reporting requirements; (iv) to make the Litigation Trust a reporting entity and, in such event, to comply with any requirements in connection with satisfying any applicable registration or reporting requirements; (v) to evidence and provide for the acceptance of appointment hereunder by a successor trustee in accordance with the terms of this Agreement; and (vi) to achieve any other purpose that is inconsistent with the purpose and intention of this Agreement.

# ARTICLE 11
# MISCELLANEOUS PROVISIONS

## 11.1    Intention of Parties to Establish the Litigation Trust

[This Agreement is intended to create a liquidating trust for federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Agreement may be amended in accordance with Section 10.1 to comply with such federal income tax laws, which amendments may apply retroactively.]

## 11.2    Laws as to Construction

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federals laws of Canada applicable therein, without regard to whether any conflicts of law would require the application of the law of another jurisdiction.

## 11.3    Jurisdiction

Without limiting any Person's right to appeal any order of the CCAA Court with regard to any matter, (i) the CCAA Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all actions related to the foregoing shall be filed and maintained only in the