CCAA Court, and the parties, including the holders of the Litigation Trust Interests, and holders of Claims, hereby consent to and submit to the jurisdiction and venue of the CCAA Court.

## 11.4    Severability

If any provision of this Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

## 11.5    Notices

All notices, requests or other communications to the parties hereto shall be in writing and shall be sufficiently given only if (i) delivered in person; (ii) sent by electronic mail or facsimile communication (as evidenced by a confirmed fax transmission report); (iii) sent by registered or certified mail, return receipt requested; or (iv) sent by commercial delivery service or courier. Until a change of address is communicated, as provided below, all notices, requests and other communications shall be sent to the parties at the following addresses or facsimile numbers:

| | | |
|---|---|---|
| **If to the Litigation Trustee:** | **[Address]** | |
| | Telephone: | **[●]** |
| | Facsimile: | **[●]** |
| | Attn: | **[●]** |
| (with a copy to) | **[Address]** | |
| | Telephone: | **[●]** |
| | Facsimile: | **[●]** |
| | Attn: | **[●]** |
| **If to SFC:** | **[Address]** | |
| | Telephone: | **[●]** |
| | Facsimile: | **[●]** |
| | Attn: | **[●]** |
| (with a copy to) | **[Address]** | |
| | Telephone: | **[●]** |
| | Facsimile: | **[●]** |
| | Attn: | **[●]** |
| **If to the Litigation Trust Board Members:** | **[Address]** | |
| | Telephone: | **[●]** |
| | Facsimile: | **[●]** |
| | Attn: | **[●]** |

DRAFT

| | |
|---|---|
| (with a copy to) | **[Address]** |
| | Telephone:    **[●]** |
| | Facsimile:    **[●]** |
| | Attn:          **[●]** |
| **If to a holder of a** | To the name and address set forth on the Trust |
| **Litigation Trust Interest:** | Register. |

All notices shall be effective and shall be deemed delivered (i) if by personal delivery, delivery service or courier, on the date of delivery; (ii) if by electronic mail or facsimile communication, on the date of receipt or confirmed transmission of the communication; and (iii) if by mail, on the date of receipt.  Any Person from time to time may change his, her or its address, facsimile number, or other information for the purpose of notices to that Person by giving notice specifying such change to the Litigation Trustee and the Persons who are at the time of such notice members of the Litigation Trust Board.

**11.6    Fiscal Year**

The fiscal year of the Litigation Trust will begin on the first day of January and end on the last day of December of each calendar year.

**11.7    Construction; Usage**

(a)    <u>Interpretation</u>.  In this Agreement, unless a clear contrary intention appears:

(i)    the singular number includes the plural number and vice versa;

(ii)    reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

(iii)    reference to any gender includes each other gender;

(iv)    reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

(v)    reference to any applicable law means such applicable law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any applicable law means that provision of such applicable law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision;

(vi)    "hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision hereof;

(vii)    reference to Articles, Sections, Schedules or Exhibits herein shall be deemed to be references to the Articles, Sections, Schedules and Exhibits to this Agreement unless otherwise specified;

(viii)    "including" means including without limiting the generality of any description preceding such term; and

(ix)    references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto.

(b)    <u>Legal Representation of the Parties</u>.    This Agreement was negotiated by the parties and beneficiaries hereto with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any party hereto shall not apply to any construction or interpretation hereof.

(c)    <u>Headings</u>.    The headings contained in this Agreement are for the convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

## 11.8    Counterparts; Facsimile; PDF

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.    Any facsimile or portable document format copies hereof or signature hereon shall, for all purposes, be deemed originals.

## 11.9    Confidentiality

The Litigation Trustee and each successor trustee and each member of the Litigation Trust Board and each successor member of the Litigation Trust Board (each a "**Covered Person**") shall, during the period that they serve in such capacity under this Agreement and following either the termination of this Agreement or such individual's removal, incapacity, or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any Person to which any of the assets of the Litigation Trust relates or of which it has become aware in its capacity (the "**Information**"), including without limitation, the identity of any Holder of Litigation Trust Interests and the extent of their holdings thereof, except to the extent disclosure of any such information is required by applicable law, order, regulation or legal process.    In the event that any Covered Person is requested or required (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigation, demand or similar legal process) to disclose any Information, such Covered Person shall notify the Litigation Trust Board reasonably promptly (unless prohibited by law) so that the Litigation Trust Board may seek an appropriate protective order or other appropriate remedy or, in its discretion, waive compliance with the terms of this Section 11.9 (and if the Litigation Trust

Board seeks such an order, the relevant Covered Person will provide cooperation as the Litigation Trust Board shall reasonably request). In the event that no such protective order or other remedy is obtained, or that the Litigation Trust Board waives compliance with the terms of this Section 11.9 and that any Covered Person is nonetheless legally compelled to disclose the Information, the Covered Person will furnish only that portion of the Information, which the Covered Person, advised by counsel, is legally required and will give the Litigation Trust Board written notice (unless prohibited by law) of the Information to be disclosed as far in advance as practicable and exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Information.

## 11.10   Entire Agreement

This Agreement (including the Recitals), the Plan, and the Sanction Order constitute the entire agreement by and among the parties hereto and there are no representations, warranties, covenants or obligations except as set forth herein or therein. This Agreement, the Plan and the Sanction Order supersede all prior and contemporaneous agreements, understandings, negotiations, discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder. Except as otherwise specifically provided herein, in the Plan or in the Sanction Order, nothing in this Agreement is intended or shall be construed to confer upon or to give any Entity or Person other than the parties hereto and their respective heirs, administrators, executors, permitted successors, or permitted assigns any right to remedies under or by reason of this Agreement, except that (i) the Persons identified in Article 7 hereof are intended third party beneficiaries of Article 7 hereof and shall be entitled to enforce the provisions thereof as if they were parties hereto and (ii) the members (and former members) of the Litigation Trust Board are intended third party beneficiaries of Article 4 hereof and shall be entitled to enforce the provisions thereof as if they were parties hereto.

## 11.11   No Bond

Notwithstanding any state or federal law to the contrary, the Litigation Trustee (including any successor trustee) shall be exempt from giving any bond or other security in any jurisdiction.

## 11.12   Effectiveness

This Agreement shall become effective on the Effective Date.

## 11.13   Successor and Assigns

This Agreement shall inure to the benefit of the parties hereto and the intended third party beneficiaries identified in Section 11.10 hereof (to the extent specified therein), and shall be binding upon the parties hereto, and each of their respective successors and assigns to the extent permitted by this Agreement and applicable law.

## 11.14   No Execution

All funds in the Litigation Trust shall be deemed in *custodia legis* until such times as the funds have actually been paid to or for the benefit of a holder of a Litigation Trust Interest, and no holder of a Litigation Trust Interest or any other Person can execute upon, garnish or attach the

- 32 -                                                       DRAFT

assets of the Litigation Trust in any manner or compel payment from the Litigation Trust except by an order of the CCAA Court.  Distributions from the Litigation Trust will be governed solely by the Plan and this Agreement.

**11.15   Irrevocability**

The Litigation Trust is irrevocable, but is subject to amendment and waiver as provided for in this Agreement.

[SIGNATURE PAGE FOLLOWS]

DRAFT

**IN WITNESS WHEREOF**, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

**SINO-FOREST CORPORATION:**

**SINO FOREST CORPORATION**
(on behalf of itself and the direct and indirect subsidiaries listed in Schedule A)

By: _____
       Name:
       Title:

**LITIGATION TRUSTEE:**

**[●]**

By: _____
       Name:
       Title:

## SCHEDULE A

### Index of Defined Terms

| Term | Location |
| --- | --- |
| 2013 and 2016 Note Indenture Trustee | Introduction |
| 2014 and 2017 Note Indenture Trustee | Introduction |
| Ad Hoc Committee | Section 3.12(f) |
| Agreement | Introduction |
| Cause | Section 4.9(c) |
| CCAA | Preliminary Statement |
| CCAA Court | Preliminary Statement |
| Companies | Introduction |
| Covered Person | Section 11.9 |
| Effective Date | Section 1.2(b) |
| Exchange Act | Section 2.4 |
| Filing Date | Preliminary Statement |
| Indemnified Persons | Section 7.1(a) |
| Indenture Trustees | Introduction |
| Information | Section 11.9 |
| Interim Trustee | Section 3.5(g) |
| Investment Company Act | Section 2.4 |
| Litigation Trust Assets | Preliminary Statement |
| Litigation Trust Beneficiary | Preliminary Statement |
| Litigation Trust Board | Section 4.1 |
| Litigation Trust Claims | Preliminary Statement |
| Litigation Trust Claims Transferors | Preliminary Statement |
| Litigation Trust Proceeds | Section 3.1 |
| Litigation Trustee | Introduction |
| Plan | Preliminary Statement |
| Privileges | Section 1.3(a) |
| Registrar | Section 2.5(a) |
| SEC | Section 2.4 |
| Securities Act | Section 2.4 |
| SFC | Introduction |
| Sino-Forest Litigation Trust | Section 1.2(a) |
| Subsidiaries | Introduction |
| Transfer | Section 2.5(a) |
| Trust Indenture Act | Section 2.4 |
| Trust Register | Section 2.5(c) |

## EXHIBIT C

## INFORMATION REGARDING NEWCO

*The information concerning Newco contained herein is based upon information provided by the Noteholder Advisors. Although the Company has no knowledge that would indicate that any statements contained herein relating to Newco are untrue or incomplete, the Company and its directors or officers disclaim any responsibility for the accuracy or completeness of such information, or for any failure by the Company to disclose events or facts that may have occurred or which may affect the significance or accuracy of any such information, but which are unknown to the Company. Defined terms capitalized but not otherwise defined in this Plan Supplement shall have the meanings given them in the Information Statement.*

Newco will be incorporated as an exempt company under the laws of the Cayman Islands pursuant to the Plan. Newco will be formed and organized in a manner acceptable to the Initial Consenting Noteholders and in form and substance satisfactory to SFC and the Monitor. It is expected that Newco will be formed shortly before the Plan Implementation Date.

### Newco Shares

Newco will have share capital consisting of a single class of voting shares, being the Newco Shares. The Newco Shares issued on the Plan Implementation Date will be fully paid and non-assessable.

In the event that the share capital of Newco is subsequently divided into different classes of shares, the rights attached to any class may be varied by a shareholders' resolution passed at a separate meeting of the holders of shares of that class by at least 66 2/3% of the votes cast at such meeting. In addition, with the consent of the holders of at least 66 2/3% of the votes cast at a shareholders' meeting, Newco may issue equity securities having a preference over the Newco Shares. According to the law of the Cayman Islands, such issuances and variances of rights will not generally give rise to dissent rights (as that term is understood under Canadian law).

Newco is not, and will not be following the Plan Implementation Date, a reporting issuer (or equivalent) in any jurisdiction and the Newco Shares will not be listed on any stock exchange or quotation service on the Plan Implementation Date.

### *Dividends*

Subject to preferences for the receipt of dividends that may be accorded to holders of any other classes of shares of Newco ranking senior to the Newco Shares that may be authorized from time to time holders of Newco Shares are entitled to receive, if, as and when declared by the board of directors of Newco, such dividends as may be declared thereon by the board from time to time in equal amounts per share on the Newco Shares at the time outstanding, without preference or priority.

### *Shareholder Meetings*

Newco will hold its first annual general meeting of shareholders not earlier than 12 months following the Plan Implementation Date, with subsequent annual general meetings to be held annually thereafter. At any time after the expiry of the first 12-month period following the Plan Implementation Date, an extraordinary general meeting may be requisitioned by Newco shareholders holding 10% or more of the issued and outstanding Newco Shares.

Quorum for any annual or extraordinary general meeting of shareholders shall be two or more persons present in person and representing in person or by proxy in excess of 33 1/3% of the issued and outstanding shares entitled to vote at a general meeting.

### Board of Directors

The board of directors of Newco will initially consist of up to five directors, who will be satisfactory to the Initial Consenting Noteholders, and may be expanded to include up to ten directors. Although Cayman law and Newco's articles of association permit corporations to serve as directors, all of the directors on the Newco board as of the Plan Implementation Date will be individuals. A director is entitled to appoint an alternate or a proxy to attend board meetings (in person or by telephone) in the director's absence.

Commencing with the first annual general meeting of Newco shareholders following the Plan Implementation Date, any shareholder that (i) was an Initial Consenting Noteholder and (ii) owns (individually or together with its affiliates) shares representing 10.0% or more of the shares then issued and outstanding that carry the right to vote at general meetings (excluding for the purposes of such calculation any shares held at such time by SFC Escrow Co.) (a "**10% Position**") and has either (A) owned (beneficially or as a registered shareholder) such 10% Position continuously since the Plan Implementation Date, or (B) acquired such 10% Position from a prior 10%+ Shareholder (each a "**10%+ Shareholder**") shall be entitled to appoint one director to the board. The remaining directors shall be elected by the Newco shareholders as a group. A Newco shareholder must be the registered owner of its 10% Position in order to exercise any rights it may have as a 10%+ Shareholder.

A 10%+ Shareholder's board appointment right shall be transferable only in connection with its sale of a 10% Position to another person. No person that acquires a 10% Position after the Plan Implementation Date, other than in connection with an acquisition of a 10% Position from a 10%+ Shareholder, shall be entitled to appoint a director to the Newco board. In the event a 10%+ Shareholder ceases to own a 10%+ Position, the director appointed by it shall resign and such 10%+ Shareholder will lose its right to appoint a director to the Newco board.

Directors (other than any director appointed by a 10%+ Shareholder) will be elected by shareholders on an annual basis at the Newco annual general meeting. Any director appointed by a 10%+ Shareholder may only be removed by that 10%+ Shareholder and a 10%+ Shareholder shall be entitled to appoint another director in his place.

Prior to the first annual general meeting, a director may only be removed with the support of shareholders holding at least 66-2/3% of the votes cast at the meeting. On or following the first annual general meeting, a director (other than a director appointed by a 10%+ Shareholder) may be removed with the support of shareholders holding more than 50% of the votes cast at the meeting.

### Information Rights

Newco will deliver to each shareholder: (a) copies of Newco's annual financial statements within 180 days of each fiscal year end; and (b) copies of Newco's semi-annual financial statements within 90 days of the end of each financial half-year. The board of directors of Newco will have the discretion whether or not to obtain an audit of the annual financial statements. Upon reasonable request, Newco will also deliver to any shareholder, at the cost and expense of such shareholder, such tax-related information, reports and statements relating to Newco and its

subsidiaries as are reasonably necessary for the filing of any tax return or the making or implementing of any election related to taxes.

### Pre-emptive Rights

If Newco wishes to issue equity securities (or any securities convertible into or exchangeable for equity securities of Newco, including convertible debt) other than (a) pursuant to an initial public offering, (b) equity incentive awards to directors, officers or employees of Newco, which awards represent in the aggregate less than 10% of the outstanding Newco Shares (or such higher limit as may be approved by shareholders), or (c) in respect of share splits, share dividends or similar capital reorganizations, it shall offer such securities to each shareholder pro rata in proportion to the number of Newco Shares held by such shareholder at the time of the offer prior to selling such securities to non-shareholders.

### Redemption

Newco may redeem Newco Shares in accordance with applicable Cayman law, provided that such shares are redeemed on a pro rata basis.

### Drag-Along Rights

In the event holders of at least 66-2/3% of the outstanding Newco Shares wish to sell all of their Newco Shares to a third party, they will have the right to force the other shareholders to sell all of their Newco Shares on the same terms, thereby enabling a sale of the entire company.

### Shareholder Approval Rights

In addition to certain other matters requiring approval by special resolution under applicable Cayman law (including amendment of Newco's memorandum or articles of association and a voluntary winding-up of Newco), other than as specified in the Plan Newco may not undertake any of the following fundamental actions without the prior approval of shareholders holding at least 66-2/3% of the Newco Shares present and voting at the meeting:

- any reorganization, recapitalization, amalgamation, merger or consolidation of or involving Newco;

- issuance of (i) any equity securities having a preference over the Newco Shares, or (ii) equity incentive awards to directors, officers or employees, which awards represent in the aggregate in excess of 10% of the outstanding Newco Shares;

- the sale of all or substantially all of Newco's assets (on a consolidated basis);

- any material change in the nature of Newco's business;

- affiliated or related party transactions (other than transactions between Newco and its wholly-owned subsidiaries); and

- a voluntary liquidation, dissolution or winding up of Newco or any of its material Subsidiaries (other than in connection with an internal restructuring).

**Management**

The ad hoc committee of Noteholders, together with its advisors, is reviewing potential candidates for appointment to the Newco board of directors and to serve as senior management of Newco.  It is intended that the directors and senior management of Newco will be appointed on or prior to the Plan Implementation Date.

**Newco II**

Prior to the Plan Implementation Date, it is intended that Newco will organize a wholly-owned subsidiary as an exempt company under the laws of the Cayman Islands ("Newco II") for the purpose of acquiring from Newco the SFC Assets to be transferred by SFC to Newco on implementation of the Plan.  As the SFC Assets consist primarily of the shares of the six Direct Subsidiaries of SFC (which are incorporated in multiple different jurisdictions), holding the SFC Assets through a single, wholly-owned subsidiary of Newco is intended to facilitate the resolution of any tax, jurisdictional or other issues that may arise out of a subsequent sale of all or substantially all of Newco's assets.  It is intended that the memorandum and articles of association of Newco II will be in a form customary for a wholly-owned subsidiary and that the initial board of directors of Newco II will consist of the same individuals appointed as the directors of Newco on or prior to the Plan Implementation Date.

**Newco Names**

Newco will be named Evergreen China Holdings Ltd. and Newco II will be named Evergreen China Holdings II Ltd.

## EXHIBIT D

## DESCRIPTION OF NEWCO NOTES

For purposes of this "Description of the Notes," the term "Company," "we" and "our" refers to Evergreen China Holdings Ltd., and any successor obligor on the Notes, and not to any of its Subsidiaries. Each Subsidiary of the Company which Guarantees the Notes is referred to as a "Subsidiary Guarantor," and each such Guarantee is referred to as a "Subsidiary Guarantee."

The Notes are to be issued under an Indenture, to be dated as of the Original Issue Date, among the Company, the Subsidiary Guarantors, as guarantors, Computershare Trust Company, N.A., as trustee (the "Trustee") and Computershare Trust Company, N.A., as collateral trustee (the "Security Trustee").

The following is a summary of certain material provisions of the Indenture, the Notes and the Subsidiary Guarantees. This summary does not purport to be complete and is qualified in its entirety by reference to all of the provisions of the Indenture, the Notes and the Subsidiary Guarantees. It does not restate those agreements in their entirety. Whenever particular sections or defined terms of the Indenture not otherwise defined herein are referred to, such sections or defined terms are incorporated herein by reference. Copies of the Indenture will be available on or after the Original Issue Date at the corporate trust office of the Trustee in Colorado and on the website maintained by the Monitor at the following web address: http://cfcanada.fticonsulting.com/sfc.

**Brief Description of the Notes**

**General**

The Notes are limited in aggregate principal amount to US$300 million. After the Original Issue Date, the Company may at any time and from time to time issue (a) Additional Notes under the Indenture in one or more series that share Liens on the Collateral on a pari-passu basis with the Notes (and without regard to any restrictions or limitations set forth under the covenants entitled "Limitation on Indebtedness and Disqualified or Preferred Stock" and "Limitation on Liens"), provided that the aggregate principal amount of the Notes and Additional Notes outstanding at any time may not exceed $400 million; (b) in connection with the payment of PIK Interest (as defined below) (and without regard to any restrictions or limitations set forth under the covenants entitled "Limitation on Indebtedness and Disqualified or Preferred Stock" and "Limitation on Liens"), increase the outstanding principal amount of the Notes or issue additional notes (the "PIK Notes") under the Indenture on the same terms and conditions as the Notes issued on the Original Issue Date. The Notes, any Additional Notes and any PIK Notes subsequently issued under the Indenture will be treated as a single series for all purposes under the Indenture; and (c) Permitted Priority Secured Indebtedness that is secured by Liens on the Collateral ranking senior in priority to the Liens granted to secure payment of the Notes, Additional Notes and PIK Notes (and without regard to any restrictions or limitations set forth under the covenants entitled "Limitation on Indebtedness and Disqualified or Preferred Stock" and "Limitation on Liens"), provided that the aggregate principal amount of such Permitted Priority Secured Indebtedness outstanding at any time may not exceed the Permitted Priority Secured Indebtedness Cap. Unless the context requires otherwise, references to "Notes" for all purposes of the Indenture and this "Description of the Notes" include any Additional Notes and any PIK Notes that are actually issued.

The Notes are:

- general obligations of the Company;

- guaranteed by the Subsidiary Guarantors on a senior basis, subject to the limitations described below under the caption "—The Subsidiary Guarantees,

- senior in right of payment to any existing and future obligations of the Company expressly subordinated in right of payment to the Notes;

- 2 -

- at least *pari passu* in right of payment with all other unsecured, unsubordinated Indebtedness of the Company (subject to any priority rights of such unsubordinated Indebtedness pursuant to applicable law); and

- effectively subordinated to all existing and future obligations of the Non-Guarantor Subsidiaries.

In addition, the Notes will be secured by pledges, mortgages and/or charges of the Collateral as described below under the caption "—Security" and will:

- effectively rank, with respect and to the extent of the value of the Collateral, subject to Permitted Liens, *pari passu* with any Additional Notes issued in compliance with the Indenture;

- effectively rank, with respect and to the extent of the value of the Collateral, junior to all future obligations of the Company in respect of any Permitted Priority Secured Indebtedness that are secured on a first priority basis by the Collateral; and

- rank effectively senior in right of payment to unsecured obligations of the Company with respect to the value of the Collateral pledged, mortgaged or charged by the Company securing the Notes (subject to any priority rights of such unsecured obligations pursuant to applicable law).

**Maturity and Interest**

The Notes will mature 7 years from the Original Issue Date, unless earlier redeemed pursuant to the terms thereof and the Indenture. The Indenture allows additional Notes to be issued from time to time (the "Additional Notes"), subject to certain limitations described under "—Further Issues." Unless the context requires otherwise, references to the "Notes" for all purposes of the Indenture and this "Description of Notes" include any Additional Notes and PIK Notes that are actually issued.

Interest on the Notes will be payable in cash or, at the Company's election (a "PIK Election") from time to time, partially in cash and partially in payment in kind notes, or entirely in PIK Notes ("PIK Notes").  In all cases, interest shall be payable on a semi-annual basis in arrears on the last day of the month which is the sixth month following the Original Issue Date and the twelfth month following the Original Issue Date of each year (each an "Interest Payment Date"), commencing on the last day of the month which is the sixth month following the Original Issue Date, to holders of record of the Notes at the close of business on the immediately preceding fifteenth day of such sixth or twelfth month, respectively (each, a "Record Date") notwithstanding any transfer, exchange or cancellation thereof after a Record Date and prior to the immediately following Interest Payment Date.

Interest on the Notes will accrue from the later of the Original Issue Date or the most recent date to which interest has been paid, as applicable. Interest on the Notes will be calculated on the basis of a 360-day year comprised of twelve 30-day months.

Interest will accrue at a rate of 6% per annum if the interest for such interest period is paid fully in cash.  In the event that the Company makes a PIK Election in accordance with the Indenture, the cash interest portion (if any) of interest payable will accrue and be paid for such interest period at a rate of 6% per annum and the interest paid-in-kind portion ("PIK Interest") of interest paid through the issuance of PIK Notes will accrue for such interest period at a rate of 8% per annum.  The Company must elect the form of interest payment with respect to each interest period by delivering a written notice to the Trustee on or prior to the Record Date in respect of the relevant Interest Payment Date.  In the absence of such an election for any interest period, interest on the Notes shall be payable according to the election for the previous interest period.

From and after the occurrence of an Event of Default, overdue principal and interest on the Notes will bear interest payable in cash at the rate of an additional 2% per annum

In any case in which the date of the payment of principal of or interest on the Notes shall not be a Business Day in the relevant place of payment, then payment of principal or interest need not be made in such place on such date but may be made on the next succeeding Business Day in such place.

Any payment made on such Business Day shall have the same force and effect as if made on the date on which such payment is due, and no interest on the Notes shall accrue for the period after such date.

The Notes will be issued only in fully registered form, without coupons, in minimum denominations of US$2,000 of principal amount and integral multiples of US$1,000 in excess thereof. No service charge will be made for any registration of transfer or exchange of Notes, but the Company or the Trustee may require payment of a sum sufficient to cover any transfer tax or other similar governmental charge payable in connection therewith.

All payments on the Notes will be made in U.S. dollars by the Company at the office or agency of the Company maintained for that purpose  (which initially will be the corporate trust administration office of the Trustee, currently located at 350 Indiana Street, Suite 750, Golden, CO  80401), and the Notes may be presented for registration of transfer or exchange at such office or agency; provided that, at the option of the Company, payment of interest may be made by check mailed to the address of the Holders as such address appears in the Note register. Interest payable on the Notes held through DTC will be available to DTC participants (as defined herein) in accordance with DTC's applicable procedures.

**The Subsidiary Guarantees**

The Subsidiary Guarantee of each Subsidiary Guarantor:

- is a general obligation of such Subsidiary Guarantor;

- is senior in right of payment to all future obligations of such Subsidiary Guarantor expressly subordinated in right of payment to such Subsidiary Guarantee; and

- ranks at least *pari passu* with all other unsecured, unsubordinated Indebtedness of such Subsidiary Guarantor (subject to priority rights of such unsubordinated Indebtedness pursuant to applicable law).

In addition, subject to the limitations described therein, the Subsidiary Guarantee of each Subsidiary Guarantor Pledgor (as defined below) will:

- effectively rank, with respect and to the extent of the value of the Collateral owned by such Subsidiary Guarantor Pledgor, subject to Permitted Liens, *pari passu* with any future Additional Notes issued in compliance with the Indenture;

- effectively rank, with respect and to the extent of the value of the Collateral owned by such Subsidiary Guarantor Pledgor, junior to all future Permitted Priority Secured Indebtedness of such Subsidiary Guarantor Pledgor that is secured by Liens on the Collateral owned by such Subsidiary Guarantor Pledgor in favour of the holders of the Permitted Priority Secured Indebtedness; and

- will rank effectively senior in right of payment to the unsecured obligations of such Subsidiary Guarantor Pledgor with respect to the value of the Collateral securing such Subsidiary Guarantee (subject to priority rights of such unsecured obligations pursuant to applicable law).

Under the Indenture, each of the Subsidiary Guarantors will jointly and severally Guarantee the due and punctual payment of the principal of, premium, if any, and interest on, and all other amounts payable under, the Notes, the Indenture and the Security Documents.  The Subsidiary Guarantors have (1) agreed that their obligations under the Subsidiary Guarantees will be enforceable irrespective of any invalidity, irregularity or unenforceability of the Notes or the Indenture and (2) waived their right to require the Trustee to pursue or exhaust its legal or equitable remedies against the Company prior to exercising its rights under the Subsidiary Guarantees. Moreover, if at any time any amount paid under a Note is rescinded or must otherwise be restored, the rights of the Holders under the

- 4 -

Subsidiary Guarantees will be reinstated with respect to such payments as though such payment had not been made. All payments under the Subsidiary Guarantees will be made in U.S. dollars.

