51.   Generally, private enterprises cannot own plantation land in the PRC but may hold plantation land use rights for a specified duration (up to 70 years but typically 30 to 50 years), timber ownership and timber use rights.  However, foreign enterprises cannot acquire land use rights and can instead only acquire timber ownership or timber use rights.

52.   The various rights associated with plantations in the PRC and the limitations on which entities can hold which rights were the driving forces behind Sino-Forest's complex business models discussed below.

53.   For its timber business in the PRC, Sino-Forest utilizes two models, one involving BVI entities ("BVIs"), and the other involving subsidiaries incorporated in the PRC as wholly foreign owned enterprises ("WFOEs").

## 2.   The BVI Model

54.   Until 2004, due to restrictions on foreign companies carrying on business in the PRC, and foreign ownership restrictions on land ownership and use rights, the BVI structure was the model primarily used by Sino-Forest for its forestry business in the PRC.  Sino-Forest has established 58 BVI companies, 55 of which are guarantors of at least certain of SFC's notes.  Not all of these BVIs are involved in the BVI model or standing timber business.  Of the 58, there are 20 involved in the BVI standing timber business while the remaining BVIs are either holding companies or used in Sino-Forest's log trading business.

55.   The Sino-Forest BVI entities involved in the standing timber business acquire standing timber from suppliers.  The suppliers are usually aggregators who acquire the standing timber and, typically, land use rights from other suppliers or from original timber owners, such as villagers or collectives, or from smaller aggregators.  As non-PRC companies, the BVIs could

not and did not acquire land use rights in the PRC, and instead only acquired the rights to timber in the PRC pursuant to the relevant standing timber purchase contracts.

56.   Due to restrictions under PRC laws, foreign companies are not permitted to conduct business in the PRC without business licenses granted by competent governmental authorities. Therefore, the Sino-Forest BVI entities do not sell standing timber directly to customers. Instead, for historical and commercial reasons, they conduct the sale of standing timber through "authorized intermediaries" ("AIs", which are also called "entrusted sales agents" in the BVI model) pursuant to "entrusted sales agreements". The AIs serve as Sino-Forest's customers under the BVI model of its standing timber business.

57.   Pursuant to the entrusted sales agreements entered into with the AIs, the AIs are obliged to deduct and remit all of the applicable taxes on behalf of Sino-Forest.   Sino-Forest is not, however, in a position to know whether or not the AIs have in fact remitted applicable taxes on behalf of Sino-Forest.

58.   As at June 30, 2011, Sino-Forest therefore accumulated and recognized a provision, based on a probability-weighted average of the amounts that the PRC tax authorities might seek to recover under various scenarios, of $204,722,000 in its reported financial results to account for this potential tax liability.   The method used to calculate this provision is explained at note 18 of SFC's 2011 second quarter financial statements, which were previously attached.   A similar provision was included in SFC's 2010 Audited Financial Statements and was audited by SFC's external auditors.

59.   BVIs are not allowed to have bank accounts in the PRC and money flowing in and out of the PRC is strictly controlled through foreign exchange controls.   As a result, the Sino-Forest

BVI entities do not directly pay the suppliers or receive payments from the AIs. Instead, they are instructed to make set-off payments under which, pursuant to the instructions of Sino-Forest, AIs directly or indirectly make payments directly or indirectly to Sino-Forest's suppliers for amounts owed by Sino-Forest BVI entities to those suppliers. As a result, no cash actually flows directly through the BVIs. SFC then receives confirmations from the suppliers confirming that payments have been made.

60.    The BVI structure is the central driver of asset value, revenue and income for Sino-Forest. As at December 31, 2010, it accounted for $2.476 billion of book value (466,826 hectares of timber assets, representing approximately 59.2% of Sino-Forest's timber holdings by area and 89.2% of its timber holdings by book value), $1.326 billion in revenue (representing approximately 70% of Sino-Forest's revenue), and approximately $622 million of gross profit (representing approximately 92.6% of Sino-Forest's gross profits) for the year then ended.

61.    The cashless nature of the BVI model means that Sino-Forest cannot obtain cash from its operations or monetize its assets without engaging in the complicated on-shoring process which is discussed further below. Furthermore, the set-off payment system necessitated by the BVI model impaired the IC's efforts to verify the flow of funds during its investigation.

### 3.    The WFOE Model

62.    Commencing in 2004, the PRC's Ministry of Commerce permitted foreign investors to invest in PRC-incorporated trading companies and to participate in most areas of the commodity distribution industry, including the purchase of standing timber and land use rights throughout the PRC. Prior to this time, WFOEs were prohibited from engaging in the commodity distribution industry.

63.    Since 2004, almost all of Sino-Forest's new capital invested in timber assets has been employed through the WFOE model (as opposed to the BVI model).

64.    Unlike BVIs, WFOEs can acquire land use rights or land leases as well as standing timber rights, and can have bank accounts in the PRC.  Because of the WFOEs' direct presence in the PRC, they can also obtain financing from PRC banks to finance their operations. WFOEs can log the timber and sell both logs and standing timber to end customers, which means they do not need (and do not use) AIs.  The WFOEs directly pay the suppliers for the standing timber and directly receive payment from end customers instead of utilizing the set-off arrangement used by Sino-Forest's BVI entities in the BVI model.

65.    As at December 31, 2010, Sino-Forest's WFOEs held approximately 244,000 hectares of purchased plantations (representing approximately 30.9% of Sino-Forest's timber holdings by area) and 77,700 hectares of planted plantations (representing approximately 9.9% of Sino-Forest's timber holdings by area).  Purchased plantations and planted plantations are discussed in further detail below.  The WFOE standing timber assets accounted for approximately 10.8% of Sino-Forest's timber holdings by book value, and represented approximately $298.6 million of book value, $74 million in revenue, and $10 million of income for the 2010 year before the allocation of corporate overhead.

66.    None of Sino-Forest's WFOEs are guarantors of SFC's notes, nor have their shares been pledged by their BVI parents.

### 4.    On-shoring Plan

67.    Given the inherent problems with the BVI structure and the relative advantages of the WFOE structure, Sino-Forest has explored various methods of migrating or "on-shoring" its BVI

timber assets into WFOE structures.  The successful transition of assets from a BVI structure to a WFOE structure has many merits including, significantly, providing a foreign parent an ability to have direct access to the cash generated from the sale of BVI timber assets.

68.    The on-shoring process is expected to be a multi-year process due to (i) the volume of assets that need to be moved into the WFOE model, (ii) the large number of different locations in which Sino-Forest has timber assets in the PRC, (iii) the likely multiple rounds of negotiations required with the various stakeholders in each location, and (iv) SFC's limited resources.

E.    Operations

69.    Sino-Forest's operations are comprised of three core business segments.  Wood fibre operations and log trading are the primary revenue contributors, while manufacturing and other operations enhance the value of the fibre operations by producing downstream products.

1.    Wood Fibre Operations

70.    Sino-Forest's wood fibre operations consists of acquiring, cultivating and selling standing timber or logs from purchased and planted plantations in nine provinces across the PRC.

71.    Sino-Forest's upstream wood fibre operations generate the majority of its revenue, accounting for 96.4% of total revenue in the year ended December 31, 2010.  Most of the standing timber and logs sold by Sino-Forest come from Sino-Forest's tree plantations, located primarily in the southern and eastern regions of the PRC.

72.    Sino-Forest operates plantations for the wood fibre operations using two principal business models: purchased and planted, each of which is explained in greater detail below.  The purchased plantation model operates through two legal structures: the BVI/AI legal structure

and, to a lesser but growing extent, the WFOE legal structure. The planted plantations model is operated exclusively through the WFOE legal structure, although the WFOEs themselves are typically held indirectly through a BVI holding structure. Many foreign investors, including well known multi-national companies, hold their investments in the PRC in special purpose vehicles established overseas in jurisdictions with a familiar and internationally accepted system of corporate governance. For example, over 75% of blue chip companies listed on the Hong Kong Stock Exchange (Hang Seng Index constituent stocks excluding the Finance Sub-Index) utilize BVI holding structures, including for their investments in the PRC.

(a)    Purchased Plantation Model

73.    The purchased plantation model under the BVI/AI legal structure involves the purchase of standing timber and sale of standing timber pursuant to standardized timber purchase agreements and "entrusted sale agreements". The standing timber purchased is generally on land owned by collectives or villages, not PRC state-owned land. When conducted through the BVI/AI legal structure, of which 20 BVIs hold all of the BVI timber assets, the timber purchases are arranged through suppliers.

74.    The BVI structure does not involve the BVIs concurrently purchasing land use rights or leases with the purchase of standing timber, as the BVIs cannot legally acquire land use rights. However, the BVIs' supply contracts typically contain a right of first refusal for the BVIs to acquire, or nominate an affiliate to acquire, the plantation land use rights after the timber has been harvested. Despite such common contractual provisions, such right has rarely, if ever, been exercised.

75.   The BVIs do not sell standing timber directly to customers.  They sell under contract to the AI (customer) who usually resells the standing timber to its own customers.  The BVIs' timber sales accounts receivables are settled by the AI making payments to suppliers (directly or indirectly to other parties on their behalf) on behalf of Sino-Forest.  The AI does not pay the same supplier for the same trees it is selling to its customers.  It pays a supplier for trees newly purchased by Sino-Forest from that supplier.  These payments made by way of set-off enable the BVIs to acquire further standing timber from suppliers, which is matured and later sold.  All BVI purchases are funded through the set-off mechanism using accounts receivable owed to Sino-Forest. This is a recognized legal structure in the PRC.

76.   WFOEs are also engaged in the purchase and sale of standing timber. When conducted through a WFOE, purchases of standing timber are sometimes accompanied by concurrently obtaining plantation land use rights or leases (which are purchased plantations).  WFOE standing timber transactions do not involve payments by way of set-off.  They are conducted on a direct fund transfer basis.

77.   In both the BVI and WFOE structure, the purchase price of the trees takes into account a variety of factors such as the trees' species, yield, age, size, quality and location.   Other considerations include soil and weather conditions for replanting, log prices, and regional market location and demand.   Sino-Forest does not typically need to conduct extensive plantation management work with respect to the trees growing on the purchased plantations, but does take measures to ensure that the trees are protected from pests, disease and theft.

78.    SFC's approach is to purchase plantations in remote parts of the PRC that the PRC government has identified in its five year plans as being areas for future development.    As a result, physical access to the plantations is often very challenging.

79.    As at December 31, 2010, the purchased plantations under Sino-Forest management in the PRC consisted of approximately 711,000 hectares.    These plantations consisted of a diverse mix of tree species, predominantly pine, Chinese fir and eucalyptus.    Purchasing trees allows Sino-Forest to quickly expand its plantation portfolio geographically, as well as its inventory of harvestable fibre and leasable land.

(b)    **Planted Plantation Model**

80.    The planted plantation model is conducted by WFOEs, and involves obtaining plantation land use rights, sometimes with standing timber and sometimes as bare land suitable for planting. Sales from these planted plantations do not utilize the AI model but rather generally involve direct fund transfers to and from the WFOEs' suppliers and customers.    As of December 31, 2010, SFC's planted plantations in the PRC operated through WFOEs comprised approximately 77,700 hectares.

81.    Sino-Forest leases suitable land on a long-term basis, typically 30 to 50 years, and applies scientifically advanced seedling technology and silviculture techniques to improve tree growth. The mature trees are sold as standing timber or as harvested logs, and then Sino-Forest replants the land with seedlings.

82.    Sino-Forest's operating model allows for the sale of fibre either as standing timber or harvested logs, depending on its customers' preferences and market demand.

83.    Sino-Forest's planted plantations consist primarily of eucalyptus trees, a fast-growing high yielding species.   According to the seventh five-year National Forest Inventory released by the State Forestry Administration (2004 to 2008), it is estimated that the PRC has 195 million hectares of forest resources, with approximately 120 million hectares of natural forest and 62 million hectares of plantation forest.   The density of its total forest area was only 70 cubic metres per hectare in the PRC.

84.    The PRC government encourages the development of the plantation industry in the PRC. In June 2003, the PRC State Council promulgated "The Notice on the Decision to Speed Up the Development of Plantation Industry".   Subsequently, in August 2007, "The Key Elements of the Policies in Forestry Industry" was jointly promulgated by seven ministries including the State Forestry Administration, National Development and Reform Commission, Ministry of Finance, Ministry of Commerce, State Administration of Taxation, China Banking Regulatory Commission and China Securities Regulatory Commission to develop the non-state owned plantation industry, and to encourage the participation of foreign investors in the plantation industry, either solely or jointly with others.

85.    The planted plantation model is generally viewed more favourably by the PRC government because it demonstrates a long-term commitment to the forestry business.   That long-term commitment is very important from the perspective of the PRC government in light of the fact that demand for wood fibre in the PRC is approximately double that of available supply.

### 2.    Log Trading Operations

86.    Sino-Forest's operations in the trading of wood logs includes the sourcing of wood logs and wood-based products from the PRC and globally, and selling them in the domestic PRC market.

87.   These wood-based products consist primarily of large diameter logs, sawn timber, veneers and other wood-based products sourced from the PRC, Thailand, Suriname, Papua New Guinea, Brazil, Vietnam, Russia and New Zealand. In these transactions, Sino-Forest purchases wood-based products that correspond to the requirements of wood dealers, and sells directly to these dealers. Sino-Forest's customers in these transactions are primarily wood dealers in the PRC.

### 3.   Manufacturing and Other Operations

88.   Sino-Forest currently has manufacturing operations in six provinces in the PRC that produce various wood-based products. In addition, Sino-Forest has greenery and nursery operations based in Jiangsu Province, which were established to source, supply and manage landscaping products for property developers and other organizations.

89.   In order to maximize and increase the value of Sino-Forest's forestry products, Sino-Forest has been investing in research and development ("R&D"). On January 12, 2010, Sino-Forest announced its acquisition of HOMIX LIMITED ("HOMIX") in order to enhance its R&D portfolio. HOMIX has an R&D laboratory and two engineered-wood production operations based in Guangdong and Jiangsu provinces, covering eastern and southern PRC wood product markets. HOMIX develops a number of new technologies suitable for domestic plantation logs including poplar and eucalyptus species. HOMIX specializes in curing, drying and dyeing methods for engineered-wood and has the know-how to produce recomposed wood products and laminated veneer lumber. Recomposed wood technology is considered to be environmentally friendly and versatile, as it uses fibre from forest plantations, recycled wood and/or wood residue.

90.    The goal of Sino-Forest's R&D efforts has been to improve tree plantation yields and the quality of the trees grown on Sino-Forest's plantations. While performing R&D activities, Sino-Forest from time to time collaborates with, and receives assistance from, research and academic institutions in the PRC. Sino-Forest's R&D efforts are viewed very positively in the PRC as they also demonstrate a long-term commitment to the forestry business in the PRC and can help address the significant shortage of wood fibre in the PRC.

F.    Sales

91.    Substantially all of Sino-Forest's sales are generated in the PRC. In the year ended December 31, 2010, sales to customers in the PRC were $1.8723 billion and sales to customers located in other countries were $51.3 million. In the year ended December 31, 2010, sales to customers in the PRC of standing timber, logs and other wood-based products accounted for substantially all of Sino-Forest's revenue.

G.    Suppliers

92.    Logs and wood-based products supplied through Sino-Forest's trading activities are sourced primarily from suppliers outside the PRC. These products are also sourced for Sino-Forest trading activities from overseas, primarily from Thailand, Suriname, Papua New Guinea, Brazil, Vietnam, Russia and New Zealand. The credit terms granted by suppliers of these products generally range from one to three months on open account and by letters of credit. Standing timber is sourced primarily from local suppliers in the PRC.

93.    As discussed above, the PRC based suppliers are usually aggregators who acquire standing timber and/or land use rights from other suppliers or from original timber owners such as villagers or collectives who have certified title to the land.

## H.    Employees

94.    SFC currently has 3 employees. Collectively, the Sino-Forest Companies employ a total of approximately 3553 employees, with approximately 3460 located in the PRC and approximately 90 located in Hong Kong. The Greenheart Group employs an additional approximately 273 employees.

## I.    Assets & Liabilities

95.    The unconsolidated book values of SFC's assets and liabilities as at June 30, 2011 are listed below.[1] However, given that, as described below, SFC is in default under the notes and the indenture trustees would be in a position to accelerate and enforce on the notes but for the waiver agreements (subject to sending the appropriate notices and the cure period expiring), I have categorized the full amount of the notes (including the non-current portion and the derivative financial instrument, as opposed to just the current portion) as a current liability below.

| Current Assets | | Current Liabilities | |
|---|---|---|---|
| Cash and cash equivalents[2] | $5,676,040 | Notes (current portion) | $87,670,000 |
| Prepayments[3] | $1,173,553 | Notes[4] (non-current) | $1,541,744,429 |
| Other Receivables[5] | $188,575 | Notes Derivative Financial Instrument | $31,858,210 |
| Due from Intercompany[6] | $109,813,620 | Trade Payable | $2,202 |
| | | Others Payable | $231,723 |
| | | Accrued Liabilities | $39,687,268 |
| | | Due to Intercompany | $1,818,313 |
| Total Current Assets | $116,851,788 | Total Current Liabilities | $1,703,012,145 |

---

[1] The chart only reflects the assets and liabilities of SFC, and therefore does not accord with the consolidated quarterly financial results for the second quarter ended June 30, 2011.

