(c)    The trading business has stopped importing, other than the existing Thai Redwood transaction.  The Thai Redwood transaction that was expected to occur in May 2012 has been delayed multiple times.

41.    The Monitor also notes that as the restructuring proceedings continue with no resolution, the ability of Sino-Forest to maintain its relationship with the PRC government may become increasingly difficult.

*Chops, Annual Review and Process to Change Legal Representatives*

42.    Upon filing, FTI began discussions regarding the corporate governance of the Sino-Forest Subsidiaries, particularly the PRC entities which are located in various regions in the PRC.  Through initial conversations and advice provided by Hong Kong and PRC counsel, the Monitor learned that, as a corporate governance matter, companies incorporated in the PRC:

(a)    Are represented by an individual who is appointed as the "legal representative" of that company in dealing with external parties and under the PRC law; and

(b)    conduct business through "chops" which are akin to company seals.  PRC companies can have different kinds of chops including the "company chops", "financial chops" and "individual bank signatory chop".  These chops are generally located at the subsidiary where they are used and may only be used by authorized individuals.

43.    Shortly after the Filing Date, Sino-Forest sent out a company-wide letter (the "**Letter**") to all of the subsidiaries identifying new restrictions on the use of the chops and prohibiting the use of these chops without prior permission from identified senior management of Sino-Forest.  As discussed in further detail below, the Letter also outlined a new protocol for proposed disbursements and for entering into new contracts and commitments above a pre-determined threshold, including prior review by FTI.

44.    As previously reported, in April 2012 there were several personnel changes due in large part to the ongoing investigation and charges laid by the OSC.  As a consequence of these

changes, the Company and FTI undertook a diligence exercise to determine the legal representatives for all Sino-Forest PRC companies and the location and security of the various chops. A summary of the steps taken is as follows:

(a)     The Company, through its legal counsel, conducted a corporate review of the PRC subsidiaries to determine the identity of the legal representatives of each company. This review showed that there was a consistent legal representative across many of the subsidiaries and that in most cases the legal representative was no longer an employee of Sino-Forest.

(b)     FTI then conducted physical visits of approximately 50% of Sino-Forest's PRC subsidiaries and observed the location of the company chop, financial chop and individual bank signatory chop for those subsidiaries it inspected.

(c)     It was determined that it was not necessary or prudent to conduct an initial review of all PRC subsidiaries. This determination was based on the fact that: chops are physically located at the subsidiary offices throughout the PRC, the costs associated with physically visiting all locations and the relative levels of business historically reported by such subsidiaries. Instead, FTI selected a sample of subsidiaries to visit based on levels of business, cash balances and physical ability to visit those locations.

45.     Based on the inspections that FTI has conducted, the chops appear to be physically locked in storage or other cabinets at the subsidiary level. Initially, there was one exception, but FTI has been advised that it has been remedied. FTI cannot be sure that the chops are kept under lock and key at all times given the practical prohibitions on such monitoring. However, FTI is advised by Sino-Forest management that the protocols set out in the Letter continue to be followed.

46.     The Monitor expressed concern to Sino-Forest regarding the physical location of the chops at each of the subsidiaries as well as the legal representatives (particularly those that are no longer employees of Sino-Forest). These concerns were somewhat mitigated by the implementation of the new controls under the Letter. Further, at the time these

concerns were initially raised, Sino-Forest's view was that (a) physical relocation of the chops to a more centralized location was not possible as a practical matter as they are needed by each subsidiary on a daily basis to conduct any business; and (b) any changes in legal representatives or other protocols at that time were not timely due to the fact that the PRC subsidiaries were undergoing their annual review process. The annual review process is described in more detail below.

47.    Over the past number of months, Sino-Forest's PRC subsidiaries have been undergoing annual reviews. These reviews are government mandated and companies are required to pass these reviews every year in order to carry on business in the PRC. As of July 31, 2012, all of the annual reviews have now been completed. FTI is advised that all but three (3) of the PRC subsidiaries have passed their review and FTI is now in the process of receiving copies of the stamped business licenses indicating that the reviews were successful. For those three (3) that remain outstanding, two (2) are expected to be complete by August 10, 2012 and the last one by August 31, 2012.

48.    Given the completion of the annual reviews, the Monitor is re-visiting discussions with Sino-Forest management to determine whether further steps should be taken to either replace the legal representatives and/or obtain a greater degree of certainty on the use and security of the chops.

*Cash Position of Sino-Forest Subsidiaries*

49.    Prior to the CCAA proceedings, the Independent Committee, through its financial advisor, PricewaterhouseCoopers LLP ("**PwC**") was trying to verify the cash position of Sino-Forest. PwC was able to complete verification as of June 13, 2011 of 81% of the cash position in the PRC and 100% in Hong Kong.

50.    Since the Filing Date, FTI has continued to work with Sino-Forest to verify cash positions on an on-going basis particularly given the fact that the PwC verification was as of ten (10) months prior to the filing.

51.    Sino-Forest has approximately 546 bank accounts, 327 of which are located in various parts of the PRC. FTI initially commenced work to understand the logistics, location and

reported balances in these accounts and based on that, determined that the best approach was to conduct an initial review of all accounts with a balance over $5 million. The further following actions continue to be taken by FTI in order to verify cash positions:

(a)    FTI performs a monthly review of bank statements for over 60% of the bank accounts as compared to the bank statements. Included in the accounts that are under review are all of the accounts with significant balances as well as a monthly random review of selected accounts with smaller balances;

(b)    FTI has also physically visited specific banks in efforts to confirm certain account balances as at March 31, 2012. Sino-Forest has 17 bank accounts in the PRC with balances in excess of $5 million as at March 30, 2012. The 17 accounts represent approximately 65% of the expected total of all PRC bank accounts, or 44% of the expected total of all account balances;

(c)    FTI selected 9 of the 17 accounts to be verified and visited the banks with local Sino-Forest personnel located in: Hunan Province, Jiangzi Province, Guizhou Province, Shanghai and Guangzhou. No material misstatements were identified for any of the reviewed account balances as of March 30, 2012; and

(d)    There were 216 non-PRC bank accounts with a total balance of approximately $167 million as at March 30, 2012. FTI has verified all of these accounts with a balance of over $100,000 by checking bank statements, which represents approximately 99% of the total non-PRC balance. FTI performs a selected review of a portion of the non-PRC bank accounts on an ongoing basis.

52.    As an example, the breakdown of accounts reviewed per segment for June 2012 is detailed below. Based on the review procedures set out in 51(a) and (d) above, there were no material misstatements in those accounts checked.

| USD | Sino-Wood | Sino-Panel | Non-PRC | Total |
|---|---|---|---|---|
| # of accounts with balances | 147 | 180 | 219 | 546 |
| Balances as at June 30, 2012 ($ 000s) | $    92,709 | $  126,275 | $ 145,235 | $364,218 |
| % of bank account balances reviewed | 58% | 64% | 69% | 64% |

*Receivables*

53.    The Initial Order Affidavit set out Sino-Forest's receivable balances, including ongoing difficulties in collecting those receivables given the MW Report and the uncertainty surrounding the business.  Sino-Forest had, in fact, instructed one of its then PRC counsel to send demand letters in respect of significant receivable balances.

54.    As of July 12, 2012, the Company had recorded receivables totalling approximately $1 billion.  Details regarding the outstanding receivables balance can be found below:

|  | $ | % |
|---|---|---|
| BVI Standing Timber | $ 887 | 82% |
| Wood WFOE Standing Timber | $ 1 | 0% |
| Panel WFOE Standing Timber | $ 42 | 4% |
| BVI Trading | $ 126 | 12% |
| WFOE Trading | $ 11 | 1% |
| Miscellaneous | $ 14 | 1% |
| **Total** | **$ 1,081** | **100%** |

55.    Subsequent to the commencement of the CCAA proceedings, management engaged another PRC law firm, Jingtian & Gongcheng ("**J&G**") to follow up on the collection of outstanding receivables. Collection methods include detailed analysis of existing outstanding receivables, demand letters, follow up on demand letters that Sino-Forest's prior PRC counsel had advised it sent and face-to-face discussions with third parties in respect of certain specific outstanding receivables.

56.    FTI has also begun participating (and continues to participate) in weekly meetings with Sino-Forest for a status update on legal proceedings/actions launched against specific debtors throughout the CCAA proceedings.   FTI has also been participating (and continues to participate) in weekly meetings with subsidiaries as well as weekly calls with Jingtian & Gongcheng.

57.    More recently, FTI has taken additional measures in following up on the status of the outstanding receivables, understanding the nature of collection methods being used and the impact these methods may have had on reducing the total outstanding balance.

58.     In the course of FTI's increased role in assisting with the collection of receivables, FTI requested J&G to conduct searches of several entities, the results of which can be summarized as follows:

    (a)     Searches were conducted against six (6) AIs with whom the BVI entities conduct business for standing timber and who make up approximately $887 million of the Company's reported receivables.  Based on the search results, three (3) of those entities, representing $504 million in receivables, have been de-registered.

    (b)     Searches were conducted against twelve (12) entities with whom the BVI entities conduct business for BVI trading and who make up approximately $126 million of the Company's reported receivables.  Based on the search results, six (6) of those entities, representing $63 million, have been de-registered, one (1) of which is also included in paragraph (a) above.

59.     Although discussions are ongoing regarding the impact of de-registration and possible recourse available to Sino-Forest, the receivables position of Sino-Forest appears to be significantly different from past reported receivables. On July 31, 2012, the Company issued a press release outlining the discoveries made regarding the de-registration of these parties.  A copy of the press release is attached as Appendix J hereto.

60.     By far, the most significant impact of the above has been the de-registration of the AIs. As was set out in the IC Reports as well as the Initial Order Affidavit, there has always been very little insight into the business of the AIs including their books and records, cash collections and disbursements.  Further, based on the IC investigation, it is apparent that there are on-going issues with respect to many aspects of the business transactions between Sino-Forest and the AIs, including the nature of many of these relationships. Historically, receivables from AIs were not collected as they were used to offset new standing timber purchases, as described in the description of the BVI model in the Initial Order Affidavit and the IC Reports.

61.     The Monitor has been informed by King & Wood Mallesons that "de-registration" in the PRC is effectively the wind-up or termination of such company.  In other words, after de-

registration, the company ceases to exist.  However, as of the date of this Report, the Company and the Monitor are still at the stage of obtaining further legal advice regarding the de-registration process and possible civil and/or criminal remedies that might be available to Sino-Forest including pursuit of the shareholders of the AIs that have been de-registered and other related parties.

62.   In the event that, in fact, these debts are not honoured, they may be written off by the Sino-Forest Subsidiaries that they are owed to, which would a typical accounting practice.

*The Thai Redwood Transaction*

63.   In March 2011, at the initiation of a former senior employee of Sino-Forest, Sino-Forest entered into two contracts (which were subsequently amended) for the purchase of approximately 6,500 tons of Thai Redwood through a PRC distributor (the "**Thai Redwood Transaction**").  In connection with the entering into of those contracts, Sino-Forest paid a deposit of $15 million in April 2011 and a further deposit of $32 million in December 2011.

64.   Since the commencement of the proceedings, Sino-Forest has made ongoing efforts to either receive the Thai Redwood or get a return of the deposits.  In that regard, numerous meetings have taken place with various individuals involved in the Thai Redwood Transaction.  FTI has attended some of these meetings.

65.   To date, Sino-Forest has not received shipment of the Thai Redwood.  Sino-Forest and FTI have been advised by the supplier that the delay is due to many complicating factors including the political changes in Thailand and weather conditions.  However, the significant delay has been of great concern to both the Monitor and the Company and, as a result, Sino-Forest is in ongoing negotiations with its supplier for return of the deposit or delivery of the wood.  As of the date of this report, no resolution has been reached.  It is the Monitor's view that, at this point, recovery of either the deposits or delivery of the Thai Redwood is uncertain.

*Management's  Internal December 2011 Financial Statement Impairment Provisions*

66.    Management of the Company advised the Monitor that it has recorded approximately
$560 million in impairment provisions in respect of its internal 2011 financial statements.
Management is currently working on finalizing the internal financial statements for Q1
2012 and expects to do so over the coming weeks.

67.    A majority of the write-offs that pertain to the internal 2011 year-end financial statements
relate to goodwill impairment, trade receivable impairments, fair value impairments of
standing timber and deposits and plantation prepayments made in respect of contractual
commitments.  The 2011 provision does not take into account any potential additional
write-offs related to accounts receivable, that may have to be accounted for due to the
recent discovery of the de-registration of AIs or other third parties as described above.
Any additional provisions will be recorded in the Q1 2012 internal financial statements.

68.    The Monitor has had a number of discussions with the Company's management to
understand the rationale and underlying justification for this provision.  The Monitor has
also requested back up information and documentation to try to understand the
Company's decision more thoroughly.  To date, the Monitor has reviewed a number of
documents and makes the following observations:

(a)    Approximately 13% of the provision taken relates to trade receivable impairments
and bad debts written off.  The impairment provision relates to the fact that the
receivables balances are more than one year old and the Company follows a
policy of providing for receivables that are more than one year past due.  There
are a number of customers that may also be suppliers and/or be related to
suppliers and therefore there may be opportunities for set-off that management is
currently looking into;

(b)    Approximately 20% of the provision taken relates to wood log deposits, of which
approximately 30% relate to certain 2011 deposits with the same supplier
discussed above, who is party to the Thai Redwood Transaction, but relating to
separate transactions.  The assumptions underlying the impairments are based on

F T I

a lack of activity with counterparties to Sino-Forest's log supply agreements since MW;

(c)     Approximately 38% of the provision taken appears to be related to Mandra goodwill and intangibles and write offs of the fair value of timber assets based on management's estimate of recovery;

(d)     The remaining provision amounts include certain balances that management has deemed impaired and/or written off due to existing external circumstances; and

(e)     There are a number of explanations that are still outstanding as they relate to specific questions in the PRC and/or analysis performed by individuals who are no longer employed by Sino-Forest.

69.     The Monitor continues to hold discussions with management to better understand the assumptions underlying the write-offs and potential impact on the existing business.  The Monitor continues to review explanations and supporting documentation in both Canada and Hong Kong.

*Disbursements*

70.     As set out above, the Letter provided for a new protocol on authorized disbursements. The Letter specifically provided that no disbursements or new commitments were to be made over an agreed upon threshold without approval from senior management and review by FTI.

71.     FTI continues to work with Sino-Forest to monitor disbursements and confirm that the protocol on disbursements is followed.  On a weekly basis, FTI reviews a list of proposed payments by Sino-Forest in excess of a pre-determined threshold.  On a monthly basis, FTI reviews a sample of bank statements to verify that payments in excess of a pre-determined threshold were made and to verify the ending cash balances.  Based on these controls, with one exception that took place shortly after the Filing Date, the appropriate protocols on disbursements appear to be followed.

72.    As of July 20, 2012, Sino-Forest is approximately $91 million ahead of its cash flow, a significant portion of this relating to a difference in actual versus forecast disbursements. Further details explaining the variance analysis can be found in the section entitled "Cumulative Variance Analysis".

73.    A significant portion of the approximately $91 million is attributable to lower actual disbursements than forecast in Sino-Panel.  The differences are primarily a result of:

(a)    approximately $18 million in operating expenses that were lower than forecast due to lower work levels at manufacturing plants, poor weather conditions; and

(b)    approximately $50 million in outstanding accounts payable payments for plantation purchases and lease payments that have been delayed (at this point in time, it is still unknown what portion of the difference is timing versus permanent).

*Cumulative Variance Analysis*

74.    The Sino-Forest Subsidiaries' net cash flows broken down by Sino-Forest's key operating lines, together with an explanation of key variances as compared to forecast is described below.  Actual net cash flows are for the period from March 30, 2012 to July 20, 2012.

| USD millions | Actual | Forecast | Difference |
|---|---|---|---|
| HK/BVI/Barbados | $       (16) | $       (18) | $        (2) |
| Sino-Wood | $        12 | $       (10) | $       (22) |
| Sino-Panel | $       (10) | $       (63) | $       (53) |

The key variances in actual receipts and disbursements as compared to forecast are:

(a)    Sino-Wood:

(i)    Sino-Wood received a $5 million bank loan which was not originally forecast by the Company;

(ii)    Sino-Wood was supposed to receive an approximate $5 million capital injection which has been delayed;

(iii)    Expenses related to planted plantations of approximately $5 million were lower than forecast due to unforeseen weather and timing issues; and

(iv)    General overhead expenses were lower than forecast by approximately $3 million resulting primarily from timing differences.

(b)    Sino-Panel:

(i)    Sino-Forest forecast that the Thai Redwood Transaction would be completed and that approximately $14 million in sales would have occurred.  The Thai Redwood Transaction has been delayed and therefore the sales have not yet materialized;

(ii)    Delayed payment to a specific supplier harvesting timber has further delayed expected revenue of approximately $9 million related to the timber;

(iii)    A majority of the forecast accounts payable have been delayed.  A portion of the positive variance of approximately $50 million may be a permanent difference, but this has not yet been determined; and

(iv)    Operating expenses were lower than forecast due to lower work levels at the manufacturing plants than forecast, poor weather and the delayed Thai Redwood Transaction.  A portion of the positive variance of $18 million may be permanent, but this has not yet been determined.

## UPDATE ON SINO-FOREST SUBSIDIARY OPERATIONS

75.    Reference should be made to the IC Reports and the Initial Order Affidavit for an overview of the different segments of Sino-Forest's business as well as historic operating levels.

*Operational Changes*

76.    Since the filing, the Monitor is not aware of any new Sino-Forest entities being incorporated or any major transfers of assets among subsidiaries.  Sino-Forest has continued to employ the vast majority of its employees (other than those personnel changes that have previous been discussed), the majority of whom work in Sino-Forest's manufacturing operations.

77.    Subsequent to the filing, management of the Sino-Panel subsidiaries was replaced after the April 2012 personnel changes were made.  New management of Sino-Panel are in the process of dealing with on-going operational issues, meeting with agents and negotiating resolutions to the outstanding legal matters.

*Wood Fibre Operations*

78.    As set out in the Initial Order Affidavit for the year ended December 2010, revenue from wood fibre operations accounted for approximately 96.4% of Sino-Forest's reported revenue.  In June 2011, upon the release of the MW Report, wood fibre operations, effectively halted, with very little purchases or sales in the third or fourth quarter of 2011 and no purchases or sales in 2012.

*Other Businesses*

79.    The balance of Sino-Forest's businesses (which are all described in the Initial Order Affidavit) accounted for approximately 3.6% of Sino-Forest's reported revenue in 2010. These businesses were also significantly impacted by the MW Report, and have continued at diminished levels for the balance of 2011 and the first quarter of 2012.

