**<u>Exhibit B</u>**
**<u>First Supplemental Report to the Thirteenth Report of the Monitor</u>**
**<u>dated December 4, 2012</u>**

**Court File No. CV-12-9667-00CL**

# Sino-Forest Corporation

## SUPPLEMENTAL REPORT TO THE
## THIRTEENTH REPORT OF THE MONITOR

**December 4, 2012**



**Court File No. CV-12-9667-00CL**

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

### SUPPLEMENTAL REPORT TO THE
### THIRTEENTH REPORT TO THE COURT
### SUBMITTED BY FTI CONSULTING CANADA INC.,
### IN ITS CAPACITY AS MONITOR

1.    The purpose of this Supplemental Report to the Thirteenth Report (the "**Supplemental Report**") is to supplement the Thirteenth Report of the Monitor dated November 22, 2012 (the "**Thirteenth Report**") by:

   (a)    Reporting on amendments to the Plan since the October 19 Plan (defined below) that was described in the Thirteenth Report;

   (b)    to report on the results of the Meeting (defined below); and

   (c)    to provide the Monitor's recommendation that the Court approve the Plan.

2.    Capitalized terms used herein and not otherwise defined have the meaning given to them in the Plan and, if not defined in the Plan, the Thirteenth Report. Paragraphs 5 and 6 of the Thirteenth Report are incorporated herein by reference.

3.    The following appendices have been attached to this Supplemental Report:

   (a)    Appendix A – The Plan of Compromise and Reorganization dated December 3, 2012 (the "**Plan**")



(b)      Appendix B – Blackline of the October 19 Plan to the Plan

(c)      Appendix C – Blackline of the November 28 Plan to the Plan

(d)      Appendix D – Copy of the Company's press releases dated November 28, 2012, November 30, 2012 and December 3, 2012

(e)      Appendix E – Copy of the Emails to the Service List dated November 28, 2012, November 30, 2012 and December 3, 2012

(f)      Appendix F – Voting Procedures

(g)      Appendix G - Form of Resolution

(h)      Appendix H – Copy of the Minutes of the Meeting including Scrutineer's Report

(i)      Appendix I – OSC Notice of Hearing and Statement of Allegations against EY

(j)      Appendix J – Letter from Wardle Daley Bernstein re Claim of David Horsley dated November 29, 2012 and responding letter of Bennett Jones LLP dated November 30, 2012

(k)      Appendix K – Proof of Claim (excluding Tab 1 and 2) of David Horsley for vacation pay, termination and severance dated November 1, 2012

(l)      Appendix L - Letter from Davis LLP re Kai Kit Poon dated November 28, 2012 and responding letter of Gowling Lafleur Henderson LLP dated November 29, 2012

## AMENDMENTS TO THE PLAN

*Changes to the Plan (Non-Third Party Defendants)*

4.      As  result of numerous negotiations which have occurred since the October 19 Plan was filed, a number of changes to the Plan have been agreed upon.  Certain of those changes relate specifically to certain Third Party Defendants and those changes are summarized in



the next section below. A summary of certain of the other changes contained in the Plan is as follows:

(a)     Reserves (which are also discussed in more detail below):

(i)     the amount of the Administration Charge Reserve will be $500,000 or such other amount as may be agreed to by the Monitor and the ICNs;

(ii)    there will be no Directors' Charge Reserve nor will there be any amount in the Unresolved Claims Reserve set aside for OSC claims against Directors and Officers;

(iii)   the Unresolved Claims Reserve will now consist of Plan consideration sufficient to make potential distributions under the Plan in respect of the following in the event that they become Proven Claims: (a) indemnity claims of Third Party Defendants for Indemnified Noteholder Class Action Claims up to the Indemnified Noteholder Class Action Limit; (b) Defence Costs Claims of up to $12 million[1] or such other amount as may be agreed by the Monitor and the ICNs; and (c) other unresolved Affected Creditor Claims of up to $500,000 or such other amount as may be agreed by the Monitor and the ICNs;

(iv)    the Monitor's Post-Implementation Charge Reserve will be $5 million or such other amount as may be agreed to by the Monitor and the ICNs; and

(v)     The Unaffected Claims Reserve will be $1.5 million or such other amount as may be agreed to by the Monitor, the Company and the ICNs.

(b)     Matters relating to the Litigation Trust:

(i)     the amount of the Litigation Funding Amount is $1 million; and

---

[1] Please see the section below entitled "Additional Information Relating to the Reserves" for the Monitor's report on the adjustment to the calculation of the Defence Costs Claims Limit (defined below).

(ii)    at any date prior to the Plan Implementation Date, the Company and the ICNs may agree to exclude one or more claims, actions or causes of action from the Litigation Trust Claims that would otherwise be assigned to the Litigation Trust on Plan Implementation ("**Excluded Litigation Trust Claims**").

(c)    Certain provisions relating to the creation of "Newco II" in connection with the implementation of the restructuring transaction have been incorporated throughout the Amended Plan.  Newco II will be a wholly-owned subsidiary of Newco to which Newco will transfer the SFC Assets on the Plan Implementation Date.  Following implementation of the Plan, Newco II will own the SFC Assets.

(d)    Unaffected Claims no longer includes Claims for termination pay or severance pay payable by the Company to any Person who ceased to be an employee, director or officer of the Company prior to the date of the Plan.  Any claims in this regard will now be treated as Unresolved Claims.

(e)    Persons with Unresolved Claims shall have standing in any proceeding in respect of the determination or status of any Unresolved Claims and Goodmans LLP shall have standing in any such proceeding on behalf of the ICNs.

(f)    The due diligence condition precedent in favour of the ICNs now extends to the Plan Implementation Date with respect to any new material information or events arising or discovered on or after the date of the Sanction Hearing provided that any "new material information or events" does not include any information or events disclosed prior to the date of the Sanction Hearing in a press release or affidavit of the Company or a report of the Monitor that has been filed with the Court.

