**<u>Exhibit D</u>**
**<u>Affidavit of W. Judson Martin in support of the Plan,</u>**
**<u>sworn and submitted to the Ontario Court on November 29, 2012</u>**

Court File No.

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

**AFFIDAVIT OF W. JUDSON MARTIN**
**(Sworn March 30, 2012)**

I, W. Judson Martin, of the City of Hong Kong, Special Administrative Region, People's Republic of China, **MAKE OATH AND SAY:**

1.    I am the Vice-Chairman and Chief Executive Officer of Sino-Forest Corporation ("SFC"). I therefore have personal knowledge of the matters set out below, except where otherwise stated. Where I do not possess personal knowledge, I have stated the source of my information and I believe such information to be true.

2.    This affidavit is sworn in support of an application by SFC for an initial order (the "Initial Order") pursuant to the *Companies' Creditors Arrangement Act* (the "CCAA"), a sale process order (the "Sale Process Order") and other requested relief.  In preparing this affidavit, I have consulted with other members of SFC's senior management team and, where necessary, members of the senior management teams of certain of SFC's subsidiaries.

2

3.     All references to dollar amounts contained in this affidavit are to United States Dollars unless otherwise stated.

## I.     OVERVIEW

4.     SFC is a Canadian corporation and is the direct or indirect parent of approximately 140 subsidiaries, the majority of which are incorporated in the People's Republic of China (the "PRC"). The terms "Sino-Forest Companies" and "Sino-Forest" refer to the global enterprise as a whole (but, for greater certainty, do not include the Greenheart Group, defined below).

5.     Sino-Forest is a major integrated forest plantation operator and forest products company. Its principal businesses include the ownership and management of plantation forests, the sale of standing timber and wood logs, and the complementary manufacturing of downstream engineered-wood products. The majority of Sino-Forest's plantations are located in the southern and eastern regions of the PRC, primarily in inland regions suitable for large-scale replanting.

6.     Sino-Forest's business operations are mainly in the PRC with corporate offices in Hong Kong and Ontario, Canada.

7.     On June 2, 2011, Muddy Waters, LLC ("Muddy Waters"), which held a short position on SFC's shares, published a report (the "MW Report") alleging that Sino-Forest, among other things, was a "near total fraud" and a "Ponzi scheme." SFC's board of directors (the "Board") appointed an independent committee (the "IC") to investigate the Muddy Waters allegations.

8.     While the IC has been able to address certain of the allegations made by Muddy Waters, the MW Report has had a ripple effect in causing substantial damage to SFC, its business, and future prospects for viability. As part of the fallout from the MW Report, (i) SFC now finds

itself embroiled in multiple class action proceedings across Canada and in the U.S., (ii) SFC is the subject of Ontario Securities Commission ("OSC"), Hong Kong Securities and Futures Commission ("HKSFC"), and Royal Canadian Mounted Police ("RCMP") investigations, and (iii) SFC's Audit Committee recommended, and the Board agreed, that SFC should defer the release of SFC's third quarter 2011 financial statements (the "Q3 Results") until certain issues could be resolved to the satisfaction of the Board and SFC's external auditor

9.    Significantly, SFC's inability to file its Q3 Results resulted in a default under its note indentures, which could have resulted in the acceleration and enforcement of approximately $1.8 billion in notes issued by SFC and guaranteed by many of its subsidiaries.

10.    Following extensive discussions with an ad hoc committee of noteholders (the "Ad Hoc Noteholders"), holders of a majority in principal amount of SFC's senior notes agreed to waive the default arising from SFC's failure to release the Q3 Results on a timely basis, on certain terms and conditions that were set forth in waiver agreements between certain of the noteholders and SFC, which were made publicly available on January 12, 2012 and are attached as Exhibit "A".

11.    While the waiver agreements prevented the indenture trustees under the relevant note indentures from accelerating and enforcing the note indebtedness as a result of SFC's failure to file its Q3 Results, those waiver agreements will expire on the earlier of April 30, 2012 and any earlier termination of the waiver agreements in accordance with their terms.  In addition, SFC's pending failure to file its audited financial statements for its fiscal year ended December 31, 2011 (the "2011 Results") by March 30, 2012 will again put the indenture trustees in a position

to accelerate and enforce the bond indebtedness, creating additional uncertainty around Sino-Forest's business.

12.    SFC has made considerable efforts to address issues identified by SFC's Audit Committee and the IC and by its external auditor, Ernst & Young LLP, as requiring resolution in order for SFC to be in a position to obtain an audit opinion in relation to its 2011 financial statements.

13.    However, notwithstanding SFC's best efforts, many of these issues cannot be resolved to the satisfaction of SFC's auditor or cannot be resolved within a timeframe that would protect and preserve the value of the business, and that would allow SFC to comply with its obligations under its note indentures.    Therefore, absent a resolution with the noteholders, the indenture trustees would be in a position to enforce their legal rights as early as April 30, 2012.

14.    Following extensive arm's length negotiations between SFC and the Ad Hoc Noteholders, the parties agreed on the framework for a consensual resolution of SFC's defaults and the restructuring of its business, and entered into a support agreement (the "Support Agreement") on March 30, 2012, which was executed by holders of SFC's notes holding approximately 40% of the notes. The Support Agreement contemplates, and in fact provides an incentive for, additional noteholders becoming party to the Support Agreement by way of joinder agreements. Accordingly, I fully expect that noteholders holding more than 50% of each series of notes will ultimately sign up to the Support Agreement.

15.    The Support Agreement provides that SFC will pursue a plan of arrangement or compromise (the "Plan") on the terms set out in the Support Agreement in order to implement the agreed-upon restructuring transaction as part of this CCAA proceeding which would, among other things, (i) see SFC's business operations conveyed to, and revitalized under, a new entity to

be owned primarily by the noteholders ("SF Newco"), (ii) provide stakeholders of SFC with claims ranking behind the noteholders (the "Junior Constituents") with certain participation rights in SF Newco, and (iii) create (and provide funding for) a framework for the prosecution of certain litigation claims for the benefit of certain of SFC's stakeholders. The agreement also provides that each noteholder that is a signatory thereto (the "Consenting Noteholders") will vote its notes in favour of the Plan at any meeting of creditors.

16.    The Support Agreement further provides that SFC will undertake a sale process (the "Sale Process") in accordance with the sale process procedures (the "Sale Process Procedures") which have been developed in consultation with the proposed monitor, and have been accepted by the parties to the Support Agreement.

17.    The Sale Process is intended to provide a "market test" by which third parties may propose to acquire Sino-Forest's business operations through a CCAA Plan (in a manner that would under certain scenarios potentially allow Junior Constituents to share in the proceeds of a sale even though the noteholders may not be paid in full) as an alternative to the SF Newco restructuring transaction between SFC and its noteholders, described above.

18.    A redacted copy of the Support Agreement (redacted to preserve confidentiality of the parties only) is attached as Exhibit "**B**" and will be posted on SEDAR and the proposed monitor's website at http://cfcanada.fticonsulting.com/sfc.

19.    As described in greater detail below, SFC's business operations are primarily in the PRC and are held by SFC through intermediate holding companies incorporated (for the most part) in either the British Virgin Islands ("BVI") or Hong Kong. Most of these intermediate holding companies are guarantors of SFC's note indebtedness.

20.    As further described below, as a result of the uncertainty created by the MW Report, Sino-Forest's business has been severely curtailed, and Sino-Forest's ability to grow its business has been severely reduced. Therefore, SFC now needs to be restructured in order to continue the development of the business and unlock the value of its asset base for the benefit of its stakeholders.    Further, although the PRC government has been generally cooperative and encouraging of Sino-Forest to date, it has expressed increasing concern as to the future of Sino-Forest in the PRC.  As discussed below, the ongoing support and relationship with the PRC government (on all levels) is crucial to Sino-Forest's operations.

21.    Among other things, the Sino-Forest Companies are (i) having a difficult time maintaining existing and obtaining new credit in the PRC to help fund the PRC-based business operation and in Hong Kong for the imported log trading business, (ii) making very few purchases of new timber (and therefore not expanding their asset base), (iii) finding it difficult to collect their accounts receivables, and (iv) receiving increasing demands on their accounts payable.  I believe that, if Sino-Forest's business is to be saved in a manner beneficial to SFC's stakeholders, it is imperative that SFC take steps to demonstrate that Sino-Forest's business is being separated from the uncertainty created by the MW Report.

22.    Accordingly, and for the reasons set out herein, the commencement of a restructuring and the Sale Process is urgently required and should be pursued to preserve SFC's business as a going concern and thus the inherent value of the enterprise.

23.    This application has been authorized by the Board.

## II.    PERSONAL BACKGROUND

24.    I began my career with PricewaterhouseCoopers in 1979.    In 1982 I joined Trizec Corporation Ltd. ("Trizec"), a Toronto Stock Exchange ("TSX") listed commercial real estate company then controlled by the Brascan Group.    During my 13 years with the group of companies controlled by the Brascan Group, I held several senior positions, including Vice President, Finance and Treasurer of Trizec, Executive Vice President and Chief Financial Officer of Brookfield Development Corporation, and President and CEO of Trilon Securities Corporation.

25.    After leaving the Brascan Group, I joined MDC Corporation, where my positions included Senior Executive Vice President, Chief Financial Officer and Chief Operating Officer, and a member of the company's board of directors.

26.    In 1999, I was appointed Senior Executive Vice President and Chief Financial Officer of Alliance Atlantis Communications Inc. ("Alliance Atlantis"), then Canada's leading entertainment and broadcasting company that was then listed on the TSX and on the NASDAQ. I ceased to be an executive and employee of Alliance Atlantis in 2005 due to health reasons and thereafter acted as a consultant to Alliance Atlantis until 2007.

27.    I have been a director of SFC since 2006.  I joined the Board in 2006 as an independent, external director.  I was appointed Lead Director in 2007, a position I held until June 2010, when I became an employee of SFC responsible for its acquisition of Greenheart Group Limited (Bermuda) ("Greenheart") and its subsidiaries (collectively, the "Greenheart Group").  At that time I became Executive Vice-Chairman of SFC and, following SFC's acquisition of a majority interest in Greenheart in August 2010, I became the CEO and an Executive Director of

Greenheart and in 2011 was appointed Chairman of Greenheart. On August 26, 2011, I was appointed as CEO of SFC. I have lived and worked out of Hong Kong since becoming an employee of SFC in 2010.

## III.    SINO-FOREST CORPORATION

### A.    Overview

28.    SFC was formed under the *Business Corporations Act* (Ontario) upon the amalgamation of Mt. Kearsage Minerals Inc. and 1028412 Ontario Inc. pursuant to articles of amalgamation dated March 14, 1994. The articles of amalgamation were amended by articles of amendment filed on July 20, 1995 and May 20, 1999 to effect certain changes in the provisions attaching to SFC's class A subordinate-voting shares and SFC's class B multiple-voting shares.

29.    On June 25, 2002, SFC filed articles of continuance to continue under the *Canada Business Corporations Act* (the "CBCA"). On June 22, 2004, SFC filed articles of amendment whereby its class A subordinate-voting shares were reclassified as common shares and its class B multiple-voting shares were eliminated. A copy of the articles of continuance referred to above is attached as Exhibit "**C**".

30.    Subject to paragraph 31 below, copies of all SFC financial statements prepared during the year preceding the application for the Initial Order are attached as Exhibit "**D**". In considering these financial statements, the Court should be aware that SFC cautioned in a January 10, 2012 press release, a copy of which is attached as Exhibit "**E**", that its historic financial statements (upon which portions of this affidavit are based) and related audit reports should not be relied upon. The circumstances giving rise to the press release are discussed below.

31.   Attached as Exhibit "F" is a copy of the management-prepared unaudited financial statements for the third quarter of 2011.  These statements have not been approved by SFC's Audit Committee or the Board and are subject to the limitations described in the January 10, 2012 press release.  Moreover, they have not been subject to the same level of internal and external review and analysis as SFC's prior annual audited and quarterly financial statements. These financial unaudited statements have not previously been publicly disclosed.

