**Exhibit E**
***Factum of the Applicant* dated December 5, 2012**
**and submitted to the Ontario Court in support of the Plan**

Court File No. CV-12-9667-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

---

**FACTUM OF THE APPLICANT,
SINO-FOREST CORPORATION**

**(Sanction Order Motion returnable December 7 and 10, 2012)**

---

Dated: December 5, 2012

**BENNETT JONES LLP**
3400 One First Canadian Place
P.O. Box 130
Toronto ON  M5X 1A4

Robert W. Staley (LSUC #27115J)
Kevin Zych (LSUC #33129T)
Raj Sahni (LSUC #42942U)
Derek J. Bell  (LSUC #43420J)
Jonathan Bell (LSUC #55457P)

Tel: 416-863-1200
Fax: 416-863-1716

Lawyers for the Applicant

2

TO:     THE SERVICE LIST

3

Court File No. CV-12-9667-00CL

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

---

### FACTUM OF THE APPLICANT,
### SINO-FOREST CORPORATION

### (Sanction Order Motion returnable December 7 and 10, 2012)

---

## I.    OVERVIEW

1.    The Applicant, Sino-Forest Corporation ("SFC") seeks an order sanctioning a Plan of Compromise and Reorganization dated December 3, 2012, concerning, affecting and involving SFC, as modified, amended, varied or supplemented in accordance with its terms (the "Plan") pursuant to section 6 of the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36, as amended (the "CCAA"), and ancillary relief as set out in the proposed Sanction Order.

2.    The Plan represents a fair and reasonable compromise with SFC's creditors reached after many months of intense negotiation with SFC's main creditors. The Plan, including its treatment of holders of equity claims, complies with the requirements of the CCAA. The Plan is consistent with the decision of this Honourable Court on the equity claims motion (the "Equity Claims

4

Decision"), which was upheld by the Court of Appeal. The classification of creditors for the purpose of voting on the Plan at the Meeting (defined below) was proper and consistent with the CCAA, existing law and prior orders of this Court, including the Equity Claims Decision and the Plan Filing and Meeting Order.

3.      The Plan is supported by: (a) the Monitor; (b) SFC's largest creditors, the Noteholders; (c) Ernst & Young LLP ("E&Y"); (d) BDO Limited ("BDO"); and (e) the Underwriters. The Ad Hoc Committee of Purchasers of the Applicants' Securities (the "Ad Hoc Securities Purchasers Committee") has agreed not to oppose the Plan. The Monitor has considered possible alternatives to the Plan including liquidation or bankruptcy to conclude that the Plan is clearly preferable.

4.      The Plan was approved by an overwhelming majority of Affected Creditors[1] voting on the Plan in person or by proxy. In total, 99% in number, and greater than 99% in value of those Affected Creditors voting on the Plan, voted in favour.

5.      Options and alternatives to the Plan have been explored throughout these proceedings. Among other things, SFC carried out a court-supervised sale process (the "Sale Process") pursuant to an Order of this Honourable Court (the "Sale Process Order"), to seek out potential qualified strategic and financial purchasers of SFC's assets on a global basis and attempted to engage such potential purchasers in the Sale Process. After a thorough canvassing of the market, it was determined that there were no qualified purchasers who offered to acquire the assets of SFC for the Qualified Consideration, which was set at 85% of the value of the outstanding amount owing under the Notes.

---

[1] Capitalized terms used in this factum that are not defined have the same meaning as that stated in the Affidavit of W. Judson Martin sworn November 29, 2012 (the "Martin November Affidavit") and the Plan.

5

6.     The Plan is fair and reasonable and achieves the objective stated at the commencement of

these proceedings to be the primary purpose hereof, namely to provide a "clean break" between

the business operations of the global SFC enterprise ("Sino-Forest") and the problems facing

SFC, with the intention of saving and preserving the value of SFC's underlying business for the

benefit of SFC's creditors.

7.     It is important to note what SFC is *not* asking this Honourable Court to rule on.    This

Court is not being asked to opine on the fairness of the E&Y Settlement.    This Court is not

being asked to opine on the continuing discovery rights of parties to the Ontario Class Actions.

This Court is not being asked to rule on continuing opt-out rights.    All of these matters relate to

the implementation and approval of the E&Y Settlement, which are not required features of the

Plan, and which are not before this Honourable Court today.

## II.    FACTS

### A.    Background

8.     SFC is an integrated forest plantation operator and forest products company, with most of

its assets and the majority of its business operations located in the southern and eastern regions

of the People's Republic of China (the "PRC").[2]    SFC's registered office is in Toronto and its

principal business office is in Hong Kong.

9.     SFC is a holding company with six direct subsidiaries and an indirect majority interest in

Greenheart Group Limited (Bermuda) ("Greenheart"), a publicly traded company.    Including

---

[2] Martin November Affidavit, para. 7, Motion Record of Sino-Forest Corporation (the "Motion Record"), Tab 2, pp.
7-8; Affidavit of W. Judson Martin sworn March 30, 2012 (the "Martin March Affidavit"), paras. 5-6, Motion
Record Tab 2(A), p. 56; Thirteenth Report of the Monitor, November 22, 2012 ("Thirteenth Report of the
Monitor") para. 8, p. 4.

6

SFC and the six direct subsidiaries, there are 137 entities that make up Sino-Forest:   67
companies incorporated in the PRC (with 11 branch companies), 58 companies incorporated in
the British Virgin Islands ("BVI"), 7 companies incorporated in Hong Kong, 2 companies
incorporated in Canada, and 3 companies incorporated elsewhere.[3]  The term "Sino-Forest" is
used herein to refer to the global enterprise as a whole.

10.     On June 2, 2011, a short-seller of SFC's securities, Muddy Waters LLC ("Muddy
Waters"), released a report that alleged that SFC was a "near total fraud" and a "Ponzi scheme".[4]
As a result of this report, SFC found itself embroiled in multiple class actions across Canada and
in the U.S., investigations and regulatory proceedings with the Ontario Securities Commission
(the "OSC"), the Hong Kong Securities and Futures Commission and the RCMP.[5]

11.     Immediately after the allegations were made by Muddy Waters, the Board appointed an
independent committee (the "IC") of the Board, which in turn engaged legal and accounting
professionals in Ontario, Hong Kong and the PRC to assist in investigating the allegations.[6]  The
IC and its advisors worked to compile and analyze the vast amount of data required for their
review of Sino-Forest's operations and business, the relationships between Sino-Forest and other
entities, and Sino-Forest's ownership of assets.[7]

12.     In late August 2011, the IC's efforts uncovered information that raised conduct issues
about certain members of former management of Sino-Forest.  This information was shared by

---

[3] Martin November Affidavit, paras. 29-31, Motion Record Tab 2, p. 14.

[4] Martin November Affidavit, para. 8, Motion Record Tab 2, p. 8; Thirteenth Report of the Monitor, para. 10, p. 4.

[5] Martin November Affidavit, para. 8, Motion Record Tab 2, p. 8.

[6] Martin November Affidavit, para. 9, Motion Record Tab 2, p. 8.

[7] Martin November Affidavit, para. 12, Motion Record Tab 2, p. 9; Thirteenth Report of the Monitor, para. 11, p. 4.

7

the IC with staff of the OSC. This information resulted in the OSC imposing a temporary cease

trade order (the "TCTO") on the securities of SFC on August 26, 2011. This order was later

continued and continues to be in force.[8]

13.    Arising from these developments, certain former members of management were placed

on administrative leave. The Board appointed W. Judson Martin as Chief Executive Officer of

SFC after Allen Chan ("Chan") resigned as Chairman, CEO and a Director, on August 28, 2011.[9]

14.    From late August 2011 onward, under the Board's oversight, considerable effort was

directed at determining if the issues identified by Muddy Waters and by investigative work to

date could be resolved with sufficient time to allow SFC to become current in its financial

reporting, and to obtain an audit opinion for 2011. Failure to issue quarterly results or to issue

audited annual financial results could lead to the possible acceleration and enforcement of

approximately $1.8 billion[10] in notes issued by SFC and guaranteed by many of its Subsidiaries.[11]

15.    By December 2011, it appeared that it would not be possible to obtain an audit opinion

for 2011 in sufficient time to avoid defaults under SFC's Note Indentures, nor would it be

possible to issue third quarter 2011 financial results.[12]

16.    On December 16, 2011, the Board established a Special Restructuring Committee ("RC")

of the Board, comprised exclusively of directors independent of management of SFC, for the

_____

[8] Martin November Affidavit, para. 14, Motion Record Tab 2, p. 9; Thirteenth Report of the Monitor, para. 32, p. 10.

[9] Martin November Affidavit, para. 15, Motion Record Tab 2, p. 9.

[10] Currency references in this factum are to USD unless otherwise noted.

[11] Martin November Affidavit, para. 16, Motion Record Tab 2, p. 10. Defined in the Plan.

[12] Martin November Affidavit, para. 18, Motion Record Tab 2, p. 10.

8

purpose of supervising, analyzing and managing the strategic options available to SFC. Subsequent to its appointment, the RC has been fully engaged and active in supervising and supporting SFC's restructuring efforts.[13]

**B.     Defaults under the Indentures and the Support Agreement**

17.     SFC's inability to file its third quarter 2011 financial statements ultimately resulted in a default under its note indentures.   After extensive discussions with an ad hoc committee of Noteholders (the "Ad Hoc Noteholders"), Noteholders representing a majority in principal amount of SFC's senior notes agreed to waive the default arising under the relevant indentures from the failure to release the SFC 2011 third quarter results.   While the waiver agreements prevented an acceleration of the note indebtedness as a result of SFC's failure to file its 2011 third quarter results, the waiver agreements would have expired on April 30, 2012 (or any earlier termination of the waiver agreements in accordance with their terms).   In addition, SFC's pending failure to file its audited financial statements for its fiscal year ended December 31, 2011 by March 30, 2012, would have caused another potential acceleration and enforcement event, creating additional uncertainty around SFC's business.[14]

18.     Following extensive arm's length negotiations between SFC and the Ad Hoc Noteholders, the parties agreed on a framework for a consensual resolution of SFC's defaults under its note indentures and the restructuring of its business, and entered into a restructuring support agreement (the "Support Agreement") on March 30, 2012, which was initially executed by holders of SFC's Notes holding approximately 40% of the aggregate principal amount of the

--------------------------------

[13] Martin November Affidavit, para. 19, Motion Record Tab 2, p. 10.

[14] Martin November Affidavit, para. 20, Motion Record Tab 2, p. 11.

9

Notes.[15]    Additional Consenting Noteholders subsequently executed joinder agreements,
resulting in Noteholders representing a total of more than 72% of aggregate principal amount of
the Notes agreeing to support the restructuring.[16]

19.    From a commercial perspective, the restructuring contemplated by the Support Agreement
was intended to separate Sino-Forest's business operations from the problems facing the parent
holding company outside of the PRC, with the intention of saving and preserving the value of
SFC's underlying business.  To this end, two possible transactions were contemplated:

(a)    First, a court-supervised Sale Process being undertaken to determine if any person
or group of persons would purchase SFC's business operations for an amount in
excess of a threshold amount of consideration (which was set at 85% of the
amount outstanding under the Notes at the CCAA filing date), with the potential
for excess above such threshold amount being directed to stakeholders
subordinate to the Noteholders.  The Sale Process was intended to ensure that
SFC pursued all avenues available to it to maximize value for its stakeholders;

(b)    Second, if the Sale Process was not successful, a transfer of the six immediate
holding companies that own SFC's operating business to an acquisition vehicle to
be owned by Affected Creditors in compromise of their claims against SFC and
the creation of a litigation trust (including funding) that would enable SFC's
litigation claims against any Person not otherwise released within the CCAA

---

[15] Martin November Affidavit, para. 21, Motion Record Tab 2, p. 11; Thirteenth Report of the Monitor, para. 23,
p. 7.
[16] Martin November Affidavit, para. 22, Motion Record Tab 2, p. 11.

10

proceedings to be preserved and pursued for the benefit of SFC's stakeholders in accordance with the Support Agreement (the "Restructuring Transaction").[17]

20.    Quite apart from the provisions of the Support Agreement, the circumstances facing SFC and its Subsidiaries (as described above and in the Initial Order Affidavit) necessitated the commencement of these CCAA proceedings in order to attempt to separate the business operations of Sino-Forest from the challenges facing the holding company parent in order to allow the business to be saved.[18]

21.    SFC applied to this Honourable Court and obtained an Initial Order under the CCAA on March 30, 2012 (the "Initial Order"), pursuant to which a limited stay of proceedings was also granted in respect of the Subsidiaries.  The stay of proceedings provided for in the Initial Order was subsequently extended by Orders dated May 31, September 28, October 10, and November 23, 2012, and unless further extended by the Court, will expire on February 1, 2013.[19]

C.    The Sale Process

22.    On March 30, 2012, this Honourable Court issued the Sale Process Order approving the sale process procedures (the "Sale Process Procedures") and authorizing and directing SFC, the Monitor, and SFC's financial advisor, Houlihan Lokey ("Houlihan"), to do all things reasonably necessary to perform each of their obligations under the Sale Process Order.[20]

_____

[17] Martin November Affidavit, para. 24, Motion Record Tab 2, pp. 12-13.

[18] Martin November Affidavit, para. 27, Motion Record Tab 2, p. 13.

[19] Martin November Affidavit, para. 28, Motion Record Tab 2, p. 13.

[20] Martin November Affidavit, para. 34, Motion Record Tab 2, p. 13; Thirteenth Report of the Monitor, para. 24, p.7.

11

23.    Pursuant to the Sale Process Procedures, SFC, through Houlihan, sought out potential qualified strategic and financial purchasers (including existing shareholders and noteholders) of SFC's assets on a global basis and attempted to engage such potential purchasers in the Sale Process.[21] Among other things, a teaser letter was sent to 85 potentially interested parties and 14 confidentiality agreements were negotiated with interested parties.[22]

24.    Qualified Letters of Intent were sought, as contemplated by the Sale Process Order. A Qualified Letter of Intent had to indicate that the bidder was offering to acquire SFC's assets for the "Qualified Consideration", which was defined as:[23]

> "Qualified Consideration" means cash consideration payable to SFC (or such other form of consideration as may be acceptable to SFC and the Initial Consenting Noteholders) in an amount equal to 85% of the aggregate principal amount of the Notes, plus all accrued and unpaid interest on Notes, at the regular rates provided therefor pursuant to the Note indentures, up to and including March 30, 2012.

25.    While a number of letters of intent were received on or about the deadline, none of them were Qualified Letters of Intent, because none of them offered to acquire the assets of SFC for the Qualified Consideration.[24] As such, on July 10, 2012, SFC announced the termination of the Sale Process and SFC's intention to proceed with the Restructuring Transaction.[25]

---

[21] Martin November Affidavit, para. 35, Motion Record Tab 2, pp. 15-16.

[22] Martin November Affidavit, para. 36, Motion Record Tab 2, p. 16; Thirteenth Report of the Monitor, para. 25, p.8.

[23] Martin November Affidavit, para. 37, Motion Record Tab 2, p. 16.

[24] Martin November Affidavit, para. 38, Motion Record Tab 2, p. 17; Thirteenth Report of the Monitor, para. 25, p.8.

[25] Martin November Affidavit, para. 38, Motion Record Tab 2, p. 17.

12

## D.    Claims Process

26.    On May 14, 2012, this Honourable Court granted an order (the "Claims Procedure Order") which approved a claims process that was developed by SFC, in consultation with the Monitor.[26]  The Claims Procedure Order was not appealed.

27.    Under the Claims Procedure Order, Proofs of Claim and D&O Proofs of Claim were required to be filed with the Monitor on or before the Claims Bar Date (June 20, 2012), while Restructuring Claims were required to be filed on or before the Restructuring Claims Bar Date (the later of the Claims Bar Date and 30 days after a Person is deemed under the Claims Procedure Order to receive a Proof of Claim Document Package).  D&O Indemnity Proofs of Claim were also required to be filed with the Monitor on a date that was relative to when the director or officer received notice of a D&O Proof of Claim.[27]

28.    In order to identify the nature and extent of claims asserted against the Subsidiaries, the Claims Procedure Order required any claimant that had or intended to assert a right or claim against one or more Subsidiaries relating to a purported claim made against SFC to so indicate on their Proof of Claim.[28]

29.    Paragraphs 27 and 28 of the Claims Procedure Order permitted the Ontario Plaintiffs and the Quebec Plaintiffs to file Proofs of Claim on behalf of the National Class and the Quebec Class, respectively.

---

[26] Martin November Affidavit, para. 39, Motion Record Tab 2, p. 17; Thirteenth Report of the Monitor, para. 27, p.8.

[27] Martin November Affidavit, para. 40, Motion Record Tab 2, p. 17.

[28] Martin November Affidavit, para. 41, Motion Record Tab 2, pp. 17-18.

