## Exhibit K
### Unpublished Decisions And Orders Cited In The Accompanying Memorandum Of Law

**Exhibit K.1**
*Collins v. Oilsands Quest, Inc.*, **No. 12-10476, 2012 U.S. Dist.
LEXIS 182647 (S.D.N.Y. Dec. 27, 2012)**



1 of 1 DOCUMENT

**MARSHALL W. COLLINS, GARY DANNENBERG, THEODORE M. KOLER, and ELMER WALKER, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, -v- OILSANDS QUEST INC. (f/k/a CANWEST PETROLEUM CORPORATION), CHRISTOPHER H. HOPKINS, T. MURRAY WILSON, KARIM HIRJI, GARTH WONG, RONALD PHILLIPS, THOMAS MILNE, GORDON TALLMAN, WILLIAM SCOTT THOMPSON, PAMELA WALLIN, JOHN READ, MCDANIEL & ASSOCIATES CONSULTINGS LTD. and TD SECURITIES, INC., Defendants. In re: OILSANDS QUEST INC., et.al., Applicants in Foreign Proceedings**

**11 Civ. 1288 (JSR),12-10476(JSR)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2012 U.S. Dist. LEXIS 182647*

**December 27, 2012, Decided**
**December 28, 2012, Filed**

**PRIOR HISTORY:** [*1]
   Chapter 15.

**CASE SUMMARY:**

**OVERVIEW:** Court could not conclude that the enforcement of the Canadian court's temporary stay of proceedings would be contrary to the most fundamental policies of the U.S.; extending a temporary stay of proceedings would not be manifestly contrary to the protection of U.S. investors and the regulation of U.S. capital markets.

**OUTCOME:** Court reaffirmed its order granting the monitor's petitions.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings*
[HN1] See *11 U.S.C.S. § 1516(c)*.

*Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings*
[HN2] In determining where a debtor's center of main interest lies, factors that are normally relevant include, inter alia, the locations of the debtor's headquarters, management, assets, and creditors, and the jurisdiction whose law would apply to most disputes.

*Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings*
[HN3] See *11 U.S.C.S. § 1509(b)(3)*.

*Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings*

[HN4] The statutory imperative that the court shall grant comity or cooperation does not mean that the court must enforce every order entered into by the foreign court, for, under the plain terms of the statute, the court must also consider any limitations that the court may impose consistent with the policy of Chapter 15 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. *11 U.S.C.S. § 1509(b)*. More generally, the principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or contrary to the public policy of the United States. *11 U.S.C.S. § 1506*. The public policy exception should be "narrowly interpreted" and is restricted to the most fundamental policies of the United States. Accordingly, a foreign judgment should generally be accorded comity if its proceedings are "fair and impartial."

*Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings*

[HN5] A court should not enforce a ruling from a foreign court under Chapter 15 of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 where a party has engaged in strategic conduct that is not to be encouraged.

**COUNSEL:** For Mark Rubenstein, Individually and on behalf of all others similarly situated, Plaintiff: David R. Scott, LEAD ATTORNEY, Scott & Scott, LLC(CT), New York, NY; Amanda F. Lawrence, Scott & Scott, LLC(CT), Colchester, CT; Beth Ann Kaswan, Joseph Peter Guglielmo, Scott + Scott, L.L.P.(NYC), New York, NY; Mary Katherine Blasy, Scott Scott LLP, San Diego, CA.

For St. Lucie County Fire District Firefighter's Pension Trust Fund, individually and on behalf of all others similarly situated, Marshalll W. Collins, individually and on behalf of all others similarly situated, Gary Dannenberg, individually and on behalf of all others similarly situated, Theodore Koler, Simon Salo, individually and on behalf of all others similarly situated, Elmer Walker, Individually and on behalf of all others similarly situated, Plaintiffs: David R. Scott, LEAD

ATTORNEY, Scott & Scott, LLC(CT), New York, NY; Amanda F. Lawrence, Scott & Scott, LLC(CT), Colchester, CT; Beth Ann Kaswan, Thomas Livezey Laughlin, IV, Scott + Scott, L.L.P.( NYC), New York, NY; Judith S. Scolnick, Scott Scott, L.L.P.( NYC), New York, NY.

For Oilsands Quest Lead Plaintiff Group, Movant: Amanda F. Lawrence, Scott & Scott, LLC(CT), [*2] Colchester, CT; Beth Ann Kaswan, Scott + Scott, L.L.P.( NYC), New York, NY.

For Oilsands Quest Inc., formerly known as Canwest Petroleum Corporation, Christopher H. Hopkins, Garth Wong, Karim Hirji, Ronald Phillips, Gordan Tallman, Pamela Wallin, John Read, T. Murray Wilson, Defendants: Andrew Garry Gordon, LEAD ATTORNEY, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Moses Silverman, Robyn F. Tarnofsky, LEAD ATTORNEY, James Joseph Beha, II, Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY), New York, NY.

For Thomas Milne, Defendant: Jennifer M. Osgood, LEAD ATTORNEY, Sara Cantrick Van Deusen, PRO HAC VICE, Burns Figa & Will PC, Greenwood Village, CO.

For William Scott Thompson, Defendant: Jennifer M. Osgood, Sara Cantrick Van Deusen, PRO HAC VICE, Burns Figa & Will PC, Greenwood Village, CO; Trevor A. Crow, PRO HAC VICE, Burns Figa & Will PC, Greenwood Village, CO.

For McDaniels & Associates Consultants Ltd., Defendant: Matthew Terrence McLaughlin, LEAD ATTORNEY, Andrew Flagg Brin Diamond, David Neil Cinotti, Edmund M. O'Toole, Julia Lucia Davis, Venable LLP (NYC), New York, NY.

For Ernst & Young Inc., Bankruptcy Movant: Ken Coleman, LEAD ATTORNEY, Allen & Overy, LLP, New [*3] York, NY.

**JUDGES:** JED S. RAKOFF, United States District Judge.

**OPINION BY:** JED S. RAKOFF

**OPINION**

MEMORANDUM

JED S. RAKOFF, U.S.D.J.

Ernst & Young Inc., a bankruptcy monitor and authorized foreign representative (the "Monitor") for Oilsands Quest, Inc. ("Oilsands") and certain of its subsidiaries, filed Verified Petitions for Recognition of Foreign Proceedings and Related Relief (the "Petitions") pursuant to Chapter 15 of the Bankruptcy Code. The Monitor seeks 1) recognition of certain bankruptcy proceedings (the "Canadian Proceedings") pending before the Court of Queen's Bench of Alberta (the "Alberta Court") as foreign main proceedings under *section 1517 of the Bankruptcy Code*; 2) an order giving full force in the United States to certain orders of the Alberta Court (the only contested parts of these orders being the stays of pending litigation against the individual officers and directors of Oilsands); and 3) a stay of proceedings in the above-captioned civil case against McDaniel & Associates Consulting, Ltd. ("McDaniel"), a former consultant to Oilsands. Plaintiffs in the above-captioned civil action initially objected to all three of the Monitor's requests, but they later agreed that if the Court decided to grant [*4] the Monitor's first two requests, the Court should also grant the Monitor's third request, the stay against McDaniel. By bottom-line order dated March 29, 2012, the Court granted the Monitor's petitions in their entirety. Although the parties have now filed proposed settlement papers, this Memorandum explains the reason for those rulings.

The Court turns first to the question of recognition of the Canadian Proceeding as a foreign main proceeding. The Monitor bears the burden of proof on this issue. See *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 128 (S.D.N.Y. 2007)*. However, the only dispute relating to this recognition is whether the Canadian bankruptcy is indeed pending in the country where the debtor has its center of main interests. See *11 U.S.C. § 1517(b)(1)*. If it is not, then this Court cannot recognize the Canadian proceedings as a foreign main proceeding.

Oilsands has a registered office in Colorado. *Section 1516(c) of the Bankruptcy Code* provides that [HN1] "[i]n the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." *11 U.S.C. § 1516(c)*. Here however, [*5] there is evidence to the contrary, and so the Court must examine all of the evidence to [HN2]

determine where Oilsands's center of main interest lies. In so doing, factors that are normally relevant include, inter alia, the locations of the debtor's headquarters, management, assets, and creditors, and the jurisdiction whose law would apply to most disputes. *See In re Millennium Global Emerging Credit Master Fund Ltd., 458 B.R. 63, 70 (Bankr. S.D.N.Y. 2011)*.

As to headquarters and management, the Court agrees with the Monitor that Oilsands "is a highly centralized business that is located and operated entirely in and around Alberta, Canada." See Memorandum of Law in Support of Chapter 15 Petitions for Recognition of Foreign Proceedings and Related Relief ("Monitor Mem.") at 8. Oilsands does not have any place of business in the United States, and its headquarters, executive offices, and principal street address are located in Alberta, Canada. Verified Petitions for Recognition of Foreign Proceedings and Related Relief ("Petitions") ¶ 22. Moreover, all of Oilsands's strategic decisionmaking and corporate functions occur in Canada, and all of Oilsands's employees are located in Canada. See Monitor [*6] Mem. at 8; Petitions ¶ 8. The fact that Oilsands has a registered agent in Colorado and is listed on the American Stock Exchange is not sufficient to overcome the other evidence that Oilsands's headquarters and management are located in Canada.

Oilsands's principal assets are also located in Canada. Those assets are permits, licenses, and leases relating to natural resource properties in Alberta and Saskatchewan, which were granted by the provinces of Alberta or Saskatchewan. Petitions, ¶ 24.

Oilsands's primary creditors are also in Canada. See Petitions, ¶ 25. In fact, all but two of the 90 creditors who have filed claims against Oilsands are located in Canada. See Transcript of Oral Argument, March 15, 2012 ("Tr.") at 6. While plaintiffs argue that the putative class in the above-captioned civil suit before this Court is the largest creditor of Oilsands, the members of the putative class are not yet proven creditors, and even if plaintiffs ultimately prevail in the civil suit, their claims would be subordinated to general unsecured claims. *11 U.S.C. § 510(b)*; Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 § 2(d).

Turning to the jurisdiction whose law will govern most disputes, [*7] the Court also finds that this jurisdiction is Canada. Most disputes that arise out of the bankruptcy will relate to assets and property, and those

disputes will be governed by Canadian law.

Finally, as discussed above, a company's center of main interests should be ascertainable by third parties. The Monitor correctly argues that Oilsands has represented itself to investors as a company based in Canada. Every SEC filing, press release, presentation, and prospectus has said that the company was based in Canada. See Monitor Mem. at 4-5. It is true that Oilsands was required in SEC filings to state that it was incorporated in the United States, but those SEC filings also stated that the principal executive offices of the Company were located in Alberta. See Declaration of Judith Scolnick, Mar. 5, 2012, Exs. A, B.

Therefore, the Court recognizes the Canadian Proceedings as "foreign main proceedings." Having done so, the Court must next determine whether to give full force and effect to the orders of the Alberta Court.

*Section 1509 of the Bankruptcy Code* provides that [HN3] "if the court grants recognition [as a foreign main proceeding] under *section 1517*, and subject to any limitations that the [*8] court may impose consistent with the policy of [chapter 15] . . . a court in the United States shall grant comity or cooperation to the foreign representative." *11 U.S.C. § 1509(b) (3).* But [HN4] the statutory imperative that the Court shall grant comity or cooperation does not mean that the Court must enforce every order entered into by the Alberta Court, for, under the plain terms of the statute, the Court must also consider "any limitations that the court may impose consistent with the policy of [chapter 15." Id. *§ 1509(b).* More generally, "[t]he principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or contrary to the public policy of the United States." See *11 U.S.C. § 1506*; Monitor Mem. at 12; Pls.' Mem. at 4. As this Court has previously held, the legislative history of *section 1506* makes clear that the public policy exception should be "narrowly interpreted" and is restricted to "the most fundamental policies of the United States." *In re Ephedra Prods. Liab. Litig., 349 B.R. 333, 336 (S.D.N.Y. 2006).* Accordingly, a foreign [*9] judgment should generally be accorded comity if its proceedings are "fair and impartial." Id. at 90-91. It is clear that the Canadian proceedings have been fair and impartial, and that the Canadian proceedings have afforded creditors a full and fair opportunity to be heard

in a manner that is fully consistent with this country's standards of due process.

The stay of proceedings for officers and directors is a standard feature of proceedings under the CCAA and has routinely been enforced in the United States upon recognition of a foreign proceeding under Chapter 15. See, e.g., In re Muscletech Research and Development Inc. et al., 06 Civ. 538, Dkts. 45, 46. The stay against individual directors is a fixture of Canadian bankruptcy proceedings in part because Canadian bankruptcy proceedings typically involve a claims process where claims against the company, officers, and directors are filed and handled together. See Tr. at 12. Although this is not always true in the United States, "[w]e are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home." *Ackermann v. Levine, 788 F.2d 830 (2d Cir. 1986)* (quoting *Loucks v. Standard Oil Co., 224 N.Y. 99, 111, 120 N.E. 198 (N.Y. 1918)).* [*10] Thus, for example, this Court has enforced claims processes that did not provide for a jury trial. *Ephedra, 349 B.R. at 336.*

The Court cannot conclude that the enforcement of the Canadian Court's temporary stay of proceedings would be contrary to the most fundamental policies of the United States. It is true that the protection of United States investors and the regulation of United States capital markets are matters of national public interest, and private securities class actions are an important component of that protection. See *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007).* But, extending a temporary stay of proceedings will not be manifestly contrary to those interests. If the request for a stay had been presented to this Court in the first instance, the Court might not have granted it. But, the question here is not whether this Court should grant a stay in the first instance, but whether should accord comity and deference to the stay orders entered by the Alberta Court. The Court concludes that in light of the comity principles laid out above, the Court must defer to the procedures set forth in the Canadian Proceedings and enforce the stay.

Plaintiffs make [*11] one final argument that the Court must address, viz., that Oilsands and the Monitor have engaged in gamesmanship, and that this gamesmanship is a separate reason for refusing to enforce the Alberta Court's orders. [HN5] A court should not enforce a ruling from a foreign court under Chapter 15

2012 U.S. Dist. LEXIS 182647, *11

where a party has engaged in "strategic conduct that is not to be encouraged." See *Underwood v. Hilliard (In re Rimsat), 98 F.3d 956, 962 (7th Cir. 1996).* Plaintiffs argue that Oilsands decided to file bankruptcy proceedings in Canada as a "legal maneuver" that was "apparently designed to obtain for [the Individual Defendants] a type of relief generally not available in the United States: a stay of actions against them." Pls.' Mem. at 1. Plaintiffs undermine their own argument I however I by simultaneously asserting that the Monitor "sat on its hands for ten weeks" after the Alberta Court issued the initial stay before filing its Chapter 15 petition. See Id. If the filing of the Canadian Proceedings had been part of a broader strategy to stay the ongoing civil case, the Monitor would have immediately filed the Chapter 15 petitions and sought a stay; it would not have debated for ten weeks about whether [*12] to file the Chapter 15 petitions.

Finally, was the Court noted in its bottom-line order, plaintiffs agreed at oral argument that if the Court granted the Monitor's requests to recognize the Canadian Proceedings as foreign main proceedings and to enforce the Alberta Court's orders it should also grant the Monitor's request to stay the above-captioned civil case against McDaniel. See Tr. at 40-41.

For the foregoing reasons, the Court reaffirms its order of March 29, 2012, granting the Monitor's petitions. It remains only to add that on August 231 20121 the Alberta Court lifted its stay as to Oilsands's former officers and directors with respect to this litigation, and that, accordingly, on October 19, 2012, this Court lifted its stay as to Oilsands's officers and directors and as to McDaniels. In addition, the Court notes that on December 21, 2012, the parties filed a joint motion for preliminary approval of a class action settlement, which will be resolved in due course.

Dated: New York, NY
December 27, 2012

/s/ JED S. RAKOFF

JED S. RAKOFF, U.S.D.J.

**Exhibit K.2**
***In re Angiotech Pharmaceuticals, Inc., et al.*, No. 11-10269**
**(Bankr. D. Del. Feb. 22, 2011) [Docket No. 83]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------- x

In re                                             : Chapter 15
                                                  :
Angiotech Pharmaceuticals, Inc., et al.[1]        : Case No. ~~11-10629 (KG)~~ *11-10269*
                                                  :
                                                  : Jointly Administered
Debtor in a Foreign Proceeding.                   :
--------------------------------------------------------------- x **Ref. Docket Nos. 1 and 7**

## ORDER GRANTING FINAL RELIEF IN AID OF
## CANADIAN PROCEEDING PURSUANT TO SECTIONS
## 105(a), 1517, 1520, AND 1521 OF THE BANKRUPTCY CODE

Upon consideration of the Verified Petitions commencing these cases and the motion (the

"**Motion**")[2] of Alvarez & Marsal Canada Inc. (the "**Monitor**"), in its capacity as the court-

appointed monitor and authorized foreign representative of the above-captioned debtors

(collectively, the "**Debtors**") in a proceeding (the "**Canadian Proceeding**") under *Canada's*

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the

Supreme Court of British Columbia (the "**Canadian Court**"), pursuant to sections 105(a), 1517,

1519, 1520, and 1521 of title 11 of the United States Code (the "**Bankruptcy Code**"), seeking:

(a) entry of a provisional order (the "**Provisional Relief Order**") applying sections 362 and

365(e) of the Bankruptcy Code in these chapter 15 cases, pursuant to sections 1519(a)(3),

---

[1]     The last four digits of the United States Tax Identification Number or Canadian Business Number of the
Debtors, as applicable, follow in parentheses: (i) 0741693 B.C. Ltd. (1270); (ii) Afmedica, Inc. (3293);
(iii) American Medical Instruments Holdings, Inc. (1114); (iv) Angiotech America, Inc. (4001);
(v) Angiotech BioCoatings Corp. (8560); (vi) Angiotech Delaware, Inc. (6401); (vii) Angiotech Florida
Holdings, Inc. (9389); (viii) Angiotech International Holdings, Corp. (2274); (ix) Angiotech
Pharmaceuticals, Inc. (6269); (x) Angiotech Pharmaceuticals (US), Inc. (9490); (xi) B.G. Sulzle, Inc.
(4551); (xii) Manan Medical Products, Inc. (3265); (xiii) Medical Device Technologies, Inc. (3996);
(xiv) NeuColl, Inc. (8863); (xv) Quill Medical, Inc. (7914); (xvi) Surgical Specialties Corporation (9848);
and (xvii) Surgical Specialties Puerto Rico, Inc. (3379). The Debtors' executive headquarters' addresses
are 1618 Station Street, Vancouver, BC A1 V6A 1B6, Canada, and 1633 Westlake Ave N., Suite 400,
Seattle, WA 98109.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

1

1521(a)(7), and 105(a) of the Bankruptcy Code; (b) entry of this final order (this "**Recognition Order**") after notice and a hearing (i) granting the petitions in these cases and recognizing the Canadian Proceeding as a foreign main proceeding under section 1517 of the Bankruptcy Code, (ii) giving full force and effect in the United States to the Initial Order, including any extensions or amendments thereof authorized by the Canadian Court, and (iii) granting the Debtors' postpetition lenders certain protections afforded by the Bankruptcy Code; and (c) such other and further relief as this Court deems just and proper; and upon the First Day Declarations and the Memorandum of Law; and upon the Order Granting Provisional Relief Pursuant to Sections 105(a), 1519, 1520 and 1521 of the Bankruptcy Code Docket No. 26 (the "**Provisional Relief Order**") previously entered by this Court; and the Court having considered the *Limited Objection of the Affected FRN Holders to the Motion for Final Relief in Aid of Canadian Proceeding* (the "**FRN Objection**"), the *United States' Objection to the Motion to Approve Final Relief in Aid of Canadian Proceeding*, and the *Limited Objection by the United States to Motion for Provisional and Final Relief in Aid of Canadian Proceedings and Motion for Extension of Time*, and the *Response of the Monitor*, the accompanying *Declaration of John F. Grieve* in support of the *Response of the Monitor*, and the *Debtors' Response and Joinder to Response of Monitor* filed in response to the FRN Objection; and any objections to the Motion that have not been withdrawn or resolved having been overruled; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that venue of the Chapter 15 Cases and the Motion in this District is proper pursuant to 28 U.S.C. § 1410(1); and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that notice of the Motion has been given as set forth in the Motion and that such notice is adequate and no other or further notice need be given under the circumstances; and

2

upon the record of the hearing on the Motion; and the Court having found and determined that

the relief sought in the Motion is consistent with the purpose of chapter 15 of the Bankruptcy

Code and that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, the Court finds

and concludes as follows:

(i)     The Monitor is a person within the meaning of section 101(41) of the Bankruptcy Code and is the duly appointed foreign representative of each of the Debtors within the meaning of section 101(24) of the Bankruptcy Code.

(ii)    The Chapter 15 Cases were properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code.

(iii)   The Chapter 15 Petitions meet the requirements of section 1515 of the Bankruptcy Code.

(iv)    The Canadian Proceeding is entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

(v)     The Canadian Proceeding pending in the Canadian Court, in the location that is the Debtors' center of main interest, constitutes a foreign main proceeding pursuant to section 1502(4) of the Bankruptcy Code and is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

(vi)    The Monitor as a foreign representative is entitled, to the extent not inconsistent with the Initial Order, to all of the relief provided pursuant to section 1520 on the Bankruptcy Code.

(vii)   The Monitor has demonstrated that the borrowing authorized by the Initial Order is necessary to prevent a deterioration of value, which could result in significantly decreased recovery for the Debtors' creditors.

(viii)  The Monitor has demonstrated that the terms of the postpetition financing (the "**DIP Facility**") and the Credit Agreement (the "**DIP Credit Agreement**") entered into by and among Debtors and the agent and lenders that are party thereto (collectively, the "**DIP Lender**"), as approved in the Initial Order (in draft form), are fair and reasonable and were entered into in good faith by the Debtors and the DIP Lender and that the DIP Lender would not extend financing without the protection

3

provided by section 364(e) of the Bankruptcy Code, as made applicable by section 1521(a)(7) of the Bankruptcy Code.

(ix)   The relief granted herein is necessary and appropriate, in the interest of the public and international comity, consistent with the public policy of the United States, warranted pursuant to section 1521 of the Bankruptcy Code, and will not cause any hardship to any parties in interest that is not outweighed by the benefits of the relief granted.

## NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.   The Motion is granted.

2.   The Petitions are granted and the Canadian Proceeding is hereby recognized as a "foreign main proceeding" pursuant to section 1517(b)(1) of the Bankruptcy Code.

3.   The Initial Order, including any extensions or amendments thereto, is hereby enforced on a final basis and given full force and effect in the United States.

4.   All relief afforded a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code is hereby granted without limitation. Specifically, the automatic stay provisions of section 362, except as expressly provided otherwise in paragraphs 48(b) and (c) of the Initial Order, and the provisions of section 363 of the Bankruptcy Code apply with respect to the Debtors and any property of the Debtors that is within the territorial jurisdiction of the United States throughout the duration of these chapter 15 cases or until otherwise ordered by this Court.

5.   Pursuant to section 1521(a)(6) of the Bankruptcy Code, all other prior relief granted pursuant to the Provisional Relief Order pursuant to section 1519(a) of the Bankruptcy Code is hereby extended on a final basis.

6.   Nothing herein shall enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding against any party to the extent set forth in sections 362(b) or 1521(d) of the Bankruptcy Code.

4

7.      Pursuant to the Initial Order, the Debtors are hereby authorized and
empowered to enter into the DIP Credit Agreement, substantially in the form attached to the
Motion as Exhibit A, and are authorized and empowered to borrow, repay, and reborrow up to
$28 million from the DIP Facility under and in accordance with the terms of the DIP Credit
Agreement.

8.      The Debtors are hereby authorized and empowered to execute and deliver
such credit agreements, mortgages, charges, hypothecs and security documents, guarantees and
other definitive documents (collectively, the "**Definitive Documents**") as are contemplated by
the DIP Credit Agreement or as may be reasonably required by the DIP Lender pursuant to the
terms thereof, and the Debtors are hereby authorized and directed to pay and perform all of their
indebtedness, interest, fees, liabilities, and obligations to the DIP Lender under and pursuant to
the DIP Credit Agreement and the Definitive Documents, including, but not limited to, the fees
and expenses of the DIP Lender's Canadian and United States counsel, and other advisors, as
and when the same become due and are to be performed, notwithstanding any other provision of
this Order.

9.      Pursuant to section 364 of the Bankruptcy Code and subject to the
priorities, terms, and conditions of the Initial Order, to secure current and future amounts
outstanding under the DIP Credit Agreement, the DIP Lender is hereby granted the DIP Lender's
Charge on all of the Debtors' United States assets in the maximum amount of all DIP
Obligations (as defined in the Initial Order) outstanding under the DIP Facility at any given time.

10.     Any obligations incurred by the Debtors as a result of entering into or
performing their obligations under the DIP Credit Agreement do not and will not constitute

5

preferences, fraudulent conveyances or transfers, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

11.    The Definitive Documents have been negotiated in good faith and at arms' length between the Debtors and the DIP Lender. Any financial accommodations made to the Debtors by the DIP Lender pursuant to the Initial Order and the Definitive Documents shall be deemed to have been made by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code. Accordingly, pursuant to sections 105(a) and 1521(a)(7) of the Bankruptcy Code, section 364(e) of the Bankruptcy Code hereby applies for the benefit of the DIP Lender, and the validity of the indebtedness, and the priority of the liens authorized by the Initial Order made enforceable in the United States by this Recognition Order, shall not be affected by any reversal or modification of this Recognition Order on appeal or the entry of an order denying recognition of the Canadian Proceeding pursuant to section 1517 of the Bankruptcy Code.

12.    Notwithstanding any other provision of this Order: (a) the DIP Lender may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lender's Charge or any of the Definitive Documents; provided, however, that the DIP Lender's Charge shall be and hereby is deemed a fully perfected lien and security interest, effective and perfected upon entry of this Recognition Order without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, and other agreements or instruments, such that no additional steps need be taken by the DIP Lender to perfect the DIP Lender's Charge; (b) the DIP Lender may cease making advance payments to the Debtors in accordance with, and as provided in, the DIP Credit Agreement; (c) upon the occurrence of an event of default under the

6

DIP Credit Agreement, or the DIP Lender's Charge, the DIP Lender and/or agent and the lenders under the Wells Fargo Credit Agreement (as defined in the Initial Order), may, upon five days' notice to the Debtors and the Monitor, (i) exercise any and all of its, or their, rights and remedies against the Debtors or the Property (as defined in the Initial Order) under or pursuant to the Wells Fargo Credit Agreement, the DIP Credit Agreement, the Definitive Documents and the DIP Lender's Charge, including without limitation, to set-off and/or consolidate any amounts owing to the DIP Lenders and/or the agents and lenders under the Wells Fargo Credit Agreement by the Debtors against the DIP Obligations (as defined in the Initial Order), the Definitive Documents, the DIP Lender's Charge or the Obligations under the Wells Fargo Creditor Agreement, to make demand, accelerate payment and give other notices or to apply to court for the appointment of a receiver, receiver manager or interim receiver, or for a bankruptcy order against the Debtors and for the appointment of a trustee in bankruptcy of the Debtors; and (ii) the DIP Lender, the agent and lenders under the Wells Fargo Credit Agreement shall be entitled to seize and retain proceeds from the sale of the Property and the cash flow of the Debtors to repay amounts owing to the lenders under the Wells Fargo Credit Agreement and the DIP Lender under the DIP Facility in each case, in accordance with the Definitive Documents and the DIP Lender's Charge, but subject to the priorities as set out in paragraphs 55 and 57 of the Initial Order. The foregoing rights and remedies of the DIP Lender and the agent and lenders under the Wells Fargo Credit Agreement in this paragraph 11 shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Debtors or the Property.

13.    No action taken by the Monitor, the Debtors, or each of their successors, agents, representatives, advisors, or counsel, in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the Canadian

7

Proceeding, this Recognition Order, or the Chapter 15 Cases or any adversary proceeding therein, or any further proceeding commenced thereunder, shall be deemed to constitute a waiver of the immunity afforded such person under sections 306 and 1510 of the Bankruptcy Code.

14.     The Chapter 15 Petitions, the Motion, the Provisional Relief Order and this Recognition Order shall be made publicly available by the Monitor on its website at www.alvarezandmarsal.com/angiotech or upon request to its counsel, Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020, Attn. Jonathan Cho, Esq.

15.     Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) this Recognition Order shall be effective immediately and enforceable upon its entry; (b) neither the Monitor, nor the DIP Lender, nor the agent and lenders under the Wells Fargo Credit Agreement (to the extent provided in paragraphs 48(b) and (c) of the Initial Order), is subject to any stay in the implementation, enforcement or realization of the relief granted in this Recognition Order; and (c) the Monitor is authorized and empowered, and may in its discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Recognition Order.

16.     This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Recognition Order, any requests for additional relief or any adversary proceeding brought in and through the Chapter 15 Cases, and any request by an entity for relief from the provisions of this Recognition Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

Dated: Wilmington, Delaware
       FEB. 22, 2011

       17. See rider attached
       , hereto.

UNITED STATES BANKRUPTCY JUDGE

8

17. In light of the FRN Objection having been withdrawn by certain minority holders of senior floating rate notes (the "Minority FRN Holders") on the record at the February 22, 2011 hearing with respect to the Court's consideration of the Motion as a result of the Minority FRN Holders, the Debtors, and the Subordinated Noteholder Group (as defined in the Minority FRN Objection) having settled the Minority FRN Objection by reaching agreement on terms regarding the Exchange ~~Transaction~~ Offer (as defined in the FRN Objection) as set forth in that certain Sixth Agreement ~~Amendment~~ to Amend the Floating Rate Support Agreement (the "Sixth Amendment") and the Fee Undertaking (as defined in the Sixth Amendment, the "FRN Settlement"), all parties' rights to seek relief in the appropriate forum, in the event the FRN Settlement is not executed by the parties thereto or the FRN Settlement fails to be consummated or fully performed shall be and is hereby reserved in all respects.

### Exhibit K.3
### *In re Bd. of Directors of Telecom Argentina S.A.*, No. 05-17811 (BRL), 2006 WL 686867 (Bankr. S.D.N.Y. Feb. 24, 2006), *aff'd sub nom. Argo Fund Ltd. v. Bd. of Dirs. of Telecom Argentine, S.A. (In re Bd. of Dirs. of Telecom Argentina, S.A.)*, 528 F.3d 162 (2d Cir. 2008)

2006 WL 686867
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
S.D. New York.

In re: BOARD OF DIRECTORS OF
TELECOM ARGENTINA S.A. as Foreign
Representative of Telecom Argentina
S.A., Debtor in Foreign Proceeding.

No. 05–17811 (BRL).    |    Feb. 24, 2006.

**Attorneys and Law Firms**

Davis Polk & Wardwell, New York, New York, By: Karen E. Wagner, Trisha Lawson, Charles R. Nightingale, Jordan Leigh Santeramo, for Petitioner Telecom Argentina.

Kasowitz, Benson, Torres & Friedman LLP, New York, New York, By: Michael M. Fay, David S. Rosner, Kim Conroy, for Respondent The Argo Fund, Ltd.

Dorsey & Whitney LLP, Minneapolis, Minnesota, By: Christopher T. Lenhart, for U.S. Bank National Association, as Indentured Trustee.

**Opinion**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING SECTION 304 PETITION AND ISSUING DECLARATORY RELIEF

LIFLAND, Bankruptcy J.

**\*1** Upon all the pleadings and submissions filed herein by petitioner, the Board of Directors of Telecom Argentina, S.A. (the "Board"), as foreign representative of Telecom Argentina, S.A. ("Telecom Argentina"), and by respondent, The Argo Fund Ltd. ("Argo"); and upon the record of and the evidence adduced at the trial held before this Court on December 12, 2005 (the "Hearing"), to consider the petition for an order under section 304 of title 11 of the United States Code (the "Bankruptcy Code"), granting recognition to a final order of a Court in Argentina approving the restructuring of Telecom Argentina under Argentine law pursuant to an *acuerdo preventivo extrajudicial* ("APE"), and Argo's objection to such request, and having received testimonial evidence submitted by petitioner's and respondent's witnesses, and having reviewed

the evidence submitted; and keeping in mind that a court should not blindly accept findings of fact and conclusions of law proffered by the parties, *see St. Clare's Hospital and Health Center v. Insurance Company of North America (In re St. Clare's Hospital and Health Center )*, 934 F.2d 15 (2d Cir.1991) (citing *United States v. El Paso Natural Gas Co., 376 U.S. 651, 656 (1964)*), and having conducted an independent analysis of the law and the facts, this Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

*The Parties*

1. Telecom Argentina is a *sociedad anonima* organized under Argentine law, with its principal place of business at Alicia Moreau de Justo 50, Buenos Aires, Argentina. Telecom Ex. 1 (Caride Trial Decl.) ¶ 2. [1] Telecom Argentina provides public telecommunications services in Argentina, in particular, fixed-line local, national and international long distance services, data transmission, and access to Internet service. *Id.* Through its subsidiaries, it also provides mobile telecommunications services in Argentina and Paraguay. *Id.*

2. Argo, a Cayman Island-based entity, is an emerging markets fund which, in its own name or through affiliates, beneficially owns over U.S. $35 million in notes (the "Notes") issued by Telecom. [Argo Ex. 3, ¶¶ 2–4 (Declaration of Andreas Rialas, sworn to on December 8, 2005); Docket No. 32; Respondent The Argo Fund, Ltd's Answer, Defenses and Objections to the Verified Petition of Telecom Argentina, S.A., dated October 11, 2005, Docket No. 10]. The Notes were issued pursuant to the Trust Indenture Act of 1939 ("TIA"). [Argo Ex. 3 at Ex. 2, p. i, §§ 4.07, 7.06; Telecom Ex. 1 at Ex. M]

3. U.S. Bank, National Association ("US Bank"), is a national banking association which serves as the Indenture Trustee for the Notes. [Telecom Ex. 1, ¶ 4]

*Background*

4. In late 2001, after almost four years of economic recession, Argentina spiraled into a deep political, economic and social crisis. Telecom Ex. 1 (Caride Trial Decl.) ¶ 6. The economic environment in Argentina deteriorated, and in the first six months of 2002, the Argentine peso, which had been pegged to the U.S. dollar at a fixed rate, was devalued and permitted to float freely. *Id.* In addition, Argentina

In re Board of Directors of Telecom Argentina S.A., Not Reported in B.R. (2006)

promulgated laws that converted the rates of services charged to customers and due to Telecom Argentina into pesos. *Id.* Moreover, Argentina also prohibited increases in public service rates or indexing of tariffs to foreign currencies, and created uncertainties concerning Telecom Argentina's ability to increase its rates. *Id.* Thus, Telecom Argentina was being paid in a rapidly devaluing peso, was prevented from adjusting its rates, yet was required to pay its foreign financial debt obligations in foreign currency. The result was a severe liquidity crisis. *Id.*

**\*2** 5. As of December 31, 2001, Telecom Argentina was the obligor on approximately US$3.3 billion of debt (the "Old Debt") on a consolidated basis, including both notes issued in Europe and the United States (the "Old Notes"), and debt issued under various credit agreements in the United States and elsewhere which, together with the notes, constituted the Old Debt. *Id.* at ¶ 7. As of December 31, 2001, the Old Debt included:

- The equivalent of approximately US$1,572 million aggregate principal face amount of outstanding Old Notes issued under medium term note programs;

- The equivalent of approximately US$1,626 million aggregate principal face amount of outstanding loans owed to financial institutions relating to working capital loans, debt issuances and trade financings; and

- The equivalent of approximately US$52 million in accrued but unpaid interest (including penalties and post-default interest rate increases) on outstanding notes and outstanding loans, calculated, in each case, at the rate specified in these notes and loans.

*Id.*

6. On February 27, 2002, Telecom Argentina hired Morgan Stanley & Co. Inc. and MBA Banco de Inversiones S.A. as its financial advisors to develop a comprehensive plan to restructure the Old Debt. *Id.* at ¶ 8.

7. On April 2, 2002, Telecom Argentina publicly informed investors of the need to suspend principal payments on all of its Old Debt, and, on June 24, 2002, announced the suspension of interest payments. Telecom Ex. 1, Tabs A (Press Release, dated 4/2/02) and B (Press Release, dated 6/24/02).

8. Throughout the restructuring process, Telecom Argentina communicated both formally and informally with its

creditors. Telecom Ex. 1 (Caride Trial Decl.), ¶ 10. Telecom Argentina posted, in Spanish, English and Italian, press releases concerning its debt restructuring efforts on its public website. *Id.; see http://www.telecom.com.ar/index-flash.html.*

9. Telecom Argentina also worked with a group of creditors acting as an *ad hoc* creditors' committee (the "Committee"). *Id.* at ¶ 11. On June 4, 2002, Telecom Argentina received a letter from the Committee requesting negotiations regarding the restructuring. *Id.* Telecom Argentina indicated its willingness to work with the Committee, and agreed to pay for the Committee's U.S. counsel, Cleary Gottlieb Steen & Hamilton LLP, and Argentine counsel, Errecondo, Salaverri, Dellatore, Gonzalez & Burgio Abogados. *Id.*

10. Telecom Argentina held an initial meeting with the Committee in Buenos Aires in mid–2002. *Id.* at ¶ 12.

11. On September 17, 2002, Telecom Argentina held a meeting with members of the Committee where the June 30, 2002 earnings results were reviewed, together with Telecom Argentina's business plan. *Id .* at ¶ 13.

12. On October 3, 2002, Telecom Argentina met again with the Committee in Buenos Aires to provide additional information on its financial condition and business plan, and to present its initial proposal for restructuring the Old Debt on a consensual basis. *Id.* at ¶ 14. The participants discussed the amount of debt to be issued to the holders of Old Debt and rates of interest thereon, whether any equity or equity-linked instrument would be issued to creditors, the amount and terms of any equity capital that creditors would receive, the extent, if any, to which a part of the new debt obligations would be collateralized, and the terms of specific covenants. *Id.*

**\*3** 13. The Committee first presented formal comments on Telecom Argentina's proposal in a letter dated October 24, 2002, to which Telecom Argentina responded by letter and at a meeting held with the Committee on November 18, 2002. *Id.* at ¶ 15.

14. During the week of December 16, 2002, Telecom Argentina held a series of meetings with members of the Committee to revise the assumptions and general guidelines used for the business plans. *Id .* at ¶ 16.

15. On February 5, 2003, Telecom Argentina presented a revised restructuring proposal to the Committee which

included an equity participation and, as an initial step in the restructuring, a proposal to conduct a cash tender offer for a portion of its financial debt obligations and to make partial interest payments on the financial debt obligations. *Id.* at ¶ 17. While the Committee did not endorse either, it indicated that it would not block the tender offer. *Id.*

16. Telecom Argentina publicly announced its intention to launch the tender offer on February 12, 2003. *Id.* at ¶ 18. Press releases and other information regarding the transaction were posted on Telecom Argentina's public website. *Id.*

17. The tender offer commenced on April 16, 2003 and expired on June 2, 2003. *Id.* at ¶ 19. The offering document for the cash tender offer also described the restructuring proposal. *Id.* Cash consideration for the tender offer and partial interest payments were paid on June 9, 2003. *Id.* Telecom Argentina was able to purchase and retire the equivalent of approximately US$208 million of its outstanding financial indebtedness for the equivalent of approximately US$115 million (representing a 45% discount), and repaid a portion of the accrued interest on all of its financial indebtedness for an equivalent of US $98 million. *Id.*

18. After the expiration of the tender offer, Telecom Argentina and the Committee continued to negotiate. *Id.* at ¶ 20. No mutually acceptable proposal emerged. *Id.*

19. Between October 29, 2003 and January 8, 2004, Argo purchased 560,000 Euro of Old Notes. Argo Ex. 3 (Rialas Decl.), Tab A.

20. On January 9, 2004, Telecom Argentina announced its own restructuring proposal pursuant to an *Acuerdo Preventivo Extrajudicial* ("APE"), an out-of-court restructuring agreement governed by Argentine law. Telecom Ex. 1, Tab C (Press Release, dated 1/9/04).

21. On January 9, 2004, Argo purchased an additional 5,000,000 Euro of Old Notes. Argo Ex. 3 (Rialas Decl.), Tab A.

22. On January 23, 2004, Telecom Argentina was informed that the Committee believed its proposal was not acceptable. Telecom Ex. 1 (Caride Trial Decl.) ¶ 20.

23. The Board determined to go forward with the APE process, finding it to be the appropriate method by which to effect the restructuring proposal. *Id.* at ¶ 21.

24. Since Telecom Argentina's debt was held in several countries, Telecom Argentina determined that it would conduct its solicitation of consents to the APE proposal pursuant to the applicable public offering regulations in Argentina, the United States and Italy. *Id .* at ¶ 22. Therefore, Telecom Argentina filed a registration statement (the "Registration Statement") describing the APE proposal with the U.S. Securities and Exchange Commission (the "SEC"). *Id.* Subsequent press releases and modifications were also filed with the SEC, and were reviewable on the SEC's EDGAR website. *Id.* A similar solicitation statement was filed with the Argentine and Italian securities regulators. *Id.*

 **\*4** 25. The initial APE proposal offered the holders of Telecom Argentina's Old Debt three different consideration options, including a mix of fixed rate, floating rate and pay-in-kind debt securities (the "New Notes"), and a cash alternative. *Id.* at ¶ 23. Telecom Argentina also proposed to make a partial cash interest payment to each holder for the period from January 1, 2004 through the issuance date of the New Notes. *Id.*

26. On April 7, 2004, the Committee submitted a preliminary response to Telecom Argentina's proposal. *Id.* at ¶ 24. Thereafter, Telecom Argentina made modifications based on the concerns and comments of the creditors. *Id.*

27. During the week of April 12, 2004, Telecom Argentina held meetings in New York City at which representatives of Telecom Argentina, its financial advisors and counsel, and representatives of the Committee and its counsel were present, in order to negotiate an amended proposal. *Id.* at ¶ 25.

28. On May 10, 2004, Telecom Argentina announced the timeline for the commencement of the solicitation process and the terms of a modified proposal which represented the core details of the final proposal and reflected the concerns expressed by the Committee. *Id .* at ¶ 26. Among other things, in accordance with the Committee's feedback, the amended proposal simplified the terms of the consideration offered to the creditors and provided for higher interest rates for the New Notes. *Id.* The modified proposal also included modifications to the terms of the covenants, made at the insistence of the Committee, to provide further protections and benefits for creditors. *Id.* The full details of the proposal were set forth in Amendment No. 1 to the Registration Statement, which was filed with the SEC and other agencies on May 11, 2004. *Id.*

29. The Committee and its counsel, as well as a representative of Italian noteholders, and other creditors, worked with Telecom Argentina to finalize the proposed form of the APE, the form of indenture for the New Notes to be issued under the APE, and other relevant documentation. *Id.* at ¶ 27.

30. On June 22, 2004, Telecom Argentina filed Amendment No. 2 to the Registration Statement. *Id.* at ¶ 28. The Committee supported the proposal. *Id.* On July 9, 2004, the solicitation statement was again amended to reflect modifications to the proposal reflecting negotiations with creditors of a significant subsidiary. Telecom Ex. 1, Tab D (Final Solicitation Statement). The statement was also filed with Argentine and Italian securities regulators. Telecom Ex. 1 (Caride Trial Decl.), ¶ 28.

31. Telecom Argentina publicized the final solicitation by issuing press releases and distributing the solicitation statement to its creditors through the holders of record and/ or the clearing systems [2] that held the Old Debt. *Id.* at ¶ 29. Telecom Argentina also hired a proxy service, GSC Proxitalia, to assist with the dissemination of the solicitation statement and investor inquiries in the United States, Italy and Argentina. *Id.*

**\*5** 32. In the weeks of June 28, 2004 and July 5, 2004, Telecom Argentina marketed the final restructuring proposal by means of a roadshow in Miami, New York, London, Milan and Geneva. *Id.* at ¶ 30. During the roadshow, Telecom Argentina met with several institutional investors and described the final proposal. *Id.* During the week of July 12, 2004, Telecom Argentina held meetings in Buenos Aires with participant banks and investors to describe the final debt restructuring proposal. *Id.*

33. The APE solicitation period expired on August 6, 2004 (in Italy, on July 30, 2004). *Id.* at ¶ 31.

34. Telecom Argentina took the position that all consenting creditors affected by the APE must be treated equally. Its proposals provided that all holders of Old Debt be given three consideration options, which were, generally:

- Option A: New Notes due 2014 (the "Series A notes") to be issued in an amount equal to the principal face amount of the outstanding notes, plus an adjustment for a portion of the unpaid interest; or

- Option B: New Notes due 2011 (the "Series B notes") (constituting, together with the Series A notes, the New

Notes) which were to have a shorter maturity and higher interest rate, but which were to be issued at a discount of approximately 5.5% to the principal face amount and adjustment for a portion of the unpaid interest (creditors selecting Option B agreed to have up to 37.5% of their debt allocated into the cash option described below); or

- Option C: A cash payment in equivalent U.S. dollars at a price not greater than 850 nor less than 740, to be determined pursuant to a "Modified Dutch Auction."

*Id.* at ¶ 32.

35. Depending on their elections, creditors would be paid amounts ranging from 80.3% (for creditors electing the cash option) to 100% (for creditors electing to receive Series A notes) of the outstanding principal face amount of their claims plus an adjustment factor that represented a portion of unpaid interest. *Id.* at ¶ 33. According to Telecom Argentina's Argentina law expert, Dr. Lorente, the consideration options offered to creditors amounted to "the best consideration" he has ever seen in an APE. Tr. Lorente 31:18–31:20.

36. On August 23, 2004, Telecom Argentina announced that approximately *94.4%* in principal face amount, or approximately *82.4%* in number, of the holders of Old Debt had consented to the APE proposal. Telecom Ex. 1, Tab E (Press Release, dated 8/23/04) (emphasis supplied).

37. Between January 9, 2004 and August 26, 2004, Argo had purchased 14,010,000 Euro, 13,535,000,000 ITL and US $1,000,000 of Old Notes. Argo Ex. 3 (Rialas Decl.), Tab A.

38. The APE was executed on August 26, 2004. Telecom Ex. 1, Tab F (APE Agreement).

39. The next day, Argo purchased 2,755,000,000 ITL and 615,000 Euro of Old Notes. Argo Ex. 3 (Rialas Decl.), Tab A. On or about September 13, 2004, long after the commencement of the APE process, Argo wrote to First Trust of New York, N.A., the predecessor to U.S. Bank National Association ("U.S. Bank" or "Indenture Trustee") as Indenture Trustee for the Old Notes. Telecom Ex. 1, Tab M (Letter, dated 9/13/04). The letter stated that Argo held over US$20 million principal amount of Old Notes, and requested that the Indenture Trustee not exchange Argo's Old Notes, stating that Argo would take all actions necessary to enforce its rights under the Old Notes in the United States. *Id.*

In re Board of Directors of Telecom Argentina S.A., Not Reported in B.R. (2006)

**\*6** Argo has been informed that in issuing the APE Notes, Telecom Argentina is purportedly availing itself of foreign insolvency proceedings. This contention cannot justify the forced exchange of the Notes for APE Notes. First, any such insolvency laws cannot supersede the mandates of the TIA. Second, Telecom Argentina is clearly not insolvent.

*Id.*

40. On October 21, 2004, Telecom Argentina submitted its APE to the *Juzgado Comercial No. 19, Secretaria No. 38* (the National Commercial Court No. 19) in Buenos Aires, Argentina (the "Argentine Court"), commencing a proceeding under Chapter VII, Title II of Law No. 24,522, as amended (the "Argentine Insolvency Law"). Telecom Ex. 1 (Caride Trial Decl.), ¶ 35.

41. Argo had purchased an additional 2,296,000 Euro, 2,755,000,000 ITL and US \$120,000 of Old Notes between August 27, 2004 and October 21, 2004. Argo Ex. 3 (Rialas Decl.), Tab A. On November 10, 2004, Argo purchased another 66,000 Euro of Old Notes. *Id.*

42. On December 6, 2004, the Argentine Court ordered Telecom Argentina to convene a meeting of noteholders at which they would vote on the APE and select a consideration option. Telecom Ex. 3, Tab F (Argentine Court Order, dated 12/6/04). The Argentine Court ordered Telecom Argentina to publish notices of the meeting for five business days in specified newspapers in Argentina as well as in other markets where the Old Notes were issued. *Id.* In addition, the Court designated examiners to verify the submission of consents to the APE pursuant to the solicitation and oversee the outcome of the noteholders meeting. *Id.*

43. From January 3, 2005 through January 7, 2005, Telecom Argentina published notices that the noteholders meeting would be held on February 4, 2005, in compliance with the Argentine Court's order. Telecom Ex. 1 (Caride Trial Decl.), ¶ 37. Notice was published in the United States in the Wall Street Journal. Telecom Ex. 1, Tab G (Wall Street Journal Notice). Notice was also published in the London Financial Times, the Luxemburg Wort, Il Sole 24 Ore of Italy, the Buenos Aires Stock Exchange Bulletin, and six

widely distributed Argentine newspapers (collectively, the "Journals"). Telecom Ex. 1 (Caride Trial Decl.), ¶ 37.

44. On January 7, 2005, counsel for Argo sent another letter to the attorneys for U.S. Bank, the Indenture Trustee, claiming to be "a holder of over USD \$30 million in principal amount of notes" under the March 2000 Indenture, informing U.S. Bank of Telecom Argentina's February 4, 2005 bondholder meeting and indicating its refusal to "[support] the Agreement or [elect] any of the options under that Agreement on February 4." Telecom Ex. 1, Tab N (Letter, dated 1/7/05).

45. Argo warned the Indenture Trustee that if it "(a) takes any action as a result of the Agreement that results in the release, cancellation, transfer or exchange of the Notes in which Argo holds a beneficial interest; or (b) acts in any way to facilitate the terms of the Agreement and deprive Argo of its rights under these Notes" without Argo's written consent, Argo would "use all available means to enforce its rights." *Id.*

**\*7** As we have previously discussed, Telecom Argentina has publicly announced that it intends to hold a bondholder meeting in Buenos Aires, Argentina, on February 4, 2005, for the purpose of seeking approval for a purported Out–of–Court Reorganization Agreement ("Agreement"). (A copy of a notice that appeared in the January 3, 2005 edition of the *Wall Street Journal* is attached.) Through this Agreement, Telecom Argentina seeks to compel Note holders to accept new notes (the "APE Notes") which bear a lower interest payment obligation and have a longer period of maturity than the Notes. Such efforts clearly violate the provisions of the Trust Indenture Act of 1939, which are expressly incorporated in the Notes.

Although Telecom Argentina contends that the Agreement is part of a U.S.-like bankruptcy plan of reorganization, it is not, and the Agreement violates one of the most fundamental protections provided creditors under U.S. law: the best interests test. Telecom Argentina, with over \$2 billion in market capitalization, is solvent. Accordingly, the Note holders that U.S. Bank represents are entitled to payment in full with interest to the date of payment. The Agreement provides far less.

Further, the Agreement violates a second fundamental creditor right: absolute priority. Here, the shareholders of Telecom Argentina will, under the terms of the Agreement, retain 100 percent of their investment in Telecom, which creditors will be compelled to accept

less than 100 percent of the amounts they are owed. Indeed, since Telecom Argentina announced its plan to exchange the Notes for APE Notes, Telecom shares have risen significantly; clearly, bondholder value is being stripped and redistributed to shareholders.

*Id.*

46. Counsel for U.S. Bank responded on January 14, 2005, agreeing not to cancel or transfer Argo's Old Notes, but stating that the "confirmation is subject to actions that [the Indenture Trustee] may be legally required to take pursuant to or under force of law, including without limitation, court orders and governing documents, such as the Indenture." Telecom Ex. 1, Tab O (Letter, dated 1/14/05).

47. The noteholders meeting was held in Buenos Aires on February 4, 2005. Telecom Ex. 1 (Caride Trial Decl.), ¶ 38. Participants included one consenting creditor appearing in person; a representative of non-Italian noteholders appearing via powers of attorney; a representative of Italian noteholders acting via powers of attorney; and the Indenture Trustee for the Old Notes. *Id.* All noteholders participating in person or voting by proxy cast ballots in favor of the APE. *Id.*

48. The Argentine Court examiners reviewed the solicitation materials and each letter of transmittal submitted by the holders of the debt instruments together with certificates issued by the clearing systems to verify the completeness of the documentation and the accuracy of the calculations of the majorities achieved in the solicitation. *Id.* at ¶ 39.

**\*8** 49. On February 25, 2005, after conducting an examination of the procedural fairness of the APE solicitation process and verifying the completeness of the documentation and the accuracy of the calculations of the majorities achieved during that process, the Argentine Court accepted the APE as having been duly and validly approved by the requisite majorities under the Argentine law. Telecom Ex. 1, Tab H (Argentine Court Order, dated 2/25/05).

50. The Court ordered Telecom Argentina to publish notices of the approval of the APE in specified newspapers in Argentina, as well as in other markets where the Old Notes were issued, and granted creditors the right to assert any objections regarding the APE before April 7, 2005. *Id.* The Court also imposed a "general restraint on the disposition of the debtor's property." *Id.*

51. From March 4, 2005 to March 22, 2005, Telecom Argentina published notices of the approval of the APE in the Journals. Telecom Ex. 1 (Caride Trial Decl.), ¶ 41.

52. Subsequently, creditors raised four objections with the Argentine Court.

  a) Two tax authorities objected on the grounds that the amounts owed to them were greater than the ones reported by Telecom Argentina in the statement of assets and liabilities filed with the Argentine Court in connection with the APE.

  b) One creditor objected to the form of consideration to be provided to non-consenting and absent creditors and requested that non-consenting and absent creditors be permitted to elect the form of consideration to be paid to them.

  c) One creditor objected on the grounds that (i) the consideration to be paid to the creditors under the APE was less than Telecom Argentina's liquidation value and (ii) Telecom Argentina failed to include a bankruptcy petition in the list of judicial proceedings required to be filed with the Argentine court together with the APE.

Telecom Ex. 1 (Caride Trial Decl.), ¶ 42; Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05).

53. It is not disputed that neither Argo nor U.S. Bank raised any objections with the Argentine Court.

54. Argo's letters to the Indenture Trustee demonstrate that Argo had notice of Telecom Argentina's APE proceedings, and had articulated its objections to the Indenture Trustee. Nevertheless, Argo failed to bring these objections to the attention of the Argentine Court.

55. Telecom Argentina responded to the four objections raised by creditors. Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05).

56. On May 26, 2005, the Argentine Court overruled the objections and issued the Approval Order, approving the APE. *Id.*

57. Noting Telecom Argentina's business crisis, the Court overruled all objections and held that the APE was not abusive, fraudulent or discriminatory.

In respect of the proposal made, taking into consideration the restructuring sought as a means of turning around the business crisis, the elements provided to the case by the debtor and those required by the Court, such proposal does not appear to be abusive, fraudulent or discriminatory in accordance with the applicable legal regulations.

**\*9**  *Id.*

58. The Court also ordered that Telecom Argentina grant those holders of Old Debt that had not selected a payment option under the APE the right to select one of the three consideration options available to consenting creditors. *Id.* To alert non-consenting and absent creditors of this right, the Court ordered Telecom Argentina to publish notice of the Approval Order stating that holders of Old Debt that had not selected a payment option under the APE had an additional ten court days following the last publication of the notices in which to do so. *Id.*

59. On June 16, 17 and 20, 2005, Telecom Argentina published notices in the Journals. Telecom Ex. 1 (Caride Trial Decl.) ¶ 43. Some creditors did avail themselves of the opportunity to elect payment. *Id.*

60. Telecom Argentina also advised the Court that it would establish a trust into which it would deposit the consideration for payment to any remaining non-consenting creditor. *Id.* at ¶ 44.

61. Meanwhile, during April and May 2005, Telecom Argentina held discussions regarding the procedures for completing the APE (the "Closing") with The Bank of New York,[3] the clearing systems and the Indenture Trustee. Telecom Ex. 1 (Caride Trial Decl.), ¶ 52. Because the APE provided that all of the Old Debt was to be cancelled upon receipt of the requisite consideration by the creditors, the discussions addressed the mechanics for cancellation. *Id.*

62. In the course of these discussions, U.S. Bank agreed that it would order the cancellation of the outstanding notes held by the consenting creditors at the Closing. *Id.* at ¶ 53. However, U.S. Bank indicated that, in the absence of an order from a U.S. court directing it to do so, it would not take any

action to cancel the Old Notes held by creditors who had not affirmatively consented to the APE or to cancellation. *Id.*

63. On May 30, 2005 Telecom Argentina wrote to U.S. Bank to request that it complete the APE and cancel the outstanding Old Notes at the Closing in accordance with the Argentine Court's Approval Order. Telecom Ex. 1, Tab P (Letter, dated 5/30/05).

64. U.S. Bank responded on June 3, 2005, stating that it would only agree to cancel the Old Notes held by consenting creditors and would not cancel Old Notes of nonconsenting creditors absent a U.S. court order that "governs the Indenture and the rights of noteholders." Telecom Ex. 1, Tab Q (Letter, dated 6/3/05).

65. On July 6, 2005, Argo purchased 400,000,000 ITL of Old Notes. Argo Ex. 3 (Rialas Decl.), Tab A.

66. On August 11, 2005, Telecom Argentina's Board of Directors passed a resolution (the "Resolution") authorizing the filing of the Section 304 Petition should U.S. Bank continue to refuse to cancel the Old Notes. Telecom Ex. 1, Tab T (Telecom Argentina Board Minutes).

67. On August 24, 2005, Telecom Argentina announced its intent to complete the Closing on August 31, 2005. Telecom Ex. 1, Tab J (Press Release, dated 8/24/05).

**\*10**  68. On August 31, 2005, the Closing occurred. Telecom Ex. 1 (Caride Trial Decl.), ¶ 46; Telecom Ex. 1, Tab K (Press Release, dated 8/31/05). Telecom Argentina paid, or made available to, creditors the consideration owing pursuant to the APE, and the Old Debt was extinguished as a matter of Argentine law. Telecom Ex. 1 (Caride Trial Decl.), ¶ 46.

69. In connection with the Closing, the Old Notes held by creditors that had consented to the APE were cancelled. *Id.* Approximately US$80 million of Old Notes, held by creditors who had not consented to the APE, were not cancelled. *Id.*

70. The consideration owing to non-consenting holders was paid into a trust. *Id.* That consideration has been made available for distribution to creditors that have acknowledged the extinguishment of their claims and have agreed to cancellation of the Old Notes. *Id.*

71. On the date of the Closing, Argo purchased 319,000 Euro of Old Notes. Argo Ex. 3 (Rialas Decl.), Tab A.

72. On September 6, 2005, Telecom Argentina again requested that U.S. Bank cancel the remaining Old Notes. Telecom Ex. 1, Tab R (Letter, dated 9/6/05). U.S. Bank again refused to do so. Telecom Ex. 1, Tab S (Letter, dated 9/12/05).

73. Between the August 31, 2005 Closing date and December 5, 2005, additional non-consenting creditors agreed to the terms of the APE and collected payments totaling approximately US$34,230,000. Telecom Ex. 1, Tab L (Chart of Positions of Non–Participating Creditors).

74. On September 9, 2005, Argo purchased US$1,640,625 of the New Notes issued under the APE. Argo Ex. 3 (Rialas Decl.), Tab A.

75. The Indenture Trustee's refusal to cancel the Old Notes held by the non-consenting creditors, notwithstanding the occurrence of the Closing, deprives Telecom Argentina, and those creditors who have consented to the APE, of the full benefit of the APE.

76. A failure by Telecom Argentina to adhere to the equality of treatment that was the basis for the APE and was mandated by the Approval Order would constitute a breach of the APE, and would violate Argentine law, *see, infra.* The evidence shows that a breach of the APE could also have a detrimental effect on Telecom Argentina's relationships with its current and future creditors and a negative impact on Telecom Argentina's ability to secure financing in the future.

### *Section 304 Proceedings and Trial*

77. On September 13, 2005, the Board filed a verified Section 304 petition commencing, on behalf of Telecom Argentina, a case ancillary to a foreign proceeding pursuant to Section 304 of the Bankruptcy Code. (Verified Petition For Relief Under 11 U.S.C. § 304 (Docket No. 1)).

78. The petition sought judgment declaring that the Approval Order and the APE should be given full force and effect in the United States, to the same degree as they are given effect in Argentina; that the Approval Order and the APE are binding on all creditors and their agents, as well as on any trustee or agent or other intermediary for the Old Notes, as they are in Argentina; and that, since the Closing had occurred, all of the Old Notes had been extinguished and must be cancelled. *Id.*

**\*11**  79. On September 21, 2005, U.S. Bank sent a notice to holders of the Old Notes informing them of the filing of

the 304 Petition and of the objection deadline. (U.S. Bank's Limited Objection to Relief Requested Under 28 U.S.C. § 2201 Pursuant to Section 304 Petition (Docket No. 9), at 3–4).

80. Thereafter, on October 11, 2005, U.S. Bank filed a limited objection to the Section 304 Petition, requesting the inclusion of certain language protective of the Indenture Trustee in any order granting the requested relief. (U.S. Bank's Limited Objection to Relief Requested Under 28 U.S.C. § 2201 Pursuant to Section 304 Petition (Docket No. 9)).

81. On October 11, 2005, Argo filed a purported answer ("Answer") to the Section 304 Petition. (The Argo Fund, Ltd.'s Answer, Defenses and Objections to the Verified Petition of Telecom Argentina, S.A. (Docket no. 10)). Argo also filed a motion to withdraw the reference of the Section 304 Petition in the United States District Court for the Southern District of New York ("District Court") on the grounds that consideration of Telecom Argentina's petition would require substantial and material consideration of the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa, *et seq.* ("Trust Indenture Act"). (Argo's Mem. of Law in Support of its Mot. to Withdraw the Ref. From the Bankr.Ct. Pursuant to 28 U.S.C. § 157(d) (Docket no. 12)).

82. Telecom Argentina filed a response, contending that withdrawal was unwarranted. (Pet.'s Mem. Of Law in Opposition to Mot. to Withdraw the Ref. (District Court Docket no. 6)).

83. On November 18, 2005, the District Court denied Argo's motion to withdraw the reference, finding that if the Trust Indenture Act was relevant at all, its application would be a routine matter, and that the critical question was whether the requirements of Section 304 were met, a matter squarely within the expertise of this Court. *In re Bd. of Dirs. of Telecom Argentina,* No. 05 Civ. 8803(SAS), 2005 U.S. Dist. LEXIS 28640, *11 (S.D.N.Y. Nov. 18, 2005).

84. Meanwhile, Argo had attempted to purchase approximately US$386,657.01 of the Old Notes but was prevented from doing so by the terms of Telecom Argentina's APE, which blocked the purchase of Old Notes after the Closing had occurred and the Old Notes had been extinguished. Argo Ex. 3 (Rialas Decl.), Tab A.

85. On November 11, 2005, Telecom Argentina moved *in limine* to prevent introduction of evidence addressing Telecom Argentina's financial eligibility to file an APE on the

grounds, *inter alia,* that no collateral attack of the Argentine Court's Approval Order would be permissible. (Pet.'s Mot. *in Limine* to Exclude the Testimony of Prof. Israel Shaked [proffered expert] and Evidence of Telecom Argentina's Financial Status (Docket no. 19)).

86. On November 22, 2005, this Court granted Telecom Argentina's motion *in limine* to prevent the introduction of evidence regarding Telecom Argentina's financial eligibility to file an APE. (Order Granting Mot. *in Limine* (Docket no. 27)).

**\*12** 87. On December 12, 2005, a trial was held before this Court.

88. At the trial, Telecom Argentina introduced the testimony of Mr. Pablo Caride, Finance Director of Telecom Argentina, who testified to the background facts that were the cause of Telecom Argentina's financial difficulties, and to the APE process, including both the negotiating phase and the court-supervised stage. Telecom Ex. 1 (Caride Decl.). Mr. Caride also introduced copies of, *inter alia,* the APE, the Argentine Court orders, the various documents filed with regulatory authorities, and the letters sent by Argo to the Indenture Trustee. Telecom Ex. 1, Tab D (Final Solicitation Statement), Tab F (APE Agreement), Tab H (Argentine Court Order, dated 2/25/05), Tab I (Argentine Court Order, dated 5/26/05), Tab M (Letter, dated 9/13/04) and Tab N (Letter, dated 1/7/05). All of Mr. Caride's evidence was introduced into evidence without objection. Tr. 4:17–5:3.

89. In addition, Telecom Argentina introduced the testimony of Dr. Javier Lorente, an expert in Argentine insolvency law. Dr. Lorente's testimony was introduced in written form as well as pursuant to live testimony. Telecom Ex. 2 (Lorente Decl.); Telecom Ex. 3 (Lorente Supp. Decl.); Tr. 22–56, 86–91. Dr. Lorente's credentials as an expert were not challenged.

90. U.S. Bank introduced no evidence.

91. Argo introduced the testimony of Mr. Andreas Rialas, the Chief Executive of Argo Capital Management Ltd., the investment advisory company for Argo. Argo Ex. 3 (Rialas Decl.), ¶ 1. Mr. Rialas testified to Argo's beneficial interest in Telecom Argentina's Old Notes. *Id.* at ¶¶ 2–4 and Tab A. Mr. Rialas's testimony was introduced in written submission only. Argo Ex. 3 (Rialas Decl.); Tr. 85:10–85:15.

92. Argo also introduced the testimony of Dr. Julio César Rivera, its Argentine insolvency law expert. Dr. Rivera's testimony was introduced in both written form and pursuant to live testimony. Argo Ex. 1 (Rivera Trial Decl.); Argo Ex. 2 (Rivera Supp. Decl.); Tr. Rivera 57–85.

93. Post-trial submissions were required to be submitted by January 31, 2006. (Minute Order (Docket no. 35)).

### *Argentine Insolvency Law*

94. The testimony of the Argentine experts demonstrates that the Argentine Insolvency Law, and Telecom Argentina's APE, meet the requirements of Section 304 of the Bankruptcy Code.

### A. An APE is Governed by Argentine Insolvency Law

95. The Argentine Insolvency Law provides for three types of insolvency-related proceedings, two of which are consensual and one of which is a liquidation. Tr. Lorente 23:8–23:16, 53:4–53:8, 53:15–53:16. The two proceedings intended to effect a consensual arrangement between the debtor and its creditors are the *concurso preventivo* proceeding and the *acuerdo preventivo extrajudicial,* or "APE." Tr. Lorente 23:8–23:16. An APE proceeding is thus an insolvency proceeding. Tr. Rivera 67:16–67:23.

96. The APE law employed by Telecom Argentina had been amended in May 2002 (the "May 2002 Amendment") to recognize that a privately negotiated debt restructuring plan, supported by a qualified majority of a debtor's unsecured creditors prior to its filing, if confirmed by a court of competent jurisdiction, would become binding upon non-consenting holders of affected debt. Tr. Lorente 23:18–23:24. The May 2002 Amendment thus permitted a process which is analogous to a United States pre-packaged plan process.

**\*13** 97. The May 2002 Amendment was issued in the midst of a severe economic and financial crisis affecting the Argentine economy, which produced an extended inability of the private sector to honor its debts in accordance with their original terms. The devaluation of the peso, the restrictions on the banking system, the "pesification" and freezing of the public service tariffs and the default of the Argentine sovereign debt deeply affected the performance of the Argentine economy, resulting in a substantial decrease of the gross domestic product in year 2002 and a substantial increase in inflation. *In re Bd. of Dirs. of Multicanal, S.A.,* 314 B.R. 486, 493 (Bankr.S.D.N.Y.2004).

98. The May 2002 Amendment rendered the APE Proceeding an effective means of solving conflicts between debtors and creditors by making a judicially confirmed APE binding on all creditors affected by such APE, while avoiding the expense of the more cumbersome and time-consuming *concurso preventivo* proceeding. Telecom Ex. 2 (Lorente Decl.), ¶ 7. Argo's expert, Dr. Rivera, noted that this amendment gave the APE law a "true usefulness" that had previously been absent. Telecom Ex. 3, Tab E (Article by Dr. Rivera entitled, "*Instituciones de Derecho Concursal*"), at 544.

99. While Dr. Rivera initially contended that the APE process is not an insolvency process, he acknowledged that his position has been rejected by Argentine courts. Tr. Rivera 67:6–67:25. Indeed, at least ten lower Argentine courts and three appellate-level courts have explicitly held that an APE proceeding constitutes an insolvency proceeding under Argentine Insolvency Law. Telecom Ex. 3 (Lorente Supp. Decl.), ¶ 9.

**B. Commencing the APE Process**

100. In order to invoke the APE law, the debtor must be either insolvent or in "general financial or economic difficulties." Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 69. Thus, a debtor is not required to be insolvent. Telecom Ex. 2 (Lorente Decl), ¶ 31; Argo Ex. 1 (Rivera Trial Decl.), ¶ 14.

101. In similar fashion to a U.S. Bankruptcy Code pre-packaged plan, to commence the APE process, the debtor must first formulate a financial restructuring proposal with its affected creditors. Eventually, the debtor will execute an APE agreement with those creditors. Telecom Ex. 2 (Lorente Decl.), ¶ ¶ 7, 24 and 25. The Argentine Insolvency Law requires the debtor to obtain the support of two-thirds of the total outstanding amount of the unsecured debt affected by the APE and more than one half in number of the claims affected by the APE. *Id.* at ¶ 27.

102. The debtor may then seek court approval, or *homologation*, of the APE from an Argentine court of competent jurisdiction. As the Telecom Argentina Court found, the reason for seeking such approval is to bind non-consenting creditors. Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05), at 3–4. Again, this process is very similar to the pre-packaged plan process under the U.S. Bankruptcy Code.

**\*14** 103. To initiate the court process, the debtor must file, in addition to the APE, a number of other documents disclosing its financial condition and its creditors. [4] Telecom Ex. 2 (Lorente Decl.), ¶ 32. A court will only confirm an APE if full, complete and transparent information has been included in the APE filing. *Id.* at ¶ 33. Argentine courts presiding over APEs have found that there is an implicit requirement in the APE rules that the court and creditors affected by an APE be provided complete and accurate information. *Id.* at ¶ 49.

104. In addition, other laws mandate full disclosure of financial information. For example, Argentine securities laws mandate disclosure of information material to a restructuring pursuant to an APE. *Id.* at ¶ 33. These disclosure materials are distributed, in accordance with applicable Argentine securities laws, with a view to reaching the owners of a debtor's debt securities to solicit their vote to accept or reject the APE proposal. *Id.*

105. There is no dispute that Telecom Argentina provided creditors with a great deal of information regarding its APE, [5] and the Argentine Court so found. Telecom Ex. 1 (Caride Trial Decl.), ¶¶ 22, 26, and 28–30, Telecom Ex. 1, Tab D (Final Solicitation Statement) and Tab H (Argentine Court Order, dated 2/25/05).

**C. Court Review of the APE Vote**

106. After the initial papers are filed, the Argentine Court makes an initial determination whether an APE has been validly filed, by ensuring that the requisite majority votes were obtained in an appropriate manner.

107. In this case, the Argentine Court required Telecom Argentina to submit all the consents and powers of attorneys (letters of transmittal) received from its creditors for review by the Court. Telecom Ex. 2 (Lorente Decl.), ¶ 64 (discussing resolution dated 11/3/04). The Court also required Telecom Argentina to submit an auditor's certificate certifying the existence and the outstanding amount of its bank debt. Telecom Ex. 3, Tab F (Argentine Court Order, dated 12/6/04).

108. The Argentine Court ordered Telecom Argentina to hold a noteholders meeting at which creditors would vote on the APE and select a form of consideration. *Id.* The Court examined the procedural fairness of the APE solicitation process, reviewing Telecom Argentina's solicitation materials and other documents to ensure that the required majority approval votes had actually been achieved. Telecom Ex. 1,

In re Board of Directors of Telecom Argentina S.A., Not Reported in B.R. (2006)

Tab H (Argentine Court Order, dated 2/25/05), at 1, and Tab I (Argentine Court Order, dated 5/26/05), at 4–5.

**D. Protective Aspects of Argentine Insolvency Law**

109. Telecom Argentina's board and management remained in possession, so two overseers were appointed to perform certain specified tasks.

> Given the particulars of the APE, pursuant to the applicable laws, given the lack of trustees and under the terms of Section 36 of the Code of Procedure and Section 45 bis, subsection 8 of the BL to the effects therein, Messrs. Mario Ernesto Kaminker and Jorge Daniel Grispo, both domiciled at Avda Carlos Pellegrini 961, 5th Floor of [the City of Buenos Aires], are hereby appointed judicial overseers, whose duties shall be to: 1) enforce the requirements set forth above; 2) examine any documents deemed necessary, obtaining copies; 3) request explanations; and 4) in order to gain access to any place that is necessary and maintain the order of the Meeting, they may require the aid of the police forces, and shall be required to report to the Court the outcome of their mission in the Notarial minutes that will supplement the minutes required to be taken at the Meeting.

**\*15** Telecom Ex. 3, Tab F (Argentine Court Order, dated 12/6/04).

110. In addition, the directors and officers of Telecom Argentina were required to act as "good business persons" with respect to creditors, both prior to the filing of an APE proceeding as well as during and after any such proceeding, and to adhere to a number of other laws governing the conduct of officers and directors of a public company. Telecom Ex. 2 (Lorente Decl.), ¶¶ 59–61.

111. Upon a judicial determination that a debtor has validly filed its APE, a stay comes into effect regarding affected claims. *Id.* at ¶¶ 8 and 34. Article 60 of

the Argentine insolvency law prohibits the debtor from making any payments on affected claims. Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 60. Article 72 automatically stays all claims against the debtor and all of its assets arising under the debt instruments affected by the APE, to the same extent that such claims would be stayed in the case of the filing of a *concurso preventivo,* or plenary bankruptcy proceeding. *Id.* at Art. 72.

112. In the Telecom Argentina case, the stay came into effect on October 21, 2004, and was confirmed by the court in a resolution dated February 25, 2005. Telecom Ex. 1, Tab H (Argentine Court Order, dated 2/25/05). In that resolution, the Court specifically restrained Telecom Argentina from use of much of its property, in particular, real estate and registered moveable assets. *Id.* (imposing a "general restraint on the disposition of the debtor's property"); Tr. Rivera 74:14–74:23 (acknowledging that the Argentine Court barred Telecom Argentina from disposing of its assets during the confirmation proceedings).

113. Courts have also undertaken to ensure that the debtor does not dispose of assets outside the ordinary course of business for the duration of the APE process. Telecom Ex. 2 (Lorente Decl.), ¶ 56. In at least six proceedings, including Telecom Argentina's APE proceedings, courts have enjoined the petitioners from transferring or disposing properties and assets by ordering a precautionary measure to restrain transfer of assets, which is registered in public records. *Id.;* Telecom Ex. 1, Tab H (Argentine Court Order, dated 2/25/05).

114. The Argentine Insolvency Law also provides procedures for the avoidance of preferential or fraudulent dispositions of property. Telecom Ex. 2 (Lorente Decl.), ¶¶ 55, 58. Depending on when and in what context a preferential or fraudulent conveyance was made, creditors affected thereby may object to the confirmation of an APE or request that a confirmed APE be declared null and void on this ground. *Id.* at ¶ 55.

115. Further, the general principle of equal treatment of similarly situated classes of creditors affected by a restructuring plan prevents a debtor from making discriminatory payments to creditors affected by its APE. *Id.* at ¶ 58.

**E. Subsequent Proceedings and Creditor Participation**

**\*16** 116. After a court concludes that the filing requirements are met, public notice is issued to open an objection period.

Tr. Lorente 25:17–25:22; Telecom Ex. 3 (Lorente Supp. Decl.), ¶ 18.

117. Objections unrelated to confirmation may be raised prior to the period in which the Argentine Court hears confirmation objections, and thereafter objections related to the confirmability of the APE will be heard. Non-confirmation objections that could be asserted prior to the period for submitting confirmation-related objections include objections based on an entity's eligibility, financial or otherwise, to be a debtor in an APE proceeding, since the Argentine Insolvency law provides that a debtor must "have economic or financial difficulties" in order to qualify. Telecom Ex. 3 (Lorente Supp. Decl.), ¶¶ 20–21.

118. Therefore, a creditor, such as Argo, could have objected to Telecom Argentina's APE on the ground that Telecom Argentina was not financially eligible to be a debtor as required by the APE law. *Id* . at 21.

119. Once the initial filing has been approved, objections to confirmation may be made. Argentine courts may hear objections to confirmation of an APE based on many grounds, derived from both the Argentine Insolvency Law and from other general bodies of law.

120. Under Article 75 of the Argentine Insolvency Law, a creditor may object based upon either (a) misrepresentation in the Assets and Liabilities Statement filed with the Argentine court, or (b) failure of the debtor to obtain the support and consent of the Requisite Holders. Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 75.

121. Article 75 also permits objections regarding whether the legal requirements of an APE have been met. *Id.;* Tr. Lorente 40:8–40:14. This broad right stems from the second paragraph of Article 75, which states: "When legal requirements have been met and no objections are raised, the Court shall approve the APE." Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 75. This language broadens the scope of permissible objections to an APE. Tr. Lorente 41:10–41:14. Dr. Rivera agreed that the second paragraph of Article 75 directs judges to consider these requirements before approving an APE. Tr. Rivera 60:20–60:24.

122. In addition, the 2002 Amendments brought into existence Article 52.4, which enables creditors to object to the confirmation of an APE on grounds that the APE is "abusive or fraudulent." Telecom Ex. 3 (Lorente Supp.

Decl.), ¶ 24. Article 52.4 provides that "[i]n no case shall the Court approve a proposal that is abusive or contrary to law." Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 52.4. In addition to inviting creditor objections, Article 52.4 imposes an obligation on the Argentine court to review the APE for abusiveness. Tr. Lorente 34:2–34:6.

123. The concept of "abusiveness" is defined broadly. Telecom Ex. 3 (Lorente Supp. Decl.), ¶¶ 29–30; Tr. Rivera 76–77. "Abusiveness" is a fact-specific inquiry that must be determined on a case-by-case basis. Tr. Lorente 48:2–48:7. Creditors may question the abusive features of an APE on any ground. "That is not limited." Tr. Rivera 76–77, 74:24–75:8 (stating that "creditors have the right to call attention to the judge about the abuse [or] fraud, and of course they make all kinds of argument").

**\*17** 124. There are many Argentine cases in which Argentine courts have considered the issue of abuse and fraud. Telecom Ex. 3 (Lorente Supp. Decl.), ¶ 26; Tr. Lorente 38:6–38:8. As one such case noted:

> The powers of the judge, also confirmed by case law upon rejecting in numerous cases the approval of abusive agreements ... are fully applicable to the [APE].

> Additionally, and as is already known, the [2002 Amendment] expressly addressed such powers by setting forth in section 52, sub-section 4 of Law No. 24,522 that *"The Judge shall in no case approve a proposal which is abusive or contrary to the law."* (Julio César Rivera, Institutes of Bankruptcy Law, Volume 1, page 478....).

Telecom Ex. 3, Tab H (*Micro Omnibus Norte S.A.,* Order, dated 9/14/05), at 5–6 (emphasis in original).

125. Although Dr. Rivera initially claimed that the Argentine legal definition of the term "abusive" is limited, and that Art. 75 provides the only grounds on which creditors can object to an APE, he agreed at trial that there was no limit to the possible objections:

> Q Is it true that you testified on Saturday that in response to the question whether a creditor could object under Article 52(2)(b)(4), the creditor can state that the APE is abusive or fraudulent. What is abusive or fraudulent and especially what is abusive are standards that have to be applied in every specific case. And you [ ] went on to say, the creditor could question the abusive features

In re Board of Directors of Telecom Argentina S.A., Not Reported in B.R. (2006)

of an APE with all kinds of reasons. That is not limited. And then you go on to say, there is nothing against the concept that within the argument the idea would include that the results of the liquidation will be better. Is that accurate?

A Yes, it is.

Tr. Rivera 76–77. [6]

126. Dr. Rivera attempted to argue that the bases upon which creditors could object were procedurally limited, contending that creditors can object under Article 75 but may only file a *denuncia* under Article 52.4, and that a judge is not required to consider a *denuncia*. Tr. Rivera 65:19–66:5. However, Dr. Rivera agreed that the concept of a *denuncia* comes from only one Argentine case. Tr. Rivera 82:23–83:6. In any event, there is no substantive or material difference between a *denuncia* and an objection. As Dr. Rivera recognized, "like Dr. Lorente said in his declaration, the creditors have the right to call attention to the judge about the abuse [or] fraud, and of course they make all kinds of argument." Tr. Rivera 74:24–75:8. Dr. Rivera also testified that he is unaware of any lower court or appellate authority that prevents a creditor who files a *denuncia* from raising an appeal. Tr. Rivera 81.

127. In the Telecom Argentina case, the Court required extensive notice of various steps in the confirmation process, including the bondholder meeting held on February 4, 2005, and the process by which it was determined that the APE proceeding had been properly filed. Telecom Ex. 1, Tab H (Argentine Court Order, dated 2/25/05) and Tab I (Argentine Court Order, dated 5/26/05); Telecom Ex. 3, Tab F (Argentine Court Order, dated 12/6/04).

**\*18** 128. Consequently, creditors had ample opportunity to object to the Telecom Argentina APE on all of the grounds now raised by Argo in this Court. As Telecom Argentina's expert, Dr. Lorente, testified without contradiction

> [I]t is my opinion that the Argentine Insolvency Law and Telecom Argentina's APE proceedings provided creditors, including Argo, with a full and fair opportunity to assert objections to the APE, and that these objections were considered in a meaningful way by the Argentine Court.

Telecom Ex. 3 (Lorente Supp. Decl.), ¶ 8. [7]

129. Further, Argentine courts are empowered to require evidence where appropriate in considering objections. An Argentine court may rule on issues of law without requiring evidence, or may order that evidence be produced if an issue of fact exists. *Id.* ¶ 32; Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 75. Therefore, a creditor may put forth, or demand, evidence with regard to any objection to an APE.

130. In fact, four creditors filed objections to the Telecom Argentina APE. Two are relevant here.

131. One creditor claimed that the plan was abusive because it did not grant non-consenting creditors the same consideration options as those granted consenting creditors. "The proposal is abusive or violates the *credito pars creditorum* ... [The APE] implies a differential and abusive treatment under the bankruptcy system on the basis of the aforementioned principle and the remaining legal provisions they quote." Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05), at 3.

132. Telecom Argentina opposed on the grounds, *inter alia,* that the objection was outside the scope of Article 75. *Id.* The Argentine Court overruled the objection and granted the relief, requiring that the APE provide the same consideration options to consenting and non-consenting creditors alike. *Id.* at 4–5. This ruling is one example of the fact that the bases for objection go beyond the scope of Article 75, and further demonstrates the commitment of the law generally, and of the Argentine Court in particular, to equal treatment of similarly situated creditors.

133. Another creditor objected on the ground that the plan was abusive because Telecom Argentina could have paid more because creditors would have received more in a liquidation. Tr. Lorente 27:6–27:10. This claim was deemed untimely, but Dr. Lorente testified that the creditor had stated a valid legal ground of objection:

> [I]f you can pay more because you have more assets and you are offering less and you reach a plan that offers less, that objection could be raised because you are being abusive with that plan.

Tr. Lorente 32:8–32:13.

134. Dr. Rivera agreed that the issue whether a debtor could pay more could be raised in an objection. Tr. Rivera 74:24–75:21.

135. It was also agreed that in considering this objection, the Argentine Courts have requested evidence regarding liquidation value. Tr. Rivera 76:2–76:11. Dr. Lorente testified that the "abusiveness concept includes liquidation value." Tr. Lorente 34:8–34:11.

**\*19** 136. Thus, the evidence demonstrates that Argo could have objected to Telecom Argentina's eligibility to file its APE, as a pre-confirmation objection, and to the fairness or abusiveness of the substantive provisions of the APE, in connection with confirmation. Argo made no objection at any stage in the Argentine courts. Notwithstanding Argo's silence before the Argentine courts, Argo now seeks to attack the Argentine Court's findings collaterally in this forum.

137. Further, no evidence was offered to suggest that U.S. creditors suffered any prejudice or inconvenience in their ability to participate in the Argentine proceedings, or in the processing of their claims. [8] Indeed, all creditors, wherever situated, were required simply to send a letter of transmittal indicating their vote on the APE, and all were invited to the bondholder meeting and to participate in the process generally. Telecom Ex. 1, Tab D (Final Solicitation Statement), at cover page 2, and Tab F (Argentine Court Order, dated 12/6/04). No evidence was presented to demonstrate that any U.S. creditor was dissatisfied with the APE.

### F. Grounds for Approval of An APE

138. As a matter of Argentine law, the Argentine Court would not have confirmed the APE if the Court had found that the APE exceeded the limits imposed by good faith, ethics, and morals. Telecom Ex. 3 (Lorente Supp. Decl.), ¶ 31.

139. As noted, the Telecom Argentina Court was presented with and considered four objections to the APE. The Argentine Court addressed each objection in the Approval Order, finding, *inter alia,* that Telecom Argentina had met the financial eligibility requirements ("taking into consideration the restructuring sought as a means of turning around the business crisis") and had met the requisite standards for approval. Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05).

140. Thus, the Court found:

> In respect of the proposal made, taking into consideration the restructuring sought as a means of turning around the business crisis, the elements provided to the case by the debtor and those required by the Court, such proposal does not appear to be abusive, fraudulent or discriminatory in accordance with the applicable legal regulations.

*Id.*

141. As noted, the Court ruled that all creditors were to be given the same consideration options. [9] *Id.* at 4–5.

142. Therefore, under the approved APE all affected creditors were treated equally and justly, consistent with the required provisions for distribution in a case under the U.S. Bankruptcy Code.

143. The Argentine Insolvency Law does not require that a restructuring plan, particularly an agreed APE, eliminate the rights of equity holders. Telecom Ex. 2 (Lorente Decl.), ¶ 24 n. 1. Here, Telecom Argentina had advised its creditors that any change in the direct or indirect ownership of Telecom Argentina would result in the termination of its license and its business. Telecom Ex. 1, Tab D (Final Solicitation Statement); Tr. Lorente 30:12–30:19, 30:22–30:23, 89:16–90:3. Consequently, no such requirement was demanded by creditors in the Telecom Argentina APE, and no objection was made on the basis that ownership would be unchanged under the APE. Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05).

### G. Telecom Argentina APE Recoveries Were Very High

**\*20** 144. Mr. Caride, Telecom Argentina's Finance Director, testified without contradiction that creditor recoveries ranged from 80.3% to 100% of outstanding principal face amount of their claims, plus an additional amount for interest. Telecom Ex. 1 (Caride Trial Decl.), ¶ 33.

145. Dr. Lorente, Telecom Argentina's expert, testified without contradiction that the consideration provided by Telecom Argentina in its APE was the "best consideration I have seen in an APE." Tr. Lorente 31:18–31:20.

In re Board of Directors of Telecom Argentina S.A., Not Reported in B.R. (2006)

146. Mr. Caride also testified, without contradiction, that 94.4% of principal face amount of debt, or approximately 82.4% in number, of affected creditors voted for the APE. Telecom Ex. 1 (Caride Trial Decl.), ¶ 34. These numbers well exceed the voting requirements of Argentine law, and well exceed the voting requirements of U.S. law for approval of a plan.

147. Between the August 31, 2005 Closing date and December 5, 2005, additional non-consenting creditors agreed to the terms of the APE and collected payments totaling approximately US$34,230,000. Telecom Ex. 1, Tab L (Chart of Positions of Non–Participating Creditors).

#### H. Post Confirmation Grounds for Objection or Appeal

148. The court reviewing the APE must rule on any objections within the ten days following the close of evidence. Telecom Ex. 2 (Lorente Decl.), ¶ 44. A party whose objection is overruled by the court reviewing the APE may appeal such decision within five business days. *Id.* No evidence was offered to suggest that the right to appeal the overruling of an objection was in any way limited. Tr. Rivera 81:23–81:25, 82:1–82:6.

149. In its Approval Order, the Argentine Court required that notice of the Approval Order be widely circulated, and it was. Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05).

150. No appeal was brought from the Approval Order.

151. Even if Argo had discovered grounds for attacking the APE after the order had become final, Argo could have at that point attacked the APE. Creditors may bring claims under Argentina's Civil Code to challenge the validity of an APE fraudulently obtained or otherwise in violation of Argentine public order. Telecom Ex. 2 (Lorente Decl.), ¶ 46. Further, under Article 60, an affected creditor may file a petition to have an APE that has been confirmed declared null and void based on willful misrepresentation in the Assets and Liabilities Statement, or the creation of illegitimate preferences in favor of certain creditors, which, in either case, is discovered after the court confirmation of the APE. Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 60.

152. No such attack was brought in the Argentine courts, by Argo or any other creditor.

#### I. The *Res Judicata* Effect of the Argentine Court's Decision

153. Pursuant to the Argentine Insolvency Law, an APE that has obtained final court confirmation is entitled to *res judicata.* Telecom Ex. 2, Tab A (Argentine Insolvency Law), Arts. 55 and 56. Consequently, the Approval Order is entitled to *res judicata* and binds all affected creditors, both consenting and non-consenting. *Id.*

**\*21** 154. Therefore, an Argentine court would not enforce an order of this or any other court that was inconsistent with the Approval Order. Telecom Ex. 2 (Lorente Decl.), ¶ 81.

155. Pursuant to the approved APE, on August 31, 2005, Telecom Argentina paid, or made available to the consenting creditors, the consideration contemplated in the APE. The consideration owed to non-consenting holders of Old Notes was transferred into a trust, and is available for distribution to any such creditor that acknowledges the extinguishment of its claims and agrees to the cancellation of their old debt. Telecom Ex. 1 (Caride Trial Decl.), ¶ 46.

156. Pursuant to Article 55, the confirmation of Telecom Argentina's APE coupled with the closing of the APE caused the novation of all claims affected by the APE. Telecom Ex. 2, Tab A (Argentine Insolvency Law), Art. 55. The Old Notes are cancelled and replaced by the new obligations issued under the APE. "The old [bonds] ha[ve] been [extinguished] because of that order, that final order, and the new debt, the new [bonds] ha[ve] been bor[n]." Tr. Lorente 29:2–29:5. Consequently, the old debt is extinguished. Telecom Ex. 2 (Lorente Decl.), ¶ 68.

157. U.S. Bank, the indenture trustee for the Old Debt, is bound by the Approval Order as a matter of Argentine law and is therefore required to cancel all of the Old Notes, including those few held by non-consenting holders of Old Notes. Telecom Ex. 2, Tab A (Argentine Insolvency Law), Arts. 55 and 56; Telecom Ex. 2 (Lorente Decl.), ¶¶ 68 and 69.

#### J. The Consequences of Breach of the APE

158. If Telecom Argentina now chose, or were required, to treat Argo or any other non-consenting creditor differently from all of those who have taken the consideration offered in the APE, Telecom Argentina would risk liquidation. Telecom Ex. 2 (Lorente Decl.), ¶ 79.

159. Articles 60–63 establish the effects of a failure by Telecom Argentina to fulfill its obligations under the APE. If a court were to compel Telecom Argentina to comply with an order inconsistent with the Approval Order, Telecom Argentina would be forced to breach its APE. Any such payment would be considered null and void, and Telecom Argentina would run the risk that the company could be placed in immediate liquidation. *Id.;* Telecom Ex. 2, Tab A (Argentine Insolvency Law), Arts. 60–63; Tr. Lorente 29:17–30:2.

### CONCLUSIONS OF LAW

160. Telecom Argentina filed its Section 304 petition to seek an order of this Court granting recognition to the Approval Order and the APE.

161. Section 304 provides that a bankruptcy court may hear a "case ancillary to a foreign proceeding" brought by a "foreign representative" of the debtor in a district where venue is proper. 11 U.S.C. § 304(a); 28 U.S.C. § 1410(c).

162. There is no dispute that the Board is a "foreign representative" of Telecom Argentina and that venue in this district is proper.

163. Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as: "[A] proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization[.] 11 U.S.C. § 101(23). "[T]he phrase 'foreign proceeding' is to be broadly construed." *In re Netia Holdings S.A ., 277 B.R. 571, 581 (Bankr.S.D.N.Y.2002)* (citing *In re MMG LLC, 256 B.R. 544, 550 (Bankr.S.D.N.Y.2000)*) (footnote omitted).

**\*22** 164. To constitute a "foreign proceeding" under Section 101(23) of the Bankruptcy Code, three requirements must be met:

(1) the proceeding must entail an administrative or judicial process involving insolvency or reorganization;

(2) it must be conducted for the purpose of liquidating an estate, adjusting its debts or effecting its reorganization; and

(3) it must be pending in a foreign country where the debtor maintains its residence, domicile, [or] principal place of business.

*Id.* at 581 (quoting *MMG, 256 B.R. at 550*) (alteration in original).

165. Courts also consider "the amount of judicial involvement and supervision or, conversely, the degree of access to the court available at various stages to creditors so that they may voice any objections they may have." *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd., 238 B.R. 25, 50 (Bankr.S.D.N.Y.1999)* (citations omitted), *aff'd, 275 B.R. 699 (S.D.N.Y.2002); see also In re Ward, 201 B.R. 357, 361 (Bankr.S.D.N.Y.1996); In re Tam, 170 B.R. 838, 843 (Bankr.S.D.N.Y.1994).*

166. At the trial in this case, the experts agreed that an APE proceeding is a judicially supervised insolvency proceeding, and that Telecom Argentina's APE proceeding was subject to judicial supervision.

167. Under section 304 of the Bankruptcy Code, the rule of the foreign jurisdiction "need not be identical to those of the United States" but it must be "substantially in accordance" with United States bankruptcy law. *In re Board of Dirs. Telecom Argentina,* 05 Civ. 8803(SAS), 2005 U.S. Dist. LEXIS 28640, *11, citing Bank of New York v. Treco (In re Treco), 240 F.3d 148, 158* (2d Cir.2001); *In re Petition of Hourani, 180 B.R. 58, 65 (Bkrtcy.S.D.N.Y.,1995)* ("There is no requirement in section 304 that other nations adopt or mirror our Bankruptcy Code ... The key is that the insolvency laws in the foreign proceeding must not be repugnant to this nation's general principles of justice, regardless of the form in which those principles are manifested.")

168. The rules governing an APE are consistent with the Bankruptcy Code. Both require approval of the holders of two-thirds of the unsecured indebtedness and more than half of the number of claims affected by the proceedings. *See Multicanal, 314 B.R. at 505;* Telecom Ex. 2 (Lorente Decl.), ¶¶ 25–30. Both provide for a stay of litigation against the debtor. *See Multicanal, 314 B.R. at 505;* Telecom Ex. 2 (Lorente Decl.), ¶¶ 8 and 34. In both, the debtor remains in possession of its property, while the bankruptcy court exercises supervision over the APE process. *See Multicanal, 314 B.R. at 505;* Telecom Ex. 2 (Lorente Decl.), ¶¶ 7, 9 and 35. In both, the court ensures that the required majorities have been obtained. *See Multicanal, 314 B.R. at 505–06;* Telecom

13-10361-mg    Doc 4-20    Filed 02/04/13    Entered 02/04/13 23:49:31    Exhibit K    Pg
35 of 246

Ex. 2 (Lorente Decl.), ¶¶ 25–30, 32 and 38. Argentine courts, like their U.S. counterparts, retain the power to unwind the proceeding if the confirmation of the plan has been obtained by fraud. Telecom Ex. 2 (Lorente Decl.), ¶¶ 45–46 and 71.

**\*23** 169. This Court has already found that an APE proceeding is a "foreign proceeding." *See Multicanal,* 314 B.R. at 501 (holding that an APE proceeding was "clearly a judicial 'proceeding ... for the purpose of ... adjusting debts ... or effecting a reorganization[,]' ' and that Argentine APE proceedings are sufficiently similar to prepackaged Chapter 11 cases so as to lead to their classification as a "foreign proceeding" under Section 304).

170. In the *Multicanal* case, Judge Gropper analyzed in detail the provisions of Argentina's APE law, and found it worthy of recognition under Section 304 based upon well settled precedent. *See, e.g., Canada S. Ry. Co. v. Gebhard,* 109 U.S. 527, 537 (1883); *Cunard S.S. Co. v. Salen Reefer Servs. AB (In re Cunard),* 773 F.2d 452, 458 (2d Cir.1985); *In re Treco,* 240 F.3d at 153–54; *Koreag, Controle et Revision S.A. v. Refco FX Assocs. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 358 (2d Cir.1992).

171. The Court concluded that the APE law generally, and Multicanal's APE in particular, were entitled to recognition.[10] *Id.* at 523. Specifically, the Court concluded that "Multicanal's APE, which bears many similarities to a prepackaged Chapter 11 proceeding, is the type of reorganization proceeding that, in principle, is subject to recognition under § 304." *Id.* at 509.

172. Likewise, the evidence and record before me demonstrate that an APE proceeding under the Argentine Insolvency Law is entitled to comity.

173. In addition, the Telecom Argentina APE, and the Approval Order, qualify for recognition under Section 304.

174. Section 304(c) of the Bankruptcy Code provides:

In determining whether to grant relief under [Section 304](b) ] the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; [and]

(5) comity.

11 U.S.C. § 304(c).[11]

#### 1. *Just Treatment Of Affected Creditors Was Provided*

175. Section 304 requires the just treatment of all holders of claims against or interests in the estate of the foreign debtor. 11 U.S.C. § 304(c)(1). "[T]he requirement of just treatment implicates general due process standards [and] § 304(c)(1) [is] satisfied if a foreign proceeding provides for a comprehensive procedure for the orderly and equitable distribution of [a debtor's] assets among all of its creditors." *Multicanal,* 314 B.R. at 510 (quoting *In re Treco,* 240 F.3d at 158 (internal quotations omitted and final alteration in original).

**\*24** 176. There is no dispute that Telecom Argentina's APE proceeding provided holders of all affected claims with notice, due process and an opportunity to participate in negotiating the APE, in voting to approve the APE, and in the court-supervised approval process. Telecom Ex. 1 (Caride Decl.), ¶¶ 10–21, 24–32, 38–39 and 43.

177. I find that this element of Section 304 has been met.

#### 2. *United States Creditors Were Not Prejudiced Or Inconvenienced*

178. The next Section 304 factor considers the "protection of claim holders in the United States against prejudice and inconvenience" in the processing of their claims in the foreign proceeding. 11 U.S.C. § 304(c)(2).

179. No evidence was presented to suggest that U.S. creditors did not participate in the APE on exactly the same terms as all other affected creditors, or were otherwise prejudiced or inconvenienced. On the contrary, Argo seeks to force better terms than other creditors—and in any event, it is not clear

that the Cayman Island-based Argo is a U.S. claimholder entitled to protection. 11 U .S.C. § 304(c)(2).

180. Thus, to ensure that U.S. creditors were given appropriate information, Telecom Argentina filed a registration statement describing the APE with the SEC which allowed Unites States creditors to be informed and to participate in the process. Telecom Ex. 1 (Caride Decl.), ¶ 28 and Tab D (Final Solicitation Statement). As in *Multicanal,* notice of the APE was "extensive and highly sophisticated," *id.,* including the Registration Statement, newspaper notices, materials on a website, and the solicitation statement. Telecom Ex. 1 (Caride Decl.), ¶¶ 10 and 24–32.

181. Nor were U.S. creditors prejudiced by the processing of claims. U.S. noteholders were required to return a letter of transmittal to The Bank of New York, the settlement agent, to participate in the APE. Telecom Ex. 1, Tab D (Solicitation Statement), at cover page 2.

182. I find that this element of Section 304 has been met.

### 3. *Argentine Law Provides Procedures For The Prevention Of Preferential Or Fraudulent Distributions Of Estate Property*

183. The third Section 304 factor examines the protections against preferential or fraudulent dispositions of property in the foreign proceeding. 11 U.S.C. § 304(c)(3).

184. No issue has been raised regarding preferential or fraudulent distribution. In any event, a creditor could have objected to the APE's confirmation if a preference or fraudulent conveyance had not been disclosed by Telecom Argentina. Telecom Ex. 2 (Lorente Decl.), ¶¶ 51 and 55–58.

185. Further, a stay prevented payments to affected creditors, and the Argentine Court imposed restrictions upon any transfer of property by Telecom Argentina during the case. Telecom Ex. 1, Tab H (Argentine Court Order, dated 2/25/05). These safeguards are exactly the same as the safeguards in the *Multicanal* APE proceeding, which was found to have satisfied Section 304(c)(3). *Multicanal,* 314 B.R. at 508–09.

**\*25** 186. I find that this element of Section 304 has been met.

### 4. *The APE Provides For Distribution Substantially In Accordance With The Bankruptcy Code*

187. The fourth factor considers whether the distribution of the property of the estate pursuant to the foreign proceeding is "substantially in accordance" with the United States Bankruptcy Code. 11 U.S.C. § 304(c)(4).

188. Argentine insolvency law requires that general unsecured creditors receive like treatment and prohibits discriminatory treatment of similarly situated creditors, which is virtually identical to U.S. law. Telecom Ex. 2 (Lorente Decl.), ¶¶ 23, 58, 83 and 85.

189. Only unsecured holders of financial debt were affected by the APE, and by virtue of the Approval Order each creditor was given the same consideration options. Therefore, distribution was "substantially in accordance with the order prescribed by the Bankruptcy Code." *Multicanal,* 314 B.R. at 506.

190. Dr. Rivera admitted that all creditors were treated equally by the Approval Order. Tr. Rivera 71:17–73:8.

191. I find that this element of Section 304 has been met.

### 5. *The APE And The Approval Order Are Entitled To Comity*

192. Comity, the fifth and perhaps most important element of Section 304, strongly favors Telecom Argentina's request for declaratory relief, particularly in a case in which a foreign court with undisputed jurisdiction has issued a final order, akin to a confirmation order, approving a consensual foreign proceeding upon the near unanimous approval of its creditors.

193. The doctrine of comity has been defined by the Supreme Court as:

> [T]he recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*Hilton v. Guyot,* 159 U.S. 113, 164 (1895).

194. "Outside the § 304 context, U.S. courts have granted comity to foreign insolvency proceedings when it has been demonstrated that 'the foreign court is a court of competent

jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated." ' *Multicanal,* 314 B.R. at 502–03 (quoting *Cunard S.S. Co. v. Salen Reefer Servs. AB (In re Cunard),* 773 F.2d 452, 457 (2d Cir.1985)); *see also Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 713 (2d Cir.1987) ( "Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy.") (citations omitted). Comity does not require "that the foreign law be a carbon copy of our law; rather, [it] must not be repugnant to American laws and policies." *In re Brierley,* 145 B .R 151, 166 (Bankr.S.D.N.Y.1992); *In re Culmer,* 25 B.R. at 631.

**\*26**  195. Comity is essential in cross-border bankruptcy cases. "American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings." *Victrix S.S.,* 825 F.2d at 713 (citations omitted). *See also In re Treco,* 240 F.3d at 156 ("comity is the ultimate consideration in determining whether to provide relief under § 304.")

196. The importance of comity is well noted in the newly enacted chapter 15 of the Bankruptcy Code that has incorporated concepts of section 304(c)(2) with the major difference that comity is elevated as the prime consideration for the grant of ancillary relief to a foreign representative. 11 U.S.C. § 1507(b). *See also, In re Treco,* 240 F.3d at 157, n. 7 (a section 304 case recognizing the potential primacy of comity in the yet to-be-enacted chapter 15 legislation) *citing* Stuart A. Krause, et al., *Relief Under Section 304 of the Bankruptcy Code: Clarifying the Principal Role of Comity in Transnational Insolvencies,* 64 Fordham L.Rev. 2591, 2591–92 (1996); Hon. Burton R. Lifland, *Suggested Modification to Ancillary Proceeding Statutes,* 4 Am. Bankr.Inst. L.Rev. 530, 530 (1996).

197. In determining whether to grant comity, "[t]he key issue is one of due process and the public policy of the forum." *Multicanal,* 314 B.R. at 503 (citing *Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 246 (2d Cir.1999)). Specifically, courts should analyze whether the proceeding is conducted in good faith, *id.* at 507 ("[Good faith] is incorporated into § 304 through the concept of comity.... Notice is, of course, a key element of due process.") (citations omitted), and satisfies "certain indicia of fairness, including 'whether creditors of the same class are treated equally in the distribution of assets," ' *id.* at 519 (quoting *Allstate Life Ins. v. Linter Group Ltd.,* 994 F.2d 996, 999 (2d Cir.1993)).

198. The *Multicanal* court granted comity, finding that Multicanal's APE had been pursued in good faith due to its fundamental consistency "with the provisions of a confirmable Chapter 11 plan." *Id.* at 507. Similarly, the Argentine Court has ruled that Telecom Argentina's APE proceeding was consistent with Argentine law, which, as has been described, was and is fundamentally consistent with the procedural and substantive requirements of the Bankruptcy Code.

199. The Argentine Court has ruled that the APE was an appropriate response to the business crisis faced by Telecom Argentina.

> In respect of the proposal made, taking into consideration the restructuring sought as a means of turning around the business crisis, the elements provided to the case by the debtor and those required by the Court, such proposal does not appear to be abusive, fraudulent or discriminatory in accordance with the applicable legal regulations.

Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05), at 5.

200. Comity is therefore especially appropriate where, as here, the Argentine Court has issued a final judgment that the APE meets the requirements of Argentine Insolvency Law, and that judgment is final and binding on all affected creditors as a matter of Argentine law.

**\*27**  201. "Implicit in the notion of the extension of comity is the acceptance that, once the demands of procedural due process have been met, the court granting comity must accept the finality of those foreign acts, and not question or address issues that could have been but were not raised in that foreign proceeding." *Hopewell,* 238 B.R. at 60 (internal citation omitted); *see also Sure–Snap Corp. v. State Street Bank & Trust Co.,* 948 F.2d 869, 873 (2d Cir.1991) (recognizing that confirmed plans are binding on debtors and creditors and that the doctrine of *res judicata* "bars re-litigation not just of those claims which were brought in a prior proceeding, but of 'any other admissible matter' which could have been brought, but wasn't") (citations omitted).

202. As the Court of Appeals for the Second Circuit has recognized, the "finality interests of *res judicata* are particularly important in the bankruptcy context, where numerous contending claims and interests are gathered, jostle, and are determined and released." *In re Am. Preferred Prescription Inc.,* 255 F.3d 87, 94 (2d Cir.2001) (quoting *Corbett v. MacDonald Moving Servs., Inc.,* 124 F.3d 82, 91 (2d Cir.1997)).

203. Argo's grounds for arguing that comity should be denied include these:

? Telecom Argentina was not insolvent.

? Telecom Argentina could have paid more.

? Telecom Argentina's APE agreement was not consistent with the Trust Indenture Act.

? The APE process does not permit adequate bases for objection to an APE.

204. None of these grounds will suffice to deny comity.

205. First, in its Approval Order the Argentine Court found expressly that the restructuring was undertaken as "a means of turning around the business crisis," and that Telecom Argentina's APE "does not appear to be abusive, fraudulent or discriminatory." Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05), at 5. That ruling, which constitutes a finding that Telecom Argentina met the financial eligibility requirements to file an APE, was not contested by Argo in the Argentine Court, and may not be collaterally attacked by Argo in this Court.

206. Moreover, the Bankruptcy Code contains no requirement that a debtor be insolvent to be eligible to file, so the APE law's standards are consistent with those of the United States. *See,* 2 Collier on Bankruptcy, ¶ 109,03[2] at 109–16 (Alan N. Resnick & Henry J. Sommer, 15th ed. rev.2005) (insolvency not required for chapter 7 eligibility). *See also NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.),* 384 F.3d 108, 112 (3d Cir.2004) ("[A] debtor need not be insolvent before filing for bankruptcy protection."), *cert. denied,* 125 S.Ct. 2542 (2005); *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.),* 200 F.3d 154, 163 (3d Cir.1999) ("It is well-established that a debtor need not be insolvent before filing for bankruptcy protection.").

**\*28** 207. Second, whether a debtor could have paid more is not a basis for withholding comity. *Multicanal,* 314 B.R. at 507–08 ("[T]he bankruptcy code does not require rejection of a consensual plan that has received the requisite vote because the debtor could 'pay more.' "). While equity holders were permitted to retain their interests, uncontradicted evidence demonstrated that the alternative was liquidation, since Telecom Argentina would have lost its operating license. Telecom Ex. 1, Tab D (Final Solicitation Statement); Tr. Lorente 30:12–30:19. Given the extremely high vote in favor of the APE, U.S. law would favor approval whether or not the absolute priority rule were met.

208. Third, a grant of comity does not depend upon adherence to the Trust Indenture Act, which would prevent most reorganizations where a debtor has issued public debt. *Argentinian Recovery Co., et al. v. Bd. of Dir. Of Multicanal S.A.,* No. 04 Civ. 3619(AKH) (S.D.N.Y. filed Apr. 5, 2005) (affirming bankruptcy court decision based upon oral ruling); *Argentinian Recovery Co. v. Bd. of Dirs. Of Multicanal S.A.,* 331 B.R. 537 (S.D.N.Y.2005) (reaffirming bankruptcy court's determination); *In re Bd. of Dirs. of Multicanal S.A.,* 307 B.R. 384 (Bankr.S.D.N.Y.2004); *see also In re Board of Dirs. Telecom Argentina,* 2005 U.S. Dist. LEXIS 28640, *8 ("If a foreign insolvency proceeding is entitled to comity under section 304, there is no principaled basis for concluding that a noteholder's rights under the [Trust Indenture Act] should trump that proceeding.") As the Argentine Court noted:

This is the main reason why an *Acuerdo Preventivo Extrajudicial* is filed with a jurisdictional body for purposes of approval, that is, to cause the proposal to be enforceable against absent or non-consenting creditors upon the existence of a majority, but not unanimous, acceptance.

In such respect, the legal provisions are consistent with the application of the insolvency principles relating to the restructuring and protection of financially distressed companies, the preservation of job positions, equal treatment to creditors in the same condition, among others.

Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05), at 4.

209. Finally, the experts agreed that the term "abuse" was an umbrella for a wide variety of objections. Telecom Ex. 3 (Lorente Supp. Decl.), ¶ 29–30; Tr. Lorente 32:3–32:14;

Tr. Rivera 76–77, 74:24–75:8. Argo availed itself of none of them.

210. For these reasons, this Court will grant comity to Telecom Argentina's APE Proceeding.

**6. *Argo And U.S. Bank Are Bound By The Approval Order***
211. As under U.S. law, all affected creditors are bound by an approved APE, to ensure that no creditor may do an end run around the process. *See* Telecom Ex. 2 (Lorente Decl.), ¶¶ 7, 10, 37 and 69. Indeed, the Argentine Court noted in the Approval Order that one of the major objectives of the 2002 Amendment of the APE law was to ensure that minority non-consenting creditors could be bound. Telecom Ex. 1, Tab I (Argentine Court Order, dated 5/26/05), at 3.

**\*29** 212. Similarly, under the Bankruptcy Code any creditor is bound by a confirmation order, whether or not the creditor

participated in the bankruptcy case. *See* 11 U.S.C. § 1141(a); *Maxwell Communication Corp. PLC by Homan v. Societe Generale (In re Maxwell Communication Corp. plc),* 93 F.3d 1036, 1044 (2d Cir.1996) ("An order of confirmation concededly binds the debtor and its creditors whether or not they have accepted the confirmed plan."); *cf. Tennessee Student Assistance Corp. v. Hood,* 541 U.S. 440, 447 (2004) ("A bankruptcy court is able to provide the debtor a fresh start ... despite the lack of participation of all of his creditors, because the court's jurisdiction is premised on the debtor and his estate, and not on the creditors.") (citations omitted).

213. Based upon the foregoing, the petitioner's request for relief under section 304 of the Bankruptcy Code is granted. An order and judgment in accordance with these findings of fact and conclusions of law shall be entered simultaneously herewith.

## Footnotes

1   References to the trial transcript are indicated by "Tr. [Witness] ___." References to trial exhibits are indicated by "Telecom Ex. __" or "Argo Ex. __."

2   The clearing systems are systems for transferring bonds and cash between buyers and sellers. Transfers of bonds are usually made by book entry transfer. The systems used for these securities are Depository Trust Company, Euroclear Bank S.A./N.V. and Clearstream Banking S.A (Luxembourg).

3   The Bank of New York was the "settlement agent" under the terms of the APE, acting as attorney in fact for holders of outstanding notes. Telecom Ex. 1, Tab F (APE Agreement), at 1.

4   These documents include the following, each certified by a public accountant (preferably the debtor's independent auditors): (i) a statement of assets and liabilities valued as of a cut-off date (the "Assets and Liabilities Statement") on or about the date of the APE; (ii) a schedule listing all of the debtor's creditors, certified as to completeness; (iii) a schedule listing pending lawsuits and administrative procedures against the debtor, indicating the courts where such proceedings are pending; (iv) a schedule listing its accounting books, and other books; and (v) evidence that the Requisite Holders have consented to the APE, indicating the amount of debt affected by the APE that is held by creditors that have expressed their support for and consent to the APE and the number of claims represented by such creditors. Telecom Ex. 2 (Lorente Decl.) ¶ 32.

5   Dr. Rivera had no knowledge of the disclosure of information to creditors in Telecom Argentina's case and, therefore, offered no opinion regarding this issue. Tr. Rivera 73:9–73:22.

6   Dr. Rivera's limited definition also ignored the fact that the term "abusive" is a legal term defined in Article 1071 of the Argentine Civil Code, which the appellate courts have held is applicable to APE proceedings. Telecom Ex. 3 (Lorente Decl.), ¶ 30. As set forth in Article 1071 of the Argentine Civil Code, "[t]he abusive exercise of rights shall be considered that which contravenes the purposes the law had in mind when recognizing them or that which exceeds the limits imposed by good faith, ethics, and morals." *Id.* (citing Article 1071 of the Argentine Civil Code).

7   Dr. Rivera, Argo's expert, had not studied Telecom Argentina's Argentine Court proceedings prior to issuing his opinion and neither did contradict, nor could have contradicted, Dr. Lorente's testimony. Tr. Rivera 73:23–74:13.

8   Argo is not a U.S. creditor. (Respondent The Argo Fund, Ltd.'s Answer, Defenses and Objections to the Verified Petition of Telecom Argentina, S.A. (Docket no. 10), at 10). There is no need to address the question whether Argo is entitled to the protections of Section 304.

9   Although Argo's expert initially believed that Telecom Argentina's proposal treated creditors unequally because dissenting creditors were not given the same opportunity as consenting creditors to choose among the three consideration options, he had failed to review the Argentine Court's order mandating a change in the APE. Tr. Rivera 71:17–73:8. After discovering that the Approval Order

required Telecom Argentina to allow dissenting creditors to elect from the three options, he agreed that the basis for his objection no longer existed. *Id.*

10    The Multicanal APE was found to have certain deficiencies that are not relevant here.

11    The sixth enumerated factor, the "provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns," does not apply to this case because Telecom Argentina is a business entity. *See In re Culmer,* 25 B.R. 621, 631 n. 4 (Bankr.S.D.N.Y.1982) (The § 304(c)(6) factor "by its terms relates to individual debtors and thus has no application" in the case of a business entity.).

---

**End of Document**                                           © 2013 Thomson Reuters. No claim to original U.S. Government Works.

## Exhibit K.4

***In re Canwest Global Communications Corp., et al.*, No. 09-15994
(Bankr. S.D.N.Y. Nov. 3, 2009) [Docket No. 34]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ X
                                                    :
In re:                                              :    Chapter 15
                                                    :
CANWEST GLOBAL COMMUNICATIONS                       :    Case No. 09 - 15994
CORP., et al.                                       :
                                                    :
        Debtors in a Foreign Proceeding.            :    Jointly Administered
                                                    :
------------------------------------------------------------------ X

## ORDER GRANTING RECOGNITION
## AND RELIEF IN AID OF FOREIGN MAIN PROCEEDINGS

Hearings having been held before this Court on October 6, 2009, October 15, 2009 and

November 3, 2009 (the "Hearings") to consider (1) the Official Form B-1 Petitions (the "Chapter

15 Petitions") and the Verified Petition Pursuant To 11 U.S.C. §§ 105(a), 1504, 1507, 1515,

1517, 1519, 1520 And 1521, Commencing Chapter 15 Cases And Seeking Entry Of An Order

Recognizing Foreign Main Proceedings And Granting Further Relief And Additional Assistance

(together with all exhibits appended thereto, the "Verified Petition") of Canwest Global

Communications Corp. ("Canwest Global"), Canwest Media Inc. ("CMI"), 4501063 Canada Inc.

("4501063"), Canwest Television GP Inc. ("Canwest Television"), and Canwest Global

Broadcasting Inc./Radiodiffusion Canwest Global Inc. ("Canwest Broadcasting," and

collectively with Canwest Global, CMI, 4501063, and Canwest Television, the "Debtors"),

presented by FTI Consulting Canada Inc. as court-appointed monitor and authorized

representative ("Monitor") of the Debtors, for recognition of foreign main proceedings (the

"Canadian Proceedings") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985,

c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List) at

Toronto (the "Canadian Court"), and seeking enforcement pursuant to sections 105(a), 1504,

1507, 1515, 1517, 1519, 1520, and 1521 of title 11 of the United States Code (the "Bankruptcy

Code") of the Initial Order of the Canadian Court dated October 6, 2009 (as it may be amended

or extended from time to time by the Canadian Court, the "Initial CCAA Order") in the United

States and (2) the Monitor's *Ex Parte* Motion for Order to Show Cause with Temporary

Restraining Order and, After Notice and a Hearing, a Preliminary Injunction (the "TRO

Motion"); and upon this Court's review and consideration of the Chapter 15 Petitions, the

Verified Petition, the TRO Motion, the Affidavit of John E. Maguire annexed to the Verified

Petition, the Memorandum of Law in Support of the Verified Petition, the Amended

Supplemental Memorandum of Law in Support of Monitor's *Ex Parte* Motion for Order to Show

Cause with Temporary Restraining Order and, After Notice and a Hearing, Preliminary

Injunction, the Supplemental Declaration of John E. Maguire in support of the TRO Motion, the

Declaration of Ashley John Taylor, Esq. in support of the TRO Motion and all other documents

filed in support of the Verified Petition and the TRO Motion on behalf of the Debtors; and this

Court having concluded that appropriate and timely notice of the filing of the Chapter 15

Petitions, the Verified Petition, and the TRO Motion have been given; and the Hearings having

been held; and upon the record of the statements made at the Hearings; and after due deliberation

and sufficient cause appearing therefor, this Court finds and concludes as follows:

A.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.

B.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

C.      Venue is properly located in this District pursuant to 28 U.S.C. § 1410.

D.      These chapter 15 cases were properly commenced pursuant to sections 1504 and

1515 of the Bankruptcy Code.

2

E.     The Monitor is a "foreign representative" and a person within the meaning of sections 101(24) and 1517(a)(2) of the Bankruptcy Code; and the Monitor is the duly appointed foreign representative of the Debtors, as required by section 101(24) of the Bankruptcy Code.

F.     The Canadian Proceedings currently pending before the Canadian Court for the Debtors constitute "foreign proceedings" within the meaning of section 101(23) of the Bankruptcy Code.

G.     The Canadian Proceedings are pending in Canada, which is where the center of main interests of each of the Debtors is located, and each is a "foreign main proceeding" within the meaning of section 1502(4) of the Bankruptcy Code and under section 1517(b)(1) of the Bankruptcy Code.

H.     The Chapter 15 Petitions and the Verified Petition meet the requirements of section 1515 of the Bankruptcy Code.

I.     The Canadian Proceedings are entitled to recognition as foreign main proceedings under section 1517 of the Bankruptcy Code.

J.     **SMB 11/3/09**  The Monitor is entitled to all of the relief provided under sections 1520 ~~and 1521~~ of the Bankruptcy Code, without limitation.

K.     **SMB 11/3/09** ~~It appears to~~ The Court **concludes**  that the Debtors will suffer irreparable harm unless creditors and contractual counterparties are enjoined to the extent provided in this Order.

L.     The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to sections 1517, 1520 and 1521 of the Bankruptcy Code.

3

M.    **SMB 11/3/09**  To the extent not already provided by virtue of sections 105(a), 1517, 1519, **and** 1520 ~~and 1521~~ of the Bankruptcy Code, and as may be necessary to effectuate the Initial CCAA Order in the United States, additional assistance pursuant to section 1507 of the Bankruptcy Code is consistent with the principles of comity as the Canadian Proceedings reasonably assure (1) just treatment of all holders of claims against or interests in the Debtors' property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the Canadian Proceedings; (3) prevention of preferential or fraudulent dispositions of property of the Debtors; and (4) distribution of proceeds of the Debtors' property substantially in accordance with the order prescribed by title 11 of the United States Code.

THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.    The Canadian Proceedings are recognized as foreign main proceedings under section 1517(b)(1) of the Bankruptcy Code.

2.    **SMB 11/3/09**  All provisions of section  1520 ~~and 1521(a)~~ of the Bankruptcy Code apply in these chapter 15 cases, including, without limitations, the stay under section 362 of the Bankruptcy Code and the provisions of section 363 of the Bankruptcy Code throughout the duration of these chapter 15 cases or until otherwise ordered by this Court.

3.    **SMB 11/3/09**  ~~Pursuant to sections 1520 and 1521 of the Bankruptcy Code and, as necessary, sections 105(a) and 1507 of the Bankruptcy Code, the Initial CCAA Order is hereby given full force and effect in the United States as to the Debtors so long as such Initial CCAA Order is in effect in the Canadian Proceedings.~~

4.    For so long as the Initial CCAA Order is in effect in the Canadian Proceedings or otherwise ordered by this Court, the individuals, firms, corporations and other

NEWYORK\39492.9

entities listed on annexed Exhibit A hereto (all of the foregoing, collectively being "Person" and each being a "Person"), and all those acting for or on their behalf, are hereby enjoined **SMB 11/3/09** ~~and prohibited on a preliminary basis for an indefinite period~~, in the United States and its territories from, discontinuing, altering, failing to honor, interfering with, repudiating, ceasing to perform, or terminating any right, renewal right, contract agreement, license or permit with Canwest Television Limited Partnership ("Television Partnership") for the supply of goods and/or services, including without limitation all programming supply, computer software, communication and other data services to Television Partnership, on the basis of, or as a result of, the filing of the Chapter 15 cases, the Canadian Proceedings or any amounts outstanding as of the filing of the Chapter 15 cases to the same extent as set forth in the Initial CCAA Order as it exists as of this date; provided, in each case, that the contractual prices or charges for all such goods or services received after the date of the Initial CCAA Order are paid by the Debtors or Television Partnership in accordance with normal payment practices of the Debtors or Television Partnership or such other practices as may be agreed upon by the supplier or service provider, the Debtors, Television Partnership and the Monitor, or as may be ordered by the Court. Notwithstanding the foregoing, nothing contained in this Paragraph 4 is intended to nor shall it be construed as preempting, abrogating or otherwise limiting any rights of a Person under the Initial CCAA Order and the CCAA.

5.      Nothing in this Order shall be construed to limit in any way any additional relief granted by this Court or any other additional injunctive relief the Court may grant from time to time.

6.      **SMB 11/3/09** ~~Notwithstanding anything to the contrary in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or the Federal Rules of Civil Procedure, all~~

~~persons and entities (other than the Monitor and its expressly authorized representatives and agents) are hereby enjoined from invoking, enforcing or relying on the benefits of any statute, rule or requirement of federal, state or local law or regulation requiring the Monitor or the Debtors to establish or post security in the form of a bond, letter of credit or otherwise as a condition of prosecuting or defending any proceeding, and such statute, rules or requirement will be rendered null and void for the purposes of such proceedings~~.

7.      This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any request for additional relief and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

8.      The Monitor shall provide service and notice of this Order by first class mail, postage prepaid, upon (a) all known parties against whom provisional relief is being granted in these chapter 15 cases,  **SMB 11/3/09  including all parties listed on Exhibit A**  (b) all parties to litigation pending in the United States in which a Debtor is a party at the time of filing of the Chapter 15 Petitions and (c) the United States Trustee, which service and notice shall constitute sufficient service and notice of this Order.

Dated:   November 3, 2009
        New York, New York


**/s/  STUART M. BERNSTEIN**
UNITED STATES BANKRUPTCY JUDGE


**Issued:  2:22 p.m.**

NEWYORK\39492.9

7

# AMENDED CHAPTER 15 SERVICE LIST

### CANWEST CONTRACT COUNTERPARTIES

ADVERTISING AGE INTL.
SUBSCRIBER SERVICES
1155 GRATIOT AVE
DETROIT, MI 482072912

AKAMAI TECHNOLOGIES
8 CAMBRIDGE CENTER
CAMBRIDGE, MA 02142
ATTN: GENERAL COUNSEL

ALAN LESNER
#27C - 1600 PARKER AVENUE
FORT LEE, NJ 07024

ALFRED HABER DISTRIBUTION INC.
#203 - 111 GRAND AVENUE
PALISADES PARK, NJ 07650

ALL MOBILE VIDEO
221 WEST 26TH STREET
NEW YORK, NY 10001

ALLEN J. ABEL
17811 SHOTLEY BRIDGE PLACE
OLNEY, MD 208321669

ARC HOLDING, LTD
SPORT ACCESS, A DIVISION OF ARC
HOLDING, LTD, A TEXAS LIMITED
PARTNERSHIP
100 E. ROYAL LANE
SUITE 250
IRVING, TX 75039

ARVATO SYSTEMS NA, INC.
1540 BROADWAY, 11TH FLOOR
NEW YORK, NY 10036

ASCENT MEDIA
520 BROADWAY, 5TH FLOOR
LOS ANGELES, CA 90401-2420

ASI PHOTO
4945 PRESIDENTS WAY
TUCKER, GA 30084

ASSOCIATED PRESS TELEVISION NEWS
1825 K STREET, NW, SUITE 800
WASHINGTON, DC 2006-1217

ATLANTIC TELEVISION INC.
524 BROADWAY - 4TH FLOOR
NEW YORK, NY 10012

AUDIO IMPLEMENTS/GKC
1703 PEARL STREET
WAUKESHA, WI 53186

AUDIT BUREAU OF CIRCULATIONS
1884 PAYSPHERE CIRCLE
CHICAGO, IL 60674

AVID TECHNOLOGY INC.
ONE PARK WEST
TEWKSBURY, MA 01876

B&B ELECTRONICS MANUFACTURING
COMPANY
707 DAYTON ROAD
OTTAWA, IL 61350

BARWALL PRODUCTIONS INC.
C/O STARR & COMPANY, LLC
850 THIRD AVENUE
NEW YORK, NY 10022

BEXEL
1001 N UNION BOWER RD.
IRVING, TX 75061

BLAKE NEBEL (HAYES)
76 RIVERSIDE DRAPT 2-B
NEW YORK NY 10024

1

BRIAN C. KALT
MICHIGAN STATE UNIVERSITY
415 LAW COLLEGE BUILDING
EAST LANSING, MI 48824

BROADWAY VIDEO ENTERPRISES
1619 BROADWAY - 9TH FLOOR
NEW YORK, NY 10019

BUENA VISTA INTERNATIONAL INC.
350 SOUTH BUENA VISTA STREET
BURBANK, CA 91521

CAPANIS NETWORKS
419 LAFAYETTE STREET
NEW YORK, NY 10003

CBS BROADCAST INTERNATIONAL
1700 BROADWAY 9TH FLOOR
NY, NY 10019-5905
ATTN LISA CABRAL

CBS INC.
7800 BEVERLEY BOULEVARD
LOS ANGELES, CA 90063

CBS NEWS
21940 NETWORK PLACE
CHICAGO, IL 606731219

CBS NEWS
524 WEST 57TH STREET
NEW YORK, NY 100192985

CBS PHOTO ARCHIVE
51 WEST 52ND STREET, ROOM 463
NEW YORK, NY 10019

CBS STUDIOS INC.
#353 - 345 NORTH MAPLE DRIVE
BEVERLY HILLS, CA 90210

CBS TELEVISION NETWORK
51 WEST 52ND STREET
NEW YORK, NY 10019

CINAMOUR ENTERTAINMENT
BLDG B
#470 - 15301 VENTURA BLVD.
SHERMAN OAKS, CA 91403

CINCITY MEDIA INC.
720 TAM O'SHANTER
LAS VEGAS, NV 89109

CLASSIFIEDS PLUS INC.
2451 WEHRLE DRIVE
WILLIAMSVILLE, NY 14221

CNN NEWSOURCE SALES
ONE CNN CENTRE ROOM #NT1212B
ATLANTA, GA 30303-2762

COMMENTARY
165 EAST 56TH STREET
NEW YORK, NY 10022

CRAWFORD COMMUNICATIONS INC.
3845 PLEASANTDALE ROAD
ATLANTA, GA 303404205

CW LICENSING, LLC
#600 - 1207 VENTURA BOULEVARD
ENCINO, CA 91436

DANIELLE CRITTENDEN FRUM
3111 FOXHALL ROAD N.W.
WASHINGTON, DC 20016

DDDDC INC.
464 GIBBS POND ROAD
NESCONSET, NY 11767

DICOMM MEDIA
333 WEST 39TH STREET, SUITE 602, NEW
YORK, NY 10018 USA
ATTENTION: MR. PAUL SCHNABEL,
PRINCIPAL

DIGI-KEY CORPORATION
701 BROOKS AVENUE S.
THIEF RIVER FALLS, MN 56701

2

DIGITAL MEDIA COMMUNICATIONS
140 DUTCHMAN BLVD., SUITE C
IRMO, SC 29063

DIRECT RESOURCES GROUP
#300 - 311 OCCIDENTAL AVENUE S.
SEATTLE, WA 98104

E! ENTERTAINMENT TELEVISION
5750 WILSHIRE BOULEVARD
LOS ANGELES, CA 90036
ATTN: CHERYL MCDERMOTT VICE
PRESIDENT E! ENTERTAINMENT
TELEVISION INC. FAX (310) 954-2617
WITH A COPY TO STEPHEN COHEN, VICE
PRESIDENT BUSINESS AND LEGAL AFFAIRS
FAX (323) 954-2770

E2V TECHNOLOGIES INC.
4 WESTCHESTER PLAZA
ELMSFORD, NY 10523

EAGLEVISION ENTERTAINMENT
CORPORATION
13400 ISIS AVENUE
HAWTHORNE, CA 90250

EMI ENTERTAINMENT WORLD INC.
75 NINTH AVENUE – 4TH FLOOR
NEW YORK, NY 10011

EMILY COX & HENRY RATHVON
863 HILLTOP ROAD
LEMOYNE, PA 17043

ENDEMOL ENTERTAINMENT USA INC.
#1100 - 9255 SUNSET BOULEVARD
LOS ANGELES, CA 90069

ERIC PALMA
#9B - 75 LIVINGSTON STREET
BROOKLYN, NY 11201

ERIC SORENSEN
27 VALEWOOD CRESCENT
OTTAWA, ON
K1B 4G1

COPY TO:
#850 - 400 NORTH CAPITAL STREET N.W
WASHINGTON, DC 20001

ESTEL DILLON
687 OLD HUNT WAY
HERNDON, VA 20170

EXCLUSIVE ARTISTS MANAGEMENT
7700 SUNSET BOULEVARD
LOS ANGELES CA 90046

FEATUREWELL.COM INC.
238 WEST FOURTH ST
NEW YORK, NY 10014

FILM/VIDEO EQUIPMENT SERVICE CO.
800 S. JASON STREET
DENVER, CO 80223

FLETCHER CHICAGO INC.
39185 TREASURY CENTER
CHICAGO, IL 606949100

FOCAL POINT PRODUCTIONS
#298 - 269 SOUTH BEVERLY DRIVE
BEVERLY HILLS, CA 90212

FORRESTER RESEARCH, INC.
233 BROADWAY, SUITE 1005
NEW YORK, NY 10279

FOX MOBILE ENTERTAINMENT INC.
#353 - 345 NORTH MAPLE DRIVE
BEVERLY HILLS, CA 90210

FOX NEWS NETWORK EDGE
BANK OF AMERICA
5731 COLLECTION CENTER DRIVE
CHICAGO, IL 60693
ATTN: JUDY SLATER

FOX ROTHSCHILD LLP
2000 MARKET STREET - 10TH FLOOR
PHILADELPHIA, PA 191033291

FOX SPORTS INTERNATIONAL INC.
10201 WEST PICO BLVD. BUILDING 103
LOS ANGELES CA 90035
ATTN: DIRECTOR OF PROGRAMMING AND
AN ADDITIONAL COPY TO VICE PRESIDENT,
BUSINESS AND LEGAL AFFAIRS

3

FOX SPORTS PRODUCTIONS
10201 WEST PICO BLVD. BUILDING 103
LOS ANGELES, CA 90035
ATTN: DIRECTOR OF PROGRAMMING AND
AN ADDITIONAL COPY TO VICE PRESIDENT,
BUSINESS AND LEGAL AFFAIRS

FRANK STURGES REP
142 WEST WINTER STREET
DELAWARE, OH  43015

FRONT PORCH DIGITAL INC.
#204-2011 CHERRY STREET
LOUISVILLE, CO  80027

GLAM MEDIA INC.
#130 - 8000 MARINA BOULEVARD
BRISBANE, CA  94005

GORILLA NATION MEDIA (CANADA), ULC
#300 - 5140 WEST GOLDLEAF
LOS ANGELES, CA  90056

GURIN JUMA LLC
THE GURIN COMPANY AND JUMA
ENTERTAINMENT LLC
11846 VENTURA BLVD SUITE 303
VENTURA CITY, CA 91604

HARPER COLLINS PUBLISHERS
10 EAST 53RD STREET
NEW YORK, NY  100225299

HARRIS CORPORATION
DAVID HALL, TREASURER, JDS COLUMBINE
SYSTEMS INC.
1999 BROADWAY, SUITE 4000,
DENVER, COLORADO 90202 (FAX: 303 237
0085)
WITH A COPY TO:
CONTRACTS DEPARTMENT, JDS
COLUMBINE SYSTEMS INC.
1999 BROADWAY, SUITE 4000,
DENVER, COLORADO, 90202

HBO ENTERPRISES
1100 AVENUE OF THE AMERICAS
NEW YORK, NY 10036
ATTN: CO-PRESIDENT AND GENERAL
COUNSEL
AND TO: VICE PRESIDENT, DISTRIBUTION
OPERATIONS AND REPORTING

HOME BOX OFFICE
1100 AVENUE OF THE AMERICAS
NEW YORK, NY 10036
ATTN: CO-PRESIDENT AND GENERAL
COUNSEL
AND TO: VICE PRESIDENT, DISTRIBUTION
OPERATIONS AND REPORTING

IMPULSE MEDIA
322 8TH AVENUE
8TH FLOOR
NEW YORK, NY 10001

INFORM TECHNOLOGIES LLC
145 EAST 57TH STREET  6TH FLOOR
NEW YORK, NY  10022
ATTN: CHIEF EXECUTIVE OFFICER
FAX (212) 937-2804

INTERNATIONAL ELECTRONIC
ENTERPRISES
INC.110 AGATE AVENUE
NEWPORT BEACH CA 92662

IRON MOUNTAIN INTELLECTUAL
PROPERTY
MANAGEMENT
745 ATLANTIC AVE.
BOSTON MA 02111

JANET WHITMAN
5C-6C, 307 EAST 8TH STREET
NEW YORK, NY  10009

JAYNE LUKAS
10716 KINGS RIDING WAY #101
ROCKVILLE, MD  20852

4

JEFF TURICK
63 WHITTINGHAM PLACE
WEST ORANGE, NJ 07052

JEFF ZELEVANSKY PHOTOGRAPHY
9 OAKVIEW AVENUE
MAPLEWOOD, NJ 07040

JESSE WINTER PHOTOGRAPHY
2273-244 5TH AVENUE
NEW YORK, NY 10001

JMBP, INC.
640 NORTH SEPULVEDA
LOS ANGELES, CA 90049

JOHN NORMILE
DBA – PRO PHOTOS BY JOHN
1712 LAKEVIEW RD.
LAKEVIEW, NY 14085

JUST CHRISTMAS DECOR INC.
#D384 - 28039 SCOTT ROAD
MURRIETA, CA 92563

KEVIN MCMANUS
1416 NORTH TAYLOR STREET
ARLINGTON, VA 22201

KILLER TRACKS, A DIVISION OF BMG
MUSIC PUBLISHING NA, INC.
8750 WILSHIRE BOULEVARD
BEVERLY HILLS, CA 90211

KING COMMUNICATIONS
STE 1309, 436 14TH STREETCENTRAL
BUILDING
OAKLAND, CA 94612

LEGACY.COM
820 DAVIS STREET
SUITE 504
EVANSTON, ILLINOIS 60201

LILLA ROGERS
6 PARKER ROAD
ARLINGTON, MA 02474

MADELINE WOODMANSEE
38 PERRY STREET
AUBURN, NY 13021

MAPS.COM
#H - 120 CREMONA DRIVE
SANTA BARBARA, CA 93117

MARTIN WILLIAMS ADVERTISING
2800-60S 6TH STREET
MINNEAPOLIS, MN 55402

MELISSA ARONCZYK
#2R 2576 44TH STREET
ASTORIA, NY 11103

MICHAEL FUMENTO
1439 NORTH SCOTT ST
ARLINGTON, VA 222093011

MIMI TOMPKINS
#41 - 240 WAVERLY PLACE
NEW YORK, NY 10014

MIT SLOAN MANAGEMENT REVIEW
ROOM E60-10077 MASSACHUSETTS AVENUE
CAMBRIDGE, MA 021394307

MSE MEDIA SOLUTIONS
6013 SCOTT WAY
LOS ANGELES, CA 90040

MTV NETWORKS
1515 BROADWAY
NEW YORK, NY, 100036
ATTN DEBBIE BLACK

MULTIMEDIA GRAPHIC NETWORK INC.
#260 - 2533 S. HIGHWAY 101
CARDIFF, CA 92007

MY MEDIA WORKS
#600 - 255 SOUTH ORANGE AVENUE
ORLANDO, FL 32801

MYWEATHER LLC
401 CHARMANY DRIVE, SUITE 200
MADISON, WI 53719

NBC NEWS CHANNEL
925 WOOD RIDGE CENTRE DRIVE
CHARLOTTE, NORTH CAROLINA 28217
ATTN: PRESIDENT
FAX (704) 329-8709

NES COMMUNICATION SERVICES
786 HARTFORD TURNPIKE
SHREWSBURY, MA 015454168

NEIL DUNLOP
655 OAK TREE ROAD
PALISADES, NY 10964

NEW YORK TIMES SYNDICATION SALES
CORP.
609 GREENWICH STREET, 6TH FLOOR
NEW YORK, NY 10014-3610

NEWSCOM SERVICES INC.
#B - 375 CHIPETA WAY
SALT LAKE CITY, UT 841081261

NEWSPAPER ASSOCIATION OF AMERICA
4401 WILSON BLVD. SUITE 900
ARLINGTON, VA 22203

NOLL & ASSOCIATES MANAGEMENT
SERVICES
#I - 20 SUNNYSIDE AVENUE
MILL VALLEY, CA 94941

ORAD, INC.
30 MONTGOMERY STREET, SUITE 270
JERSEY NJ 07302

ORR & RENO
1 EAGLE SQUARE #10
CONCORD, NH 03301-4903
WITH A COPY TO:
P.O. BOX 3550
CONCORD, NH 03302-355

PA SPORTSTICKER INC.
989 6TH AVENUE, 2ND FLOOR
NEW YORK, NY 10018

PACIFIC TELEVISION CENTRE
3440 MOTOR AVENUE
THE CIRCULAR BUILDING
LOS ANGELES, CA 90034

PAUL JOHNSON
3451 - 17TH STREET N.W.
WASHINGTON, DC 20010

PAUL KEPPLE
#5F, 428 NORTH 13TH STREET
PHILADELPHIA PA 19123

PENGUIN GROUP (USA) INC.
375 HUDSON STREET, 3RD FLOOR
NEW YORK, NY 10014

PETER MANDEL
239 TRANSIT STREET
PROVIDENCE, RI 02906

PGA TOUR, INC.
2315 COHEN
ST. LAURENT QUEBEC H4R 2N7
COPY OF NOTICE TO:
PGA TOUR, INC.
112 PGA TOUR BOULEVARD
PONTE VEDRA BEACH, FL 32082
ATTN.: GENERAL COUNSEL

PHILIP RAMEY PHOTOGRAPHY LLC
23852 PACIFIC COAST HIGHWAY
#910
MALIBU, CA 90265

PIXELL
360 READ DRIVE
LAFAYETTE, CA 94549

PORCHLIGHT DISTRIBUTION INC.
11777 MISSISSIPPI AVENUE
LOS ANGELES, CA 90025

6

PRESS ASSOCIATION INC.
AKA ASSOCIATED PRESS
1825 K STREET NW
WASHINGTON, D.C. 20006
ATTN: DIRECTOR OF ADMINISTRATION

PROTEUS INTERNATIONAL INC.
278 ROUTE 299
HIGHLAND, NY  12528

QUANTUM CORPORATION
1650 TECHNOLOGY DRIVE, SUITE 700
SAN JOSE, CA  95110-1382

RACER MEDIA INC.
623 N. VISTA STREET
LOS ANGELES, CA  90036

RANDOM HOUSE PUBLISHING GROUP
1745 BROADWAY, 3RD FLOOR
NEW YORK, NY  10019

REBECCA GIBB
3502 ATWATER AVENUE
LOS ANGELES, CA  90039

REUTERS AMERICA LLC
3 TIMES SQUARE
NEW YORK, NY  10036

RHI INTERNATIONAL DISTRIBUTION INC.
#2100 - 1325 AVENUE OF THE AMERICAS
NEW YORK, NY 10019

RIEDEL COMMUNICATIONS INC.
1721 VICTORY BOULEVARD
GLENDALE, CA  91201

RITSKO UCHIDA
#508 - 535 DEAN STREET
BROOKLYN, NY 11217

RON REID
3101 - 26TH STREET
LUBBOCK, TX  79410

S. GORKA
1250 PINE HILL ROAD
MCLEAN, VA 22101

SETANTA SPORTS IRL LIMITED
#360 - 501 SECOND STREET
SAN FRANCISCO, CA 94107

SFM ENTERTAINMENT LLC
1180 AVENUE OF THE AMERICAS
SUITE 2010
NEW YORK, NY  10036

SHELBY LYMAN
BASIC CHESS FEATURES
102 BLATCHLEY RD
WINDSOR, NY  13865

SHELDON ALBERTS
1804 ALCAN DRIVE
SILVER SPRING, MD  20902

SIMON & SCHUSTER INC
1230 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

SOCCER UNITED MARKETING, LLC
420 5TH AVENUE - 7TH FLOOR
NEW YORK, NY  10018

SONY PICTURES STUDIOS GROUP
365 BLOOR STREET EAST SUITE 1602
TORONTO, ON M4W 3L4

SONY PICTURES TELEVISION
INTERNATIONAL
10202 WEST WASHINGTON BLVD.
CULVER CITY, CA  902323119

SPLASH
SPLASH NEWS AND PICTURE AGENCY INC.
333 W. WASHINGTON BLVD. SUITE 508
MARINA DEL RAY,  CA 90212

7

STACIA TIMONERE PHOTOGRAPHY
#509 - 1415 WEST LUNT AVENUE
CHICAGO, IL 60626

STARZ MEDIA LLC
2950 NORTH HOLLYWOOD WAY - 2ND FLR.
BURBANK, CA 91505

STEVEN EDWARDS
#5D - 310 EAST 70TH STREET
NEW YORK, NY 100218619

STEVEN MUSKAT
2100 LEE HIGHWAY #449
ARLINGTON, VA 22201

STONE STANLEY DISTRIBUTION INC.
1040 NORTH LAS PALMAS AVENUE, #1
LOS ANGELES, CA 90038

SUNSHINE REALTY MANAGEMENT INC.
419 LAFAYETTE STREET - 2ND FLOOR
NEW YORK, NY 10003

SUN-TIMES NEWS GROUP INC.
350 N. ORLEANS STREET - 9TH FLOOR
CHICAGO, IL 60654

TANDBERG TELEVISION INC.
4500 RIVER GREEN PARKWAY
DULUTH, GA 30096

TEKTRONIX INC.
7416 COLLECTION CENTER DRIVE
CHICAGO, IL 60693

TELECAST FIBER SYSTEMS
102 GROVE ST.
WORCHESTER MA 01605

THE DOUBLEDAY BROADWAY PUBLISHING
GROUP
A DIVISION OF RANDOM HOUSE, INC.
1745 BROADWAY, 3RD FLOOR
NEW YORK, NY 10019

THE NEW YORK OBSERVER
915 BROADWAY
9TH FLOOR
NEW YORK, NY 10010

THE NEW YORK TIMES SYNDICATION
609 GREENWICH STREET, 6TH FLOOR
NEW YORK, NY 10014-3610

THOMSON BROADCAST & MULTIMEDIA
INC.
104 FEEDING HILLS ROAD
SOUTHWICK, MA 01077

TORNQUIST PRODUCTIONS, LLC
#6A - 410 WEST END AVENUE
NEW YORK, NY 10024

TOT PRODUCTION SERVICES
1407 SANTANELLA TERRACE
CORONA DEL MAR, CA 92625

TRACEY LAZOS
APT 809 - 95 WEST SQUANTUM STREET
QUINCY, MA 02171

TRANS WORLD INTERNATIONAL INC.
IMG CENTRE
1360 EAST 9TH STREET
CLEVELAND, OH 441141782

TRIBUNE MEDIA SERVICES
INTERNATIONAL
333 GLEN STREET
GLENS FALLS
NEW YORK, NY 12801

TRIVENI DIGITAL
40 WASHINGTON ROAD
PRINCETON JUNCTION NJ 08550

TV GUIDE
11 WEST 42ND STREET
NEW YORK, NY 10036

8

UNIVERSAL CITY STUDIOS PRODUCTIONS
100 UNIVERSAL CITY PLAZA
UNIVERSAL CITY, CA 91068

UNIVERSAL PRESS SYNDICATE
4520 MAIN STREET
KANSAS CITY, MO 64111-77701

WALTER PETERSEN
DBA RAVEN RESEARCH
320 GROVE AVENUE
FALLS CHURCH, VA 22046

WALTER ZABINSKI VIDEO
8 HENRY STREET
TENAFLY, NJ 07670

WARNER BROS. ENTERTAINMENT INC.
BUILDING 151 4000 WARNER BOULEVARD -
3RD FLOOR
BURBANK, CA 91522

WEATHER METRICS INC.
11100 W 91ST STREET
OVERLAND PARK, KS 66214

WEATHERCENTRAL
5725 TOKAY BOULEVARD
MADISON, WI 53719

YURI GRIPAS
APT 203-522 21ST STREET NW
WASHINGTON, DC 200065013

9

**Exhibit K.5**
*In re Fairfield Sentry Ltd.*, **440 B.R. 60 (Bankr. S.D.N.Y.),**
*aff'd* **No. 10 Civ. 7311(GBD), 2011 WL 4357421 (S.D.N.Y. Sept. 16, 2011)**

2011 WL 4357421
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

In re FAIRFIELD SENTRY LIMITED,
et al., Debtors in Foreign Proceedings.

No. 10 Civ. 7311(GBD).    |    Sept. 16, 2011.

**Opinion**

### MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, District Judge.

**\*1** Morning Mist Holdings Limited and Miguel Lomeli ("Appellants") bring this bankruptcy appeal challenging the July 22, 2010 Order and Opinion [1] ("Opinion") of the Honorable Burton Lifland, Bankruptcy Judge that (1) recognized the liquidation proceeding of Fairfield Sentry Limited ("Sentry") [2] pending in the British Virgin Islands (the "BVI Proceeding") as a foreign main proceeding pursuant to 11 U.S.C. § 1517(b)(l); and (2) stayed Appellants' purported derivative action as well as all actions concerning Sentry's rights and assets, except the Bernard L. Madoff Investment Securities, Inc. Trustee's pending adversary proceeding against Sentry. Appellants claim that the Bankruptcy Court erred by (1) finding that Sentry's center of main interests is the British Virgin Islands when it is instead New York; (2) failing to deny main recognition of the BVI Proceeding pursuant to the Chapter 15 public policy exception; and (3) staying Appellants' derivative action. The decision of the Bankruptcy Court is AFFIRMED.

### I. RELEVANT BACKGROUND

Sentry was organized and incorporated under the law of the British Virgin Islands ("BVI") in 1990 as a vehicle for mainly non-U.S. persons and certain tax-exempt U.S. entities to invest with Bernard L. Madoff Investment Securities, Inc. ("BLMIS"). Record on Appeal ("ROA") Vol. 1, Tab 3, ¶ 11, Tab 28, ¶ 3. It maintains its registration there. Id Fairfield Greenwich Group ("FGG"), based on Manhattan's Upper East Side, served as Sentry's investment manager. Id., Tab 28 ¶¶ 32, 47, 74. In December 2008, it became publicly known that BLMIS had for many years, if not many decades, been operated by Bernard L. Madoff as a massive Ponzi scheme.

Id., Tab 3, ¶ 18. As a result of Madoff's fraudulent scheme, billions of dollars of investor funds, including funds held on behalf of Sentry, were paid out by BLMIS as returns of principal, as distributions of fictitious profits, or otherwise dissipated and misappropriated by Madoff and/or others acting in concert with him. Id.

Following the disclosure of Madoff's scheme, Sentry ceased its routine operations and changed its business purpose to "preserv[ing] and realiz[ing] Sentry's] assets for purposes of ultimate, orderly and equitable distribution, in compliance with the BVI insolvency law, to creditors and other lawful claimants." Id ., Tab 6 at 2. On December 22, 2008, Sentry's Board of Directors began reaching out to its shareholders via correspondence from Sentry's registered offices in the BVI to keep them apprised of the Board's actions in the wake of the revelation of Madoff s scheme and the subsequent collapse of BLMIS. Id., Tab 3, ¶ 21.

In February 2009, Sentry's Board of Directors established a "Litigation Committee," of independent and non-New York, non-United States based directors, which was granted "all power and authority [ ] necessary or desirable in connection with considering, commencing, negotiating, furthering, settling, compromising, completing, or terminating any litigation to be taken by the Fund against any person, or taken against the Fund by any person ... or to carry out all other actions related in any way with the foregoing." Id., Tab 3, ¶ 22, Tab 34, ¶ 14. This Litigation Committee governed Sentry's affairs until the commencement of the BVI Proceeding. Id.

**\*2** In April 2009, ten of Sentry's shareholders requested that the BVI court appoint a liquidator over Sentry. Id., Tab 3, ¶ 27. On July 21, 2009, the BVI court appointed Kenneth Krys and Christopher Stride, both BVI residents and BVI-licensed insolvency practitioners as joint liquidators of Sentry (the "Liquidators"). [3] The Liquidators assumed all statutory and fiduciary duties to realize and recover assets belonging to Sentry's estate, wherever located, for the benefit of Sentry's stakeholders. Id., Tab 3, ¶ 46; Tab 41, ¶¶ 18–22. Since their appointment, the Liquidators have administered Sentry's liquidation proceedings from the BVI with the approval of the BVI court. Id., Tab 6 at 3, Tab 34, ¶¶ 18–22. Sentry's present and former contract counterparties, including administrative agents, payment agents, and depositories, deal exclusively with the Liquidators as representatives of Sentry. Id., Tab 6 at 4.

Upon the disclosure of Madoff's scheme, Sentry also began to sever its contractual relationship with FGG and related affiliates and individuals, who had long standing affiliations with Madoff. *Id.* Sentry's only FGG-affiliated director participated in only two board meetings between December 18, 2008 and the Liquidator's appointment in July 2009. *Id.* Sentry formally terminated its investment management agreement with FGG in May 2009, effective June 30, 2009—6 weeks before the Liquidators filed their Chapter 15 petition. *Id.*

*Petition for Chapter 15 Recognition*
On June 14, 2010, the Liquidators filed a petition seeking Chapter 15 recognition of the BVI Proceeding in order to *inter alia,* (i) facilitate the Liquidators' enhanced access to United States courts in connection with the pursuit of claims on behalf of Sentry, (ii) afford the Liquidators the right to seek discovery to identify parties that bear liability to Sentry and the claims against those parties; (iii) provide protection of the recoveries made by the Liquidators in the United States from piecemeal attack; (iv) provide a means to facilitate a consensual resolution of the BLMIS Proceeding against Sentry that would benefit the stakeholders of both Sentry and the Madoff estate; and (v) provide a means to ensure that recoveries will be distributed in an orderly and equitable manner through the BVI proceeding in accordance with BVI insolvency law. *See, id.,* Tab 1, Tab 6 at 6. Appellants, investors in Sentry and plaintiffs in a putative derivative action on Sentry's behalf in New York State Supreme Court, filed the only objection to the Chapter 15 recognition petition. *See, id.,* Tab 2.

After a hearing, the Bankruptcy Court issued an order on July 22, 2010 recognizing Sentry's liquidation proceeding as a foreign main proceeding pursuant to 11 U.S.C. § 1517(b)(1), and staying Appellants' purported derivative action as well as all actions concerning Sentry's rights and assets, except the BLMIS Trustee's pending adversary proceeding against Sentry. *In re Fairfield Sentry, Ltd.,* 440 B.R. 60, 67 (Bankr.S.D.N.Y.2010).

## II. JURISDICTION AND STANDARD OF REVIEW
**\*3** District courts have jurisdiction to hear appeals from final orders issued by Bankruptcy Courts pursuant to 28 U.S.C. § 158(a) (1) and Fed. R. Bankr.P. 8001(a). "On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, decree or remand with instructions for further proceedings."

Fed. R. Bankr.P. 8013. The Bankruptcy Court's legal conclusions are subject to *de novo* review, factual findings are subject to a clearly erroneous standard, and decisions based on equitable relief are subject to an abuse of discretion review. *Jackson v. Novak (In re Jackson),* 593 F.3d 171, 176 (2d Cir.2010) (quoting *In re Momentum Mfg. Corp.,* 25 F.3d 1132, 1136 (2d Cir.1994); *In re Ames Dep't Stores, Inc.,* 582 F.3d 422, 426 (2d Cir.2009)); *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.),* 365 B.R. 401, 407 (S.D.N.Y.2007); *In re Adelphia Comm'cs Corp.,* No. 02 Civ. 9770, 2006 WL 1559437, at \*2 (S.D.N.Y. June 6, 2006).

## III. CHAPTER 15 RECOGNITION
A foreign proceeding is "a collective judicial or administrative proceeding in a foreign country ... under a law relating to insolvency ... in which ... the assets and affairs of the debtor are subject to control or supervision by a foreign court for the purpose of ... liquidation." 11 U.S.C. § 101(23). A foreign proceeding will be recognized under Chapter 15 of the Bankruptcy Code ("the Code") if (1) it is a main or non-main proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515 of the Code. *See* 11 U.S.C. § 1517(a). As the Bankruptcy Court noted, it is undisputed that requirements (2) and (3) are satisfied as the Petitioners are "persons," and the Petition includes the necessary certifications under section 1515(b) of the Code. *Fairfield Sentry,* 440 B.R. at 63; ROA Vol. 1, Tab 1, Ex. A. The parties only dispute whether the proceeding is a main or non-main proceeding pursuant to section 1502 of the Code.

### A. *Foreign Main Recognition*
Courts will recognize a liquidation proceeding as a "foreign main proceeding" if it is "pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1). It is the petitioners' burden to persuade the Court by a preponderance of the evidence that Sentry's center of main interests ("COMI") is in the BVI. *See In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd. (Bear Stearns I),* 374 B.R. 122, 128 (Bankr.S.D.N.Y.2007), aff'd, 389 B.R. 325 (S.D.N.Y.2008). *See, Lavie v. Ran,* 607 F.3d 1017, 1025 (5th Cir.2010). "In the absence of evidence to the contrary, the debtor's registered office ... is presumed to be [its] COMI." 11 U.S.C. § 1516(c). However, where evidence is presented to the contrary, the court cannot rely solely upon this presumption, but rather must consider all of the relevant evidence. *In re Bear Stearns High–Grade Structured Credit*

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

*Strategies Master Fund, Ltd. (Bear Steams II),* 389 B.R. 325, 335 (S.D.N.Y.2008); *In re Betcorp Ltd.,* 400 B.R. 266, 285–86 (Bankr.D.Nev.2009).

**\*4** Although the Bankruptcy Code does not state the type of evidence relevant to the COMI determination, courts typically consider the following *Sphinx* factors:

> the location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and the jurisdiction whose law would apply to most disputes." *Bear Stearns II,* 389 B.R. at 336 (citing *In re Sphinx, Ltd.,* 351 B.R. 103, 117 (Bankr.S.D.N.Y.2006); *see, Ran,* 607 F.3d at 1023.

A debtor's COMI has also been equated with the concept of a "principal place of business." *Bear Stearns I,* 374 B.R. at 129 (citing *Tri–Continental Exchange Ltd.,* 349 B.R. 627, 633–34 (Bankr.E.D.Cal.2006). Finally, courts also consider the expectations of third parties with regard to the location of a debtor's COMI. *In re British Am. Isle of Venice,* 441 B.R. 713, 720 (Bankr.S.D.Fla.2010).

**1) *The Court Properly Considered the Liquidators' Activities in its COMI Analysis***

Appellants claim that the bankruptcy court committed legal error by largely relying upon the BVI Proceeding itself, including activities incidental thereto, to determine that Sentry's center of main interests is the BVI. Accordingly, Appellants argue that the Liquidators' activities over the 11 months leading up to the Chapter 15 petition are irrelevant to COMI determination, and that Sentry's prior 18–year history of activity in New York requires that this Court find that the COMI is in New York.

Contrary to Appellants' arguments, courts have recognized that where a debtor's activities for an extended period of time have been conducted only in connection with winding up a debtor's business, the activities of a debtor's liquidators are both relevant and important to the COMI determination. *See British Am. Isle of Venice,* 441 B.R. at 713 (holding

that a debtor's liquidation proceeding in the British Virgin Islands was a foreign main proceeding under Chapter 15 of the Code); *In re British Ins. Co., Ltd.,* 425 B.R. 884, 915 (Bankr.S.D.Fla.2010) (stating in dicta that "there may be instances where a foreign representative remains in place for an extended period, and relocates all of the primary business activities of the debtor to his location (or brings business to a halt), thereby causing creditors and other parties to look to the judicial manager as the location of the debtor's business [and] lead[ing] to the conclusion that the center of main interest has been lodged with the corporate representative"); *Betcorp Ltd.,* 400 B.R. at 266 (holding that a voluntary winding up in Australia was a foreign main proceeding under Chapter 15).

In *Betcorp,* an Australian liquidator in a voluntary winding up petitioned the court for recognition of the proceeding as a foreign main proceeding under Chapter 15 of the Code. *Id.* at 271. A United States company in litigation with Betcorp objected to the petition on numerous grounds, including that Australia was not Betcorp's center of main interests. *Id.* at 285. The objector argued that the facts that Betcorp's creditors were in the United States and the United Kingdom, and that Betcorp's operational history was in the United States, required that the court hold that Betcorp's COMI was not in Australia. *Id.* at 290–92. Upon examining factors including that (1) the location of Betcorp's registered office and the place from where the winding up was being administered was Australia, (2) the location of those that manage Betcorp—the liquidators (since commencement of the winding up divested the directors of their authority) were located in Australia; and (3) Betcorp had no employees save and except for those selected by the liquidators, the court held that Betcorp's COMI was Australia. *Id.* at 292.

**\*5** Similarly, in *British Am. Isle of Venice,* a debtor sought foreign main recognition of its liquidation in the British Virgin Islands over the objection of a United States creditor which argued that the debtor's COMI was the United States. *British Am. Isle of Venice,* 441 B.R. at 716. Addressing the COMI factors of both the location of the debtor's headquarters and those who manage the debtor, the court noted:

> The Debtor has been involved in liquidation proceedings in the British Virgin Islands, under the control of [the liquidator] and supervised by the BVI Court, for [almost 14 months]. At the time of the Petitioner's appointment as provisional liquidator, the Debtor had no officers or directors.

For more than a year, the [liquidator] has been the Debtor's only manager, the only person authorized to act on behalf of the Debtor. From the time of his appointment by the BVI Court to the present, the Petitioner has been solely responsible for the day to day management of the Debtor and he has done this consistently, with only limited exceptions not material to this analysis, from his offices in the British Virgin Islands. *Id.* at 720–721.

Considering these factors along with additional evidence, the court granted foreign main recognition of the British Virgin Islands liquidation. *Id.* at 723.

Here, as in *British Am. Isle of Venice* and *Betcorp,* Sentry's activities for an extended period of time have been conducted only in connection with the winding up of Sentry's business. Sentry effectively ceased doing business more than 18 months before its Chapter 15 Petition, and 7 months before the commencement of the BVI Proceeding. Upon the revelation of the Madoff fraud in December 2008, Sentry discontinued the transfer of funds for investment with BLMIS in New York, which comprised 95% of Sentry's investments. The board of representatives at the FGG resigned shortly thereafter, and Sentry's contracts with FGG were severed in 2009, before the filing of the Petition. As a result, Sentry has no place of business, no management, and no tangible assets located in the United States. The BVI based Liquidators have been directing and coordinating Sentry's affairs since their appointment in July 2009. Accordingly, the Bankruptcy Court appropriately considered the Liquidator's activities in determining Sentry's COMI.

Appellants contend that *Ran* and *Bear Stearns II* are instructive and support their argument that the Liquidator's activities should be disregarded in determining Sentry's COMI. However, both *Ran* and *Bear Stearns II* are inapposite.

Appellants rely on the *Ran* court's holding that an individual debtor's bankruptcy proceeding in Israel alone was insufficient to demonstrate that the debtor had an establishment in Israel, which was required for the court to grant *non-main* recognition. *See, Ran,* 607 F.3d at 1028. There, an individual debtor had relocated from Israel nearly 10 years prior to filing his Chapter 15 petition, maintained his finances and business exclusively in the United States,

had established employment and a residence in Texas, was a permanent legal resident of the United States, and had neither a secondary residence nor place of employment in Israel. *Id.* at 1024, 1028. Based upon those facts, the court held that the debtor neither had a place of operations nor conducted nontransitory economic activity in Israel, and thus he could not demonstrate that he had an establishment in Israel. *Id.* at 1027. By contrast, here a *corporate* debtor maintains its finances and business primarily in the BVI and has its corporate headquarters in the BVI. Accordingly, Sentry is not seeking recognition solely based upon the existence of the foreign proceeding like in *Ran.*

*6 Appellants also rely on the *Bear Stearns II* court's holding that the debtor's allegations that it was incorporated in the foreign country, and "required to be wound up there and that upon appointment of joint provisional liquidators, the powers of the board of directors ceased and control of the company was transferred to the [foreign country,]" did not constitute substantive economic activity in the foreign country. *Bear Stearns II,* 389 B.R. at 338. There, the liquidators were appointed on the same day that they filed their Chapter 15 petition and had not yet taken any action. *Id.* at 329. By contrast, the Liquidators in this case were appointed 7 months prior to the Chapter 15 petition and have conducted all of the business of Sentry since that time.

### 2) *The Court Properly Considered the Activity At and Around the Time of Sentry's Chapter 15 Petition in Determining Sentry's COMI*

Appellants argue that Sentry's recent activity in the BVI cannot displace Sentry's 18–year center of main interests in the United States. On the contrary, courts, including the very court cited by Appellants in support of their position, have consistently held that the relevant time for determining a debtor's COMI is when the Chapter 15 petition was filed. *See Ran,* 607 F.3d at 1025; *British Am. Ins.,* 425 B.R. at 190; *Betcorp Ltd.,* 400 B.R. at 290–92.

In *Ran,* the court refused to look back at the debtor's operational history and held that COMI is appropriately determined at the time of the petition for recognition. *Ran,* 607 F.3d at 1025. The court examined the text of Section 1502 of the Code and noted that every operative verb is written in the present or present progressive tense, and "[m]ore specifically, Section 1502 defines foreign main proceeding as a 'foreign proceeding pending in the country where the debtor *has* the center of its main interests.' " *Id.* (citing 11 U.S.C. §

1502(4)). It then held that Congress's choice to use the present tense requires courts to view the COMI determination in the present, i.e., at the time the recognition petition was filed. *Id.* Further, the court cautioned that "if [it] were to assess COMI by focusing on a debtor's operational history, there would be an increased likelihood of conflicting COMI determinations, as courts may tend to attach greater importance to activities in their own countries, or may simply weigh the evidence differently which may lead to the possibility of competing main proceedings, thus defeating the purpose of using the COMI construct." *Ran,* 607 F.3d at 1025; *see Betcorp,* 400 B.R. at 290.

Appellants argue that *Ran* supports their position because the court, in dicta, noted that although the case "d[id] not involve a recent change of domicile by the party in question, [a] similar case brought immediately after a party's arrival in the United States following a long period of domicile in the country where the bankruptcy is pending would likely lead to a different result." *Ran,* 607 F.3d at 1026. However, this dicta in no way bolsters Appellants' position here. Noting Ran's warning that looking solely at the time of the Chapter 15 petition creates the potential for mischief and COMI manipulation, the Bankruptcy Court undertook a broader temporal COMI assessment and found that Sentry's COMI had been in the BVI for a significant time before the filing of the Chapter 15 petition. *Fairfield Sentry,* 440 B.R. at 66. Sentry's petition was not brought immediately after arrival in the BVI as specifically contemplated by *Ran.* Although Appellants claim that the liquidators waited 11 months to file their chapter 15 petition and "purported to engage in COMI-relevant activities ... in the BVI, which they then bootstrapped to support their Chapter 15 petition," [4] they have presented no evidence to support a finding of an opportunistic shift of Sentry's COMI or any biased activity or motivation to distort factors to establish a COMI in the BVI. Notably, the shareholders initiated the Liquidation proceedings in the BVI —not the Liquidators. Accordingly, the Bankruptcy Court appropriately considered the time at and around Sentry's Chapter 15 filing in determining Sentry's COMI.

### 3) Significant Evidence Supported the Bankruptcy Court's Determination that Sentry's COMI is the BVI

**\*7**  Given that the Bankruptcy Court properly considered the Liquidators' activities, there is no clear error in the Bankruptcy Court's determination that Sentry's COMI is the BVI. Significant evidence in the record supported the Bankruptcy Court's determination including that: (1) Sentry

is incorporated and maintains its registered office in BVI; (2) an independent litigation committee governed Sentry's affairs for several months [5] leading up to the commencement of the liquidation proceedings, and the majority of that committee's administrative decision-making originated in the BVI; (3) since the commencement of the BVI Liquidation Proceeding in July 2009, the BVI-based Liquidators have been directing and coordinating Sentry's affairs; (4) Sentry maintains liquid assets of approximately $17.5 million in a BVI account; (5) Sentry has BVI-resident employees and offices, and has undertaken to transfer significant books and records to office space leased by Sentry in the BVI. The Court may not upset these factual findings unless it has a "definite and firm conviction that a mistake has been committed." *Vasquez v. GMD Shipyard Corp.,* 582 F.3d 293, 297 (2d Cir.2009) (internal quotations and citations omitted). The evidence overwhelmingly shows that the *Sphinx* factors of the location of Sentry's headquarters, and the location of those who actually manage the debtor, place Sentry's COMI in the BVI. The evidence supports a finding that Sentry's principal place of business is the BVI. Finally, as Sentry's creditors, and not the Liquidators, initiated the liquidation proceedings in the BVI and those proceedings had been taking place there for 11 months leading up to the petition, the expectations of third parties would also likely be that Sentry's COMI is the BVI.

Appellants argue that a number of factors demonstrate that instead, Sentry's COMI is in New York. Most significantly, they argue that (1) Sentry's prior 18–year operational history is in New York, (2) Sentry's charter significantly restricts activity in the BVI (3) Sentry holds relatively little cash and has few shareholders in the BVI, and (4) significant litigation over disputed and contingent claims that constitute Sentry's principal assets and its principal liability is in New York. [6] While this evidence may rebut a presumption that Sentry's COMI is the BVI, ultimately the total evidence considered by the Bankruptcy Court proved by a preponderance of the evidence that the BVI is Sentry's COMI. Sentry's prior 18–year operational history in New York is not determinative as to Sentry's COMI. Sentry's charter does not at all restrict the Liquidators' activities which are the business activities now relevant to COMI determination. Sentry's cash and shareholders are not concentrated in any one location which makes the fact that they are not in the BVI not particularly compelling or relevant. Although significant litigation over disputed and contingent claims is taking place in New York, there is also substantial litigation pending in Ireland and the BVI. The pendency of the New York litigation does not guarantee recovery of any assets in New York. When weighed

against the overwhelming evidence as to the other COMI factors, the litigation in New York is of little import.

**\*8** Appellants' arguments that these factors purportedly support the alternate conclusion of a New York COMI do not compel a finding that the Bankruptcy Court made a clearly erroneous ruling. Appellants' further argument that the bankruptcy court erroneously placed the burden of proof on the Objectors has no merit. The Bankruptcy Court explicitly noted that it was Sentry's burden to prove COMI. This Court finds sufficient evidence that Sentry met that burden.

**B. United States Public Policy**

Section 1506 of the Code provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. Thus, a court may refuse to grant main or non-main recognition if it would be manifestly contrary to United States public policy. See, e.g., In re Gold & Honey, 410 B.R. 357 (Bankr.E.D.N.Y.2009). Although few reported decisions address the scope of section 1506, courts have agreed that Congress's use of the word "manifestly" requires the statute to be interpreted restrictively. See Micron Tech. v. Qimonda AG, 433 B.R. 547, 567–70 (E.D.Va.2010) (reviewing decisions to date); British Am. Isle of Venice, 441 B.R. at 717. Accordingly, section 1506 should be construed narrowly, and invoked only under exceptional circumstances concerning matters of fundamental importance to the United States. Id. at 717; Qimonda, 433 B.R. at 568.

In determining whether to apply section 1506, courts have focused on two factors: "(1) whether the foreign proceeding was procedurally unfair; and (2) whether the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would 'severely impinge the value and import of a United States statutory or constitutional right, such that granting comity would 'severely hinder United States bankruptcy courts' abilities to carry out ... the most fundamental policies and purposes of these rights.'' Id. at 568–69; British Am. Isle of Venice, 441 B.R. at 718.

Appellants argue that the Bankruptcy Court erred by refusing to apply section 1506 because "compelling public policy considerations warrant non-recognition of the BVI Proceeding, because that proceeding—including the BVI court's orders and the applications filed by the Liquidators —has been cloaked in secrecy." [7] Appellants' Memo of Law

in Supp. Of Appeal at 12. Additionally, Appellants argue that a stay of their derivative action without a stay of the BLMIS trustee's claim against Sentry is "value destructive, discriminatory and inimical to the fundamental objectives of Chapter 15." Id. at 14.

Recognition of the BVI Proceeding as a foreign main proceeding is not manifestly contrary to United States public policy. Although there is a strong presumption of public access to court records that is "firmly entrenched and well supported by policy and practical considerations, the right is not absolute." In re Orion Pictures Corp., 21 F.3d 24, 26–27 (2d Cir.1994). "In limited circumstances, courts must deny access to judicial documents—generally where open inspection may be used as vehicle for improper purposes." Id. at 27. Congress itself has recognized that under compelling or extraordinary circumstances, an exception to the general policy of public access is necessary." Id. at 27; see, e.g. Fed.R.Crim. P. 6(e)(2) (secrecy of grand jury proceedings); 5 U.S.C. § 552(b)(1) (provision of FOIA that exempts from disclosure material affecting the national defense); Fed.R.Civ.P. 26(c)(5)-(8) (sealing of depositions and restrictions on revealing trade secrets or other confidential information). In fact, the Code explicitly permits sealing of court files to "protect an entity with respect to a trade secret or confidential research, development, or commercial information." 11 U.S.C. § 107(b); Orion Pictures Corp., 21 F.3d at 27.

**\*9** The BVI Court ordered that the proceeding be sealed because Sentry's applications to the BVI Court include explanations of their litigation strategy and/or information protected by attorney-client privilege. Appellees' Memo of Law in Opp. to Appeal at 8. Where the sealing of court files is determined by a court to be necessary, the sealing itself does not run contrary to the fundamental policies and purposes of either a United States statutory or constitutional right. Though the sealing here may be broader than specifically provided by the Code or other United States statutory authority, "[t]he mere fact of conflict between foreign law and U.S. law, absent other considerations, is insufficient to support the invocation of the public policy exception." Qimonda, 433 B.R. at 570. Appellants have failed to demonstrate that the sealing of the proceedings renders them fundamentally unfair. Accordingly, this Court finds that the sealing of the BVI Proceeding is not contrary to Unites States public policy such that the section 1506 exception should be invoked.

Appellants' argument that a stay of their Derivative Action without a stay of the BLMIS trustee's action is "value destructive, discriminatory, and inimical to the fundamental objectives of Chapter 15, including 'protection and maximization of the value of the debtor's assets'" is similarly unsupported. Pursuant to Chapter 15, upon main recognition of a foreign proceeding, the automatic stay of section 362 is applicable to all property of the debtor and stays all litigation against it. *See* 11 U.S.C. § 1520(a)(1) (applying §§ 361 and 362 automatically in chapter 15 cases). However, section 362(d) of the Code explicitly permits the Bankruptcy Court to modify the automatic stay upon "consider[ing] the particular circumstances of the case and ascertain[ing] what is just to the claimants, the debtor, and the estate." *City Ins. Co. v. Mego Int'l, Inc.,* 28 B.R. 324, 326 (Bankr.S.D.N.Y.1983); *see In re Lehman Bros.,* No. 08–13555, 2008 WL 4902179 (Bankr.S.D.N.Y. November 5, 2008) (modifying the automatic stay upon the debtors' motion, to permit employees to proceed with their workers' compensation claims against the debtors).

Here, Appellees demonstrated to the Bankruptcy Court that they had been engaged in good faith settlement discussions with the BLMIS trustee and that a limited modification of the automatic stay to continue those discussions would benefit Sentry's estate. Tellingly, since the BVI Proceeding was granted main recognition, the Bankruptcy Court has

approved a settlement of the BLMIS Trustee's adversary proceeding such that expensive and protracted litigation has been avoided. This settlement is directly in line with Chapter 15's goal of "protecting and maximizing the debtor's assets." 11 U.S.C. § 1501(a)(4). The Bankruptcy Code explicitly authorizes a Bankruptcy Court to grant relief from the automatic stay upon good cause on a case-by-case basis where appropriate. The Bankruptcy Court's stay of all proceedings, except the BLMIS Trustee's adversary proceeding, is not manifestly contrary to the public policy of the United States.

## IV. *The Bankruptcy Court Properly Stayed Appellants' Action*

**\*10** Because the Bankruptcy Court properly granted main recognition to the BVI Proceeding, Sentry was entitled to an automatic stay of all proceedings pending against Sentry. Additionally, section 362(d) of the Code empowered the Court to modify the automatic stay to permit the action with the BLMIS trustee to continue. The Bankruptcy Court properly stayed Appellants' Action. [8]

Appellants' appeal is DENIED.

SO ORDERED:

## Footnotes

1    As amended by Errata Orders dated July 26, 2010 and July 30, 2010.

2    Judge Lifland's Order and Opinion granted foreign main recognition to the liquidation proceedings of Fairfield Sigma Limited ("Sigma"), Fairfield Lambda Limited ("Lambda") as well as Sentry. However, Appellants only objected to foreign main recognition as to Sentry in the bankruptcy proceeding and now only appeal with respect to Sentry.

3    On or about September 8, 2010, following Chapter 15 recognition, Christopher Stride resigned from his position as joint liquidator of Sentry. On that same date, Joanna Lau, a BVI resident and BVI-licensed insolvency practitioner, succeeded to Mr. Stride's position. Reference to the Liquidators herein shall be in reference to Mr. Krys and Mr. Stride, in their positions as joint liquidators of Sentry on and prior to the date of Chapter 15 recognition.

4    Appellants' Memo of Law in Support of Appeal at 23.

5    The bankruptcy court found that the Litigation Committee governed Sentry for seven months leading up to the appointment of the Liquidators. However, upon examining the ROA, this Court finds that the litigation committee only served for 5 months.

6    This Court grants Appellants' Motion for Judicial Notice, Supplemental Motion for Judicial Notice, and Second Supplemental Motion for Judicial Notice. Under Federal Rule of Evidence 201, a district court may "take judicial notice of documents filed in other courts ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *BRS Associates, L.P. v. Dansker,* 246 B.R. 755, 765 (S.D.N.Y.2000) (internal citations omitted); *see, also In re Musilli,* 398 B.R. 447, 453 (E.D.Mich.2008) ("A district court is authorized to supplement the record in a bankruptcy appeal, and to take judicial notice of appropriate evidence.")

7    Appellees argue that Appellants waived their "secrecy" argument because they did not raise it in the Bankruptcy Court. However, Appellants raised the argument during the recognition hearing and thus it is properly before this Court on appeal. *See* ROA Vol. 2, Tab 49 at 84–85, 90.

8    This Court agrees with the Bankruptcy Court that if main recognition were not granted, non-main recognition of Sentry's BVI
Proceeding would be appropriate because Sentry has an establishment in the BVI for the conduct of nontransitory economic activity,
i.e. a local place of business. *See* 11 U.S.C. § 1502(5). This Court further agrees that as a result, pursuant to 11 U.S.C. § 1521(a),
the stay would be proper.

---

**End of Document**                                      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

## Exhibit K.6
### *In re Fairfield Sentry Ltd.*, No. 10-13164, 2011 U.S. Dist. LEXIS 105770
### (S.D.N.Y. Sept. 15, 2011)





Analysis
As of: Jan 16, 2013

**In re: Fairfield Sentry Limited, et al., Debtors in Foreign Proceedings**

**10 Civ. 7311 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2011 U.S. Dist. LEXIS 105770*

**September 15, 2011, Decided**
**September 16, 2011, Filed**

**PRIOR HISTORY:** *In re Fairfield Sentry Ltd., 440 B.R. 60, 2010 Bankr. LEXIS 3789 (Bankr. S.D.N.Y., 2010)*

**CASE SUMMARY:**

**OVERVIEW:** A British Virgin Islands (BVI) liquidation was a foreign main proceeding under *11 U.S.C.S. § 1517(b)(1)*. Activities of BVI liquidators of the bankrupt entity, which was a BVI company with employees and offices in BVI, confirmed the entity's center of main interests in the BVI despite claims of the entity as a Ponzi scheme victim pending in New York.

**OUTCOME:** The court affirmed the decision of the bankruptcy court.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Practice & Proceedings > Appeals > Jurisdiction*

*Bankruptcy Law > Practice & Proceedings > Appeals > Procedures*

*Bankruptcy Law > Practice & Proceedings > Appeals > Standards of Review > De Novo Review*

[HN1] District courts have jurisdiction to hear appeals from final orders issued by Bankruptcy Courts pursuant to *28 U.S.C.S. § 158(a)(1)* and *Fed. R. Bankr. P. 8001(a)*. On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, decree or remand with instructions for further proceedings. *Fed. R. Bankr. P. 8013*. The Bankruptcy Court's legal conclusions are subject to de novo review, factual findings are subject to a clearly erroneous standard, and decisions based on equitable relief are subject to an abuse of discretion review.

*Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings*

[HN2] A foreign proceeding is a collective judicial or administrative proceeding in a foreign country under a law relating to insolvency in which the assets and affairs

of the debtor are subject to control or supervision by a foreign court for the purpose of liquidation. *11 U.S.C.S. § 101(23)*. A foreign proceeding will be recognized under Chapter 15 of the Bankruptcy Code, *11 U.S.C.S. § 1517(a)*, if (1) it is a main or non-main proceeding within the meaning of *11 U.S.C.S. § 1502*; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of *11 U.S.C.S. § 1515*.

***Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings***

[HN3] Courts recognize a liquidation proceeding as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests. *11 U.S.C.S. § 1517(b)(1)*. It is the petitioners' burden to persuade the court by a preponderance of the evidence where the debtor's center of main interests is. In the absence of evidence to the contrary, the debtor's registered office is presumed to be its center of main interests. *11 U.S.C.S. § 1516(c)*. However, where evidence is presented to the contrary, the court cannot rely solely upon this presumption but rather must consider all of the relevant evidence.

***Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings***

[HN4] The Bankruptcy Code does not state the type of evidence relevant to determination of a debtor's center of main interests that would support finding that a liquidation proceeding is a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests. *11 U.S.C.S. § 1517(b)(1)*. Courts typically consider the following factors: the location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and the jurisdiction whose law would apply to most disputes. A debtor's center of main interests has also been equated with the concept of a principal place of business. Courts also consider the expectations of third parties with regard to the location of a debtor's center of main interests.

***Bankruptcy Law > Case Administration >***

***Commencement > Cases Ancillary to Foreign Proceedings***

[HN5] Where a debtor's activities for an extended period of time have been conducted only in connection with winding up a debtor's business, the activities of a debtor's liquidators are both relevant and important to the determination of a debtor's center of main interests that would support finding a liquidation proceeding is a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests. *11 U.S.C.S. § 1517(b)(1)*.

***Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings***

[HN6] The relevant time for determining a debtor's center of main interests that would support finding that a liquidation proceeding is a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests, *11 U.S.C.S. § 1517(b)(1)*, is when the Chapter 15 petition was filed.

***Evidence > Judicial Notice > Adjudicative Facts > Proceedings in Other Courts***

[HN7] Under *Fed. R. Evid. 201*, a district court may take judicial notice of documents filed in other courts not for the truth of the matters asserted in the other litigation but rather to establish the fact of such litigation and related filings.

***Bankruptcy Law > Practice & Proceedings > Appeals > Procedures***
***Evidence > Judicial Notice > Adjudicative Facts > Proceedings in Other Courts***

[HN8] A district court is authorized to supplement the record in a bankruptcy appeal and to take judicial notice of appropriate evidence.

***Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings***

[HN9] *Section 1506 of the Bankruptcy Code*, *11 U.S.C.S. § 1506*, provides that nothing in Chapter 15 of the Code prevents the court from refusing to take an action governed by the chapter if the action would be manifestly contrary to the public policy of the United States. Thus, a court may refuse to grant main or non-main recognition

13-10361-mg    Doc 4-20    Filed 02/04/13    Entered 02/04/13 23:49:31    Exhibit K    Pg
70 of 246

Page 3
2011 U.S. Dist. LEXIS 105770, *

of a debtor's center of main interests that would support finding a liquidation proceeding is a foreign main proceeding if it would be manifestly contrary to United States public policy. Although few reported decisions address the scope of *§ 1506*, courts agree that Congress's use of the word "manifestly" requires the statute to be interpreted restrictively. Accordingly, *§ 1506* should be construed narrowly and invoked only under exceptional circumstances concerning matters of fundamental importance to the United States.

***Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings***
[HN10] In determining whether to apply *11 U.S.C.S. § 1506*, courts focus on two factors: (1) whether the foreign proceeding was procedurally unfair; and (2) whether the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 of the Bankruptcy Code would severely impinge the value and import of a United States statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out the most fundamental policies and purposes of these rights.

***Bankruptcy Law > Case Administration > Administrative Powers > General Overview***
***Civil Procedure > Discovery > Protective Orders***
***Governments > Courts > Court Records***
[HN11] Although there is a strong presumption of public access to court records that is firmly entrenched and well supported by policy and practical considerations, the right is not absolute. In limited circumstances, courts must deny access to judicial documents, generally where open inspection may be used as a vehicle for improper purposes. The Bankruptcy Code explicitly permits sealing of court files to protect an entity with respect to a trade secret or confidential research, development, or commercial information. *11 U.S.C.S. § 107(b)*.

***Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings***
***Civil Procedure > Discovery > Protective Orders***
***Governments > Courts > Court Records***
[HN12] Where the sealing of court files is determined by a court to be necessary, the sealing itself does not run contrary to the fundamental policies and purposes of

either a United States statutory or constitutional right. Though the sealing of files by a foreign court may be broader than specifically provided by the Bankruptcy Code or other United States statutory authority, the mere fact of conflict between foreign law and U.S. law, absent other considerations, is insufficient to support the invocation of the public policy exception of *§ 1506 of the Bankruptcy Code*, *11 U.S.C.S. § 1506*, which provides that nothing in Chapter 15 of the Code prevents the court from refusing to take an action governed by the chapter if the action would be manifestly contrary to the public policy of the United States.

***Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays > Cause***
***Bankruptcy Law > Case Administration > Commencement > Cases Ancillary to Foreign Proceedings***
[HN13] Pursuant to Chapter 15 of the Bankruptcy Code, upon main recognition of a foreign proceeding, the automatic stay of *11 U.S.C.S. § 362* is applicable to all property of the debtor and stays all litigation against it. *11 U.S.C.S. § 1520(a)(1)* applies *11 U.S.C.S. § 361* and *11 U.S.C.S. § 362* automatically in Chapter 15 cases. However, *11 U.S.C.S. § 362(d)* of the Code explicitly permits the Bankruptcy Court to modify the automatic stay upon considering the particular circumstances of the case and ascertaining what is just to the claimants, the debtor, and the estate.

***Bankruptcy Law > Case Administration > Administrative Powers > Stays > Relief From Stays > Cause***
[HN14] The Bankruptcy Code explicitly authorizes a Bankruptcy Court to grant relief from the automatic stay upon good cause on a case-by-case basis where appropriate.

**COUNSEL:** [*1] For Morning Mist Holdings Limited, Miguel Lomeli, Appellants: Parvin Kristy Aminolroaya, Stephen A. Weiss, LEAD ATTORNEYS, Christopher Matthew Van de Kieft, Seeger Weiss LLP, Philadelphia, PA; Charles Slidders, Kent Andrew Bronson, Kristi Stahnke McGregor, Robert Alan Wallner, Milberg LLP (NYC), New York, NY.

For Kenneth Krys, Christopher Stride, Appellees: David J. Molton, Brown Rudnick LLP, New York, NY.

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINION BY:** GEORGE B. DANIELS

**OPINION**

**MEMORANDUM DECISION AND ORDER**

GEORGE B. DANIELS, District Judge:

Morning Mist Holdings Limited and Miguel Lomeli ("Appellants") bring this bankruptcy appeal challenging the July 22, 2010 Order and Opinion [1] ("Opinion") of the Honorable Burton Lifland, Bankruptcy Judge that (1) recognized the liquidation proceeding of Fairfield Sentry Limited ("Sentry") [2] pending in the British Virgin Islands (the "BVI Proceeding") as a foreign main proceeding pursuant to *11 U.S.C. §1517(b)(1)*; and *(2)* stayed Appellants' purported derivative action as well as all actions concerning Sentry's rights and assets, except the Bernard L. Madoff Investment Securities, Inc. Trustee's pending adversary proceeding against Sentry. Appellants claim that [*2] the Bankruptcy Court erred by (1) finding that Sentry's center of main interests is the British Virgin Islands when it is instead New York; (2) failing to deny main recognition of the BVI Proceeding pursuant to the Chapter 15 public policy exception; and (3) staying Appellants' derivative action. The decision of the Bankruptcy Court is AFFIRMED.

> 1    As amended by Errata Orders dated July 26, 2010 and July 30, 2010.
> 2    Judge Lifland's Order and Opinion granted foreign main recognition to the liquidation proceedings of Fairfield Sigma Limited ("Sigma"), Fairfield Lambda Limited ("Lambda") as well as Sentry. However, Appellants only objected to foreign main recognition as to Sentry in the bankruptcy proceeding and now only appeal with respect to Sentry.

**I. RELEVANT BACKGROUND**

Sentry was organized and incorporated under the law of the British Virgin Islands ("BVI") in 1990 as a vehicle for mainly non-U.S. persons and certain tax-exempt U.S. entities to invest with Bernard L. Madoff Investment Securities, Inc. ("BLMIS"). Record on Appeal ("ROA") Vol. 1, Tab 3, ¶11, Tab 28, ¶ 3. It maintains its

registration there. Id. Fairfield Greenwich Group ("FGG"), based on Manhattan's Upper East Side, served [*3] as Sentry's investment manager. Id., Tab 28 ¶¶ 32, 47, 74. In December 2008, it became publicly known that BLMIS had for many years, if not many decades, been operated by Bernard L. Madoff as a massive Ponzi scheme. Id., Tab 3, ¶ 18. As a result of Madoff's fraudulent scheme, billions of dollars of investor funds, including funds held on behalf of Sentry, were paid out by BLMIS as returns of principal, as distributions of fictitious profits, or otherwise dissipated and misappropriated by Madoff and/or others acting in concert with him. Id.

Following the disclosure of Madoff's scheme, Sentry ceased its routine operations and changed its business purpose to "preserv[ing] and realiz[ing Sentry's] assets for purposes of ultimate, orderly and equitable distribution, in compliance with the BVI insolvency law, to creditors and other lawful claimants." Id., Tab 6 at 2. On December 22, 2008, Sentry's Board of Directors began reaching out to its shareholders via correspondence from Sentry's registered offices in the BVI to keep them apprised of the Board's actions in the wake of the revelation of Madoff's scheme and the subsequent collapse of BLMIS. Id., Tab 3, ¶ 21.

In February 2009, Sentry's [*4] Board of Directors established a "Litigation Committee," of independent and non-New York, non-United States based directors, which was granted "all power and authority [] necessary or desirable in connection with considering, commencing, negotiating, furthering, settling, compromising, completing, or terminating any litigation to be taken by the Fund against any person, or taken against the Fund by any person. . . and to carry out all other actions related in any way with the foregoing." Id., Tab 3, ¶ 22, Tab 34, ¶ 14. This Litigation Committee governed Sentry's affairs until the commencement of the BVI Proceeding. Id.

In April 2009, ten of Sentry's shareholders requested that the BVI court appoint a liquidator over Sentry. Id., Tab 3, ¶ 27. On July 21, 2009, the BVI court appointed Kenneth Krys and Christopher Stride, both BVI residents and BVI-licensed insolvency practitioners as joint liquidators of Sentry (the "Liquidators"). [3] The Liquidators assumed all statutory and fiduciary duties to realize and recover assets belonging to Sentry's estate, wherever located, for the benefit of Sentry's stakeholders. Id., Tab 3, ¶ 46; Tab 41, ¶¶ 18-22. Since their

appointment, the Liquidators [*5] have administered Sentry's liquidation proceedings from the BVI with the approval of the BVI court. Id., Tab 6 at 3, Tab 34, ¶¶ 18-22. Sentry's present and former contract counterparties, including administrative agents, payment agents, and depositories, deal exclusively with the Liquidators as representatives of Sentry. Id., Tab 6 at 4.

> 3   On or about September 8, 2010, following Chapter 15 recognition, Christopher Stride resigned from his position as joint liquidator of Sentry. On that same date, Joanna Lau, a BVI resident and BVI-licensed insolvency practitioner, succeeded to Mr. Stride's position. Reference to the Liquidators herein shall be in reference to Mr. Krys and Mr. Stride, in their positions as joint liquidators of Sentry on and prior to the date of Chapter 15 recognition.

Upon the disclosure of Madoff's scheme, Sentry also began to sever its contractual relationship with FGG and related affiliates and individuals, who had long standing affiliations with Madoff. Id. Sentry's only FGG-affiliated director participated in only two board meetings between December 18, 2008 and the Liquidator's appointment in July 2009. Id. Sentry formally terminated its investment management agreement [*6] with FGG in May 2009, effective June 30, 2009-6 weeks before the Liquidators filed their Chapter 15 petition. Id.

**Petition for Chapter 15 Recognition**

On June 14, 2010, the Liquidators filed a petition seeking Chapter 15 recognition of the BVI Proceeding in order to *inter alia*, (i) facilitate the Liquidators' enhanced access to United States courts in connection with the pursuit of claims on behalf of Sentry, (ii) afford the Liquidators the right to seek discovery to identify parties that bear liability to Sentry and the claims against those parties; (iii) provide protection of the recoveries made by the Liquidators in the United States from piecemeal attack; (iv) provide a means to facilitate a consensual resolution of the BLMIS Proceeding against Sentry that would benefit the stakeholders of both Sentry and the Madoff estate; and (v) provide a means to ensure that recoveries will be distributed in an orderly and equitable manner through the BVI proceeding in accordance with BVI insolvency law. See, id., Tab 1, Tab 6 at 6. Appellants, investors in Sentry and plaintiffs in a putative derivative action on Sentry's behalf in New York State Supreme Court, filed the only objection to the [*7]

Chapter 15 recognition petition. See, id., Tab 2.

After a hearing, the Bankruptcy Court issued an order on July 22, 2010 recognizing Sentry's liquidation proceeding as a foreign main proceeding pursuant to *11 U.S.C. §1517(b)(1)*, and staying Appellants' purported derivative action as well as all actions concerning Sentry's rights and assets, except the BLMIS Trustee's pending adversary proceeding against Sentry. *In re Fairfield Sentry, Ltd., 440 B.R. 60, 67 (Bankr. S.D.N.Y. 2010).*

**II. JURISDICTION AND STANDARD OF REVIEW**

[HN1] District courts have jurisdiction to hear appeals from final orders issued by Bankruptcy Courts pursuant to *28 U.S.C. § 158(a)(1)* and *Fed. R. Bankr. P. 8001(a)*. "On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, decree or remand with instructions for further proceedings." *Fed. R. Bankr. P. 8013*. The Bankruptcy Court's legal conclusions are subject to *de novo* review, factual findings are subject to a clearly erroneous standard, and decisions based on equitable relief are subject to an abuse of discretion review. See *Jackson v. Novak (In re Jackson), 593 F.3d 171, 176 (2d Cir. 2010)* (quoting *In re Momentum Mfg Corp., 25 F. 3d 1132, 1136 (2d Cir. 1994)*; [*8] *In re Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009))*; *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.), 365 B.R. 401, 407 (S.D.N.Y. 2007)*; *In re Adelphia Comm'cs Corp., No. 02 Civ. 9770, 2006 U.S. Dist. LEXIS 37112, 2006 WL 1559437, at *2 (S.D.N.Y. June 6, 2006).*

**III. CHAPTER 15 RECOGNITION**

[HN2] A foreign proceeding is "a collective judicial or administrative proceeding in a foreign country. . . under a law relating to insolvency. . . in which . . . the assets and affairs of the debtor are subject to control or supervision by a foreign court for the purpose of . . . liquidation." *11 U.S.C. § 101(23)*. A foreign proceeding will be recognized under Chapter 15 of the Bankruptcy Code ("the Code") if (1) it is a main or non-main proceeding within the meaning of *section 1502*; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of *section 1515* of the Code. See *11 U.S.C. § 1517(a)*. As the Bankruptcy Court noted, it is undisputed that requirements (2) and (3) are satisfied as

the Petitioners are "persons," and the Petition includes the necessary certifications under *section 1515(b)* of the Code. *Fairfield Sentry, 440 B.R. at 63*; ROA Vol. 1, Tab [*9] 1, Ex. A. The parties only dispute whether the proceeding is a main or non-main proceeding pursuant to *section 1502* of the Code.

**A. Foreign Main Recognition**

[HN3] Courts will recognize a liquidation proceeding as a "foreign main proceeding" if it is "pending in the country where the debtor has the center of its main interests." *11 U.S.C. § 1517(b)(1)*. It is the petitioners' burden to persuade the Court by a preponderance of the evidence that Sentry's center of main interests ("COMI") is in the BVI. See *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (Bear Stearns I), 374 B.R. 122, 128 (Bankr. S.D.N.Y. 2007)*, aff'd, *389 B.R. 325 (S.D.N.Y. 2008)*. See, *Lavie v. Ran, 607 F.3d 1017, 1025 (5th Cir. 2010)*. "In the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be [its COMI]." *11 U.S.C. § 1516(c)*. However, where evidence is presented to the contrary, the court cannot rely solely upon this presumption, but rather must consider all of the relevant evidence. *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (Bear Stearns II), 389 B.R. 325, 335 (S.D.N.Y. 2008)*; *In re Betcorp Ltd., 400 B.R. 266, 285-86 (Bankr. D. Nev. 2009)*.

[HN4] Although [*10] the Bankruptcy Code does not state the type of evidence relevant to the COMI determination, courts typically consider the following *Sphinx* factors:

> the location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes." *Bear Stearns II, 389 B.R. at 336* (citing *In re Sphinx, Ltd., 351 B.R. 103, 117 (Bankr. S.D.N.Y 2006)*); see, *Ran, 607 F.3d at 1023*.

A debtor's COMI has also been equated with the concept of a "principal place of business." *Bear Steams I, 374*

*B.R. at 129* (citing *Tri-Continental Exchange Ltd., 349 B.R. 627, 633-34 (Bankr. E.D. Cal. 2006)*. Finally, courts also consider the expectations of third parties with regard to the location of a debtor's COMI. *In re British Am. Isle of Venice, 441 B.R. 713, 720 (Bankr. S.D. Fla. 2010)*.

**1) The Court Properly Considered the Liquidators' Activities in its COMI Analysis**

Appellants claim that the bankruptcy court committed legal error by largely relying upon the BVI Proceeding [*11] itself, including activities incidental thereto, to determine that Sentry's center of main interests is the BVI. Accordingly, Appellants argue that the Liquidators' activities over the 11 months leading up to the Chapter 15 petition are irrelevant to COMI determination, and that Sentry's prior 18-year history of activity in New York requires that this Court find that the COMI is in New York.

Contrary to Appellants' arguments, courts have recognized that [HN5] where a debtor's activities for an extended period of time have been conducted only in connection with winding up a debtor's business, the activities of a debtor's liquidators are both relevant and important to the COMI determination. See *British Am. Isle of Venice, 441 B.R. at 713* (holding that a debtor's liquidation proceeding in the British Virgin Islands was a foreign main proceeding under Chapter 15 of the Code); *In re British Ins. Co., Ltd., 425 B.R. 884, 915 (Bankr. S.D. Fla. 2010)* (stating in dicta that "there may be instances where a foreign representative remains in place for an extended period, and relocates all of the primary business activities of the debtor to his location (or brings business to a halt), thereby causing [*12] creditors and other parties to look to the judicial manager as the location of the debtor's business [and] lead[ing] to the conclusion that the center of main interest has been lodged with the corporate representative"); *Betcorp Ltd., 400 B.R. at 266* (holding that a voluntary winding up in Australia was a foreign main proceeding under Chapter 15).

In *Betcorp*, an Australian liquidator in a voluntary winding up petitioned the court for recognition of the proceeding as a foreign main proceeding under Chapter 15 of the Code. *Id. at 271*. A United States company in litigation with Betcorp objected to the petition on numerous grounds, including that Australia was not Betcorp's center of main interests. *Id. at 285*. The objector argued that the facts that Betcorp's creditors

were in the United States and the United Kingdom, and that Betcorp's operational history was in the United States, required that the court hold that Betcorp's COMI was not in Australia. *Id. at 290-92*. Upon examining factors including that (1) the location of Betcorp's registered office and the place from where the winding up was being administered was Australia, (2) the location of those that manage Betcorp--the liquidators [*13] (since commencement of the winding up divested the directors of their authority) were located in Australia; and (3) Betcorp had no employees save and except for those selected by the liquidators, the court held that Betcorp's COMI was Australia. *Id. at 292*.

Similarly, in *British Am. Isle of Venice*, a debtor sought foreign main recognition of its liquidation in the British Virgin Islands over the objection of a United States creditor which argued that the debtor's COMI was the United States. *British Am. Isle of Venice, 441 B.R. at 716*. Addressing the COMI factors of both the location of the debtor's headquarters and those who manage the debtor, the court noted:

> The Debtor has been involved in liquidation proceedings in the British Virgin Islands, under the control of [the liquidator] and supervised by the BVI Court, for [almost 14 months]. At the time of the Petitioner's appointment as provisional liquidator, the Debtor had no officers or directors. For more than a year, the [liquidator] has been the Debtor's only manager, the only person authorized to act on behalf of the Debtor. From the time of his appointment by the BVI Court to the present, the Petitioner has been solely responsible [*14] for the day to day management of the Debtor and he has done this consistently, with only limited exceptions not material to this analysis, from his offices in the British Virgin Islands. *Id. at 720-721*.

Considering these factors along with additional evidence, the court granted foreign main recognition of the British Virgin Islands liquidation. *Id. at 723*.

Here, as in *British Am. Isle of Venice* and *Betcorp*, Sentry's activities for an extended period of time have been conducted only in connection with the winding up

of Sentry's business. Sentry effectively ceased doing business more than 18 months before its Chapter 15 Petition, and 7 months before the commencement of the BVI Proceeding. Upon the revelation of the Madoff fraud in December 2008, Sentry discontinued the transfer of funds for investment with BLMIS in New York, which comprised 95% of Sentry's investments. The board of representatives at the FGG resigned shortly thereafter, and Sentry's contracts with FGG were severed in 2009, before the filing of the Petition. As a result, Sentry has no place of business, no management, and no tangible assets located in the United States. The BVI based Liquidators have been directing and [*15] coordinating Sentry's affairs since their appointment in July 2009. Accordingly, the Bankruptcy Court appropriately considered the Liquidator's activities in determining Sentry's COMI.

Appellants contend that *Ran* and *Bear Stearns II* are instructive and support their argument that the Liquidator's activities should be disregarded in determining Sentry's COMI. However, both *Ran* and *Bear Stearns II* are inapposite.

Appellants rely on the *Ran* court's holding that an individual debtor's bankruptcy proceeding in Israel alone was insufficient to demonstrate that the debtor had an establishment in Israel, which was required for the court to grant *non-main* recognition. See, *Ran, 607 F.3d at 1028*. There, an individual debtor had relocated from Israel nearly 10 years prior to filing his Chapter 15 petition, maintained his finances and business exclusively in the United States, had established employment and a residence in Texas, was a permanent legal resident of the United States, and had neither a secondary residence nor place of employment in Israel. *Id. at 1024, 1028*. Based upon those facts, the court held that the debtor neither had a place of operations nor conducted nontransitory economic [*16] activity in Israel, and thus he could not demonstrate that he had an establishment in Israel. *Id. at 1027*. By contrast, here a *corporate* debtor maintains its finances and business primarily in the BVI and has its corporate headquarters in the BVI. Accordingly, Sentry is not seeking recognition solely based upon the existence of the foreign proceeding like in *Ran*.

Appellants also rely on the *Bear Stearns II* court's holding that the debtor's allegations that it was incorporated in the foreign country, and "required to be wound up there and that upon appointment of joint provisional liquidators, the powers of the board of

directors ceased and control of the company was transferred to the [foreign country,]" did not constitute substantive economic activity in the foreign country. *Bear Steams II, 389 B.R. at 338*. There, the liquidators were appointed on the same day that they filed their Chapter 15 petition and had not yet taken any action. *Id. at 329*. By contrast, the Liquidators in this case were appointed 7 months prior to the Chapter 15 petition and have conducted all of the business of Sentry since that time.

### 2) The Court Properly Considered the Activity At and Around the Time of Sentry's [*17] Chapter 15 Petition in Determining Sentry's COMI

Appellants argue that Sentry's recent activity in the BVI cannot displace Sentry's 18-year center of main interests in the United States. On the contrary, courts, including the very court cited by Appellants in support of their position, have consistently held that [HN6] the relevant time for determining a debtor's COMI is when the Chapter 15 petition was filed. See *Ran, 607 F.3d at 1025*; *British Am. Ins., 425 B.R. at 190*; *Betcorp Ltd., 400 B.R. at 290-92*.

In *Ran*, the court refused to look back at the debtor's operational history and held that COMI is appropriately determined at the time of the petition for recognition. *Ran, 607 F.3d at 1025*. The court examined the text of *Section 1502* of the Code and noted that every operative verb is written in the present or present progressive tense, and "[m]ore specifically, *Section 1502* defines foreign main proceeding as a 'foreign proceeding pending in the country where the debtor *has* the center of its main interests.'" Id. (citing *11 U.S.C. §1502(4)*). It then held that Congress's choice to use the present tense requires courts to view the COMI determination in the present, i.e., at the time the recognition [*18] petition was filed. Id. Further, the court cautioned that "if [it] were to assess COMI by focusing on a debtor's operational history, there would be an increased likelihood of conflicting COMI determinations, as courts may tend to attach greater importance to activities in their own countries, or may simply weigh the evidence differently which may lead to the possibility of competing main proceedings, thus defeating the purpose of using the COMI construct." *Ran, 607 F.3d at 1025*; see *Betcorp, 400 B.R. at 290*.

Appellants argue that *Ran* supports their position because the court, in dicta, noted that although the case "d[id] not involve a recent change of domicile by the party in question, [a] similar case brought immediately after a party's arrival in the United States following a long period of domicile in the country where the bankruptcy is pending would likely lead to a different result." *Ran, 607 F.3d at 1026*. However, this dicta in no way bolsters Appellants' position here. Noting *Ran*'s warning that looking solely at the time of the Chapter 15 petition creates the potential for mischief and COMI manipulation, the Bankruptcy Court undertook a broader temporal COMI assessment and found [*19] that Sentry's COMI had been in the BVI for a significant time before the filing of the Chapter 15 petition. *Fairfield Sentry, 440 B.R. at 66*. Sentry's petition was not brought immediately after arrival in the BVI as specifically contemplated by *Ran*. Although Appellants claim that the liquidators waited 11 months to file their chapter 15 petition and "purported to engage in COMI-relevant activities. . . in the BVI, which they then bootstrapped to support their Chapter 15 petition," [4] they have presented no evidence to support a finding of an opportunistic shift of Sentry's COMI or any biased activity or motivation to distort factors to establish a COMI in the BVI. Notably, the shareholders initiated the Liquidation proceedings in the BVI--not the Liquidators. Accordingly, the Bankruptcy Court appropriately considered the time at and around Sentry's Chapter 15 filing in determining Sentry's COMI.

4    Appellants' Memo of Law in Support of Appeal at 23.

### 3) Significant Evidence Supported the Bankruptcy Court's Determination that Sentry's COMI is the BVI

Given that the Bankruptcy Court properly considered the Liquidators' activities, there is no clear error in the Bankruptcy Court's determination [*20] that Sentry's COMI is the BVI. Significant evidence in the record supported the Bankruptcy Court's determination including that: (1) Sentry is incorporated and maintains its registered office in BVI; (2) an independent litigation committee governed Sentry's affairs for several months [5] leading up to the commencement of the liquidation proceedings, and the majority of that committee's administrative decision-making originated in the BVI; (3) since the commencement of the BVI Liquidation Proceeding in July 2009, the BVI-based Liquidators have been directing and coordinating Sentry's affairs; (4) Sentry maintains liquid assets of approximately $17.5 million in a BVI account; (5) Sentry has BVI-resident

employees and offices, and has undertaken to transfer significant books and records to office space leased by Sentry in the BVI. The Court may not upset these factual findings unless it has a "definite and firm conviction that a mistake has been committed." *Vasquez v. GMD Shipyard Corp., 582 F.3d 293, 297 (2d Cir. 2009)* (internal quotations and citations omitted). The evidence overwhelmingly shows that the *Sphinx* factors of the location of Sentry's headquarters, and the location of those [*21] who actually manage the debtor, place Sentry's COMI in the BVI. The evidence supports a finding that Sentry's principal place of business is the BVI. Finally, as Sentry's creditors, and not the Liquidators, initiated the liquidation proceedings in the BVI and those proceedings had been taking place there for 11 months leading up to the petition, the expectations of third parties would also likely be that Sentry's COMI is the BVI.

> 5   The bankruptcy court found that the Litigation Committee governed Sentry for seven months leading up to the appointment of the Liquidators. However, upon examining the ROA, this Court finds that the litigation committee only served for 5 months.

Appellants argue that a number of factors demonstrate that instead, Sentry's COMI is in New York. Most significantly, they argue that (1) Sentry's prior 18-year operational history is in New York, (2) Sentry's charter significantly restricts activity in the BVI (3) Sentry holds relatively little cash and has few shareholders in the BVI, and (4) significant litigation over disputed and contingent claims that constitute Sentry's principal assets and its principal liability is in New York. 6 While this evidence may rebut [*22] a presumption that Sentry's COMI is the BVI, ultimately the total evidence considered by the Bankruptcy Court proved by a preponderance of the evidence that the BVI is Sentry's COMI. Sentry's prior 18-year operational history in New York is not determinative as to Sentry's COMI. Sentry's charter does not at all restrict the Liquidators' activities which are the business activities now relevant to COMI determination. Sentry's cash and shareholders are not concentrated in any one location which makes the fact that they are not in the BVI not particularly compelling or relevant. Although significant litigation over disputed and contingent claims is taking place in New York, there is also substantial litigation pending in Ireland and the BVI. The pendency of the

New York litigation does not guarantee recovery of any assets in New York. When weighed against the overwhelming evidence as to the other COMI factors, the litigation in New York is of little import.

> 6   This Court grants Appellants' Motion for Judicial Notice, Supplemental Motion for Judicial Notice, and Second Supplemental Motion for Judicial Notice. [HN7] Under *Federal Rule of Evidence 201*, a district court may "take judicial notice of [*23] documents filed in other courts ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *BRS Associates, L.P. v. Dansker, 246 B.R. 755, 765 (S.D.N.Y. 2000)* (internal citations omitted) ; see, also *In re Musilli, 398 B.R. 447, 453 (E.D. Mich. 2008)* ([HN8] "A district court is authorized to supplement the record in a bankruptcy appeal, and to take judicial notice of appropriate evidence.")

Appellants' arguments that these factors purportedly support the alternate conclusion of a New York COMI do not compel a finding that the Bankruptcy Court made a clearly erroneous ruling. Appellants' further argument that the bankruptcy court erroneously placed the burden of proof on the Objectors has no merit. The Bankruptcy Court explicitly noted that it was Sentry's burden to prove COMI. This Court finds sufficient evidence that Sentry met that burden.

## B. United States Public Policy

[HN9] *Section 1506* of the Code provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." *11 U.S.C. § 1506.* [*24] Thus, a court may refuse to grant main or non-main recognition if it would be manifestly contrary to United States public policy. See, e.g., *In re Gold & Honey, 410 B.R. 357 (Bankr. E.D.N.Y. 2009)*. Although few reported decisions address the scope of *section 1506*, courts have agreed that Congress's use of the word "manifestly" requires the statute to be interpreted restrictively. See *Micron Tech. v. Qimonda AG, 433 B.R. 547, 567-70 (E.D. Va. 2010)* (reviewing decisions to date); *British Am. Isle of Venice, 441 B.R. at 717*. Accordingly, *section 1506* should be construed narrowly, and invoked only under exceptional circumstances concerning matters of fundamental importance to the United States. *Id. at 717*; *Qimonda,*

*433 B.R. at 568.*

[HN10] In determining whether to apply *section 1506*, courts have focused on two factors: "(1) whether the foreign proceeding was procedurally unfair; and (2) whether the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would 'severely impinge the value and import of a United States statutory or constitutional right, such that granting comity would 'severely hinder United States bankruptcy courts' abilities to carry out. . . [*25] the most fundamental policies and purposes of these rights." *Id. at 568-69*; *British Am. Isle of Venice, 441 B.R. at 718.*

Appellants argue that the Bankruptcy Court erred by refusing to apply *section 1506* because "compelling public policy considerations warrant non-recognition of the BVI Proceeding, because that proceeding--including the BVI court's orders and the applications filed by the Liquidators--has been cloaked in secrecy."[7] Appellants' Memo of Law in Supp. Of Appeal at 12. Additionally, Appellants argue that a stay of their derivative action without a stay of the BLMIS trustee's claim against Sentry is "value destructive, discriminatory and inimical to the fundamental objectives of Chapter 15." Id. at 14.

> [7] Appellees argue that Appellants waived their "secrecy" argument because they did not raise it in the Bankruptcy Court. However, Appellants raised the argument during the recognition hearing and thus it is properly before this Court on appeal. See ROA Vol. 2, Tab 49 at 84-85, 90.

Recognition of the BVI Proceeding as a foreign main proceeding is not manifestly contrary to United States public policy. [HN11] Although there is a strong presumption of public access to court records that [*26] is "firmly entrenched and well supported by policy and practical considerations, the right is not absolute." *In re Orion Pictures Corp., 21 F.3d 24, 26-27 (2d Cir. 1994).* "In limited circumstances, courts must deny access to judicial documents--generally where open inspection may be used as vehicle for improper purposes." *Id. at 27.* Congress itself has recognized that under compelling or extraordinary circumstances, an exception to the general policy of public access is necessary." *Id. at 27*; see, e.g. *Fed. R. Crim. P. 6(e)(2)* (secrecy of grand jury proceedings); *5 U.S.C. § 552(b)(1)* (provision of FOIA that exempts from disclosure material affecting the national defense); *Fed. R. Civ. P. 26(c)(5)-(8)* (sealing of depositions and restrictions on revealing trade secrets or other confidential information). In fact, the Code explicitly permits sealing of court files to "protect an entity with respect to a trade secret or confidential research, development, or commercial information." *11 U.S.C. § 107(b)*; *Orion Pictures Corp., 21 F.3d at 27.*

The BVI Court ordered that the proceeding be sealed because Sentry's applications to the BVI Court include explanations of their litigation strategy and/or [*27] information protected by attorney-client privilege. Appellees' Memo of Law in Opp. to Appeal at 8. [HN12] Where the sealing of court files is determined by a court to be necessary, the sealing itself does not run contrary to the fundamental policies and purposes of either a United States statutory or constitutional right. Though the sealing here may be broader than specifically provided by the Code or other United States statutory authority, "[t]he mere fact of conflict between foreign law and U.S. law, absent other considerations, is insufficient to support the invocation of the public policy exception." *Qimonda, 433 B.R. at 570.* Appellants have failed to demonstrate that the sealing of the proceedings renders them fundamentally unfair. Accordingly, this Court finds that the sealing of the BVI Proceeding is not contrary to United States public policy such that the *section 1506* exception should be invoked.

Appellants' argument that a stay of their Derivative Action without a stay of the BLMIS trustee's action is "value destructive, discriminatory, and inimical to the fundamental objectives of Chapter 15, including 'protection and maximization of the value of the debtor's assets'" is similarly [*28] unsupported. [HN13] Pursuant to Chapter 15, upon main recognition of a foreign proceeding, the automatic stay of *section 362* is applicable to all property of the debtor and stays all litigation against it. See *11 U.S.C. § 1520(a)(1)* (applying *§§ 361* and *362* automatically in chapter 15 cases). However, *section 362(d)* of the Code explicitly permits the Bankruptcy Court to modify the automatic stay upon "consider[ing] the particular circumstances of the case and ascertain[ing] what is just to the claimants, the debtor, and the estate." *City Ins. Co. v. Mego Int'l, Inc., 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983)*; see *In re Lehman Bros., No. 08-13555, 2008 Bankr. LEXIS 4564, 2008 WL 4902179 (Bankr. S.D.N.Y. November 5, 2008)* (modifying the automatic stay upon the debtors' motion, to permit employees to proceed with their workers' compensation claims against the debtors).

Here, Appellees demonstrated to the Bankruptcy Court that they had been engaged in good faith settlement discussions with the BLMIS trustee and that a limited modification of the automatic stay to continue those discussions would benefit Sentry's estate. Tellingly, since the BVI Proceeding was granted main recognition, the Bankruptcy Court has approved  [*29] a settlement of the BLMIS Trustee's adversary proceeding such that expensive and protracted litigation has been avoided. This settlement is directly in line with Chapter 15's goal of "protecting and maximizing the debtor's assets." *11 U.S.C. § 1501(a)(4)*. [HN14] The Bankruptcy Code explicitly authorizes a Bankruptcy Court to grant relief from the automatic stay upon good cause on a case-by-case basis where appropriate. The Bankruptcy Court's stay of all proceedings, except the BLMIS Trustee's adversary proceeding, is not manifestly contrary to the public policy of the United States.

## IV.    The Bankruptcy Court Properly Stayed Appellants' Action

Because the Bankruptcy Court properly granted main recognition to the BVI Proceeding, Sentry was entitled to an automatic stay of all proceedings pending against Sentry. Additionally, *section 362(d)* of the Code empowered the Court to modify the automatic stay to permit the action with the BLMIS trustee to continue. The Bankruptcy Court properly stayed Appellants' Action. [8]

> 8    This Court agrees with the Bankruptcy Court that if main recognition were not granted, non-main recognition of Sentry's BVI Proceeding would be appropriate because Sentry has an establishment  [*30] in the BVI for the conduct of nontransitory economic activity, i.e. a local place of business. See *11 U.S.C. § 1502(5)*. This Court further agrees that as a result, pursuant to *11 U.S.C. § 1521(a)*, the stay would be proper.

Appellants' appeal is DENIED.

Dated: September 15, 2011
New York, New York

SO ORDERED:

/s/ George B. Daniels

GEORGE B. DANIELS

United States District Judge

**Exhibit K.7**
*In re Fairfield Sentry Ltd.*, **No. 10-13164, 2013 Bankr. LEXIS 136**
**(Bankr. S.D.N.Y. Jan. 10, 2013)**





Analysis
As of: Jan 16, 2013

**In re: FAIRFIELD SENTRY LIMITED, et al., Debtors in Foreign Proceedings.**

**Chapter 15, Case No. 10-13164 (BRL) (Jointly Administered)**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2013 Bankr. LEXIS 136*

**January 10, 2013, Decided**

**COUNSEL:** [*1] For Foreign Representative: David J. Molton, William R. Baldiga, May Orenstein, Daniel J. Saval, BROWN RUDNICK LLP, Seven Times Square, New York, New York.

For Farnum Place, LLC: Scott C. Shelley, Robert Juman, QUINN EMANUEL URQUHART & SULLIVAN LLP, New York, New York; Eric D. Winston, Shane McKenzie, Matthew Scheck, Los Angeles, California.

**JUDGES:** Before: Hon. Burton R. Lifland, United States Bankruptcy Judge.

**OPINION BY:** Burton R. Lifland

**OPINION**

**MEMORANDUM DECISION AND ORDER DENYING RELIEF REQUESTED IN THE FOREIGN REPRESENTATIVE'S APPLICATION FOR CONSIDERATION OF SIPA CLAIM ASSIGNMENT TRANSACTION CONTEMPLATED BY TRADE CONFIRMATION PURSUANT TO SECTIONS 105(a), 363(b), 1507(a), 1520(a)(2) AND**

**1521(a) OF THE CODE**

This is a pure and simple case of seller's remorse. A Chapter 15 foreign representative sold his Madoff SIPA[1] claim to the buyer, Farnum Place, LLC ("Farnum")[2] in an arms-length transaction following months of good faith negotiations (the "SIPA Claim Sale" or "Sale"). Unrelatedly, three days later, the Trustee administering the Madoff estate executed a multi-billion dollar settlement, significantly bolstering the value of this SIPA claim. Disheartened by his bad luck, the foreign representative scrambled [*2] to undo the Sale by any means necessary. He turned first to the Eastern Caribbean Supreme Court in the High Court of Justice, Commercial Division, of the British Virgin Islands (the "BVI Court"), which is overseeing the liquidation of Fairfield Sentry Limited ("Fairfield Sentry" or "Sentry"), one of the debtors[3] in the above-captioned Chapter 15 case. Consequently, the BVI Court held an in-depth, three-day, evidentiary hearing involving the testimony of multiple witnesses and experts, and ultimately found that the Sale is valid. The allowed SIPA claim is presently $230 million.

1   Securities Investor Protection Act [hereinafter

"SIPA"].

2   Farnum is a special purpose entity created and owned by The Baupost Group LLC, which is a hedge fund with approximately $20 billion in assets under management and experience in acquisitions of distressed debt.

3   The other two debtors in the above-captioned case are Fairfield Sentry's two sister funds, Fairfield Sigma Limited ("Sigma") and Fairfield Lambda Limited ("Lambda," and together with Sentry and Sigma, the "Chapter 15 Debtors" or the "Debtors").

The foreign representative now turns to this Court in another attempt to undo the transaction. The instant [*3] application (the "Application")[4] of Kenneth Krys, the foreign representative (together with his predecessors,[5] the "Foreign Representative" or "BVI Liquidator") of Fairfield Sentry seeks the disapproval of this Sale pursuant to *sections 105(a), 363(b), 1507(a), 1520(a)(2) and 1521(a) of the United States Bankruptcy Code* (the "Code"), asserting domestic Code *section 363* concepts (best interests of the estate). However, conducting a plenary *section 363* review, as urged by the Foreign Representative, is not warranted under the present circumstances because the Sale does not involve the transfer of an interest in property within the United States, as statutorily mandated by Chapter 15. Moreover, accepting such assertions would contravene the origins of Chapter 15 and the critical concept of comity embedded therein. Indeed, this Court has no further meaningful interest in the disposition of the SIPA claim, which lies at the heart of the instant Application.

4   Memorandum of Law In Support of Foreign Representative's Application, Pursuant To *11 U.S.C. §§ 105(a), 363, 1507(a), 1520(a)(2) And 1521(a)*, For Consideration of SIPA Claim Assignment Transaction Contemplated By Trade Confirmation (Dkt. [*4] No. 593).

5   Christopher Stride, the former BVI Liquidator of Fairfield Sentry, resigned in September 2010 and was replaced by Joanna Lau, who later resigned in November 2011.

Accordingly, the Foreign Representative's attempts to persuade this Court to disapprove the Sale, the *bona fides* of which are untainted by the slightest hint of fraud or foul play, are simply unavailing. The Foreign Representative challenged the validity of the Sale before

his home court in the BVI and lost. His Hail Mary, last-ditch effort to renew that challenge before this Court is without any basis and is therefore DENIED.

## BACKGROUND

### 1. BVI Liquidation and Recognition

Fairfield Sentry was established for the purpose of allowing mainly non-U.S. persons and certain tax-exempt United States entities to invest with Bernard L. Madoff Investment Securities ("BLMIS"). *See In re Fairfield Sentry Ltd., 440 B.R. 60, 62 (Bankr. S.D.N.Y. 2010)*. It was a customer of and feeder fund to BLMIS, where it invested 95% of its assets, *see id.*, and maintained four direct customer accounts (nos. 1FN012, 1FN045, 1FN069, and 1FN070), *Picard v. Fairfield Sentry Ltd. et al.*, Adv. Pro. No. 09-01239, (Dkt. No. 69) [hereinafter "Settlement [*5] Motion[6]"], ¶ 6. On July 21, 2009, shortly after the revelation of Bernard L. Madoff's ("Madoff") Ponzi scheme and the collapse of BLMIS,[7] Sentry was placed into liquidation in the BVI Court. *See* Declaration of Kenneth Krys In Support of Application (Dkt. No. 591) [hereinafter "Krys Decl."], ¶ 3. On June 14, 2010, the Foreign Representative filed a petition in this Court, seeking recognition of the BVI liquidation proceedings (the "BVI Proceedings") of Sentry and its sister funds Sigma and Lambda as "foreign main proceedings" under Chapter 15.[8] *See* Krys Decl., ¶ 4. On July 22, 2010, this Court issued an order recognizing the BVI Proceedings as "foreign main proceedings" and granting other relief under Chapter 15 to the Foreign Representative (the "Recognition Order"). *See In re Fairfield Sentry, 440 B.R. 60*. The Recognition Order was affirmed in its entirety by the district court, *see In re Fairfield Sentry, No. 10-CIV-7311, 2011 U.S. Dist. LEXIS 105770, 2011 WL 4357421 (S.D.N.Y. Sept. 16, 2011)*, and is currently on appeal before the Second Circuit Court of Appeals, *see* Krys Decl., ¶ 4. The Recognition Order has not been stayed, *see id.*, and remains in full force and effect, *see id.*

6   Motion to Approve/Motion [*6] for Entry of Order Pursuant to *Section 105(a) of the Bankruptcy Code* and *Rules 2002(a)(3)* and *9019(a) of the Federal Rules of Bankruptcy Procedure* Approving An Agreement By and Between the Trustee and Kenneth Krys and Joanna Lau, Solely in Their Respective Capacities as the Foreign Representatives for and Joint Liquidators of Fairfield Sentry Limited, Fairfield

Sigma Limited, and Fairfield Lambda Limited.

7    A comprehensive discussion of the facts underlying Madoff's notorious Ponzi scheme is set forth in this Court's March 1, 2010 net equity decision. *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC), 424 B.R. 122, 125-33 (Bankr. S.D.N.Y. 2010)* [hereinafter the "Net Equity Decision"].

8    The BVI Proceedings were commenced on separate dates with respect to each of the Chapter 15 Debtors: Lambda on February 27, 2009, Sentry on April 21, 2009, and Sigma on April 23, 2009. *See In re Fairfield Sentry Ltd., 440 B.R. at 62.*

## 2. The Settlement and SIPA Claim

Prior to July 2, 2009, the bar date for filing claims in the substantively consolidated SIPA liquidation of BLMIS (the "SIPA Liquidation"), Fairfield Sentry filed three customer claims (assigned [*7] claim numbers 008037, 007898 and 11251, collectively, the "SIPA Claim") in the SIPA Liquidation. *See* Settlement Motion, ¶ 10. The SIPA Claim at the time of the filing, if allowed in full, amounted to approximately $1.2 billion under the Trustee's "net equity" method for determining customer claims, as set out in this Court's Net Equity Decision. *See id.*[9]

9    The Net Equity Decision was affirmed by the Second Circuit Court of Appeals in a direct appeal from this Court, *see In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229 (2d Cir. 2011)*, and was then denied certiorari by the Supreme Court, *see Sterling Equities Assocs. v. Picard, 132 S. Ct. 2712, 183 L. Ed. 2d 65 (2012).*

On or about May 18, 2009, Irving H. Picard (the "Trustee"), trustee for the SIPA Liquidation, commenced an adversary proceeding (the "Adversary Proceeding") against the Chapter 15 Debtors and other defendants in this Court seeking recovery of $3.054 billion under various provisions of the Code, SIPA, and New York Debtor and Creditor Law. *See* Amended Complaint, *Picard v. Fairfield Sentry Ltd.*, Adv. Pro. No. 09-1239 (Dkt. No. 23). The Trustee also asserted claims for turnover and accounting, and for disallowance of the claims filed by the [*8] Chapter 15 Debtors, as well as threatened to seek equitable subordination of the SIPA Claim pursuant to *section 510(c)* of the Code. *See id.*

The Foreign Representative, on behalf of the Chapter 15 Debtors, engaged in negotiations with the Trustee during 2010 and 2011 to resolve the Adversary Proceeding. *See* Krys Decl., ¶ 6. In May 2011, the Foreign Representative and the Trustee reached a global settlement (the "Settlement"). *See id.* at ¶ 7; Settlement Motion, ¶ 19. Subsequently, the Court entered an order approving this Settlement on June 10, 2011, followed by the BVI Court that approved the same on June 24, 2011. *See* Krys Decl., ¶ 7. Pursuant to its terms, Sentry is entitled to an allowed SIPA Claim in the BLMIS Proceedings in the amount of $230 million, subject to the Foreign Representative's payment of $70 million of Sentry's cash to the Trustee. *See* Settlement Motion, ¶ 22. Prior to November 2012, the Foreign Representative had paid $24 million to the Trustee, resulting in an allowed SIPA Claim in the interim amount of $78 million. *See id*; Settlement Motion, Ex. A (Dkt. No. 69, Attachment 3) [hereinafter "Settlement Agreement[10]"], ¶ 2. The remaining $46 million due to the Trustee [*9] was paid in full, and the Sentry SIPA Claim is allowed in its full amount of $230 million.

10    Form of Agreement Between The Trustee And Kenneth Krys And Joanna Lau, Solely In Their Respective Capacities As The Foreign Representatives For And Joint Liquidators Of Fairfield Sentry Limited, Fairfield Sigma Limited, And Fairfield Lambda Limited, May 9, 2011.

The SIPA Claim is presently one of Sentry's primary assets. Apart from the SIPA Claim, Sentry's liquid, non-contingent assets total approximately $115 million in value, comprised of (i) approximately $71 million in cash in an account at Citco Bank Nederland N.V. Dublin branch, which is currently unavailable to Sentry and subject to an order of attachment from a Netherlands court; (ii) approximately $6.7 million in non-BLIMS investments; and (iii) approximately $36.7 million in other cash. *See* Krys Decl., ¶ 9.

## 3. The SIPA Claim Sale

During the final four months of 2010, the Foreign Representative conducted a competitive auction for the SIPA Claim. *See id.*, ¶ 10. At that time, there were many publicly available facts suggesting that the Trustee could obtain substantial returns for the BLMIS Customer Funds. *See* Declaration of Patrick M. McKee [*10] in Support of Farnum Place LLC's Objection to Foreign Representative's Application (Dkt. No. 658), ¶ 17. For

example, the Trustee had already brought many adversary proceedings, including the one against the Picower defendants seeking more than $7 billion. *See* Declaration of Scott C. Shelley (Dkt. No. 657) [hereinafter "Shelley Decl."], Ex. 19. On December 7, 2010, the Trustee announced a $550 million settlement with the family of Carl Shapiro. *See id*. On December 2, 2010, the Trustee and his counsel filed a lawsuit against JP Morgan Chase, Madoff's primary banker, and related entities, seeking more than $6.5 billion in fees, profits, avoidable transfers and damages. *See id*.

The Foreign Representative elected to accept Farnum's offer to purchase the SIPA Claim for 32.125% of its ultimate allowed amount. *See* Krys Decl., ¶11. The Foreign Representative indicated that Farnum's bid was "in the best interest of the estate of Sentry." *See* Shelley Decl., Ex. 18 (Forbes Hare Letter to Conyers, Dill & Pearman, dated December 6, 2011, Concerning the BVI Applications).

Accordingly, in early December 2010, the parties negotiated, documented and signed, with representation by U.S. counsel, a trade [*11] confirmation (the "Trade Confirmation") setting forth the material terms and conditions of the SIPA Claim Sale for 32.125% of its ultimate allowed amount. *See* Declaration of James F. Mooney in Support of Farnum Place LLC's Objection (Dkt. No. 659), ¶¶ 9-11.

At the heart of the Trade Confirmation was a mutual assumption of risk: Farnum assumed the risks associated with having to collect an uncertain amount of distributions on an unknown timeline through the SIPA Proceeding, while Sentry assumed the risk that the recovery rate on customer claims in the BLMIS Proceeding might rise above 32.125%, which it ultimately did. *See id*.

### 4. The SIPA Claim Price Spike

On December 14, 2010, BLMIS customer claims were trading for approximately 20% to 30% of their face value. *See* Application, ¶ 5. Just three days after the Trade Confirmation was signed, the Trustee announced that he had entered into a settlement agreement with the estate of Jeffrey Picower for the forfeiture and repayment of approximately $7.2 billion (the "Picower Settlement"), of which $5 billion was to be paid to the Trustee. *See id*. This led to a dramatic increase in the prices offered for BLMIS claims. It was noted in early 2011, [*12] for

example, that prices in the "mid 60s" were regularly offered by investors for SIPA claims. *See* Krys Decl., ¶ 18. Currently, the Trustee has recovered more than 50% of the estimated customer losses in BLMIS. *See* The Madoff Recovery Initiative, http://www.madofftrustee.com (last visited on January 10, 2013). Therefore, the Foreign Representative alleges that the "floor" for the market value of the SIPA Claim is now over 50%, regardless of whether developments in litigation regarding recoveries by the Trustee lead to fluctuations in the market for SIPA claims. See Krys Decl., ¶ 17. Since the announcement of the Picower Settlement, the Foreign Representative has received, on an unsolicited basis, inquiries from a number of institutions expressing an interest in purchasing the SIPA Claim for amounts significantly higher than Farnum's sale price. *See id*.

### 5. The Necessary Approvals of the Trade Confirmation

Under "Other Terms and Trades" in the Trade Confirmation, the parties themselves agreed that the Transaction shall be subject to, *inter alia*, (i) "[a]pproval by the BVI Court of the terms of this Trade Confirmation," and (ii) "[a]pproval by a Final Order of each of the US Bankruptcy [*13] Court and the BVI Court of the assignment of the Claim by Seller [Sentry] to Buyer [Farnum]." *See* Krys Decl., Ex. B, p. 4. Under the terms of the Trade Confirmation, the Foreign Representative was obliged to "endeavor to obtain promptly the approval of the BVI Court of the terms and conditions of this Trade Confirmation." *See id*., p. 10. However, that obligation was expressly made "[s]ubject to Seller's exercise (in Seller's sole discretion) of its fiduciary duties or obligations as court-appointed liquidator." *See id*. The Trade Confirmation expressly provides that it is governed by New York law. *See id*., p. 9.

### 6. The BVI Proceedings

On or about May 31, 2011, the Foreign Representative filed an application in the BVI Court recommending that it disapprove the Trade Confirmation (the "First Sentry BVI Application"). *See* Krys Decl., ¶ 21. At the hearing on this application, held on June 7, 2011, the Foreign Representative withdrew the First Sentry BVI Application to "consider issues raised by the BVI Court with respect to the approval of the Trade Confirmation under BVI law." Application, ¶ 25.

Subsequently, on or about June 29, 2011, the Foreign Representative submitted an application [*14] to the BVI Court (the "Second Sentry BVI Application"), requesting leave to file an application with this Court to consider the Sale and the Trade Confirmation pursuant to *section 363* of the Code, as made applicable to the Sale by *section 1520(a)(2)* of the Code. *See id.* The BVI Court denied the Second Sentry BVI Application without prejudice on the basis that the Trade Confirmation, as a contractual matter, contemplated the BVI Court's consideration and approval prior to making an application to this Court. *See id.*

On October 27, 2011, given that the Foreign Representative had failed to submit an application to secure the BVI Court's approval of the terms and conditions of the Trade Confirmation, Farnum (through BVI counsel) filed an application in the BVI Court (the "Farnum BVI Application") seeking (i) an order pursuant to section 273 of the Virgin Islands Insolvency Act of 2003 (the "BVI Insolvency Act")[11] directing the Foreign Representative to seek approval from the BVI Court of the terms and conditions of the Trade Confirmation and take necessary steps to satisfy other conditions precedent to the Transaction, and, in the alternative, (ii) an order granting Farnum leave to commence [*15] proceedings against Sentry for specific performance of the Trade Confirmation or damages resulting from a purported breach of the covenant of good faith and fair dealing. *See* Krys Decl., ¶ 22.

> 11    Section 273 of the BVI Insolvency Act provides: "A person aggrieved by an act, omission or decision of an office holder may apply to the Court and the Court may confirm, reverse or modify the act, omission or decision of the office holder." *Available at* http://www.bvifsc.vg/Portals/2/INSOLVENCY_ACT_NO.5OF2003.pdf.

From March 13 to March 15, 2012, the BVI Court conducted a three-day evidentiary hearing regarding approval of the Sale. During that hearing, the BVI Court heard the testimony of fact witnesses, as well as experts for each side on both New York state law and United States bankruptcy law.[12] On March 27, 2012, the BVI Court issued a judgment (the "BVI Judgment"), *see* Dkt. No. 591, Ex. G, holding that (i) the Trade Confirmation is valid and subsisting as a matter of New York state contract law, *see* BVI Judgment, ¶ 40; (ii) approval of the Trade Confirmation was warranted as a matter of BVI

insolvency law, *see id.*, ¶ 57; (iii) the Foreign Representative did not breach the Trade Confirmation [*16] or violate any implied covenant of good faith and fair dealing therein in not pursuing the BVI Court's approval of the Trade Confirmation, *see id.*, ¶¶ 29-31; and (iv) the U.S. bankruptcy law issues are properly determined by this Court, *see id.*, ¶ 48 ("[I]t would be unwise for [the BVI Court] to express views on the issues that will arise for determination by the US"). Accordingly, upon the insistence of the Foreign Representative, the BVI Court permitted the Foreign Representative "to take the necessary steps to bring before the US Bankruptcy Court the question of approval (or non-approval) by that Court of the Trade Confirmation" and held that if this Court "decides, for whatever reason, to withhold approval of the Trade Confirmation, that will bring the Trade Confirmation to an end." *See id.*, ¶ 51.

> 12    Such experts and witnesses included the Honorable Joseph Bellacosa, retired Judge of the New York Court of Appeals; the Honorable Melanie Cyganowski, retired Chief Judge of U.S. Bankruptcy Court for the Eastern District of New York; Professor Joseph Perillo of Fordham Law School; and Charles Axelrod, counsel with the firm Fox Rothschild LLP.

Consequently, on April 18, 2012, the Foreign [*17] Representative filed the Application with this Court. Following an unsuccessful attempt at mediation, a hearing (the "Hearing") was held on January 9, 2013.

## DISCUSSION

The threshold issue in the instant Application is whether the Court should conduct a best interests of the estate review under *section 363* of the Code ("Section 363"), as urged by the Foreign Representative, in considering disapproval of the Sale. Based on its analysis of the papers and the arguments set forth at the Hearing, the Court finds that a *Section 363* review is not warranted under *section 1520(a)(2)* of the Code ("*Section 1520(a)(2)*"). Such finding is consonant with the origins of Chapter 15 and the notion of comity, a central tenet therein. Accordingly, the Application is DENIED.

## I. *SECTION 363* REVIEW OF THE SALE IS NOT WARRANTED UNDER SECTION 1520(a)(2)

In considering whether a *Section 363* review must be

undertaken by this Court, the parties focus on *Section 1520(a)(2)*, which provides:

> (a) Upon recognition of a foreign proceeding that is a foreign main proceeding . . . (2) *sections 363, 549 and 552* apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United [*18] States to the same extent that the sections would apply to property of an estate . . . .

*11 U.S.C. § 1520(a)(2)*. The parties dispute whether the instant Sale involves a "transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States" ("*Section 1520(a)(2)* Transfer"). *See 11 U.S.C. § 1520(a)(2)* (emphasis added). The Foreign Representative argues that a *Section 363* review is necessary because the Sale involves such a transfer "within the territorial jurisdiction of the United States:" the "interest" is the SIPA Claim and the "property" is the Customer Funds, both of which are within the United States. Farnum, on the other hand, maintains that a *Section 363* review is not necessary because there is no such transfer in the United States: the "interest" is the ownership interests in the SIPA Claim and the "property" is the SIPA Claim itself, both of which are intangibles located in the BVI.

The Court finds that the Sale does not involve a *Section 1520(a)(2)* Transfer and, therefore, a *Section 363* review of the Sale is not warranted under the present circumstances.

## A. THE SALE DOES NOT INVOLVE A *SECTION 1520(A)(2)* TRANSFER

The instant Sale does [*19] not involve a *Section 1520(a)(2)* Transfer because the allowed SIPA Claim is not "within the territorial jurisdiction of the United States." Rather, according to applicable non-bankruptcy law, it constitutes an intangible asset located in the BVI.

*Section 1502(8)* of the Code defines "within the territorial jurisdiction of the United States" as:

> [T]angible property located within the territory of the United States and intangible property deemed under applicable nonbankruptcy law to be located within that territory, including any

> property subject to attachment or garnishment that may properly be seized or garnished by an action in a Federal or State court in the United States.

*11 U.S.C. § 1502(8)*. Therefore, with respect to intangible property, in order to find that "an interest of the Debtor in property" is "within the territorial jurisdiction of the United States," a court must find that such interest is located within the United States under applicable non-bankruptcy law. *See id.; see also Butner v. United States, 440 U.S. 48, 54, 99 S. Ct. 914, 59 L. Ed. 2d 136 (1979)* (finding that in assessing the quality and situs of property interests, bankruptcy courts are to apply non-bankruptcy law); *Peterson v. Islamic Republic of Iran, 627 F.3d 1117, 1131 (9th Cir. 2010)* [*20] ("To determine the location of an intangible right to payment, we must look to [applicable] state law."). Thus, New York law, as set forth in the Trade Confirmation and agreed upon by the parties, determines the appropriate situs.

Here, the property in question is the allowed SIPA Claim and Sentry's ownership rights therein. The SIPA Claim Sale contemplates the transfer of Sentry's ownership interest in its rights against BLMIS. *See* Trade Confirmation, p. 1. Under New York law, Sentry's Claim against BLMIS therefore constitutes a "general intangible." *See, e.g., Communicators PCS L.P. v. Gabriel Capital, L.P., 394 B.R. 325, 337 (S.D.N.Y. 2008)* (suggesting that contingent rights to payment such as licenses, proceeds of certain collateral, causes of action and capital stock are each "general intangibles"); *see also In re Iroquois Energy Mgmt., LLC, 284 B.R. 28, 31 (Bankr. W.D.N.Y. 2002)* (finding debtor's right to a refund in connection with its overpayment for natural gas was in nature of a "general intangible" under the Uniform Commercial Code).

In determining the location of intangibles under New York law, the flexible test annunciated in *Severnoe Securities Corp. v. London and Lancashire Insurance Co., 255 N.Y. 120, 123-24, 174 N.E. 299 (1931)*, [*21] which has been adopted by many New York courts and is referred to by both parties, applies here:

> The situs of intangibles is in truth a legal fiction, but there are times when justice or convenience requires that a legal situs be ascribed to them. The locality selected is

for some purposes, the domicile of the creditor; for others, the domicile or place of business of the debtor, the place, that is to say, where the obligation was created or was meant to be discharged; for others, the place where the debtor can be found. *At the root of the selection is generally a common sense appraisal of the requirements of justice and convenience in particular conditions.*

*Id.* (emphasis added) (internal citations omitted). Indeed, "determination of situs for one purpose has no necessary bearing on its determination for another purpose" and the corresponding analysis is highly contextual. *Bankers Trust Co. v. Equitable Life Assur. Soc. of U.S., 19 N.Y.2d 552, 556-57, 227 N.E.2d 863, 281 N.Y.S.2d 57 (1967)* ("Stated another way, [determining the situs of intangibles] is fundamentally a question of ease of administration and of equity."); *see Yayasan Sabah Dua Shipping SDN BHB v. Scandinavian Liquid Carriers Ltd., 335 F. Supp. 2d 441, 448 (S.D.N.Y. 2004)* [*22] ("[P]inpointing the location of intangible assets . . . is a dilemma that calls for a practical judgment"); *In re Iroquois Energy Mgmt., LLC, 284 B.R. 28, 31 (Bankr. W.D.N.Y. 2002)* (emphasizing that "the concerns for justice and the convenience of all parties who may have an interest in that asset" must be adequately apprised in ascertaining the location of that intangible asset).

In applying the *Severnoe* test, the *Iroquois* court shed light on the relevant considerations regarding the situs of an intangible in the context of a right to a payment from a third party. There, the court found that right constituted an intangible property interest. *In re Iroquois, 284 B.R. at 32.* In determining the situs of such interest, the court then found that it was located at the domicile of the debtor, not with the third-party obligor. *Id.* The court reasoned that the relevant interest "arises not from contacts in the jurisdiction of any [third-party] obligor of the [debtor], but principally from contacts with the debtor's domicile or principal business location" because: (i) "[t]o its own secured creditors, the owner of an intangible asset provides the one certain link between the secured claim and [*23] the payment of cash. From a transaction secured by intangibles, the source of cash is a step removed," (ii) the underlying dispute involved only the debtor and the creditor, and (iii) the dispute arose "principally from contacts with the debtor's domicile or principal business location." *Id.*[13]

13    The Foreign Representative wrongly asserts that *Iroquois* is not pertinent because it applied a choice of law analysis. *See* Reply in Further Support of Foreign Representative's Application (Dkt. No. 676) [hereinafter the "Reply"], p. 26 n.25. This assertion overlooks that the primary basis for the court's conclusion that New York law applied was its finding that the situs of the intangible property interest in question was in New York. *See In re Iroquois, 284 B.R. at 31-32* (framing the choice of law analysis with the assertion, "[i]n defining rights to intangible property, New York looks to the law of the situs of those assets," and concluding, "[w]hile [*24] the refunded cash may at one time have been situated in Canada, the situs of [the debtor's] interest in that refund is New York . . . . Accordingly, New York's substantive law must govern the effectiveness of [the creditor's] security interest.").

As in *Iroquois*, justice, convenience and common sense dictate that this Court find that the SIPA Claim is located with the debtor in the BVI, and not the third-party obligor. Indeed, the Sale involves the transfer of the SIPA Claim by a BVI incorporated entity, being administered by the BVI Court. The Liquidator was appointed by, and must answer to, the BVI Court. This Court has recognized that the Liquidator is deemed to "have custody and control of all the assets" of Sentry under the BVI Insolvency Order, *In re Fairfield Sentry Ltd., 452 B.R. 52, 56 (Bankr. S.D.N.Y. 2011)*, and that the Liquidator conducts the business of administering Sentry's assets in the BVI, *see In re Fairfield Sentry, 440 B.R. at 64-65.* The Liquidator himself, in arguing that this Chapter 15 Court was not the proper forum to examine the Settlement, emphasized: "The BVI court oversees the [Chapter 15 Debtors'] activities and administers [their] estates . . . . That is [*25] the proper venue for dealing with the reasonableness of this settlement under applicable law in connection with the fiduciary duties of the Fairfield liquidators." *See* Transcript Regarding Hearing Held on June 7, 2011, *Picard v. Fairfield Sentry Ltd.*, Adv. Pro. No. 09-1239 (Dkt. No. 93) at 14:4-11. In addition, at this time, the Foreign Representative seeks relief against *his claim* to BLMIS Customer Funds; he is not seeking relief against those funds themselves. *See* Trade Confirmation, p. 1 (providing for the sale of the "Claim," which is defined as "[a]ll Seller's rights, title and interest in and to Seller's claims against BLMIS in the

Proceedings"). Finally, any proceeds of the SIPA Claim Sale will be administered in the BVI pursuant to BVI insolvency law to primarily foreign creditors.

In sum, in undertaking a common sense appraisal of the requirements of justice and convenience in the instant circumstances, this Court finds that the SIPA Claim is not within the territorial jurisdiction of the United States and, therefore, the Sale does not involve a *Section 1520(a)(2)* Transfer.[14]

> 14    Belatedly, the Foreign Representative in his reply, for the first time, seeks to establish claim situs [*26] in the United States under *section 1502(8)* of the Code by asserting that the SIPA Claim is subject to attachment in New York. *See* Reply, pp. 26-27. The Foreign Representative mistakenly relies on *ABKCO Industries, Inc. v. Apple Films, Inc., 39 N.Y.2d 670, 350 N.E.2d 899, 385 N.Y.S.2d 511 (1976)* for the proposition that the situs of an intangible property interest for purposes of attachment is the location of the obligor. *ABKCO* holds, however, that the situs of "intangible personal property in an *ordinary contract*" for attachment purposes is the location of the obligor. *Id. at 675* (emphasis added). Thus, because, *inter alia*, a SIPA claim to a pool of slowly accumulating assets is not akin to an ordinary contract, and the Court has not otherwise been persuaded that attachment purposes that the situs of the SIPA Claim is in the United States, this argument fails. Furthermore, even if the SIPA Claim were located in the United States for attachment purposes, it cannot be "properly seized or garnished," *see 11 U.S.C. § 1502(8)*, because it is stayed by the BVI Court in accordance with BVI law, as well as by this Court by operation of law under *section 1520(a)(1)* of the Code. *See* BVI Insolvency Law § 175; Verified Petition [*27] of Foreign Representatives Kenneth Krys And Christopher Stride In Support of Application of Fairfield Sentry Limited For Recognition of Foreign Main Proceeding (Dkt. No. 2), Ex. A; *In re Fairfield Sentry, 440 B.R. 60*.

## II. COMITY

Such finding is consistent with Chapter 15's origins and its governing concept of comity. The origins of Chapter 15 rest in *section 304* of the Code ("*Section 304*") and the Model Law on Cross-Border Insolvency ("the

Model Law"), each of which were specifically designed to formalize cross-border coordination and cooperation, as well as delineate the role of an ancillary court as an aid to the foreign main court in international insolvency proceedings. *See, e.g.*, H. Rep. No. 95-595, 95th Cong. 1st Sess., 324-325 (a977); S. Rep. 95-989, 95th Cong., 2d Sess. 35 (1978) (indicating *Section 304* "governs cases filed in the bankruptcy courts that are ancillary to foreign proceedings"). Integral to these objectives is the governing concept of comity, which is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its [*28] own citizens, or of other persons who are under the protections of its laws." *Hilton v. Guyot, 159 U.S. 113, 164, 16 S. Ct. 139, 40 L. Ed. 95 (1895)*.

Both parties cite to the Fifth Circuit's recent decision in *In re Vitro S.A.B. de CV, No. 12-10542, 2012 U.S. App. LEXIS 24443, 2012 WL 5935630 (5th Cir. Nov. 28, 2012)* and the Delaware Bankruptcy Court's decision in *In re Elpida Memory, Inc., No. 12-10947, 2012 Bankr. LEXIS 5367, 2012 WL 6090194 (Bankr. D. Del. Nov. 16, 2012)*, recent cases that are at odds with each other regarding the role of comity in Chapter 15. While the *Vitro* court elevated comity to a "principal objective," *see 2012 U.S. App. LEXIS 24443, 2012 WL 5935630, at **7, 26* (finding comity to be "the rule . . . not the exception"), the *Elpida* court found that comity is "not the end all be all of the statute," *2012 Bankr. LEXIS 5367, 2012 WL 6090194, at *8*. For the reasons stated below, this Court disagrees with the *Elpida* court's downplay of the role of comity in Chapter 15.[15]

> 15    Although the *Elpida* court correctly focuses on the location of domestic assets in considering the application of *Section 1520(a)(2)*, it also focuses extensively on the application of comity. Interestingly, the *Elpida* court found support in its evaluation of the importance of comity by counting the number of times it appears in [*29] Chapter 15 (two). The relevance of that exercise is questionable in view of the substantial jurisprudence otherwise extant. The comity analysis notwithstanding, *Elpida* is on entirely different footing from the instant case in light of the existence of a Chapter 15 controlling order as part of the recognition order in that case. Specifically, due to concerns raised by U.S.

creditors, the *Elpida* court modified the recognition order and explicitly prohibited the foreign representative from selling "Elpida's U.S. assets or interests without first . . . obtaining approval of [the U.S. Bankruptcy] court." *See In re Elpida Memory, Inc*., Interim Order Modifying Order Recognizing Foreign Representatives and Foreign Main Proceeding, Case No. 12-10947 (Dkt. No. 138). Here, on the other hand, there was no such court order from either this Court or the BVI Court requiring this Court's approval of the sale of assets--all that exists, at most, is a similar but *gratuitous* approval requirement present in the Trade Confirmation.

The doctrine of comity predates the United States Bankruptcy Code, *see Hilton, 159 U.S. at 164*, and was placed as one of six factors to be considered in granting relief under [*30] former *Section 304*. *See* REORGANIZING FAILING BUSINESSES: A COMPREHENSIVE REVIEW AND ANALYSIS OF FINANCIAL RESTRUCTURING AND BUSINESS REORGANIZATION, VOL. II, American Bar Association, Business Law Section, 13-12 (2006) [hereinafter "Reorganizing Failing Businesses"]. It has become the primary consideration in the grant of relief analysis as observed by the United States Court of Appeals for the Second Circuit in *Bank of New York v. Treco (In re Treco)*:

> [C]omity is the ultimate consideration in determining whether to provide relief under *§ 304*. The purpose of the section is to provide a statutory mechanism through which United States courts may defer to and facilitate foreign insolvency proceedings.

*240 F.3d 148, 156 (2d Cir. 2001)*; *see also* Reorganizing Failing Businesses, p. 13-12.

The importance of comity has been codified in Chapter 15 to emphasize its primacy by inserting it in the preamble of *section 1507(b)* of the Code, rather than listing it as one of the source factors of displaced *section 304(c)* of the Code. *See Vitro, 2012 U.S. App. LEXIS 24443, 2012 WL 5935630, at *26*. The analog to *section 1507* is article 7 of the Model Law ("Article 7"). The United States delegation to UNCITRAL (Working Group V), of [*31] which the undersigned was, and is, a member, was instrumental in inserting language of

comity status elevation to Article 7 (*section 1507(b)* of the Code): "Therefore, in *section 1507(b)*, comity is raised to the introductory language to make clear that it is the central concept to be addressed." *See* Burton R. Lifland, *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-By-Section Analysis*, CROSS-BORDER INSOLVENCY AND CONFLICT OF JURISDICTIONS (Bruylant, 2007); *see also Suggested Modification to Ancillary Proceeding Statutes, 4 AM. BANKR. INST. L. REV. 530 (1996)* (same author).

Indeed, Chapter 15 emanates from and was designed around this central concept of comity, as evidenced by its primary purpose and deferential framework for international judicial cooperation. *See, e.g.*, *11 U.S.C. § 1501(a)* (specifying Chapter 15's "most basic objective is to foster the orderly administration of cross-border restructurings"); *11 U.S.C. § 1504* (indicating that "any case commenced under Chapter 15 is 'ancillary' to a foreign proceeding pending elsewhere"); *11 U.S.C. § 1525* ("[T]he [ancillary] court shall cooperate to the *maximum extent possible* with a foreign court") (emphasis added); [*32] *11 U.S.C. § 1527* (stating cooperation "may be implemented *by any appropriate means*") (emphasis added); *see also In re JSC BTA Bank, 434 B.R. 334, 342 (Bankr. S.D.N.Y. 2010)* (emphasizing that ancillary cases are "meant to support, not supplant, a main proceeding in a foreign jurisdiction"). All in all, "Chapter 15 provides courts with broad, flexible rules to fashion relief appropriate for effectuating its objectives in accordance with comity." *Vitro, 2012 U.S. App. LEXIS 24443, 2012 WL 5935630, at *16*. In fashioning such relief, courts must "take into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *Id*. (internal quotations omitted).

Considering the facts before the Court, as established above, it is clear not only that the SIPA Claim is located in the BVI, but also that the BVI Court has the paramount interest in the sale of the SIPA Claim. Moreover, this Court lacks a meaningful interest in the disposition of the SIPA Claim. Once this Court approved the Settlement between the Trustee and Fairfield Sentry and the claims allowance procedure order in [*33] the SIPA Liquidation, it relinquished its stake in the adjudication of the Sale of the SIPA Claim, parking it squarely in the BVI Court. Even if requested to do so, this Court is not empowered to enjoin the BVI Liquidator from entering

into a voluntary claim assignment or sale of the SIPA Claim in the BVI. In addition, there are no interests, such as liens or intellectual property, unique to any of the United States parties at issue, and United States creditors have limited interest in the SIPA Claim Sale. *See In re Fairfield Sentry, 440 B.R. at 62* (indicating the Debtors "were established as vehicles for mainly non-U.S. persons and tax-exempt United States entities to invest with BLMIS"). Put another way, the transaction at issue is BVI-centric for purposes of this Court's review. Under such circumstances, comity dictates that this Court defer to the BVI Judgment.

Failing to grant such comity to the BVI Judgment under these circumstances "necessarily undermines the equitable and orderly distribution of a debtor's property by transforming a domestic court into a foreign appellate court where creditors are always afforded the proverbial 'second bite at the apple.'" [*34] *See SNP Boat Serv. Sa v. Hotel Le St. James, No. 11-CIV-62671, 2012 U.S. Dist. LEXIS 54615, 2012 WL 1355550, at *9 (S.D. Fla. Aug. 27, 2012)* (reversing bankruptcy court decision permitting discovery for the purpose of determining whether a judgment creditor's interests were sufficiently protected in a foreign proceeding). This Court, supervising an ancillary proceeding, declines to offend principles of international comity by second guessing the BVI Court's approval of the Sale when the United States' interests are so minimal. Chapter 15 was not designed to permit parties to mix and match multiple countries' laws, which would lead to "haphazard, erratic, or piecemeal" adjudication of the distribution of assets, *In re Atlas Shipping A/S, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009)*, as the administration and disbursement of *the same* assets would be handled by "different tribunals in different countries according to different laws," *see* Daniel M. Glosband, *et al.*, THE AMERICAN BANKRUPTCY INSTITUTE GUIDE TO CROSS BORDER INSOLVENCY 6 (2008). As the drafters of the Model Law emphasized, "inharmonious legal approaches"--such as ones in which parties can obtain duplicative, cross-border review on the basis of a contrived relationship to an [*35] ancillary court--"hamper the rescue of financially troubled businesses, are not conducive to a fair and efficient administration of cross-border insolvencies, impede the protection of the assets of the insolvent debtor against dissipation and hinder maximization of the value of those assets." UNCITRAL, LEGISLATIVE GUIDE ON INSOLVENCY LAW, ANNEX III, 310, ¶ 13 (2005).

Furthermore, an absence of "predictability in the handling of cross-border insolvency cases impedes capital flow and is a disincentive to cross border investment," *id.*, which is exactly the outcome Chapter 15 was designed to prevent, *see Fogerty v. Petroquest (In re Condor Ins. Ltd.), 601 F.3d 319, 322 (5th Cir. 2010).*

* * *

For the reasons set forth above, this Court declines to conduct a plenary *Section 363* review.[16]

> 16    Attempting to cover all bases, the Foreign Representative also seeks a *Section 363* review pursuant to *sections 1521(a), 1507(a)* and *105(a)* of the Code. However, such a review is not warranted under *section 1521(a)* of the Code's "appropriate relief" because it contravenes *Section 1520(a)(2)*'s express territorial limitation. *See JSC BTA Bank, 434 B.R. at 342.* Nor is such a review warranted under *section 1507(a)* [*36] of the Code's "additional assistance" because, as explained above, it violates principles of comity. Finally, such a review is not warranted under *section 105(a)* of the Code because such section, on its own, cannot form a basis for such a review. *See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988)* ("The short answer to these arguments is that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").

## CONCLUSION

To the extent that this Court has been requested to express its view of the Trade Confirmation, this Court finds no basis for disapproval thereof. Accordingly, the Application is DENIED.

**IT IS SO ORDERED**.

Dated: New York, New York

January 10, 2013

/s/ Burton R. Lifland

United States Bankruptcy Judge

**Exhibit K.8**
*In re MAAX Corporation*, **No. 08-11443 (Bankr. D. Del. Aug. 5, 2008)**
**[Docket No. 37]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| MAAX Corporation, *et al.*, | Case No. 08-11443 (CSS) |
| Foreign Applicants in Foreign Proceedings. | Jointly Administered |

### ORDER GRANTING RECOGNITION AND RELATED RELIEF

This matter was brought before the Court by Alvarez & Marsal Canada ULC, the court-appointed monitor (the **"Monitor"**) and authorized foreign representative of the MAAX Corporation and certain of its direct and indirect wholly owned subsidiaries (together, the **"MAAX Group"**)[1] in proceedings (the **"Canadian Proceedings"**) under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Quebec Superior Court (Commercial Division) (the **"Quebec Court"**), to consider the Verified Petitions for Recognition of the Canadian Proceeding which were filed on July 14, 2008 for each member of the MAAX Group (collectively, the **"Chapter 15 Petitions"**)[2] commencing the above-captioned chapter 15 cases (collectively, the **"Chapter 15 Cases"**) pursuant to sections 1504, 1515 and 1517 of title 11 of the United States Code (as amended, the **"Bankruptcy Code"**), and seeking enforcement pursuant to sections 1507, 1520, 1521, 363 and 105 of the Bankruptcy Code of (i) the Initial Order of the Quebec Court dated June 12, 2008 (the **"Initial Order"**), as extended on June 26, 2008 and on July 10, 2008 (collectively, the **"Initial Orders"**) and (ii) the Sale and Vesting Order of the Quebec Court dated July 10, 2008 (the **"Vesting Order"**). Due

---

[1] The MAAX Group includes MAAX Corp., MAAX Canada Inc., 4200217 Canada Inc., MAAX Spas (Ontario), Inc., MAAX Cabinets Inc., MAAX KSD LLC, Pearl Baths LLC, MAAX-Hydro Swirl Manufacturing Corp., MAAX Midwest, Inc., MAAX Spas (Arizona), Inc. and Aker Plastics Company, Inc.

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Vesting Order.

and timely notice of the filing of the Chapter 15 Petitions was given in accordance with this Court's order dated July 14, 2008, approving the form of notice and manner of service thereof, which notice is deemed adequate for all purposes such that no other or further notice thereof need be given. The Court has considered and reviewed the other pleadings and exhibits submitted by the Monitor in support of the Chapter 15 Petitions including the Initial Orders annexed hereto as Exhibits 1A, 1B and 1C respectively, the Vesting Order annexed hereto as Exhibit 2 and the Asset Purchase Agreement between the MAAX Group and the Purchaser dated June 11, 2008 (the **"Purchase Agreement"**) annexed hereto as Exhibit 3 (collectively the **"Supporting Papers"**). Any objections to the Chapter 15 Petitions that have not been withdrawn or resolved have been overruled.

Therefore, after due deliberation and sufficient cause appearing therefor, the Court finds and concludes as follows:

(A)     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and section 1501 of the Bankruptcy Code.

(B)     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

(C)     Venue is proper in this District pursuant to 28 U.S.C. §§ 1410 (1) and (3).

(D)     The Monitor is a person within the meaning of section 101(41) of the Bankruptcy Code and is the duly appointed foreign representative of each member of the MAAX Group within the meaning of section 101(24) of the Bankruptcy Code.

(E)     The Chapter 15 Cases were properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code.

(F)     The Chapter 15 Petitions meet the requirements of section 1515 of the Bankruptcy Code.

(G)     The Canadian Proceedings are foreign proceedings within the meaning of section 101(23) of the Bankruptcy Code.

(H)     The Canadian Proceedings are entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

2

(I)   The Canadian Proceedings are pending in Canada, which is the location of each member of the MAAX Group's center of main interests, and as such, constitute foreign main proceedings pursuant to section 1502(4) of the Bankruptcy Code and are entitled to recognition as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code.

(J)   The Monitor is entitled to all the relief provided by section 1520 of the Bankruptcy Code without limitation.

(K)   The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, warranted pursuant to section 1521 of the Bankruptcy Code, and will not cause any hardship to any party in interest that is not outweighed by the benefits of granting that relief.

(L)   The interest of the public will be served by this Court granting the relief requested by the Monitor.

(M)   Purchaser has acted in good faith, within the meaning of section 363(m) of the Bankruptcy Code.

(N)   Time is of the essence in consummating the sale. To maximize the value of the assets, it is essential that the sale of the Purchased Assets occur within the time constraints set forth in the Purchase Agreement. Cause has been shown as to why this Order should not be subject to the stay provided by Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.   The Canadian Proceedings are hereby recognized as foreign main proceedings pursuant to section 1517 of the Bankruptcy Code.

2.   All provisions of section 1520 of the Bankruptcy Code apply in these Chapter 15 Cases, including, without limitation, the stay under section 362 of the Bankruptcy Code throughout the duration of these Chapter 15 Cases or until otherwise ordered by this Court.

3.   The Initial Orders are hereby given full force and effect in the United States.

4.   The Vesting Order is hereby given full force and effect in the United States.

3

5.     The Purchaser is hereby found to be a good-faith purchaser and granted all
of the protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy
Code.

6.     As set forth in the Vesting Order, effective as of the delivery of a
Monitor's certificate to the Purchaser substantially in the form attached as Schedule A to the
Vesting Order, the sale of the Purchased Assets by the MAAX Group to Purchaser shall
constitute a legal, valid, and effective transfer of the MAAX Group's right, title and interest in
the Purchased Assets notwithstanding any requirement for approval or consent by any person
and shall vest Purchaser with all right, title, and interest of the MAAX Group in and to the
Purchased Assets free and clear of all liens, claims and encumbrances of any kind (except the
Permitted Encumbrances set forth in the Purchase Agreement), pursuant to section 363(f) of
the Bankruptcy Code.

7.     The MAAX Group is authorized and empowered to cause to be filed with
the secretary of state of any state or other applicable officials of any applicable governmental
units any and all certificates, agreements, or amendments necessary or appropriate to effectuate
the transactions contemplated by the Purchase Agreement, any related agreements and this
Order, including amended and restated limited-liability-company agreements, certificates or
articles of incorporation and by-laws or certificates or articles of amendment, and all such
other actions, filings, or recordings as may be required under appropriate provisions of the
applicable laws of all applicable governmental units or as any officer of the Debtors may
determine are necessary or appropriate. The execution of any such document or the taking of
any such action is deemed conclusive evidence of the authority of such person to so act. Without
limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if

4

any, required by the corporation laws of the state of Delaware and all other applicable business corporation, trust, and other laws of the applicable governmental units with respect to the implementation and consummation of the Purchase Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

8.     The MAAX Group is hereby authorized and empowered to assign all real property leases required to be assigned under the Purchase Agreement.

9.     Notwithstanding Bankruptcy Rules 6004, 7062, and 9021, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the MAAX Group and Purchaser are free to close under the agreement at any time, subject to the terms of the Purchase Agreement. In the absence of any person or entity obtaining a stay pending appeal, if the MAAX Group and Purchaser close under the Purchase Agreement, Purchaser shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the agreement if this Order or any authorization contained herein is reversed or modified on appeal.

10.    The automatic stay under section 362(a) of the Bankruptcy Code shall not apply to and otherwise shall not prevent the exercise or performance by any party of its rights or obligations under the Purchase Agreement.

11.    The MAAX Group shall be entitled to continue to utilize the central cash management system currently in place or replace it with another substantially similar central cash management system and continue their current and any future banking arrangements (collectively, the "**Cash Management System**") and the stay under section 362 of the Bankruptcy Code shall not apply to the operation of such Cash Management System.

5

12.    Any present or future bank, financial institution or person providing the Cash Management System (i) shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the MAAX Group of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; (ii) shall be entitled to provide the Cash Management System without any liability in respect thereof to any person other than the MAAX Group, pursuant to the terms of the documentation applicable to the Cash Management System; and (iii) shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under any plan formulated in the Canadian Proceedings with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

13.    To the extent provided in paragraph 21 of the Initial Order, and notwithstanding anything in this Order to the contrary, the MAAX Group shall be entitled but not required to pay and fulfil the following expenses and obligations whether incurred prior to or after this Order:

(a)    all outstanding and future wages, salaries, employee and pension benefits, vacation pay, bonuses, and expenses payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)    all outstanding and future trade obligations or related expenses incurred in the ordinary course of business and other amounts related to the preservation of the Property or the Business, including without limitation obligations to customers, suppliers, sale agents, independent contractors, governmental and taxation authorities or other third parties;

(c)    the fees and disbursements of any assistants retained or employed by the Petitioners in respect of these proceedings, at their standard rates and charges; and

6

(d)  such other amounts and obligations as agreed to by the MAAX
Group and BBLF.

14.  This Court shall retain jurisdiction with respect to the enforcement,
amendment or modification of this Order, any request for additional relief or any adversary
proceeding brought in and through these Chapter 15 Cases, and any request by an entity for relief
from the provisions of this Order, for cause shown, that is properly commenced and within the
jurisdiction of this Court.

15.  Service in accordance with this Order shall constitute adequate and
sufficient service and notice of this Order.

16.  The Chapter 15 Petitions and the Supporting Papers shall be made
available by the Monitor through its website at http://www.alvarezandmarsal.com/maax or upon
request at the offices of Allen & Overy LLP, 1221 Avenue of the Americas, New York, New
York  10020  to  the  attention  of  Tania  Ingman,  (212)  756-1199,
Chapter15.MAAX@allenovery.com.

17.  Notwithstanding Bankruptcy Rule 7062, made applicable to these Chapter
15 Cases by Bankruptcy Rule 1018, the terms and conditions of this Order shall be immediately
effective and enforceable upon its entry, and upon its entry, this Order shall become final and
appealable.

Dated: Wilmington, Delaware
 $8/5$ , 2008

UNITED STATES BANKRUPTCY JUDGE

7

**Exhibit K.9**

***In re Metcalfe & Mansfield Alternative Investments, et al.*, No. 09-16709
(Bankr. S.D.N.Y. Jan. 5, 2010) [Docket No. 28]**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Metcalfe & Mansfield Alternative Investments et al., | Case No. 09-16709 (MG) |
| Debtors in Foreign Proceedings. | Jointly Administered |

**ORDER GRANTING RECOGNITION, ENFORCEMENT**
**OF CANADIAN ORDERS AND RELATED RELIEF**

This matter was brought before the Court by Ernst & Young Inc., the court-appointed monitor (the "**Monitor**") and authorized foreign representative of Metcalfe & Mansfield Alternative Investments II Corp., ("**Metcalfe II**"), Metcalfe & Mansfield Alternative Investments III Corp. ("**Metcalfe III**"), Metcalfe & Mansfield Alternative Investments V Corp. ("**Metcalfe V**"), Metcalfe & Mansfield Alternative Investments XI Corp. ("**Metcalfe XI**"), Metcalfe & Mansfield Alternative Investments XII Corp. ("**Metcalfe XII**"), 6932819 Canada Inc. ("**6932819**") and 4446372 Canada Inc., ("**4446372**" and together with Metcalfe II, Metcalfe III, Metcalfe V, Metcalfe XI, Metcalfe XII, and 6932819, the "**Issuer Trustees**"), which are the trustees of the third-party (non-bank sponsored) conduit trusts, and the debtors in proceedings (the "**Canadian Proceedings**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") pending before the Ontario Superior Court of Justice (Commercial List) (the "**Ontario Court**").

This Court has reviewed the Verified Petitions For Recognition of Foreign Proceedings which were filed on November 10, 2009 for each Issuer Trustee (collectively, the "**Chapter 15 Petitions**") commencing the above-captioned chapter 15 cases (collectively, the

"**Chapter 15 Cases**") pursuant to sections 1504, 1515 and 1517 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), and seeking enforcement pursuant to sections 1507, 1521(a) and 105(a) of the Bankruptcy Code of the Amended Sanction Order and the Plan Implementation Order of the Ontario Court (together, the "**Canadian Orders**") and attached as Exhibits 1 and 2, respectively to the Amended Proposed Order (Document Number 25) in the Lead Case.

Due and timely notice of the filing of the Chapter 15 Petitions was given in accordance with this Court's order dated November 23, 2009, approving the form of notice and manner of service thereof, which notice is deemed adequate for all purposes such that no other or further notice thereof need be given.  No objections to the Chapter 15 Petitions or any of the relief sought thereby have been filed with the Court.

Therefore, after due deliberation and sufficient cause appearing therefor, the Court finds and concludes as follows:

(A)     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and section 1501 of the Bankruptcy Code.

(B)     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

(C)     Venue is proper in this District pursuant to 28 U.S.C. §§ 1410(3).

(D)     The Monitor is a person within the meaning of section 101(41) of the Bankruptcy Code and is the duly appointed foreign representative of each Issuer Trustee within the meaning of section 101(24) of the Bankruptcy Code.

(E)     The Chapter 15 Cases were properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code.

(F)     The Chapter 15 Petitions meet the requirements of section 1515 of the Bankruptcy Code.

(G)     The Canadian Proceedings are foreign proceedings within the meaning of section 101(23) of the Bankruptcy Code.

(H)     The Canadian Proceedings are entitled to recognition by this Court pursuant to section 1517 of the Bankruptcy Code.

(I)      The Canadian Proceedings are pending in Canada, which is the location of each Issuer Trustee's center of main interests, and as such, constitute foreign main proceedings pursuant to section 1502(4) of the Bankruptcy Code and are entitled to recognition as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code.

(J)      The Monitor is entitled to all the relief provided by section 1520 of the Bankruptcy Code without limitation.

(K)     The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, warranted pursuant to section 1521 of the Bankruptcy Code, and will not cause any hardship to any party in interest that is not outweighed by the benefits of granting that relief.

(L)      The interest of the public will be served by this Court granting the relief requested by the Monitor.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.      The Canadian Proceedings are hereby recognized as foreign main proceedings pursuant to section 1517 of the Bankruptcy Code.

2.      All provisions of section 1520 of the Bankruptcy Code apply in these Chapter 15 Cases, including, without limitation, the stay under section 362 of the Bankruptcy Code throughout the duration of these Chapter 15 Cases or until otherwise ordered by this Court.

3.      The Canadian Orders are hereby given full force and effect in the United States and are binding on all persons subject to this court's jurisdiction pursuant to sections 1521(a)(7), 1507 and 105(a) of the Bankruptcy Code.

4.      This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any request for additional relief or any adversary proceeding brought in and through these Chapter 15 Cases, and any request by an entity for relief

from the provisions of this Order, for cause shown, that is properly commenced and within the

jurisdiction of this Court.

      5.     Notice of entry of this order shall be served in accordance with this Court's

prior order directing the manner of service and notice.  Such service in accordance with this

Order shall constitute adequate and sufficient service and notice of this Order.

      6.     The Chapter 15 Petitions and copies of the Canadian Orders shall be made

available upon request at the offices of Allen & Overy LLP, 1221 Avenue of the Americas, New

York, New York 10020 to the attention of Amélie Baudot, (212) 610-6300,

amelie.baudot@allenovery.com.

      7.     Notwithstanding Bankruptcy Rule 7062, made applicable to these Chapter

15 Cases by Bankruptcy Rule 1018, this Order shall be immediately effective and enforceable

upon its entry, and upon its entry, this Order shall become final and appealable.

Dated:  New York, New York
        January 5, 2009

                                 /s/Martin Glenn
                                 UNITED STATES BANKRUPTCY JUDGE

## **Exhibit K.10**
### ***In re Muscletech Research and Development Inc. et al.,***
### **Nos. 06 CIV 538 and 539 (S.D.N.Y. March 2, 2006) [Docket No. 46]**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
In re EPHEDRA PRODUCTS LIABILITY     :
LITIGATION                           :          04 MD 1598 (JSR)
------------------------------------ x
In re MUSCLETECH RESEARCH AND        :
DEVELOPMENT INC., et al.;            :
                                     :
Foreign Applicants in Foreign        :          06 Civ. 538 (JSR)
Proceedings.                         :
                                     :
------------------------------------ x
In re RSM RICHTER INC., AS FOREIGN   :
REPRESENTATIVE OF MUSCLETECH RESEARCH:
AND DEVELOPMENT INC. AND ITS         :          06 Civ. 539 (JSR)
SUBSIDIARIES,                        :
                                     :
              Plaintiff,             :
                                     :
              -v-                    :
                                     :
SHARON AGUILAR, an individual; et    :               ORDER
al.,                                 :
                                     :
              Defendants.            :
------------------------------------ x
```

JED S. RAKOFF, U.S.D.J.

Before the Court are certain petitions of RSM Richter, Inc.
-- appointed by the Ontario Superior Court of Justice as monitor and
foreign representative of MuscleTech Research and Development Inc.
and certain of its subsidiaries (collectively, the "Foreign
Applicants"), which are in bankruptcy in Canada -- seeking
recognition and relief in aid of "foreign main proceedings" pursuant
to 11 U.S.C. §§ 1504 and 1519.  For the reasons stated from the
bench, see transcript, March 2, 2006:

1.  The Canadian bankruptcy proceedings involving the Foreign
Applicants are hereby recognized as foreign main proceedings pursuant
to 11 U.S.C. § 1517.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3-3-06_

2.    The provisions of 11 U.S.C. § 1520 apply in the above-captioned Chapter 15 cases.

3.    The prior orders of this Court giving effect to orders of the Ontario Court shall continue in effect in accordance with their terms pursuant to 11 U.S.C. § 1521.

4.    A copy of this Order shall be served upon all known creditors (or their counsel) of the Foreign Applicants by electronic mail or by facsimile transmission or, in the event service by electronic mail or facsimile cannot be accomplished, by overnight delivery service, on or before March 9, 2006.  Service in accordance with this Order shall constitute adequate and sufficient service and notice of this Order.

SO ORDERED.

_____
JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       March 2, 2006

2

**Exhibit K.11**
***In re Nortel Networks Corp.*****, No. 09-10164 (Bankr. D. Del. Feb. 27. 2009)**
**[Docket No. 40]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| Nortel Networks Corporation, *et al.*, | Case No. 09-10164 (KG) |
| Foreign Applicants in Foreign Proceedings. | Jointly Administered |

## ORDER GRANTING RECOGNITION AND RELATED RELIEF

This matter was brought before the Court by Ernst & Young Inc., the court-appointed monitor (the "**Monitor**") and authorized foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation (collectively, the "**Canadian Nortel Group**") in proceedings (the "**Canadian Proceedings**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List) (the "**Ontario Court**"), to consider the Verified Petitions for Recognition of Foreign Proceedings which were filed on January 14, 2009 for each member of the Canadian Nortel Group (collectively, the "**Chapter 15 Petitions**") commencing the above-captioned chapter 15 cases (collectively, the "**Chapter 15 Cases**") pursuant to sections 1504, 1515 and 1517 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**"), and seeking enforcement pursuant to sections 1507, 1520, 1521 and 105(a) of the Bankruptcy Code of the Initial Order of the Ontario Court dated January 14, 2009 (the "**Initial Order**"), an amended and restated form of which was approved by the Ontario Court on February 10, 2009 (the "**Amended Initial Order**"). Based upon the Affidavit of Service of Patricia Birley sworn to on February 9, 2009, the

Affidavit of Publication in the Wall Street Journal (national edition) of Erin Ostenson sworn to

on January 28, 2009 and the Affidavit of Publication in The Globe and Mail sworn to on January

28, 2009, sufficient notice of the Chapter 15 Petitions has been given. The Monitor also filed

notice of the Amended Initial Order on February 10, 2009 (docket no. 29) and served a copy of

the notice on parties in interest as reflected in the Affidavit of Melissa N. Flores sworn to on

February 11, 2009 (docket no. 30). The Court has considered and reviewed the pleadings and

exhibits submitted by the Monitor in support of the Chapter 15 Petitions including the Amended

Initial Order annexed hereto as Exhibit 1. No objections to the Chapter 15 Petitions were filed

with the Court.

Therefore, after due deliberation and sufficient cause appearing therefor, the

Court finds and concludes as follows:

(A)     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157
and 1334 and section 1501 of the Bankruptcy Code.

(B)     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

(C)     Venue is proper in this District pursuant to 28 U.S.C. §§ 1410 (1) and (3).

(D)     The Monitor is a person within the meaning of section 101(41) of the
Bankruptcy Code and is the duly appointed foreign representative of each member of the
Canadian Nortel Group within the meaning of section 101(24) of the Bankruptcy Code.

(E)     The Chapter 15 Cases were properly commenced pursuant to sections
1504 and 1515 of the Bankruptcy Code.

(F)     The Chapter 15 Petitions meet the requirements of section 1515 of the
Bankruptcy Code.

(G)     The Canadian Proceedings are foreign proceedings within the meaning of
section 101(23) of the Bankruptcy Code.

(H)     The Canadian Proceedings are entitled to recognition by this Court
pursuant to section 1517 of the Bankruptcy Code.

(I)     The Canadian Proceedings are pending in Canada, which is the location of
each member of the Canadian Nortel Group's center of main interests, and as such,
constitute foreign main proceedings pursuant to section 1502(4) of the Bankruptcy Code

2

and are entitled to recognition as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code.

(J) The Monitor is entitled to all the relief provided by section 1520 of the Bankruptcy Code without limitation.

(K) The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, warranted pursuant to section 1521 of the Bankruptcy Code, and will not cause any hardship to any party in interest that is not outweighed by the benefits of granting that relief.

(L) The interest of the public will be served by this Court granting the relief requested by the Monitor.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1. The Canadian Proceedings are hereby recognized as foreign main proceedings pursuant to section 1517 of the Bankruptcy Code.

2. All provisions of section 1520 of the Bankruptcy Code apply in these Chapter 15 Cases, including, without limitation, the stay under section 362 and the provisions of section 363 of the Bankruptcy Code throughout the duration of these Chapter 15 Cases or until otherwise ordered by this Court.

3. The Amended Initial Order (and any further amendments or extensions thereof as may be granted from time to time by the Ontario Court) is hereby given full force and effect in the United States.

4. This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any request for additional relief or any adversary proceeding brought in and through these Chapter 15 Cases, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

3

5.      Service in accordance with this Order shall constitute adequate and sufficient service and notice of this Order.

6.      The Chapter 15 Petitions and the Supporting Papers shall be made available by the Monitor through its website at www.ey.com/ca/nortel, or upon request at the offices of Allen & Overy LLP, 1221 Avenue of the Americas, New York, New York 10020 to the attention of Bethany Kriss, (212) 756-1199, Bethany.Kriss@allenovery.com.

7.      Notwithstanding Bankruptcy Rule 7062, made applicable to these Chapter 15 Cases by Bankruptcy Rule 1018, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and upon its entry, this Order shall become final and appealable.

Dated: Wilmington, Delaware
       February **27**, 2009

UNITED STATES BANKRUPTCY JUDGE

4

## Exhibit 1

Court File No. ___09-CL-7950___

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

THE HONOURABLE MR.      )     WEDNESDAY, THE 14TH

                       )

JUSTICE MORAWETZ      )     DAY OF JANUARY, 2009

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the "Applicants")

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AMENDED AND RESTATED INITIAL ORDER

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn January 14, 2009 (the "Doolittle Affidavit") and the Exhibits thereto, the report dated January 14, 2009 of Ernst & Young Inc. ("E&Y"), the proposed monitor, and on hearing the submissions of counsel for the Applicants, counsel for the boards of directors of Nortel Networks Corporation and Nortel Networks Limited, counsel for E&Y, counsel for Export Development Canada ("EDC"), Flextronics Telecom Systems Ltd., no one else appearing on this Application and on reading the consent of E&Y to act as the Monitor,

-2-

### SERVICE

1.      THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

### APPLICATION

2.      THIS COURT ORDERS AND DECLARES that each of the Applicants is a "debtor company" to which the CCAA applies.

### PLAN OF ARRANGEMENT

3.      THIS COURT ORDERS that each of the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, such Applicant and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

### POSSESSION OF PROPERTY AND OPERATIONS

4.      THIS COURT ORDERS that each of the Applicants shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property"). Subject to further Order of this Court, each of the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property. Each of the Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, brokers, accountants, legal counsel, financial advisors and such other persons (collectively "Assistants") currently retained or employed by such Applicant, with liberty to retain such further Assistants as such Applicant deems reasonably necessary or desirable for the Business or to carry out the terms of this Order or for the purposes of the Plan.

5.      THIS COURT ORDERS that the Applicants shall be entitled to continue to utilize the central cash management system currently in place as described in the Doolittle Affidavit or replace it with another substantially similar central cash management system (the "Cash

- 3 -

Management System") and that any present or future bank or banks providing the Cash
Management System shall not be under any obligation whatsoever to inquire into the propriety,
validity or legality of any transfer, payment, collection or other action taken under the Cash
Management System, or as to the use or application by the Applicants of funds transferred, paid,
collected or otherwise dealt with in the Cash Management System; shall be entitled to provide
the Cash Management System without any liability in respect thereof to any Person (as
hereinafter defined) other than the Applicants, pursuant to the terms of the documentation
applicable to the Cash Management System; and shall be, in its capacity as provider of the Cash
Management System, an unaffected creditor under the Plan with regard to any claims or
expenses it may suffer or incur in connection with the provision of the Cash Management
System.

6.     THIS COURT ORDERS that each of the Applicants, either on its own behalf or on
behalf of another Applicant, shall be entitled but not required to pay the following expenses
whether incurred prior to, on or after the date of this Order:

   (a)   all outstanding and future wages, salaries and employee benefits (including, but not
         limited to, employee medical and similar benefit plans, relocation and tax
         equalization programs, the Incentive Plan (as defined in the Doolittle Affidavit) and
         employee assistance programs), current service, special and similar pension benefit
         payments, vacation pay, commissions and employee and director expenses, in each
         case incurred in the ordinary course of business and consistent with existing
         compensation policies and arrangements;

   (b)   compensation to employees in respect of any payments made to employees prior to
         the date of this Order by way of the issuance of cheques or electronic transfers, which
         are subsequently dishonoured due to the commencement of proceedings under the
         CCAA;

   (c)   all outstanding and future amounts owing to or in respect of individuals working as
         independent contractors in connection with the Business;

-4-

(d) the fees and disbursements of any Assistants retained or employed in accordance with paragraph 4 hereof;

(e) subject to the consent of the Monitor, amounts owing by one of more of the Applicants in respect of its Customer Programs (as defined in the Doolittle Affidavit);

(f) subject to consent of the Monitor, amounts owing by one or more of the Applicants to any other Nortel Company (as defined in the Doolittle Affidavit) in order to settle their inter-company accounts and make inter-company loans in the ordinary course of business, including as a result of the Nortel Companies' Transfer Pricing Model (as defined in the Doolittle Affidavit); and

(g) subject to the consent of the Monitor, amounts owing to the Applicants' carriers and warehousemen.

7.    THIS COURT ORDERS that, except as otherwise provided to the contrary herein, each of the Applicants shall be entitled but not required to pay all reasonable expenses incurred by it in carrying on the Business in the ordinary course on and after the date of this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a) all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance) and maintenance and security services;

(b) payment for goods or services actually supplied to the Applicants on or after the date of this Order;

(c) with the written approval of the Monitor, the posting of additional cash collateral into existing cash collateral accounts (collectively, and together with the cash collateral posted as at February 10, 2009, the "LC Cash Collateral") held by either or both of ABN AMRO Bank N.V., Canada Branch ("ABN") and Royal Bank of Canada ("RBC") as additional and continuing security for existing, renewed and new letters of credit, letters of guarantee, surety bonds, and similar instruments (collectively, "LCs") issued (whether before or after January 14, 2009) for the account of or

- 5 -

requested by the Applicants or any of them to third parties pursuant to the existing
letter of credit agreements between the Applicants and ABN and RBC and any
amendments thereto made with the written approval of the Monitor, and for any
foreign exchange losses incurred by ABN and its correspondent banks, if any, under
LCs issued in currencies other than Canadian dollars, U.S. dollars, British pounds
sterling and Euros, on the following basis:

    (i)      the posting of such additional cash collateral is for the purposes of
paragraph 10 hereof specifically permitted herein and authorized hereby
and shall not and will not constitute a fraudulent preference, fraudulent
conveyance, oppressive conduct, settlement or other challengeable,
voidable or reviewable transaction under any applicable law;

    (ii)     the aggregate of all cash collateral that may be posted (inclusive of the
cash collateral posted as at February 10, 2009) in respect of LCs issued in
Canadian dollars, U.S. dollars, British pounds sterling and Euros shall not
exceed the amount of U.S.$40 million (converting Canadian dollars at the
Bank of Canada's Noon spot exchange rate for any day), provided that the
LC Banks shall have no liability in the event that cash collateral is posted
in an amount that exceeds such maximum and the validity of their claims
with respect to any or all of the LC Cash Collateral shall not be limited,
lessened or otherwise impaired in any way as a result of such excess; and

    (iii)    cash collateral may be posted in respect of LCs issued by ABN in any
other currencies in such amounts as are required by the provisions of the
applicable letter of credit agreement, including amendments thereto
made with the written approval of the Monitor; *as security for ABN's*

    (d)    if the same is not guaranteed by EDC, payment of any indebtedness of the Applicants *expense*
to the LC Banks (as defined in paragraph 10A hereof) when due under the LC *to*
Agreements (as defined in paragraph 10A hereof) by way of set-off and transfer of *foreign*
LC Cash Collateral posted as at January 14, 2009 or posted thereafter pursuant to the *exchange*
LC Agreements and subparagraph (c) above; and *rate*

*losses*

*JD)*

- 6 -

(e)     without limiting (d), payment of costs and expenses of the LC Banks in connection with the amendment and enforcement of rights under the LC Agreements and any related guarantee bonds issued by EDC if so provided for under an applicable LC Agreement, whether incurred before or after February 10, 2009, including by way of set-off and transfer of LC Cash Collateral.

7A.     THIS COURT ORDERS that no provision of this Order shall require EDC to provide its approval for any proposed amendments to any of the LC Agreements pursuant to any agreement between EDC and any of the LC Banks.

8.      THIS COURT ORDERS that the each of the Applicants shall remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(b)     all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by such Applicant in connection with the sale of goods and services by such Applicant, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)     any amount payable to the Crown in right of Canada or of any Province or Territory thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by such Applicant.

- 7 -

9.      THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing
to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of
Repudiation"), each Applicant shall pay all amounts constituting rent or payable as rent under
real property leases (including, for greater certainty, common area maintenance charges, utilities
and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise
may be negotiated by such Applicant and the landlord from time to time ("Rent"), for the period
commencing from and including the date of this Order, monthly on the first day of each month,
in advance (but not in arrears). On the date of the first of such payment, any arrears relating to
the period commencing from and including the date of this Order shall also be paid.  Upon
delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice period
stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already
been paid.

10.     THIS COURT ORDERS that, except as specifically permitted herein, each of the
Applicants is hereby directed, until further Order of this Court: (a) to make no payments of
principal, interest thereon or otherwise on account of amounts owing by such Applicant to any of
its creditors as of this date unless such payments have been approved by the Monitor; (b) to grant
no security interests, trust, liens, charges or encumbrances upon or in respect of any of its
Property; and (c) to not grant credit or incur liabilities except in the ordinary course of business
unless such obligation has been approved by the Monitor.

10A.    THIS COURT ORDERS that, notwithstanding paragraph 10 hereof, the existing letter of
credit agreements between the Applicants and ABN, RBC and Citibank, N.A. acting through its
Canadian branch ("Citibank") and any amendments thereto made after January 14, 2009 with the
written approval of the Monitor, together with any agreements entered into by the Applicants or
any of them with any other lenders with the written approval of the Monitor providing letter of
credit facilities or similar facilities to the Applicants or any of them (including those which may
be the subject of EDC guarantee bonds issued pursuant to the EDC Support Facility)
(collectively, the "LC Agreements"), and the issuance or renewal of LC's pursuant thereto by
ABN, RBC, Citibank and any other lenders (collectively, the "LC Banks"), are, together with
any payments made by the Applicants or EDC with respect thereto, specifically permitted herein
and authorized hereby and shall not and will not constitute fraudulent preferences, oppressive

- 8 -

conduct, settlements or other challengeable, voidable or reviewable transactions under any
applicable law.

10B.    THIS COURT ORDERS that, notwithstanding any other provision in this Order, no LC
Bank shall be required to issue a letter of credit to the Applicants or any of them.

### RESTRUCTURING

11.    THIS COURT ORDERS that each of the Applicants shall, have the right to:

(a)    permanently or temporarily cease, downsize or shut down any of its business or
operations and to dispose of redundant or non-material assets not exceeding
CDN$10,000,000 in any one transaction or CDN$50,000,000 in the aggregate,
subject to paragraph (c), if applicable;

(b)    terminate the employment of such of its employees or temporarily lay off such of its
employees as it deems appropriate and to deal with the consequences thereof in the
Plan or on further order of the Court;

(c)    in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not
part of any leased premises and/or repudiate any real property lease and any ancillary
agreements relating to any leased premises, on not less than seven (7) days notice in
writing to the relevant landlord on such terms as may be agreed upon between the
Applicant and such landlord, or failing such agreement, to deal with the consequences
thereof in the Plan;

(d)    repudiate such of its arrangements or agreements of any nature whatsoever, including,
without limitation, any of its deferred compensation, or bonus plans, change of
control plans, stock options or restructured stock unit plans and  shareholder rights
plans whether oral or written, as such Applicant may deem appropriate on such terms
as may be agreed upon between such Applicant or any one of them and such counter-
parties, or failing such agreement, to deal with the consequences thereof in the Plan;
and

- 9 -

(e)     pursue all avenues of refinancing and offers for material parts of its Business or
Property, in whole or part, subject to prior approval of this Court being obtained
before any material refinancing or any sale (except as permitted by subparagraph (a),
above);

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the
Business (the "Restructuring").

12.     THIS COURT ORDERS that each of the Applicants shall provide each of the relevant
landlords with notice of such Applicant's intention to remove any fixtures from any leased
premises at least seven (7) days prior to the date of the intended removal. The relevant landlord
shall be entitled to have a representative present in the leased premises to observe such removal
and, if the landlord disputes such Applicant's entitlement to remove any such fixture under the
provisions of the lease, such fixture shall remain on the premises and shall be dealt with as
agreed between any applicable secured creditors, such landlord and such Applicant, or by further
Order of this Court upon application by such Applicant on at least two (2) days notice to such
landlord and any such secured creditors. If such Applicant repudiates the lease governing such
leased premises in accordance with paragraph 11(c) of this Order, it shall not be required to pay
Rent under such lease pending resolution of any such dispute (other than Rent payable for the
notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall
be without prejudice to such Applicant's claim to the fixtures in dispute.

13.     THIS COURT ORDERS that if a Notice of Repudiation is delivered, then (a) during the
notice period prior to the effective time of the repudiation, the landlord may show the affected
leased premises to prospective tenants during normal business hours, on giving the Applicants
and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the
relevant landlord shall be entitled to take possession of any such leased premises without waiver
of or prejudice to any claims or rights such landlord may have against the Applicants in respect
of such lease or leased premises and such landlord shall be entitled to notify the Applicants of
the basis on which it is taking possession and to gain possession of and re-lease such leased
premises to any third party or parties on such terms as such landlord considers advisable,

- 10 -

provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

## NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY

14. THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

15. THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

## NO INTERFERENCE WITH RIGHTS

16. THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

- 11 -

## CONTINUATION OF SERVICES

17.    THIS COURT ORDERS that during the Stay Period, all Persons having oral or written
agreements with the Applicants or with third parties on behalf of the Applicants, or statutory or
regulatory mandates for the supply of goods and/or services, including without limitation all
computer software, communication and other data services, centralized banking services, payroll
services, employment agency services, insurance, transportation services, utility, leasing or other
services to the Business or to any of the Applicants, are hereby restrained until further Order of
this Court from discontinuing, altering, interfering with or terminating the supply of such goods
or services as may be required by the applicable Applicant and that such Applicant shall be
entitled to the continued use of its current premises, telephone numbers, facsimile numbers,
internet addresses and domain names, provided in each case that the normal prices or charges for
all such goods or services received after the date of this Order are paid by such Applicant, in
accordance with normal payment practices of such Applicant, as applicable, or such other
practices as may be agreed upon by the supplier or service provider and the affected Applicant
and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

18.    THIS COURT ORDERS that, notwithstanding anything else contained herein, no
creditor of the Applicants shall be under any obligation after the making of this Order to advance
or re-advance any monies or otherwise extend any credit to the Applicants. Nothing in this
Order shall derogate from the rights conferred and obligations imposed by the CCAA.

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

19.    THIS COURT ORDERS that during the Stay Period, and except as permitted by
subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of
the former, current or future directors or officers of the Applicants with respect to any claim
against the directors or officers that arose before the date hereof and that relates to any
obligations of the Applicants whereby the directors or officers are alleged under any law to be
liable in their capacity as directors or officers for the payment or performance of such

- 12 -

obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

## DIRECTORS AND OFFICERS

20.     THIS COURT ORDERS that each of the Applicants shall indemnify its directors and officers from all claims, costs, charges and expenses relating to the failure of such Applicant, after the date hereof, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or for the Applicants' failure to make payments in respect of employer health tax or workers' compensation which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

21.     THIS COURT ORDERS that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of CDN$90 million, as security for the indemnities provided in paragraph 20 of this Order as well as the fees and disbursements of their legal counsel. The Directors' Charge shall have the priority set out in paragraphs 42 and 44 herein.

22.     THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) each of the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order.

23.     THIS COURT ORDERS that each of NNC's and NNL's directors shall be entitled to receive remuneration in cash on a current basis at current compensation levels (less an overall U.S.$25,000 reduction) notwithstanding the terms of, or elections made under, the Directors' Compensation Plan.

DOCSTOR: 1616765\2A

**APPOINTMENT OF MONITOR**

24.     THIS COURT ORDERS that E&Y is hereby appointed pursuant to the CCAA as the
Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the
Business with the powers and obligations set out in the CCAA or set forth herein and that each of
the Applicants and its officers, directors, and Assistants shall advise the Monitor of all material
steps taken by such Applicant pursuant to this Order, and shall co-operate fully with the Monitor
in the exercise of its powers and discharge of its obligations.

25.     THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and
obligations under the CCAA, is hereby directed and empowered to:

    (a)     monitor the Applicants' receipts and disbursements;

    (b)     provide the consents contemplated herein;

    (c)     report to this Court at such times and intervals as the Monitor may deem appropriate
        with respect to matters relating to the Property, the Business, and such other matters
        as may be relevant to the proceedings herein;

    (d)     advise the Applicants in their preparation of the Applicants' cash flow statements and
        any other reporting to the Court or otherwise;

    (e)     advise the Applicants in their development of the Plan or Plans and any amendments
        to such Plan or Plans;

    (f)     assist the Applicants, to the extent required by the Applicants, with the Restructuring;

    (g)     assist the Applicants, to the extent required by the Applicants, with the holding and
        administering of creditors' or shareholders' meetings for voting on the Plan or Plans;

    (h)     have full and complete access to the books, records and management, employees and
        advisors of the Applicants and to the Business and the Property to the extent required
        to perform its duties arising under this Order;

- 14 -

(i)     be at liberty to engage independent legal counsel or such other persons as the Monitor
        deems necessary or advisable respecting the exercise of its powers and performance
        of its obligations under this Order including, without limitation, one or more entities
        related to or affiliated with the Monitor;

(j)     consider, and if deemed advisable by the Monitor, prepare a report and assessment on
        the Plan or Plans;

(k)     assist the Applicants with respect to any insolvency proceedings commenced by or
        with respect to any other Nortel Company (as defined in the Doolittle Affidavit) in
        any foreign jurisdiction (collectively, "Foreign Proceedings") and report to this Court,
        as it deems appropriate, on the Foreign Proceedings with respect to matters relating to
        the Applicants;

(l)     apply as the foreign representative of the Applicants, for recognition of these
        proceedings as "Foreign Main Proceedings", pursuant to Chapter 15 of the United
        States Bankruptcy Code, 11 U.S.C. §101 (the "U.S. Bankruptcy Code") or similar
        legislation in any other jurisdiction; and

(m)     perform such other duties as are required by this Order or by this Court from time to
        time.

26.     THIS COURT ORDERS that the Monitor shall not take possession of the Property and
shall take no part whatsoever in the management or supervision of the management of the
Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or
maintained possession or control of the Business or Property, or any part thereof.

27.     THIS COURT ORDERS that nothing herein contained shall require the Monitor to
occupy or to take control, care, charge, possession or management (separately and/or
collectively, "Possession") of any of the Property that might be environmentally contaminated,
might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release
or deposit of a substance contrary to any federal, provincial or other law respecting the
protection, conservation, enhancement, remediation or rehabilitation of the environment or
relating to the disposal of waste or other contamination including, without limitation, the

- 15 -

*Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder (the "Environmental Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

28. THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

29. THIS COURT ORDERS that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment and the fulfilment of its duties or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

30. THIS COURT ORDERS that the Monitor, counsel to the Monitor, counsel to the Applicants and counsel to directors shall be paid their reasonable fees and disbursements incurred both before and after the making of the Order, in each case at their standard rates and charges, by the Applicants as part of the costs of these proceedings. Each of the Applicants is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Applicants and counsel to directors on a weekly basis and, in addition, each of the Applicants is hereby authorized to pay to: (a) the Monitor and its Canadian and U.S. counsel a retainer in the aggregate amount of CDN$750,000; and (b) counsel to the Applicants a retainer

- 16 -

in the amount of CDN$750,000 (collectively, the "Retainers") to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

31.     THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

32.     THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $5,000,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priorities set out in paragraphs 42 and 44 hereof.

**EDC**

33.     THIS COURT ORDERS that EDC shall be entitled to the benefit of and is hereby granted a charge on the Property (the "EDC Charge") as security for new Support (as that term is used in the short-term support agreement between NNL and EDC dated January 14, 2009 and the amended and restated short-term support agreement between NNL and EDC dated February ~~5~~, 2009), including any increases in or renewals or extensions of Support existing at January 14, 2009 and agreed to fees and expenses. The EDC Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**INTERCOMPANY LOANS** — *and any amendments thereto made with the written approval of the Monitor*

34.     THIS COURT ORDERS to the extent that an Applicant receives a post-filing inter-company loan or other transfer (including goods and services) from a Chapter 11 Entity (as defined in the Doolittle Affidavit) (including as a result of the Applicants' cash management system or otherwise) (each such Applicant, a "Beneficiary Applicant"), and such post-filing inter-company loan or other transfer is made (each an "Advance") by a Chapter 11 Entity (a "Protected Entity"), then, subject to the limitations set forth in this paragraph:

DOCSTOR: 1616765\2A

- 17 -

(a)    the Protected Entity shall have a proven and valid claim against such Beneficiary
Applicant for the amount of such Advance (each, an "Inter-company Reimbursement
Claim"), which Inter-company Reimbursement Claim shall bear interest at a rate
agreed between the applicable Beneficiary Applicant and Protected Entity from time
to time for the period in accordance with past practice; and

(b)    all of the Property of the Beneficiary Applicant, is hereby charged by a mortgage,
lien and security interest (such mortgage, lien and security interest, "Inter-company
Charge") in favour of each of the Protected Entities as security for payment of the
Inter-company Reimbursement Claim (including principal, interest and expenses) by
the applicable Beneficiary Applicant to the corresponding Protected Entity.

35.    THIS COURT ORDERS that the Inter-company Charge shall also secure any amounts
owed by any of the Applicants to any Chapter 11 Entity at the date of filing under the Existing
NNI Revolver (as defined in the Doolittle Affidavit) and all rights that such Chapter 11 Entity
has with respect thereto are preserved.

36.    THIS COURT ORDERS the Inter-company Charge shall be junior, subject and
subordinate only to the other Charges (defined below), and any other future charges against such
Beneficiary Applicant that, by the Court order creating them, are expressly stated to be senior to
the Inter-company Charges entered after notice and a hearing.

37.    THIS COURT ORDERS that pending further order of this Court, an Inter-company
Charge shall be a "silent" charge and the Protected Applicant shall forbear from exercising, and
shall not be entitled to exercise, any right or remedy relating to any Inter-company
Reimbursement Claim held by such party, including, without limitation, as to seeking relief from
the stay granted hereunder, or seeking any sale, foreclosure, realization upon repossession or
liquidation of any Property of a Beneficiary Applicant, or taking any position with respect to any
disposition of the Property, the business operations, or the reorganization of a Beneficiary
Applicant. An Inter-company Charge automatically, and without further action of any person or
entity of any kind, shall be released or otherwise terminated to the extent that Property subject to
such Inter-company Charge is sold or otherwise disposed of in accordance with the terms of this

- 18 -

Order or further order of this Court after notice and a hearing, with respect to the effect of an
Inter-company Charge on any sale of Property by any Beneficiary Applicant.

38.     THIS COURT ORDERS that the Beneficiary Applicants may sell Property, in
accordance with the terms of this Order or further order of this Court after notice and a hearing,
in each case free and clear of any Inter-company Charge, with such Inter-company Charge
attaching to the proceeds of sale in the same priority and subject to the same limitations and
restrictions as existed in respect of the Property sold.

### INTERIM GROUP SUPPLIER PROTOCOL AGREEMENT

39.     THIS COURT ORDERS that the Applicants be and are hereby authorized to enter into a
group supplier protocol agreement (the "Interim GSPA") substantially in the form attached as
Exhibit "C" to the Doolittle Affidavit which agreement shall be effective upon the appointment
of the Administrators in the United Kingdom, and the Applicants are hereby authorized to
perform each of their obligations, if any, under the Interim GSPA. The obligations of the
Applicants under the Interim GSPA shall be secured by the Inter-Company Charge.

### CARLING FACILITY CHARGES

40.     THIS COURT ORDERS that the loan agreement (the "NNI Loan Agreement") entered
into between NNL, Nortel Networks Technology Corporation ("NNTC") and Nortel Networks
Inc. ("NNI"), substantially in the form attached as Exhibit "I" to the Doolittle Affidavit
providing for a revolving loan facility of up to U.S.$200 million and each of NNL and NNTC is
hereby directed to comply with its obligations under the NNI Loan Agreement.

41.     THIS COURT ORDERS that as security for NNLS's and NNTC's obligations under the
NNI Loan Agreement, upon the approval of the NNI Loan Agreement by the United States
Bankruptcy Court, NNI is hereby granted charges (the "Carling Facility Charges") by each of
NNL and NNTC, NNL's wholly owned subsidiary, on all of the fee simple interest of NNTC and
leasehold interest of NNL respectively in the Carling Facility (as defined in the Doolittle
Affidavit) and that no equal or higher charge shall be granted by the Court order unless
consented to by NNI as authorized by the United States Bankruptcy Court for the District of
Delaware. To the extent the proceeds realized from the Carling Facility are insufficient to satisfy

- 19 -

NNL's and NNTC's obligations under the NNI Loan Agreement, any deficiency shall be deemed
an Inter-Company Reimbursement Claim entitled to the security of an Inter-Company Charge.

### VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER

42.    THIS COURT ORDERS that the priorities of the Administration Charge, the Carling
Facility Charges, the EDC Charge, the Directors' Charge and the Inter-company Charge on all
Property:

> First – the Administration Charge;

> Second – the Carling Facility Charges;

> Third – the EDC Charge;

> Fourth – the Directors' Charge; and

> Fifth – the Inter-Company Charge.

43.    THIS COURT ORDERS that the filing, registration or perfection of the Administration
Charge, and the Carling Facility Charges, the EDC Charge, the Directors' Charge, the Inter-
company Charge (collectively, the "Charges") shall not be required, and that the Charges shall be
valid and enforceable for all purposes, including as against any right, title or interest filed,
registered, recorded or perfected subsequent to the Charges coming into existence,
notwithstanding any such failure to file, register, record or perfect. Notwithstanding anything
herein, the Charges shall not attach to the Retainers.

44.    THIS COURT ORDERS that each of the Charges (all as constituted and defined herein),
shall subject to this paragraph 44 and to paragraph 46 herein constitute a charge on the Property
secured thereunder, and such Charges shall rank in priority to all other security interests, trusts,
liens, charges and encumbrances, statutory or otherwise (collectively, "Encumbrances") in
favour of any Person. For greater certainty, the Charges shall attach to the LC Cash Collateral
junior in priority to any rights or Encumbrances in favour of LC Banks in respect of LC Cash
Collateral and only to the extent of the rights of the Applicants to the return of any LC Cash
Collateral from the LC Banks following the exercise of the rights of the LC Banks as against any

- 20 -

such LC Cash Collateral pursuant to the LC Agreements or section 18.1 of the CCAA,
notwithstanding anything to the contrary contained in the Initial Order.

45. THIS COURT ORDERS that except as otherwise expressly provided for herein, or as
may be approved by this Court, the Applicants shall not grant any Encumbrances over any
Property that rank in priority to, or *pari passu* with, any of the Charges, unless the Applicants
also obtain the prior written consent of the Monitor and the beneficiaries of the Directors'
Charge, the EDC Charge, the Administration Charge, the Inter-Company Charge and the Carling
Facility Charges, or by further Order of this Court.

46. THIS COURT ORDERS that neither the Charges nor the LC Agreements shall be
rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the
benefit of the Charges (collectively, the "Chargees") thereunder and the rights of the LC Banks
under LC Agreements shall not otherwise be limited or impaired in any way by (a) the pendency
of these proceedings and the declarations of insolvency made herein; (b) any application(s) for
bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such
applications; (c) the filing of any assignments for the general benefit of creditors made pursuant
to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants,
prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation
of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or
other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding
any provision to the contrary in any Agreement:

(a)   the creation of the Charges, the entering into of the LC Agreements and the issuance
or renewal of LC's thereunder shall not create or be deemed to constitute a breach by
any of the Applicants of any Agreement to which it is a party;

(b)   none of the Chargees or the LC Banks shall have any liability to any Person
whatsoever as a result of any breach of any Agreement caused by or resulting from,
the creation of the Charges, entering into of the LC Agreements or the issuance or
renewal of LC's thereunder; and

(c)     the payments made by the Applicants pursuant to this Order and the granting of the
Charges and the entering into of the LC Agreements, do not and will not constitute
fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements or
other challengeable, voidable or reviewable transactions under any applicable law.

47.     THIS COURT ORDERS that any Charge created by this Order over leases of real
property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

### FLEXTRONICS AMENDING AGREEMENT

48.     THIS COURT ORDERS that the Flextronics Amending Agreement in the form attached
as Exhibit "B" to the Doolittle Affidavit be and is hereby approved and NNL is hereby
authorized and directed to comply with its obligations thereunder.

### CROSS-BORDER PROTOCOL

49.     THIS COURT ORDERS that the cross-border protocol in the form attached as Schedule
"A" hereto be and is hereby approved and shall become effective upon its approval by the United
States Bankruptcy Court for the District of Delaware and the parties to these proceedings and
any other Person shall be governed by it and shall comply with the same.

### FOREIGN PROCEEDINGS

50.     THIS COURT ORDERS that the Monitor is hereby authorized and directed to apply for
recognition of these proceedings as "Foreign Main Proceedings" in the United States pursuant to
Chapter 15 of the U.S. Bankruptcy Code.

51.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal,
regulatory or administrative body having jurisdiction in Canada, the United States, the United
Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and
their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory
and administrative bodies are hereby respectfully requested to make such orders and to provide
such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be
necessary or desirable to give effect to this Order, to grant representative status to the Monitor in

- 22 -

any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

52. THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

**SERVICE AND NOTICE**

53. THIS COURT ORDERS that the Monitor shall, within ten (10) business days of the date of entry of this Order, send notice of this Order and the commencement of the within proceedings to the Applicants' known creditors, other than employees and creditors to which the Applicants owe less than $5,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process. The Monitor, on behalf of the Applicants, shall, in its discretion, be entitled to engage a third party mailing service in order to assist or complete the mailing. Any such service provider shall be considered an "Assistant" hereunder.

54. THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, and any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

55. THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service

DOCSTOR: 1616765\2A

- 23 -

List from time to time, in accordance with the E-filing protocol of the Commercial List to the
extent practicable, and the Monitor may post a copy of any or all such materials on its website at
http://www.ey.com/ca/nortel.

**GENERAL**

56.     THIS COURT ORDERS that any of the Applicants or the Monitor may from time to time
apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

57.     THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting
as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the
Applicants, the Business or the Property.

58.     THIS COURT ORDERS that any interested party (including the Applicants and the
Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days
notice to any other party or parties likely to be affected by the order sought or upon such other
notice, if any, as this Court may order.

59.     THIS COURT ORDERS that this Order and all of its provisions are effective as of
12:01 a.m. Eastern Standard Time on the date of this Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

FEB 1 0 2009

PER/PAR:

DOCSTOR: 1616765\2A

## SCHEDULE "A" – CROSS-BORDER PROTOCOL

**Attached.**

## CROSS-BORDER INSOLVENCY PROTOCOL
## FOR NORTEL NETWORKS INC. AND ITS AFFILIATES

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

A.    Background

1.    Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2.    NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138. The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation ("NNCC") (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).

1

businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy
Code. The Office of United States Trustee (the "U.S. Trustee") has appointed or may appoint an
official committee of unsecured creditors (the "Creditors Committee") in the U.S. Proceeding.

3.   On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC, NNI's
direct corporate parent NNL (together with NNC and their affiliates, including the U.S. Debtors,
"Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an
application with the Ontario Superior Court of Justice (the "Canadian Court") under the
Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their
creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors have obtained an
initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under
which, inter alia: (a) the Canadian Debtors have been determined to be entitled to relief under
the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the
Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the
CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors
has been granted.

4.   The Monitor filed petitions in the U.S. Court seeking recognition of the
Canadian Proceedings under chapter 15 of the Bankruptcy Code (the "Chapter 15 Proceedings").
NNI also filed an application to the Canadian Court pursuant to section 18.6 of the CCAA
recognizing the U.S. Proceedings as "foreign proceedings" in Canada and giving effect to the
automatic stay thereunder in Canada. None of the U.S. Debtors or Canadian Debtors are
applicants in both the U.S. Proceedings and Canadian Proceedings.

---

[2]   The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

2

5. For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

**B.    Purpose and Goals**

6. Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity. Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.    harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.    promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.    honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.    promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditor and interested parties in the Insolvency Proceedings;

e.    facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

3

f.    implement a framework of general principles to address basic
administrative issues arising out of the cross-border nature of the
Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-

border matters that may arise in the Insolvency Proceedings should be dealt with under and in

accordance with the principles of this Protocol. Where an issue is to be addressed only to one

Court, in rendering a determination in any cross-border matter, such Court may: (a) to the extent

practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in

mind the principles of comity, either (i) render a binding decision after such consultation; (ii)

defer to the determination of the other Court by transferring the matter, in whole or in part to the

other Court; or (iii) seek a joint hearing of both Courts.

C.    Comity and Independence of the Courts

7.    The approval and implementation of this Protocol shall not divest nor

diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the

subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By

approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the

Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in

any infringement on the sovereignty of the United States of America or Canada.

8.    The U.S. Court shall have sole and exclusive jurisdiction and power over the

conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S.

Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the

conduct of the Canadian Proceedings and the hearing and determination of matters arising in the

Canadian Proceedings.

9.    In accordance with the principles of comity and independence recognized

herein, nothing contained herein shall be construed to:

4

a.    increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief under applicable law on an ex parte or "limited notice" basis;

b.    require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

c.    require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

d.    require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law;

e.    authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

f.    preclude the Debtors, the Creditors Committee, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10.  The Debtors, the Creditors Committee, the Estate Representative and their respective employees, members, agents and professionals shall respect and comply with the independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the CCAA, the CCAA Order and other applicable laws.

**D.    Cooperation**

11.  To assist in the efficient administration of the Insolvency Proceedings and in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others' estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a) cooperate with each other in connection with actions taken in both the U.S. Court and the Canadian Court

5

and (b) take any other appropriate steps to coordinate the administration of the Insolvency

Proceedings for the benefit of the Debtors' respective estates.

       12.    To harmonize and coordinate the administration of the Insolvency

Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider

whether it is appropriate to defer to the judgment of the other Court. In furtherance of the

foregoing:

        a.     The U.S. Court and the Canadian Court may communicate with one
another with respect to any procedural matter relating to the Insolvency
Proceedings.

        b.     Where the issue of the proper jurisdiction or Court to determine an issue is
raised by an interested party in either of the Insolvency Proceedings with
respect to a motion or application filed in either Court, the Court before
which such motion or application was initially filed may contact the other
Court to determine an appropriate process by which the issue of
jurisdiction will be determined; which process shall be subject to
submissions by the Debtors, the U.S. Trustee, the Creditors Committee,
the Monitor and any interested party prior to a determination on the issue
of jurisdiction being made by either Court.

        c.     The Courts may, but are not obligated to, coordinate activities in the
Insolvency Proceedings such that the subject matter of any particular
action, suit, request, application, contested matter or other proceeding is
determined in a single Court.

        d.     The U.S. Court and the Canadian Court may conduct joint hearings with
respect to any cross-border matter or the interpretation or implementation
of this Protocol where both the U.S. Court and the Canadian Court
consider such a joint hearing to be necessary or advisable. With respect to
any joint hearings, unless otherwise ordered, the following procedures will
be followed:

          (i)     A telephone or video link shall be established so that both the U.S.
Court and the Canadian Court shall be able to simultaneously hear
the proceedings in the other Court.

          (ii)    Submissions or applications by any party that are or become the
subject of a joint hearing of the Courts (collectively, "Pleadings")
shall be made or filed initially only to the Court in which such
party is appearing and seeking relief. Promptly after the
scheduling of any joint hearing, the party submitting such

6

Pleadings to one Court shall file courtesy copies with the other
Court. In any event, Pleadings seeking relief from both Courts
shall be filed with both Courts.

(iii)    Any party intending to rely on any written evidentiary materials in
support of a submission to the U.S. Court or the Canadian Court in
connection with any joint hearing or application (collectively,
"Evidentiary Materials") shall file or otherwise submit such
materials to both Courts in advance of the joint hearing. To the
fullest extent possible, the Evidentiary Materials filed in each
Court shall be identical and shall be consistent with the procedural
and evidentiary rules and requirements of each Court.

(iv)    If a party has not previously appeared in or attorned or does not
wish to attorn to the jurisdiction of a Court, it shall be entitled to
file Pleadings or Evidentiary Materials in connection with the joint
hearing without, by the mere act of such filings, being deemed to
have attorned to the jurisdiction of the Court in which such
material is filed, so long as it does not request in its materials or
submissions any affirmative relief from such Court.

(v)    The Judge of the U.S. Court and the Justice of the Canadian Court
who will preside over the joint hearing shall be entitled to
communicate with each other in advance of any joint hearing, with
or without counsel being present, to establish guidelines for the
orderly submission of Pleadings, Evidentiary Materials and other
papers and for the rendering of decisions by the Courts, and to
address any related procedural, administrative or preliminary
matters.

(vi)    The Judge of the U.S. Court and the Justice of the Canadian Court,
shall be entitled to communicate with each other during or after
any joint hearing, with or without counsel present, for the purposes
of determining whether consistent rulings can be made by both
Courts, coordinating the terms upon of the Courts' respective
rulings, and addressing any other procedural or administrative
matters.

13.   Notwithstanding the terms of the paragraph 12 above, this Protocol

recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly,

although the Courts will seek to cooperate and coordinate with each other in good faith, each of

the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with

7

respect to:  (a) matters presented to such Court; and (b) the conduct of the parties appearing in
such matters.

14.  Where one Court has jurisdiction over a matter which requires the application
of the law of the jurisdiction of the other Court in order to determine an issue before it, the Court
with jurisdiction over such matter may, among other things, hear expert evidence or seek the
advice and direction of the other Court in respect of the foreign law to be applied, subject to
paragraph 26 herein.

E.    Retention and Compensation of Estate Representative and Professionals

15.  The Monitor, its officers, directors, employees, counsel and agents, wherever
located, (collectively the "Monitor Parties") and any other estate representatives in the Canadian
Proceedings (collectively, the "Canadian Representatives") shall be subject to the sole and
exclusive jurisdiction of the Canadian Court with respect to all matters, including:  (a) the
Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian
Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity,
including the Canadian Debtors and any third parties, in connection with the Insolvency
Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian
Representatives arising in the Canadian Proceedings under the CCAA or other applicable
Canadian law.  The Canadian Representatives shall not be required to seek approval of their
retention in the U.S. Court for services rendered to the Debtors.  Additionally, the Canadian
Representatives:  (a) shall be compensated for their services to the Debtors solely in accordance
with the CCAA, the CCAA Order and other applicable Canadian law or orders of the Canadian
Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

16.  The Monitor Parties shall be entitled to the same protections and immunities
in the United States as those granted to them under the CCAA and the CCAA Order.  In

8

particular, except as otherwise provided in any subsequent order entered in the Canadian

Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the CCAA

Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the

CCAA and the CCAA Order by the Monitor Parties, except any such liability arising from

actions of the Monitor Parties constituting gross negligence or willful misconduct.

17. Any estate representative appointed in the U.S. Proceedings, including

without limitation any examiners or trustees appointed in accordance with section 1104 of the

Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall be subject to the sole and

exclusive jurisdiction of the U.S. Court with respect to all matters, including: (a) the Chapter 11

Representatives' tenure in office; (b) the retention and compensation of the Chapter 11

Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity,

including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings;

and (d) the hearing and determination of any other matters relating to the Chapter 11

Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable

laws of the United States. The Chapter 11 Representatives and their counsel and other

professionals retained therefor shall not be required to seek approval of their retention in the

Canadian Court. Additionally, the Chapter 11 Representatives and their counsel and such other

professionals: (a) shall be compensated for their services to the Debtors solely in accordance

with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S.

Court; and (b) shall not be required to seek approval of their compensation for services

performed for the Debtors in the Canadian Court.

18. Any professionals retained by or with the approval of the Canadian Debtors

(collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive

9

jurisdiction of the Canadian Court, provided they are not paid by the U.S. Debtors. Accordingly, the Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in Canada with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court with respect to services performed on behalf of the Canadian Debtors.

19. Any professionals retained by the U.S. Debtors and any professionals retained by the Creditors Committee (collectively, the "Chapter 11 Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Accordingly, the Chapter 11 Professionals: (a) shall be subject to the procedures and standard for retention and compensation applicable in the U.S. Court under the Bankruptcy Code with respect to services performed on behalf of the U.S. Debtors and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court with respect to services performed on behalf of the U.S. Debtors.

**F.    Appearances**

20. Upon any appearance or filing, as may be permitted or provided for by the rules of the applicable Court, the Debtors, their creditors and other interested parties in the Insolvency Proceedings, including the Creditors Committee, the Estate Representatives and the U.S. Trustee, shall be subject to the personal jurisdiction of the Canadian Court or the U.S. Court, as applicable, with respect to the particular matters as to which they appear before that Court.

**G.    Notice**

21. Notice of any motion, application or other pleading or paper filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means

10

(including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following:  (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee and any other statutory committees appointed in these cases and such other parties as may be designated by either of the Courts from time to time.  Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur.  In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

22.  When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 21 above.

**H.    Effectiveness; Modification**

23.  This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

24.  This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing.  Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given accordance with the notice provisions set forth in paragraph 21 above.

**I.    Procedure for Resolving Disputes Under this Protocol**

11

25. Disputes relating to the terms, intent or application of this Protocol may be
addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice
in accordance with the notice provisions outlined in paragraph 21 above. In rendering a
determination in any such dispute, the Court to which the issue is addressed: (a) shall consult
with the other Court; and (b) may, in its sole and exclusive discretion, either: (i) render a binding
decision after such consultation; (ii) defer to the determination of the other Court by transferring
the matter, in whole or in part, to such other Court; or (iii) seek a joint hearing of both Courts in
accordance with paragraph 12 above. Notwithstanding the foregoing, in making a determination
under this paragraph, each Court shall give due consideration to the independence, comity and
inherent jurisdiction of the other Court established under existing law.

26. In implementing the terms of this Protocol, the U.S. Court and the Canadian
Court may, in their sole, respective discretion, provide advice or guidance to each other with
respect to legal issues in accordance with the following procedures:

    a.   the U.S. Court or the Canadian Court, as applicable, may determine that
such advice or guidance is appropriate under the circumstances;

    b.   the Court issuing such advice or guidance shall provide it to the non-
issuing Court in writing;

    c.   copies of such written advice or guidance shall be served by the applicable
Court in accordance with paragraph 21 hereof; and

    d.   the Courts may jointly decide to invite the Debtors, the Creditors
Committee, the Estate Representatives, the U.S. Trustee and any other
affected or interested party to make submissions to the appropriate Court
in response to or in connection with any written advice or guidance
received from the other Court.

J.    **Preservation of Rights**

27. Except as specifically provided herein, neither the terms of this Protocol nor
any actions taken under the terms of this Protocol shall: (a) prejudice or affect the powers,

12

rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate

Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law,

including the Bankruptcy Code and the CCAA, and the orders of the Courts; or (b) preclude or

prejudice the rights of any person to assert or pursue such person's substantive rights against any

other person under the applicable laws of Canada or the United States.

**Schedule A**
**(Guidelines)**

# Guidelines
## Applicable to Court-to-Court Communications in Cross-Border Cases

### *Introduction:*

One of the most essential elements of cooperation in cross-border cases is communication among the administrating authorities of the countries involved. Because of the importance of the courts in insolvency and reorganization proceedings, it is even more essential that the supervising courts be able to coordinate their activities to assure the maximum available benefit for the stakeholders of financially troubled enterprises.

These Guidelines are intended to enhance coordination and harmonization of insolvency proceedings that involve more than one country through communications among the jurisdictions involved. Communications by judges directly with judges or administrators in a foreign country, however, raise issues of credibility and proper procedures. The context alone is likely to create concern in litigants unless the process is transparent and clearly fair. Thus, communication among courts in cross-border cases is both more important and more sensitive than in domestic cases. These Guidelines encourage such communications while channeling them through transparent procedures. The Guidelines are meant to permit rapid cooperation in a developing insolvency case while ensuring due process to all concerned.

A Court intending to employ the Guidelines — in whole or part, with or without modifications — should adopt them formally before applying them. A Court may wish to make its adoption of the Guidelines contingent upon, or temporary until, their adoption by other courts concerned in the matter. The adopting

1

Court may want to make adoption or continuance conditional
upon adoption of the Guidelines by the other Court in a sub-
stantially similar form, to ensure that judges, counsel, and parties
are not subject to different standards of conduct.

The Guidelines should be adopted following such notice
to the parties and counsel as would be given under local pro-
cedures with regard to any important procedural decision
under similar circumstances. If communication with other
courts is urgently needed, the local procedures, including
notice requirements, that are used in urgent or emergency sit-
uations should be employed, including, if appropriate, an initial
period of effectiveness, followed by further consideration of
the Guidelines at a later time. Questions about the parties enti-
tled to such notice (for example, all parties or representative
parties or representative counsel) and the nature of the court's
consideration of any objections (for example, with or without a
hearing) are governed by the Rules of Procedure in each juris-
diction and are not addressed in the Guidelines.

The Guidelines are not meant to be static, but are meant to
be adapted and modified to fit the circumstances of individual
cases and to change and evolve as the international insolvency
community gains experience from working with them. They are
to apply only in a manner that is consistent with local procedures
and local ethical requirements. They do not address the details of
notice and procedure that depend upon the law and practice in
each jurisdiction. However, the Guidelines represent approaches
that are likely to be highly useful in achieving efficient and just
resolutions of cross-border insolvency issues. Their use, with such
modifications and under such circumstances as may be appropri-
ate in a particular case, is therefore recommended.

2

### Guideline 1

Except in circumstances of urgency, prior to a communication with another Court, the Court should be satisfied that such a communication is consistent with all applicable Rules of Procedure in its country. Where a Court intends to apply these Guidelines (in whole or in part and with or without modifications), the Guidelines to be employed should, wherever possible, be formally adopted before they are applied. Coordination of Guidelines between courts is desirable and officials of both courts may communicate in accordance with Guideline 8(d) with regard to the application and implementation of the Guidelines.

### Guideline 2

A Court may communicate with another Court in connection with matters relating to proceedings before it for the purposes of coordinating and harmonizing proceedings before it with those in the other jurisdiction.

### Guideline 3

A Court may communicate with an Insolvency Administrator in another jurisdiction or an authorized Representative of the Court in that jurisdiction in connection with the coordination and harmonization of the proceedings before it with the proceedings in the other jurisdiction.

### Guideline 4

A Court may permit a duly authorized Insolvency Administrator to communicate with a foreign Court directly, subject to the approval of the foreign Court, or through an Insolvency Administrator in the other jurisdiction or through an autho-

3

rized Representative of the Foreign Court on such terms as the
Court considers appropriate.

### Guideline 5

A Court may receive communications from a foreign
Court or from an authorized Representative of the foreign
Court or from a foreign Insolvency Administrator and should
respond directly if the communication is from a foreign Court
(subject to Guideline 7 in the case of two-way communica-
tions) and may respond directly or through an authorized
Representative of the Court or through a duly authorized
Insolvency Administrator if the communication is from a for-
eign Insolvency Administrator, subject to local rules concern-
ing ex parte communications.

### Guideline 6

Communications from a Court to another Court may take
place by or through the Court:

(a) Sending or transmitting copies of formal orders,
judgments, opinions, reasons for decision, endorse-
ments, transcripts of proceedings, or other docu-
ments directly to the other Court and providing ad-
vance notice to counsel for affected parties in such
manner as the Court considers appropriate;

(b) Directing counsel or a foreign or domestic Insolvency
Administrator to transmit or deliver copies of docu-
ments, pleadings, affidavits, factums, briefs, or other
documents that are filed or to be filed with the Court
to the other Court in such fashion as may be appropri-
ate and providing advance notice to counsel for affect-

4

ed parties in such manner as the Court considers appropriate;

(c) Participating in two-way communications with the other Court by telephone or video conference call or other electronic means, in which case Guideline 7 should apply.

### Guideline 7

In the event of communications between the Courts in accordance with Guidelines 2 and 5 by means of telephone or video conference call or other electronic means, unless otherwise directed by either of the two Courts:

(a) Counsel for all affected parties should be entitled to participate in person during the communication and advance notice of the communication should be given to all parties in accordance with the Rules of Procedure applicable in each Court;

(b) The communication between the Courts should be recorded and may be transcribed. A written transcript may be prepared from a recording of the communication which, with the approval of both Courts, should be treated as an official transcript of the communication;

(c) Copies of any recording of the communication, of any transcript of the communication prepared pursuant to any Direction of either Court, and of any official transcript prepared from a recording should be filed as part of the record in the proceedings and made available to counsel for all parties in both

5

Courts subject to such Directions as to confidentiality as the Courts may consider appropriate; and

(d) The time and place for communications between the Courts should be to the satisfaction of both Courts. Personnel other than Judges in each Court may communicate fully with each other to establish appropriate arrangements for the communication without the necessity for participation by counsel unless otherwise ordered by either of the Courts.

### Guideline 8

In the event of communications between the Court and an authorized Representative of the foreign Court or a foreign Insolvency Administrator in accordance with Guidelines 3 and 5 by means of telephone or video conference call or other electronic means, unless otherwise directed by the Court:

(a) Counsel for all affected parties should be entitled to participate in person during the communication and advance notice of the communication should be given to all parties in accordance with the Rules of Procedure applicable in each Court;

(b) The communication should be recorded and may be transcribed. A written transcript may be prepared from a recording of the communication which, with the approval of the Court, can be treated as an official transcript of the communication;

(c) Copies of any recording of the communication, of any transcript of the communication prepared pursuant to any Direction of the Court, and of any official tran-

6

script prepared from a recording should be filed as part of the record in the proceedings and made available to the other Court and to counsel for all parties in both Courts subject to such Directions as to confidentiality as the Court may consider appropriate; and

(d) The time and place for the communication should be to the satisfaction of the Court. Personnel of the Court other than Judges may communicate fully with the authorized Representative of the foreign Court or the foreign Insolvency Administrator to establish appropriate arrangements for the communication without the necessity for participation by counsel unless otherwise ordered by the Court.

### Guideline 9

A Court may conduct a joint hearing with another Court. In connection with any such joint hearing, the following should apply, unless otherwise ordered or unless otherwise provided in any previously approved Protocol applicable to such joint hearing:

(a) Each Court should be able to simultaneously hear the proceedings in the other Court.

(b) Evidentiary or written materials filed or to be filed in one Court should, in accordance with the Directions of that Court, be transmitted to the other Court or made available electronically in a publicly accessible system in advance of the hearing. Transmittal of such material to the other Court or its public availability in an electronic system should not subject the party filing the material in one Court to the jurisdiction of the other Court.

7

(c) Submissions or applications by the representative of
any party should be made only to the Court in which
the representative making the submissions is appear-
ing unless the representative is specifically given per-
mission by the other Court to make submissions to it.

(d) Subject to Guideline 7(b), the Court should be entitled
to communicate with the other Court in advance of a
joint hearing, with or without counsel being present, to
establish Guidelines for the orderly making of submis-
sions and rendering of decisions by the Courts, and to
coordinate and resolve any procedural, administrative,
or preliminary matters relating to the joint hearing.

(e) Subject to Guideline 7(b), the Court, subsequent to
the joint hearing, should be entitled to communicate
with the other Court, with or without counsel pres-
ent, for the purpose of determining whether coordi-
nated orders could be made by both Courts and to
coordinate and resolve any procedural or nonsub-
stantive matters relating to the joint hearing.

### Guideline 10

The Court should, except upon proper objection on valid
grounds and then only to the extent of such objection, recog-
nize and accept as authentic the provisions of statutes, statuto-
ry or administrative regulations, and rules of court of general
application applicable to the proceedings in the other jurisdic-
tion without the need for further proof or exemplification
thereof.

8

### Guideline 11

The Court should, except upon proper objection on valid grounds and then only to the extent of such objection, accept that Orders made in the proceedings in the other jurisdiction were duly and properly made or entered on or about their respective dates and accept that such Orders require no further proof or exemplification for purposes of the proceedings before it, subject to all such proper reservations as in the opinion of the Court are appropriate regarding proceedings by way of appeal or review that are actually pending in respect of any such Orders.

### Guideline 12

The Court may coordinate proceedings before it with proceedings in another jurisdiction by establishing a Service List that may include parties that are entitled to receive notice of proceedings before the Court in the other jurisdiction ("Non-Resident Parties"). All notices, applications, motions, and other materials served for purposes of the proceedings before the Court may be ordered to also be provided to or served on the Non-Resident Parties by making such materials available electronically in a publicly accessible system or by facsimile transmission, certified or registered mail or delivery by courier, or in such other manner as may be directed by the Court in accordance with the procedures applicable in the Court.

### Guideline 13

The Court may issue an Order or issue Directions permitting the foreign Insolvency Administrator or a representative of creditors in the proceedings in the other jurisdiction or an authorized

9

Representative of the Court in the other jurisdiction to appear
and be heard by the Court without thereby becoming subject to
the jurisdiction of the Court.

### Guideline 14

The Court may direct that any stay of proceedings affecting
the parties before it shall, subject to further order of the Court,
not apply to applications or motions brought by such parties
before the other Court or that relief be granted to permit such
parties to bring such applications or motions before the other
Court on such terms and conditions as it considers appropriate.
Court-to-Court communications in accordance with Guidelines 6
and 7 hereof may take place if an application or motion brought
before the Court affects or might affect issues or proceedings in
the Court in the other jurisdiction.

### Guideline 15

A Court may communicate with a Court in another juris-
diction or with an authorized Representative of such Court in the
manner prescribed by these Guidelines for purposes of coordi-
nating and harmonizing proceedings before it with proceedings
in the other jurisdiction regardless of the form of the proceedings
before it or before the other Court wherever there is commonal-
ity among the issues and/or the parties in the proceedings. The
Court should, absent compelling reasons to the contrary, so com-
municate with the Court in the other jurisdiction where the inter-
ests of justice so require.

### Guideline 16

Directions issued by the Court under these Guidelines are
subject to such amendments, modifications, and extensions as

10

may be considered appropriate by the Court for the purposes
described above and to reflect the changes and developments
from time to time in the proceedings before it and before the
other Court. Any Directions may be supplemented, modified,
and restated from time to time and such modifications, amend-
ments, and restatements should become effective upon being
accepted by both Courts. If either Court intends to supplement,
change, or abrogate Directions issued under these Guidelines
in the absence of joint approval by both Courts, the Court
should give the other Courts involved reasonable notice of its
intention to do so.

### Guideline 17

Arrangements contemplated under these Guidelines do not
constitute a compromise or waiver by the Court of any powers,
responsibilities, or authority and do not constitute a substantive
determination of any matter in controversy before the Court or
before the other Court nor a waiver by any of the parties of any
of their substantive rights and claims or a diminution of the effect
of any of the Orders made by the Court or the other Court.

11

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION**

Court File No: 09-CL-7950

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**AMENDED AND RESTATED INITIAL
ORDER**

---

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel: (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930
Lawyers for the Applicants

**Exhibit K.12**
*In re Quebecor World Inc.*, **No. 08-13814 (Bankr. S.D.N.Y. July 1, 2009)**
**[Docket No. 12]**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | Chapter 15 |
| Quebecor World Inc., | Case No. 08-13814 (JMP) |
| Debtor in Foreign Proceedings. | Honorable James M. Peck |

## ORDER GRANTING RECOGNITION AND ENFORCEMENT OF CANADIAN SANCTION ORDER AND RELATED RELIEF

This matter was brought before the Court by Ernst & Young Inc., the court-appointed monitor (the "**Monitor**") and authorized foreign representative of Quebecor World Inc. ("**QWI**") in proceedings (the "**Canadian Proceedings**") pending before the Quebec Superior Court (Commercial Division) (the "**Quebec Court**") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**Motion**") seeking entry of an order pursuant to sections 1507, 1521 and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), recognizing and giving effect in the United States to the Quebec Court's order sanctioning the Plan of Reorganization and Compromise of Quebecor World Inc. (the "**Canadian Sanction Order**"), a copy of which is annexed hereto as Exhibit 1.

Due and timely notice of the filing of the Motion was given to those creditors of QWI required to be served under the Bankruptcy Code, other parties in interest, and the Office of the United States Trustee, which notice is adequate for purposes of the Motion and no other or further notice thereof need be given. Any objections to the Motion that have not been withdrawn or resolved have been overruled.

Therefore, after due deliberation and sufficient cause appearing therefor, the

Court finds and concludes as follows:

(A)    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and section 1501 of the Bankruptcy Code.

(B)    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

(C)    Venue is proper in this District pursuant to 28 U.S.C. § 1410(3).

(D)    The relief granted is necessary and appropriate, in the interests of the public and international comity, consistent with United States public policy, warranted pursuant to section 1521 of the Bankruptcy Code, and will not cause any hardship to any party in interest that is not outweighed by the benefits of granting that relief.

(E)    Pursuant to section 1507(b), the relief granted will reasonably assure:

(1)    just treatment of all holders of claims against or interests in QWI's property;

(2)    protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the Canadian Proceedings;

(3)    prevention of preferential or fraudulent dispositions of property of QWI;  and

(4)    distribution of proceeds of QWI's property substantially in accordance with the order prescribed by the Bankruptcy Code.

(F)    The interest of the public will be served by this Court granting the relief requested by the Monitor.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1.    The Canadian Sanction Order is hereby given full force and effect in the

United States and is binding on all persons subject to this Court's jurisdiction pursuant to sections

1507, 1521(a)(7), and 105(a) of the Bankruptcy Code.

2.    The Motion and this Order shall be made available on the Monitor's

website at www.ey.com/ca/quebecorworld or upon request at the offices of Allen & Overy LLP,

1221 Avenue of the Americas, New York, New York 10020, Attention: Bethany Kriss, (212)

610-6300, Bethany.Kriss@allenovery.com.

       3.      Notwithstanding Rule 7062 of the Federal Rules of Bankruptcy Procedure,

made applicable to this case by Rule 1018 of the Federal Rules of Bankruptcy Procedure, the

terms and conditions of this Order shall be immediately effective and enforceable upon its entry,

and upon its entry, this Order shall become final and appealable.

Dated:  New York, New York
        July 1, 2009


                             ___ *s/ James M. Peck*_____
                             UNITED STATES BANKRUPTCY JUDGE

13-10361-mg    Doc 12    Filed 02/04/13    Entered 02/04/13 23:48:31    Main Document
Pg 4 of 55

# EXHIBIT 1

## Canadian Sanction Order

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTRÉAL

SUPERIOR COURT
Commercial Division
(Sitting as a court designated pursuant to the
*Companies' Creditors Arrangement Act*,
R.S.C. 1985, c. C-36)

File No: 500-11-032338-085

Montréal, June 30, 2009

Present: The Honourable Robert Mongeon, J.S.C.

IN THE MATTER OF THE *COMPANIES'
CREDITORS ARRANGEMENT ACT*, R.S.C.
1985, c. C-36, AS AMENDED:

QUEBECOR WORLD INC. and the other
Petitioners listed on Schedule "A" to the Initial
Order and to this Order

Petitioners

and

ERNST & YOUNG INC.

Monitor

## ORDER
(Sanctioning QWI Plan)

SEEING the Petitioners' Motion for an Order Sanctioning the Second Amended and Restated
Plan of Reorganization and Compromise of Quebecor World Inc. attached as Schedule "B" to
this Order (the "QWI Plan"), including the Articles of Reorganization and the Series I and
Series II Warrant Indenture posted on the Monitor's website on June 20, 2009 with the note that
the latter two documents remain subject to the acceptance of each of the Administrative Agent,
the Ad Hoc Group of Noteholders and the Creditors' Committee, acting reasonably, and Other
Relief pursuant to Sections 6, 9 and 10 of the *Companies' Creditors Arrangement Act*, R.S.C.
1985, C-36, as amended (the "CCAA") and Section 191 of the *Canada Business Corporations
Act*, R.S.C. 1985, c. C-44, as amended (the "CBCA"), and the affidavit of Mr. Roland Ribotti in
support thereof (the "Motion"), the Monitor's Twenty-Seventh Report dated June 10, 2009 and

Twenty-Eighth Report dated June 23, 2009, and the submissions of counsel for the Petitioners
and the Monitor, and other interested parties;

**GIVEN** the provisions of the initial order granted by this Court in this matter on January 21,
2008, as amended (the **"Initial Order"**), the cross-border insolvency protocol approved by this
Court pursuant to the Initial Order, as amended and confirmed by this Court on April 21, 2008
(the **"CBIP"**), the claims procedure order granted by this Court on September 29, 2008 (the
**"Claims Procedure Order"**), the cross-border claims protocol approved by this Court on
September 29, 2008 pursuant to the Claims Procedure Order (the **"Claims Protocol"**), and the
creditors' meeting order granted by this Court on May 14, 2009 (the **"Creditors' Meeting
Order"**);

**GIVEN** the provisions of the CCAA and CBCA;

**WHEREFORE, THE COURT:**

1.   **GRANTS** the Motion;

**Definitions**

2.   **ORDERS** that any capitalized terms not otherwise defined in this Order shall have the
     meaning ascribed thereto in the QWI Plan or the Creditors' Meeting Order, as the case
     may be;

**Joint Hearing**

3.   **AUTHORIZES** the holding of a Joint Hearing (as such term is defined in the CBIP) to
     facilitate and coordinate the proper and efficient resolution and adjudication of this
     matter, and **DECLARES** that said Joint Hearing was validly called and held;

**Service and Meeting**

4.   **DECLARES** that the notices given of the presentation of the Motion and the related
     Sanction Hearing are proper and sufficient, and in accordance with the Creditors'
     Meeting Order;

5.    **DECLARES** that there has been proper and sufficient service and notice of the Articles
     of Reorganization and the Meeting Materials, including the QWI Plan, the Circular and
     the Notice to Creditors in connection with the Creditors' Meeting, to all Affected
     Creditors, and that the Creditors' Meeting was duly convened, held and conducted in
     conformity with the CCAA and all other Orders of the Court;

6.    **DECLARES** that no meetings or votes of holders of Existing QWI Shares or Other
     Equity Securities are required in connection with the QWI Plan or the adoption or filing
     of the Articles of Reorganization, or any exchange, transfer, compromise, arrangement,
     reorganization or other transaction, including the Restructuring Transactions, effected or
     contemplated thereby;

**QWI Plan Sanction**

7.    **DECLARES** that:

     (a)    the QWI Plan has been approved by the Required Majorities of Affected Creditors
           of QWI in conformity with the CCAA;

     (b)    there is no evidence before the Court to suggest that QWI has not complied with
           the provisions of the CCAA and the Orders of the Court made in the CCAA
           Proceedings in all respects;

     (c)    there is no evidence before the Court to suggest that QWI has neither done nor
           purported to do anything that is not authorized by the CCAA;

     (d)    the QWI Plan and the transactions, including the Restructuring Transactions and
           reorganization, contemplated thereby are fair and reasonable, and in the best
           interests of QWI, the Affected Creditors and the other stakeholders of QWI
           (having considered, among other things, the composition of the vote, what
           creditors would receive in liquidation or sale as compared to the QWI Plan,
           alternatives to the QWI Plan or liquidation or sale, whether any oppression exists
           or has occurred, the treatment of shareholders and the public interest);

(e)    prior to the Court's sanctioning of the QWI Plan and approving the transactions, including the Restructuring Transactions, contemplated therein, the Court conducted a hearing and made findings of fact and conclusions of law that the terms and conditions of the issuance of the QWI Common Shares, the QWI Class A Preferred Shares, the Warrant Bundles and the Litigation Trust Interests to the Affected Creditors under the QWI Plan and the U.S. Plan collectively in exchange for, and in full and final satisfaction of, the Affected Claims held by the Affected Creditors, were approved and determined to be substantively and procedurally "fair" to the Affected Creditors and all other Persons (the **"Fairness Hearing"**) and, in connection therewith, as part of the Fairness Hearing, the Court made the following additional findings of fact and/or conclusions of law: (i) that prior to the Fairness Hearing, QWI advised the Court that it would be relying on the Section 3(a)(10) exemption under the *U.S. Securities Act*, and the exemption under Section 1145 of the *U.S. Bankruptcy Code* in order to issue, without registration with the United States Securities and Exchange Commission, the QWI Common Shares, the QWI Class A Preferred Shares, the Warrant Bundles and the Litigation Trust Interests to the Affected Creditors (or to such other Persons as set out in the Restructuring Transactions Notice); (ii) that the Court was, and is, authorized under the CCAA to conduct the Fairness Hearing and to approve the fairness of the terms and conditions of such issuance and exchange; and (iii) that the Fairness Hearing was open to all of the Affected Creditors and all other Persons and, prior to the Fairness Hearing, all of the Affected Creditors and all other Persons were given adequate notice thereof and that there were no impediments to the Affected Creditors and all other Persons appearing and being heard at said hearing;

8.    **ORDERS** that the QWI Plan (including the compromises, arrangements, reorganizations, corporate transactions, releases and discharges set out therein and the transactions, Restructuring Transactions and reorganization contemplated thereby) is sanctioned and approved pursuant to Section 6 of the CCAA and Section 191 of the CBCA and, as at the Completion Time, will be effective and will enure to the benefit of and be binding upon QWI, the Affected Creditors and all other Persons stipulated in the QWI Plan;

## QWI Plan Implementation

9.   **ORDERS** that QWI, the other Petitioners and the Monitor are authorized and directed to take all steps and actions necessary or appropriate, as determined by QWI and the other Petitioners in accordance with and subject to the terms of the QWI Plan, to implement the QWI Plan, including, without limitation, filing the Articles of Reorganization with the Director, and the transactions contemplated by the QWI Plan in accordance with and subject to the terms of the QWI Plan and this Order (including to enter into, implement and consummate the contracts, instruments, releases, indentures and other documents to be created or which have come into effect in connection with the QWI Plan) and such steps and actions are approved;

10.   **DECLARES** that, effective as of the Implementation Date, the articles of QWI will be amended as set out in the Articles of Reorganization;

11.   **DECLARES** that, effective as of the Implementation Date, all Other Equity Securities will be of no further force or effect, and that all such Other Equity Securities will be cancelled for no consideration and any agreement, contract, plan, indenture, deed, certificate or other document or instrument having created or governing such Other Equity Securities will be terminated as at such date;

12.   **DECLARES** that the Restructuring Transactions shall be effected, subject to Section 5.2 of the QWI Plan, in accordance with the Restructuring Transactions Notice;

13.   **DECLARES** that the QWI Common Shares, QWI Class A Preferred Shares and Warrant Bundles issued in connection with the QWI Plan, the Articles of Reorganization or the Warrant Indenture (these two last documents having been posted on the Monitor's website on June 20, 2009 with the note that they remain subject to the acceptance of each of the Administrative Agent, the Ad Hoc Group of Noteholders and the Creditors' Committee, acting reasonably), will be validly issued and outstanding, and in the case of the QWI Common Shares and the QWI Class A Preferred Shares, will be issued as fully paid and non-assessable;

14.   **ORDERS** that, without limitation to the Claims Procedure Order and the Claims Protocol, an Affected Creditor who did not file a Proof of Claim in accordance with the

provisions of the Claims Procedure Order and the Claims Protocol, whether or not such Affected Creditor received notice of the claims process established by the Claims Procedure Order and the Claims Protocol, shall be and is hereby forever barred from making any Affected Claim against QWI and shall not be entitled to any distribution under the QWI Plan, and that such Affected Claim is forever extinguished;

15.   **ORDERS** that, as of the Implementation Date, and subject to the terms of the QWI Plan (including, without limitation, Article 4 thereof), all Affected Claims of Affected Creditors of any nature against QWI or the Property (as defined in the Initial Order) are hereby forever discharged and released and all proceedings with respect thereto or in connection therewith are permanently stayed, subject only to the right of the Affected Creditors to receive the distributions in respect of such Affected Claims in accordance with the QWI Plan, the Claims Procedure Order and the Claims Protocol;

16.   **ORDERS** that all Affected Creditors having an Affected Claim of any nature against QWI or the Property (as defined in the Initial Order) shall, at the request of QWI from and after the Completion Time, execute and deliver to QWI such further releases, discharges, authorizations and directions, instruments, notices and other documents as QWI may reasonably request for the purpose of evidencing the release of all of the security interests, hypothecs, assignments, pledges, mortgages, charges and other liens with respect to such Affected Claim of any nature against QWI or the Property, the whole at the expense of QWI;

17.   **DECLARES** that all Proven Claims determined in accordance with the Claims Procedure Order, the Claims Protocol, the Creditors' Meeting Order and the QWI Plan are final and binding on QWI and all Affected Creditors;

18.   **GIVEN** that the discharge and release provisions set forth herein constitute good faith compromises and settlements of the matters covered thereby, such compromises and settlements are made in exchange for consideration and are in the best interests of QWI and its stakeholders, are fair, equitable, reasonable, and are integral elements of the restructuring and resolution of these proceedings in accordance with the Plan, and each of the discharges and releases provisions set forth in the Plan;

(a)     is within the jurisdiction of the Court,

(b)     is an essential means of implementing the Plan,

(c)     is an integral element of the settlements and transactions incorporated into the Plan.

(d)     is supported by valuable consideration provided by the beneficiary of such provisions;

(e)     confers material benefit on, and is in the best interests of, QWI and their stakeholders, and,

(f)     is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties- in-interest in these proceedings with respect to QWI and its organization, capitalization, operation, and reorganization.

the failure to effect the discharge, release, indemnification, and exculpation provisions described in the Plan would seriously impair the ability of QWI to sanction the Plan.

19.     **ORDERS** that as at the Completion Time and subject to the provisions of Subsection 5.1(2) of the CCAA, QWI will be deemed forever to release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights of QWI to enforce the QWI Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder or pursuant thereto) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing in any way relating to QWI, the subject matter of, or the transactions or events giving rise to, any Claims or interests that are treated in the QWI Plan or in the U.S. Plan that could be asserted by or on behalf of QWI against: (i) present or former directors, officers and employees of QWI, in each case, in their respective capacities as of the Determination Date; (ii) the New Directors (as defined below) in respect of any actions taken pursuant to the consulting and indemnity agreement referred to below; (iii) the agents, legal counsel, financial advisors and other professionals of QWI and the Subsidiaries (including all current and former legal counsel to the directors of QWI and the Subsidiaries); (iv) the Monitor, its legal counsel and its current officers and directors; (v) the Syndicate Committee, all current and former members of the Syndicate Committee in

their respective capacities as such, and the Administrative Agent and the Syndicate Agreement Collateral Agent in their respective capacities as such; (vi) the Syndicate Released Parties; (vii) the Senior Notes Released Parties; (viii) the DIP Lenders solely in their capacities as such; (ix) the Creditors' Committee and all current and former members of the Creditors' Committee in their respective capacities as such; (x) the Chief Restructuring Officer; and (xi) where applicable, with respect to each of the above named parties, such party's advisors, principals, employees, officers, directors, representatives, financial advisors, counsel, accountants, investment bankers, consultants, agents and other representatives or professionals, provided, however, and notwithstanding anything else contained in the QWI Plan or the U.S. Plan, that any Holder of Affected Soc. Gen Claims in its capacity as such shall not be deemed to be released in respect of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, including, without limitation, in respect of the Paulian Action;

20.    **ORDERS** that, as at the Completion Time, or in the case of Subsidiaries that are also subject to releases under the U.S. Plan, at the times contemplated for such releases under the U.S. Plan, the Released Parties, namely, QWI, the Subsidiaries, the Monitor and the Chief Restructuring Officer, as well as their respective present and former officers, directors, principals, employees, financial advisors, counsel, investment bankers, consultants, agents and accountants, and the New Directors (as defined below) will be released and discharged from any and all demands, claims, actions, causes of action, counterclaims, suits, debts, sums of money, accounts, covenants, damages, judgments, expenses, executions, liens and other recoveries on account of any indebtedness, liability, obligation, demand or cause of action of whatever nature that any Person (including QWI and the U.S. Debtors, as applicable, and including any Person who may claim contribution or indemnification against or from them) may be entitled to assert (including any and all claims in respect of potential statutory liabilities of the Persons for which the Initial Order authorized the granting of a CCAA Charge, but other than the rights of Persons to enforce the QWI Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered thereunder or pursuant thereto) whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, existing or hereafter arising, based in whole or in part on any act or omission, transaction,

dealing or other occurrence existing or taking place on or prior to the Completion Time relating to, arising out of or in connection with the Claims, the business and affairs of the Petitioners, the CCAA Charges, the QWI Plan, the U.S. Plan and the CCAA Proceedings, provided that nothing in this paragraph 20 will release or discharge any Petitioner from or in respect of any Excluded Claim, or QWI from or in respect of the Paulian Action;

21. **ORDERS**, that as at the Completion Time, all Affected Creditors will be deemed forever to release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, as against the Syndicate Releasees, namely the Administrative Agent, and any lender in the Syndicate, from time to time, and each such Person's advisors, principals, employees, officers, directors, representatives, financial advisors, counsel, accountants, investment bankers, consultants, agents and other representatives or professionals, and the Syndicate Agreement Collateral Agent in relation to the Syndicate Agreement and the recoveries or distributions to which the Administrative Agent, the Syndicate Agreement Collateral Agent or any Syndicate member may be, or may in the future become, entitled to receive under the QWI Plan and in furtherance thereof, without limitation, the Paulian Action shall be dismissed, with prejudice, without costs as against the Syndicate Releasees and the Syndicate Agreement Collateral Agent to the extent of the rights and benefits it holds in favour of the Syndicate Releasees under the Syndicate Agreement;

22. **ORDERS** that, from and after the Completion Time, all Persons shall be deemed to have waived any and all defaults of QWI (except for defaults under the securities, contracts, instruments, releases and other documents delivered under the QWI Plan or entered into in connection therewith or pursuant thereto) then existing or previously committed by QWI or caused by QWI, directly or indirectly, or non-compliance with any covenant, positive or negative pledge, warranty, representation, term, provision, condition or obligation, express or implied, in any contract, credit document, agreement for sale, lease or other agreement, written or oral, and any and all amendments or supplements thereto, existing between such Person and QWI arising from the filing by the Petitioners under the CCAA or the transactions contemplated by the QWI Plan, and any and all notices of

default and demands for payment under any instrument, including any guarantee arising from such default, shall be deemed to have been rescinded;

23.   **DECLARES** that, subject to the performance by QWI of its obligations under the QWI Plan, all contracts, leases, agreements and other arrangements to which QWI is a party and that have not been terminated or repudiated pursuant to the Initial Order will be and remain in full force and effect, unamended, as at the Completion Time, and no Person who is a party to any such contract, lease, agreement or other arrangement may accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder, or enforce or exercise any right (including any right of dilution or other remedy) or make any demand under or in respect of any such contract, lease, agreement or other arrangement and no automatic termination will have any validity or effect, by reason only of:

(a)   any event that occurred on or prior to the Implementation Date and is not continuing that would have entitled such Person to enforce those rights or remedies (including defaults, events of default, or termination events arising as a result of the insolvency of QWI);

(b)   the insolvency of QWI or the fact that QWI or any Subsidiary sought or obtained relief under the CCAA, the CBCA or the Bankruptcy Code;

(c)   any compromises or arrangements effected pursuant to the QWI Plan or any action taken or transaction effected pursuant to the QWI Plan; or

(d)   any change in the control of QWI arising from the implementation of the QWI Plan;

24.   **ENJOINS** the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgement, damage, demand, debt, right, cause of action, liability or interest released, discharged or terminated pursuant to the QWI Plan including, without limitation, the Paulian Action against the Syndicate Released Parties;

25.   **ORDERS**, that each of the individuals named on Schedule "C" hereto shall, upon their consent, be appointed as new directors of QWI (the "**New Directors**") to hold office until

such time as successors shall be appointed or elected in accordance with the CBCA or they sooner cease to hold office in accordance with the CBCA, and further **ORDERS** that such appointments shall be effective upon the Implementation Date (or, in the event that their consent to act as a new Director of QWI is given after the Implementation Date, upon such consent date), or:

(a)  in the event that any of the individuals named on Schedule "C" hereto cannot serve as new directors of QWI as and from the Implementation Date but are ultimately able to serve beginning on a date after the Implementation Date (such later date for any given individual being his "**Delayed Incumbency Date**"), then the applicable Delayed Incumbency Date for such individual, such date not to be later than thirty days following the Implementation Date; or

(b)  in the event that it is impossible to establish, as of the Implementation Date, the legislatively prescribed minimum quorum of three (3) directors of QWI, then such later date (the "**Quorum-related Incumbency Date**") as the search committee referred to in Section 5.9 of the QWI Plan (the "**Selection Committee**") shall designate in respect of the new director(s) required to meet such minimum quorum, such date not to be later than thirty days following the Implementation Date;

26.    **ORDERS** that effective upon the Implementation Date, or the Quorum-related Incumbency Date, if any, any current director who is then in office shall cease to be a director of QWI, unless such individual is appointed as new director pursuant to paragraph 25 above;

27.    **ORDERS** that QWI is hereby authorized and directed to provide an indemnity to the New Directors substantially in the form of the consulting and indemnity agreement dated June 18, 2009 and attached hereto as Schedule "D";

28.    **DECLARES** that, effective as at the Completion Time, the Application for Bankruptcy Order, and the endorsement related thereto dated January 25, 2008 will be of no further force or effect and that the Syndicate Released Parties are released and discharged from the Paulian Action;

## Charges created in the CCAA Proceedings

29.    **ORDERS** that all CCAA Charges and any other charges against the assets of the
Petitioners that were created pursuant to orders of the Court in the CCAA Proceedings
will be cancelled, released and discharged as of the Completion Time;

## Exit Financing

30.    **ORDERS** that QWI is authorized and empowered to (i) enter into and perform and
receive the proceeds of the Exit Loan Facility, including a revolving credit facility in the
aggregate principal amount of approximately U.S. $350,000,000 and a term loan in the
aggregate principal amount of approximately U.S. $450,000,000, the whole to be in form
and substance acceptable to the Administrative Agent, the Ad Hoc Group of Noteholders
and the Creditors' Committee, acting reasonably, and on the terms described in the exit
financing term sheets, as filed, as such term sheets may be amended, supplemented or
otherwise modified, in each case as approved by the borrowers, the lead arrangers and
agents parties thereunder and the whole to be in form and substance acceptable to the
Administrative Agent, the Ad Hoc Group of Noteholders and the Creditors' Committee,
acting reasonably, (the "Term Sheets"), (ii) grant security interests, hypothecs, charges,
claims and liens in connection therewith, and (iii) pay the fees, costs and expenses in
connection with the arrangement, syndication and all other matters relating to or arising
under the Exit Loan Facility as set out in the Term Sheets, and the Engagement Letter
approved by this Court on May 8, 2009. On the Implementation Date, all of the liens and
security interests to be granted by QWI in accordance with the Exit Loan Facility shall be
deemed to be approved. The terms and conditions of the Exit Loan Facility as set forth in
said exit financing term sheets, as such term sheets may be amended, supplemented or
otherwise modified from time to time by the borrowers, the lead arrangers and
agents parties thereunder, in form and substance acceptable to the Administrative Agent,
the Ad Hoc Group of Noteholders and the Creditors' Committee, acting reasonably, are
approved and ratified as being entered into in good faith and being critical to the success
and feasibility of the Plan;

31.    **ORDERS** that QWi is authorized and empowered to execute and deliver credit
agreements, guarantees, security documents, and other documents required to effectuate

the Exit Loan Facility (collectively, the "**Exit Loan and Security Documents**"), as may be required by the Exit Loan Facility's lenders in connection with the Exit Loan Facility, such Exit Loan Facility and the Exit Loan and Security Documents to be in form and substance acceptable to the Administrative Agent, the Ad Hoc Group of Noteholders and the Creditors' Committee, acting reasonably, and QWI is authorized to perform all of its obligations under the Exit Loan and Security Documents;

## Stay Extension

32.    **DECLARES** that the stay of proceedings under the Initial Order shall continue until the filing with this Court of a certificate of the Monitor confirming that the Implementation Date has occurred, the date of such filing to be the Stay Termination Date (as such term is defined in the Initial Order);

33.    **ORDERS** that all other Orders made in the CCAA Proceedings shall continue in full force and effect in accordance with their respective terms, except to the extent that such Orders are varied by, or inconsistent with, this Order, the Creditors' Meeting Order, or any further Order of this Court;

## Monitor and Chief Restructuring Officer

34.    **ORDERS** that the First to Twenty Ninth Reports of the Monitor filed with this Court (the "**Monitors' Reports**") be and are hereby approved, that all actions and conduct of the Monitor and Chief Restructuring Officer in connection with the Claims, the business and affairs of the Petitioners, the CCAA Charges, the QWI Plan, the U.S. Plan and the CCAA Proceedings, including, without limitation, the actions and conduct of the Monitor and the Chief Restructuring Officer disclosed in the Monitors' Reports, are hereby approved, and that the Monitor and the Chief Restructuring Officer have satisfied all of their obligations up to and including the date of this Order;

35.    **APPROVES** the conduct of the Chief Restructuring Officer and the Monitor in relation to QWI and the other Petitioners and, provided that they have acted reasonably and in good faith, **DECLARES** that they shall not be held liable for loss or damage to any person with respect to their acts errors and omissions;

36.    **ORDERS** that no proceeding shall be commenced against the Monitor or the Chief Restructuring Officer in any way arising from or related to its capacity or conduct as Monitor or Chief Restructuring Officer except with prior leave of this Court on notice to the Monitor and Chief Restructuring Officer and upon further order securing, as security for costs, the solicitor and his own client costs of the Monitor in connection with the proposed action or proceeding;

37.    **ORDERS** that the protections afforded to Ernst & Young Inc. as Monitor and as an officer of this Court, and to the Chief Restructuring Officer pursuant to the terms of the Initial Order and the other Orders made in the CCAA Proceedings shall not expire or terminate on the Implementation Date and, subject to the terms hereof, shall remain effective and in full force and effect notwithstanding the discharge provided for herein;

38.    **ORDERS** that the Monitor shall be discharged of its duties and obligations pursuant to the QWI Plan, this Order and all other Orders made in the CCAA Proceedings, upon the filing with this Court of a certificate of the Monitor certifying that all of its duties in relation to the claims procedure and all matters relating thereto as set out in the Claims Procedure Order and the Claims Protocol, and all other matters for which it is responsible under the QWI Plan or pursuant to the Orders of this Court made in the CCAA Proceedings, are completed to the best of the Monitor's knowledge;

## Claims Officers

39.    **ORDERS** that, in accordance with paragraph 33 hereof, any Claims Officer appointed in accordance with the Claims Procedure Order shall continue to have the authority conferred upon, and to benefit from all protections afforded to, Claims Officers pursuant to Orders in the CCAA Proceedings;

## General

40.    **ORDERS** that the Administrative Agent, the Ad Hoc Group of Noteholders and the Creditors' Committee, the Petitioners and the Monitor shall continue to discuss with a view to reaching an acceptable compromise on the wording of the Articles of Reorganization and the Series I and II Warrant Indenture (Exhibit R-4). If no agreement is reached by July 13, 2009 a Joint Hearing shall be scheduled and held at 2:30 p.m. to

further assess the situation, take whatever steps and render such further orders as are necessary in order to resolve any dispute resulting for the foregoing;

41.    **DECLARES** that any of the Petitioners or the Monitor may, from time to time, apply to this Court for directions concerning the exercise of their respective powers, duties and rights hereunder or in respect of the proper execution of the Order on notice only to each other;

42.    **DECLARES** that this Order shall have full force and effect in all provinces and territories in Canada, in the United States of America and elsewhere;

43.    **REQUESTS** the aid and recognition of any Court or administrative body in any Province of Canada and any Canadian federal court or administrative body and any federal or state court or administrative body in the United States of America and any court or administrative body elsewhere, to act in aid of and to be complementary to this Court in carrying out the terms of the Order, including, without limitation, the registration of this Order in any office of public record by any such court or administrative body or by any Person affected by the Order;

**Provisional Execution**

44.    **ORDERS** the provisional execution of this Order notwithstanding any appeal and without the necessity of furnishing any security;

**THE WHOLE**, without costs.

Montréal (Quebec), June 30, 2009

Certified True Copy

Honourable Robert Mongeon, J.S.C.

Hon. Robert Mongeon J.S.C.

## Schedule "A"

| | |
|---|---|
| Quebecor World (USA) Inc. | Delaware |
| Quebecor Printing Holding Company | Delaware |
| Quebecor World Capital Corporation | Delaware |
| Quebecor World Capital II GP | Delaware |
| Quebecor World Capital II LLC | Delaware |
| QW Memphis Corp. | Delaware |
| The Webb Company | Delaware |
| Quebecor World Printing (USA) Corp. | Delaware |
| Quebecor World Loveland Inc. | Delaware |
| Quebecor World Systems Inc. | Delaware |
| Quebecor World San Jose Inc. | California |
| Quebecor World Buffalo Inc. | New York |
| Quebecor World Johnson & Hardin Co. | Ohio |
| Quebecor World Northeast Graphics Inc. | Delaware |
| Quebecor World Up / Graphics Inc. | Delaware |
| Quebecor World Great Western Publishing Inc. | Arizona |
| Quebecor World DB Acquisition Corp. | Georgia |
| WCP-D, Inc. | Delaware |
| Quebecor World Taconic Holdings Inc. | Virginia |
| Quebecor World Retail Printing Corporation | Massachusetts |
| Quebecor World Arcata Corp. | Delaware |
| Quebecor World Nevada Inc. | Nevada |
| Quebecor World Atglen Inc. | Delaware |
| Quebecor World Krueger Acquisition Corp. | Delaware |
| Quebecor World Book Services LLC | Delaware |
| Quebecor World Dubuque Inc. | Delaware |
| Quebecor World Pendell Inc. | Michigan |
| Quebecor World Fairfield Inc. | Delaware |
| QW New York Corp. | Delaware |
| Quebecor World Dallas II Inc. | Delaware |
| Quebecor World Nevada II LLC | Delaware |
| Quebecor World Dallas, L.P. | Delaware |
| Quebecor World Mt. Morris II LLC | Delaware |
| Quebecor World Petty Printing Inc. | Illinois |
| Quebecor World Hazleton Inc. | Pennsylvania |
| Quebecor World Olive Branch Inc. | Delaware |
| Quebecor World Dittler Brothers Inc. | Georgia |
| Quebecor World Atlanta II LLC | Georgia |
| Quebecor World Rai Inc. | Wisconsin |
| Quebecor World KRI Inc. | Delaware |
| Quebecor World Century Graphics Corporation | Louisiana |
| Quebecor World Waukee Inc. | Iowa |
| Quebecor World Logistics Inc. | Delaware |
| Quebecor World Mid-South Press Corporation | Tennessee |
| Quebecor World Lease GP | Delaware |
| Quebecor Printing Aviation Inc. | Delaware |
| WCZ, LLC | Delaware |
| Quebecor World Eusey Press Inc. | Massachusetts |
| Quebecor World Infiniti Graphics Inc. | Connecticut |
| Quebecor World Lincoln Inc. | Delaware |
| Quebecor World Magna Graphic Inc. | Kentucky |
| Quebecor World Memphis LLC | Delaware |
| Quebecor World Lease LLC | Delaware |

## Schedule "B"
### Second Amended and Restated Plan of Reorganization and Compromise
### dated June 8, 2009 of QWI
(Attached)

a clean copy thereof to be attached to the Court Order to be presented at the Sanction Hearing

and a copy thereof is available at the following page of the Monitor's website

**http://documentcentre.eycan.com/Pages/Main.aspx?SID=54**

under the heading "Information relating to the Creditors' Meeting and the vote",
subheading "Updated and New Documents, dated June 8, 2009".

together with the Articles of Reorganization and the Series I and Series II Warrant Indenture posted on the Monitor's website on June 20, 2009, under the same heading "Information relating to the Creditors' Meeting and the vote", and subheading "New documents, dated June 20, 2009", with the note that these two documents remain subject to the acceptance of each of the Administrative Agent, the Ad Hoc Group of Noteholders and the Creditors' Committee, acting reasonably

## Schedule "C"
## Directors of QWI

1. **Michael Allen**, veteran of the printing industry.

2. **Mark Angelson**, CEO and Director at RR Donnelley between 2004 and March 2007.

3. **Raymond J. Bromark**, director of CA. Inc. since 2007 and retired senior partner of PricewaterhouseCoopers.

4. **Gabriel de Alba**, Managing Director and Partner of Catalyst Capital Group of Toronto.

5. **James J. Gaffney**, serving on Duff & Phelps' Senior Advisory Board since 2007 and director of the Imperial Sugar Company since August 2001. Also served as Chairman since February 2003.

6. **Jack Kliger**, former President and CEO of Hachette Filipacchi. Occupied other positions at Si Newhuse's Advance Publications, Condé Nast and *Parade*.

7. **Jacques Mallette**, Quebecor World Inc.'s Chief Executive Officer.

8. **David L. McAusland**, Executive Vice President of Corporate Development at Rio Tinto Alcan (formerly, Alcan Inc.) of Alcan France S.A.S. from 2005 to 2008 and Chief Legal Officer from October 2000 to February 2008.

9. **Thomas O. Ryder**, Director of Amazon.Com, Inc. since November 2002, Director of Starwoods Hotels & Resorts Worldwide, Inc. and Chairman of the Board of Directors at Virgin Mobile USA, Inc.

**Schedule "D"**
**Consulting and Indemnity Agreement**

## CONSULTING AND INDEMNITY AGREEMENT

**THIS AGREEMENT** is made as of June 18, 2009
**BETWEEN:**

> **QUEBECOR WORLD INC.**, a corporation governed by the laws
> of Canada, (the "**Corporation**")

> - and -
> The individuals listed on Schedule "A" hereto
> (the "**Consulting Parties**" and each an "**Consulting Party**")

**RECITALS:**

A.   On January 21, 2008, the Corporation filed for creditor protection under the *Companies' Creditors Arrangement Act* in Canada with the Quebec Superior Court of Justice (the "**Court**"), as well as in the United States under Chapter 11 of the United States Bankruptcy Code (the "**Proceedings**").

B.   In connection with the Proceedings, a meeting of the creditors of the Corporation was held on June 22, 2009, to consider and approve the Second Amended and Restated Plan of Reorganization and Compromise of the Corporation dated June 8, 2009 (the "**Reorganization Plan**"), pursuant to which, among other things, a new slate of directors (the "**Proposed Directors**") will be appointed upon the implementation of the Reorganization Plan on or before July 21, 2009.

C.   It is currently anticipated that the Reorganization Plan will be sanctioned by the Court on June 30, 2009 and that such order will, effective on the implementation of the Reorganization Plan, appoint the following individuals as directors of the Corporation: Mark Angelson, Michael Allen, Raymond J. Bromark, James J. Gaffney, Jack Kliger, David L. McAusland, Thomas O. Ryder and Gabriel de Alba.

D.   In order to facilitate an orderly transition of the Corporation on the date that the Corporation implements the Reorganization Plan (the "**Implementation Date**"), it is in the best interests of the Corporation that the Proposed Directors receive information concerning the business and affairs of the Corporation (including confidential and proprietary information), make preparations to assume responsibility for board matters on the Implementation Date, and in that regard, provide the Corporation and the existing board with consulting advice regarding transitional and other matters as they may deem appropriate or necessary to effect or facilitate such orderly transition of responsibility for board matters (the "**Transition Process**").

E.   Accordingly, the Corporation considers it desirable and in the best interests of the Corporation to enter into this Agreement to set out, *inter alia*, the circumstances and manner in which the Proposed Directors may be indemnified in respect of certain

liabilities or expenses which such Proposed Directors may incur as a result of participating in the Transition Process.

**THEREFORE**, the Parties agree as follows:

**ARTICLE 1**
**DEFINITIONS AND PRINCIPLES OF INTERPRETATION**

1.1    **Definitions**

Whenever used in this Agreement, the following words and terms shall have the meanings set out below:

(a)    "**Act**" means the *Canada Business Corporations Act*, as the same exists on the date of this Agreement or may hereafter be amended;

(b)    "**Agreement**" means this consulting and indemnity agreement, including all schedules, and all amendments or restatements as permitted, and references to "Article" or "Section" mean the specified Article or Section of this Agreement;

(c)    "**Business Day**" means any day, other than a Saturday or Sunday, on which the principal commercial banks located in Toronto, Ontario and Montreal, Quebec are open for commercial banking business during normal banking hours;

(d)    "**Claim**" includes any civil, criminal, administrative or investigative or other proceeding of any nature or kind in which the Consulting Party is involved during the Transition Period because of the Consulting Party's association with the Corporation or Other Entity, or as a result of his or her participation in the Transition Process;

(e)    "**Losses**" includes all costs, charges, expenses, losses, damages, fees (including any legal, professional or advisory fees or disbursements), liabilities, amounts paid to settle or dispose of any Claim or satisfy any judgment, fines, penalties or liabilities, without limitation, and whether incurred alone or jointly with others, including any amounts which the Consulting Party may reasonably suffer, sustain, incur or be required to pay in respect of the investigation, defence, settlement or appeal of or preparation for any Claim or in connection with any action to establish a right to indemnification under this Agreement, and for greater certainty, includes all taxes, interest, penalties and related outlays of the Consulting Party arising from any indemnification of the Consulting Party by the Corporation pursuant to this Agreement;

(f)    "**Other Entity**" means a Subsidiary of the Corporation;

(g)    "**Parties**" means the Corporation and the Consulting Party collectively and "**Party**" means any one of them;

(h)    **"Subsidiary"** has the meaning set out in the Act; and

(i)    **"Transition Period"** means the period of time commencing on the date of this Agreement and terminating on the Implementation Date.

## 1.2    Certain Rules of Interpretation

In this Agreement:

(a)    **Governing Law** – This Agreement is a contract made under and shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable in the Province of Ontario.

(b)    **Headings** – Headings of Articles and Sections are inserted for convenience of reference only and do not affect the construction or interpretation of this Agreement.

(c)    **Number** – Unless the context otherwise requires, words importing the singular include the plural and *vice versa*.

(d)    **Severability** – If, in any jurisdiction, any provision of this Agreement or its application to any Party or circumstance is restricted, prohibited or unenforceable, the provision shall, as to that jurisdiction, be ineffective only to the extent of the restriction, prohibition or unenforceability without invalidating the remaining provisions of this Agreement and without affecting the validity or enforceability of such provision in any other jurisdiction or without affecting its application to other Parties or circumstances.

(e)    **Entire Agreement** – This Agreement, including Schedule A, constitutes the entire agreement between the Parties and sets out all the covenants, promises, warranties, representations, conditions and agreements between the Parties in connection with the subject matter of this Agreement and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, pre-contractual or otherwise. There are no covenants, promises, warranties, representations, conditions or other agreements, whether oral or written, pre-contractual or otherwise, express, implied or collateral, between the Parties in connection with the subject matter of this Agreement except as specifically set forth in this Agreement.

(f)    **Schedules** – Schedule A is an integral part of this Agreement.

## ARTICLE 2
## REPRESENTATIONS

### 2.1    Representations of the Corporation

The Corporation represents and warrants to the Consulting Party that:

(a)    **Incorporation and Corporate Power** – The Corporation is a corporation duly incorporated and existing under the laws of Canada and has all necessary corporate power, authority and capacity to enter into this Agreement, to carry out its obligations under this Agreement, to own its assets and to carry on its business as presently conducted.

(b)    **Due Authorization** – The execution and delivery of this Agreement and the performance of the obligations contemplated by this Agreement have been duly authorized by all necessary corporate action on behalf of the Corporation. Subject to the approval of the Court, this Agreement constitutes a valid and binding obligation of the Corporation enforceable against it in accordance with its terms.

(c)    **No Conflict** – The Corporation is not a party to, bound or affected by or subject to any:

(i)    indenture, mortgage, agreement, obligation or instrument;

(ii)    charter or by-law; or

(iii)    applicable law, statute, regulation, rule, order, ordinance, judgment, decree, licence or permit,

that would be violated, breached by, or under which default would occur or an encumbrance would be created as a result of the execution and delivery of this Agreement or the performance of any of the obligations provided for under this Agreement.

## ARTICLE 3
## TRANSITIONAL MATTERS

### 3.1    Engagement of Consulting Parties

The Corporation hereby engages each of the Consulting Parties to: (a) provide the Corporation and the existing board of directors of the Corporation with such advice as he deems necessary or advisable from time to time in connection with the Transition Process; and (b) prepare, plan for and do or take all such necessary or advisable steps to effect an orderly transition of responsibility for board matters on the Implementation Date. It is understood and agreed that, until the appointment of the Consulting Parties as directors of the Corporation on the Implementation Date, none of the Consulting Parties shall be deemed to be acting as directors of the Corporation, and that all authority, power and responsibility for any and all corporate and

other matters regarding the Corporation prior to the Implementation Date shall remain the sole authority, power and responsibility of the existing board of directors of the Corporation and management. For greater certainty: (a) all matters, steps or measures taken by the Corporation in respect of the Transition Process prior to the Implementation Date shall be subject to the approval of the existing board of directors of the Corporation; and (b) the Consulting Parties do not and shall not be deemed to assume any powers, authorities, responsibilities or duties of or belonging to the existing board of directors of the Corporation or management in respect of any corporate, transition or other matters relating to or arising prior to the Implementation Date.

## 3.2    Confidentiality

Each of the Consulting Parties agrees to maintain as confidential all information of a non-public nature relating to the Corporation which is provided to them prior to the Implementation Date.

**ARTICLE 4**
**INDEMNIFICATION BY CORPORATION AND**
**OBLIGATIONS OF CONSULTING PARTY**

### 4.1    Indemnification

(a)    **General Indemnity** – Except in respect of an action by or on behalf of the Corporation or Other Entity to procure a judgment in its favour against the Consulting Party, or except as otherwise provided in this Agreement, the Corporation agrees to indemnify and hold the Consulting Party harmless from and against any and all Losses which the Consulting Party may reasonably suffer, sustain, incur or be required to pay in respect of any Claim, provided that the indemnity provided for in this Section 4.1(a) will only be available if:

(i)    the Consulting Party was acting honestly and in good faith with a view to the best interests of the Corporation or Other Entity, as the case may be;

(ii)    in the case of a criminal or administrative action or proceeding that is enforced by monetary penalty, the Consulting Party had reasonable grounds for believing that the Consulting Party's conduct was lawful.

(b)    **Indemnity as of Right** – Notwithstanding anything in this Agreement, the Consulting Party is entitled to an indemnity from the Corporation in respect of all costs, charges and expenses reasonably incurred by the Consulting Party in connection with the defence of any Claim, if the Consulting Party:

(i)    was not judged by the court or other competent authority to have committed any fault or omitted to do anything that the Consulting Party ought to have done; and

(ii)    fulfils the conditions set out in Sections 4.1(a)(i) and (a)(ii) above.

(c)     **Derivative Claims** – In respect of any action by or on behalf of the Corporation or Other Entity to procure a judgment in its favour against the Consulting Party, in respect of which the Consulting Party is made a party because of the Consulting Party's association with the Corporation or Other Entity or as a result of the Consulting Party's participation in the Transition Process, the Corporation shall make application, at its expense, for the approval of a court of competent jurisdiction to advance monies to the Consulting Party for costs, charges and expenses reasonably incurred by the Consulting Party in connection with such action and to indemnify and save harmless the Consulting Party for such costs, charges and expenses of such action provided the Consulting Party fulfils the conditions set out in Sections   4.1(a)(i) and (a)(ii) above and provided the Consulting Party shall repay such funds advanced if the Consulting Party ultimately does not fulfil the conditions set out in Sections   4.1(a)(i) and (a)(ii) above.

(d)     **Incidental Expenses** – Except to the extent such costs, charges or expenses are paid by the Other Entity, the Corporation shall pay or reimburse the Consulting Party for the Consulting Party's reasonable and necessary travel, lodging or accommodation costs, charges or expenses paid or incurred by or on behalf of the Consulting Party.

(e)     **Partial Indemnification** – If the Consulting Party is determined to be entitled under any provisions of this Agreement to indemnification by the Corporation for some or a portion of the Losses incurred in respect of any Claim but not for the total amount thereof, the Corporation shall nevertheless indemnify the Consulting Party for the portion thereof to which the Consulting Party is determined by a court of competent jurisdiction to be so entitled.

(f)     **Advance of Expenses** – Subject to Section 4.1(c) of this Agreement, the Corporation shall, at the request of the Consulting Party, advance to the Consulting Party sufficient funds, or arrange to pay on behalf of or reimburse the Consulting Party for any costs, charges or expenses reasonably incurred by the Consulting Party in investigating, defending, appealing, preparing for, providing evidence in or instructing and receiving the advice of the Consulting Party's counsel or other professional advisors in regard to any Claim or other matter for which the Consulting Party may be entitled to an indemnity or reimbursement under this Agreement, and such amounts shall be treated as a non-interest bearing advance or loan to the Consulting Party, pending approval of the Corporation and the court (if required), to the payment thereof as an indemnity and provided that the Consulting Party fulfils the conditions set out in Sections 4.1(a)(i) and (a)(ii) above.   In the event it is ultimately determined by a court of competent jurisdiction that the Consulting Party did not fulfil the conditions set out in Sections 4.1(a)(i) and (a)(ii) above, or that the Consulting Party was not entitled to be fully so indemnified, such loan or advance, or the appropriate portion thereof shall, upon written notice of such determination being given by the Corporation to the Consulting Party detailing the basis for such determination, be

repayable on demand and shall bear interest from the date of such notice at the prime rate prescribed from time to time by the Bank of Canada.

## 4.2    Notice of Proceedings

The Consulting Party shall give notice in writing to the Corporation as soon as practicable upon being served with any statement of claim, writ, notice of motion, indictment, subpoena, investigation order or other document commencing, threatening or continuing any Claim involving the Corporation or Other Entity or the Consulting Party which may result in a claim for indemnification under this Agreement, and the Corporation agrees to give the Consulting Party notice in writing as soon as practicable upon it or any Other Entity being served with any statement of claim, writ, notice of motion, indictment, subpoena, investigation order or other document commencing or continuing any Claim involving the Consulting Party. Such notice shall include a description of the Claim or threatened Claim, a summary of the facts giving rise to the Claim or threatened Claim and, if possible, an estimate of any potential liability arising under the Claim or threatened Claim. Failure by the Consulting Party to so notify the Corporation of any Claim shall not relieve the Corporation from liability under this Agreement except to the extent that the failure materially prejudices the Corporation.

## 4.3    Subrogation – The Corporation

Promptly after receiving written notice from the Consulting Party of any Claim or threatened Claim (other than a Claim by or on behalf of the Corporation or Other Entity to procure a judgment in its favour against the Consulting Party), the Corporation may, and upon the written request of the Consulting Party shall, by notice in writing to the Consulting Party, assume conduct of the defence thereof in a timely manner and retain counsel on behalf of the Consulting Party who is reasonably satisfactory to the Consulting Party, to represent the Consulting Party in respect of the Claim. On delivery of such notice by the Corporation, the Corporation shall not be liable to the Consulting Party under this Agreement for any fees and disbursements of counsel the Consulting Party may subsequently incur with respect to the same matter. In the event the Corporation assumes conduct of the defence on behalf of the Consulting Party, the Consulting Party consents to the conduct thereof and of any action taken by the Corporation, in good faith, in connection therewith, and the Consulting Party shall fully cooperate in such defence including, without limitation, the provision of documents, attending examinations for discovery, making affidavits, meeting with counsel, testifying and divulging to the Corporation all information reasonably required to defend or prosecute the Claim.

## 4.4    Separate Counsel

In connection with any Claim or other matter for which the Consulting Party may be entitled to indemnity under this Agreement, the Consulting Party shall have the right to employ separate counsel of the Consulting Party's choosing and to participate in the defence thereof but the fees and disbursements of such counsel shall be at the Consulting Party's expense unless employment of such other counsel has been authorized by the Corporation, in which event, the fees and disbursements of such counsel shall be paid by the Corporation.

## 4.5    No Presumption as to Absence of Good Faith

Unless a court of competent jurisdiction otherwise has held or decided that the Consulting Party is not entitled to be fully or partially indemnified under this Agreement, the determination of any

Claim by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create any presumption for the purposes of this Agreement that the Consulting Party is not entitled to indemnity under this Agreement.

### 4.6    Settlement of Claim

No admission of liability and no settlement of any Claim in a manner adverse to the Consulting Party shall be made without the consent of the Consulting Party, acting reasonably.    No admission of liability shall be made by the Consulting Party without the consent of the Corporation and the Corporation shall not be liable for any settlement of any Claim made without its consent.

### 4.7    Determination of Right to Indemnification

If the payment of an indemnity or the advancement of funds under this Agreement requires the approval of a court either the Corporation or the Consulting Party may apply to a court of competent jurisdiction for an order approving such indemnity or the advancement of such funds by the Corporation pursuant to this Agreement.

## ARTICLE 5
## MISCELLANEOUS MATTERS

### 5.1    Corporation and Consulting Party to Cooperate

The Corporation and the Consulting Party shall, from time to time, provide such information and cooperate with the other, as the other may reasonably request, in respect of all matters under this Agreement.

### 5.2    Insolvency

The liability of the Corporation under this Agreement shall not be affected, discharged, impaired, mitigated or released by reason of the discharge or release of the Consulting Party in any bankruptcy, insolvency, receivership or other similar proceeding of creditors, including, without limitation, the Proceedings and the implementation of the Reorganization Plan.

### 5.3    Multiple Proceedings

No action or proceeding brought or instituted under this Agreement and no recovery pursuant thereto shall be a bar or defence to any further action or proceeding which may be brought under this Agreement.

## ARTICLE 6
## GENERAL

### 6.1    Assignment

Neither Party may assign this Agreement or any rights or obligations under this Agreement without the prior written consent of the other Party.

## 6.2   Enurement

This Agreement enures to the benefit of and is binding upon the Parties and the heirs, attorneys, guardians, estate trustees, executors, trustees, administrators and permitted assigns of the Consulting Party and the successors (including any successor by reason of amalgamation) and permitted assigns of the Corporation.

## 6.3   Amendments

No amendment, supplement, modification or waiver or termination of this Agreement and, unless otherwise specified, no consent or approval by any Party, is binding unless executed in writing by the Party to be so bound. For greater certainty, the rights of the Consulting Party under this Agreement shall not be prejudiced or impaired by permitting or consenting to any assignment in bankruptcy, reeceivership, insolvency or any other creditor's proceedings of or against the Corporation or by the winding-up or dissolution of the Corporation.

## 6.4   Notices

Any notice, consent or approval required or permitted to be given in connection with this Agreement (in this Section referred to as a "**Notice**") shall be in writing and shall be sufficiently given if delivered (whether in person, by courier service or other personal method of delivery), or if transmitted by facsimile or e-mail:

(a)   in the case of a Notice to the Consulting Parties, in accordance with the information set out on Schedule "A" hereto; and

(b)   in the case of a Notice to the Corporation at:

> Quebecor World Inc.
> 999 Boulevard de Maisonneuve West
> Suite 1100
> Montreal, Quebec
> H3A 3L4
>
> Attention:    ●
> Fax:          ●
> E-mail:       ●

Any Notice delivered or transmitted to a Party as provided above shall be deemed to have been given and received on the day it is delivered or transmitted, provided that it is delivered or transmitted on a Business Day prior to 5:00 p.m. local time in the place of delivery or receipt. If the Notice is delivered or transmitted after 5:00 p.m. local time or if such day is not a Business Day, then the Notice shall be deemed to have been given and received on the next Business Day. Any Party may, from time to time, change its address by giving Notice to the other Party in accordance with the provisions of this Section.

## 6.5   Further Assurances

The Corporation and the Consulting Party shall, with reasonable diligence, do all things and execute and deliver all such further documents or instruments as may be necessary or desirable for the purpose of assuring and conferring on the Consulting Party the rights created or intended

by this Agreement and giving effect to and carrying out intention or facilitating the performance
of the terms of this Agreement, or evidencing any loan or advance made pursuant to Section
4.1(f) hereof.

6.6    **Independent Legal Advice**

The Consulting Party acknowledges that the Consulting Party has been advised to obtain
independent legal advice with respect to entering into this Agreement, that the Consulting Party
has obtained such independent legal advice or has expressly determined not to seek such advice,
and that the Consulting Party is entering into this Agreement with full knowledge of the contents
hereof, of the Consulting Party's own free will and with full capacity and authority to do so.

6.7    **Execution and Delivery**

This Agreement may be executed by the Parties in counterparts and may be executed and
delivered by facsimile and all such counterparts and facsimiles together shall constitute one and
the same agreement.

*[Signature Page Follows]*

**IN WITNESS OF WHICH** the Parties have duly executed this Agreement.

**QUEBECOR WORLD INC.**

By: _____

     Name:

     Title:

By: _____

     Name:

     Title:

SIGNED, SEALED & DELIVERED
In the presence of:


_____     _____
          Witness                               Mark Angelson

SIGNED, SEALED & DELIVERED
In the presence of:


_____     _____
          Witness                               Michael Allen

SIGNED, SEALED & DELIVERED
In the presence of:


_____     _____
          Witness                            Raymond J. Bromark

SIGNED, SEALED & DELIVERED
In the presence of:


_____     _____
          Witness                            James J. Gaffney

SIGNED, SEALED & DELIVERED
In the presence of:

_____
Witness

_____
Jack Kliger

SIGNED, SEALED & DELIVERED
In the presence of:

_____
Witness

_____
David L. McAusland

SIGNED, SEALED & DELIVERED
In the presence of:

_____
Witness

_____
Thomas O. Ryder

SIGNED, SEALED & DELIVERED
In the presence of:

_____
Witness

_____
Gabriel de Alba

## SCHEDULE A
### Consulting Parties

| Name | Address | Email Address | Facsimile |
|---|---|---|---|
| Mark Angelson | ● | ● | ● |
| Michael Allen | ● | ● | ● |
| Raymond J. Bromark | ● | ● | ● |
| James J. Gaffney | ● | ● | ● |
| Jack Kliger | ● | ● | ● |
| David L. McAusland | ● | ● | ● |
| Thomas O. Ryder | ● | ● | ● |
| Gabriel de Alba | ● | ● | ● |

**Exhibit K.13**
*In re Vitro S.A.B. de CV*, No. 12-10542, 2012 WL 5935630
(5th Cir. Nov. 28, 2012)

Westlaw.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

H

Only the Westlaw citation is currently available.

United States Court of Appeals,
Fifth Circuit.
In the Matter of VITRO S.A.B. DE CV, Debtor.
Ad Hoc Group of Vitro Noteholders, Appellant,
v.
Vitro S.A.B. de CV, Appellee.
In the Matter of Vitro S.A.B. de CV, Debtor.
Vitro S.A.B. de CV, Appellant,
v.
Ad Hoc Group of Vitro Noteholders; Wilmington
Trust, National Association, solely in its capacity as
indenture trustee; U.S. Bank National Association,
Appellees.
In the Matter of Vitro S.A.B. de CV, Debtor.
Fintech Investments, Limited, Appellant,
v.
Ad Hoc Group of Vitro Noteholders; Wilmington
Trust, National Association, solely in its capacity as
indenture trustee; U.S. Bank National Association,
Appellees.

Nos. 12–10542, 12–10689, 12–10750.
Nov. 28, 2012.

**Background:** Mexican holding company filed
Chapter 15 petition for recognition of its Mexican
bankruptcy proceeding as foreign main proceeding.
Ad hoc group of noteholders objected to petition.
The United States Bankruptcy Court for the North-
ern District of Texas, Harlin DeWayne Hale, J.,
granted petition, and noteholders appealed. The
District Court, A. Joe Fish, Senior District Judge,
470 B.R. 408, affirmed, and noteholders appealed.
In separate proceeding, foreign representatives
moved for post-recognition relief in nature of en-
forcement of judgment entered by Mexican court,
which not only modified debts owed by foreign
debtor, but novated and extinguished guarantees of
foreign debtor's indebtedness by its nondebtor sub-
sidiaries. The Bankruptcy Court, Harlin DeWayne
Hale, J., 473 B.R. 117, denied motion, and foreign

representatives appealed directly to the Court of
Appeals, where appeal was consolidated with prior
appeal by noteholders.

**Holdings:** The Court of Appeals, King, Circuit
Judge, held that:

(1) individuals were not disqualified from serving
as "foreign representatives" of company that was
the subject of Mexican reorganization proceeding
merely because they were designated as represent-
atives by company's board of directors, and not of-
ficially appointed by Mexican court;

(2) as matter of apparent first impression, court had
to consider availability of post-recognition relief
first under provision of Chapter 15 authorizing "any
appropriate relief," before employing provision au-
thorizing "additional assistance";

(3) unavailability of non-debtor releases in reorgan-
ization cases under United States bankruptcy law
did not necessarily mean that foreign representat-
ives of debtor that was reorganizing under Mexican
law could not obtain enforcement of such releases;
but

(4) bankruptcy court did not abuse its discretion in
denying enforcement motion.

Affirmed.

West Headnotes

**[1] Bankruptcy 51 ☞3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of law; de novo
review. Most Cited Cases

**Bankruptcy 51 ☞3786**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3786 k. Clear error. Most Cited

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

Cases

Court of Appeals reviews district court's affirmance of bankruptcy court decision by applying same standard of review that district court applied, and reviews bankruptcy court's findings of fact for clear error and its conclusions of law, and determinations on mixed questions of law and fact, de novo. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

**[2] Bankruptcy 51 ⟿3782**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3782 k. Conclusions of law; de novo review. Most Cited Cases

**Bankruptcy 51 ⟿3786**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3785 Findings of Fact
                51k3786 k. Clear error. Most Cited Cases

On direct appeal from bankruptcy court, the Court of Appeals reviews bankruptcy court's findings of fact for clear error and its conclusions of law, and determinations on mixed questions of law and fact, de novo. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

**[3] Bankruptcy 51 ⟿3784**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3784 k. Discretion. Most Cited Cases

On appeal in bankruptcy case, the Court of Appeals reviews denial of declaratory or injunctive relief for abuse of discretion.

**[4] Bankruptcy 51 ⟿3784**

51 Bankruptcy
    51XIX Review

51XIX(B) Review of Bankruptcy Court
    51k3784 k. Discretion. Most Cited Cases

Bankruptcy court's decision whether to grant comity to foreign proceedings is reviewed for abuse of discretion.

**[5] Bankruptcy 51 ⟿2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Central to Chapter 15 is concept of comity.

**[6] Courts 106 ⟿512**

106 Courts
    106VII Concurrent and Conflicting Jurisdiction
        106VII(C) Courts of Different States or Countries
            106k512 k. Comity between courts of different countries. Most Cited Cases

**International Law 221 ⟿10.1**

221 International Law
    221k10.1 k. Public policy and comity in general. Most Cited Cases

"Comity" is the recognition which one nation allows within its territory to legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to rights of its own citizens, or of other persons who are under protections of its laws.

**[7] International Law 221 ⟿10.1**

221 International Law
    221k10.1 k. Public policy and comity in general. Most Cited Cases

Comity is not rule of law, but one of practice, convenience, and expediency.

**[8] Bankruptcy 51 ⟿2341**

51 Bankruptcy

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
        51k2341 k. In general. Most Cited Cases

Chapter 15 provides for broad range of relief, including ability to sue and be sued in United States courts, to apply directly to United States court for relief, to commence non-Chapter 15 case, and to intervene in any United States case to which foreign debtor is party.

**[9] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

It is not necessary that the result achieved in foreign bankruptcy proceeding be identical to that which would be had in the United States in order for court to grant relief in Chapter 15 case ancillary to foreign bankruptcy proceeding; it is sufficient if the result is comparable. 11 U.S.C.A. §§ 1507(a), 1521(a).

**[10] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

In order for court to grant relief in Chapter 15 case ancillary to foreign bankruptcy proceeding, foreign laws need not be identical to their counterparts under laws of the United States; it is enough that they are not repugnant to United States laws and policies. 11 U.S.C.A. §§ 1507(a), 1521(a).

**[11] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings

            51k2341 k. In general. Most Cited Cases

Whether any relief should be granted under Chapter 15 is separate question from whether foreign proceeding will be recognized by United States bankruptcy court.

**[12] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Federal court's recognition of representatives appointed in course of foreign bankruptcy or liquidation proceeding is matter of comity; it is an acknowledgment of validity of foreign proceeding.

**[13] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Duly recognized foreign representative has capacity to sue and be sued in the United States and to apply directly to United States court for relief, and is entitled to the comity and cooperation of all United States courts. 11 U.S.C.A. § 1509.

**[14] Bankruptcy 51 ⟨⟩2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Statutory requirements for recognition of foreign insolvency proceeding as either a foreign main, or foreign nonmain, proceeding are to be strictly construed in keeping with fact that recognition is not rubber stamp exercise, and even in absence of objection, courts must undertake their own jurisdictional analysis and grant or deny recognition under Chapter 15 as the facts of each case warrant.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

11 U.S.C.A. § 1517.

**[15] Bankruptcy 51 ⌖2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases
    Individuals were not disqualified from serving as "foreign representatives" of company that was the subject of Mexican reorganization proceeding merely because they were designated as representatives by company's board of directors, and not officially appointed by Mexican court, especially where Mexican court had power to enjoin these individuals from acting as foreign representatives but chose not to do so and thereby gave the representatives its tacit approval. 11 U.S.C.A. § 101(24).

**[16] Statutes 361 ⌖188**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k187 Meaning of Language
        361k188 k. In general. Most Cited Cases
    Courts interpret statutes according to their plain meaning.

**[17] Bankruptcy 51 ⌖2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases
    Representatives appointed by company that was in process of reorganizing its business in concurso proceeding brought under Mexican law, as representatives of foreign debtor that retained broad control over its affairs pursuant to provisions of Mexican law, had requisite administrative power over reorganization of debtor's business, as required for them to qualify as "foreign representatives," re-

gardless of whether company possessed all the powers accorded to Chapter 11 debtor-in-possession under United States bankruptcy law. 11 U.S.C.A. § 101(24).

**[18] International Law 221 ⌖10.1**

221 International Law
  221k10.1 k. Public policy and comity in general. Most Cited Cases
    In applying principles of comity, court takes into account the interests of United States, interests of the foreign state or states involved, and mutual interests of family of nations in just and efficiently functioning rules of international law.

**[19] Bankruptcy 51 ⌖2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases
    Chapter 15 provides courts with broad, flexible rules to fashion relief appropriate for effectuating its objectives in accordance with comity.

**[20] Bankruptcy 51 ⌖2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases
    Mere fact that foreign representative requests relief that would be available under law of the foreign proceeding, but not in the United States, is not grounds for denying comity.

**[21] Bankruptcy 51 ⌖2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases
    In deciding whether to grant post-recognition

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))

**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

relief to foreign representatives of debtor that is subject of foreign main, or of foreign nonmain, proceeding pending in another country, when relief requested is not a type of relief specifically identified as being among types of "any appropriate relief" available upon recognition, bankruptcy court should first consider whether relief requested comes within scope of broad statutory phrase "any appropriate relief" by interpreting that phrase as referring to relief available under Chapter 15's predecessor, § 304; it is only if court determines that requested relief was not formerly available under § 304 and not currently provided for under United States law that it should consider whether the relief would be appropriate as "additional assistance" under separate provision of Chapter 15. 11 U.S.C.A. §§ 1507, 1521(a); 11 U.S.C.(2000 Ed.) § 304.

**[22] Bankruptcy 51 ⊂⊃2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Relief under section of Chapter 15 authorizing "additional assistance" to foreign representative if recognition is granted is of nature more extraordinary than that provided under separate section of Chapter 15 authorizing court to grant "any appropriate" post-recognition relief, including seven specifically identified categories of relief, and as result, test for obtaining "additional assistance" under this earlier section of Chapter 15 is more rigorous. 11 U.S.C.A. §§ 1507, 1521.

**[23] Bankruptcy 51 ⊂⊃2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

While section of Chapter 15 authorizing "additional assistance" to foreign representative if recognition is granted is intended to be "catchall"

provision, it cannot be used to circumvent restrictions present in other parts of Chapter 15, nor to provide relief otherwise available under other provisions. 11 U.S.C.A. § 1507.

**[24] Bankruptcy 51 ⊂⊃2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Foreign representatives, in seeking enforcement of plan of reorganization that was previously approved in concurso proceeding under Mexican law, which provided for discharge of its non-debtor subsidiaries' obligations on their guarantees of foreign debtor's indebtedness to noteholders, were not merely seeking to "stay the commencement or continuation" of "proceeding concerning the debtor's assets, rights, obligations or liabilities," or to "entrust the distribution of all or part of the debtor's assets," but were seeking to permanently enjoin lawsuits against subsidiaries and to affect their assets, so that relief was not among that specifically identified as being included in the "any appropriate relief" available to foreign representatives following recognition of Mexican proceeding. 11 U.S.C.A. § 1521(a)(1), (b).

**[25] Bankruptcy 51 ⊂⊃2341**

51 Bankruptcy
    51III The Case
        51III(H) Cases Ancillary to Foreign Proceedings
            51k2341 k. In general. Most Cited Cases

Foreign representatives, in seeking enforcement of plan of reorganization that was previously approved in concurso proceeding under Mexican law, which provided for discharge of its non-debtor subsidiaries' obligations on their guarantees of foreign debtor's indebtedness to noteholders, were not seeking relief which was previously available under predecessor law to Chapter 15, or which was currently provided for under United States law, as be-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))

**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

ing in nature of non-consensual, non-debtor release through bankruptcy; accordingly, relief was available, if at all, only under section of Chapter 15 authorizing "additional assistance" to foreign representatives. 11 U.S.C.A. §§ 1507, 1521(a).

**[26] Bankruptcy 51 ⬡2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

Even assuming that relief sought by foreign representatives of debtor that was reorganizing its business in concurso proceeding under Mexican law, being in nature of non-consensual release of subsidiaries that had not filed for bankruptcy on their guarantees of debtor's indebtedness, was available under section of Chapter 15 authorizing court to grant "any appropriate" post-recognition relief, bankruptcy court did not abuse its discretion in denying such relief, upon determination that concurso plan did not provide for appropriate balance among interests of debtor, its creditors, and its subsidiaries/guarantors. 11 U.S.C.A. §§ 1521(a), 1522.

**[27] Bankruptcy 51 ⬡2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

Unavailability of non-debtor releases in reorganization cases under United States bankruptcy law did not necessarily mean that foreign representatives of debtor that was reorganizing under Mexican law could not obtain enforcement of such releases, which were included in its concurso plan, under section of Chapter 15 authorizing "additional assistance" to foreign representative, which was intended to provide relief not otherwise available under the Bankruptcy Code or United States law. 11 U.S.C.A. § 1507.

**[28] Bankruptcy 51 ⬡2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

Bankruptcy court did not abuse its discretion in denying, as form of "additional assistance" allegedly available following recognition of reorganization proceedings that were pending in Mexico, foreign representatives' request for entry of order enforcing the concurso plan previously approved by Mexican court, which purported to release debtor's subsidiaries of any liability that they otherwise had on their guarantees of debtor's indebtedness, despite fact that subsidiaries had not themselves filed for bankruptcy, that affected creditors had not consented to plan, and that affected creditors were not given any alternative means to recover and would receive only tiny fraction of what was owed to them. 11 U.S.C.A. § 1507(b)(4).

**[29] Bankruptcy 51 ⬡2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

Chapter 15's "public policy" exception is narrow provision, that is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States. 11 U.S.C.A. § 1506.

**[30] Bankruptcy 51 ⬡2341**

51 Bankruptcy
  51III The Case
    51III(H) Cases Ancillary to Foreign Proceedings
      51k2341 k. In general. Most Cited Cases

Key determination required of court to decide whether relief under Chapter 15 is barred on "public policy" grounds is whether the procedures

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

used in foreign proceeding meet fundamental standards of fairness applicable in the United States. 11 U.S.C.A. § 1506.

**[31] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases
     In deciding whether Chapter 15's narrow "public policy" exception applies as bar to relief, bankruptcy court need not engage in independent determination on propriety of individual acts of foreign court. 11 U.S.C.A. § 1506.

**[32] Bankruptcy 51 ☞2341**

51 Bankruptcy
   51III The Case
      51III(H) Cases Ancillary to Foreign Proceedings
         51k2341 k. In general. Most Cited Cases
     Even the absence of certain procedural or constitutional rights in foreign proceeding will not itself be a bar to grant of relief in a Chapter 15 case ancillary to foreign proceeding under Chapter 15's narrow "public policy" exception. 11 U.S.C.A. § 1506.

Jeff Philipp Prostok, Forshey & Prostok, L.L.P., Fort Worth, TX, Allan S. Brilliant, Dechert, L.L.P., New York City, G. Eric Brunstad, Jr. (argued), Matthew Joseph Delude, Collin O'Connor Udell, Dechert, L.L.P., Hartford, CT, for Ad Hoc Group of Vitro Noteholders.

Andrew M. Leblanc (argued), Milbank, Tweed, Hadley & McCloy, L.L.P., Washington, DC, David Mark Bennett, Katharine Battaia Clark, Cassandra Ann Sepanik, Thompson & Knight, L.L.P., Dallas, TX, Alan J. Stone, Jeremy C. Hollembeak, Milbank, Tweed, Hadley & McCloy, L.L.P., New York City, for Vitro S.A.B. de CV.

Kevin K. Russell, Goldstein & Russell, P.C., Wash-

ington, DC, for Government of the United Mexican States, Amicus Curiae.

Jeff Philipp Prostok, Forshey & Prostok, L.L.P., Fort Worth, TX, Sanford M. Litvack, Hogan Lovells US, L.L.P., New York City, for Wilmington Trust, Nat. Ass'n.

Jason S. Brookner, Cameron Phair Pope, Andrews Kurth, L.L.P., Houston, TX, Jeanne P. Darcey, Kevin M. Colmey, Richard Hiersteiner, Amy A. Zuccarello, Sullivan & Worcester, Boston, MA, Jeff Philipp Prostok, Forshey & Prostok, L.L.P., Fort Worth, TX, for U.S. Bank Nat. Ass'n.

Lindsee P. Granfield (argued), Cleary, Gottlieb, Steen & Hamilton, L.L.P., New York City, Briana Leigh Cioni, Sander L. Esserman, Stutzman, Bromberg, Esserman & Plifka, P.C., Dallas, TX, for Fintech Investments, Limited.

Appeals from the United States Bankruptcy Court for the Northern District of Texas.

Before KING, SMITH and BARKSDALE, Circuit Judges.

KING, Circuit Judge:

   **\*1** Consolidated before us are three cases relating to the Mexican reorganization proceeding of Vitro S.A.B. de C.V., a corporation organized under the laws of Mexico. The Ad Hoc Group of Vitro Noteholders, a group of creditors holding a substantial amount of Vitro's debt, appeal from the district court's decision affirming the bankruptcy court's recognition of the Mexican reorganization proceeding and Vitro's appointed foreign representatives under Chapter 15 of the Bankruptcy Code. Vitro and one of its largest third-party creditors, Fintech Investments, Ltd., each appeals directly to this court the bankruptcy court's decision denying enforcement of the Mexican reorganization plan because the plan would extinguish the obligations of non-debtor guarantors. For the following reasons, we affirm the district court's judgment recognizing

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

the Mexican reorganization proceeding and the appointment of the foreign representatives. We also affirm the bankruptcy court's order denying enforcement of the Mexican reorganization plan.

## I. FACTUAL AND PROCEDURAL BACK-GROUND

### A. Vitro S.A.B. de C.V. and the 2008 Financial Crisis

Vitro S.A.B. de C.V. ("Vitro") is a holding company that, together with its subsidiaries, constitutes the largest glass manufacturer in Mexico. Originally incorporated in 1909, Vitro operates manufacturing facilities in seven countries, as well as distribution centers throughout the Americas and Europe, and exports its products to more than 50 countries worldwide. Vitro employs approximately 17,000 workers, the majority of whom work in Mexico. Between February 2003 and February 2007, Vitro borrowed a total of approximately $1.216 billion, predominately from United States investors. Vitro's indebtedness is evidenced by three series of unsecured notes. The first series was issued on October 22, 2003 and consisted of $225 million aggregate principal amount of 11.75% notes due 2013; the second and third series were issued on February 1, 2007, and consisted of $300 million of 8.625% notes due 2012 and $700 million of 9.125% notes due 2017 (collectively the "Old Notes").

Payment in full of the Old Notes was guaranteed by substantially all of Vitro's subsidiaries (the "Guarantors"). The guaranties provide that the obligations of the Guarantors will not be released, discharged, or otherwise affected by any settlement or release as a result of any insolvency, reorganization, or bankruptcy proceeding affecting Vitro. The guaranties further provide that they are to be governed and construed under New York law and include the Guarantors' consent to litigate any disputes in New York state courts. The guaranties state that "any rights and privileges that [Guarantors] might otherwise have under the laws of Mexico shall not be applicable to th[e] Guarant[ies]."

**\*2** In the latter half of 2008, Vitro's fortunes took a turn for the worse when the global financial crisis significantly reduced demand for its products. Vitro's operating income declined by 36.8% from 2007 to 2008, and an additional 22.3% from 2008 to 2009. In February of 2009, Vitro announced its intention to restructure its debt and stopped making scheduled interest payments on the Old Notes.

### B. Vitro Restructures Its Obligations

After Vitro stopped making payments on the Old Notes, it entered into a series of transactions restructuring its debt obligations. On December 15, 2009, Vitro entered into a sale leaseback transaction with Fintech Investments Ltd. ("Fintech"), one of its largest third-party creditors, holding approximately $600 million in claims (including $400 million in Old Notes). Under the terms of this agreement, Fintech paid $75 million in exchange for the creation, in its favor, of a Mexican trust composed of real estate contributed by Vitro's subsidiaries. This real estate was then leased to one of Vitro's subsidiaries to continue normal operations. The agreement also gave Fintech the right to acquire 24% of Vitro's outstanding capital or shares of a sub-holding company owned by Vitro in exchange for transferring Fintech's interest in the trust back to Vitro or its subsidiaries.

Partly as a result of these transactions, Vitro generated a large quantity of intercompany debt. Previously, certain of Vitro's operating subsidiaries directly and indirectly owed Vitro an aggregate of approximately $1.2 billion in intercompany debt. As a result of a series of financial transactions in December of 2009, that debt was wiped out and, in a reversal of roles, Vitro's subsidiaries became creditors to which Vitro owed an aggregate of approximately $1.5 billion in intercompany debt. Despite requests by holders of Old Notes, Vitro did not disclose these transactions. In August of 2010, Fintech purchased claims by five banks holding claims against Vitro and its subsidiaries and extended the maturity of various promissory notes issued by Vitro's subsidiaries. Pursuant to a "Lock-up

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

Agreement" completed between Fintech and Vitro, Fintech also agreed not to transfer any debt it held in Vitro unless such transfer was in line with the terms of that agreement.

Only in October of 2010, approximately 300 days after completing the transactions with its subsidiaries, did Vitro disclose the existence of the subsidiary creditors. This took the transactions outside Mexico's 270–day "suspicion period," during which such transactions would be subject to additional scrutiny before a business enters bankruptcy.

## C. Vitro Commences a *Concurso* Proceeding in Mexican Court

**\*3** Between August 2009 and July 2010, Vitro engaged in negotiations with its creditors and submitted three proposals for reorganization. Each was rejected by creditors. After the last proposal, the Ad Hoc Group of Vitro Noteholders (the "Noteholders"), a group of creditors holding approximately 60% of the Old Notes, issued a press release "strongly recommend[ing]" that all holders of the Old Notes deny consent to any reorganization plan that the Noteholders had not approved. On November 1, 2010, Vitro disclosed its intention to commence a voluntary reorganization proceeding in Mexico, together with a pre-packaged plan of reorganization. On December 13, 2010, Vitro initiated in a Mexican court a *concurso* proceeding under the Mexican Business Reorganization Act, or *Ley de Concursos Mercantiles* ("LCM").[FN1]

The Mexican court initially rejected Vitro's filing on January 7, 2011, because Vitro could not reach the 40% creditor approval threshold necessary to file a *concurso* petition without relying on intercompany claims held by its subsidiaries. On April 8, 2011, that decision was overruled on appeal and Vitro was then declared to be in bankruptcy, or *concurso mercantil.* Pursuant to Mexican law, Javier Luis Navarro Velasco was appointed as *conciliador.*[FN2]

The *conciliador* was tasked with filing an initial list of recognized claims and mediating the cre-

ation of a reorganization plan. The *conciliador* did so, and on August 5, 2011, filed a proposed final list of recognized creditors, which included those subsidiaries holding intercompany debt. The *conciliador* then negotiated terms of a reorganization plan between Vitro and the recognized creditors to submit to the Mexican court for approval. Throughout this process, the parties were apparently in frequent contact with the Mexican court on an ex parte basis.

## 1. Terms of the *Concurso* Plan

On December 5, 2011 the *conciliador* submitted to the Mexican court a proposed restructuring plan (the "*Concurso* plan" or "Plan") substantially identical to the one Vitro had originally proposed. Under the terms of the Plan, the Old Notes would be extinguished and the obligations owed by the Guarantors would be discharged. Specifically, the Plan provides that:

> [O]nce this Agreement is approved by the Court ... this Agreement ... will substitute, pay, replace and terminate the above obligations, instruments, securities, agreements and warranties in which were agreed upon Approved Credits and, therefore ... will terminate personal guarantees granted a third and/or direct and indirect subsidiaries [sic] of Vitro with regards to the obligations, instruments, securities and agreements that gave rise to the Approved Credits.

The Plan further provides that Vitro would issue new notes payable in 2019 (the "New 2019 Notes"), with a total principal amount of $814,650,000. The New 2019 Notes would be issued to Vitro's third-party creditors (not including those subsidiaries holding intercompany debt, who would forgo their *pro rata* share of the Plan's consideration and instead receive other promissory notes). The New 2019 Notes would bear a fixed annual interest rate of 8.0%, but would "not have ... payments of principal during the first 4 (years) years [sic] ... and from the fifth year of operation and until the seventh year ... will have repayments or payments of [a] total principal amount of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))

$23,960,000.00 USD ... payable semiannually on June 30 and December 31 of each year and the remaining balance upon due date." The New 2019 Notes would also "be unconditionally and supportively guaranteed for each of the Guarantors." Payment under the New 2019 Notes would go into a third-party payment trust, which would deliver payment to those creditors who had consented to the Plan. A second trust would be created to pay non-consenting creditors upon their written agreement to the terms of the Plan. In addition to the New 2019 Notes, Vitro would also provide to the holders of the Old Notes $95,840,000 aggregate principal amount of new mandatory convertible debt obligations ("MCDs") due in 2015 with an interest rate of 12%, convertible into 20% equity in Vitro if not paid at full maturity. Finally, the Plan also provided cash consideration of approximately $50 per $1000 of principal of Old Notes.

## 2. The *Concurso* Plan is Approved

**\*4** Under Mexican law, approval of a reorganization plan requires votes by creditors holding at least 50% in aggregate principal amount of unsecured debt. As distinguished from United States law, Mexico does not divide unsecured creditors into interest-aligned classes, but instead counts the votes of all unsecured creditors, including insiders, as a single class. As a result, although creditors holding 74.67% in aggregate principal amount of recognized claims voted in favor of the plan, over 50% of all voting claims were held by Vitro's subsidiaries in the form of intercompany debt. The 50% approval threshold could not have been met without the subsidiaries' votes. After the initial approval, the LCM provides a period during which objecting creditors can veto the plan. A veto requires agreement by recognized creditors holding a minimum of 50% in aggregate principal amount of debt or by recognized creditors numbering at least 50% of all unsecured creditors. As only 26 of the 886 recognized creditors sought to veto the *Concurso* plan, and as those creditors held less than 50% of the aggregate recognized debt, the veto failed.[FN3]

The Mexican court approved the *Concurso* plan on February 3, 2012. On February 23, 2012, the Plan went into effect, and Vitro issued New 2019 Notes and MCDs and paid restructuring cash into two third-party payment trusts, one for consenting creditors and the other for non-consenting creditors. The *Concurso* plan approval order has been appealed, and such appeal has been accepted by, and is currently pending in, the Mexican judicial appellate system; no stay of effectiveness of the *Concurso* plan was entered.[FN4]

## D. Objecting Creditors Resist Enforcement

**\*5** While objecting to the *concurso* proceeding in Mexico, creditors dissatisfied with Vitro's reorganization efforts attempted to collect on the Old Notes and guaranties in a variety of ways. By April 2010, Vitro had received acceleration notices for all the Old Notes. On November 17, 2010, involuntary Chapter 11 petitions were filed against fifteen Guarantors domiciled in the United States.[FN5] Various holders of Old Notes also commenced two substantially identical lawsuits in New York state court against Vitro and 49 Guarantors, resulting in orders of attachment with respect to any property located in New York.

Parallel to the *concurso* proceeding, in August 2011, Wilmington Trust, National Association ("Wilmington"), the indenture trustee for the Old Notes due in 2012 and 2017, filed suit in New York state court against various of the Guarantors, seeking a declaratory judgment confirming the Guarantors' obligations under the related indentures. The state court granted partial summary judgment in Wilmington's favor on December 5, 2011. The court held that New York law applied to the dispute and that under the unambiguous terms of the relevant Old Notes, "any non-consensual release, discharge or modification of the obligations of the Guarantors ... is prohibited." *Wilmington Trust v. Vitro Automotriz, S.A. De C.V.,* 33 Misc.3d 1231, 943 N.Y.S.2d 795 (table), 2011 WL 6141025, at \*6 (N.Y.Sup.Ct. Dec. 5, 2011). The court went on to find, however, that "whether such prohibitive pro-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

visions may be modified or eliminated by applicable Mexican laws is not at issue here." *Id.* at *5. FN6 A separate suit brought by U.S. Bank National Association ("U.S. Bank"), the indenture trustee for the Old Notes due in 2013, achieved the same outcome.

### E. Vitro Commences a Chapter 15 Proceeding in the United States

On October 29, 2010, Vitro's Board of Directors appointed Alejandro Sanchez–Mujica to act as Vitro's foreign representative. On April 14, 2011, Sanchez–Mujica commenced a Chapter 15 proceeding in United States bankruptcy court by filing a petition for recognition of the Mexican *concurso* proceeding. FN7 The petition was originally filed in the United States Bankruptcy Court for the Southern District of New York, but, on May 13, 2011, by motion of objecting creditors, venue was transferred to the United States Bankruptcy Court for the Northern District of Texas. Because Sanchez–Mujica could not leave Mexico—a result of certain travel restrictions imposed by the Mexican court because of his role in Vitro's restructuring—Vitro filed a supplemental petition to recognize Javier Arechavaleta–Santos, another appointee of Vitro's Board of Directors, as "co-foreign representative." FN8 The bankruptcy court, over objections, held that the Mexican reorganization proceeding was a "foreign main proceeding" and approved the petition confirming Sanchez–Mujica and Arechavaleta–Santos as foreign representatives pursuant to 11 U.S.C. § 1515 and § 1517. FN9 The United States District Court for the Northern District of Texas affirmed the bankruptcy court's order. *In re Vitro, S.A.B. de C.V.,* 470 B.R. 408 (N.D.Tex.2012) (*Vitro I* ). That decision has been appealed, Case No. 12–10542, and is one of the cases consolidated in this appeal.

On March 2, 2012, Vitro's foreign representatives filed a motion in bankruptcy court entitled "Motion of Foreign Representatives of Vitro S.A.B. de C.V. for an Order Pursuant to 11 U.S.C. §§ 105(a), 1507 and 1521 to (I) Enforce the Mexican

Plan of Reorganization of Vitro S.A.B. de C.V., (II) Grant a Permanent Injunction, and (III) Grant Related Relief" (the "Enforcement Motion"). The Noteholders, Wilmington, and U.S. Bank (collectively, the "Objecting Creditors") objected, and the matter proceeded to trial on June 4, 2012. Following a four-day trial, in which hundreds of exhibits were presented and several witnesses testified, the bankruptcy court denied the Enforcement Motion. *In re Vitro, S.A.B. de C.V.,* 473 B.R. 117 (Bankr.N.D.Tex.2012) (*Vitro II* ). As part of that ruling, the court also denied Vitro's motion to enjoin the Objecting Creditors from initiating litigation against the Guarantors. FN10 To permit Vitro time to appeal, the bankruptcy court did, however, extend a previously issued temporary restraining order. Vitro and Fintech have appealed the bankruptcy court's decision, which has been certified for direct appeal, and Case Nos. 12–10689 (Vitro's appeal) and 12–10750 (Fintech's appeal) were subsequently consolidated with the other case before us. FN11 Vitro subsequently sought, and was granted on June 28, 2012, an order by this court staying the expiration of the bankruptcy court's temporary restraining order.

### II. STANDARD OF REVIEW

**\*6** [1][2][3][4] We review a district court's affirmance of a bankruptcy court's decision by applying the same standard of review that the district court applied. *In re Martinez,* 564 F.3d 719, 725–26 (5th Cir.2009). Accordingly, questions of fact are reviewed for clear error and conclusions of law are reviewed de novo. *Id.* at 726. Mixed questions of law and fact are reviewed de novo. *In re McLain,* 516 F.3d 301, 307 (5th Cir.2008). We review a bankruptcy court's decision on direct appeal under the same standards. By contrast, "[w]e review a denial of declaratory or injunctive relief for abuse of discretion." *In re Schimmelpenninck,* 183 F.3d 347, 353 (5th Cir.1999). A court's decision to grant comity is also reviewed for abuse of discretion. *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV,* 347 F.3d 589, 593 (5th Cir.2003) (applying abuse of discretion standard to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

review district court's grant of comity to Mexican bankruptcy court's ex parte order); *see also In re Qimonda AG Bankr. Litig.,* 433 B.R. 547, 556 (E.D.Va.2010).

### III. CHAPTER 15

The dispute before us arises under Chapter 15 of the Bankruptcy Code and broadly involves two issues: recognition of the foreign representatives and enforcement of the *Concurso* plan. As to the first, on April 14, 2011, Sanchez–Mujica and Arechavaleta–Santos, as co-foreign representatives, filed a petition seeking recognition of the *concurso* proceeding under Chapter 15. The Noteholders objected that Sanchez–Mujica and Arechavaleta–Santos were not properly appointed as foreign representatives because they were not appointed by the Mexican court and because Vitro did not have the powers of a debtor in possession. The bankruptcy court granted recognition of the *concurso* proceeding as a foreign main proceeding under 11 U.S.C. § 1517. On appeal, the district court affirmed, holding that it was sufficient that Sanchez–Mujica and Arechavaleta–Santos were authorized as co-foreign representatives in the context of a foreign bankruptcy proceeding and that Vitro retained sufficient control over its business to be a debtor in possession. The Noteholders appeal, raising substantially the same arguments before us that they raised in the lower courts.

Because recognition of a proceeding under Chapter 15 is a precondition for the more substantive relief Vitro seeks in the Enforcement Motion, we will resolve the recognition issue first. We hold that the bankruptcy court and the district court correctly interpreted Chapter 15 as not requiring official court appointment. We further find that the term "foreign representatives" was intended to include debtors in possession, including those that may not meet Chapter 11's definition of debtors in possession, and that Vitro retained enough authority over its affairs to be a debtor in possession and could thus appoint Sanchez–Mujica and Arechavaleta–Santos as foreign representatives. Ac-

cordingly, we affirm the district court's ruling affirming the bankruptcy court's order.

**\*7** We then address the Enforcement Motion. On March 2, 2012, Vitro's co-foreign representatives filed a motion seeking "to 1) give full force and effect in the United States to the *Concurso* Approval Order, 2) grant a permanent injunction prohibiting certain actions in the United States against Vitro SAB, as well as its non-debtor subsidiaries, and 3) grant certain related relief." *Vitro II,* 473 B.R. at 120–21 (quotation marks omitted). The bankruptcy court denied relief under 11 U.S.C. §§ 1507, 1521, and 1506 because approval of the Plan would extinguish claims held by the Objecting Creditors against the subsidiaries. *Id.* at 131. Vitro and Fintech appeal this decision solely on the issue of whether the bankruptcy court erred as a matter of law in refusing to enforce the *Concurso* plan because the Plan novated guaranty obligations of non-debtor parties. While the relief available under Chapter 15 may, in exceptional circumstances, include enforcing a foreign court's order extinguishing the obligations of non-debtor guarantors, Vitro has failed to demonstrate that comparable circumstances were present here. Because Vitro has not done so, we affirm the bankruptcy court's decision denying the Enforcement Motion.

### A. Chapter 15 of the United States Bankruptcy Code

This case concerns a foreign bankruptcy proceeding for which recognition and enforcement are sought under Chapter 15 of the United States Bankruptcy Code. Chapter 15 was enacted in 2005 to implement the Model Law on Cross–Border Insolvency ("Model Law") formulated by the United Nations Commission on International Trade Law ("UNCITRAL"), and replaced former 11 U.S.C. § 304.[FN12] *See In re Ran,* 607 F.3d at 1020; *In re Iida,* 377 B.R. 243, 256 (B.A.P. 9th Cir.2007).[FN13] It was intended "to provide effective mechanisms for dealing with cases of cross-border insolvency," 11 U.S.C. § 1501(a), as well as to be "the exclusive door to ancillary assistance to foreign proceedings,"

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

thus "concentrat[ing] control of these questions in one court." H.R.Rep. No. 109–31, pt. 1, at 110 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 178. It was also intended to increase legal certainty, promote fairness and efficiency, protect and maximize value, and facilitate the rescue of financially troubled businesses. 11 U.S.C. § 1501(a).

[5][6][7] Central to Chapter 15 is comity. Comity is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protections of its laws." *Hilton v. Guyot,* 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). "It is not a rule of law, but one of practice, convenience, and expediency." *Overseas Inns S.A. P.A. v. United States,* 911 F.2d 1146, 1148 (5th Cir.1990) (quotation marks and citation omitted). Within the context of Chapter 15, however, it is raised to a principal objective. Section 1501(a) begins by listing, as one of Chapter 15's goals, the furtherance of cooperation between domestic and foreign courts in cross-border insolvency cases. Section 1508 goes on to provide that Chapter 15's provisions shall be interpreted by considering "its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. Comity considerations are explicitly included in the introduction to § 1507, and § 1509(b)(3) further provides that our courts "shall grant comity or cooperation to the foreign representative" of a foreign proceeding.

**\*8** Such a foreign representative must first petition a United States bankruptcy court for recognition of a foreign proceeding. 11 U.S.C. §§ 1504, 1515. Chapter 15 defines such a foreign proceeding as:

[A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets

and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

Only after a United States court recognizes a proceeding can "the foreign representative ... apply directly to a court in the United States for appropriate relief in that court." 11 U.S.C. § 1509(b)(2); *see also United States v. J.A. Jones Constr. Grp., LLC,* 333 B.R. 637, 638 (E.D.N.Y.2005).

[8] Chapter 15 provides for a broad range of relief. This includes the ability to sue and be sued in United States courts, to apply directly to a United States court for relief, to commence a non-Chapter 15 case, and to intervene in any United States case to which the debtor is a party. *In re Condor Ins. Ltd.,* 601 F.3d 319, 324 (5th Cir.2010). Section 1520 also provides for certain automatic relief upon recognition of a foreign main proceeding, like the one here, including an automatic stay and the power to prevent transfers of the debtor's property. A bankruptcy court is also empowered under § 1521(a) to "grant any appropriate relief" necessary to "effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors." Finally, § 1507(a) gives a court authority to provide "additional assistance," subject to certain restrictions imposed by Chapter 15 and § 1507(b).

[9][10] In considering whether to grant relief, it is not necessary that the result achieved in the foreign bankruptcy proceeding be identical to that which would be had in the United States. It is sufficient if the result is "comparable." *In re Schimmelpenninck,* 183 F.3d at 364; *Overseas Inns,* 911 F.2d at 1149; *see also In re Sivec SRL,* 476 B.R. 310, 324 (Bankr.E.D.Okla.2012) ("The fact that priority rules and treatment of claims may not be identical is insufficient to deny a request for comity."); *In re Qimonda AG,* 462 B.R. 165, 184 n. 17 (Bankr.E.D.Va.2011); *In re Petition of Garcia Avila,* 296 B.R. 95, 112 (Bankr.S.D.N.Y.2003).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

"[T]he foreign laws need not be identical to their counterparts under the laws of the United States; they merely must not be repugnant to our laws and policies." *In re Schimmelpennick,* 183 F.3d at 365.

**\*9** [11] But as discussed, whether any relief under Chapter 15 will be granted is a separate question from whether a foreign proceeding will be recognized by a United States bankruptcy court. The consolidated cases before us arise from decisions addressing each of these issues. We first turn to whether Vitro's co-foreign representatives were properly recognized.

**B. Recognition of Foreign Representatives**

[12][13] After initiation of a foreign bankruptcy proceeding, a "foreign representative" may petition a United States court to recognize the proceeding under Chapter 15. Chapter 15 defines a "foreign representative" as "a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). "A federal court's recognition of representatives appointed in the course of a foreign bankruptcy or liquidation proceeding is a matter of comity—it is an acknowledgment of the validity of the foreign proceeding." *Reserve Int'l Liquidity Fund, Ltd. v. Caxton Int'l Ltd.,* No. 09 Civ. 9021(PGG), 2010 WL 1779282, at \*5 (S.D.N.Y. Apr. 29, 2010) (citing *Finanz AG Zurich v. Banco Economico S.A.,* 192 F.3d 240, 246 (2d Cir.1999)). A duly recognized foreign representative has the capacity to sue and be sued in the United States and to apply directly to a United States court for relief, and a foreign representative is entitled to the comity and cooperation of all United States courts. 11 U.S.C. § 1509.

Three requirements, contained in § 1517, must be met before a foreign proceeding will be recognized:

(a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceed-

ing shall be entered if—

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

**\*10** (3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517.

Section 1515, in turn, provides the following procedural requirements:

(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b) A petition for recognition shall be accompanied by—

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

English. The court may require a translation into English of additional documents.

11 U.S.C. § 1515.

[14] These requirements are to be strictly construed in line with our holding that the requisite analysis is not a "rubber stamp exercise," and that "[e]ven in the absence of an objection, courts must undertake their own jurisdictional analysis and grant or deny recognition under Chapter 15 as the facts of each case warrant." *In re Ran,* 607 F.3d at 1021.

Neither Sanchez–Mujica nor Arechavaleta–Santos, the recognized foreign representatives in this case, was appointed by a foreign court or tribunal. Both were voted into their positions by Vitro's Board of Directors. The bankruptcy court recognized the *concurso* proceeding under Chapter 15 and the district court affirmed, holding that whether a given individual could act as a foreign representative was a matter of United States law, and that it was unnecessary for a foreign representative to be appointed by a court. The court's holding rested on its analysis of § 101(24)'s language and cases applying that subsection, which showed that it was sufficient for a foreign representative to be authorized in the context of a foreign bankruptcy proceeding. *Vitro I,* 470 B.R. at 411–13. The district court further determined that Vitro was the Mexican equivalent of a "debtor in possession," able to administer its own reorganization, and was thus able to appoint a foreign representative under Chapter 15. *Id.* at 412.[FN14]

On appeal, the Noteholders argue that the individuals appointed here do not satisfy Chapter 15's definition of "foreign representatives" for two reasons. First, neither was "authorized in a foreign proceeding," because neither was appointed by a foreign court or administrative tribunal. 11 U.S.C. § 101(24). In support, the Noteholders rely on § 101(23)'s definition of "foreign proceeding," as well as 11 U.S.C. §§ 1515(a), 1515(b)(1)-(2), and 1509(b)(2). Second, the Noteholders argue that

even if Chapter 15 did not require such an appointment, the foreign representatives still did not qualify for their positions because they did not have the authority "to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

Vitro responds that the plain language of § 101(24) does not require court appointment and that this conclusion is support by both Chapter 15's legislative history and UNCITRAL's Model Law. Vitro further argues that § 101(24) was intended to apply to a "debtor in possession," like Vitro, and thus it had the power to appoint individuals as foreign representatives of the *concurso* proceeding.

**\*11** Because the district court correctly interpreted § 101(24), defining foreign representatives as having been appointed in the context of a foreign proceeding, and because Vitro, as a debtor in possession, met the requirements of that subsection, we affirm the district court's decision. We address each of these points in turn.

**1. Authorized in a Foreign Proceeding**

[15] The Noteholders point to numerous parts of Chapter 15 that allegedly show that a foreign court must explicitly authorize individuals or bodies to act as representatives. Contrary to the Noteholders' interpretation, we do not find that any of Chapter 15's provisions requires action by a foreign tribunal.

[16] We interpret statutes according to their plain meaning. *Gaddis v. United States,* 381 F.3d 444, 472 (5th Cir.2004). Section 101(24)—defining the term "foreign representative"—is wholly devoid of any statement that a foreign representative must be judicially appointed. The definition's requirement that a representative be "authorized in a foreign proceeding" is certainly compatible with appointment by a foreign court, but it is hardly necessary. As the district court observed, it would be equally compatible with a requirement that an individual be appointed "in the context of" a foreign

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

proceeding. *Vitro I,* 470 B.R. at 411. It could also mean during, or in the course of, a foreign proceeding.

The other provisions the Noteholders identify suffer from the same defect. Section 1515(a) provides that "[a] foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed" and requires that a petition for recognition be accompanied by, either, 1) "a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative," 2) "a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative," or 3) other evidence "of such foreign proceeding and of the appointment of the foreign representative." 11 U.S.C. § 1515. None of these provisions states who has the official authority to appoint a foreign representative. At best, they provide the context in which a foreign representative should be appointed. By comparison, § 1509(b)(2) states that if a court grants recognition to a foreign proceeding, it shall grant "comity or cooperation" to the foreign representative. Although use of the word "comity" connotes recognition of another judicial proceeding, the word "cooperation" suggests a much broader meaning.

Caselaw supports our interpretation. To be sure, foreign representatives have been appointed by foreign tribunals in many cases. One such case was *In re Grand Prix Associates, Inc.,* where the court specifically held that § 1517(a) was satisfied where the purported foreign representative was able to present an order by the foreign court appointing it as the foreign representative of the business entities in question. No. 09–16545(DHS), 2009 WL 1410519, at *5 (Bankr.D.N.J. May 18, 2009); *see also In re Innua Canada Ltd.,* No. 09–16362(DHS), 2009 WL 1025090, at *4–5 (Bankr.D.N.J. Apr. 15, 2009) (receivership order entered by Canadian court stated foreign representative had capacity to commence Chapter 15 proceeding); *In re Oversight,* 385 B.R. at 534 (Spanish insolvency court

had power to appoint foreign representative for Chapter 15 purposes); *In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 46 n. 30 (Bankr.S.D.N.Y.2008); *In re Tri–Cont'l Exch. Ltd.,* 349 B.R. 627, 632 (Bankr.E.D.Cal.2006). But the district court identified numerous cases cited by the bankruptcy court that, although not binding, demonstrate that recognition is routinely granted to petitioners appointed by Mexican debtors to serve as foreign representatives. *Vitro I,* 470 B.R. at 412 (listing cases). FN15

**\*12** The Mexican court's actions make it equally apparent that Sanchez–Mujica and Arechavaleta–Santos were properly appointed. It is undisputed that the Mexican court had the power to enjoin Sanchez–Mujica and Arechavaleta–Santos from acting as foreign representatives. Yet, when presented with a motion requesting such an order, the Mexican court denied it in full. The Mexican court also refused to declare the *conciliador* to be the only person authorized to act as foreign representative. In deciding not to enjoin the foreign representatives' conduct, the Mexican court gave the representatives its tacit approval. FN16

Finally, our decision is informed by consideration of the Model Law, and reports by the UNCITRAL Working Group on Insolvency Law ("Working Group"). 11 U.S.C. § 1501(a) (purpose of Chapter 15 is to incorporate the Model Law); *see also In re Tri–Cont'l Exch. Ltd.,* 349 B.R. at 633 (treating as persuasive authority the Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency); *In re Condor,* 601 F.3d at 326–27 & nn. 37–40 (discussing and citing Working Group).

The definition of foreign representatives in § 101(24) closely follows the language of Model Law Article 2(d). FN17 In drafting this definition, the Working Group expressly rejected the requirement that a foreign representative be "[specifically] authorized by statute or other order of court (administrative body) to act in connection with a foreign proceeding." UNCITRAL Rep. of the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Working Group on Insolvency Law on the Work of the Eighteenth Session, ¶ 111, U.N. Doc. A/CN.9/419 (Dec. 1, 1995), *available at* http://www.uncitral.org/uncitral/en/commission/working_groups/5Insolvency.html (Dec. 1995 Rep.) (alteration in original). That definition was rejected because of concerns that "the expressions would be unfamiliar and might have the unintended effect of being unduly restrictive, since the list would inevitably be incomplete." *Id.* ¶ 112. The Working Group also declined to include the word "specifically" because "it would be unusual for a State to appoint an insolvency representative specifically to act abroad." *Id.* ¶ 113. This supports our conclusion that the Noteholders' proposed interpretation—which would require exactly such an appointment—is wrong. FN18

Accordingly, we conclude that Sanchez–Mujica and Arechavaleta–Santos are not disqualified from serving as foreign representatives merely because they were not the subject of an official court-appointment.

**2. Power to Administer the Reorganization or Liquidation of a Debtor's Assets or Affairs**

**\*13** [17] Having determined that Chapter 15 does not require a foreign representative to be appointed by court order, we still must address whether Sanchez–Mujica's and Arechavaleta–Santos' appointments comport with the remainder of § 101(24). In particular, § 101(24) requires that a foreign representative have the authority "to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24). Vitro does not argue that Sanchez–Mujica and Arechavaleta–Santos have the authority to represent the *concurso* proceeding, and we therefore do not address that prong of § 101(24). FN19 The only remaining question is whether they had administrative power over the reorganization of Vitro's business.

The district court held that Vitro could appoint its own foreign representatives because, under Mexican law, a debtor continues to manage its business during a *concurso* proceeding, making it akin to a "debtor in possession." *Vitro I*, 470 B.R. at 412. FN20 The Working Group clearly intended to include foreign representatives of proceedings in which a debtor in possession remains in control of its assets. Dec. 1995 Rep. ¶ 115. The National Bankruptcy Review Commission, created by Congress in 1994 to make recommendations on improving bankruptcy law and procedure, in its review of the Model Law, reached the same conclusion. Nat'l Bankr.Rev. Comm'n, *Bankruptcy: The Next Twenty Years, Nat'l Bankr. Rev. Comm'n Final Rep.*, (1997), *available at* http://govinfo.library.unt.edu/nbrc/reportcont.html (Nat'l Bankr. Comm'n).

The Noteholders, however, challenge whether Vitro can be classified as a debtor in possession, and argue that such power is reserved for the *conciliador* in a *concurso* proceeding. The Noteholders also point out that under Chapter 11, a debtor in possession has the rights, powers, and duties of a Chapter 11 trustee, which include the right to negotiate, file, and seek confirmation of a plan of reorganization, and that Vitro lacked this authority. FN21

The Noteholders' argument fails for relying exclusively on Chapter 11's definition of a debtor in possession. The Working Group's decision to include debtors in possession was not made on the basis of how United States law defined the term. Rather, the Working Group understood debtors in possession to include those cases "in which the debtor remained in control of its assets and could technically be regarded as exercising administration type of functions, although under the supervision of a judicial or administrative authority." Dec. 1995 Rep. ¶ 115. The UNCITRAL Practice Guide on Cross–Border Insolvency Cooperation similarly defines debtor in possession to mean "a debtor in reorganization proceedings, which retains full control over the business, with the consequence that the court does not appoint an insolvency represent-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ative." UNCITRAL, Practice Guide on Cross–Border Insolvency Cooperation 5 (July 1, 2009), *available at* http:// www.uncitral.org/pdf/english/texts/insolven/Practice_Guide_Ebook_eng.pdf. At least one court has understood foreign representatives to include debtors in possession, including those in "debtor-in-possession reorganization proceedings in Latin American countries." *In re Cenargo Int'l, PLC,* 294 B.R. 571, 598 n. 31 (Bankr.S.D.N.Y.2003) (internal quotation marks and citation omitted). We likewise hold that under Chapter 15 the correct analogy is not to whether a debtor meets Chapter 11's definition of a "debtor in possession," but whether it meets that definition originally envisioned by the drafters of the Model Law and incorporated into § 101(24). *See* 11 U.S.C. § 1508 (Chapter 15 to be interpreted by consideration of its international origin, and consistent with application of similar foreign statutes); Nat'l Bankr. Comm'n, *supra,* at 357 (definitions in Model Law are "carefully constructed to include the United States Chapter 11 proceeding (and similar debtor in possession reorganization proceedings in Latin America and elsewhere)").

Here, there is little doubt that Vitro met that definition. Vitro has presented extensive evidence that it retained broad control over its affairs, pursuant to various provisions of the LCM. *See* Ley de Concursos Mercantiles [LCM] [Bankruptcy Law], Diario Oficial de la Federación [DO], *as amended,* 12 de mayo de 2000, art. 74 (debtor will be entrusted with enterprise's management throughout conciliation stage unless court grants *conciliador's* request to remove debtor to protect the estate); *Id.* art. 84 (debtor retains ability to litigate pending claims under *conciliador's* supervision). Commentary on the LCM agrees that a board of directors generally remains in control and possession of its business during a *concurso* proceeding. *See* Jonathan Graham–Canedo, *Comparative Analysis of Bankruptcy Legal Provisions from Mexico and the United States: Which Legal System is More Attractive?,* 6 DePaul Bus. & Com. L.J. 19, 27 (Fall 2007).

**\*14** We further observe that if Vitro were not permitted to proceed as a debtor in possession, with the power to appoint foreign representatives, it is unclear who would. Any other potential candidate would be susceptible to the same attacks raised by the Noteholders. For example, in a *concurso* proceeding the *conciliador* acts as mediator between the debtor and creditors. A *visitador* only inspects the debtor's accounting books and records and determines whether the debtor meets the LCM's liquidity standard. The *sindico* is a receiver charged with liquidating the business and selling its assets if a plan is not reached within a specific period of time. None of these individuals possesses the full authority the Noteholders argue is required under § 101(24).

Accordingly, we conclude that Vitro had the powers of a debtor in possession for purposes of § 101(24) and affirm the district court's decision affirming the bankruptcy court's order that Sanchez–Mujica and Arechavaleta–Santos are properly appointed foreign representatives under Chapter 15.

**C. Enforcement of the Plan**

**1. Vitro's Request for Relief**

In the Enforcement Motion, Vitro sought broad relief pursuant to 11 U.S.C. §§ 105(a), 1507, and 1521. Specifically, Vitro sought an order giving full force and effect in the United States to the Mexican court's order approving the *Concurso* plan. Vitro further sought a permanent injunction prohibiting certain actions in the United States against itself and its non-debtor subsidiaries, specifically:

[A] permanent injunction enjoining all persons from initiating or continuing any suit, action, extra-judicial proceeding or other proceeding (including [already commenced actions in New York state court] ) or any enforcement or collection process (including pursuant to any judgment, notices of attachment or [levies, restraining notices, or similar documentation] ) in any jurisdiction within the United States or its territories ...

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

against Vitro SAB and/or the Old Guarantors ... or their Property ... except as permitted under the *Concurso* Plan or the *Concurso* Approval Order ....

If Vitro were to succeed in obtaining all the relief that it requested, actions, executions, attachments, or other collection or enforcement processes currently pending against Vitro or its subsidiaries would be "permanently stayed, suspended, discharged, and dismissed." Judgments already rendered against it or its subsidiaries would be declared "null and void and of no further force or effect." Moreover, any entity having withheld payment to Vitro or its subsidiaries as a result of Vitro's default would immediately remit such payments to the applicable party. Finally, Vitro and its subsidiaries would be released from all liabilities with respect to any claims discharged under the *Concurso* plan. Of course, the bankruptcy court could grant some, but not all, of the relief requested.

**\*15** The bankruptcy court held that the *Concurso* plan "which extinguishes the guarantee claims of the Objecting Creditors that were given under an indenture issued in the United States against non-debtor entities that are subsidiaries of Vitro, should not be accorded comity to the extent it provides for the extinguishment of the non-debtor guarantees of the indentures." *Vitro II*, 473 B.R. at 132. The bankruptcy court specifically denied enforcement under §§ 1507, 1521, and 1506. It denied relief under § 1507 because the Mexican court's approval order did "not provide for the distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by Title 11 [of the Bankruptcy Code]." *Id.* "The *Concurso* plan provides drastically different treatment in that the noteholders receive a fraction of the amounts owed under the indentures from Vitro SAB and their rights against the other obligors are cut off." *Id.* Relief under § 1521 was inappropriate because the Mexican court's approval order "neither sufficiently protects the interests of creditors in the United

States, nor does it provide an appropriate balance between the interests of creditors and Vitro SAB and its non-debtor subsidiaries." *Id.* Finally, the relief sought would not be allowed under Chapter 15 because "the protection of third party claims in a bankruptcy case is a fundamental policy of the United States" and "the *Concurso* plan does not recognize and protect such rights." *Id.*

The circumstances under which the Plan was approved and the treatment creditors received raise many questions that are not before us about whether such a plan could be enforced under Chapter 15. The bankruptcy court explicitly dealt with some of these questions, while flagging others for our consideration without itself reaching them. Thus, for example, the bankruptcy court considered whether, as alleged by the Objecting Creditors, the Mexican judicial system and the *concurso* proceeding were corrupt, and should not be granted comity for this reason. Addressing the Objecting Creditors' expert—Dr. Stephen D. Morris—who testified to a series of "suspicious circumstances" and "red flags" in the *concurso* proceeding, the bankruptcy court held that, although the witness was knowledgeable and qualified to speak on corruption in Mexico generally, his analysis of what impact such corruption had on this proceeding was unpersuasive. The bankruptcy court therefore concluded that it "ha[d] not seen evidence that the Mexican Proceeding [was] the product of corruption, or that the LCM itself is a corrupt process," and rejected the Objecting Creditors' argument. *Id.* at 130. The bankruptcy court reached a similar conclusion as to whether, as argued by the Objecting Creditors, enforcement would have an adverse impact on credit markets. The court ultimately concluded that, while testimony by Dr. Elaine Buckberg, a former economist at the International Monetary Fund, was credible, her testimony did not quantify the negative effects of enforcing the Plan, and thus the court could not conclude that enforcement would adversely affect credit markets. *Id.* The bankruptcy court also considered, but rejected, the argument that relief should not be granted because the Mexic-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

an proceeding was "unfair." *Id.* at 130–31. The bankruptcy court observed that although there had been ex parte meetings, such meetings were had by both sides and were, in fact, common in Mexico. *Id.* at 131. Responding to the Objecting Creditors' allegations that they were not permitted to raise certain arguments in the Mexican court and that the *conciliador* was biased, the bankruptcy court held that such arguments were better left for the Mexican court system.FN22 *Id.*

The bankruptcy court did not reach two other arguments it described as "[p]ossibl[y] [m]eritorious [o]bjections." *Id.* at 132. These were that insiders were allowed to vote in favor of the Plan, and that the *Concurso* plan violates the absolute priority rule. Other arguments the bankruptcy court did not explicitly address, but which might be subsumed under its other holdings, are that the *Concurso* plan imposed a kind of "death trap" provision that precluded non-consenting creditors from recovering anything. Another such argument is that Mexico's single-class voting made no distinctions between creditors with adverse interests. Finally, a third such argument challenges the propriety of Vitro's orchestrating a balance transfer of several billion dollars between itself and its subsidiaries, turning those subsidiaries into creditors, prior to entering into the *concurso* proceeding and failing promptly to disclose the existence of these newly minted insider creditors.

**\*16** We need not concern ourselves with the vast majority of these issues, as Vitro and Fintech have framed their appeal in terms of only one:

Whether the Bankruptcy Court erred as a matter of law when, after it concluded that the *Concurso* Approval Order was the product of a process that was not corrupt or unfair to the Appellees, it refused to enforce the *Concurso* Approval Order solely because the *Concurso* plan novated guarantee obligations of non-debtor parties and replaced them with new obligations of substantially the same parties?

The issue Vitro and Fintech identify underpins the bankruptcy court's entire opinion. As that court summarized, "the *Concurso* plan approved in this instance ... extinguishes the guarantee claims of the Objecting Creditors that were given under an indenture issued in the United States against non-debtor entities that are subsidiaries of Vitro .... Such order manifestly contravenes the public policy of the United States and is also precluded from enforcement under §§ 1507, 1521 and 1522 of the Bankruptcy Code," and would not be accorded comity. *Id.* at 133.

**2. Chapter 15's Framework for Granting Relief**

[18][19] As already discussed, "[a] central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings." *In re Cozumel Caribe, S.A. de C.V.,* 482 B.R. 96 (Bankr.S.D.N.Y.2012). "The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call the comity of nations." *Hilton,* 159 U.S. at 164, 16 S.Ct. 139. In applying the principles of comity, we "take[ ] into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law." *In re Artimm, S.r.L.,* 335 B.R. 149, 161 (Bankr.C.D.Cal.2005). Accordingly, Chapter 15 provides courts with broad, flexible rules to fashion relief appropriate for effectuating its objectives in accordance with comity. *See In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 333–34 (S.D.N.Y.2008); *In re SPhinX, Ltd.,* 351 B.R. 103, 112 (Bankr.S.D.N.Y.2006) ("[C]hapter 15 maintains—and in some respects enhances—the 'maximum flexibility,' that section 304 provided bankruptcy courts ... in light of principles of international comity and respect for the laws and judgments of other nations." (citation omitted)).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

[20] Given Chapter 15's heavy emphasis on comity, it is not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law. *In re Metcalfe & Mansfield Alternative Investments,* 421 B.R. 685, 697 (Bankr.S.D.N.Y.2010) ("The relief granted in the foreign proceeding and the relief available in a U.S. proceeding need not be identical."); *see also Artimm,* 335 B.R. at 160 n. 11. We have previously cautioned that the mere fact that a foreign representative requests relief that would be available under the law of the foreign proceeding, but not in the United States, is not grounds for denying comity. *See In re Condor,* 601 F.3d at 327.

**\*17** Nevertheless, Chapter 15 does impose certain requirements and considerations that act as a brake or limitation on comity, and preclude granting the relief requested by a foreign representative. In this case, the bankruptcy court rested on three of Chapter 15's sections, §§ 1521, 1507, and 1506, each of which it found precluded the relief Vitro sought. *Vitro II,* 473 B.R. at 133. Vitro's appeal predominantly rests on finding relief under § 1507 and, only in the alternative, under § 1521. Vitro argues that it would be inappropriate to deny its request for comity under § 1507, simply because the relief might not meet the requirements of § 1521. The Objecting Creditors, in turn, argue extensively that the relief Vitro requests, to the extent it is available at all, must fall under § 1521(a)(1) and (b), and that the bankruptcy court was correct to deny enforcement because of the limitations imposed by § 1522.

Thus, while comity should be an important factor in determining whether relief will be granted, we are compelled by the bankruptcy court's decision and the parties' arguments to get into the weeds of Chapter 15 to determine whether a foreign representative may independently seek relief under either § 1521 or § 1507, and whether a court may itself determine under which of Chapter 15's provision such relief would fall. Both appear to be questions of first impression.

[21] We conclude that a court confronted by this situation should first consider the specific relief enumerated under § 1521(a) and (b). If the relief is not explicitly provided for there, a court should then consider whether the requested relief falls more generally under § 1521's grant of any appropriate relief. We understand "appropriate relief" to be relief previously available under Chapter 15's predecessor, § 304. Only if a court determines that the requested relief was not formerly available under § 304 should a court consider whether relief would be appropriate as "additional assistance" under § 1507.[FN23]

We start by acknowledging that "[t]he relationship between § 1507 and § 1521 is not entirely clear." *In re Toft,* 453 B.R. at 190; *see also In re Atlas Shipping A/S,* 404 B.R. at 741.[FN24] This leaves litigants uncertain as to which provision they should rely on for relief. Indeed, Vitro itself acknowledges that its decision to seek relief under § 1507 and, only in the alternative, § 1521 was motivated, in part, by the fact that every other foreign representative requesting enforcement of a *concurso* plan under Chapter 15 has cited both § 1507 and § 1521.

Section 1521(a) empowers a court to "grant any appropriate relief" at the request of the foreign representative when necessary to "effectuate the purpose of [Chapter 15] and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a). In addition, § 1521 lists a series of non-exclusive forms of relief. These include:

**\*18** (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3) suspending the right to transfer, encumber or

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

> 11 U.S.C. § 1521(a).

Additionally, under § 1521(b), "the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative ... provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." Section 1522 provides an important limiting factor: relief under § 1521 may be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected," and a court may impose appropriate conditions on relief. 11 U.S.C. § 1522(a)-(b).

Unlike § 1521's "any appropriate relief" language, § 1507 gives courts the authority to provide "additional assistance." Section 1507 "was added to the Bankruptcy Code because Congress recognized that Chapter 15 may not anticipate all of the types of relief that a foreign representative may require and which would otherwise be available to such foreign representative." 8 Collier on Bankruptcy ¶

1507.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012) (Collier).[FN25] A court determining whether to provide additional assistance under § 1507 considers the factors listed under subsection (b),[FN26] which provides that:

(b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with principles of comity, will reasonably assure

1) just treatment of all holders of claims against or interests in the debtor's property;

**\*19** 2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

3) prevention of preferential or fraudulent dispositions of property of the debtor;

4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

> 11 U.S.C. § 1507(b).[FN27]

We are thus faced with two statutory provisions that each provide expansive relief, but under different standards. To clarify our resolution of requests for relief under Chapter 15 we adopt the following framework for analyzing such requests.

First, because § 1521 lists specific forms of relief, a court should initially consider whether the relief requested falls under one of these explicit provisions. *In re Read,* 692 F.3d 1185, 1191 (11th Cir.2012) (specific terms prevail over the general (quoting *D. Ginsberg & Sons, Inc. v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 76 L.Ed. 704 (1932))); *see also* 1 Collier, *supra,* ¶ 13.07[2]; Ran-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

ney–Marinelli, *Overview, supra,* at 317 (arguable that foreign representatives should be bound by those provisions specifically providing the relief sought). Other courts have held that, where the requested relief is explicitly provided for under § 1521, it is unnecessary to consider § 1507. *In re Atlas Shipping A/S,* 404 B.R. at 740 ("Whatever the outer bounds of discretionary relief chapter 15 allows, this case does not push the boundaries. The relief sought by the foreign representative is expressly provided for in §§ 1521(a)(5) and 1521(b). The Court need not venture into the area of 'additional assistance,' 'consistent with principles of comity' under § 1507."); *In re Int'l Banking Corp. B.S.C.,* 439 B.R. 614, 626 n. 10 (Bankr.S.D.N.Y.2010).

Second, if § 1521(a)(1)-(7) and (b) does not list the requested relief, a court should decide whether it can be considered "appropriate relief" under § 1521(a). This, in turn, requires consideration of whether such relief has previously been provided under § 304. *See In re Condor,* 601 F.3d at 329 (observing that avoidance actions under foreign law were permitted under § 304 and reading § 1521(a)(7) to permit such relief). This latter consideration aligns with Congress's intent that § 1521 was not intended to "expand or reduce the scope of relief" previously available under other provisions, including § 304. H.R.Rep. No. 109–31, pt. 1, at 116. A court should also consider whether the requested relief would otherwise be available in the United States. *Cf. Artimm,* 335 B.R. at 160 n. 11 ( section 1507 authorizes relief beyond that provided for in Bankruptcy Code or United States law).

[22][23] Third, only if the requested relief appears to go beyond the relief previously available under § 304 or currently provided for under United States law, *Artimm,* 335 B.R. at 160 n. 11, should a court consider § 1507. *See* H.R.Rep. No. 109–31, pt. 1, at 109 ("Subsection (2) [of § 1507] makes the authority for additional relief (*beyond that permitted under section*[ ] *... 1521,* below) subject to the conditions for relief heretofore specified in United

States law under section 304 ...." (emphasis added)). This approach recognizes that relief under § 1507 "is in nature more extraordinary" than that provided under § 1521, as a result of which "the test for granting that relief is more rigorous." Leif M. Clark, *Chapter 15 Bankruptcy Strategies: Leading Bankruptcy Experts on Understanding the Filing Process and Achieving Successful Outcomes in Cross–Border Insolvency Cases—Advice for Handling Cross–Border Bankruptcy Cases Effectively* (Aspatore Sept. 2012), *available at* 2012 WL 3279175, at *10. It also acknowledges that, while § 1507's broad grant of assistance is intended to be a "catch-all," it cannot be used to circumvent restrictions present in other parts of Chapter 15, nor to provide relief otherwise available under other provisions. *In re Int'l Banking Corp. B.S.C.,* 439 B.R. at 626 n. 10; 1 Collier, *supra,* ¶ 13.07 [2] n. 34 ( section 1507 should not be used "to eviscerate limitations placed within chapter 15 itself").

*20 We believe this framework provides foreign representatives with the clearest path by which to seek Chapter 15 relief. *See* Clark, *supra,* at *10 (advising attorneys to consult § 1507 if the relief under § 1521 is insufficiently broad). This framework also conforms to Congress's intent that courts should not deny Chapter 15 relief for failure to meet the requirements of § 1507, which, in any case, "is not to be the basis for denying or limiting relief otherwise available under this chapter." H.R.Rep. No. 109–31, pt. 1, at 109; *see also* Ranney–Marinelli, *Overview, supra,* at 316 n. 267. Under this framework, courts will also "not construe the range of relief under § 1507 to be bound by the same limitations that apply in § 1521," with the exception of those limitations specifically provided for. Clark & Goldstein, *Sacred Cows, supra,* at 529.

At the same time, this approach means that, by first considering § 1521 relief—which we deem co-extensive with that previously available under § 304—courts begin their analysis in familiar territory. Ranney–Marinelli, *Overview, supra,* at 317 n. 274 (noting that, compared to other sections, §

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

1507's standard of proof is unclear). This prevents all-encompassing applications of § 1507 and avoids prematurely expanding the reach of Chapter 15 beyond current international insolvency law. H.R. Rep. No. 109–31, pt. 1, at 109 (purpose of § 1507 is "to permit the further development of international cooperation begun under section 304 "); Clark & Goldstein, *Sacred Cows, supra,* at 529 (whether a "court [would] ever dare to employ § 1507 as a substitute for (or worse, an end-around of) § 1521" is an open question).

**3. Availability of Relief under § 1521 and § 1507**

*21 Applying our analytic framework to Vitro's request for relief, the bankruptcy court did not err in denying relief. Sections 1521(a)(1)-(7) and (b) do not provide for discharging obligations held by non-debtor guarantors. Section 1521(a)'s general grant of "any appropriate relief" also does not provide the necessary relief because our precedent has interpreted the Bankruptcy Code to foreclose such a release, and because when such relief has been granted, it has been granted under § 1507, not § 1521. Even if the relief sought were theoretically available under § 1521, the facts of this case run afoul of the limitations in § 1522. Finally, although we believe the relief requested may theoretically be available under § 1507 generally, Vitro has not demonstrated circumstances comparable to those that would make possible such a release in the United States, as contemplated by § 1507(b)(4).

(a) Step 1: Section 1521's enumerated provisions

[24] The bankruptcy court denied relief under § 1521(b) and § 1522(a), observing that "[o]ne could argue that Vitro SAB, as a holding company, is trying to achieve, through its *Concurso* plan, an entrustment of the distribution of the assets of its nondebtor U.S. subsidiaries without sufficiently protecting the Objecting Creditors." *Vitro II,* 473 B.R. at 132. Vitro concedes that § 1507, on which it primarily relies, does not explicitly provide for a "discharge" of non-debtors, and thus injunctive relief is a necessary by-product of granting enforcement, but Vitro argues that this fact alone does not

mean that it must satisfy the requirements of § 1522 .FN28  The Objecting Creditors respond that the relief Vitro seeks is addressed by § 1521(a)(1) and (b), and thus Vitro is bound by the limitations in § 1521 and § 1522 that any relief must ensure that the interests of creditors and other interested parties are sufficiently protected.

Contrary to the Objecting Creditors' assertion and the bankruptcy court's finding, the requested relief is not available under any of § 1521's specific provisions because none of the types of relief enumerated under § 1521(a) or § 1521(b) matches the type of relief Vitro seeks. The closest provision is § 1521(a)(1), which provides for "staying the commencement or continuation of an individual action or proceeding *concerning* the debtor's assets, rights, obligations or liabilities." 11 U.S.C. § 1521(a)(1) (emphasis added).FN29  But Vitro is not merely seeking a stay. Rather, Vitro seeks to permanently enjoin actions brought against its subsidiaries and, moreover, to discharge obligations and liabilities owed by those subsidiaries. We reject the bankruptcy court's suggestion to treat the assets of Vitro's subsidiaries as Vitro's "assets" for this purpose. *In re Guyana Dev. Corp.,* 168 B.R. 892, 905 (Bankr.S.D.Tex.1994) ("As a general rule, property of the estate includes the debtor's stock in a subsidiary but not the assets of the subsidiary."). As the Objecting Creditors repeatedly remind us, most of Vitro's subsidiaries have not gone into bankruptcy. Vitro's subsidiaries are also its creditors. Thus, there is no basis to conclude that § 1521(a)(1) adequately responds to the type of relief Vitro seeks. FN30

For substantially the same reason, we reject the bankruptcy court's suggestion that § 1521(b) applies. Section 1521(b) provides that "the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative ... provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected." Because the subsidiaries'

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

Page 25

assets are not Vitro's, § 1521(b) does not apply.
FN31

(b) Step 2: Section 1521(a)'s grant of "any appro-
priate relief"

**\*22** [25] Having determined that none of the
enumerated forms of relief listed under § 1521
provides the range of relief Vitro seeks, we proceed
to consider whether the relief sought fits into the
court's more general power to grant "any appropri-
ate relief." We conclude that the requested relief
falls outside § 1521(a)'s grant of authority for two
reasons.

First, the relief Vitro seeks, a non-consensual,
non-debtor release through a bankruptcy proceed-
ing, is generally not available under United States
law. Indeed, this court has explicitly prohibited
such relief. In re Pac. Lumber Co., 584 F.3d 229,
251–52 (5th Cir.2009) (discharge of debtor's debt
does not affect liability of other entities on such
debt and denying non-debtor release and permanent
injunction); In re Zale Corp., 62 F.3d 746, 760 (5th
Cir.1995) ("Section 524 prohibits the discharge of
debts of nondebtors."). Because our law prohibits
the requested discharge, a request for such relief
more properly falls under § 1507, which was in-
cluded to address such circumstances.

Second, our conclusion is bolstered by the fact
that in the one case where a foreign proceeding's
non-debtor discharge was approved by a United
States court, it was under § 1507, not § 1521. In
Metcalfe, the court recognized that "a third-party
non-debtor release 'is proper only in rare cases.' "
421 B.R. 685, 694 (Bankr.S.D.N.Y.2010) (quoting
In re Metromedia Fiber Network, Inc., 416 F.3d
136, 141 (2d Cir.2005)). The court nevertheless
found that approval was not precluded under § 1507
. Id. at 697. FN32

[26] Finally, we note that the bankruptcy
court's decision was proper under § 1522, which re-
quires that the relief contemplated under § 1521
balance the interests of the creditors and debtors.
See In re Tri–Cont'l Exch. Ltd., 349 B.R. at 637

(analysis of § 1522 "emphasize[s] the need to tailor
relief and conditions so as to balance the relief
granted to the foreign representative and the in-
terests of those affected by such relief, without un-
duly favoring one group of creditors over another").
Because the bankruptcy court also found that the
Concurso plan did not provide for an appropriate
balance among the interests of Vitro, its creditors,
and the Guarantors under § 1521 and § 1522, we
observe that even were we to agree that the reques-
ted relief is provided for under § 1521, the bank-
ruptcy court did not abuse its discretion in denying
it. Because the reasons for which the bankruptcy
court denied relief under § 1521 are largely identic-
al, however, we jointly address those reasons under
our discussion of § 1507. We proceed to consider
whether, as Vitro and Fintech argue, the relief was
available under § 1507, and whether the bankruptcy
court properly denied it.

(c) Step Three: Section 1507's "additional assist-
ance"

**\*23** The bankruptcy court denied relief under §
1507 because the Plan "does not provide for the
distribution of proceeds of the debtor's property
substantially in accordance with the order pre-
scribed by Title 11," contrary to § 1507(b)(4). Vitro
II, 473 B.R. at 132.

Under a Chapter 11 plan, the noteholders would
receive their distribution from the debtor and
would be free to pursue their other obligors, in
this case the non-debtor guarantors. The Con-
curso plan provides drastically different treat-
ment in that the noteholders receive a fraction of
the amounts owed under the indentures from
Vitro SAB and their rights against the other ob-
ligors are cut off.

Id.

Vitro challenges the bankruptcy court's holding
predominantly on the ground that it accorded insuf-
ficient weight to comity. The Objecting Creditors
point to disparities between the Concurso plan and
a similar proceeding in United States bankruptcy

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

court. They also assert that the Mexican court's disregard for a relevant decision in New York state court precludes extending comity to its decision.

We conclude that § 1507 theoretically provides for the relief Vitro seeks because it was intended to provide relief not otherwise available under United States law. But the devil is in the details, and in this case, the bankruptcy court correctly determined that relief was precluded by § 1507(b)(4). Under that provision, the bankruptcy court had to consider whether the relief requested was comparable to that available under the Bankruptcy Code. We conclude below that, although a non-consensual, non-debtor discharge would not be available in this circuit, it could be available in other circuits. We also hold that because Vitro has failed to show the presence of the kind of comparable extraordinary circumstances that would make enforcement of such a plan possible in the United States, the bankruptcy court did not abuse its discretion in denying relief.

*i. Availability of non-consensual, non-debtor discharges under § 1507*

This court has previously foreclosed the type of relief sought here in the context of a United States bankruptcy proceeding. We acknowledge, however, that our view on this subject is not universally shared by our sister circuits. Although § 1521 relief is precluded by our prior holdings, relief may nevertheless be appropriate under § 1507 which, as discussed above, was included under Chapter 15 to permit the expansion of relief previously available under § 304. We begin by analyzing release of nondebtors under United States bankruptcy law.

*In re Pacific Lumber Co.* concerned a proposed plan that would "release [ ] [owners and guarantors] from liability ... related to proposing, implementing, and administering the [reorganization] plan." 584 F.3d at 251. Quoting 11 U.S.C. § 524(e)'s language that the "discharge of a debt of the debtor does not affect the liability of any other entity on ... such debt," we went on to reject the guarantors' argument that "the release clause is part of their bargain because without the clause neither company

would have been willing to provide the plan's financing." *Id.* at 251–52 (quotation marks omitted). This conclusion was consistent with prior rulings from this circuit that "seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions." *Id.* at 252; *see also In re Bigler LP*, 442 B.R. 537, 546 (Bankr.S.D.Tex.2010); *In re Pilgrim's Pride Corp.*, No. 08–45664–DML–11, 2010 WL 200000, at *5 (Bankr.N.D.Tex. Jan. 14, 2010).

Other circuits agree. *See In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir.1995) ("This court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *In re W. Real Estate Fund, Inc.*, 922 F.2d 592, 600–02 (10th Cir.1990); *In re Jet Fla. Sys., Inc.*, 883 F.2d 970, 972–73 (11th Cir.1989). Those circuits not in agreement nevertheless prohibit such releases in all but the rarest of cases.

**\*24** In *Metromedia*, for example, the court expressed great reluctance in approving non-debtor releases. 416 F.3d at 141. It observed that the Bankruptcy Code expressly authorizes such releases only under 11 U.S.C. § 524(g), a provision authorizing such release upon satisfaction of specific conditions in the context of asbestos cases. *Id.* at 142. That court also noted that the release of non-debtors "is a device that lends itself to abuse" because it "may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the [Bankruptcy] Code." *Id.* "No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique," and such releases have been appropriate only in "rare cases." *Id.* at 141–42. The *Metromedia* court elaborated that "[a] nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to success of the plan," focusing on considerations such as whether: "the estate received substantial consideration ...; the enjoined claims were channeled to a settlement fund rather than extinguished ...; the enjoined claims

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

would indirectly impact the debtor's reorganization by way of indemnity or contribution .... and the plan otherwise provided for the full payment of the enjoined claims .... [or] the affected creditors consent[ed]." *Id.* at 142–43 (internal citations and quotation marks omitted).

Similarly, in *In re Dow Corning Corp.,* the court observed that enjoining a non-consenting creditor's claim against a non-debtor is a "dramatic measure" and instructed courts to approve such a release only when the following seven factors are present:

(1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*280 F.3d 648, 658–61 (6th Cir.2002).*

**\*25** Other courts have imposed similar restrictions on enjoining third-party claims against non-debtors. *See In re Specialty Equip. Cos.,* 3 F.3d 1043, 1044–49 (7th Cir.1993) (section 524(e) does not bar granting release to third parties where release is consensual and non-coercive and would bind only those creditors voting in favor of the plan); *In re A.H. Robins Co., Inc.,* 880 F.2d 694, 701–02 (4th Cir.1989) (enjoining suits where plan

was overwhelmingly approved, late claimants were given opportunity to recover, reorganization hinged on debtor being free from claims against parties with indemnity or contribution claims against it, and creditors who opted out would have had their claims fully satisfied by staying within settlement agreement).

[27] The decisions of these courts demonstrate disagreement among the circuits as to when, if ever, a non-debtor discharge is appropriate. We conclude that, although our court has firmly pronounced its opposition to such releases, relief is not thereby precluded under § 1507, which was intended to provide relief not otherwise available under the Bankruptcy Code or United States law. *See Artimm,* 335 B.R. at 160 n. 11.

### ii. *Appropriateness of non-consensual, non-debtor discharges under § 1507*

[28] Having determined that the relief Vitro seeks is theoretically available under § 1507, we turn to whether the bankruptcy court abused its discretion in determining that such relief was not appropriate in this case. The bankruptcy court held a four-day trial, involving hundreds of exhibits and testimony by witnesses from both sides. It concluded that the requested relief did not substantially conform to the order of distribution under Title 11 because the *Concurso* plan provided creditors with a substantially reduced recovery, while cutting off their ability to pursue relief against the Guarantors.

Vitro contends that the bankruptcy court incorrectly denied enforcement because the *Concurso* plan did not provide creditors with exactly what they would have received under Chapter 11.[FN33] Vitro further challenges the applicability of § 1507(b)(4) because the bankruptcy court based its decision on the discharge of non-debtors' obligations, and not the distribution of Vitro's property. Finally, Vitro argues that whatever concerns this case implicates, the bankruptcy court erred in concluding that they outweighed the interests of comity.[FN34] [FN35],

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

The Objecting Creditors respond that the evidence presented at trial demonstrated that, under the *Concurso* plan, they would recover only around 40% of the Old Notes' value, while Vitro's shareholders would retain equity interests worth $500 million.[FN36] They also point to various parts of the Plan that do not conform with Chapter 11. These include that guarantor obligations cannot be discharged over the objections of creditors, creditors would not have been grouped for voting purposes into a single class together with parties having adverse interests, and insider votes would not count towards the Plan's approval. The Objecting Creditors further argue that comity does not weigh in favor of enforcement of this plan because the Mexican court, which approved it, ignored a ruling by a New York state court holding that the indentures expressly prohibited modification of the Guarantors' obligations.

We conclude that the evidence Vitro presented at trial does not support the presence of circumstances comparable to those necessary for effectuating the release of non-debtor guarantors in those of our sister circuits that allow such a release. *See In re Schimmelpenninck,* 183 F.3d at 364.

**\*26** We begin our analysis, as we must, by considering comity. 11 U.S.C. § 1507 (court may grant "additional assistance ... consistent with principles of comity"). In revising Chapter 15's predecessor, § 304, Congress elevated comity from a factor under § 304(c) to the introductory text of § 1507 "to make it clear that it is the central concept to be addressed." H.R.Rep. No. 109–31, pt. 1, at 109. Vitro is thus correct to focus its argument on comity, and we agree with Vitro that comity is the rule under Chapter 15, not the exception. It is thus necessary to first address the Objecting Creditors' most direct challenge to that principle, namely that the Mexican court failed to extend comity to the decision of a New York state court on issues central to this case. *See United States ex rel. Saroop v. Garcia,* 109 F.3d 165, 170 (3d Cir.1997) (reciprocity is condition for honoring foreign country's judicial de-

crees); *Remington Rand Corp.-Del. v. Bus. Sys. Inc.,* 830 F.2d 1260, 1273 (3d Cir.1987) (describing comity as a "two-way street").[FN37]

The New York state court addressed a declaratory judgment action brought by Wilmington, which sought a confirmation of Vitro's obligations under the indentures. *Wilmington Trust,* 2011 WL 6141025, at *1. The state court carefully parsed the issues before it and determined that "any declaratory relief in this court can only be in the context of determining the rights and obligation of the parties under the Indentures." *Id.* at *5. The court next determined that the indentures were governed by New York law and that "pursuant to the relevant provisions of the Indentures ... any non-consensual ... release, discharge or modification of the Guarantors' obligations is prohibited." *Id.* The court was clear, however, that its authority went no further. "Whether such rights and obligations can or cannot be novated, substituted, released or modified under the Mexican bankruptcy law is an issue for the Mexican Court." *Id.* To remove all doubt, the court explicitly stated that "granting a declaratory judgment in favor of [the Objecting Creditors], to the extent stated herein, will not interfere with the Mexican Court proceeding, which is the proper jurisdiction to determine the issues that may arise in connection with the approval of the Concurso Plan, pursuant to applicable Mexican law." *Id.* The court concluded by stating that "whether any Concurso Plan that is ultimately approved by the Mexican Court may be enforced in the United States is an issue for the federal courts, including the Bankruptcy Court." *Id.*

The Mexican court was presented with the opportunity to consider the New York decision and its impact on the *concurso* proceeding. Although the Mexican court does not appear to have provided specific reasons, we infer from its decision that it did not find that the indentures precluded Mexican law from novating the obligations contained therein. Because the New York court explicitly set aside this issue for the Mexican court, reciprocity

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

was not offended by the Mexican court's sub-sequent decision of that very issue. We thus do not view this as a ground for denying comity. Our decision comports with the approach adopted by the court in *Metcalfe,* which, while recognizing that a third-party non-debtor release might be inappropriate under United States law, left it to the Canadian courts to determine whether they had the jurisdiction to grant such relief. 421 B.R. at 697–700.

**\*27** We next consider whether the bankruptcy court erred in basing its decision on § 1507(b)(4). FN38 Section 1507(b)(4) provides that a court should consider whether to grant additional assistance to a foreign representative by considering the "distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title." Vitro asserts that the bankruptcy court's opinion was based on the distribution of non-debtor's property, that of Vitro's subsidiaries, and thus § 1507(b)(4) is inapplicable. But the focus of § 1507(b)(4) is on the plan of distribution, and Vitro ignores that the Plan it seeks to enforce premises distribution of its assets on the discharge of obligations owed by non-debtors who are also Vitro's creditors. The respective amounts that Vitro pays under the Plan to the Objecting Creditors and to its subsidiaries are inescapably dependent on the discharge of the non-debtor Guarantors. That the detriment of this distribution falls on the Objecting Creditors, whose rights are extinguished in exchange for their distribution under the Plan, in no way subtracts from the fact that the release affects how the proceeds of Vitro's property are distributed.

We turn finally to whether the evidence Vitro has presented in favor of comity and enforcement so outweighed the bankruptcy court's concerns under § 1507(b)(4) that it was an abuse of discretion for the bankruptcy court to deny relief. Vitro's primary witness was its foreign representative, Sanchez–Mujica. He testified that the *conciliador* persuaded Vitro to offer more favorable terms to third-party creditors in the *Concurso* plan. These

included a 5% increase—from 15% to 20%—of the equity available on default under the MCDs, and that consent payments, previously made to only some of the creditors, be extended to all consenting creditors. But this hardly shows that the result of the *concurso* proceeding is in line with what would be available under Chapter 11, much less that this case features the unique circumstances that would warrant a general release of the non-debtor subsidiaries. Sanchez–Mujica also testified that over 74% of recognized creditors approved the plan. But this ignores that recognized creditors holding over 50% of all unsecured debt who voted in favor of the Plan were Vitro subsidiaries.

Vitro's second witness, Luis Mejan—an expert in Mexican bankruptcy law—was cross-examined at trial, and his expert report and rebuttal were introduced in lieu of direct examination. Mejan's expert report provides a comprehensive breakdown of the LCM and how it operates in the *concurso* context. This merely establishes, however, that the LCM is a process comparable to that of the United States, a fact which no party seriously disputes. The bankruptcy court also had to consider whether the results yielded under the LCM, on the facts of this case, were comparable to the result likely in the United States. *See In re Treco,* 240 F.3d at 159 ("A court must consider the effect of the difference in the law on the creditor in light of the particular facts presented."); *In re Sivec SRL,* 476 B.R. at 324 ("The fact that priority rules and treatment of claims may not be identical is insufficient to deny a request for comity. What this Court must consider is the effect of that difference on the creditor in light of the existing facts."). Mejan's expert report extensively describes Mexican law, but does not explain how the results achieved in this case would compare to those in a United States bankruptcy proceeding. When asked if he had considered "whether other plans that had been approved or enforced in the United States were comparable to Vitro in terms of what happened in the Mexican proceedings," Mejan conceded that he "did not conduct a specific search in order to make

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

[that] comparison." FN39 This failure is especially troubling given Vitro's request for relief which, under United States law, would not be available in this circuit, and would only be available under the narrowest of circumstances in some of our sister circuits. FN40

*28 In summary, although extensive testimony was taken before the bankruptcy court that the LCM's legal framework is substantially in accordance with our own, this does not end the analysis of whether to grant comity. *See In re Treco,* 240 F.3d at 158–61 (bankruptcy court abused its discretion by affording comity to Bahamian bankruptcy proceeding without considering effects on creditor's claim). The bankruptcy court correctly observed that we have "largely foreclosed non-consensual non-debtor releases and permanent injunctions outside of the context of mass tort claims being channeled toward a specific pool of assets." *Vitro II,* 473 B.R. at 131. There appears little dispute that, under United States law, non-debtor releases, while possible in other circuits, are only appropriate in extraordinary circumstances. To that end, Vitro was required to show that something comparable to such circumstances was present here. The mere fact that the *concurso* proceeding complied with the relevant provisions of the LCM is not, in itself, sufficient. Were it otherwise, we would be treating the extraordinary relief available under § 1507 with the casual indifference we have already rejected in the context of recognition determinations under Chapter 15. *See In re Ran,* 607 F.3d at 1021 (recognition determination is not a "rubber stamp exercise"). We would also be disregarding the considerations and safeguards Congress included in § 1507(b).

To that end, we observe that many of the factors that might sway us in favor of granting comity and reversing the bankruptcy court to that end are absent here. Vitro has not shown that there existed truly unusual circumstances necessitating the release. To the contrary, the evidence shows that equity retained substantial value. The creditors

also did not receive a distribution close to what they were originally owed. Moreover, the affected creditors did not consent to the Plan, but were grouped together into a class with insider voters who only existed by virtue of Vitro reshuffling its financial obligations between it and its subsidiaries. It is also not the case that the majority of the impacted group of creditors, consisting predominantly of the Objecting Creditors, voted in favor of the Plan. Nor were non-consenting creditors given an alternative to recover what they were owed in full. FN41

*29 Vitro cannot rely on the fact that a substantial majority of unsecured creditors voted in favor of the Plan. Vitro's majority depends on votes by insiders. To allow it to use this as a ground to support enforcement would amount to letting one discrepancy between our law and that of Mexico (approval of a reorganization plan by insider votes over the objections of creditors) make up for another (the discharge of non-debtor guarantors). *Cf. CIBC Bank & Trust Co. (Cayman) Ltd.,* 886 F.Supp. at 1114. FN42

Vitro argues that there would be financial chaos as a result of the Plan not being enforced. We are aware of the adverse consequences that may ensue from the decision not to enforce the Plan. But Vitro's reasoning seeks to justify a prior bad decision on the basis that not enforcing it now would lead to further negative consequences. FN43 Worse, the harm from those consequences would predominantly affect Vitro, the party responsible for bringing about this state of affairs in the first place. Vitro cannot propose a plan that fails to substantially comply with our order of distribution and then defend such a plan by arguing that it would suffer were it not enforced. Vitro's two-wrongs-make-a-right reasoning is unpersuasive.

Those cases Vitro points to in which a similar discharge of non-debtor obligations was allowed are inapposite. The closest factual analog to this case is the bankruptcy court's decision in *Metcalfe.* As here, the central issue in *Metcalfe* was "[t]he en-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

forceability of the non-debtor release and injunction on private civil actions in the United States" contained in a Canadian court order approving a restructuring plan. 421 B.R. at 687–88 n. 1. Recognizing that "a third-party non-debtor release 'is proper only in rare cases,' " *id.* at 694 (quoting *Metromedia,* 416 F.3d at 141), the court nevertheless found that approval was not precluded under § 1507, *id.* at 697. The only explanation the court provided was that the non-debtor release and injunction provisions "treat[ed] all claimants in the Canadian Proceedings similarly" and that "[n]o objections ha[d] been lodged that inclusion of these provisions adversely affects any claimant's treatment against any of the debtors' property." *Id.* The bankruptcy court distinguished *Metcalfe* because, in that case, "there was near unanimous approval of the plan by the creditors, who were not insiders of the debtor .... the plan was negotiated between the parties and there appears not to have been a timely objection .... [and] the release was not complete like the one in the present case." *Vitro II,* 473 B.R. at 131.

We agree that *Metcalfe* is distinguishable. The fact that the Plan approved here was the result of votes by insiders holding intercompany debt means that, although under *Metcalfe* non-debtor releases may be enforced in the United States under Chapter 15, the facts of this case exceed the scope of that decision. We further observe that in that case the Canadian court's decision to approve the non-debtor release "reflect[ed] similar sensitivity to the circumstances justifying approving such provisions," a sensitivity we find absent in the Mexican court's approval of the Plan. 421 B.R. at 698. The Canadian court's decision was also the result of "near-cataclysmic turmoil in the Canadian commercial paper market following the onset of the global financial crisis." *Id.* at 700. As already discussed, Vitro's evidence on this point largely emphasizes the turmoil only Vitro would be exposed to.

**\*30** Vitro also relies on our decision in *Republic Supply Co. v. Shoaf,* 815 F.2d 1046 (5th

Cir.1987). In that case, "we address[ed] the question whether [the] bankruptcy court's confirmation order which, beyond the statutory grant of the [Bankruptcy] Code, expressly released a third-party guarantor, [was] to be given *res judicata* effect." *Id.* at 1047. We held that once a reorganization plan passed the appeal stage it could not be challenged even though it violated the Bankruptcy Code's prohibition on such discharges. *Id.* at 1050. Aside from the fact that *Republic Supply Co.* was a case about the effects of res judicata and has been distinguished for not addressing the legality of non-debtor releases, *see In re Pacific Lumber Co.,* 584 F.3d at 252 n. 27, we have also emphasized the "limited nature" of that decision, *In re Applewood Chair Co.,* 203 F.3d 914, 918 (5th Cir.2000). For example, *Republic Supply Co.* involved a reorganization plan in which a third-party guarantor and creditor were specifically discharged. 815 F.2d at 1051–54. We have distinguished other cases for including general, as opposed to specific, releases. *Applewood Chair,* 203 F.3d at 919. As a result, *Republic Supply Co.* provides no guidance where, as here, we are confronted not by a specific release, but by a general release of all the non-debtor subsidiaries. *See id.*[FN44][FN45],

On the basis of the foregoing analysis, we hold that Vitro has not met its burden of showing that the relief requested under the Plan—a non-consensual discharge of non-debtor guarantors—is substantially in accordance with the circumstances that would warrant such relief in the United States. In so holding, we stress the deferential standard under which we review the bankruptcy court's determination. It is not our role to determine whether the above-summarized evidence would lead us to the same conclusion. Our only task is to determine whether the bankruptcy court's decision was reasonable. *See Friends for Am. Free Enter. Ass'n v. Wal–Mart Stores, Inc.,* 284 F.3d 575, 578 (5th Cir.2002) (" 'Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court.' " (quoting *Dawson v. United States,* 68 F.3d 886, 896 (5th Cir.1995)));

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

*Bear Stearns,* 389 B.R. at 333 (relief under § 1521 and § 1507 is largely discretionary). Having reviewed the record and relevant caselaw, we conclude that the bankruptcy court's decision was reasonable.

**4. Section 1506's Bar to Relief**

**\*31** The bankruptcy court concluded that "the protection of third party claims in a bankruptcy case is a fundamental policy of the United States" and held that even if Chapter 15 relief were appropriate, it would be barred under § 1506 because "the *Concurso* plan does not recognize and protect such rights." *Vitro II,* 473 B.R. at 132.

[29][30][31][32] Section 1506 provides that "[n]othing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. The narrow public policy exception contained in § 1506 "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States." *In re Ran,* 607 F.3d at 1021. "The key determination required by this Court is whether the procedures used in [the foreign proceeding] meet our fundamental standards of fairness." *Metcalfe,* 421 B.R. at 697. A court need not engage in an "independent determination about the propriety of individual acts of a foreign court." *Id.* Furthermore, even the absence of certain procedural or constitutional rights will not itself be a bar under § 1506. *See In re Ephedra Prods. Liab. Litig.,* 349 B.R. 333, 336 (S.D.N.Y.2006) ( "Federal courts have enforced against U.S. citizens foreign judgments rendered by foreign courts for whom the very idea of a jury trial is foreign.").

As already discussed, this court holds that the Bankruptcy Code precludes non-consensual, nondebtor releases. *In re Pac. Lumber Co.,* 584 F.3d at 252. Nevertheless, not all our sister circuits agree, and we recognize that the relief potentially available under § 1507 was intended to be expansive. At the same time, § 1506 was intended to be read nar-

rowly, a fact that does not sit well with the bankruptcy court's broad description of the fundamental policy at stake as "the protection of third party claims in a bankruptcy case." *Vitro II,* 473 B.R. at 132. Because we conclude that relief is not warranted under § 1507, however, and would also not be available under § 1521, we do not reach whether the *Concurso* plan would be manifestly contrary to a fundamental public policy of the United States. FN46

**IV. CONCLUSION**

For the aforementioned reasons, we AFFIRM in all respects the judgment of the district court affirming the order of the bankruptcy court in No. 12–10542, and we AFFIRM the order of the bankruptcy court in Nos. 12–10689 and 12–10750. The temporary restraining order originally entered by the bankruptcy court, the expiration of which was stayed by this court, is VACATED, effective December 14, 2012. Each party shall bear its own costs.

FN1. A *concurso* proceeding is the Mexican equivalent of a voluntary judicial reorganization proceeding under United States law.

FN2. A *conciliador* is an individual appointed by the *Instituto Federal de Especialistas de Concursos Mercantiles* —the Federal Institute of Specialists of Insolvency Procedures—to serve as a quasi-judicial officer with certain responsibilities in a *concurso* proceeding, including filing an initial list of recognized claims, mediating a plan, and, if necessary to protect the debtor's estate, managing the debtor's business. A *conciliador's* pay is based on the number of recognized claims in a *concurso* proceeding, a fact the Noteholders argue encouraged him to recognize intercompany claims. The Noteholders also point out that, in this case, the *conciliador's* law firm provided legal services to Vitro since 2001, and that the *conciliador* retained, as

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

his financial advisor, a firm that also acted as Vitro's internal auditor.

**FN3.** Of the creditors resisting veto of the Plan, approximately 360 were Vitro employees to each of whom Vitro had issued a note in the amount of $1,000 prior to the Plan's filing.

**FN4.** Letters submitted to this court demonstrate that substantially all of the issues relating to enforcement of the Plan before us are also being appealed in Mexican courts.

**FN5.** This matter proceeded to trial on March 31, 2011. As a result of this proceeding, four of Vitro's subsidiaries requested permission to sell substantially all their assets. Vitro's subsidiaries continued resisting the Noteholders' efforts and, initially, received favorable judgments that they were generally paying their debts as they became due or that no demand for payment had been made at the time the involuntary proceedings were commenced. That decision was appealed and, on August 28, 2012, the United States District Court for the Northern District of Texas held that the bankruptcy court erred in its findings and vacated that court's order.

**FN6.** Wilmington and other creditors then sought a temporary restraining order directing the Guarantors to withdraw their consent to the *Concurso* plan. The state court granted the TRO, but that order was stayed by the bankruptcy court on the basis that the TRO interfered with Vitro's rights in a lockup agreement between it and its subsidiaries, and the *concurso* proceeding. That order was separately appealed and is before another panel of this court, Case No. 11–11239.

Objecting creditors also took further leg-

al action to resist Vitro's reorganization efforts, including involuntary *concurso* proceedings in Mexico.

**FN7.** This filing actually constituted Vitro's second filing of a petition for recognition under Chapter 15. Vitro first filed such a petition on December 14, 2010, but, by agreement of the parties, withdrew that petition after the Mexican court initially denied Vitro's entry into *concurso mercantil.*

**FN8.** The travel restrictions on Sanchez–Mujica were later lifted, permitting him to travel to the United States and testify at trial.

**FN9.** A "foreign main proceeding" is "a foreign proceeding pending in the country where the debtor has the center of its main interests," 11 U.S.C. § 1502(4), and is to be distinguished from a foreign nonmain proceeding, which is "a foreign proceeding ... pending in a country where the debtor has an establishment," *id.* § 1502(5). Depending on whether a proceeding is a foreign main or a foreign nonmain, certain Chapter 15 relief will be automatic or discretionary. *See In re Ran,* 607 F.3d 1017, 1026 (5th Cir.2010).

**FN10.** Previously, on June 24, 2011, the bankruptcy court had issued a preliminary injunction in Vitro's favor to protect its assets, but denied such relief as to the guarantors.

**FN11.** Although brought under separate case numbers, the only substantive difference between the cases is that Vitro is the appellant in Case No. 12–10689, while Fintech is the appellant in Case No. 12–10750.

**FN12.** As Professor Jay Lawrence West-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

brook has previously explained, the Model Law, along with the European Union Insolvency Regulation ("EU Regulation"), and the American Law Institute's Principles of Cooperation in Transnational Insolvency Cases Among Members of the North American Free Trade Agreement ("ALI Principles"), was a response to international trade and "the growth of multinational enterprise," as well as "the increased incidence of multinational financial failure." Jay Lawrence Westbrook, *Multinational Enterprises in General Default: Chapter 15, the ALI Principles, and the EU Insolvency Regulation, 76 Am. Bankr. L.J. 1, 1–2 (2002).* Of the three, the EU Regulation "served as the source of some of the key concepts adopted in both the Model Law and the ALI Principles." *Id.* at 2. The ALI Principles, by contrast, were the last to be approved, and thus "in some important respects represent the next generation of reform." *Id.*

FN13. While § 304 has been replaced by Chapter 15, caselaw applying that section remains relevant to evaluating requests for relief. *See In re Atlas Shipping A/S, 404 B.R. 726, 738 (Bankr.S.D.N.Y.2009);* Leif M. Clark & Karen Goldstein, *Sacred Cows: How to Care for Secured Creditors' Rights in Cross–Border Bankruptcies, 46 Tex. Int'l L.J. 513, 524 (2011)* ("Not surprisingly, the case law under former § 304 is still relevant to the interpretation of Chapter 15, especially as it concerns the remedies available to a foreign representative once recognition has been granted.").

FN14. The district court was skeptical of whether Sanchez–Mujica and Arechavaleta–Santos, as co-foreign representatives, could properly constitute a person or body under 11 U.S.C. § 101(24) and § 1517(a)(2). *Vitro I, 470 B.R. at 410 n. *.*

The source for this skepticism is unclear, and neither the parties nor the district court explores the matter further. Because § 101(41) provides that "[t]he term 'person' includes individual, partnership, and corporation," there is little doubt that Sanchez–Mujica and Arechavaleta–Santos, both natural persons, qualify as a "person or body." This is especially so because the Bankruptcy Code utilizes the word "includes" in a non-limiting capacity. 11 U.S.C. § 102(3). This means that § 101(41) potentially includes an even broader range of entities. *See In re Oversight & Control Comm'n of Avanzit, S.A., 385 B.R. 525, 540 (Bankr.S.D.N.Y.2008)* (holding oversight commission was person or body within meaning of § 1517(a)).

FN15. The Noteholders point out that none of these decisions entailed a challenge to the foreign representatives' appointment. While correct, in the context of the issue above, this fact does not diminish their persuasive value. Assuming the Noteholders' interpretation was correct, and a foreign representative had to show it was appointed by a foreign tribunal to receive Chapter 15 relief, it would be irrelevant whether another party objected because the court would still need to determine whether the appointment was correct as a threshold matter prior to granting recognition. *See In re Ran, 607 F.3d at 1021.*

FN16. The *conciliador* also submitted a letter to the bankruptcy court, as a party in interest, to the effect that he agreed with the appointment of Sanchez–Mujica and Arechavaleta–Santos.

FN17. Article 2(d) provides that a foreign representative is "a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

of the debtor's assets or affairs or to act as a representative of the foreign proceeding." UNCITRAL, UNCITRAL Model Law on Cross–Border Insolvency with Guide to Enactment, art. 2(d) (1997), *available at* http://www.uncitral.org/pdf/english/texts/insolven/insolvency-e.pdf (Model Law Guide). The only change in 11 U.S.C. § 101(24) is the addition of the words "including a person or body appointed," in lieu of the original "including one appointed."

FN18. For the same reason, we are not persuaded by the Noteholders' argument that their interpretation would result in a more objective and predictable appointment process.

FN19. The Noteholders argue that our understanding of § 101(24) would allow parties to appoint competing foreign representatives, but that concern is invalid. The number of parties who are authorized to "administer the reorganization of a debtor's assets" is necessarily limited. As we have said, we do not opine on the limits of authorization to "act as a representative," because that issue is not pertinent here.

FN20. Under Chapter 11, the term "debtor in possession" refers to the debtor itself, unless an entity is serving as the debtor's trustee pursuant to 11 U.S.C. § 322. "A debtor in possession stands in the shoes of the bankruptcy trustee, generally having the same rights, powers, duties and functions, with certain exceptions." *Soto–Rios v. Banco Popular de Puerto Rico,* 662 F.3d 112, 115 n. 2 (1st Cir.2011) (citing 11 U.S.C. § 1107(a)).

FN21. The Noteholders raise a number of additional arguments that are ultimately unavailing. The Noteholders argue that, assuming Vitro could act as its own foreign representative, it could not appoint others to that role. The Noteholders also argue that Vitro's appointment fails because it occurred prior to the *concurso* filing and because the appointment creates a conflict of interest between Vitro and its creditors. Finally, they repeatedly point out that the foreign representatives lacked the expertise necessary to serve in that role, and that they abdicated their responsibilities by ceding decision-making authority to United States counsel. The Noteholders cite no pertinent authority in support of these contentions.

FN22. The Objecting Creditors' briefs reiterate many of the factual allegations they made in the bankruptcy court, without addressing the bankruptcy court's holdings on those allegations. Because we affirm the bankruptcy court's ultimate holding denying enforcement to the Plan, we do not address those allegations further.

FN23. Although this approach—first considering relief under § 1521(a) and (b) and then proceeding to § 1507—has not been explicitly mandated in this circuit, this three-step approach, as we explain below, finds support in the statutory language and in Congress's express intent in crafting § 1507.

FN24. *See generally* Alesia Ranney–Marinelli, *Overview of Chapter 15 Ancillary and Other Cross–Border Cases,* 82 Am. Bankr. L.J. 269, 317 (2008) ("What is not clear is whether a foreign representative can pick and choose which section to proceed under in order to take advantage of different standards for affording relief or burdens of proof."); George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings,* 14 Am. Bankr. Inst. L.Rev. 431, 455 ("Because it is unclear where section 1521

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

ends and where section 1507 begins, it is also unclear which of these paths the court will follow—whether it will consider entry of an order enforcing a foreign discharge as 'appropriate relief' under section 1521 or as 'additional assistance' under section 1507.").

FN25. The Model Law's analog to § 1507 "was designed to insure access to relief that might be available under law other than the insolvency law." 8 Collier, *supra,* ¶ 1507.01.

FN26. These factors are identical to those formerly found under § 304(c), with the exception that comity has been elevated from a factor to the introductory text.

FN27. Because of § 1521's broad reach, § 1507's scope is uncertain. *See* Lesley Salafia, *Cross–Border Insolvency Law in the United States and Its Application to Multinational Corporate Groups,* 21 Conn. J. Int'l L. 297, 322 (2006) (section 1507 "might not have been necessary," given expansive relief available under other parts of Chapter 15); 8 Collier, *supra,* ¶ 1507.01 ("In light of this display of [ § 1521's] weaponry, it is not clear what section 1507 adds to the arsenal."). Scholarly commentary has speculated that § 1507 was merely intended to incorporate § 304's jurisprudence. 8 Collier, *supra,* ¶ 1507.01. Further muddying § 1507's role is that, although § 304(c)'s factors are included under § 1507, a court may nevertheless consider those factors under § 1521. "It would be anomalous to suggest that in determining whether creditor interests are sufficiently protected for purposes of ... [§ ] 1521, a court could not consider evidence of procedural or substantive prejudice to non-domestic creditors in the foreign proceeding or a significant deviation between the distribution scheme in the foreign proceeding and the

distribution scheme prescribed by the Code." Paul L. Lee, *Ancillary Proceedings under Section 304 and Proposed Chapter 15 of the Bankruptcy Code,* 76 Am. Bankr. L.J. 115, 193 (2002).

FN28. Vitro also argues that § 1521 only applies during the pendency of a foreign insolvency proceeding, and not after the foreign court approves a reorganization plan, and Vitro cites in support *In re Daewoo Logistics Corp.,* 461 B.R. 175, 179–80 (Bankr.S.D.N.Y.2011). That case only states that "relief may be available after close of the foreign proceeding under section 1507." *Id.* at 180. It does not create a categorical rule and § 1521 does not include such a limitation.

FN29. Scholarly commentary has suggested that § 1521(a)(1)'s use of the word "concerns" "indicates that a stay of actions against someone other than the debtor or the debtor's assets is a possibility," including "a stay of litigation against a third party with indemnification rights against the debtor, or with shared liability ... on the theory that the litigation so stayed *concerns* the debtor's rights, obligations or liabilities." 1 Collier, *supra,* ¶ 13.07[2] & n. 37 (emphasis in original). However, the situation in this case is different. The worry is not that Vitro will be harmed by creditors collecting from the subsidiaries who will in turn come looking for Vitro. Instead, Vitro's subsidiaries are guarantors, and thus it was Vitro's defaulting on its obligations which now endangers the subsidiaries by triggering the guaranties.

FN30. We are aware that under the older § 304(b)(1) a bankruptcy court could "enjoin actions against the debtor with regard to property *involved in* such foreign proceeding" and that "against the debtor" has been understood to include non-debtors "when

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

failure to enjoin the action would jeopardize the success of the bankruptcy process or cause irreparable harm to the debtor's estate and its creditors." *In re Schimmelpenninck,* 183 F.3d at 362 (internal quotation marks and citation omitted). However, under 11 U.S.C. § 362(a)(1), which includes the same "against the debtor" language as § 304(b), stays against non-debtors were reserved for "very limited situations." *Matter of S.I. Acquisition, Inc.,* 817 F.2d 1142, 1147 (5th Cir.1987). Moreover, unlike in a case such as *In re Schimmelpenninck,* we are not dealing with creditors attempting to recover on a debt under an alter ego and single business enterprise theory. 183 F.3d at 363. Instead, the Objecting Creditors are trying to recover from the subsidiaries under guaranties that were triggered only as a result of Vitro's default. Vitro is not seeking a temporary injunction, but a permanent discharge of the Guarantors' obligations. Vitro itself points out that injunctive relief is only incidental to the broader relief it seeks.

FN31. We also note that the Enforcement Motion does not seek relief under § 1521(b). Instead, the Enforcement Motion refers to § 1521(a)(1), (a)(2), (a)(5), and (a)(7). Neither Vitro's nor Fintech's brief argues how these other provisions would apply and they actually appear to present reasons for why the requested relief might not be available under § 1521.

FN32. While we agree with the bankruptcy court that *Metcalfe* is ultimately distinguishable, *Vitro II,* 473 B.R. at 131, we nevertheless find it instructive in determining which part of Chapter 15 would provide the requested relief.

FN33. Vitro also argues that the bankruptcy court erred in treating § 1507(b)'s

subsections as prongs of a test, as opposed to mere considerations, and did not consider the totality of the circumstances. Although it is not necessary for a plan to meet all § 1507(b) factors, *see In re Bd. of Dirs. of Telecom Arg. S.A.,* 528 F.3d 162, 169 n. 7 (2d Cir.2008) (noting that "Chapter 15 dispenses with the explicit requirement that courts consider the five factors listed in § 304(c) [now § 1507(b) ] as part of an application for recognition of foreign insolvency proceedings"), failure to meet any one of these can suffice to deny enforcement, *see In re Treco,* 240 F.3d at 158–61 (denying enforcement because of violation of § 304(c)(4) (now § 1507(b)(4))).

FN34. Fintech also argues that failure to enforce the Plan would encourage investors to resort to litigation, instead of negotiating compromises with a debtor in bankruptcy. Given our very limited holding on the facts of this case we find this to be a slight risk. Even were it otherwise, we are bound to apply the statutory provisions of Chapter 15 faithfully irrespective of whether the effect will be to spur further litigation.

FN35. The parties dispute whether we need to consider the traditional factors of comity. In *International Transactions, Ltd.* we enumerated five requirements that would make a foreign court's judgment on a matter conclusive in federal court. 347 F.3d at 594. Section 1507 explicitly incorporates comity, however, and thus, given our reasoning above, we assume that comity would be granted were the Plan to also reasonably address the concerns enumerated in § 1507(b)(1)-(4). *See In re Treco,* 240 F.3d at 158 (observing that § 304(c) (now § 1507(b)) supplants federal common law analysis).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN36. The Objecting Creditors' briefs largely omit any discussion of how the distributions under the *Concurso* plan, including the New 2019 Notes, the MCDs, and the cash consideration, resulted in this amount. The Objecting Creditors' witness, Dan Gropper, a managing director of one of the Noteholders, testified as a fact witness on this issue. Gropper was uncertain of what worth, for example, the MCDs, which convert into 20% equity in Vitro upon Vitro's default, would have, given the questionable value of equity in a defaulting company. The bankruptcy court made no specific factual findings in his regard, and thus we are left with the court's more general observation that creditors would, under the Plan, receive a fraction of what they would have received under the Old Notes.

The Objecting Creditors also make much of testimony by their expert witness, Dr. Joseph W. Doherty, that there was only a 10,000 to 1 chance that Vitro would have received a distribution in United States bankruptcy court like that resulting from the *concurso* proceeding. But this calculation was not based on any case-by-case comparison between Vitro and other bankruptcies. Instead, it was based on a sample of cases drawn from an incomplete database of bankruptcy proceedings, which, at the time, contained 108 relevant cases, of which 37 involved any distributions of equity. Doherty himself admitted that the database was still in the process of being compiled and presently contained only cases with information easily available on the Public Access to Court Electronic Records database ("PACER"). Statistical evidence of this variety is, to say the least, of limited value when considering the complexities of bankruptcy proceed-

ings of this scale. The bankruptcy court acknowledged that Doherty testified as to "[t]he wide variance in return to creditors from what would be expected in a Chapter 11 plan," but only found that testimony "credible," without making any specific factual findings, and only made his credibility finding within the scope of arguments the court did not reach.

FN37. We found the discussion on this issue in the amicus curiae brief filed by the United Mexican States of assistance.

FN38. Because the bankruptcy court did not discuss whether § 1507(b)(1)-(3) weighed in favor of, or against, granting relief, and because we find that relief was properly denied on other grounds, we do not reach the Objecting Creditors' argument that the *Concurso* plan violated § 1507(b)'s other subsections.

FN39. Mejan's rebuttal report also seeks to undermine the Objecting Creditors' claim that there is a debate in the Mexican legal community as to whether insiders are allowed to vote. Regardless of whether such a debate exists, or whether the LCM permits it or not, it is surely the case that in the United States insider voters cannot themselves push through a plan where there is a class of dissenting creditors. *See CIBC Bank & Trust Co. (Cayman) Ltd. v. Banco Cent. do Brasil,* 886 F.Supp. 1105, 1114 (S.D.N.Y.1995) (citing 11 U.S.C. § 1129(a)(10)) (Bankruptcy Code "prevents 'insiders' from voting on whether a reorganization plan will be accepted by a class of impaired creditors"). As we have explained previously, the Bankruptcy Code requires that at least one impaired class of creditors approve a plan, where the class is made up of claims that are substantially similar or share the impaired creditors' in-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))
**(Cite as: 2012 WL 5935630 (C.A.5 (Tex.)))**

terests. *In re Save Our Springs (S.O.S.) Alliance, Inc.,* 632 F.3d 168, 174 (5th Cir.2011).

**FN40.** Vitro also called as a rebuttal witness Claudio Del Valle, Vitro's chief financial and restructuring officer. That witness testified as to the amount of default interest recognized in the *concurso* proceeding.

**FN41.** Vitro stresses that the Objecting Creditors are sophisticated parties, and that many noteholders did not purchase notes until after Vitro had defaulted, the implication being that creditors knew what they were getting into. As a preliminary matter, it appears to us that all the parties involved are "sophisticated." We also do not understand why an investor's background should excuse a plan's failure to substantially adhere to our law's order of distribution.

We similarly reject the argument that because the Objecting Creditors participated in the *concurso* proceeding they are now estopped from resisting Vitro's Chapter 15 action. Chapter 15's protections address a separate set of concerns beyond what may have been litigated in a foreign proceeding.

**FN42.** For the same reasons we conclude that, even if § 1521 did provide the broad relief Vitro seeks, enforcement of this Plan would be precluded under § 1522 for failing to provide an adequate "balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief." *In re Int'l Banking Corp. B.S.C.,* 439 B.R. at 626 (quoting Model Law Guide, *supra,* ¶ 161); *see also In re Sivec SRL,* 476 B.R. at 323.

**FN43.** Sanchez–Mujica's declaration only

states that "Vitro's business, as well as those who have an interest in seeing Vitro's business succeed, such as its customers and creditors, will continue to suffer immense harm" if the Plan is not enforced.

**FN44.** Presumably, Vitro is arguing that the Mexican court's decision is the prior action and, thus, the bankruptcy court and this court are required to recognize that foreign court's holding and confer it res judicata effect. Such reasoning conflates the difference between a foreign ruling and the bankruptcy court's decision to grant relief pursuant to Chapter 15, and is rejected.

**FN45.** The other cases Vitro and Fintech cite in support appear to have involved consensual agreements between the parties and are thus inapposite.

**FN46.** For the same reason, we do not reach the Objecting Creditors' arguments that the Plan violates a fundamental public policy for infringing on the absolute priority rule, the Contract Clause of the United States Constitution, U.S. Const. art. I, § 10, cl. 1, the Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa, *et seq.,* or the interests of the United States in protecting creditors from so called "bad faith schemes."

C.A.5 (Tex.),2012.
In re Vitro S.A.B. de CV
--- F.3d ----, 2012 WL 5935630 (C.A.5 (Tex.))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Date of Printing: Jan 16, 2013

**KEYCITE**

**H In re Vitro S.A.B. de CV,** --- F.3d ----, 2012 WL 5935630 (5th Cir.(Tex.), Nov 28, 2012) (NO. 12-10542,
12-10689, 12-10750)

No negative history cases/references were found for your request.

© 2013 Thomson Reuters. All rights reserved.

**Exhibit K.14**
***Smith v. Dominion Bridge Corp.*, No. 96-7580, 1999 WL 111465
(E.D. Pa. March 2, 1999)**

Not Reported in F.Supp.2d, 1999 WL 111465 (E.D.Pa.), 33 Bankr.Ct.Dec. 1263
**(Cite as: 1999 WL 111465 (E.D.Pa.))**

▷

United States District Court, E.D. Pennsylvania.
James B. SMITH, On Behalf of Himself and Others
Similarly Situated, Plaintiff,
v.
DOMINION BRIDGE CORPORATION (f/k/a Cedar Group, Inc.), Michel L. MarengÈre and Nicolas
Matossian, Defendants.

No. CIV. A. 96–7580.
March 2, 1999.

*MEMORANDUM*

REED.

*1 Before the Court is the motion of defendants
Dominion Bridge Corporation ("DBC"), Michel L.
Marengère, and Nicolas Matossian (collectively the
"individual defendants") for stay of proceedings
(Document No. 32). Based on the following analysis, the motion to stay will be granted.

I. BACKGROUND AND POSITIONS OF THE
PARTIES

The following background on this class action
is taken from the complaint and the Memorandum
and Order of the Court dated March 5, 1998 granting the plaintiff's motion for class certification
(Document No. 28). Cedar Group, Inc. was an international engineering, infrastructure, project management, aerospace and industrial metal transformation company. In August of 1996, Cedar changed
its name to Dominion Bridge Corporation. Defendant Michel L. Marengère was DBC's Chairman of
the Board and Chief Executive Officer, and defendant Nicolas Matossian was DBC's President, Chief
Financial Officer, and Chief Operating Officer during the period of time relevant to this lawsuit. The
common stock of DBC was traded publicly in the
United States on the NASDAQ Stock Exchange and
in Canada on the Vancouver Stock Exchange.

The plaintiffs allege that between April 20,
1995 and May 18, 1996, defendants failed to disclose to the investment community that DBC's construction contracts were at risk of either not being
formed or being canceled, that DBC lost $40 million in contracts for fiscal 1996, that DBC suffered
from a lack of adequate accounting controls, that
DBC's financial status lacked credibility because of
inaccurate and misleading accounting practices, and
that the defendants had been accused of violations
of federal securities law in a letter from a former
executive. The *Montreal Gazette* published this information on May 18, 1996. In addition to DBC's
failure to disclose, Smith alleges that DBC issued
several misleading statements to the press touting
the purported success and growth of DBC during
this period.

Smith brought this class action in this Court on
November 12, 1996 alleging violations of Sections
10(b) and 20(a) of the Securities Exchange Act of
1934, 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b–5,
17 C.F.R. 240.10b–5, which was promulgated
thereunder. Marengère and Matossian resigned
from DBC on April 28, 1998. (Marengère Declaration ¶ 3; Matossian Declaration ¶ 3).

The defendants filed the pending motion to stay
the proceedings after DBC filed a notice of intention to file a proposal [FN1] pursuant to Canada's
Bankruptcy and Insolvency Act ("BIA") § 50.4 in
the Quebec Superior Court, Bankruptcy Division,
District of Montréal, Canada on August 11, 1998.
(Leduc Declaration ¶ 1). The defendants contend
that under BIA § 69, the filing of the notice of intention automatically stayed the commencement or
continuation of all suits, actions and proceedings
against DBC, except by leave of the Canadian
court. (Leduc Declaration ¶ 6; Pls.' Ex. A, Notice of
Stay Order). The defendants argue that this Court
should extend comity to the stay of the Canadian
court and exercise its inherent power to stay the
proceedings as to DBC in this lawsuit.

FN1. A notice of intention to file a proposal is an indication to creditors that the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 111465 (E.D.Pa.), 33 Bankr.Ct.Dec. 1263
**(Cite as: 1999 WL 111465 (E.D.Pa.))**

debtor is going to reorganize. (Pls.' Ex. C, Leduc Dep. at 11).

**\*2** Although the defendants acknowledge that the stay issued by the Canadian court does not apply to the individual defendants in this lawsuit, the defendants seek to stay the proceedings against the individual, non-debtor defendants as well, in order to protect the interests of DBC. The defendants contend that any judgment against the individual defendants could have a collateral estoppel effect on the liability of DBC. In addition, under to the Certificate of Incorporation of DBC and agreements entered into between the individual defendants and DBC (Defs.' Exs. A, B, and C), the individual defendants contend that they are entitled to indemnity from DBC for any liability that they may incur as a result of this litigation. (Marengère Declaration ¶ 6; Matossian Declaration ¶ 6).

The plaintiffs argue that comity should not be extended to the Canadian stay and that this lawsuit should proceed against DBC. Alternatively, the plaintiffs argue that if the Court grants the stay as to the claims against DBC, it should be conditioned upon DBC's production of certain documents. The plaintiffs argue that a stay should not be granted as to their claims against the individual defendants as they are former officers and directors of DBC who are not involved in the reorganization efforts of DBC. In addition, the plaintiffs argue that no harm would incur to DBC if the case proceeds against the individual defendants as collateral estoppel would not apply to the claims against DBC and DBC has no duty to indemnify the individual defendants.

## II. ANALYSIS

### A. Extension of Comity to the Canadian Stay

A federal court has discretion to exercise its inherent power to stay the proceedings before it. *See I.J.A., Inc. v. Marine Holdings, Ltd.,* 524 F.Supp. 197, 198 (E.D.Pa.1981) (citing *Landis v. North American Co.,* 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936)). In general, a federal court should give

effect to executive, legislative, and judicial acts of a foreign nation under the principle of international comity. *See Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.,* 44 F.3d 187, 191 (3d Cir.1994).* Comity is the "recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 163, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Courts in the United States have long extended comity to foreign bankruptcy actions. *See Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,* 825 F.2d 709, 714 (2d Cir.1987). According comity to a foreign bankruptcy proceeding enables "the assets of debtor to be disbursed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic, or piecemeal fashion." *Cunard S.S. Co. v. Salen Reefer Services A.B.,* 773 F.2d 452, 457–58 (2d Cir.1985). "Under general principles of comity ..., federal courts will recognize foreign bankruptcy proceedings provided the foreign laws comport with due process and fairly treat the claims of local creditors." *Victrix S.S. Co.,* 825 F.2d at 714. In *Philadelphia Gear Corp.,* the Court of Appeals for the Third Circuit concluded that a party seeking a stay of a judicial proceeding based on a foreign bankruptcy proceeding must demonstrate that "(1) the foreign bankruptcy court shares our policy of equal distribution of assets; and (2) the foreign law mandates the issuance or at least authorizes the request for the stay." 44 F.3d at 193.

**\*3** As a sister common law jurisdiction, courts have consistently extended comity to Canadian bankruptcy proceedings. *See In re Davis,* 191 B.R. 577, 587 (Bankr.S.D.N.Y.1996) (finding that the BIA "contains a comprehensive procedure for the orderly marshaling and equitable distribution of a Canadian debtor's assets which closely resembles that under the [Bankruptcy] Code"); *Cornfeld v. Investors Overseas Services, Ltd.,* 471 F.Supp. 1255, 1259 (S.D.N.Y.1979). The defendants submitted the declaration of René C. Leduc, the administrator

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 111465 (E.D.Pa.), 33 Bankr.Ct.Dec. 1263
**(Cite as: 1999 WL 111465 (E.D.Pa.))**

acting on behalf of Arthur Andersen Inc. who was appointed trustee under DBC's proposal, which describes Canadian bankruptcy law. (Leduc Declaration ¶¶ 6, 9–20). Canadian law provides for equal distribution of assets and authorizes the stay of proceedings against an entity that has filed for bankruptcy protection. (Leduc Declaration ¶¶ 9, 6). The provision for an automatic stay of proceedings against the debtor issued under Canadian law is analogous to 11 U.S.C. § 362, which provides for an automatic stay of the continuation or commencement of any action against a bankrupt. Moreover, there is no indication in the record that the proceedings instituted by DBC in Canada do not comport with American notions of due process or that extending comity here would be prejudicial to the interests of the plaintiffs or the United States. *See Philadelphia Gear Corporation,* 44 F.3d at 193 (noting that a court should consider (1) whether the court in which the proceedings were pending is a duly authorized tribunal, (2) whether the foreign bankruptcy code provides for equal treatment of creditors, (2) whether a stay would be in some manner "inimical to this country's policy of equality;" and (4) whether the creditor would be prejudiced by the stay).

The plaintiffs argue that the United States has an overriding public policy interest in enforcing its securities laws; however, deference may be given to foreign bankruptcy proceedings notwithstanding that the plaintiffs in this Court are Americans and the claims are based on the securities laws of this country. *See Lindner Fund, Inc. v. Polly Peck International PLC,* 143 B.R. 807, 810 (S.D.N.Y.1992) (extending comity to English bankruptcy proceedings by dismissing action claiming violations of the Security and Exchange Act of 1934 filed in the United States federal court against debtor on the grounds that dismissal "would further the public policies underlying the automatic stay provisions of the English Insolvency Act and the analogous provision of the United States Bankruptcy Code.").

These notions of international comity and the

case law on the issue suggest that comity should be extended to the Canadian bankruptcy proceedings and the automatic stay issued by the Canadian court; accordingly, the motion to stay will be granted as to the proceedings against DBC.

**B. Extension of Stay to Proceedings against Non–Debtor Defendants**

 **\*4** Neither the stay entered by the Canadian court nor the automatic stay provision of § 362(a) apply to non-bankrupt co-defendants of the debtor, such as the individual defendants in this case. *See United National Insurance Company v. Equipment Managers, Inc.,* No. 95–0116, 1997 WL 241152, *3 (E.D.Pa. May 6, 1997).* However, under certain "unusual circumstances,"[FN2] courts have stayed proceedings against non-debtor co-defendants in cases in which the claims against the debtor were automatically stayed. *See McCartney v. Integra Nat'l Bank North,* 106 F.3d 506, 510 (3d Cir.1997). "Unusual circumstances" exist when "there is such identity between the debtor and third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third party defendant will in effect be a judgment or finding against the debtor" or where the protection of a stay is essential to the debtor's reorganization efforts. *Id.* (quoting *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 999 (4th Cir.), *cert. denied,* 479 U.S. 876 (1986)). Similarly, many bankruptcy courts have issued preliminary injunctions pursuant to 11 U.S.C. § 105(a),[FN3] staying the prosecution of actions against non-debtor defendants who were officers or directors of the debtor. *See e.g., In re American Film Technologies, Inc.,* 175 B.R. 847, 850 (Bankr.D.Del.1994) (citing cases).

> FN2. There is some disagreement as to whether under "unusual circumstances," the stay provisions of § 362 apply automatically to non-debtor co-defendants or if the stay provisions must be extended by court order. *See In re Bidermann Industries U.S.A., Inc.,* 200 B.R. 779, 782 (Bankr.S.D.N.Y.1996). There is no need to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 111465 (E.D.Pa.), 33 Bankr.Ct.Dec. 1263
**(Cite as: 1999 WL 111465 (E.D.Pa.))**

address this issue here as the Court is only considering the automatic stay by analogy in determining whether to exercise its inherent power to stay proceedings before it.

FN3. The plaintiffs argue that the Court should apply the standard for a preliminary injunction to determine whether to stay the proceedings against the individual defendants. However, the cases which the plaintiffs cite concern a court's power to issue an injunction staying proceedings in other courts pursuant to § 105. As the motion requests that this Court stay proceedings before it pursuant to its inherent power to stay, the defendants do not need to satisfy the requirements for a preliminary injunction to obtain a stay in this Court.

In *United National Insurance,* the court, in the context of considering a motion to sever the claims against individual, non-debtor defendants, considered four factors that have been used to determine whether a court should proceed without a party whose absence from the litigation is compelled by other reasons: "(1) the plaintiff's interest in having a forum and whether or not plaintiff has a satisfactory alternative forum; (2) whether the defendant may wish to avoid multiple litigation or inconsistent relief or sole responsibility for liability he shares with another; (3) the interest of the outsider whom it would have been desirable to join and the extent to which the judgment may, as a practical matter, impair or impede the absent party's ability to protect his interest; and (4) the interest of the courts and the public in the complete, consistent and efficient settlement of controversies." 1997 WL 241152 at *3 (citing *Cushman and Wakefield, Inc. v. Backos,* 129 B.R. 35, 36 (E.D.Pa.1991)). Consideration of these factors is helpful in determining whether unusual circumstances exist such that the proceedings against the individual defendants should be stayed.

As to the first factor, because this is a motion

to stay the proceedings not a motion to dismiss, the plaintiffs retain this Court as the forum in which to bring their claims, even if they are unable to bring their claims before the bankruptcy court in Canada. Extending the stay to all defendants does not shield any of the defendants from liability, but rather merely delays the proceedings until DBC can submit and implement a reorganization plan to its creditors. The interests in avoiding multiple proceedings and potentially inconsistent relief and in the efficient resolution of claims, represented in the second and fourth factors, weigh in favor of extending the stay to the claims against the individual defendants.

**\*5** As to the third factor, given the fact that the individual defendants were officers of DBC at the time of the allegations of plaintiffs and that the claims against the individual defendants arise out of the same factual basis as the claims against DBC, I conclude that DBC will not be able to adequately protect its interests if it is not present while the case proceeds against the individual defendants. Two issues contribute to this potential hindrance to DBC: the possible operation of collateral estoppel and DBC's potential duty to indemnify the individual defendants. If this case is allowed to proceed against the individual defendants, collateral estoppel may prevent DBC from litigating factual and legal issues critical to the claims of the plaintiffs against it. *See In re Johns–Manville Corporation,* 26 B.R. 420, 429 (Bankr.S.D.N.Y.1983) (extending the automatic stay to enjoin a security holders' class action suit against various employees and agents of a debtor, noting the risk that the corporate debtor "would be found to be a controlling nonparty ... [and] thus could be collaterally estopped in subsequent suits from relitigating issues determined against its officers and directors"), *vacated in part on other grounds,* 41 B.R. 926 (S.D.N.Y.1984).

The parties disagree as to whether the individual defendants have a right to indemnification by DBC for any liability they may incur in this lawsuit. Because it is possible that DBC may be re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 111465 (E.D.Pa.), 33 Bankr.Ct.Dec. 1263
**(Cite as: 1999 WL 111465 (E.D.Pa.))**

quired to indemnify the individual defendants for any liability they incur as a result of this lawsuit and in the least, it would be in DBC's interest to protect itself in the proceedings against the individual defendants in case its duty to indemnify is later established, continuing with the claims against the individual defendants in the absence of DBC would undermine the purpose of granting the stay as to the claims against DBC. Indeed, it is likely that DBC would have to focus some of its efforts on the defense of these individual defendants to protect its interests, which would detract from its ability to successfully reorganize.

All four of the factors discussed in *United National Insurance* weigh in favor of staying the proceedings against the individual defendants. In addition, the case law addressing this issue under similar facts supports the same conclusion. *See e.g., Allstate Life Insurance Co. v. Linter Group Ltd.,* 994 F.2d 996, 1000 (2d Cir.1993) (affirming the lower court's dismissal of suit against individual, non-debtor defendants and noted that "since these individuals were sued solely because of their affiliation with the [debtor], to allow these claims to go forward in the United States despite the dismissal as to the [debtor] would defeat the purpose of granting comity in the first place"); *United National Insurance,* 1997 WL 241152 at *4 (denying motion to sever case against individual defendants and proceed to trial and noting that "where wrongful conduct by officers and agents of a corporation and the corporation itself are alleged, there is great potential for the interest of [the debtor] to be impaired or impeded if the case were to proceed against the individual defendants"). Because I find that unusual circumstances exist such that there is identify between DBC and the individual defendants such that DBC may be said to be the real party defendant and a stay is necessary to DBC's reorganization efforts, the motion to stay as to the claims against the individual defendants will be granted.

C. Request for Discovery

**\*6** The plaintiffs request that this Court require

DBC to produce certain documents that the plaintiffs argue DBC agreed to produce in July of 1998 before it filed for bankruptcy protection in Canada. Because I conclude that the plaintiffs will not suffer prejudice if discovery is delayed and that requiring DBC to proceed with document production in this lawsuit during its efforts to reorganize would defeat the purpose in extending comity to the Canadian stay in the first place, the request will be denied.

IV. CONCLUSION

Based on the foregoing analysis, the motion to stay will be granted. The request of plaintiffs that this Court condition the stay on the production of certain documents by DBC will be denied.

An appropriate Order follows.

*ORDER*

AND NOW, this 2nd day of March, 1999, upon consideration of the motion of defendants for stay of proceedings (Document No. 32), the response of the plaintiffs thereto (Document No. 35), and the reply of the defendants (Document No. 36), and for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that the motion is GRANTED and the proceedings in this Court are STAYED until further order of the Court. The parties shall notify the Court when the automatic stay imposed by the Canadian bankruptcy court is lifted.

IT IS FURTHER ORDERED THAT the request of the plaintiffs that the stay be conditioned on the production of certain documents by Dominion Bridge Corporation is DENIED.

IT IS FURTHER ORDERED that the Clerk shall place this case on the civil suspension docket of this Court.

E.D.Pa.,1999.
Smith v. Dominion Bridge Corp.
Not Reported in F.Supp.2d, 1999 WL 111465 (E.D.Pa.), 33 Bankr.Ct.Dec. 1263

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 111465 (E.D.Pa.), 33 Bankr.Ct.Dec. 1263
**(Cite as: 1999 WL 111465 (E.D.Pa.))**

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Date of Printing: Jan 17, 2013

**KEYCITE**

▷ **Smith v. Dominion Bridge Corp.,** 1999 WL 111465, 33 Bankr.Ct.Dec. 1263 (E.D.Pa., Mar 02, 1999) (NO. CIV. A. 96-7580)

### History

### Direct History

=>          1 **Smith v. Dominion Bridge Corp.,** 1999 WL 111465, 33 Bankr.Ct.Dec. 1263 (E.D.Pa. Mar 02, 1999) (NO. CIV. A. 96-7580)

### Negative Citing References (U.S.A.)

*Called into Doubt by*

▷          2 In re Philadelphia Newspapers, LLC, 407 B.R. 606 (E.D.Pa. Jul 02, 2009) (NO. 09-11204, CIV.A. 09-2638) ★ ★

### Related References

H          3 Smith v. Dominion Bridge Corp., 1998 WL 98998, Fed. Sec. L. Rep. P 90,163 (E.D.Pa. Mar 06, 1998) (NO. CIV. A. 96-7580)

H          4 Smith v. Dominion Bridge Corp., 2007 WL 1101272, Fed. Sec. L. Rep. P 94,205 (E.D.Pa. Apr 11, 2007) (NO. CIV.A.96 7580)

### Court Documents

### Trial Court Documents (U.S.A.)

**E.D.Pa. Trial Pleadings**

          5 James B. SMITH, On Behalf Of Himself and Others Similarly Situated, Plaintiffs, v. DOMINION BRIDGE CORP. (f/k/a Cedar Group, Inc.), Michel L. Marengere and Nicolas Matossian, Defendants., 1996 WL 34446247 (Trial Pleading) (E.D.Pa. Aug. 1, 1996) **Complaint - Class Action** (NO. 296CV07580)

### Dockets (U.S.A.)

**E.D.Pa.**

          6 SMITH v. DOMINION BRIDGE CORP, ET AL, NO. 2:96cv07580 (Docket) (E.D.Pa. Nov. 12, 1996)

© 2013 Thomson Reuters. All rights reserved.