**EXHIBIT B**

CITATION: Labourers' Pension Fund of Central and Eastern Canada v. Sino-Forest Corporation, 2013 ONSC 1078
COURT FILE NO.: CV-12-9667-00CL
CV-11-431153-00CP
DATE: 20130320

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**(COMMERCIAL LIST)**

RE:  IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF SINO-FOREST CORPORATION, Applicant

AND RE:  THE TRUSTEES OF THE LABOURERS' PENSION FUND OF CENTRAL AND EASTERN CANADA, THE TRUSTEES OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 793 PENSION PLAN FOR OPERATING ENGINEERS IN ONTARIO, SJUNDE AP-FONDEN, DAVID GRANT AND ROBERT WONG, Plaintiffs

AND:

SINO-FOREST CORPORATION, ERNST & YOUNG LLP, BDO LIMITED (FORMERLY KNOWN AS BDO MCCABE LO LIMITED), ALLEN T.Y. CHAN, W. JUDSON MARTIN, KAI KIT POON, DAVID J. HORSLEY, WILLIAM E. ARDELL, JAMES P. BOWLAND, JAMES M.E. HYDE, EDMUND MAK, SIMON MURRAY, PETER WANG, GARRY J. WEST, PÖYRY (BEIJING) CONSULTING COMPANY LIMITED, CREDIT SUISSE SECURITIES (CANADA) IN., TD SECURITIES INC., DUNDEE SECURITIES CORPORATION, RBC DOMINION SECURITIES INC., SCOTIA CAPITAL INC., CIBC WORLD MARKETS INC., MERRILL LUNCH CANADA INC., CANACCORD FINANCIAL LTD., MAISON PLACEMENTS CANADA INC., CREDIT SUISSE SECURITIES (USA) LLC AND MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED (SUCCESSOR BY MERGER TO BANC OF AMERICA SECURITIES LLC), Defendants

BEFORE:  MORAWETZ J.

COUNSEL:  Kenneth Rosenberg, Max Starnino, A. Dimitri Lascaris, Daniel Bach, Charles M. Wright, and Jonathan Ptak, for the Ad Hoc Committee of Purchasers including the Class Action Plaintiffs

Peter Griffin, Peter Osborne, and Shara Roy, for Ernst & Young LLP

John Pirie and David Gadsden, for Pöyry (Beijing) Consulting Company Ltd.

Robert W. Staley, for Sino-Forest Corporation

Won J. Kim, Michael C. Spencer, and Megan B. McPhee, for the Objectors, Invesco Canada Ltd., Northwest & Ethical Investments LP and Comité Syndical National de Retraite Bâtirente Inc.

John Fabello and Rebecca Wise for the Underwriters

Ken Dekker and Peter Greene, for BDO Limited

Emily Cole and Joseph Marin, for Allen Chan

James Doris, for the U.S. Class Action

Brandon Barnes, for Kai Kit Poon

Robert Chadwick and Brendan O'Neill, for the Ad Hoc Committee of Noteholders

Derrick Tay and Cliff Prophet for the Monitor, FTI Consulting Canada Inc.

Simon Bieber, for David Horsley

James Grout, for the Ontario Securities Commission

Miles D. O'Reilly, Q.C., for the Junior Objectors, Daniel Lam and Senthilvel Kanagaratnam

HEARD:    FEBRUARY 4, 2013

## ENDORSEMENT

### INTRODUCTION

[1] The Ad Hoc Committee of Purchasers of the Applicant's Securities (the "Ad Hoc Securities Purchasers' Committee" or the "Applicant"), including the representative plaintiffs in the Ontario class action (collectively, the "Ontario Plaintiffs"), bring this motion for approval of a settlement and release of claims against Ernst & Young LLP [the "Ernst & Young Settlement", the "Ernst & Young Release", the "Ernst & Young Claims" and "Ernst & Young", as further defined in the Plan of Compromise and Reorganization of Sino-Forest Corporation ("SFC") dated December 3, 2012 (the "Plan")].

[2] Approval of the Ernst & Young Settlement is opposed by Invesco Canada Limited ("Invesco"), Northwest and Ethical Investments L.P. ("Northwest"), Comité Syndical National de Retraite Bâtirente Inc. ("Bâtirente"), Matrix Asset Management Inc. ("Matrix"), Gestion

- Page 3 -

Férique and Montrusco Bolton Investments Inc. ("Montrusco") (collectively, the "Objectors"). The Objectors particularly oppose the no-opt-out and full third-party release features of the Ernst & Young Settlement. The Objectors also oppose the motion for a representation order sought by the Ontario Plaintiffs, and move instead for appointment of the Objectors to represent the interests of all objectors to the Ernst & Young Settlement.

[3] For the following reasons, I have determined that the Ernst & Young Settlement, together with the Ernst & Young Release, should be approved.

