CITATION: Metcalfe & Mansfield Alternative Investments II Corp., (Re) , 2008 ONCA 587
DATE: 20080818
DOCKET: C48969 (M36489)

# COURT OF APPEAL FOR ONTARIO

LASKIN, CRONK and BLAIR JJ.A.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE AND ARRANGEMENT
INVOLVING

METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS II CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS III CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS V CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS XI CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS XII CORP.,
4446372 CANADA INC. AND 6932819 CANADA INC.,
TRUSTEES OF THE CONDUITS LISTED IN SCHEDULE "A" HERETO

BETWEEN:

THE INVESTORS REPRESENTED ON THE PAN-CANADIAN INVESTORS
COMMITTEE FOR THIRD-PARTY STRUCTURED ASSET-BACKED
COMMERCIAL PAPER LISTED IN SCHEDULE "B" HERETO,

Applicants (Respondents in Appeal)

and

METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS II CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS III CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS V CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS XI CORP.,
METCALFE & MANSFIELD ALTERNATIVE INVESTMENTS XII CORP.,
4446372 CANADA INC. AND 6932819 CANADA INC.,
TRUSTEES OF THE CONDUITS LISTED IN SCHEDULE "A" HERETO

Respondents (Respondents in Appeal)

2008 ONCA 587 (CanLII)

Page:  2

and

AIR TRANSAT A.T. INC., TRANSAT TOURS CANADA INC., THE JEAN COUTU
GROUP (PJC) INC., AÉROPORTS DE MONTRÉAL INC., AÉROPORTS DE
MONTRÉAL CAPITAL INC., POMERLEAU ONTARIO INC., POMERLEAU INC.,
LABOPHARM INC.,, DOMTAR INC., DOMTAR PULP AND PAPER PRODUCTS
INC., GIRO INC., VÊTEMENTS DE SPORTS R.G.R. INC., 131519 CANADA INC.,
AIR JAZZ LP, PETRIFOND FOUNDATION COMPANY LIMITED, PETRIFOND
FOUNDATION MIDWEST LIMITED, SERVICES HYPOTHÉCAIRES LA
PATRIMONIALE INC., TECSYS INC.SOCIÉTÉ GÉNÉRALE DE FINANCEMENT
DU QUÉBEC, VIBROSYSTM INC., INTERQUISA CANADA L.P., REDCORP
VENTURES LTD., JURA ENERGY CORPORATION, IVANHOE MINES LTD.,
WEBTECH WIRELESS INC., WYNN CAPITAL CORPORATION INC., HY BLOOM
INC., CARDACIAN MORTGAGE SERVICES, INC., WEST ENERGY LTD., SABRE
ENERTY LTD., PETROLIFERA PETROLEUM LTD., VAQUERO RESOURCES
LTD. and STANDARD ENERGY INC.

Respondents (Appellants)

See Schedule "A" – Counsel for the list of counsel

Heard: June 25 and 26, 2008

On appeal from the sanction order of Justice Colin L. Campbell of the Superior Court of
Justice, dated June 5, 2008, with reasons reported at [2008] O.J. No. 2265.

BLAIR J.A.:

## A.    INTRODUCTION

[1]    In August 2007 a liquidity crisis suddenly threatened the Canadian market in Asset
Backed Commercial Paper ("ABCP").  The crisis was triggered by a loss of confidence
amongst investors stemming from the news of widespread defaults on U.S. sub-prime
mortgages.  The loss of confidence placed the Canadian financial market at risk generally
and was reflective of an economic volatility worldwide.

[2]    By agreement amongst the major Canadian participants, the $32 billion Canadian
market in third-party ABCP was frozen on August 13, 2007 pending an attempt to

2008 ONCA 587 (CanLII)

2008 ONCA 587 (CanLII)

resolve the crisis through a restructuring of that market.  The Pan-Canadian Investors Committee, chaired by Purdy Crawford, C.C., Q.C., was formed and ultimately put forward the creditor-initiated Plan of Compromise and Arrangement that forms the subject-matter of these proceedings.  The Plan was sanctioned by Colin L. Campbell J. on June 5, 2008.

[3]    Certain creditors who opposed the Plan seek leave to appeal and, if leave is granted, appeal from that decision.  They raise an important point regarding the permissible scope of a restructuring under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 as amended ("CCAA"): can the court sanction a Plan that calls for creditors to provide releases to third parties who are themselves solvent and not creditors of the debtor company?  They also argue that, if the answer to this question is yes, the application judge erred in holding that this Plan, with its particular releases (which bar some claims even in fraud), was fair and reasonable and therefore in sanctioning it under the CCAA.

<u>Leave to Appeal</u>

[4]    Because of the particular circumstances and urgency of these proceedings, the court agreed to collapse an oral hearing for leave to appeal with the hearing of the appeal itself.  At the outset of argument we encouraged counsel to combine their submissions on both matters.

[5]    The proposed appeal raises issues of considerable importance to restructuring proceedings under the CCAA Canada-wide.  There are serious and arguable grounds of appeal and – given the expedited time-table – the appeal will not unduly delay the progress of the proceedings. I am satisfied that the criteria for granting leave to appeal in CCAA proceedings, set out in such cases as *Re Cineplex Odeon Corp.* (2001), 24 C.B.R. (4th) 201 (Ont. C.A.), and *Re Country Style Food Services* (2002), 158 O.A.C. 30, are met.  I would grant leave to appeal.

<u>Appeal</u>

[6]    For the reasons that follow, however, I would dismiss the appeal.

**B.    FACTS**
    **The Parties**

[7]    The appellants are holders of ABCP Notes who oppose the Plan. They do so principally on the basis that it requires them to grant releases to third party financial

2008 ONCA 587 (CanLII)

institutions against whom they say they have claims for relief arising out of their purchase of ABCP Notes.  Amongst them are an airline, a tour operator, a mining company, a wireless provider, a pharmaceuticals retailer, and several holding companies and energy companies.

[8]    Each of the appellants has large sums invested in ABCP – in some cases, hundreds of millions of dollars.  Nonetheless, the collective holdings of the appellants – slightly over $1 billion – represent only a small fraction of the more than $32 billion of ABCP involved in the restructuring.

[9]    The lead respondent is the Pan-Canadian Investors Committee which was responsible for the creation and negotiation of the Plan on behalf of the creditors.  Other respondents include various major international financial institutions, the five largest Canadian banks, several trust companies, and some smaller holders of ABCP product.  They participated in the market in a number of different ways.

### The ABCP Market

[10]    Asset Backed Commercial Paper is a sophisticated and hitherto well-accepted financial instrument.  It is primarily a form of short-term investment – usually 30 to 90 days – typically with a low interest yield only slightly better than that available through other short-term paper from a government or bank.  It is said to be "asset backed" because the cash that is used to purchase an ABCP Note is converted into a portfolio of financial assets or other asset interests that in turn provide security for the repayment of the notes.

[11]    ABCP was often presented by those selling it as a safe investment, somewhat like a guaranteed investment certificate.

[12]    The Canadian market for ABCP is significant and administratively complex.  As of August 2007, investors had placed over $116 billion in Canadian ABCP.  Investors range from individual pensioners to large institutional bodies.  On the selling and distribution end, numerous players are involved, including chartered banks, investment houses and other financial institutions.  Some of these players participated in multiple ways.  The Plan in this proceeding relates to approximately $32 billion of non-bank sponsored ABCP the restructuring of which is considered essential to the preservation of the Canadian ABCP market.

[13]    As I understand it, prior to August 2007 when it was frozen, the ABCP market worked as follows.

[14]    Various corporations (the "Sponsors") would arrange for entities they control ("Conduits") to make ABCP Notes available to be sold to investors through "Dealers"

2008 ONCA 587 (CanLII)

(banks and other investment dealers).   Typically, ABCP was issued by series and sometimes by classes within a series.

[15]   The cash from the purchase of the ABCP Notes was used to purchase assets which were held by trustees of the Conduits ("Issuer Trustees") and which stood as security for repayment of the notes.  Financial institutions that sold or provided the Conduits with the assets that secured the ABCP are known as "Asset Providers".  To help ensure that investors would be able to redeem their notes, "Liquidity Providers" agreed to provide funds that could be drawn upon to meet the demands of maturing ABCP Notes in certain circumstances.  Most Asset Providers were also Liquidity Providers.  Many of these banks and financial institutions were also holders of ABCP Notes ("Noteholders").  The Asset and Liquidity Providers held first charges on the assets.

[16]   When the market was working well, cash from the purchase of new ABCP Notes was also used to pay off maturing ABCP Notes; alternatively, Noteholders simply rolled their maturing notes over into new ones.  As I will explain, however, there was a potential underlying predicament with this scheme.

**The Liquidity Crisis**

[17]   The types of assets and asset interests acquired to "back" the ABCP Notes are varied and complex.  They were generally long-term assets such as residential mortgages, credit card receivables, auto loans, cash collateralized debt obligations and derivative investments such as credit default swaps.  Their particular characteristics do not matter for the purpose of this appeal, but they shared a common feature that proved to be the Achilles heel of the ABCP market: because of their long-term nature there was an inherent timing mismatch between the cash they generated and the cash needed to repay maturing ABCP Notes.

[18]   When uncertainty began to spread through the ABCP marketplace in the summer of 2007, investors stopped buying the ABCP product and existing Noteholders ceased to roll over their maturing notes.  There was no cash to redeem those notes.  Although calls were made on the Liquidity Providers for payment, most of the Liquidity Providers declined to fund the redemption of the notes, arguing that the conditions for liquidity funding had not been met in the circumstances.  Hence the "liquidity crisis" in the ABCP market.