The initial Subsidiary Guarantors that will execute the Indenture on the Original Issue Date will be Sino-Capital Global Inc., Sino-Panel Holdings Limited (BVI), Sino-Global Holdings Inc. (BVI), Sino-Wood Partners, Limited (HK), Grandeur Winway Ltd. (BVI), Sinowin Investments Ltd. (BVI), Sinowood Limited (Cayman Islands), Sino-Forest Bio-Science Limited (formerly known as: Sino-Two Limited) (BVI), Sino-Forest Resources Inc. (BVI), Sino-Plantation Limited (HK), Suri-Wood Inc. (BVI), Sino-Forest Investments Limited (BVI), Sino-Wood (Guangxi) Limited (HK), Sino-Wood (Jiangxi) Limited (HK), Sino-Wood (Guangdong) Limited (HK), Sino-Wood (Fujian) Limited (HK), Sino-Panel (Asia) Inc. (BVI), Sino-Panel (Guangxi) Limited (BVI), Sino-Panel (Yunnan) Limited (BVI), Sino-Panel (North East China) Limited (BVI), Sino-Panel (Xiangxi) Limited (formerly known as: Rich Base Worldwide Limited) (BVI), Sino-Panel (Hunan) Limited (formerly known as Comtech Universal Limited) (BVI), SFR (China) Inc. (BVI), Sino-Panel (Suzhou) Limited (formerly known as: Pacific Harvest Holdings Limited) (BVI), Sino-Panel (Gaoyao) Ltd. (BVI), Sino-Panel (Guangzhou) Limited (BVI), Sino-Panel (North Sea) Limited (BVI), Sino-Panel (Guizhou) Limited (BVI), Sino-Panel (Huaihua) Limited (BVI), Sino-Panel (Qinzhou) Limited (formerly known as Sino-Panel (Jiayu) Ltd.) (BVI), Sino-Panel (Yongzhou) Limited (BVI), Sino-Panel (Fujian) Limited (BVI), Sino-Panel (Shaoyang) Limited (BVI), Amplemax Worldwide Limited (BVI), Ace Supreme International Limited (BVI), Express Point Holdings Limited (BVI), Glory Billion International Limited (BVI), Smart Sure Enterprises Limited (BVI), Expert Bonus Investment Limited (BVI), Dynamic Profit Holding Limited (BVI), Alliance Max Limited (BVI), Brain Force Limited (BVI), General Excel Limited (BVI), Poly Market Limited (BVI), Prime Kinetic Limited (BVI), Trillion Edge Limited (BVI), Sino-Panel (China) Nursery Limited (BVI), Sino-Wood Trading Limited (BVI), Homix Limited (BVI), Sino-Panel Trading Limited (BVI), Sino-Panel (Russia) Limited (BVI), Sino-Forest International (Barbados) Corporation (Barbados), Sino-Global Management Consulting Inc. (BVI), Value Quest International Limited (BVI), Well Keen Worldwide Limited (BVI), Harvest Wonder Worldwide Limited (BVI), Cheer Gold Worldwide Limited (BVI), Regal Win Capital Limited (BVI), Rich Choice Worldwide Limited (BVI), Mandra Forestry Holdings Limited (BVI), Mandra Forestry Finance Limited (BVI), Mandra Forestry Anhui Limited (BVI), Mandra Forestry Hubei Limited (HK) and Elite Legacy Limited.

Not all of the Company's Restricted Subsidiaries will guarantee the Notes. None of the Company's over 40 significant current operating or other PRC Subsidiaries, or our Initial Unrestricted Subsidiaries (as defined herein), will provide a Subsidiary Guarantee. Each of the Company's Subsidiaries that does not guarantee the Notes is referred to as a "Non-Guarantor Subsidiary." In addition, no future Subsidiaries of the Company that may be organized under the laws of the PRC or another jurisdiction that prohibits such Subsidiary from guaranteeing the payment of the Notes will provide a Subsidiary Guarantee, such Subsidiaries referred to herein as "Foreign Subsidiaries." In the event of a bankruptcy, liquidation or reorganization of any Non-Guarantor Subsidiary, the Non-Guarantor Subsidiary will pay the holders of its debt and its trade creditors before it will be able to distribute any of its assets to the Company or a subsidiary of the Company, as the case may be. The Subsidiary Guarantors are primarily either holding companies that operate through subsidiaries or entities that directly hold property and assets and/or engage in business operations and generate income. Although under the accounting standards applicable to us and our Subsidiaries, such Subsidiary Guarantors recognize a significant portion of our income and hold a significant portion of our assets on a consolidated basis, most of such property and assets are physically located, and most of such income is earned and held, in the PRC and denominated in Renminbi. As a result, even though such Subsidiary Guarantors have agreed to guarantee the obligations of the Company under the Notes, their assets and cash are unlikely to be available to service our obligations under the Notes due to PRC foreign currency exchange controls or uncertainties in the PRC legal system and/or payments from them may be delayed or subject to PRC tax regimes.

In addition, our Subsidiaries that do not guarantee the Notes hold significant amounts of our assets and/or generate a significant portion of our income and the portion of assets held or income generated by Subsidiary Guarantors may decrease in the future. We are a holding company and payments with respect to the Notes are structurally subordinated to liabilities, contingent liabilities and obligations of certain of our Subsidiaries.

The Company will cause each of its future Restricted Subsidiaries (other than Subsidiaries organized under the laws of the PRC or Foreign Subsidiaries), immediately upon becoming a Restricted Subsidiary, to execute and deliver to the Trustee a supplemental indenture pursuant to which such Restricted Subsidiary will become a Subsidiary Guarantor and will Guarantee the payment of the Notes.

- 5 -

Under the Indenture, and any supplemental indenture thereto, as applicable, each Subsidiary Guarantee will be limited in an amount not to exceed the maximum amount that can be guaranteed by the applicable Subsidiary Guarantor without rendering the Subsidiary Guarantee, as it relates to such Subsidiary Guarantor, voidable under applicable law relating to insolvency, fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally or the ability of related parties to provide guarantees. If a Subsidiary Guarantee were to be rendered void or voidable, it could be rendered ineffective or subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the applicable Subsidiary Guarantor, and, depending on the amount of such indebtedness, a Subsidiary Guarantor's liability on its Subsidiary Guarantee could be reduced to zero.

### *Release of the Subsidiary Guarantees*

A Subsidiary Guarantee given by a Subsidiary Guarantor may be released in certain circumstances, including:

- upon repayment in full of the Notes;

- upon a defeasance as described under "—Defeasance;"

- upon the designation by the Company of a Subsidiary Guarantor as an Unrestricted Subsidiary in compliance with terms of the Indenture; or

- upon the sale of a Subsidiary Guarantor in compliance with the terms of the Indenture (including the covenants under the captions "Certain Covenants—Limitation on Sales and Issuances of Capital Stock in Restricted Subsidiaries," "Certain Covenants—Limitation on Asset Sales" and "Consolidation, Merger and Sale of Assets") resulting in such Subsidiary Guarantor no longer being a Restricted Subsidiary, so long as (1) such Subsidiary Guarantor is simultaneously released from its obligations in respect of any of the Company's other Indebtedness or any Indebtedness of any other Restricted Subsidiary and (2) the proceeds from such sale or disposition are used for the purposes permitted or required by the Indenture.

### *Limitations on Subsidiary Guarantees and Enforcement of Security*

The obligations of each Subsidiary Guarantor under its respective Subsidiary Guarantee and the enforceability of the Collateral granted in respect of such Subsidiary Guarantees of the Subsidiary Guarantor Pledgors may be limited, or possibly invalid, under applicable laws. Certain of the Subsidiary Guarantors have significant loans or other obligations due to other subsidiaries within the Sino-Forest group. The guarantee by a Subsidiary Guarantor may be voided or subject to review under applicable insolvency or fraudulent transfer laws, or subject to a lawsuit by or on behalf of creditors of such Subsidiary Guarantor. In addition, the Subsidiary Guarantees may be challenged under applicable insolvency or fraudulent transfer laws, which could impair the enforceability of the Subsidiary Guarantees.

### *Unrestricted Subsidiaries*

As of the date of the Indenture, all of the Company's Subsidiaries (except Greenheart Group Limited and its Subsidiaries (the "Initial Unrestricted Subsidiaries")) will be "Restricted Subsidiaries." Additionally, under the circumstances described below under the caption "—Certain Covenants—Designation of Restricted and Unrestricted Subsidiaries," the Company will be permitted to designate certain of its other Subsidiaries as "Unrestricted Subsidiaries." The Company's Unrestricted Subsidiaries (including the Initial Unrestricted Subsidiaries) will not be subject to many of the restrictive covenants in the Indenture. The Company's Unrestricted Subsidiaries (including the Initial Unrestricted Subsidiaries) will not Guarantee the Notes.

- 6 -

**Security**

Subject to the arrangements described under the caption "—Intercreditor Agreement—" below, Company has agreed, for the benefit of the Holders of the Notes, to pledge, mortgage or charge, or cause the initial Subsidiary Guarantor Pledgors to pledge, mortgage or charge, as the case may be, all property and assets of the Company and the initial Subsidiary Guarantors (including the Capital Stock of the initial Subsidiary Guarantors) (the "Collateral") on a first priority basis (subject to Permitted Liens) on the Original Issue Date in order to secure the obligations of the Company under the Notes and the Indenture and of such initial Subsidiary Guarantor Pledgors under their respective Subsidiary Guarantees.

The initial Subsidiary Guarantor Pledgors will be Sino-Forest Investments Limited (BVI), Sino-Capital Global Inc. (BVI), Mandra Forestry Holdings Limited (BVI), Mandra Forestry Finance Limited (BVI), Mandra Forestry Anhui Limited (BVI), Sino-Global Holdings Inc. (BVI), Sino-Wood Partners, Limited (HK), Sinowood Limited (Cayman Islands), Sino-Plantation Limited (HK), Suri-Wood Inc. (BVI), Sino-Panel (Asia) Inc. (BVI), Sino-Panel Holdings Limited (BVI), Dynamic Profit Holdings Limited (BVI) and Sino-Forest International (Barbados) Corporation (Barbados).

The Company has also agreed, for the benefit of the Holders of the Notes, to pledge, mortgage or charge, or cause each Subsidiary Guarantor to pledge, mortgage or charge, all property and assets (including the Capital Stock owned by the Company or such Subsidiary Guarantor) of any Person that is a Restricted Subsidiary or becomes a Restricted Subsidiary (other than Persons organized under the laws of the PRC or any other jurisdiction that prohibits such property and assets of such Restricted Subsidiaries from being pledged, mortgaged or charged, to secure the obligations of the Company or such Subsidiary Guarantor) after the Original Issue Date, promptly upon such Person becoming a Restricted Subsidiary, to secure the obligations of the Company under the Notes and the Indenture, and of such Subsidiary Guarantor under its Subsidiary Guarantee, in the manner described above.

The value of the Collateral securing the Notes and the Subsidiary Guarantees of the Subsidiary Guarantor Pledgors may not be sufficient to satisfy the Company's and each of the Subsidiary Guarantor Pledgors' obligations under the Notes, and the Subsidiary Guarantees of the Subsidiary Guarantor Pledgors, and the Collateral securing the Notes and such Subsidiary Guarantees may be reduced or diluted under certain circumstances, including the enforcement of the priority Liens granted over the Collateral as security for the payment of any Permitted Priority Secured Indebtedness and any Permitted Priority Subsidiary Guarantees, the issuance of Additional Notes and the disposition of assets comprising the Collateral, subject to the terms of the Indenture.

No appraisals of the Collateral have been prepared in connection with this offering of the Notes. There can be no assurance that the proceeds of any sale of the Collateral, in whole or in part, pursuant to the Indenture and the Security Documents following an Event of Default, would be sufficient to satisfy amounts due on the Notes or the Subsidiary Guarantees of the Subsidiary Guarantor Pledgors. By its nature, some or all of the Collateral will be illiquid and may have no readily ascertainable market value. Accordingly, there can be no assurance that the Collateral would be sold in a timely manner or at all.

So long as no Default has occurred and is continuing, and subject to the terms of the Security Documents, the Company and the Subsidiary Guarantor Pledgors, as the case may be, will be entitled to exercise any and all voting rights and to receive and retain any and all cash dividends, stock dividends, liquidating dividends, non-cash dividends, shares or stock resulting from stock splits or reclassifications, rights issues, warrants, options and other distributions (whether similar or dissimilar to the foregoing) in respect of Capital Stock constituting Collateral.

***Permitted Priority Secured Indebtedness***

The Company and each Subsidiary Guarantor Pledgor may create Liens on the Collateral ranking senior to the Lien for the benefit of the Holders to secure Permitted Priority Secured Indebtedness of the Company and any Permitted Priority Subsidiary Guarantee of a Subsidiary Guarantor Pledgor; *provided that* (i) the principal amount of such Permitted Priority Secured Indebtedness may not exceed the amount of the Permitted Priority Secured Indebtedness Cap, (ii) the holders of such Indebtedness (or their representative) become party to an Intercreditor Agreement, as referred to below, (iii) the instrument or agreement creating such Indebtedness contains provisions with respect to releases of Collateral and such Permitted Priority Subsidiary Guarantee substantially similar to and no more restrictive on the Company and such Subsidiary Guarantor Pledgor than the provisions of the Indenture and

the Security Documents and (iv) the Company and such Subsidiary Guarantor Pledgor deliver to the Security Trustee an Opinion of Counsel with respect to corporate and collateral matters in connection with the Security Documents, in form and substance as set forth in the Security Documents. The Trustee and the Security Trustee will be permitted and authorized, without the consent of any Holder, to enter into any amendments to the Security Documents or the Indenture and take any other action necessary to permit the creation and registration of Liens on the Collateral to secure Permitted Priority Secured Indebtedness in accordance with this paragraph (including, without limitation, the appointment of any collateral agent or trustee under the Intercreditor Agreement referred to below to hold the Collateral on behalf of the Holders and the holders of Permitted Priority Secured Indebtedness).

Except for certain Permitted Liens and the Permitted Priority Secured Indebtedness, the Company and its Restricted Subsidiaries will not be permitted to issue or Incur any other Indebtedness secured by all or any portion of the Collateral without the consent of each Holder of the Notes then outstanding.

### *Intercreditor Agreement*

As of the Original Issue Date, the Collateral will be pledged, mortgaged or charged, to secure the obligations of the Company and the Subsidiary Guarantors under the Notes and the Subsidiary Guarantees, pursuant to the terms of the Security Documents. After the Original Issue Date, to the extent that the Company issues Permitted Priority Secured Indebtedness in accordance with the terms of the Indenture, the holders of such Permitted Priority Secured Indebtedness (or the agent, trustee or representative thereof) (the "Permitted Priority Trustee") will be required to enter into an intercreditor agreement (the "Intercreditor Agreement") with the Trustee and the Security Trustee, and acknowledged by the Company, providing, among other things, (1) that the Liens in and to the Collateral securing the Notes shall rank second only to the Liens in and to the Collateral securing the Permitted Priority Secured Indebtedness in favour of the Permitted Priority Trustee, all to the extent and in the manner set forth in such Intercreditor Agreement and containing the additional terms set forth in the Indenture (the "Pre-Agreed Intercreditor Terms") (2) for the conditions under which the parties thereto will consent to the release of or granting of any Lien on such Collateral; and (3) for the conditions under which the parties thereto will enforce their rights with respect to such Collateral and the Indebtedness secured thereby. The Collateral securing the obligations of the Company and the Subsidiary Guarantors in favour of the Holders of any Permitted Priority Secured Indebtedness shall in no event be comprised of any collateral in addition to the Collateral securing the obligations of the Company and the Subsidiary Guarantors in respect of the Notes unless such additional collateral is also granted to the Trustee and the Security Trustee for the benefit of the Holders.

Each Holder of Notes shall be bound by the provisions of the Indenture and any intercreditor agreement entered into by the Trustee which contains terms and conditions substantially the same as the Pre-Agreed Intercreditor Terms, and the Trustee and the Security Trustee shall be authorized and directed pursuant to the terms of the Indenture to enter into any such Intercreditor Agreement with the Permitted Priority Trustee for the holders of any such Permitted Priority Secured Indebtedness.

The Intercreditor Agreement will also provide that when the property and assets (including the Capital Stock) of any Person that is or becomes a Restricted Subsidiary (other than Persons organized under the laws of the PRC or any other jurisdiction that prohibits such Restricted Subsidiaries from guaranteeing the payment of the Notes) is delivered as security as described in the third paragraph of "—Security" above, such property and assets (including the Capital Stock) would also be deemed to be Collateral, and subject to the sharing of interest in such security, under the terms of the Intercreditor Agreement.

### *Enforcement of Security*

The Liens securing the Notes and the Subsidiary Guarantees of the Subsidiary Guarantor Pledgors will be granted to the Security Trustee. The Security Trustee will hold such Liens and security interests in the Collateral granted pursuant to the Security Documents with sole authority as directed by the Secured Parties (or their respective representatives) to exercise remedies under the Security Documents. The Security Trustee will agree to act as secured party on behalf of the Secured Parties (or their respective representatives) under the applicable Security Documents, to follow the instructions provided to it by the Secured Parties (or their respective representatives) under the Indenture and to carry out certain other duties. The Trustee will give instructions to the Security Trustee in accordance with instructions it receives from the Holders under the Indenture.

- 8 -

The Indenture and/or the Security Documents will principally provide that, at any time while the Notes are outstanding, the Security Trustee will have the exclusive right to manage, perform and enforce the terms of the Security Documents relating to the Collateral and to exercise and enforce all privileges, rights and remedies thereunder according to its direction, including to take or retake control or possession of such Collateral and to hold, prepare for sale, process, lease, dispose of or liquidate such Collateral, including, without limitation, following the occurrence of a Default under the Indenture.

All payments received and all amounts held by the Security Trustee in respect of the Collateral under the Security Documents will be applied, subject to the terms of any Intercreditor Agreement, as follows:

*first*, to the Security Trustee to the extent necessary to reimburse the Security Trustee for any expenses incurred in connection with the collection or distribution of such amounts held or realized or in connection with expenses incurred in enforcing its remedies under the Security Documents and preserving the Collateral and all amounts for which the Security Trustee is entitled to indemnification or otherwise owed under the Indenture and/or the Security Documents;

*second*, to the Trustee for its benefit and the benefit of Holders, to the Paying Agent and Registrar, all pursuant to the terms of the Indenture; and

*third*, any surplus remaining after such payments will be paid to the Company or the Subsidiary Guarantor Pledgors or to whomever may be lawfully entitled thereto.

The Security Trustee may decline to foreclose on, or enforce the security interest created over, the Collateral or exercise remedies available if it does not receive indemnification to its satisfaction. In addition, the Security Trustee's ability to foreclose on, or enforce the security interest created over, the Collateral may be subject to lack of perfection, the consent of third parties, prior Liens and practical problems associated with the realization of the Security Trustee's Liens on the Collateral. Neither the Security Trustee nor any of its officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral securing the Notes, for the legality, enforceability, effectiveness or sufficiency of the Security Documents, for the creation, perfection, priority, sufficiency, maintenance or protection of any of the Liens, or for any defect or deficiency as to any such matters, or for any failure to demand, collect, foreclose or realize upon or otherwise enforce any of the Liens or Security Documents or any delay in doing so.

The Indenture and/or the Security Documents will provide that the Company and the Subsidiary Guarantor Pledgors will Indemnify the Security Trustee for all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind imposed against the Security Trustee arising out of the Security Documents or the Indenture except to the extent that any of the foregoing are finally judicially determined to have resulted from the gross negligence or willful misconduct of the Security Trustee.

### *Release of Security*

The security created in respect of the Collateral granted under the Security Documents may be released in certain circumstances, subject to the terms of the Security Documents and any Intercreditor Agreement, including:

- upon repayment in full of the Notes;

- upon defeasance and discharge of the Notes as provided below under the caption "—Defeasance";

- upon certain dispositions of the Collateral in compliance with the covenants under the captions "—Limitation on Sales and Issuances of Capital Stock in Restricted Subsidiaries" or "—Limitation on Asset Sales" or in accordance with the provision under the caption "—Consolidation, Merger and Sale of Assets";

- with respect to security granted by a Subsidiary Guarantor Pledgor, upon the release of the Subsidiary Guarantee of such Subsidiary Guarantor Pledgor in accordance with the terms of the Indenture; and

- 9 -

- with respect to all or any part of the Collateral, by the Security Trustee in connection with any enforcement of its Liens pursuant to the terms of the Security Agreement.

**Further Issues**

The Company may, from time to time, without notice to or the consent of the Holders (and without regard to any restrictions or limitations set forth under the "Limitation on Indebtedness and Disqualified or Preferred Stock" covenant described below), create and issue Additional Notes having the same terms and conditions as the Notes (including the benefit of the Subsidiary Guarantees) in all respects (or in all respects except for issue date, issue price, and the first payment of interest on them and, to the extent necessary, certain temporary securities law transfer restrictions) so that such subsequently issued debt securities may be consolidated and form a single series with the previously outstanding Notes; *provided that* any Additional Notes must be treated as part of the same issue as the Notes for U.S. federal income tax purposes and *provided further* that in connection with the payment of PIK Interest, the Company is entitled to, without the consent of the Holders (and without regard to any restrictions or limitations set forth under the "Limitation on Indebtedness and Disqualified or Preferred Stock" covenant described below), issue PIK Notes under the Indenture on the same terms and conditions as all other issued Notes (except for issue date, issue price, and the first payment of interest on them and, to the extent necessary, certain temporary securities law transfer restrictions). All PIK Notes will be *pari passu* in right of payment with all other issued Notes, will be guaranteed on a *pari passu* basis by each Subsidiary Guarantor and will be secured equally and ratably with all other issued Notes by Liens on the Collateral held by the Security Trustee for as long as the Notes and the Subsidiary Guarantees are secured by the Collateral, subject to the covenants contained in the Indenture.

**Optional Redemption**

At any time and from time to time on or after the fourth anniversary date of the Original Issue Date, the Company may redeem the Notes, in whole or in part, at a redemption price equal to the percentage of the principal amount set forth below plus accrued and unpaid interest to the redemption date if redeemed during the twelve-month period beginning on the anniversary date of the Original Issue Date of the years indicated below:

| 12- month period commencing in the year | Redemption Price |
| --- | --- |
| 2017 ................................................................................................................................. | 103.125% |
| 2018 ................................................................................................................................. | 101.563% |
| 2019 and thereafter ......................................................................................................... | 100.000% |

At any time prior to the fourth anniversary date of the Original Issue Date, the Company may at its option redeem the Notes, in whole but not in part, at a redemption price equal to 100% of the principal amount of the Notes plus the Applicable Premium as of, and accrued and unpaid interest, if any, to the redemption date.

At any time prior to the third anniversary date of the Original Issue Date, the Company may redeem up to 35% of the principal amount of the Notes with the Net Cash Proceeds of one or more sales of its Common Stock in an Equity Offering at a redemption price of 106.25% of the principal amount of the Notes, plus accrued and unpaid interest, if any, to the redemption date; *provided that* at least 65% of the aggregate principal amount of the Notes originally issued on the Original Issue Date remains outstanding after each such redemption and any such redemption takes place within 60 days after the closing of the related sale of Capital Stock.

The Company will give not less than 30 days' nor more than 60 days' notice of any redemption. If less than all of the Notes are to be redeemed, selection of the Notes for redemption will be made on a pro rata basis, or if the Notes are issued in global form, in accordance with applicable DTC procedures (subject, in all cases, to compliance with the rules of any national securities exchange on which the Notes may be listed).

However, no Note of US$1,000 in principal amount or less shall be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note will state the portion of the principal amount to be redeemed. A new Note in principal amount equal to the unredeemed portion will be issued upon cancellation of the original Note.

- 10 -

## Mandatory Redemption of Notes upon an Entire Sale Transaction

Within 10 days of the occurrence of an Entire Sale Transaction, the Company shall issue (by publication and mail) a notice to all Holders to redeem all of the Notes then outstanding (an "Entire Sale Transaction Mandatory Redemption") at a redemption price equal to 100% of their principal amount plus accrued and unpaid interest, if any, to the Payment Date (the "Entire Sale Transaction Redemption Price"). Such notice will give not less than thirty (30) days' nor more than sixty (60) days' notice of the Entire Sale Transaction Mandatory Redemption. All Notes that are so redeemed will be cancelled.

Pending the application of the proceeds from an Entire Sale Transaction to the Entire Sale Transaction Redemption Price, the Company shall invest such proceeds in a deposit account or securities account, which account shall be subject to a first priority Lien in favour of the Security Trustee, on behalf of the Trustee, and constitute additional Collateral for the benefit of the Holders, and which account shall not be subject to any other Lien whatsoever.

## Repurchase of Notes Upon a Change of Control Triggering Event

The Company must commence, within 30 days of the occurrence of a Change of Control Triggering Event, and consummate an Offer to Purchase for all Notes then outstanding (a "Change of Control Offer"), at a purchase price equal to 101% of their principal amount plus accrued and unpaid interest, if any, to the Payment Date.

Except as described above with respect to a Change of Control Triggering Event or as described below with respect to an Entire Sale Transaction, the Indenture does not contain provisions that permit or require the Company to repurchase or redeem the Notes in the event of a takeover, recapitalization or similar transaction. Holders may not be entitled to require the Company to purchase their Notes in certain circumstances involving a significant change in the composition of Board of Directors.

If a Change of Control Offer is made, there can be no assurance that the Company will have available funds sufficient to pay the purchase price for all the Notes that might be tendered by the Holders seeking to accept the Change of Control Offer. In the event that the Company purchases Notes pursuant to a Change of Control Offer, the Company expects that it would seek third party financing to the extent it does not have available funds to purchase the Notes. However, there can be no assurance that the Company would be able to obtain such financing.

In order to repurchase the Notes in an Offer to Purchase, the Company will, unless consents are obtained, be required to repay all Indebtedness then outstanding which by its terms would prohibit such Note repurchase, either prior to or concurrently with such Note repurchase.

## Sinking Fund

There will be no sinking fund payments for the Notes.

## Additional Amounts

All payments of, or in respect of, principal of, and premium (if any) and interest (including PIK Interest) in respect of the Notes (including PIK Notes) or the Subsidiary Guarantees will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or within any jurisdiction in which the Company, a Surviving Person (as defined under the caption "—Consolidation, Merger and Sale of Assets") or the applicable Subsidiary Guarantor is organized or resident for tax purposes (or any political subdivision or taxing authority thereof or therein) (each a "Relevant Jurisdiction"), unless such withholding or deduction is required by law or by regulation or governmental policy having the force of law. In the event that any such withholding or deduction is so required, the Company, a Surviving Person or the applicable Subsidiary Guarantor, as the case may be, will pay such additional amounts ("Additional Amounts") as will result in receipt by the Holder of each Note or the Subsidiary Guarantees, as the case may be, of such amounts as would have been received by such Holder had no such withholding or deduction been required, except that no Additional Amounts shall be payable:

- 11 -

(a)     for or on account of:

    (i)    any tax, duty, assessment or other governmental charge that would not have been imposed but for:

        (A)    the existence of any present or former connection between the Holder of such Note and the Relevant Jurisdiction other than merely holding such Note, including such Holder being or having been a national, domiciliary or resident of or treated as a resident thereof or being or having been physically present or engaged in a trade or business therein or having or having had a permanent establishment therein;

        (B)    the presentation of such Note (in cases in which presentation is required) more than 30 days after the later of the date on which the payment of the principal of, premium, if any, and interest on, such Note became due and payable pursuant to the terms thereof or was made or duly provided for, except to the extent that the Holder thereof would have been entitled to such Additional Amounts if it had presented such Note for payment on any date within such 30 day period;

        (C)    the failure of the Holder, despite being required by law, to comply with a timely request of the Company addressed to the Holder or beneficial owner to provide information concerning such Holder's nationality, residence, identity or connection with any Relevant Jurisdiction, if and to the extent that due and timely compliance with such request would have reduced or eliminated any taxes as to which Additional Amounts would have otherwise been payable to such Holder; or

        (D)    the presentation of such Note (where presentation is required) for payment in the Relevant Jurisdiction, unless such Note could not have been presented for payment elsewhere;

    (ii)    any estate, inheritance, gift, sale, transfer, personal property or similar tax, assessment or other governmental charge;

    (iii)    any withholding or deduction that is imposed or levied on a payment to an individual and is required to be made pursuant to European Council Directive 2004/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of November 26-27, 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directives; or

    (iv)    any combination of taxes, duties, assessments or other governmental charges referred to in the preceding clauses (i), (ii) and (iii);or

(b)    with respect to any payment of the principal of, or any premium, if any, or interest on, such Note or any payment under any Subsidiary Guarantee to the Holder, if such Holder is a fiduciary, partnership or person other than the sole beneficial owner of any payment to the extent that such payment would be required to be included in the income under the laws of the Relevant Jurisdiction, for tax purposes, of a beneficiary or settlor, with respect to the fiduciary, or a member of that partnership or a beneficial owner who would not have been entitled to such Additional Amounts had that beneficiary, settlor, partner, person or beneficial owner been the registered Holder thereof.