[2] Mainly represents cash on hand, cash at bank and short-term deposits with a maturity of three months or less.

[3] Mainly represents prepaid legal and professional fees and insurance.

[4] The Notes (current portion), Notes (non-current) and Notes Derivative Financial Instrument do not equate on this balance sheet to approximately $1.8 billion (the face value of the notes) due to the accounting treatment of financing costs and the carrying value of the convertible notes.

[5] Mainly represents HST receivables, staff advances and deposits.

[6] Non-interest bearing with no fixed date of repayment.

| Non-Current Assets | | Non-Current Liabilities | |
|---|---|---|---|
| Property, Plant & Equipment[7] | $1,166 | | |
| Investment in Subsidiaries[8] | $1,589,153,984 | Intercompany Loans | $235,000,000 |
| Intercompany Loans[9] | $1,582,781,672 | | |
| | | | |
| Total Non-Current Assets | $3,171,936,822 | Total Non-Current Liabilities | $235,000,000 |
| | | | |
| Total Assets | $3,288,518,610 | Total Liabilities | $1,938,012,145 |

96.   With respect to the assets, while they reflect an accurate implementation of the relevant accounting policies, I do not believe that the book values of the assets reflect the realizable value of those assets for a number of reasons, including the complexities associated with the business, the significant amount of intercompany loans owing to SFC, and the costs and potential PRC tax liabilities that may be payable if the assets were realized on.  SFC is not able to simply monetize its assets in the short term in order to satisfy its obligations under the notes as a result of, among other things, the hard to quantify potential PRC tax liability previously discussed at paragraph 58 above and the stringent currency exchange controls in the PRC.

97.   As discussed above, Sino-Forest is not in a position to know whether or not the AIs have in fact remitted applicable taxes on behalf of Sino-Forest.  Although Sino-Forest recognized a provision as at June 30, 2011 of $204,722,000 in its reported financial results to account for this potential tax liability, I am advised by SFC's counsel in the PRC, Ching Wo Ng at King & Wood Mallesons, that the amount of the tax liabilities under PRC law arising from the operation of the BVIs could be significantly higher if responsible tax authorities take different views than that of management in respect of a number of tax issues, including, without limitation, whether by their

---

[7] Mainly represents office equipment.
[8] Historical cost for interests in subsidiaries.
[9] Interest bearing with defined terms of repayment date.

operation the BVIs have formed an establishment in the PRC, whether value added tax is payable, the likelihood and severity of a tax penalty, the applicable default interests on late payments, the numbers of years to "look back", whether certain tax preferential treatments apply to foreign companies such as BVI entities, and other relevant matters. The views on these issues may also differ from locality to locality.

98.    In addition, as a result of the currency exchange controls in the PRC, all cash to be repatriated from the PRC is subject to approval from the State Administration of Foreign Exchange (the "SAFE").  I am advised by SFC's counsel in the PRC, Ching Wo Ng at King & Wood Mallesons, that for normal and regular foreign exchange transactions in the PRC which require the approval of SAFE, the applications for such approvals can normally be processed within the time limits prescribed by law. However, the transactions undertaken by the BVIs in respect of their forestry assets in the PRC are very dissimilar to those contemplated by the relevant rules and regulations of the PRC.  Therefore, there is no assurance that any application to SAFE for repatriation of funds by the BVIs can be processed within the time limits prescribed by law, or within a reasonable time thereafter.

99.    As a result of Sino-Forest, among other things, operating in a critical natural resource sector with insufficient supply in the PRC, investing in research and development initiatives in the PRC, and employing a significant number of people in the PRC, it has generally enjoyed positive working relationships with all levels of government in the PRC.  However, I believe that if Sino-Forest were to cease operating under a business strategy that is consistent with and supportive of PRC government policy, including its policy on sustainable forestry, for example, investing in research and development or employing a significant number of people in the PRC, Sino-Forest would enjoy much less favourable treatment from PRC government officials, and

would likely have greater difficulties resolving the issues discussed above relating to tax liabilities and repatriation of cash. This is particularly true in respect of the BVI structure where, among other things, the ability to access cash is further impaired and Sino-Forest is not in a position to know whether or not the AIs have remitted applicable taxes on behalf of Sino-Forest.

## J.    Importance of Relationships to Doing Business in the PRC

100.  From my time with SFC I have come to understand the importance of relationships to doing business in the PRC.  This is particularly true in relation to those doing business in the forestry sector.

101.  The PRC has extensive resource needs, including in the forestry sector.  Historically, forestry resources in the PRC have been collectively owned at a local level.  Forestry resources have largely been managed without the resources necessary to increase yields and allow for harvesting at a commercial level from a western forestry perspective.

102.  Part of Sino-Forest's success has been attributable to its ability to acquire forestry resources from local sources of supply, at a good price, and to resell them at a good profit.  In relation to Sino-Forest's planted plantation model, Sino-Forest also has benefited from the application of advanced silviculture techniques to those resources.  Based on my interactions with PRC government officials, I understand that the PRC government recognizes that for the industry to mature, become efficient, and improve yields to reduce the fiber deficit, forest asset management has to be consolidated.

103.  A good relationship with the various levels of PRC government is important to doing business successfully in the PRC.  Historically, Sino-Forest's relationships with these governments have been important to Sino-Forest's success in the PRC.  Loss of their support

could, correspondingly, have significant negative consequences for Sino-Forest, for its ability to continue to do business in the PRC, and its ability to continue to control its PRC-based assets for the benefit of its stakeholders.

104. Sino-Forest's most important relationships have been and continue to be through Allen Chan ("Chan"). From my observations and experience, Chan has established significant relationships in the PRC, and my understanding is that this is a direct result of his long-standing personal contribution to the development of the forestry sector both through Sino-Forest and in a personal capacity as an informal advisor to various relevant industry bodies.

105. Following the MW Report, Chan was requested to meet with officials in the PRC State Forestry Administration ("SFA") and other senior officials on multiple occasions in Beijing. I have been introduced to some officials and attended some of these meetings.

106. My observation from my personal involvement in these discussions and meetings is that Chan continues to be consulted and respected within the PRC government as an expert in the forestry industry. I therefore believe his continued participation will be extremely helpful in allowing SFC to unlock value in the PRC for the benefit of its stakeholders.

107. Notwithstanding the allegations in the MW Report (which have received widespread coverage in the PRC and in Hong Kong), Chan has continued to be honoured within the PRC. In November 2011, at the 2nd China Forestry Expo, Chan was presented an "Outstanding Achievement" award from the China National Forestry Industry Federation (the "CNFIF"). In recognition of his contribution to the forestry industry in the PRC, Chan was the first keynote speaker following the Minister of the SFA at the China Forestry Expo.

108. Chan was also appointed Vice President of the CNFIF in 2010. The CNFIF is an affiliate of the SFA and is chaired by the Minister of the SFA or the Director of the SFA. The SFA is the PRC government ministry responsible for its forests and forest management.

109. In 2007, Chan was appointed an Honourable Director of Renmin University (also known as the People's University of China), one of the most prestigious universities in the PRC with a distinct focus on humanities and social sciences, and highly regarded by top leaders in the PRC. In addition, Chan is a member of the Jiangxi Committee of the Chinese People's Political Consultative Conference.

110. In February 2012, Chan was presented with the "2011 China Forestry Persons of the Year" award by the CNFIF.

111. Many of the PRC's commercially attractive forestry resources are in areas of sensitivity within the PRC, including areas that are sensitive from a military perspective. Private air travel is prohibited or strictly controlled in many of the areas in which Sino-Forest does business.

112. The strategic significance attaching to Sino-Forest's forestry assets in the PRC increases the importance to SFC of maintaining positive relationships with authorities in the PRC. If Sino-Forest is to monetize its PRC based assets for the benefit of stakeholders, I strongly believe that the outcome of this process must be acceptable to relevant authorities in the PRC.

113. In the course of its 18 years of operations, Sino-Forest has been viewed by the Minister of the SFA positively and as a model for privately owned enterprises carrying on business in the PRC and promoting PRC policies. For that reason, Sino-Forest has enjoyed a positive relationship with the PRC. Even since June of last year, the Minister of the SFA has remained

cooperative and encouraging of a solution for Sino-Forest. However, recently, the government has expressed increasing concern and interest as to what the solution is for Sino-Forest. As a result, not only do I believe that any solution needs to be acceptable to the authorities in the PRC, such solution needs to be presented in the very near future.

## IV.   THE MUDDY WATERS ALLEGATIONS: CHRONOLOGY AND RESPONSES

114. On June 2, 2011, Muddy Waters, which admitted to holding a short position on SFC's shares, published the MW Report alleging, among other things, that Sino-Forest is a "near total fraud" and a "Ponzi scheme."

115. While the allegations contained in the MW Report are diverse and far-reaching, the IC set out to address the issues raised in three core areas: (i) the verification of timber assets reported by Sino-Forest, (ii) the value of the timber assets held by Sino-Forest, and (iii) revenue recognition.

116. Among other things, the MW Report alleged that Sino-Forest does not hold the full amount of timber assets that it reports, that the timber assets actually held by Sino-Forest have been overstated, and that Sino-Forest overstated its revenue. In addition, the MW Report alleged that Sino-Forest has engaged in unreported related-party transactions. A copy of the MW Report is attached as Exhibit "M". Two subsequent reports by Muddy Waters relating to Sino-Forest are attached as Exhibit "N". These reports are attached to provide context to the Court and definitely not because I agree with their contents.

## A.   The IC, OSC, RCMP and HKSFC Investigations

117. On June 2, 2011, the same day that the MW Report was released, the Board appointed the IC, a Board committee consisting exclusively of independent directors, which in turn retained

independent legal and financial advisors in Canada, Hong Kong and the PRC, to investigate the allegations set out in the MW Report.

118. On June 8, 2011, the OSC publicly announced that it was investigating matters related to SFC. That investigation has been active and is ongoing.

119. Later in June 2011, the HKSFC commenced an investigation into Greenheart Group. As a company listed on the Hong Kong Stock Exchange and headquartered in Hong Kong, the HKSFC is Greenheart's primary securities regulator. I believe that the HKSFC's investigation was largely reactive to the allegations against Sino-Forest, SFC's control position in relation to Greenheart Group, and to the fact that the principal offices of Sino-Forest and Greenheart Group are located in Hong Kong. As indicated above, SFC had acquired a majority interest in Greenheart Group less than a year earlier, and had separate management and premises.

120. In addition to its investigation of Greenheart Group, the HKSFC has been assisting the OSC with its investigation. I am advised by Gary Solway of Bennett Jones LLP, counsel to SFC, that the HKSFC has a mutual-assistance treaty with the OSC. The OSC has conducted witness interviews in Hong Kong with the assistance of and out of the premises of the HKSFC.

121. Sino-Forest believes that it has attempted to cooperate with the OSC, HKSFC and RCMP investigations. Sino-Forest has made extensive production of documents, in particular to the OSC, including documents sourced from jurisdictions outside of the OSC's power to compel production.

122. Sino-Forest also has facilitated interviews by the OSC with Sino-Forest personnel. In circumstances where OSC staff sought to examine Sino-Forest personnel resident in the PRC

(where neither the OSC nor the HKSFC had the ability to compel their attendance at interviews), Sino-Forest arranged to bring individuals to Hong Kong to be examined.

123. Sino-Forest has responded to extensive inquiries, the most far-reaching coming from the OSC, and has provided periodic oral briefings to OSC staff. The IC reports were provided to OSC staff on an unredacted basis, as discussed below.

124. The scope of the IC's review was significant, reflecting the wide range of allegations contained in the MW Report. The IC and its advisors worked to compile and analyze the vast amount of data required for their comprehensive review of Sino-Forest's operations and business, the relationships between Sino-Forest and other entities, and Sino-Forest's ownership of assets.

125. At the beginning of the IC's investigation, the IC informed the Board that the review would likely take at least two to three months to complete. On August 10, 2011, the IC delivered its first interim report to the Board (the "First Interim Report"). A redacted copy of the First Interim Report is attached as Exhibit "O".

126. SFC has publicly disclosed on SEDAR and on its website redacted versions of the First Interim Report and the two subsequent reports of the IC. The three reports have been redacted to protect information that the Board believes is commercially sensitive, the disclosure of which could be harmful to Sino-Forest's business and operations, especially in the PRC. These redactions have not been made to conceal information from regulatory scrutiny. Each of the three reports has been produced without redactions to OSC staff pursuant to a compelled process designed to allow OSC staff to receive information relevant to its investigation, while at the same time protecting SFC's sensitive information.

127. The First Interim Report was the result of the IC and its advisors assembling and organizing significant data from Sino-Forest's records, and reviewing Sino-Forest's cash holdings, revenue and relationships. In the First Interim Report, while the IC did not determine that there was any validity to the allegations in the MW Report, its findings were limited as the investigation was still ongoing.

128. Also in its First Interim Report, the IC's accounting advisors confirmed Sino-Forest's cash balances in specific accounts as at June 13, 2011, for accounts located inside and outside of the PRC. A total of 293 accounts controlled by Sino-Forest in Hong Kong were confirmed, representing 100% of the expected cash position in Hong Kong. However, Sino-Forest had 267 accounts in the PRC, so the logistics and requirements of in-person/in-branch verification in the PRC led the IC advisors to confirm 28 accounts, representing approximately 81% of the expected cash position in the PRC. The IC was satisfied based on this verification that Sino-Forest's expected cash position in the PRC existed as at the date of confirmation.

129. The First Interim Report was delivered to the Board shortly before the Board was asked to authorize the release of SFC's 2011 quarterly financial results for the second quarter ended June 30, 2011 (the "Q2 Results"). The Q2 Results were released on August 15, 2011.

130. Almost immediately after the Q2 Results were released, the IC's advisors identified and brought to the attention of the IC just under 60 documents, some of which raised potential conduct issues and others of which raised questions as to whether Sino-Forest's relationships with some of its AIs and suppliers were conducted at arm's length.

131. The IC concluded that interviews concerning the documents should be conducted with relevant Sino-Forest personnel. The interviews were conducted from August 24 to 26, 2011 in Hong Kong.

132. As part of its efforts to cooperate with OSC staff, on August 24, 2011, before the documents were shown to relevant Sino-Forest personnel and those personnel were provided with an opportunity to comment, the IC's advisors provided copies of the documents to OSC staff. The IC's advisors and SFC's external counsel also provided oral briefings about the interviews to OSC staff from August 24 to 26, 2011, as the interviews were being conducted.

133. Seen in their proper context, and with the benefit of fuller explanations, I believe that the documents identified by the IC's advisors and provided to OSC staff at that time fall well short of the misconduct alleged in the MW Report.

134. However, as a result of the documents and interviews, Sino-Forest placed three employees on administrative leave, and a fourth senior employee was requested to act solely on my instructions. It was my decision in each case to take this action.

135. SFC's Board met on the morning of Friday August 26, 2011, Toronto time (which was Friday evening Hong Kong time) to hear reports about the interviews and about communications between SFC and OSC staff. The Board was told that Chan had agreed to resign as Chairman, CEO and as a director of SFC pending the completion of the review by the IC of the allegations in the MW Report. He was appointed Founding Chairman Emeritus and I was appointed as CEO.

136. On August 26, 2011, the OSC issued a cease trade order with respect to the securities of SFC and with respect to certain senior management personnel. A copy of the cease trade order dated August 26, 2011 (as corrected by the OSC later that day) is attached as Exhibit "**P**". The Board first learned of the cease trade order during the Board meeting that day, after Chan tendered his resignation.

137. With the consent of SFC, the cease trade order was extended by subsequent orders of the OSC, copies of which are attached as Exhibit "**Q**". The cease trade order continues in force to this date.

138. Based on my review of the IC's second interim report to the Board (the "Second Interim Report", which is discussed below) and discussions I have had with William Ardell, Board Chair and Chair of the IC, I understand that in late August 2011, counsel for the IC received an inquiry from the RCMP requesting cooperation from the IC in connection with an investigation into the allegations in the MW Report. Representatives of the IC met with and provided information to the RCMP from time to time. The RCMP also has made information requests from time to time. It has been SFC's intention to cooperate with the RCMP in connection with its investigation.

139. On November 13, 2011, the IC delivered its Second Interim Report to the Board, a redacted copy of which is attached as Exhibit "**R**".

140. Subject to the limitations described therein, the Second Interim Report confirmed registered title or contractual or other rights to Sino-Forest's stated timber assets, reconciled the book value of the BVI timber assets and Sino-Forest WFOE standing timber assets as set out in the 2010 financial statements to the purchase prices for such assets as set out in the BVI and

WFOE standing timber purchase contracts reviewed by the IC advisors, reconciled reported total revenue to sales contracts, and addressed certain allegations regarding related-party transactions.