80.    A brief summary of some of those on-going businesses is as follows:

(a)    *Manufacturing and Other Operations*.  The industrial segment of the subsidiaries includes manufacturing and industrial operations and employs approximately 2290 employees.  Historically, only two of the operations provided positive financial performance, the remaining industrial operations have historically incurred financial losses.  There has been no significant changes in the operations of this business segment.

(b)    *Log Trading*.  The subsidiaries dealing with trading activities are in the process of being shut down.  The only potential forecast incoming supply of logs is related to the Thai Redwood Transaction, which has been discussed above.  The trading business segment has an inventory of existing logs, which they are in the process of selling.

*Overall Impact*

81.    The Monitor continues to be of the view that it is important for these proceedings to be completed as soon as possible given the events that have taken place and may continue to take place which have a significantly negative impact on the business.

## UPDATE ON TIMBER ASSETS AND VERIFICATION EFFORTS

82.    The Monitor is aware that verification and valuation of the Sino-Forest assets is of ongoing interest to many participants in the Sino-Forest CCAA proceedings for various reasons.  Indeed, verification and valuation were issues that was addressed by the IC in its reports.  The Final Report provided some information regarding verification work that was considered.  However, the IC observed that even if verification work was able to be completed, there were still significant hurdles to establishing valuation given the title issues in the BVI model and the relationship issues regarding many of the AIs.

83.    Indufor was engaged by Sino-Forest during the course of the independent committee investigation to perform an area verification of the forestry estate of Sino-Forest. However, for the reasons set out above as well as the time consuming nature of verification, very little or no verification was completed prior to the issuance of the Final Report.

84.    Indufor, under the supervision of Stewart Murray and the Company, has continued to work on verification post-filing.  The area verification process is a two stage process that is being undertaken in the PRC.  The process involves incrementally confirming the geographic location of each compartment, followed by a verification of each compartment's area of stocked forest cover using an independent source of satellite imagery.

85.    The Monitor has been advised that the area verification exercise currently being
undertaken by Indufor is a lengthy process and requires the dedication of long term
resources.  The work Indufor is undertaking includes the following:

(a)    Registering and digitizing maps;

(b)    The use of Satellite imagery and image pre-processing routines;

(c)    Atmospheric Correction;

(d)    Vegetation classification;

(e)    Map uplift, digitization and satellite imagery process (a time-consuming process
that is necessary to ensure compliance with restrictions that apply to the
distribution of PRC maps); and

(f)    Area verification.

86.    To date, Indufor has completed six (6) verification reports confirming the compartment
locations of 63,956 hectares of the Sino-Forest estate to date.  The confirmation involves
geo-referencing and digital mapping of the compartments and represents approximately
8% of total Sino-Forest reported net stocked area of 808,685 hectares as at the end of
December 31, 2011.  Analysis and findings of these reports are limited solely to the area
that has been verified.  No extrapolations of findings to the wider Sino-Forest estate are
possible or implied.

87.    The Monitor is not yet clear as to whether the Indufor work will ultimately be timely or
helpful in resolving the questions concerning the value of Sino-Forest's business.  The
Monitor understands that this type of work is extremely time consuming and that, in
order to complete any meaningful amount of verification could take years, at a minimum.

88.    As set out in previous documents including the IC Reports and the Initial Order Affidavit,
asset verification to any degree of certainty may be difficult in this situation given many
factors including, the nature of the assets, geographical impediments, political
impediments and financial resources available.  The verification exercise is a lengthy

process and likely to take years to verify any significant percentage of the Sino-Forest estate.

89.     The Monitor also notes that even if Indufor is able to verify even a portion of the assets, further work will need to be done to verify the underlying documents and assumptions used by Indufor. Lastly, as discussed above, verification does not establish title or deal with the relationships with the AIs (or address the issues arising from the de-registration of AIs).

Dated this 10th day of August, 2012.

FTI Consulting Canada Inc.
In its capacity as Monitor of
Sino-Forest Corporation, and not in its personal capacity

Greg Watson
Senior Managing Director

Court File No.: CV-12-9667-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

---

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
### (Commercial List)
(PROCEEDING COMMENCED AT TORONTO)

---

## SIXTH REPORT OF THE MONITOR

---

GOWLING LAFLEUR HENDERSON LLP
Barristers and Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto ON  M5X 1G5

**Derrick Tay (LSUC No. 21152A)**
Tel: (416) 369-7330 / Fax: (416) 862-7661
Email: derrick.tay@gowlings.com

**Jennifer Stam (LSUC No. 46735J)**
Tel: (416) 862-5697 / Fax: (416) 862-7661
Email: jennifer.stam@gowlings.com

Lawyers for the Monitor,
FTI Consulting Canada Inc.

## APPENDIX I - THE TENTH REPORT
## (WITHOUT APPENDICES)

*(See Attached)*



**Court File No. CV-12-9667-00CL**

# Sino-Forest Corporation

## TENTH REPORT OF THE MONITOR

**October 18, 2012**



Court File No. CV-12-9667-00CL

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
SINO-FOREST CORPORATION

## TENTH REPORT TO THE COURT
## SUBMITTED BY FTI CONSULTING CANADA INC.,
## IN ITS CAPACITY AS MONITOR

### INTRODUCTION

1.      On March 30, 2012 (the "**Filing Date**"), Sino-Forest Corporation (the "**Company**") filed for and obtained protection under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "**CCAA**").   Pursuant to the Order of this Honourable Court dated March 30, 2012 (the "**Initial Order**"), FTI Consulting Canada Inc. was appointed as the Monitor of the Company (the "**Monitor**") in the CCAA proceedings. By Order of this Court dated April 20, 2012, the powers of the Monitor were expanded in order to, among other things, provide the Monitor with access to information concerning the Company's subsidiaries.   Pursuant to an Order of this Court made on October 9, 2012, this Court granted an Order extending the Stay Period to December 3, 2012.   The proceedings commenced by the Company under the CCAA will be referred to herein as the "**CCAA Proceedings**".

2.      On the Filing Date, the Court also issued an Order authorizing the Company to conduct a Sale Process (the "**Sale Process Order**").



3.      The Monitor's Sixth Report dated August 10, 2012 (the "**Sixth Report**") provided a report on the Sino-Forest business and subsidiaries.  A copy of the Sixth Report (without appendices) is attached hereto as Appendix A.  The Monitor and FTI Consulting (Hong Kong) Limited have continued to work with the Company and its advisors with respect to the Sino-Forest business and the financial status of the Sino-Forest Subsidiaries.  The purpose of this Tenth Report is to provide a financial and operational update relating to the Sino-Forest Subsidiaries since the Sixth Report.

4.      This Tenth Report is based on recent information and is subject to change based on additional information generated as a result of the ongoing activities by FTI (defined below) in Hong Kong in addition to the ongoing work by the Company's advisors located in Hong Kong and the PRC.

5.      In preparing this Tenth Report, the Monitor has relied upon unaudited financial information of Sino-Forest, Sino-Forest's books and records, certain financial information prepared by Sino-Forest, the Reports of the Independent Committee of the Company's Board of Directors (the "**Independent Committee**") dated August 10, 2011 (the "**First IC Report**"), November 13, 2011 (the "**Second IC Report**"), and January 31, 2012 (the "**Final IC Report**" and together, the "**IC Reports**"), and discussions with Sino-Forest's management.  The Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information.  In addition, the Monitor notes that on January 10, 2012, the Company issued a press release cautioning that the Company's historic financial statements and related audit reports should not be relied upon.  Accordingly, the Monitor expresses no opinion or other form of assurance on the information contained in this Tenth Report or relied on in its preparation.  Future oriented financial information reported or relied on in preparing this Tenth Report is based on management's assumptions regarding future events; actual results may vary from forecast and such variations may be material.

6.      Unless otherwise stated, all monetary amounts contained herein are expressed in US Dollars.



7.      The term "**Sino-Forest**" refers to the global enterprise as a whole but does not include references to the Greenheart Group.   "**Sino-Forest Subsidiaries**" refers to all of the direct and indirect subsidiaries of the Company, but does not include references to the Greenheart Group.

8.      Capitalized terms not defined in this Tenth Report are defined in the Sixth Report.

## GENERAL BACKGROUND

*Sino-Forest Business*

9.      Sino-Forest conducts business as a forest plantation operator in the People's Republic of China ("**PRC**").   Its principal businesses include ownership and management of forest plantation trees, the sale of standing timber and wood logs, and complementary manufacturing of downstream engineered-wood products.

10.     The Company is a public holding company whose common shares were listed on the Toronto Stock Exchange ("**TSX**").   Prior to August 26, 2011 (the date of the Cease Trade Order), the Company had 246,095,926 common shares issued and outstanding and trading under the trading symbol "TRE" on the TSX.   Effective May 9, 2012, the common shares were delisted from the TSX.

11.     On June 2, 2011, Muddy Waters, LLC ("**MW**"), which held a short position on the Company's shares, issued a report (the "**MW Report**") alleging, among other things, that Sino-Forest is a "ponzi-scheme" and a "near total fraud".   The MW Report was issued publicly and immediately caught the attention of the media on a world-wide basis.

12.     Subsequent to the issuance of the MW Report, the Company devoted extensive time and resources to investigate and address the allegations in the MW Report as well as responding to additional inquiries from, among others, the Ontario Securities Commission, the Royal Canadian Mounted Police and the Hong Kong Securities and Futures Commission.

13.     The Pre-Filing Report and the Initial Order Affidavit provide a detailed outline of Sino-Forest's corporate structure, business, reported assets and financial information as well as



- 4 -

a detailed chronology of the Company and its actions since the issuance of the MW Report in June 2011.

## FINANCIAL UPDATE REGARDING THE SINO-FOREST SUBSIDIARIES

*Overview*

14.    Since the outset of these proceedings (including the Initial Order Affidavit and the Pre-Filing Report), stakeholders have been informed that the Company's business remained frozen and placed into a stalemate.  Further, management of Sino-Forest has advised the Monitor that the uncertainty surrounding the business, and the deterioration of the company's relationships in the PRC, would only increase the longer that these proceedings continued without resolution and contracting parties in the PRC believed that they could avoid honouring their obligations in the expectation that the CCAA Proceedings would not be timely resolved in a way that saw the business continue. Management has also advised and continues to emphasize the importance of relationships in doing business in the PRC, which importance was also noted by the Independent Committee in the Second IC Report.

*Financial Statements*

15.    As previously reported, the Company's most recent consolidated financial statements are as of December 31, 2011.  In the following discussion of various balance sheet accounts, the Monitor used the most current information available from the Company based on its internal books and records.

*Cash Position of Sino-Forest Subsidiaries*

16.    The Sixth Report set out the efforts undertaken by the Monitor and FTI Consulting (Hong Kong) Limited (collectively, "**FTI**") regarding verification of Sino-Forest's cash balances in its various accounts in the PRC and elsewhere.  Monthly reconciliations (as described in the Sixth Report) are on-going. The updated breakdown of accounts reviewed up to August 31, 2012 are detailed below. No significant variations or other issues have arisen as a result of those checks.



| USD | Sino-Wood | Sino-Panel | Non-PRC | Total |
|---|---|---|---|---|
| # of accounts with balances | 147 | 175 | 217 | 539 |
| Balances as at August 31, 2012 ($ 000s) | $  84,030 | $  118,943 | $  130,244 | $  333,217 |
| % of bank account balances reviewed | 79% | 83% | 90% | 85% |

*Overview of Receivables*

17.    The Sixth Report provided an overview of Sino-Forest's receivables. As of December 31, 2011, the Company had recorded receivables totalling approximately $1.1 billion in their books and records. The $1.1 billion is net of an allowance of $73 million that was made in December 2011:

|  | $000 | % |
|---|---|---|
| BVI Standing Timber | 887 | 82% |
| Wood WFOE Standing Timber | 1 | 0% |
| Panel WFOE Standing Timber | 42 | 4% |
| BVI Trading | 126 | 12% |
| WFOE Trading | 11 | 1% |
| Miscellaneous | 14 | 1% |
| **Total** | **1081** | 100% |

(a) BVI Standing Timber Receivables

18.    Since the commencement of the CCAA, none of the outstanding BVI Standing Timber receivables (which are owed by authorized intermediaries or "**AIs**") have been collected or converted into new standing timber.

19.    At the time of the issuance of the Sixth Report, FTI (in consultation with the Company and the advisors to the ad hoc committee of noteholders (the "**AHC**")) had started to investigate the receivables in more detail.  The Sixth Report set out that approximately $887 million of these receivables were owed by six (6) AIs (the "**AI Receivables**"). The Sixth Report also set out that it had been discovered that three (3) of the AIs owing approximately $504 million in receivables have de-registered themselves under PRC law.



- 6 -

20. Since discovering the de-registrations of these AIs, Sino-Forest has been attempting to set up meetings with the AIs and the financial backers of the AIs. To date, although there have been conversations with some of these AIs, none of the parties have agreed to a meeting.  Further, Sino-Forest has been unable to contact the financial backers to the AIs**.**

21. FTI has been advised by the Company that it is considering the need to take a provision for a portion of the AI Receivables in its books and records as a result of the de-registering of the three (3) AIs as well as the magnitude of such provision.

22. In respect of the de-registered AIs, FTI continues to work with Sino-Forest and legal counsel to determine its available criminal and civil recourse under PRC law. Sino-Forest, with the assistance of its PRC legal counsel, is also exploring other alternatives to prevent additional third parties from de-registering and/or from de-registering without prior notice and has taken preliminary steps in this regard.

### (b) BVI Trading Receivables

23. Accounts receivable relating to BVI trading ("**BVI Trading Receivables**") are made up of sales of wood logs by Sino-Forest to twelve (12) separate entities.  Ten (10) of these entities were registered in the PRC the other two (2) are registered in the BVI.

24. As set out in the Sixth Report, since the commencement of the CCAA Proceedings:

    (a)     there have been no collections of the outstanding BVI Trading Receivables; and

    (b)     Six (6) entities owing approximately $63 million (of the total $126 million) in receivables for BVI trading, have de-registered.

25. Since the Sixth Report, in consultation with the Company and the AHC, FTI has continued its investigation into these entities.  In that regard, FTI has attempted to make contact with the entities owing the BVI Trading Receivables by telephone, but has had limited success in communicating with these entities and has not received any meaningful information as to their status or intention to honour their receivables.  In two (2) instances, initial contact was made and a promise to investigate and respond was not kept.



Further contact of these two (2) entities has been attempted, but has been unsuccessful to date.

26.     FTI has also made discreet site visits to the PRC entities' addresses of record and has found only one (1) of the entities is operational at the address of record. At the other nine (9) addresses, minimal operation or no evidence of existence of the entity was found.

<u>(c) Panel WFOE Receivables</u>

27.     The Sino-Panel WFOE receivables (totalling $42 million) are made up of sales of wood logs by Sino-Forest to nine (9) separate entities. All nine (9) of these entities were registered in the PRC.

28.     Since the commencement of the CCAA:

(a)     there have been minimal collections from outstanding Panel WFOE receivables; and

(b)     One (1) entity owing approximately $10 million in receivables for Sino-Panel WFOEs, has de-registered.

29.     FTI has attempted to make contact with the entities owing the Panel WFOE receivables by telephone, but has had limited success in communicating with these entities and has not received any meaningful information as to their status or intention to honour their receivables.

30.     FTI has also made discreet site visits to all nine (9) entities addresses of record and has found only two (2) of the entities are operational at the address of record. At the other seven (7) addresses, minimal operations or no evidence of existence of the entity was found.

*Prepayments and the Status of the Thai Redwood Transaction*

31.     In the course of both its standing timber and trading business, Sino-Forest made prepayments (or deposits) from time to time. These prepayments were generally either in



- 8 -

respect of wood log deposits (such as in the case of the Thai Redwood Transaction) for prepaid lease interests for standing timber, or for prepaid plantation costs.

32.    As of December 31, 2011, the financial statements of the Company show total prepayments of approximately $219 million, split between current and non-current as detailed below:

| Prepayments and Other Assets | Book Value | |
|---|---|---|
| | $ millions | % |
| **Current** | | |
| Prepaid Lease Payments | 7 | 9% |
| Wood Logs Deposits | 49 | 66% |
| Wood-Based Products Deposit | 2 | 3% |
| Other | 16 | 22% |
| **Total Current** | **74** | **100%** |
| **Non-Current** | | |
| Prepaid Lease Payments | 116 | 80% |
| Prepaid Plantation Costs | 24 | 17% |
| Deposit for acquisition | 2 | 1% |
| Other | 3 | 2% |
| **Total Non-Current** | **145** | **100%** |

| **Total** | **219** |
|---|---|

33.    The Company made allowances or impairment charges of approximately $135 million prior to closing the December 31, 2011 books.  Approximately $108 million of the allowance related to wood log deposits, a further $27 million related to prepaid plantation costs.

(a) Wood Log Deposits

34.    As noted above the Company has recorded an impairment charge of $108 million or roughly 70% of the outstanding wood log deposits at December 31, 2011.  Prior to the impairment charge the balance of wood log deposits was $157 million.  The log trading business of the Company was discontinued in April of this year, which is the reason the Company has provided for the impairment charge.

(b) Status of Thai Redwood Transaction

35.    The remaining balance of wood log deposits of $49 million, relates mainly to the Thai Redwood Transaction which was described in detail in the Sixth Report.

36.    Sino-Forest has taken additional steps in an attempt to recover its deposits paid to the supplier involved in Thai Redwood Transaction. These steps include:

(a)    Sino-Forest has successfully obtained an ex-parte freezing order over certain of the supplier's assets located in Hong Kong;

(b)    Sino-Forest has filed a request for Arbitration with the International Chamber of Commerce (the **"ICC"**) on August 28, 2012;

(c)    Demand letter has been sent to the supplier for the additional approximately $40 million that the suppliers owed to Sino-Forest; and

(d)    Sino-Forest and the relevant Supplier have agreed to hold further litigation in abeyance to allow for settlement discussions to take place in late October or early November.

(c)  Prepaid Lease Payments

37.    Historically, Sino-Forest made land lease payments for future periods in the normal course of its business.  Some of these prepayments were for significant periods of time in the future, in certain cases as much as 30 years.  Current Sino-Forest management has questioned this practice and has, in certain instances, refused to approve these disbursements.  Sino-Forest has not entered into further arrangements of this nature during the CCAA Proceedings.

38.    While, FTI has not examined the validity of the historical payments recorded in the books and records of the Company, certain land owners have alleged that they have not received amounts due under specific land leases even though these payments may have been made to third parties (referred to as "agents" by Sino-Forest). The Monitor understands that



litigation among the relevant Sino-Forest Subsidiary and such land owners is ongoing in the PRC.