(g)    Within three (3) business days of the Plan Implementation Date, a foreign representative of the Company will commence a proceeding in the United States for the purpose of seeking recognition of the Plan and the Sanction Order and shall use its reasonable best efforts to obtain such recognition.



*Changes to the Plan (Third Party Defendants)*

5.      In addition to the foregoing changes, the Plan was also amended to incorporate changes that relate specifically to the Underwriters and Ernst & Young as well as additional changes to provide a mechanism for a Plan release in the event that the Underwriters and BDO enter into settlements with the Class-Action Plaintiffs  or the Litigation Trustee (on behalf of the Litigation Trust), all of which is discussed below.

6.      Changes relating to the Underwriters:

(a)      Claims of the Underwriters against the Company for indemnification in respect of any Noteholder Class Action Claims (other than claims against them for fraud or criminal conduct) shall, for the purposes of the Plan, be deemed to be valid and enforceable Class Action Indemnity Claims against the Company.

(b)      The Underwriters shall not be entitled to any distributions under the Plan.

(c)      All Causes of Action against the Underwriters by the Company or the Trustees are deemed to be Excluded Litigation Trust Claims.

(d)      Any portion or amount of liability of the Underwriters for the Noteholder Class Action Claims (other than such claims for fraud or criminal conduct) that exceeds the Indemnified Noteholder Class Action Limit is released under the Plan.

(e)      The Underwriters are Named Third Party Defendants (as discussed and defined below).

7.      Changes relating to Ernst & Young (as defined in the Plan):

(a)      Any and all indemnification rights and entitlements of Ernst & Young and any indemnification agreement between Ernst & Young and the Company shall be deemed to be valid and enforceable in accordance with their terms for the purposes of determining whether the Claims of Ernst & Young for

indemnification in respect of the Noteholder Class Action Claims are valid and enforceable within the meaning of section 4.4(b) the Plan.[2]

(b)     Ernst & Young shall not be entitled to any distributions under the Plan.

(c)     The Sanction Order shall contain a stay against Ernst & Young between the Plan Implementation Date and the earlier of the Ernst & Young Settlement Date (as defined in the Plan) or such other date as may be ordered by the Court on a motion to the Court.

(d)     In addition to the foregoing, Ernst & Young has now entered into a settlement with the Ontario Plaintiffs and the Quebec Plaintiffs, which is still subject to several conditions and approval of the Ernst & Young Settlement itself, does not form part of the Sanction Order.  Section 11.1 of the Plan contains provisions that provide a framework pursuant to which a release of the Ernst & Young Claims[3] under the Plan would happen if several conditions were met.  That release will only be granted if all conditions are met including further Court approval. A summary of those terms is as follows:

(i)     Notwithstanding anything to the contrary in the Plan, subject to (A) the granting of the Sanction Order; (B) the issuance of the Settlement Trust Order (as may be modified in a manner satisfactory to the parties to the Ernst & Young Settlement and the Company (if occurring on or prior to the Plan Implementation Date), the Monitor and the ICNs, as applicable, to the extent, if any, that such modifications affect the Company, the Monitor or the ICNs, each acting reasonably); (C) the granting of an Order under Chapter 15 of the United States Bankruptcy Code recognizing and enforcing the Sanction Order and the Settlement Trust Order in the United States; (D) any other order necessary to give effect to the Ernst & Young

---

[2] Section 4.4(b) of the Plan, among other things, establishes the Indemnified Noteholder Class Action Limit.
[3] "Ernst & Young Claims" has the definition given to it in the Plan and does not include any proceedings or remedies that may be taken against Ernst & Young by the Ontario Securities Commission or by staff of the Ontario Securities Commission and the jurisdiction of the Ontario Securities Commission is expressly preserved.



Settlement (the orders referenced in (C) and (D) being collectively the "**Ernst & Young Orders**"); (E) the fulfillment of all conditions precedent in the Ernst & Young Settlement and the fulfillment by the Ontario Class Action Plaintiffs of all of their obligations thereunder; and (F) the Sanction Order, the Settlement Trust Order and all Ernst & Young Orders being final orders and not subject to further appeal or challenge, Ernst & Young shall pay the settlement amount as provided in the Ernst & Young Settlement to the trust established pursuant to the Settlement Trust Order (the "**Settlement Trust**");

(ii)     Upon receipt of a certificate from Ernst & Young confirming it has paid the settlement amount to the Settlement Trust in accordance with the Ernst & Young Settlement and the trustee of the Settlement Trust confirming receipt of such settlement amount, the Monitor shall deliver to Ernst & Young  the Monitor's Ernst & Young Settlement Certificate. The Monitor shall thereafter file the Monitor's Ernst & Young Settlement Certificate with the Court;

(iii)    Notwithstanding anything to the contrary in the Plan, upon receipt by the Settlement Trust of the settlement amount in accordance with the Ernst & Young Settlement: (A) all Ernst & Young Claims shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled, barred and deemed satisfied and extinguished as against Ernst & Young; (B) section 7.3 of the Plan shall apply to Ernst & Young and the Ernst & Young Claims *mutatis mutandis* on the Ernst & Young Settlement Date; and (C) none of the plaintiffs in the Class Actions shall be permitted to claim from any of the other Third Party Defendants that portion of any damages that corresponds to the liability of Ernst & Young, proven at trial or otherwise, that is the subject of the Ernst & Young Settlement; and

(iv)     In the event that the Ernst & Young Settlement is not completed in accordance with its terms, the Ernst & Young Release will not become

effective (and any claims against Ernst & Young will be assigned to the Litigation Trust).