32.   Sino-Forest is a publicly listed major integrated forest plantation operator and forest products company, with assets predominantly in the PRC.  Its principal businesses include the sale of standing timber and wood logs, the ownership and management of forest plantation trees, and the complementary manufacturing of downstream engineered-wood products.  As at December 31, 2010, Sino-Forest reported approximately 788,700 hectares of forest plantations under management, located primarily in the southern and eastern regions of the PRC.

33.   In addition, SFC holds an indirect majority interest in Greenheart, a Hong Kong listed investment holding company, which, together with its subsidiaries, as at March 31, 2011, owned certain rights and managed approximately 312,000 hectares of hardwood forest concessions in the Republic of Suriname ("Suriname") and 11,000 hectares of a radiata pine plantation on 13,000 hectares of freehold land in New Zealand.

34.   While Greenheart is an indirect subsidiary of SFC, it has its own distinct operations and financing arrangements and is not party to or a guarantor of the notes issued by SFC.  Greenheart Group and SFC operate out of separate office buildings in Hong Kong.

35.   Greenheart Group was not implicated in the allegations made against Sino-Forest by Muddy Waters on June 2, 2011, discussed below.  As such, the Greenheart Group and matters

relating thereto are not intended to be affected by or included in this proceeding. Greenheart Group has nevertheless been impacted by the allegations made against Sino-Forest. Among other things, Greenheart Group has previously relied on funding from SFC and could be negatively impacted if SFC's business ceases to operate as a going concern. This in turn could negatively impact the value of SFC's investment in Greenheart.

36.    Since 1995, SFC has been a publicly listed company on the TSX with its shares traded under the symbol "TRE". SFC's registered office is in Mississauga, Ontario and its principal executive office is in Hong Kong. Two of SFC's senior financial officers reside in Ontario, as do three of its external directors.

37.    SFC has issued four series of notes which have a combined principal amount outstanding of approximately $1.8 billion. Two of the series of notes are supported by guarantees from 64 of SFC's subsidiaries (none of which are incorporated in the PRC), and the other two series of notes are supported by guarantees from 60 of those same subsidiaries and share pledges from 10 of those same subsidiaries.

38.    Certain other Sino-Forest Companies have their own distinct banking facilities which are not intended to be affected by or included in this proceeding. In particular, none of the subsidiaries incorporated in the PRC are party to or guarantors of SFC's notes and are not intended to be affected by or included in this proceeding.

## B.    Corporate Structure

39.    SFC is the sole shareholder of Sino-Panel Holdings Limited (incorporated in the BVI), Sino-Global Holdings Inc. (incorporated in the BVI), Sino-Panel Corporation (incorporated in Canada), Sino-Wood Partners Limited (incorporated in Hong Kong), Sino-Capital Global Inc.

(incorporated in the BVI), and Sino-Forest International (Barbados) Corporation (incorporated in Barbados).    SFC also holds all of the preference shares of Sino-Forest Resources Inc. (incorporated in the BVI).    Some of these subsidiaries have further direct and indirect subsidiaries.    A copy of the Sino-Forest corporate organization chart is attached as Exhibit "G" (which includes certain major subsidiaries of Greenheart).

40.    A total of 137 entities make up the Sino-Forest Companies: 67 PRC incorporated entities (with 12 branch companies), 58 BVI incorporated entities, 7 Hong Kong incorporated entities, 2 Canadian entities and 3 entities incorporated in other jurisdictions.    A list of all subsidiaries with addresses is attached as Exhibit "H" (which does not include subsidiaries of Greenheart, but does contain Sino-Forest branch companies).

## C.    Capital Structure

### 1.    Equity

41.    The authorized share capital of SFC consists of an unlimited number of common shares and an unlimited number of preference shares issuable in series.    Each holder of common shares is entitled to one vote at meetings of shareholders other than meetings of the holders of another class of shares.

42.    Each holder of common shares is also entitled to receive dividends if, as and when declared by the Board.    Holders of common shares are also entitled to participate in any distribution of net assets upon liquidation, dissolution or winding-up on an equal basis per share. There are no pre-emptive, redemption, retraction, purchase or conversion rights attaching to the common shares.

43.   As at June 30, 2011, a total of 246,095,926 common shares were issued and outstanding.
No preference shares have been issued.

### 2.   Debt

44.   SFC has issued four series of notes which remain outstanding.  The four series of notes
mature at various times between 2013 and 2017.  The note indenture for each series of notes
provides that it is governed by New York law.  Each note indenture contains a "no suits by
holders" clause.  Other than the debt outstanding under the notes, SFC does not have any
significant levels of normal course payables.

### (a) 2017 Senior Notes

45.   On October 21, 2010, SFC issued guaranteed senior notes in the principal amount of $600
million.  These notes mature on October 21, 2017, and interest is payable semi-annually, on
April 21 and October 21, at a rate of 6.25% per annum.  These notes are listed on the Singapore
Stock Exchange and are supported by guarantees from 60 subsidiaries of SFC and share pledges
from 10 of those same subsidiaries.  A copy of the relevant indenture is attached as Exhibit "I".

### (b) 2016 Convertible Notes

46.   On December 17, 2009, SFC issued convertible guaranteed notes in the principal amount
of $460 million.  These notes mature on December 15, 2016, and interest is payable semi-
annually, on June 15 and December 15, at a rate of 4.25% per annum.  These notes are supported
by guarantees from 64 subsidiaries of SFC.  A copy of the relevant indenture is attached as
Exhibit "J".

### (c) 2014 Senior Notes

47.   On July 27, 2009, SFC issued guaranteed senior notes in the principal amount of $399,187,000. These notes mature on July 28, 2014, and interest is payable semi-annually, on January 26 and July 26, at a rate of 10.25% per annum. These notes are listed on the Singapore Stock Exchange and are supported by guarantees from 60 subsidiaries of SFC and share pledges from 10 of those same subsidiaries. A copy of the relevant indenture is attached as Exhibit "K".

### (d) 2013 Convertible Notes

48.   On July 23, 2008, SFC issued convertible guaranteed notes in the principal amount of $345 million. These notes mature on August 1, 2013, and interest is payable semi-annually, on February 1 and August 1, at a rate of 5% per annum. These notes are supported by guarantees from 64 subsidiaries of SFC. A copy of the relevant indenture is attached as Exhibit "L".

49.   In addition to the four series of notes issued by SFC, many of SFC's subsidiaries (including the Greenheart Group and many of those incorporated in the PRC) have their own distinct banking facilities, including lending facilities, which are not intended to be affected by this proceeding.

### D.    The Business Model

### 1.    Plantation / Timber Rights in the PRC

50.   There are four types of rights associated with plantations in the PRC, namely (i) plantation land ownership, (ii) plantation land use rights, (iii) timber ownership, and (iv) timber use rights. All of these are separate rights and can be separately owned by different parties.

51.    Generally, private enterprises cannot own plantation land in the PRC but may hold

plantation land use rights for a specified duration (up to 70 years but typically 30 to 50 years),

timber ownership and timber use rights.  However, foreign enterprises cannot acquire land use

rights and can instead only acquire timber ownership or timber use rights.

52.    The various rights associated with plantations in the PRC and the limitations on which

entities can hold which rights were the driving forces behind Sino-Forest's complex business

models discussed below.

53.    For its timber business in the PRC, Sino-Forest utilizes two models, one involving BVI

entities ("BVIs"), and the other involving subsidiaries incorporated in the PRC as wholly foreign

owned enterprises ("WFOEs").

### 2.    The BVI Model

54.    Until 2004, due to restrictions on foreign companies carrying on business in the PRC, and

foreign ownership restrictions on land ownership and use rights, the BVI structure was the model

primarily used by Sino-Forest for its forestry business in the PRC.  Sino-Forest has established

58 BVI companies, 55 of which are guarantors of at least certain of SFC's notes.  Not all of these

BVIs are involved in the BVI model or standing timber business.  Of the 58, there are 20

involved in the BVI standing timber business while the remaining BVIs are either holding

companies or used in Sino-Forest's log trading business.

55.    The Sino-Forest BVI entities involved in the standing timber business acquire standing

timber from suppliers.  The suppliers are usually aggregators who acquire the standing timber

and, typically, land use rights from other suppliers or from original timber owners, such as

villagers or collectives, or from smaller aggregators.  As non-PRC companies, the BVIs could

not and did not acquire land use rights in the PRC, and instead only acquired the rights to timber in the PRC pursuant to the relevant standing timber purchase contracts.

56.    Due to restrictions under PRC laws, foreign companies are not permitted to conduct business in the PRC without business licenses granted by competent governmental authorities. Therefore, the Sino-Forest BVI entities do not sell standing timber directly to customers. Instead, for historical and commercial reasons, they conduct the sale of standing timber through "authorized intermediaries" ("AIs", which are also called "entrusted sales agents" in the BVI model) pursuant to "entrusted sales agreements". The AIs serve as Sino-Forest's customers under the BVI model of its standing timber business.

57.    Pursuant to the entrusted sales agreements entered into with the AIs, the AIs are obliged to deduct and remit all of the applicable taxes on behalf of Sino-Forest. Sino-Forest is not, however, in a position to know whether or not the AIs have in fact remitted applicable taxes on behalf of Sino-Forest.

58.    As at June 30, 2011, Sino-Forest therefore accumulated and recognized a provision, based on a probability-weighted average of the amounts that the PRC tax authorities might seek to recover under various scenarios, of $204,722,000 in its reported financial results to account for this potential tax liability. The method used to calculate this provision is explained at note 18 of SFC's 2011 second quarter financial statements, which were previously attached. A similar provision was included in SFC's 2010 Audited Financial Statements and was audited by SFC's external auditors.

59.    BVIs are not allowed to have bank accounts in the PRC and money flowing in and out of the PRC is strictly controlled through foreign exchange controls. As a result, the Sino-Forest

BVI entities do not directly pay the suppliers or receive payments from the AIs. Instead, they are instructed to make set-off payments under which, pursuant to the instructions of Sino-Forest, AIs directly or indirectly make payments directly or indirectly to Sino-Forest's suppliers for amounts owed by Sino-Forest BVI entities to those suppliers. As a result, no cash actually flows directly through the BVIs. SFC then receives confirmations from the suppliers confirming that payments have been made.

60.    The BVI structure is the central driver of asset value, revenue and income for Sino-Forest. As at December 31, 2010, it accounted for $2.476 billion of book value (466,826 hectares of timber assets, representing approximately 59.2% of Sino-Forest's timber holdings by area and 89.2% of its timber holdings by book value), $1.326 billion in revenue (representing approximately 70% of Sino-Forest's revenue), and approximately $622 million of gross profit (representing approximately 92.6% of Sino-Forest's gross profits) for the year then ended.

61.    The cashless nature of the BVI model means that Sino-Forest cannot obtain cash from its operations or monetize its assets without engaging in the complicated on-shoring process which is discussed further below. Furthermore, the set-off payment system necessitated by the BVI model impaired the IC's efforts to verify the flow of funds during its investigation.

### 3.    The WFOE Model

62.    Commencing in 2004, the PRC's Ministry of Commerce permitted foreign investors to invest in PRC-incorporated trading companies and to participate in most areas of the commodity distribution industry, including the purchase of standing timber and land use rights throughout the PRC.    Prior to this time, WFOEs were prohibited from engaging in the commodity distribution industry.

63.    Since 2004, almost all of Sino-Forest's new capital invested in timber assets has been
employed through the WFOE model (as opposed to the BVI model).

64.    Unlike BVIs, WFOEs can acquire land use rights or land leases as well as standing timber
rights, and can have bank accounts in the PRC.    Because of the WFOEs' direct presence in the
PRC, they can also obtain financing from PRC banks to finance their operations. WFOEs can log
the timber and sell both logs and standing timber to end customers, which means they do not
need (and do not use) AIs. The WFOEs directly pay the suppliers for the standing timber and
directly receive payment from end customers instead of utilizing the set-off arrangement used by
Sino-Forest's BVI entities in the BVI model.