13

### E.    SFC's Primary Stakeholders

#### 1.    *The Noteholders*

30.    As at the date of filing, SFC had approximately $1.8 billion of principal amount of debt owing under the Notes, plus accrued and unpaid interest.  There are four series of Notes issued and outstanding.  Two of the series of Notes are senior notes and the other two are convertible notes.  All of the Notes are supported by guarantees from 60 to 64 Subsidiaries (which are substantially all of the Subsidiaries with any assets[29]), and the two series of senior notes are also supported by share pledges from eleven of those same Subsidiaries.[30]

31.    As of May 15, 2012, Noteholders (including the Initial Consenting Noteholders) holding in aggregate approximately 72% of the principal amount of the Notes, and representing more than 66.67% of the principal amount of each of the four series of Notes, agreed to support the Plan.[31]

#### 2.    *The Shareholder / Former Noteholder Group*

32.    As indicated above, after the Muddy Waters report was released, SFC and certain of its officers, directors and employees, along with SFC's former auditors, technical consultants and the Underwriters (defined below) involved in prior equity and debt offerings, were named as defendants in a number of proposed class action lawsuits.  Presently there are active proposed class actions in four jurisdictions: Ontario, Quebec, Saskatchewan, and New York.[32]

---

[29] Thirteenth Report of the Monitor, para. 26, p. 8.

[30] Martin November Affidavit, para. 43, Motion Record Tab 2, pp. 18-19.

[31] Martin November Affidavit, para. 44, Motion Record Tab 2, p. 19.

[32] Martin November Affidavit, paras. 45-50, Motion Record Tab 2, pp. 19-21.

14

33.    The *Labourers v. Sino-Forest Corporation* class action (the "Ontario Class Action") was commenced in Ontario by Koskie Minsky LLP and Siskinds LLP.[33]  It has two components. First, there is a shareholder claim, brought on behalf of current and former shareholders of SFC, seeking damages in the amount of $6.5 billion for general damages, $174.8 million in connection with a prospectus issued in June 2007, $330 million in relation to a prospectus issued in June 2009, and $319.2 million in relation to a prospectus issued in December 2009.[34]  Second, there is a Noteholder claim, brought on behalf of former holders of SFC's Notes in the amount of approximately $1.8 billion. The Noteholder component of this claim asserts, among other things, damages for loss of value in the Notes.[35]

34.    The Quebec class action was brought by Siskinds' office in Quebec, and is similar in nature to the Ontario Class Action.  The Ontario and Quebec Class Action Plaintiffs both filed Proofs of Claim.[36]  The plaintiffs in the Saskatchewan claim did not file a Proof of Claim in this proceeding.[37]  The New York complaint is brought on behalf of persons who purchased SFC shares on the over-the-counter market and on behalf of non-Canadian purchasers of SFC debt securities, but no quantum of damages is specified in the complaint.[38]  The plaintiffs in the New

---

[33] Who succeeded in a carriage fight.  See *Smith v. Sino-Forest Corporation*, 2012 ONSC 24, para. 233 ["I award carriage to Koskie Minsky and Siskinds in *Labourers v. Sino-Forest*. In the race for carriage of an action against Sino-Forest, I would have ranked Rochon Genova second and Kim Orr third."], Applicant's Brief of Authorities, Tab 1.

[34] Martin November Affidavit, para. 47, Motion Record Tab 2, p. 20.

[35] Martin November Affidavit, para. 48, Motion Record Tab 2, pp. 20-21.

[36] Thirteenth Report of the Monitor, para. 46, p. 13.

[37] Martin November Affidavit, para. 49, Motion Record Tab 2, p. 21.

[38] Martin November Affidavit, para. 50, Motion Record Tab 2, p. 21.

15

York class action filed Proofs of Claims and have thus attorned to this proceeding.[39]    A few

shareholders filed Proofs of Claim separately,[40] but no Proof of Claim was filed by Kim Orr LLP.

35.    In this proceeding, an "Ad Hoc Committee of Purchasers of the Applicant's Securities"

(the "Ad Hoc Securities Purchasers Committee") has appeared to represent the interests of

shareholders and noteholders who have asserted class action claims against SFC and others. The

Ad Hoc Securities Purchasers Committee is represented in this proceeding by Siskinds LLP,

Koskie Minsky, and Paliare Roland Rosenberg Rothstein LLP.[41]

### 3.    *Auditors*

36.    Since 2000 SFC has had two auditors: E&Y, who acted as auditor from 2000 to 2004 and

2007 to 2012, and BDO, who acted as auditor from 2005 to 2006.[42]

37.    The auditors have asserted claims against SFC for contribution and indemnity for any

amounts paid or payable in respect of the shareholder class actions, with each of the auditors

having asserted claims in excess of $6.5 billion. In addition the auditors have asserted claims for

payment of professional fees associated with SFC after the release of the Muddy Waters report,

and    generalized    claims    for    damage    to    reputation.[43]    The    auditors    have    also    asserted

---

[39] Thirteenth Report of the Monitor, para. 46, p. 13.  On attornment and proofs of claims, see *Microbiz Corp. v. Classic Software Systems Inc.* (1996), 45 C.B.R. (3d) 40 (Ont. Gen. Div.) at para. 3, Applicant's Brief of Authorities at Tab 2;  *Roberts v. Picture Butte Municipal Hospital,* 1998 ABQB 636 at para. 24, Applicant's Brief of Authorities at Tab 3 and *Canlau International (Barbados) Corp. v. Atlas Securities Inc. (Liquidator of)* (2002), 35 C.B.R. (4th) 232 (Ont. S.C.J.), Applicant's Brief of Authorities at Tab 4.   By filing a proof of claim, the New York Class Action plaintiffs have become subject to orders of this Honourable Court: see *Nortel Networks Corp. (Re.),* 2010 ONSC 1304 (S.C. (Comm. List)), aff'd 2010 ONCA 464, Applicant's Brief of Authorities at Tab 5.

[40] Thirteenth Report of the Monitor, para. 46, p. 14.

[41] Martin November Affidavit, para. 51, Motion Record Tab 2, p. 21.

[42] Martin November Affidavit, para. 61, Motion Record Tab 2, p. 23.

[43] Martin November Affidavit, para. 62, Motion Record Tab 2, p. 24.

indemnification claims in respect of the class action claims against them by the former Noteholders.[44]  The auditors have also asserted claims against the Subsidiaries for, among other things, indemnification in connection with the shareholder class actions.  Those claims have tended to treat SFC and the Subsidiaries interchangeably or as one collective entity.[45]

**4.**     *Underwriters*

38.     In each instance where SFC has had a debt or equity public offering, such offering has been underwritten.   A total of eleven firms[46] (the "Underwriters") have acted as SFC's underwriters and also have been named as defendants in the Ontario Class Action.  Certain of the Underwriters also are defendants in the New York class action.[47]

39.     Like the auditors, the Underwriters have filed claims against SFC seeking contribution and indemnity for the shareholder class actions.[48]   The Underwriters have also asserted indemnification claims in respect of the class action claims against them by the former Noteholders.[49]  Certain of the Underwriters have also asserted claims against the Subsidiaries in connection with the four Note offerings.[50]

---

[44] Martin November Affidavit, para. 66, Motion Record Tab 2, p. 25.

[45] Martin November Affidavit, para. 67, Motion Record Tab 2, p. 25.

[46] The full list of the underwriting firms is provided in the Martin November Affidavit, para. 68, Motion Record Tab 2, pp. 25-26.

[47] Martin November Affidavit, para. 68, Motion Record Tab 2, pp. 25-26.   E&Y is also a defendant in the New York class action.

[48] Martin November Affidavit, para. 69, Motion Record Tab 2, p. 26.

[49] Martin November Affidavit, para. 71, Motion Record Tab 2, p. 26.

[50] Martin November Affidavit, para. 72, Motion Record Tab 2, p. 26.

17

## 5.    *Ontario Securities Commission*

40.    On June 8, 2011, six days after the Muddy Waters report was released and the Board of SFC appointed the IC to investigate the allegations contained in that report, the OSC publicly announced that it was investigating matters related to SFC.[51]

41.    SFC has made extensive production of documents, including documents sourced from jurisdictions outside of the OSC's power to compel production.    SFC also has facilitated interviews by the OSC with SFC and other Sino-Forest personnel.    In circumstances where OSC staff sought to examine Sino-Forest personnel resident in the PRC, outside the OSC's jurisdiction to compel attendance at examination, SFC arranged to bring individuals to Hong Kong to be examined.[52]

42.    In April 2012, SFC received an Enforcement Notice from OSC staff.[53]    Enforcement Notices typically are issued by OSC staff at or near the end of an investigation, identify issues that have been the subject of investigation, and advise that staff contemplate commencing formal proceedings in relation to those issues. They also afford recipients an opportunity to make representations before a decision is taken by staff of the OSC to commence formal proceedings.[54]

43.    On May 22, 2012, a Notice of Hearing and Statement of Allegations was issued by OSC staff against SFC, Chan, Albert Ip ("Ip"), Alfred C.T. Hung ("Hung"), George Ho ("Ho"), Simon

---

[51] Martin November Affidavit, para. 73, Motion Record Tab 2, p. 27.

[52] Martin November Affidavit, para. 74, Motion Record Tab 2, p. 27.

[53] Martin November Affidavit, para. 77, Motion Record Tab 2, p. 28; Thirteenth Report of the Monitor, para. 33, p. 10.

[54] Martin November Affidavit, para. 77, Motion Record Tab 2, p. 28.

18

Yeung ("Yeung"), and David Horsley ("Horsley").[55]   OSC staff alleged in the Statement of

Allegations that SFC and the other respondents, except Horsley, had engaged in a complex

fraudulent scheme to inflate the assets and revenue of SFC and made materially misleading

statements in SFC's public disclosure record. It is further alleged by OSC staff that such conduct

was contrary to the Ontario *Securities Act* and contrary to the public interest. No date has been

set for a hearing on the merits.[56]

44.     On September 25, 2012, SFC received a second "Enforcement Notice" from OSC staff.

The second Enforcement Notice includes a further allegation, which is similar in nature to the

allegations in the Statement of Allegations discussed above.[57]

45.     By letter dated September 13, 2012, counsel for OSC staff advised that OSC staff would

not be seeking any monetary sanctions against SFC, and that they would not seek monetary

sanctions against any of the directors and officers of SFC in excess of CAD$100 million. This

amount was later reduced to CAD$84 million.[58] The OSC has further confirmed that of the OSC

Monetary Claims which may be asserted against Officers and Directors, $7 million to $72

million could relate to fraud.[59]

---

[55] Statement of Allegations dated May 22, 2012, Exhibit "L" to the Martin November Affidavit, Motion Record Tab 2(L), pp. 496-533.

[56] Martin November Affidavit, para. 78, Motion Record Tab 2, p. 28.

[57] Martin November Affidavit, para. 79, Motion Record Tab 2, p. 28.

[58] Martin November Affidavit, para. 80, Motion Record Tab 2, p. 29; Letter from J. Grout dated September 13, 2012, Exhibit "N" to the Martin November Affidavit, Motion Record Tab 2(N), pp. 537-539; Letter from J. Grout dated October 25, 2012, Exhibit "O" to the Martin November Affidavit, Motion Record Tab 2(O), pp. 541-542.

[59] Thirteenth Report of the Monitor, para. 59, pp. 17-18.

19

## 6.    *Trade Creditors and Other Creditors*

46.    As SFC is a holding company whose business is substantially carried out through its subsidiaries in the PRC and Hong Kong, SFC has very few trade creditors.  Only three trade claims have been filed pursuant to the Claims Procedure Order.  The only other claim of any potential significance is a claim filed by the former CFO arising from the termination of his employment.[60]

## F.    The Equity Claims Decision

47.    On June 26, 2012, SFC brought a motion for an order directing that claims against SFC that arise in connection with the ownership, purchase or sale of an equity interest in SFC and related indemnity claims are "equity claims" as defined in section 2 of the CCAA, including the claims by or on behalf of shareholders asserted in class action proceedings commenced against SFC.[61]  The equity claims motion did not purport to deal with the component of the class action proceedings that relate to claims relating to the Notes.[62]

48.    In reasons released on July 27, 2012, this Honourable Court granted the relief sought by SFC (the "Equity Claims Decision"), finding that "the claims advanced in the Shareholder Claims are clearly equity claims."  The Ad Hoc Securities Purchasers Committee did not oppose

---

[60] Martin November Affidavit, para. 81, Motion Record Tab 2, p. 29.

[61] Martin November Affidavit, para. 52, Motion Record Tab 2, p. 17;  Thirteenth Report of the Monitor, para. 29, p. 9.

[62] Martin November Affidavit, para. 52, Motion Record Tab 2, p. 17.

20

the motion and no issue was taken by any party with the Court's determination that the

shareholder claims against SFC were "equity claims".[63]

49.    The Court also stated that:

> [T]he claims of E&Y, BDO and the Underwriters constitutes an
> 'equity claim' within the meaning of the CCAA.  Simply put, but
> for the Class Action Proceedings, it is inconceivable that claims of
> this magnitude would have been launched by E&Y, BDO and the
> Underwriters as against SFC.

50.    The auditors and Underwriters appealed the decision to the Court of Appeal for Ontario.
On November 23, 2012, the Court of Appeal dismissed the appeal.  The Court of Appeal stated
"[W]e agree with the supervising judge that the appellants' claims for contribution or indemnity
are equity claims within s. 2(1)(e) of the CCAA".[64]

**G.    Efforts and Achievements in Arriving at a Negotiated Resolution**

51.    From shortly after this proceeding was commenced, efforts have been made to develop a
path forward for SFC that could achieve the requisite creditor support.

52.    On July 25, 2012, the Court issued a mediation order on the consent of all parties.[65]  SFC
established a confidential data room, containing approximately 18,000 documents.  These were
made available to parties to the mediation who signed non-disclosure agreements.[66]

---

[63] Martin November Affidavit, para. 54-55, Motion Record Tab 2, p. 22.

[64] Court of Appeal Decision dated November 23, 2012, para. 59, Exhibit "J" to the Martin November Affidavit,
Motion Record Tab 2(J), p. 485.

[65] Martin November Affidavit, para. 84-85, Motion Record Tab 2, p. 30;  Thirteenth Report of the Monitor, para. 31.

[66] Martin November Affidavit, para. 84-85, Motion Record Tab 2, p. 30.

21

53.    The mediation took place on September 4 and 5, 2012.  Justice Newbould acted as the mediator.  While the mediation did not result in a global resolution, further discussions continued among certain of the parties after the conclusion of the mediation, and those discussions continued up to the Meeting.[67]

54.    As a result of these efforts, SFC obtained the support of and non-opposition to the Plan by significant participants in these proceedings prior to the Meeting, namely: (1) Noteholders representing 72% of the principal amount of outstanding Notes agreed to support the proposed restructuring at an early stage of this proceeding; (2) shareholders and former Noteholders, through the Ad Hoc Securities Purchasers Committee, agreed on October 26, 2012 to not oppose the Plan and agreed to the amendments embodied in the Plan as approved;[68] (3) E&Y agreed to support the Plan; and (4) the Underwriters agreed to support the Plan.  As at the time of this factum, the only parties in this proceeding who have not expressly agreed to support (or not oppose) the Plan are Chan, Kai Kit Poon ("Poon"), and Horsley.

55.    These results are a reflection of the significant efforts that were made to obtain the support of other participants in these proceedings, including efforts encouraged by this Honourable Court.

---

[67] Martin November Affidavit, para. 86, Motion Record Tab 2, p. 30.

[68] Martin November Affidavit, para. 83, Motion Record Tab 2, p. 29.

22

## H.    The Plan

### 1.    *Overview*

56.    On August 31, 2012, this Honourable Court issued an order approving the filing of the Plan

(the "Plan Filing and Meeting Order") as well as an endorsement stating that no determination

had been made of (a) the test for approval of the Plan; (b) the validity or quantum of any claims;

and (c) the classification of creditors for voting purposes.[69]  The endorsement also stated that the

Plan Filing and Meeting Order did not prevent or restrict any party from opposing the Sanction

Order now being sought.[70]

57.    The Plan sets out to achieve the following purposes:

(a)    to effect a full, final and irrevocable compromise, release, discharge, cancellation

and bar of all Affected Claims;

(b)    to effect the distribution of the consideration provided for in the Plan in respect of

Proven Claims;

(c)    to transfer ownership of the Sino-Forest business to Newco and then to Newco II,

in each case free and clear of all claims against SFC and certain related claims

against the Subsidiaries, so as to enable the Sino-Forest business to continue on a

viable, going concern basis for the benefit of the Affected Creditors; and

---

[69] Martin November Affidavit, para. 91, Motion Record Tab 2, pp. 31-32;  Thirteenth Report of the Monitor, para.
36, p. 11.