## FACTS

### Class Action Proceedings

[4] SFC is an integrated forest plantation operator and forest productions company, with most of its assets and the majority of its business operations located in the southern and eastern regions of the People's Republic of China. SFC's registered office is in Toronto, and its principal business office is in Hong Kong.

[5] SFC's shares were publicly traded over the Toronto Stock Exchange. During the period from March 19, 2007 through June 2, 2011, SFC made three prospectus offerings of common shares. SFC also issued and had various notes (debt instruments) outstanding, which were offered to investors, by way of offering memoranda, between March 19, 2007 and June 2, 2011.

[6] All of SFC's debt or equity public offerings have been underwritten. A total of 11 firms (the "Underwriters") acted as SFC's underwriters, and are named as defendants in the Ontario class action.

[7] Since 2000, SFC has had two auditors: Ernst & Young, who acted as auditor from 2000 to 2004 and 2007 to 2012, and BDO Limited ("BDO"), who acted as auditor from 2005 to 2006. Ernst & Young and BDO are named as defendants in the Ontario class action.

[8] Following a June 2, 2011 report issued by short-seller Muddy Waters LLC ("Muddy Waters"), SFC, and others, became embroiled in investigations and regulatory proceedings (with the Ontario Securities Commission (the "OSC"), the Hong Kong Securities and Futures Commission and the Royal Canadian Mounted Police) for allegedly engaging in a "complex fraudulent scheme". SFC concurrently became embroiled in multiple class action proceedings across Canada, including Ontario, Quebec and Saskatchewan (collectively, the "Canadian Actions"), and in New York (collectively with the Canadian Actions, the "Class Action Proceedings"), facing allegations that SFC, and others, misstated its financial results, misrepresented its timber rights, overstated the value of its assets and concealed material information about its business operations from investors, causing the collapse of an artificially inflated share price.

[9] The Canadian Actions are comprised of two components: first, there is a shareholder claim, brought on behalf of SFC's current and former shareholders, seeking damages in the amount of $6.5 billion for general damages, $174.8 million in connection with a prospectus issued in June 2007, $330 million in relation to a prospectus issued in June 2009, and $319.2 million in relation to a prospectus issued in December 2009; and second, there is a noteholder

claim, brought on behalf of former holders of SFC's notes (the "Noteholders"), in the amount of approximately $1.8 billion. The noteholder claim asserts, among other things, damages for loss of value in the notes.

[10]   Two other class proceedings relating to SFC were subsequently commenced in Ontario: *Smith et al. v. Sino-Forest Corporation et al.*, which commenced on June 8, 2011; and *Northwest and Ethical Investments L.P. et al. v. Sino-Forest Corporation et al.*, which commenced on September 26, 2011.

[11]   In December 2011, there was a motion to determine which of the three actions in Ontario should be permitted to proceed and which should be stayed (the "Carriage Motion"). On January 6, 2012, Perell J. granted carriage to the Ontario Plaintiffs, appointed Siskinds LLP and Koskie Minsky LLP to prosecute the Ontario class action, and stayed the other class proceedings.

*CCAA Proceedings*

[12]   SFC obtained an initial order under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA") on March 30, 2012 (the "Initial Order"), pursuant to which a stay of proceedings was granted in respect of SFC and certain of its subsidiaries. Pursuant to an order on May 8, 2012, the stay was extended to all defendants in the class actions, including Ernst & Young. Due to the stay, the certification and leave motions have yet to be heard.

[13]   Throughout the CCAA proceedings, SFC asserted that there could be no effective restructuring of SFC's business, and separation from the Canadian parent, if the claims asserted against SFC's subsidiaries arising out of, or connected to, claims against SFC remained outstanding.

[14]   In addition, SFC and FTI Consulting Canada Inc. (the "Monitor") continually advised that timing and delay were critical elements that would impact on maximization of the value of SFC's assets and stakeholder recovery.

[15]   On May 14, 2012, an order (the "Claims Procedure Order") was issued that approved a claims process developed by SFC, in consultation with the Monitor. In order to identify the nature and extent of the claims asserted against SFC's subsidiaries, the Claims Procedure Order required any claimant that had or intended to assert a right or claim against one or more of the subsidiaries, relating to a purported claim made against SFC, to so indicate on their proof of claim.

[16]   The Ad Hoc Securities Purchasers' Committee filed a proof of claim (encapsulating the approximately $7.3 billion shareholder claim and $1.8 billion noteholder claim) in the CCAA proceedings on behalf of all putative class members in the Ontario class action. The plaintiffs in the New York class action filed a proof of claim, but did not specify quantum of damages. Ernst & Young filed a proof of claim for damages and indemnification. The plaintiffs in the Saskatchewan class action did not file a proof of claim. A few shareholders filed proofs of claim separately. No proof of claim was filed by Kim Orr Barristers P.C. ("Kim Orr"), who represent the Objectors.