[19]   The crisis was fuelled largely by a lack of transparency in the ABCP scheme. Investors could not tell what assets were backing their notes – partly because the ABCP Notes were often sold before or at the same time as the assets backing them were acquired; partly because of the sheer complexity of certain of the underlying assets; and partly because of assertions of confidentiality by those involved with the assets.  As fears arising from the spreading U.S. sub-prime mortgage crisis mushroomed, investors

2008 ONCA 587 (CanLII)

became increasingly concerned that their ABCP Notes may be supported by those crumbling assets.  For the reasons outlined above, however, they were unable to redeem their maturing ABCP Notes.

### The Montreal Protocol

[20]    The liquidity crisis could have triggered a wholesale liquidation of the assets, at depressed prices.  But it did not.  During the week of August 13, 2007, the ABCP market in Canada froze – the result of a standstill arrangement orchestrated on the heels of the crisis by numerous market participants, including Asset Providers, Liquidity Providers, Noteholders and other financial industry representatives.  Under the standstill agreement – known as the Montréal Protocol – the parties committed to restructuring the ABCP market with a view, as much as possible, to preserving the value of the assets and of the notes.

[21]    The work of implementing the restructuring fell to the Pan-Canadian Investors Committee, an applicant in the proceeding and respondent in the appeal.  The Committee is composed of 17 financial and investment institutions, including chartered banks, credit unions, a pension board, a Crown corporation, and a university board of governors. All 17 members are themselves Noteholders; three of them also participated in the ABCP market in other capacities as well. Between them, they hold about two thirds of the $32 billion of ABCP sought to be restructured in these proceedings.

[22]    Mr. Crawford was named the Committee's chair.  He thus had a unique vantage point on the work of the Committee and the restructuring process as a whole.  His lengthy affidavit strongly informed the application judge's understanding of the factual context, and our own.  He was not cross-examined and his evidence is unchallenged.

[23]    Beginning in September 2007, the Committee worked to craft a plan that would preserve the value of the notes and assets, satisfy the various stakeholders to the extent possible, and restore confidence in an important segment of the Canadian financial marketplace.  In March 2008, it and the other applicants sought CCAA protection for the ABCP debtors and the approval of a Plan that had been pre-negotiated with some, but not all, of those affected by the misfortunes in the Canadian ABCP market.

### The Plan

a) Plan Overview

[24]    Although the ABCP market involves many different players and kinds of assets, each with their own challenges, the committee opted for a single plan.  In Mr. Crawford's

words, "all of the ABCP suffers from common problems that are best addressed by a common solution." The Plan the Committee developed is highly complex and involves many parties.  In its essence, the Plan would convert the Noteholders' paper – which has been frozen and therefore effectively worthless for many months – into new, long-term notes that would trade freely, but with a discounted face value.  The hope is that a strong secondary market for the notes will emerge in the long run.

[25]    The Plan aims to improve transparency by providing investors with detailed information about the assets supporting their ABCP Notes. It also addresses the timing mismatch between the notes and the assets by adjusting the maturity provisions and interest rates on the new notes. Further, the Plan adjusts some of the underlying credit default swap contracts by increasing the thresholds for default triggering events; in this way, the likelihood of a forced liquidation flowing from the credit default swap holder's prior security is reduced and, in turn, the risk for ABCP investors is decreased.

[26]    Under the Plan, the vast majority of the assets underlying ABCP would be pooled into two master asset vehicles (MAV1 and MAV2). The pooling is designed to increase the collateral available and thus make the notes more secure.

[27]    The Plan does not apply to investors holding less than $1 million of notes. However, certain Dealers have agreed to buy the ABCP of those of their customers holding less than the $1-million threshold, and to extend financial assistance to these customers.  Principal among these Dealers are National Bank and Canaccord, two of the respondent financial institutions the appellants most object to releasing.  The application judge found that these developments appeared to be designed to secure votes in favour of the Plan by various Noteholders, and were apparently successful in doing so.  If the Plan is approved, they also provide considerable relief to the many small investors who find themselves unwittingly caught in the ABDP collapse.

b) The Releases

[28]    This appeal focuses on one specific aspect of the Plan: the comprehensive series of releases of third parties provided for in Article 10.

[29]    The Plan calls for the release of Canadian banks, Dealers, Noteholders, Asset Providers, Issuer Trustees, Liquidity Providers, and other market participants – in Mr. Crawford's words, "virtually all participants in the Canadian ABCP market" – from any liability associated with ABCP, with the exception of certain narrow claims relating to fraud.  For instance, under the Plan as approved, creditors will have to give up their claims against the Dealers who sold them their ABCP Notes, including challenges to the way the Dealers characterized the ABCP and provided (or did not provide) information about the ABCP.  The claims against the proposed defendants are mainly in tort: negligence, misrepresentation, negligent misrepresentation, failure to act prudently as a

2008 ONCA 587 (CanLII)

dealer/advisor, acting in conflict of interest, and in a few cases fraud or potential fraud. There are also allegations of breach of fiduciary duty and claims for other equitable relief.

[30]    The application judge found that, in general, the claims for damages include the face value of the Notes, plus interest and additional penalties and damages.

[31]    The releases, in effect, are part of a *quid pro quo*.  Generally speaking, they are designed to compensate various participants in the market for the contributions they would make to the restructuring.   Those contributions under the Plan include the requirements that:

    a) Asset Providers assume an increased risk in their credit default swap contracts, disclose certain proprietary information in relation to the assets, and provide below-cost financing for margin funding facilities that are designed to make the notes more secure;

    b) Sponsors – who in addition have cooperated with the Investors' Committee throughout the process, including by sharing certain proprietary information – give up their existing contracts;

    c) The Canadian banks provide below-cost financing for the margin funding facility and,

    d) Other parties make other contributions under the Plan.

[32]    According to Mr. Crawford's affidavit, the releases are part of the Plan "because certain key participants, whose participation is vital to the restructuring, have made comprehensive releases a condition for their participation."

### The CCAA Proceedings to Date

[33]    On March 17, 2008 the applicants sought and obtained an Initial Order under the CCAA staying any proceedings relating to the ABCP crisis and providing for a meeting of the Noteholders to vote on the proposed Plan.  The meeting was held on April 25th. The vote was overwhelmingly in support of the Plan – 96% of the Noteholders voted in favour.  At the instance of certain Noteholders, and as requested by the application judge (who has supervised the proceedings from the outset), the Monitor broke down the voting results according to those Noteholders who had worked on or with the Investors' Committee to develop the Plan and those Noteholders who had not.  Re-calculated on this basis the results remained firmly in favour of the proposed Plan – 99% of those connected with the development of the Plan voted positively, as did 80% of those Noteholders who had not been involved in its formulation.

[34]    The vote thus provided the Plan with the "double majority" approval – a majority of creditors representing two-thirds in value of the claims – required under s. 6 of the CCAA.

2008 ONCA 587 (CanLII)

[35]   Following the successful vote, the applicants sought court approval of the Plan under s. 6.  Hearings were held on May 12 and 13.  On May 16, the application judge issued a brief endorsement in which he concluded that he did not have sufficient facts to decide whether all the releases proposed in the Plan were authorized by the CCAA. While the application judge was prepared to approve the releases of negligence claims, he was not prepared at that point to sanction the release of fraud claims.  Noting the urgency of the situation and the serious consequences that would result from the Plan's failure, the application judge nevertheless directed the parties back to the bargaining table to try to work out a claims process for addressing legitimate claims of fraud.

[36]   The result of this renegotiation was a "fraud carve-out" – an amendment to the Plan excluding certain fraud claims from the Plan's releases.  The carve-out did not encompass all possible claims of fraud, however.  It was limited in three key respects. First, it applied only to claims against ABCP Dealers.  Secondly, it applied only to cases involving an express fraudulent misrepresentation made with the intention to induce purchase and in circumstances where the person making the representation knew it to be false.  Thirdly, the carve-out limited available damages to the value of the notes, minus any funds distributed as part of the Plan.  The appellants argue vigorously that such a limited release respecting fraud claims is unacceptable and should not have been sanctioned by the application judge.

[37]   A second sanction hearing – this time involving the amended Plan (with the fraud carve-out) – was held on June 3, 2008.  Two days later, Campbell J. released his reasons for decision, approving and sanctioning the Plan on the basis both that he had jurisdiction to sanction a Plan calling for third-party releases and that the Plan including the third-party releases in question here was fair and reasonable.

[38]   The appellants attack both of these determinations.

## C.    LAW AND ANALYSIS

[39]   There are two principal questions for determination on this appeal:

1)  As a matter of law, may a CCAA plan contain a release of claims against anyone other than the debtor company or its directors?
2)  If the answer to that question is yes, did the application judge err in the exercise of his discretion to sanction the Plan as fair and reasonable given the nature of the releases called for under it?

### (1)      Legal Authority for the Releases

[40]   The standard of review on this first issue – whether, as a matter of law, a CCAA plan may contain third-party releases – is correctness.

[41]   The appellants submit that a court has no jurisdiction or legal authority under the CCAA to sanction a plan that imposes an obligation on creditors to give releases to third parties other than the directors of the debtor company.[1]  The requirement that objecting creditors release claims against third parties is illegal, they contend, because:

    a)  on a proper interpretation, the CCAA does not permit such releases;

    b)  the court is not entitled to "fill in the gaps" in the CCAA or rely upon its inherent jurisdiction to create such authority because to do so would be contrary to the principle that Parliament did not intend to interfere with private property rights or rights of action in the absence of clear statutory language to that effect;

    c)  the releases constitute an unconstitutional confiscation of private property that is within the exclusive domain of the provinces under s. 92 of the *Constitution Act*, 1867;

    d)  the releases are invalid under Quebec rules of public order; and because

    e)  the prevailing jurisprudence supports these conclusions.