Whenever there is mentioned in any context the payment of principal, any premium or interest, in respect of any Note or Subsidiary Guarantee, such mention shall be deemed to include payment of Additional Amounts provided for in the Indenture to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

- 12 -

**Redemption for Taxation Reasons**

The Notes may be redeemed, at the option of the Company or Surviving Person, as a whole but not in part, at any time, upon giving not less than 30 days nor more than 60 days notice to the Holders (which notice shall be irrevocable), at a redemption price equal to 100% of the principal amount thereof, together with accrued and unpaid interest, if any, to the date fixed by the Company for redemption (the "Tax Redemption Date") if, as a result of:

    (1)    any change in, or amendment to, the laws (or any regulations or rulings promulgated thereunder) of a Relevant Jurisdiction affecting taxation; or

    (2)    any change in the existing official position or the stating of an official position regarding the application or interpretation of such laws, regulations or rulings (including a holding, judgment, or order by a court of competent jurisdiction),

which change, amendment, application or interpretation (a) in the case of the Company, Surviving Person and any initial Subsidiary Guarantor becomes effective on or after the Original Issue Date and (b) in the case of any successor to a Subsidiary Guarantor or a future Subsidiary Guarantor becomes effective after such Subsidiary Guarantor assumes the obligations under the Indenture or becomes a Subsidiary Guarantor, with respect to any payment due or to become due under the Notes or the Indenture, the Company, Surviving Person or a Subsidiary Guarantor, as the case may be, is, or on the next interest payment date would be, required to withhold or deduct any tax, duty, assessment or other governmental charge imposed, levied, collected, withheld or assessed by a Relevant Jurisdiction and to pay Additional Amounts, and in each case, such requirement to withhold or deduct cannot be avoided by the taking of reasonable measures by the Company, Surviving Person or a Subsidiary Guarantor; provided that no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Company, Surviving Person or a Subsidiary Guarantor, as the case may be, would be obligated to pay such Additional Amounts if a payment in respect of the Notes was then due.

Prior to the publication and mailing of any notice of redemption of the Notes pursuant to the foregoing, the Company or Surviving Person will deliver to the Trustee (a) a certificate signed by a duly authorized officer stating that the Company or Surviving Person is entitled to effect the redemption under the Indenture and stating that the conditions precedent to the right of redemption have occurred and (b) an Opinion of Counsel or tax consultant of recognized standing stating that the circumstances referred to in the prior paragraph exist. The Trustee shall accept such Opinion as sufficient evidence of the satisfaction of the conditions precedent described above, in which event it shall be conclusive and binding on the Holders.

Any Notes that are redeemed will be cancelled.

**Certain Covenants**

Set forth below are summaries of certain covenants contained in the Indenture.

***Limitation on Indebtedness and Disqualified or Preferred Stock***

    (a)    The Company will not Incur any Indebtedness or Disqualified Stock, provided that the Company may Incur Indebtedness if, after giving effect to the Incurrence of such Indebtedness and the receipt and application of the proceeds therefrom, the Fixed Charge Coverage Ratio would be not less than 2.0 to 1.0. The Company will not permit any Restricted Subsidiary to Incur any Indebtedness (including Acquired Indebtedness), Disqualified Stock or Preferred Stock (other than Disqualified Stock or Preferred Stock of Restricted Subsidiaries held by the Company or a Subsidiary Guarantor, so long as it is so held).

    Notwithstanding the foregoing, the Company and, to the extent provided below, any Restricted Subsidiary may Incur each and all of the following ("Permitted Indebtedness"):

    (1)    Indebtedness under the Notes (including any PIK Notes and any Additional Notes), and each Subsidiary Guarantee;

- 13 -

(2)      Any Permitted Priority Secured Indebtedness and any Permitted Priority Subsidiary Guarantees;

(3)      Indebtedness of the Company or any Restricted Subsidiary outstanding on the Original Issue Date excluding Indebtedness permitted under clause (4);

(4)      Indebtedness of the Company or any Restricted Subsidiary owed to the Company or any Wholly-Owned Restricted Subsidiary; provided that (x) any event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any subsequent transfer of such Indebtedness (other than to the Company or any Wholly-Owned Restricted Subsidiary) shall be deemed, in each case, to constitute an Incurrence of such Indebtedness not permitted by this clause (4) and (y) if the Company or any Subsidiary Guarantor is the obligor on such Indebtedness, such Indebtedness must expressly be subordinated in right of payment to the Notes, in the case of the Company, or the Subsidiary Guarantee of such Subsidiary Guarantor, in the case of a Subsidiary Guarantor;

(5)      Indebtedness issued in exchange for, or the net proceeds of which are used to refinance or refund, then outstanding Indebtedness Incurred under the immediately preceding paragraph or clauses (1) or (2)of this covenant and any refinancings thereof in an amount not to exceed the amount so refinanced or refunded (plus premiums, accrued interest, fees and expenses); provided that (a) Indebtedness the proceeds of which are used to refinance or refund the Notes or Indebtedness that is subordinated in right of payment to, the Notes or a Subsidiary Guarantee shall only be permitted under this clause (5) if (x) in case the Notes are refinanced in part, such new Indebtedness, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is outstanding, is expressly made *pari passu* with, or subordinate in right of payment to, the remaining Notes or such Subsidiary Guarantee, or (y) in case the Indebtedness to be refinanced is subordinated in right of payment to the Notes or a Subsidiary Guarantee, such new Indebtedness, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is issued or remains outstanding, is expressly made subordinate in right of payment to the Notes or such Subsidiary Guarantee at least to the extent that the Indebtedness to be refinanced is subordinated to the Notes or such Subsidiary Guarantee, (b) such new Indebtedness, determined as of the date of Incurrence of such new Indebtedness, does not mature prior to the Stated Maturity of the Indebtedness to be refinanced or refunded, and the Average Life of such new Indebtedness is at least equal to the remaining Average Life of the Indebtedness to be refinanced or refunded, (c) Indebtedness the proceeds of which are used to refinance or refund Permitted Priority Secured Indebtedness would otherwise be entitled be Incurred as Permitted Priority Secured Indebtedness pursuant to the terms of the Indenture, and (d) in no event may Indebtedness of the Company or any Subsidiary Guarantor be refinanced pursuant to this clause (5) by means of any Indebtedness of any Restricted Subsidiary that is not a Subsidiary Guarantor;

(6)      the Incurrence by the Company or any Restricted Subsidiaries of Indebtedness under Commodity Agreements, Interest Rate Agreements and Currency Agreements entered into in the ordinary course of business and designed solely to protect the Company or any of its Restricted Subsidiaries from fluctuations in interest rates, currencies or the price of commodities and not for speculation;

(7)      Indebtedness Incurred by the Company or any Restricted Subsidiary constituting reimbursement obligations with respect to letters of credit, trade guarantees or similar instruments issued in the ordinary course of business to the extent that such letters of credit or trade guarantees are not drawn upon or, if drawn upon, to the extent such drawing is reimbursed no later than 90 days following receipt by the Company or such Restricted Subsidiary of a demand for reimbursement;

- 14 -

(8)    (i) Guarantees by the Company or any Subsidiary Guarantor of Indebtedness of the Company or any Restricted Subsidiary that was permitted to be Incurred by another provision of this covenant, or (ii) Guarantees by any Restricted Subsidiary of Indebtedness of another Restricted Subsidiary that was permitted to be Incurred under clause (6) or (7) above; and

(9)    Indebtedness Incurred after the Original Issue Date by any Restricted Subsidiary organized under the laws of the PRC which, when taken together with the total amount of all other Indebtedness Incurred under this clause (9), will not exceed US$100 million.

(b)    For purposes of determining compliance with this "Limitation on Indebtedness and Disqualified or Preferred Stock" covenant, in the event that an item of Indebtedness meets the criteria of more than one of the categories of Indebtedness described in part (a) above (other than the Notes, Additional Notes or PIK Notes, which shall be treated as Incurred pursuant to clause (a)(1) above), including under the proviso in the first paragraph of part (a), the Company, in its sole discretion, shall classify, and from time to time may reclassify one or more times, such item of Indebtedness, and such item of Indebtedness will, upon such classification or reclassification (as the case may be) be treated as having been Incurred in accordance with only one of such clauses or in accordance with the proviso in the first paragraph of part (a).

(c)    The Company will not Incur, and will not permit any Subsidiary Guarantor to Incur, any Indebtedness if such Indebtedness is subordinate in right of payment to any other Indebtedness of the Company or such Subsidiary Guarantor, as the case may be, unless such Indebtedness is also subordinate in right of payment to the Notes or the applicable Subsidiary Guarantee, on substantially identical terms. This does not apply to distinctions between categories of Indebtedness that exist by reason of any Liens or Guarantees securing or in favor of some but not all of such Indebtedness.

### *Limitation on Restricted Payments*

The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly (the payments or any other actions described in clauses (1) through (4) below being collectively referred to as "Restricted Payments"):

(1)    declare or pay any dividend or make any distribution on or with respect to the Company's or any of its Restricted Subsidiaries' Capital Stock (other than dividends or distributions payable solely in shares of the Company's or any of its Restricted Subsidiaries' Capital Stock (other than Disqualified Stock or Preferred Stock) or in options, warrants or other rights to acquire shares of such Capital Stock) held by Persons other than the Company or any Wholly-Owned Restricted Subsidiary;

(2)    purchase, call for redemption or redeem, retire or otherwise acquire for value any shares of Capital Stock of the Company or any Restricted Subsidiary (including options, warrants or other rights to acquire such shares of Capital Stock, but excluding any Indebtedness of the Company or any Restricted Subsidiary that is not subordinated in right of payment to the Notes or any Subsidiary Guarantee that is convertible into Capital Stock of the Company) held by any Persons other than the Company or any Wholly-Owned Restricted Subsidiary;

(3)    make any voluntary or optional principal payment, or voluntary or optional redemption, repurchase, defeasance, or other acquisition or retirement for value, of Indebtedness that is subordinated in right of payment to the Notes or any of the Subsidiary Guarantees (excluding any intercompany Indebtedness between or among the Company and any of its Wholly-Owned Restricted Subsidiaries); or

(4)    make any Investment, other than a Permitted Investment, in any Person;

- 15 -

if, at the time of, and after giving effect to, the proposed Restricted Payment:

(a)    a Default shall have occurred and be continuing;

(b)    the Company could not Incur at least US$1.00 of Indebtedness under the proviso in the first paragraph of part (a) of the covenant under the caption "—Limitation on Indebtedness and Disqualified or Preferred Stock;" or

(c)    such Restricted Payment, together with the aggregate amount of all Restricted Payments made by the Company and its Restricted Subsidiaries after the Measurement Date, shall exceed the sum of

(1)    50% of the aggregate amount of the Consolidated Net Income of the Company (or, if the Consolidated Net Income is a loss, minus 100% of the amount of such loss) accrued on a cumulative basis during the period (taken as one accounting period) beginning on the first day of the fiscal half-year immediately following the Measurement Date and ending on the last day of the Company's most recently ended fiscal half-year for which consolidated financial statements of the Company (which the Company shall use its best efforts to compile in a timely manner) are available and have been provided to the Trustee at the time of such Restricted Payment; plus

(2)    100% of the aggregate Net Cash Proceeds received by the Company after the Measurement Date as a capital contribution or from the issuance and sale of its Capital Stock (other than Disqualified Stock) to a Person who is not a Restricted Subsidiary of the Company, including any such Net Cash Proceeds received upon (x) the conversion of any Indebtedness (other than Subordinated Indebtedness) of the Company into Capital Stock (other than Disqualified Stock) of the Company, or (y) the exercise by a Person who is not a Restricted Subsidiary of the Company of any options, warrants or other rights to acquire Capital Stock of the Company (other than Disqualified Stock) in each case after deducting the amount of any such Net Cash Proceeds used to redeem, repurchase, defease or otherwise acquire or retire for value any Subordinated Indebtedness or Capital Stock of the Company; plus

(3)    an amount equal to the net reduction in Investments (other than reductions in Permitted Investments) that were made after the Measurement Date in any Person resulting from (a) payments of interest on Indebtedness, dividends or repayments of loans or advances, in each case to the Company or any Restricted Subsidiary (except, in each case, to the extent any such payment or proceeds are included in the calculation of Consolidated Net Income), or (b) from redesignations of Unrestricted Subsidiaries as Restricted Subsidiaries, not to exceed, in each case, the amount of Investments made by the Company or a Restricted Subsidiary after the Measurement Date in any such Person.

The foregoing provision shall not be violated by reason of:

(1)    the payment of any dividend or redemption of any Capital Stock within 60 days after the related date of declaration or call for redemption if, at said date of declaration or call for redemption, such payment or redemption would comply with the preceding paragraph;

(2)    the redemption, repurchase, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any of the Subsidiary Guarantors that is subordinated in right of payment to the Notes or to any Subsidiary Guarantee with the Net Cash Proceeds

of, or in exchange for, Indebtedness Incurred under clause (5)(y) of the second paragraph of part (a) of the covenant under the caption "—Limitation on Indebtedness and Disqualified or Preferred Stock;"

(3)     the redemption, repurchase or other acquisition of Capital Stock of the Company or any Subsidiary Guarantor (or options, warrants or other rights to acquire such Capital Stock) in exchange for, or out of the Net Cash Proceeds of a capital contribution or a substantially concurrent sale (other than to a Restricted Subsidiary of the Company) of, shares of Capital Stock (other than Disqualified Stock) of the Company or any Subsidiary Guarantor (or options, warrants or other rights to acquire such Capital Stock); *provided that* the amount of any such Net Cash Proceeds that are utilized for any such Restricted Payment will be excluded from clause (c)(2) of the preceding paragraph;

(4)     the redemption, repurchase, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any of the Subsidiary Guarantors that is subordinated in right of payment to the Notes or to any Subsidiary Guarantee in exchange for, or out of the Net Cash Proceeds of, a substantially concurrent offering of, shares of the Capital Stock (other than Disqualified Stock) of the Company or any of the Subsidiary Guarantors (or options, warrants or other rights to acquire such Capital Stock); *provided that* the amount of any such Net Cash Proceeds that are utilized for any such Restricted Payment will be excluded from clause (c)(2) of the preceding paragraph;

(5)     the payment of any dividends or distributions declared, paid or made by a Restricted Subsidiary payable on a pro rata basis to all holders of any class of Capital Stock of such Restricted Subsidiary, a majority of which is held, directly or indirectly, through Restricted Subsidiaries by the Company;

(6)     any Investment in Greenheart Group Limited and its Subsidiaries;

(7)     any Investment in an Unrestricted Subsidiary (other than Greenheart Group Limited and its Subsidiaries) that is engaged in a Permitted Business which, when taken together with the total amount of all other Investments made pursuant to this clause (7), will not exceed US$25 million (or the Dollar Equivalent thereof);

(8)     any Investment in a Joint Venture (other than Greenheart Group Limited and its Subsidiaries) which, when taken together with the total amount of all other Investments made pursuant to this clause (8), will not exceed US$25 million (or the Dollar Equivalent thereof); or

(9)     Restricted Payments, if, at the time of the making of such payments, and after giving effect thereto (including, without limitation, the incurrence of any Indebtedness to finance such payment) and giving effect to the *pro forma* adjustment set forth in clauses (A) through (E) of the definition of "Fixed Charge Coverage Ratio," the Leverage Ratio would not exceed 2.0:1.0;

*provided that*, no Default shall have occurred and be continuing or would occur as a consequence of the actions or payments set forth therein.

Each Restricted Payment permitted pursuant to clauses (1), (5), (7), (8), and (9) of the preceding paragraph shall be included in calculating whether the conditions of clause (c) of the first paragraph of this "Limitation on Restricted Payments" covenant have been met with respect to any subsequent Restricted Payments.

The amount of any Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or the Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment. The value of any assets or securities that are required to be valued by this covenant will be the Fair Market Value.

- 17 -

The Board of Directors' determination of the Fair Market Value of a Restricted Payment or any such assets or securities must be based upon an opinion or appraisal issued by an appraisal or investment banking firm of international standing if the Fair Market Value exceeds US$5.0 million (or the Dollar Equivalent thereof).

Not later than the date of making any Restricted Payment in an amount in excess of US$5.0 million (or the Dollar Equivalent thereof), the Company will deliver to the Trustee an Officer's Certificate stating that such Restricted Payment is permitted and setting forth the basis upon which the calculations required by this covenant under the caption "—Limitation on Restricted Payments" were computed, together with a copy of any fairness opinion or appraisal required by the Indenture.

### *Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries*

The Company will not, and will not permit any Restricted Subsidiary to, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Restricted Subsidiary to (1) pay dividends or make any other distributions on any Capital Stock of such Restricted Subsidiary owned by the Company or any other Restricted Subsidiary, (2) pay any Indebtedness owed to the Company or any other Restricted Subsidiary, (3) make loans or advances to the Company or any other Restricted Subsidiary or (4) sell, lease or transfer any of its property or assets to the Company or any other Restricted Subsidiary.

The foregoing provisions shall not restrict any encumbrances or restrictions:

(1)     in the Notes, the Subsidiary Guarantees, the Indenture, the Security Documents, or under any Permitted Priority Secured Indebtedness of the Company or any Subsidiary Guarantor Pledgor or Permitted Priority Subsidiary Guarantee of any Subsidiary Guarantor, and any extensions, refinancings, renewals, supplements, amendments or replacements of any of the foregoing agreements; *provided that* the encumbrances and restrictions in any such extension, refinancing, renewal, amendment or replacement, taken as a whole, are no less favorable in any material respect to the Holders than those encumbrances or restrictions that are then in effect and that are being extended, refinanced, renewed, supplemented, amended or replaced;

(2)     existing under or by reason of applicable law;

(3)     existing with respect to any Person or the property or assets of such Person acquired by the Company or any Restricted Subsidiary, existing at the time of such acquisition and not incurred in contemplation thereof, which encumbrances or restrictions are not applicable to any Person or the property or assets of any Person other than such Person or the property or assets of such Person so acquired, and any extensions, refinancings, renewals or replacements thereof; provided that the encumbrances and restrictions in any such extension, refinancing, renewal or replacement, taken as a whole, are no less favorable in any material respect to the Holders than those encumbrances or restrictions that are then in effect and that are being extended, refinanced, renewed or replaced;

(4)     in the case of clause (4) of the first paragraph of this covenant, that (i) restrict in a customary manner the subletting, assignment or transfer of any property or asset that is a lease, license, conveyance or contract or similar property or asset, or (ii) exist by virtue of any transfer of, agreement to transfer, option or right with respect to, or Lien on, any property or assets of the Company or any Restricted Subsidiary not otherwise prohibited by the Indenture or (iii) arise or are agreed to in the ordinary course of business, not relating to any Indebtedness, and that do not, individually or in the aggregate, detract from the value of property or assets of the Company or any Restricted Subsidiary in any manner material to the Company or any Restricted Subsidiary;

(5)     with respect to a Restricted Subsidiary and imposed pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock of, or property and assets of, such Restricted Subsidiary that is permitted by the "—Limitation on Sales and Issuances of Capital Stock in Restricted Subsidiaries," "—

- 18 -

Limitation on Indebtedness and Disqualified or Preferred Stock" and "—Limitation on Asset Sales" covenants.

### *Limitation on Sales and Issuances of Capital Stock in Restricted Subsidiaries*

The Company will not sell, and will not permit any Restricted Subsidiary, directly or indirectly, to issue or sell any shares of Capital Stock of a Restricted Subsidiary (including options, warrants or other rights to purchase shares of such Capital Stock) except:

(1)     to the Company or a Wholly-Owned Restricted Subsidiary;

(2)     to the extent such Capital Stock represents director's qualifying shares or is required by applicable law to be held by a Person other than the Company or a Wholly-Owned Restricted Subsidiary;

(3)     for the sale of shares of all the Capital Stock of a Restricted Subsidiary if permitted under, and made in accordance with, the "—Limitation on Asset Sales" covenant; and

(4)     the issuance and sale of Capital Stock of a Restricted Subsidiary (which remains a Restricted Subsidiary after any such issuance or sale); *provided that* the Company or such Restricted Subsidiary applies the Net Cash Proceeds of such issuance or sale in accordance with the "—Limitation on Asset Sales" covenant.

### *Limitation on Issuances of Guarantees by Restricted Subsidiaries*

The Company will not permit any Restricted Subsidiary which is not a Subsidiary Guarantor, directly or indirectly, to Guarantee any Indebtedness ("Guaranteed Indebtedness") of the Company or any other Restricted Subsidiary, unless (1) (a) such Restricted Subsidiary simultaneously executes and delivers a supplemental indenture to the Indenture providing for an unsubordinated Subsidiary Guarantee of payment of the Notes by such Restricted Subsidiary and (b) such Restricted Subsidiary waives and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Company or any other Restricted Subsidiary as a result of any payment by such Restricted Subsidiary under its Subsidiary Guarantee until the Notes have been paid in full or (2) such Guarantee and such Guaranteed Indebtedness are permitted by clauses (a) (2), (3), (4) or (8)(ii) (other than, in the case of clause (8)(ii), a Guarantee by a Restricted Subsidiary organized under the laws of the PRC of the Indebtedness of a non-PRC Restricted Subsidiary) under the caption "—Limitation on Indebtedness and Disqualified or Preferred Stock."

If the Guaranteed Indebtedness (A) ranks *pari passu* in right of payment with the Notes or any Subsidiary Guarantee, then the Guarantee of such Guaranteed Indebtedness shall rank *pari passu* in right of payment with, or subordinated to, the Subsidiary Guarantee or (B) is subordinated in right of payment to the Notes or any Subsidiary Guarantee, then the Guarantee of such Guaranteed Indebtedness shall be subordinated in right of payment to the Subsidiary Guarantee at least to the extent that the Guaranteed Indebtedness is subordinated to the Notes or the Subsidiary Guarantee.

### *Limitation on Transactions with Shareholders and Affiliates*

The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, enter into, renew or extend any transaction or arrangement (including, without limitation, the purchase, sale, lease or exchange of property or assets, or the rendering of any service) with (x) any holder (or any Affiliate of such holder) of 5% or more of any class of Capital Stock of the Company or (y) with any Affiliate of the Company or any Restricted Subsidiary (each an "Affiliate Transaction"), unless:

(1)     the Affiliate Transaction is on fair and reasonable terms that are no less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or the relevant Restricted Subsidiary with an unrelated Person; and

- 19 -

(2) the Company delivers to the Trustee:

  (a) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$5.0 million (or the Dollar Equivalent thereof), a Board Resolution set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with this covenant and such Affiliate Transaction has been approved by a majority of the disinterested members of the Board of Directors; and

  (b) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of US$10.0 million (or the Dollar Equivalent thereof), an opinion as to the fairness to the Company or such Restricted Subsidiary of such Affiliate Transaction from a financial point of view issued by an Independent Financial Advisor.

The foregoing limitation does not limit, and shall not apply to:

(1) the payment of reasonable and customary regular fees to directors of the Company who are not employees of the Company;

(2) transactions between or among the Company and any of its Wholly-Owned Restricted Subsidiaries or between or among Wholly-Owned Restricted Subsidiaries;

(3) issuances or sales of Capital Stock (other than Disqualified Stock) of the Company or options, warrants or other rights to acquire such Capital Stock;

(4) transactions or payments pursuant to any employee, officer or director compensation or benefit plans or similar arrangements entered into in the ordinary course approved by a majority of the Board of Directors of the Company in good faith; and

(5) any Restricted Payment of the type described in clauses (1),(2), or (3) of the first paragraph of the covenant described above under the caption "—Limitation on Restricted Payments" if permitted by that covenant.

In addition, the requirements of clause (2) of the first paragraph of this covenant shall not apply to (i) transactions between or among the Company and any of its Restricted Subsidiaries that is not a Wholly-Owned Restricted Subsidiary to the extent entered into in the ordinary course of business, (ii) Investments (other than Permitted Investments) not prohibited by the "—Limitation on Restricted Payments" covenant, (iii) transactions pursuant to agreements in effect on the Original Issue Date and described in this Plan Supplement or in the Information Circular of Sino Forest Corporation dated October 20, 2012, or any amendment or modification or replacement thereof, so long as such amendment, modification or replacement is not more disadvantageous to the Company and its Restricted Subsidiaries than the original agreement in effect on the Original Issue Date; *provided that*, in the case of (iii) such transaction is entered into in the ordinary course of business.

### *Limitation on Liens*

The Company will not, and will not permit any of its Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien on the Collateral (other than Permitted Liens).

The Company will not, and will not permit any of its Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien on any of its assets or properties of any kind (other than the Collateral), now owned or hereafter acquired, except Permitted Liens, unless the Notes are equally and ratably secured by such Lien.

- 20 -

*Limitation on Sale-Leaseback Transactions*

The Company will not, and will not permit any of its Restricted Subsidiaries to, enter into any Sale and Leaseback Transaction.

*Limitation on Entire Sale Transaction and on Asset Sales*

The Company will not, and will not permit any Restricted Subsidiary to, enter into or consummate an Entire Sale Transaction unless, as a condition thereof, the consideration received consists of net cash proceeds to the Company of not less than an amount sufficient to pay the Entire Sale Transaction Redemption Price in full and without restriction.