141. Subject to the scope limitations described in the Second Interim Report, the IC confirmed 99.3% of Sino-Forest's timber area to its satisfaction and that Sino-Forest had registered title to 100% of its disclosed planted timber holdings by area, and contractual or other rights to approximately 81.3% of its disclosed purchased timber holdings by area. The IC reported that it or its advisors had reviewed originals or copies of purchase contracts for the acquisition by Sino-Forest of virtually all of its disclosed timber holdings as at December 31, 2010.

142. The IC indicated in its Second Interim Report that it viewed its work to be substantially complete and that it expected to deliver its final report prior to the end of 2011.

**B.    Failure to Release Q3 Results and Default Under the Notes**

143. Subsequent to August 26, 2011, the IC's advisors identified additional documents that raised issues meriting comment and explanation from SFC's management. Also, SFC's external counsel, in responding to requests from the OSC, also identified documents of a similar nature. Further documents meriting comment and explanation were identified by SFC's external auditors and in interviews conducted by OSC staff.

144. As SFC reached the November 15, 2011 deadline to release its 2011 third quarter financial statements (the "Q3 Results"), the Audit Committee recommended and the Board agreed that SFC should defer the release of the Q3 Results until certain issues could be resolved to the satisfaction of the Board and SFC's auditor. The issues included (i) determining the nature and scope of the relationships between Sino-Forest and certain of its AIs and suppliers, as discussed in the Second Interim Report, and (ii) the satisfactory explanation and resolution of issues raised

by certain documents identified by the IC's advisors, SFC's counsel, SFC's external auditors, and/or by OSC staff.

145. On November 15, 2011, the date upon which SFC's Q3 Results were due, SFC issued a press release announcing that the IC had delivered its Second Interim Report to the Board. A copy of the November 15, 2011 press release is attached as Exhibit "S". The executive summary to the Second Interim Report is attached as a schedule to the press release.

146. The November 15, 2011 press release also stated that the Board had concluded that, as a result of ongoing work arising from the allegations raised in the MW Report, it was not in a position to authorize the release of the Q3 Results at that time. The release stated that SFC would try to release the Q3 Results within 30 days.

147. SFC's failure to file the Q3 Results and provide a copy of the Q3 Results to the trustee and to its noteholders under its senior and convertible note indentures on or before November 15, 2011 constituted a default under those note indentures. Pursuant to the indentures, an event of default would have occurred if SFC failed to cure that breach within 30 days in the case of the senior notes, and 60 days in the case of the convertible notes, after having received written notice of such default from the relevant indenture trustee or the holders of 25% or more in aggregate principal amount of a given series of notes.

148. While SFC worked diligently to try to resolve the outstanding issues, it became clear that SFC was not going to be able to release the Q3 Results within that timeframe. On December 12, 2011, SFC issued a press release announcing that it would not be able to release the Q3 Results within the 30-day period originally indicated.

149. Moreover, in the press release, SFC announced that, in the circumstances, there was no assurance that it would be able to release the Q3 Results, or, if able, as to when such release would occur. In the December 12, 2011 press release, SFC also announced that the Board had determined not to make the $9.775 million interest payment on SFC's 2016 convertible notes that was due on December 15, 2011. A copy of the December 12, 2011 press release is attached as Exhibit "T".

150. As disclosed in the December 12, 2011 press release, the circumstances that caused SFC to be unable to release the Q3 Results also could impact SFC's historic financial statements and SFC's ability to obtain an audit for its 2011 fiscal year.

151. SFC's failure to make the $9.775 million interest payment on the 2016 convertible notes when due on December 15, 2011 constituted a default under that indenture. Under the terms of that indenture, SFC had 30 days to cure its default and make the required interest payment in order to prevent an event of default from occurring, which could have resulted in the acceleration and enforcement of the approximately $1.8 billion in notes which have been issued by SFC and guaranteed by many of its subsidiaries outside of the PRC.

152. On December 18, 2011, SFC announced that it had received written notices of default dated December 16, 2011, in respect of its senior notes due 2014 and its senior notes due 2017. The notices, which were sent by the trustees under the senior note indentures, referenced SFC's previously-disclosed failure to release the Q3 Results on a timely basis. SFC reiterated in the December 18, 2011 press release that it did not expect to be able to file the Q3 Results and cure the default within the 30 day cure period. A copy of the December 18, 2011 press release is attached as Exhibit "U".

153. In response to the receipt of the notices of default, among other considerations, on December 16, 2011, the Board established a Special Restructuring Committee of the Board (the "Restructuring Committee") comprised exclusively of directors independent of management of SFC, for the purpose of supervising, analyzing and managing strategic options available to SFC. The members of the Restructuring Committee are William Ardell, Chair of the Board, who is also Chair of the Restructuring Committee and Garry West. James Hyde, Chair of the Audit Committee and an independent director, while not a member of the Restructuring Committee, has attended meetings of the Restructuring Committee and participated fully in its deliberations.

154. Following discussions with its external auditors, on January 10, 2012, SFC issued a press release cautioning that its historic financial statements and related audit reports should not be relied upon. The January 10, 2012 press release is previously attached.

C.      The Waiver Agreements

155. On January 12, 2012, SFC announced that following extensive discussions with the Ad Hoc Noteholders, holders of a majority in principal amount of SFC's senior notes due 2014 and its senior notes due 2017 agreed to waive the default arising from SFC's failure to release the Q3 Results on a timely basis. A copy of the January 12, 2012 press release, together with the waiver agreements, is attached as Exhibit "V".

156. Pursuant to the waiver agreements, SFC agreed to, among other things, make the $9.775 million interest payment on its 2016 convertible notes that was due on December 15, 2011, curing that default. That payment was made in accordance with the waiver agreements.

157. While the waiver agreements prevented the indenture trustees under the relevant note indentures from accelerating and enforcing the note indebtedness as a result of SFC's failure to

file its Q3 Results, those waiver agreements expire on the earlier of April 30, 2012 and any earlier termination of the waiver agreements in accordance with their terms. In addition, should SFC fail to file its 2011 Results by March 30, 2012 (and upon the necessary notices being sent and cure periods expiring), the indenture trustees would again be in a position to accelerate and enforce.

**D.    The IC's Final Report and Verification of SFC's Assets**

158. On January 31, 2012, SFC publicly released a redacted version of the final report of the IC (the "Final Report"). A copy of the redacted Final Report is attached as Exhibit "**W**".

159. Following the delivery of the Final Report, and in accordance with the waiver agreements, the Board adopted a resolution instructing the IC to cease its investigative, review and oversight activities. Any issues within the authority of the IC that remained outstanding were referred to SFC's Audit Committee or Restructuring Committee.

160. In its January 31, 2012 press release, attached as Exhibit "**X**", announcing the release of the Final Report, SFC also disclosed the results of a "proof of concept" exercise undertaken to determine if the standing timber referenced in particular purchase contracts could be located and quantified by an independent forestry expert engaged to undertake the exercise. The exercise was undertaken to address the issue raised in the Second Interim Report regarding the absence of maps in the possession of SFC's BVI subsidiaries to show the precise location of the timber subject to plantation purchase contracts.

161. As disclosed in the January 31, 2012 press release, the proof of concept exercise was confined to two compartments. The selection criteria limited the sample to purchased timber assets located in Yunnan province. The candidate assets were acquired prior to the allegations in

the MW Report. They were listed as being held by BVIs and not by WFOEs. At the IC's request, the consultants selected a shortlist of ten possible compartments covering multiple forestry bureaus and meeting the criteria above, avoiding any prospect that the sampling involved personnel from Sino-Forest. Multiple county forestry bureaus were represented in the shortlist, and the IC made the final selection of compartments to ensure more than one county forestry bureau was represented.

162. As described in the Final Report and the accompanying press release, maps for the two compartments were obtained from the relevant forestry bureaus in the PRC by the contracted survey companies and made available to the consultants. Using the techniques described in the Final Report, compartment boundaries were superimposed on recent high resolution satellite imagery which allowed for the measurement of each compartment's forest cover. The consultants compared the net stocked area of forest cover that they assessed for each compartment with that stated in the Sino-Forest purchase contracts and forest survey reports. The consultants found that the net stocked area of forest cover in each compartment was up to six percent greater than that stated in the relevant purchase contracts and forest survey reports, with the current assessed area for each compartment exceeding the purchase contract area.

163. While the consultant report and press release cautioned against extrapolation of these findings over Sino-Forest's broader forestry assets, I took considerable comfort from these findings. In relation to two randomly-selected contracts held through the BVI structure, the property descriptions and expected forest cover in the contracts matched the boundaries and forest cover on the ground.

164. Subsequent to January 31, 2012, Sino-Forest has taken steps to see the proof of concept process applied over a statistically relevant sampling of Sino-Forest's forest assets. That work is ongoing.

E.    Gating Issues to an Audit

165. SFC has worked diligently to address issues identified by SFC's Audit Committee, the IC and by its external auditor, Ernst & Young LLP, as requiring resolution in order for SFC to be in a position to obtain an audit opinion in relation to the 2011 Results. Many of the same issues also impact SFC's ability to release the Q3 Results.

166. As SFC has publicly disclosed in its press releases, the gating issues to the release of the Q3 Results and to obtaining an audit of the 2011 Results include (i) determining the nature and scope of the relationships between Sino-Forest and certain of its AIs and suppliers, and (ii) the satisfactory explanation and resolution of issues raised by certain documents identified by the IC's advisors, SFC's counsel, SFC's auditors, and/or by OSC staff.

167. The "relationship issues" described above are discussed extensively in the Second Interim Report and in the Final Report of the IC. Relationship issues were prominent in the approximately 60 documents provided to OSC staff on August 24, 2011, and relationships continue to be an issue that SFC has been unable to resolve.

168. As part of the IC's investigative process a significant amount of electronic data was extracted and reviewed by the IC and its advisors. The same data also has been reviewed by counsel for SFC and SFC's advisors. Over one million electronic records have been reviewed.

169.  The search of electronic records and other inquiries have not produced evidence to support the allegations made in the MW Report that Sino-Forest is a near total fraud or Ponzi scheme. The searches and inquiries have produced some evidence of possible lesser improper conduct that SFC has been making efforts to investigate, address and quantify.

170.  There is no single theme among the documents and issues that SFC has been taking steps to address. In some cases, the documents speak to efforts to deal with foreign currency exchange restrictions applicable to the PRC. The documents suggest that in some cases SFC personnel may have received personal benefits at Sino-Forest's expense and may have appropriated some of Sino-Forest's assets. They also show that, in a few cases, whistleblower complaints in some subsidiaries alleging misconduct by certain personnel in those subsidiaries appear not to have been adequately investigated and addressed.

171.  The record-keeping of SFC's subsidiaries in the PRC appeared to be adequate prior to the recent heightened scrutiny being focused on companies with significant operations in the PRC. The nature of SFC's books and records, combined with the inability to compel disclosure and participation by third party PRC companies, primarily SFC's customers (AIs) and suppliers, and the unwillingness of these companies to become involved in an investigation, makes it difficult to definitively assess some of the explanations offered by Sino-Forest personnel.

172.  In light of this heightened scrutiny, SFC's subsidiaries in the PRC do not have the scope of books and records that might be used to definitively address some issues raised by potentially problematic email communications. The nature of SFC's BVI structure, and the absence of contractual rights to examine the books and records of customers and suppliers, deprives SFC of

access to information that may be necessary to allow SFC to determine whether some of the documents and issues identified are material from a financial reporting perspective.

173.  Notwithstanding SFC's best efforts, many of these issues may not be capable of resolution, and certainly not within a timeframe that would allow SFC to comply with its obligations under its note indentures and securities laws.  Consequently, absent a resolution with the noteholders, the indenture trustees would be in a position to enforce their legal rights as early as April 30, 2012.

174.  However extensive and challenging the work done to respond to the MW Report has been, the simple fact is that the uncertainty it has created has caused Sino-Forest's business to deteriorate.  Repairing the damage to the business simply cannot wait any longer.  Without decisive action in the immediate term, I fear that the ability to save the business for the benefit of SFC and its stakeholders will be irreparably lost.

175.  As described in greater detail herein, even though the allegations set out in the MW Report and the OSC cease trade orders are unproven, the allegations have had a catastrophic negative impact on Sino-Forest's business activities and have created substantial uncertainty regarding the future of Sino-Forest's business in the minds of the Sino-Forest Companies' stakeholders in the PRC, including its lenders, customers, suppliers, employees, and governmental officials.  The allegations made against SFC have resulted in a substantial erosion of Sino-Forest's business. The business in the PRC continues to deteriorate with every passing day and it has become clear to SFC that the Sino-Forest business needs to be separated from the cloud that continues to hang over SFC if there is any future for that business (and thus value for SFC's stakeholders) to be preserved.

## V.    IMPACT OF MUDDY WATERS ALLEGATIONS ON SINO-FOREST

### A.    Class Action Lawsuits

176.  SFC and certain of its officers, directors and employees, along with SFC's current and former auditors, technical consultants and various underwriters involved in prior equity and debt offerings, have been named as defendants in eight class action lawsuits.

177.  Five of these class action lawsuits, commenced by three separate groups of counsel, were filed in the Ontario Superior Court of Justice on June 8, 2011, June 20, 2011, July 20, 2011, September 26, 2011 and November 14, 2011.  A carriage motion in relation to these actions was heard on December 20 and 21, 2011, and by Order dated January 6, 2012, Justice Perell appointed Koskie Minsky LLP and Siskinds LLP as class counsel.  As a result, Koskie Minsky LLP and Siskinds LLP discontinued their earliest action, and their other two actions have been consolidated and will move forward as one proceeding.  The other two Ontario actions, commenced by other counsel, have been stayed.  Pursuant to Justice Perell's January 6, 2012 Order, Koskie Minsky LLP and Siskinds LLP have filed a fresh as amended Statement of Claim in the consolidated proceeding.  A copy of this Statement of Claim is attached as Exhibit "Y".

178.  The action purports to be brought on behalf of noteholders.  The plaintiffs and plaintiff law firms have not complied with the prerequisites to bringing suit in the relevant note indentures, which each contain a "no suits by holders" clause.

179.  Parallel class actions have been filed in Quebec and Saskatchewan.  Copies of the originating documents in those actions are attached as Exhibit "Z".

180.  Additionally, on January 27, 2012, a class action was commenced against SFC and other defendants in the Supreme Court of the State of New York, U.S.A.  The complaint alleges that

the action is brought on behalf of persons who purchased SFC shares on the over-the-counter market and on behalf of non-Canadian purchasers of SFC debt securities. The quantum of damages sought is not specified in the complaint. A copy of the complaint in this action is attached as Exhibit "AA".

181. Additional law firms in both the United States and Canada have announced that they are investigating SFC and certain directors and officers thereof with respect to potential additional class action lawsuits.

## B.    Effects of MW Report and Related Events

182. The allegations set forth in the MW Report, despite being denied by SFC, have had catastrophic negative effects on the reputation and business of Sino-Forest. As a result, Sino-Forest's ability to conduct its operations in the normal course of business has been materially affected. For example: creditors are increasing legal demands with respect to accounts payable; at the same time, collections of accounts receivables is increasingly difficult due to a widespread belief that Sino-Forest will not survive; sales in the WFOE model have also slowed substantially in response to views on accounts receivable payments; cash flow issues have resulted in a cessation of any expansion or modernization; the inability to fund purchases of raw materials has caused a slowdown in production or, in many cases, a shutdown; certain timber assets have been frozen as Sino-Forest has been unable to keep current with payments; deposits put down on standing timber purchases by WFOEs, of approximately $27 million, may be unrealizable due to an inability to generate cash to pay off outstanding payables under those contracts; offshore banking facilities have been repaid and frozen or cancelled, leading to substantial damage in Sino-Forest's trading business; relationships with local governments and plantation land owners have become strained; Sino-Forest is unable to complete various projects, contracts and

acquisitions; and the PRC government is expressing increased concern over SFC and is becoming less inclined to be supportive of Sino-Forest, making the ability to obtain legal documents for Sino-Forest's operations increasingly difficult.

### 1.    Diversion of Operational Resources & Effects on Operations

183.  The investigations being conducted by the OSC, the HKSFC and the RCMP, the examination by the IC (and now the Audit Committee and Restructuring Committee), and the class action lawsuits have required, and will continue to require, significant resources to be expended by the directors, officers and employees of Sino-Forest. As a result, the diversion of such resources has affected Sino-Forest's ability to conduct its operations in the normal course of business. Sino-Forest's timber and trading businesses have effectively been frozen and have ground to a halt.

184.  Since the MW Report was released, in order to conserve cash, Sino-Forest has only completed cash purchases which were previously committed to and has not made any new commitments (i.e. in the WFOE structure), despite having been presented with some attractive buying opportunities. Sino-Forest has therefore not grown its asset base as it would have but for the MW Report.