(d)  Prepaid Plantation Costs

39.   Prepaid plantation costs are deposits which Sino-Forest has paid to third parties for partial acquisition costs of plantations.  Sino-Forest is contractually bound to pay the remainder of the plantation acquisition costs at some point in the future based on the acquisition contract.  Given the uncertainty surrounding the future operations of Sino-Forest, the Company has recorded an impairment charge against the amounts already paid as deposits.

40.   The Company recorded an impairment charge of approximately $27 million in December 2011, leaving a net balance of $24 million in their books and records at December 31, 2011.

*Inventory*

41.   The total inventory recorded in the books and records of the Company as at March 31, 2012 is as follows:

| Inventory | $000 |
|---|---|
| Raw Materials | $    3,627 |
| Work in Process | $  13,341 |
| Finished Goods | $  19,929 |
| Timber logs | $  26,581 |
| Nursery | $    2,406 |
| **Total** | $  65,884 |

42.   Sino-Forest is not purchasing any new timber and is attempting to sell all of its existing inventory.

*Timber Holdings*



43.     The Sixth Report set out the verification and validation efforts by the Company of its timber holdings. Specifically, the Sixth Report provided an overview of the verification efforts being undertaken by Indufor post-filing in respect of geo-referencing and digital mapping of compartments.

44.     As of December 31, 2011, the Company has recorded total timber holdings of approximately $3.4 billion (approximately 807k hectares):

| Forest Estate Category | Sino-Forest Reported Forest Estate Area as at 31 December 2011 (ha) | Book Value at December 31, 2011 ($000s) | Gross Area Detailed in the Purchase Contracts & Certificate Maps Supplied to Indufor (ha) | % of Hectares for which Maps have been provided by Company |
|---|---|---|---|---|
| WFOE Planted Timber and Leased Land | 50,697 | $134,634 | 46,951 | 93% |
| WFOE Purchased Timber and Leased Land | 31,371 | $83,310 | 13,780 | 44% |
| WFOE Purchased Timber Only without Land Leases entered | 71,577 | $190,084 | - | - |
| Mandra Purchased Timber and Leased Land | 132,695 | $58,107 | 84,826 | 64% |
| BVI Purchased Timber Only without Land Leased entered | 520,435 | $2,921,976 | 5,542 | 1% |
| **Total** | **806,775** | **$3,388,111** | **151,099** | 19% |

Note: The book value of the WFOE Timber is approximately $408 million at December 31, 2011, this amount has been allocated to the three WFOE categories above on a pro rata basis

45.     As detailed in the Sixth Report, the Company engaged Indufor Asia Pacific Ltd. ("**Indufor**") to conduct an area verification of the forestry estate of the Company.

46.     In order for Indufor to begin its area verification work it must be provided maps of the various compartments of land by Sino-Forest. To date:

(a)     Sino-Forest has been able to provide Indufor maps for the majority of the compartments which are on leased lands (i.e. WFOE Planted Timber and Leased Lands, WFOE Purchased Timber and Leased Lands and Mandra);

(b)     Sino-Forest has been able to produce less than 1% of the maps for compartments which do not include land leases; and

(c)     The maps that were provided in respect of the less than 1% or 5,542 hectares were provided by certain of the former senior management group of Sino-Forest.



47.     In the Second IC Report, the Independent Committee reported the potential consequences
        associated with not obtaining maps for non-leased lands (i.e. BVI Standing Timber),
        stating that it was not clear "how the Company would be able to identify the relevant
        areas of timber purchased by the BVI's at the time of sale or harvesting".

48.     In light of recent results from attempts at obtaining maps, FTI has been informed that
        Indufor has been instructed by Sino-Forest to discontinue further area verification work at
        the present time while Sino-Forest, FTI and the AHC continue to discuss the appropriate
        work to be done.

*Timber Suppliers*

49.     As set out in the Initial Order Affidavit and the Pre-Filing Report, Sino-Forest has a
        number of key relationships, which have been progressively breaking down since June
        2011 such as its relationships with Sino-Forest's "suppliers" ("**Suppliers**").  These are
        parties with whom Sino-Forest has entered into the purchase contracts for the timber
        assets.  The contracts entered into by Sino-Forest and the Suppliers contain numerous
        clauses compelling the Suppliers to assist Sino-Forest (which assistance can include
        providing land rights certificates, dealing with the land owners and other matters which
        are crucial to Sino-Forest's business operations).

50.     FTI in consultation with the Company and the AHC, has commenced efforts to contact
        nine (9) Suppliers who were responsible for supplying approximately 93% of the
        Company's total book value and area (hectares) of BVI Standing Timber and has sought
        to set up meetings with Suppliers.

51.     FTI has learned that two (2) of nine (9) Suppliers have de-registered, and has been unable
        to date to confirm the corporate existence of a third entity. FTI has attempted to contact
        all nine (9) Suppliers with the result being that the Suppliers have either been unreachable
        or have indicated they were unavailable until after the end of the PRC national holiday
        week (which ends on October 7, 2012).   Now that the holiday week is completed, efforts
        with these Suppliers will continue.



52. The Company, the AHC and FTI continue to assess the impact of the deterioration of these Supplier relationships on the Sino-Forest business and its future prospects as well as potential strategies (including legal strategies in the PRC) in that regard.

53. The Monitor notes from its review of the IC Reports that, in the course of its investigation, the Independent Committee also reported on the difficulty in receiving cooperation from AIs and Suppliers in connection with its investigation of Sino-Forest's relationships with such persons.

*Mandra Timber Holdings*

54. In 2010, the Company purchased Mandra for total consideration of approximately $263 million. As at December 31, 2011, management booked an impairment charge of approximately $212 million to the Mandra investment such that the net book value of Mandra as of March 31, 2012 was approximately $51 million.

55. Sino-Forest has expressed the following reasons for the impairment:

(a) Approximately $89 million of goodwill and intangibles was written off reflecting Sino-Forest's assessment of the deterioration of its business activities after MW and the uncertainty around the ability of the Company to implement its strategy with the Mandra asset; and

(b) Approximately $90 million of timber fair value was written off reflecting Sino-Forest's assessment of a lack of support from local government and a change in attitude since June 2011 in respect of obtaining plantation harvesting rights as well as swapping plantation assets.

56. The future viability of the Mandra timber holdings continues to be reviewed by Sino-Forest, FTI and the AHC.

FTI CONSULTING

*Management's Internal Financial Statements*

57.    As discussed earlier, the most current financial statements provided to FTI are December 31, 2011.  Management continues to work on consolidated internal financial statements for Q1 and Q2 2012.

*Cumulative Variance Analysis*

58.    The Sino-Forest Subsidiaries' net cash flows broken down by Sino-Forest's key operating lines, together with an explanation of key variances as compared to its forecast, is described below.  Actual net cash flows are for the period from March 30, 2012 to September 7, 2012:

| USD millions | Actual | Forecast | Difference |
|---|---|---|---|
| HK/BVI/Barbados | (20) | (11) | (9) |
| Sino-Wood | 7 | (15) | 22 |
| Sino-Panel | (18) | (64) | 46 |

59.    The key variances in actual receipts and disbursements as compared to forecast are:

(a)    HK/BVI/Barbados:

(i) The significant difference in actual versus forecast balances, is that the forecast assumed there would be revenue of $9.5 million from the sale of Thai Redwood in early September, however, the sale did not take place.  It should be noted that the forecast also assumed an additional $42.5 million of revenue from the sale of Thai Redwood in September and October 2012.

(b)    Sino-Wood

(i) The difference in Sino-Wood remains the same as reported in the Sixth Report. Business continues to be slow and so inflows are lower than

forecast, while expenditures (including capital expenditures) are also lower.

(c)    Sino-Panel

(i)   The difference between actual cash inflow/outflow and the forecast has deteriorated by approximately $7 million since the Sixth Report. The largest difference relates to the sale of Thai redwood which the Forecast assumed to be approximately $20 million, however, there has been no revenue from the sale of the Thai Redwood in the period. It should be noted that the forecast assumed an additional $53 million of revenue from the sale of Thai Redwood through the end of the year; and

(ii)  The forecast also assumed the purchase by Sino-Panel of approximately $20 million in Standing Timber in the period from July 21, 2012 to September 7, 2012. None of the Standing Timber was purchased.

60.    Sino-Forest is ahead of its estimated cash position at the present time.  As set out in the Sixth Report, the forecast was originally prepared primarily by certain of the former senior manager group of Sino-Forest and as such, the appropriateness of many forecasted disbursements have not been fully assessed.  This is particularly the case with respect to those disbursements that relate to future lease payments (discussed above).  FTI has and will continue to support delaying the payment of these amounts, including the prepayment of long term land leases, however it should be noted that they are in the books and records of Sino-forest and may need to be paid in the future.

**OPERATIONAL UPDATE REGARDING SINO-FOREST SUBSIDIARIES**

*Chops, Annual Review and Process to Change Legal Representatives*

61.    Issues relating to the legal representatives and chops (as set out in the Sixth Report) remain outstanding and have not been resolved.   However, Sino-Forest's PRC subsidiaries have now completed their annual reviews.

*Changes in Operations*



62.     Since the Sixth Report, there have been no significant operational changes in the business. With respect to the balance of Sino-Forest's businesses, the Monitor is aware of the following updates:

(a)     Sino-Forest is analyzing all aspects of their current business to ascertain if any functions should be wound down.  To date two subsidiaries have been identified as redundant and are in the process of being wound up.  It is fully expected that additional subsidiaries will also be identified as redundant and will be wound up in the near term; and

(b)     Sino-Forest is in the process of identifying real estate that can be leased/ sold for the purpose of realizing on empty premises.

*Engagement of an Independent Consultant*

63.     On September 5, 2012, Sino-Forest Subsidiaries engaged the services of an independent consultant to assist management in its restructuring activities and to help prepare an action plan for the post-plan implementation period. The consultant does not have any management responsibility or control over any Sino-Forest Subsidiaries' operations, assets, business or affairs.



Dated this 18th day of October, 2012.

FTI Consulting Canada Inc.
In its capacity as Monitor of
Sino-Forest Corporation, and not in its personal capacity

Greg Watson
Senior Managing Director



**706**

Court File No.: CV-12-9667-00CL

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c.C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**
(PROCEEDING COMMENCED AT TORONTO)

**TENTH REPORT OF THE MONITOR**

**GOWLING LAFLEUR HENDERSON** LLP
Barristers and Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto ON  M5X 1G5

**Derrick Tay (LSUC No. 21152A)**
Tel: (416) 369-7330 / Fax: (416) 862-7661
Email: derrick.tay@gowlings.com

**Jennifer Stam (LSUC No. 46735J)**
Tel: (416) 862-5697 / Fax: (416) 862-7661
Email: jennifer.stam@gowlings.com

Lawyers for the Monitor,
FTI Consulting Canada Inc.

## APPENDIX J – THE CLAIMS PROCEDURE ORDER

*(See Attached)*



Court File No. CV-12-9667-00CL



***ONTARIO***
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | MONDAY, THE 14th |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF MAY, 2012 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE AND ARRANGEMENT OF SINO-FOREST CORPORATION

### CLAIMS PROCEDURE ORDER

THIS MOTION, made by Sino-Forest Corporation (the "Applicant") for an order establishing a claims procedure for the identification and determination of certain claims was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the Applicant's Notice of Motion, the affidavit of W. Judson Martin sworn on May 2, 2012, the Second Report of FTI Consulting Canada Inc. (the "Monitor") dated April 30, 2012 (the "Monitor's Second Report") and the Supplemental Report to the Monitor's Second Report dated May 12, 2012 (the "Supplemental Report"), and on hearing the submissions of counsel for the Applicant, the Applicant's directors, the Monitor, the *ad hoc* committee of Noteholders (the "Ad Hoc Noteholders"), and those other parties present, no one appearing for the other parties served with the Applicant's Motion Record, although duly served as appears from the affidavit of service, filed:

**SERVICE**

1.       THIS COURT ORDERS that the time for service of the Notice of Motion, the Motion Record, the Monitor's Second Report and the Supplemental Report is hereby abridged and

validated such that this Motion is properly returnable today and hereby dispenses with further service thereof.

**DEFINITIONS AND INTERPRETATION**

2.      The following terms shall have the following meanings ascribed thereto:

> (a)     "2013 and 2016 Trustee" means The Bank of New York Mellon, in its capacity as trustee for the 2013 Notes and the 2016 Notes;

> (b)     "2014 and 2017 Trustee" means Law Debenture Trust Company of New York, in its capacity as trustee for the 2014 Notes and the 2017 Notes;

> (c)     "2013 Note Indenture" means the indenture dated as of July 23, 2008, by and between the Applicant, the entities listed as subsidiary guarantors thereto, and The Bank of New York Mellon, as trustee, as amended, modified or supplemented;

> (d)     "2014 Note Indenture" means the indenture dated as of July 27, 2009 entered into by and between the Applicant, the entities listed as subsidiary guarantors thereto, and Law Debenture Trust Company of New York, as trustee, as amended, modified or supplemented;

> (e)     "2016 Note Indenture" means the indenture dated as of December 17, 2009, by and between the Applicant, the entities listed as subsidiary guarantors thereto, and The Bank of New York Mellon, as trustee, as amended, modified or supplemented;

> (f)     "2017 Note Indenture" means the indenture dated as of October 21, 2010, by and between the Applicant, the entities listed as subsidiary guarantors thereto, and Law Debenture Trust Company of New York, as trustee, as amended, modified or supplemented;

> (g)     "2013 Notes" means the US$345,000,000 of 5.00% Convertible Senior Notes Due 2013 issued pursuant to the 2013 Note Indenture;

**709**

-3-

(h)    "2014 Notes" means the US$399,517,000 of 10.25% Guaranteed Senior Notes Due 2014 issued pursuant to the 2014 Note Indenture;

(i)    "2016 Notes" means the US$460,000,000 of 4.25% Convertible Senior Notes Due 2016 issued pursuant to the 2016 Note Indenture;

(j)    "2017 Notes" means the US$600,000,000 of 6.25% Guaranteed Senior Notes Due 2017 issued pursuant to the 2017 Note Indenture;

(k)    "Administration Charge" has the meaning given to that term in paragraph 37 of the Initial Order;

(l)    "BIA" means the Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, as amended;

(m)    "Business Day" means a day, other than a Saturday or a Sunday, on which banks are generally open for business in Toronto, Ontario;

(n)    "CCAA" means the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended;

(o)    "CCAA Proceedings" means the proceedings commenced by the Applicant in the Court under Court File No. CV-12-9667-00CL;

(p)    "CCAA Service List" means the service list in the CCAA Proceedings posted on the Monitor's Website, as amended from time to time;

(q)    "Claim" means:

(i)    any right or claim of any Person that may be asserted or made in whole or in part against the Applicant, whether or not asserted or made, in connection with any indebtedness, liability or obligation of any kind whatsoever, and any interest accrued thereon or costs payable in respect thereof, including by reason of the commission of a tort (intentional or unintentional), by reason of any breach of contract or other agreement

-4-

(oral or written), by reason of any breach of duty (including any legal, statutory, equitable or fiduciary duty) or by reason of any right of ownership of or title to property or assets or right to a trust or deemed trust (statutory, express, implied, resulting, constructive or otherwise), and whether or not any indebtedness, liability or obligation is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, unsecured, present or future, known or unknown, by guarantee, surety or otherwise, and whether or not any right or claim is executory or anticipatory in nature, including any right or ability of any Person (including Directors and Officers) to advance a claim for contribution or indemnity or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation, and any interest accrued thereon or costs payable in respect thereof (A) is based in whole or in part on facts prior to the Filing Date, (B) relates to a time period prior to the Filing Date, or (C) is a right or claim of any kind that would be a claim provable in bankruptcy within the meaning of the BIA had the Applicant become bankrupt on the Filing Date, or an Equity Claim (each a "Prefiling Claim", and collectively, the "Prefiling Claims");

(ii)     a Restructuring Claim; and

(iii)    a Secured Claim;

provided, however, that "Claim" shall not include an Excluded Claim, a D&O Claim or a D&O Indemnity Claim;

(r)    "Claimant" means any Person having a Claim, a D&O Claim or a D&O Indemnity Claim and includes the transferee or assignee of a Claim, a D&O Claim or a D&O Indemnity Claim transferred and recognized as a Claimant in accordance with paragraphs 46 and 47 hereof or a trustee, executor, liquidator, receiver, receiver and manager, or other Person acting on behalf of or through such Person;

(s)    "Claimants' Guide to Completing the D&O Proof of Claim" means the guide to completing the D&O Proof of Claim form, in substantially the form attached as Schedule "E-2" hereto;

(t)    "Claimants' Guide to Completing the Proof of Claim" means the guide to completing the Proof of Claim form, in substantially the form attached as Schedule "E" hereto;

(u)    "Claims Bar Date" means June 20, 2012;

(v)    "Class" means the National Class and the Quebec Class;

(w)    "Court" means the Ontario Superior Court of Justice (Commercial List);

(x)    "Creditors' Meeting" means any meeting of creditors called for the purpose of considering and voting in respect of the Plan, if one is filed, to be scheduled pursuant to further order of the Court;

(y)    "D&O Claim" means, other than an Excluded Claim, (i) any right or claim of any Person that may be asserted or made in whole or in part against one or more Directors or Officers that relates to a Claim for which such Directors or Officers are by law liable to pay in their capacity as Directors or Officers, or (ii) any right or claim of any Person that may be asserted or made in whole or in part against one or more Directors or Officers, in that capacity, whether or not asserted or made, in connection with any indebtedness, liability or obligation of any kind whatsoever, and any interest accrued thereon or costs payable in respect thereof, including by reason of the commission of a tort (intentional or unintentional), by reason of any breach of contract or other agreement (oral or written), by reason of any breach of duty (including any legal, statutory, equitable or fiduciary duty) or by reason of any right of ownership of or title to property or assets or right to a trust or deemed trust (statutory, express, implied, resulting, constructive or otherwise), and whether or not any indebtedness, liability or obligation, and any interest accrued thereon or costs payable in respect thereof, is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

disputed, undisputed, legal, equitable, secured, unsecured, present or future, known or unknown, by guarantee, surety or otherwise, and whether or not any right or claim is executory or anticipatory in nature, including any right or ability of any Person to advance a claim for contribution or indemnity from any such Directors or Officers or otherwise with respect to any matter, action, cause or chose in action, whether existing at present or commenced in the future, which indebtedness, liability or obligation, and any interest accrued thereon or costs payable in respect thereof (A) is based in whole or in part on facts prior to the Filing Date, or (B) relates to a time period prior to the Filing Date;