8.      Changes relating to Named Third Party Defendants:

(a)      The Plan now provides a mechanism that would provide the framework for any Eligible Third Party Defendants[4] to become a "Named Third Party Defendant" with the consent of such Third Party Defendant, the Monitor, the ICNs, counsel to the Ontario Plaintiffs and, if occurring prior to the Plan Implementation Date, the Company.  As set out above, the Underwriters have become Named Third Party Defendants pursuant to the Plan.

(b)      The deadline for an Eligible Third Party Defendant to become a Named Third Party Defendant is 10am on December 6, 2012 or such later date as may be consented to by the Monitor, the Company (if on or prior to the Plan Implementation Date) and the ICNs. As set out above, the Underwriters have become Named Third Party Defendants.

(c)      Any Named Third Party Defendants will not be entitled to any distributions under the Plan.

(d)      If an Eligible Third Party Defendant becomes a Named Third Party Defendant, then any indemnification rights and entitlements of such party and any indemnity agreements between such party and by the Company shall be deemed valid and enforceable in accordance with their terms for the purpose of determining whether the Claims of that Named Third Party Defendant for indemnification in respect of the Noteholder Class Action Claims are valid and enforceable within the meaning of section 4.4(b) the Plan.

---

[4] The Eligible Third Party Defendants are the Underwriters, BDO and, if the Ernst & Young Settlement is not completed, Ernst & Young.

(e)     The Plan now provides the framework pursuant to which a Named Third Party Defendant Settlement would be approved and such Named Third Party Defendant would obtain a release under the Plan as follows:

(i)     Notwithstanding anything to the contrary in the Plan, subject to: (A) the granting of the Sanction Order; (B) the granting of the applicable Named Third Party Defendant Settlement Order; and (C) the satisfaction or waiver of all conditions precedent contained in the applicable Named Third Party Defendant Settlement, the applicable Named Third Party Defendant Settlement shall be given effect in accordance with its terms;

(ii)    Upon receipt of a certificate (in form and in substance satisfactory to the Monitor) from each of the parties to the applicable Named Third Party Defendant Settlement confirming that all conditions precedent thereto have been satisfied or waived, and that any settlement funds have been paid and received, the Monitor shall deliver to the applicable Named Third Party Defendant a Monitor's Named Third Party Defendant Settlement Certificate stating that (A) each of the parties to such Named Third Party Defendant Settlement has confirmed that all conditions precedent thereto have been satisfied or waived; (B) any settlement funds have been paid and received; and (C) immediately upon the delivery of the Monitor's Named Third Party Settlement Certificate, the applicable Named Third Party Defendant Release will be in full force and effect in accordance with the Plan. The Monitor shall thereafter file the Monitor's Named Third Party Settlement Certificate with the Court; and

(iii)   Notwithstanding anything to the contrary in the Plan, upon delivery of the Monitor's Named Third Party Settlement Certificate, any claims and Causes of Action shall be dealt with in accordance with the terms of the applicable Named Third Party Defendant Settlement, the Named Third Party Defendant Settlement Order and the Named Third Party Defendant Release. To the extent provided for by the terms of the applicable Named

Third Party Defendant Release: (A) the applicable Causes of Action against the applicable Named Third Party Defendant shall be fully, finally, irrevocably and forever compromised, released, discharged, cancelled, barred and deemed satisfied and extinguished as against the applicable Named Third Party Defendant; and (B) section 7.3 of the Plan shall apply to the applicable Named Third Party Defendant and the applicable Causes of Action against the applicable Named Third Party Defendant *mutatis mutandis* on the effective date of the Named Third Party Defendant Settlement.

*Other Changes that Relate to the Third Party Defendants*

9.     Indemnified Noteholder Class Action Limit:

(a)     It has been clarified that in the event that a Third Party Defendant is found to be liable for or agrees to a settlement in respect of Noteholder Class Action Claims (other than for fraud or criminal conduct), and such amounts are paid by the Third Party Defendant, then the amount of the Indemnified Noteholder Class Action Limit applicable to the remaining Third Party Defendants shall be reduced by the amount of such judgement or settlement.[5]

10.     Document Preservation.

(a)     Prior to Plan Implementation, the Company shall:[6]

(i)     preserve or cause to be preserved copies of any documents (as such term is defined in the *Rules of Civil Procedure* (Ontario)) that are relevant to the issues raised in the Class Actions; and

(ii)     make arrangements acceptable to SFC, the Monitor, the ICNs, counsel to Ontario Class Action Plaintiffs, counsel to Ernst & Young, counsel to the Underwriters and counsel to any other Eligible Third Party Defendant if

---

[5] Section 4.4(b)(iii)
[6] Section 8.2(x)



they become a Named Third Party Defendants to provide the parties to the Class Actions with access thereto, subject to customary commercial confidentiality, privilege or other applicable restrictions, including lawyer-client privilege, work product privilege and other privileges or immunities, and to restrictions on disclosure arising from s. 16 of the *Securities Act* (Ontario) and comparable restrictions on disclosure in other relevant jurisdictions, for purposes of prosecuting and/or defending the Class Actions, as the case may be, provided that nothing in the foregoing reduces or otherwise limits the parties' rights to production and discovery in accordance with the *Rules of Civil Procedure* (Ontario) and the *Class Proceedings Act, 1992* (Ontario).

## ADDITIONAL INFORMATION RELATING TO THE RESERVES

*The Cash Reserves*

11.     Information relating to the purpose of the Administration Charge, the Unaffected Claims Reserve and the Monitor's Post-Implementation Reserve was contained in the Thirteenth Report. The Plan now provides for the amounts of these Reserves as follows:

(a)     *Administration Charge Reserve ($500,000).*   The Plan now provides for the payment of the final invoices of the beneficiaries of the Administration Charge Reserve as a condition to the implementation of the Plan.   The amount of $500,000 has been allocated to the Administration Charge Reserve as a safeguard in the event that there are miscellaneous amounts which are inadvertently missed upon the final payments prior to Plan implementation.