65.    As at December 31, 2010, Sino-Forest's WFOEs held approximately 244,000 hectares of
purchased plantations (representing approximately 30.9% of Sino-Forest's timber holdings by
area) and 77,700 hectares of planted plantations (representing approximately 9.9% of Sino-
Forest's timber holdings by area).    Purchased plantations and planted plantations are discussed in
further detail below.    The WFOE standing timber assets accounted for approximately 10.8% of
Sino-Forest's timber holdings by book value, and represented approximately $298.6 million of
book value, $74 million in revenue, and $10 million of income for the 2010 year before the
allocation of corporate overhead.

66.    None of Sino-Forest's WFOEs are guarantors of SFC's notes, nor have their shares been
pledged by their BVI parents.

   **4.    On-shoring Plan**

67.    Given the inherent problems with the BVI structure and the relative advantages of the
WFOE structure, Sino-Forest has explored various methods of migrating or "on-shoring" its BVI

timber assets into WFOE structures. The successful transition of assets from a BVI structure to a WFOE structure has many merits including, significantly, providing a foreign parent an ability to have direct access to the cash generated from the sale of BVI timber assets.

68.    The on-shoring process is expected to be a multi-year process due to (i) the volume of assets that need to be moved into the WFOE model, (ii) the large number of different locations in which Sino-Forest has timber assets in the PRC, (iii) the likely multiple rounds of negotiations required with the various stakeholders in each location, and (iv) SFC's limited resources.

## E.    Operations

69.    Sino-Forest's operations are comprised of three core business segments.    Wood fibre operations and log trading are the primary revenue contributors, while manufacturing and other operations enhance the value of the fibre operations by producing downstream products.

### 1.    Wood Fibre Operations

70.    Sino-Forest's wood fibre operations consists of acquiring, cultivating and selling standing timber or logs from purchased and planted plantations in nine provinces across the PRC.

71.    Sino-Forest's upstream wood fibre operations generate the majority of its revenue, accounting for 96.4% of total revenue in the year ended December 31, 2010.    Most of the standing timber and logs sold by Sino-Forest come from Sino-Forest's tree plantations, located primarily in the southern and eastern regions of the PRC.

72.    Sino-Forest operates plantations for the wood fibre operations using two principal business models: purchased and planted, each of which is explained in greater detail below.    The purchased plantation model operates through two legal structures: the BVI/AI legal structure

and, to a lesser but growing extent, the WFOE legal structure. The planted plantations model is operated exclusively through the WFOE legal structure, although the WFOEs themselves are typically held indirectly through a BVI holding structure. Many foreign investors, including well known multi-national companies, hold their investments in the PRC in special purpose vehicles established overseas in jurisdictions with a familiar and internationally accepted system of corporate governance. For example, over 75% of blue chip companies listed on the Hong Kong Stock Exchange (Hang Seng Index constituent stocks excluding the Finance Sub-Index) utilize BVI holding structures, including for their investments in the PRC.

### (a)   Purchased Plantation Model

73.   The purchased plantation model under the BVI/AI legal structure involves the purchase of standing timber and sale of standing timber pursuant to standardized timber purchase agreements and "entrusted sale agreements". The standing timber purchased is generally on land owned by collectives or villages, not PRC state-owned land. When conducted through the BVI/AI legal structure, of which 20 BVIs hold all of the BVI timber assets, the timber purchases are arranged through suppliers.

74.   The BVI structure does not involve the BVIs concurrently purchasing land use rights or leases with the purchase of standing timber, as the BVIs cannot legally acquire land use rights. However, the BVIs' supply contracts typically contain a right of first refusal for the BVIs to acquire, or nominate an affiliate to acquire, the plantation land use rights after the timber has been harvested. Despite such common contractual provisions, such right has rarely, if ever, been exercised.

75.    The BVIs do not sell standing timber directly to customers. They sell under contract to the AI (customer) who usually resells the standing timber to its own customers. The BVIs' timber sales accounts receivables are settled by the AI making payments to suppliers (directly or indirectly to other parties on their behalf) on behalf of Sino-Forest. The AI does not pay the same supplier for the same trees it is selling to its customers. It pays a supplier for trees newly purchased by Sino-Forest from that supplier. These payments made by way of set-off enable the BVIs to acquire further standing timber from suppliers, which is matured and later sold. All BVI purchases are funded through the set-off mechanism using accounts receivable owed to Sino-Forest. This is a recognized legal structure in the PRC.

76.    WFOEs are also engaged in the purchase and sale of standing timber. When conducted through a WFOE, purchases of standing timber are sometimes accompanied by concurrently obtaining plantation land use rights or leases (which are purchased plantations). WFOE standing timber transactions do not involve payments by way of set-off. They are conducted on a direct fund transfer basis.

77.    In both the BVI and WFOE structure, the purchase price of the trees takes into account a variety of factors such as the trees' species, yield, age, size, quality and location. Other considerations include soil and weather conditions for replanting, log prices, and regional market location and demand. Sino-Forest does not typically need to conduct extensive plantation management work with respect to the trees growing on the purchased plantations, but does take measures to ensure that the trees are protected from pests, disease and theft.

78.  SFC's approach is to purchase plantations in remote parts of the PRC that the PRC
government has identified in its five year plans as being areas for future development.  As a
result, physical access to the plantations is often very challenging.

79.  As at December 31, 2010, the purchased plantations under Sino-Forest management in the
PRC consisted of approximately 711,000 hectares.  These plantations consisted of a diverse mix
of tree species, predominantly pine, Chinese fir and eucalyptus.  Purchasing trees allows Sino-
Forest to quickly expand its plantation portfolio geographically, as well as its inventory of
harvestable fibre and leasable land.

### (b)    Planted Plantation Model

80.  The planted plantation model is conducted by WFOEs, and involves obtaining plantation
land use rights, sometimes with standing timber and sometimes as bare land suitable for planting.
Sales from these planted plantations do not utilize the AI model but rather generally involve
direct fund transfers to and from the WFOEs' suppliers and customers.  As of December 31,
2010, SFC's planted plantations in the PRC operated through WFOEs comprised approximately
77,700 hectares.

81.  Sino-Forest leases suitable land on a long-term basis, typically 30 to 50 years, and applies
scientifically advanced seedling technology and silviculture techniques to improve tree growth.
The mature trees are sold as standing timber or as harvested logs, and then Sino-Forest replants
the land with seedlings.

82.  Sino-Forest's operating model allows for the sale of fibre either as standing timber or
harvested logs, depending on its customers' preferences and market demand.

83.    Sino-Forest's planted plantations consist primarily of eucalyptus trees, a fast-growing high yielding species.  According to the seventh five-year National Forest Inventory released by the State Forestry Administration (2004 to 2008), it is estimated that the PRC has 195 million hectares of forest resources, with approximately 120 million hectares of natural forest and 62 million hectares of plantation forest.  The density of its total forest area was only 70 cubic metres per hectare in the PRC.

84.    The PRC government encourages the development of the plantation industry in the PRC. In June 2003, the PRC State Council promulgated "The Notice on the Decision to Speed Up the Development of Plantation Industry".  Subsequently, in August 2007, "The Key Elements of the Policies in Forestry Industry" was jointly promulgated by seven ministries including the State Forestry Administration, National Development and Reform Commission, Ministry of Finance, Ministry of Commerce, State Administration of Taxation, China Banking Regulatory Commission and China Securities Regulatory Commission to develop the non-state owned plantation industry, and to encourage the participation of foreign investors in the plantation industry, either solely or jointly with others.

85.    The planted plantation model is generally viewed more favourably by the PRC government because it demonstrates a long-term commitment to the forestry business.  That long-term commitment is very important from the perspective of the PRC government in light of the fact that demand for wood fibre in the PRC is approximately double that of available supply.

## 2.    Log Trading Operations

86.    Sino-Forest's operations in the trading of wood logs includes the sourcing of wood logs and wood-based products from the PRC and globally, and selling them in the domestic PRC market.

87.    These wood-based products consist primarily of large diameter logs, sawn timber, veneers and other wood-based products sourced from the PRC, Thailand, Suriname, Papua New Guinea, Brazil, Vietnam, Russia and New Zealand. In these transactions, Sino-Forest purchases wood-based products that correspond to the requirements of wood dealers, and sells directly to these dealers. Sino-Forest's customers in these transactions are primarily wood dealers in the PRC.

### 3.    Manufacturing and Other Operations

88.    Sino-Forest currently has manufacturing operations in six provinces in the PRC that produce various wood-based products. In addition, Sino-Forest has greenery and nursery operations based in Jiangsu Province, which were established to source, supply and manage landscaping products for property developers and other organizations.

89.    In order to maximize and increase the value of Sino-Forest's forestry products, Sino-Forest has been investing in research and development ("R&D"). On January 12, 2010, Sino-Forest announced its acquisition of HOMIX LIMITED ("HOMIX") in order to enhance its R&D portfolio. HOMIX has an R&D laboratory and two engineered-wood production operations based in Guangdong and Jiangsu provinces, covering eastern and southern PRC wood product markets. HOMIX develops a number of new technologies suitable for domestic plantation logs including poplar and eucalyptus species. HOMIX specializes in curing, drying and dyeing methods for engineered-wood and has the know-how to produce recomposed wood products and laminated veneer lumber. Recomposed wood technology is considered to be environmentally friendly and versatile, as it uses fibre from forest plantations, recycled wood and/or wood residue.

90.    The goal of Sino-Forest's R&D efforts has been to improve tree plantation yields and the quality of the trees grown on Sino-Forest's plantations. While performing R&D activities, Sino-Forest from time to time collaborates with, and receives assistance from, research and academic institutions in the PRC. Sino-Forest's R&D efforts are viewed very positively in the PRC as they also demonstrate a long-term commitment to the forestry business in the PRC and can help address the significant shortage of wood fibre in the PRC.

**F.    Sales**

91.    Substantially all of Sino-Forest's sales are generated in the PRC. In the year ended December 31, 2010, sales to customers in the PRC were $1.8723 billion and sales to customers located in other countries were $51.3 million. In the year ended December 31, 2010, sales to customers in the PRC of standing timber, logs and other wood-based products accounted for substantially all of Sino-Forest's revenue.

**G.    Suppliers**

92.    Logs and wood-based products supplied through Sino-Forest's trading activities are sourced primarily from suppliers outside the PRC. These products are also sourced for Sino-Forest trading activities from overseas, primarily from Thailand, Suriname, Papua New Guinea, Brazil, Vietnam, Russia and New Zealand. The credit terms granted by suppliers of these products generally range from one to three months on open account and by letters of credit. Standing timber is sourced primarily from local suppliers in the PRC.

93.    As discussed above, the PRC based suppliers are usually aggregators who acquire standing timber and/or land use rights from other suppliers or from original timber owners such as villagers or collectives who have certified title to the land.

## H.    Employees

94.    SFC currently has 3 employees. Collectively, the Sino-Forest Companies employ a total of approximately 3553 employees, with approximately 3460 located in the PRC and approximately 90 located in Hong Kong. The Greenheart Group employs an additional approximately 273 employees.