[70] Martin November Affidavit, para. 91, Motion Record Tab 2, pp. 31-32;  Thirteenth Report of the Monitor, para.
38, p. 11.

23

(d)      to allow Affected Creditors and Noteholder Class Action Claimants to benefit

from contingent value that may be derived from litigation claims to be advanced

by the Litigation Trustee.[71]

58.    Given that the Sale Process was not successful, the Plan contemplates that a new company

and a further subsidiary ("Newco" and "Newco II", respectively) will be incorporated and SFC

will transfer substantially all of its assets to Newco in compromise and satisfaction of all claims

made against it.   The result will be that Newco will own, directly or indirectly, all of SFC's

Subsidiaries and SFC's interest in Greenheart and its subsidiaries as well as any intercompany

debts owed by the Subsidiaries to SFC.   Pursuant to the Plan, as explained in further detail

below, the shares of Newco will be distributed to the Affected Creditors.[72]   Newco will

immediately transfer the acquired assets to Newco II.

59.    The Plan represents the best available outcome in the circumstances and those with an

economic interest in SFC, when considered as a whole, will derive a greater benefit from the

implementation of the Plan and the continuation of the business of Sino-Forest as a going

concern than would result from a bankruptcy or liquidation of SFC.[73]   The Plan fairly and

equitably takes into account the interests of the Third Party Defendants, who seek indemnity and

contribution from SFC and its Subsidiaries on a contingent basis, in the event that they are found

---

[71] Martin November Affidavit, para. 92, Motion Record Tab 2, p. 32.

[72] Martin November Affidavit, para. 94, Motion Record Tab 2, p. 33.

[73] Thirteenth Report of the Monitor, pp. 102-105.

24

to be liable to SFC's stakeholders.[74] In this respect, it is notable that the three most significant

Third Party Defendants (E&Y, BDO and the Underwriters) support the Plan.

## 2.    *Key Features of the Plan*

60.    SFC filed a version of the Plan in August 2012 which set out the core restructuring plan of

SFC.  Amendments were made over the following months, leading to further revised versions in

October and November 2012, and a final version dated December 3, 2012 which was voted on

and approved at the Meeting.  Further amendments were made to obtain the support of E&Y and

the Underwriters, and those amendments were and are available for certain other parties who are

interested in the same terms.  BDO availed itself of those terms on December 5, 2012.

61.    The current form of the Plan does not settle the class actions.   However, it contains terms

that would be implemented if certain conditions are met, including if the class action settlement

with E&Y is later approved by the relevant courts.

62.    A detailed description of the Plan is set out in Schedule "C" to this Factum.

63.    The Plan contemplates the distribution to Affected Creditors with Proven Claims entitled

to receive distributions under the Plan of (1) Newco[75] Shares, (2) Newco Notes in the aggregate

---

[74] Martin November Affidavit, para. 93, Motion Record Tab 2, p. 32.

[75] Newco will be incorporated as an exempt company under the laws of the Cayman Islands pursuant to the Plan.
Newco will organize Newco II as a wholly-owned subsidiary and an exempt company under the laws of the
Cayman Islands, for the purpose of acquiring from Newco the SFC assets to be transferred by SFC to Newco on
the implementation of the Plan.

25

principal amount of US$300 million which will be guaranteed by the Subsidiary Guarantors and will be secured, and (3) Litigation Trust Interests.[76]

64.    Affected Creditors with Proven Claims will be entitled under the Plan to: (a) their pro-rata share of 92.5% of the Newco Shares with Early Consenting Noteholders also being entitled to their pro-rata share of the remaining 7.5% of the Newco Shares;[77] and (b) their pro-rata share of the Newco Notes.[78] Affected Creditors with Proven Claims will be entitled to their pro-rata share of 75% of the Litigation Trust Interests and the Noteholder Class Action Claimants are entitled to their pro-rata share of the remaining 25% of the Litigation Trust Interests.[79]

65.    The Plan contemplates the establishment of three cash reserves to fund costs of administering the Plan and the Claims Procedure Order and to pay Unaffected Claims. The Plan also contemplates the establishment of an Unresolved Claims Reserve, which will contain the amount of Newco Shares, Newco Notes, and Litigation Trust Interests as is necessary to make any potential distributions under the Plan in respect of any Unresolved Claims.  It is expected that the Unresolved Claims as at the Plan Implementation Date will consist primarily of Indemnified Noteholder Class Action Claims, Defence Cost Claims, and Unresolved Claims by trade and other creditors.

---

[76] The Litigation Trust will include all claims and actions that have been or may be asserted by or on behalf of SFC against any and all third parties and the Note Indenture Trustees against any and all persons in connection with the Notes.

[77] Martin November Affidavit, para. 97, Motion Record Tab 2, p. 33.

[78] Martin November Affidavit, para. 101, Motion Record Tab 2, p. 34.

[79] Martin November Affidavit, para. 103, Motion Record Tab 2, p. 35.

26

66.    With respect to the Indemnified Noteholder Class Action Claims, these relate to claims by former Noteholders against third parties who, in turn, have alleged corresponding indemnification claims against SFC. The Class Action Plaintiffs have agreed that the aggregate amount of those former Noteholder claims will not exceed the Indemnified Noteholder Class Action Limit of $150 million. In turn, indemnification claims of Third Party Defendants against SFC with respect to Indemnified Noteholder Class Action Claims are also limited to the $150 million Indemnified Noteholder Class Action Limit. This $150 million amount is an aggregate limit in respect of all Indemnified Noteholder Class Action Claims, such that it will be reduced for remaining Third Party Defendants by the amount of liability or settlement paid by any Third Party Defendant in respect of Noteholder Class Action Claims.

67.    The Plan includes releases for, among others (a) the Subsidiaries; (b) the Underwriters' liability for Noteholder claims in excess of the Indemnified Noteholder Class Action Limit; (c) E&Y in the event that all of the pre-conditions to the E&Y settlement with the Ontario Class Action Plaintiffs are met; and (d) certain current and former directors and officers of SFC (collectively, the "Named Directors and Officers"). As explained in greater detail in Schedule C, among other things, Non-Released D&O Claims (being claims for fraud or criminal conduct), Conspiracy Claims, and Section 5.1(2) D&O Claims are not being released pursuant to the Plan.[80]

68.    The Plan contemplates that recovery in respect of claims against the Named Directors and Officers of SFC in respect of any Section 5.1(2) D&O Claims and any Conspiracy Claims shall

---

[80] Martin November Affidavit, para. 118, Motion Record Tab 2, p. 40.

27

be directed and limited to insurance proceeds available from the insurance policies[81] maintained by SFC.[82]

### 3.    *The Meeting*

69.    The Meeting was carried out in accordance with the provisions of the Plan Filing and Meeting Order.  The meeting materials approved by the Court were sent to stakeholders in the manner required by the Plan Filing and Meeting Order.[83]  The Plan Supplement was authorized by and distributed in accordance with the Plan Filing and Meeting Order.[84]

70.    The Meeting Date was extended on two occasions to allow for further discussions among the parties with a view to arriving at a global or broader resolution.[85]  The Meeting was ultimately held on December 3, 2012.

71.    The results of the Meeting were as follows:[86]

  (a)    the number of Voting Claims that voted on the Plan and their value for and against the Plan:

|  | Number of Votes | % | Value of Votes | % |
|---|---|---|---|---|
| Total Claims Voting For | 250 | 98.81% | $ 1,465,766,204 | 99.97% |
| Total Claims Voting Against | 3 | 1.19% | $ 414,087 | 0.03% |
| Total Claims Voting | 253 | 100.00% | $ 1,466,180,291 | 100.00% |

---

[81] SFC has D&O coverage in 2011 providing for a total of $60 million, and slightly in excess of $10 million has been paid out on account of insured costs by SFC.  Martin November Affidavit, para. 120, Motion Record Tab 2, p. 40.

[82] Martin November Affidavit, para. 119, Motion Record Tab 2, p. 40.

[83] Martin November Affidavit, paras. 126-129, Motion Record Tab 2, p. 42.

[84] Martin November Affidavit, paras. 130-131, Motion Record Tab 2, p. 43.

[85] Martin November Affidavit, para. 134, Motion Record Tab 2, pp. 43-44.

[86] Supplement to the Monitor's Thirteenth Report, December 4, 2012 ("Supplement to the Monitor's Thirteenth Report") at para. 31, pp. 17-18.

28

(b)    the number of votes for and against the Plan in connection with Class Action
Indemnity Claims in respect of Indemnified Noteholder Class Action Claims up
to the Indemnified Noteholder Limit:

|  | Vote For | Vote Against | Total Votes |
|---|---|---|---|
| Class Action Indemnity Claims | 4 | 1 | 5 |

(c)    the number of Defence Costs Claims votes for and against the Plan and their
value:

|  | Number of Votes | % | Value of Votes | % |
|---|---|---|---|---|
| Total Claims Voting For | 12 | 92.31% | $ 8,375,016 | 96.10% |
| Total Claims Voting Against | 1 | 7.69% | $ 340,000 | 3.90% |
| Total Claims Voting | 13 | 100.00% | $ 8,715,016 | 100.00% |

(d)    the overall impact on the approval of the Plan if the count were to include Total
Unresolved Claims (including Defence Costs Claims) and, in order to
demonstrate the "worst case scenario" if the entire $150 million of the
Indemnified Noteholder Class Action Limit had been voted a "no" vote (even
though 4 of 5 votes were "yes" votes and the remaining "no" vote was from BDO,
who has now agreed to support the Plan):

|  | Number of Votes | % | Value of Votes | % |
|---|---|---|---|---|
| Total Claims Voting For | 263 | 98.50% | $ 1,474,149,082 | 90.72% |
| Total Claims Voting Against | 4 | 1.50% | $ 150,754,087 | 9.28% |
| Total Claims Voting | 267 | 100.00% | $ 1,624,903,169 | 100.00% |

**4.    Steps Taken at the OSC With Respect to the Plan**

72.    The mailing of the Meeting Materials, the holding of the Meeting, and the steps
contemplated to implement the Plan could have individually or collectively constituted an act in
furtherance of a trade, which would have been contrary to the TCTO first made by the OSC on

29

August 26, 2011. To avoid that result, SFC sought and obtained two orders of the OSC to vary

the TCTO, on September 18, 2012 and October 26, 2012.[87]

73.    As a result, except in the circumstances where an Alternative Sale Transaction was being

pursued, there are no further regulatory requirements that relate to the OSC that are needed to

effectuate the transactions contemplated in the Plan, other than an order from the OSC and other

provincial securities regulators for a decision that SFC is not a reporting issuer effective as of the

implementation date of the Plan. If granted, that order would result in SFC and Newco not being

reporting issuers in Ontario or any other province in Canada following the implementation date

of the Plan.[88]

## I.    The E&Y Settlement

74.    As indicated above, E&Y has now entered into a settlement (the "E&Y Settlement") with

the Ontario Plaintiffs and the Quebec Plaintiffs, which is still subject to several conditions and

approval of the E&Y Settlement itself.[89]

75.    While SFC supports the E&Y Settlement, it does not form part of the Sanction Order and

no relief is being sought at the return of this motion with respect to the E&Y Settlement.

Rather, section 11.1 of the Plan contains provisions that provide a framework pursuant to which

a release of the Ernst & Young Claims[90] under the Plan would happen if several conditions were

_____

[87] Martin November Affidavit, paras. 140-142, Motion Record Tab 2, pp. 45-46.

[88] Martin November Affidavit, para. 143, Motion Record Tab 2, pp. 45-46.

[89] Supplement to the Monitor's Thirteenth Report, para. 7, pp. 5-6.

[90] "Ernst & Young Claims" has the definition given to it in the Plan and does not include any proceedings or
remedies that may be taken against Ernst & Young by the Ontario Securities Commission or by staff of the
Ontario Securities Commission and the jurisdiction of the Ontario Securities Commission is expressly preserved.

30

met.[91] That release will only be granted if all conditions are met including further Court approval.

76.   Any issues relating to the E&Y Settlement, including its fairness, continuing discovery rights in the Ontario or Quebec Class Actions, or opt-out rights, are to be dealt with at a further Court approval hearing in the future.

## III.   LAW AND ARGUMENT

### A.   The Requirements for Sanction of a Plan

77.   Subsection 6(1) of the CCAA provides that the Court may sanction a plan of compromise or arrangement if the plan has achieved the support of a majority in number representing two-thirds in value of the creditors.  To obtain the Court's approval of a plan of compromise or arrangement under the CCAA, the debtor company must establish:[92]

   (a)    there has been strict compliance with all statutory requirements and adherence to previous orders of the court;

   (b)    nothing has been done or purported to be done that is not authorized by the CCAA; and

   (c)    the plan is fair and reasonable.

---

[91] Amended Plan of Compromise and Reorganization, dated December 3, 2012, Appendix "A" to the Supplemental Report to the Thirteenth Report of the Monitor ("Plan") , s. 11.1, pp. 99-10.

[92] *Nelson Financial Group Ltd. (Re.)*, 2011 ONSC 2750 (S.C.J. (Comm. List)) at para. 23, Applicant's Brief of Authorities, Tab 6;  *Re Canadian Airlines Corp.,* 2000 ABQB 442 at para. 60, lv to app. denied 2000 ABCA 238, aff'd 2001 ABCA 9, lv. to app to SCC ref'd July 21, 2001, Applicant's Brief of Authorities, Tab 7;  *Re Sammi Atlas* (1998), 3 C.B.R. (4th) 171 (Ont. S.C.J.) at para. 2, Applicant's Brief of Authorities, Tab 8.

31

## B.    Compliance with All Statutory Requirements

78.    The first requirement typically requires proof that the debtor is a debtor corporation

entitled to the protection of the CCAA and that the debtor or affiliated debtor companies have

total claims in excess of $5 million.[93]    The court also considers the statutory requirements

surrounding the meeting of creditors: whether the notice of meeting was sent in accordance with

the meeting order of the Court; whether the creditors were properly classified at the meeting;

whether the meeting was properly constituted; whether the voting was properly carried out; and

whether the plan was approved by the requisite majority of creditors.[94]    Finally, the courts often

consider whether there has been compliance with the substance of all Orders made in the CCAA

proceedings.[95]

79.    In the present case, there has been strict compliance with all statutory requirements.    This

Honourable Court has already found, for the purposes of the Initial Order application, that SFC is

a "debtor company" to which the CCAA applies.[96]    SFC is a corporation continued under the

CBCA and is a "company" as defined in the CCAA.[97]    SFC was "reasonably expected to run out

---

[93] *Canadian Airlines, supra* at para. 62, Applicant's Brief of Authorities, Tab 7; *Canadian Red Cross Society (Re.)* (2000), 19 C.B.R. (4th) 158 (Ont. S.C.J.) at para. 17, Applicant's Brief of Authorities, Tab 9; *Re Canwest Global,* 2010 ONSC 4209 (S.C.J. (Comm. List.)) at para. 15, Applicant's Brief of Authorities, Tab 10; *Algoma Steel Inc. (Re.)* (2002), 30 C.B.R. (4th) 1 (Ont. S.C.J.) at para. 3, Applicant's Brief of Authorities, Tab 11.

[94] *Canadian Red Cross, supra* at paras. 18-19, Applicant's Brief of Authorities, Tab 9; *Canwest Global, supra* at para. 15, Applicant's Brief of Authorities, Tab 10; *Algoma Steel, supra* at para. 3, Applicant's Brief of Authorities, Tab 11.

[95] *Canadian Red Cross, supra* at para. 18, Applicant's Brief of Authorities, Tab 9; *Algoma Steel, supra* at para. 3, Applicant's Brief of Authorities, Tab 11.

[96] *Sino-Forest Corporation (Re.),* 2012 ONSC 2063 (S.C.J.) at para. 29, Applicant's Brief of Authorities, Tab 12.

[97] Affidavit of W. Judson Martin sworn March 30, 2012 [the "Martin March 30 Affidavit"], Exhibit "A" to the Martin November Affidavit, paras. 28-29, Motion Record, Tab 2(A), p. 62.

32

of liquidity within a reasonable proximity of time"[98] prior to the Initial Order, and as such was and continues to be insolvent.[99]   SFC has total claims and liabilities against it substantially in excess of the $5 million statutory requirement.[100]

80.   The Notice of Creditors Meeting was sent in accordance with the Meeting Order and the Revised Noteholder Mailing Process Order.[101] The Plan Supplement and the Voting Procedures were posted to the Monitor's website and emailed to each of the Ordinary Affected Creditors with a Voting Claim and/or an Unresolved Claim, as well as to the Service List.  These were also delivered by email to the Trustees and DTC, as well as to Globic who disseminated the information to the Registered Noteholders.[102]   The final version of the Plan was emailed to Affected Creditors, posted on the Monitor's website, and made available for review at the Meeting.