[17]   Prior to the commencement of the CCAA proceedings, the plaintiffs in the Canadian Actions settled with Pöyry (Beijing) Consulting Company Limited ("Pöyry") (the "Pöyry Settlement"), a forestry valuator that provided services to SFC. The class was defined as all persons and entities who acquired SFC's securities in Canada between March 19, 2007 to June 2, 2011, and all Canadian residents who acquired SFC securities outside of Canada during that same period (the "Pöyry Settlement Class").

[18]   The notice of hearing to approve the Pöyry Settlement advised the Pöyry Settlement Class that they may object to the proposed settlement. No objections were filed.

[19]   Perell J. and Émond J. approved the settlement and certified the Pöyry Settlement Class for settlement purposes. January 15, 2013 was fixed as the date by which members of the Pöyry Settlement Class, who wished to opt-out of either of the Canadian Actions, would have to file an opt-out form for the claims administrator, and they approved the form by which the right to opt-out was required to be exercised.

[20]   Notice of the certification and settlement was given in accordance with the certification orders of Perell J. and Émond J. The notice of certification states, in part, that:

> IF YOU CHOOSE TO OPT OUT OF THE CLASS, YOU WILL BE OPTING OUT OF THE **ENTIRE** PROCEEDING. THIS MEANS THAT YOU WILL BE UNABLE TO PARTICIPATE IN ANY FUTURE SETTLEMENT OR JUDGMENT REACHED WITH OR AGAINST THE REMAINING DEFENDANTS.

[21]   The opt-out made no provision for an opt-out on a conditional basis.

[22]   On June 26, 2012, SFC brought a motion for an order directing that claims against SFC that arose in connection with the ownership, purchase or sale of an equity interest in SFC, and related indemnity claims, were "equity claims" as defined in section 2 of the CCAA, including the claims by or on behalf of shareholders asserted in the Class Action Proceedings. The equity claims motion did not purport to deal with the component of the Class Action Proceedings relating to SFC's notes.

[23]   In reasons released July 27, 2012 [*Re Sino-Forest Corp.*, 2012 ONSC 4377], I granted the relief sought by SFC (the "Equity Claims Decision"), finding that "the claims advanced in the shareholder claims are clearly equity claims". The Ad Hoc Securities Purchasers' Committee did not oppose the motion, and no issue was taken by any party with the court's determination that the shareholder claims against SFC were "equity claims". The Equity Claims Decision was subsequently affirmed by the Court of Appeal for Ontario on November 23, 2012 [*Re Sino-Forest Corp.*, 2012 ONCA 816].

*Ernst & Young Settlement*

[24]   The Ernst & Young Settlement, and third party releases, was not mentioned in the early versions of the Plan. The initial creditors' meeting and vote on the Plan was scheduled to occur on November 29, 2012; when the Plan was amended on November 28, 2012, the creditors' meeting was adjourned to November 30, 2012.

[25]     On November 29, 2012, Ernst & Young's counsel and class counsel concluded the proposed Ernst & Young Settlement. The creditors' meeting was again adjourned, to December 3, 2012; on that date, a new Plan revision was released and the Ernst & Young Settlement was publicly announced. The Plan revision featured a new Article 11, reflecting the "framework" for the proposed Ernst & Young Settlement and for third-party releases for named third-party defendants as identified at that time as the Underwriters or in the future.

[26]     On December 3, 2012, a large majority of creditors approved the Plan. The Objectors note, however, that proxy materials were distributed weeks earlier and proxies were required to be submitted three days prior to the meeting and it is evident that creditors submitting proxies only had a pre-Article 11 version of the Plan. Further, no equity claimants, such as the Objectors, were entitled to vote on the Plan. On December 6, 2012, the Plan was further amended, adding Ernst & Young and BDO to Schedule A, thereby defining them as named third-party defendants.

[27]     Ultimately, the Ernst & Young Settlement provided for the payment by Ernst & Young of $117 million as a settlement fund, being the full monetary contribution by Ernst & Young to settle the Ernst & Young Claims; however, it remains subject to court approval in Ontario, and recognition in Quebec and the United States, and conditional, pursuant to Article 11.1 of the Plan, upon the following steps:

(a)     the granting of the sanction order sanctioning the Plan including the terms of the Ernst & Young Settlement and the Ernst & Young Release (which preclude any right to contribution or indemnity against Ernst & Young);

(b)     the issuance of the Settlement Trust Order;

(c)     the issuance of any other orders necessary to give effect to the Ernst & Young Settlement and the Ernst & Young Release, including the Chapter 15 Recognition Order;

(d)     the fulfillment of all conditions precedent in the Ernst & Young Settlement; and

(e)     all orders being final orders not subject to further appeal or challenge.

[28]     On December 6, 2012, Kim Orr filed a notice of appearance in the CCAA proceedings on behalf of three Objectors: Invesco, Northwest and Bâtirente. These Objectors opposed the sanctioning of the Plan, insofar as it included Article 11, during the Plan sanction hearing on December 7, 2012.