[42]   I would not give effect to any of these submissions.

<u>Interpretation, "Gap Filling" and Inherent Jurisdiction</u>

[43]   On a proper interpretation, in my view, the CCAA permits the inclusion of third party releases in a plan of compromise or arrangement to be sanctioned by the court where those releases are reasonably connected to the proposed restructuring.  I am led to this conclusion by a combination of (a) the open-ended, flexible character of the CCAA itself, (b) the broad nature of the term "compromise or arrangement" as used in the Act, and (c) the express statutory effect of the "double-majority" vote and court sanction which render the plan binding on <u>all</u> creditors, including those unwilling to accept certain portions of it.  The first of these signals a flexible approach to the application of the Act in new and evolving situations, an active judicial role in its application and interpretation, and a liberal approach to that interpretation.  The second provides the entrée to negotiations between the parties affected in the restructuring and furnishes them with the ability to apply the broad scope of their ingenuity in fashioning the proposal.  The latter afford necessary protection to unwilling creditors who may be deprived of certain of their civil and property rights as a result of the process.

[44]   The CCAA is skeletal in nature.  It does not contain a comprehensive code that lays out all that is permitted or barred.  Judges must therefore play a role in fleshing out the details of the statutory scheme.  The scope of the Act and the powers of the court

---

[1] Section 5.1 of the CCAA specifically authorizes the granting of releases to directors in certain circumstances.

2008 ONCA 587 (CanLII)

under it are not limitless.  It is beyond controversy, however, that the CCAA is remedial legislation to be liberally construed in accordance with the modern purposive approach to statutory interpretation.  It is designed to be a flexible instrument and it is that very flexibility which gives the Act its efficacy: *Canadian Red Cross Society (Re)* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div.).  As Farley J. noted in *Re Dylex Ltd.* (1995), 31 C.B.R. (3d) 106 at 111 (Ont. Gen. Div.), "[t]he history of CCAA law has been an evolution of judicial interpretation."

[45]    Much has been said, however, about the "evolution of judicial interpretation" and there is some controversy over both the source and scope of that authority.  Is the source of the court's authority statutory, discerned solely through application of the principles of statutory interpretation, for example? Or does it rest in the court's ability to "fill in the gaps" in legislation? Or in the court's inherent jurisdiction?

[46]    These issues have recently been canvassed by the Honourable Georgina R. Jackson and Dr. Janis Sarra in their publication "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters,"[2] and there was considerable argument on these issues before the application judge and before us.  While I generally agree with the authors' suggestion that the courts should adopt a hierarchical approach in their resort to these interpretive tools – statutory interpretation, gap-filling, discretion and inherent jurisdiction – it is not necessary in my view to go beyond the general principles of statutory interpretation to resolve the issues on this appeal.  Because I am satisfied that it is implicit in the language of the CCAA itself that the court has authority to sanction plans incorporating third-party releases that are reasonably related to the proposed restructuring, there is no "gap-filling" to be done and no need to fall back on inherent jurisdiction.  In this respect, I take a somewhat different approach than the application judge did.

[47]    The Supreme Court of Canada has affirmed generally – and in the insolvency context particularly – that remedial statutes are to be interpreted liberally and in accordance with Professor Driedger's modern principle of statutory interpretation. Driedger advocated that "the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament": *Re Rizzo & Rizzo Shoes Ltd.*, [1998] 1 S.C.R. 27 at para. 21, quoting E.A. Driedger, *Construction of Statutes*, 2nd ed. (Toronto: Butterworths, 1983); *Bell Expressvu Ltd. Partnership v. R.*, [2002] 2 S.C.R. 559 at para. 26.

---

[2] Justice Georgina R. Jackson and Dr. Janis P. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters" in Sarra, ed., *Annual Review of Insolvency Law, 2007* (Vancouver: Thomson Carswell, 2007).

2008 ONCA 587 (CanLII)

[48]    More broadly, I believe that the proper approach to the judicial interpretation and application of statutes – particularly those like the CCAA that are skeletal in nature – is succinctly and accurately summarized by Jackson and Sarra in their recent article, *supra*, at p. 56:

> The exercise of a statutory authority requires the statute to be construed.  The plain meaning or textualist approach has given way to a search for the object and goals of the statute and the intentionalist approach.  This latter approach makes use of the purposive approach and the mischief rule, including its codification under interpretation statutes that every enactment is deemed remedial, and is to be given such fair, large and liberal construction and interpretation as best ensures the attainment of its objects.  This latter approach advocates reading the statute as a whole and being mindful of Driedger's "one principle", that the words of the Act are to be read in their entire context, in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament.  It is important that courts first interpret the statute before them and exercise their authority pursuant to the statute, before reaching for other tools in the judicial toolbox.  Statutory interpretation using the principles articulated above leaves room for gap-filling in the common law provinces and a consideration of purpose in *Québec* as a manifestation of the judge's overall task of statutory interpretation.  Finally, the jurisprudence in relation to statutory interpretation demonstrates the fluidity inherent in the judge's task in seeking the objects of the statute and the intention of the legislature.

[49]    I adopt these principles.

[50]    The remedial purpose of the CCAA – as its title affirms – is to facilitate compromises or arrangements between an insolvent debtor company and its creditors.  In *Chef Ready Foods Ltd. v. Hongkong Bank of Canada* (1990), 4 C.B.R. (3d) 311 at 318 (B.C.C.A.), Gibbs J.A. summarized very concisely the purpose, object and scheme of the Act :

> Almost inevitably, liquidation destroyed the shareholders' investment, yielded little by way of recovery to the creditors, and exacerbated the social evil of devastating levels of unemployment.  The government of the day sought, through the C.C.A.A., to create a regime whereby the principals of the

company and the creditors could be brought together under the supervision of the court to attempt a reorganization or compromise or arrangement under which the company could continue in business.

[51]    The CCAA was enacted in 1933 and was necessary – as the then Secretary of State noted in introducing the Bill on First Reading—"because of the prevailing commercial and industrial depression" and the need to alleviate the effects of business bankruptcies in that context: see the statement of the Hon. C.H. Cahan, Secretary of State, *House of Commons Debates (Hansard)* (April 20, 1933) at 4091.  One of the greatest effects of that Depression was what Gibbs J.A. described as "the social evil of devastating levels of unemployment".  Since then, courts have recognized that the Act has a broader dimension than simply the direct relations between the debtor company and its creditors and that this broader public dimension must be weighed in the balance together with the interests of those most directly affected: see, for example, *Elan Corp. v. Comiskey (Trustee of)* (1990), 1 O.R. (3d) 289 (C.A.), *per* Doherty J.A. in dissent; *Re Skydome Corp.* (1998), 16 C.B.R. (4th) 125 (Ont. Gen. Div.); *Re Anvil Range Mining Corp.* (1998), 7 C.B.R. (4th) 51 (Ont. Gen. Div.).

[52]    In this respect, I agree with the following statement of Doherty J.A. in *Elan, supra,* at pp. 306-307:

> . . . [T]he Act was designed to serve a "broad constituency of investors, creditors and employees".[3]  Because of that "broad constituency" the court must, when considering applications brought under the Act, *have regard not only to the individuals and organizations directly affected by the application, but also to the wider public interest*. [Emphasis added.]

Application of the Principles of Interpretation

[53]    An interpretation of the CCAA that recognizes its broader socio-economic purposes and objects is apt in this case.  As the application judge pointed out, the restructuring underpins the financial viability of the Canadian ABCP market itself.

[54]    The appellants argue that the application judge erred in taking this approach and in treating the Plan and the proceedings as an attempt to restructure a financial market (the ABCP market) rather than simply the affairs between the debtor corporations who caused the ABCP Notes to be issued and their creditors.  The Act is designed, they say, only to

---

[3] Citing Gibbs J.A. in *Chef Ready Foods, supra,* at pp.319-320.

2008 ONCA 587 (CanLII)

effect reorganizations between a corporate debtor and its creditors and not to attempt to restructure entire marketplaces.

[55]    This perspective is flawed in at least two respects, however, in my opinion.  First, it reflects a view of the purpose and objects of the CCAA that is too narrow.  Secondly, it overlooks the reality of the ABCP marketplace and the context of the restructuring in question here.  It may be true that, in their capacity as ABCP *Dealers*, the releasee financial institutions are "third-parties" to the restructuring in the sense that they are not creditors of the debtor corporations.  However, in their capacities as *Asset Providers* and *Liquidity Providers*, they are not only creditors but they are prior secured creditors to the Noteholders.  Furthermore – as the application judge found – in these latter capacities they are making significant contributions to the restructuring by "foregoing immediate rights to assets and … providing real and tangible input for the preservation and enhancement of the Notes" (para. 76).  In this context, therefore, the application judge's remark at para. 50 that the restructuring "involves the commitment and participation of all parties" in the ABCP market makes sense, as do his earlier comments at paras. 48-49:

> Given the nature of the ABCP market and all of its participants, it is more appropriate to consider all Noteholders as claimants and the object of the Plan to restore liquidity to the assets being the Notes themselves.  The restoration of the liquidity of the market necessitates the participation (including more tangible contribution by many) of all Noteholders.
>
> In these circumstances, *it is unduly technical to classify the Issuer Trustees as debtors and the claims of the Noteholders as between themselves and others as being those of third party creditors*, although I recognize that the restructuring structure of the CCAA requires the corporations as the vehicles for restructuring. [Emphasis added.]