The Company will not, and will not permit any Restricted Subsidiary to, consummate any Asset Sale, unless:

(1)     no Default shall have occurred and be continuing or would occur as a result of such Asset Sale;

(2)     the consideration received by the Company or such Restricted Subsidiary, as the case may be, is at least equal to the Fair Market Value of the assets sold or disposed of;

(3)     in the case of an Asset Sale that constitutes an Asset Disposition, the Company could Incur at least US$1.00 of Indebtedness under the proviso in the first paragraph of part (a) of the covenant under the caption "—Limitation on Indebtedness and Disqualified or Preferred Stock" after giving *pro forma* effect to such Asset Disposition; and

(4)     at least 75% of the consideration received consists of cash, Temporary Cash Investments or Replacement Assets; *provided that* in case of an Asset Sale in which the Company or such Restricted Subsidiary receives Replacement Assets (i) the Company delivers to the Trustee an Officer's Certificate stating that (a) the Company's chief executive officer or chief financial officer has approved such Asset Sale, (b) such Asset Sale is on fair and reasonable terms on an arm's length basis, and (c) the Fair Market Value of the Replacement Assets, together with any cash consideration is no less than the Fair Market Value of the assets subject to such Asset Sale, and (ii) with respect to any such Asset Sale involving an aggregate consideration with a Fair Market Value in excess of US$25.0 million (or the Dollar Equivalent thereof), the Company shall deliver to the Trustee an opinion as to the fairness to the Company or such Restricted Subsidiary of such Asset Sale from a financial point of view issued by an Independent Financial Advisor. For purposes of this provision, each of the following will be deemed to be cash:

(a)     any liabilities, as shown on the Company's most recent consolidated balance sheet prepared in accordance with IFRS, of the Company or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms subordinated to the Notes or any Subsidiary Guarantee) that are actually assumed by the transferee of any such assets pursuant to a customary, assumption, assignment, novation or similar agreement that fully and unconditionally releases the Company or such Restricted Subsidiary from further liability; and

(b)     any securities, notes or other obligations received by the Company or any Restricted Subsidiary from such transferee that are contemporaneously, subject to ordinary settlement periods, converted by the Company or such Restricted Subsidiary into cash, to the extent of the cash received in that conversion.

Within 360 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Company (or the applicable Restricted Subsidiary, as the case may be) may apply such Net Cash Proceeds to:

- 21 -

(1)      permanently repay Senior Indebtedness of the Company or any Restricted Subsidiary (and, if such Senior Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto) in each case owing to a Person other than the Company or a Restricted Subsidiary; or

(2)      make an Investment in Replacement Assets, provided that such Investment occurs within 360 days following the receipt of such Net Cash Proceeds.

Pending the final application of any Net Cash Proceeds from an Asset Sale in excess of $10 million, the Company shall invest such Net Cash Proceeds in a deposit account or securities account, which account(s) shall (except if prohibited by applicable laws) be subject to a first priority Lien in favour of the Security Trustee and constitute additional Collateral for the benefit of the Holders or the other Secured Parties, and which account(s) shall not be subject to any other Lien whatsoever.

Any Net Cash Proceeds from Asset Sales that are not applied or invested as provided in the second paragraph of this covenant will constitute "Excess Proceeds." Excess Proceeds of less than US$5 million (or the Dollar Equivalent thereof) will be carried forward and accumulated. When the aggregate amount of Excess Proceeds exceeds US$10 million (or the Dollar Equivalent thereof), within 10 days thereof, the Company must make an Offer to Purchase to all Holders (and, with respect to indebtedness of the Company, that ranks equally with or senior to, the Notes, containing provisions similar to those set forth in the Indenture with respect to offers to purchase or redeem with the proceeds of sales of assets, to the holders of such Indebtedness, including any Permitted Priority Secured Indebtedness) to purchase the maximum principal amount of Notes (and any such other *pari passu* Indebtedness) that may be purchased out of the Excess Proceeds. The offer price in any Offer to Purchase will be equal to 100% of the principal amount plus accrued and unpaid interest to the date of purchase, and will be payable in cash.

Notwithstanding the foregoing, the Company will not, and will not permit any Restricted Subsidiary to sell, transfer or otherwise dispose of any shares of Capital Stock of Sino-Forest (China) Investments Limited or of any Restricted Subsidiary that owns directly or indirectly any shares of Capital Stock of Sino-Forest (China) Investments Limited.

If any Excess Proceeds remain after consummation of an Offer to Purchase, the Company may use those Excess Proceeds for any purpose not otherwise prohibited by the Indenture. If the aggregate principal amount of Notes (and any other *pari passu* or senior Indebtedness) tendered in such Offer to Purchase exceeds the amount of Excess Proceeds, the Trustee will select the Notes (and such other *pari passu* or senior Indebtedness) to be purchased on a pro rata basis or in accordance with applicable DTC procedures. Upon completion of each Offer to Purchase, the amount of Excess Proceeds will be reset at zero.

### Limitation on the Company's Business Activities

The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, engage in any business other than Permitted Businesses; *provided*, however, that the Company or any Restricted Subsidiary may own Capital Stock of an Unrestricted Subsidiary or joint venture or other entity that is engaged in a business other than Permitted Businesses as long as any Investment therein was not prohibited when made by the covenant under the caption "—Limitation on Restricted Payments."

### Designation of Restricted and Unrestricted Subsidiaries

The Board of Directors may designate any Restricted Subsidiary to be an Unrestricted Subsidiary, unless a Subsidiary of such Restricted Subsidiary is a Restricted Subsidiary (and is not concurrently being designated as an Unrestricted Subsidiary); *provided that* (i) Sino-Forest (China) Investments Limited shall always be a Restricted Subsidiary, (ii) such designation would not cause a Default, (iii) a Restricted Subsidiary cannot be a Subsidiary of an Unrestricted Subsidiary and (iv) the Investment deemed to have been made thereby in such newly-designated Unrestricted Subsidiary would be permitted to be made by the covenant described under "—Limitation on Restricted Payments."

- 22 -

The Board of Directors may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided that* (i) such designation shall not cause a Default, (ii) any Indebtedness of such Unrestricted Subsidiary outstanding at the time of such designation which will be deemed to have been Incurred by such newly-designated Restricted Subsidiary as a result of such designation would be permitted to be Incurred by the covenant described under the caption "—Limitation on Indebtedness and Disqualified or Preferred Stock;" (iii) any Lien on the property of such Unrestricted Subsidiary at the time of such designation which will be deemed to have been incurred by such newly-designated Restricted Subsidiary as a result of such designation would be permitted to be incurred by the covenant described under the caption "—Limitation on Liens;" (iv) such Unrestricted Subsidiary is not a Subsidiary of another Unrestricted Subsidiary (that is not concurrently being designated as a Restricted Subsidiary), (v) if such Restricted Subsidiary is not organized under the laws of the PRC and is not a Foreign Subsidiary, such Restricted Subsidiary shall upon such designation execute and deliver to the Trustee a supplemental indenture by which such Restricted Subsidiary shall become a Subsidiary Guarantor, and (vi) if such Restricted Subsidiary is not organized under the laws of the PRC or any other jurisdiction that prohibits the Capital Stock of such Restricted Subsidiary from being pledged to secure the obligations of the Company or a Subsidiary Guarantor, all Capital Stock of such Restricted Subsidiary owned by the Company or any other Restricted Subsidiary shall be pledged, mortgaged or charged as required under "—Security."

### *Government Approvals and Licenses; Compliance with Law*

The Company will, and will cause each Restricted Subsidiary to, (i) obtain and maintain in full force and effect all governmental approvals, authorizations, consents, permits, concessions and licenses as are necessary to engage in the Permitted Businesses, (ii) preserve and maintain good and valid title to its properties and assets (including land use rights) free and clear of any Liens other than Permitted Liens and (iii) comply with all laws, regulations, orders, judgments and decrees of any governmental body, except to the extent that failure to so obtain, maintain, preserve and comply would not reasonably be expected to have a material adverse effect on (A) the business, results of operations or prospects of the Company and its Restricted Subsidiaries taken as a whole or (B) the ability of the Company or any Subsidiary Guarantor to perform its obligations under the Notes, the relevant Subsidiary Guarantee or the Indenture.

## Provision of Financial Statements and Reports

The Company will file with the Trustee and provide the holders of the Notes with copies of all financial statements or reports that are distributed by the Company to its members from time to time.

As of the Original Issue Date, the Memorandum and Articles of Association of the Company will provide that the Board of Directors will cause to be delivered to each member: (i) as soon as available, but not later than 180 days after the end of each financial year of the Company, a copy of the consolidated balance sheet of the Company as of the end of such financial year and the related consolidated statements of income, changes in equity and cash flows for such financial year, setting forth in each case in comparative form the figures for the previous year, all in reasonable detail and accompanied by a management summary and analysis of the operations for the Company for such financial year; and (ii) as soon as available, but not later than 90 days after the end of each financial half-year of the Company, a copy of the consolidated balance sheet of the Company as of the end of such financial half-year and the related consolidated statements of income, changes in equity and cash flows for such financial half-year, and accompanied by a management summary and analysis of the operations for the Company for such financial half-year.  In the event that this provision of the Memorandum and Articles of Association of the Company is amended after the Original Issue Date, the Company shall provide notice of such amendment to the Trustee as soon as practicable following the enactment of such amendment.

Delivery of such reports and information to the Trustee is for informational purposes only and the Trustee's receipt of them will not constitute constructive notice of any information contained therein or determinable from information contained therein (including the Company's compliance with any of it covenants under the Indenture as to which the Trustee is entitled to rely exclusively on an Officer's Certificate).

- 23 -

**Events of Default**

The following events will be defined as "Events of Default" in the Indenture:

(a)     default in the payment of principal of (or premium, if any, on) the Notes when the same becomes due and payable at maturity, upon acceleration, redemption or otherwise;

(b)     default in the payment of interest on any Note when the same becomes due and payable, and such default continues for a period of 30 days;

(c)     default in the performance or breach of the provisions of the covenants described under "—Consolidation, Merger and Sale of Assets," "—Limitation on Indebtedness and Disqualified or Preferred Stock," "—Limitation on Restricted Payments," "—Limitation on Liens," the failure by the Company to make or consummate an Offer to Purchase in the manner described under the captions "—Repurchase of Notes upon a Change of Control Triggering Event" or "—Limitation on Asset Sales", the failure by the Company to redeem the Notes in the manner described under the caption "—Mandatory Redemption of Notes upon an Entire Sale Transaction" or the failure by the Company to create, or cause its Restricted Subsidiaries to create a First Priority Lien on the Collateral (subject to any Permitted Liens) in accordance or otherwise comply with the covenant described under the caption "—Security;"

(d)     the Company or any Restricted Subsidiary defaults in the performance of or breaches any other covenant or agreement in the Indenture or under the Notes (other than a default specified in clause (a), (b) or (c) above) and such default or breach continues for a period of 30 consecutive days after written notice by the Trustee or the Holders of 25% or more in aggregate principal amount of the Notes;

(e)     there occurs with respect to any Indebtedness of the Company or any Restricted Subsidiary having an outstanding principal amount of US$50.0 million (or the Dollar Equivalent thereof) or more in the aggregate for all such Indebtedness of all such Persons, whether such Indebtedness now exists or shall hereafter be created, (A) an event of default that has caused the holder thereof to declare such Indebtedness to be due and payable prior to its Stated Maturity and/or (B) the failure to make a principal payment when due;

(f)     any final judgment or order for the payment of money in excess of US$50.0 million (or the Dollar Equivalent thereof) in the aggregate for all such final judgments or orders shall be rendered against the Company or any Restricted Subsidiary and shall not be paid or discharged for a period of 60 days during which a stay of enforcement of such final judgment or order shall not be in effect;

(g)     a court having jurisdiction in the premises enters a decree or order for (A) relief in respect of the Company or any Restricted Subsidiary in an involuntary case or proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect (including any proceeding under any corporate law seeking an arrangement of, or stay of proceedings to enforce, some or all of its debts), (B) appointment of a receiver, liquidator, assignee, custodian, monitor, trustee, sequestrator or similar official of the Company or any Restricted Subsidiary or for all or substantially all of the property and assets of the Company or any Restricted Subsidiary or (C) the winding up or liquidation of the affairs of the Company or any Restricted Subsidiary and, in each case, such

- 24 -

decree or order shall remain unstayed and in effect for a period of 60 consecutive days;

(h)    the Company or any Restricted Subsidiary (A) commences a voluntary case or proceeding under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect (including any proceeding under any corporate law seeking an arrangement of, or stay of proceedings to enforce, some or all of its debts), or consents to the entry of an order for relief in an involuntary case or proceeding under any such law, (B) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, monitor, trustee, sequestrator or similar official of the Company or any Restricted Subsidiary or for all or substantially all of the property and assets of the Company or any Restricted Subsidiary or (C) effects any general assignment for the benefit of creditors;

(i)    any Subsidiary Guarantor repudiates its obligations under its Subsidiary Guarantee or, except as permitted by the Indenture, any Subsidiary Guarantee is determined to be unenforceable or invalid or shall for any reason cease to be in full force and effect;

(j)    any default by the Company or any Subsidiary Guarantor Pledgor in the performance of any of its obligations under the Security Documents or the Indenture, which adversely affects the enforceability, validity, perfection or priority of the applicable Lien on the Collateral or which adversely affects the condition or value of the Collateral, taken as a whole, in any material respect; or

(k)    the Company or any Subsidiary Guarantor Pledgor repudiates its obligations under any Security Document or, other than in accordance with the Indenture and the Security Documents, any Security Document ceases to be or is not in full force and effect or the Trustee ceases to have a first priority Lien in the Collateral (subject to any Permitted Liens).

If an Event of Default (other than an Event of Default specified in clause (g) or (h) above) occurs and is continuing under the Indenture, the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes, then outstanding, by written notice to the Company (and to the Trustee if such notice is given by the Holders), may, and the Trustee at the request of such Holders shall, declare the principal of, premium, if any, and accrued and unpaid interest on the Notes to be immediately due and payable. Upon a declaration of acceleration, such principal of, premium, if any, and accrued and unpaid interest shall be immediately due and payable. In the event of a declaration of acceleration because an Event of Default set forth in clause (e) above has occurred and is continuing, such declaration of acceleration shall be automatically rescinded and annulled if the event of default triggering such Event of Default pursuant to clause (e) shall be remedied or cured by the Company or the relevant Restricted Subsidiary or waived by the holders of the relevant Indebtedness within 60 days after the declaration of acceleration with respect thereto. If an Event of Default specified in clause (g) or (h) above occurs with respect to the Company or any Restricted Subsidiary, the principal of, premium, if any, and accrued and unpaid interest on the Notes then outstanding shall automatically become and be immediately due and payable without any declaration or other act on the part of the Trustee or any Holder. The Holders of at least a majority in principal amount of the outstanding Notes by written notice to the Company and to the Trustee, may waive all past defaults and rescind and annul a declaration of acceleration and its consequences if (x) all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the Notes that have become due solely by such declaration of acceleration, have been cured or waived, (y) the rescission would not conflict with any judgment or decree of a court of competent jurisdiction, and (z) the Company has paid to the Trustee all fees, expenses and amounts owed to the Trustee in connection with such Event of Default. For information as to the waiver of defaults, see "—Amendments and Waiver."

If an Event of Default occurs and is continuing, the Trustee may, and shall upon request of Holders of at least 25% in aggregate principal amount of outstanding Notes, instruct the Security Trustee to foreclose on the

- 25 -

Collateral in accordance with the terms of the Security Documents and take such further action on behalf of the Holders of the Notes with respect to the Collateral as the Trustee is instructed by such Holders. See "—Security."

The Holders of at least a majority in aggregate principal amount of the outstanding Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred on the Trustee. However, the Trustee may refuse to follow any direction that conflicts with law or the Indenture, that may involve the Trustee in personal liability, or that the Trustee determines in good faith may be unduly prejudicial to the rights of Holders not joining in the giving of such direction and may take any other action it deems proper that is not inconsistent with any such direction received from Holders. A Holder may not pursue any remedy with respect to the Indenture or the Notes unless:

(1)    the Holder gives the Trustee written notice of a continuing Event of Default;

(2)    the Holders of at least 25% in aggregate principal amount of outstanding Notes make a written request to the Trustee to pursue the remedy;

(3)    such Holder or Holders offer the Trustee indemnity reasonably satisfactory to the Trustee against any costs, liability or expense;

(4)    the Trustee does not comply with the request within 60 days after receipt of the request and the offer of indemnity; and

(5)    during such 60-day period, the Holders of a majority in aggregate principal amount of the outstanding Notes do not give the Trustee a direction that is inconsistent with the request.

However, such limitations do not apply to the right of any Holder to receive payment of the principal of, premium, if any, or interest on, such Note or to bring suit for the enforcement of any such payment, on or after the due date expressed in the Notes, which right shall not be impaired or affected without the consent of the Holder.

Officers of the Company, one of whom must be the Company's principal executive officer, principal financial officer or principal accounting officer, must certify in an Officer's Certificate, on or before a date not more than 120 days after the end of each fiscal year, that a review has been conducted of the activities of the Company and its Restricted Subsidiaries and the Company's and its Restricted Subsidiaries' performance under the Indenture and that the Company has fulfilled all obligations thereunder, or, if there has been a default in the fulfillment of any such obligations, specifying each such default and the nature and status thereof. The Company will also be obligated to notify the Trustee of any default or defaults in the performance of any covenants or agreements under the Indenture.

**Consolidation, Merger and Sale of Assets**

The Company will not consolidate with, merge with or into another Person, permit any Person to merge with or into it, or sell, convey, transfer, lease or otherwise dispose of all or substantially all of its and its Restricted Subsidiaries' properties and assets (computed on a consolidated basis) (as an entirety or substantially an entirety in one transaction or a series of related transactions), unless:

(1)    the Company shall be the continuing Person, or the Person (if other than it) formed by such consolidation or merger or that acquired or leased such property and assets (the "Surviving Person") shall be an exempted company limited by shares organized and validly existing under the laws of the Cayman Islands and shall expressly assume, by a supplemental indenture, executed and delivered to the Trustee, all the obligations of the Company under the Indenture, the Notes and the Security Documents, as the case may be, and the Indenture, the Notes and the Security Documents, as the case may be, shall remain in full force and effect;

(2)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

- 26 -

(3)    immediately after giving effect to such transaction on a *pro forma* basis, the Company or the Surviving Person, as the case may be, shall have a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Company immediately prior to such transaction;

(4)    immediately after giving effect to such transaction on a *pro forma* basis the Company or the Surviving Person, as the case may be, could Incur at least US$1.00 of Indebtedness under the first paragraph of the covenant under the caption "—Limitation on Indebtedness and Disqualified or Preferred Stock;"

(5)    the Company delivers to the Trustee (x) an Officer's Certificate (attaching the arithmetic computations to demonstrate compliance with clauses (3) and (4)) and (y) an Opinion of Counsel, in each case stating that such consolidation, merger or transfer and such supplemental indenture complies with this provision and that all conditions precedent provided for herein relating to such transaction have been complied with; and

(6)    each Subsidiary Guarantor, unless such Subsidiary Guarantor is the Person with which the Company has entered into a transaction described under the caption "—Consolidation, Merger and Sale of Assets," shall execute and deliver a supplemental indenture confirming that its Subsidiary Guarantee shall apply to the obligations of the Company or the Surviving Person in accordance with the Notes and the Indenture.

No Subsidiary Guarantor will consolidate with, merge with or into another Person, permit any Person to merge with or into it, or sell, convey, transfer, lease or otherwise dispose of all or substantially all of its and its Restricted Subsidiaries' properties and assets (computed on a consolidated basis) (as an entirety or substantially an entirety in one transaction or a series of related transactions) to another Person (other than the Company or another Subsidiary Guarantor), unless:

(1)    such Subsidiary Guarantor shall be the continuing Person, or the Person (if other than it) formed by such consolidation or merger or that acquired or leased such property and assets shall be the Company, another Subsidiary Guarantor or shall become a Subsidiary Guarantor concurrently with the transaction;

(2)    immediately after giving effect to such transaction, no Default shall have occurred and be continuing;

(3)    immediately after giving effect to such transaction on a *pro forma* basis, the Company shall have a Consolidated Net Worth equal to or greater than the Consolidated Net Worth of the Company immediately prior to such transaction;

(4)    immediately after giving effect to such transaction on a *pro forma* basis, the Company could Incur at least US$1.00 of Indebtedness under the first paragraph of the covenant under the caption "—Limitation on Indebtedness and Disqualified or Preferred Stock"; and

(5)    the Company delivers to the Trustee (x) an Officer's Certificate (attaching the arithmetic computations to demonstrate compliance with clauses (3) and (4)) and (y) Opinion of Counsel, in each case stating that such consolidation, merger or transfer and such supplemental indenture complies with this provision and that all conditions precedent provided for herein relating to such transaction have been complied with;

*provided that* this paragraph shall not apply to any Entire Sale Transaction, which transaction shall be subject to and governed by the provisions that require the Company to redeem all of the Notes in the manner described under the caption "-Mandatory Redemption of Notes upon an Entire Sale Transaction", and shall not otherwise apply to any other sale or other disposition that complies with the "Limitation on Asset Sales" covenant or any Subsidiary Guarantor whose Subsidiary Guarantee is unconditionally released in accordance with the provisions described under "— Release of the Subsidiary Guarantees."

- 27 -

The foregoing provisions would not necessarily afford holders of the Notes protection in the event of highly leveraged or other transactions involving the Company that may adversely affect holders of the Notes.

**No Payments for Consents**

The Company will not, and shall not permit any of its Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any Holder of any Notes for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the Indentures or the Notes unless such consideration is offered to be paid or is paid to all Holders of the Notes that consent, waive or agree to amend in the time frame set forth in the solicitation documents relating to such consent, waiver or agreement.

**Defeasance**

*Defeasance and Discharge*

The Indenture will provide that the Company will be deemed to have paid and will be discharged from any and all obligations in respect of the Notes on the 365th day after the deposit referred to below, and the provisions of the Indenture and the Security Documents will no longer be in effect with respect to the Notes (except for, among other matters, certain obligations to register the transfer or exchange of the Notes, to replace stolen, lost or mutilated Notes, to maintain paying agencies and to hold monies for payment in trust, and certain obligations owed to the Trustee and the Security Trustee) if, among other things:

(a)     the Company has deposited with the Trustee, in trust, money and/or U.S. Government Obligations that through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient (in the case of U.S. Government Obligations, in the opinion of a reputable firm of certified accountants) to pay the principal of, premium, if any, and accrued interest on the Notes on the Stated Maturity of such payments in accordance with the terms of the Indenture and the Notes,

(b)     the Company has delivered to the Trustee (1) either (x) an Opinion of Counsel to the effect that, as a result of a change occurring after the Original Issue Date in applicable U.S. federal income tax law, Holders will not recognize income, gain or loss for United States federal income tax purposes as a result of the Company's exercise of its option under this "Defeasance" provision and will be subject to United States federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit, defeasance and discharge had not occurred or (y) a ruling directed to the Trustee received from the U.S. Internal Revenue Service to the same effect as the aforementioned Opinion of Counsel and (2) an Opinion of Counsel to the effect that the creation of the defeasance trust does not violate the U.S. Investment Company Act of 1940, as amended, and after the passage of 365 days following the deposit, the trust fund will not be subject to the effect of Section 547 of the United States Bankruptcy Code or Section 15 of the New York Debtor and Creditor Law, and

(c)     immediately after giving effect to such deposit on a *pro forma* basis, no Event of Default, or event that after the giving of notice or lapse of time or both would become an Event of Default, shall have occurred and be continuing on the date of such deposit or during the period ending on the 365th day after the date of such deposit, and such defeasance shall not result in a breach or violation of, or constitute a default under, any other agreement or instrument to which the Company or any of its Restricted Subsidiaries is a party or by which the Company or any of its Restricted Subsidiaries is bound.

In the case of either discharge or defeasance of the Notes, the Subsidiary Guarantees will terminate.

*Defeasance of Certain Covenants*

The Indenture further will provide that the provisions of the Indenture will no longer be in effect with respect to clauses (3), (4) and (5)(x) under the first paragraph and clauses (3), (4) and (5)(x) under the second

- 28 -

paragraph under "Consolidation, Merger and Sale of Assets" and all the covenants described herein under "Covenants," clause (c) under "Events of Default" with respect to such clauses (3), (4) and (5)(x) under the first paragraph and clauses (3), (4) and (5)(x) under the second paragraph under "Consolidation, Merger and Sale of Assets," clause (d) under "Events of Default" with respect to such other covenants and clauses (e), (f), (i), (j) and (k) under "Events of Default" shall be deemed not to be Events of Default upon, among other things, the deposit with the Trustee, in trust, of money and/or U.S. Government Obligations that through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient to pay the principal of, premium, if any, and accrued interest on the Notes on the Stated Maturity of such payments in accordance with the terms of the Indenture and the Notes, the satisfaction of the provisions described in clause (b)(2) of the preceding paragraph and the delivery by the Company to the Trustee of an Opinion of Counsel to the effect that, among other things, the Holders will not recognize income, gain or loss for United States federal income tax purposes as a result of such deposit and defeasance of certain covenants and Events of Default and will be subject to federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred.

As a condition to the Company exercising its right to discharge or defease the Notes or to defease the covenants as provided in the immediately preceding paragraphs, the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for relating to such discharge and/or defeasance have been complied with.

### Defeasance and Certain Other Events of Default

In the event the Company exercises its option to omit compliance with certain covenants and provisions of the Indenture with respect to the Notes as described in the immediately preceding paragraph and the Notes are declared due and payable because of the occurrence of an Event of Default that remains applicable, the amount of money and/or U.S. Government Obligations on deposit with the Trustee will be sufficient to pay amounts due on the Notes at the time of their Stated Maturity but may not be sufficient to pay amounts due on the Notes at the time of the acceleration resulting from such Event of Default. However, the Company will remain liable for such payments.

## Amendments and Waiver

### Amendments Without Consent of Holders

The Indenture or any Security Document may be amended, without the consent of any Holder, to:

(1)    cure any ambiguity, defect or inconsistency in the Indenture, the Notes or any Security Document;

(2)    comply with the provisions described under "Consolidation, Merger and Sale of Assets;"

(3)    evidence and provide for the acceptance of appointment by a successor Trustee;

(4)    add any Subsidiary Guarantor or any Subsidiary Guarantee or release any Subsidiary Guarantor from any Subsidiary Guarantee as provided or permitted by the terms of the Indenture;

(5)    provide for the issuance of Additional Notes (including PIK Notes) in accordance with the limitations set forth in the Indenture;

(6)    add any Subsidiary Guarantor Pledgor or release any Subsidiary Guarantor Pledgor as provided or permitted by the terms of the Indenture;

(7)    add additional Collateral to secure the Notes or any Subsidiary Guarantee;

(8)    effect any change to the Indenture in a manner necessary to comply with the procedures of DTC;

- 29 -

(9)     permit Permitted Priority Secured Indebtedness (including, without limitation, permitting the Trustee to enter into any amendments to the Security Documents or the Indenture and take any other action necessary to permit the creation and registration of Liens on the Collateral to secure Permitted Priority Secured Indebtedness, in accordance with the Indenture); or

(10)    make any other change that would provide additional rights or benefits to the Holders or that does not adversely affect the rights of any Holder.