185.  Also, the Sino-Forest Companies have had an extremely difficult time collecting outstanding receivables as a result of the perceived uncertainty surrounding them in the PRC. The total amount of outstanding receivables in the WFOE structure was approximately $130.5 million as at February 29, 2012, with more than 83.5% of those receivables being over 90 days. Sino-Forest's counsel in the PRC, KaiTong Law Firm, has sent legal demand letters to 12 BVI trading companies for accounts receivable totaling approximately $126 million and five WFOE

companies totaling approximately RMB 224.5 million. Additional legal demand letters for smaller accounts are also in process, and other accounts receivable are being negotiated.

186.   At the same time that the Sino-Forest Companies are having a difficult time collecting outstanding receivables, they are receiving increased demands on their payables. Certain of Sino-Forest's creditors in the PRC have taken aggressive collection tactics in the PRC, including filing court claims in an effort to be paid amounts owed to them by Sino-Forest. If the uncertainty related to SFC is allowed to continue to affect Sino-Forest's business operations, Sino-Forest expects increasing legal actions from other creditors.

187.   Sino-Forest has not been able to secure or renew certain existing onshore banking facilities and has been unable to obtain offshore letters of credit to facilitate Sino-Forest's trading business. All offshore banking facilities have been repaid and frozen, or cancelled. Since June 2, 2011, all Hong Kong banks have asked for voluntary repayment of outstanding loans.  Banking facilities with a total credit amount of $67.9 million were terminated by four banks between June 10, 2011 and August 29, 2011.  Facilities of $152.3 million were frozen upon full repayment. In the PRC, facilities totaling RMB 159.6 million were asking for voluntary repayments.  For the PRC banks providing facilities, Sino-Forest was requested to increase its cash deposits so as to demonstrate financial strength. This has lead to substantial damage in Sino-Forest's operations, and affects Sino-Forest's ability to complete obligations under existing contracts, resulting in losses potentially in excess of $100 million.

188.   Various projects and contracts, such as nursery projects in certain provinces with a contract value of approximately RMB 1 billion, have been stopped or are unable to be fulfilled.

189.  Due to the allegations in the MW Report, the PRC government is expressing increased concern over SFC and is becoming less inclined to be supportive of Sino-Forest, making the ability to obtain legal documents more difficult.  For example, the PRC government has withheld cutting licenses resulting in lower harvesting volumes. Relationships with local government and local plantation suppliers have also become strained, resulting in many difficulties and obstacles in Sino-Forest's operations including an inability to complete certain acquisitions of plantations. For example, in the Anqing, Anhui area in the PRC, the local government no longer showed support to Sino-Forest and the plantation land owner refused to honour the plantation purchase contracts.

## 2.    Fees and Expenses

190.  SFC has and will continue to incur a substantial amount of fees and expenses in connection with the examination by the IC (and now the Audit Committee and Restructuring Committee), the investigations by the OSC and the RCMP, and the class action lawsuits.  Further, pursuant to indemnification agreements between SFC and its directors and certain officers as well as with auditors, underwriters and other parties, SFC may be obligated to indemnify such individuals for additional legal and other expenses pursuant to such proceedings. The aggregate of such fees and expenses is substantial and has had an extremely negative effect on Sino-Forest's operating results.

## 3.    Value of Common Shares and Credit Rating

191.  Prior to the release of the MW Report on June 2, 2011, SFC's common shares had a 20-day volume weighted average price of CDN $19.58 for a total market capitalization of approximately CDN $4.8 billion.  In the weeks that followed the release of the MW Report, the value of SFC's common shares plunged to a low of CDN $1.29 for a total market capitalization of

approximately CDN $300 million.  As at August 25, 2011, the day prior to the OSC cease trading SFC's common shares, its shares were trading at CDN $4.81 for a total market capitalization of approximately CDN $1.2 billion.

192.  The allegations set forth in the MW Report have resulted in a material decline in the market value of SFC's common shares and notes. On June 30, 2011, Standard & Poor's Ratings Services lowered its long-term corporate credit rating on SFC to 'B+' from 'BB', lowered the issue ratings on SFC's outstanding senior notes and convertible notes to 'B+', and lowered the Greater China scale credit ratings on SFC and its notes to 'cnBB' from 'cnBBB-'.  On August 29, 2011, Standard & Poor downgraded to 'CCC-', then withdrew its ratings. Fitch Ratings withdrew its Foreign Currency Issuer Default Rating and senior debt rating of 'BB-' on July 14, 2011, after placing SFC on Negative Watch on June 20, 2011.  On July 19, 2011, Moody's Investors Service downgraded the corporate family and senior unsecured debt ratings of SFC to 'B1' from 'Ba2'. On August 29, 2011, Moody's downgraded to 'Caa1' from 'B1', and on December 14, 2011, Moody's downgraded to 'Ca1' and withdrew its rating.

193.  Sino-Forest's primary sources of funding have been short-term and long-term borrowings, equity offerings and cash generated by operating activities. However, as a result of the reputational damage that the MW Report inflicted on SFC, I believe that SFC has no ability to access the capital markets at the present time, including to refinance its notes.

## VI.    CLAIM AGAINST MUDDY WATERS

194.  On March 29, 2012, SFC commenced a claim in the Ontario Superior Court of Justice against Muddy Waters, its principal, and persons who traded with prior knowledge of the MW Report.  A copy of SFC's claim against Muddy Waters *et al* is attached as Exhibit "BB".

195. In this action, SFC seeks total damages in the sum of CDN $4 billion in relation to harm caused to SFC as a result of the allegations made by Muddy Waters. If SFC is successfully restructured as contemplated, it is anticipated that the action will be funded by the litigation trust provided for in the Support Agreement described below, and the benefits of the action will be shared as contemplated by the Support Agreement.

## VII.    PROPOSED RESTRUCTURING TRANSACTIONS

196. Following extensive arm's length negotiations between SFC and the Ad Hoc Noteholders, the parties entered into the Support Agreement. The Support Agreement contains, among other things, the summary terms and conditions of a going concern restructuring of SFC (the "Restructuring Transaction"). A copy of the Support Agreement is previously attached.

197. The Support Agreement provides that SFC will file the Plan in order to implement the Restructuring Transaction as part of this CCAA proceeding, and that the Consenting Noteholders will vote their notes in favour of the Plan at any meeting of creditors, each subject to certain conditions.

198. From a commercial perspective, the Restructuring Transaction contemplated by the Support Agreement is intended to accomplish the following objectives:

(a)    the separation of Sino-Forest's business operations from the problems facing SFC outside of the PRC by transferring the intermediate holding companies which own "the business" and SFC's intercompany claims against its subsidiaries (which include the entire substantive operations of the Sino-Forest Companies) to the noteholders in compromise of their claims against SFC (if the Sale Process does not generate a superior transaction, as described below);

(b)     the Sale Process being undertaken to determine if any person or group of persons will purchase Sino-Forest's business operations pursuant to the Plan for an amount of consideration acceptable to SFC and the noteholders, with the potential for excess above such amount being directed to Junior Constituents.  The Sale Process is intended to ensure that SFC is pursuing all avenues to maximize value for its stakeholders;

(c)     a structure (including funding) that will enable litigation claims to be pursued for the benefit of SFC's stakeholders in accordance with the Support Agreement against a number of potential defendants (including Muddy Waters, its principal, and any persons who benefited from the allegations made by Muddy Waters in a coordinated way); and

(d)     if the Sale Process does not result in a sale, the Junior Constituents recovering some "upside" in the form of a profit participation if Sino-Forest's business operations acquired by the noteholders are monetized within seven years from the date of the implementation of the Plan at a profit, as further described in the Support Agreement.

199.  The decision to enter into the Support Agreement was given careful consideration by SFC and the Board and was not taken lightly.  However, the inability to obtain an audit creates a default under the note indentures which simply cannot be cured within a reasonable timeframe, if at all.

200.   More significantly, it has become clear that the problems facing SFC outside of the PRC are causing Sino-Forest's business operations in the PRC to deteriorate and that, unless decisive

steps are taken to restructure Sino-Forest, the PRC business operations will continue to deteriorate to the point that they will cease to be capable of being turned around, which will further diminish the value that can be realized for SFC and its stakeholders. While there remains substantial work ahead in the PRC to turn the business around and convince stakeholders in the PRC (including customers, suppliers, employees and PRC governmental officials of all levels) that the Sino-Forest business built up over the past 18 years is here to stay, I firmly believe that the transactions which SFC proposes to initiate pursuant to the CCAA will show a path out of the uncertainty which it has faced since last June.

201. The Support Agreement provides that SFC will make an application under the CCAA in order to implement the Plan. The Consenting Noteholders executed the Support Agreement on the basis that a restructuring of SFC as proposed would be undertaken pursuant to the CCAA.

202. But for the negotiation and execution of the Support Agreement, SFC would be unable to prevent the acceleration and enforcement of the rights of the noteholders as soon as April 30, 2012, in which case SFC would be unable to continue as a going concern, and is thus insolvent. Accordingly, and for the reasons set out herein, a restructuring is urgently required and should be pursued to preserve its enterprise value.

203. SFC has reached an agreement on a consensual restructuring transaction with the Ad Hoc Noteholders. SFC is seeking a stay of proceedings under the CCAA in order to allow it time to proceed to develop the Plan which, if approved by the creditors and this Honourable Court, would, among other things, allow for a going concern emergence of Sino-Forest's business.

## VIII.  THE SALE PROCESS

204.  Under the Sale Process, SFC, through its financial advisor, Houlihan Lokey ("Houlihan"), and with the oversight of the monitor, will seek qualified purchasers (including existing shareholders and noteholders) of SFC's assets on a global basis and attempt to engage them in the Sale Process.  The Sale Process Procedures, which were agreed to by the parties to the Support Agreement in consultation with the proposed monitor, provide that SFC will have up to 90 days to solicit letters of intent, and if qualified letters of intent are received, a further 90 days to solicit qualified bids. A copy of the Sale Process Procedures is attached as Schedule D to the Support Agreement.

205.  I believe it is critically important that the Sale Process Order be granted at this time for a variety of reasons.  First and most importantly, it is very important that SFC conclude a restructuring by the end of the third fiscal quarter.  The business of the Sino-Forest Companies is seasonal, and the vast majority of transactions (both purchases and sales) typically occur in the third and fourth quarters.  All stakeholders will therefore be prejudiced if SFC cannot complete a restructuring by the end of the third quarter, or soon thereafter, as the business will continue to be frozen through the critical fourth quarter.

206.  With that target end date in mind, the process must begin immediately.  I understand that in other insolvency filings in Canada, sale processes have been done on much shorter timetables than what SFC is proposing; however, I believe the proposed timetable is necessary and appropriate in light of the specific circumstances. In fact, given the critical timing of this process, I am aware that Houlihan has already been in contact with parties who may be interested parties in this Sale Process.

207. The assets being sold, especially given the allegations in the MW Report, are extremely complex and are being offered for sale without current audited financial statements. Potential buyers therefore need to be afforded sufficient time to do due diligence.

208. In addition, there are limited potential buyers for these assets. I believe that potential buyers will need to have, in addition to the significant capital to complete a transaction of this size, an in-depth and intimate knowledge of the PRC market. I do not expect that the ultimate buyer for these assets, if any, will be a typical buyer of distressed assets in an insolvency proceeding.

209. Accordingly, given that a transaction must be implemented as soon as possible, and given the complexity of the assets and the fact that there is a limited universe of potential buyers, I believe it is necessary that the Sale Process Order be granted at this time, and that the Sale Process provides the best potential for recovery for SFC's stakeholders.

210. I have no reason to believe that any creditors have a *bona fide* reason to object to the Sale Process.

## IX.   SFC MEETS CCAA STATUTORY REQUIREMENTS

211. I am advised by Gary Solway of Bennett Jones LLP, counsel to SFC, that the CCAA applies in respect of a "debtor company" if the claims against the debtor company or affiliated debtor companies total more than CDN $5 million. I am further advised by Gary Solway that a "debtor company" is a company incorporated under an Act of Parliament or the legislature of a province which has, among other things, become bankrupt or insolvent.

## A.    SFC is a "Company" Under the CCAA

212. SFC is a "company" to which the CCAA applies as it is a company continued under the CBCA. A copy of SFC's articles of continuance was previously attached.

## B.    SFC has Claims Against it in Excess of $5 Million

213. As discussed above, SFC has debts against it far in excess of the CDN $5 million statutory requirement.

## C.    SFC is Insolvent

214. I am advised by Gary Solway of Bennett Jones LLP, counsel to SFC, that under section 2 of the *Bankruptcy and Insolvency Act* (and a similar definition exists under sections 192(2) and 208 of the CBCA), an insolvent person is one whose liabilities to creditors exceeds CDN $1,000 and (i) is for any reason unable to meet his obligations as they generally become due, (ii) has ceased paying his current obligations in the ordinary course of business as they generally become due, or (iii) the aggregate of whose property is not, at a fair valuation, sufficient, or, if disposed of at a fairly conducted sale under legal process, would not be sufficient to enable payment of all his obligations, due and accruing due.

215. As discussed herein, the holders of SFC's senior notes entered into waiver agreements wherein they agreed not to have the indenture trustees demand immediate payment of the principal amount of the senior notes. Such waiver agreements expire on the earlier of April 30, 2012 and any earlier termination of the waiver agreements in accordance with their terms. Moreover, in addition to the default dealt with pursuant to the waiver agreements in respect of the Q3 Results, SFC will be in further default on April 30, 2012 as a result of the fact that it will

fail to file its audited 2011 Results. As discussed in greater detail herein, SFC will be unable to cure such default in the immediate to near term (if ever).

216. But for the execution of the Support Agreement and the standstill provided for therein, the indenture trustees under the notes could be entitled to accelerate and enforce the rights of the noteholders as soon as April 30, 2012. Without the liquidity provided by the waiver agreements, SFC would be unable to meet its obligations as they come due or continue as a going concern and is thus insolvent.

## X.   RELIEF SOUGHT

### A.   Stay of Proceedings

217. SFC needs a stay of proceedings to pursue and implement the Restructuring Transaction in an attempt to complete a going concern restructuring of its businesses. In the interim, the class actions lawsuits, as well as any other potential actions, need to be stayed so that the Restructuring Committee can focus on formulating the Plan.

### B.   Appointment of Monitor

218. FTI Consulting Canada Inc. ("FTI") has consented to act as the monitor of SFC (the "Monitor") in the CCAA proceedings, and I believe that FTI is qualified and competent to so act.

219. FTI will be filing a pre-filing report with the Court as prospective monitor in conjunction with SFC's request for relief under the CCAA.

### C.   Payments During CCAA Proceeding

220. During the course of this CCAA proceeding, SFC intends to make payments for goods and services supplied post-filing as set out in the cash flow projections described below and as permitted by the draft Initial Order.

## D.    Administration Charge

221.  It is contemplated that the Monitor, counsel to the Monitor, counsel to SFC, counsel to the Board, Houlihan, FTI Consulting (Hong Kong) Limited, counsel to the Ad Hoc Noteholders and the financial advisor to the Ad Hoc Noteholders would be granted a first priority Court-ordered charge on the assets, property and undertakings of SFC, other than SFC's assets which are subject to *Personal Property Security Act* registrations (the "SFC Property") in priority to all other charges (the "Administration Charge") up to the maximum amount of CDN $15 million in respect of their respective fees and disbursements, incurred at standard rates and charges. SFC believes the Administration Charge is fair and reasonable in the circumstances.

222.    The nature of the Sino-Forest Companies' business requires the expertise, knowledge and continuing participation of the proposed beneficiaries of the Administration Charge in order to complete a successful restructuring. I believe this Administration Charge is necessary to ensure their continued participation.

223.    I do not believe that there is any unwarranted duplication of roles between the proposed beneficiaries of the Administration Charge.

## E.    Directors' Charge

224.  A successful restructuring of SFC will only be possible with the continued participation of the Board.  These personnel are essential to the viability of the continuing business of Sino-Forest.  SFC's Board members have specialized expertise and relationships with Sino-Forest's suppliers, employees and other stakeholders, as well as knowledge gained throughout the IC process that cannot be replicated or replaced.

225. The directors of SFC have indicated that due to the potential for significant personal liability, they cannot continue their service in this restructuring unless the Initial Order grants a charge on the SFC Property in priority to all other charges except the Administration Charge, as security for SFC's indemnification obligations for the potential obligations and liabilities they may incur after the commencement of these proceedings. It is proposed that the directors of SFC be granted a directors' charge in the amount of CDN $3.2 million (the "Directors' Charge") over the SFC Property. SFC believes the Directors' Charge is fair and reasonable in the circumstances.

226. SFC, for itself and its subsidiaries, currently has primary insurance coverage of $10 million and five separate excess insurance policies collectively providing CDN $45 million (the "2012 Insurance Policies"), for a total of CDN $55 million of coverage in place to attempt to protect SFC and its directors and officers. The 2012 Insurance Policies were put in place and became effective after prior policies of insurance were not renewed following their expiry on December 31, 2011, by the insurers who had issued the policies (the "2011 Insurance Policies"). Although coverage is being provided to SFC and certain of its directors and officers under the 2011 Insurance Policies for claims that were advanced or threatened prior to the expiry of the 2011 Insurance Policies on December 31, 2011, those policies provide no coverage or protection to SFC or its officers and directors for new claims that are made after December 31, 2011 which are based on new events or allegations unrelated to the subject matter of the claims that have already been advanced or threatened.