(z)     "D&O Indemnity Claim" means any existing or future right of any Director or Officer against the Applicant which arose or arises as a result of any Person filing a D&O Proof of Claim in respect of such Director or Officer for which such Director or Officer is entitled to be indemnified by the Applicant;

(aa)    "D&O Indemnity Claims Bar Date" has the meaning set forth in paragraph 19 of this Order;

(bb)    "D&O Indemnity Proof of Claim" means the indemnity proof of claim in substantially the form attached as Schedule "F" hereto to be completed and filed by a Director or Officer setting forth its purported D&O Indemnity Claim;

(cc)    "D&O Proof of Claim" means the proof of claim in substantially the form attached as Schedule "D-2" hereto to be completed and filed by a Person setting forth its purported D&O Claim and which shall include all supporting documentation in respect of such purported D&O Claim;

(dd)    "Directors" means anyone who is or was, or may be deemed to be or have been, whether by statute, operation of law or otherwise, a director or *de facto* director of the Applicant;

(ee)    "Directors' Charge" has the meaning given to that term in paragraph 26 of the Initial Order;

(ff)    "Dispute Notice" means a written notice to the Monitor, in substantially the form attached as Schedule "B" hereto, delivered to the Monitor by a Person who has received a Notice of Revision or Disallowance, of its intention to dispute such Notice of Revision or Disallowance;

(gg)    "Employee Amounts" means all outstanding wages, salaries and employee benefits (including, employee medical, dental, disability, life insurance and similar benefit plans or arrangements, incentive plans, share compensation plans and employee assistance programs and employee or employer contributions in respect of pension and other benefits), vacation pay, commissions, bonuses and other incentive payments, termination and severance payments, and employee expenses and reimbursements, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(hh)    "Equity Claim" has the meaning set forth in Section 2(1) of the CCAA;

(ii)    "Excluded Claim" means:

   (i)    any Claims entitled to the benefit of the Administration Charge or the Directors' Charge, or any further charge as may be ordered by the Court;

   (ii)    any Claims of the Subsidiaries against the Applicant;

   (iii)    any Claims of employees of the Applicant as at the Filing Date in respect of Employee Amounts;

   (iv)    any Post-Filing Claims;

   (v)    any Claims of the Ontario Securities Commission; and

   (vi)    any D&O Claims in respect of (i) though (v) above;

(jj)    "Filing Date" means March 30, 2012;

-8-

(kk)    "Government Authority" means a federal, provincial, territorial, municipal or other government or government department, agency or authority (including a court of law) having jurisdiction over the Applicant;

(ll)    "Initial Order" means the Initial order of the Honourable Mr. Justice Morawetz made March 30, 2012 in the CCAA Proceedings, as amended, restated or varied from time to time;

(mm)    "Known Claimants" means:

(i)    any Persons which, based upon the books and records of the Applicant, was owed monies by the Applicant as of the Filing Date and which monies remain unpaid in whole or in part;

(ii)    any Person who has commenced a legal proceeding in respect of a Claim or D&O Claim or given the Applicant written notice of an intention to commence a legal proceeding or a demand for payment in respect of a Claim or D&O Claim, provided that where a lawyer of record has been listed in connection with any such proceedings, the "Known Claimant" for the purposes of any notice required herein or to be given hereunder shall be, in addition to that Person, its lawyer of record; and

(iii)    any Person who is a party to a lease, contract, or other agreement or obligation of the Applicant which was restructured, terminated, repudiated or disclaimed by the Applicant between the Filing Date and the date of this Order;

(nn)    "Monitor's Website" has the meaning set forth in paragraph 12(a) of this Order;

(oo)    "National Class" has the meaning given to it in the Fresh As Amended Statement of Claim in the Ontario Class Action;

(pp)    "Note Indenture Trustees" means, collectively, the 2013 and 2016 Trustee and the 2014 and 2017 Trustee;

-9-

(qq)    "Notes" means, collectively, the 2013 Notes, the 2014 Notes, the 2016 Notes, and the 2017 Notes;

(rr)    "Noteholder" means a registered or beneficial holder on or after the Filing Date of a Note in that capacity, and, for greater certainty, does not include former registered or beneficial holders of Notes;

(ss)    "Notice of Revision or Disallowance" means a notice, in substantially the form attached as Schedule "A" hereto, advising a Person that the Monitor has revised or disallowed all or part of such Person's purported Claim, D&O Claim or D&O Indemnity Claim set out in such Person's Proof of Claim, D&O Proof of Claim or D&O Indemnity Proof of Claim;

(tt)    "Notice to Claimants" means the notice to Claimants for publication in substantially the form attached as Schedule "C" hereto;

(uu)    "Officers" means anyone who is or was, or may be deemed to be or have been, whether by statute, operation of law or otherwise, an officer or *de facto* officer of the Applicant;

(vv)    "Ontario Class Action: means the action commenced against the Applicant and others in the Ontario Superior Court of Justice, bearing (Toronto) Court File No. CV-11-431153-00CP;

(ww)    "Ontario Plaintiffs" means the Trustees of the Labourers' Pension Fund of Central and Eastern Canada and the other named Plaintiffs in the Ontario Class Action;

(xx)    "Person" is to be broadly interpreted and includes any individual, firm, corporation, limited or unlimited liability company, general or limited partnership, association, trust, unincorporated organization, joint venture, Government Authority or any agency, regulatory body, officer or instrumentality thereof or any other entity, wherever situate or domiciled, and whether or not having legal status, and whether acting on their own or in a representative capacity;

(yy)    "Plan" means any proposed plan of compromise or arrangement filed in respect of the Applicant pursuant to the CCAA as the same may be amended, supplemented or restated from time to time in accordance with its terms;

(zz)    "Post-Filing Claims" means any claims against the Applicant that arose from the provision of authorized goods and services provided or otherwise incurred on or after the Filing Date in the ordinary course of business, but specifically excluding any Restructuring Claim;

(aaa)   "Proof of Claim" means the proof of claim in substantially the form attached as Schedule "D" hereto to be completed and filed by a Person setting forth its purported Claim and which shall include all supporting documentation in respect of such purported Claim;

(bbb)   "Proof of Claim Document Package" means a document package that includes a copy of the Notice to Claimants, the Proof of Claim form, the D&O Proof of Claim form, the Claimants' Guide to Completing the Proof of Claim form, the Claimants' Guide to Completing the D&O Proof of Claim form, and such other materials as the Monitor, in consultation with the Applicant, may consider appropriate or desirable;

(ccc)   "Proven Claim" means the amount and Status of a Claim, D&O Claim or D&O Indemnity Claim of a Claimant as determined in accordance with this Order;

(ddd)   "Quebec Class" has the meaning given to it in the statement of claim in the Quebec Class Action;

(eee)   "Quebec Class Action" means the action commenced against the Applicant and others in the Quebec Superior Court, bearing Court File No. 200-06-000132-111 ;

(fff)   "Quebec Plaintiffs" means Guining Liu and the other named plaintiffs in the Quebec Class Action;

(ggg)   "Restructuring Claim" means any right or claim of any Person that may be asserted or made in whole or in part against the Applicant, whether or not asserted

-11-

or made, in connection with any indebtedness, liability or obligation of any kind arising out of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation on or after the Filing Date and whether such restructuring, termination, repudiation or disclaimer took place or takes place before or after the date of this Order;

(hhh)   "Restructuring Claims Bar Date" means, in respect of a Restructuring Claim, the later of (i) the Claims Bar Date, and (ii) 30 days after a Person is deemed to receive a Proof of Claim Document Package pursuant to paragraph 12(e) hereof.

(iii)   "Secured Claim" means that portion of a Claim that is (i) secured by security validly charging or encumbering property or assets of the Applicant (including statutory and possessor liens that create security interests) up to the value of such collateral, and (ii) duly and properly perfected in accordance with the relevant legislation in the appropriate jurisdiction as of the Filing Date;

(jjj)   "Status" means, with respect to a Claim, D&O Claim or D&O Indemnity Claim, or a purported Claim, D&O Claim or D&O Indemnity Claim, whether such claim is secured or unsecured; and

(kkk)   "Subsidiaries" means all direct and indirect subsidiaries of the Applicant other than Greenheart Group Limited (Bermuda) and its direct and indirect subsidiaries, and "Subsidiary" means any one of the Subsidiaries.

3.   THIS COURT ORDERS that all references as to time herein shall mean local time in Toronto, Ontario, Canada, and any reference to an event occurring on a Business Day shall mean prior to 5:00 p.m. on such Business Day unless otherwise indicated herein.

4.   THIS COURT ORDERS that all references to the word "including" shall mean "including without limitation".

5.   THIS COURT ORDERS that all references to the singular herein include the plural, the plural include the singular, and any gender includes the other gender.

## GENERAL PROVISIONS

6.      THIS COURT ORDERS that the Monitor, in consultation with the Applicant, is hereby authorized to use reasonable discretion as to the adequacy of compliance with respect to the manner in which forms delivered hereunder are completed and executed, and may, where it is satisfied that a Claim, a D&O Claim or a D&O Indemnity Claim has been adequately proven, waive strict compliance with the requirements of this Order as to completion and execution of such forms and to request any further documentation from a Person that the Monitor, in consultation with the Applicant, may require in order to enable it to determine the validity of a Claim, a D&O Claim or a D&O Indemnity Claim.

7.      THIS COURT ORDERS that if any purported Claim, D&O Claim or D&O Indemnity Claim arose in a currency other than Canadian dollars, then the Person making the purported Claim, D&O Claim or D&O Indemnity Claim shall complete its Proof of Claim, D&O Proof of Claim or D&O Indemnity Proof of Claim, as applicable, indicating the amount of the purported Claim, D&O Claim or D&O Indemnity Claim in such currency, rather than in Canadian dollars or any other currency. The Monitor shall subsequently calculate the amount of such purported Claim, D&O Claim or D&O Indemnity Claim in Canadian Dollars, using the Reuters closing rate on the Filing Date (as found at http://www.reuters.com/finance/currencies), without prejudice to a different exchange rate being proposed in any Plan.

8.      THIS COURT ORDERS that a Person making a purported Claim, D&O Claim or D&O Indemnity Claim shall complete its Proof of Claim, D&O Proof of Claim or Indemnity Proof of Claim, as applicable, indicating the amount of the purported Claim, D&O Claim or D&O Indemnity Claim without including any interest and penalties that would otherwise accrue after the Filing Date.

9.      THIS COURT ORDERS that the form and substance of each of the Notice of Revision or Disallowance, Dispute Notice, Notice to Claimants, the Proof of Claim, the D&O Proof of Claim, the Claimants' Guide to Completing the Proof of Claim, the Claimants' Guide to Completing the D&O Proof of Claim, and D&O Indemnity Proof of Claim substantially in the forms attached as Schedules "A", "B", "C", "D", "D-2", "E", "E-2" and "F" respectively to this Order are hereby approved. Notwithstanding the foregoing, the Monitor, in consultation with the

Applicant, may from time to time make minor non-substantive changes to such forms as the Monitor, in consultation with the Applicant, considers necessary or advisable.

## MONITOR'S ROLE

10.     THIS COURT ORDERS that the Monitor, in addition to its prescribed rights, duties, responsibilities and obligations under the CCAA and under the Initial Order, is hereby directed and empowered to take such other actions and fulfill such other roles as are authorized by this Order or incidental thereto.

11.     THIS COURT ORDERS that (i) in carrying out the terms of this Order, the Monitor shall have all of the protections given to it by the CCAA, the Initial Order, and this Order, or as an officer of the Court, including the stay of proceedings in its favour, (ii) the Monitor shall incur no liability or obligation as a result of the carrying out of the provisions of this Order, (iii) the Monitor shall be entitled to rely on the books and records of the Applicant and any information provided by the Applicant, all without independent investigation, and (iv) the Monitor shall not be liable for any claims or damages resulting from any errors or omissions in such books, records or information.

## NOTICE TO CLAIMANTS, DIRECTORS AND OFFICERS

12.     THIS COURT ORDERS that:

(a)     the Monitor shall no later than five (5) Business Days following the making of this Order, post a copy of the Proof of Claim Document Package on its website at http://cfcanada.fticonsulting.com/sfc ("Monitor's Website");

(b)     the Monitor shall no later than five (5) Business Days following the making of this Order, send on behalf of the Applicant to the Note Indenture Trustees (or to counsel for the Note Indenture Trustees as appears on the CCAA Service List if applicable) a copy of the Proof of Claim Document Package;

(c)     the Monitor shall no later than five (5) Business Days following the making of this Order, send on behalf of the Applicant to each of the Known Claimants a copy of the Proof of Claim Document Package, provided however that the

-14-

Monitor is not required to send Proof of Claim Document Packages to
Noteholders;

(d)     the Monitor shall no later than five (5) Business Days following the making of
this Order, cause the Notice to Claimants to be published in (i) The Globe and
Mail newspaper (National Edition) on one such day, and (ii) the Wall Street
Journal (Global Edition) on one such day;

(e)     with respect to Restructuring Claims arising from the restructuring, termination,
repudiation or disclaimer of any lease, contract, or other agreement or obligation,
the Monitor shall send to the counterparty(ies) to such lease, contract, or other
agreement or obligation a Proof of Claim Document Package no later than five (5)
Business Days following the time the Monitor becomes aware of the
restructuring, termination, repudiation or disclaimer of any such lease, contract, or
other agreement or obligation;

(f)     the Monitor shall, provided such request is received by the Monitor prior to the
Claims Bar Date, deliver as soon as reasonably possible following receipt of a
request therefor a copy of the Proof of Claim Document Package to any Person
requesting such material; and

(g)     the Monitor shall send to any Director of Officer named in a D&O Proof of Claim
received by the Claims Bar Date a copy of such D&O Proof of Claim as soon as
practicable along with an D&O Indemnity Proof of Claim form, with a copy to
counsel for such Directors or Officers.

13.     THIS COURT ORDERS that the Applicant shall (i) inform the Monitor of all Known
Claimants by providing the Monitor with a list of all Known Claimants and their last known
addresses according to the books and records of the Applicant and (ii) provide the Monitor with a
list of all Directors and Officers and their last known addresses according to the books and
records of the Applicant.

14.     THIS COURT ORDERS that, except as otherwise set out in this Order or other orders of
the Court, neither the Monitor nor the Applicant is under any obligation to send notice to any

-15-

Person holding a Claim, a D&O Claim or a D&O Indemnity Claim, and without limitation, neither the Monitor nor the Applicant shall have any obligation to send notice to any Person having a security interest in a Claim, D&O Claim or D&O Indemnity Claim (including the holder of a security interest created by way of a pledge or a security interest created by way of an assignment of a Claim, D&O Claim or D&O Indemnity Claim), and all Persons (including Known Claimants) shall be bound by any notices published pursuant to paragraphs 12(a) and 12(d) of this Order regardless of whether or not they received actual notice, and any steps taken in respect of any Claim, D&O Claim or D&O Indemnity Claim in accordance with this Order.

15.    THIS COURT ORDERS that the delivery of a Proof of Claim, D&O Proof of Claim, or D&O Indemnity Proof of Claim by the Monitor to a Person shall not constitute an admission by the Applicant or the Monitor of any liability of the Applicant or any Director of Officer to any Person.

**CLAIMS BAR DATES**

*Claims and D&O Claims*

16.    THIS COURT ORDERS that (i) Proofs of Claim (but not in respect of any Restructuring Claims) and D&O Proofs of Claim shall be filed with the Monitor on or before the Claims Bar Date, and (ii) Proofs of Claim in respect of Restructuring Claims shall be filed with the Monitor on or before the Restructuring Claims Bar Date.  For the avoidance of doubt, a Proof of Claim or D&O Proof of Claim, as applicable, must be filed in respect of every Claim or D&O Claim, regardless of whether or not a legal proceeding in respect of a Claim or D&O Claim was commenced prior to the Filing Date.

17.    THIS COURT ORDERS that any Person that does not file a Proof of Claim as provided for herein such that the Proof of Claim is received by the Monitor on or before the Claims Bar Date or the Restructuring Claims Bar Date, as applicable, (a) shall be and is hereby forever barred from making or enforcing such Claim against the Applicant and all such Claims shall be forever extinguished; (b) shall be and is hereby forever barred from making or enforcing such Claim as against any other Person who could claim contribution or indemnity from the Applicant; (c) shall not be entitled to vote such Claim at the Creditors' Meeting in respect of the

Plan or to receive any distribution thereunder in respect of such Claim; and (d) shall not be entitled to any further notice in, and shall not be entitled to participate as a Claimant or creditor in, the CCAA Proceedings in respect of such Claim.

18.     THIS COURT ORDERS that any Person that does not file a D&O Proof of Claim as provided for herein such that the D&O Proof of Claim is received by the Monitor on or before the Claims Bar Date (a) shall be and is hereby forever barred from making or enforcing such D&O Claim against any Directors or Officers, and all such D&O Claims shall be forever extinguished; (b) shall be and is hereby forever barred from making or enforcing such D&O Claim as against any other Person who could claim contribution or indemnity from any Directors or Officers; (c) shall not be entitled to vote such D&O Claim at the Creditors' Meeting or to receive any distribution in respect of such D&O Claim; and (d) shall not be entitled to any further notice in, and shall not be entitled to participate as a Claimant or creditor in, the CCAA Proceedings in respect of such D&O Claim.

*D&O Indemnity Claims*

19.     THIS COURT ORDERS that any Director of Officer wishing to assert a D&O Indemnity Claim shall deliver a D&O Indemnity Proof of Claim to the Monitor so that it is received by no later than fifteen (15) Business Days after the date of receipt of the D&O Proof of Claim by such Director or Officer pursuant to paragraph 12(g) hereof (with respect to each D&O Indemnity Claim, the "D&O Indemnity Claims Bar Date").

20.     THIS COURT ORDERS that any Director of Officer that does not file a D&O Indemnity Proof of Claim as provided for herein such that the D&O Indemnity Proof of Claim is received by the Monitor on or before the D&O Indemnity Claims Bar Date (a) shall be and is hereby forever barred from making or enforcing such D&O Indemnity Claim against the Applicant, and such D&O Indemnity Claim shall be forever extinguished; (b) shall be and is hereby forever barred from making or enforcing such D&O Indemnity Claim as against any other Person who could claim contribution or indemnity from the Applicant; and (c) shall not be entitled to vote such D&O Indemnity Claim at the Creditors' Meeting or to receive any distribution in respect of such D&O Indemnity Claim.