(b)     *Monitor's Post-Implementation Reserve ($5,000,000).* The Monitor's Post-Implementation Reserve is intended to capture costs in administering the SFC estate and the Claims Process post-implementation.

(c)     *The Unaffected Claims Reserve ($1,500,000).*  Pursuant to the Plan, the following categories of Claims are Unaffected Claims under the Plan: (i) Claims secured by the Administration Charge; (ii) Government Priority Claims; (iii) Employee

Priority Claim; (iv) Lien Claims; (iv) any other Claims of any employee, former employee, Director or Officer of SFC in respect of wages, vacation pay, bonuses, termination pay, severance pay or other remuneration payable to such Person by SFC, other than any termination pay or severance pay payable by SFC to a Person who ceased to be an employee, Director or Officer of SFC prior to the date of this Plan; (v) Trustee Claims; and (vi) any trade payables that were incurred by SFC (A) after the Filing Date but before the Plan Implementation Date; and (B) in compliance with the Initial Order or other Order issued in the CCAA Proceeding. The Monitor and the Company have reviewed the categories of Unaffected Claims (other than those that are covered by the Administration Charge Reserve) taking into consideration the Company's incurred expenses post-filing, Lien Claims which may be asserted by parties with personal property security registrations, the fact that the Trustees are expected to be paid prior to Plan Implementation (see section 9.1(ee) of the Plan) and the maximum estimated employee related Claims for employees who did not cease to be an employee prior to the date of the Plan. Based on the foregoing, the Monitor and the Company estimate that any such Claims would not exceed $1.5 million in the aggregate.

*The Unresolved Claims Reserve*

12.    The Unresolved Claims Reserve now accounts for three categories of Unresolved Claims:

(a)    Class Action Indemnity Claims by the Third Party Defendants in respect of Indemnified Noteholder Class Action Claims up to $150 million (being the Indemnified Noteholder Class Action Limit). In light of the fact that the Plan provides for a release of any Third Party Defendants for any Indemnified Noteholder Class Action Claims beyond the Indemnified Noteholder Class Action Limit, the total potential maximum liability of the Company for any resulting Indemnified Noteholder Class Action Claims is thereby also limited to the Indemnified Noteholder Class Action Limit.

(b)     Defence Costs Claims of up to $12 million (the "**Defence Costs Claims Limit**").
The basis for the calculation of the Defence Costs Claims Limit is discussed in the
following paragraphs.

(c)     Other Affected Creditor Claims that are Unresolved Claims up to $500,000 which
represents the amount of Affected Creditor Claims as set out in the proofs of
claims filed that are Unresolved Claims and not otherwise accounted for in the
Unresolved Claims Reserve or otherwise provided for in the Plan.

*Basis for Calculating Reserve for Defence Costs Claims*

13.     In accordance with the process established under the Claims Procedure Order, a number
of claims have been filed by persons who seek indemnification for Defence Costs
Claims[7] (in this capacity, "**Cost Claim Defendants**"). In light of the recent changes to
the Plan which release the right of EY or the Underwriters to any distribution under the
Plan, the amount of the Unresolved Claims Reserve to address Defence Costs Claims has
been reduced to $12 million.

14.     As set out above, the Defence Costs Claims Limit has been established as part of the
Unresolved Claims Reserve for Defence Costs Claims.  All remaining Defence Costs
Claims will be treated as Unresolved Claims until such time as they are disposed of or
may become Proven Claims for Plan purposes.

15.     The Company has requested the Monitor's views concerning the quantum of the reserve
for remaining Defence Costs Claims.

16.     In considering this issue, the Monitor has taken account of a number of factors, including
but not limited to the following:

(a)     the amounts claimed as having been actually incurred;

---

[7] Pursuant to section 4.8 of the Plan, Claims for "Defence Costs" are all Claims against SFC for indemnification of
defence costs incurred by any Person (other than a Named Director or Officer) in connection with defending against
Shareholder Claims (as defined in the Equity Claims Order), Noteholder Class Action Claims or any other claims of
any kind relating to SFC or the Subsidiaries.



(b)     the specific nature of the claims to which the Cost Claim Defendants are responding;

(c)     the anticipated synergies arising where multiple Cost Claim Defendants in similar legal and factual circumstances are represented by the same counsel;

(d)     the experience of counsel to the Monitor in relation to the costs of other class proceedings;

(e)     costs previously claimed as having been incurred and costs awarded by courts in other class proceedings, both on certification motions and following trial;

(f)     the overlap in subject area between the class proceedings and regulatory or other proceedings in which the Cost Claim Defendants are involved; and

(g)     the difficulties inherent in estimating costs to be incurred in the future which are contingent upon the actions of other parties and the course of complex litigation that is currently at an early stage.

17.     Having weighed these factors, it is the Monitor's view that the aggregate amount of $12 million would constitute a reasonable reserve for costs claimed in connection with the class proceedings by the Cost Claim Defendants (excluding EY, the Underwriters and the Named Directors and Officers who have waived any right to distributions under the Plan).

18.     In forming its views concerning the amount to be reserved in connection with the Defence Costs Claims, the Monitor has made the following basic assumptions:

(a)     certification will be contested by all defendants, but ultimately granted;

(b)     the Ontario class proceeding will be the only class proceeding to go to trial; and

(c)     except for defendants represented by the same counsel, there will be no general cost sharing arrangements between defendants.

19.     The establishment of the Unresolved Claims Reserve is not an admission by the Company, the Monitor or any other party (including the ICNs) as to the validity of any such Claims and all rights to dispute such Claims are reserved.