## I.    Assets & Liabilities

95.    The unconsolidated book values of SFC's assets and liabilities as at June 30, 2011 are listed below.[1] However, given that, as described below, SFC is in default under the notes and the indenture trustees would be in a position to accelerate and enforce on the notes but for the waiver agreements (subject to sending the appropriate notices and the cure period expiring), I have categorized the full amount of the notes (including the non-current portion and the derivative financial instrument, as opposed to just the current portion) as a current liability below.

| Current Assets | | Current Liabilities | |
|---|---|---|---|
| Cash and cash equivalents[2] | $5,676,040 | Notes (current portion) | $87,670,000 |
| Prepayments[3] | $1,173,553 | Notes[4] (non-current) | $1,541,744,429 |
| Other Receivables[5] | $188,575 | Notes Derivative Financial Instrument | $31,858,210 |
| Due from Intercompany[6] | $109,813,620 | Trade Payable | $2,202 |
| | | Others Payable | $231,723 |
| | | Accrued Liabilities | $39,687,268 |
| | | Due to Intercompany | $1,818,313 |
| **Total Current Assets** | **$116,851,788** | **Total Current Liabilities** | **$1,703,012,145** |

---

[1] The chart only reflects the assets and liabilities of SFC, and therefore does not accord with the consolidated quarterly financial results for the second quarter ended June 30, 2011.
[2] Mainly represents cash on hand, cash at bank and short-term deposits with a maturity of three months or less.
[3] Mainly represents prepaid legal and professional fees and insurance.
[4] The Notes (current portion), Notes (non-current) and Notes Derivative Financial Instrument do not equate on this balance sheet to approximately $1.8 billion (the face value of the notes) due to the accounting treatment of financing costs and the carrying value of the convertible notes.
[5] Mainly represents HST receivables, staff advances and deposits.
[6] Non-interest bearing with no fixed date of repayment.

| Non-Current Assets | | Non-Current Liabilities | |
|---|---|---|---|
| Property, Plant & Equipment[7] | $1,166 | | |
| Investment in Subsidiaries[8] | $1,589,153,984 | Intercompany Loans | $235,000,000 |
| Intercompany Loans[9] | $1,582,781,672 | | |
| **Total Non-Current Assets** | $3,171,936,822 | **Total Non-Current Liabilities** | $235,000,000 |
| **Total Assets** | $3,288,518,610 | **Total Liabilities** | $1,938,012,145 |

96.    With respect to the assets, while they reflect an accurate implementation of the relevant

accounting policies, I do not believe that the book values of the assets reflect the realizable value

of those assets for a number of reasons, including the complexities associated with the business,

the significant amount of intercompany loans owing to SFC, and the costs and potential PRC tax

liabilities that may be payable if the assets were realized on. SFC is not able to simply monetize

its assets in the short term in order to satisfy its obligations under the notes as a result of, among

other things, the hard to quantify potential PRC tax liability previously discussed at paragraph 58

above and the stringent currency exchange controls in the PRC.

97.    As discussed above, Sino-Forest is not in a position to know whether or not the AIs have in

fact remitted applicable taxes on behalf of Sino-Forest.  Although Sino-Forest recognized a

provision as at June 30, 2011 of $204,722,000 in its reported financial results to account for this

potential tax liability, I am advised by SFC's counsel in the PRC, Ching Wo Ng at King & Wood

Mallesons, that the amount of the tax liabilities under PRC law arising from the operation of the

BVIs could be significantly higher if responsible tax authorities take different views than that of

management in respect of a number of tax issues, including, without limitation, whether by their

---

[7] Mainly represents office equipment.
[8] Historical cost for interests in subsidiaries.
[9] Interest bearing with defined terms of repayment date.

operation the BVIs have formed an establishment in the PRC, whether value added tax is payable, the likelihood and severity of a tax penalty, the applicable default interests on late payments, the numbers of years to "look back", whether certain tax preferential treatments apply to foreign companies such as BVI entities, and other relevant matters. The views on these issues may also differ from locality to locality.

98.    In addition, as a result of the currency exchange controls in the PRC, all cash to be repatriated from the PRC is subject to approval from the State Administration of Foreign Exchange (the "SAFE"). I am advised by SFC's counsel in the PRC, Ching Wo Ng at King & Wood Mallesons, that for normal and regular foreign exchange transactions in the PRC which require the approval of SAFE, the applications for such approvals can normally be processed within the time limits prescribed by law. However, the transactions undertaken by the BVIs in respect of their forestry assets in the PRC are very dissimilar to those contemplated by the relevant rules and regulations of the PRC. Therefore, there is no assurance that any application to SAFE for repatriation of funds by the BVIs can be processed within the time limits prescribed by law, or within a reasonable time thereafter.

99.    As a result of Sino-Forest, among other things, operating in a critical natural resource sector with insufficient supply in the PRC, investing in research and development initiatives in the PRC, and employing a significant number of people in the PRC, it has generally enjoyed positive working relationships with all levels of government in the PRC. However, I believe that if Sino-Forest were to cease operating under a business strategy that is consistent with and supportive of PRC government policy, including its policy on sustainable forestry, for example, investing in research and development or employing a significant number of people in the PRC, Sino-Forest would enjoy much less favourable treatment from PRC government officials, and

would likely have greater difficulties resolving the issues discussed above relating to tax

liabilities and repatriation of cash. This is particularly true in respect of the BVI structure where,

among other things, the ability to access cash is further impaired and Sino-Forest is not in a

position to know whether or not the AIs have remitted applicable taxes on behalf of Sino-Forest.

## J.   Importance of Relationships to Doing Business in the PRC

100.  From my time with SFC I have come to understand the importance of relationships to

doing business in the PRC. This is particularly true in relation to those doing business in the

forestry sector.

101.  The PRC has extensive resource needs, including in the forestry sector.  Historically,

forestry resources in the PRC have been collectively owned at a local level.  Forestry resources

have largely been managed without the resources necessary to increase yields and allow for

harvesting at a commercial level from a western forestry perspective.

102.  Part of Sino-Forest's success has been attributable to its ability to acquire forestry resources

from local sources of supply, at a good price, and to resell them at a good profit.  In relation to

Sino-Forest's planted plantation model, Sino-Forest also has benefited from the application of

advanced silviculture techniques to those resources.  Based on my interactions with PRC

government officials, I understand that the PRC government recognizes that for the industry to

mature, become efficient, and improve yields to reduce the fiber deficit, forest asset management

has to be consolidated.

103.  A good relationship with the various levels of PRC government is important to doing

business successfully in the PRC.  Historically, Sino-Forest's relationships with these

governments have been important to Sino-Forest's success in the PRC.  Loss of their support

could, correspondingly, have significant negative consequences for Sino-Forest, for its ability to continue to do business in the PRC, and its ability to continue to control its PRC-based assets for the benefit of its stakeholders.

104. Sino-Forest's most important relationships have been and continue to be through Allen Chan ("Chan"). From my observations and experience, Chan has established significant relationships in the PRC, and my understanding is that this is a direct result of his long-standing personal contribution to the development of the forestry sector both through Sino-Forest and in a personal capacity as an informal advisor to various relevant industry bodies.

105. Following the MW Report, Chan was requested to meet with officials in the PRC State Forestry Administration ("SFA") and other senior officials on multiple occasions in Beijing. I have been introduced to some officials and attended some of these meetings.

106. My observation from my personal involvement in these discussions and meetings is that Chan continues to be consulted and respected within the PRC government as an expert in the forestry industry. I therefore believe his continued participation will be extremely helpful in allowing SFC to unlock value in the PRC for the benefit of its stakeholders.

107. Notwithstanding the allegations in the MW Report (which have received widespread coverage in the PRC and in Hong Kong), Chan has continued to be honoured within the PRC. In November 2011, at the 2nd China Forestry Expo, Chan was presented an "Outstanding Achievement" award from the China National Forestry Industry Federation (the "CNFIF"). In recognition of his contribution to the forestry industry in the PRC, Chan was the first keynote speaker following the Minister of the SFA at the China Forestry Expo.

108. Chan was also appointed Vice President of the CNFIF in 2010. The CNFIF is an affiliate of the SFA and is chaired by the Minister of the SFA or the Director of the SFA. The SFA is the PRC government ministry responsible for its forests and forest management.

109. In 2007, Chan was appointed an Honourable Director of Renmin University (also known as the People's University of China), one of the most prestigious universities in the PRC with a distinct focus on humanities and social sciences, and highly regarded by top leaders in the PRC. In addition, Chan is a member of the Jiangxi Committee of the Chinese People's Political Consultative Conference.

110. In February 2012, Chan was presented with the "2011 China Forestry Persons of the Year" award by the CNFIF.

111. Many of the PRC's commercially attractive forestry resources are in areas of sensitivity within the PRC, including areas that are sensitive from a military perspective. Private air travel is prohibited or strictly controlled in many of the areas in which Sino-Forest does business.

112. The strategic significance attaching to Sino-Forest's forestry assets in the PRC increases the importance to SFC of maintaining positive relationships with authorities in the PRC. If Sino-Forest is to monetize its PRC based assets for the benefit of stakeholders, I strongly believe that the outcome of this process must be acceptable to relevant authorities in the PRC.

113. In the course of its 18 years of operations, Sino-Forest has been viewed by the Minister of the SFA positively and as a model for privately owned enterprises carrying on business in the PRC and promoting PRC policies. For that reason, Sino-Forest has enjoyed a positive relationship with the PRC. Even since June of last year, the Minister of the SFA has remained

cooperative and encouraging of a solution for Sino-Forest. However, recently, the government
has expressed increasing concern and interest as to what the solution is for Sino-Forest. As a
result, not only do I believe that any solution needs to be acceptable to the authorities in the PRC,
such solution needs to be presented in the very near future.

## IV.    THE MUDDY WATERS ALLEGATIONS: CHRONOLOGY AND RESPONSES

114. On June 2, 2011, Muddy Waters, which admitted to holding a short position on SFC's
shares, published the MW Report alleging, among other things, that Sino-Forest is a "near total
fraud" and a "Ponzi scheme."

115. While the allegations contained in the MW Report are diverse and far-reaching, the IC set
out to address the issues raised in three core areas: (i) the verification of timber assets reported
by Sino-Forest, (ii) the value of the timber assets held by Sino-Forest, and (iii) revenue
recognition.

116. Among other things, the MW Report alleged that Sino-Forest does not hold the full amount
of timber assets that it reports, that the timber assets actually held by Sino-Forest have been
overstated, and that Sino-Forest overstated its revenue. In addition, the MW Report alleged that
Sino-Forest has engaged in unreported related-party transactions. A copy of the MW Report is
attached as Exhibit "**M**". Two subsequent reports by Muddy Waters relating to Sino-Forest are
attached as Exhibit "**N**". These reports are attached to provide context to the Court and definitely
not because I agree with their contents.

## A.    The IC, OSC, RCMP and HKSFC Investigations

117. On June 2, 2011, the same day that the MW Report was released, the Board appointed the
IC, a Board committee consisting exclusively of independent directors, which in turn retained

independent legal and financial advisors in Canada, Hong Kong and the PRC, to investigate the allegations set out in the MW Report.

118.  On June 8, 2011, the OSC publicly announced that it was investigating matters related to SFC. That investigation has been active and is ongoing.

119.  Later in June 2011, the HKSFC commenced an investigation into Greenheart Group. As a company listed on the Hong Kong Stock Exchange and headquartered in Hong Kong, the HKSFC is Greenheart's primary securities regulator.  I believe that the HKSFC's investigation was largely reactive to the allegations against Sino-Forest, SFC's control position in relation to Greenheart Group, and to the fact that the principal offices of Sino-Forest and Greenheart Group are located in Hong Kong.  As indicated above, SFC had acquired a majority interest in Greenheart Group less than a year earlier, and had separate management and premises.

120.  In addition to its investigation of Greenheart Group, the HKSFC has been assisting the OSC with its investigation.  I am advised by Gary Solway of Bennett Jones LLP, counsel to SFC, that the HKSFC has a mutual-assistance treaty with the OSC.  The OSC has conducted witness interviews in Hong Kong with the assistance of and out of the premises of the HKSFC.

121.  Sino-Forest believes that it has attempted to cooperate with the OSC, HKSFC and RCMP investigations.  Sino-Forest has made extensive production of documents, in particular to the OSC, including documents sourced from jurisdictions outside of the OSC's power to compel production.

122.  Sino-Forest also has facilitated interviews by the OSC with Sino-Forest personnel.  In circumstances where OSC staff sought to examine Sino-Forest personnel resident in the PRC

(where neither the OSC nor the HKSFC had the ability to compel their attendance at interviews),
Sino-Forest arranged to bring individuals to Hong Kong to be examined.

123. Sino-Forest has responded to extensive inquiries, the most far-reaching coming from the
OSC, and has provided periodic oral briefings to OSC staff. The IC reports were provided to
OSC staff on an unredacted basis, as discussed below.

124. The scope of the IC's review was significant, reflecting the wide range of allegations
contained in the MW Report. The IC and its advisors worked to compile and analyze the vast
amount of data required for their comprehensive review of Sino-Forest's operations and business,
the relationships between Sino-Forest and other entities, and Sino-Forest's ownership of assets.

125. At the beginning of the IC's investigation, the IC informed the Board that the review would
likely take at least two to three months to complete. On August 10, 2011, the IC delivered its
first interim report to the Board (the "First Interim Report"). A redacted copy of the First Interim
Report is attached as Exhibit "**O**".