81.   The creditors were properly classified at the Meeting.  The Affected Creditors constituted a single class for the purposes of considering and voting on the Plan.[103]   Consistent with the Equity Claims Decision, Equity Claimants constituted a single class but were not entitled to vote on the Plan.[104]  Unaffected Creditors were not entitled to vote on the Plan.[105]

---

[98] *Re Stelco Inc.*(2004), 48 C.B.R. (4th) 299, para. 26, Applicant's Brief of Authorities, Tab 13; *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.*, [2008] O.J. No. 1818 (S.C.J.) at paras. 12 and 32, Applicant's Brief of Authorities, Tab 14.

[99] Martin March 30 Affidavit, paras. 215-216, Motion Record, Tab 2(A), p. 111-112.

[100] Martin March 30 Affidavit, para. 213, Motion Record Tab 2(A), p. 111.

[101] Thirteenth Report of the Monitor, para. 85, p. 37.

[102] Thirteenth Report of the Monitor, para. 86, pp. 37-38.

[103] Plan, s. 3.2 at p. 51.

[104] Plan, s. 3.2, p. 51

33

82.    The classification of creditors as a single class in the present case complies with the

commonality of interest test established by the courts.[106]  The interests to be considered are the

legal interests that the creditors hold *qua* creditor in relationship to the debtor prior to and under

the Plan.[107]  The commonality of interests should be considered purposively, bearing in mind the

object of the CCAA, namely to facilitate reorganizations if possible.[108]  The Court should resist

classification approaches that potentially jeopardize viable Plans.[109]

83.    The Affected Creditors voted in one class, consistent with the commonality of interest

among Affected Creditors, considering their legal interests as creditors.  The classification was

consistent with the Equity Claims Decision.  Under the Plan, the Affected Creditors receive the

same distribution of Newco Shares, Newco Notes, and Litigation Trust Interests, other than Early

Consent Noteholders who receive an additional distribution of Newco Shares (which Early

Consent Consideration was available to all Noteholders who became Consenting Noteholders

prior to the May 15, 2012 early consent deadline).  That additional distribution, dealt with in

greater detail below, is insufficient to displace the commonality of interest of creditors.

84.    The Meeting was properly constituted and the voting was properly carried out.  As

described in the Fourteenth Report of the Monitor, the Meeting was held at Gowlings' office on

---

[105] Plan, s. 3.3, pp. 51-52.

[106] *Re Stelco Inc.* (2005), 78 O.R. (3d) 241 (ONCA), paras 21-23, Applicant's Brief of Authorities, Tab 13;  *ATB Financial, supra,* paras. 52-53, Applicant's Brief of Authorities, Tab 14;  *Re Canadian Airlines Corp.,* [2000] A.J. No. 1693, para. 31, Applicant's Brief of Authorities, Tab 16.

[107] Ibid.

[108] *Stelco Inc. (Re.), supra,* at paras 21-23, Applicant's Brief of Authorities, Tab 13;  *Re Canadian Airlines Corp., supra,* at para 31, Applicant's Brief of Authorities, Tab 16;  *Nortel Networks Corporation,* [2009] O.J. No. 2166 at para. 62, Applicant's Brief of Authorities, Tab 17;  *SemCanada Crude Company (Re)* (2009), 57 C.B.R. (5th) 205 (Alta. Q.B.) at paras. 32-34, Applicant's Brief of Authorities, Tab 18.

[109] Ibid.

34

December 3, 2012. Mr. Greg Watson, an officer of the Monitor, acted as chair of the Meeting. Ms. Jodi Porepa of the Monitor acted as scrutineer. A quorum was obtained and the Chair declared that the Meeting was properly constituted.[110]

85.    The Plan was approved by an overwhelming majority of Affected Creditors. As described above, 99% in number and more than 99% in value voting at the Meeting voted in favour of the Plan.

86.    Finally, prior Orders of the Court have been complied with. As described above, the Sale Process was carried out in accordance with the terms of the Sale Process Order. Pursuant to the Claims Procedure Order, the Monitor (in consultation with SFC and the Directors and Officers named in the D&O Claim, as applicable) reviewed all Proofs of Claim and D&O Proofs of Claim that had been filed, and described those proofs of claim in its Thirteenth Report.[111]    The mediation was carried out in accordance with the terms of the Mediation Order. The Meeting, including distribution of the Notice of Creditors Meeting, was carried out in accordance with the Plan Filing and Meeting Order. Notice was provided to Noteholders in accordance with the Revised Noteholder Process Order.

**C.    No Unauthorized Steps Taken By SFC**

87.    SFC has not taken any steps unauthorized by the CCAA or by Orders of this Honourable Court.

---

[110] Supplement to the Thirteenth Report of the Monitor, para. 25, p. 16.

[111] Thirteenth Report of the Monitor, paras. 44-54, p. 13; Sixth Report of the Monitor, Appendix "H" to the Thirteenth Report of the Monitor, paras. 22-23, pp. 663-664.

35

88.    The second criterion of the test has been stated to have not received much consideration in the authorities.[112]  In assessing this criterion, the Court is to be guided by the Monitor's reports and the submissions of the parties and their stakeholders.[113]

89.    Throughout this proceeding, SFC has regularly filed affidavits addressing key developments in the Sino-Forest business in general and in this restructuring in particular.  The Monitor has provided regular reports (fourteen in nine months) and has consistently opined that SFC is acting in good faith and with due diligence, and this Honourable Court has so ruled on every stay extension order that has been granted.  Moreover, the Monitor has monitored not only SFC but also the Subsidiaries in accordance with the expanded Monitor's powers granted by Order of this Court.[114]

90.    Insofar as any stakeholder has made any complaints about any aspect of that Plan, or previous versions of the Plan, whether under the "not authorized" criterion or under the fair and reasonableness criterion, such issues are addressed by separate heading below.

**D.    The Plan is Fair and Reasonable**

91.    When determining whether a plan is fair and reasonable, the court does not require perfection.  Rather:

> The court's role on a sanction hearing is to consider whether the plan fairly balances the interests of all stakeholders. Faced with an insolvent organization, its role is to look forward and ask: does this

---

[112] *Canadian Airlines, supra,* para. 64, Applicant's Brief of Authorities, Tab 7.

[113] *Canwest Global, supra,* para. 17, Applicant's Brief of Authorities, Tab 10.

[114] Thirteenth Report of the Monitor, para. 18, p. 6.

36

plan represent a fair and reasonable compromise that will permit a
viable commercial entity to emerge? It is also an exercise in
assessing current reality by comparing available commercial
alternatives to what is offered in the proposed plan.[115]

92.    These considerations are to be informed by the objectives of the CCAA, "namely, to

facilitate the reorganization of a debtor company, its creditors, shareholders, employees and in

many instances, a much broader constituency of affected persons."[116]

93.    There is a heavy onus on persons who seek to displace a plan that the required majority

has supported – particularly where, as here, the plan has received overwhelming support.    In

general, the court will not second-guess the business judgment of the stakeholders as expressed

by their majority vote:

A Plan under the CCAA is a compromise; it cannot be expected to
be perfect.    It should be approved it is fair, reasonable and
equitable.    Equitable treatment is not necessarily equal treatment.
Equal treatment may be contrary to equitable treatment.    One must
look at the creditors as a whole (i.e., generally) and to objecting
creditors (specifically) and see if rights are compromised in an
attempt to balance interests (and have the pain of the compromise
equitably shared) as opposed to a confiscation of rights. [...]

Those voting on the Plan (and I noted there was a very significant
"quorum" present at the meeting) do so on a business basis.    As
Blair J. said at p. 510 of Olympia & York Developments Ltd.:

As the other courts have done, I observe it is not my
function to second guess the business people with respect
to the "business" aspects of the Plan, descending into the
negotiating arena and substituting my own view of what is
a fair and reasonable compromise or arrangement for that
of the business judgment of the participants.    The parties

---

[115] *Canadian Airlines, supra* at para. 3, Applicant's Brief of Authorities, Tab 7, as adopted in *Canwest Global, supra*
at para. 19, Applicant's Brief of Authorities, Tab 10.

[116] *Canwest Global, supra* at para. 20, Applicant's Brief of Authorities, Tab 10.

> themselves know best what is in their interests in those areas.
>
> The court should be appropriately reluctant to interfere with the business decisions of creditors reached as a body. There was no suggestion that these creditors were unsophisticated or unable to look out for their own best interests.[117]

94.     Most recently, in *Nelson Financial*, this Honourable Court set out the following relevant factors on a sanction hearing:[118]

> 1.  The claims must have been properly classified; there must be no secret arrangements to give an advantage to a creditor or creditors; the approval of the plan by the requisite majority of creditors is most important.
>
> 2.  It is helpful if the monitor or some other disinterested person has prepared an analysis of anticipated receipts and liquidation or bankruptcy.
>
> 3.  If other options or alternatives have been explored and rejected as workable, this will be significant.
>
> 4.  Consideration of the oppression of rights of certain creditors.
>
> 5.  Unfairness to shareholders.
>
> 6.  The court will consider the public interest.

---

[117] *Re T. Eaton Co.,* [1999] O.J. No. 5322 (S.C.J. (Comm. List)), at para. 5, Applicant's Brief of Authorities, Tab 19; See similarly, *Canadian Airlines, supra,* at para. 97, Applicant's Brief of Authorities, Tab 7; *Re Sammi Atlas, supra,* at para. 5, Applicant's Brief of Authorities, Tab 8; *Algoma Steel (Re.), supra* at para. 5, Applicant's Brief of Authorities, Tab 11; *Metcalfe & Mansfield, supra* at para. 61, Applicant's Brief of Authorities, Tab 20; and *Muscletech Research and Developement Inc. (Re.)*, (2007), 30 C.B.R. (5th) 59 (Ont. S.C.J.) at para. 18, Applicant's Brief of Authorities, Tab 21.

[118] *Nelson Financial, supra.* at para. 37, Applicant's Brief of Authorities, Tab 6. This list of factors is similar to those set out in *Canwest Global, supra* at para. 21, Applicant's Brief of Authorities, Tab 10.

38

95.    An analysis of these factors demonstrates that the Plan provides a fair and reasonable

balance among its stakeholders while providing the ability for the Sino-Forest to continue as a

going concern for the benefit of stakeholders.

### 1.    *Classification and the Requisite Vote*

96.    As set out above, creditors were appropriately classified at the Meeting.

97.    As further set out above, the Plan received the support of 99% of Affected Creditors, in

both number and value.   While court sanction is not a "rubber stamp process", the vote of

creditors is still important:[119]

> Creditor support creates an inference that the plan is fair and
> reasonable because the assenting creditors believe that their
> interests are treated equitably under the plan.  Moreover, it creates
> an inference that the arrangement is economically feasible and
> therefore reasonable because the creditors are in a better position
> than the courts to gauge business risk.

98.    In the present case, 99% in number representing more than 99% in value of Affected

Creditors who voted at the Meeting voted in favour of the Plan.  As such, substantially more than

the required majority approved the Plan.  This is a factor that supports a finding that the Plan is

fair and reasonable.

### 2.    *Bankruptcy and Liquidation Alternatives*

99.    SFC is a holding company and the Sino-Forest business is held through the Subsidiaries.

To recover any value in a bankruptcy or liquidation scenario, creditors would need to realize

upon the assets where they are resident.  The majority of SFC's business operations are located in

_____

[119] *Canadian Airlines, supra* at para. 97, Applicant's Brief of Authorities, Tab 7.

the PRC, and the majority of SFC's forest plantations are located in the southern and eastern regions of the PRC, primarily in inland regions suitable for large-scale replanting. Other jurisdictions where bankruptcy or liquidations would need to take place would be in Hong Kong and the BVI.[120]

100. Beyond the legal hurdles of effecting any bankruptcy or liquidation in these various jurisdictions, any of SFC's creditors seeking a liquidation in the PRC, Hong Kong or BVI, would be confronted with significant difficulties in collecting receivables as has been detailed in the evidence.[121] Significant efforts have been expended by Sino-Forest over the past several months to recover its receivables, and notwithstanding long-standing relationships with many of the parties owing such amounts, Sino-Forest has largely been unsuccessful. The ability of third party creditors of a Canadian parent company (or a liquidator appointed outside of the PRC in respect of the Subsidiaries) to collect such receivables in these various regions is speculative, at best.[122]

101. Any creditors in a bankruptcy or liquidation scenario in these various jurisdictions would also have significant challenges in monetizing any of the assets of the Subsidiaries, given the

---

[120] Martin November Affidavit, para. 152, Motion Record Tab 2, p. 49.

[121] Martin November Affidavit, paras. 153 and 185-186, Motion Record Tab 2, p. 49; Martin March Affidavit, para. 21, Motion Record Tab 2 (A), pp. 60, 102-103; Monitor's Pre-Filing Report, Appendix "G" to the Thirteenth Report of the Monitor, para. 20, p. 635; Sixth Report of the Monitor, Appendix "H" to the Thirteenth Report of the Monitor at paras. 40 and 64-62, pp. 670-671 and pp. 675-677; Tenth Report of the Monitor, Appendix "I" to the Thirteenth Report of the Monitor at paras. 18-30, 36, pp. 693-695 and 697; Seventh Report of the Monitor, Appendix "M" to the Thirteenth Report, para. 55, p. 850.

[122] Martin November Affidavit, para. 153, Motion Record Tab 2, p. 49.

40

challenges in establishing title capable of being transferred to a buyer.[123]    Even if such assets

were successfully monetized, insofar as such assets are located in the PRC, creditors would be

faced with the numerous legal and regulatory issues associated with removing funds from the

PRC.[124]

102.    Any liquidation or bankruptcy of SFC, through its Subsidiaries, would result in loss of

value to the creditors of SFC and its Subsidiaries as a going concern.    Significantly greater value

can be obtained through the Sino-Forest business continuing as a going concern than could be

obtained through piecemeal dismantling of the enterprise through a bankruptcy or liquidation.[125]

103.    The Monitor has considered the liquidation and bankruptcy alternatives and has stated

that it does not believe that liquidation or bankruptcy would be a preferable alternative to the

Plan.[126]

### 3.    *Other Options and Alternatives*

104.    Since the Muddy Waters report was issued on June 2, 2011, SFC has expended

considerable efforts and resources examining alternatives to find the best possible resolution to

the issues facing the company described above.[127]

---

[123] Martin November Affidavit, para. 154, Motion Record Tab 2, p. 49; Sixth Report of the Monitor, Appendix "H"
to the Thirteenth Report of the Monitor, paras. 82-89, pp. 683-685; Thirteenth Report of the Monitor, para. 104, p.
44.

[124] Martin November Affidavit, para. 154, Motion Record Tab 2, pp. 49-50.

[125] Martin November Affidavit, para. 155, Motion Record Tab 2, p. 50.

[126] Thirteenth Report of the Monitor, paras. 102-105, pp. 43-44.

[127] Martin November Affidavit, para. 148, Motion Record Tab 2, p. 47.

41

105.    Prior to filing for protection under the CCAA, SFC worked hard to attempt to avoid the

defaults that ultimately forced it to commence insolvency proceedings.  However, SFC was in

default under certain of the Notes as a result of being unable to issue 2011 third quarter financial

statements.  While waivers of such defaults were obtained for a period of time, those waivers

were set to expire at the end of April 2012 and the Noteholders, with the guarantees and share

pledges described above, would have been in a position to enforce their rights under the Note

Indentures.  Any alternative to the commencement of CCAA proceedings would have risked the

immediate cessation of the Sino-Forest business resulting in significant detriment to SFC's

stakeholders.[128]

106.    As described above, following the commencement of these CCAA proceedings, SFC

conducted a court supervised Sale Process to determine whether there was a potential purchaser

willing to purchase the assets of SFC for the Qualified Consideration.  With the assistance of

Houlihan, the market was thoroughly canvassed and no such bidder could be found.[129]

107.    The Plan was the subject of significant and extensive negotiations.  In negotiating the

Plan, the Board of SFC considered the interests of all stakeholders of SFC.  Alternatives were

explored throughout the negotiations, and the Plan was the product of such negotiations.  There

were no other viable alternatives that would have been acceptable to SFC and its creditors.  The

---

[128] Martin November Affidavit, para. 149, Motion Record Tab 2, p. 48.

[129] Martin November Affidavit, para. 150, Motion Record Tab 2, p. 48.

42

Plan represents the best available alternative remaining in these proceedings, and provides a

better result for SFC's creditors than could be achieved through a bankruptcy or liquidation.[130]

108.    As has been stated from the outset, and not contested by any person, to achieve a going

concern outcome for the business of Sino-Forest, SFC cannot remain in CCAA for much longer.