[29]     At the Plan sanction hearing, SFC's counsel made it clear that the Plan itself did not embody the Ernst & Young Settlement, and that the parties' request that the Plan be sanctioned did not also cover approval of the Ernst & Young Settlement. Moreover, according to the Plan and minutes of settlement, the Ernst & Young Settlement would not be consummated (*i.e.* money paid and releases effective) unless and until several conditions had been satisfied in the future.

[30]     The Plan was sanctioned on December 10, 2012 with Article 11. The Objectors take the position that the Funds' opposition was dismissed as premature and on the basis that nothing in the sanction order affected their rights.

[31]    On December 13, 2012, the court directed that its hearing on the Ernst & Young Settlement would take place on January 4, 2013, under both the CCAA and the *Class Proceedings Act, 1992*, S.O. 1992, c. 6 ("CPA"). Subsequently, the hearing was adjourned to February 4, 2013.

[32]    On January 15, 2013, the last day of the opt-out period established by orders of Perell J. and Émond J., six institutional investors represented by Kim Orr filed opt-out forms. These institutional investors are Northwest and Bâtirente, who were two of the three institutions represented by Kim Orr in the Carriage Motion, as well as Invesco, Matrix, Montrusco and Gestion Ferique (all of which are members of the Pöyry Settlement Class).

[33]    According to the opt-out forms, the Objectors held approximately 1.6% of SFC shares outstanding on June 30, 2011 (the day the Muddy Waters report was released). By way of contrast, Davis Selected Advisors and Paulson and Co., two of many institutional investors who support the Ernst & Young Settlement, controlled more than 25% of SFC's shares at this time. In addition, the total number of outstanding objectors constitutes approximately 0.24% of the 34,177 SFC beneficial shareholders as of April 29, 2011.

## LAW AND ANALYSIS

### *Court's Jurisdiction to Grant Requested Approval*

[34]    The Claims Procedure Order of May 14, 2012, at paragraph 17, provides that any person that does not file a proof of claim in accordance with the order is barred from making or enforcing such claim as against any other person who could claim contribution or indemnity from the Applicant. This includes claims by the Objectors against Ernst & Young for which Ernst & Young could claim indemnity from SFC.

[35]    The Claims Procedure Order also provides that the Ontario Plaintiffs are authorized to file one proof of claim in respect of the substance of the matters set out in the Ontario class action, and that the Quebec Plaintiffs are similarly authorized to file one proof of claim in respect of the substance of the matters set out in the Quebec class action. The Objectors did not object to, or oppose, the Claims Procedure Order, either when it was sought or at any time thereafter. The Objectors did not file an independent proof of claim and, accordingly, the Canadian Claimants were authorized to and did file a proof of claim in the representative capacity in respect of the Objectors' claims.

[36]    The Ernst & Young Settlement is part of a CCAA plan process. Claims, including contingent claims, are regularly compromised and settled within CCAA proceedings. This includes outstanding litigation claims against the debtor and third parties. Such compromises fully and finally dispose of such claims, and it follows that there are no continuing procedural or other rights in such proceedings. Simply put, there are no "opt-outs" in the CCAA.

[37]    It is well established that class proceedings can be settled in a CCAA proceeding. See *Robertson v. ProQuest Information and Learning Co.*, 2011 ONSC 1647 [*Robertson*].

[38]    As noted by Pepall J. (as she then was) in *Robertson*, para. 8:

When dealing with the consensual resolution of a CCAA claim filed in a claims process that arises out of ongoing litigation, typically no court approval is required. In contrast, class proceedings settlements must be approved by the court. The notice and process for dissemination of the settlement agreement must also be approved by the court.

[39] In this case, the notice and process for dissemination have been approved.

[40] The Objectors take the position that approval of the Ernst & Young Settlement would render their opt-out rights illusory; the inherent flaw with this argument is that it is not possible to ignore the CCAA proceedings.

[41] In this case, claims arising out of the class proceedings are claims in the CCAA process. CCAA claims can be, by definition, subject to compromise. The Claims Procedure Order establishes that claims as against Ernst & Young fall within the CCAA proceedings. Thus, these claims can also be the subject of settlement and, if settled, the claims of all creditors in the class can also be settled.

[42] In my view, these proceedings are the appropriate time and place to consider approval of the Ernst & Young Settlement. This court has the jurisdiction in respect of both the CCAA and the CPA.

*Should the Court Exercise Its Discretion to Approve the Settlement*

[43] Having established the jurisdictional basis to consider the motion, the central inquiry is whether the court should exercise its discretion to approve the Ernst & Young Settlement.