[56]    The application judge did observe that "[t]he insolvency is of the ABCP market itself, the restructuring is that of the market for such paper …" (para. 50).  He did so, however, to point out the uniqueness of the Plan before him and its industry-wide significance and not to suggest that he need have no regard to the provisions of the CCAA permitting a restructuring as between debtor and creditors.  His focus was on *the effect* of the restructuring, a perfectly permissible perspective, given the broad purpose and objects of the Act.  This is apparent from his later references.  For example, in balancing the arguments against approving releases that might include aspects of fraud, he responded that "what is at issue is a liquidity crisis that affects the ABCP market in Canada" (para. 125).  In addition, in his reasoning on the fair-and-reasonable issue, he

stated at para. 142:  "Apart from the Plan itself, there is a need to restore confidence in the financial system in Canada and this Plan is a legitimate use of the CCAA to accomplish that goal."

[57]    I agree.  I see no error on the part of the application judge in approaching the fairness assessment or the interpretation issue with these considerations in mind.  They provide the context in which the purpose, objects and scheme of the CCAA are to be considered.

### The Statutory Wording

[58]    Keeping in mind the interpretive principles outlined above, I turn now to a consideration of the provisions of the CCAA.  Where in the words of the statute is the court clothed with authority to approve a plan incorporating a requirement for third-party releases?  As summarized earlier, the answer to that question, in my view, is to be found in:

    a)    the skeletal nature of the CCAA;

    b)    Parliament's reliance upon the broad notions of "compromise" and "arrangement" to establish the framework within which the parties may work to put forward a restructuring plan; and in

    c)    the creation of the statutory mechanism binding all creditors in classes to the compromise or arrangement once it has surpassed the high "double majority" voting threshold and obtained court sanction as "fair and reasonable".

        Therein lies the expression of Parliament's intention to permit the parties to negotiate and vote on, and the court to sanction, third-party releases relating to a restructuring.

[59]    Sections 4 and 6 of the CCAA state:

        4. Where a compromise or an arrangement is proposed between a debtor company and its unsecured creditors or any class of them, the court may, on the application in a summary way of the company, of any such creditor or of the trustee in bankruptcy or liquidator of the company, order a meeting of the creditors or class of creditors, and, if the court so determines, of the shareholders of the company, to be summoned in such manner as the court directs.

        6. Where a majority in number representing two-thirds in value of the creditors, or class of creditors, as the case may

2008 ONCA 587 (CanLII)

be, present and voting either in person or by proxy at the meeting or meetings thereof respectively held pursuant to sections 4 and 5, or either of those sections, agree to any compromise or arrangement either as proposed or as altered or modified at the meeting or meetings, the compromise or arrangement may be sanctioned by the court, and if so sanctioned is binding

(*a*) on all the creditors or the class of creditors, as the case may be, and on any trustee for any such class of creditors, whether secured or unsecured, as the case may be, and on the company; and

(*b*) in the case of a company that has made an authorized assignment or against which a bankruptcy order has been made under the *Bankruptcy and Insolvency Act* or is in the course of being wound up under the *Winding-up and Restructuring Act*, on the trustee in bankruptcy or liquidator and contributories of the company.

### *Compromise or Arrangement*

[60]   While there may be little practical distinction between "compromise" and "arrangement" in many respects, the two are not necessarily the same.  "Arrangement" is broader than "compromise" and would appear to include any scheme for reorganizing the affairs of the debtor: Houlden & Morawetz, *Bankruptcy and Insolvency Law of Canada*, loose-leaf, 3rd ed., vol. 4 (Toronto: Thomson Carswell) at 10A-12.2, N§10.  It has been said to be "a very wide and indefinite [word]": *Re Refund of Dues under Timber Regulations*, [1935] A.C. 184 at 197 (P.C.), affirming S.C.C. [1933] S.C.R. 616.  See also, *Re Guardian Assur. Co.*, [1917] 1 Ch. 431 at 448, 450; *Re T&N Ltd. and Others (No. 3)*, [2007] 1 All E.R. 851 (Ch.).

[61]   The CCAA is a sketch, an outline, a supporting framework for the resolution of corporate insolvencies in the public interest.  Parliament wisely avoided attempting to anticipate the myriad of business deals that could evolve from the fertile and creative minds of negotiators restructuring their financial affairs.  It left the shape and details of those deals to be worked out within the framework of the comprehensive and flexible concepts of a "compromise" and "arrangement."  I see no reason why a release in favour of a third party, negotiated as part of a package between a debtor and creditor and reasonably relating to the proposed restructuring cannot fall within that framework.

[62]    A proposal under the *Bankruptcy and Insolvency Act*, R.S., 1985, c. B-3 (the "BIA") is a contract: *Employers' Liability Assurance Corp. Ltd. v. Ideal Petroleum* (1959) Ltd. [1978] 1 S.C.R. 230 at 239; *Society of Composers, Authors & Music Publishers of Canada v. Armitage* (2000), 50 O.R. (3d) 688 at para. 11 (C.A.).  In my view, a compromise or arrangement under the CCAA is directly analogous to a proposal for these purposes, and therefore is to be treated as a contract between the debtor and its creditors.  Consequently, parties are entitled to put anything into such a plan that could lawfully be incorporated into any contract.  See *Re Air Canada* (2004), 2 C.B.R. (5th) 4 at para. 6 (Ont. S.C.J.); *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 12 O.R. (3d) 500 at 518 (Gen. Div.).

[63]    There is nothing to prevent a debtor and a creditor from including in a contract between them a term providing that the creditor release a third party.  The term is binding as between the debtor and creditor.  In the CCAA context, therefore, a plan of compromise or arrangement may propose that creditors agree to compromise claims against the debtor and to release third parties, just as any debtor and creditor might agree to such a term in a contract between them.  Once the statutory mechanism regarding voter approval and court sanctioning has been complied with, the plan – including the provision for releases – becomes binding on all creditors (including the dissenting minority).

[64]    *Re T&N Ltd. and Others, supra,* is instructive in this regard.  It is a rare example of a court focussing on and examining the meaning and breadth of the term "arrangement".  T&N and its associated companies were engaged in the manufacture, distribution and sale of asbestos-containing products.  They became the subject of many claims by former employees, who had been exposed to asbestos dust in the course of their employment, and their dependents.  The T&N companies applied for protection under s. 425 of the U.K. *Companies Act 1985*, a provision virtually identical to the scheme of the CCAA – including the concepts of compromise or arrangement.[4]

[65]    T&N carried employers' liability insurance.  However, the employers' liability insurers (the "EL insurers") denied coverage.  This issue was litigated and ultimately resolved through the establishment of a multi-million pound fund against which the employees and their dependants (the "EL claimants") would assert their claims.  In return, T&N's former employees and dependants (the "EL claimants") agreed to forego any further claims against the EL insurers.  This settlement was incorporated into the plan of compromise and arrangement between the T&N companies and the EL claimants that was voted on and put forward for court sanction.

---

[4] The Legislative Debates at the time the CCAA was introduced in Parliament in April 1933 make it clear that the CCAA is patterned after the predecessor provisions of s. 425 of the *Companies Act 1985* (U.K.): see *House of Commons Debates (Hansard), supra*.

[66]   Certain creditors argued that the court could not sanction the plan because it did not constitute a "compromise or arrangement" between T&N and the EL claimants since it did not purport to affect rights as between them but only the EL claimants' rights against the EL insurers.  The Court rejected this argument.  Richards J. adopted previous jurisprudence – cited earlier in these reasons – to the effect that the word "arrangement" has a very broad meaning and that, while both a compromise and an arrangement involve some "give and take", an arrangement need not involve a compromise or be confined to a case of dispute or difficulty (paras. 46-51).  He referred to what would be the equivalent of a solvent arrangement under Canadian corporate legislation as an example.[5]  Finally, he pointed out that the compromised rights of the EL claimants against the EL insurers were not unconnected with the EL claimants' rights against the T&N companies; the scheme of arrangement involving the EL insurers was "an integral part of a single proposal affecting all the parties" (para. 52).  He concluded his reasoning with these observations (para. 53):

> In my judgment it is not a necessary element of an arrangement for the purposes of s 425 of the 1985 Act that it should alter the rights existing between the company and the creditors or members with whom it is made.  No doubt in most cases it will alter those rights.  But, provided that the context and content of the scheme are such as properly to constitute an arrangement between the company and the members or creditors concerned, it will fall within s 425.  It is … neither necessary nor desirable to attempt a definition of arrangement.  The legislature has not done so.  To insist on an alteration of rights, or a termination of rights as in the case of schemes to effect takeovers or mergers, is to impose a restriction which is neither warranted by the statutory language nor justified by the courts' approach over many years to give the term its widest meaning.  *Nor is an arrangement necessarily outside the section, because its effect is to alter the rights of creditors against another party or because such alteration could be achieved by a scheme of arrangement with that party*. [Emphasis added.]

[67]   I find Richard J.'s analysis helpful and persuasive.  In effect, the claimants in *T&N* were being asked to release their claims against the EL insurers in exchange for a call on the fund.  Here, the appellants are being required to release their claims against certain financial third parties in exchange for what is anticipated to be an improved position for

---

[5] See *Canada Business Corporations Act*, R.S.C. 1985, c. C-44, s. 192; *Ontario Business Corporations Act,* R.S.O. 1990, c. B.16, s. 182.