### *Amendments with Consent of Holders*

Amendments of the Indenture or any Security Document may be made by the Company, the Subsidiary Guarantors and the Trustee with the consent of the Holders of not less than a majority in aggregate principal amount of the outstanding Notes; provided, however,

(a)     that no such modification or amendment may, without the consent of each Holder affected thereby:

(1)     change the Stated Maturity of the principal of, or any installment of interest on, any Note;

(2)     reduce the principal amount of, or premium, if any, or interest on, any Note;

(3)     change the currency of payment of principal of, or premium, if any, or interest on, any Note;

(4)     impair the right to institute suit for the enforcement of any payment on or after the Stated Maturity (or, in the case of a redemption, on or after the redemption date) of any Note;

(5)     reduce (i) the above stated percentage of outstanding Notes, or (ii) the stated percentage of outstanding Notes referred to in clause (b) below, the consent of whose Holders is necessary to modify or amend the Indenture;

(6)     waive a default in the payment of principal of, premium, if any, or interest on the Notes;

(7)     reduce the percentage or aggregate principal amount of outstanding Notes the consent of whose Holders is necessary for waiver of compliance with certain provisions of the Indenture or for waiver of certain defaults; or

(8)     amend, change or modify any provision of the Indenture or the related definition affecting the ranking of the Notes or any Subsidiary Guarantee in a manner which adversely affects the Holders, and

(b)     that no such modification or amendment may, without the consent of the Holders of not less than 80% in aggregate principal amount of the outstanding Notes affected thereby:

(1)     release any Subsidiary Guarantor from its Subsidiary Guarantee, except as provided in the Indenture;

(2)     release any Collateral, except as provided in the Indenture and the Security Documents;

(3)     amend, change or modify any Subsidiary Guarantee in a manner that adversely affects the Holders;

(4)     amend, change or modify any provision of any Security Document, or any provision of the Indenture relating to the Collateral, in a manner that adversely affects the Holders, except in accordance with the other provisions of the Indenture;

- 30 -

    (5)    change the redemption date or the redemption price of the Notes from that stated under the captions "Optional Redemption" or "Redemption for Taxation Reasons;"or

    (6)    amend, change or modify the obligation of the Company or any Subsidiary Guarantor to pay Additional Amounts.

**Unclaimed Money**

Claims against the Company for the payment of principal of, premium, if any, or interest, on the Notes will become void unless presentation for payment is made as required in the Indenture within a period of six years.

**No Personal Liability of Incorporators, Stockholders, Members, Officers, Directors or Employees**

No recourse for the payment of the principal of, premium, if any, or interest on any of the Notes or for any claim based thereon or otherwise in respect thereof, and no recourse under or upon any obligation, covenant or agreement of the Company or any of the Subsidiary Guarantors in the Indenture, or in any of the Notes or the Subsidiary Guarantees or because of the creation of any Indebtedness represented thereby, shall be had against any incorporator, stockholder, member, officer, director, employee or controlling person of the Company or of any of the Subsidiary Guarantors or of any successor Person thereof. Each Holder, by accepting the Notes, waives and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes and the Subsidiary Guarantees. Such waiver may not be effective to waive liabilities under the federal securities laws.

**Concerning the Trustee and the Paying Agent**

Computershare Trust Company, N.A. is to be appointed as Trustee under the Indenture and Computershare Trust Company, N.A. is to be appointed as registrar and paying agent (the "Paying Agent") with regard to the Notes. Except during the continuance of a Default, the Trustee will not be liable, except for the performance of such duties as are specifically set forth in the Indenture. If an Event of Default has occurred and is continuing, the Trustee will use the same degree of care and skill in its exercise of the rights and powers vested in it under the Indenture as a prudent person would exercise under the circumstances in the conduct of such person's own affairs.

The Indenture contains limitations on the rights of the Trustee, should it become a creditor of the Company or any of the Subsidiary Guarantors, to obtain payment of claims in certain cases or to realize on certain property received by it in respect of any such claims, as security or otherwise. The Trustee is permitted to engage in other transactions; provided, however, that if it acquires any conflicting interest, it must eliminate such conflict or resign.

Computershare Trust Company, N.A. will initially act as Security Trustee under the Security Documents in respect of the Security over the Collateral. The Security Trustee, acting in its capacity as such, shall have such duties with respect to the Collateral pledged, mortgaged or charged pursuant to the Security Documents as are set forth in the Indenture and the Security Documents. Under certain circumstances, the Security Trustee may have obligations under the Security Documents that are in conflict with the interests of the Holders. The Trustee and the Security Trustee will be under no obligation to exercise any rights or powers conferred under the Indenture or any of the Security Documents for the benefit of the Holders unless such Holders have offered to the Trustee and the Security Trustee indemnity or security reasonably satisfactory to the Trustee and the Security Trustee against any loss, liability or expense.

Furthermore, each Holder, by accepting the Notes will agree, for the benefit of the Trustee and the Security Trustee, that it is solely responsible for its own independent appraisal of and investigation into all risks arising under or in connection with the Security Documents and has not relied on and will not at any time rely on the Trustee or the Security Trustee in respect of such risks.

**Book-Entry; Delivery and Form**

The certificates representing the Notes will be issued in fully registered form without interest coupons. Notes will initially be represented by one or more permanent global notes in definitive, fully registered form without

- 31 -

interest coupons (each a "Global Note") and will be deposited with the Trustee as custodian for, and registered in the name of a nominee of, DTC.

Each Global Note (and any Notes issued for exchange therefor) will be subject to certain restrictions on transfer set forth therein as described under "Transfer Restrictions."

Ownership of beneficial interests in a Global Note will be limited to persons who have accounts with DTC ("participants") or persons who hold interests through participants. Ownership of beneficial interests in a Global Note will be shown on, and the transfer of that ownership will be effected only through, records maintained by DTC or its nominee (with respect to interests of participants) and the records of participants (with respect to interests of persons other than participants).

So long as DTC, or its nominee, is the registered owner or holder of a Global Note, DTC or such nominee, as the case may be, will be considered the sole owner or holder of the Notes represented by such Global Note for all purposes under the Indenture and the Notes. No beneficial owner of an interest in a Global Note will be able to transfer that interest except in accordance with DTC's applicable procedures, in addition to those provided for under the Indenture.

Payments of the principal of, and interest on, a Global Note will be made to DTC or its nominee, as the case may be, as the registered owner thereof. Neither the Company, nor any of the Subsidiary Guarantors, the Trustee nor any Paying Agent will have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Note or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

The Company expects that DTC or its nominee, upon receipt of any payment of principal or interest in respect of a Global Note, will credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the principal amount of such Global Note as shown on the records of DTC or its nominee. The Company also expects that payments by participants to owners of beneficial interests in such Global Note held through such participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for such customers. Such payments will be the responsibility of such participants.

Transfers between participants in DTC will be effected in the ordinary way in accordance with DTC rules and will be settled in same-day funds.

The Company expects that DTC will take any action permitted to be taken by a Holder (including the presentation of Notes for exchange as described below) only at the direction of one or more participants to whose account the DTC interests in a Global Note is credited and only in respect of such portion of the aggregate principal amount of Notes as to which such participant or participants has or have given such direction. However, if there is an Event of Default under the Notes, DTC will exchange the applicable Global Note for Certificated Notes, which it will distribute to its participants and which may be legended as set forth under the heading "Transfer Restrictions."

Although DTC is expected to follow the foregoing procedures in order to facilitate transfers of interests in a Global Note among participants of DTC, it is under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. None of the Company, any of the Subsidiary Guarantors, the Trustee or any Paying Agent will have any responsibility for the performance by DTC or its participants or indirect participants of its obligations under the rules and procedures governing its operations.

If DTC is at any time unwilling or unable to continue as a depositary for the Global Notes and a successor depositary is not appointed by the Company within 90 days, the Company will issue Certificated Notes in registered form, which may bear the legend referred to under "Transfer Restrictions," in exchange for the Global Notes. Holders of an interest in a Global Note may receive Certificated Notes, which may bear the legend referred to under "Transfer Restrictions," in accordance with the DTC's rules and procedures in addition to those provided for under the Indenture.

- 32 -

**The Clearing System**

*General*

DTC has advised the Company as follows:

*DTC*. DTC is a limited-purpose trust company organized under the laws of the State of New York, a "banking organization" within the meaning of New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities of its participants and to facilitate the clearance and settlement of securities transactions among its participants in such securities through electronic book-entry changes in accounts of its participants, thereby eliminating the need for physical movement of securities certificates. DTC's participants include securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations, some of whom own DTC, and may include the dealer manager. Indirect access to the DTC system is also available to others that clear through or maintain a custodial relationship with a DTC participant, either directly or indirectly. Transfers of ownership or other interests in Notes in DTC may be made only through DTC participants. In addition, beneficial owners of Notes in DTC will receive all distributions of principal of and interest on the Notes from the Trustee through such DTC participant.

*Deposit and Holding of Notes; Settlement*

All Notes issued in the form of global notes will be deposited with the Trustee as custodian for DTC. Investors' interests in Notes held in book-entry form by DTC will be represented through financial institutions acting on their behalf as direct and indirect participants in DTC.

Investors holding their Notes through DTC must follow the settlement practices applicable to United States corporate debt obligations. The securities custody accounts of investors will be credited with their holdings against payment in same day funds on the settlement date.

*Secondary Market Trading*

Because the purchaser determines the place of delivery, it is important to establish at the time of trading of any Notes where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

*Trading between DTC Participants*. Secondary market trading between DTC participants will occur in the ordinary way in accordance with DTC rules and will be settled using the procedures applicable to United States corporate debt obligations in same-day funds using DTC's Same Day Funds Settlement System.

The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC participant, a cross-market transaction will settle no differently than a trade between two DTC participants.

None of the Company, the Trustee or any Paying Agent will have any responsibility for the performance by DTC or its respective participants or indirect participants of its obligations under the rules and procedures governing their operations.

**Notices**

All notices or demands required or permitted by the terms of the Notes or the Indenture to be given to or by the Holders are required to be in writing and may be given or served by being sent by prepaid courier or by being deposited, first-class postage prepaid, in the United States mail (if intended for the Company or any Subsidiary Guarantor or the Trustee) addressed to the Company, such Subsidiary Guarantor or the Trustee, as the case may be, at the corporate trust office of the Trustee; and (if intended for any Holder) addressed to such Holder at such Holder's last address as it appears in the Note register.

- 33 -

Any such notice or demand will be deemed to have been sufficiently given or served when so sent or deposited and, if to the Holders, when delivered in accordance with the applicable rules and procedures of DTC. Any such notice shall be deemed to have been delivered on the day such notice is delivered to DTC or if by mail, when so sent or deposited.

## Consent to Jurisdiction; Service of Process

The Company and each of the Subsidiary Guarantors will irrevocably (i) submit to the non-exclusive jurisdiction of any U.S. Federal or New York State court located in the Borough of Manhattan, The City of New York in connection with any suit, action or proceeding arising out of, or relating to, the Notes, any Subsidiary Guarantee, the Indenture or any transaction contemplated thereby and (ii) designate and appoint a reputable professional service company in New York City, New York for receipt of service of process in any such suit, action or proceeding.

## Governing Law

Each of the Notes, the Subsidiary Guarantees and the Indenture provides that such instrument will be governed by, and construed in accordance with, the laws of the State of New York without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

## Definitions

Set forth below are defined terms used in the covenants and other provisions of the Indenture.

Reference is made to the Indenture for other capitalized terms used in this "Description of the Notes" for which no definition is provided.

"Acquired Indebtedness" means Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary or Indebtedness of a Restricted Subsidiary assumed in connection with an Asset Acquisition by such Restricted Subsidiary.

"Adjusted Treasury Rate" means, with respect to any redemption date, the rate per annum equal to the semi-annual equivalent yield in maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

"Affiliate" means, with respect to any Person, any other Person (i) directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person or (ii) who is a director or officer of such Person or any Subsidiary of such Person or of any Person referred to in clause (i) of this definition. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Applicable Premium" means with respect to an Note at any redemption date, the greater of (1) 1.00% of the principal amount of such Note and (2) the excess of (A) the present value at such redemption date of (x) the redemption price of such Note at the fourth anniversary date of the Original Issue Date (such redemption price being set forth in the table appearing under the caption "—Optional Redemption"), plus (y) all required remaining scheduled interest payments due on such Note (but excluding accrued and unpaid interest to the redemption date) through the fourth anniversary date of the Original Issue Date, computed using a discount rate equal to the Adjusted Treasury Rate plus 50 basis points, over (B) the principal amount of such Note on such redemption date.

"Asset Acquisition" means (1) an investment by the Company or any of its Restricted Subsidiaries in any other Person pursuant to which such Person shall become a Restricted Subsidiary or shall be merged into or consolidated with the Company or any of its Restricted Subsidiaries, or (2) an acquisition by the Company or any of

- 34 -

its Restricted Subsidiaries of the property and assets of any Person other than the Company or any of its Restricted Subsidiaries that constitute substantially all of a division or line of business of such Person.

"Asset Disposition" means the sale or other disposition by the Company or any of its Restricted Subsidiaries (other than to the Company or another Restricted Subsidiary) of (1) all or substantially all of the Capital Stock of any Restricted Subsidiary or (2) all or substantially all of the assets that constitute a division or line of business of the Company or any of its Restricted Subsidiaries.

"Asset Sale" means any sale, transfer or other disposition (including by way of merger, consolidation or Sale and Leaseback Transaction) of any of its property or assets (including Capital Stock of a Restricted Subsidiary) in one transaction or a series of related transactions by the Company or any of its Restricted Subsidiaries to any Person other than the Company or any Wholly-Owned Restricted Subsidiary; provided that "Asset Sale" shall not include:

<ol type="a">
<li>sales or other dispositions of inventory, receivables and other current assets (including, but not limited to wood chips, logs, lumber, and manufactured wood and wood panel products) or standing timber in the ordinary course of business,</li>

<li>any disposition that constitutes a Change of Control or an Entire Sale Transaction;</li>

<li>sales, transfers or other dispositions of assets constituting a Permitted Investment or Restricted Payment permitted to be made under the "Limitation on Restricted Payments" covenant,</li>

<li>sales, transfers or other dispositions of assets with a Fair Market Value not in excess of US$5.0 million (or the Dollar Equivalent thereof) in any transaction or series of related transactions,</li>

<li>any sale, transfer, assignment or other disposition of any property, or equipment that has become damaged, worn out, obsolete or otherwise unsuitable for use in connection with the business of the Company or its Restricted Subsidiaries,</li>

<li>any, transfer, assignment or other disposition deemed to occur in connection with creating or granting any Permitted Lien, or</li>

<li>a transaction covered by the covenant under the caption "—Consolidation, Merger and Sale of Assets."</li>
</ol>

"Average Life" means, at any date of determination with respect to any Indebtedness, the quotient obtained by dividing (1) the sum of the products of (a) the number of years from such date of determination to the dates of each successive scheduled principal payment of such Indebtedness and (b) the amount of such principal payment by (2) the sum of all such principal payments.

"Board of Directors" means the board of directors elected or appointed by the members of the Company to manage the business of the Company or any committee of such board duly authorized to take the action purported to be taken by such committee.

"Board Resolution" means any resolution of the Board of Directors taking an action which it is authorized to take and adopted at a meeting duly called and held at which a quorum of disinterested members (if so required) was present and acting throughout or adopted by written resolution executed by every member of the Board of Directors.

"Business Day" means any day which is not a Saturday, Sunday, legal holiday or other day on which banking institutions in The City of New York, United States, the city in which the Corporate Trust Office of the Trustee is located, Hong Kong or the Cayman Islands (or in any other place in which payments on the Notes are to be made) are authorized by law or governmental regulation to close.

- 35 -

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) in equity of such Person, whether outstanding on the Original Issue Date or issued thereafter, including, without limitation, all Common Stock and Preferred Stock, but excluding any debt securities convertible into such equity.

"Capitalized Lease" means, with respect to any Person, any lease of any property (whether real, personal or mixed) which, in conformity with IFRS, is required to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" means the discounted present value of the rental obligations under a Capitalized Lease.

"Change of Control" means the occurrence of one or more of the following events:

(1)        the merger, amalgamation, or consolidation of the Company with or into another Person or the merger or amalgamation of another Person with or into the Company, or the sale of all or substantially all the assets of the Company to another Person (other than an Entire Sale Transaction);

(2)        any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act) is or becomes the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 35% of the total voting power of the Voting Stock of the Company;

(3)        the majority of the directors of the Company are not Continuing Directors; or

(4)        the adoption of a plan relating to the liquidation or dissolution of the Company.

"Change of Control Triggering Event" means the occurrence of a Change of Control.

"Collateral" means all collateral securing, or purported to be securing, directly or indirectly, the Company's obligations under the Indenture, the Security Documents and the Notes, any Subsidiary Guarantee, Permitted Priority Secured Indebtedness or any Permitted Priority Subsidiary Guarantee, pursuant to the Security Documents, and shall initially consist of all property and assets (including Capital Stock) of the Company and the initial Subsidiary Guarantors held by the Company or a Subsidiary Guarantor Pledgor, and may include all property and assets (including any other Capital Stock of any Person) owned by the Company or any Subsidiary Guarantor Pledgor that becomes a Restricted Subsidiary (other than those organized under the laws of the PRC, or which are a Foreign Subsidiary) as may be pledged, mortgaged or charged by the Company or the Subsidiary Guarantor Pledgors from time to time pursuant to the section "Security."

"Commodity Agreement" means any forward contract, commodity swap agreement, commodity option agreement or other similar agreement or arrangement.

"Common Stock" means, with respect to any Person, any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of such Person's common stock or ordinary shares, whether or not outstanding at the date of the Indenture, and include, without limitation, all series and classes of such common stock or ordinary shares.

"Comparable Treasury Issue" means the U.S. Treasury security selected by a Reference Treasury Dealer having a comparable maturity to the fourth anniversary date of the Original Issue Date that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the fourth anniversary date of the Original Issue Date.

- 36 -

"Comparable Treasury Price" means, with respect to any redemption date, as calculated by a Reference Treasury Dealer:

    (1)    the average of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) on the third Business Day preceding such redemption date, as set forth in the daily statistical release (of any successor release) published by the Federal Reserve Bank of New York and designated "Composite 3:30 p.m. Quotations for U.S. Government Securities;" or

    (2)    if such release (or any successor release) is not published or does not contain such prices on such Business Day, (a) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest of such Reference Treasury Dealer Quotations, or (b) if fewer than three such Reference Treasury Dealer Quotations are available, the average of all such quotations.

"Consolidated EBITDA" means, for any period, Consolidated Net Income for such period plus, to the extent such amount was deducted in calculating such Consolidated Net Income:

    (1)    Consolidated Interest Expense,

    (2)    income taxes (other than income taxes attributable to extraordinary and non-recurring gains (or losses) or sales of assets),

    (3)    depreciation expense, amortization expense and all other non-cash items reducing Consolidated Net Income (other than depletion of timber holdings or non-cash items in a period which reflect cash expenses paid or to be paid in another period), less all non-cash items increasing Consolidated Net Income,

all as determined on a consolidated basis for the Company and its Restricted Subsidiaries in conformity with IFRS, *provided that* if any Restricted Subsidiary is not a Wholly-Owned Restricted Subsidiary, Consolidated EBITDA shall be reduced (to the extent not otherwise reduced in accordance with IFRS) by an amount equal to (A) the amount of the Consolidated Net Income attributable to such Restricted Subsidiary multiplied by (B) the percentage ownership interest in the income of such Restricted Subsidiary not owned on the last day of such period by the Company or any of its Restricted Subsidiaries.

"Consolidated Fixed Charges" means, for any period, the sum (without duplication) of (i) Consolidated Interest Expense for such period and (ii) all cash and non cash dividends, accrued or accumulated during such period on any Disqualified Stock or Preferred Stock of the Company or any Restricted Subsidiary held by Persons other than the Company or any Wholly-Owned Restricted Subsidiary.

"Consolidated Interest Expense" means, for any period, the amount that would be included in gross interest expense on a consolidated income statement prepared in accordance with IFRS for such period of the Company and its Restricted Subsidiaries, plus, to the extent not included in such gross interest expense, and to the extent incurred or paid during such period by the Company and its Restricted Subsidiaries, without duplication, (i) interest expense attributable to Capitalized Lease Obligations, (ii) amortization of debt issuance costs and original issue discount expense and non cash interest payments in respect of any Indebtedness, (iii) the interest portion of any deferred payment obligation, (iv) all commissions, discounts and other fees and charges with respect to letters of credit or similar instruments issued for financing purposes or in respect of any Indebtedness, (v) the interest equivalent costs associated with Interest Rate Agreements, (vi) interest actually paid by the Company or any Restricted Subsidiary on Indebtedness of any other Person that is Guaranteed by the Company or any Restricted Subsidiary and (vii) any capitalized interest, *provided that* interest expense attributable to interest on any Indebtedness bearing a floating interest rate will be computed on a *pro forma* basis as if the rate in effect on the date of determination had been the applicable rate for the entire relevant period.

"Consolidated Net Income" means, with respect to any specified Person for any period, the aggregate of the net income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in

- 37 -

conformity with IFRS; *provided that* the following items shall be excluded in computing Consolidated Net Income (without duplication):

(1)    the net income (or loss) of any Person that is not a Restricted Subsidiary or that is accounted for by the equity method of accounting except to the extent of the amount of dividends or similar distributions actually paid in cash to the specified Person or a Restricted Subsidiary of the Person during such period;

(2)    the net income (and loss) of any Person accrued prior to the date it becomes a Restricted Subsidiary or is merged into or consolidated with the Company or any of its Restricted Subsidiaries or all or substantially all of the property and assets of such Person are acquired by the Company or any of its Restricted Subsidiaries;

(3)    the net income of any Restricted Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of such net income is not at the time permitted by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Restricted Subsidiary;

(4)    the cumulative effect of a change in accounting principles will be excluded;

(5)    any net after tax gains (or losses) realized on the sale or other disposition of (A) any property or assets of the Company or any Restricted Subsidiary which is not sold in the ordinary course of its business or (B) any Capital Stock of any Person (including any gains by the Company realized on sales of Capital Stock of the Company or other Restricted Subsidiaries);

(6)    any translation gains and losses due solely to fluctuations in currency values and related tax effects; and

(7)    any net after-tax extraordinary or non-recurring gains (or losses).

"Consolidated Net Worth" means, at any date of determination, stockholders' equity or members' equity as set forth on the most recently available semi-annual or annual consolidated balance sheet of the Company and its Restricted Subsidiaries, plus, to the extent not included, any Preferred Stock of the Company, less any amounts attributable to Disqualified Stock or any equity security convertible into or exchangeable for Indebtedness, the cost of treasury stock or shares and the principal amount of any promissory notes receivable from the sale of the Capital Stock of the Company or any of its Restricted Subsidiaries, each item to be determined in conformity with IFRS.

"Continuing Directors" means, as of any date of determination, any member of the Board of Directors of the Company who:

(1)    was a member of such Board of Directors on the Original Issue Date;

(2)    was designated by any shareholder entitled to designate a director under the Company's Memorandum and Articles of Association; or

(3)    was elected or appointed to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such director's nomination or election.

"Currency Agreement" means any foreign exchange contract, currency swap agreement or other similar agreement or arrangement.

"Default" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"Disqualified Stock" means any class or series of Capital Stock of any Person that by its terms or otherwise is (1) required to be redeemed prior to the Stated Maturity of the Notes, (2) redeemable at the option of the holder of

- 38 -

such class or series of Capital Stock at any time prior to the Stated Maturity of the Notes or (3) convertible into or exchangeable for Capital Stock referred to in clause (1) or (2) above or Indebtedness having a scheduled maturity prior to the Stated Maturity of the Notes; *provided that* any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the Stated Maturity of the Notes shall not constitute Disqualified Stock if the "asset sale" or "change of control" provisions applicable to such Capital Stock are no more favorable to the holders of such Capital Stock than the provisions contained in "Limitation on Asset Sales" and "Repurchase of Notes upon a Change of Control Triggering Event" covenants and such Capital Stock specifically provides that such Person will not repurchase or redeem any such Capital Stock pursuant to such provision prior to the Company's repurchase of such Notes as are required to be repurchased pursuant to the "Limitation on Asset Sales" and "Repurchase of Notes upon a Change of Control Triggering Event" covenants.

"Dollar Equivalent" means, with respect to any monetary amount in a currency other than U.S. dollars, at any time for the determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the base rate for the purchase of U.S. dollars with the applicable foreign currency as quoted by the Federal Reserve Bank of New York on the date of determination.

"DTC" means The Depository Trust Company, a New York corporation, and its successors.

"Entire Sale Transaction" means an Asset Disposition by the Company (other than to a Restricted Subsidiary) of all or substantially all of the Capital Stock of all Subsidiaries owned by the Company and/or of all or substantially all of the assets of the Company.

"Entire Sale Transaction Mandatory Redemption" has the meaning under the heading "*Mandatory Redemption of Notes upon an Entire Sale Transaction*".

"Entire Sale Transaction Redemption Price" has the meaning under the heading "*Mandatory Redemption of Notes upon an Entire Sale Transaction*".

"Equity Offering" means any primary private or public offering of Common Stock of the Company after the Original Issue Date.

"Fair Market Value" means the price that would be paid in an arm's length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by the Board of Directors, whose determination shall be conclusive if evidenced by a Board Resolution; provided, however, that for purposes of clause (4)(a) under the caption "—Certain Covenants—Limitation on Asset Sales," such determination may instead be made by the Company's Chief Executive Officer or Chief Financial Officer.

"Fixed Charge Coverage Ratio" means, on any Transaction Date, the ratio of (1) the aggregate amount of Consolidated EBITDA for the then most recent two fiscal half-years prior to such Transaction Date for which consolidated financial statements of the Company (which the Company shall use its best efforts to compile in a timely manner) are available and have been provided to the Trustee (the "Two Half-Year Period") to (2) the aggregate Consolidated Fixed Charges during such Two Half-Year Period. In making the foregoing calculation:

(A)     *pro forma* effect shall be given to any Indebtedness, Disqualified Stock or Preferred Stock Incurred, repaid or redeemed during the period (the "Reference Period") commencing on and including the first day of the Two Half-Year Period and ending on and including the Transaction Date (other than Indebtedness Incurred or repaid under a revolving credit or similar arrangement (or under any predecessor revolving credit or similar arrangement) in effect on the last day of such Two Half-Year Period), in each case as if such Indebtedness, Disqualified Stock or Preferred Stock had been Incurred, repaid or redeemed on the first day of such Reference Period;

(B)     Consolidated Interest Expense attributable to interest on any Indebtedness (whether existing or being Incurred) computed on a *pro forma* basis and bearing a floating interest rate shall be computed as if the rate in effect on the Transaction Date (taking into account any Interest Rate

- 39 -

Agreement applicable to such Indebtedness if such Interest Rate Agreement has a remaining term in excess of 12 months or, if shorter, at least equal to the remaining term of such Indebtedness) had been the applicable rate for the entire period;

(C)     *pro forma* effect shall be given to the creation, designation or redesignation of Restricted and Unrestricted Subsidiaries as if such creation, designation or redesignation had occurred on the first day of such Reference Period;

(D)     *pro forma* effect shall be given to Asset Dispositions and Asset Acquisitions (including giving *pro forma* effect to the application of proceeds of any Asset Disposition) that occur during such Reference Period as if they had occurred and such proceeds had been applied on the first day of such Reference Period; and

(E)     *pro forma* effect shall be given to asset dispositions and asset acquisitions (including giving *pro forma* effect to the application of proceeds of any asset disposition) that have been made by any Person that has become a Restricted Subsidiary or has been merged with or into the Company or any Restricted Subsidiary during such Reference Period and that would have constituted Asset Dispositions or Asset Acquisitions had such transactions occurred when such Person was a Restricted Subsidiary as if such asset dispositions or asset acquisitions were Asset Dispositions or Asset Acquisitions that occurred on the first day of such Reference Period;

*provided that* to the extent that clause (D) or (E) of this sentence requires that *pro forma* effect be given to an Asset Acquisition or Asset Disposition (or asset acquisition or asset disposition), such *pro forma* calculation shall be based upon the two full fiscal half-years immediately preceding the Transaction Date of the Person, or division or line of business of the Person, that is acquired or disposed for which financial information is available.