227. As was the case with the 2011 Insurance Policies, the 2012 Insurance Policies provide for three types of coverage: (i) director and officer liability, (ii) corporate liability for indemnifiable loss, and (iii) corporate liability arising from securities claims. The 2012 Insurance Policies expire on December 31, 2012 and exclude coverage for directors' liabilities for wages. There are

also other exclusions and limitations of coverage which may leave SFC's directors and officers without coverage under the 2012 Insurance Policies. Depending on the circumstances of any particular claim, the insurers which have issued the 2012 Insurance Policies may deny coverage on the basis that the 2012 Insurance Policies exclude such other claims, that coverage limits have been exhausted by claims made against the 2012 Insurance Policies, or that the matters reported fall within the coverage provided by the 2011 Insurance Policies (which are already responding to a number of significant claims that have the potential to exhaust or exceed the applicable limits). Finally, there is no guarantee that SFC will be able to renew the 2012 Insurance Policies when they expire at the end of the year.

228. Contractual indemnities have been provided by SFC to its directors. SFC does not have sufficient funds to satisfy those indemnities should the directors of SFC incur obligations and liabilities in that regard after the commencement of these proceedings.

229. The Directors' Charge is necessary so that SFC may benefit from its directors' experience, knowledge and ability to guide SFC's restructuring efforts. It is critical to the restructuring efforts that SFC's directors remain with SFC in order to assist SFC in achieving the Restructuring Transaction to benefit SFC's stakeholders.

230. As such, it is proposed that the priorities of the Administration Charge and the Directors' Charge be as follows:

(a)    First – Administration Charge; and

(b)    Second – Directors' Charge.

231. Based on the books and records of SFC, and to the best of my knowledge, there are no secured creditors who are likely to be affected by the Administration Charge or the Directors' Charge.

**F.      Postponement of Annual Shareholders' Meeting**

232. As previously mentioned, SFC is a public company under the CBCA. I am advised by Gary Solway of Bennett Jones LLP, counsel to SFC, that, as such, SFC is required, pursuant to paragraph 133(1)(b) of the CBCA, to call an annual meeting of its shareholders by no later than June 30, 2012, being six months after the end of its preceding financial year which ended on December 31, 2011. Accordingly, SFC is required to call its annual general meeting no later than June 30, 2012. SFC's annual general meeting has typically been held in the month of May.

233. However, the management of SFC and other Sino-Forest Companies are presently devoting their efforts to stabilizing the business with a view to implementing the Restructuring Transaction in accordance with the terms of the Support Agreement.

234. Preparing the proxy materials required for an annual meeting of shareholders (which must be prepared well in advance of any meeting so that they can be mailed to shareholders in advance of the meeting) and holding the annual meeting of shareholders would divert the attention of senior management of the Sino-Forest Companies away from implementing the Restructuring Transaction, would require significant financial resources, and could impede SFC's ability to achieve a restructuring under the CCAA.

235. In addition, pursuant to section 155 of the CBCA, SFC is required to place before the annual meeting financial statements of SFC for a period ended not more than six months prior to

the date of the annual meeting. SFC has been unable to complete its financial statements for the reasons already discussed.

236. I am advised by Gary Solway of Bennett Jones LLP, counsel to SFC, that, under subsection 106(6) of the CBCA, if directors are not elected at an annual meeting, the incumbent directors will continue to hold office until their successors are elected.

237. Certain financial and other information is and will continue to be available to the public through SFC's court filing which will be easily accessible on the proposed Monitor's website (http://cfcanada.fticonsulting.com/sfc). Consequently, the failure to hold an annual general meeting within the time prescribed by the CBCA will not deprive shareholders of access to the financial information of SFC that is publicly available from SFC.

238. Under the circumstances, I believe it is impractical for SFC to call and hold an annual meeting of shareholders during this CCAA proceeding.

## G.    Foreign Proceedings

239. SFC is seeking in the Initial Order to have the Monitor authorized, as the foreign representative of SFC, to apply for recognition of these proceedings, as necessary, in any jurisdiction outside of Canada, including as "Foreign Main Proceedings" in the United States pursuant to Chapter 15 of the *U.S. Bankruptcy Code* (the "Chapter 15 Proceedings"). The initial effect of the Chapter 15 Proceedings would be to give effect to the Initial Order in the United States.

## H.    Financial Advisor Agreement

240.  It became clear to SFC at the beginning of September 2011, that it would greatly benefit from the expertise of a financial advisor.  Accordingly, SFC invited four reputable global financial advisory firms to make presentations for the role on or about September 14, 2011. Houlihan was selected as SFC's first choice as a result of, among others, its significant experience in debt restructurings, its strong presence and reputation in both the North American and Asian markets, and its strong standing with the global noteholders community, especially those event driven funds which customarily play a leadership role in these situations.

241.  On or about September 26, 2011, Bennett Jones LLP, as counsel to SFC, entered into an agreement with Houlihan relating to Houlihan's provision of financial advisory and investment banking services to SFC.  That agreement was amended and replaced by an agreement dated as of December 22, 2011 (the "Financial Advisor Agreement").  A copy of the Financial Advisor Agreement is attached as Exhibit "CC".

242.  The Financial Advisor Agreement provides, among other things, that if SFC commences any proceedings under the CCAA or similar legislation or statute, SFC will promptly seek to have the Court approve (i) the Financial Advisor Agreement, and (ii) Houlihan's retention by SFC under the terms of the Financial Advisor Agreement, including the payment to be made to Houlihan thereunder.  As such, the draft Initial Order provides for such approvals.

243.  It is my belief that Houlihan's significant restructuring experience and expertise in the area of debt restructuring has greatly benefited SFC.  The proposed Restructuring Transaction would not have been achievable without the advice and assistance of Houlihan.  Houlihan was also instrumental in assisting SFC in obtaining the waiver agreements described herein.

244.  Houlihan has spent approximately seven months working closely with senior management of SFC and its other advisors.  Houlihan has greatly assisted SFC in its restructuring efforts to date and has gained a thorough and intimate understanding of the Sino-Forest business.  If SFC was deprived of the benefit of Houlihan's continued advice and assistance and was required to retain a new financial advisor, it would likely take a significant period of time for such a financial advisor to acquire a similar working knowledge of the business and would make it extremely difficult, if not impossible, to implement the Restructuring Transaction in the currently contemplated time frame.  Thus, I believe that the continued involvement of Houlihan is essential to the completion of the Restructuring Transaction.

245.  It is also my belief that the quantum and nature of the remuneration provided for in the Financial Advisor Agreement is fair and reasonable.  Specifically, the restructuring fees payable to Houlihan are only payable if a restructuring transaction is completed and the quantum of those fees is dependent on various factors intended to measure the success of the restructuring.

## XI.    13 WEEK CASH FLOW FORECAST

246.  As set out in the cash flow forecast attached as Exhibit "**DD**", SFC's principal uses of cash during the next 13 weeks will consist of the payment of ongoing day-to-day operational expenses, the costs associated with the ongoing investigation into the MW Report, the costs associated with responding to demands from the OSC, HKSFC and RCMP for information, and professional fees and disbursements in connection with these CCAA proceedings.

247.  As at March 29, 2012, SFC had approximately $67.8 million available cash on hand.  SFC's cash flow forecast projects that, subject to obtaining the relief outlined herein, it will have sufficient cash to fund its projected operating costs for the next 13 weeks.

## XII.    CONCLUSION

248.  I am confident that granting the Initial Order and Sale Process Order sought by SFC is in the best interests of SFC and its stakeholders.  SFC requires the stay of proceedings to pursue and implement the Restructuring Transaction in an attempt to complete a going concern restructuring of its businesses.  The Ad Hoc Noteholders support this application and SFC's pursuit of the Plan in this CCAA proceeding.

249.  Without the stay of proceedings and the opportunity to effect the Restructuring Transaction (including the Sale Process), Sino-Forest faces a possible cessation of going concern operations, the liquidation of its assets, and the loss of employment for a significant number of employees worldwide.  The granting of the requested stay of proceedings will assist an orderly restructuring of SFC.

SWORN BEFORE ME at the City of Hong )
Kong, Special Administrative Region, )
People's Republic of China, this 30th day of )
March, 2012 )
)

_____
W. Judson Martin

LEE HONG KU KILDARIA

Solicitor, Hong Kong SAR

**626**

IN THE MATTER OF THE *COMPANIES CREDITORS' ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OR COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

Court File No.

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceedings commenced in Toronto

AFFIDAVIT OF W. JUDSON MARTIN
(Sworn March 30, 2012)

**BENNETT JONES LLP**
One First Canadian Place
Suite 3400, P.O. Box 130
Toronto, Ontario
M5X 1A4

Robert W. Staley (LSUC #27115J)
Kevin Zych (LSUC #33129T)
Derek J. Bell (LSUC #43420J)
Jonathan Bell (LSUC #55457P)
Tel: 416-863-1200
Fax: 416-863-1716

Lawyers for the Applicant

## APPENDIX G – THE PRE-FILING REPORT

*(See Attached)*



**Court File No. _____**

# Sino-Forest Corporation

## PRE-FILING REPORT OF THE PROPOSED MONITOR

**March 30, 2012**



Court File No. _____

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
SINO-FOREST CORPORATION

**PRE-FILING REPORT TO THE COURT**
**SUBMITTED BY FTI CONSULTING CANADA INC.,**
**IN ITS CAPACITY AS PROPOSED MONITOR**

## INTRODUCTION

1.      FTI Consulting Canada Inc. ("**FTI Canada**" or the "**Proposed Monitor**") has
been informed that Sino-Forest Corporation (the "**Company**") intends to make an
application under the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-
36, as amended (the "**CCAA**") and to seek an initial order (the "**Initial Order**")
from the Ontario Superior Court of Justice (Commercial List) (the "**Court**"),
granting, *inter alia*, a stay of proceedings against the Company until April 29,
2012, (the "**Stay Period**") and appointing FTI Canada as monitor of the
Company's CCAA Proceedings (defined below). The proceedings commenced by
the Company under the CCAA, if granted, will be referred to herein as the
"**CCAA Proceedings**".

2.      FTI Canada is a trustee within the meaning of section 2 of the *Bankruptcy and
Insolvency Act, R.S.C. 1985, c. B-3, as amended*, and is not subject to any of the
restrictions on who may be appointed as monitor set out in section 11.7(2) of the
CCAA.  FTI Canada has provided its consent to act as Monitor.



**Engagement of FTI Consulting and Preparation of this Report**

3.         FTI was originally retained through its Hong Kong office, FTI Consulting (Hong Kong) Limited ("**FTI HK**" and together with FTI Canada, "**FTI Consulting**") in October 2011.  The purpose of FTI HK's retainer was primarily in connection with the work being done to determine whether the Q3 Results (defined below) could be issued.  The scope of FTI HK's retention was expanded in January 2012. The expanded role of FTI HK included assisting management in the review and preparation of detailed cash flow forecasts and analysis of outstanding receivables, including collection options.  FTI Canada has been formally retained since March 12, 2012.  FTI HK and FTI Canada have worked together in advising the Company and in the preparation of this report.

4.         Since its engagement, FTI Consulting has worked with the Company and its advisors extensively.  Among other things, FTI Consulting has:

(a)        Attended in-person meetings involving Houlihan (defined below), senior management including the chief executive officer, chief financial officer and Allen Chan (Sino-Forest's founder and chief executive officer up to August 2011) and others in order to gain information regarding Sino-Forest and its situation;

(b)        Attended in-person and telephone meetings with other stakeholders including the Ad Hoc Noteholders (defined below), the Board (defined below) and others;

(c)        Engaged legal counsel in Canada who has also participated in certain of these meetings;

(d)        Had a local team review certain Sino-Forest documents and engage in discussions with Sino-Forest in both Hong Kong and the PRC (defined below);

(e)        Met with Sino-Forest finance personnel located in  Canada, Hong Kong



and the PRC;

(f)    Obtained financial and other information produced by Sino-Forest relating to its operations, its cash flow forecasts and current financial situation;

(g)    Reviewed redacted versions of the IC Reports (defined below);

(h)    Reviewed certain of the books and records of the Company;

(i)    Reviewed the Note Indentures (defined below) and related guarantee and security documents; and

(j)    Reviewed various other documents and materials relevant to the Company and its business.

5.    As a result of these efforts, FTI Consulting has become familiar with the Company's current state of affairs including the basis on which it is now seeking CCAA protection, and approval of the Sale Process (defined below).

6.    Although this Report has been prepared in anticipation of FTI Canada's appointment as monitor of the Company, it has been prepared with the same duty and care and with the same level of diligence as though FTI Canada had already been appointed to such role.

7.    In preparing this report, the Proposed Monitor has relied upon unaudited financial information of the Company, the Company's books and records, certain financial information prepared by the Company, the IC Reports (defined below) and discussions with the Company's management.    Other than as described in paragraph 4 above, the Proposed Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information. Accordingly, the Proposed Monitor expresses no opinion or other form of assurance on the information contained in this Report or relied on in its preparation.    Future oriented financial information reported or relied on in preparing this Report is based on management's assumptions regarding future events; actual results may vary from forecast and such variations may be material.



### Purpose of this Report

8.      The purpose of this report is to:

(a)     Inform the Court on the following:

(i)      an overview of the Company and its current situation;

(ii)     an outline of the Proposed Monitor's understanding of circumstances that have led to the Company's current request for relief;

(iii)    the proposed restructuring activities of the Company including the Support Agreement (defined below);

(iv)     the Sale Process to be undertaken for the business and assets of the Sino-Forest Companies (defined below);

(v)      the Company's March 29 Forecast (defined below); and

(b)     Support the Company's application and recommend that the Court grant the proposed Initial Order and Sale Process Order including the following relief:

(i)      a stay of proceedings to April 29, 2012;

(ii)     approval of certain payments during the CCAA Proceedings;

(iii)    approval of a charge securing the fees and expenses of the Monitor, its counsel and counsel to the Company, counsel to the Board (defined below), Houlihan, FTI HK, counsel to the Ad Hoc Noteholders (defined below) and the financial advisor to the Ad Hoc Noteholders in the aggregate amount of CAD$15 million (the "**Administration Charge**");

(iv)     approval of a charge securing an indemnity in favour of the



directors and officers of the Company in the aggregate amount of CAD$3.2 million (the "**Directors' Charge**");

(v)    approval of the engagement of Houlihan Lokey Capital, Inc. (**"Houlihan"**), pursuant to an engagement letter dated as of December 22, 2011, (the **"Financial Advisor Agreement"**);

(vi)    approval of the Sale Process (defined below); and

(vii)    authorizing and directing the Company and the Proposed Monitor to engage in certain procedures to notify the Company's noteholders regarding certain issues related to the Support Agreement (defined below).

9.    Unless otherwise stated, all monetary amounts contained herein are expressed in US Dollars.

10.    The terms "**Sino-Forest Companies**" and "**Sino-Forest**" refer to the global enterprise as a whole but do not include references to the Greenheart Group (defined below).

11.    This report focuses on the Company's current situation and immediate need for court protection.  This report should be read in conjunction with the affidavit of W. Judson Martin, vice-chairman and chief executive officer of the Company, sworn March 30, 2012 (the "**Martin Affidavit**") which provides an overview as to Sino-Forest's history, business and operations and is therefore not repeated herein.

## BACKGROUND

### Overview of Sino-Forest

12.    Sino-Forest conducts business as a forest plantation operator in the People's Republic of China ("**PRC**"). Its principal businesses include ownership and management of forest plantation trees, the sale of standing timber and wood logs



and complementary manufacturing of downstream engineered-wood products.

13.    The Company is a public holding company whose common shares are listed on the Toronto Stock Exchange ("**TSX**").  Prior to August 26, 2011 (the date of the Cease Trade Order, defined below), the Company had 246,095,926 common shares issued and outstanding and trading under the trading symbol "TRE" on the TSX.

14.    On June 2, 2011, Muddy Waters, LLC ("**MW**"), which held a short position on the Company's shares, issued a report (the "**MW Report**") alleging, among other things, that Sino-Forest is a "ponzi-scheme" and a "near total fraud".  The MW Report was issued publicly and immediately caught the attention of the media on a world-wide basis.

15.    Since the issuance of the MW Report, the Company has devoted extensive time and resources to investigate and address the allegations in the MW Report as well as responding to additional inquiries from, among others, the Ontario Securities Commission (the "**OSC**"), the Royal Canadian Mounted Police ("**RCMP**") and the Hong Kong Securities and Futures Commission ("**HKSFC**").

16.    To carry out this work, on June 2, 2011, the Company's board of directors (the "**Board**") appointed a three (3) person independent committee (the "**IC**") to investigate the allegations contained in the MW Report. The IC retained three (3) law firms in Canada, Hong Kong and the PRC as well as financial advisors to assist in the IC investigation.