*Excluded Claims*

21.    THIS COURT ORDERS that Persons with Excluded Claims shall not be required to file
a Proof of Claim in this process in respect of such Excluded Claims, unless required to do so by
further order of the Court.

**PROOFS OF CLAIM**

22.    THIS COURT ORDERS that (i) each Person shall include any and all Claims it asserts
against the Applicant in a single Proof of Claim, provided however that where a Person has taken
assignment or transfer of a purported Claim after the Filing Date, that Person shall file a separate
Proof of Claim for each such assigned or transferred purported Claim, and (ii) each Person that
has or intends to assert a right or claim against one or more Subsidiaries which is based in whole
or in part on facts, underlying transactions, causes of action or events relating to a purported
Claim made against the Applicant shall so indicate on such Claimant's Proof of Claim.

23.    THIS COURT ORDERS that each Person shall include any and all D&O Claims it
asserts against one or more Directors or Officers in a single D&O Proof of Claim, provided
however that where a Person has taken assignment or transfer of a purported D&O Claim after
the Filing Date, that Person shall file a separate D&O Proof of Claim for each such assigned or
transferred purported D&O Claim.

24.    THIS COURT ORDERS that the 2013 and 2016 Trustee is authorized and directed to file
one Proof of Claim on or before the Claims Bar Date in respect of each of the 2013 Notes and
the 2016 Notes, indicating the amount owing on an aggregate basis as at the Filing Date under
each of the 2013 Note Indenture and the 2016 Note Indenture.

25.    THIS COURT ORDERS that the 2014 and 2017 Trustee is authorized and directed to file
one Proof of Claim on or before the Claims Bar Date in respect of each of the 2014 Notes and
the 2017 Notes, indicating the amount owing on an aggregate basis as at the Filing Date under
each of the 2014 Note Indenture and the 2017 Note Indenture.

26.    Notwithstanding any other provisions of this Order, Noteholders are not required to file
individual Proofs of Claim in respect of Claims relating solely to the debt evidenced by their

**724**

-18-

Notes.   The Monitor may disregard any Proofs of Claim filed by any individual Noteholder claiming the debt evidenced by the Notes, and such Proofs of Claim shall be ineffective for all purposes.   The process for determining each individual Noteholder's Claim for voting and distribution purposes with respect to the Plan and the process for voting on the Plan by Noteholders will be established by further order of the Court.

27.    THIS COURT ORDERS that the Ontario Plaintiffs are, collectively, authorized to file, on or before the Claims Bar Date, one Proof of Claim and, if applicable, one D&O Proof of Claim, in respect of the substance of the matters set out in the Ontario Class Action, notwithstanding that leave to make a secondary market liability claim has not be granted and that the National Class has not yet been certified, and that members of the National Class may rely on the one Proof of Claim and/or one D&O Proof of Claim filed by the counsel for the Ontario Plaintiffs and are not required to file individual Proofs of Claim or D&O Proofs of Claim in respect of the Claims forming the subject matter of the Ontario Class Action.

28.    THIS COURT ORDERS that the Quebec Plaintiffs are, collectively, authorized to file, on or before the Claims Bar Date, one Proof of Claim and, if applicable, one D&O Proof of Claim, in respect of the substance of the matters set out in the Quebec Class Action, notwithstanding that leave to make a secondary market liability claim has not be granted and that the Quebec Class has not yet been certified, and that members of the Quebec Class may rely on the one Proof of Claim and/or one D&O Proof of Claim filed by the counsel for the Quebec Plaintiffs and are not required to file individual Proofs of Claim or D&O Proofs of Claim in respect of the Claims forming the subject matter of the Quebec Class Action.

**REVIEW OF PROOFS OF CLAIM**

29.    THIS COURT ORDERS that any Claimant filing a Proof of Claim, D&O Proof of Claim or D&O Indemnity Proof of Claim shall clearly mark as "Confidential" any documents or portions thereof that that Person believes should be treated as confidential.

30.    THIS COURT ORDERS that with respect to documents or portions thereof that are marked "Confidential", the following shall apply:

-19-

(a)      any information that is otherwise publicly available shall not be treated as "Confidential" regardless of whether it is marked as such;

(b)      subject to the following, such information will be accessible to and may be reviewed only by the Monitor, the Applicant, any Director or Officer named in the applicable D&O Proof of Claim or D&O Indemnity Proof of Claim and each of their respective counsel, or as otherwise ordered by the Court ("**Designated Persons**") or consented to by the Claimant, acting reasonably; and

(c)      any Designated Person may provide Confidential Information to other interested stakeholders (who shall have provided non-disclosure undertakings or agreements) on not less than 3 Business Days' notice to the Claimant.  If such Claimant objects to such disclosure, the Claimant and the relevant Designated Person shall attempt to settle any objection, failing which, either party may seek direction from the Court.

31.      THIS COURT ORDERS that the Monitor (in consultation with the Applicant and the Directors and Officers named in the D&O Proof of Claim, as applicable), subject to the terms of this Order, shall review all Proofs of Claim and D&O Proofs of Claim filed, and at any time:

(a)      may request additional information from a purported Claimant;

(b)      may request that a purported Claimant file a revised Proof of Claim or D&O Proof of Claim, as applicable;

(c)      may, with the consent of the Applicant and any Person whose liability may be affected or further order of the Court, attempt to resolve and settle any issue arising in a Proof of Claim or D&O Proof of Claim or in respect of a purported Claim or D&O Claim, provided that if a Director or Officer disputes all or any portion of a purported D&O Claim, then the disputed portion of such purported D&O Claim may not be resolved or settled without such Director or Officer's consent or further order of the Court;

(d)    may, with the consent of the Applicant and any Person whose liability may be affected or further order of the Court, accept (in whole or in part) the amount and/or Status of any Claim or D&O Claim, provided that if a Director or Officer disputes all or any portion of a purported D&O Claim against such Director or Officer, then the disputed portion of such purported D&O Claim may not be accepted without such Director or Officer's consent or further order of the Court; and

(e)    may by notice in writing revise or disallow (in whole or in part) the amount and/or Status of any purported Claim or D&O Claim.

32.    THIS COURT ORDERS that where a Claim or D&O Claim has been accepted by the Monitor in accordance with this Order, such Claim or D&O Claim shall constitute such Claimant's Proven Claim. The acceptance of any Claim or D&O Claim or other determination of same in accordance with this Order, in full or in part, shall not constitute an admission of any fact, thing, liability, or quantum or status of any claim by any Person, save and except in the context of the CCAA Proceedings, and, for greater certainty, shall not constitute an admission of any fact, thing, liability, or quantum or status of any claim by any Person as against any Subsidiary.

33.    THIS COURT ORDERS that where a purported Claim or D&O Claim is revised or disallowed (in whole or in part, and whether as to amount and/or Status), the Monitor shall deliver to the purported Claimant a Notice of Revision or Disallowance, attaching the form of Dispute Notice.

34.    THIS COURT ORDERS that where a purported Claim or D&O Claim has been revised or disallowed (in whole or in part, and whether as to amount and/or as to Status), the revised or disallowed purported Claim or D&O Claim (or revised or disallowed portion thereof) shall not be a Proven Claim until determined otherwise in accordance with the procedures set out in paragraphs 42 to 45 hereof or as otherwise ordered by the Court.

## REVIEW OF D&O INDEMNITY PROOFS OF CLAIM

35.     THIS COURT ORDERS that the Monitor, subject to the terms of this Order, shall review
all D&O Indemnity Proofs of Claim filed, and at any time:

> (a)     may request additional information from a Director of Officer;
>
> (b)     may request that a Director or Officer file a revised D&O Indemnity Proof of
> Claim;
>
> (c)     may attempt to resolve and settle any issue arising in a D&O Indemnity Proof of
> Claim or in respect of a purported D&O Indemnity Claim;
>
> (d)     may accept (in whole or in part) the amount and/or Status of any D&O Indemnity
> Claim; and
>
> (e)     may by notice in writing revise or disallow (in whole or in part) the amount
> and/or Status of any purported D&O Indemnity Claim.

36.     THIS COURT ORDERS that where a D&O Indemnity Claim has been accepted by the
Monitor in accordance with this Order, such D&O Indemnity Claim shall constitute such
Director or Officer's Proven Claim.  The acceptance of any D&O Indemnity Claim or other
determination of same in accordance with this Order, in full or in part, shall not constitute an
admission of any fact, thing, liability, or quantum or Status of any claim by any Person, save and
except in the context of the CCAA Proceedings, and, for greater certainty, shall not constitute an
admission of any fact, thing, liability, or quantum or Status of any claim by any Person as against
any Subsidiary.

37.     THIS COURT ORDERS that where a purported D&O Indemnity Claim is revised or
disallowed (in whole or in part, and whether as to amount and/or Status), the Monitor shall
deliver to the Director or Officer a Notice of Revision or Disallowance, attaching the form of
Dispute Notice.

38.     THIS COURT ORDERS that where a purported D&O Indemnity Claim has been revised
or disallowed (in whole or in part, and whether as to amount and/or as to Status), the revised or

-22-

disallowed purported D&O Indemnity Claim (or revised or disallowed portion thereof) shall not be a Proven Claim until determined otherwise in accordance with the procedures set out in paragraphs 42 to 45 hereof or as otherwise ordered by the Court.

39.    THIS COURT ORDERS that, notwithstanding anything to the contrary in this Order, in respect of any Claim, D&O Claim or D&O Indemnity Claim that exceeds $1 million, the Monitor and the Applicant shall not accept, admit, settle, resolve, value (for any purpose), revise or reject such Claim, D&O Claim or D&O Indemnity Claim ~~without the consent of the Ad Hoc Noteholders or~~ Order of the Court.      _without_

## DISPUTE NOTICE

40.    THIS COURT ORDERS that a purported Claimant who intends to dispute a Notice of Revision or Disallowance shall file a Dispute Notice with the Monitor as soon as reasonably possible but in any event such that such Dispute Notice shall be received by the Monitor on the day that is fourteen (14) days after such purported Claimant is deemed to have received the Notice of Revision or Disallowance in accordance with paragraph 50 of this Order.  The filing of a Dispute Notice with the Monitor within the fourteen (14) day period specified in this paragraph shall constitute an application to have the amount or Status of such claim determined as set out in paragraphs 42 to 45 of this Order.

41.    THIS COURT ORDERS that where a purported Claimant that receives a Notice of Revision or Disallowance fails to file a Dispute Notice with the Monitor within the time period provided therefor in this Order, the amount and Status of such purported Claimant's purported Claim, D&O  Claim or D&O Indemnity Claim, as applicable, shall be deemed to be as set out in the Notice of Revision or Disallowance and such amount and Status, if any, shall constitute such purported Claimant's Proven Claim, and the balance of such purported Claimant's purported Claim, D&O Claim, or D&O Indemnity Claim, if any, shall be forever barred and extinguished.

## RESOLUTION OF CLAIMS, D&O CLAIMS AND D&O INDEMNITY CLAIMS

42.    THIS COURT ORDERS that as soon as practicable after the delivery of the Dispute Notice to the Monitor, the Monitor, in accordance with paragraph 31(c), shall attempt to resolve and settle the purported Claim or D&O Claim with the purported Claimant.

43.    THIS COURT ORDERS that as soon as practicable after the delivery of the Dispute
Notice in respect of a D&O Indemnity Claim to the Monitor, the Monitor, in accordance with
paragraph 35(c), shall attempt to resolve and settle the purported D&O Indemnity Claim with the
Director or Officer.

44.    THIS COURT ORDERS that in the event that a dispute raised in a Dispute Notice is not
settled within a time period or in a manner satisfactory to the Monitor, the Applicant and the
applicable Claimant, the Monitor shall seek direction from the Court, on the correct process for
resolution of the dispute.  Without limitation, the foregoing includes any dispute arising as to
whether a Claim is or is not an "equity claim" as defined in the CCAA.

45.    THIS COURT ORDERS that any Claims and related D&O Claims and/or D&O
Indemnity Claims shall be determined at the same time and in the same proceeding.

**NOTICE OF TRANSFEREES**

46.    THIS COURT ORDERS that neither the Monitor nor the Applicant shall be obligated to
send notice to or otherwise deal with a transferee or assignee of a Claim, D&O Claim or D&O
Indemnity Claim as the Claimant in respect thereof unless and until (i) actual written notice of
transfer or assignment, together with satisfactory evidence of such transfer or assignment, shall
have been received by the Monitor and the Applicant, and (ii) the Monitor shall have
acknowledged in writing such transfer or assignment, and thereafter such transferee or assignee
shall for all purposes hereof constitute the "Claimant" in respect of such Claim, D&O Claim or
D&O Indemnity Claim.  Any such transferee or assignee of a Claim, D&O Claim or D&O
Indemnity Claim, and such Claim, D&O Claim or D&O Indemnity Claim shall be bound by all
notices given or steps taken in respect of such Claim, D&O Claim or D&O Indemnity Claim in
accordance with this Order prior to the written acknowledgement by the Monitor of such transfer
or assignment.

47.    THIS COURT ORDERS that if the holder of a Claim, D&O Claim or D&O Indemnity
Claim has transferred or assigned the whole of such Claim, D&O Claim or D&O Indemnity
Claim to more than one Person or part of such Claim, D&O Claim or D&O Indemnity Claim to
another Person or Persons, such transfer or assignment shall not create a separate Claim, D&O

-24-

Claim or D&O Indemnity Claim and such Claim, D&O Claim or D&O Indemnity Claim shall continue to constitute and be dealt with as a single Claim, D&O Claim or D&O Indemnity Claim notwithstanding such transfer or assignment, and the Monitor and the Applicant shall in each such case not be bound to acknowledge or recognize any such transfer or assignment and shall be entitled to send notice to and to otherwise deal with such Claim, D&O Claim or D&O Indemnity Claim only as a whole and then only to and with the Person last holding such Claim, D&O Claim or D&O Indemnity Claim in whole as the Claimant in respect of such Claim, D&O Claim or D&O Indemnity Claim. Provided that a transfer or assignment of the Claim, D&O Claim or D&O Indemnity Claim has taken place in accordance with paragraph 46 of this Order and the Monitor has acknowledged in writing such transfer or assignment, the Person last holding such Claim, D&O Claim or D&O Indemnity Claim in whole as the Claimant in respect of such Claim, D&O Claim or D&O Indemnity Claim may by notice in writing to the Monitor direct that subsequent dealings in respect of such Claim, D&O Claim or D&O Indemnity Claim, but only as a whole, shall be with a specified Person and, in such event, such Claimant, transferee or assignee of the Claim, D&O Claim or D&O Indemnity Claim shall be bound by any notices given or steps taken in respect of such Claim, D&O Claim or D&O Indemnity Claim by or with respect to such Person in accordance with this Order.

48.     THIS COURT ORDERS that the transferee or assignee of any Claim, D&O Claim or D&O Indemnity Claim (i) shall take the Claim, D&O Claim or D&O Indemnity Claim subject to the rights and obligations of the transferor/assignor of the Claim, D&O Claim or D&O Indemnity Claim, and subject to the rights of the Applicant or Director or Officer against any such transferor or assignor, including any rights of set-off which the Applicant, Director or Officers had against such transferor or assignor, and (ii) cannot use any transferred or assigned Claim, D&O Claim or D&O Indemnity Claim to reduce any amount owing by the transferee or assignee to the Applicant, Director or Officer, whether by way of set off, application, merger, consolidation or otherwise.

## DIRECTIONS

49.    THIS COURT ORDERS that the Monitor, the Applicant and any Person (but only to the extent such Person may be affected with respect to the issue on which directions are sought) may, at any time, and with such notice as the Court may require, seek directions from the Court with respect to this Order and the claims process set out herein, including the forms attached as Schedules hereto.

## SERVICE AND NOTICE

50.    THIS COURT ORDERS that the Monitor and the Applicant may, unless otherwise specified by this Order, serve and deliver the Proof of Claim Document Package, and any letters, notices or other documents to Claimants, purported Claimants, Directors or Officers, or other interested Persons, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission to such Persons (with copies to their counsel as appears on the CCAA Service List if applicable) at the address as last shown on the records of the Applicant or set out in such Person's Proof of Claim, D&O Proof of Claim or D&O Indemnity Proof of Claim. Any such service or notice by courier, personal delivery or electronic or digital transmission shall be deemed to have been received: (i) if sent by ordinary mail, on the third Business Day after mailing within Ontario, the fifth Business Day after mailing within Canada (other than within Ontario), and the tenth Business Day after mailing internationally; (ii) if sent by courier or personal delivery, on the next Business Day following dispatch; and (iii) if delivered by electronic or digital transmission by 6:00 p.m. on a Business Day, on such Business Day, and if delivered after 6:00 p.m. or other than on a Business Day, on the following Business Day. Notwithstanding anything to the contrary in this paragraph 50, Notices of Revision or Disallowance shall be sent only by (i) facsimile to a number that has been provided in writing by the purported Claimant, Director or Officer, or (ii) courier.

51.    THIS COURT ORDERS that any notice or other communication (including Proofs of Claim, D&O Proofs of Claims, D&O Indemnity Proofs of Claim and Notices of Dispute) to be given under this Order by any Person to the Monitor shall be in writing in substantially the form, if any, provided for in this Order and will be sufficiently given only if delivered by prepaid registered mail, courier, personal delivery or electronic or digital transmission addressed to:

-26-

FTI Consulting Canada Inc.
Court-appointed Monitor of Sino-Forest Corporation
TD Waterhouse Tower
79 Wellington Street West
Suite 2010, P.O. Box 104
Toronto, Ontario  M5K 1G8

Attention: Jodi Porepa
Telephone: (416) 649-8094
E-mail: sfc@fticonsulting.com

Any such notice or other communication by a Person shall be deemed received only upon actual
receipt thereof during normal business hours on a Business Day, or if delivered outside of a
normal business hours, the next Business Day.

52.   THIS COURT ORDERS that if during any period during which notices or other
communications are being given pursuant to this Order a postal strike or postal work stoppage of
general application should occur, such notices or other communications sent by ordinary mail
and then not received shall not, absent further Order of the Court, be effective and notices and
other communications given hereunder during the course of any such postal strike or work
stoppage of general application shall only be effective if given by courier, personal delivery or
electronic or digital transmission in accordance with this Order.

53.   THIS COURT ORDERS that in the event that this Order is later amended by further
order of the Court, the Monitor shall post such further order on the Monitor's Website and such
posting shall constitute adequate notice of such amended claims procedure.

**MISCELLANEOUS**

54.   THIS COURT ORDERS that notwithstanding any other provision of this Order, the
solicitation of Proofs of Claim, D&O Proofs of Claim and D&O Indemnity Proofs of Claim and
the filing by a Person of any Proof of Claim, D&O Proof of Claim or D&O Indemnity Proof of
Claim shall not, for that reason only, grant any Person any standing in the CCAA Proceedings or
rights under the Plan.