**THE MEETING**

*Meeting Date*

20.     On November 28, 2012, the Company issued a press release (Appendix D) announcing it had further amended its plan dated October 19, 2012 (the "**October 19 Plan")** and that, to provide creditors with time to review this amended plan (the "**November 28 Plan**"), the Meeting would be postponed to 10am on Friday November 30, 2012.  The Company also announced the change in location of the meeting to the offices of Gowling Lafleur Henderson LLP ("**Gowlings**") at 1 First Canadian Place, 100 King Street West, Suite 1600, Toronto, Ontario.  The Monitor provided notice of these changes to the service list and posted the revised plan and the new time for the Meeting on its website (Appendix E).

21.     On November 30, 2012, the Company issued a further press release (Appendix D) announcing that the Meeting would be postponed to 10am on Monday, December 3, 2012.  The Monitor provided notice of the postponement of the Meeting to the service list and posted notice of the new time for the Meeting on its website (Appendix E).

22.     On December 3, 2012, the Company issued a further press release (Appendix D) that it had further amended the November 28 Plan with the Plan.  The Monitor provided a copy of the Plan to the CCAA service list (Appendix E) and the press release stated that the Plan would be posted on the Monitor's website but that in the meantime, parties could contact the Monitor for a copy of the Plan.

*Summary of Meeting*

23.     The Meeting was held at Gowlings office on December 3, 2012, starting shortly after 10am.



- 16 -

24.    In accordance with the Meeting Order, Greg Watson, an officer of FTI Consulting Canada Inc., acted as chair (the "**Chair**") of the Meeting.    Stephen McKersie of Gowlings acted as secretary of the Meeting and Jodi Porepa of FTI Consulting Canada Inc. acted as scrutineer (the "**Scrutineer**").

25.    Quorum for the purposes of the Meeting was one Affected Creditor with a Voting Claim present at the Meeting (in person or by proxy).    The Scrutineer confirmed that there was at least one (1) Affected Creditor with a Voting Claim present at the Meeting (in person or by proxy).    Accordingly, the Chair declared that the Meeting was properly constituted.

26.    The Chair then provided an overview of the process for providing notice of the Plan and dispensed with the reading of the Notice to Affected Creditors (as set out in the Meeting Order) asked whether there was any person present with a Voting Claim or Unresolved Claim who had not submitted a proxy and who wished to vote at the Meeting.    No such person responded.

27.    The Chair then provided a brief overview of the CCAA proceedings and summarized the amendments to the Plan since the October 19 Plan. Upon conclusion of the summary of the Plan, the Chair asked whether anyone who was entitled to speak had any questions regarding the Plan.    Ken Dekker of Affleck Greene McMurtry LLP, counsel for BDO, asked a question regarding the timeframe for further detail surrounding the mechanics regarding the implementation of the Plan and the continuation of the Class Actions including matters relating to documentary discovery and the impact of the release. Derrick Tay of Gowlings, counsel for the Monitor, replied that while discussions may take place prior to the Sanction Hearing, it was unlikely that all such issues would be resolved prior to the Sanction Hearing.

28.    Upon conclusion of the discussion of the Plan, the Chair reviewed the process for voting on the Plan as set out in the Voting Procedures (Appendix F).    The Chair then confirmed that: (a) the result of the proxy count would be announced after proposal and consideration of the motion and that results of both Voting Claims and Unresolved Claims would be announced; and (b) the CCAA requires a majority in number and 2/3 in

value of the voting class (present at the Meeting in person or by proxy) for approval of the Plan.

29.     The Chair then read out the proposed resolution (Appendix G), as follows:

(a)     *"The plan of compromise and reorganization (the "CCAA Plan") under the Companies' Creditors Arrangement Act (Canada) and the Canada Business Corporations Act concerning, affecting and involving Sino-Forest Corporation ("SFC"), substantially in the form dated December 3, 2012 (as such CCAA Plan may be amended, varied or supplemented by SFC from time to time in accordance with its terms) and the transactions contemplated therein be and it is hereby accepted, approved, agreed to and authorized;*

(b)     *Notwithstanding the passing of this resolution by each Affected Creditor Class (as defined in the CCAA Plan) or the passing of similar resolutions or approval of the Ontario Superior Court of Justice (the "Court"), the board of directors of SFC, without further notice to, or approval of, the Affected Creditors (as defined in CCAA Plan), subject to the terms of the CCAA Plan, may decide not to proceed with the CCAA Plan or may revoke this resolution at any time prior to the CCAA Plan becoming effective, provided that any such decision after the issuance of a sanction order shall require the approval of the Monitor and the Court; and*

(c)     *Any director or officer of SFC be and is hereby authorized, for and on behalf of SFC, to execute and deliver, or cause to be executed and delivered, any and all documents and instruments and to take or cause to be taken such other actions as he or she may deem necessary or desirable to implement this resolution and the matters authorized hereby, including the transactions required by the CCAA Plan, such determination to be conclusively evidenced by the execution and delivery of such documents or other instruments or taking of any such actions."*

30.     Robert Chadwick of Goodmans LLP, holder of a number of proxies on behalf of Noteholders, then proposed the motion.

31.     The Monitor then advised that it had tabulated the proxies indicating votes received for both Voting Claims and Unresolved Claims in connection with the Plan (as amended up to December 3, 2012). The following tables show:

(a)     the number of Voting Claims and their value for and against the Plan (table 1):

| | Number of Votes | % | Value of Votes | % |
|---|---|---|---|---|
| **Total Claims Voting For** | 250 | 98.81% | $ 1,465,766,204 | 99.97% |
| **Total Claims Voting Against** | 3 | 1.19% | $ 414,087 | 0.03% |
| **Total Claims Voting** | 253 | 100.00% | $ 1,466,180,291 | 100.00% |

(b)     the number of votes for and against the Plan in connection with Class Action Indemnity Claims in respect of Indemnified Noteholder Class Action Claims up to the Indemnified Noteholder Limit (table 2):

|  | Vote For | Vote Against | Total Votes |
|---|---|---|---|
| Class Action Indemnity Claims | 4 | 1 | 5 |