126. SFC has publicly disclosed on SEDAR and on its website redacted versions of the First
Interim Report and the two subsequent reports of the IC. The three reports have been redacted to
protect information that the Board believes is commercially sensitive, the disclosure of which
could be harmful to Sino-Forest's business and operations, especially in the PRC. These
redactions have not been made to conceal information from regulatory scrutiny. Each of the
three reports has been produced without redactions to OSC staff pursuant to a compelled process
designed to allow OSC staff to receive information relevant to its investigation, while at the same
time protecting SFC's sensitive information.

127. The First Interim Report was the result of the IC and its advisors assembling and organizing significant data from Sino-Forest's records, and reviewing Sino-Forest's cash holdings, revenue and relationships. In the First Interim Report, while the IC did not determine that there was any validity to the allegations in the MW Report, its findings were limited as the investigation was still ongoing.

128. Also in its First Interim Report, the IC's accounting advisors confirmed Sino-Forest's cash balances in specific accounts as at June 13, 2011, for accounts located inside and outside of the PRC. A total of 293 accounts controlled by Sino-Forest in Hong Kong were confirmed, representing 100% of the expected cash position in Hong Kong. However, Sino-Forest had 267 accounts in the PRC, so the logistics and requirements of in-person/in-branch verification in the PRC led the IC advisors to confirm 28 accounts, representing approximately 81% of the expected cash position in the PRC. The IC was satisfied based on this verification that Sino-Forest's expected cash position in the PRC existed as at the date of confirmation.

129. The First Interim Report was delivered to the Board shortly before the Board was asked to authorize the release of SFC's 2011 quarterly financial results for the second quarter ended June 30, 2011 (the "Q2 Results"). The Q2 Results were released on August 15, 2011.

130. Almost immediately after the Q2 Results were released, the IC's advisors identified and brought to the attention of the IC just under 60 documents, some of which raised potential conduct issues and others of which raised questions as to whether Sino-Forest's relationships with some of its AIs and suppliers were conducted at arm's length.

131. The IC concluded that interviews concerning the documents should be conducted with relevant Sino-Forest personnel. The interviews were conducted from August 24 to 26, 2011 in Hong Kong.

132. As part of its efforts to cooperate with OSC staff, on August 24, 2011, before the documents were shown to relevant Sino-Forest personnel and those personnel were provided with an opportunity to comment, the IC's advisors provided copies of the documents to OSC staff. The IC's advisors and SFC's external counsel also provided oral briefings about the interviews to OSC staff from August 24 to 26, 2011, as the interviews were being conducted.

133. Seen in their proper context, and with the benefit of fuller explanations, I believe that the documents identified by the IC's advisors and provided to OSC staff at that time fall well short of the misconduct alleged in the MW Report.

134. However, as a result of the documents and interviews, Sino-Forest placed three employees on administrative leave, and a fourth senior employee was requested to act solely on my instructions. It was my decision in each case to take this action.

135. SFC's Board met on the morning of Friday August 26, 2011, Toronto time (which was Friday evening Hong Kong time) to hear reports about the interviews and about communications between SFC and OSC staff. The Board was told that Chan had agreed to resign as Chairman, CEO and as a director of SFC pending the completion of the review by the IC of the allegations in the MW Report. He was appointed Founding Chairman Emeritus and I was appointed as CEO.

136. On August 26, 2011, the OSC issued a cease trade order with respect to the securities of SFC and with respect to certain senior management personnel. A copy of the cease trade order dated August 26, 2011 (as corrected by the OSC later that day) is attached as Exhibit "**P**". The Board first learned of the cease trade order during the Board meeting that day, after Chan tendered his resignation.

137. With the consent of SFC, the cease trade order was extended by subsequent orders of the OSC, copies of which are attached as Exhibit "**Q**". The cease trade order continues in force to this date.

138. Based on my review of the IC's second interim report to the Board (the "Second Interim Report", which is discussed below) and discussions I have had with William Ardell, Board Chair and Chair of the IC, I understand that in late August 2011, counsel for the IC received an inquiry from the RCMP requesting cooperation from the IC in connection with an investigation into the allegations in the MW Report. Representatives of the IC met with and provided information to the RCMP from time to time. The RCMP also has made information requests from time to time. It has been SFC's intention to cooperate with the RCMP in connection with its investigation.

139. On November 13, 2011, the IC delivered its Second Interim Report to the Board, a redacted copy of which is attached as Exhibit "**R**".

140. Subject to the limitations described therein, the Second Interim Report confirmed registered title or contractual or other rights to Sino-Forest's stated timber assets, reconciled the book value of the BVI timber assets and Sino-Forest WFOE standing timber assets as set out in the 2010 financial statements to the purchase prices for such assets as set out in the BVI and

WFOE standing timber purchase contracts reviewed by the IC advisors, reconciled reported total revenue to sales contracts, and addressed certain allegations regarding related-party transactions.

141.  Subject to the scope limitations described in the Second Interim Report, the IC confirmed 99.3% of Sino-Forest's timber area to its satisfaction and that Sino-Forest had registered title to 100% of its disclosed planted timber holdings by area, and contractual or other rights to approximately 81.3% of its disclosed purchased timber holdings by area.  The IC reported that it or its advisors had reviewed originals or copies of purchase contracts for the acquisition by Sino-Forest of virtually all of its disclosed timber holdings as at December 31, 2010.

142.  The IC indicated in its Second Interim Report that it viewed its work to be substantially complete and that it expected to deliver its final report prior to the end of 2011.

## B.    Failure to Release Q3 Results and Default Under the Notes

143.  Subsequent to August 26, 2011, the IC's advisors identified additional documents that raised issues meriting comment and explanation from SFC's management.  Also, SFC's external counsel, in responding to requests from the OSC, also identified documents of a similar nature. Further documents meriting comment and explanation were identified by SFC's external auditors and in interviews conducted by OSC staff.

144.  As SFC reached the November 15, 2011 deadline to release its 2011 third quarter financial statements (the "Q3 Results"), the Audit Committee recommended and the Board agreed that SFC should defer the release of the Q3 Results until certain issues could be resolved to the satisfaction of the Board and SFC's auditor.  The issues included (i) determining the nature and scope of the relationships between Sino-Forest and certain of its AIs and suppliers, as discussed in the Second Interim Report, and (ii) the satisfactory explanation and resolution of issues raised

by certain documents identified by the IC's advisors, SFC's counsel, SFC's external auditors, and/or by OSC staff.

145. On November 15, 2011, the date upon which SFC's Q3 Results were due, SFC issued a press release announcing that the IC had delivered its Second Interim Report to the Board. A copy of the November 15, 2011 press release is attached as Exhibit "**S**". The executive summary to the Second Interim Report is attached as a schedule to the press release.

146. The November 15, 2011 press release also stated that the Board had concluded that, as a result of ongoing work arising from the allegations raised in the MW Report, it was not in a position to authorize the release of the Q3 Results at that time. The release stated that SFC would try to release the Q3 Results within 30 days.

147. SFC's failure to file the Q3 Results and provide a copy of the Q3 Results to the trustee and to its noteholders under its senior and convertible note indentures on or before November 15, 2011 constituted a default under those note indentures. Pursuant to the indentures, an event of default would have occurred if SFC failed to cure that breach within 30 days in the case of the senior notes, and 60 days in the case of the convertible notes, after having received written notice of such default from the relevant indenture trustee or the holders of 25% or more in aggregate principal amount of a given series of notes.

148. While SFC worked diligently to try to resolve the outstanding issues, it became clear that SFC was not going to be able to release the Q3 Results within that timeframe. On December 12, 2011, SFC issued a press release announcing that it would not be able to release the Q3 Results within the 30-day period originally indicated.

149. Moreover, in the press release, SFC announced that, in the circumstances, there was no assurance that it would be able to release the Q3 Results, or, if able, as to when such release would occur. In the December 12, 2011 press release, SFC also announced that the Board had determined not to make the $9.775 million interest payment on SFC's 2016 convertible notes that was due on December 15, 2011. A copy of the December 12, 2011 press release is attached as Exhibit "T".

150. As disclosed in the December 12, 2011 press release, the circumstances that caused SFC to be unable to release the Q3 Results also could impact SFC's historic financial statements and SFC's ability to obtain an audit for its 2011 fiscal year.

151. SFC's failure to make the $9.775 million interest payment on the 2016 convertible notes when due on December 15, 2011 constituted a default under that indenture. Under the terms of that indenture, SFC had 30 days to cure its default and make the required interest payment in order to prevent an event of default from occurring, which could have resulted in the acceleration and enforcement of the approximately $1.8 billion in notes which have been issued by SFC and guaranteed by many of its subsidiaries outside of the PRC.

152. On December 18, 2011, SFC announced that it had received written notices of default dated December 16, 2011, in respect of its senior notes due 2014 and its senior notes due 2017. The notices, which were sent by the trustees under the senior note indentures, referenced SFC's previously-disclosed failure to release the Q3 Results on a timely basis. SFC reiterated in the December 18, 2011 press release that it did not expect to be able to file the Q3 Results and cure the default within the 30 day cure period. A copy of the December 18, 2011 press release is attached as Exhibit "U".

153. In response to the receipt of the notices of default, among other considerations, on

December 16, 2011, the Board established a Special Restructuring Committee of the Board (the

"Restructuring Committee") comprised exclusively of directors independent of management of

SFC, for the purpose of supervising, analyzing and managing strategic options available to SFC.

The members of the Restructuring Committee are William Ardell, Chair of the Board, who is

also Chair of the Restructuring Committee and Garry West. James Hyde, Chair of the Audit

Committee and an independent director, while not a member of the Restructuring Committee,

has attended meetings of the Restructuring Committee and participated fully in its deliberations.

154. Following discussions with its external auditors, on January 10, 2012, SFC issued a press

release cautioning that its historic financial statements and related audit reports should not be

relied upon. The January 10, 2012 press release is previously attached.

## C.    The Waiver Agreements

155. On January 12, 2012, SFC announced that following extensive discussions with the Ad

Hoc Noteholders, holders of a majority in principal amount of SFC's senior notes due 2014 and

its senior notes due 2017 agreed to waive the default arising from SFC's failure to release the Q3

Results on a timely basis. A copy of the January 12, 2012 press release, together with the waiver

agreements, is attached as Exhibit "V".

156. Pursuant to the waiver agreements, SFC agreed to, among other things, make the $9.775

million interest payment on its 2016 convertible notes that was due on December 15, 2011,

curing that default. That payment was made in accordance with the waiver agreements.

157. While the waiver agreements prevented the indenture trustees under the relevant note

indentures from accelerating and enforcing the note indebtedness as a result of SFC's failure to

file its Q3 Results, those waiver agreements expire on the earlier of April 30, 2012 and any
earlier termination of the waiver agreements in accordance with their terms. In addition, should
SFC fail to file its 2011 Results by March 30, 2012 (and upon the necessary notices being sent
and cure periods expiring), the indenture trustees would again be in a position to accelerate and
enforce.

### D.    The IC's Final Report and Verification of SFC's Assets

158. On January 31, 2012, SFC publicly released a redacted version of the final report of the IC
(the "Final Report"). A copy of the redacted Final Report is attached as Exhibit "**W**".

159. Following the delivery of the Final Report, and in accordance with the waiver agreements,
the Board adopted a resolution instructing the IC to cease its investigative, review and oversight
activities. Any issues within the authority of the IC that remained outstanding were referred to
SFC's Audit Committee or Restructuring Committee.

160. In its January 31, 2012 press release, attached as Exhibit "**X**", announcing the release of the
Final Report, SFC also disclosed the results of a "proof of concept" exercise undertaken to
determine if the standing timber referenced in particular purchase contracts could be located and
quantified by an independent forestry expert engaged to undertake the exercise. The exercise
was undertaken to address the issue raised in the Second Interim Report regarding the absence of
maps in the possession of SFC's BVI subsidiaries to show the precise location of the timber
subject to plantation purchase contracts.