The fact of these proceedings has already caused considerable strains on Sino-Forest's business

relationships and its ability to collect very sizable accounts receivable has been significantly

constrained.[131]   Moreover, while SFC has sufficient cash to exist to February 1, 2013, SFC's cash

position is being rapidly depleted and SFC will likely have insufficient funds to continue

operating in these CCAA proceedings for any extended period of time beyond February 1,

2013.[132]

## 4.    *Oppression of Creditors or Unfairness to Shareholders*

109.    Neither SFC nor the Board has acted in a manner that unfairly disregards, or is unfairly

prejudicial to, or oppresses the interests of any stakeholders.  It is not unfair for shareholders to

not receive any distribution under the Plan given that there are insufficient funds to satisfy the

claims of SFC's creditors.  The treatment of shareholder claims and related indemnity claims is

fair and consistent with the CCAA and the Equity Claims Decision, as affirmed by the Court of

Appeal.  99% of Affected Creditors voted in favour of the Plan at the Meeting, and the Ad Hoc

---

[130] Martin November Affidavit, para. 151, Motion Record Tab 2, p. 48.

[131] Sixth Report of the Monitor, Appendix" H" to the Thirteenth Report of the Monitor, paras. 53-62, pp. 675-677;
    Tenth Report of the Monitor, Appendix "I" to the Thirteenth Report of the Monitor, paras. 49-53, pp. 700-701.

[132] Thirteenth Report of the Monitor, para. 110, p. 47.

43

Securities Purchasers Committee have agreed not to oppose the Plan.[133]  These are exercises of

those parties' business judgment, which should not be displaced.

110.    The Plan provides a fair and reasonable balance among SFC's stakeholders while

providing the ability for the Sino-Forest business to continue as a going concern for the benefit

of stakeholders.[134]

111.    The Plan is not oppressive to the rights of creditors and is not unfair to shareholders.

**5.    *The Public Interest***

112.    The Plan will enable SFC to achieve a going concern outcome for the business of Sino-

Forest that fully and finally deals with debt issues and will extract the business of Sino-Forest

from the uncertainties surrounding SFC.  The Plan will remove uncertainty for Sino-Forest's

employees, suppliers, customers and other stakeholders, and provide a path for recovery of the

debt owed to SFC's non-subordinated creditors.[135]  This is all in the public interest.

113.    The Plan preserves the rights of aggrieved parties, including SFC through the Litigation

Trust, to pursue (in litigation or settlement) those parties that are alleged to share some or all of

the responsibility for the problems that led SFC to file for CCAA protection in the first place.

Releases are not being granted to individuals who have been charged by OSC staff, or to other

---

[133] Martin November Affidavit, para. 156, Motion Record Tab 2, p. 50.

[134] Martin November Affidavit, para. 164, Motion Record Tab 2, p. 52.

[135] Martin November Affidavit, para. 158, Motion Record Tab 2, p. 51.

44

individuals against whom the Ad Hoc Securities Purchasers Committee wishes to preserve litigation claims.[136] This is in the public interest.

## 6.    *Conclusion on Fairness Test*

114.    The foregoing factors demonstrate that the Plan is fair and reasonable and should be sanctioned by the Court.

## E.    Specific Issues

## 1.    *Early Consent Consideration*

115.    The Plan contemplates that, in addition to the consideration that is payable to Affected Creditors, Early Consent Noteholders[137] will receive their *pro rata* share of an additional 7.5% of the Newco Shares (the "Early Consent Consideration").[138]

116.    Plans do not need to provide the same recovery to all creditors to be considered fair and reasonable.    Several plans of compromise have been sanctioned by the courts where there has been differential treatment for one creditor, or one class of creditors.[139]    The common theme in

---

[136] Martin November Affidavit, para. 159, Motion Record Tab 2, p. 51.

[137] Defined as "any Noteholder that: (a) (i) as confirmed by the Monitor on June 12, 2012, executed the (A) RSA, (B) a support agreement with SFC and the Direct Subsidiaries in the form of the RSA or (C) a joinder agreement in the form attached as Schedule C to the RSA; (ii) provided evidence satisfactory to the Monitor in accordance with section 2(a) of the RSA of the Notes held by such Noteholder as at the Consent Date (the "Early Consent Notes"), as such list of Noteholders and Notes held has been verified and is maintained by the Monitor on a confidential basis; and (iii) continues to hold such Early Consent Notes as at the Distribution Record Date; or (b) (i) has acquired Early Consent Notes; (ii) has signed the necessary transfer and joinder documentation as required by the RSA and has otherwise acquired such Early Consent Notes in compliance with the RSA; and (iii) continues to hold such Early Consent Notes as at the Distribution Record Date."

[138] See Plan, s. 4.3, Appendix "A" to the Supplemental Report to the Thirteenth Report of the Monitor, p. 53.

[139] *Canwest Global, supra* at paras. 22-24, Applicant's Brief of Authorities at Tab 10; *Armbro Enterprises Inc. (Re.)* (1993), 22 C.B.R. (3d) 80 (Ont. Gen. Div.), Applicant's Brief of Authorities at Tab 22; *Uniforet Inc. (Re.)* (2003), 43 C.B.R. (4th) 254 (Que. S.C.), at paras. 21, 26, Applicant's Brief of Authorities at Tab 23.

45

such cases has been that if there is a rational explanation for the differential treatment, then the

fact of that differential treatment will not necessarily result in a finding that the plan is unfair.

117.    The Early Consent Consideration has been a feature of this restructuring since its

inception. It was made available to any and all Noteholders: Noteholders who wished to become

Consenting Noteholders were invited and permitted to do so until the early consent deadline of

May 15, 2012. This Honourable Court previously determined that SFC made available to the

Noteholders all information needed to decide whether they should sign a Joinder Agreement and

receive the Early Consent Consideration, and that there was no prejudice to the Noteholders in

being put to that election early in this proceeding.[140] Determining which Noteholders had signed

the Support Agreement (or joinder agreements thereto) facilitated the negotiations and approval

of the Plan.

118.    There was a rational purpose for the Early Consent Consideration. The Early Consent

Noteholders supported the restructuring throughout the CCAA proceedings, which, in turn,

provided increased confidence in the Plan and facilitated the negotiations and approval of the

Plan. Accordingly, this feature of the Plan is fair and reasonable.

**2.**    *Indemnified Noteholder Class Action Limit*

119.    The Indemnified Noteholder Class Action Limit was established after extensive and

difficult negotiations and discussion spanning many months among the Ad Hoc Securities

Purchasers Committee, the Ad Hoc Noteholders and SFC.

---

[140]Endorsement of Justice Morawetz, dated May 14, 2012, Brief of Previously Filed Materials and Court Orders,
    Tab 4, pp. 541-544.

46

120.    As a result of the limit, the maximum exposure of the Third Party Defendants with

respect to Indemnified Noteholder Class Action Claims is, in the aggregate, $150 million.

Accordingly, the maximum potential indemnity claims of such Third Party Defendants against

SFC are likewise limited to $150 million in the aggregate. Such contingent indemnity claims are

treated as Unresolved Claims under the Plan, and the potential Plan consideration that could be

distributed in respect of any such indemnity claims that could become Proven Claims will be

held in escrow in the Unresolved Claims Reserve. [141]  As discussed above, the quantum of the

Indemnified Noteholder Class Action Limit will be reduced by that portion of the E&Y

settlement payment that is on account of Indemnified Noteholder Class Action Claims (and any

other settlement payment) only if and when such payments are made.

121.    The $150 million number agreed upon reflected risks that both sides faced.  On the one

hand, SFC and the Third Party Defendants faced Noteholder claims in the Ontario Class Action

of $1.8 billion.[142]   On the other hand, SFC (and the Third Party Defendants) had a number of

strong defences to such claims:

(a)    *Transfer of Claims Under New York Law:*  Had this matter been litigated, SFC

would have argued that, under the governing New York law in the Indentures,[143]

any claims held by former Noteholders were transferred by operation of law when

---

[141] Martin November Affidavit, para. 89, Motion Record Tab 2, p. 31.

[142] Martin November Affidavit, para. 48, Motion Record Tab 2, pp. 20-21.

[143] It is at least arguable that this principle applies equally in Ontario. See *Securities Transfer Act, 2006*, S.O. 2006, c. 8, s. 69 [purchaser "acquires all rights that the transferor had or had the power to transfer"].

47

they sold their Notes to the current Noteholders (at least 72% of whom are supporting the Plan).[144]

(b)    *Double Proof*: SFC would have argued that any claims by former Noteholders would have been barred under the doctrine of "double proof". The rule against double proof prevents two claimants from making two claims in one estate in respect of one debt.[145]

(c)    *Limitation Periods*: One of the series of Notes – the 2013 Convertible Notes – were issued on July 23, 2008, more than three years before the first claim advanced on behalf of Noteholders was commenced,[146] and as such, at least $345 million of the claim was statute-barred[147]

---

[144] N.Y. General Obligations Law § 13-107 (Q.L. 2012); *Bluebird Partners, LP v. First Fid. Bank*, 97 N.Y.2d 456, 461-462 (2002), Applicant's Brief of Authorities, Tab 24.

[145] *Olympia & York Developments Ltd. (Re)* (1998), 3 C.B.R. (4th) 304 (Ont. Gen. Div.) (overturned (1998), 4 C.B.R. (4th) 189 (Ont. Gen. Div.) but not on this ground as the claim of double proof was allowed on appeal) at para. 10, Applicant's Brief of Authorities, Tab 25; *Maple City Ford Sales (1986) Ltd. (Re)* (1998), 39 O.R. (3d) 702 (Gen. Div.), Applicant's Brief of Authorities, Tab 26; *In re Melton; Milk v. Towers*, [1918] 1 Ch. 37, as cited in *Cuchuran v. Dubitz*, [1945] 3 W.W.R. 541 (Alta. Dist. Ct.) at para. 11, Applicant's Brief of Authorities, Tab 27; *Re Coughlin & Co.*, [1923] 4 D.L.R. 971 (Man. C.A.), Applicant's Brief of Authorities, Tab 28; *Deco Electric Ltd. v. Republic Building Systems Alberta Ltd.* (1983), 45 A.R. 325 (Q.B.) at para. 41, Applicant's Brief of Authorities, Tab 29; *Isabelle Estate (Trustee of) v. Royal Bank of Canada*, 2008 NBCA 69 at para. 46, Applicant's Brief of Authorities, Tab 30; *Riddler (Re)* (1991), 3 C.B.R. (3d) 273 (B.C. S.C.), Applicant's Brief of Authorities, Tab 31; *Labarre (Syndic de)*, [2004] Q.J. No. 13895 (S.C.) at para. 22, Applicant's Brief of Authorities, Tab 32; *Olympia & York Developments (Re)* (1998), 4 C.B.R. (4th) 189 (Ont. Gen. Div.) at paras. 27-28 & 36, Applicant's Brief of Authorities, Tab 33.

[146] Martin November Affidavit, paras. 43(d), 48, Motion Record Tab 2, pp. 19-21.

[147] *Securities Act*, R.S.O. 1990, c. S-1, s. 138.14.

48

(d)    *Statutory Issues*:   The former Noteholder claim had defects relating to the
calculation of damages under the *Securities Act*,[148] and relating to statutory
damage caps.[149]

122.    The selection of a $150 million cap reflects the business judgment of the parties making
assessments of the risks associated with the Noteholder component of the Ontario Class Action,
and was well within the "general range of acceptability on a commercially reasonable basis."[150]
While the New York Class Action Plaintiffs filed a Proof of Claim, they have not appeared in
this proceeding and have not stated any opposition to the Plan, which has included this concept
since its inception.

## 3.    *Releases of Subsidiaries*

123.    The unchallenged evidentiary record demonstrates that there can be no effective
restructuring of SFC's business and separation from its Canadian parent (which SFC has said
from the outset was the objective of the commencement of these proceedings) if the claims
asserted against the Subsidiaries arising out of or connected to claims against SFC remain
outstanding.   Just as the claims of the Noteholders against the Subsidiaries are to be released
under the Plan upon implementation, so are the other claims against the Subsidiaries which relate
to claims asserted against SFC (as well as any claims that the Subsidiaries have against SFC).[151]

---

[148] *Securities Act, supra*, s. 138.5(1).   In the months following the Muddy Waters report, the relevant Notes traded at
a range of $53 to $64 per $100 amount of principal owing, not zero.  See Martin November Affidavit, para. 48,
Motion Record Tab 2, pp. 20-21.   The most the Ontario Class Action Plaintiffs could have realistically have
claimed (even claiming for the statute-barred Notes) was $648 million to $846 million.

[149] *Securities Act, supra*

[150] *Ravelston Corp., Re.* (2005), 14 C.B.R. (5th) 207 (Ont. S.C.J.) at para. 4, Applicant's Brief of Authorities, Tab 34.

[151] Martin November Affidavit, para. 124, Motion Record Tab 2, p. 41.

49

124.    The Monitor has examined all of the releases in the Plan, and has stated that the Monitor

"believes that they are fair and reasonable in the circumstances."[152]

125.    The Court of Appeal in *Metcalfe & Mansfield* stated that "the court has authority to

sanction plans incorporating third-party releases that are reasonably related to the proposed

restructuring..."[153]  The reason was stated by the Court of Appeal as follows:[154]

> The CCAA is a sketch, an outline, a supporting framework for the
> resolution of corporate insolvencies in the public interest. Parliament
> wisely avoided attempting to anticipate the myriad of business deals that
> could evolve from the fertile and creative minds of negotiators
> restructuring their financial affairs. It left the shape and details of those
> deals to be worked out within the framework of the comprehensive and
> flexible concepts of a "compromise" and "arrangement". I see no reason
> why a release in favour of a third party, negotiated as part of a package
> between a debtor and creditor and reasonably relating to the proposed
> restructuring cannot fall within that framework.

126.    The applicable test is whether there is a reasonable connection between the released

claim and the restructuring achieved by the plan (at para. 70):

> The release of the claim in question must be justified as part of the
> compromise or arrangement between the debtor and its creditors.  In
> short, there must be a reasonable connection between the third party
> claim being compromised in the plan and the restructuring achieved by
> the plan to warrant inclusion of the third party release in the plan.

---

[152] Thirteenth Report of the Monitor, para. 106, pp. 44-45.

[153] *Metcalfe & Mansfield, supra* at para. 46, Applicant's Brief of Authorities, Tab 20.  While releases of third party
subsidiaries have been approved by the Courts in the past, there has never been any significant consideration of
the issue in that context. See *Canadian Airlines Corporation (Re.), supra*, Applicant's Brief of Authorities, Tab 3;
*Angiotech Pharmaceuticals Inc.,* 2011 BCSC 450, Applicant's Brief of Authorities, Tab 35, and in the BIA
context (said to be the same test), *Kitchener Frame Limited*, 2012 ONSC 234, Applicant's Brief of Authorities,
Tab 36.

[154] *Metcalfe & Mansfield, supra* at para. 61, Applicant's Brief of Authorities, Tab 20.

50

127.    While the Court of Appeal in *Metcalfe & Manfield* was clear that the following factors did not form a new "test" on a sanction hearing[155] (such that it cannot be said that every factor is required to approve a third party release) the Court did note the following findings of fact by the motions judge that related to the third party releases:[156]

    (a)    The parties to be released are necessary and essential to the restructuring of the debtor;

    (b)    The claims to be released are rationally related to the purpose of the Plan and necessary for it;

    (c)    The Plan cannot succeed without the releases;

    (d)    The parties who are to have claims against them released are contributing in a tangible and realistic way to the Plan; and

    (e)    The Plan will benefit not only the debtor companies but creditor[s] generally.

128.    Additionally, in *Nortel Networks*, this Honourable Court considered the following factors to be relevant in determining whether the third party releases could be justified: whether the releases are necessary and connected to a resolution of claims against the debtor; whether the

---

[155] *Metcalfe & Mansfield, supra* at para. 114, Applicant's Brief of Authorities, Tab 20.

[156] *Metcalfe & Mansfield, supra* at para. 71, Applicant's Brief of Authorities, Tab 20.  See also *Kitchener Frame Limited (Re), supra,* Applicant's Brief of Authorities, Tab 36.

51

releases will benefit creditors generally; and whether the releases are not overly broad or offensive to public policy.[157]

129.    In the present case, the release of Subsidiaries is necessary and essential to the restructuring of SFC.  SFC has stated from the outset of these proceedings that it is necessary to have a clean break for the Subsidiaries from SFC in order for these proceedings to be successful. The primary purpose of the CCAA proceeding was to extricate the business of Sino-Forest, through the operation of SFC's Subsidiaries (which were protected by the stay of proceedings issued by this Honourable Court), from the cloud of uncertainty surrounding SFC.  Accordingly, there is a clear and rational connection between the release of the Subsidiaries and the Plan and it is difficult to see how any viable plan could be made that does not cleanse the Subsidiaries of the claims made against SFC.[158]  The Plan that has been supported by an overwhelming majority of Affected Creditors cannot succeed without the releases of the Subsidiaries.