*CCAA Interpretation*

[44] The CCAA is a "flexible statute", and the court has "jurisdiction to approve major transactions, including settlement agreements, during the stay period defined in the Initial Order". The CCAA affords courts broad jurisdiction to make orders and "fill in the gaps in legislation so as to give effect to the objects of the CCAA." [*Re Nortel Networks Corp.*, 2010 ONSC 1708, paras. 66-70 ("*Re Nortel*")); *Re Canadian Red Cross Society* (1998), 5 C.B.R. (4th) 299, 72 O.T.C. 99, para. 43 (Ont. C.J.)]

[45] Further, as the Supreme Court of Canada explained in *Re Ted Leroy Trucking Ltd. [Century Services]*, 2010 SCC 60, para. 58:

> CCAA decisions are often based on discretionary grants of jurisdiction. The incremental exercise of judicial discretion in commercial courts under conditions one practitioner aptly described as "the hothouse of real time litigation" has been the primary method by which the CCAA has been adapted and has evolved to meet contemporary business and social needs (internal citations omitted). ...When large companies encounter difficulty, reorganizations become increasingly complex. CCAA courts have been called upon to innovate accordingly in exercising their jurisdiction beyond merely staying proceedings against the

Debtor to allow breathing room for reorganization. They have been asked to sanction measures for which there is no explicit authority in the CCAA.

[46] It is also established that third-party releases are not an uncommon feature of complex restructurings under the CCAA [*ATB Financial v. Metcalf and Mansfield Alternative Investments II Corp.*, 2008 ONCA 587 ("*ATB Financial*"); *Re Nortel, supra*; *Robertson, supra*; *Re Muscle Tech Research and Development Inc.* (2007), 30 C.B.R. (5th) 59, 156 A.C.W.S. (3d) 22 (Ontario S.C.J.) ("*Muscle Tech*"); *Re Grace Canada Inc.* (2008), 50 C.B.R. (5th) 25 (Ont. S.C.J.); *Re Allen-Vanguard Corporation*, 2011 ONSC 5017].

[47] The Court of Appeal for Ontario has specifically confirmed that a third-party release is justified where the release forms part of a comprehensive compromise. As Blair J. A. stated in *ATB Financial, supra*:

> 69. In keeping with this scheme and purpose, I do not suggest that any and all releases between creditors of the debtor company seeking to restructure and third parties may be made the subject of a compromise or arrangement between the debtor and its creditors. Nor do I think the fact that the releases may be "necessary" in the sense that the third parties or the debtor may refuse to proceed without them, of itself, advances the argument in favour of finding jurisdiction (although it may well be relevant in terms of the fairness and reasonableness analysis).
>
> 70. The release of the claim in question must be justified as part of the compromise or arrangement between the debtor and its creditors. In short, there must be a reasonable connection between the third party claim being compromised in the plan and the restructuring achieved by the plan to warrant inclusion of the third party release in the plan ...
>
> 71. In the course of his reasons, the application judge made the following findings, all of which are amply supported on the record:
>
> a) The parties to be released are necessary and essential to the restructuring of the debtor;
>
> b) The claims to be released are rationally related to the purpose of the Plan and necessary for it;
>
> c) The Plan cannot succeed without the releases;
>
> d) The parties who are to have claims against them released are contributing in a tangible and realistic way to the Plan; and
>
> e) The Plan will benefit not only the debtor companies but creditor Noteholders generally.
>
> 72. Here, then – as was the case in T&N – there is a close connection between the claims being released and the restructuring proposal. The tort claims arise out of

the sale and distribution of the ABCP Notes and their collapse in value, just as do the contractual claims of the creditors against the debtor companies. The purpose of the restructuring is to stabilize and shore up the value of those notes in the long run. The third parties being released are making separate contributions to enable those results to materialize. Those contributions are identified earlier, at para. 31 of these reasons. The application judge found that the claims being released are not independent of or unrelated to the claims that the Noteholders have against the debtor companies; they are closely connected to the value of the ABCP Notes and are required for the Plan to succeed …

73. I am satisfied that the wording of the CCAA – construed in light of the purpose, objects and scheme of the Act and in accordance with the modern principles of statutory interpretation – supports the court's jurisdiction and authority to sanction the Plan proposed here, including the contested third-party releases contained in it.

…

78. … I believe the open-ended CCAA permits third-party releases that are reasonably related to the restructuring at issue because they are encompassed in the comprehensive terms "compromise" and "arrangement" and because of the double-voting majority and court sanctioning statutory mechanism that makes them binding on unwilling creditors.

…

113. At para. 71 above I recited a number of factual findings the application judge made in concluding that approval of the Plan was within his jurisdiction under the CCAA and that it was fair and reasonable. For convenience, I reiterate them here – with two additional findings – because they provide an important foundation for his analysis concerning the fairness and reasonableness of the Plan. The application judge found that:

a) The parties to be released are necessary and essential to the restructuring of the debtor;

b) The claims to be released are rationally related to the purpose of the Plan and necessary for it;

c) The Plan cannot succeed without the releases;

d) The parties who are to have claims against them released are contributing in a tangible and realistic way to the Plan;

e) The Plan will benefit not only the debtor companies but creditor Noteholders generally;

f) The voting creditors who have approved the Plan did so with knowledge of the nature and effect of the releases; and that,

g) The releases are fair and reasonable and not overly broad or offensive to public policy.