2008 ONCA 587 (CanLII)

all ABCP Noteholders, stemming from the contributions the financial third parties are making to the ABCP restructuring.  The situations are quite comparable.

### The Binding Mechanism

[68]    Parliament's reliance on the expansive terms "compromise" or "arrangement" does not stand alone, however.  Effective insolvency restructurings would not be possible without a statutory mechanism to bind an unwilling minority of creditors.  Unanimity is frequently impossible in such situations.   But the minority must be protected too.  Parliament's solution to this quandary was to permit a wide range of proposals to be negotiated and put forward (the compromise or arrangement) and to bind all creditors by class to the terms of the plan, but to do so only where the proposal can gain the support of the requisite "double majority" of votes[6] and obtain the sanction of the court on the basis that it is fair and reasonable.  In this way, the scheme of the CCAA supports the intention of Parliament to encourage a wide variety of solutions to corporate insolvencies without unjustifiably overriding the rights of dissenting creditors.

### The Required Nexus

[69]    In keeping with this scheme and purpose, I do not suggest that any and all releases between creditors of the debtor company seeking to restructure and third parties may be made the subject of a compromise or arrangement between the debtor and its creditors.  Nor do I think the fact that the releases may be "necessary" in the sense that the third parties or the debtor may refuse to proceed without them, of itself, advances the argument in favour of finding jurisdiction (although it may well be relevant in terms of the fairness and reasonableness analysis).

[70]    The release of the claim in question must be justified as part of the compromise or arrangement between the debtor and its creditors.  In short, there must be a reasonable connection between the third party claim being compromised in the plan and the restructuring achieved by the plan to warrant inclusion of the third party release in the plan.  This nexus exists here, in my view.

[71]    In the course of his reasons, the application judge made the following findings, all of which are amply supported on the record:

> a)  The parties to be released are necessary and essential to the restructuring of the debtor;

---

[6] A majority in number representing two-thirds in value of the creditors (s. 6)

b) *The claims to be released are rationally related to the purpose of the Plan and necessary for it*;

c) The Plan cannot succeed without the releases;

d) *The parties who are to have claims against them released are contributing in a tangible and realistic way to the Plan*; and

e) The Plan will benefit not only the debtor companies but creditor Noteholders generally.

[72]    Here, then – as was the case in *T&N* – there is a close connection between the claims being released and the restructuring proposal.  The tort claims arise out of the sale and distribution of the ABCP Notes and their collapse in value, just as do the contractual claims of the creditors against the debtor companies.  The purpose of the restructuring is to stabilize and shore up the value of those notes in the long run.  The third parties being released are making separate contributions to enable those results to materialize.  Those contributions are identified earlier, at para. 31 of these reasons.  The application judge found that the claims being released are not independent of or unrelated to the claims that the Noteholders have against the debtor companies; they are closely connected to the value of the ABCP Notes and are required for the Plan to succeed.  At paras. 76-77 he said:

> [76] I do not consider that the Plan in this case involves a change in relationship among creditors "that does not directly involve the Company."  Those who support the Plan and are to be released are "directly involved in the Company" in the sense that many are foregoing immediate rights to assets and are providing real and tangible input for the preservation and enhancement of the Notes.  It would be unduly restrictive to suggest that the moving parties' claims against released parties do not involve the Company, since the claims are directly related to the value of the Notes.  The value of the Notes is in this case the value of the Company.

> [77] This Plan, as it deals with releases, doesn't change the relationship of the creditors apart from involving the Company and its Notes.

[73]    I am satisfied that the wording of the CCAA – construed in light of the purpose, objects and scheme of the Act and in accordance with the modern principles of statutory interpretation – supports the court's jurisdiction and authority to sanction the Plan proposed here, including the contested third-party releases contained in it.

The Jurisprudence

[74]    Third party releases have become a frequent feature in Canadian restructurings since the decision of the Alberta Court of Queen's Bench in *Re Canadian Airlines Corp.* (2000), 265 A.R. 201, leave to appeal refused by *Resurgence Asset Management LLC v. Canadian Airlines Corp.* (2000), 266 A.R. 131 (C.A.), and [2001] 293 A.R. 351 (S.C.C.). In *Re Muscle Tech Research and Development Inc.* (2006), 25 C.B.R (5th) 231 (Ont. S.C.J.) Justice Ground remarked (para. 8):

> [It] is not uncommon in CCAA proceedings, in the context of a plan of compromise and arrangement, to compromise claims against the Applicants and other parties against whom such claims or related claims are made.

[75]    We were referred to at least a dozen court-approved CCAA plans from across the country that included broad third-party releases.  With the exception of *Re Canadian Airlines*, however, the releases in those restructurings – including *Muscle Tech* – were not opposed.  The appellants argue that those cases are wrongly decided, because the court simply does not have the authority to approve such releases.

[76]    In *Re Canadian Airlines* the releases in question were opposed, however.  Paperny J. (as she then was) concluded the court had jurisdiction to approve them and her decision is said to be the well-spring of the trend towards third-party releases referred to above. Based on the foregoing analysis, I agree with her conclusion although for reasons that differ from those cited by her.

[77]    Justice Paperny began her analysis of the release issue with the observation at para. 87 that "[p]rior to 1997, the CCAA did not provide for compromises of claims against anyone other than the petitioning company."  It will be apparent from the analysis in these reasons that I do not accept that premise, notwithstanding the decision of the Quebec Court of Appeal in *Michaud v. Steinberg,*[7] of which her comment may have been reflective.  Paperny J.'s reference to 1997 was a reference to the amendments of that year adding s. 5.1 to the CCAA, which provides for limited releases in favour of directors. Given the limited scope of s. 5.1, Justice Paperny was thus faced with the argument – dealt with later in these reasons – that Parliament must not have intended to extend the authority to approve third-party releases beyond the scope of this section.  She chose to address this contention by concluding that, although the amendments "[did] not authorize a release of claims against third parties other than directors, [they did] not prohibit such releases either" (para. 92).

[78]    Respectfully, I would not adopt the interpretive principle that the CCAA permits releases because it does not expressly prohibit them.  Rather, as I explain in these

---

[7] *Steinberg* was originally reported in French: [1993] R.J.Q. 1684 (C.A.). All paragraph references to *Steinberg* in this judgment are from the unofficial English translation available at 1993 CarswellQue 2055.

2008 ONCA 587 (CanLII)

reasons, I believe the open-ended CCAA permits third-party releases that are reasonably related to the restructuring at issue because they are encompassed in the comprehensive terms "compromise" and "arrangement" and because of the double-voting majority and court sanctioning statutory mechanism that makes them binding on unwilling creditors.

[79]    The appellants rely on a number of authorities, which they submit support the proposition that the CCAA may not be used to compromise claims as between anyone other than the debtor company and its creditors.  Principal amongst these are *Michaud v. Steinberg*, *supra*; *NBD Bank, Canada v. Dofasco Inc.*, (1999), 46 O.R. (3d) 514 (C.A.); *Pacific Coastal Airlines Ltd. v. Air Canada* (2001), 19 B.L.R. (3d) 286 (B.C.S.C.); and *Re Stelco Inc.* (2005), 78 O.R. (3d) 241 (C.A.) ("*Stelco I*").  I do not think these cases assist the appellants, however.  With the exception of *Steinberg*, they do not involve third party claims that were reasonably connected to the restructuring.  As I shall explain, it is my opinion that *Steinberg* does not express a correct view of the law, and I decline to follow it.

[80]    In *Pacific Coastal Airlines*, Tysoe J. made the following comment at para. 24:

> [The purpose of the CCAA proceeding] is not to deal with disputes between a creditor of a company and a third party, even if the company was also involved in the subject matter of the dispute.  While issues between the debtor company and non-creditors are sometimes dealt with in CCAA proceedings, it is not a proper use of a CCAA proceeding to determine disputes between parties other than the debtor company.

[81]    This statement must be understood in its context, however.  Pacific Coastal Airlines had been a regional carrier for Canadian Airlines prior to the CCAA reorganization of the latter in 2000.  In the action in question it was seeking to assert separate tort claims against Air Canada for contractual interference and inducing breach of contract in relation to certain rights it had to the use of Canadian's flight designator code prior to the CCAA proceeding.  Air Canada sought to have the action dismissed on grounds of *res judicata* or issue estoppel because of the CCAA proceeding.  Tysoe J. rejected the argument.

[82]    The facts in *Pacific Coastal* are not analogous to the circumstances of this case, however.  There is no suggestion that a resolution of Pacific Coastal's separate tort claim against Air Canada was in any way connected to the Canadian Airlines restructuring, even though Canadian – at a contractual level – may have had some involvement with the particular dispute.  Here, however, the disputes that are the subject-matter of the impugned releases are not simply "disputes between parties other than the debtor

2008 ONCA 587 (CanLII)

company".  They are closely connected to the disputes being resolved between the debtor companies and their creditors and to the restructuring itself.

[83]    Nor is the decision of this Court in the *NBD Bank* case dispositive.  It arose out of the financial collapse of Algoma Steel, a wholly-owned subsidiary of Dofasco.  The Bank had advanced funds to Algoma allegedly on the strength of misrepresentations by Algoma's Vice-President, James Melville.  The plan of compromise and arrangement that was sanctioned by Farley J. in the Algoma CCAA restructuring contained a clause releasing Algoma from all claims creditors "may have had against Algoma or its directors, officers, employees and advisors."  Mr. Melville was found liable for negligent misrepresentation in a subsequent action by the Bank.  On appeal, he argued that since the Bank was barred from suing Algoma for misrepresentation by its officers, permitting it to pursue the same cause of action against him personally would subvert the CCAA process – in short, he was personally protected by the CCAA release.