"Foreign Subsidiary" means any Restricted Subsidiary of the Company organized under the laws of a jurisdiction that prohibits such Subsidiary from guaranteeing payments under the Notes.

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation of such other Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (2) entered into for purposes of assuring in any other manner the obligee of such Indebtedness or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Holder" means the Person in whose name a Note is registered in the Note register.

"IFRS" means International Financial Reporting Standards as adopted by the International Accounting Standards Board, applied on a consistent basis. All ratios and computations contained or referred to in the Indenture shall be computed in conformity with IFRS applied on a consistent basis.

"Incur" means, with respect to any Indebtedness or Capital Stock, to incur, create, issue, assume, Guarantee or otherwise become liable for or with respect to, or become responsible for, the payment of, contingently or otherwise, such Indebtedness or Capital Stock; *provided that* (1) any Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary and (2) the accretion of original issue discount shall not be considered an Incurrence of Indebtedness. The terms "Incurrence," "Incurred" and "Incurring" have meanings correlative with the foregoing.

- 40 -

"Indebtedness" means, with respect to any Person at any date of determination (without duplication):

(1) all indebtedness of such Person for borrowed money;

(2) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3) all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments;

(4) all obligations of such Person to pay the deferred and unpaid purchase price of property or services, except Trade Payables;

(5) all Capitalized Lease Obligations;

(6) all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided that* the amount of such Indebtedness shall be the lesser of (A) the Fair Market Value of such asset at such date of determination and (B) the amount of such Indebtedness;

(7) all Indebtedness of other Persons Guaranteed by such Person to the extent such Indebtedness is Guaranteed by such Person; and

(8) to the extent not otherwise included in this definition, obligations under Commodity Agreements, Currency Agreements and Interest Rate Agreements.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and, with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation, provided

(A) that the amount outstanding at any time of any Indebtedness issued with original issue discount is the face amount of such Indebtedness less the remaining unamortized portion of the original issue discount of such Indebtedness at such time as determined in conformity with IFRS,

(B) that money borrowed and set aside at the time of the Incurrence of any Indebtedness in order to prefund the payment of the interest on such Indebtedness shall not be deemed to be "Indebtedness" so long as such money is held to secure the payment of such interest, and

(C) that the amount of Indebtedness with respect to any Commodity Agreements, Currency Agreements and Interest Rate Agreements shall be equal to the net amount payable if such agreements terminated at that time due to default by such Person.

"Independent Financial Advisor" means an investment banking firm or accounting firm of national reputation in the United States of America or in Hong Kong (i) which does not, and whose directors, officers, employees and affiliates do not, have a direct or indirect financial interest in the Company or any of its Affiliates, and (ii) which, in the judgement of the Board of Directors of the Company, is otherwise independent and qualified to perform the task for which it is to be engaged.

"Intercreditor Agreement" has the meaning set forth under "Security".

"Interest Rate Agreement" means any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement, option or future contract or other similar agreement or arrangement.

- 41 -

"Investment" means:

(i)     any direct or indirect advance, loan or other extension of credit (other than Trade Payables that are, in conformity with IFRS, recorded as accounts receivable, prepaid expenses or deposits on the balance sheet of the Company or its Restricted Subsidiaries) to another Person,

(ii)     capital contribution to another Person (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others),

(iii)     any purchase or acquisition of Capital Stock, Indebtedness, bonds, notes, debentures or other similar instruments or securities issued by another Person, or

(iv)     any Guarantee of any obligation of another Person;

*provided that* an acquisition of assets, Capital Stock or other securities by the Company or a Subsidiary for consideration to the extent such consideration consists of common equity securities of the Company shall not be deemed to be an Investment.

For the purposes of the provisions of the "Designation of Restricted and Unrestricted Subsidiaries" and "Limitation on Restricted Payments" covenants: (i) the Company will be deemed to have made an investment in an Unrestricted Subsidiary in an amount equal to the Fair Market Value of the assets (net of liabilities owed to any Person other than the Company or a Restricted Subsidiary and that are not Guaranteed by the Company or a Restricted Subsidiary) of a Restricted Subsidiary that is designated an Unrestricted Subsidiary at the time of such designation, and (ii) any property transferred to or from any Person shall be valued at its Fair Market Value at the time of such transfer, as determined in good faith by the Board of Directors.

"Joint Venture" means any Person engaged in a Permitted Business of which the Company, together with its Restricted Subsidiaries, directly holds or, as a result of the respective Investment, will hold, at least 50.1% of its Capital Stock.

"Leverage Ratio" means, as at the time of determination, the aggregate principal amount of Indebtedness of the Company and the Restricted Subsidiaries outstanding at such time determined on a consolidated basis, divided by the Consolidated EBITDA of the Company for the two fiscal half-years immediately preceding the date of determination for which consolidated financial statements of the Company are available and have been provided to the Trustee.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof or any agreement to create any mortgage, pledge, security interest, lien, charge, easement or encumbrance of any kind).

"Measurement Date" means the first day of fiscal half-year period of the Company immediately preceding the Original Issue Date.

"Moody's" means Moody's Investors Service and its affiliates.

"Net Cash Proceeds" means:

(a)     with respect to any Asset Sale, the proceeds of such Asset Sale in the form of cash or cash equivalents, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not interest, component thereof) when received in the form of cash or cash equivalents and proceeds from the conversion of other property received when converted to cash or cash equivalents, net of

(i)     brokerage commissions and other fees and expenses (including fees and expenses of counsel and investment bankers) related to such Asset Sale;

(ii) provisions for all taxes (whether or not such taxes will actually be paid or are payable) as a result of such Asset Sale without regard to the consolidated results of operations of the Company and its Restricted Subsidiaries, taken as a whole;

(iii) payments made to repay Indebtedness or any other obligation outstanding at the time of such Asset Sale that either (x) is secured by a Lien on the property or assets sold or (y) is required to be paid as a result of such sale;

(iv) appropriate amounts to be provided by the Company or any Restricted Subsidiary as a reserve against any liabilities associated with such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in conformity with IFRS; and

(b) with respect to any issuance or sale of Capital Stock, the proceeds of such issuance or sale in the form of cash or cash equivalents, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not interest, component thereof) when received in the form of cash or cash equivalents and proceeds from the conversion of other property received when converted to cash or cash equivalents, net of attorney's fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof.

"Offer to Purchase" means an offer to purchase Notes by the Company from the Holders commenced by the Company mailing a notice by first class mail, postage prepaid, to the Trustee and each Holder at its last address appearing in the Note register stating:

(1) the covenant pursuant to which the offer is being made and that all Notes validly tendered will be accepted for payment on a pro rata basis;

(2) the purchase price and the date of purchase (which shall be a Business Day no earlier than 30 days nor later than 60 days from the date such notice is mailed) (the "Payment Date");

(3) that any Note not tendered will continue to accrue interest pursuant to its terms;

(4) that, unless the Company defaults in the payment of the purchase price, any Note accepted for payment pursuant to the Offer to Purchase shall cease to accrue interest on and after the Payment Date;

(5) that Holders electing to have a Note purchased pursuant to the Offer to Purchase will be required to surrender the Note, together with the form entitled "Option of the Holder to Elect Purchase" on the reverse side of the Note completed, to the Paying Agent at the address specified in the notice prior to the close of business on the Business Day immediately preceding the Payment Date;

(6) that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than the close of business on the third Business Day immediately preceding the Payment Date, a facsimile transmission or letter setting forth the name of such Holder, the principal amount of Notes delivered for purchase and a statement that such Holder is withdrawing his election to have such Notes purchased; and

(7) that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered; *provided that* each Note purchased and each new Note issued shall be in a principal amount of US$2,000 or integral multiples of US$1,000.

- 43 -

On the Payment Date, the Company shall (a) accept for payment on a *pro rata* basis Notes or portions thereof tendered pursuant to an Offer to Purchase; (b) deposit with the Paying Agent money sufficient to pay the purchase price of all Notes or portions thereof so accepted; and (c) deliver, or cause to be delivered, to the Trustee all Notes or portions thereof so accepted together with an Officer's Certificate specifying the Notes or portions thereof accepted for payment by the Company. The Paying Agent shall promptly mail or wire to the Holders so accepted payment in an amount equal to the purchase price, and the Trustee shall promptly authenticate and mail to such Holders a new Note equal in principal amount to any unpurchased portion of the Note surrendered; *provided that* each Note purchased and each new Note issued shall be in a principal amount of US$2,000 or integral multiples of US$1,000. The Company will publicly announce the results of an Offer to Purchase as soon as practicable after the Payment Date. The Company will comply with Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable, in the event that the Company is required to repurchase Notes pursuant to an Offer to Purchase.

The offer is required to contain or incorporate by reference information concerning the business of the Company and its Subsidiaries which the Company in good faith believes will assist such Holders to make an informed decision with respect to the Offer to Purchase, including a brief description of the events requiring the Company to make the Offer to Purchase, and any other information required by applicable law to be included therein. The offer is required to contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Offer to Purchase.

"Officer" means one of the executive officers of the Company, or, in the case of a Subsidiary Guarantor, one of the directors or officers of such Subsidiary Guarantor.

"Officer's Certificate" means (i) a certificate signed by two Officers or (ii) in the event the relevant entity has one appointed Officer only, a certificate signed by such Officer or (iii) in the event the relevant entity has no appointed Officer, a certificate signed by either its sole director or two directors if such entity has more than one director.

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Trustee.

"Original Issue Date" means the date on which the Notes are originally issued under the Indenture.

"Permitted Businesses" means the Permitted Forestry Plantation Business and the manufacturing of wood and wood-based products and related businesses and activities incidental to such activities.

"Permitted Forestry Plantation Business" means the operation of forestry plantations and production and processing facilities, the processing, sale, distribution, transportation, cultivation and development of wood fibers and logs, and other similar wood and wood-based products, including bio-fuels, the operation of plantation nurseries, and the sale and distribution of seeds and saplings, inputs and similar products, or intermediate products and by-products used or produced in connection with such activities, the planting of saplings and trees in city greening and urban landscaping projects, including the design and implementation of such projects, the import and export of logs, lumber and other wood and wood-based products, trading agency activities related to the foregoing, and related businesses and activities incidental to any of the foregoing activities.

"Permitted Investment" means:

(1)    any Investment in the Company or a Restricted Subsidiary that is primarily engaged in a Permitted Forestry Plantation Business or a Person which will, upon the making of such Investment, become a Restricted Subsidiary that is primarily engaged in a Permitted Forestry Plantation Business or be merged or consolidated with or into or transfer or convey all or substantially all its assets to, the Company or a Restricted Subsidiary that is primarily engaged in a Permitted Forestry Plantation Business;

(2)    Temporary Cash Investments;

- 44 -

(3)     payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses in accordance with IFRS;

(4)     an Investment in an Unrestricted Subsidiary consisting solely of an Investment in another Unrestricted Subsidiary;

(5)     Commodity Agreements, Interest Rate Agreements and Currency Agreements designed solely to protect the Company or any Restricted Subsidiary against fluctuations in commodity prices, interest rates or foreign currency exchange rates;

(6)     receivables owing to the Company or any Restricted Subsidiary, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(7)     any securities, non-cash consideration or other Investments received as consideration in, or retained in connection with, sales or other dispositions of property or assets, including Asset Dispositions made in compliance with the covenant described under "—Limitation on Asset Sales;"

(8)     pledges or deposits (x) with respect to leases or utilities provided to third parties in the ordinary course of business or (y) otherwise described in the definition of "Permitted Liens" or made in connection with Liens permitted under the covenant described under "—Limitation on Liens;"

(9)     loans or advances to employees made in the ordinary course of business and consistent with past practices of the Company or past practices of a Restricted Subsidiary, as the case may be, in an aggregate amount outstanding not to exceed at any one time US$500,000 (or the Dollar Equivalent thereof); and

(10)    loans to employees, directors and officers not exceeding the amount required to exercise an option to purchase the Company's Capital Stock held by such individual, provided that the Capital Stock issued upon exercise of such option is pledged, mortgaged and/or charged to the Company as security for such loan.

"Permitted Liens" means:

(1)     Liens for taxes, assessments, governmental charges or claims that are being contested in good faith by appropriate legal or administrative proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as shall be required in conformity with IFRS shall have been made;

(2)     statutory and common law Liens of landlords and carriers, warehousemen, mechanics, suppliers, repairmen or other similar Liens arising in the ordinary course of business and with respect to amounts not yet delinquent or being contested in good faith by appropriate legal or administrative proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as shall be required in conformity with IFRS shall have been made;

(3)     Liens incurred or deposits made to secure the performance of tenders, bids, leases, statutory or regulatory obligations, bankers' acceptances, surety and appeal bonds, government contracts, performance and return-of-money bonds and other obligations of a similar nature incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money);

(4)     leases or subleases granted to others that do not materially interfere with the ordinary course of business of the Company and its Restricted Subsidiaries, taken as a whole;

(5)     Liens encumbering property or assets under construction arising from progress or partial payments by a customer of the Company or its Restricted Subsidiaries relating to such property or assets;

529

- 45 -

(6)     any interest or title of a lessor in the property subject to any operating lease;

(7)     Liens on property of, or on shares of Capital Stock or Indebtedness of, any Person existing at the time such Person becomes, or becomes a part of, any Restricted Subsidiary; provided that such Liens do not extend to or cover any property or assets of the Company or any Restricted Subsidiary other than the property or assets acquired;

(8)     Liens in favor of the Company or any Wholly-Owned Restricted Subsidiary;

(9)     Liens arising from the rendering of a final judgment or order against the Company or any Restricted Subsidiary that does not give rise to an Event of Default;

(10)    Liens securing reimbursement obligations with respect to letters of credit that encumber documents and other property relating to such letters of credit and the products and proceeds thereof;

(11)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(12)    Liens encumbering customary initial deposits and margin deposits, and other Liens that are within the general parameters customary in the industry and incurred in the ordinary course of business, in each case, securing Indebtedness under Commodity Agreements, Interest Rate Agreements and Currency Agreements designed solely to protect the Company or any of its Restricted Subsidiaries from fluctuations in interest rates, currencies or the price of commodities;

(13)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business in accordance with the past practices of the Company and its Restricted Subsidiaries prior to the Original Issue Date;

(14)    Liens existing on the Original Issue Date;

(15)    Liens on real property, trees or current assets securing Indebtedness which is permitted to be Incurred under clause (7) of the second paragraph of the "Limitation on Indebtedness and Disqualified or Preferred Stock" covenant;

(16)    Liens securing Indebtedness which is Incurred to refinance secured Indebtedness which is permitted to be Incurred under clause (5) of the second paragraph of the "Limitation on Indebtedness and Disqualified or Preferred Stock" covenant; provided that such Liens do not extend to or cover any property or assets of the Company or any Restricted Subsidiary other than the property or assets securing the Indebtedness being refinanced;

(17)    Liens under the Security Documents; and

(18)    Liens securing any Permitted Priority Secured Indebtedness that complies with each of the requirements set forth under "Security—Permitted Priority Secured Indebtedness."

"Permitted Priority Secured Indebtedness" means Indebtedness of the Company which, in the instrument creating or evidencing the same, is expressly stated to be secured by a lien over the Collateral ranking in priority to the Lien over the Collateral granted to the Holders of the Notes, and all guarantees thereof by any of the Subsidiary Guarantors provided that:

(a)     on or before the date on which such Indebtedness is Incurred, the Company, in an Officer's Certificate delivered to the Trustee and the Security Trustee designates such Indebtedness as "Permitted Priority Secured Indebtedness" for the purposes of the Indenture, such Indebtedness is certified in such Officer's Certificate as having been incurred in compliance with the terms of the

- 46 -

Indenture and no Default or Event of Default under the Indenture has occurred and is continuing; and

(b)        such additional Indebtedness, together with all other outstanding Permitted Priority Secured Indebtedness does not exceed the amount of the Permitted Priority Secured Indebtedness Cap;

"Permitted Priority Secured Indebtedness Cap" means $200 million, less any mandatory pre-payments or repurchases of any Permitted Priority Secured Indebtedness made pursuant to the terms of the instrument or agreement creating such Permitted Priority Secured Indebtedness or any agreements entered into in connection therewith.

"Permitted Priority Subsidiary Guarantee" means a guarantee by any Subsidiary Guarantor of Permitted Priority Secured Indebtedness.

"Permitted Priority Subsidiary Guarantor" means any Subsidiary Guarantor guaranteeing the obligations of the Company in respect of the Permitted Priority Secured Indebtedness.

"Permitted Priority Subsidiary Guarantor Pledgor" means any Subsidiary Guarantor which is required to pledge, mortgage or charge Collateral to secure the obligations of the Company in respect of any Permitted Priority Secured Indebtedness.

"Permitted Priority Trustee" has the meaning under the heading "*Intercreditor Agreement*".

"Person" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Preferred Stock" as applied to the Capital Stock of any Person means Capital Stock of any class or classes that by its term is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of Capital Stock of any other class of such Person.

"Reference Treasury Dealer" means each of any three investment banks of recognized standing that is a primary U.S. Government securities dealer in The City of New York, selected by the Company in good faith.

"Reference Treasury Dealer Quotations" means, with respect to each Reference Treasury Dealer and any redemption date, the average as determined by the Company of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Company by such Reference Treasury Dealer at 5:00 p.m. on the third Business Day preceding such redemption date.

"Replacement Assets" means, on any date, property or assets (other than current assets) of a nature or type or that are used in a Permitted Business and shall include Capital Stock of any Person holding such property or assets, which is primarily engaged in a Permitted Business and will upon the acquisition by the Company or any of its Restricted Subsidiaries of such Capital Stock, become a Restricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Company other than an Unrestricted Subsidiary.

"S&P" means Standard & Poor's Ratings Group and its affiliates.

"Sale and Leaseback Transaction" means any direct or indirect arrangement relating to property (whether real, personal or mixed), now owned or hereafter acquired whereby the Company or any Restricted Subsidiary transfers such property to another Person and the Company or any Restricted Subsidiary leases it from such Person.

"Secured Party" means the (i) Holders, including (without limitation) any holders of Additional Notes and PIK Notes, and the Trustee and the Security Trustee, and (ii) if and when any Permitted Priority Secured Indebtedness is Incurred, the holders of any Permitted Priority Secured Indebtedness Incurred in compliance with the covenant "Limitation on Indebtedness and Disqualified or Preferred Stock", or the Permitted Priority Trustee or Security Trustee on their behalf.

- 47 -

"Security Documents" means, collectively, the pledge agreements, equitable mortgages, charges over shares, fixed and floating charges, or other agreements or instruments that may evidence or create any Lien in favor of the Security Trustee, the Trustee and/or any Holders in any or all of the Collateral.

"Senior Indebtedness" of the Company or a Subsidiary Guarantor, as the case may be, means all Indebtedness of the Company or the Subsidiary Guarantor, as relevant, whether outstanding on the Original Issue Date or thereafter created, except for Indebtedness which, in the instrument creating or evidencing the same, is expressly stated to be not senior in right of payment to the Notes or, in respect of such Subsidiary Guarantor, its Subsidiary Guarantee; provided that Senior Indebtedness does not include (i) any obligation to the Company or any Restricted Subsidiary, (ii) trade payables or (iii) Indebtedness Incurred in violation of the Indenture.

"Stated Maturity" means, (1) with respect to any Indebtedness, the date specified in such debt security as the fixed date on which the final installment of principal of such Indebtedness is due and payable as set forth in the documentation governing such Indebtedness and (2) with respect to any scheduled installment of principal of or interest on any Indebtedness, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Indebtedness.

"Subordinated Indebtedness" means any Indebtedness of the Company which is subordinated or junior in right of payment to the Notes pursuant to a written agreement to such effect.

"Subsidiary" means, with respect to any Person, any corporation, association or other business entity of which more than 50% of the voting power of the outstanding Voting Stock is owned, directly or indirectly, by such Person and one or more other Subsidiaries of such Person.

"Subsidiary Guarantee" means any Guarantee of the obligations of the Company under the Indenture and the Notes by any Subsidiary Guarantor.

"Subsidiary Guarantor" means any initial Subsidiary Guarantor named herein and any other Restricted Subsidiary which is required to guarantee the payment of the Notes pursuant to the Indenture and the Notes; provided that Subsidiary Guarantor will not include any Person whose Subsidiary Guarantee has been released in accordance with the Indenture and the Notes.

"Subsidiary Guarantor Pledgor" means any initial Subsidiary Guarantor Pledgor named herein and any other Subsidiary Guarantor which is required to pledge, mortgage or charge Collateral to secure the obligations of the Company under the Notes and the Indenture and of such Subsidiary Guarantor under its Subsidiary Guarantee; provided that a Subsidiary Guarantor Pledgor will not include any person whose pledge, mortgage or charge under the Security Documents has been released in accordance with the Security Documents, the Indenture and the Notes.

"Temporary Cash Investment" means any of the following:

(1)     direct obligations of the United States of America or any agency thereof or obligations fully and unconditionally Guaranteed by the United States of America or any agency thereof, in each case maturing within 12 months;

(2)     time deposit accounts, certificates of deposit and money market deposits maturing within 12 months of the date of acquisition thereof issued by a bank or trust company which is organized under the laws of the United States of America, any state thereof, or Hong Kong, and has outstanding debt which is rated "A" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) or any money market fund sponsored by a registered broker dealer or mutual fund distributor;

(3)     repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (1) above entered into with a bank or trust company meeting the qualifications described in clause (2) above;

- 48 -

(4)     commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation (other than an Affiliate of the Company) organized in and existence under the laws of the United States of America or any state thereof with a rating at the time as of which any investment therein is made of "P-2" (or higher) according to Moody's or "A-2" (or higher) according to S&P;

(5)     securities with maturities of 12 months or less from the date of acquisition issued or fully and unconditionally Guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least "A" by S&P or Moody's;

(6)     any money market fund that has at least 95% of its assets continuously invested in investments of the types described in clauses (1) through (5) above; and

(7)     time deposit accounts, certificates of deposit and money market deposits with (i) Bank of China, Industrial Commercial Bank of China, Construction Bank of China, Shanghai Pudong Development Bank, Bank of Shanghai, (ii) any other bank or trust company organized under the laws of the PRC whose long term debt is rated as high or higher than any of those banks or (iii) any other bank organized under the laws of the PRC, provided that, in the case of clause (iii), such deposits do not exceed US$2.5 million (or the Dollar Equivalent thereof) with any single bank or US$5 million (or the Dollar Equivalent thereof) in the aggregate, at any date of determination.

"Trade Payables" means, with respect to any Person, any accounts payable or any other indebtedness or monetary obligation to trade creditors created, assumed or Guaranteed by such Person or any of its Subsidiaries arising in the ordinary course of business in connection with the acquisition of goods or services.

"Transaction Date" means, with respect to the Incurrence of any Indebtedness, the date such Indebtedness is to be Incurred and, with respect to any Restricted Payment, the date such Restricted Payment is to be made.

"Unrestricted Subsidiary" means (1) any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors in the manner provided herein; and (2) any Subsidiary of an Unrestricted Subsidiary.

"U.S. Government Obligations" means securities that are (1) direct obligations of the United States of America for the payment of which its full faith and credit is pledged or (2) obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the payment of which is unconditionally Guaranteed as a full faith and credit obligation by the United States of America, which, in either case, are not callable or redeemable at the option of the Company thereof at any time prior to the Stated Maturity of the Notes, and shall also include a depository receipt issued by a bank or trust company as custodian with respect to any such U.S. Government Obligation or a specific payment of interest on or principal of any such U.S. Government Obligation held by such custodian for the account of the holder of a depository receipt; provided that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. Government Obligation or the specific payment of interest on or principal of the U.S. Government Obligation evidenced by such depository receipt.

"Voting Stock" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"Wholly-Owned" means, with respect to any Subsidiary of any Person, the ownership of all of the outstanding Capital Stock of such Subsidiary (other than any director's qualifying shares or Investments by foreign nationals mandated by applicable law) by such Person or one or more Wholly-Owned Subsidiaries of such Person.

# EXHIBIT E

## INFORMATION REGARDING SFC ESCROW CO.

SFC Escrow Co. will be incorporated prior to the Plan Implementation Date under the laws of the Cayman Islands or such other jurisdiction as may be agreed by SFC, the Monitor and the Initial Consenting Noteholders.  SFC Escrow Co. will be a wholly-owned subsidiary of SFC, and the sole director of SFC Escrow Co. will be Codan Services (Cayman) Limited, or such other Person as may be agreed by SFC, the Monitor and the Initial Consenting Noteholders.  At the time that SFC Escrow Co. is incorporated, SFC Escrow Co. will issue one share (the "**SFC Escrow Co. Share**") to SFC, as the sole shareholder of SFC Escrow Co. and SFC will be deemed to hold the SFC Escrow Co. Share solely for the purpose of facilitating the Restructuring Transaction.  The sole share of SFC Escrow Co. is an "Excluded Asset" under the Plan and will therefore not be transferred to Newco pursuant to the Plan and will remain the property of SFC to hold in accordance with the Plan. SFC Escrow Co. will have no assets other than any assets that it is required to hold in escrow pursuant to the terms of the Plan, and it will have no liabilities other than its obligations as set forth in the Plan.

The sole activities and function of SFC Escrow Co. will be to perform the obligations of the Unresolved Claims Escrow Agent and to administer Undeliverable Distributions, in each case as set forth in the Plan.  SFC Escrow Co. will not carry on any other activities or issue any shares or other securities (other than the SFC Escrow Co. Share to be held by SFC).

### *Unresolved Claims Escrow Agent*

SFC Escrow Co. will act as the Unresolved Claims Escrow Agent unless otherwise agreed by agreed by SFC, the Monitor and the Initial Consenting Noteholders.  Distributions in respect of any Unresolved Claim in existence at the Plan Implementation Date will be held in escrow by the Unresolved Claims Escrow Agent in the Unresolved Claims Reserve until settlement or final determination of the Unresolved Claim in accordance with the Claims Procedure Order, the Meeting Order, the Plan or otherwise, as applicable.  To the extent that Unresolved Claims become Proven Claims or are finally disallowed, the Unresolved Claims Escrow Agent will release from escrow and deliver (or in the case of Litigation Trust Interests, cause to be registered) from the Unresolved Claims Reserve the applicable distributions to Affected Creditors with Proven Claims, in each case as set forth in sections 5.5(c) and 5.5(d) the Plan.

During the time that Newco Shares, Newco Notes and/or Litigation Trust Interests are held in escrow in the Unresolved Claims Reserve, any income or proceeds received therefrom or accruing thereon will be added to the Unresolved Claims Reserve by the Unresolved Claims Escrow Agent and no Person will have any right to such income or proceeds until such Newco Shares, Newco Notes or Litigation Trust Interests, as applicable, are distributed (or in the case of Litigation Trust Interests, registered) in accordance with sections 5.5(c) and 5.5(d) of the Plan, at which time the recipient thereof is entitled to any applicable income or proceeds therefrom.

The Unresolved Claims Escrow Agent will have no beneficial interest or right in the Unresolved Claims Reserve.  The Unresolved Claims Escrow Agent will not take any step or action with

respect to the Unresolved Claims Reserve or any other matter without the consent or direction of the Monitor or the direction of the Court.