17.    The IC ultimately issued three (3) reports on August 10, 2011, November 13, 2011 and January 31, 2012 (the "**First Interim Report**" the "**Second Report**" and the "**Final Report**" and collectively, the "**IC Reports**").  The IC was able to reach many conclusions addressing many of the allegations contained in the MW Report. However, the IC was unable to make certain conclusions, particularly as it related to certain of Sino-Forest's relationships with third party intermediaries and suppliers.  The inability of the IC (and others) to have conclusively resolved those



issues has had an ongoing impact on the Company, namely the ability of the Company to issue its Q3 Results and the 2011 Financial Statements (both defined below).

18.    With the issuance of its Final Report, the IC concluded its active investigation. However, the Board established a Special Restructuring Committee of the Board comprised exclusively of directors independent of management of the Company for the purpose of supervising, analyzing and managing strategic options available to the Company.

19.    Despite the work that was done by the IC, the IC's advisors, the Company (including senior management) and others in the last nine months, it is apparent to the Proposed Monitor that the MW Report, the subsequent litigation and regulatory investigations and other issues continue to have a significant negative impact on the Company and have threatened the long term viability of Sino-Forest's operations.  For the reasons discussed below, the Proposed Monitor is of the view that the events and occurrences over the last nine months have led the Company and the business into a stalemate that cannot be resolved without a Court supervised solution.

**Current State of Sino-Forest**

20.    The Proposed Monitor understands that the current state of the Sino-Forest Companies is effectively as follows:

    (a)    Business impact:

        (i)    The ability of Sino-Forest to access new offshore capital injections for expansion has dried up and PRC funding has been substantially curtailed given the uncertainty around the Company;

        (ii)    The Proposed Monitor understands that operations in the trading and standing timber business outside the PRC and the standing timber business in the WFOEs are effectively frozen, the trading



business has stopped importing (other than the existing Thai Redwood transaction which is ongoing) and manufacturing is operating at lower levels than normal;

(iii) Many customers have ceased paying their receivables despite concentrated efforts by Sino-Forest to collect on outstanding balances, which, the Proposed Monitor understands includes SFC's counsel in the PRC sending legal demand letters to 12 BVI trading companies for accounts receivable totalling approximately $126 million and 5 WFOE companies totalling approximately RMB 224.5 million;

(iv) Sino-Forest has had to reserve millions of dollars to pay suppliers for outstanding debts, in order to avoid litigation or further hostile situations from its suppliers and landlords/farmers (which the Proposed Monitor understands has historically involved threats of violence and occupation of Sino-Forest offices in Hunan);

(v) The Company has been unable to release its financial results for the nine-month period ended September 30, 2011 (the "**Q3 Results**") and for reasons discussed below, is unlikely to be in a position to release such statements in the near term, if ever;

(vi) The Company has been unable to release its 2011 audited financial statements for the year ended December 31, 2011 ("**2011 Financial Statements**") and for reasons discussed below, is unlikely to be in a position to release such statements in the near term, if ever;

(b) Financial situation:

(i) As of March 23, 2012, the Company has approximately $70.5 million in cash;



(ii)    The ability to repatriate funds from the PRC into off shore (i.e. non-PRC) companies is limited by many factors including the historic "BVI" corporate structure, state administration of foreign exchange ("**SAFE**") regulations and other currency control issues (which are discussed extensively in the Martin Affidavit);

(iii)    The Company has limited prospects of being able to raise further capital or debt in the near future;

(iv)    Sino-Forest has not been able to secure or renew certain existing onshore banking facilities, has been unable to obtain offshore letters of credit to facilitate Sino-Forest's trading business, and all offshore banking facilities have been repaid and frozen, or cancelled;

(v)    Sino-Forest's operating subsidiaries have lost access to capital injections, local bank financing and intercompany funding for expansion opportunities due to the Company's financial situation;

(vi)    Due to the business constraints above, Sino-Forest's operations are now operating on a significant burn as they are being pressured to continue to honour payables while collecting minimal receivables and failing to generate significant new sales;

(c)    Legal and Regulatory Proceedings:

(i)    Sino-Forest continues to divert significant resources to address the ongoing regulatory and criminal investigations by the OSC and the RCMP as well as inquiries from the HKSFC;

(ii)    Numerous class actions have been commenced in Canada and the US and more are threatened;

(iii)    The OSC has issued a Cease Trade Order in respect of the Company's shares, which is ongoing;



(d)     Default under the Note Indentures:

(i)     As a result of the Company's failure to issue its Q3 Results, the Company is in default (the "**Financial Reporting Covenant Default**") under its four (4) series of issued notes (the **"Notes"**) and is unlikely to be in a position to cure such default in the near term, if ever;

(ii)    On January 12, 2012, the Company announced that holders of a majority of its 2014 Senior Notes and 2017 Senior Notes (who had issued default notices under their respective note indentures) had agreed to waive (the "**Waiver Agreements**") the Financial Reporting Covenant Default on certain terms and conditions (discussed below) including a covenant to make certain interest payments;

(iii)   The Waiver Agreements terminate on the earlier of April 30, 2012 and any earlier termination of the Waiver Agreements in accordance with their terms;

(iv)    The failure to deliver the 2011 Financial Statements by March 31, 2011 will constitute a further default under the Note Indentures (subject to a 30 day cure period);

(e)     Failure to Produce Q3 Results and 2011 Audited Statements

(i)     As set out in the IC's Second Report, subsequent to August 26, 2011, a number of documents came to the IC's attention that required further investigation and review;

(ii)    On or before November 15, 2011, the deadline for the release of the Q3 Results, the Board's audit committee recommended and the Board agreed that the Company should defer the release of the Q3 Results until certain issues could be resolved to the satisfaction of



the Board and the Company's external auditor;

(iii)    The issues included (A) determining the nature and scope of the relationships between Sino-Forest and certain of its AIs (defined below) and suppliers, as discussed in the Second Report, and (B) the satisfactory explanation and resolution of issues raised by certain documents identified by the IC's advisors, the Company's counsel, the Company's auditors, and/or by OSC staff;

(iv)    Although the Company (and the IC) continued to work to resolve these issues, the allegations set out in the MW Report and raised by the OSC, the Company subsequently announced that there was no assurance that it would be able to release the Q3 Results, or, if able, as to when such release would occur;

(v)    Those same issues outlined above remain gating items to the Company's ability to release 2011 Audited Financial Statements;

(f)    Political Factors:

(i)    Sino-Forest requires ongoing support from all levels of the PRC government to operate its business in a manner that will be profitable;

(ii)    To date, the PRC government has been supportive, but has recently expressed concern regarding the ongoing distress of the business and has indicated that it expects the Company to propose a viable solution in the near future; and

(iii)    Loss of support from the PRC government would likely be fatal to any chance of success in restructuring the Company in a way that maximizes value for the Company's stakeholders.

21.    In summary, Sino-Forest's state of affairs is such that it cannot maintain a status quo for much longer.



### CIRCUMSTANCES OF THE CCAA APPLICATION

22.     The Martin Affidavit provides a detailed outline of Sino-Forest's corporate structure, business, reported assets and financial information.    The Martin Affidavit also provides a detailed chronology of the Company and its actions since the issuance of the MW Report in June 2011 including the formation of the IC, the issuance and conclusions set out in the IC Reports, the Class Actions, the OSC, RCMP and HKSFC investigations and the defaults under the Notes.

23.     This Report does not propose to repeat those details.    Instead, the Proposed Monitor has focused on the following areas, which it believes are relevant for understanding the basis on which it is recommending the granting of the Initial Order and the approval of the Sale Process at this time:

(a)     Sino-Forest's historical method of doing business and certain of the legal issues that are embedded within that structure;

(b)     the role of the PRC government and the forestry industry in the PRC; and

(c)     Sino-Forest's current options.

**The Company's history**

24.     Sino-Forest operates through two different corporate models – the "BVI" model and the "WFOE" model.    It is significant to understand the corporate models used by Sino-Forest in its operations because of the corresponding issues associated with repatriating value offshore from each of those various entities.

*BVI Forestry Holding Companies ("**BVIs**")*

25.     Until 2004, Sino-Forest used the BVI model exclusively to invest in timber rights in the PRC.    The Proposed Monitor understands that the BVI model essentially involves the use of a British Virgin Island company to invest in timber rights in the PRC.    Due to the restrictions on foreign companies under PRC law which do not permit foreign companies to conduct business in the PRC without business



licenses granted by competent government authorities, BVIs must carry on their sale activities through authorized intermediaries ("**AIs**") onshore. Further, BVIs are not permitted to have bank accounts in the PRC. It is the AIs who enter into the direct contracts for the sale of standing timber with end customers. AIs are also responsible for remitting taxes arising from sales to the relevant PRC tax authorities. Once money is in the BVI system, it has never been repatriated off shore and any profit has always been re-invested in further plantation timber rights. The only exception to that are in the small instances where Sino-Forest has tested its on-shoring strategy (discussed in further detail below).

26.     The BVI model was the model used by Sino-Forest when it started operations in 1994 due to the restrictions on foreign business operations in the PRC. Over the years, the BVI model was therefore used to purchase significant amounts of Sino-Forest's reported timber holdings (approximately 60% of its reported timber holdings). From an investor/creditor perspective, the model is problematic for a number of reasons including:

(a)     BVIs are restricted from carrying on business directly in the PRC – as such, many of the title verification issues that were contained in the MW Report and arose during the IC investigation were due to the fact that when BVIs purchase timber, they are only purchasing the timber rights and not any underlying land use rights (which interests are capable of being registered in most parts of the PRC);

(b)     BVIs must sell through the AIs. This has resulted in a certain lack of transparency in a number of issues that were the focus of the MW Report and the IC investigation – including the relationships between the AIs and certain of the suppliers, an inability to see into the books and records of the AIs to verify booked sales, and the extent to which the AIs had, in fact, remitted applicable taxes to relevant tax authorities; and

(c)     The Proposed Monitor understands that for various reasons, but primarily related to the SAFE regulations, there is no way for a BVI to efficiently



repatriate cash off shore without giving rise to significant negative tax consequences - as such, since the businesses' inception, all profit has simply been further re-invested in the BVI model in new trees.

*WFOEs*

27.     In 2004, the Ministry of Commerce for the PRC began allowing wholly foreign owned enterprises ("**WFOEs**") to conduct business in the trading of timber on shore in the PRC.  Post 2004, almost all of Sino-Forest's new capital invested in timber assets has been employed through the WFOE model.  The Proposed Monitor understands that the WFOE model is preferable for several reasons including:

(a)     WFOEs can conduct business on shore in the PRC and as such, they do not need to use the AI model.  They can (and do) transact directly with customers;

(b)     Financial information as to the WFOE holdings on Sino-Forest's books and records is more readily verifiable and therefore more transparent in nature;

(c)     WFOEs can acquire land use rights through pre-paid long term leases. The ability of WFOEs to invest in land use rights is advantageous because (i) for the most part, it appears that these rights can be registered and are therefore more easily verifiable; (ii) the WFOE can finance its business against its land rights; and (iii) it is viewed favourably by the PRC because it is evidence of Sino-Forest's long term intentions within the forestry industry in the PRC; and

(d)     WFOEs are preferable from a foreign investor perspective because there is an identifiable process for the repatriation of funds off-shore to the foreign investor parent.

28.     As of December 31, 2010, approximately 40% of Sino-Forest's reported timber



holdings were held through the WFOE structure.

*On-shoring*

29.    As part of its long term strategy, the Company has been considering options to transition its BVI assets into WFOE assets.  This process is referred to as "on-shoring".  The Proposed Monitor understands there is no single standard protocol for on-shoring Sino-Forest's assets and that Sino-Forest is looking into various alternative methods of migrating the ownership of the BVI assets.  At its root, on-shoring requires the creation of a new WFOE that is capitalized to receive timber rights from the BVIs and at the same time, acquire the accompanying underlying land use rights.  The Proposed Monitor understands that the precise methods for successfully on-shoring varies on a county to county basis and requires extensive negotiations with various stakeholders including potentially the land owners and tax authorities.  It could also involve the cooperation of suppliers and AIs.

30.    The Proposed Monitor understands there are no assurances that on-shoring will be successful on a large scale basis and that, even if the Company is successful in on-shoring certain of its assets, that does not necessarily mean it will be successful in other regions.  However, the Company has indicated that it believes there are incentives for parties to cooperate with an on-shoring process as it generally involves the promotion of business in more rural areas, the ongoing employment of individuals in those regions and cash injections to the land owners on the pre-paid leases.

**The Role of the PRC Government**

31.    Based on the conversations that the Proposed Monitor has had with members of senior management of the Company and various of its advisors, the Proposed Monitor understands that the PRC government has and will continue to play a key role in any successful restructuring.

32.    The forestry industry in the PRC is subject to The Forestry Law which provides for a limited system pursuant to which verification as to legal ownership of timber



or land may be obtained.  The Monitor has also been advised that it is not clear that the Forestry Law has been fully implemented on a nation-wide basis such that, in some instances, no verification from regional forestry bureaus may be available.

33.     The Company has advised that the PRC has taken numerous steps in the last years to promote the timber plantation industry including opportunities for foreign investment.  It is also apparent that navigating timber operations within the PRC has obvious political and state related implications due to the role of the Chinese government in business operations in China generally, the geographic location of many of the plantations, the reliance upon provincial and other registries for asset verification, and the uncertainty surrounding certain taxation and other laws in the PRC that could have significant implications on Sino-Forest's business structure and/or ability to expand.

34.     Further, it is clear that in many instances, there is an emphasis put on "business relationships" among parties that is paramount to any contractual or legal relationship that may have been entered into by the parties.  These relationships are relied upon for the conduct of business in this industry in the PRC.  In the course of its investigation, the IC reported that it was apparent that integral to Sino-Forest's business model was its relationships with business partners.

35.     The Company has advised the Proposed Monitor that it believes that the PRC has been and will continue to be supportive of Sino-Forest as an ongoing business.  Sino-Forest is the largest private forestry operator in the PRC and it has complied with and promoted PRC policy in terms of growth and efficiency in the natural resource sector over its 18 years of business.  All of these factors have resulted in Sino-Forest having a positive and encouraging relationship with the PRC government.   Consequently, the PRC government has, by and large, been facilitative of Sino-Forest's business.  Ongoing support will be required if this restructuring process is to be successful.  Maintaining relations with the PRC government both nationally and locally will also be crucial to Sino-Forest's on-shoring strategy.



36.     Through extensive discussions that the Proposed Monitor has had with the Company and various advisors to the Company, it has become apparent that much of Sino-Forest's historical success has been due to the leadership of Allen Chan. Although Mr. Chan resigned as CEO and chairman after the issuance of the MW Report, Mr. Chan has remained involved in Sino-Forest and, in particular, plays a key role in maintaining and building on existing PRC relations. The Martin Affidavit also contains further detail as to the importance of Mr. Chan in any restructuring.

37.     It is equally clear to the Proposed Monitor that the PRC government has the ability to be a significant impediment to solutions that it does not view as favourable or in furtherance of PRC policy. The Company and Houlihan have both expressed the view that if attempts were made to break up the company, that could be viewed as being contrary to the general direction of, and have a significant impact on, the PRC's natural resource growth policies and would likely be viewed negatively by the PRC government. Further, the PRC government is cognizant of the location of many of the Sino-Forest plantations and their proximity to state run facilities and has expressed concern to the Company as to how these issues will be addressed going forward if ownership is to change hands.

**The Company's Options**

38.     The Proposed Monitor is aware that the Company, in consultation with its various advisors, has considered many alternatives to solve both the Company's current problems as well as to provide longer term solutions to the issues inherent in the BVI structure. For various reasons, the options of maintaining the status quo or attempting to liquidate the assets (i.e. timber) are not feasible options notwithstanding the guarantees and pledges that may have given the noteholders certain rights to do so. Some of the issues that would prohibit status quo or liquidation are as follows:

(a)     <u>Status quo</u> – as set out above and in the Martin Affidavit, the MW Report



and subsequent events have left the Sino-Forest business paralyzed and unable to continue. Sources of outside funding for expansion have dried up, sales have been halted while the business continues to burn money necessary to its operations. Further, the Company has advised that based on meetings between members of senior management and the PRC, the PRC is not content to allow Sino-Forest's current situation to continue indefinitely and has insisted that a path forward for Sino-Forest be proposed;

(b)   <u>Liquidation</u> – It is not clear to the Proposed Monitor that a liquidation could even be achieved in this circumstance. However, even if it could be, liquidating the timber assets within the PRC is unlikely to achieve any desired result. As set out above, given the historical structural issues inherent within the BVI structure, it is doubtful that any proceeds of a liquidation could be moved off shore successfully.

39.   The Proposed Monitor is aware that the Company and its advisors have engaged in extensive conversations and negotiations with an ad hoc committee of noteholders (the "**Ad Hoc Noteholders**") for the past several months as to the various options available to Sino-Forest as well as the noteholders.

40.   The Proposed Monitor understands that these extensive arm's length negotiations involved email, telephonic and in-person meetings between the various parties and have included, at different times, the Company's senior management (including Mr. Martin, the Company's chief financial officer, Mr. David Horsley and Mr. Chan), Houlihan, the Company's legal advisors, certain of the Ad Hoc Noteholders themselves and their legal and financial advisors. During the course of these meetings, the parties have explored the options available to both the Company and the noteholders including the liquidation option.