55.   THIS COURT ORDERS that the rights of the Ontario Plaintiffs and the Quebec Plaintiffs
granted pursuant to paragraphs 27 and 28 of this Order are limited to filing a single Proof of

*quantification,*

-27-

Claim and, if applicable, a single D&O Proof in respect of each of the National Class and the Quebec Class in these proceedings, and not for any other purpose. Without limiting the generality of the foregoing, the filing of any Proof of Claim or D&O Proof of Claim by the Ontario Plaintiffs or the Quebec Plaintiffs pursuant to this Order:

(a)     is not an admission or recognition of their right to represent the Class for any other purpose, including with respect to settlement or voting in these proceedings, the Ontario Class Action or the Quebec Class Action; and

(b)     is without prejudice to the right of the Ontario Plaintiffs and the Quebec Plaintiffs or their counsel to seek an order granting them rights of representation in these proceedings, the Ontario Class Action or the Quebec Class Action.

56.     THIS COURT ORDERS that nothing in this Order shall constitute or be deemed to constitute an allocation or assignment of Claims, D&O Claims, D&O Indemnity Claims, or Excluded Claims into particular affected or unaffected classes for the purpose of a Plan and, for greater certainty, the treatment of Claims, D&O Claims, D&O Indemnity Claims, Excluded Claims or any other claims are to be subject to a Plan and the class or classes of creditors for voting and distribution purposes shall be subject to the terms of any proposed Plan or further Order of the Court.

57.     THIS COURT ORDERS that nothing in this Order shall prejudice the rights and remedies of any Directors or Officers or other persons under any existing Director and Officers or other insurance policy or prevent or bar any Person from seeking recourse against or payment from the Applicant's insurance and any Director's and/or Officer's liability insurance policy or policies that exist to protect or indemnify the Directors and/or Officers or other persons, whether such recourse or payment is sought directly by the Person asserting a Claim or a D&O Claim from the insurer or derivatively through the Director or Officer or Applicant; provided, however, that nothing in this Order shall create any rights in favour of such Person under any policies of insurance nor shall anything in this Order limit, remove, modify or alter any defence to such claim available to the insurer pursuant to the provisions of any insurance policy or at law.

-28-

58.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, Barbados, the British Virgin Islands, Cayman Islands, Hong Kong, the People's Republic of China or in any other foreign jurisdiction, to give effect to this Order and to assist the Applicant, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicant and to the Monitor, as an officer of the Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicant and the Monitor and their respective agents in carrying out the terms of this Order.

MAY 14 2012

LE / DANS LE REGISTRE NO.:
ON / BOOK NO.:
ENTERED AT / INSCRIT A TORONTO

## SCHEDULE "A"

### NOTICE OF REVISION OR DISALLOWANCE

**For Persons that have asserted Claims against Sino-Forest Corporation, D&O Claims against the Directors or Officers of Sino-Forest Corporation or D&O Indemnity Claims against Sino-Forest Corporation**

Claim Reference Number: _____

TO: _____

*(Name of purported claimant)*

Defined terms not defined in this Notice of Revision or Disallowance have the meaning ascribed in the Order of the Ontario Superior Court of Justice dated May 8, 2012 (the "Claims Procedure Order"). **All dollar values contained herein are in Canadian dollars unless otherwise noted.**

Pursuant to 31 of the Claims Procedure Order, the Monitor hereby gives you notice that it has reviewed your Proof of Claim, D&O Proof of Claim or D&O Indemnity Proof of Claim and has revised or disallowed all or part of your purported Claim, D&O Claim or D&O Indemnity Claim, as the case may be. Subject to further dispute by you in accordance with the Claims Procedure Order, your Proven Claim will be as follows:

| | Amount as submitted | | Amount allowed by Monitor |
|---|---|---|---|
| | (original currency amount) | (in Canadian dollars) | (in Canadian dollars) |
| A. Prefiling Claim | $ | $ | $ |
| B. Restructuring Claim | $ | $ | $ |
| C. Secured Claim | $ | $ | $ |
| D. D&O Claim | $ | $ | $ |
| E. D&O Indemnity Claim | $ | $ | $ |
| F. Total Claim | $ | $ | $ |

-2-

Reasons for Revision or Disallowance:

_____

_____

_____

## SERVICE OF DISPUTE NOTICES

If you intend to dispute this Notice of Revision or Disallowance, you must, no later than 5:00 p.m. (prevailing time in Toronto) on the day that is fourteen (14) days after this Notice of Revision or Disallowance is deemed to have been received by you (in accordance with paragraph 50 of the Claims Procedure Order), deliver a Dispute Notice to the Monitor by registered mail, courier, personal delivery or electronic or digital transmission to the address below.  In accordance with the Claims Procedure Order, notices shall be deemed to be received upon actual receipt thereof by the Monitor during normal business hours on a Business Day, or if delivered outside of normal business hours, on the next Business Day.  The form of Dispute Notice is enclosed and can also be accessed on the Monitor's website at http://cfcanada.fticonsulting.com/sfc.

    FTI Consulting Canada Inc.
    Court-appointed Monitor of Sino-Forest Corporation
    TD Waterhouse Tower
    79 Wellington Street West
    Suite 2010, P.O. Box 104
    Toronto, Ontario  M5K 1G8

    Attention: Jodi Porepa
    Telephone: (416) 649-8094
    E-mail: sfc@fticonsulting.com

-3-

**IF YOU FAIL TO FILE A DISPUTE NOTICE WITHIN THE PRESCRIBED TIME
PERIOD, THIS NOTICE OF REVISION OR DISALLOWANCE WILL BE BINDING
UPON YOU.**

**DATED** at Toronto, this      day of                              , 2012.

FTI Consulting Canada Inc., solely in its capacity as Court-appointed Monitor of Sino-Forest
Corporation and not in its personal or corporate capacity

Per: Greg Watson / Jodi Porepa

## SCHEDULE "B"

### DISPUTE NOTICE

### With respect to Sino-Forest Corporation

Claim Reference Number: _____

1.

    **Particulars of Claimant:**

    Full Legal Name of claimant (include trade name, if different):

    _____

    _____

    *(the "Claimant")*

    Full Mailing Address of the Claimant:

    _____

    _____

    Other Contract Information of the Claimant:

        Telephone Number: _____

        Email Address: _____

        Facsimile Number: _____

        Attention (Contact Person): _____

-2-

2.

**Particulars of original Claimant from whom you acquired the Claim, D&O Claim or D&O Indemnity Claim:**

Have you acquired this purported Claim, D&O Claim or D&O Indemnity Claim by assignment?

Yes: ☐                    No: ☐

If yes and if not already provided, attach documents evidencing assignment.

Full Legal Name of original Claimant(s): _____

3.

**Dispute of Revision or Disallowance of Claim, D&O Claim or D&O Indemnity Claim, as the case may be:**

*For the purposes of the Claims Procedure Order only (and without prejudice to the terms of any plan of arrangement or compromise), claims in a foreign currency will be converted to Canadian dollars at the exchange rates set out in the Claims Procedure Order.*

The Claimant hereby disagrees with the value of its Claim, D&O Claim or D&O Indemnity Claim, as the case may be, as set out in the Notice of Revision or Disallowance and asserts a Claim, D&O Claim or D&O Indemnity Claim, as the case may be, as follows:

|  | Amount allowed by Monitor: (Notice of Revision or Disallowance) (in Canadian dollars) | Amount claimed by Claimant: (in Canadian Dollars) |
|---|---|---|
| A. Prefiling Claim | $ | $ |
| B. Restructuring Claim | $ | $ |
| C. Secured Claim | $ | $ |
| D. D&O Claim | $ | $ |
| E. D&O Indemnity Claim | $ | $ |
| F. Total Claim | $ | $ |

-3-

**REASON(S) FOR THE DISPUTE:**

_____

_____

_____

_____

**SERVICE OF DISPUTE NOTICES**

**If you intend to dispute a Notice of Revision or Disallowance, you must, by no later than the date that is fourteen (14) days after the Notice of Revision or Disallowance is deemed to have been received by you (in accordance with paragraph 50 of the Claims Procedure Order), deliver to the Monitor this Dispute Notice by registered mail, courier, personal delivery or electronic or digital transmission to the address below.** In accordance with the Claims Procedure Order, notices shall be deemed to be received upon actual receipt thereof by the Monitor during normal business hours on a Business Day, or if delivered outside of normal business hours, on the next Business Day.

FTI Consulting Canada Inc.
Court-appointed Monitor of Sino-Forest Corporation
TD Waterhouse Tower
79 Wellington Street West
Suite 2010, P.O. Box 104
Toronto, Ontario  M5K 1G8

Attention: Jodi Porepa
Telephone: (416) 649-8094
E-mail: sfc@fticonsulting.com

**741**

-4-

DATED this _____ day of _____, 2012.


Name of Claimant: _____


_____     Per: _____
Witness                                                        Name:
                                                                    Title:
                                                                    *(please print)*

SCHEDULE "C"

## NOTICE TO CLAIMANTS
## AGAINST SINO-FOREST CORPORATION
(hereinafter referred to as the "Applicant")

**RE:    NOTICE OF CLAIMS PROCEDURE FOR THE APPLICANT PURSUANT TO THE *COMPANIES' CREDITORS ARRANGEMENT ACT* (the "CCAA")**

PLEASE TAKE NOTICE that this notice is being published pursuant to an Order of the Superior Court of Justice of Ontario made on May 8, 2012 (the "Claims Procedure Order").  Pursuant to the Claims Procedure Order, Proof of Claim Document Packages will be sent to claimants by mail, on or before May 15, 2012, if those claimants are known to the Applicant.  Claimants may also obtain the Claims Procedure Order and a Proof of Claim Document Package from the website of the Monitor at http://cfcanada.fticonsulting.com/sfc, or by contacting the Monitor by telephone (416-649-8094).

Proofs of Claim (including D&O Proofs of Claim) must be submitted to the Monitor for any claim against the Applicant, whether unliquidated, contingent or otherwise, or a claim against any current or former officer or director of the Applicant, in each case where the claim (i) arose prior to March 30, 2012, or (ii) arose on or after March 30, 2012 as a result of the restructuring, termination, repudiation or disclaimer of any lease, contract, or other agreement or obligation.  Please consult the Proof of Claim Document Package for more details.

**Completed Proofs of Claim must be received by the Monitor by 5:00 p.m. (prevailing Eastern Time) on the applicable claims bar date, as set out in the Claims Procedure Order. It is your responsibility to ensure that the Monitor receives your Proof of Claim or D&O Proof of Claim by the applicable claims bar date.**

**Certain Claimants are exempted from the requirement to file a Proof of Claim.  Among those claimants who do not need to file a Proof of Claim are individual noteholders in respect of Claims relating solely to the debt evidenced by their notes and persons whose Claims form the subject matter of the Ontario Class Action or the Quebec Class Action. Please consult the Claims Procedure Order for additional details.**

**CLAIMS AND D&O CLAIMS WHICH ARE NOT RECEIVED BY THE APPLICABLE CLAIMS BAR DATE WILL BE BARRED AND EXTINGUISHED FOREVER.**

**DATED** at Toronto this • day of •, 2012.

-2-

## SCHEDULE "D"

### PROOF OF CLAIM AGAINST
### SINO-FOREST CORPORATION

**1.    Original Claimant Identification (the "Claimant")**

Legal Name of Claimant _____    Name of Contact _____

Address _____    Title _____

_____    Phone # _____

_____    Fax # _____

City _____  Prov / State ____    e-mail _____

Postal/Zip code _____

**2.    Assignee, if claim has been assigned**

Full Legal Name of Assignee _____    Name of Contact _____

Address _____    Phone # _____

_____    Fax # _____

City _____  Prov / State ____    e-mail _____

Postal/Zip code _____

**3a.    Amount of Claim**

The Applicant or Director or Officer was and still is indebted to the Claimant as follows:

| Currency | Original Currency Amount | Unsecured Prefiling Claim | Restructuring Claim | Secured Claim |
|---|---|---|---|---|
| _____ | _____ | ☐ | ☐ | ☐ |
| _____ | _____ | ☐ | ☐ | ☐ |
| _____ | _____ | ☐ | ☐ | ☐ |
| _____ | _____ | ☐ | ☐ | ☐ |
| _____ | _____ | ☐ | ☐ | ☐ |

**3b.    Claim against Subsidiaries**

If you have or intend to make a claim against one or more Subsidiaries which is based in whole or in part on facts, underlying transactions, causes of action or events relating to a claim made against the Applicant above, check the box below, list the Subsidiaries against whom you assert your claim, and provide particulars of your claim against such Subsidiaries.

☐ I/we have a claim against one or more Subsidiary

| Name(s) of Subsidiaries | Currency | Original Currency Amount | Amount of Claim |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

-3-

## 4. Documentation

Provide all particulars of the Claim and supporting documentation, including amount, and description of transaction(s) or agreement(s), or legal breach(es) giving rise to the Claim.

## 5. Certification

I hereby certify that:

1. I am the Claimant, or authorized representative of the Claimant.
2. I have knowledge of all the circumstances connected with this Claim.
3. Complete documentation in support of this claim is attached.

Name

Title

Dated at _____

Signature

this _____ day of _____ 2012

Witness

## 6. Filing of Claim

This Proof of Claim **must be received by the Monitor by no later than 5:00 p.m. (prevailing Eastern Time) on June 20, 2012,** by registered mail, courier, personal delivery or electronic or digital transmission at the following address:

FTI Consulting Canada Inc.
Court-appointed Monitor of Sino-Forest Corporation
TD Waterhouse Tower
79 Wellington Street West
Suite 2010, P.O. Box 104
Toronto, Ontario M5K 1G8

Attention: Jodi Porepa
Telephone: (416) 649-8094
E-mail: sfc@fticonsulting.com

An electronic version of this form is available at http://cfcanada.fticonsulting.com/sfc.

-2-
## SCHEDULE "D-2"

## PROOF OF CLAIM AGAINST
## DIRECTORS OR OFFICERS OF SINO-FOREST CORPORATION

This form is to be used only by Claimants asserting a claim against any director and/or officers of Sino-Forest Corporation, and <u>NOT</u> for claims against Sino-Forest Corporation itself. For claims against Sino-Forest Corporation, please use the form titled "Proof of Claim Against Sino-Forest Corporation", which is available on the Monitor's website at http://cfcanada.fticonsulting.com/sfc.

### 1. Original Claimant Identification (the "Claimant")

| | |
|---|---|
| Legal Name of Claimant _____ | Name of Contact _____ |
| Address _____ | Title _____ |
| _____ | Phone # _____ |
| _____ | Fax # _____ |
| City _____ Prov / State ____ | e-mail _____ |
| Postal/Zip code _____ | |

### 2. Assignee, if D&O Claim has been assigned

| | |
|---|---|
| Full Legal Name of Assignee _____ | Name of Contact _____ |
| Address _____ | Phone # _____ |
| _____ | Fax # _____ |
| City _____ Prov / State ____ | e-mail _____ |
| Postal/Zip code _____ | |

### 3. Amount of D&O Claim

The Director or Officer was and still is indebted to the Claimant as follows:

☐ I/we have a claim against a Director(s) and/or Officer(s)

| Name(s) of Director(s) and/or Officer(s) | Currency | Original Currency Amount | Amount of Claim |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

### 4. Documentation

Provide all particulars of the D&O Claim and supporting documentation, including amount, and description of transaction(s) or agreement(s), or legal breach(es) giving rise to the D&O Claim.

### 5. Certification

I hereby certify that:

1. I am the Claimant, or authorized representative of the Claimant.

-3-

2.  I have knowledge of all the circumstances connected with this D&O Claim.
3.  Complete documentation in support of this D&O Claim is attached.

Name _____

Title _____

Dated at _____

Signature _____

this _____ day of _____ 2012

Witness _____

## 6.  Filing of D&O Claim

This Proof of Claim **must be received by the Monitor by no later than 5:00 p.m. (prevailing Eastern Time) on June 20, 2012,** by registered mail, courier, personal delivery or electronic or digital transmission at the following address:

> FTI Consulting Canada Inc.
> Court-appointed Monitor of Sino-Forest Corporation
> TD Waterhouse Tower
> 79 Wellington Street West
> Suite 2010, P.O. Box 104
> Toronto, Ontario  M5K 1G8
>
> Attention: Jodi Porepa
> Telephone: (416) 649-8094
> E-mail: sfc@fticonsulting.com

An electronic version of this form is available at http://cfcanada.fticonsulting.com/sfc

## SCHEDULE "E"

## GUIDE TO COMPLETING THE PROOF OF CLAIM FOR CLAIMS AGAINST SINO-FOREST-CORPORATION

This Guide has been prepared to assist Claimants in filling out the Proof of Claim with respect to Sino-Forest Corporation (the "Applicant"). If you have any additional questions regarding completion of the Proof of Claim, please consult the Monitor's website at http://cfcanada.fticonsulting.com/sfc or contact the Monitor, whose contact information is shown below.

Additional copies of the Proof of Claim may be found at the Monitor's website address noted above.

Please note that this is a guide only, and that in the event of any inconsistency between the terms of this guide and the terms of the Claims Procedure Order made on May 8, 2012 (the "Claims Procedure Order"), the terms of the Claims Procedure Order will govern.

### SECTION 1 - ORIGINAL CLAIMANT

4.      A separate Proof of Claim must be filed by each legal entity or person asserting a claim against the Applicant.

5.      The Claimant shall include any and all Claims it asserts against the Applicant in a single Proof of Claim.

6.      The full legal name of the Claimant must be provided.

7.      If the Claimant operates under a different name, or names, please indicate this in a separate schedule in the supporting documentation.

8.      If the Claim has been assigned or transferred to another party, Section 2 must also be completed.

9.      Unless the Claim is assigned or transferred, all future correspondence, notices, etc. regarding the Claim will be directed to the address and contact indicated in this section.

10.     Certain Claimants are exempted from the requirement to file a Proof of Claim. Among those claimants who do not need to file a Proof of Claim are individual noteholders in respect of Claims relating solely to the debt evidenced by their notes. Please consult the Claims Procedure Order for details with respect to these and other exemptions.

### SECTION 2 - ASSIGNEE

11.     If the Claimant has assigned or otherwise transferred its Claim, then Section 2 must be completed.

12.     The full legal name of the Assignee must be provided.

13.     If the Assignee operates under a different name, or names, please indicate this in a separate schedule in the supporting documentation.

14.     If the Monitor in consultation with the Applicant is satisfied that an assignment or transfer has occurred, all future correspondence, notices, etc. regarding the Claim will be directed to the Assignee at the address and contact indicated in this section.