(c)     the number of Defence Costs Claims votes for and against the Plan and their value (table 3):

|  | Number of Votes | % | Value of Votes | % |
|---|---|---|---|---|
| Total Claims Voting For | 12 | 92.31% | $ 8,375,016 | 96.10% |
| Total Claims Voting Against | 1 | 7.69% | $ 340,000 | 3.90% |
| Total Claims Voting | 13 | 100.00% | $ 8,715,016 | 100.00% |

(d)     the overall impact on the approval of the Plan if the count were to include Total Unresolved Claims (including Defence Costs Claims) and if the entire $150 million of the Indemnified Noteholder Class Action Limit had been voted a "no" vote (table 4):

|  | Number of Votes | % | Value of Votes | % |
|---|---|---|---|---|
| Total Claims Voting For | 263 | 98.50% | $ 1,474,149,082 | 90.72% |
| Total Claims Voting Against | 4 | 1.50% | $ 150,754,087 | 9.28% |
| Total Claims Voting | 267 | 100.00% | $ 1,624,903,169 | 100.00% |

32.     A copy of the Minutes of the Meeting including a copy of the scrutineer's report is attached as Appendix H.

33.     The motion was carried and Meeting was terminated at approximately 10:34am.

**ADDITIONAL UPDATES**

*OSC Proceedings regarding EY*

34.     On December 3, 2012, the OSC issued a statement of allegations and notice of hearing against EY (Appendix I).  The hearing was set for January 7, 2013.

*Appeal of the Equity Decision*



35.    On November 28, 2012, the Underwriters provided notice of their intention to seek leave of the Supreme Court of Canada to appeal the Ontario Court of Appeal's decision dismissing the appeal of the Equity Claims Decision.  The Underwriters have now advised of their decision to not further pursue leave of the Supreme Court of Canada.

## REMAINING OBJECTIONS TO THE PLAN

36.    The Company and the ICNs have made significant progress in resolving issues relating to the Plan such that, neither the Ontario Plaintiffs nor the Quebec Plaintiffs are opposed to the Plan; and both Ernst & Young and the Underwriters are supportive of the Plan. As of the date of this Report, the Monitor is aware of objections to the Plan from only from BDO and one former director and one former officer.  The Company and the ICNs intend to continue to work to see if the objections of BDO can be resolved prior to the Sanction Hearing.

37.    As of the date of this Supplemental Report, the former director and former officer referred to above have written letters indicating their intention to object to the Plan.  For the reference of the Court, attached are the following documents:

(a)    Letter from Wardle Daley Bernstein re Claim of David Horsley dated November 29, 2012 and responding letter of Bennett Jones LLP dated November 30, 2012 (Appendix J);

(b)    Proof of Claim (excluding Tab 1 and 2) of David Horsley for vacation pay, termination and severance pay dated November 1, 2012 (Appendix K); and

(c)    Letter from Davis LLP re Kai Kit Poon dated November 28, 2012 and responding letter of Gowling Lafleur Henderson LLP dated November 29, 2012 (Appendix L).

38.    Additionally, the Monitor is aware that an individual, Mr. Lam, who the Monitor understands was a purchaser of shares after the release of the MW Report (and therefore not part of the Class Actions) has requested changes to the Plan to, among other things, expressly preserve his claims against the Third Party Defendants.  The Monitor has



written to Mr. Lam and indicated that it was not prepared to recommend any of the changes requested.

## RECOMMENDATION AND CONCLUSIONS

39.     The Thirteenth Report contained the Monitor's analysis as to the reasonableness of the Plan.  The Monitor remains of the view that liquidation or bankruptcy would not be more beneficial to the Company's Affected Creditors.

40.     As set out above, a number of outstanding objections to the Plan have now been settled and an overwhelming majority in number and in value of Affected Creditors with Voting Claims present in person or by proxy at the Meeting voted in favour of the Plan.

41.     Accordingly, for the reasons set out in the Thirteenth Report and this Supplemental Report, the Monitor believes that the Plan is fair and reasonable and respectfully recommends that this Honourable Court grant the Company's request for sanction of the Plan.

Dated this 4th day of December, 2012.

FTI Consulting Canada Inc.
In its capacity as Monitor of
Sino-Forest Corporation, and not in its personal capacity

Greg Watson
Senior Managing Director

Jodi Porepa
Managing Director

F T I
CONSULTING

## APPENDIX H – COPY OF THE MINUTES OF THE MEETING
## INCLUDING SCRUTINEER'S REPORT

*(See Attached)*



MINUTES OF THE MEETING OF CREDITORS OF

SINO-FOREST CORPORATION

RELATING TO THE PLAN OF COMPROMISE

AND REORGANIZATION DATED DECEMBER 3, 2012

**held at the Offices of Gowling Lafleur Henderson LLP, 1 First Canadian Place,
Suite 1600, 100 King Street West, Toronto, Ontario
on Monday, December 3, 2012 at 10:00 a.m.** *(Toronto time)*

---

## OPENING FORMALITIES AND APPOINTMENT OF SECRETARY AND SCRUTINEER

On December 3, 2012 at 10:12 a.m., Greg Watson, a Senior Managing Director of FTI Consulting Canada, the Court-appointed Monitor in the CCAA proceedings of Sino-Forest Corporation., took the Chair and commenced the meeting. The Monitor had been directed to chair the Meeting pursuant to an order issued by the Honourable Mr. Justice Morawetz of the Ontario Superior Court of Justice on August 31, 2012. Stephen McKersie, a Partner at Gowling Lafleur Henderson LLP, counsel to the Monitor, acted as Secretary of the Meeting. At the request of the Chairman, Jodi Porepa of the Monitor, acted as Scrutineer to report on the number of Affected Creditors present in person or represented by proxy at the Meeting and to report the results of the voting of Affected Creditor Claims at the Meeting.