161. As disclosed in the January 31, 2012 press release, the proof of concept exercise was
confined to two compartments. The selection criteria limited the sample to purchased timber
assets located in Yunnan province. The candidate assets were acquired prior to the allegations in

the MW Report. They were listed as being held by BVIs and not by WFOEs. At the IC's request, the consultants selected a shortlist of ten possible compartments covering multiple forestry bureaus and meeting the criteria above, avoiding any prospect that the sampling involved personnel from Sino-Forest. Multiple county forestry bureaus were represented in the shortlist, and the IC made the final selection of compartments to ensure more than one county forestry bureau was represented.

162. As described in the Final Report and the accompanying press release, maps for the two compartments were obtained from the relevant forestry bureaus in the PRC by the contracted survey companies and made available to the consultants. Using the techniques described in the Final Report, compartment boundaries were superimposed on recent high resolution satellite imagery which allowed for the measurement of each compartment's forest cover. The consultants compared the net stocked area of forest cover that they assessed for each compartment with that stated in the Sino-Forest purchase contracts and forest survey reports. The consultants found that the net stocked area of forest cover in each compartment was up to six percent greater than that stated in the relevant purchase contracts and forest survey reports, with the current assessed area for each compartment exceeding the purchase contract area.

163. While the consultant report and press release cautioned against extrapolation of these findings over Sino-Forest's broader forestry assets, I took considerable comfort from these findings. In relation to two randomly-selected contracts held through the BVI structure, the property descriptions and expected forest cover in the contracts matched the boundaries and forest cover on the ground.

164. Subsequent to January 31, 2012, Sino-Forest has taken steps to see the proof of concept process applied over a statistically relevant sampling of Sino-Forest's forest assets. That work is ongoing.

**E.    Gating Issues to an Audit**

165. SFC has worked diligently to address issues identified by SFC's Audit Committee, the IC and by its external auditor, Ernst & Young LLP, as requiring resolution in order for SFC to be in a position to obtain an audit opinion in relation to the 2011 Results. Many of the same issues also impact SFC's ability to release the Q3 Results.

166. As SFC has publicly disclosed in its press releases, the gating issues to the release of the Q3 Results and to obtaining an audit of the 2011 Results include (i) determining the nature and scope of the relationships between Sino-Forest and certain of its AIs and suppliers, and (ii) the satisfactory explanation and resolution of issues raised by certain documents identified by the IC's advisors, SFC's counsel, SFC's auditors, and/or by OSC staff.

167. The "relationship issues" described above are discussed extensively in the Second Interim Report and in the Final Report of the IC.   Relationship issues were prominent in the approximately 60 documents provided to OSC staff on August 24, 2011, and relationships continue to be an issue that SFC has been unable to resolve.

168. As part of the IC's investigative process a significant amount of electronic data was extracted and reviewed by the IC and its advisors. The same data also has been reviewed by counsel for SFC and SFC's advisors. Over one million electronic records have been reviewed.

44

169.  The search of electronic records and other inquiries have not produced evidence to support

the allegations made in the MW Report that Sino-Forest is a near total fraud or Ponzi scheme.

The searches and inquiries have produced some evidence of possible lesser improper conduct

that SFC has been making efforts to investigate, address and quantify.

170.  There is no single theme among the documents and issues that SFC has been taking steps

to address.  In some cases, the documents speak to efforts to deal with foreign currency exchange

restrictions applicable to the PRC.  The documents suggest that in some cases SFC personnel

may have received personal benefits at Sino-Forest's expense and may have appropriated some

of Sino-Forest's assets.  They also show that, in a few cases, whistleblower complaints in some

subsidiaries alleging misconduct by certain personnel in those subsidiaries appear not to have

been adequately investigated and addressed.

171.  The record-keeping of SFC's subsidiaries in the PRC appeared to be adequate prior to the

recent heightened scrutiny being focused on companies with significant operations in the PRC.

The nature of SFC's books and records, combined with the inability to compel disclosure and

participation by third party PRC companies, primarily SFC's customers (AIs) and suppliers, and

the unwillingness of these companies to become involved in an investigation, makes it difficult

to definitively assess some of the explanations offered by Sino-Forest personnel.

172.  In light of this heightened scrutiny, SFC's subsidiaries in the PRC do not have the scope of

books and records that might be used to definitively address some issues raised by potentially

problematic email communications.  The nature of SFC's BVI structure, and the absence of

contractual rights to examine the books and records of customers and suppliers, deprives SFC of

access to information that may be necessary to allow SFC to determine whether some of the documents and issues identified are material from a financial reporting perspective.

173. Notwithstanding SFC's best efforts, many of these issues may not be capable of resolution, and certainly not within a timeframe that would allow SFC to comply with its obligations under its note indentures and securities laws. Consequently, absent a resolution with the noteholders, the indenture trustees would be in a position to enforce their legal rights as early as April 30, 2012.

174. However extensive and challenging the work done to respond to the MW Report has been, the simple fact is that the uncertainty it has created has caused Sino-Forest's business to deteriorate. Repairing the damage to the business simply cannot wait any longer. Without decisive action in the immediate term, I fear that the ability to save the business for the benefit of SFC and its stakeholders will be irreparably lost.

175. As described in greater detail herein, even though the allegations set out in the MW Report and the OSC cease trade orders are unproven, the allegations have had a catastrophic negative impact on Sino-Forest's business activities and have created substantial uncertainty regarding the future of Sino-Forest's business in the minds of the Sino-Forest Companies' stakeholders in the PRC, including its lenders, customers, suppliers, employees, and governmental officials. The allegations made against SFC have resulted in a substantial erosion of Sino-Forest's business. The business in the PRC continues to deteriorate with every passing day and it has become clear to SFC that the Sino-Forest business needs to be separated from the cloud that continues to hang over SFC if there is any future for that business (and thus value for SFC's stakeholders) to be preserved.

## V.    IMPACT OF MUDDY WATERS ALLEGATIONS ON SINO-FOREST

### A.    Class Action Lawsuits

176.  SFC and certain of its officers, directors and employees, along with SFC's current and former auditors, technical consultants and various underwriters involved in prior equity and debt offerings, have been named as defendants in eight class action lawsuits.

177.  Five of these class action lawsuits, commenced by three separate groups of counsel, were filed in the Ontario Superior Court of Justice on June 8, 2011, June 20, 2011, July 20, 2011, September 26, 2011 and November 14, 2011.  A carriage motion in relation to these actions was heard on December 20 and 21, 2011, and by Order dated January 6, 2012, Justice Perell appointed Koskie Minsky LLP and Siskinds LLP as class counsel.  As a result, Koskie Minsky LLP and Siskinds LLP discontinued their earliest action, and their other two actions have been consolidated and will move forward as one proceeding.  The other two Ontario actions, commenced by other counsel, have been stayed.  Pursuant to Justice Perell's January 6, 2012 Order, Koskie Minsky LLP and Siskinds LLP have filed a fresh as amended Statement of Claim in the consolidated proceeding.  A copy of this Statement of Claim is attached as Exhibit "**Y**".

178.  The action purports to be brought on behalf of noteholders.  The plaintiffs and plaintiff law firms have not complied with the prerequisites to bringing suit in the relevant note indentures, which each contain a "no suits by holders" clause.

179.  Parallel class actions have been filed in Quebec and Saskatchewan.  Copies of the originating documents in those actions are attached as Exhibit "**Z**".

180.  Additionally, on January 27, 2012, a class action was commenced against SFC and other defendants in the Supreme Court of the State of New York, U.S.A.  The complaint alleges that

the action is brought on behalf of persons who purchased SFC shares on the over-the-counter
market and on behalf of non-Canadian purchasers of SFC debt securities. The quantum of
damages sought is not specified in the complaint. A copy of the complaint in this action is
attached as Exhibit "AA".

181. Additional law firms in both the United States and Canada have announced that they are
investigating SFC and certain directors and officers thereof with respect to potential additional
class action lawsuits.

## B.    Effects of MW Report and Related Events

182. The allegations set forth in the MW Report, despite being denied by SFC, have had
catastrophic negative effects on the reputation and business of Sino-Forest. As a result, Sino-
Forest's ability to conduct its operations in the normal course of business has been materially
affected. For example: creditors are increasing legal demands with respect to accounts payable;
at the same time, collections of accounts receivables is increasingly difficult due to a widespread
belief that Sino-Forest will not survive; sales in the WFOE model have also slowed substantially
in response to views on accounts receivable payments; cash flow issues have resulted in a
cessation of any expansion or modernization; the inability to fund purchases of raw materials has
caused a slowdown in production or, in many cases, a shutdown; certain timber assets have been
frozen as Sino-Forest has been unable to keep current with payments; deposits put down on
standing timber purchases by WFOEs, of approximately $27 million, may be unrealizable due to
an inability to generate cash to pay off outstanding payables under those contracts; offshore
banking facilities have been repaid and frozen or cancelled, leading to substantial damage in
Sino-Forest's trading business; relationships with local governments and plantation land owners
have become strained; Sino-Forest is unable to complete various projects, contracts and

acquisitions; and the PRC government is expressing increased concern over SFC and is
becoming less inclined to be supportive of Sino-Forest, making the ability to obtain legal
documents for Sino-Forest's operations increasingly difficult.

### 1.    Diversion of Operational Resources & Effects on Operations

183. The investigations being conducted by the OSC, the HKSFC and the RCMP, the
examination by the IC (and now the Audit Committee and Restructuring Committee), and the
class action lawsuits have required, and will continue to require, significant resources to be
expended by the directors, officers and employees of Sino-Forest. As a result, the diversion of
such resources has affected Sino-Forest's ability to conduct its operations in the normal course of
business. Sino-Forest's timber and trading businesses have effectively been frozen and have
ground to a halt.

184. Since the MW Report was released, in order to conserve cash, Sino-Forest has only
completed cash purchases which were previously committed to and has not made any new
commitments (i.e. in the WFOE structure), despite having been presented with some attractive
buying opportunities. Sino-Forest has therefore not grown its asset base as it would have but for
the MW Report.

185. Also, the Sino-Forest Companies have had an extremely difficult time collecting
outstanding receivables as a result of the perceived uncertainty surrounding them in the PRC.
The total amount of outstanding receivables in the WFOE structure was approximately $130.5
million as at February 29, 2012, with more than 83.5% of those receivables being over 90 days.
Sino-Forest's counsel in the PRC, KaiTong Law Firm, has sent legal demand letters to 12 BVI
trading companies for accounts receivable totaling approximately $126 million and five WFOE

companies totaling approximately RMB 224.5 million.  Additional legal demand letters for smaller accounts are also in process, and other accounts receivable are being negotiated.

186.  At the same time that the Sino-Forest Companies are having a difficult time collecting outstanding receivables, they are receiving increased demands on their payables. Certain of Sino-Forest's creditors in the PRC have taken aggressive collection tactics in the PRC, including filing court claims in an effort to be paid amounts owed to them by Sino-Forest. If the uncertainty related to SFC is allowed to continue to affect Sino-Forest's business operations, Sino-Forest expects increasing legal actions from other creditors.

187.  Sino-Forest has not been able to secure or renew certain existing onshore banking facilities and has been unable to obtain offshore letters of credit to facilitate Sino-Forest's trading business. All offshore banking facilities have been repaid and frozen, or cancelled. Since June 2, 2011, all Hong Kong banks have asked for voluntary repayment of outstanding loans.  Banking facilities with a total credit amount of $67.9 million were terminated by four banks between June 10, 2011 and August 29, 2011.  Facilities of $152.3 million were frozen upon full repayment. In the PRC, facilities totaling RMB 159.6 million were asking for voluntary repayments.  For the PRC banks providing facilities, Sino-Forest was requested to increase its cash deposits so as to demonstrate financial strength. This has lead to substantial damage in Sino-Forest's operations, and affects Sino-Forest's ability to complete obligations under existing contracts, resulting in losses potentially in excess of $100 million.

188.  Various projects and contracts, such as nursery projects in certain provinces with a contract value of approximately RMB 1 billion, have been stopped or are unable to be fulfilled.

189. Due to the allegations in the MW Report, the PRC government is expressing increased concern over SFC and is becoming less inclined to be supportive of Sino-Forest, making the ability to obtain legal documents more difficult. For example, the PRC government has withheld cutting licenses resulting in lower harvesting volumes. Relationships with local government and local plantation suppliers have also become strained, resulting in many difficulties and obstacles in Sino-Forest's operations including an inability to complete certain acquisitions of plantations. For example, in the Anqing, Anhui area in the PRC, the local government no longer showed support to Sino-Forest and the plantation land owner refused to honour the plantation purchase contracts.