130.    The Subsidiaries who are to have claims against them released are contributing in a tangible and realistic way to the Plan.  The Subsidiaries are effectively contributing their assets to SFC to satisfy SFC's obligations under their guarantees of SFC's Note indebtedness, for the benefit of the Affected Creditors (the Subsidiaries are not asserting any claims against SFC for doing so, and in fact are releasing SFC from any such claims and guaranteeing the Newco Notes).[159]  As such, the releases benefit SFC and the creditors generally.

---

[157] *Re Nortel Networks*, 2010 ONSC 1708 at para. 79, Applicant's Brief of Authorities, Tab 37.

[158] Martin November Affidavit, para. 157, Motion Record Tab 2, pp. 50-51.

[159] Martin November Affidavit, para. 157, Motion Record Tab 2, pp. 50-51.

52

131.    Full disclosure of the releases was made in the Plan, the Notice of Meeting and Meeting

Information Statement, and the motion materials served in this proceeding.  The releases are fair

and reasonable and are rationally connected to the overall purpose of the Plan.

## 4.    *Release of Named Directors and Officers*

132.    Horsley and Poon were removed from the Named Directors and Officers category as part

of the arrangements with the Ad Hoc Securities Purchasers Committee and to secure that group's

agreement to not oppose the Plan.  Similarly, Chan has never been included in the Named

Directors and Officers category.

133.    The Named Directors and Officers group consists principally of Board members and

members of management who have been important to efforts to avoid Note defaults and to

facilitate SFC's restructuring efforts.  It also includes some individuals formerly associated with

SFC who, to SFC's knowledge, after extensive inquiry and investigation, are not implicated in

any conduct issues.

134.    The Board took a number of steps since the release of the Muddy Waters report that were

fundamental to addressing SFC's financial and business affairs and to attempt a financial

restructuring for the benefit of SFC's stakeholders.  Among other things, the Board:

(a)    established the IC to investigate the matters alleged in the Muddy Waters

report;[160]

---

[160] Martin November Affidavit, para. 9, Motion Record Tab 2, p. 8.

53

(b)     brought in new company counsel to assist and work with the IC and the IC's advisors;[161]

(c)     appointed W. Judson Martin as SFC's CEO;[162]

(d)     was responsible for supervising and furthering the IC's work to develop reports that were fundamental to understanding the restructuring challenges faced by SFC and its stakeholders;[163]

(e)     made considerable effort in determining whether the issues identified could be resolved in sufficient time to allow SFC to become current in its financial reporting, and to obtain an audit opinion for 2011, which would have been necessary to avoid a default under the Notes;[164]

(f)     engaged, supervised and supported professionals for both the IC and SFC to better understand the restructuring challenges faced by SFC and its stakeholders and to prepare SFC for the rigors occasioned by a restructuring;[165]

(g)     appointed the RC, which was responsible for preserving stakeholder value to the extent possible;[166]

---

[161] Martin November Affidavit, para. 10, Motion Record Tab 2, p. 8.

[162] Martin March Affidavit, para. 27, Motion Record Tab 2(A), p. 61.

[163] Martin November Affidavit, para. 16, Motion Record Tab 2, p. 10.

[164] Martin November Affidavit, para. 16, Motion Record Tab 2, p. 10.

[165] Martin November Affidavit, para. 9, Motion Record Tab 2, p. 8.

[166] Martin November Affidavit, para. 19, Motion Record Tab 2, p. 10.

54

(h)      engaged with professionals representing the Ad Hoc Noteholders to assist them in
         understanding the restructuring challenges faced by SFC and its stakeholders;[167]

(i)      engaged on a "principal to principal" basis with representatives of its Noteholders
         to develop a shared understanding of the restructuring challenges faced by SFC
         and its stakeholders;[168]

(j)      negotiated and entered into the Support Agreement to permit a potential sale
         opportunity to arise and to ensure the potential restructuring of SFC's business in
         the event a third party sale could not be achieved;[169]

(k)      called management to account for SFC's financial affairs during the IC
         investigation and the formal restructuring processes after sufficient levels of
         concern were identified and confirmed.    Since the commencement of these
         proceedings, Chan, Hung, Ho, Yeung, Ip and Horsley have ceased to be employed
         by Sino-Forest.  Other less senior employees have also ceased to be employed by
         Sino-Forest;[170]

(l)      conducted and supervised asset verification procedures in order to attempt to
         address alleged shortcomings in SFC's business and financial affairs;[171] and

---

[167] Martin November Affidavit, para. 23, Motion Record Tab 2, p. 12.

[168] Martin November Affidavit, para. 23, Motion Record Tab 2, p. 12.

[169] Martin November Affidavit, paras. 21, 25, Motion Record Tab 2, p. 11, 13.

[170] Martin November Affidavit, para. 162, Motion Record Tab 2, p. 52.

[171] Martin March Affidavit, paras. 160-164, Motion Record Tab 2A, pp. 95-96.

55

(m)    complied fully with the information requests of the regulatory authorities and
Noteholders throughout the IC investigation and formal restructuring processes,
other than in respect of privileged information.[172]

135.    Further, the Named Directors and Officers release is necessary to effect a greater
recovery for SFC's creditors, rather than having those directors and officers assert indemnity
claims against SFC.[173]    Without these releases, the quantum of the Unresolved Claims Reserve
would have had to be materially increased, and to the extent that any such indemnity claim were
found to be a Proven Claim, there would have been a corresponding dilution of consideration
paid to Affected Creditors.

136.    As discussed above, the release of the Named Directors and Officers is not unlimited;
among other things, claims for fraud or criminal conduct, Conspiracy Claims, and Section 5.1(2)
D&O Claims are excluded.[174]

137.    Accordingly, there is a reasonable connection between the claims being compromised in
the Plan and the restructuring achieved by the Plan to warrant inclusion of the release in the Plan.
The release of the Named Directors and Officers is essential to the restructuring of SFC; the
Named Directors and Officers have not been implicated in alleged wrongdoing;[175] and the
release, as included in the Plan, has been agreed to by an overwhelming majority of SFC's

---

[172] Martin November Affidavit, para. 76, Motion Record Tab 2, p. 27.

[173] Martin November Affidavit, para. 163, Motion Record Tab 2, p. 52.

[174] Martin November Affidavit, para. 118, Motion Record Tab 2, p. 40

[175] The Court in *BlueStar Battery Systems International Corp.*, 2000 Carswell Ont 4837, Applicant's Brief of
Authorities at Tab 38, commented at para. 16 that the language of section 5.1 of the CCAA is broad enough to
allow the debtor to select among its directors only certain to receive the releases.

creditors. The releases are rationally related to the purpose of the Plan and are necessary for it. The Named Directors and Officers have contributed in a tangible and realistic way to the restructuring of SFC and the development and negotiation of the Plan. Moreover, the Named Directors and Officers release benefits not only SFC but creditors generally, as described above.

138.    The Monitor has considered the Named Director and Officer release, and has stated that the Monitor "believes that they are fair and reasonable in the circumstances",[176] and Affected Creditors voted to approve the Plan, including the releases contained therein.

## 5.    *Treatment of Subsection 5.1(2) Claims*

139.    Subsection 5.1(2) of the CCAA precludes the compromise of claims against directors that (a) relate to the contractual rights of one or more creditors; or (b) are based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors.[177]

140.    The restriction in subsection 5.1(2) is on the <u>compromise</u> of certain types of claims. A "compromise" by definition involves a final resolution of such dispute or claim.[178] The Plan does not finally resolve any claims against the Named Directors and Officers that cannot be compromised under subsection 5.1(2). To the contrary, sections 4.9(c) and 7.2(c) of the Plan explicitly state that no such claims against SFC's directors are compromised or released.

---

[176] Thirteenth Report of the Monitor, para. 106, pp. 44-45.

[177] CCAA, s. 5.1(2).

[178] *Oxford Concise English* (9th ed.), p. 273, Applicant's Brief of Authorities, Tab 41. See similar definition in *Webster's Ninth New Collegiate Dictionary*, as quoted in *Ayles v. Neil*, 2002 CanLII 54082 (NL SCTD) at para. 23, Applicant's Brief of Authorities, Tab 39.

57

141.    The Plan does not release the directors from any claims covered by subsection 5.1(2) and

it does not preclude the claimants from pursuing remedies with respect to such claims, subject

only to the streaming of recovery to the applicable insurance proceeds.  While it is provided that

financial recourse against the Named Officers and Directors of SFC in respect of claims within

subsection 5.1(2) will be limited to applicable insurance proceeds, this does not involve a release

of the directors in respect of such claims.  Plaintiffs remain free to prosecute such claims, and the

directors remain liable to the full range of available relief, including declaratory relief, subject

only to the limitation of financial recovery being solely from the insurance proceeds.

142.    The treatment of subsection 5.1(2) claims having recourse to insurance proceeds is

consistent with this Honourable Court's decision in *Allen-Vanguard*, which similarly provided

for the sole recourse of subsection 5.1(2) claims against directors being to insurance policies of

the applicants.[179]

### 6.    *Complaints of Horsley and Poon*

143.    Certain former directors or officers have raised specific complaints, as described below.

144.    Horsley complains that the definition of "Unaffected Claim" has been modified from

prior versions of the Plan such that Horsley's claim for termination and severance pay will no

longer be treated as an Unaffected Claim.  SFC takes the position that Horsley's termination is

such that he has no enforceable claim against SFC.  Regardless, in the Proof of Claim filed by

Horsley, it is explicitly stated that Horsley's claim is a "Restructuring Claim".[180]  Restructuring

---

[179] *Allen-Vanguard Corporation (Re)*, 2011 ONSC 5017, Applicant's Brief of Authorities at Tab 40.

[180] Proof of Claim of D. Horsley at para. 8, Appendix "K" to the Supplementary Report to the Thirteenth Report of
the Monitor, p. 336.

58

Claims are (and were when Horsley's Proof of Claim was filed) Affected Claims that are subject
to compromise under the Plan.

145.    Poon stated in a letter from counsel dated November 28, 2012, that the Sanction Order
should contain language:

> acknowledging that the Court's approval of the Plan does not
> impair Mr. Poon from contending, in the Class Proceedings or any
> other related or subsequent proceedings, that recovery in
> fulfillment of any judgment against him, to the extent permitted by
> the Plan, on the basis that Mr. Poon is jointly and severally liable
> with any defendant (including defendants added at a later point in
> time and third parties) against whom the plaintiff's claim has been
> compromised by the Plan, should be barred to the extent that such
> other defendant is found to be proportionally responsible for the
> judgment liability.

146.    It is not entirely clear what this means. If Poon's position is that the Plan should not
prevent him from asserting that he is not jointly and severally liable, there is no reasonable
reading of the Plan that would suggest otherwise. No special language is needed to preserve that
right. That right is never (to the knowledge of SFC) carved out of class action "some-but-not-
all" settlements, of the type seen with Poyry in the Ontario Class Action case. Regardless, this
is an issue that properly relates to the subsequent order of the Court to implement the E&Y
settlement, and not a matter that needs to be adjudicated at this time by this Honourable Court.

59

## IV.    RELIEF SOUGHT

147.    SFC requests that this Court grant relief by making an order substantially in the form of the draft Sanction Order.

ALL OF WHICH IS RESPECTFULLY SUBMITTED,

BENNETT JONES LLP

Lawyers for Sino-Forest Corporation

60

## SCHEDULE "A" – AUTHORITIES CITED

**Jurisprudence**

1. *Smith v. Sino-Forest Corporation,* 2012 ONSC 24

2. *Microbiz Corp. v.Classic Software Systems Inc.* (1996), 45 C.B.R. (3d) 40 (Ont. Gen. Div.)

3. *Roberts v. Picture Butte Municipal Hospital*, 1998 ABQB 636

4. *Canlau International (Barbados) Corp. v.Atlas Securities Inc. (Liquidator of)* (2002), 35 C.B.R. (4th) 232 (Ont. S.C.J.)

5. *Nortel Networks Corp. (Re.)*, 2010 ONSC 1304 (S.C. (Comm. List))

6. *Nelson Financial Group Ltd. (Re.)*, 2011 ONSC 2750 (S.C.J. (Comm. List))

7. *Re Canadian Airlines Corp.,* 2000 ABQB 442

8. *Re Sammi Atlas* (1998), 3 C.B.R. (4th) 171 (Ont. S.C.J.)

9. *Canadian Red Cross Society (Re.)* (2000), 19 C.B.R. (4th) 158 (Ont. S.C.J.)

10. *Re Canwest Global Communications*, 2010 ONSC 4209 (S.C.J. (Comm. List))

11. *Algoma Steel Inc. (Re.)* (2002), 30 C.B.R. (4th) 1 (Ont. S.C.J.)

12. *Sino-Forest Corporation (Re.)*, 2012 ONSC 2063 (S.C.J.)

13. *Re Stelco Inc.* (2004), 48 C.B.R. (4th) 299 (Ont. S.C.J. (Comm. List))

14. *ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.*, [2008] O.J. No. 1818 (S.C.J.)

15. *Re Stelco Inc.* (2005), 78 O.R. (3d) 241 (O.N.C.A)

16. *Re Canadian Airlines Corp.* (2000), 19 C.B.R. (4th) 12 (Alta. Q.B.)

17. *Re Nortel Networks Corp.,* [2009] O.J. No. 2166

18. *SemCanada Crude Company (Re)* (2009), 57 C.B.R. (5th) 205 (Alta. Q.B.)

19. *Re T. Eaton Co.,* [1999] O.J. No. 5322 (S.C.J. (Comm.List))

20. *Re Metcalfe & Mansfield Alternative Investments II Corp,* 92 O.R. (3d) 513 (O.N.C.A.)

21. *Muscletech Research and Development Inc. (Re.)*, (2007), 30 C.B.R. (5th) 59 (Ont. S.C.J.)

61

22.    *Armbro Enterprises Inc. (Re.)* (1993), 22 C.B.R. (3d) 80 (Ont. Gen. Div.)

23.    *Uniforet Inc. (Re.)* (2003), 43 C.B.R. (4th) 254 (Que. S.C.)

24.    *Bluebird Partners, LP v. First Fid. Bank*, 97 N.Y.2d 456, 461 (2002)

25.    *Olympia & York Developments Ltd. (Re)* (1998), 3 C.B.R. (4th) 304 (Ont. Gen. Div.)

26.    *Maple City Ford Sales (1986) Ltd. (Re)* (1998), 39 O.R. (3d) 702 (Gen. Div.)

27.    *Cuchuran v. Dubitz,* [1945] 3 W.W.R. 541 (Alta. Dist. Ct.)

28.    *Re Coughlin & Co.,* [1923] 1 D.L.R. 632 (Man. K.B.)

29.    *Deco Electric Ltd. v. Republic Building Systems Alberta Ltd.* (1983), 45 A.R. 325 (Q.B.)

30.    *Isabelle Estate (Trustee of) v. Royal Bank of Canada,* 2008 NBCA 69

31.    *Riddler (Re)* (1991), 3 C.B.R. (3d) 273 (B.C. S.C.)

32.    *Labarre (Syndic de),* [2004] Q.J. No. 13895 (S.C.)

33.    *Olympia & York Developments (Re)* (1998), 4 C.B.R. (4th) 189 (Ont. Gen. Div.)

34.    *Ravelston Corp., Re.* (2005), 14 C.B.R. (5th) 207 (Ont. S.C.J.)

35.    *Angiotech Pharmaceuticals Inc.,* 2011 BCSC 450

36.    *Kitchener Frame Limited,* 2012 ONSC 234

37.    *Re Nortel Networks Corp.,* 2010 ONSC 1708

38.    *BlueStar Battery Systems International Corp.*, 2000 Carswell Ont 4837 (S.C.J. (Comm.List))

39.    *Ayles v. Neil*, 2002 CanLII 54082 (NL SCTD)

40.    *Allen-Vanguard Corporation (Re)*, 2011 ONSC 5017

**Secondary Sources**

41.    Oxford Concise English, 2d ed, sub verdo "compromise"

62

## SCHEDULE B – STATUTORY REFERENCES

*Companies' Creditors Arrangement Act*, R.S.C., 1985, c. C-36

**Compromises to be sanctioned by court**

**6. (1)** If a majority in number representing two thirds in value of the creditors, or the class of creditors, as the case may be — other than, unless the court orders otherwise, a class of creditors having equity claims, — present and voting either in person or by proxy at the meeting or meetings of creditors respectively held under sections 4 and 5, or either of those sections, agree to any compromise or arrangement either as proposed or as altered or modified at the meeting or meetings, the compromise or arrangement may be sanctioned by the court and, if so sanctioned, is binding

(*a*) on all the creditors or the class of creditors, as the case may be, and on any trustee for that class of creditors, whether secured or unsecured, as the case may be, and on the company; and

(*b*) in the case of a company that has made an authorized assignment or against which a bankruptcy order has been made under the *Bankruptcy and Insolvency Act* or is in the course of being wound up under the *Winding-up and Restructuring Act*, on the trustee in bankruptcy or liquidator and contributories of the company.