[48] Furthermore, in *ATB Financial, supra*, para. 111, the Court of Appeal confirmed that parties are entitled to settle allegations of fraud and to include releases of such claims as part of the settlement. It was noted that "there is no legal impediment to granting the release of an antecedent claim in fraud, provided the claim is in the contemplation of the parties to the release at the time it is given".

*Relevant CCAA Factors*

[49] In assessing a settlement within the CCAA context, the court looks at the following three factors, as articulated in *Robertson, supra*:

(a) whether the settlement is fair and reasonable;

(b) whether it provides substantial benefits to other stakeholders; and

(c) whether it is consistent with the purpose and spirit of the CCAA.

[50] Where a settlement also provides for a release, such as here, courts assess whether there is "a reasonable connection between the third party claim being compromised in the plan and the restructuring achieved by the plan to warrant inclusion of the third party release in the plan". Applying this "nexus test" requires consideration of the following factors: [*ATB Financial, supra*, para. 70]

(a) Are the claims to be released rationally related to the purpose of the plan?

(b) Are the claims to be released necessary for the plan of arrangement?

(c) Are the parties who have claims released against them contributing in a tangible and realistic way? and

(d) Will the plan benefit the debtor and the creditors generally?

*Counsel Submissions*

[51] The Objectors argue that the proposed Ernst & Young Release is not integral or necessary to the success of Sino-Forest's restructuring plan, and, therefore, the standards for granting third-party releases in the CCAA are not satisfied. No one has asserted that the parties require the Ernst & Young Settlement or Ernst & Young Release to allow the Plan to go forward; in fact, the Plan has been implemented prior to consideration of this issue. Further, the Objectors contend that the $117 million settlement payment is not essential, or even related, to the restructuring, and that it is concerning, and telling, that varying the end of the Ernst & Young Settlement and Ernst & Young Release to accommodate opt-outs would extinguish the settlement.

[52] The Objectors also argue that the Ernst & Young Settlement should not be approved because it would vitiate opt-out rights of class members, as conferred as follows in section 9 of the CPA: "Any member of a class involved in a class proceeding may opt-out of the proceeding in the manner and within the time specified in the certification order." This right is a fundamental element of procedural fairness in the Ontario class action regime [*Fischer v. IG Investment Management Ltd.*, 2012 ONCA 47, para. 69], and is not a mere technicality or illusory. It has been described as absolute [*Durling v. Sunrise Propane Energy Group Inc.*, 2011 ONSC 266]. The opt-out period allows persons to pursue their self-interest and to preserve their rights to pursue individual actions [*Mangan v. Inco Ltd.*, (1998) 16 C.P.C. (4th) 165 38 O.R. (3d) 703 (Ont. C.J.)].

[53] Based on the foregoing, the Objectors submit that a proposed class action settlement with Ernst & Young should be approved solely under the CPA, as the Pöyry Settlement was, and not through misuse of a third-party release procedure under the CCAA. Further, since the minutes of settlement make it clear that Ernst & Young retains discretion not to accept or recognize normal opt-outs if the CPA procedures are invoked, the Ernst & Young Settlement should not be approved in this respect either.

[54] Multiple parties made submissions favouring the Ernst & Young Settlement (with the accompanying Ernst & Young Release), arguing that it is fair and reasonable in the circumstances, benefits the CCAA stakeholders (as evidenced by the broad-based support for the Plan and this motion) and rationally connected to the Plan.

[55] Ontario Plaintiffs' counsel submits that the form of the bar order is fair and properly balances the competing interests of class members, Ernst & Young and the non-settling defendants as:

   (a) class members are not releasing their claims to a greater extent than necessary;

   (b) Ernst & Young is ensured that its obligations in connection to the Settlement will conclude its liability in the class proceedings;

   (c) the non-settling defendants will not have to pay more following a judgment than they would be required to pay if Ernst & Young remained as a defendant in the action; and

   (d) the non-settling defendants are granted broad rights of discovery and an appropriate credit in the ongoing litigation, if it is ultimately determined by the court that there is a right of contribution and indemnity between the co-defendants.

[56] SFC argues that Ernst & Young's support has simplified and accelerated the Plan process, including reducing the expense and management time otherwise to be incurred in litigating claims, and was a catalyst to encouraging many parties, including the Underwriters and BDO, to withdraw their objections to the Plan. Further, the result is precisely the type of compromise that the CCAA is designed to promote; namely, Ernst & Young has provided a tangible and significant contribution to the Plan (notwithstanding any pitfalls in the litigation claims against Ernst & Young) that has enabled SFC to emerge as Newco/NewcoII in a timely way and with potential viability.