[84]    Rosenberg J.A., writing for this Court, rejected this argument.  The appellants here rely particularly upon his following observations at paras. 53-54:

> 53    In my view, the appellant has not demonstrated that allowing the respondent to pursue its claim against him would undermine or subvert the purposes of the Act. As this court noted in *Elan Corp. v. Comiskey* (1990), 1 O.R. (3d) 289 at 297, the *CCAA* is remedial legislation "intended to provide a structured environment for the negotiation of compromises between a debtor company and its creditors for the benefit of both". It is a means of avoiding a liquidation that may yield little for the creditors, especially unsecured creditors like the respondent, and the debtor company shareholders. However, the appellant has not shown that allowing a creditor to continue an action against an officer for negligent misrepresentation would erode the effectiveness of the Act.

> 54    In fact, to refuse on policy grounds to impose liability on an officer of the corporation for negligent misrepresentation would contradict the policy of Parliament as demonstrated in recent amendments to the *CCAA* and the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3. Those Acts now contemplate that an arrangement or proposal may include a term for compromise of certain types of claims against directors of the company except claims that "are based on allegations of misrepresentations made by directors". L.W. Houlden and C.H. Morawetz, the editors of *The 2000 Annotated Bankruptcy and Insolvency Act* (Toronto:

2008 ONCA 587 (CanLII)

Carswell, 1999) at p. 192 are of the view that the policy behind the provision is to encourage directors of an insolvent corporation to remain in office so that the affairs of the corporation can be reorganized. I can see no similar policy interest in barring an action against an officer of the company who, prior to the insolvency, has misrepresented the financial affairs of the corporation to its creditors. It may be necessary to permit the compromise of claims against the debtor corporation, otherwise it may not be possible to successfully reorganize the corporation. The same considerations do not apply to individual officers. Rather, it would seem to me that it would be contrary to good policy to immunize officers from the consequences of their negligent statements which might otherwise be made in anticipation of being forgiven under a subsequent corporate proposal or arrangement. [Footnote omitted.]

[85]   Once again, this statement must be assessed in context.  Whether Justice Farley had the authority in the earlier Algoma CCAA proceedings to sanction a plan that included third party releases was not under consideration at all.  What the Court was determining in *NBD Bank* was whether the release extended by its terms to protect a third party.  In fact, on its face, it does not appear to do so.  Justice Rosenberg concluded only that not allowing Mr. Melville to rely upon the release did not subvert the purpose of the CCAA.  As the application judge here observed, "there is little factual similarity in *NBD* to the facts now before the Court" (para. 71).  Contrary to the facts of this case, in *NBD Bank* the creditors had not agreed to grant a release to officers; they had not voted on such a release and the court had not assessed the fairness and reasonableness of such a release as a term of a complex arrangement involving significant contributions by the beneficiaries of the release – as is the situation here.  Thus, *NBD Bank* is of little assistance in determining whether the court has authority to sanction a plan that calls for third party releases.

[86]   The appellants also rely upon the decision of this Court in *Stelco I*.   There, the Court was dealing with the scope of the CCAA in connection with a dispute over what were called the "Turnover Payments".  Under an inter-creditor agreement one group of creditors had subordinated their rights to another group and agreed to hold in trust and "turn over" any proceeds received from Stelco until the senior group was paid in full.  On a disputed classification motion, the Subordinated Debt Holders argued that they should be in a separate class from the Senior Debt Holders.   Farley J. refused to make such an order in the court below, stating:

> [Sections] 4, 5 and 6 [of the CCAA] talk of compromises or
> arrangements between a company and its creditors.  There is
> no mention of this extending by statute to encompass a
> change of relationship among the creditors vis-à-vis the
> creditors themselves *and not directly involving the company*.
> [Citations omitted; emphasis added.]

See *Re Stelco Inc.* (2005), 15 C.B.R. (5th) 297 (Ont. S.C.J.) at para. 7.

[87]    This Court upheld that decision.  The legal relationship between each group of creditors and Stelco was the same, albeit there were inter-creditor differences, and creditors were to be classified in accordance with their legal rights.  In addition, the need for timely classification and voting decisions in the CCAA process militated against enmeshing the classification process in the vagaries of inter-corporate disputes.  In short, the issues before the Court were quite different from those raised on this appeal.

[88]    Indeed, the Stelco plan, as sanctioned, included third party releases (albeit uncontested ones).  This Court subsequently dealt with the same inter-creditor agreement on an appeal where the Subordinated Debt Holders argued that the inter-creditor subordination provisions were beyond the reach of the CCAA and therefore that they were entitled to a separate civil action to determine their rights under the agreement: *Re Stelco Inc.*, (2006), 21 C.B.R. (5th) 157 (Ont. C.A.) ("*Stelco II"*).  The Court rejected that argument and held that where the creditors' rights amongst themselves were sufficiently related to the debtor and its plan, they were properly brought within the scope of the CCAA plan.  The Court said (para. 11):

> In [*Stelco I*] – the classification case – the court observed that
> it is not a proper use of a CCAA proceeding to determine
> disputes between parties other than the debtor company …
> *[H]owever, the present case is not simply an inter-creditor*
> *dispute that does not involve the debtor company; it is a*
> *dispute that is inextricably connected to the restructuring*
> *process.* [Emphasis added.]

[89]    The approach I would take to the disposition of this appeal is consistent with that view.  As I have noted, the third party releases here are very closely connected to the ABCP restructuring process.

[90]    Some of the appellants – particularly those represented by Mr. Woods – rely heavily upon the decision of the Quebec Court of Appeal in *Michaud v. Steinberg, supra*. They say that it is determinative of the release issue.  In *Steinberg*, the Court held that the CCAA, as worded at the time, did not permit the release of directors of the debtor

corporation and that third-party releases were not within the purview of the Act. Deschamps J.A. (as she then was) said (paras. 42, 54 and 58 – English translation):

> [42] Even if one can understand the extreme pressure weighing on the creditors and the respondent at the time of the sanctioning, a plan of arrangement is not the appropriate forum to settle disputes other than the claims that are the subject of the arrangement.  In other words, one cannot, under the pretext of an absence of formal directives in the Act, transform an arrangement into a potpourri.
>
> …
>
> [54] The Act offers the respondent a way to arrive at a compromise with is creditors.  It does not go so far as to offer an umbrella to all the persons within its orbit by permitting them to shelter themselves from any recourse.
>
> …
>
> [58] The [CCAA] and the case law clearly do not permit extending the application of an arrangement to persons other than the respondent and its creditors and, consequently, the plan should not have been sanctioned as is [that is, including the releases of the directors].

[91]    Justices Vallerand and Delisle, in separate judgments, agreed.  Justice Vallerand summarized his view of the consequences of extending the scope of the CCAA to third party releases in this fashion (para. 7):

> In short, the Act will have become the Companies' *and Their Officers and Employees* Creditors Arrangement Act – an awful mess – and likely not attain its purpose, which is to enable the company to survive in the face of *its* creditors and through their will, and not in the face of the creditors of its officers.  This is why I feel, just like my colleague, that such a clause is contrary to the Act's mode of operation, contrary to its purposes and, for this reason, is to be banned.

[92]    Justice Delisle, on the other hand, appears to have rejected the releases because of their broad nature – they released directors from all claims, including those that were altogether unrelated to their corporate duties with the debtor company – rather than because of a lack of authority to sanction under the Act.  Indeed, he seems to have

recognized the wide range of circumstances that could be included within the term "compromise or arrangement". He is the only one who addressed that term. At para. 90 he said:

> The CCAA is drafted in general terms. It does not specify, among other things, what must be understood by "compromise or arrangement". However, it may be inferred from the purpose of this [A]ct that these terms *encompass all that should enable the person who has recourse to it to fully dispose of his debts*, both those that exist on the date when he has recourse to the statute and *those contingent on the insolvency in which he finds himself* … [Emphasis added.]

[93]   The decision of the Court did not reflect a view that the terms of a compromise or arrangement should "encompass all that should enable the person who has recourse to [the Act] to dispose of his debts … and those contingent on the insolvency in which he finds himself," however. On occasion such an outlook might embrace third parties other than the debtor and its creditors in order to make the arrangement work. Nor would it be surprising that, in such circumstances, the third parties might seek the protection of releases, or that the debtor might do so on their behalf. Thus, the perspective adopted by the majority in *Steinberg*, in my view, is too narrow, having regard to the language, purpose and objects of the CCAA and the intention of Parliament. They made no attempt to consider and explain why a compromise or arrangement could not include third-party releases. In addition, the decision appears to have been based, at least partly, on a rejection of the use of contract-law concepts in analysing the Act – an approach inconsistent with the jurisprudence referred to above.

[94]   Finally, the majority in *Steinberg* seems to have proceeded on the basis that the CCAA cannot interfere with civil or property rights under Quebec law. Mr. Woods advanced this argument before this Court in his factum, but did not press it in oral argument. Indeed, he conceded that if the Act encompasses the authority to sanction a plan containing third-party releases – as I have concluded it does – the provisions of the CCAA, as valid federal insolvency legislation, are paramount over provincial legislation. I shall return to the constitutional issues raised by the appellants later in these reasons.