Each of SFC, the Monitor and the Initial Consenting Noteholders have reserved all their rights to seek or obtain an Order, whether before or after the Plan Implementation Date, directing that any Unresolved Claims should be disallowed in whole or in part or that such Unresolved Claims should receive the same or similar treatment as is afforded to Equity Claims under the terms of this Plan.  SFC will seek relief in the Sanction Order confirming that SFC, the Monitor, the Initial Consenting Noteholders and each of the parties with Unresolved Claims will have standing in any Court hearing or other proceeding with respect to the resolution or determination of Unresolved Claims, including the classification of any Unresolved Claims as Equity Claims for purposes of the Plan.

### Undeliverable Distributions

SFC Escrow Co. will hold any Undeliverable Distributions in escrow and administer them in accordance with the Plan.  No distributions in respect of an Undeliverable Distribution will be made unless and until SFC and the Monitor are notified by the Person entitled to receive the Undeliverable Distribution of its current address and/or registration information, as applicable, at which time the Monitor will direct SFC Escrow Co. to make all such distributions to such Person, and SFC Escrow Co. will make all such distributions to such Person.  All claims for Undeliverable Distributions must be made on or before the date that is six months following the final Distribution Date, after which date the right to receive distributions under the Plan in respect of such Undeliverable Distributions shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred, without any compensation therefor, at which time any such Undeliverable Distributions held by SFC Escrow Co. will be deemed to be cancelled without consideration.  No interest is payable in respect of an Undeliverable Distribution.

### Other Restrictions

SFC Escrow Co. will not make any sale, distribution, transfer or conveyance of any Newco Shares, Newco Notes or any other assets or property that it holds unless it is directed to do so by an Order of the Court or by a written direction from the Monitor.  SFC is not permitted to sell, transfer or convey the SFC Escrow Co. Share nor effect or cause to be effected any liquidation, dissolution, merger or other corporate reorganization of SFC Escrow Co. unless it is directed to do so by an Order of the Court or by a written direction from the Monitor.  SFC Escrow Co. is not permitted to exercise any voting rights (including any right to vote at a meeting of shareholders or creditors held or in any written resolution) in respect of Newco Shares or Newco Notes held in the Unresolved Claims Reserve.   SFC Escrow Co. will not receive any compensation for the performance of its obligations under the Plan.

## EXHIBIT F

## RESERVES AND OTHER AMOUNTS RELATING TO THE PLAN

As set out in the Plan, certain reserves and other amounts must be established on or prior to the Plan Implementation Date in accordance with the provisions of the Plan. Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan.

**Indemnified Noteholder Class Action Limit**

The Indemnified Noteholder Class Action Limit has been established as $150 million.

**Unresolved Claims Reserve**

The Unresolved Claims Reserve will contain Newco Shares, Newco Notes and Litigation Trust Interests in respect of any Unresolved Claims. The Unresolved Claims as at the Plan Implementation Date are expected to consist of contingent and unresolved indemnity claims against SFC in respect of (1) monetary penalties that may be imposed by the Ontario Securities Commission against third parties seeking indemnity from SFC, (2) the Indemnified Noteholder Class Action Claims, which claims and related indemnity claims are limited to a maximum of $150 million by operation of the Indemnified Noteholder Class Action Limit, and (3) reimbursement of defence costs of third parties seeking indemnity from SFC. No consideration will be paid in respect of Unresolved Claims unless, until and then only to the extent that such Unresolved Claims are ultimately determined to be Proven Claims.

Each of SFC, the Monitor and the Initial Consenting Noteholders have reserved all their rights to seek or obtain an Order, whether before or after the Plan Implementation Date, directing that any Unresolved Claims should be disallowed in whole or in part or that such Unresolved Claims should receive the same or similar treatment as is afforded to Equity Claims under the terms of this Plan. SFC will seek relief in the Sanction Order confirming that SFC, the Monitor, the Initial Consenting Noteholders and each of the parties with Unresolved Claims will have standing in any Court hearing or other proceeding with respect to the resolution or determination of Unresolved Claims, including the classification of any Unresolved Claims as Equity Claims for purposes of the Plan.

**Other Reserves**

The amount of the Administration Charge Reserve, the Directors' Charge Reserve, the Unaffected Claims Reserve and the Monitor's Post-Implementation Reserve will be determined prior to the Plan Implementation Date.

**536**

# EXHIBIT G

# DRAFT PLAN SANCTION ORDER

**537**

DRAFT

Court File No. CV-12-9667-00CL

*ONTARIO*

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | MONDAY, THE 10th |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF DECEMBER, 2012 |

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF SINO-FOREST CORPORATION

**PLAN SANCTION ORDER**

**THIS MOTION**, made by Sino-Forest Corporation ("**SFC**"), for an order (i) pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), sanctioning the plan of compromise and reorganization dated October 19, 2012, which Plan is attached as Schedule "**A**" hereto, as supplemented by the plan supplement dated November ●, 2012 previously filed with the Court, as the Plan may be further amended, varied or supplemented from time to time in accordance with the terms thereof (the "**Plan**"), and (ii) pursuant to the section 191 of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, as amended (the "**CBCA**"), approving the Plan and amending the articles of SFC and giving effect to the changes and transactions arising therefrom, was heard on December 7, 2012 and December 10, 2012 at 330 University Avenue, Toronto, Ontario.

**ON READING** the Notice of Motion, the Affidavit of W. Judson Martin sworn ●, 2012 (the "**Martin Affidavit**"), the ● Report of FTI Consulting Canada Inc. in its capacity as monitor of SFC (the "**Monitor**") dated ●, 2012 (the "**Monitor's ● Report**") and the supplemental report to the Monitor's ● Report (the "**Supplemental Report**") and on hearing the submissions of counsel for SFC, the Monitor, the *ad hoc* committee of Noteholders (the "**Ad Hoc**

Noteholders"), and such other counsel as were present, no one else appearing for any other party, although duly served with the Motion Record as appears from the Affidavit of Service, filed.

## DEFINED TERMS

1.      **THIS COURT ORDERS** that any capitalized terms not otherwise defined in this Plan Sanction Order shall have the meanings ascribed to such terms in the Plan and/or the Plan Filing and Meeting Order granted by the Court on August 31, 2012 (the "**Plan Filing and Meeting Order**"), as the case may be.

## SERVICE, NOTICE AND MEETING

2.      **THIS COURT ORDERS** that the time for service of the Notice of Motion, the Motion Record in support of this motion, the Monitor's ● Report and the Supplemental Report be and are hereby abridged and validated so that the motion is properly returnable today and service upon any interested party other than those parties served is hereby dispensed with.

3.      **THIS COURT ORDERS AND DECLARES** that there has been good and sufficient notice, service and delivery of the Plan Filing and Meeting Order and the Meeting Materials (including, without limitation, the Plan) to all Persons upon which notice, service and delivery was required.

4.      **THIS COURT ORDERS AND DECLARES** that the Meeting was duly convened and held, all in conformity with the CCAA and the Orders of this Court made in the CCAA Proceeding, including, without limitation, the Plan Filing and Meeting Order.

5.      **THIS COURT ORDERS AND DECLARES** that: (i) the hearing of the Plan Sanction Order was open to all of the Affected Creditors and all other Persons with an interest in SFC and that such Affected Creditors and other Persons were permitted to be heard at the hearing in respect of the Plan Sanction Order; and (ii) prior to the hearing, all of the Affected Creditors and all other Persons on the Service List in respect of the CCAA Proceeding were given adequate notice thereof.

## SANCTION OF THE PLAN

6.      **THIS COURT ORDERS** that the relevant class of Affected Creditors of SFC for the purposes of voting to approve the Plan is the Affected Creditors Class.

7.      **THIS COURT ORDERS AND DECLARES** that:

(a)      the Plan has been approved by the Required Majority in conformity with the CCAA and the Plan Filing and Meeting Order;

(b)      SFC has complied with the provisions of the CCAA and the Orders of the Court made in the CCAA Proceeding in all respects;

(c)      SFC has acted and is acting in good faith and with due diligence, and has not done or purported to do (nor does the Plan do or purport to do) anything that is not authorized by the CCAA; and

(d)      the Plan, and all the terms and conditions thereof, and matters and transactions contemplated thereby, are fair and reasonable.

8.      **THIS COURT ORDERS** that the Plan is hereby sanctioned and approved pursuant to section 6 of the CCAA.

## PLAN IMPLEMENTATION

9.      **THIS COURT ORDERS AND DECLARES** that the Plan and all associated steps, compromises, releases, discharges, cancellations, transactions, arrangements and reorganizations effected thereby are approved and shall be deemed to be implemented, binding and effective in accordance with the provisions of the Plan as of the Plan Implementation Date at the Effective Time, or at such other time, times or manner as may be set forth in the section 6.4 or 6.5 of the Plan, and shall enure to the benefit of and be binding upon SFC, the other Released Parties, the Affected Creditors and all other Persons and parties named or referred to in, affected by, or subject to the Plan, including, without limitation, their respective heirs, administrators, executors, legal representatives, successors, and assigns.

10.     **THIS COURT ORDERS** that each of SFC and the Monitor are authorized and directed to take all steps and actions, and to do all things, necessary or appropriate to implement the Plan in accordance with its terms and to enter into, execute, deliver, complete, implement and consummate all of the steps, transactions, distributions, deliveries, allocations, instruments and agreements contemplated pursuant to the Plan, and such steps and actions are hereby authorized, ratified and approved. Furthermore, neither SFC nor the Monitor shall incur any liability as a result of acting in accordance with terms of the Plan and the Plan Sanction Order.

11.     **THIS COURT ORDERS** that SFC, the Monitor, Newco, the Litigation Trustee, the Trustees, DTC, the Unresolved Claims Escrow Agent, all Transfer Agents and any other Person required to make any distributions, deliveries or allocations or take any steps or actions related thereto pursuant to the Plan are hereby directed to complete such distributions, deliveries or allocations and to take any such related steps and/or actions in accordance with the terms of the Plan, and such distributions, deliveries and allocations, and steps and actions related thereto, are hereby approved.

12.     **THIS COURT ORDERS** that upon the satisfaction or waiver, as applicable, of the conditions precedent set out in section 9.1 of the Plan in accordance with the terms of the Plan, as confirmed by SFC and Goodmans LLP to the Monitor in writing, the Monitor is authorized and directed to deliver to SFC and Goodmans LLP a certificate in the form attached hereto as Schedule "**B**" (the "**Monitor's Certificate**") signed by the Monitor, certifying that the Plan Implementation Date has occurred and that the Plan and this Plan Sanction Order are effective in accordance with their terms.  Following the Plan Implementation Date, the Monitor shall file the Monitor's Certificate with this Court.

13.     **THIS COURT ORDERS AND DECLARES** that the steps, compromises, releases, discharges, cancellations, transactions, arrangements and reorganizations to be effected on the Plan Implementation Date are deemed to occur and be effected in the sequential order contemplated in sections 6.4 and 6.5 of the Plan, without any further act or formality, beginning at the Effective Time.

14.     **THIS COURT ORDERS** that SFC, the Monitor and the Ad Hoc Noteholders are hereby authorized and empowered to exercise all such consent and approval rights in the manner set forth in the Plan, whether prior to or after implementation of the Plan.

15.     **THIS COURT ORDERS** that from and after the Plan Implementation Date, and for the purposes of the Plan only, (i) if SFC does not have the ability or the capacity pursuant to Applicable Law to provide its agreement, waiver, consent or approval to any matter requiring SFC's agreement, waiver, consent or approval under this Plan, such agreement, waiver consent or approval may be provided by the Monitor; and (ii) if SFC does not have the ability or the capacity pursuant to Applicable Law to provide its agreement, waiver, consent or approval to any matter requiring SFC's agreement, waiver, consent or approval under this Plan, and the Monitor has been discharged pursuant to an Order, such agreement, waiver consent or approval shall be deemed not to be necessary.

## COMPROMISE OF CLAIMS AND EFFECT OF PLAN

16.     **THIS COURT ORDERS AND DECLARES** that, pursuant to and in accordance with the terms of the Plan, on the Plan Implementation Date, any and all Affected Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred, subject only to the right of the applicable Persons to receive the distributions and interests to which they are entitled pursuant to the Plan.

17.     **THIS COURT ORDERS AND DECLARES** that, pursuant to and in accordance with the terms of the Plan, on the Plan Implementation Date and at the time specified in Section 6.4 of the Plan, all accrued and unpaid interest owing on, or in respect of, or as part of, Affected Creditor Claims (including any Accrued Interest on the Notes and any interest accruing on the Notes or any Ordinary Affected Creditor Claim after the Filing Date) shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred for no consideration and no Person shall have any entitlement to any such accrued and unpaid interest.

18.     **THIS COURT ORDERS AND DECLARES** that, on the Plan Implementation Date, the ability of any Person to proceed against SFC or the Subsidiaries in respect of any Released Claims shall be forever discharged, barred and restrained, and all proceedings with respect to, in connection with, or relating to any such matter shall be permanently stayed.

19.     **THIS COURT ORDERS** that each Affected Creditor is hereby deemed to have consented to all of the provisions of the Plan, in its entirety, and each Affected Creditor is hereby

deemed to have executed and delivered to SFC all consents, releases, assignments and waivers, statutory or otherwise, required to implement and carry out the Plan in its entirety.

20.     **THIS COURT ORDERS** that, on the Plan Implementation Date and at the time specific in Section 6.4 of the Plan, the SFC Assets (including for greater certainty the Direct Subsidiary Shares, the SFC Intercompany Claims and all other SFC Assets assigned transferred and conveyed to Newco pursuant to section 6.4 of the Plan) shall vest in the Person to whom such assets are being assigned, transferred and conveyed, in accordance with the terms of the Plan, free and clear of and from any and all Charges, Claims (including, notwithstanding anything to the contrary herein, any Unaffected Claims), D&O Claims, D&O Indemnity Claims, Section 5.1(2) D&O Claims, Conspiracy Claims, Continuing Other D&O Claims, Non-Released D&O Claims, Affected Claims, Class Action Claims, Class Action Indemnity Claims, claims or rights of any kind in respect of the Notes or the Note Indentures, and any right or claim that is based in whole or in part on facts, underlying transactions, causes of action or events relating to the Restructuring Transaction, the CCAA Proceedings or any of the foregoing, and any guarantees or indemnities with respect to any of the foregoing. Any Encumbrances or claims affecting, attaching to or relating to the SFC Assets in respect of the foregoing are and shall be deemed to be irrevocably expunged and discharged as against the SFC Assets, and no such Encumbrances or claims shall be pursued or enforceable as against Newco or any other Person.

21.     **THIS COURT ORDERS** that any securities, interests, rights or claims pursuant to the Plan, including the Newco Shares, the Newco Notes and the Litigation Trust Interests, issued, assigned, transferred or conveyed pursuant to the Plan will be will be free and clear of and from any and all Charges, Claims (including, notwithstanding anything to the contrary herein, any Unaffected Claims), D&O Claims, D&O Indemnity Claims, Affected Claims, Section 5.1(2) D&O Claims, Conspiracy Claims, Continuing Other D&O Claims, Non-Released D&O Claims, Class Action Claims, Class Action Indemnity Claims, claims or rights of any kind in respect of the Notes or the Note Indentures, and any right or claim that is based in whole or in part on facts, underlying transactions, causes of action or events relating to the Restructuring Transaction, the CCAA Proceedings or any of the foregoing, and any guarantees or indemnities with respect to any of the foregoing.

22.     **THIS COURT ORDERS** that the Litigation Trust Agreement is hereby approved and deemed effective as of the Plan Implementation Date, including with respect to the transfer, assignment and delivery of the Litigation Trust Claims to the Litigation Trustee which shall, and are hereby deemed to, occur on and as of the Plan Implementation Date.

23.     **THIS COURT ORDERS** that section 36.1 of the CCAA, sections 95 to 101 of the BIA and any other federal or provincial Law relating to preferences, fraudulent conveyances or transfers at undervalue, shall not apply to the Plan or to any payments, distributions, transfers, allocations or transactions made or completed in connection with the restructuring and recapitalization of SFC, whether before or after the Filing Date, including, without limitation, to any and all of the payments, distributions, transfers, allocations or transactions contemplated by and to be implemented pursuant to the Plan.

24.     **THIS COURT ORDERS** that the articles of reorganization to be filed by SFC pursuant to section 191 of the CBCA, substantially in the form attached as Schedule "**C**" hereto, are hereby approved, and SFC is hereby authorized to file the articles of reorganization with the Director (as defined in the CBCA).

25.     **THIS COURT ORDERS** that on the Equity Cancellation Date, or such other date as agreed to by the Monitor, SFC and the Initial Consenting Noteholders, all Existing Shares and other Equity Interests shall be fully, finally and irrevocably cancelled.

26.     **THIS COURT ORDERS AND DECLARES** that the Newco Shares shall be and are hereby deemed to have been validly authorized, created, issued and outstanding as fully-paid and non-assessable shares in the capital of Newco as of the Effective Time.

27.     **THIS COURT ORDERS AND DECLARES** that the issuance and distribution of the Newco Shares, the Newco Notes and, to the extent they may be deemed to be securities, the Litigation Trust Interests, and any other securities to be issued pursuant to the Plan shall be exempt from all prospectus and registration requirements of any applicable securities, corporate or other law, statute, order, decree, consent decree, judgment, rule, regulation, ordinance, notice, policy or other pronouncement having the effect of law applicable in the provinces and territories of Canada.

28.    **THIS COURT ORDERS AND DECLARES** that upon the Plan Implementation Date the initial Newco Share in the capital of Newco held by the Initial Newco Shareholder shall be deemed to have been redeemed and cancelled for no consideration.

29.    **THIS COURT ORDERS AND DECLARES** that it was advised prior to the hearing in respect of the Plan Sanction Order that the Plan Sanction Order will be relied upon by SFC and Newco as an approval of the Plan for the purpose of relying on the exemption from the registration requirements of the United States Securities Act of 1933, as amended, pursuant to section 3(a)(10) thereof for the issuance of the Newco Shares, Newco Notes and, to the extent they may be deemed to be securities, the Litigation Trust Interests, and any other securities to be issued pursuant to the Plan.

**STAY OF PROCEEDINGS**

30.    **THIS COURT ORDERS** that all obligations, agreements or leases to which (i) SFC remains a party on the Plan Implementation Date, or (ii) Newco becomes a party as a result of the conveyance of the SFC Assets to Newco on the Plan Implementation Date, shall be and remain in full force and effect, unamended, as at the Plan Implementation Date and no party to any such obligation, agreement or lease shall on or following the Plan Implementation Date, accelerate, terminate, refuse to renew, rescind, refuse to perform or otherwise disclaim or resiliate its obligations thereunder, or enforce or exercise (or purport to enforce or exercise) any right or remedy under or in respect of any such obligation, agreement or lease, (including any right of set-off, dilution or other remedy), or make any demand against SFC, Newco, any Subsidiary or any other Person under or in respect of any such agreement with Newco or any Subsidiary, by reason:

(a)    of any event which occurred prior to, and not continuing after, the Plan Implementation Date, or which is or continues to be suspended or waived under the Plan, which would have entitled any other party thereto to enforce those rights or remedies;

(b)    that SFC sought or obtained relief under the CCAA or by reason of any steps or actions taken as part of the CCAA Proceeding or this Plan Sanction Order or prior orders of this Court;

(c)      of any default or event of default arising as a result of the financial condition or insolvency of SFC;

(d)      of the completion of any of the steps, actions or transactions contemplated under the Plan, including, without limitation, the transfer, conveyance and assignment of the SFC Assets to Newco; or

(e)      of any steps, compromises, releases, discharges, cancellations, transactions, arrangements or reorganizations effected pursuant to the Plan.

31.      **THIS COURT ORDERS** that from and after the Plan Implementation Date, any and all Persons shall be and are hereby stayed from commencing, taking, applying for or issuing or continuing any and all steps or proceedings, including without limitation, administrative hearings and orders, declarations or assessments, commenced, taken or proceeded with or that may be commenced, taken or proceed with to advance any Released Claims.

**<u>RELEASES</u>**

32.      **THIS COURT ORDERS** that, subject to section 7.2 of the Plan, all of the following shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled and barred on the Plan Implementation Date at the time or times and in the manner set forth in section 6.4 of the Plan:

(a)      all Affected Claims, including, without limitation, all Affected Creditor Claims, Equity Claims, D&O Claims (other than Section 5.1(2) D&O Claims, Conspiracy Claims, Continuing Other D&O Claims and Non-Released D&O Claims), D&O Indemnity Claims (except as set forth in section 7.1(d) of the Plan) and Noteholder Class Action Claims (other than the Continuing Noteholder Class Action Claims);

(b)      all Claims of the Ontario Securities Commission or any other Governmental Entity that have or could give rise to a monetary liability, including, without limitation, fines, awards, penalties, costs, claims for reimbursement or other claims having a monetary value;

(c)     all Class Action Claims (including, without limitation, the Noteholder Class Action Claims) against SFC, the Subsidiaries or the Named Directors or Officers of SFC or the Subsidiaries (other than Class Action Claims that are Section 5.1(2) D&O Claims, Conspiracy Claims or Non-Released D&O Claims);

(d)     all Class Action Indemnity Claims (including, without limitation, related D&O Indemnity Claims), other than any Class Action Indemnity Claim by the Third Party Defendants against SFC in respect of the Indemnified Noteholder Class Action Claims (including, without limitation, any D&O Indemnity Claim in that respect), which shall be limited to the Indemnified Noteholder Class Action Limit pursuant to the releases set out in section 7.1(f) of the Plan and the injunctions set out in section 7.3 of the Plan;

(e)     any portion or amount of or liability of the Third Party Defendants for the Indemnified Noteholder Class Action Claims (on a collective, aggregate basis in reference to all Indemnified Noteholder Class Action Claims together) that exceeds the Indemnified Noteholder Class Action Limit;

(f)     any portion or amount of, or liability of SFC for, any Class Action Indemnity Claims by the Third Party Defendants against SFC in respect of the Indemnified Noteholder Class Action Claims to the extent that such Class Action Indemnity Claims exceed the Indemnified Noteholder Class Action Limit;

(g)     any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including, without limitation, for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, against Newco, the directors and officers of Newco, the Noteholders, members of the *ad hoc* committee of Noteholders, the Trustees, the Transfer Agent, the Monitor, FTI Consulting Canada Inc., FTI HK, counsel for the current Directors of SFC, counsel for the Monitor, counsel for the Trustees, the SFC Advisors, the Noteholder Advisors, and

each and every member (including, without limitation, members of any committee or governance council), partner or employee of any of the foregoing, for or in connection with or in any way relating to: any Claims (including, without limitation, notwithstanding anything to the contrary herein, any Unaffected Claims); Affected Claims; Section 5.1(2) D&O Claims; Conspiracy Claims; Continuing Other D&O Claims; Non-Released D&O Claims; Class Action Claims; Class Action Indemnity Claims; any right or claim in connection with or liability for the Notes or the Note Indentures; any guarantees, indemnities, claims for contribution, share pledges or Encumbrances related to the Notes or the Note Indentures; any right or claim in connection with or liability for the Existing Shares, Equity Interests or any other securities of SFC; any rights or claims of the Third Party Defendants relating to SFC or the Subsidiaries;

(h)    any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including, without limitation, for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, against Newco, the directors and officers of Newco, the Noteholders, members of the *ad hoc* committee of Noteholders, the Trustees, the Transfer Agent, the Monitor, FTI Consulting Canada Inc., FTI HK, the Named Directors and Officers, counsel for the current Directors of SFC, counsel for the Monitor, counsel for the Trustees, the SFC Advisors, the Noteholder Advisors, and each and every member (including, without limitation, members of any committee or governance council), partner or employee of any of the foregoing, based in whole or in part on any act, omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing or other occurrence existing or taking place on or prior to the Plan Implementation Date (or, with respect to actions taken pursuant to the Plan after the Plan Implementation Date, the date of such actions) in any way relating to, arising out of, leading up to, for, or in connection with the CCAA Proceeding, RSA, the Restructuring Transaction, the Plan, any

proceedings commenced with respect to or in connection with the Plan, or the transactions contemplated by the RSA and the Plan, including, without limitation, the creation of Newco and the creation, issuance or distribution of the Newco Shares, the Newco Notes, the Litigation Trust or the Litigation Trust Interests, provided that nothing in this paragraph shall release or discharge any of the Persons listed in this paragraph from or in respect of any obligations any of them may have under or in respect of the RSA, the Plan or under or in respect of any of Newco, the Newco Shares, the Newco Notes, the Litigation Trust or the Litigation Trust Interests, as the case may be;

(i)      any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, orders, including, without limitation, for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, against the Subsidiaries for or in connection with any Claim (including, without limitation, notwithstanding anything to the contrary herein, any Unaffected Claim); any Affected Claim (including, without limitation, any Affected Creditor Claim, Equity Claim, D&O Claim, D&O Indemnity Claim and Noteholder Class Action Claim); any Section 5.1(2) D&O Claim; any Conspiracy Claim; any Continuing Other D&O Claim; any Non-Released D&O Claim; any Class Action Claim; any Class Action Indemnity Claim; any right or claim in connection with or liability for the Notes or the Note Indentures; any guarantees, indemnities, share pledges or Encumbrances relating to the Notes or the Note Indentures; any right or claim in connection with or liability for the Existing Shares, Equity Interests or any other securities of SFC; any rights or claims of the Third Party Defendants relating to SFC or the Subsidiaries; any right or claim in connection with or liability for the RSA, the Plan, the CCAA Proceedings, the Restructuring Transaction, the Litigation Trust, the business and affairs of SFC and the Subsidiaries (whenever or however conducted), the administration and/or management of SFC and the Subsidiaries, or any public filings,

statements, disclosures or press releases relating to SFC; any right or claim in connection with or liability for any indemnification obligation to Directors or Officers of SFC or the Subsidiaries pertaining to SFC, the Notes, the Note Indentures, the Existing Shares, the Equity Interests, any other securities of SFC or any other right, claim or liability for or in connection with the RSA, the Plan, the CCAA Proceedings, the Restructuring Transaction, the Litigation Trust, the business and affairs of SFC (whenever or however conducted), the administration and/or management of SFC, or any public filings, statements, disclosures or press releases relating to SFC; any right or claim in connection with or liability for any guaranty, indemnity or claim for contribution in respect of any of the foregoing; and any Encumbrance in respect of the foregoing; and

(j)     all Subsidiary Intercompany Claims as against SFC (which are assumed by Newco pursuant to the Plan).

33.    **THIS COURT ORDERS** that nothing in the Plan shall waive, compromise, release, discharge, cancel or bar any of the claims listed in section 7.2 of the Plan.

34.    **THIS COURT ORDERS** that, for greater certainty, nothing in the Plan shall release any obligations of the Subsidiaries owed to (i) any employees, directors or officers of those Subsidiaries in respect of any wages or other compensation related arrangements, or (ii) to suppliers and trade creditors of the Subsidiaries in respect of goods or services supplied to the Subsidiaries.

35.    **THIS COURT ORDERS** that any guarantees, indemnities, Encumbrances or other obligations owing by or in respect of SFC relating to the Notes or the Note Indentures shall be and are hereby deemed to be released, discharged and cancelled.

36.    **THIS COURT ORDERS** that the Trustees are hereby authorized and directed to release, discharge and cancel any guarantees, indemnities, Encumbrances or other obligations owing by or in respect of any Subsidiary relating to the Notes or the Note Indentures.