**THE SUPPORT AGREEMENT AND PROPOSED RESTRUCTURING**

41.   Following extensive arm's length negotiations, the Company and the Ad Hoc



Noteholders have reached agreement on the terms of a support agreement (the "**Support Agreement**").  The Proposed Support Agreement has been executed by holders of the Notes holding approximately 40% of the Notes.  The Support Agreement contemplates (and provides incentive for) additional noteholders becoming party to the Support Agreement by way of Joinder Agreement.  As set out below, it is contemplated that the Proposed Monitor will post a copy of the Support Agreement on its website.  The material terms of the Support Agreement are set out in the Martin Affidavit.

42.     The Proposed Monitor has reviewed the terms of the Support Agreement**.**  The Proposed Monitor believes that the terms of the Support Agreement are reasonable in the circumstances.  In reaching that conclusion, the Proposed Monitor first considered the fact that Sino-Forest's situation is not that of a typical debtor.  The Company's options in terms of realizing value on its assets are limited given not only the legal impediments, but also the nature and location of the physical assets.   Further, other considerations included the following:

(a)     Neither maintaining the status quo nor liquidation are realistic options;

(b)     The debt outstanding under the Indentures constitutes an overwhelming majority of the Company's overall debt;

(c)     The Support Agreement proposes a solution through the use of a CCAA plan that provides for, among other things:

(i)     a structured solution pursuant to which the business operations will be liberated from the existing legal challenges facing the Company (namely the extensive litigation and contingent claims) and put into a new structure which will ultimately be able to work to fix the structural issues in Sino-Forest's business;

(ii)    participation rights for certain junior constituents whose claims rank behind the noteholders;

(iii)    a framework for the litigation and/or resolution of the claims faced
by the Company;

(d)    As discussed below, there are significant challenges to finding another
buyer of the business;

(e)    Notwithstanding those challenges, the Support Agreement contemplates a
Sale Process (defined and discussed below) to determine whether a higher
or better option is available; and

(f)    As discussed above, neither maintaining the status quo nor liquidation are
desirable or possibly viable options.

## THE PROPOSED SALE PROCESS

### Sale Process Terms

43.    As contemplated under the Support Agreement, the Company is also seeking
approval of certain sale process procedures (the "**Sale Process**") and related
relief.  If approved, the Company, in consultation with the Proposed Monitor and
Houlihan, will immediately commence a marketing process for the Sino-Forest
business.

44.    The material terms of the Sale Process are set out in the Martin Affidavit.  The
Proposed Monitor has been consulted in the development of the proposed Sale
Process terms and believes they are reasonable in the circumstances.

45.    The Company, the Proposed Monitor, Houlihan, and advisors to the Ad Hoc
Noteholders have had extensive discussions as to the appropriate time frame in
which the business may be marketed.  The Proposed Monitor believes that it is
appropriate for the Company to seek approval of the Sale Process as part of its
initial application based on the following factors:

(a)    As set out above, the growth of the forestry business and the trading
business has effectively come to a halt and are rapidly burning cash;



(b)     The Sino-Forest business is extremely complicated – for any buyer, there will be significant legal, tax, regulatory, political and cultural considerations that will need to be addressed;

(c)     Given the extensive negative publicity that has surrounded the business, buyers will likely require extensive due diligence and that may include not just document review, but meetings in HK as well as the PRC, site visits and other time intensive exercises;

(d)     Timber is a seasonal business with the majority of sales taking place in Q3 and Q4 of each year – if a transaction is not completed before the end of Q3 of this year, that will effectively result in a further year with few or no sales; and

(e)     The Company needs to be able to demonstrate to the PRC government, in the near future, that it has a clear path forward, absent which it risks losing its support.

46.     The proposed Sale Process is intended to be a market test of the terms of the proposed restructuring set out in the Support Agreement.  However, given the size of the business and the issues surrounding the business, both Houlihan and the Company have indicated that there is likely to be a limited landscape of potential buyers.   The Proposed Monitor agrees that this may be the case but nonetheless believes that it is important as part of the CCAA Proceedings that the Sale Process be commenced to determine what other interest may exist.

47.     Given the urgency described above, the Proposed Monitor is aware that Houlihan has already commenced certain efforts in respect of the proposed Sale Process. Given the circumstances of this situation, the Proposed Monitor is of the view that such actions by Houlihan have been prudent.

**Retention of Houlihan**

48.     In anticipation of a potential filing and Sale Process, the Company retained



Houlihan pursuant to the terms of the Financial Advisor Agreement.  The terms of the Financial Advisor Agreement, including the proposed fee structure, are set out in the Martin Affidavit. The Proposed Monitor is aware that the Company considered at least three (3) other candidates, all of whom are well-known international investment banks, prior to retaining Houlihan.

49.   The Proposed Monitor understands that the Board's decision to retain Houlihan was based on Houlihan's experience in debt restructurings including working with noteholders as well as its extensive presence in North American and Asian markets.

50.   The Proposed Monitor has reviewed the terms of the Financial Advisor Agreement.   The Proposed Monitor believes that, in the circumstances, it is reasonable for the Company to have retained Houlihan and negotiated the terms contained in the Financial Advisor Agreement.   Accordingly, the Proposed Monitor recommends the approval of the Financial Advisor Agreement.

## THE COMPANY'S CASH FLOW FORECAST

### Cash Flow Projections

51.   The Company, with the assistance of the Proposed Monitor, has prepared consolidated 13-week cash flow projections of its receipts and disbursements (the "**March 29 Forecast**"). The March 29 Forecast, together with the management's report on the cash-flow statement as required by section 10(2)(b) of the CCAA, is attached hereto as Appendix A. The March 29 Forecast shows a negative net cash flow of approximately $19.3 million in the period March 31 to June 29, 2012, and is summarized below:

|  | $000 CAD |
|---|---|
| Cash inflow |  |
|    Interest Income | $ 412 |
| **Total cash inflows** | $ 412 |
| Cash outflow |  |
|    Payroll and Benefits | $ 181 |
|    Board & Committee Fees | $ 253 |
|    Travel | $ 315 |
|    Rent,Communication & Utilities | $ 60 |
|    Taxes & Other | $ 195 |
| **Total cash outflows** | $ 1,004 |
| **Net Operating Cashflow** | $ (591) |
| **Restructuring Costs** |  |
|    Professional Fees | $ 18,730 |
| **Total Restructuring Costs** | $ 18,730 |
| **Net Cash Flow** | $ (19,321) |
| Opening Cash Balance | $ 67,846 |
| Net Cash Balance | $ (19,321) |
| Ending Cash Balance | $ 48,525 |

52.     It is anticipated that the Company's projected liquidity requirements throughout the CCAA Proceedings will be met by existing cash available to the Company.

**Proposed Monitor's Report on the Reasonableness of the Cash Flow Projections**

53.     Section 23(1)(b) of the CCAA states that the Proposed Monitor shall:

> "review the company's cash-flow statement as to its reasonableness and file a report with the court on the Proposed Monitor's findings;"

54.     Pursuant to section 23(1)(b) of the CCAA and in accordance with the Canadian Association of Insolvency and Restructuring Professionals Standard of Practice 09-1 ("**CAIRP SOP 09-1**"), the Proposed Monitor hereby reports as follows:

    (a)     The March 29 Forecast has been prepared by the management of the



- 24 -

Applicant for the purpose described in Note 1, using the Probable and Hypothetical Assumptions set out in Notes 2 to 6;

(b)     The Proposed Monitor's review consisted of inquiries, analytical procedures and discussion related to information supplied by certain of the management and employees of the Company. Since Hypothetical Assumptions need not be supported, the Proposed Monitor's procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the March 29 Forecast. The Proposed Monitor has also reviewed the support provided by management of the Company for the Probable Assumptions, and the preparation and presentation of the Cash-Flow Statement;

(c)     Based on its review, nothing has come to the attention of the Proposed Monitor that causes it to believe that, in all material respects:

    (i)     the Hypothetical Assumptions are not consistent with the purpose of the March 29 Forecast;

    (ii)     as at the date of this report, the Probable Assumptions developed by management are not suitably supported and consistent with the plans of the Company or do not provide a reasonable basis for the March 29 Forecast, given the Hypothetical Assumptions; or

    (iii)     the March 29 Forecast does not reflect the Probable and Hypothetical Assumptions;

(d)     Since the March 29 Forecast is based on assumptions regarding future events, actual results will vary from the information presented even if the Hypothetical Assumptions occur, and the variations may be material. Accordingly, the Proposed Monitor expresses no assurance as to whether the March 29 Forecast will be achieved. The Proposed Monitor expresses no opinion or other form of assurance with respect to the accuracy of any financial information presented in this report, or relied upon by the



Proposed Monitor in preparing this report; and

(e)     The March 29 Forecast has been prepared solely for the purpose described in Note 1 on the face of the March 29 Forecast and readers are cautioned that it may not be appropriate for other purposes.

## RELIEF SOUGHT

### The Stay of Proceedings

55.     For the reasons set out herein, the Company requires a stay of proceedings while it carries out its proposed restructuring activities.  The Monitor believes that the initial 30-day request is fair and reasonable in the circumstances.

### Payments During the CCAA Proceedings

56.     The Company intends to make certain ordinary course payments during the course of the CCAA Proceedings in accordance with and as set out in the March 29 Forecast.  The Monitor believes this course of action is fair and reasonable in the circumstances.

### Administration Charge

57.     The Company is seeking an Administration Charge in the amount of CAD$15 million with priority over all encumbrances against the Company's assets other than the Company's assets which are subject to *Personal Property Security Act* registrations (the "**Encumbered Property**").  Based on personal property registry searches that were conducted by the Proposed Monitor's counsel as of March 28, 2012, other than the Indenture Trustees under the Notes who have security in respect of the pledged shares of the Company's subsidiaries there was only one registration that appeared on its face to be with respect to specific equipment.

58.     The beneficiaries of the Administration Charge if granted would be the Proposed Monitor, the Proposed Monitor's counsel, counsel to the Board, FTI HK, counsel to the Company, Houlihan, counsel to the Ad Hoc Noteholders and the financial



advisor to the Ad Hoc Noteholders.

59.     The Proposed Monitor has reviewed the underlying assumptions upon which the Company has based the quantum of the proposed Administration Charge, the complexities of the CCAA Proceedings and the services to be provided by the beneficiaries of the Administration Charge and believes that the limit of CAD$15 million is reasonable in the circumstances.

60.     The Proposed Monitor also believes that it is appropriate that the other proposed beneficiaries of the Administration Charge be afforded the benefit of a charge as they will be undertaking a necessary and integral role in the CCAA Proceedings.

**The Directors' Charge**

61.     The Company is seeking the Directors' Charge in the amount of CAD$3.2 million with priority over all encumbrances on the Company's assets other than the Administration Charge and the Encumbered Property.  The Proposed Monitor understands that the Board has insisted on the protection of the Directors' Charge in order to remain on the Board during the course of the CCAA Proceedings.  The Martin Affidavit also sets out a summary of the current insurance policies that are available to the Board as well as the exclusions and possibility of non-renewal at the end of the term.

**The Financial Advisor Agreement**

62.     Houlihan's engagement is reasonable given the Company's proposed Sale Process. As set out above, Houlihan was considered along with other international investment banks and selected on merit- based criteria.

**Publication of Notices Support Agreement**

63.     The proposed initial order contemplates that the Monitor will, among other things,

        (a)     Without delay, post a copy of the Support Agreement on its website at http://cfcanada.fticonsulting.com/sfc; and



(b)      Publish a notice in the Globe and Mail and the Wall Street Journal (in form and substance satisfactory to the Company, the Monitor and counsel to the Ad Hoc Noteholders) notifying noteholders of the Support Agreement and the deadline of 5:00pm (Toronto time) on the Consent Date (as defined in the Support Agreement) by which any noteholders (other than an Initial Consenting Noteholder) who wishes to become entitled to the Early Consent Consideration pursuant to the Support Agreement must execute and return a Joinder Agreement**.**

**The Sale Process**

64.      As set out above, the proposed Sale Process is contemplated by the Support Agreement and is intended to test the market to determine whether a higher or better offer than the transaction contemplated under the Support Agreement is available.  Further, given the circumstances and complexities of the situation as set out above, the Proposed Monitor recommends approval of the Sale Process Order on the date of this application.

**CONCLUSION**

65.      The Proposed Monitor is of the view that the relief requested by the Company is necessary, reasonable and justified. The Proposed Monitor is also of the view that granting the relief requested will provide the Company the best opportunity to undertake the CCAA Proceedings, to preserve value and maximize recoveries for the Company's stakeholders.   As set out above, absent a restructuring, the Monitor is of the view that the business has little chance of viability.  Further, given the circumstances, liquidation would likely destroy any stakeholder value.

66.      Accordingly, the Proposed Monitor respectfully recommends that the Company's request for the Initial Order and the Sale Process Order.



The Proposed Monitor respectfully submits to the Court this Pre-Filing Report.

Dated this 30th day of March, 2012.

FTI Consulting Canada Inc.
In its capacity as proposed monitor of
Sino-Forest Corporation, and not in its personal capacity

Greg Watson
Senior Managing Director

Jodi B. Porepa
Managing Director

**Court File No.:**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
(Commercial List)

(PROCEEDING COMMENCED AT TORONTO)

**PRE-FILING REPORT OF THE PROPOSED MONITOR, FTI CONSULTING CANADA INC.**

**GOWLING LAFLEUR HENDERSON LLP**
Barristers and Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto ON  M5X 1G5

**Derrick Tay (LSUC No. 21152A)**
Tel: (416) 369-7330 / Fax: (416) 862-7661
Email: derrick.tay@gowlings.com

**Jennifer Stam (LSUC No 46735J)**
Tel: (416) 862-5697 / Fax: (416) 862-7661
Email: jennifer.stam@gowlings.com

Lawyers for the Proposed Monitor,
FTI Consulting Canada Inc.

## APPENDIX H – THE SIXTH REPORT
## (WITHOUT APPENDICES)

*(See Attached)*



**Court File No. CV-12-9667-00CL**

# Sino-Forest Corporation

## SIXTH REPORT OF THE MONITOR

**August 10, 2012**

F T I

Court File No. CV-12-9667-00CL

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
SINO-FOREST CORPORATION

### SIXTH REPORT TO THE COURT
### SUBMITTED BY FTI CONSULTING CANADA INC.,
### IN ITS CAPACITY AS MONITOR

### INTRODUCTION

1.      On March 30, 2012 (the "**Filing Date**"), Sino-Forest Corporation (the "**Company**") filed for and obtained protection under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "**CCAA**").  Pursuant to the Order of this Honourable Court dated March 30, 2012 (the "**Initial Order**"), FTI Consulting Canada Inc. was appointed as the Monitor of the Company (the "**Monitor**") in the CCAA proceedings. By Order of this Court dated April 20, 2012, the powers of the Monitor were expanded in order to, among other things, provide the Monitor with access to information concerning the Company's subsidiaries.  Pursuant to an Order of this Court made on May 31, 2012, this Court granted an Order extending the Stay Period (as defined in the Initial Order) to September 28, 2012.  The proceedings commenced by the Company under the CCAA will be referred to herein as the "**CCAA Proceedings**".

2.      On the Filing Date, the Court also issued an Order authorizing the Company to conduct a Sale Process (the "**Sale Process Order**").

3.      The purpose of this Sixth Report is to:

        (a)     Provide an update on the Company's CCAA proceedings including with respect to:



(i)     the Sale Process;

(ii)    Mediation;

(iii)   the Plaintiffs' Motion re Document Production;

(iv)   Claims Process;

(v)    the Company's Equity Claims Motion;

(b)    Report on the receipts and disbursements of the Company for the period May 19, 2012 to July 20, 2012; and

(c)    Provide certain information relating to the Sino-Forest Subsidiaries, including:

(i)     overview of the Sino-Forest chops, annual review and process to change legal representatives;

(ii)    the cash position of the Sino-Forest Subsidiaries;

(iii)   receivables;

(iv)   the Thai Redwood Transaction;

(v)    management's internal December 2011 financial statement impairment provisions;

(vi)   disbursements;

(vii)  cumulative variance analysis for the Sino-Forest Subsidiaries;

(d)    Provide an update on Sino-Forest Subsidiary operations, including:

(i)  operational changes;

(ii) wood fibre operations;

(iii) other businesses; and

(e)       Provide an update on timber assets and verification efforts.

4.      In preparing this Sixth Report, the Monitor has relied upon unaudited financial information of Sino-Forest, Sino-Forest's books and records, certain financial information prepared by Sino-Forest, the Reports of the Independent Committee of the Company's Board of Directors dated August 10, 2011 (the "**First IC Report**"), November 13, 2011 (the "**Second IC Report**"), and January 31, 2012 (the "**Final IC Report**" and together, the "**IC Reports**"), and discussions with Sino-Forest's management.  The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information.  In addition, the Monitor notes that on January 10, 2012, the Company issued a press release cautioning that the Company's historic financial statements and related audit reports should not be relied upon. Accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Sixth Report or relied on in its preparation.  Future oriented financial information reported or relied on in preparing this Sixth Report is based on management's assumptions regarding future events; actual results may vary from forecast and such variations may be material.