## SECTION 3A - AMOUNT OF CLAIM OF CLAIMANT AGAINST DEBTOR

15.     Indicate the amount the Applicant was and still is indebted to the Claimant.

**Currency, Original Currency Amount**

16.     The amount of the Claim must be provided in the currency in which it arose.

17.     Indicate the appropriate currency in the Currency column.

18.     If the Claim is denominated in multiple currencies, use a separate line to indicate the Claim amount in each such currency.  If there are insufficient lines to record these amounts, attach a separate schedule indicating the required information.

19.     Claims denominated in a currency other than Canadian dollars will be converted into Canadian dollars in accordance with the Claims Procedure Order.

**Unsecured Prefiling Claim**

20.     Check this box ONLY if the Claim recorded on that line is an unsecured prefiling claim.

**Restructuring Claim**

21.     Check this box ONLY if the amount of the Claim against the Applicant arose out of the restructuring, termination, repudiation or disclaimer of a lease, contract, or other agreement or obligation on or after March 30, 2012.

**Secured Claim**

Check this box ONLY if the Claim recorded on that line is a secured claim.

## SECTION 3B - CLAIM AGAINST SUBSIDIARIES

22.     Check this box ONLY if you have or intend to make a claim against one or more Subsidiaries which is based in whole or in part on facts, underlying transactions, causes of action or events relating to a claim made against the Applicant above, and list the Subsidiaries against whom you assert your claim.

## SECTION 4 - DOCUMENTATION

23.    Attach to the claim form all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) or breach(es) giving rise to the Claim.

## SECTION 5 - CERTIFICATION

24.    The person signing the Proof of Claim should:

(a)    be the Claimant, or authorized representative of the Claimant.

(b)    have knowledge of all the circumstances connected with this Claim.

(c)    have a witness to its certification.

25.    By signing and submitting the Proof of Claim, the Claimant is asserting the claim against the Applicant.

## SECTION 6 - FILING OF CLAIM

26.    This Proof of Claim must be received by the Monitor by no later than 5:00 p.m. (prevailing Eastern Time) on June 20, 2012.  Proofs of Claim should be sent by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission to the following address:

> FTI Consulting Canada Inc.
> Court-appointed Monitor of Sino-Forest Corporation
> TD Waterhouse Tower
> 79 Wellington Street West
> Suite 2010, P.O. Box 104
> Toronto, Ontario  M5K 1G8
>
> Attention: Jodi Porepa
> Telephone: (416) 649-8094
> E-mail: sfc@fticonsulting.com

**Failure to file your Proof of Claim so that it is received by the Monitor by 5:00 p.m., on the applicable claims bar date will result in your claim being barred and you will be prevented from making or enforcing a Claim against the Applicant.  In addition, you shall not be entitled to further notice in and shall not be entitled to participate as a creditor in these proceedings.**

4

## SCHEDULE "E-2"

## GUIDE TO COMPLETING THE PROOF OF CLAIM FOR CLAIMS AGAINST
## DIRECTORS OR OFFICERS OF SINO-FOREST-CORPORATION

This Guide has been prepared to assist Claimants in filling out the D&O Proof of Claim against any Directors or Officers of Sino-Forest Corporation (the "Applicant"). If you have any additional questions regarding completion of the Proof of Claim, please consult the Monitor's website at http://cfcanada.fticonsulting.com/sfc or contact the Monitor, whose contact information is shown below.

The D&O Proof of Claim is to be used only by Claimants asserting a claim against a director and/or officer of Sino-Forest Corporation, and <u>NOT</u> for claims against Sino-Forest Corporation itself. For claims against Sino-Forest Corporation, please use the form titled "Proof of Claim Against Sino-Forest Corporation", which is available on the Monitor's website at http://cfcanada.fticonsulting.com/sfc.

Additional copies of the D&O Proof of Claim may be found at the Monitor's website address noted above.

Please note that this is a guide only, and that in the event of any inconsistency between the terms of this guide and the terms of the Claims Procedure Order made on May 8, 2012 (the "Claims Procedure Order"), the terms of the Claims Procedure Order will govern.

## SECTION 1 - ORIGINAL CLAIMANT

27.    A separate D&O Proof of Claim must be filed by each legal entity or person asserting a claim against any Directors or Officers of the Applicant.

28.    The Claimant shall include any and all D&O Claims it asserts in a single D&O Proof of Claim.

29.    The full legal name of the Claimant must be provided.

30.    If the Claimant operates under a different name, or names, please indicate this in a separate schedule in the supporting documentation.

31.    If the D&O Claim has been assigned or transferred to another party, Section 2 must also be completed.

32.    Unless the D&O Claim is assigned or transferred, all future correspondence, notices, etc. regarding the D&O Claim will be directed to the address and contact indicated in this section.

## SECTION 2 - ASSIGNEE

33.    If the Claimant has assigned or otherwise transferred its D&O Claim, then Section 2 must be completed.

34.    The full legal name of the Assignee must be provided.

35.    If the Assignee operates under a different name, or names, please indicate this in a separate schedule in the supporting documentation.

36.    If the Monitor in consultation with the Applicant is satisfied that an assignment or transfer has occurred, all future correspondence, notices, etc. regarding the D&O Claim will be directed to the Assignee at the address and contact indicated in this section.

## SECTION 3 - AMOUNT OF CLAIM OF CLAIMANT AGAINST DIRECTOR OR OFFICER

37.    Indicate the amount the Director or Officer is claimed to be indebted to the Claimant and provide all other request details.

### Currency, Original Currency Amount

38.    The amount of the D&O Claim must be provided in the currency in which it arose.

39.    Indicate the appropriate currency in the Currency column.

40.    If the D&O Claim is denominated in multiple currencies, use a separate line to indicate the Claim amount in each such currency.  If there are insufficient lines to record these amounts, attach a separate schedule indicating the required information.

41.    D&O Claims denominated in a currency other than Canadian dollars will be converted into Canadian dollars in accordance with the Claims Procedure Order.

## SECTION 4 - DOCUMENTATION

42.    Attach to the claim form all particulars of the D&O Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) or breach(es) giving rise to the D&O Claim.

## SECTION 5 - CERTIFICATION

43.    The person signing the D&O Proof of Claim should:

    (a)    be the Claimant, or authorized representative of the Claimant.

    (b)    have knowledge of all the circumstances connected with this D&O Claim.

    (c)    have a witness to its certification.

44.    By signing and submitting the D&O Proof of Claim, the Claimant is asserting the claim against the Directors and Officers identified therein.

6

## SECTION 6 - FILING OF CLAIM

45.    The D&O Proof of Claim must be received by the Monitor by no later than 5:00 p.m. (prevailing Eastern Time) on June 20, 2012.  D&O Proofs of Claim should be sent by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission to the following address:

> FTI Consulting Canada Inc.
> Court-appointed Monitor of Sino-Forest Corporation
> TD Waterhouse Tower
> 79 Wellington Street West
> Suite 2010, P.O. Box 104
> Toronto, Ontario  M5K 1G8
> Attention: Jodi Porepa
> Telephone: (416) 649-8094
> E-mail: sfc@fticonsulting.com

**Failure to file your D&O Proof of Claim so that it is received by the Monitor by 5:00 p.m., on the applicable claims bar date will result in your claim being barred and you will be prevented from making or enforcing a D&O Claim against the any directors or officers of the Applicant.  In addition, you shall not be entitled to further notice in and shall not be entitled to participate as a D&O claimant in these proceedings.**

### SCHEDULE "F"

### D&O INDEMNITY PROOF OF CLAIM
### SINO-FOREST CORPORATION

**1.    Director and /or Officer Particulars (the "Indemnitee")**

Legal Name of Indemnitee _____

Address _____     Phone # _____

_____     Fax # _____

_____

City_____     Prov / State____     e-mail _____

Postal/Zip code_____

**2.      Indemnification Claim**

Position(s) Held_____

Dates Position(s) Held: From _____ to _____

Reference Number of Proof of Claim with respect to which this D&O Indemnity Claim is made _____

Particulars of and basis for D&O Indemnity
Claim_____

_____

_____

_____

(Provide all particulars of the D&O Indemnity Claim, including all supporting documentation)

**3     Filing of Claim**

This D&O Indemnity Proof of Claim and supporting documentation are to be returned to the Monitor within ten Business Days of the date of deemed receipt by the Director or Officer of the Proof of Claim by registered mail, courier, personal delivery or electronic or digital transmission at the following address:

> FTI Consulting Canada Inc.
> Court-appointed Monitor of Sino-Forest Corporation
> TD Waterhouse Tower
> 79 Wellington Street West
> Suite 2010, P.O. Box 104
> Toronto, Ontario  M5K 1G8
>
> Attention: Jodi Porepa
> Telephone: (416) 649-8094
> E-mail: sfc@fticonsulting.com

8

**Failure to file your D&O Indemnity Proof of Claim in accordance with the Claims Procedure Order will result in your D&O Indemnity Claim being barred and forever extinguished and you will be prohibited from making or enforcing such D&O Indemnity Claim against the Applicant.**

Dated at _____, this _____ day of _____, 2012.


Per: _____
      Name


Signature: _____ (Former Director and/or Officer)

**755**

IN THE MATTER OF THE *COMPANIES CREDITORS' ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OR COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

Court File No. CV-12-9667-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
(COMMERCIAL LIST)

Proceedings commenced in Toronto

**ORDER**

**BENNETT JONES LLP**
One First Canadian Place
Suite 3400, P.O. Box 130
Toronto, Ontario
M5X 1A4

Robert W. Staley (LSUC #27115J)
Kevin Zych (LSUC #33129T)
Derek J. Bell (LSUC #43420J)
Jonathan Bell (LSUC #55457P)
Tel: 416-863-1200
Fax: 416-863-1716

Lawyers for the Applicant

## APPENDIX K – THE EQUITY CLAIMS DECISION

*(See Attached)*



JUL-27-2012 16:22    MAG
13-10361-mg   Doc 4-5   Filed 02/04/13   Entered 02/04/13 23:49:31   Exhibit A - Part
5   Pg 89 of 100
4163276228   P.002

**756**

CITATION: Sino-Forest Corporation (Re), 2012 ONSC 4377
COURT FILE NO.: CV-12-9667-00CL
DATE: 20120727

**SUPERIOR COURT OF JUSTICE – ONTARIO**

**(COMMERCIAL LIST)**

| | |
|---|---|
| RE: | IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED |
| | AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION, Applicant |
| BEFORE: | MORAWETZ J. |
| COUNSEL: | Robert W. Staley and Jonathan Bell, for the Applicant |
| | Jennifer Stam, for the Monitor |
| | Kenneth Dekker, for BDO Limited |
| | Peter Griffin and Peter Osborne, for Ernst & Young LLP |
| | Benjamin Zarnett, Robert Chadwick and Brendan O'Neill, for the Ad Hoc Committee of Noteholders |
| | James Grout, for the Ontario Securities Commission |
| | Emily Cole and Joseph Marin, for Allen Chan |
| | Simon Bieber, for David Horsley |
| | David Bish, John Fabello and Adam Slavens, for the Underwriters Named in the Class Action |
| | Max Starnino and Kirk Baert, for the Ontario Plaintiffs |
| | Larry Lowenstein, for the Board of Directors |
| HEARD: | June 26, 2012 |

**ENDORSEMENT**

JUL-27-2012 18:22 13-10361-mg Doc 4-5 MAG Filed 02/04/13 Entered 02/04/13 23:49:31 41632762226 Exhibit A - Part 5 Pg 90 of 100 P.003

**757**

- Page 2 -

**Overview**

[1] Sino-Forest Corporation ("SFC" or the "Applicant") seeks an order directing that claims against SFC, which result from the ownership, purchase or sale of an equity interest in SFC, are "equity claims" as defined in section 2 of the *Companies' Creditors Arrangement Act* ("CCAA") including, without limitation: (i) the claims by or on behalf of current or former shareholders asserted in the proceedings listed in Schedule "A" (collectively, the "Shareholder Claims"); and (ii) any indemnification claims against SFC related to or arising from the Shareholder Claims, including, without limitation, those by or on behalf of any of the other defendants to the proceedings listed in Schedule "A" (the "Related Indemnity Claims").

[2] SFC takes the position that the Shareholder Claims are "equity claims" as defined in the CCAA as they are claims in respect of a monetary loss resulting from the ownership, purchase or sale of an equity interest in SFC and, therefore, come within the definition. SFC also takes the position that the Related Indemnity Claims are "equity claims" as defined in the CCAA as they are claims for contribution or indemnity in respect of a claim that is an equity claim and, therefore, also come within the definition.

[3] On March 30, 2012, the court granted the Initial Order providing for the CCAA stay against SFC and certain of its subsidiaries. FTI Consulting Canada Inc. was appointed as Monitor.

[4] On the same day, the Sales Process Order was granted, approving Sales Process procedures and authorizing and directing SFC, the Monitor and Houlihan Lokey to carry out the Sales Process.

[5] On May 14, 2012, the court issued a Claims Procedure Order, which established June 20, 2012 as the Claims Bar Date.

[6] The stay of proceedings has since been extended to September 28, 2012.

[7] Since the outset of the proceedings, SFC has taken the position that it is important for these proceedings to be completed as soon as possible in order to, among other things, (i) enable the business operated in the Peoples Republic of China ("PRC") to be separated from SFC and put under new ownership; (ii) enable the restructured business to participate in the Q4 sales season in the PRC market; and (iii) maintain the confidence of stakeholders in the PRC (including local and national governmental bodies, PRC lenders and other stakeholders) that the business in the PRC can be successfully separated from SFC and operate in the ordinary course in the near future.

[8] SFC has negotiated a Support Agreement with the Ad Hoc Committee of Noteholders and intends to file a plan of compromise or arrangement (the "Plan") under the CCAA by no later than August 27, 2012, based on the deadline set out in the Support Agreement and what they submit is the commercial reality that SFC must complete its restructuring as soon as possible.

[9]    Noteholders holding in excess of $1.296 billion, or approximately 72% of the approximately $1.8 billion of SFC's noteholders' debt, have executed written support agreements to support the SFC CCAA Plan as of March 30, 2012.

**Shareholder Claims Asserted Against SFC**

####    (i)    Ontario

[10]    By Fresh as Amended Statement of Claim dated April 26, 2012 (the "Ontario Statement of Claim"), the Trustees of the Labourers' Pension Fund of Central and Eastern Canada and other plaintiffs asserted various claims in a class proceeding (the "Ontario Class Proceedings") against SFC, certain of its current and former officers and directors, Ernst & Young LLP ("E&Y"), BDO Limited ("BDO"), Poyry (Beijing) Consulting Company Limited ("Poyry") and SFC's underwriters (collectively, the "Underwriters").

[11]    Section 1(m) of the Ontario Statement of Claim defines "class" and "class members" as:

> All persons and entities, wherever they may reside who acquired Sino's Securities during the Class Period by distribution in Canada or on the Toronto Stock Exchange or other secondary market in Canada, which securities include those acquired over the counter, and all persons and entities who acquired Sino's Securities during the Class Period who are resident of Canada or were resident of Canada at the time of acquisition and who acquired Sino's Securities outside of Canada, except the Excluded Persons.

[12]    The term "Securities" is defined as "Sino's common shares, notes and other securities, as defined in the OSA". The term "Class Period" is defined as the period from and including March 19, 2007 up to and including June 2, 2011.

[13]    The Ontario Class Proceedings seek damages in the amount of approximately $9.2 billion against SFC and the other defendants.

[14]    The thrust of the complaint in the Ontario Class Proceedings is that the class members are alleged to have purchased securities at "inflated prices during the Class Period" and that absent the alleged misconduct, sales of such securities "would have occurred at prices that reflected the true value" of the securities. It is further alleged that "the price of Sino's Securities was directly affected during the Class Period by the issuance of the Impugned Documents".

####    (ii)    Quebec

[15]    By action filed in Quebec on June 9, 2011, Guining Liu commenced an action (the "Quebec Class Proceedings") against SFC, certain of its current and former officers and directors, E&Y and Poyry. The Quebec Class Proceedings do not name BDO or the Underwriters as defendants. The Quebec Class Proceedings also do not specify the quantum of damages sought, but rather reference "damages in an amount equal to the losses that it and the other members of the group suffered as a result of purchasing or acquiring securities of Sino at inflated prices during the Class Period".

JUL-27-2012  16:23    MAG
13-10361-mg    Doc 4-5    Filed 02/04/13    Entered 02/04/13 23:49:31    Exhibit A - Part
5    Pg 92 of 100                    4163276228    P.005

759

- Page 4 -

[16]    The complaints in the Quebec Class Proceedings centre on the effect of alleged misrepresentations on the share price. The duty allegedly owed to the class members is said to be based in "law and other provisions of the *Securities Act*", to ensure the prompt dissemination of truthful, complete and accurate statements regarding SFC's business and affairs and to correct any previously-issued materially inaccurate statements.

### (iii)    Saskatchewan

[17]    By Statement of Claim dated December 1, 2011 (the "Saskatchewan Statement of Claim"), Mr. Allan Haigh commenced an action (the "Saskatchewan Class Proceedings") against SFC, Allen Chan and David Horsley.

[18]    The Saskatchewan Statement of Claim does not specify the quantum of damages sought, but instead states in more general terms that the plaintiff seeks "aggravated and compensatory damages against the defendants in an amount to be determined at trial".

[19]    The Saskatchewan Class Proceedings focus on the effect of the alleged wrongful acts upon the trading price of SFC's securities:

> The price of Sino's securities was directly affected during the Class Period by the issuance of the Impugned Documents. The defendants were aware at all material times that the effect of Sino's disclosure documents upon the price of its Sino's [sic] securities.

### (iv)    New York

[20]    By Verified Class Action Complaint dated January 27, 2012, (the "New York Complaint"), Mr. David Leapard and IMF Finance SA commenced a class proceeding against SFC, Mr. Allen Chan, Mr. David Horsley, Mr. Kai Kit Poon, a subset of the Underwriters, E&Y, and Ernst & Young Global Limited (the "New York Class Proceedings").

[21]    SFC contends that the New York Class Proceedings focus on the effect of the alleged wrongful acts upon the trading price of SFC's securities.