## REPORT OF SCRUTINEER

The Chairman received the Scrutineer's report and advised the Meeting that quorum for the Meeting had been met since the Scrutineer's report on attendance showed that one or more Affected Creditors with Voting Claims were present at the Meeting (in person or by proxy). The report of the Scrutineer on attendance is annexed to these minutes of the Meeting as Schedule "A".

The Chairman requested that persons present at the Meeting identify themselves if they have a Voting Claim or an Unresolved Claim and wish to vote but have not received or submitted a proxy. No such persons identified themselves.

As a quorum was present, the Chairman called the Meeting to order to consider and vote on Sino-Forest's Plan of Compromise and Reorganization dated December 3, 2012 under the *Companies' Creditors Arrangement Act* and the *Canada Business Corporations Act.*

## NOTICE OF MEETING

The Chairman advised the Meeting that the notice calling the Meeting, together with accompanying meeting materials, including the Information Statement dated October 20, 2012 and a version of the Plan dated October 19, 2012, had been mailed to all Affected

Creditors of Sino-Forest on October 24, 2012. The Chairman also advised the Meeting that the following events occurred subsequent to the mailing of the original notice of meeting, which the Monitor provided notice of to the service list and posted on its website: (i) the Plan Supplement and Voting Procedures for the Meeting were mailed to all Affected Creditors on November 21, 2012; (ii) the original meeting date was postponed to 10:00am on Friday, November 30, 2012 to provide creditors with time to review a version of the Plan of Compromise and Reorganization that had been amended on November 28, 2012; (iii) the location of the Meeting was changed to the offices of Gowling Lafleur Henderson LLP; (iv) the meeting date was further postponed to 10:00am on Monday December 3, 2012; and (v) the Plan of Compromise and Reorganization was amended on December 3, 2012.

The Chairman dispensed with the reading of the notice of Meeting.

## PROPOSED AMENDMENTS TO THE PLAN

The Chairman then provided the Meeting with a summary of certain changes that had been made to the version of the Plan dated October 19, 2012, some of which were incorporated in the version of the Plan dated November 28, 2012 and others in the version of the Plan dated December 3, 2012. The Chairman's summary, which he provided for informational purposes only and qualified by cautioning the Meeting that reference should be made to the Plan itself, addressed changes to the Plan affecting or relating to: (i) the Reserves; (ii) the Litigation Trust; (iii) the creation of Newco II; (iv) conditions precedent to implementation of the Plan; (v) Third Party Defendants; (vi) the Underwriters; and (vii) Ernst & Young.

The Chairman then provided attendees at the Meeting the opportunity to ask questions about the Plan. Ken Dekker of Affleck Greene McMurtry LLP, counsel for BDO, asked a question regarding the timeframe for further detail surrounding the mechanics regarding the implementation of the Plan and the continuation of the Class Actions including matters relating to documentary discovery and the impact of the release. Derrick Tay of Gowlings, counsel for the Monitor, replied that while discussions may take place prior to the Sanction Hearing, it was unlikely that all such issues would be resolved prior to the Sanction Hearing.

## APPROVAL OF THE PLAN OF COMPROMISE AND REORGANIZATION

The Chairman then proceeded to address the formal business of the Meeting as set out in the Notice of Meeting, which is to consider and, if thought advisable, to pass a resolution to approve of Sino-Forest's Plan of Compromise and Reorganization dated December 3, 2012.

Rob Chadwick, a proxyholder, proposed the following three resolutions, which were read to the Meeting by the Chairman:

1.  The plan of compromise and reorganization (the "CCAA Plan") under the *Companies' Creditors Arrangement Act* (Canada) and the *Canada Business Corporations Act* concerning, affecting and involving Sino-Forest Corporation ("SFC"), substantially in the form of plan of compromise and reorganization dated December 3, 2012 (as such CCAA Plan may be amended, varied or supplemented by SFC from time to time in accordance with its terms) and the transactions contemplated therein be and it is hereby accepted, approved, agreed to and authorized;

2.  Notwithstanding the passing of this resolution by each Affected Creditor Class (as defined in the CCAA Plan) or the passing of similar resolutions or approval of the Ontario Superior Court of Justice (the "Court"), the board of directors of SFC, without further notice to, or approval of, the Affected Creditors (as defined in CCAA Plan), subject to the terms of the CCAA Plan, may decide not to proceed with the CCAA Plan or may revoke this resolution at any time prior to the CCAA Plan becoming effective, provided that any such decision after the issuance of a sanction order shall require the approval of the Monitor and the Court; and

3.  Any director or officer of SFC be and is hereby authorized, for and on behalf of SFC, to execute and deliver, or cause to be executed and delivered, any and all documents and instruments and to take or cause to be taken such other actions as he or she may deem necessary or desirable to implement this resolution and the matters authorized hereby, including the transactions required by the CCAA Plan, such determination to be conclusively evidenced by the execution and delivery of such documents or other instruments or taking of any such actions.

The Scrutineer tabulated the votes for Voting Claims and Unresolved Claims submitted by proxy for and against the foregoing three resolutions. The Chairman reported the results of the voting as follows, which, in addition to the calculation of votes necessary to determine whether the motion was carried, included voting calculations that were required to be made pursuant to the Meeting Order:

A.    *Votes of Affected Creditors with Voting Claims*:

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 250 | $1,465,766,204 | 99% | 99.97% |
| Against | 3 | $414,087 | 1% | 0.03% |
| **Total** | **253** | **$1,466,180,291** | **100%** | **100%** |

B.    *Votes in respect of Unresolved Claims*

|  | Number |
|---|---|
| In Favour | 4 |
| Against | 1 |
| **Total** | **5** |

C.    *Votes in respect of Defence Cost Claims:*

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 12 | $8,375,016 | 92% | 96% |
| Against | 1 | $340,000 | 8% | 4% |
| **Total** | **13** | **$8,715,016** | **100%** | **100%** |

D.    *Voting Results if all votes regarding Third Party Defendant's claims relating to Indemnified Noteholder Class Act Claims were Against the Plan (assuming the Unresolved Claims were to count towards the vote):*

|  | Number | Value | % Number | % Value |
|---|---|---|---|---|
| In Favour | 263 | $1,474,149,082 | 99% | 91% |
| Against | 4 | $150,754,087 | 1% | 9% |
| **Total** | **13** | **$1,624,903,169** | **100%** | **100%** |

The report of the Scrutineer on voting is annexed to these minutes of the Meeting as Schedule "B".