### 2.    Fees and Expenses

190. SFC has and will continue to incur a substantial amount of fees and expenses in connection with the examination by the IC (and now the Audit Committee and Restructuring Committee), the investigations by the OSC and the RCMP, and the class action lawsuits. Further, pursuant to indemnification agreements between SFC and its directors and certain officers as well as with auditors, underwriters and other parties, SFC may be obligated to indemnify such individuals for additional legal and other expenses pursuant to such proceedings. The aggregate of such fees and expenses is substantial and has had an extremely negative effect on Sino-Forest's operating results.

### 3.    Value of Common Shares and Credit Rating

191. Prior to the release of the MW Report on June 2, 2011, SFC's common shares had a 20-day volume weighted average price of CDN $19.58 for a total market capitalization of approximately CDN $4.8 billion. In the weeks that followed the release of the MW Report, the value of SFC's common shares plunged to a low of CDN $1.29 for a total market capitalization of

approximately CDN $300 million. As at August 25, 2011, the day prior to the OSC cease
trading SFC's common shares, its shares were trading at CDN $4.81 for a total market
capitalization of approximately CDN $1.2 billion.

192. The allegations set forth in the MW Report have resulted in a material decline in the
market value of SFC's common shares and notes. On June 30, 2011, Standard & Poor's Ratings
Services lowered its long-term corporate credit rating on SFC to 'B+' from 'BB', lowered the
issue ratings on SFC's outstanding senior notes and convertible notes to 'B+', and lowered the
Greater China scale credit ratings on SFC and its notes to 'cnBB' from 'cnBBB-'. On August 29,
2011, Standard & Poor downgraded to 'CCC-', then withdrew its ratings. Fitch Ratings withdrew
its Foreign Currency Issuer Default Rating and senior debt rating of 'BB-' on July 14, 2011, after
placing SFC on Negative Watch on June 20, 2011. On July 19, 2011, Moody's Investors Service
downgraded the corporate family and senior unsecured debt ratings of SFC to 'B1' from 'Ba2'. On
August 29, 2011, Moody's downgraded to 'Caa1' from 'B1', and on December 14, 2011, Moody's
downgraded to 'Ca1' and withdrew its rating.

193. Sino-Forest's primary sources of funding have been short-term and long-term borrowings,
equity offerings and cash generated by operating activities. However, as a result of the
reputational damage that the MW Report inflicted on SFC, I believe that SFC has no ability to
access the capital markets at the present time, including to refinance its notes.

## VI.   CLAIM AGAINST MUDDY WATERS

194. On March 29, 2012, SFC commenced a claim in the Ontario Superior Court of Justice
against Muddy Waters, its principal, and persons who traded with prior knowledge of the MW
Report. A copy of SFC's claim against Muddy Waters *et al* is attached as Exhibit "**BB**".

195. In this action, SFC seeks total damages in the sum of CDN $4 billion in relation to harm caused to SFC as a result of the allegations made by Muddy Waters. If SFC is successfully restructured as contemplated, it is anticipated that the action will be funded by the litigation trust provided for in the Support Agreement described below, and the benefits of the action will be shared as contemplated by the Support Agreement.

## VII.    PROPOSED RESTRUCTURING TRANSACTIONS

196. Following extensive arm's length negotiations between SFC and the Ad Hoc Noteholders, the parties entered into the Support Agreement. The Support Agreement contains, among other things, the summary terms and conditions of a going concern restructuring of SFC (the "Restructuring Transaction"). A copy of the Support Agreement is previously attached.

197. The Support Agreement provides that SFC will file the Plan in order to implement the Restructuring Transaction as part of this CCAA proceeding, and that the Consenting Noteholders will vote their notes in favour of the Plan at any meeting of creditors, each subject to certain conditions.

198. From a commercial perspective, the Restructuring Transaction contemplated by the Support Agreement is intended to accomplish the following objectives:

(a)    the separation of Sino-Forest's business operations from the problems facing SFC outside of the PRC by transferring the intermediate holding companies which own "the business" and SFC's intercompany claims against its subsidiaries (which include the entire substantive operations of the Sino-Forest Companies) to the noteholders in compromise of their claims against SFC (if the Sale Process does not generate a superior transaction, as described below);

(b)    the Sale Process being undertaken to determine if any person or group of persons will
purchase Sino-Forest's business operations pursuant to the Plan for an amount of
consideration acceptable to SFC and the noteholders, with the potential for excess
above such amount being directed to Junior Constituents. The Sale Process is
intended to ensure that SFC is pursuing all avenues to maximize value for its
stakeholders;

(c)    a structure (including funding) that will enable litigation claims to be pursued for the
benefit of SFC's stakeholders in accordance with the Support Agreement against a
number of potential defendants (including Muddy Waters, its principal, and any
persons who benefited from the allegations made by Muddy Waters in a coordinated
way); and

(d)    if the Sale Process does not result in a sale, the Junior Constituents recovering some
"upside" in the form of a profit participation if Sino-Forest's business operations
acquired by the noteholders are monetized within seven years from the date of the
implementation of the Plan at a profit, as further described in the Support
Agreement.

199.  The decision to enter into the Support Agreement was given careful consideration by SFC
and the Board and was not taken lightly. However, the inability to obtain an audit creates a
default under the note indentures which simply cannot be cured within a reasonable timeframe, if
at all.

200.    More significantly, it has become clear that the problems facing SFC outside of the PRC
are causing Sino-Forest's business operations in the PRC to deteriorate and that, unless decisive

steps are taken to restructure Sino-Forest, the PRC business operations will continue to
deteriorate to the point that they will cease to be capable of being turned around, which will
further diminish the value that can be realized for SFC and its stakeholders. While there remains
substantial work ahead in the PRC to turn the business around and convince stakeholders in the
PRC (including customers, suppliers, employees and PRC governmental officials of all levels)
that the Sino-Forest business built up over the past 18 years is here to stay, I firmly believe that
the transactions which SFC proposes to initiate pursuant to the CCAA will show a path out of the
uncertainty which it has faced since last June.

201.  The Support Agreement provides that SFC will make an application under the CCAA in
order to implement the Plan. The Consenting Noteholders executed the Support Agreement on
the basis that a restructuring of SFC as proposed would be undertaken pursuant to the CCAA.

202.  But for the negotiation and execution of the Support Agreement, SFC would be unable to
prevent the acceleration and enforcement of the rights of the noteholders as soon as April 30,
2012, in which case SFC would be unable to continue as a going concern, and is thus insolvent.
Accordingly, and for the reasons set out herein, a restructuring is urgently required and should be
pursued to preserve its enterprise value.

203.  SFC has reached an agreement on a consensual restructuring transaction with the Ad Hoc
Noteholders. SFC is seeking a stay of proceedings under the CCAA in order to allow it time to
proceed to develop the Plan which, if approved by the creditors and this Honourable Court,
would, among other things, allow for a going concern emergence of Sino-Forest's business.

## VIII. THE SALE PROCESS

204. Under the Sale Process, SFC, through its financial advisor, Houlihan Lokey ("Houlihan"), and with the oversight of the monitor, will seek qualified purchasers (including existing shareholders and noteholders) of SFC's assets on a global basis and attempt to engage them in the Sale Process. The Sale Process Procedures, which were agreed to by the parties to the Support Agreement in consultation with the proposed monitor, provide that SFC will have up to 90 days to solicit letters of intent, and if qualified letters of intent are received, a further 90 days to solicit qualified bids. A copy of the Sale Process Procedures is attached as Schedule D to the Support Agreement.

205. I believe it is critically important that the Sale Process Order be granted at this time for a variety of reasons. First and most importantly, it is very important that SFC conclude a restructuring by the end of the third fiscal quarter. The business of the Sino-Forest Companies is seasonal, and the vast majority of transactions (both purchases and sales) typically occur in the third and fourth quarters. All stakeholders will therefore be prejudiced if SFC cannot complete a restructuring by the end of the third quarter, or soon thereafter, as the business will continue to be frozen through the critical fourth quarter.

206. With that target end date in mind, the process must begin immediately. I understand that in other insolvency filings in Canada, sale processes have been done on much shorter timetables than what SFC is proposing; however, I believe the proposed timetable is necessary and appropriate in light of the specific circumstances. In fact, given the critical timing of this process, I am aware that Houlihan has already been in contact with parties who may be interested parties in this Sale Process.

207. The assets being sold, especially given the allegations in the MW Report, are extremely complex and are being offered for sale without current audited financial statements. Potential buyers therefore need to be afforded sufficient time to do due diligence.

208. In addition, there are limited potential buyers for these assets. I believe that potential buyers will need to have, in addition to the significant capital to complete a transaction of this size, an in-depth and intimate knowledge of the PRC market. I do not expect that the ultimate buyer for these assets, if any, will be a typical buyer of distressed assets in an insolvency proceeding.

209. Accordingly, given that a transaction must be implemented as soon as possible, and given the complexity of the assets and the fact that there is a limited universe of potential buyers, I believe it is necessary that the Sale Process Order be granted at this time, and that the Sale Process provides the best potential for recovery for SFC's stakeholders.

210. I have no reason to believe that any creditors have a *bona fide* reason to object to the Sale Process.

## IX.    SFC MEETS CCAA STATUTORY REQUIREMENTS

211. I am advised by Gary Solway of Bennett Jones LLP, counsel to SFC, that the CCAA applies in respect of a "debtor company" if the claims against the debtor company or affiliated debtor companies total more than CDN $5 million. I am further advised by Gary Solway that a "debtor company" is a company incorporated under an Act of Parliament or the legislature of a province which has, among other things, become bankrupt or insolvent.

## A.    SFC is a "Company" Under the CCAA

212.  SFC is a "company" to which the CCAA applies as it is a company continued under the

CBCA.  A copy of SFC's articles of continuance was previously attached.

## B.    SFC has Claims Against it in Excess of $5 Million

213.  As discussed above, SFC has debts against it far in excess of the CDN $5 million statutory

requirement.

## C.    SFC is Insolvent

214.  I am advised by Gary Solway of Bennett Jones LLP, counsel to SFC, that under section 2

of the *Bankruptcy and Insolvency Act* (and a similar definition exists under sections 192(2) and

208 of the CBCA), an insolvent person is one whose liabilities to creditors exceeds CDN $1,000

and (i) is for any reason unable to meet his obligations as they generally become due, (ii) has

ceased paying his current obligations in the ordinary course of business as they generally become

due, or (iii) the aggregate of whose property is not, at a fair valuation, sufficient, or, if disposed

of at a fairly conducted sale under legal process, would not be sufficient to enable payment of all

his obligations, due and accruing due.

215.  As discussed herein, the holders of SFC's senior notes entered into waiver agreements

wherein they agreed not to have the indenture trustees demand immediate payment of the

principal amount of the senior notes.  Such waiver agreements expire on the earlier of April 30,

2012 and any earlier termination of the waiver agreements in accordance with their terms.

Moreover, in addition to the default dealt with pursuant to the waiver agreements in respect of

the Q3 Results, SFC will be in further default on April 30, 2012 as a result of the fact that it will

fail to file its audited 2011 Results. As discussed in greater detail herein, SFC will be unable to cure such default in the immediate to near term (if ever).

216. But for the execution of the Support Agreement and the standstill provided for therein, the indenture trustees under the notes could be entitled to accelerate and enforce the rights of the noteholders as soon as April 30, 2012. Without the liquidity provided by the waiver agreements, SFC would be unable to meet its obligations as they come due or continue as a going concern and is thus insolvent.

## X.    RELIEF SOUGHT

### A.    Stay of Proceedings

217. SFC needs a stay of proceedings to pursue and implement the Restructuring Transaction in an attempt to complete a going concern restructuring of its businesses. In the interim, the class actions lawsuits, as well as any other potential actions, need to be stayed so that the Restructuring Committee can focus on formulating the Plan.