**Court may order amendment**

**(2)** If a court sanctions a compromise or arrangement, it may order that the debtor's constating instrument be amended in accord- ance with the compromise or arrangement to reflect any change that may lawfully be made under federal or provincial law.

**Definitions**

**2. (1) In this Act,**

"equity claim" means a claim that is in respect of an equity interest, including a claim for, among others,

(*a*) a dividend or similar payment,
(*b*) a return of capital,
(*c*) a redemption or retraction obligation,
(*d*) a monetary loss resulting from the ownership, purchase or sale of an equity interest or from the rescission, or, in Quebec, the annulment, of a purchase or sale of an equity interest, or
(*e*) contribution or indemnity in respect of a claim referred to in any of paragraphs (*a*) to (*d*);"

"debtor company" means any company that

63

(*a*) is bankrupt or insolvent,

(*b*) has committed an act of bankruptcy within the meaning of the *Bankruptcy and Insolvency Act* or is deemed insolvent within the meaning of the *Winding-up and Restructuring Act*, whether or not proceedings in respect of the company have been taken under either of those Acts,

(*c*) has made an authorized assignment or against which a bankruptcy order has been made under the *Bankruptcy and Insolvency Act*, or

(*d*) is in the course of being wound up under the *Winding-up and Restructuring Act* because the company is insolvent;

"company" means any company, corporation or legal person incorporated by or under an Act of Parliament or of the legislature of a province, any incorporated company having assets or doing business in Canada, wherever incorporated, and any income trust, but does not include banks, authorized foreign banks within the meaning of section 2 of the *Bank Act*, railway or telegraph companies, insurance companies and companies to which the *Trust and Loan Companies Act* applies;

**Claims against directors — compromise**

**5.1 (1)** A compromise or arrangement made in respect of a debtor company may include in its terms provision for the compromise of claims against directors of the company that arose before the commencement of proceedings under this Act and that relate to the obligations of the company where the directors are by law liable in their capacity as directors for the payment of such obligations.

**Exception**

**(2)** A provision for the compromise of claims against directors may not include claims that

(*a*) relate to contractual rights of one or more creditors; or

(*b*) are based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors.

**_Securities Transfer Act, 2006_, S.O. 2006, c.8**

**Rights of purchaser**
      **69.** (1)  Except as otherwise provided in subsections (2) and (3), a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer. 2006, c. 8, s. 69 (1).

**Same**
      (2)  A purchaser of a limited interest in a security acquires rights only to the extent of the interest purchased. 2006, c. 8, s. 69 (2).

64

**Same**
    <u>(3)</u>  A purchaser of a certificated security who as a previous holder had notice of an adverse claim does not improve that purchaser's position by virtue of taking from a protected purchaser. 2006, c. 8, s. 69 (3).

## N.Y. CLS General Obligations Law § 13-107 (West 2012);

§ 13-107. Claims or demands transferred with bond unless reserved

1. Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, (a) for damages or rescission against the obligor on such bond, (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding, and (c) for damages against any guarantor of the obligation of such obligor, trustee or depositary.

2. As used in this section, "bond" shall mean and include any and all shares and interests in an issue of bonds, notes, debentures or other evidences of indebtedness of individuals, partnerships, associations or corporations, whether or not secured.

3. As used in this section, "indenture" means any mortgage, deed of trust, trust or other indenture, or similar instrument or agreement (including any supplement or amendment to any of the foregoing), under which bonds as herein defined are issued or outstanding, whether or not any property, real or personal, is, or is to be, pledged, mortgaged, assigned, or conveyed thereunder.

## _Securities Act,_ R.S.O. 1990, CHAPTER S.5

138.5  <u>(1)</u>  Damages shall be assessed in favour of a person or company that acquired an issuer's securities after the release of a document or the making of a public oral statement containing a misrepresentation or after a failure to make timely disclosure as follows:

      1. In respect of any of the securities of the responsible issuer that the person or company subsequently disposed of on or before the 10th trading day after the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, assessed damages shall equal the difference between the average price paid for those securities (including any commissions paid in respect thereof) and the price received upon the disposition of those securities (without deducting any commissions paid in respect of the disposition), calculated taking into account the result of hedging or other risk limitation transactions.

      2. In respect of any of the securities of the responsible issuer that the person or company subsequently disposed of after the 10th trading day after the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, assessed damages shall equal the lesser of,

    i. an amount equal to the difference between the average price paid for those securities (including any commissions paid in respect thereof) and the price received upon the disposition of those securities (without deducting any commissions paid in respect of the disposition), calculated taking into account the result of hedging or other risk limitation transactions, and

    ii. an amount equal to the number of securities that the person disposed of, multiplied by the difference between the average price per security paid for those securities (including any commissions paid in respect thereof determined on a per security basis) and,

        A. if the issuer's securities trade on a published market, the trading price of the issuer's securities on the principal market (as those terms are defined in the regulations) for the 10 trading days following the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, or

        B. if there is no published market, the amount that the court considers just.

3. In respect of any of the securities of the responsible issuer that the person or company has not disposed of, assessed damages shall equal the number of securities acquired, multiplied by the difference between the average price per security paid for those securities (including any commissions paid in respect thereof determined on a per security basis) and,

    i. if the issuer's securities trade on a published market, the trading price of the issuer' securities on the principal market (as those terms are defined in the regulations) for the 10 trading days following the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, or

    ii. if there is no published market, the amount that the court considers just. 2002, c. 22, s. 185; 2006, c. 33, Sched. Z.5, s. 17; 2007, c. 7, Sched. 38, s. 12 (1-4).

**Same**

    **(2)** Damages shall be assessed in favour of a person or company that disposed of securities after a document was released or a public oral statement made containing a misrepresentation or after a failure to make timely disclosure as follows:

    1. In respect of any of the securities of the responsible issuer that the person or company subsequently acquired on or before the 10th trading day after the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, assessed damages shall equal the difference between the average price received upon the disposition of those securities (deducting any commissions paid in respect of the disposition) and the price paid for those securities (without including any commissions paid in respect thereof), calculated taking into account the result of hedging or other risk limitation transactions.

2. In respect of any of the securities of the responsible issuer that the person or company subsequently acquired after the 10th trading day after the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, assessed damages shall equal the lesser of,

    i. an amount equal to the difference between the average price received upon the disposition of those securities (deducting any commissions paid in respect of the disposition) and the price paid for those securities (without including any commissions paid in respect thereof), calculated taking into account the result of hedging or other risk limitation transactions, and

    ii. an amount equal to the number of securities that the person disposed of, multiplied by the difference between the average price per security received upon the disposition of those securities (deducting any commissions paid in respect of the disposition determined on a per security basis) and,

        A. if the issuer's securities trade on a published market, the trading price of the issuer's securities on the principal market (as those terms are defined in the regulations) for the 10 trading days following the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, or

        B. if there is no published market, the amount that the court considers just.

3. In respect of any of the securities of the responsible issuer that the person or company has not acquired, assessed damages shall equal the number of securities that the person or company disposed of, multiplied by the difference between the average price per security received upon the disposition of those securities (deducting any commissions paid in respect of the disposition determined on a per security basis) and,

    i. if the issuer's securities trade on a published market, the trading price of the issuer's securities on the principal market (as such terms are defined in the regulations) for the 10 trading days following the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, or

    ii. if there is no published market, then the amount that the court considers just. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 14; 2006, c. 33, Sched. Z.5, s. 17; 2007, c. 7, Sched. 38, s. 12 (5-8).

**Same**

    **(3)** Despite subsections (1) and (2), assessed damages shall not include any amount that the defendant proves is attributable to a change in the market price of securities that is unrelated to the misrepresentation or the failure to make timely disclosure. 2002, c. 22, s. 185.

**Limitation period**

**138.14** No action shall be commenced under section 138.3,

    **(a)** in the case of misrepresentation in a document, later than the earlier of,

67

> (i) three years after the date on which the document containing the
> misrepresentation was first released, and
>
> (ii) six months after the issuance of a news release disclosing that leave has been
> granted to commence an action under section 138.3 or under comparable
> legislation in the other provinces or territories in Canada in respect of the same
> misrepresentation;

**(b)** in the case of a misrepresentation in a public oral statement, later than the earlier of,

> (i) three years after the date on which the public oral statement containing the
> misrepresentation was made, and
>
> (ii) six months after the issuance of a news release disclosing that leave has been
> granted to commence an action under section 138.3 or under comparable
> legislation in another province or territory of Canada in respect of the same
> misrepresentation; and

**(c)** in the case of a failure to make timely disclosure, later than the earlier of,

> (i) three years after the date on which the requisite disclosure was required to be
> made, and
>
> (ii) six months after the issuance of a news release disclosing that leave has been
> granted to commence an action under section 138.3 or under comparable
> legislation in another province or territory of Canada in respect of the same
> failure to make timely disclosure. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34,
> s. 23.

68

## SCHEDULE C – DETAILS OF THE PLAN

### A.    Overview of the Plan

1.    The Plan is premised on SFC's belief that those with an economic interest in SFC will, when considered as a whole, derive greater benefit from the continued operation of the Sino-Forest business as a going concern than would result from a bankruptcy or liquidation of SFC.

2.    The Plan contemplates that Newco will be incorporated and organized under the laws of the Cayman Islands and SFC will transfer substantially all of its assets to Newco. The result will be that Newco will own, directly or indirectly, all of SFC's Subsidiaries and SFC's interest in Greenheart. Pursuant to the Plan (and as is further explained below), the shares of Newco will be held by the Affected Creditors, the vast majority of which are the current noteholders. Prior to the Plan Implementation Date, it is intended that Newco will organize a wholly-owned subsidiary, Newco II (as defined below), for the purposes of acquiring from Newco the SFC Assets to be transferred by SFC to Newco on the Plan Implementation Date.

### B.    Consideration Available for Distribution

3.    Under the terms of the Plan, the following are the primary "buckets" of consideration to be distributed [*s. 4.1 of the Plan*]:

   (a)    all of the stock of Newco: Newco will become the owner of all of SFC's stock in the six wholly owned and one non-wholly owned direct subsidiaries of SFC [*ss. 6.4(k) of the Plan*], which will result in Newco owning all of SFC's assets as well as any intercompany debts owed by the Subsidiaries to SFC;

69

(b)     Newco Notes; and

(c)     interests in the Litigation Trust which is discussed below and which will hold all
claims and actions that have been or may be asserted by or on behalf of (i) SFC
against any and all third parties, and (ii) the Note Indenture Trustees, the
Noteholders or any of their representatives against any and all persons in
connection with the notes (other than claims that are released pursuant to the
Plan) [*definition of "Litigation Trust" and "Litigation Trust Claims" in section 1.1
of the Plan*].

## C.     Information Regarding Newco

4.     As set out in Exhibit C to the Plan Supplement:

(a)     Newco will be incorporated as an exempt company under the laws of the Cayman
Islands.

(b)     Newco will have share capital consisting of a single class of voting shares, being
Newco Shares.  Newco Shares may be divided into different classes subject to
requisite shareholder approvals.   Also with requisite shareholder approvals,
Newco may issue equity securities having a preference over Newco Shares.

(c)     Newco is not and will not be following the Plan Implementation Date, a reporting
issuer in any jurisdiction and the Newco Shares will not be listed on any stock
exchange or quotation service on the Plan Implementation Date.

(d)     The board of Newco will initially consist of up to five (5) directors, who will be
satisfactory to the Initial Consenting Noteholders (as defined in the Initial Order).
The ad hoc committee of Noteholders and its advisors are reviewing potential
candidates for appointment to the Newco board of directors and senior

management.  It is intended that the directors and senior management of Newco will be appointed on or prior to the Plan Implementation Date.

(e)     Newco will deliver to each shareholder (i) copies of Newco's annual financial statements within 180 days of each fiscal year end; and (b) copies of Newco's semi-annual financial statements within 90 days of the end of each financial half-year.  The board of directors will have the discretion to determine whether or not to obtain an audit of the annual financial statements.

(f)     Prior to the Plan Implementation Date, it is intended that Newco will organize a wholly-owned subsidiary as an exempt company under the laws of the Cayman Islands ("Newco II") for the purposes of acquiring from Newco the SFC Assets to be transferred by SFC to Newco on the Plan Implementation Date.  The transfer of the SFC Assets to Newco II is intended to facilitate the resolution of any tax, jurisdictional or other issues that may arise out of a subsequent sale of all or substantially all of Newco's assets.

**D.     Description of Newco Notes**

5.    The principal aggregate amount of the Newco Notes will be $300 million [*definition of "Newco Notes" in s. 1.1 of the Plan*].

6.    As set out in Exhibit D to the Plan Supplement, the Newco Notes will:

(i)     constitute general obligations of Newco;

(ii)    mature on the date that is seven (7) years after the Original Issue Date (as defined in the Plan Supplement) unless redeemed earlier pursuant to the terms of the Newco Notes indenture;

(iii)    be subject to interest which will be payable in cash or, at Newco's election, partially in cash and partially in kind notes or entirely in PIK Notes (as defined in the Plan Supplement);

(iv)    be subject to guarantees and pledges granted by various of the Subsidiaries on terms similar to the guarantees and pledges granted on the existing Notes; and

(v)    be subject to several terms and conditions that are similar to the terms of the existing Note indentures.

E.    **Classification and Treatment of Certain Claims**

7.    In accordance with the Equity Claims Order, the Plan:

(a)    does not provide any recovery for current shareholders and shareholder class action claimants [*s. 4.5 of the Plan*]. However, the Plan preserves shareholder class action claimants' ability to continue their claims against Third Party Defendants other than those claims that are released or limited by the Plan [*s. 7.5 of the Plan*]; and

(b)    provides that indemnity claims against SFC in respect of shareholder class action claims (including indemnity claims against SFC by its auditors, underwriters and directors and officers) are "equity claims" and are subordinate to the claims of other creditors [*definition of "Equity Claims in s. 1.1 of the Plan*]. The Equity Claims Order left open the possibility that indemnification claims for defence

72

costs could potentially be non-subordinated equity claims.  Accordingly, the Plan

provides that such costs will be "Unresolved Claims" under the Plan [*definition of*

*"Unresolved Claims Reserve, s. 1.1 of the Plan*].

8.   E&Y's, BDO's and the Underwriters' claims are addressed below.  The vast majority of the

remaining Third Party Defendants' claims (other than those for defence costs and indemnity

claims relating to the plaintiffs' noteholder claims, discussed below) have been classified as

equity claims and are dealt with in that context in the Plan.

9.   Current noteholders and other "Affected Creditors" with "Proven Claims" will receive a

*pro rata* share of 92.5% of the Newco Shares, 100% of the Newco Notes and 75% of the

Litigation Trust Interests [*s. 4.1, ss. 4.1(a) and the definition of "Affected Creditors Equity Sub-*

*Pool" in s. 1.1 of the Plan*].   The remaining 7.5% of the Newco Shares will be granted to

Consenting Noteholders who are entitled to the Early Consent Consideration (as defined in the

Initial Order) [*s. 4.3 and the definition of "Early Consent Equity Sub-Pool in s. 1.1 of the Plan*].

The remaining 25% of the Litigation Trust Interests will be granted to the former noteholders [*ss.*

*4.11(a) of the Plan*].

10.   The claims of former noteholders against the Third Party Defendants who have

indemnification claims against SFC will be capped at $150 million that can be asserted in respect

of such claims (the "Indemnified Noteholder Class Action Limit") [*definition of "Indemnified*

*Noteholder Class Action Limit" in s. 1.1 and para. 4.4(b)(i) of the Plan*].   The corresponding

indemnity claims of the Third Party Defendants against SFC will be similarly capped at that

same number [*para. 4.4(b)(ii) of the Plan*].  The contingent claims of the Third Party Defendants

for indemnity from SFC in respect of any such noteholder claims shall be treated as "Unresolved

Claims" for purposes of the Plan until they are finally resolved [*definition of "Unresolved Claims Reserve in s. 1.1 of the Plan*]. Indemnified Noteholder Class Action Claims in excess of the Indemnified Noteholder Class Action Limit are released under the Plan [*para. 4.4(b)(i) of the Plan*].

11. In the event that any Third Party Defendant is found to be liable for or agrees to a settlement in respect of Noteholder Class Action Claims (other than for fraud or criminal conduct), and such amounts are paid by the Third Party Defendant, then the amount of the Indemnified Noteholder Class Action Limit applicable to the remaining Third Party Defendants shall be reduced by the amount of such judgment or settlement [*para. 4.4(b)(iii) of the Plan*].

12. The Plan specifically provides that nothing in the Plan affects or is intended to affect any claims that anyone has in respect of any insurance policies (including any rights under any directors' and officers' policy) [*s. 2.4 of the Plan*].