[57]    Ernst & Young's counsel submits that the Ernst & Young Settlement, as a whole, including the Ernst & Young Release, must be approved or rejected; the court cannot modify the terms of a proposed settlement. Further, in deciding whether to reject a settlement, the court should consider whether doing so would put the settlement in "jeopardy of being unravelled". In this case, counsel submits there is no obligation on the parties to resume discussions and it could be that the parties have reached their limits in negotiations and will backtrack from their positions or abandon the effort.

*Analysis and Conclusions*

[58]    The Ernst & Young Release forms part of the Ernst & Young Settlement. In considering whether the Ernst & Young Settlement is fair and reasonable and ought to be approved, it is necessary to consider whether the Ernst & Young Release can be justified as part of the Ernst & Young Settlement. See *ATB Financial, supra*, para. 70, as quoted above.

[59]    In considering the appropriateness of including the Ernst & Young Release, I have taken into account the following.

[60]    Firstly, although the Plan has been sanctioned and implemented, a significant aspect of the Plan is a distribution to SFC's creditors. The significant and, in fact, only monetary contribution that can be directly identified, at this time, is the $117 million from the Ernst & Young Settlement. Simply put, until such time as the Ernst & Young Settlement has been concluded and the settlement proceeds paid, there can be no distribution of the settlement proceeds to parties entitled to receive them. It seems to me that in order to effect any distribution, the Ernst & Young Release has to be approved as part of the Ernst & Young Settlement.

[61]    Secondly, it is apparent that the claims to be released against Ernst & Young are rationally related to the purpose of the Plan and necessary for it. SFC put forward the Plan. As I outlined in the Equity Claims Decision, the claims of Ernst & Young as against SFC are intertwined to the extent that they cannot be separated. Similarly, the claims of the Objectors as against Ernst & Young are, in my view, intertwined and related to the claims against SFC and to the purpose of the Plan.

[62]    Thirdly, although the Plan can, on its face, succeed, as evidenced by its implementation, the reality is that without the approval of the Ernst & Young Settlement, the objectives of the Plan remain unfulfilled due to the practical inability to distribute the settlement proceeds. Further, in the event that the Ernst & Young Release is not approved and the litigation continues, it becomes circular in nature as the position of Ernst & Young, as detailed in the Equity Claims Decision, involves Ernst & Young bringing an equity claim for contribution and indemnity as against SFC.

[63]    Fourthly, it is clear that Ernst & Young is contributing in a tangible way to the Plan, by its significant contribution of $117 million.

[64]    Fifthly, the Plan benefits the claimants in the form of a tangible distribution. Blair J.A., at paragraph 113 of *ATB Financial, supra*, referenced two further facts as found by the application

judge in that case; namely, the voting creditors who approved the Plan did so with the knowledge of the nature and effect of the releases. That situation is also present in this case.

[65]   Finally, the application judge in *ATB Financial, supra*, held that the releases were fair and reasonable and not overly broad or offensive to public policy. In this case, having considered the alternatives of lengthy and uncertain litigation, and the full knowledge of the Canadian plaintiffs, I conclude that the Ernst & Young Release is fair and reasonable and not overly broad or offensive to public policy.

[66]   In my view, the Ernst & Young Settlement is fair and reasonable, provides substantial benefits to relevant stakeholders, and is consistent with the purpose and spirit of the CCAA. In addition, in my view, the factors associated with the *ATB Financial* nexus test favour approving the Ernst & Young Release.

[67]   In *Re Nortel, supra*, para. 81, I noted that the releases benefited creditors generally because they "reduced the risk of litigation, protected Nortel against potential contribution claims and indemnity claims and reduced the risk of delay caused by potentially complex litigation and associated depletion of assets to fund potentially significant litigation costs". In this case, there is a connection between the release of claims against Ernst & Young and a distribution to creditors. The plaintiffs in the litigation are shareholders and Noteholders of SFC. These plaintiffs have claims to assert against SFC that are being directly satisfied, in part, with the payment of $117 million by Ernst & Young.

[68]   In my view, it is clear that the claims Ernst & Young asserted against SFC, and SFC's subsidiaries, had to be addressed as part of the restructuring. The interrelationship between the various entities is further demonstrated by Ernst & Young's submission that the release of claims by Ernst & Young has allowed SFC and the SFC subsidiaries to contribute their assets to the restructuring, unencumbered by claims totalling billions of dollars. As SFC is a holding company with no material assets of its own, the unencumbered participation of the SFC subsidiaries is crucial to the restructuring.

[69]   At the outset and during the CCAA proceedings, the Applicant and Monitor specifically and consistently identified timing and delay as critical elements that would impact on maximization of the value and preservation of SFC's assets.