[95]   Accordingly, to the extent *Steinberg* stands for the proposition that the court does not have authority under the CCAA to sanction a plan that incorporates third-party releases, I do not believe it to be a correct statement of the law and I respectfully decline to follow it. The modern approach to interpretation of the Act in accordance with its nature and purpose militates against a narrow interpretation and towards one that facilitates and encourages compromises and arrangements. Had the majority in *Steinberg* considered the broad nature of the terms "compromise" and "arrangement" and the

2008 ONCA 587 (CanLII)

jurisprudence I have referred to above, they might well have come to a different conclusion.

2008 ONCA 587 (CanLII)

### The 1997 Amendments

[96]    *Steinberg* led to amendments to the CCAA, however.  In 1997, s. 5.1 was added, dealing specifically with releases pertaining to directors of the debtor company. It states:

> 5.1 (1) A compromise or arrangement made in respect of a debtor company may include in its terms provision for the compromise of claims against directors of the company that arose before the commencement of proceedings under this Act and that relate to the obligations of the company where the directors are by law liable in their capacity as directors for the payment of such obligations.
>
> Exception
>
> (2) A provision for the compromise of claims against directors may not include claims that
>
> (*a*) relate to contractual rights of one or more creditors; or
>
> (*b*) are based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors.
>
> Powers of court
>
> (3) The court may declare that a claim against directors shall not be compromised if it is satisfied that the compromise would not be fair and reasonable in the circumstances.
>
> Resignation or removal of directors
>
> (4) Where all of the directors have resigned or have been removed by the shareholders without replacement, any person who manages or supervises the management of the business and affairs of the debtor company shall be deemed to be a director for the purposes of this section.
>
> 1997, c. 12, s. 122.

[97]    Perhaps the appellants' strongest argument is that these amendments confirm a prior lack of authority in the court to sanction a plan including third party releases.  If the power existed, why would Parliament feel it necessary to add an amendment specifically

permitting such releases (subject to the exceptions indicated) in favour of directors? *Expressio unius est exclusio alterius*, is the Latin maxim sometimes relied on to articulate the principle of interpretation implied in that question: to express or include one thing implies the exclusion of the other.

[98]   The maxim is not helpful in these circumstances, however.  The reality is that there *may* be another explanation why Parliament acted as it did.  As one commentator has noted:[8]

> Far from being a rule, [the maxim *expressio unius*] is not even lexicographically accurate, because it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds.  Sometimes it does and sometimes its does not, and whether it does or does not depends on the particular circumstances of context.  Without contextual support, therefore there is not even a mild presumption here.  Accordingly, the maxim is at best a description, after the fact, of what the court has discovered from context.

[99]   As I have said, the 1997 amendments to the CCAA providing for releases in favour of directors of debtor companies in limited circumstances were a response to the decision of the Quebec Court of Appeal in *Steinberg*.  A similar amendment was made with respect to proposals in the BIA at the same time.  The rationale behind these amendments was to encourage directors of an insolvent company to remain in office during a restructuring, rather than resign.  The assumption was that by remaining in office the directors would provide some stability while the affairs of the company were being reorganized: see Houlden & Morawetz, vol.1, *supra*, at 2-144, E§11A; *Le Royal Penfield Inc. (Syndic de)*, [2003] R.J.Q. 2157 at paras. 44-46 (C.S.).

[100] Parliament thus had a particular focus and a particular purpose in enacting the 1997 amendments to the CCAA and the BIA.  While there is some merit in the appellants' argument on this point, at the end of the day I do not accept that Parliament intended to signal by its enactment of s. 5.1 that it was depriving the court of authority to sanction plans of compromise or arrangement in all circumstances where they incorporate third party releases in favour of anyone other than the debtor's directors.  For the reasons articulated above, I am satisfied that the court does have the authority to do so.  Whether it sanctions the plan is a matter for the fairness hearing.

The Deprivation of Proprietary Rights

---

[8] Reed Dickerson, *The Interpretation and Application of Statutes* (1975) at pp.234-235, cited in Bryan A. Garner, ed., Black's Law Dictionary, 8th  ed. (West Group, St. Paul, Minn., 2004) at 621.

[101]  Mr. Shapray very effectively led the appellants' argument that legislation must not be construed so as to interfere with or prejudice established contractual or proprietary rights – including the right to bring an action – in the absence of a clear indication of legislative intention to that effect: *Halsbury's Laws of England*, 4th ed. reissue, vol. 44 (1) (London: Butterworths, 1995) at paras. 1438, 1464 and 1467; Driedger, 2nd ed., *supra,* at 183; Ruth Sullivan, *Sullivan and Driedger on the Construction of Statutes*, 4th ed., (Markham: Butterworths, 2002) at 399.  I accept the importance of this principle.  For the reasons I have explained, however, I am satisfied that Parliament's intention to clothe the court with authority to consider and sanction a plan that contains third party releases is expressed with sufficient clarity in the "compromise or arrangement" language of the CCAA coupled with the statutory voting and sanctioning mechanism making the provisions of the plan binding on all creditors.  This is not a situation of impermissible "gap-filling" in the case of legislation severely affecting property rights; it is a question of finding meaning in the language of the Act itself.  I would therefore not give effect to the appellants' submissions in this regard.

### The Division of Powers and Paramountcy

[102]  Mr. Woods and Mr. Sternberg submit that extending the reach of the CCAA process to the compromise of claims as between solvent creditors of the debtor company and solvent third parties to the proceeding is constitutionally impermissible.  They say that under the guise of the federal insolvency power pursuant to s. 91(21) of the *Constitution Act*, *1867*, this approach would improperly affect the rights of civil claimants to assert their causes of action, a provincial matter falling within s. 92(13), and contravene the rules of public order pursuant to the *Civil Code of Quebec*.

[103]  I do not accept these submissions.  It has long been established that the CCAA is valid federal legislation under the federal insolvency power: *Reference re: Companies' Creditors Arrangement Act (Canada)*, [1934] S.C.R. 659.   As the Supreme Court confirmed in that case (p. 661), citing Viscount Cave L.C. in *Royal Bank of Canada v. Larue* [1928] A.C. 187, "the exclusive legislative authority to deal with all matters within the domain of bankruptcy and insolvency is vested in Parliament."  Chief Justice Duff elaborated:

> Matters normally constituting part of a bankruptcy scheme
> but not in their essence matters of bankruptcy and insolvency
> may, of course, from another point of view and in another

> aspect be dealt with by a provincial legislature; but, when treated as matters pertaining to bankruptcy and insolvency, they clearly fall within the legislative authority of the Dominion.

[104]  That is exactly the case here.  The power to sanction a plan of compromise or arrangement that contains third-party releases of the type opposed by the appellants is embedded in the wording of the CCAA.  The fact that this may interfere with a claimant's right to pursue a civil action – normally a matter of provincial concern – or trump Quebec rules of public order is constitutionally immaterial.  The CCAA is a valid exercise of federal power.  Provided the matter in question falls within the legislation directly or as necessarily incidental to the exercise of that power, the CCAA governs.  To the extent that its provisions are inconsistent with provincial legislation, the federal legislation is paramount.  Mr. Woods properly conceded this during argument.

### Conclusion With Respect to Legal Authority

[105]  For all of the foregoing reasons, then, I conclude that the application judge had the jurisdiction and legal authority to sanction the Plan as put forward.

### (2)    The Plan is "Fair and Reasonable"

[106]  The second major attack on the application judge's decision is that he erred in finding that the Plan is "fair and reasonable" and in sanctioning it on that basis.  This attack is centred on the nature of the third-party releases contemplated and, in particular, on the fact that they will permit the release of some claims based in fraud.

[107]  Whether a plan of compromise or arrangement is fair and reasonable is a matter of mixed fact and law, and one on which the application judge exercises a large measure of discretion.  The standard of review on this issue is therefore one of deference.  In the absence of a demonstrable error an appellate court will not interfere:  see *Re Ravelston Corp. Ltd.* (2007), 31 C.B.R. (5th) 233 (Ont. C.A.).

[108]  I would not interfere with the application judge's decision in this regard.  While the notion of releases in favour of third parties – including leading Canadian financial institutions – that extend to claims of fraud is distasteful, there is no legal impediment to the inclusion of a release for claims based in fraud in a plan of compromise or arrangement.  The application judge had been living with and supervising the ABCP restructuring from its outset.  He was intimately attuned to its dynamics.  In the end he concluded that the benefits of the Plan to the creditors as a whole, and to the debtor companies, outweighed the negative aspects of compelling the unwilling appellants to execute the releases as finally put forward.

[109]  The application judge was concerned about the inclusion of fraud in the contemplated releases and at the May hearing adjourned the final disposition of the sanctioning hearing in an effort to encourage the parties to negotiate a resolution.  The result was the "fraud carve-out" referred to earlier in these reasons.

[110]  The appellants argue that the fraud carve-out is inadequate because of its narrow scope.  It (i) applies only to ABCP Dealers, (ii) limits the type of damages that may be claimed (no punitive damages, for example), (iii) defines "fraud" narrowly, excluding many rights that would be protected by common law, equity and the Quebec concept of public order, and (iv) limits claims to representations made directly to Noteholders. The appellants submit it is contrary to public policy to sanction a plan containing such a limited restriction on the type of fraud claims that may be pursued against the third parties.