37.    **THIS COURT ORDERS** that any claims against the Named Directors and Officers in respect of Section 5.1(2) D&O Claims or Conspiracy Claims shall be limited to recovery from any insurance proceeds payable in respect of such Section 5.1(2) D&O Claims or Conspiracy

Claims, as applicable, pursuant to the Insurance Policies, and Persons with any such Section 5.1(2) D&O Claims against Named Directors and Officers or Conspiracy Claims against Named Directors and Officers shall have no right to, and shall not, make any claim or seek any recoveries from any Person, (including SFC, any of the Subsidiaries or Newco), other than enforcing such Persons' rights to be paid from the proceeds of an Insurance Policy by the applicable insurer(s).

38.     **THIS COURT ORDERS** that all Persons are permanently and forever barred, estopped, stayed and enjoined, on and after the Effective Time, with respect to any and all Released Claims, from (i) commencing, conducting or continuing in any manner, directly or indirectly, any action, suits, demands or other proceedings of any nature or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Released Parties; (ii) enforcing, levying, attaching, collecting or otherwise recovering or enforcing by any manner or means, directly or indirectly, any judgment, award, decree or order against the Released Parties or their property; (iii) commencing, conducting or continuing in any manner, directly or indirectly, any action, suits or demands, including without limitation, by way of contribution or indemnity or other relief, in common law, or in equity, breach of trust or breach of fiduciary duty or under the provisions of any statute or regulation, or other proceedings of any nature or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes such a claim or might reasonably be expected to make such a claim, in any manner or forum, against one or more of the Released Parties; (iv) creating, perfecting, asserting or otherwise enforcing, directly or indirectly, any lien or encumbrance of any kind against the Released Parties or their property; or (v) taking any actions to interfere with the implementation or consummation of this Plan; provided, however, that the foregoing shall not apply to the enforcement of any obligations under the Plan.

**THE MONITOR**

39.     **THIS COURT ORDERS** that the Monitor, in addition to its prescribed rights and obligations under the CCAA and the powers provided to the Monitor herein and in the Plan, shall be and is hereby authorized, directed and empowered to perform its functions and fulfill its obligations under the Plan and this Plan Sanction Order to facilitate the implementation of the Plan.

40.     **THIS COURT ORDERS** that: (i) in carrying out the terms of this Plan Sanction Order and the Plan, the Monitor shall have all the protections given to it by the CCAA, the Initial Order, the Order of this Court dated April 20, 2012 expanding the powers of the Monitor, and as an officer of the Court, including the stay of proceedings in its favour; (ii) the Monitor shall incur no liability or obligation as a result of carrying out the provisions of this Plan Sanction Order and/or the Plan, save and except for any gross negligence or wilful misconduct on its part; (iii) the Monitor shall be entitled to rely on the books and records of SFC and any information provided by SFC without independent investigation; and (iv) the Monitor shall not be liable for any claims or damages resulting from any errors or omissions in such books, records or information.

41.     **THIS COURT ORDERS** that upon completion by the Monitor of its duties in respect of SFC pursuant to the CCAA, the Plan and the Orders, the Monitor may file with the Court a certificate stating that all of its duties in respect of SFC pursuant to the CCAA, the Plan and the Orders have been completed and thereupon, FTI Consulting Canada Inc. shall be deemed to be discharged from its duties as Monitor and released of all claims relating to its activities as Monitor.

42.     **THIS COURT ORDERS** that in no circumstances will the Monitor have any liability for any of SFC's tax liabilities, if any, regardless of how or when such liabilities may have arisen.

43.     **THIS COURT ORDERS** that, subject to the due performance of its obligations as set forth in the Plan and subject to its compliance with any written directions or instructions of the Monitor and/or directions of the Court in the manner set forth in the Plan, SFC Escrow Co. shall have no liabilities whatsoever arising from the performance of its obligations under the Plan.

## RESERVES AND OTHER AMOUNTS

44.     **THIS COURT ORDERS AND DECLARES** that the amount of each of the Indemnified Noteholder Class Action Limit, the Litigation Funding Amount, the Unaffected Claims Reserve, the Administration Charge Reserve, the Directors' Charge Reserve, the Monitor's Post-Implementation Reserve and the Unresolved Claims Reserve, is as provided for in the Plan, the Plan Supplement or in Schedule "**D**" hereto.

45.    **THIS COURT ORDERS AND DECLARES** that, on the Plan Implementation Date, at the time or times and in the manner set forth in section 6.4 of the Plan, each of the Charges shall be discharged, released and cancelled, and any obligations secured thereby shall be satisfied pursuant to section 4.2(b) of the Plan, and from and after the Plan Implementation Date: (i) the Administration Charge Reserve shall stand in place of the Administration Charge as security for the payment of any amounts secured by the Administration Charge; and (ii) the Directors' Charge Reserve shall stand in place of the Directors' Charge as security for the payment of any amounts secured by the Directors' Charge.

46.    **THIS COURT ORDERS** that any Unresolved Claims that exceed $1 million shall not be accepted or resolved without further Order of the Court. All parties with Unresolved Claims shall have standing in any proceeding with respect to the determination or status of any other Unresolved Claim. Counsel to the Ad Hoc Noteholders, Goodmans LLP, shall continue to have standing in any such proceeding on behalf of the Ad Hoc Noteholders, in their capacity as Affected Creditors with Proven Claims.

## EFFECT, RECOGNITION AND ASSISTANCE

47.    **THIS COURT ORDERS** that nothing in this Plan Sanction Order or as a result of the implementation of the Plan shall affect the standing any Person has at the date of this Plan Sanction Order in respect of the CCAA Proceeding or the Litigation Trust.

48.    **THIS COURT ORDERS** that the transfer, assignment and delivery to the Litigation Trustee pursuant to the Litigation Trust of (i) rights, title and interests in and to the Litigation Trust Claims and (ii) all respective rights, title and interests in and to any lawyer-client privilege, work product privilege or other privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Litigation Trust Claims, regardless of whether such documents or copies thereof have been requested by the Litigation Trustee pursuant to the Litigation Trust Agreement (collectively, the "**Privileges**") shall not constitute a waiver of any such Privileges, and that such Privileges are expressly maintained.

49.    **THIS COURT ORDERS** that the current directors of SFC shall be deemed to have resigned on the Plan Implementation Date.  The current directors of SFC shall have no liability in such capacity for any and all demands, claims, actions, causes of action, counterclaims, suits,

debts, sums of money, accounts, covenants, damages, judgments, orders, including, without limitation, for injunctive relief or specific performance and compliance orders, expenses, executions, Encumbrances and other recoveries on account of any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert, whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, arising on or after the Plan Implementation Date.

50.     **THIS COURT ORDERS** that SFC and the Monitor may apply to this Court for advice and direction with respect to any matter arising from or under the Plan or this Plan Sanction Order.

51.     **THIS COURT ORDERS** that this Plan Sanction Order shall have full force and effect in all provinces and territories of Canada and abroad as against all persons and parties against whom it may otherwise be enforced.

52.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court or any judicial, regulatory or administrative body having jurisdiction in Canada, the United States, Barbados, the British Virgin Islands, Cayman Islands, Hong Kong, the People's Republic of China or in any other foreign jurisdiction, to give effect to this Plan Sanction Order and to assist SFC, the Monitor and their respective agents in carrying out the terms of this Plan Sanction Order.   All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to SFC and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Plan Sanction Order, to grant representative status to the Monitor in any foreign proceeding, or to assist SFC and the Monitor and their respective agents in carrying out the terms of this Plan Sanction Order.

53.     **THIS COURT ORDERS** that each of SFC and the Monitor shall, following consultation with Goodmans LLP, be at liberty, and is hereby authorized and empowered, to make such further applications, motions or proceedings to or before such other courts and judicial, regulatory and administrative bodies, and take such steps in Canada, the United States of America, the British Virgin Islands, Cayman Islands, Hong Kong, the People's Republic of China or in any other foreign jurisdiction, as may be necessary or advisable to give effect to this

Plan Sanction Order and any other Order granted by this Court, including for recognition of this Plan Sanction Order and for assistance in carrying out its terms.

54.   **THIS COURT ORDERS** that this Plan Sanction Order shall be posted on the Monitor's Website at http://cfcanada.fticonsulting.com/sfc and only be required to be served upon the parties on the Service List and those parties who appeared at the hearing of the motion for this Plan Sanction Order.

_____

**Schedule "A"**

20                                                  DRAFT

**Schedule "B"**

**Schedule "C"**

**558**

22

DRAFT

**Schedule "D"**

**559**

DRAFT

IN THE MATTER OF THE *COMPANIES CREDITORS' ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OR COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

Court File No. CV-12-9667-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceedings commenced in Toronto

**PLAN SANCTION ORDER**

**BENNETT JONES LLP**
One First Canadian Place
Suite 3400, P.O. Box 130
Toronto, Ontario
M5X 1A4

Rob Staley (LSUC #27115J)
Kevin Zych (LSUC #33129T)
Derek Bell (LSUC #43420J)
Jonathan Bell (LSUC #55457P)
Tel: 416-863-1200
Fax: 416-863-1716

Lawyers for Sino-Forest Corporation

WSLegal\059250\00007\8331150v8

## APPENDIX F – THE INITIAL ORDER AFFIDAVIT

*(See Attached)*



Court File No.

ONTARIO

SUPERIOR COURT OF JUSTICE

COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

## AFFIDAVIT OF W. JUDSON MARTIN
### (Sworn March 30, 2012)

I, W. Judson Martin, of the City of Hong Kong, Special Administrative Region, People's Republic of China, **MAKE OATH AND SAY:**

1.    I am the Vice-Chairman and Chief Executive Officer of Sino-Forest Corporation ("SFC"). I therefore have personal knowledge of the matters set out below, except where otherwise stated. Where I do not possess personal knowledge, I have stated the source of my information and I believe such information to be true.

2.    This affidavit is sworn in support of an application by SFC for an initial order (the "Initial Order") pursuant to the *Companies' Creditors Arrangement Act* (the "CCAA"), a sale process order (the "Sale Process Order") and other requested relief.  In preparing this affidavit, I have consulted with other members of SFC's senior management team and, where necessary, members of the senior management teams of certain of SFC's subsidiaries.

3.    All references to dollar amounts contained in this affidavit are to United States Dollars unless otherwise stated.

I.    OVERVIEW

4.    SFC is a Canadian corporation and is the direct or indirect parent of approximately 140 subsidiaries, the majority of which are incorporated in the People's Republic of China (the "PRC"). The terms "Sino-Forest Companies" and "Sino-Forest" refer to the global enterprise as a whole (but, for greater certainty, do not include the Greenheart Group, defined below).

5.    Sino-Forest is a major integrated forest plantation operator and forest products company. Its principal businesses include the ownership and management of plantation forests, the sale of standing timber and wood logs, and the complementary manufacturing of downstream engineered-wood products. The majority of Sino-Forest's plantations are located in the southern and eastern regions of the PRC, primarily in inland regions suitable for large-scale replanting.

6.    Sino-Forest's business operations are mainly in the PRC with corporate offices in Hong Kong and Ontario, Canada.

7.    On June 2, 2011, Muddy Waters, LLC ("Muddy Waters"), which held a short position on SFC's shares, published a report (the "MW Report") alleging that Sino-Forest, among other things, was a "near total fraud" and a "Ponzi scheme." SFC's board of directors (the "Board") appointed an independent committee (the "IC") to investigate the Muddy Waters allegations.

8.    While the IC has been able to address certain of the allegations made by Muddy Waters, the MW Report has had a ripple effect in causing substantial damage to SFC, its business, and future prospects for viability. As part of the fallout from the MW Report, (i) SFC now finds

itself embroiled in multiple class action proceedings across Canada and in the U.S., (ii) SFC is

the subject of Ontario Securities Commission ("OSC"), Hong Kong Securities and Futures

Commission ("HKSFC"), and Royal Canadian Mounted Police ("RCMP") investigations, and

(iii) SFC's Audit Committee recommended, and the Board agreed, that SFC should defer the

release of SFC's third quarter 2011 financial statements (the "Q3 Results") until certain issues

could be resolved to the satisfaction of the Board and SFC's external auditor

9.    Significantly, SFC's inability to file its Q3 Results resulted in a default under its note

indentures, which could have resulted in the acceleration and enforcement of approximately $1.8

billion in notes issued by SFC and guaranteed by many of its subsidiaries.

10.    Following extensive discussions with an ad hoc committee of noteholders (the "Ad Hoc

Noteholders"), holders of a majority in principal amount of SFC's senior notes agreed to waive

the default arising from SFC's failure to release the Q3 Results on a timely basis, on certain

terms and conditions that were set forth in waiver agreements between certain of the noteholders

and SFC, which were made publicly available on January 12, 2012 and are attached as Exhibit

"A".

11.    While the waiver agreements prevented the indenture trustees under the relevant note

indentures from accelerating and enforcing the note indebtedness as a result of SFC's failure to

file its Q3 Results, those waiver agreements will expire on the earlier of April 30, 2012 and any

earlier termination of the waiver agreements in accordance with their terms.  In addition, SFC's

pending failure to file its audited financial statements for its fiscal year ended December 31,

2011 (the "2011 Results") by March 30, 2012 will again put the indenture trustees in a position

563

to accelerate and enforce the bond indebtedness, creating additional uncertainty around Sino-Forest's business.

12.    SFC has made considerable efforts to address issues identified by SFC's Audit Committee and the IC and by its external auditor, Ernst & Young LLP, as requiring resolution in order for SFC to be in a position to obtain an audit opinion in relation to its 2011 financial statements.

13.    However, notwithstanding SFC's best efforts, many of these issues cannot be resolved to the satisfaction of SFC's auditor or cannot be resolved within a timeframe that would protect and preserve the value of the business, and that would allow SFC to comply with its obligations under its note indentures.    Therefore, absent a resolution with the noteholders, the indenture trustees would be in a position to enforce their legal rights as early as April 30, 2012.

14.    Following extensive arm's length negotiations between SFC and the Ad Hoc Noteholders, the parties agreed on the framework for a consensual resolution of SFC's defaults and the restructuring of its business, and entered into a support agreement (the "Support Agreement") on March 30, 2012, which was executed by holders of SFC's notes holding approximately 40% of the notes.  The Support Agreement contemplates, and in fact provides an incentive for, additional noteholders becoming party to the Support Agreement by way of joinder agreements. Accordingly, I fully expect that noteholders holding more than 50% of each series of notes will ultimately sign up to the Support Agreement.

15.    The Support Agreement provides that SFC will pursue a plan of arrangement or compromise (the "Plan") on the terms set out in the Support Agreement in order to implement the agreed-upon restructuring transaction as part of this CCAA proceeding which would, among other things, (i) see SFC's business operations conveyed to, and revitalized under, a new entity to

be owned primarily by the noteholders ("SF Newco"), (ii) provide stakeholders of SFC with claims ranking behind the noteholders (the "Junior Constituents") with certain participation rights in SF Newco, and (iii) create (and provide funding for) a framework for the prosecution of certain litigation claims for the benefit of certain of SFC's stakeholders. The agreement also provides that each noteholder that is a signatory thereto (the "Consenting Noteholders") will vote its notes in favour of the Plan at any meeting of creditors.

16.    The Support Agreement further provides that SFC will undertake a sale process (the "Sale Process") in accordance with the sale process procedures (the "Sale Process Procedures") which have been developed in consultation with the proposed monitor, and have been accepted by the parties to the Support Agreement.

17.    The Sale Process is intended to provide a "market test" by which third parties may propose to acquire Sino-Forest's business operations through a CCAA Plan (in a manner that would under certain scenarios potentially allow Junior Constituents to share in the proceeds of a sale even though the noteholders may not be paid in full) as an alternative to the SF Newco restructuring transaction between SFC and its noteholders, described above.

18.    A redacted copy of the Support Agreement (redacted to preserve confidentiality of the parties only) is attached as Exhibit "**B**" and will be posted on SEDAR and the proposed monitor's website at http://cfcanada.fticonsulting.com/sfc.

19.    As described in greater detail below, SFC's business operations are primarily in the PRC and are held by SFC through intermediate holding companies incorporated (for the most part) in either the British Virgin Islands ("BVI") or Hong Kong. Most of these intermediate holding companies are guarantors of SFC's note indebtedness.

20.   As further described below, as a result of the uncertainty created by the MW Report, Sino-Forest's business has been severely curtailed, and Sino-Forest's ability to grow its business has been severely reduced. Therefore, SFC now needs to be restructured in order to continue the development of the business and unlock the value of its asset base for the benefit of its stakeholders.   Further, although the PRC government has been generally cooperative and encouraging of Sino-Forest to date, it has expressed increasing concern as to the future of Sino-Forest in the PRC.   As discussed below, the ongoing support and relationship with the PRC government (on all levels) is crucial to Sino-Forest's operations.

21.   Among other things, the Sino-Forest Companies are (i) having a difficult time maintaining existing and obtaining new credit in the PRC to help fund the PRC-based business operation and in Hong Kong for the imported log trading business, (ii) making very few purchases of new timber (and therefore not expanding their asset base), (iii) finding it difficult to collect their accounts receivables, and (iv) receiving increasing demands on their accounts payable.  I believe that, if Sino-Forest's business is to be saved in a manner beneficial to SFC's stakeholders, it is imperative that SFC take steps to demonstrate that Sino-Forest's business is being separated from the uncertainty created by the MW Report.

22.   Accordingly, and for the reasons set out herein, the commencement of a restructuring and the Sale Process is urgently required and should be pursued to preserve SFC's business as a going concern and thus the inherent value of the enterprise.

23.   This application has been authorized by the Board.

## II.    PERSONAL BACKGROUND

24.    I began my career with PricewaterhouseCoopers in 1979.  In 1982 I joined Trizec Corporation Ltd. ("Trizec"), a Toronto Stock Exchange ("TSX") listed commercial real estate company then controlled by the Brascan Group.  During my 13 years with the group of companies controlled by the Brascan Group, I held several senior positions, including Vice President, Finance and Treasurer of Trizec, Executive Vice President and Chief Financial Officer of Brookfield Development Corporation, and President and CEO of Trilon Securities Corporation.

25.    After leaving the Brascan Group, I joined MDC Corporation, where my positions included Senior Executive Vice President, Chief Financial Officer and Chief Operating Officer, and a member of the company's board of directors.

26.    In 1999, I was appointed Senior Executive Vice President and Chief Financial Officer of Alliance Atlantis Communications Inc. ("Alliance Atlantis"), then Canada's leading entertainment and broadcasting company that was then listed on the TSX and on the NASDAQ. I ceased to be an executive and employee of Alliance Atlantis in 2005 due to health reasons and thereafter acted as a consultant to Alliance Atlantis until 2007.

27.    I have been a director of SFC since 2006.  I joined the Board in 2006 as an independent, external director.  I was appointed Lead Director in 2007, a position I held until June 2010, when I became an employee of SFC responsible for its acquisition of Greenheart Group Limited (Bermuda) ("Greenheart") and its subsidiaries (collectively, the "Greenheart Group").  At that time I became Executive Vice-Chairman of SFC and, following SFC's acquisition of a majority interest in Greenheart in August 2010, I became the CEO and an Executive Director of

Greenheart and in 2011 was appointed Chairman of Greenheart. On August 26, 2011, I was appointed as CEO of SFC. I have lived and worked out of Hong Kong since becoming an employee of SFC in 2010.

## III.   SINO-FOREST CORPORATION

### A.   Overview

28.   SFC was formed under the *Business Corporations Act* (Ontario) upon the amalgamation of Mt. Kearsage Minerals Inc. and 1028412 Ontario Inc. pursuant to articles of amalgamation dated March 14, 1994. The articles of amalgamation were amended by articles of amendment filed on July 20, 1995 and May 20, 1999 to effect certain changes in the provisions attaching to SFC's class A subordinate-voting shares and SFC's class B multiple-voting shares.

29.   On June 25, 2002, SFC filed articles of continuance to continue under the *Canada Business Corporations Act* (the "CBCA"). On June 22, 2004, SFC filed articles of amendment whereby its class A subordinate-voting shares were reclassified as common shares and its class B multiple-voting shares were eliminated. A copy of the articles of continuance referred to above is attached as Exhibit "C".

30.   Subject to paragraph 31 below, copies of all SFC financial statements prepared during the year preceding the application for the Initial Order are attached as Exhibit "D". In considering these financial statements, the Court should be aware that SFC cautioned in a January 10, 2012 press release, a copy of which is attached as Exhibit "E", that its historic financial statements (upon which portions of this affidavit are based) and related audit reports should not be relied upon. The circumstances giving rise to the press release are discussed below.

31.    Attached as Exhibit "F" is a copy of the management-prepared unaudited financial statements for the third quarter of 2011.  These statements have not been approved by SFC's Audit Committee or the Board and are subject to the limitations described in the January 10, 2012 press release.  Moreover, they have not been subject to the same level of internal and external review and analysis as SFC's prior annual audited and quarterly financial statements.  These financial unaudited statements have not previously been publicly disclosed.

32.    Sino-Forest is a publicly listed major integrated forest plantation operator and forest products company, with assets predominantly in the PRC.  Its principal businesses include the sale of standing timber and wood logs, the ownership and management of forest plantation trees, and the complementary manufacturing of downstream engineered-wood products.  As at December 31, 2010, Sino-Forest reported approximately 788,700 hectares of forest plantations under management, located primarily in the southern and eastern regions of the PRC.

33.    In addition, SFC holds an indirect majority interest in Greenheart, a Hong Kong listed investment holding company, which, together with its subsidiaries, as at March 31, 2011, owned certain rights and managed approximately 312,000 hectares of hardwood forest concessions in the Republic of Suriname ("Suriname") and 11,000 hectares of a radiata pine plantation on 13,000 hectares of freehold land in New Zealand.

34.    While Greenheart is an indirect subsidiary of SFC, it has its own distinct operations and financing arrangements and is not party to or a guarantor of the notes issued by SFC.  Greenheart Group and SFC operate out of separate office buildings in Hong Kong.

35.    Greenheart Group was not implicated in the allegations made against Sino-Forest by Muddy Waters on June 2, 2011, discussed below.  As such, the Greenheart Group and matters

relating thereto are not intended to be affected by or included in this proceeding. Greenheart Group has nevertheless been impacted by the allegations made against Sino-Forest. Among other things, Greenheart Group has previously relied on funding from SFC and could be negatively impacted if SFC's business ceases to operate as a going concern. This in turn could negatively impact the value of SFC's investment in Greenheart.

36.   Since 1995, SFC has been a publicly listed company on the TSX with its shares traded under the symbol "TRE". SFC's registered office is in Mississauga, Ontario and its principal executive office is in Hong Kong. Two of SFC's senior financial officers reside in Ontario, as do three of its external directors.

37.   SFC has issued four series of notes which have a combined principal amount outstanding of approximately $1.8 billion. Two of the series of notes are supported by guarantees from 64 of SFC's subsidiaries (none of which are incorporated in the PRC), and the other two series of notes are supported by guarantees from 60 of those same subsidiaries and share pledges from 10 of those same subsidiaries.

38.   Certain other Sino-Forest Companies have their own distinct banking facilities which are not intended to be affected by or included in this proceeding. In particular, none of the subsidiaries incorporated in the PRC are party to or guarantors of SFC's notes and are not intended to be affected by or included in this proceeding.

B.   **Corporate Structure**

39.   SFC is the sole shareholder of Sino-Panel Holdings Limited (incorporated in the BVI), Sino-Global Holdings Inc. (incorporated in the BVI), Sino-Panel Corporation (incorporated in Canada), Sino-Wood Partners Limited (incorporated in Hong Kong), Sino-Capital Global Inc.

(incorporated in the BVI), and Sino-Forest International (Barbados) Corporation (incorporated in Barbados). SFC also holds all of the preference shares of Sino-Forest Resources Inc. (incorporated in the BVI). Some of these subsidiaries have further direct and indirect subsidiaries. A copy of the Sino-Forest corporate organization chart is attached as Exhibit "G" (which includes certain major subsidiaries of Greenheart).

40.    A total of 137 entities make up the Sino-Forest Companies: 67 PRC incorporated entities (with 12 branch companies), 58 BVI incorporated entities, 7 Hong Kong incorporated entities, 2 Canadian entities and 3 entities incorporated in other jurisdictions. A list of all subsidiaries with addresses is attached as Exhibit "H" (which does not include subsidiaries of Greenheart, but does contain Sino-Forest branch companies).

## C.    Capital Structure

### 1.    Equity

41.    The authorized share capital of SFC consists of an unlimited number of common shares and an unlimited number of preference shares issuable in series. Each holder of common shares is entitled to one vote at meetings of shareholders other than meetings of the holders of another class of shares.

42.    Each holder of common shares is also entitled to receive dividends if, as and when declared by the Board. Holders of common shares are also entitled to participate in any distribution of net assets upon liquidation, dissolution or winding-up on an equal basis per share. There are no pre-emptive, redemption, retraction, purchase or conversion rights attaching to the common shares.

43.   As at June 30, 2011, a total of 246,095,926 common shares were issued and outstanding. No preference shares have been issued.

2.   **Debt**

44.   SFC has issued four series of notes which remain outstanding. The four series of notes mature at various times between 2013 and 2017. The note indenture for each series of notes provides that it is governed by New York law. Each note indenture contains a "no suits by holders" clause. Other than the debt outstanding under the notes, SFC does not have any significant levels of normal course payables.

### (a) 2017 Senior Notes

45.   On October 21, 2010, SFC issued guaranteed senior notes in the principal amount of $600 million. These notes mature on October 21, 2017, and interest is payable semi-annually, on April 21 and October 21, at a rate of 6.25% per annum. These notes are listed on the Singapore Stock Exchange and are supported by guarantees from 60 subsidiaries of SFC and share pledges from 10 of those same subsidiaries. A copy of the relevant indenture is attached as Exhibit "I".

### (b) 2016 Convertible Notes

46.   On December 17, 2009, SFC issued convertible guaranteed notes in the principal amount of $460 million. These notes mature on December 15, 2016, and interest is payable semi-annually, on June 15 and December 15, at a rate of 4.25% per annum. These notes are supported by guarantees from 64 subsidiaries of SFC. A copy of the relevant indenture is attached as Exhibit "J".

### (c) 2014 Senior Notes

47.   On July 27, 2009, SFC issued guaranteed senior notes in the principal amount of
$399,187,000.  These notes mature on July 28, 2014, and interest is payable semi-annually, on
January 26 and July 26, at a rate of 10.25% per annum.  These notes are listed on the Singapore
Stock Exchange and are supported by guarantees from 60 subsidiaries of SFC and share pledges
from 10 of those same subsidiaries.  A copy of the relevant indenture is attached as Exhibit "K".

### (d) 2013 Convertible Notes

48.   On July 23, 2008, SFC issued convertible guaranteed notes in the principal amount of $345
million.  These notes mature on August 1, 2013, and interest is payable semi-annually, on
February 1 and August 1, at a rate of 5% per annum.  These notes are supported by guarantees
from 64 subsidiaries of SFC.  A copy of the relevant indenture is attached as Exhibit "L".

49.   In addition to the four series of notes issued by SFC, many of SFC's subsidiaries (including
the Greenheart Group and many of those incorporated in the PRC) have their own distinct
banking facilities, including lending facilities, which are not intended to be affected by this
proceeding.

### D.   The Business Model

#### 1.   Plantation / Timber Rights in the PRC

50.   There are four types of rights associated with plantations in the PRC, namely (i) plantation
land ownership, (ii) plantation land use rights, (iii) timber ownership, and (iv) timber use rights.
All of these are separate rights and can be separately owned by different parties.