5.      Unless otherwise stated, all monetary amounts contained herein are expressed in US Dollars.

6.      The term "**Sino-Forest**" refers to the global enterprise as a whole but does not include references to the Greenheart Group.   "**Sino-Forest Subsidiaries**" refers to all of the direct and indirect subsidiaries of the Company, but does not include references to the Greenheart Group.

7.      Capitalized terms not defined in this Sixth Report are as defined in the pre-filing report of the proposed monitor dated March 30, 2012 (the "**Pre-Filing Report**") and the affidavit of W. Judson Martin sworn March 30, 2012 (the "**Initial Order Affidavit**").  Copies of the Initial Order Affidavit (without exhibits) and the Pre-Filing Report are attached as Appendices "A" and "B" hereto.

## GENERAL BACKGROUND

*Sino-Forest Business*

8.      Sino-Forest conducts business as a forest plantation operator in the People's Republic of China ("**PRC**").  Its principal businesses include ownership and management of forest plantation trees, the sale of standing timber and wood logs, and complementary manufacturing of downstream engineered-wood products.

9.      The Company is a public holding company whose common shares were listed on the Toronto Stock Exchange ("**TSX**").  Prior to August 26, 2011 (the date of the Cease Trade Order, defined below), the Company had 246,095,926 common shares issued and outstanding and trading under the trading symbol "TRE" on the TSX.  Effective May 9, 2012, the common shares were delisted from the TSX.

10.     On June 2, 2011, Muddy Waters, LLC ("**MW**"), which held a short position on the Company's shares, issued a report (the "**MW Report**") alleging, among other things, that Sino-Forest is a "ponzi-scheme" and a "near total fraud".  The MW Report was issued publicly and immediately caught the attention of the media on a world-wide basis.

11.     Subsequent to the issuance of the MW Report, the Company devoted extensive time and resources to investigate and address the allegations in the MW Report as well as responding to additional inquiries from, among others, the Ontario Securities Commission ("**OSC**"), the Royal Canadian Mounted Police and the Hong Kong Securities and Futures Commission.

12.     In view of the MW Report, the subsequent litigation and regulatory investigations and other issues continue to have a significant negative impact on the Company and have threatened the long term viability of Sino-Forest's operations.  For the reasons discussed in the Pre-Filing Report and the Initial Order Affidavit, the Company and the business was placed into a stalemate that could not be resolved without the Court supervised solution offered by the CCAA Proceedings.

13.     The Pre-Filing Report and the Initial Order Affidavit provide a detailed outline of Sino-Forest's corporate structure, business, reported assets and financial information as well as

a detailed chronology of the Company and its actions since the issuance of the MW Report in June 2011.

## UPDATE ON CCAA PROCEEDINGS

*Update on Sale Process*

14.     On the Filing Date, the Company obtained the Sale Process Order.  The Phase 1 Bid Deadline (as defined in the Sale Process Order) was June 28, 2012.  On July 10, 2012, the Company issued a press release announcing that the Company had determined that none of the letters of intent were qualified letters of intent and therefore it was terminating the Sale Process and proceeding with the restructuring transaction contemplated under the Support Agreement.

15.     Also on July 10, 2012, the Monitor issued its fourth report (the "**Fourth Report**") to the Court providing an update with respect to the Sale Process and the letters of intent that had been received on the Phase 1 Bid Deadline.  The Fourth Report also noted that none of the LOIs (as defined in the Fourth Report) were deemed "Qualified Letters of Intent" under the sale process procedures and the Company subsequently issued a press release confirming the termination of the sale process.

16.     Many parties actively involved in these proceedings have requested a summary of the LOIs received.  The Monitor agrees with the Company that this information is sensitive and should not be publicly available.  However, the Monitor does believe that summary information regarding the LOIs should be placed in the Data Room (defined below) and made available to Mediation Parties (defined below) who have executed a Mediation Confidentiality Agreement (defined below) prior to the Mediation (defined below).

*Update on Mediation*

17.     The Monitor's fifth report dated July 16, 2012 filed in support of the Monitor's motion for a mediation order (the "**Mediation Motion**") provided the background and context leading up to the Mediation Motion.

18.     On July 25, 2012, this Court granted an Order (the "**Mediation Order**"):

- 6 -

(a)      directing mediation ("**Mediation**") among specified "Mediation Parties";

(b)      providing for the establishment of a data room ("**Data Room**") for access by Mediation Parties subject to confidentiality restrictions;

(c)      scheduling September 4, 5 and, if necessary, 10 as the mediation dates; and

(d)      appointing the Honourable Justice Newbould as mediator.

A copy of the Mediation Order is attached as Appendix C hereto.

19.      Since the granting of the Mediation Order, the Company has worked with the Plaintiffs and the Third Party Defendants to execute confidentiality agreements in the form agreed to with such parties at the hearing for the Mediation Order (the "**Mediation Confidentiality Agreement**").  A copy of the index to the Data Room and access to the Data Room has been provided to those Mediation Parties that have executed a Mediation Confidentiality Agreement as of the date of this Report.

*The Plaintiff's Motion re Document Production*

20.      On July 10, 2012, the Plaintiffs served a notice of motion (the "**Notice of Motion**") (followed by a full motion record on July 11, 2012) for a motion returnable July 16, 2012 (the "**Plaintiffs' Document Motion**") regarding the disclosure of certain documents set out in their Notice of Motion.  At a Court conference call held on July 13, 2012, the Plaintiffs' Document Motion was adjourned to July 25, 2012.  At a 9:30 appointment held on July 23, 2012, the motion was further adjourned to July 30, 2012.

21.      The Plaintiffs and the Company subsequently agreed upon the list of documents to be put in the Data Room and settled a form of Order in respect of the Plaintiffs' Document Motion.  The Order was granted by this Court on July 30, 2012.  A copy of the Order is attached as Appendix D hereto.

*Update on Claims Process*

22.      Pursuant to an Order of this Court made on May 14, 2012, this Court granted the Claims Procedure Order providing for a call for claims against the Company and its officers and

directors.   While the Claims Procedure Order did not purport to create a bar date in
respect of claims against Sino-Forest Subsidiaries, claimants against the Company were
ordered to indicate whether they asserted or intended to assert a similar claim against
some or all of the Sino-Forest Subsidiaries.   The primary claims bar date was June 20,
2012 (the "**Claims Bar Date**").[1]

23.     On or about the Claims Bar Date, the Monitor received a total of 228 claims with a face
value in excess of $112 billion.   This includes potential duplicative claims filed against
the Company and its officers, directors and subsidiaries.   A summary of the claims
received to date is as follows:

|  | # of Claims Submitted | $ of Claims Submitted (millions) |
|---|---|---|
| Claims | 164 | $ 66,334 |
| D&O Claims | 64 | $ 45,861 |
| **Total Claims** | **228** | **$ 112,195** |

24.     As of the date of this Report, the Monitor is continuing to review the claims received,
particularly in light of the Equity Claims Decision (defined below), discussed in further
detail below.

25.     The Monitor is also reviewing the claims under the Company's four series of notes
including the guarantees and pledges given by Sino-Forest in connection with the notes.
The Monitor intends to put its summary regarding the guarantees and security in the Data
Room.

---

[1] The applicable bar date for certain claims including Restructuring Claims and D&O Indemnity Claims is as set out
in the Claims Procedure Order.

*The Company's Equity Claims Motion*

26.    On June 26, 2012, this Court heard a motion brought by the Company for a direction that certain claims against the Company that result from the ownership, purchase or sale of an equity interest in the Company and resulting indemnity claims are "equity claims" as defined in the section 2 of the CCAA.  The motion was not opposed by the Plaintiffs but was opposed by certain Third Party Defendants.

27.    On July 27, 2012, this Court issued  its decision (the "**Equity Claims Decision**").  A copy of the Equity Claims Decision is attached as Appendix E hereto.  Pursuant to the Equity Claims Decision, this Court found, *inter alia*, that:[2]

(a)    It was not premature to determine the issue set out in the Company's motion. Instead:

(i)    it had been clear since the outset of the CCAA proceedings that this issue would have to be determined and this issue could be determined independently of the Claims Procedure Order;

(ii)    the Court did not accept that any party can be said to be prejudiced if this threshold issue is determined at this time;

(iii)    this threshold issue does not depend upon a determination of quantification of any claim; and

(iv)    the effect of the Equity Claims Decision will be to establish whether the claims of E&Y, BDO and the Underwriters will be subordinated pursuant to the CCAA and is independent of determinations as to validity and quantification.

(b)    The Shareholder Claims and Related Indemnity Claims are "equity claims" as defined in section 2 of the CCAA.

---

[2] Capitalized terms used in the summary and not otherwise defined have the meaning given to them in the Equity Claims Decision.  This summary is for information purposes only.  Reference should be made to the Equity Claims Decision itself.

(c)     With respect to the claims of E&Y, BDO and the Underwriter, the Court concluded that the most significant aspect of those claims constitute "equity claims". However, the Court did not make a determination as to whether defence costs incurred in defending the class action claims were "equity claims".

(d)     The Equity Claims Decision was without prejudice to the Company's right to apply for a similar order with respect to (i) any claims in the statement of claim that are in respect of securities other than shares and (ii) any indemnification claims against the Company related thereto.

28.     On August 3, 2012, the Court issued an Order reflecting the terms of the Equity Claims Decision, a copy of which is attached as Appendix F hereto.

**RECEIPTS AND DISBURSEMENTS OF THE COMPANY FOR THE PERIOD TO JULY 20, 2012**

**Actual Receipts & Disbursements for the Period May 19, 2012, to July 20, 2012**

29.     The Company's actual net cash flow for the period from May 19, 2012, to July 20, 2012 (the "**Current Period**") together with an explanation of key variances as compared to the May 23 Forecast (as defined in the Monitor's Third Report) is described below. Actual net cash flows for the Current Period were approximately $8.5 million higher than forecast and summarized as follows:

| $000 CAD | Forecast | Actual | Difference |
|---|---|---|---|
| Cash inflow | | | |
|    Insurance Proceeds | $ - | $ 6,664 | $ 6,664 |
|    Interest Income | $ 412 | $ 417 | $ 5 |
| **Total cash inflow** | $ 412 | $ 7,081 | $ 6,669 |
| Cash outflow | | | |
|    Payroll and Benefits | $ 121 | $ 111 | $ (9) |
|    Board & Committee Fees | $ 392 | $ 307 | $ (85) |
|    Travel | $ 185 | $ 47 | $ (137) |
|    Rent,Communication & Utilities | $ 40 | $ 52 | $ 13 |
|    Taxes & Other | $ 102 | $ 47 | $ (55) |
| **Total cash outflow** | $ 839 | $ 565 | $ (273) |
| **Net Operating Cashflow** | $ (426) | $ 6,516 | $ 6,942 |
| | | | |
| **Restructuring Costs** | | | |
|    Professional Fees | $ 10,482 | $ 8,946 | $ (1,536) |
| **Total Restructuring Costs** | $ 10,482 | $ 8,946 | $ (1,536) |
| **Net Cash Flow** | $ (10,908) | $ (2,430) | $ 8,478 |
| Opening Cash Balance | $ 61,007 | $ 61,007 | $ - |
| Net Cash Balance | $ (10,908) | $ (2,430) | $ 8,478 |
| Ending Cash Balance | $ 50,099 | $ 58,577 | $ 8,478 |

30.     The key variances in actual receipts and disbursements compared to the May 23 Forecast
is a favourable variance of approximately $8.5 million primarily relating to:

(a)     A positive variance of approximately of $6.7 million in cash inflows.  This
variance is permanent in nature and related to insurance proceeds received by
Sino-Forest in respect of professional fees incurred. The timing and estimated
value of potential insurance proceeds was unknown at the time of the preparation
of the May 23 Forecast and therefore was not included as part of the Forecast; and

(b)     A positive variance of approximately $1.5 million in professional fees.  This
variance is temporary in nature and is expected to reverse in the coming weeks as
invoices are submitted by the professionals and paid by Sino-Forest.

## INFORMATION RELATING TO SINO-FOREST SUBSIDIARIES

31.    As set out in the Third Report of the Monitor, the Monitor (both directly and through FTI Consulting (Hong Kong) Limited ("**FTI HK**" and together with the Monitor, "**FTI**")) established communication protocols and reporting mechanisms with Sino-Forest in Hong Kong and the People's Republic of China ("**PRC**").

32.    The Monitor was granted further powers pursuant to the Expanded Powers Order dated April 20, 2012, the majority of which related to direct access and involvement in the Sino-Forest Subsidiaries, as opposed to the Company itself.  The Company's request for the Expanded Powers Order was primarily as a result of certain enforcement notices received from the OSC in April 2012, and personnel changes resulting from those changes.

33.    FTI continues to work with Sino-Forest on its operational, financial, legal and other issues.  Much of the Monitor's activities to date have included, and continue to include, monitoring and reviewing financial information and Sino-Forest Subsidiaries' activities in addition to attending certain meetings between the Company and third parties.

34.    The purpose of this overview is to inform on the status of the Sino-Forest Subsidiaries from the start of the CCAA proceedings to date.  In assessing Sino-Forest, including what actions and steps should be taken, reference was made to the IC Reports and the work and background conducted by the Independent Committee and its advisors.  Copies of the IC Reports are attached as Appendices G through I hereto.

*General Overview*

35.    As was set out in the Initial Order Affidavit as well as the Pre-Filing Report, in the months after the release of the MW Report and the subsequent commencement of investigations and litigation involving Sino-Forest Corporation, the ultimate parent of the Sino-Forest Companies, the majority of the business in the PRC came to a virtual standstill.  Although certain business segments continued, they did so at diminished levels and Sino-Forest's primary business, namely the purchase and sale of standing timber, froze.  Both the Initial Order Affidavit and the Pre-Filing Report observed that a

court supervised process was necessary for any chance of resolving the stalemate that the business found itself in.

36. As discussed in the following sections, Sino-Forest's financial and operational aspects of the business in the PRC continue to be negatively impacted by the uncertainty regarding the Company's affairs. Operations in Sino-Forest's standing timber business (which accounts for the vast majority of Sino-Forest's historical reported revenue and asset base) remain frozen and the remainder of Sino-Forest's businesses are operating at substantially lower levels than in past years.

37. Further, Sino-Forest's existing senior management team has been significantly reduced since the commencement of the CCAA proceedings. As has been previously reported and disclosed by the Company, in April 2012, in response to enforcement notices issued by the OSC, a number of personnel changes were made whereby members of senior management were terminated. The chief financial officer also stepped down from that role, although he remains an employee of the Company. The Monitor understands that the terminated personnel played a significant role in Sino-Forest's business. Due to the on-going concern in the Company and the Sino-Forest business, it has not been an option for Sino-Forest to replace these individuals.

38. Although Sino-Forest's cash position may appear to be ahead of its forecast (see below), the original subsidiary level forecast was mostly prepared by individuals who are no longer employed by Sino-Forest as a result of the personnel changes in April 2012 and may not be an appropriate reference point. In reality, although disbursements are lower than normal, collection of receivables is proving difficult (as discussed below) and, to date, Sino-Forest has not been able to revive its business.

39. As evidenced by recent events, Sino-Forest is experiencing the results of a deteriorating business across multiple fronts, including:

    (a)    Provisions in respect of uncollectible receivable balances and assets with impaired values have been taken in the 2011 year end internal financial statements (which are discussed in further detail below);

(b)     Management will need to review the impact of the recent de-registrations on the interim 2012 internal financial statements and to consider the need for further provisions in respect of amounts owed by de-registered AIs (which is discussed in more detail below);

(c)     Work being performed by third party consultants to verify Sino-Forest's forestry estate is on-going and estimated to take years to complete and/or to verify a substantial portion of the estate;

(d)     There is no indication that Sino-Forest will be able to resume its business absent a successful restructuring and resolution in these CCAA proceedings; and

(e)     There is a limited pool of funds that continues to be depleted throughout the CCAA proceedings.

40.     The deterioration of Sino-Forest is also directly influenced by what appears to be the beginning of a breakdown of its relationships with certain AIs and suppliers.   As described in the Pre-filing Report, the Initial Order Affidavit and as set out in the IC Reports, it is clear that there is an emphasis put on "business relationships" among parties that is paramount to any contractual or legal relationship that may have been entered into by the parties.   These relationships are relied upon for the conduct of business in this industry in the PRC.   In the course of its investigation, the IC reported that it was apparent that integral to Sino-Forest's business model was its relationship with business partners.   Recent events highlight the breakdown:

(a)     Certain authorized intermediaries ("**AIs**") who are necessary for selling standing timber under the BVI structure and who had outstanding receivable balances with Sino-Forest, have de-registered (which is discussed in more detail below);

(b)     Certain suppliers responsible for selling standing timber to Sino-Forest have de-registered; and