[22]    The plaintiffs in the various class actions have named parties other than SFC as defendants, notably, the Underwriters and the auditors, E&Y, and BDO, as summarized in the table below. The positions of those parties are detailed later in these reasons.

|            | Ontario | Quebec | Saskatchewan | New York |
|------------|---------|--------|--------------|----------|
| E&Y LLP    | X       | X      | -            | X        |
| E&Y Global | -       | -      | -            | X        |
| BDO        | X       | -      | -            | -        |

| Poyry       | X  | X | - | - |
|-------------|----|---|---|---|
| Underwriters| 11 | - | - | 2 |

**Legal Framework**

[23]   Even before the 2009 amendments to the CCAA dealing with equity claims, courts recognized that there is a fundamental difference between shareholder equity claims as they relate to an insolvent entity versus creditor claims.  Essentially, shareholders cannot reasonably expect to maintain a financial interest in an insolvent company where creditor claims are not being paid in full.  Simply put, shareholders have no economic interest in an insolvent enterprise: *Blue Range Resource Corp. (Re)*, (2004) 4 W.W.R. 738 (Alta. Q.B.) [*Blue Range Resources*]; *Stelco Inc. (Re)*, (2006) CanLII 1773 (Ont. S.C.J.) [*Stelco*]; *Royal Bank of Canada v. Central Capital Corp.* (1996), 27 O.R. (3d) 494 (C.A.).

[24]   The basis for the differentiation flows from the fundamentally different nature of debt and equity investments.  Shareholders have unlimited upside potential when purchasing shares.  Creditors have no corresponding upside potential: *Nelson Financial Group Limited (Re)*, 2010 ONSC 6229 [*Nelson Financial*].

[25]   As a result, courts subordinated equity claims and denied such claims a vote in plans of arrangement: *Blue Range Resource, supra*; *Stelco, supra*; *EarthFirst Canada Inc. (Re)* (2009), 56 C.B.R. (5th) 102 (Alta. Q.B.) [*EarthFirst Canada*]; and *Nelson Financial, supra*.

[26]   In 2009, significant amendments were made to the CCAA.  Specific amendments were made with the intention of clarifying that equity claims are subordinated to other claims.

[27]   The 2009 amendments define an "equity claim" and an "equity interest".  Section 2 of the CCAA includes the following definitions:

"Equity Claim" means a claim that is in respect of an equity interest, including a claim for, among others, (…)

(d) a monetary loss resulting from the ownership, purchase or sale of an equity interest or from the rescission, or, in Quebec, the annulment, of a purchase or sale of an equity interest, or

(e) contribution or indemnity in respect of a claim referred to in any of paragraphs (a) to (d);

"Equity Interest" means

(a) in the case of a company other than an income trust, a share in the company – or a warrant or option or another right to acquire a share in the company – other than one that is derived from a convertible debt,

13-10361-mg   Doc 4-5   Filed 02/04/13   Entered 02/04/13 23:49:31   Exhibit A - Part
JUL-27-2012  18:24      MAG         5   Pg 94 of 100      4163276228   P.007

**761**

- Page 6 -

[28]   Section 6(8) of the CCAA prohibits a distribution to equity claimants prior to payment in full of all non-equity claims.

[29]   Section 22(1) of the CCAA provides that equity claimants are prohibited from voting on a plan unless the court orders otherwise.

## Position of Ernst & Young

[30]   E&Y opposes the relief sought, at least as against E&Y, since the E&Y proof of claim evidence demonstrates in its view that E&Y's claim:

  (a) is not an equity claim;

  (b) does not derive from or depend upon an equity claim (in whole or in part);

  (c) represents discreet and independent causes of action as against SFC and its directors and officers arising from E&Y's direct contractual relationship with such parties (or certain of such parties) and/or the tortious conduct of SFC and/or its directors and officers for which they are in law responsible to E&Y; and

  (d) can succeed independently of whether or not the claims of the plaintiffs in the class actions succeed.

[31]   In its factum, counsel to E&Y acknowledges that during the periods relevant to the Class Action Proceedings, E&Y was retained as SFC's auditor and acted as such from 2007 until it resigned on April 5, 2012.

[32]   On June 2, 2011, Muddy Waters LLC ("Muddy Waters") issued a report which purported to reveal fraud at SFC. In the wake of that report, SFC's share price plummeted and Muddy Waters profited from its short position.

[33]   E&Y was served with a multitude of class action claims in numerous jurisdictions.

[34]   The plaintiffs in the Ontario Class Proceedings claim damages in the aggregate, as against all defendants, of $9.2 billion on behalf of resident and non-resident shareholders and noteholders. The causes of action alleged are both statutory, under the *Securities Act (Ontario)* and at common law, in negligence and negligent misrepresentation.

[35]   In its factum, counsel to E&Y acknowledges that the central claim in the class actions is that SFC made a series of misrepresentations in respect of its timber assets. The claims against E&Y and the other third party defendants are that they failed to detect these misrepresentations and note in particular that E&Y's audit did not comply with Canadian generally accepted accounting standards. Similar claims are advanced in Quebec and the U.S.

[36]   Counsel to E&Y notes that on May 14, 2012 the court granted a Claims Procedure Order which, among other things, requires proofs of claim to be filed no later than June 20, 2012. E&Y takes issue with the fact that this motion was then brought notwithstanding that proofs of claim and D&O proofs of claim had not yet been filed.

JUL-27-2012  18:24        MAG        13-10361-mg   Doc 4-5   Filed 02/04/13   Entered 02/04/13 23:49:31   Exhibit A - Part        P.008
5   Pg 95 of 100                    4163276228

**762**

- Page 7 -

[37]    E&Y has filed with the Monitor, in accordance with the Claims Procedure Order, a proof of claim against SFC and a proof of claim against the directors and officers of SFC.

[38]    E&Y takes the position that it has contractual claims of indemnification against SFC and its subsidiaries and has statutory and common law claims of contribution and/or indemnity against SFC and its subsidiaries for all relevant years.  E&Y contends that it has stand-alone claims for breach of contract and negligent and/or fraudulent misrepresentation against the company and its directors and officers.

[39]    Counsel submits that E&Y's claims against Sino-Forest and the SFC subsidiaries are:

    (a) creditor claims;

    (b) derived from E&Y retainers by and/or on behalf of Sino-Forest and the SFC subsidiaries and E&Y's relationship with such parties, all of which are wholly independent and conceptually different from the claims advanced by the class action plaintiffs;

    (c) claims that include the cost of defending and responding to various proceedings, both pre- and post-filing; and

    (d) not equity claims in the sense contemplated by the CCAA.  E&Y's submission is that equity holders of Sino-Forest have not advanced, and could not advance, any claims against SFC's subsidiaries.

[40]    Counsel further contends that E&Y's claim is distinct from any and all potential and actual claims by the plaintiffs in the class actions against Sino-Forest and that E&Y's claim for contribution and/or indemnity is not based on the claims against Sino-Forest advanced in the class actions but rather only in part on those claims, as any success of the plaintiffs in the class actions against E&Y would not necessarily lead to success against Sino-Forest, and vice versa. Counsel contends that E&Y has a distinct claim against Sino-Forest independent of that of the plaintiffs in the class actions.  The success of E&Y's claims against Sino-Forest and the SFC subsidiaries, and the success of the claims advanced by the class action plaintiffs, are not co-dependent.  Consequently, counsel contends that E&Y's claim is that of an unsecured creditor.

[41]    From a policy standpoint, counsel to E&Y contends that the nature of the relationship between a shareholder, who may be in a position to assert an equity claim (in addition to other claims) is fundamentally different from the relationship existing between a corporation and its auditors.

**Position of BDO Limited**

[42]    BDO was auditor of Sino-Forest Corporation between 2005 and 2007, when it was replaced by E&Y.

[43]    BDO has a filed a proof of claim against Sino-Forest pursuant to the Claims Procedure Order.

JUL-27-2012 18:25    MAG    13-10361-mg    Doc 4-5    Filed 02/04/13    Entered 02/04/13 23:49:31    Exhibit A - Part
5    Pg 96 of 100    4163276228    P.009

**763**

- Page 8 -

[44]    BDO's claim against Sino-Forest is primarily for breach of contract.

[45]    BDO takes the position that its indemnity claims, similar to those advanced by E&Y and the Underwriters, are not equity claims within the meaning of s. 2 of the CCAA.

[46]    BDO adopts the submissions of E&Y which, for the purposes of this endorsement, are not repeated.

**Position of the Underwriters**

[47]    The Underwriters take the position that the court should not decide the equity claims motion at this time because it is premature or, alternatively, if the court decides the equity claims motion, the equity claims order should not be granted because the Related Indemnity Claims are not "equity claims" as defined in s. 2 of the CCAA.

[48]    The Underwriters are among the defendants named in some of the class actions. In connection with the offerings, certain Underwriters entered into agreements with Sino-Forest and certain of its subsidiaries providing that Sino-Forest and, with respect to certain offerings, the Sino-Forest subsidiary companies, agree to indemnify and hold harmless the Underwriters in connection with an array of matters that could arise from the offerings.

[49]    The Underwriters raise the following issues:

    (i)    Should this court decide the equity claims motion at this time?

    (ii)    If this court decides the equity claims motion at this time, should the equity claims order be granted?

[50]    On the first issue, counsel to the Underwriters takes the position that the issue is not yet ripe for determination.

[51]    Counsel submits that, by seeking the equity claims order at this time, Sino-Forest is attempting to pre-empt the Claims Procedure Order, which already provides a process for the determination of claims. Until such time as the claims procedure in respect of the Related Indemnity Claims is completed, and those claims are determined pursuant to that process, counsel contends the subject of the equity claims motion raises a merely hypothetical question as the court is being asked to determine the proper interpretation of s. 2 of the CCAA before it has the benefit of an actual claim in dispute before it.

[52]    Counsel further contends that by asking the court to render judgment on the proper interpretation of s. 2 of the CCAA in the hypothetical, Sino-Forest has put the court in a position where its judgment will not be made in the context of particular facts or with a full and complete evidentiary record.

[53]    Even if the court determines that it can decide this motion at this time, the Underwriters submit that the relief requested should not be granted.

JUL-27-2012 18:28    13-10361-mg   Doc 4-5   Filed 02/04/13   Entered 02/04/13 23:49:31   Exhibit A - Part
                                    MAG              5   Pg 97 of 100    4163276228     P.010

- Page 9 -

**764**

**Position of the Applicant**

[54]    The Applicant submits that the amendments to the CCAA relating to equity claims
closely parallel existing U.S. law on the subject and that Canadian courts have looked to U.S.
courts for guidance on the issue of equity claims as the subordination of equity claims has long
been codified there: see e.g. *Blue Range Resources, supra,* and *Nelson Financial, supra.*

[55]    The Applicant takes the position that based on the plain language of the CCAA, the
Shareholder Claims are "equity claims" as defined in s. 2 as they are claims in respect of a
"monetary loss resulting from the ownership, purchase or sale of an equity interest".

[56]    The Applicant also submits the following:

> (a) the Ontario, Quebec, Saskatchewan and New York Class Actions
> (collectively, the "Class Actions") all advance claims on behalf of
> shareholders.
>
> (b) the Class Actions also allege wrongful conduct that affected the trading price
> of the shares, in that the alleged misrepresentation "artificially inflated" the
> share price; and
>
> (c) the Class Actions seek damages relating to the trading price of SFC shares
> and, as such, allege a "monetary loss" that resulted from the ownership,
> purchase or sale of shares, as defined in s. 2 of the CCAA.

[57]    Counsel further submits that, as the Shareholder Claims are "equity claims", they are
expressly subordinated to creditor claims and are prohibited from voting on the plan of
arrangement.

[58]    Counsel to the Applicant also submits that the definition of "equity claims" in s. 2 of the
CCAA expressly includes indemnity claims that relate to other equity claims. As such, the
Related Indemnity Claims are equity claims within the meaning of s. 2.

[59]    Counsel further submits that there is no distinction in the CCAA between the source of
any claim for contribution or indemnity; whether by statute, common law, contractual or
otherwise. Further, and to the contrary, counsel submits that the legal characterization of a
contribution or indemnity claim depends solely on the characterization of the primary claim upon
which contribution or indemnity is sought.

[60]    Counsel points out that in *Return on Innovation Capital v. Gandi Innovations Limited,*
2011 ONSC 5018, leave to appeal denied, 2012 ONCA 10 [*Return on Innovation*] this court
characterized the contractual indemnification claims of directors and officers in respect of an
equity claim as "equity claims".

[61]    Counsel also submits that guidance on the treatment of underwriter and auditor
indemnification claims can be obtained from the U.S. experience. In the U.S., courts have held
that the indemnification claims of underwriters for liability or defence costs constitute equity
claims that are subordinated to the claims of general creditors. Counsel submits that insofar as

JUL-27-2012  18:26   MAG   13-10361-mg   Doc 4-5   Filed 02/04/13   Entered 02/04/13 23:49:31   Exhibit A - Part
5   Pg 98 of 100   4163276228   P.011

- Page 10 -

**765**

the primary source of liability is characterized as an equity claim, so too is any claim for contribution and indemnity based on that equity claim.

[62]    In this case, counsel contends, the Related Indemnity Claims are clearly claims for "contribution and indemnity" based on the Shareholder Claims.

**Position of the Ad Hoc Noteholders**

[63]    Counsel to the Ad Hoc Noteholders submits that the Shareholder Claims are "equity claims" as they are claims in respect of an equity interest and are claims for "a monetary loss resulting from the ownership, purchase or sale of an equity interest" per subsection (d) of the definition of "equity claims" in the CCAA.

[64]    Counsel further submits that the Related Indemnity Claims are also "equity claims" as they fall within the "clear and unambiguous" language used in the definition of "equity claim" in the CCAA.  Subsection (e) of the definition refers expressly and without qualification to claims for "contribution or indemnity" in respect of claims such as the Shareholder Claims.

[65]    Counsel further submits that had the legislature intended to qualify the reference to "contribution or indemnity" in order to exempt the claims of certain parties, it could have done so, but it did not.

[66]    Counsel also submits that, if the plain language of subsection (e) is not upheld, shareholders of SFC could potentially create claims to receive indirectly what they could not receive directly (*i.e.*, payment in respect of equity claims through the Related Indemnity Claims) – a result that could not have been intended by the legislature as it would be inconsistent with the purposes of the CCAA.

[67]    Counsel to the Ad Hoc Noteholders also submits that, before the CCAA amendments in 2009 (the "CCAA Amendments"), courts subordinated claims on the basis of:

     (a) the general expectations of creditors and shareholders with respect to priority and assumption of risks; and

     (b) the equitable principles and considerations set out in certain U.S. cases: see e.g. *Blue Range Resources, supra*.

[68]    Counsel further submits that, before the CCAA Amendments took effect, courts had expanded the types of claims characterized as equity claims; first to claims for damages of defrauded shareholders and then to contractual indemnity claims of shareholders: see *Blue Range Resources, supra* and *EarthFirst Canada, supra*.

[69]    Counsel for the Ad Hoc Noteholders also submits that indemnity claims of underwriters have been treated as equity claims in the United States, pursuant to section 510(b) of the U.S. Bankruptcy Code.  This submission is detailed at paragraphs 20-25 of their factum which reads as follows:

JUL-27-2012 18:26    13-10361-mg   Doc 4-5   Filed 02/04/13   Entered 02/04/13 23:49:31   Exhibit A - Part
                            MAG        5    Pg 99 of 100      4163276226         P.012

**766**

- Page 11 -

20. The desire to more closely align the Canadian approach to equity claims with the U.S. approach was among the considerations that gave rise to the codification of the treatment of equity claims. Canadian courts have also looked to the U.S. law for guidance on the issue of equity claims where codification of the subordination of equity claims has been long-standing.

> Janis Sarra at p. 209, Ad Hoc Committee's Book of Authorities, Tab 10.

> Report of the Standing Senate Committee on Banking, Trade and Commerce, "Debtors and Creditors Sharing the Burden: A Review of the *Bankruptcy and Insolvency Act* and the *Companies' Creditors Arrangement act*" (2003) at 158, [...]

> *Blue Range [Resources]* at paras. 41-57 [...]

21. Pursuant to § 510(b) of the *U.S. Bankruptcy Code*, all creditors must be paid in full before shareholders are entitled to receive any distribution. § 510(b) of the *U.S. Bankruptcy Code* and the relevant portion of § 502, which is referenced in § 510(b), provide as follows:

> § 510. Subordination

> (b) For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

> § 502. Allowance of claims or interests

> (e) (1) Notwithstanding subsections (a), (b) and (c) of this section and paragraph (2) of this subsection, the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that

> ...

> > (B)   such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution; or

> ...

> (2) A claim for reimbursement or contribution of such an entity that becomes fixed after the commencement of the case shall be determined,

- Page 12 -

and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) of this section, the same as if such claim had become fixed before the date of the filing of the petition.

22. U.S. appellate courts have interpreted the statutory language in § 510(b) broadly to subordinate the claims of shareholders that have a nexus or causal relationship to the purchase or sale of securities, including damages arising from alleged illegality in the sale or purchase of securities or from corporate misconduct whether predicated on pre or post-issuance conduct.

> *Re Telegroup Inc.* (2002), 281 F. 3d 133 (3rd Cir. U.S. Court of Appeals) [...]

> *American Broadcasting Systems Inc. v. Nugent*, U.S. Court of Appeals for the Ninth Circuit, Case Number 98-17133 (24 January 2001) [...]

23. Further, U.S. courts have held that indemnification claims of underwriters against the corporation for liability or defence costs when shareholders or former shareholders have sued underwriters constitute equity claims in the insolvency of the corporation that are subordinated to the claims of general creditors based on: (a) the plain language of § 510(b), which references claims for "reimbursement or contribution" and (b) risk allocation as between general creditors and those parties that play a role in the purchase and sale of securities that give rise to the shareholder claims (i.e., directors, officers and underwriters).

> *In re Mid-American Waste Sys.*, 228 B.R. 816, 1999 Bankr. LEXIS 27 (Bankr. D. Del. 1999) [*Mid-American*] [...]

> *In re Jacom Computer Servs.*, 280 B.R. 570, 2002 Bankr. LEXIS 758 (Bankr. S.D.N.Y. 2002) [...]

24. In *Mid-American*, the Court stated the following with respect to the "plain language" of § 510(b), its origins and the inclusion of "reimbursement or contribution" claims in that section:

> *... I find that the plain language of § 510(b), its legislative history, and applicable case law clearly show that § 510(b) intends to subordinate the indemnification claims of officers, directors, and underwriters for both liability and expenses incurred in connection with the pursuit of claims for rescission or damages by purchasers or sellers of the debtor's securities.* The meaning of amended § 510(b), specifically the language "for reimbursement or contribution . . . on account of [a claim arising from rescission or damages arising from the purchase or sale of a security]," can be discerned by a plain reading of its language.

> ... it is readily apparent that the rationale for section 510(b) is not limited to preventing shareholder claimants from improving their position vis-a-