The Chairman declared the motion carried and the foregoing resolutions passed.

## OTHER BUSINESS AND TERMINATION

There being no further business to be brought before the Meeting, the Chairman terminated the Meeting at 10:34 a.m.

**GREG WATSON**
Chairman of the Meeting

**STEPHEN MCKERSIE**
Secretary of the Meeting

## SCHEDULE "A"

## REPORT OF THE SCRUTINEER ON ATTENDANCE

*See attached.*

SINO-FOREST CORPORATION

MEETING OF CREDITORS

December 3, 2012
10:00 a.m.

REPORT OF SCRUTINEER ON ATTENDANCE

Capitalized terms used herein and not otherwise defined have the meaning given to them in the Amended Plan of Compromise and Reorganization dated December 3, 2012 (the "Plan"), and if not defined in the Plan, the Thirteenth Report.

The undersigned scrutineer hereby reports that the following number of Affected Creditors with Voting Claims were present and voting at the meeting of creditors (the "Meeting") either in person or by proxy, as indicated below:

|  | Number of Votes | % | Value of Votes | % |
|---|---|---|---|---|
| Total Claims Voting For | 250 | 98.81% | $ 1,465,766,204 | 99.97% |
| Total Claims Voting Against | 3 | 1.19% | $ 414,087 | 0.03% |
| Total Claims Voting | 253 | 100.00% | $ 1,466,180,291 | 100.00% |

The total number of Affected Creditors with Voting Claims represented in person or by proxy at the Meeting was 253. Accordingly, the undersigned scrutineer hereby reports that a quorum, consisting of at least one Affected Creditor with a Voting Claim, was present at the Meeting in person or by proxy.

DATED the 3rd day of December, 2012.

Name of Scrutineer                    (please print)

J. Porepa

## SCHEDULE "B"

## REPORT OF THE SCRUTINEER ON VOTING

*See attached.*

TOR_LAW\ 8053063\1

SINO-FOREST CORPORATION

MEETING OF CREDITORS

December 3, 2012
10:00 a.m.

REPORT OF SCRUTINEER ON VOTING

Capitalized terms used herein and not otherwise defined have the meaning given to them in the Amended Plan of Compromise and Reorganization dated December 3, 2012 (the "Plan"), and if not defined in the Plan, the Thirteenth Report.

The undersigned scrutineer hereby reports on the results of voting of both Affected Creditors with Voting Claims and Affected Creditors with Unresolved Claims in connection with the Plan, who were present and voting at the meeting of creditors (the "Meeting") either in person or by proxy.

The results of the tabulation of Voting Claims includes:

(a)     The number of Voting Claims and their value for and against the Plan:

| | Number of Votes | % | Value of Votes | % |
|---|---|---|---|---|
| Total Claims Voting For | 250 | 98.81% | $ 1,465,766,204 | 99.97% |
| Total Claims Voting Against | 3 | 1.19% | $ 414,087 | 0.03% |
| Total Claims Voting | 253 | 100.00% | $ 1,466,180,291 | 100.00% |

On the basis of the foregoing, a majority in number of the Voting Claims representing approximately 100% of the value of Voting Claims present and voting at the Meeting have voted in favour of the resolution approving the Plan.

The Meeting Order requires that a separate tabulation be kept of results of the voting of Affected Creditors with Voting Claims and the results of all voting including those with Unresolved Claims. The results of the tabulation of Affected Creditors with Voting Claims and Unresolved Claims includes:

(a)    the number of votes for and against the Plan in connection with Class Action Indemnity Claims in respect of Indemnified Noteholder Class Action Claims up to the Indemnified Noteholder Limit of $150,000,000:

| | Vote For | Vote Against | Total Votes |
|---|---|---|---|
| Class Action Indemnity Claims | 4 | 1 | 5 |

(b)    the number of Defence Costs Claims votes for and against the Plan and their value:

| | Number of Votes | % | Value of Votes | % |
|---|---|---|---|---|
| Total Claims Voting For | 12 | 92.31% | $ 8,375,016 | 96.10% |
| Total Claims Voting Against | 1 | 7.69% | $ 340,000 | 3.90% |
| Total Claims Voting | 13 | 100.00% | $ 8,715,016 | 100.00% |

(c)    the overall impact on the approval of the Plan if the count were to include Total Unresolved Claims (including Defence Costs Claims) and if the entire $150 million of the Indemnified Noteholder Class Action Limit had been voted a "no" vote:

| | Number of Votes | % | Value of Votes | % |
|---|---|---|---|---|
| Total Claims Voting For | 263 | 98.50% | $ 1,474,149,082 | 90.72% |
| Total Claims Voting Against | 4 | 1.50% | $ 150,754,087 | 9.28% |
| Total Claims Voting | 267 | 100.00% | $ 1,624,903,169 | 100.00% |

On the basis of the foregoing, if 100% of the votes regarding Third Party Defendants' claims relating to the Indemnified Noteholder Class Action Claims were against the Plan and were the Unresolved Claims to count towards the vote, the results of the vote would have been that a majority in number of the Voting Claims representing approximately 91% of the value of Voting Claims present and voting at the Meeting have voted in favour of the resolution approving the Plan.

DATED the 3rd day of December 2012.

- 3 -

Name of Scrutineer          (please print)

J. Porepa