### B.    Appointment of Monitor

218. FTI Consulting Canada Inc. ("FTI") has consented to act as the monitor of SFC (the "Monitor") in the CCAA proceedings, and I believe that FTI is qualified and competent to so act.

219. FTI will be filing a pre-filing report with the Court as prospective monitor in conjunction with SFC's request for relief under the CCAA.

### C.    Payments During CCAA Proceeding

220. During the course of this CCAA proceeding, SFC intends to make payments for goods and services supplied post-filing as set out in the cash flow projections described below and as permitted by the draft Initial Order.

### D.    Administration Charge

221.  It is contemplated that the Monitor, counsel to the Monitor, counsel to SFC, counsel to the Board, Houlihan, FTI Consulting (Hong Kong) Limited, counsel to the Ad Hoc Noteholders and the financial advisor to the Ad Hoc Noteholders would be granted a first priority Court-ordered charge on the assets, property and undertakings of SFC, other than SFC's assets which are subject to *Personal Property Security Act* registrations (the "SFC Property") in priority to all other charges (the "Administration Charge") up to the maximum amount of CDN $15 million in respect of their respective fees and disbursements, incurred at standard rates and charges. SFC believes the Administration Charge is fair and reasonable in the circumstances.

222.  The nature of the Sino-Forest Companies' business requires the expertise, knowledge and continuing participation of the proposed beneficiaries of the Administration Charge in order to complete a successful restructuring. I believe this Administration Charge is necessary to ensure their continued participation.

223.  I do not believe that there is any unwarranted duplication of roles between the proposed beneficiaries of the Administration Charge.

### E.    Directors' Charge

224.  A successful restructuring of SFC will only be possible with the continued participation of the Board.  These personnel are essential to the viability of the continuing business of Sino-Forest.  SFC's Board members have specialized expertise and relationships with Sino-Forest's suppliers, employees and other stakeholders, as well as knowledge gained throughout the IC process that cannot be replicated or replaced.

225. The directors of SFC have indicated that due to the potential for significant personal
liability, they cannot continue their service in this restructuring unless the Initial Order grants a
charge on the SFC Property in priority to all other charges except the Administration Charge, as
security for SFC's indemnification obligations for the potential obligations and liabilities they
may incur after the commencement of these proceedings. It is proposed that the directors of SFC
be granted a directors' charge in the amount of CDN $3.2 million (the "Directors' Charge") over
the SFC Property. SFC believes the Directors' Charge is fair and reasonable in the circumstances.

226. SFC, for itself and its subsidiaries, currently has primary insurance coverage of $10 million
and five separate excess insurance policies collectively providing CDN $45 million (the "2012
Insurance Policies"), for a total of CDN $55 million of coverage in place to attempt to protect
SFC and its directors and officers. The 2012 Insurance Policies were put in place and became
effective after prior policies of insurance were not renewed following their expiry on December
31, 2011, by the insurers who had issued the policies (the "2011 Insurance Policies"). Although
coverage is being provided to SFC and certain of its directors and officers under the 2011
Insurance Policies for claims that were advanced or threatened prior to the expiry of the 2011
Insurance Policies on December 31, 2011, those policies provide no coverage or protection to
SFC or its officers and directors for new claims that are made after December 31, 2011 which are
based on new events or allegations unrelated to the subject matter of the claims that have already
been advanced or threatened.

227. As was the case with the 2011 Insurance Policies, the 2012 Insurance Policies provide for
three types of coverage: (i) director and officer liability, (ii) corporate liability for indemnifiable
loss, and (iii) corporate liability arising from securities claims. The 2012 Insurance Policies
expire on December 31, 2012 and exclude coverage for directors' liabilities for wages. There are

also other exclusions and limitations of coverage which may leave SFC's directors and officers without coverage under the 2012 Insurance Policies. Depending on the circumstances of any particular claim, the insurers which have issued the 2012 Insurance Policies may deny coverage on the basis that the 2012 Insurance Policies exclude such other claims, that coverage limits have been exhausted by claims made against the 2012 Insurance Policies, or that the matters reported fall within the coverage provided by the 2011 Insurance Policies (which are already responding to a number of significant claims that have the potential to exhaust or exceed the applicable limits). Finally, there is no guarantee that SFC will be able to renew the 2012 Insurance Policies when they expire at the end of the year.

228. Contractual indemnities have been provided by SFC to its directors. SFC does not have sufficient funds to satisfy those indemnities should the directors of SFC incur obligations and liabilities in that regard after the commencement of these proceedings.

229. The Directors' Charge is necessary so that SFC may benefit from its directors' experience, knowledge and ability to guide SFC's restructuring efforts. It is critical to the restructuring efforts that SFC's directors remain with SFC in order to assist SFC in achieving the Restructuring Transaction to benefit SFC's stakeholders.

230. As such, it is proposed that the priorities of the Administration Charge and the Directors' Charge be as follows:

(a)    First – Administration Charge; and

(b)    Second – Directors' Charge.

231. Based on the books and records of SFC, and to the best of my knowledge, there are no secured creditors who are likely to be affected by the Administration Charge or the Directors' Charge.

## F.    Postponement of Annual Shareholders' Meeting

232. As previously mentioned, SFC is a public company under the CBCA.  I am advised by Gary Solway of Bennett Jones LLP, counsel to SFC, that, as such, SFC is required, pursuant to paragraph 133(1)(b) of the CBCA, to call an annual meeting of its shareholders by no later than June 30, 2012, being six months after the end of its preceding financial year which ended on December 31, 2011. Accordingly, SFC is required to call its annual general meeting no later than June 30, 2012.  SFC's annual general meeting has typically been held in the month of May.

233. However, the management of SFC and other Sino-Forest Companies are presently devoting their efforts to stabilizing the business with a view to implementing the Restructuring Transaction in accordance with the terms of the Support Agreement.

234. Preparing the proxy materials required for an annual meeting of shareholders (which must be prepared well in advance of any meeting so that they can be mailed to shareholders in advance of the meeting) and holding the annual meeting of shareholders would divert the attention of senior management of the Sino-Forest Companies away from implementing the Restructuring Transaction, would require significant financial resources, and could impede SFC's ability to achieve a restructuring under the CCAA.

235. In addition, pursuant to section 155 of the CBCA, SFC is required to place before the annual meeting financial statements of SFC for a period ended not more than six months prior to

the date of the annual meeting. SFC has been unable to complete its financial statements for the reasons already discussed.

236. I am advised by Gary Solway of Bennett Jones LLP, counsel to SFC, that, under subsection 106(6) of the CBCA, if directors are not elected at an annual meeting, the incumbent directors will continue to hold office until their successors are elected.

237. Certain financial and other information is and will continue to be available to the public through SFC's court filing which will be easily accessible on the proposed Monitor's website (http://cfcanada.fticonsulting.com/sfc). Consequently, the failure to hold an annual general meeting within the time prescribed by the CBCA will not deprive shareholders of access to the financial information of SFC that is publicly available from SFC.

238. Under the circumstances, I believe it is impractical for SFC to call and hold an annual meeting of shareholders during this CCAA proceeding.

G.    Foreign Proceedings

239. SFC is seeking in the Initial Order to have the Monitor authorized, as the foreign representative of SFC, to apply for recognition of these proceedings, as necessary, in any jurisdiction outside of Canada, including as "Foreign Main Proceedings" in the United States pursuant to Chapter 15 of the *U.S. Bankruptcy Code* (the "Chapter 15 Proceedings"). The initial effect of the Chapter 15 Proceedings would be to give effect to the Initial Order in the United States.

## H.    Financial Advisor Agreement

240.  It became clear to SFC at the beginning of September 2011, that it would greatly benefit from the expertise of a financial advisor.  Accordingly, SFC invited four reputable global financial advisory firms to make presentations for the role on or about September 14, 2011. Houlihan was selected as SFC's first choice as a result of, among others, its significant experience in debt restructurings, its strong presence and reputation in both the North American and Asian markets, and its strong standing with the global noteholders community, especially those event driven funds which customarily play a leadership role in these situations.

241.  On or about September 26, 2011, Bennett Jones LLP, as counsel to SFC, entered into an agreement with Houlihan relating to Houlihan's provision of financial advisory and investment banking services to SFC.  That agreement was amended and replaced by an agreement dated as of December 22, 2011 (the "Financial Advisor Agreement").  A copy of the Financial Advisor Agreement is attached as Exhibit "**CC**".

242.  The Financial Advisor Agreement provides, among other things, that if SFC commences any proceedings under the CCAA or similar legislation or statute, SFC will promptly seek to have the Court approve (i) the Financial Advisor Agreement, and (ii) Houlihan's retention by SFC under the terms of the Financial Advisor Agreement, including the payment to be made to Houlihan thereunder. As such, the draft Initial Order provides for such approvals.

243.  It is my belief that Houlihan's significant restructuring experience and expertise in the area of debt restructuring has greatly benefited SFC.  The proposed Restructuring Transaction would not have been achievable without the advice and assistance of Houlihan.  Houlihan was also instrumental in assisting SFC in obtaining the waiver agreements described herein.

244. Houlihan has spent approximately seven months working closely with senior management of SFC and its other advisors. Houlihan has greatly assisted SFC in its restructuring efforts to date and has gained a thorough and intimate understanding of the Sino-Forest business. If SFC was deprived of the benefit of Houlihan's continued advice and assistance and was required to retain a new financial advisor, it would likely take a significant period of time for such a financial advisor to acquire a similar working knowledge of the business and would make it extremely difficult, if not impossible, to implement the Restructuring Transaction in the currently contemplated time frame. Thus, I believe that the continued involvement of Houlihan is essential to the completion of the Restructuring Transaction.

245. It is also my belief that the quantum and nature of the remuneration provided for in the Financial Advisor Agreement is fair and reasonable. Specifically, the restructuring fees payable to Houlihan are only payable if a restructuring transaction is completed and the quantum of those fees is dependent on various factors intended to measure the success of the restructuring.

## XI.    13 WEEK CASH FLOW FORECAST

246. As set out in the cash flow forecast attached as Exhibit "**DD**", SFC's principal uses of cash during the next 13 weeks will consist of the payment of ongoing day-to-day operational expenses, the costs associated with the ongoing investigation into the MW Report, the costs associated with responding to demands from the OSC, HKSFC and RCMP for information, and professional fees and disbursements in connection with these CCAA proceedings.

247. As at March 29, 2012, SFC had approximately $67.8 million available cash on hand. SFC's cash flow forecast projects that, subject to obtaining the relief outlined herein, it will have sufficient cash to fund its projected operating costs for the next 13 weeks.

66

## XII.  CONCLUSION

248.  I am confident that granting the Initial Order and Sale Process Order sought by SFC is in the best interests of SFC and its stakeholders.  SFC requires the stay of proceedings to pursue and implement the Restructuring Transaction in an attempt to complete a going concern restructuring of its businesses.  The Ad Hoc Noteholders support this application and SFC's pursuit of the Plan in this CCAA proceeding.

249.  Without the stay of proceedings and the opportunity to effect the Restructuring Transaction (including the Sale Process), Sino-Forest faces a possible cessation of going concern operations, the liquidation of its assets, and the loss of employment for a significant number of employees worldwide.  The granting of the requested stay of proceedings will assist an orderly restructuring of SFC.

SWORN BEFORE ME at the City of Hong  )
Kong, Special Administrative Region,  )
People's Republic of China, this 30th day of  )
March, 2012  )
                                      )
_____   )     _____
                                                        W. Judson Martin

LEE HONG KIU KILDARIA

Solicitor, Hong Kong SAR

IN THE MATTER OF THE *COMPANIES CREDITORS' ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OR COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

Court File No.

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceedings commenced in Toronto

**AFFIDAVIT OF W. JUDSON MARTIN**
**(Sworn March 30, 2012)**

**BENNETT JONES LLP**
One First Canadian Place
Suite 3400, P.O. Box 130
Toronto, Ontario
M5X 1A4

Robert W. Staley (LSUC #27115J)
Kevin Zych (LSUC #33129T)
Derek J. Bell (LSUC #43420J)
Jonathan Bell (LSUC #55457P)
Tel: 416-863-1200
Fax: 416-863-1716

Lawyers for the Applicant