13. Certain other claims are "Unaffected Claims". Holders of Unaffected Claims are to be paid in the ordinary course and will not receive any distributions under the Plan [*ss. 2.3 and 4.2 of the Plan*]. The Unaffected Claims are [*definition of "Unaffected Claims" in s. 1.1 of the Plan*]:

    (a)    claims secured by the Administration Charge (i.e. advisor fees);

    (b)    certain government priority claims relating to taxes, if any;

    (c)    employee priority claim;

    (d)    lien claims;

74

(e)    any other Claim of any employee, former employee, director or officer of SFC in respect of wages, vacation pay, bonuses, termination pay, severance pay or other remuneration payable to such person by SFC, other than any termination pay or severance pay payable by SFC to a person who ceased to be an employee, director or officer of SFC prior to the date of this Plan;

(f)    claims of the Note Indenture Trustees for reasonable outstanding fees and expenses; and

(g)    trade payables incurred by SFC after March 30, 2012.

1.    *The Underwriters*

14.    Pursuant to the Plan:

(a)    the Underwriters shall not be entitled to any distribution under the Plan [*ss. 7.1 (o) of the Plan*];

(b)    the claims of the Underwriters against SFC for indemnification in respect of any Noteholder Class Action Claims (other than claims against them for fraud or criminal conduct) shall, for the purposes of the Plan, be deemed to be valid enforceable Class Action Indemnity Claims against SFC [*ss. 4.4(c) of the Plan*];

(c)    all causes of action against the Underwriters by the Company or the Trustees are deemed to be Excluded Litigation Trust Claims (as discussed below) [*ss. 4.12(b) of the Plan*];

75

(d)  any portion or amount of liability of the Underwriters for the Noteholder Class

Action Claims (other than such claims for fraud or criminal conduct) that exceeds

the Indemnified Noteholders Class Action Limit is released under the Plan [*ss.

7.1(f) of the Plan*]; and

(e)  the Underwriters are Named Third Party Defendants (as discussed and defined

below) [*Schedule A of the Plan*].

**2.    *E&Y***

15.  Pursuant to the Plan:

(a)  E&Y shall not be entitled to any distributions under the Plan [*ss. 7.1(m) of the

Plan*];

(b)  any and all indemnification rights and entitlement of E&Y against SFC and any

indemnification agreement between E&Y and SFC shall be deemed to be valid

and enforceable in accordance with their terms for the purposes of determining

whether E&Y's claims for indemnification in respect of the Noteholder Class

Action Claims are valid and enforceable with the meaning of section 4.4(b) of the

Plan [*ss. 4.4(d) of the Plan*]; and

(c)  the Sanction Order shall contain a stay against E&Y between the Plan

Implementation Date and the earlier of the Ernst & Young Settlement Date (as

defined in the Plan) or such other date as may be ordered by the Court on a

motion to the Court [*ss. 8.2(l) of the Plan*].

76

16.    In addition to the foregoing, E&Y has entered into a settlement agreement with the Ontario

Plaintiffs and the Quebec Plaintiffs, which is still subject to several conditions and approval of

this settlement itself does not form part of the Sanction Order.  The Plan contains provisions that

provide a framework pursuant to which E&Y receives a broad release under the Plan if several

conditions are met [*s. 11.1 of the Plan*].  That release will only be granted if all conditions are

met including further Court approval of the settlement [*ss. 8.2(z) and s. 11.1 of the Plan*].

### 3.    *Named Third Party Defendants*

17.    The Plan provides a mechanism that provides the framework for any Eligible Third Party

Defendant to become a Named Third Party Defendant with the consent of such Third Party

Defendant, the Monitor, the Initial Consenting Noteholders, counsel to the Ontario Plaintiffs and,

if occurring prior to the Plan Implementation Date, SFC [*ss. 11.2(a) of the Plan*].  As set out

above, the Underwriters are designated as Named Third Party Defendants pursuant to the Plan

[*Schedule A of the Plan*].

18.    Any Named Third Party Defendant will not be entitled to any distributions under the Plan

[*ss. 7.1(n) of the Plan*].

19.    Any indemnification rights and entitlements of a Named Third Party Defendant against

SFC and any indemnity agreements between such party and SFC shall be deemed valid and

enforceable in accordance with their terms for the purpose of determining whether the claims of

that Named Third Party Defendant for indemnification in respect of the Noteholder Class Action

Claims are valid and enforceable within the meaning of section 4.4(b) of the Plan [*ss. 4.4(e) of

the Plan*].

20.    The Plan also provides the framework pursuant to which a Named Third Party Defendant settlement would be approved and such Named Third Party Defendant would obtain a release under the Plan in substantially the same form as contemplated for E&Y [*ss. 11.2(b) & (c) of the Plan*].

21.    The deadline for an Eligible Third Party Defendant to become a Named Third Party Defendant is 10:00 a.m. on December 6, 2012 or such later date as may be consented to by the Monitor, SFC (if on or prior to the Plan Implementation Date) and the Initial Consenting Noteholders [*ss. 11.2(a) of the Plan*].

####    4.    *BDO*

22.    On December 5, 2012, BDO, an Eligible Third Party Defendant, became a Named Third Party Defendant pursuant to the mechanism and framework established by the Plan described above.

## F.    Releases

23.    The Plan includes releases for a number of parties (the "Released Parties"), certain of which are discussed below.

24.    Certain current and former directors and officers of SFC (collectively, the "Named Directors and Officers") will be released under the Plan [*ss. 4.9(a) of the Plan*].

25.    There are, however, three main categories of claims against the Named Directors and Officers that will not be released pursuant to the Plan:

78

(a)    claims that cannot be released pursuant to subsection 5.1(2) of the CCAA and
claims for conspiracy. The Plan directs and limits recovery in respect of such
claims to any available coverage under the directors' and officers' insurance policy
[*ss. 4.9 (a) & (e) of the Plan*];

(b)    claims for fraud and criminal conduct [*ss. 4.9(f) of the Plan*]; and

(c)    non-monetary remedies of the OSC or any other regulatory body [*definition of
D&O Claim in s. 1.1 of the Plan*].

26.    Any individual current or former officer or director that is not a Named Director and
Officer will not be released under the Plan except as relates to the Indemnified Noteholder Class
Action Limit which is discussed above [*ss. 4.9(b) of the Plan*].

27.    In addition to the release of certain other individuals and other persons (such as advisors
involved in the restructuring), the Plan provides for releases of all claims relating to SFC that
may be made against the Subsidiaries [*ss. 7.1(k) of the Plan*].

28.    As discussed above, the Plan also contemplates a release of E&Y should the necessary
preconditions provided for in the Plan (including court approval of the E&Y Settlement with the
Ontario and Quebec Class Action Plaintiffs) be satisfied [*ss. 11.1(b) of the Plan*].

**G.    Reserves**

**1.    *The Cash Reserves***

29.    The terms of the Plan provide for the creation of a number of cash reserves (the "Cash
Reserves") upon Plan Implementation. The Cash Reserves are as follows:

79

(a)     Administration Charge Reserve - The amount of the Administration Charge
Reserve will be $500,000 or such other amount as may be agreed to by the
Monitor and the Initial Consenting Noteholders. The Administration Charge
Reserve is intended to cover any claims which are covered by the Administration
Charge (as defined in and established by the Initial Order) and which are not
billed in time to be paid on Plan Implementation [*definition of "Administration
Charge Reserve" in the Plan*].   The beneficiaries of the Initial Order include the
Monitor, Houlihan, and counsel for SFC, the Monitor, the board and the Initial
Consenting Noteholders.

(b)     Unaffected Claims Reserve - The amount of the Unaffected Claims Reserve will
be $1.5 million or such other amount as may be agreed to by the Monitor, SFC
and the Initial Consenting Noteholders. The Unaffected Claims Reserve is
intended to provide for payment of Unaffected Claims under the Plan [*ss. 4.2(a)
of the Plan*]. The amount of the Unaffected Claims Reserve will be calculated
based on the Company's and the Monitor's estimate of the Unaffected Claims
which may not be paid upon the Plan Implementation or which are not otherwise
accounted for in the other Cash Reserves.

(c)     Monitor's Post-Implementation Reserve – The amount of the Monitor's Post-
Implementation Reserve will be $5 million or such other amount as may be
agreed to by the Monitor and the Initial Consenting Noteholders. After
implementation of the Plan, it is anticipated that there will be ongoing items to be
addressed within the CCAA Proceedings including the administration of the SFC
estate and the claims procedure.  The Monitor's Post-Implementation Reserve is
intended to provide funds to carry out these items [*definition of "Monitor's Post-
Implementation Reserve" in s. 1.1 of the Plan*].

30.   Pursuant to the Plan, the Monitor will hold and administer the monies used to fund the

Cash Reserves.  Excess funds in the Administration Charge Reserve and the Unaffected Claims

80

Reserve will be transferred to the Monitor's Post-Implementation Reserve [*ss. 5.7(a) of the Plan*].

31.   The Monitor may, at any time and from time to time in its sole discretion, release amounts from the Monitor's Post-Implementation Reserve to Newco.  Once the Monitor has determined that the cash remaining in the Monitor's Post-Implementation Reserve is no longer necessary for administering SFC or the Claims Procedure, the Monitor shall forthwith transfer any such remaining cash to Newco [*ss. 5.7(b) of the Plan*].

### 2.   *Unresolved Claims Reserve*

32.   In addition to the Cash Reserves, the Plan also contemplates the establishment of an Unresolved Claims Reserve, constituting Newco Shares, Newco Notes and Litigation Trust Interests, which will be held in escrow by SFC Escrow Co. pending the resolution of Unresolved Claims [*definition of "Unresolved Claims Reserve" in s. 1.1 of the Plan*].

33.   The Unresolved Claims Reserve will consist of Plan consideration sufficient to make potential distributions under the Plan in respect of the following in the event that the become Proven Claims [*definition of "Unresolved Claims Reserve" in s. 1.1 of the Plan*]:

   (a)   indemnity claims of Third Party Defendants for Indemnified Noteholder Class Action Claims up to the Indemnified Noteholder Class Action Limit;

   (b)   Defence Costs Claims of $8 million or such other amount as may be agreed by the Monitor and the Initial Consenting Noteholders; and

81

(c)    other unresolved Affected Creditor Claims of up to $500,000 or such other amount as my be agreed to by the Monitor and the Initial Consenting Noteholders.

**H.    SFC Escrow Co.**

34.   SFC Escrow Co. shall be incorporated prior to the Plan Implementation Date under the laws of the Cayman Islands or such other jurisdiction as may be agreed to by SFC, the Monitor and the Initial Consenting Noteholders.  SFC Escrow Co. will be a wholly-owned subsidiary of SFC and the sole director of SFC Escrow Co. will be Codan Services (Cayman) Limited or such other person as may be agreed by SFC, the Monitor and the Initial Consenting Noteholders [*s. 6.3 of the Plan*].

35.   SFC Escrow Co. is being formed to serve as the Unresolved Claims Escrow Agent and to facilitate the implementation of the Plan as the holder of the assets in the Unresolved Claims Reserve.  SFC Escrow Co. will also administer the Undeliverable Distributions in accordance with the Plan [*s. 6.3 of the Plan*].

**I.    Alternative Sale Transaction**

36.   The Plan provides that, at any time prior to the implementation of the Plan, SFC may, with the consent of the Initial Consenting Noteholders, complete a sale of all or substantially all of the SFC Assets on terms that are acceptable to the Initial Consenting Noteholders (an "Alternative Sale Transaction"), provided that any such Alternative Sale Transaction has been approved by the Court pursuant to section 36 of the CCAA on notice to the service list [*s. 10.1 of the Plan*].

82

37.   In the event that an Alternative Sale Transaction is completed, the terms and conditions of

the Plan would continue to apply subject to certain conditions identified in the Plan [*s. 10.1 of*

*the Plan*].

## J.   Document Preservation

38.   Pursuant to the Plan, prior to Plan Implementation, SFC shall:

   (a)    preserve or cause to be preserved copies of any documents (as such term is

          defined in the *Rules of Civil Procedure* (Ontario)) that are relevant to the issues

          raised in the Class Actions [*ss. 8.2(x) of the Plan*]; and

   (b)    make arrangements acceptable to SFC, the Monitor, the Initial Consenting

          Noteholders, counsel to the Ontario Class Action Plaintiffs, counsel to E&Y,

          counsel to the Underwriters, counsel to BDO, and counsel to any other Eligible

          Third Party Defendant if they become a Named Third Party Defendant to provide

          the parties to the class actions with access thereto, subject to customary

          commercial confidentiality, privilege or other applicable restrictions, including

          lawyer-client privilege, work product privilege and other privileges or

          immunities, and to restrictions on disclosure arising from section 16 of the

          *Securities Act* (Ontario) and comparable restrictions on disclosure in other

          relevant jurisdictions, for purposes of prosecuting and/or defending the class

          actions, as the case may be, provided that nothing in the foregoing reduces or

          otherwise limits the parties' rights to production and discovery in accordance with

83

the *Rules of Civil Procedure* (Ontario) and the *Class Proceedings Act*, 1992

(Ontario) [*ss. 8.2(x) of the Plan*].

**K.    Litigation Trust**

39.    The Litigation Trust will be created pursuant to the Plan on the Plan Implementation Date

[*ss. 6.4(o) of the Plan*].    Pursuant to the Litigation Trust Agreement, the Litigation Trustee will

hold the Litigation Trust Claims and the other Litigation Trust Assets for the benefit of Affected

Creditors with Proven Claims and the Noteholder Class Action Claimants entitled to receive

Litigation Trust Interests under the Plan [*preliminary statement of the Litigation Trust

Agreement, Exhibit B to the Plan Supplement*].

40.    On the Plan Implementation Date, the Litigation Trust Claims will be transferred to the

Litigation Trustee [*ss. 6.4(o) of the Plan*]. Upon the creation of the Litigation Trust, SFC will

transfer the Litigation Funding Amount to the Litigation Trustee to finance the operations of the

Litigation Trust [*ss. 6.4(o) of the Plan*]. The Litigation Funding Amount is $1 million [*definition

of "Litigation Funding Amount" in s. 1.1 of the Plan*].

41.    The Litigation Trustee will be determined by SFC and the Initial Consenting Noteholders

(with the consent of the Monitor) prior to the Plan Implementation Date.    The litigation trust

board (the "Litigation Trust Board") will be established and consist of three (3) persons and will

make decisions based on a majority vote of the Litigation Trust Board members.    The Litigation

Trust Board will have the right to direct and remove the Litigation Trustee in accordance with

the Litigation Trust Agreement and will have the right to operate and manage the Litigation

Trust in a manner not inconsistent with the Litigation Trust Agreement [*s. 4.1 of the Litigation*

84

*Trust Agreement, Exhibit B to the Plan Supplement*].  The parties have not yet determined who will serve as the members of the Litigation Trust Board, but will do so prior to the Plan Implementation Date.

42.    Subject to the terms of the Litigation Trust Agreement, the Litigation Trustee, upon the direction of the Litigation Trust Board, will prosecute the Litigation Trust Claims and preserve and enhance the value of the Litigation Trust Assets [*s. 1.5 of the Litigation Trust Agreement, Exhibit B to the Plan Supplement*].

43.    At any date prior to the Plan Implementation Date, SFC and the Initial Consenting Noteholders may agree to exclude one or more claims, actions or causes of action from the Litigation Trust Claims that would otherwise be assigned to the Litigation Trust on Plan Implementation [*ss. 4.12(a) of the Plan*].

44.    As discussed above, the Plan provides that claims against E&Y and the Underwriters would be excluded claims [*ss. 4.12(b) and 11.1(b) of the Plan*].

**L.    Conditions Precedent**

45.    Implementation of the Plan is subject to the approval of the Court and to numerous other conditions precedent, including the receipt of any necessary regulatory approvals [*s. 9.1 of the Plan*].  If the conditions precedent are satisfied or waived within the time frames anticipated, SFC intends to implement the Plan not later than January 15, 2013 [*ss. 9.1(hh) of the Plan*].

85

## M.    United States Recognition Order

46.    Within three business days of the Plan Implementation Date, a foreign representative of SFC will commence a proceeding in the United States for the purpose of seeking recognition of the Plan and the Sanction Order and shall use its reasonable best efforts to obtain such recognition [*ss. 12.10(b) of the Plan*].

IN THE MATTER OF THE *COMPANIES CREDITORS' ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OR COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION

Court File No. CV-12-9667-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceedings commenced in Toronto

**FACTUM OF THE APPLICANT**
**(Sanction Order Motion Returnable**
**December 7/10, 2012)**

**BENNETT JONES LLP**
One First Canadian Place
Suite 3400, P.O. Box 130
Toronto, Ontario M5X 1A4

Robert W. Staley (LSUC #27115J)
Kevin Zych (LSUC #3129T)
Raj Sahni (LSUC #42942U)
Derek J. Bell (LSUC #43420J)
Jonathan Bell (LSUC #55457P)

Tel: 416-777-4638
Fax: 416-863-1716

Lawyers for the Applicant