[70]   Counsel submits that the claims against Ernst & Young and the indemnity claims asserted by Ernst & Young would, absent the Ernst & Young Settlement, have to be finally determined before the CCAA claims could be quantified. As such, these steps had the potential to significantly delay the CCAA proceedings. Where the claims being released may take years to resolve, are risky, expensive or otherwise uncertain of success, the benefit that accrues to creditors in having them settled must be considered. See *Re Nortel, supra*, paras. 73 and 81; and *Muscle Tech, supra*, paras. 19-21.

[71]   Implicit in my findings is rejection of the Objectors' arguments questioning the validity of the Ernst & Young Settlement and Ernst & Young Release. The relevant consideration is whether a proposed settlement and third-party release sufficiently benefits all stakeholders to justify court approval. I reject the position that the $117 million settlement payment is not

essential, or even related, to the restructuring; it represents, at this point in time, the only real monetary consideration available to stakeholders. The potential to vary the Ernst & Young Settlement and Ernst & Young Release to accommodate opt-outs is futile, as the court is being asked to approve the Ernst & Young Settlement and Ernst & Young Release as proposed.

[72]    I do not accept that the class action settlement should be approved solely under the CPA. The reality facing the parties is that SFC is insolvent; it is under CCAA protection, and stakeholder claims are to be considered in the context of the CCAA regime. The Objectors' claim against Ernst & Young cannot be considered in isolation from the CCAA proceedings. The claims against Ernst & Young are interrelated with claims as against SFC, as is made clear in the Equity Claims Decision and Claims Procedure Order.

[73]    Even if one assumes that the opt-out argument of the Objectors can be sustained, and opt-out rights fully provided, to what does that lead? The Objectors are left with a claim against Ernst & Young, which it then has to put forward in the CCAA proceedings. Without taking into account any argument that the claim against Ernst & Young may be affected by the claims bar date, the claim is still capable of being addressed under the Claims Procedure Order. In this way, it is again subject to the CCAA fairness and reasonable test as set out in *ATB Financial*, supra.

[74]    Moreover, CCAA proceedings take into account a class of creditors or stakeholders who possess the same legal interests. In this respect, the Objectors have the same legal interests as the Ontario Plaintiffs. Ultimately, this requires consideration of the totality of the class. In this case, it is clear that the parties supporting the Ernst & Young Settlement are vastly superior to the Objectors, both in number and dollar value.

[75]    Although the right to opt-out of a class action is a fundamental element of procedural fairness in the Ontario class action regime, this argument cannot be taken in isolation. It must be considered in the context of the CCAA.

[76]    The Objectors are, in fact, part of the group that will benefit from the Ernst & Young Settlement as they specifically seek to reserve their rights to "opt-in" and share in the spoils.

[77]    It is also clear that the jurisprudence does not permit a dissenting stakeholder to opt-out of a restructuring. [*Re Sammi Atlas Inc.*, (1998) 3 C.B.R. (4th) 171 (Ont. Gen. Div. (Commercial List)).] If that were possible, no creditor would take part in any CCAA compromise where they were to receive less than the debt owed to them. There is no right to opt-out of any CCAA process, and the statute contemplates that a minority of creditors are bound by the plan which a majority have approved and the court has determined to be fair and reasonable.

[78]    SFC is insolvent and all stakeholders, including the Objectors, will receive less than what they are owed. By virtue of deciding, on their own volition, not to participate in the CCAA process, the Objectors relinquished their right to file a claim and take steps, in a timely way, to assert their rights to vote in the CCAA proceeding.

[79]    Further, even if the Objectors had filed a claim and voted, their minimal 1.6% stake in SFC's outstanding shares when the Muddy Waters report was released makes it highly unlikely that they could have altered the outcome.

[80]    Finally, although the Objectors demand a right to conditionally opt-out of a settlement, that right does not exist under the CPA or CCAA. By virtue of the certification order, class members had the ability to opt-out of the class action. The Objectors did not opt-out in the true sense; they purported to create a conditional opt-out. Under the CPA, the right to opt-out is "in the manner and within the time specified in the certification order". There is no provision for a conditional opt-out in the CPA, and Ontario's single opt-out regime causes "no prejudice...to putative class members". [CPA, section 9; *Osmun v. Cadbury Adams Canada Inc.* (2009), 85 C.P.C. (6th) 148, paras. 43-46 (Ont. S.C.J.); and *Eidoo v. Infineon Technologies AG*, 2012 ONSC 7299.]

*Miscellaneous*

[81]    For greater certainty, it is my understanding that the issues raised by Mr. O'Reilly have been clarified such that the effect of this endorsement is that the Junior Objectors will be included with the same status as the Ontario Plaintiffs.

**DISPOSITION**

[82]    In the result, for the foregoing reasons, the motion is granted. A declaration shall issue to the effect that the Ernst & Young Settlement is fair and reasonable in all the circumstances. The Ernst & Young Settlement, together with the Ernst & Young Release, is approved and an order shall issue substantially in the form requested. The motion of the Objectors is dismissed.

_____
MORAWETZ J.

Date:    March 20, 2013