[111]  The law does not condone fraud.  It is the most serious kind of civil claim.  There is therefore some force to the appellants' submission.  On the other hand, as noted, there is no legal impediment to granting the release of an antecedent claim in fraud, provided the claim is in the contemplation of the parties to the release at the time it is given: *Fotinis Restaurant Corp. v. White Spot Ltd.* (1998), 38 B.L.R. (2d) 251 at paras. 9 and 18 (B.C.S.C.).  There may be disputes about the scope or extent of what is released, but parties are entitled to settle allegations of fraud in civil proceedings – the claims here  all being untested allegations of fraud – and to include releases of such claims as part of that settlement.

[112]  The application judge was alive to the merits of the appellants' submissions.  He was satisfied in the end, however, that the need "to avoid the potential cascade of litigation that … would result if a broader 'carve out' were to be allowed" (para. 113) outweighed the negative aspects of approving  releases with the narrower carve-out provision.  Implementation of the Plan, in his view, would work to the overall greater benefit of the Noteholders as a whole. I can find no error in principle in the exercise of his discretion in arriving at this decision.  It was his call to make.

[113]  At para. 71 above I recited a number of factual findings the application judge made in concluding that approval of the Plan was within his jurisdiction under the CCAA and that it was fair and reasonable.  For convenience, I reiterate them here – with two additional findings – because they provide an important foundation for his analysis concerning the fairness and reasonableness of the Plan.  The application judge found that:

    a) The parties to be released are necessary and essential to the restructuring of the debtor;

    b) The claims to be released are rationally related to the purpose of the Plan and necessary for it;

    c) The Plan cannot succeed without the releases;

2008 ONCA 587 (CanLII)

> d) The parties who are to have claims against them released are contributing in a tangible and realistic way to the Plan;
>
> e) The Plan will benefit not only the debtor companies but creditor Noteholders generally;
>
> f) The voting creditors who have approved the Plan did so with knowledge of the nature and effect of the releases; and that,
>
> g) The releases are fair and reasonable and not overly broad or offensive to public policy.

[114] These findings are all supported on the record.  Contrary to the submission of some of the appellants, they do not constitute a new and hitherto untried "test" for the sanctioning of a plan under the CCAA.  They simply represent findings of fact and inferences on the part of the application judge that underpin his conclusions on jurisdiction and fairness.

[115] The appellants all contend that the obligation to release the third parties from claims in fraud, tort, breach of fiduciary duty, etc. is confiscatory and amounts to a requirement that they – as individual creditors – make the equivalent of a greater financial contribution to the Plan.  In his usual lively fashion, Mr. Sternberg asked us the same rhetorical question he posed to the application judge.  As he put it, how could the court countenance the compromise of what in the future might turn out to be fraud perpetrated at the highest levels of Canadian and foreign banks?  Several appellants complain that the proposed Plan is unfair to them because they will make very little additional recovery if the Plan goes forward, but will be required to forfeit a cause of action against third-party financial institutions that may yield them significant recovery.  Others protest that they are being treated unequally because they are ineligible for relief programs that Liquidity Providers such as Canaccord have made available to other smaller investors.

[116] All of these arguments are persuasive to varying degrees when considered in isolation.  The application judge did not have that luxury, however.  He was required to consider the circumstances of the restructuring as a whole, including the reality that many of the financial institutions were not only acting as Dealers or brokers of the ABCP Notes (with the impugned releases relating to the financial institutions in these capacities, for the most part) but also as Asset and Liquidity Providers (with the financial institutions making significant contributions to the restructuring in these capacities).

[117]  In insolvency restructuring proceedings almost everyone loses something.  To the extent that creditors are required to compromise their claims, it can always be proclaimed that their rights are being unfairly confiscated and that they are being called upon to make the equivalent of a further financial contribution to the compromise or arrangement.  Judges have observed on a number of occasions that CCAA proceedings involve "a balancing of prejudices," inasmuch as everyone is adversely affected in some fashion.

[118]  Here, the debtor corporations being restructured represent the issuers of the more than $32 billion in non-bank sponsored ABCP Notes.  The proposed compromise and arrangement affects that entire segment of the ABCP market and the financial markets as a whole.  In that respect, the application judge was correct in adverting to the importance of the restructuring to the resolution of the ABCP liquidity crisis and to the need to restore confidence in the financial system in Canada.  He was required to consider and balance the interests of <u>all</u> Noteholders, not just the interests of the appellants, whose notes represent only about 3% of that total.  That is what he did.

[119]  The application judge noted at para. 126 that the Plan represented "a reasonable balance between benefit to all Noteholders and enhanced recovery for those who can make out specific claims in fraud" within the fraud carve-out provisions of the releases.  He also recognized at para. 134 that:

> No Plan of this size and complexity could be expected to satisfy all affected by it.  The size of the majority who have approved it is testament to its overall fairness.  No plan to address a crisis of this magnitude can work perfect equity among all stakeholders.

[120]  In my view we ought not to interfere with his decision that the Plan is fair and reasonable in all the circumstances.

## D.    DISPOSITION

[121]  For the foregoing reasons, I would grant leave to appeal from the decision of Justice Campbell, but dismiss the appeal.

"Robert A. Blair J.A."
"I agree J.I. Laskin J.A."
"I agree E.A. Cronk J.A."

RELEASED: August 18, 2008

## SCHEDULE "A" – CONDUITS

Apollo Trust

Apsley Trust

Aria Trust

Aurora Trust

Comet Trust

Encore Trust

Gemini Trust

Ironstone Trust

MMAI-I Trust

Newshore Canadian Trust

Opus Trust

Planet Trust

Rocket Trust

Selkirk Funding Trust

Silverstone Trust

Slate Trust

Structured Asset Trust

Structured Investment Trust III

Symphony Trust

Whitehall Trust

2008 ONCA 587 (CanLII)

**SCHEDULE "B" - APPLICANTS**

ATB Financial

Caisse de dépôt et placement du Québec

Canaccord Capital Corporation

Canada Mortgage and Housing Corporation

Canada Post Corporation

Credit Union Central Alberta Limited

Credit Union Central of BC

Credit Union Central of Canada

Credit Union Central of Ontario

Credit Union Central of Saskatchewan

Desjardins Group

Magna International Inc.

National Bank of Canada/National Bank Financial Inc.

NAV Canada

Northwater Capital Management Inc.

Public Sector Pension Investment Board

The Governors of the University of Alberta

2008 ONCA 587 (CanLII)

Page:  37

### SCHEDULE "A" - COUNSEL

1)  Benjamin Zarnett and Frederick L. Myers for the Pan-Canadian Investors Committee

2)  Aubrey E. Kauffman and Stuart Brotman for 4446372 Canada Inc. and 6932819 Canada Inc.

3)  Peter F.C. Howard and Samaneh Hosseini for Bank of America N.A.; Citibank N.A.; Citibank Canada, in its capacity as Credit Derivative Swap Counterparty and not in any other capacity; Deutsche Bank AG; HSBC Bank Canada; HSBC Bank USA, National Association; Merrill Lynch International; Merrill Lynch Capital Services, Inc.; Swiss Re Financial Products Corporation; and UBS AG

4)  Kenneth T. Rosenberg, Lily Harmer and Max Starnino for Jura Energy Corporation and Redcorp Ventures Ltd.

5)  Craig J. Hill and Sam P. Rappos for the Monitors (ABCP Appeals)

6)  Jeffrey C. Carhart and Joseph Marin for Ad Hoc Committee and Pricewaterhouse Coopers Inc., in its capacity as Financial Advisor

7)  Mario J. Forte for Caisse de Dépôt et Placement du Québec

8)  John B. Laskin for National Bank Financial Inc. and National Bank of Canada

9)  Thomas McRae and Arthur O. Jacques for Ad Hoc Retail Creditors Committee (Brian Hunter, et al)

10)  Howard Shapray, Q.C. and Stephen Fitterman for Ivanhoe Mines Ltd.

11)  Kevin P. McElcheran and Heather L. Meredith for Canadian Banks, BMO, CIBC RBC, Bank of Nova Scotia and T.D. Bank

12)  Jeffrey S. Leon for CIBC Mellon Trust Company, Computershare Trust Company of Canada and BNY Trust Company of Canada, as Indenture Trustees

13)  Usman Sheikh for Coventree Capital Inc.

14)  Allan Sternberg and Sam R. Sasso for Brookfield Asset Management and Partners Ltd. and Hy Bloom Inc. and Cardacian Mortgage Services Inc.

15)  Neil C. Saxe for Dominion Bond Rating Service

16)  James A. Woods, Sebastien Richemont and Marie-Anne Paquette for Air Transat A.T. Inc., Transat Tours Canada Inc., The Jean Coutu Group (PJC) Inc., Aéroports de Montréal, Aéroports de Montréal Capital Inc., Pomerleau Ontario Inc., Pomerleau

2008 ONCA 587 (CanLII)

Page: 38

Inc., Labopharm Inc., Agence Métropolitaine de Transport (AMT), Giro Inc., Vêtements de sports RGR Inc., 131519 Canada Inc., Tecsys Inc., New Gold Inc. and Jazz Air LP

17)  Scott A. Turner for Webtech Wireless Inc., Wynn Capital Corporation Inc., West Energy Ltd., Sabre Energy Ltd., Petrolifera Petroleum Ltd., Vaquero Resources Ltd., and Standard Energy Ltd.

18)  R. Graham Phoenix for Metcalfe & Mansfield Alternative Investments II Corp., Metcalfe & Mansfield Alternative Investments III Corp., Metcalfe & Mansfield Alternative Investments V Corp., Metcalfe & Mansfield Alternative Investments XI Corp., Metcalfe & Mansfield Alternative Investments XII Corp., Quanto Financial Corporation and Metcalfe & Mansfield Capital Corp.