This is Exhibit "B" mentioned and referred to in the Affidavit of Charles M. Wright, sworn before me at the City of London, in the County of Middlesex, this 4th day of July, 2014.

A Commissioner, etc.

Court File No.: CV-11-431153-00CP

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE

B E T W E E N :

THE TRUSTEES OF THE LABOURERS' PENSION FUND OF CENTRAL AND EASTERN
CANADA, THE TRUSTEES OF THE INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 793 PENSION PLAN FOR OPERATING ENGINEERS IN ONTARIO,
SJUNDE AP-FONDEN, DAVID GRANT and ROBERT WONG

Plaintiffs

- and -

SINO-FOREST CORPORATION, ERNST & YOUNG LLP, BDO LIMITED (formerly known
as BDO MCCABE LO LIMITED), ALLEN T.Y. CHAN, W. JUDSON MARTIN, KAI KIT
POON, DAVID J. HORSLEY, WILLIAM E. ARDELL, JAMES P. BOWLAND, JAMES M.E.
HYDE, EDMUND MAK, SIMON MURRAY, PETER WANG, GARRY J. WEST, PÖYRY
(BEIJING) CONSULTING COMPANY LIMITED, CREDIT SUISSE SECURITIES
(CANADA), INC., TD SECURITIES INC., DUNDEE SECURITIES CORPORATION, RBC
DOMINION SECURITIES INC., SCOTIA CAPITAL INC., CIBC WORLD MARKETS INC.,
MERRILL LYNCH CANADA INC., CANACCORD FINANCIAL LTD., MAISON
PLACEMENTS CANADA INC., CREDIT SUISSE SECURITIES (USA) LLC and MERRILL
LYNCH, PIERCE, FENNER & SMITH INCORPORATED (successor by merger to Banc of
America Securities LLC)

Defendants

Proceeding under the *Class Proceedings Act, 1992*

## FRESH AS AMENDED STATEMENT OF CLAIM

## (NOTICE OF ACTION ISSUED JULY 20, 2011)

AMENDED THIS *April 18 12* PURSUANT TO
MODIFIÉ CE                CONFORMÉMENT À
☐ RULE/LA RÈGLE 26.02 ( _____ )
☒ THE ORDER OF *Mr. J. Perell*
   L'ORDONNANCE DU
DATED / FAIT LE *March 26 2012*

REGISTRAR                GREFFIER
SUPERIOR COURT OF JUSTICE    COUR SUPÉRIEURE DE JUSTICE

S. Chandradat
Registrar

**TO:**      **Sino-Forest Corporation**
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**   **David Horsley**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**   **Allen Chan**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**   **William Ardell**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**   **James Bowland**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**   **James Hyde**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**   **Edmund Mak**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**   **W. Judson Martin**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**   **Simon Murray**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**      **Kai Kit Poon**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**      **Peter Wang**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**      **Garry West**
Sino-Forest Corporation
1208-90 Burnhamthorpe Rd W
Mississauga, ON  L5B 3C3

**AND TO:**      **Ernst & Young LLP**
222 Bay Street
Toronto, ON  M5K 1J7

**AND TO:**      **BDO Limited**
25th Floor, Wing On Centre
111 Connaught Road Central
Hong Kong, China

**AND TO:**      **Pöyry (Beijing) Consulting Company Limited**
2208-2210 Cloud 9 Plaza
No. 1118 West Yan'an Road
Shanghai 200052
PR CHINA

**AND TO:**      **Credit Suisse Securities (Canada), Inc.**
1 First Canadian Place
100 King Street West, Suite 2900
Toronto, Ontario  M5X 1C9

**AND TO:**      **TD Securities Inc.**
66 Wellington Street West
P.O. Box 1, TD Bank Tower
Toronto, Ontario  M5K 1A2

**AND TO:**      **Dundee Securities Corporation**
1 Adelaide Street East
Toronto, ON  M5C 2V9

**AND TO:**    **RBC Dominion Securities Inc.**
155 Wellington Street West, 17th Floor
Toronto, Ontario  M5V 3K7

**AND TO:**    **Scotia Capital Inc.**
40 King Street West, Scotia Plaza
P.O. Box 4085, Station A
Toronto, Ontario  M5W 2X6

**AND TO:**    **CIBC World Markets Inc.**
161 Bay Street, Brookfield Place
P.O. Box 500
Toronto, Ontario  M5J 2S8

**AND TO:**    **Merrill Lynch Canada Inc.**
BCE Place, Wellington Tower
181 Bay Street, 4th and 5th Floors
Toronto, Ontario  M5J 2V8

**AND TO:**    **Canaccord Financial Ltd.**
161 Bay Street, Suite 2900
P.O. Box 516
Toronto, Ontario  M5J 2S1

**AND TO:**    **Maison Placements Canada Inc.**
130 Adelaide Street West, Suite 906
Toronto, Ontario M5H 3P5

**AND TO:**    **Credit Suisse Securities (USA) LLC**
Eleven Madison Avenue
New York, NY 10010

**AND TO:**    **Merrill Lynch, Pierce, Fenner & Smith Incorporated**
100 N. Tryon St., Ste. 220
Charlotte, NC 28255

## TABLE OF CONTENTS

I.    Defined Terms .................................................................................................3

II.   Claim ............................................................................................................11

III.  Overview .......................................................................................................13

IV.   The Parties ...................................................................................................18

      A.    *The Plaintiffs* ......................................................................................18

      B.    *The Defendants* ...................................................................................19

V.    The Offerings ...............................................................................................30

VI.   The Misrepresentations ..............................................................................34

      A.    *Misrepresentations relating to Sino's History and Fraudulent Origins* ...............35

            (i)     Sino Overstates the Value of, and the Revenues Generated by, the Leizhou Joint Venture .................................................................................35

            (ii)    Sino's Fictitious Investment in SJXT .......................................................39

            (iii)   Sino's MateriallyDeficient and Misleading Class Period Disclosures regarding Sino's History .................................................................44

      B.    *Misrepresentations relating to Sino's Forestry Assets* ........................................46

            (i)     Sino Overstates its Yunnan Forestry Assets ...............................................46

            (ii)    Sino Overstates its Suriname Forestry Assets; Alternatively, Sino fails to Disclose the Material Fact that its Suriname Forestry Assets are contrary to the Laws of Suriname ................................................................47

            (iii)   Sino overstates its Jiangxi Forestry Assets ................................................50

            (iv)    Poyry makes Misrepresentations in relation to Sino's Forestry Assets ......51

      C.    *Misrepresentations relating to Sino's Related Party Transactions* .....................54

            (i)     Related Party Transactions Generally .......................................................54

            (ii)    Sino fails to disclose that Zhonggan was a Related Party .........................54

            (iii)   Sino fails to disclose that Homix was a Related Party ..............................55

            (iv)    Sino fails to disclose that Yunan Shunxuan was a Related Party .............57

(v)    Sino fails to disclose that Yuda Wood was a Related Party ......................57

(vi)    Sino fails to Disclose that Major Suppliers were Related Parties .............58

D.    *Misrepresentations relating to Sino's Relations with Forestry Bureaus and its Purported Title to Forestry Assets in the PRC* ...............................................................59

E.    *Misrepresentations relating to Sino's Relationships with its AIs* .........................65

(i)    Sino Misrepresents the Degree of its Reliance on its AIs ...........................65

(ii)    Sino Misrepresents the Tax-related Risks Arising from its use of AIs .......66

(iii)    Sino Misrepresents its Accounting Treatment of its AIs ...........................71

F.    *Misrepresentations relating to Sino's Cash Flow Statements* ..............................72

G.    *Misrepresentations relating to Certain Risks to which Sino was exposed* ............74

(i)    Sino is conducting "business activities" in China ......................................74

(ii)    Sino fails to disclose that no proceeds were paid to it by its AIs ...............74

H.    *Misrepresentations relating to Sino's GAAP Compliance and the Auditors' GAAS Compliance* .........................................................................................................76

(i)    Sino, Chan and Horsley misrepresent that Sino complied with GAAP .......76

(ii)    E&Y and BDO misrepresent that Sino complied with GAAP and that they complied with GAAS .......................................................................................82

(iii)    The Market Relied on Sino's Purported GAAP-compliance and E&Y's and BDO's purported GAAS-compliance in Sino's Financial Reporting ..................84

VII.    Chan's and Horsley's False Certifications ....................................................85

VIII.    The Truth Is Revealed .................................................................................85

IX.    Sino Rewards Its Experts ...............................................................................99

X.    The Defendants' Relationship to the Class ...................................................100

XI.    The Plaintiffs' Causes of Action .................................................................103

A.    *Negligent Misrepresentation* .............................................................103

B.    *Statutory Claims, Negligence, Oppression, Unjust Enrichment and Conspiracy* 104

(i)    Statutory Liability– Secondary Market under the Securities Legislation ...104

(ii)    Statutory Liability – Primary Market for Sino's Shares under the Securities Legislation ..................................................................................................105

(iii)    Statutory Liability – Primary Market for Sino's Notes under the Securities Legislation ..................................................................................................106

(iv)    Negligence Simpliciter – Primary Market for Sino's Securities ..............106

(v)    Unjust Enrichment of Chan, Martin, Poon, Horsley, Mak and Murray ....110

(vi)    Unjust Enrichment of Sino ....................................................................111

(vi)    Unjust Enrichment of the Underwriters.................................................111

(vii)    Oppression .........................................................................................112

(viii)    Conspiracy .......................................................................................114

XII.    The Relationship between Sino's Disclosures and the Price of Sino's Securities ..........118

XIII.    Vicarious Liability.................................................................................................119

   A.    *Sino and the Individual Defendants* ..................................................................119

   B.    *E&Y* ......................................................................................................................120

   C.    *BDO* ....................................................................................................................120

   D.    *Pöyry* ..................................................................................................................120

   E.    *The Underwriters* ...............................................................................................121

XIV.    Real and Substantial Connection with Ontario ...........................................................121

XV.    Service Outside of Ontario.........................................................................................122

XVI.    Relevant Legislation, Place of Trial, Jury Trial and Headings ......................................122

## I.    DEFINED TERMS

1.    In this Statement of Claim, in addition to the terms that are defined elsewhere herein, the following terms have the following meanings:

(a)    "**AI**" means Authorized Intermediary;

(b)    "**AIF**" means Annual Information Form;

(c)     "**Ardell**" means the defendant William E. Ardell;

(d)     "**Banc of America**" means the defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated;

(e)     "**BDO**" means the defendant BDO Limited;

(f)     "**Bowland**" means the defendant James P. Bowland;

(g)     "**BVI**" means British Virgin Islands;

(h)     "**Canaccord**" means the defendant Canaccord Financial Ltd.;

(i)     "*CBCA*" means the *Canada Business Corporations Act*, RSC 1985, c. C-44, as amended;

(j)     "**Chan**" means the defendant Allen T.Y. Chan also known as "Tak Yuen Chan";

(k)     "**CIBC**" means the defendant CIBC World Markets Inc.;

(l)     "*CJA*" means the Ontario *Courts of Justice Act*, RSO 1990, c C-43, as amended;

(m)     "**Class**" and "**Class Members**" all persons and entities, wherever they may reside who acquired **Sino**'s **Securities** during the **Class Period** by distribution in Canada or on the Toronto Stock Exchange or other secondary market in Canada, which includes securities acquired over-the-counter, and all persons and entities who acquired **Sino**'s **Securities** during the **Class Period** who are resident of Canada or were resident of Canada at the time of acquisition and who acquired **Sino**'s **Securities** outside of Canada, except the **Excluded Persons**;

(n)     "**Class Period**" means the period from and including March 19, 2007 to and including June 2, 2011;

(o)     "**Code**" means **Sino**'s Code of Business Conduct;

(p)     "*CPA*" means the Ontario *Class Proceedings Act, 1992*, SO 1992, c 6, as amended;

(q)     "**Credit Suisse**" means the defendant Credit Suisse Securities (Canada), Inc.;

(r)     "**Credit Suisse USA**" means the defendant Credit Suisse Securities (USA) LLC;

(s)     "**Defendants**" means **Sino**, the **Individual Defendants**, **Pöyry**, **BDO**, **E&Y** and the **Underwriters**;

(t)     "**December 2009 Offering Memorandum**" means Sino's Final Offering Memorandum, dated December 10, 2009, relating to the distribution of Sino's 4.25% Convertible Senior Notes due 2016 which **Sino** filed on **SEDAR** on December 11, 2009;

(u)     "**December 2009 Prospectus**" means **Sino**'s Final Short Form Prospectus, dated December 10, 2009, which **Sino** filed on **SEDAR** on December 11, 2009;

(v)     "**Dundee**" means the defendant Dundee Securities Corporation;

(w)     "**E&Y**" means the defendant, Ernst and Young LLP;

(x)     "**Excluded Persons**" means the **Defendants**, their past and present subsidiaries, affiliates, officers, directors, senior employees, partners, legal representatives, heirs, predecessors, successors and assigns, and any individual who is a member of the immediate family of an **Individual Defendant;**

(y)     "**Final Report**" means the report of the IC, as that term is defined in paragraph 10 hereof;

(z)     "**GAAP**" means Canadian generally accepted accounting principles;

(aa)    "**GAAS**" means Canadian generally accepted auditing standards;

(bb)    "**Horsley**" means the defendant David J. Horsley;

(cc)    "**Hyde**" means the defendant James M.E. Hyde;

(dd)    "**Impugned Documents**" mean the 2005 Annual Consolidated Financial Statements (filed on **SEDAR** on March 31, 2006), Q1 2006 Financial Statements

(filed on **SEDAR** on May 11, 2006), the 2006 Annual Consolidated Financial Statements (filed on **SEDAR** on March 19, 2007), 2006 **AIF** (filed on **SEDAR** on March 30, 2007), 2006 Annual **MD&A** (filed on **SEDAR** on March 19, 2007), Management Information Circular dated April 27, 2007 (filed on **SEDAR** on May 4, 2007), Q1 2007 **MD&A** (filed on **SEDAR** on May 14, 2007), Q1 2007 Financial Statements (filed on **SEDAR** on May 14, 2007), **June 2007 Prospectus**, Q2 2007 **MD&A** (filed on **SEDAR** on August 13, 2007), Q2 2007 Financial Statements (filed on **SEDAR** on August 13, 2007), Q3 2007 **MD&A** (filed on **SEDAR** on November 12, 2007), Q3 2007 Financial Statements (filed on **SEDAR** on November 12, 2007), 2007 Annual Consolidated Financial Statements (filed on **SEDAR** on March 18, 2008), 2007 **AIF** (filed on **SEDAR** on March 28, 2008), 2007 Annual **MD&A** (filed on **SEDAR** on March 18, 2008), Amended 2007 Annual **MD&A** (filed on **SEDAR** on March 28, 2008), Management Information Circular dated April 28, 2008 (filed on **SEDAR** on May 6, 2008), Q1 2008 **MD&A** (filed on **SEDAR** on May 13, 2008), Q1 2008 Financial Statements (filed on **SEDAR** on May 13, 2008), **July 2008 Offering Memorandum**, Q2 2008 **MD&A** (filed on **SEDAR** on August 12, 2008), Q2 2008 Financial Statements (filed on **SEDAR** on August 12, 2008), Q3 2008 **MD&A** (filed on **SEDAR** on November 13, 2008), Q3 2008 Financial Statements (filed on **SEDAR** on November 13, 2008), 2008 Annual Consolidated Financial Statements (filed on **SEDAR** on March 16, 2009), 2008 Annual **MD&A** (filed on **SEDAR** on March 16, 2009), Amended 2008 Annual **MD&A** (filed on **SEDAR** on March 17, 2009), 2008 **AIF** (filed on **SEDAR** on March 31, 2009), Management Information Circular dated April 28, 2009 (filed on **SEDAR** on May 4, 2009), Q1 2009 **MD&A** (filed on **SEDAR** on May 11, 2009), Q1 2009 Financial Statements (filed on **SEDAR** on May 11, 2009), **June 2009 Prospectus**, **June 2009 Offering Memorandum**, Q2 2009 **MD&A** (filed on **SEDAR** on August 10, 2009), Q2 2009 Financial Statements (filed on **SEDAR** on August 10, 2009), Q3 2009 **MD&A** (filed on **SEDAR** on November 12, 2009), Q3 2009 Financial Statements (filed on **SEDAR** on November 12, 2009), **December 2009 Prospectus**, **December 2009 Offering Memorandum**, 2009

Annual **MD&A** (filed on **SEDAR** on March 16, 2010), 2009 Audited Annual Financial Statements (filed on **SEDAR** on March 16, 2010), 2009 **AIF** (filed on **SEDAR** on March 31, 2010), Management Information Circular dated May 4, 2010 (filed on **SEDAR** on May 11, 2010), Q1 2010 **MD&A** (filed on **SEDAR** on May 12, 2010), Q1 2010 Financial Statements (filed on **SEDAR** on May 12, 2010), Q2 2010 **MD&A** (filed on **SEDAR** on August 10, 2010), Q2 2010 Financial Statements (filed on **SEDAR** on August 10, 2010), **October 2010 Offering Memorandum**, Q3 2010 **MD&A** (filed on **SEDAR** on November 10, 2010), Q3 2010 Financial Statements (filed on **SEDAR** on November 10, 2010), 2010 Annual **MD&A** (March 15, 2011), 2010 Audited Annual Financial Statements (filed on **SEDAR** on March 15, 2011), 2010 **AIF** (filed on **SEDAR** on March 31, 2011), and Management Information Circular dated May 2, 2011 (filed on **SEDAR** on May 10, 2011);

(ee)    "**Individual Defendants**" means **Chan**, **Martin**, **Poon**, **Horsley**, **Ardell**, **Bowland**, **Hyde**, **Mak**, **Murray**, **Wang**, and **West**, collectively;

(ff)    "**July 2008 Offering Memorandum**" means the Final Offering Memorandum dated July 17, 2008, relating to the distribution of Sino's 5% Convertible Senior Notes due 2013 which **Sino** filed on **SEDAR** as a schedule to a material change report on July 25, 2008;

(gg)    "**June 2007 Prospectus**" means **Sino**'s Short Form Prospectus, dated June 5, 2007, which **Sino** filed on **SEDAR** on June 5, 2007;

(hh)    "**June 2009 Offering Memorandum**" means **Sino**'s Exchange Offer Memorandum dated June 24, 2009, relating to an offer to exchange Sino's Guaranteed Senior Notes due 2011 for new 10.25% Guaranteed Senior Notes due 2014 which **Sino** filed on **SEDAR** as a schedule to a material change report on June 25, 2009;

(ii)    "**June 2009 Prospectus**" means **Sino**'s Final Short Form Prospectus, dated June 1, 2009, which Sino filed on **SEDAR** on June 1, 2009;

(jj)    "**Maison**" means the defendant Maison Placements Canada Inc.;

(kk)    "**Martin**" means the defendant W. Judson Martin;

(ll)    "**Mak**" means the defendant Edmund Mak;

(mm)    "**MD&A**" means Management's Discussion and Analysis;

(nn)    "**Merrill**" means the defendant Merrill Lynch Canada Inc.;

(oo)    "**Muddy Waters**" means Muddy Waters LLC;

(pp)    "**Murray**" means the defendant Simon Murray;

(qq)    "**October 2010 Offering Memorandum**" means the Final Offering Memorandum dated October 14, 2010, relating to the distribution of Sino's 6.25% Guaranteed Senior Notes due 2017;

(rr)    "**Offering**" or "**Offerings**" means the primary distributions in Canada of Sino's **Securities** that occurred during the **Class Period** including the public offerings of Sino's common shares pursuant to the **June 2007**, **June 2009** and **December 2009 Prospectuses**, as well as the offerings of Sino's notes pursuant to **the July 2008**, **June 2009**, **December 2009**, and **October 2010 Offering Memoranda**, collectively;

(ss)    "*OSA*" means the *Securities Act*, RSO 1990 c S.5, as amended;

(tt)    "**OSC**" means the Ontario Securities Commission;

(uu)    "**Plaintiffs**" means the plaintiffs, the Trustees of the Labourers' Pension Fund of Central and Eastern Canada ("**Labourers**"), the Trustees of the International Union of Operating Engineers Local 793 Pension Plan for Operating Engineers in Ontario ("**Operating Engineers**"), Sjunde AP-Fonden ("**AP7**"), David C. Grant ("**Grant**"), and Robert Wong ("**Wong**"), collectively;

(vv)    "**Poon**" means the defendant Kai Kit Poon;

(ww)    "**Pöyry**" means the defendant, Pöyry (Beijing) Consulting Company Limited;

(xx)    "**PRC**" means the People's Republic of China;

(yy)    "**Representation**" means the statement that Sino's financial statements complied with **GAAP**;

(zz)    "**RBC**" means the defendant RBC Dominion Securities Inc.;

(aaa)    "**Scotia**" means the defendant Scotia Capital Inc.;

(bbb)    "**Second Report**" means the Second Interim Report of the IC, as that term is defined in paragraph 10 hereof;

(ccc)    "**Securities**" means Sino's common shares, notes or other securities, as defined in the *OSA*;

(ddd)    "**Securities Legislation**" means, collectively, the *OSA*, the *Securities Act*, RSA 2000, c S-4, as amended; the *Securities Act*, RSBC 1996, c 418, as amended; the *Securities Act*, CCSM c S50, as amended; the *Securities Act*, SNB 2004, c S-5.5, as amended; the *Securities Act*, RSNL 1990, c S-13, as amended; the *Securities Act*, SNWT 2008, c 10, as amended; the *Securities Act*, RSNS 1989, c 418, as amended; the *Securities Act*, S Nu 2008, c 12, as amended; the *Securities Act*, RSPEI 1988, c S-3.1, as amended; the *Securities Act*, RSQ c V-1.1, as amended; the *Securities Act*, *1988*, SS 1988-89, c S-42.2, as amended; and the *Securities Act*, SY 2007, c 16, as amended;

(eee)    "**SEDAR**" means the system for electronic document analysis and retrieval of the Canadian Securities Administrators;

(fff)    "**Sino**" means, as the context requires, either the defendant Sino-Forest Corporation, or Sino-Forest Corporation and its affiliates and subsidiaries, collectively;

(ggg)    "**TD**" means the defendant TD Securities Inc.;

(hhh)    "**TSX**" means the Toronto Stock Exchange;

(iii)    "**Underwriters**" means **Banc of America**, **Canaccord**, **CIBC**, **Credit Suisse**, **Credit Suisse USA**, **Dundee, Maison**, **Merrill**, **RBC**, **Scotia**, and **TD**, collectively;

(jjj)    "**Wang**" means the defendant Peter Wang;

(kkk)    "**West**" means the defendant Garry J. West; and

(lll)    "**WFOE**" means wholly foreign owned enterprise or an enterprise established in China in accordance with the relevant PRC laws, with capital provided solely by foreign investors.

## II.    CLAIM

2.    The Plaintiffs claim:

(a)    An order certifying this action as a class proceeding and appointing the Plaintiffs as representative plaintiffs for the Class, or such other class as may be certified by the Court;

(b)    A declaration that the Impugned Documents contained, either explicitly or implicitly, the Representation, and that, when made, the Representation was a misrepresentation, both at law and within the meaning of the Securities Legislation;

(c)    A declaration that the Impugned Documents contained one or more of the other misrepresentations alleged herein, and that, when made, those other misrepresentations constituted misrepresentations, both at law and within the meaning of the Securities Legislation;

(d)    A declaration that Sino is vicariously liable for the acts and/or omissions of the Individual Defendants and of its other officers, directors and employees;

(e)    A declaration that the Underwriters, E&Y, BDO and Pöyry are each vicariously liable for the acts and/or omissions of their respective officers, directors, partners and employees;

(f)    On behalf of all of the Class Members who purchased Sino's Securities in the secondary market during the Class Period, and as against all of the Defendants other than the Underwriters, general damages in the sum of $6.5 billion;

(g)    On behalf of all of the Class Members who purchased Sino common shares in the distribution to which the June 2007 Prospectus related, and as against Sino, Chan, Poon, Horsley, Martin, Mak, Murray, Hyde, Pöyry, BDO, Dundee, CIBC, Merrill and Credit Suisse general damages in the sum of $175,835,000;

(h)    On behalf of all of the Class Members who purchased Sino common shares in the distribution to which the June 2009 Prospectus related, and as against Sino, Chan,

Poon, Horsley, Wang, Martin, Mak, Murray, Hyde, Pöyry, E&Y, Dundee, Merrill, Credit Suisse, Scotia and TD, general damages in the sum of $330,000,000;

(i) On behalf of all of the Class Members who purchased Sino common shares in the distribution to which the December 2009 Prospectus related, and as against Sino, Chan, Poon, Horsley, Wang, Martin, Mak, Murray, Hyde, Pöyry, BDO, E&Y, Dundee, Merrill, Credit Suisse, Scotia, CIBC, RBC, Maison, Canaccord and TD, general damages in the sum of $319,200,000;

(j) On behalf of all the Class Members who purchased Sino's 5% Convertible Senior Notes due 2013 pursuant to the July 2008 Offering Memorandum, and as against Sino, Chan, Poon, Horsley, Wang, Martin, Mak, Murray, Hyde, Pöyry, BDO, E&Y and Credit Suisse USA, general damages in the sum of US$345 million;

(k) On behalf of all the Class Members who purchased Sino's 10.25% Guaranteed Senior Notes due 2014 pursuant to the June 2009 Offering Memorandum, and as against Sino, Chan, Poon, Horsley, Wang, Martin, Mak, Murray, Hyde, Pöyry, BDO, E&Y and Credit Suisse USA, general damages in the sum of US$400 million;

(l) On behalf of all the Class Members who purchased Sino's 4.25% Convertible Senior Notes due 2016 pursuant to the December 2009 Offering Memorandum, and as against Sino, Chan, Poon, Horsley, Wang, Martin, Mak, Murray, Hyde, Pöyry, BDO, E&Y, Credit Suisse USA and TD, general damages in the sum of US460 million;

(m) On behalf of all the Class Members who purchased Sino's 6.25% Guaranteed Senior Notes due 2017 pursuant to the October 2010 Offering Memorandum, and as against Sino, Chan, Poon, Horsley, Wang, Mak, Murray, Hyde, Ardell, Pöyry, E&Y, Credit Suisse USA and Banc of America, general damages in the sum of US$600 million;

(n)     On behalf of all of the Class Members, and as against Sino, Chan, Poon and Horsley, punitive damages, in respect of the conspiracy pled below, in the sum of $50 million;

(o)     A declaration that Sino, Chan, Poon, Horsley, Martin, Mak, Murray and the Underwriters were unjustly enriched;

(p)     A constructive trust, accounting or such other equitable remedy as may be available as against Sino, Chan, Poon, Horsley, Martin, Mak, Murray and the Underwriters;

(q)     A declaration that the acts and omissions of Sino have effected a result, the business or affairs of Sino have been carried on or conducted in a manner, or the powers of the directors of Sino have been exercised in a manner, that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of the Plaintiffs and the Class Members, pursuant to s. 241 of the *CBCA*;

(r)     An order directing a reference or giving such other directions as may be necessary to determine the issues, if any, not determined at the trial of the common issues;

(s)     Prejudgment and post judgment interest;

(t)     Costs of this action on a substantial indemnity basis or in an amount that provides full indemnity plus, pursuant to s 26(9) of the *CPA*, the costs of notice and of administering the plan of distribution of the recovery in this action plus applicable taxes; and

(u)     Such further and other relief as to this Honourable Court may seem just.

### III.    OVERVIEW

3.     From the time of its establishment in 1994, Sino has claimed to be a legitimate business operating in the commercial forestry industry in the PRC and elsewhere. Throughout that period, Sino has also claimed to have experienced breathtaking growth.

4.    Beguiled by Sino's reported results, and by Sino's constant refrain that China constituted an extraordinary growth opportunity, investors drove Sino's stock price dramatically higher, as appears from the following chart:



5.    The Defendants profited handsomely from the market's appetite for Sino's securities. Certain of the Individual Defendants sold Sino shares at lofty prices, and thereby reaped millions of dollars of gains.  Sino's senior management also used Sino's illusory success to justify their lavish salaries, bonuses and other perks.  For certain of the Individual Defendants, these outsized gains were not enough.  Sino stock options granted to Chan, Horsley and other insiders were backdated or otherwise mispriced, prior to and during the Class Period, in violation of the TSX Rules, GAAP and the Securities Legislation.

6.       Sino itself raised in excess of $2.7 billion[1] in the capital markets during this period. Meanwhile, the Underwriters were paid lucrative underwriting commissions, and BDO, E&Y and Pöyry garnered millions of dollars in fees to bless Sino's reported results and assets. To their great detriment, the Class Members relied upon these supposed gatekeepers.

7.       As a reporting issuer in Ontario and elsewhere, Sino was required at all material times to comply with GAAP. Indeed, Sino, BDO and E&Y, Sino's auditors during the Class Period and previously, repeatedly misrepresented that Sino's financial statements complied with GAAP. This was false.

8.       On June 2, 2011, Muddy Waters, a short seller and research firm with extensive PRC experience, issued its first research report in relation to Sino, and unveiled the scale of the deception that had been worked upon the Class Members.   Muddy Waters' initial report effectively revealed, among other things, that Sino had materially misstated its financial results, had falsely claimed to have acquired trees that it did not own, had reported sales that had not been made, or that had been made in a manner that did not permit Sino to book those sales as revenue under GAAP, and had concealed numerous related party transactions.   These revelations had a catastrophic effect on Sino's stock price.

9.       On June 1, 2011, prior to the publication of Muddy Waters' report, Sino's common shares closed at $18.21.   After the Muddy Waters report became public, Sino shares fell to $14.46 on the TSX (a decline of 20.6%), at which point trading was halted.   When trading resumed the next day, Sino's shares fell to a close of $5.23 (a decline of 71.3% from June 1).

10.     On June 3, 2011, Sino announced that, in response to the allegations of Muddy Waters, its board had formed a committee, which Sino then falsely characterized as "independent" (the

---

1 Dollar figures are in Canadian dollars (unless otherwise indicated) and are rounded for convenience.

"**Independent Committee**" or "**IC**"), to examine and review the allegations contained in the Muddy Waters' report of June 2, 2011.  The initial members of the IC were the Defendants Ardell, Bowland and Hyde.  The IC subsequently retained legal, accounting and other advisers to assist it in the fulfillment of its mandate.

11.    On August 26, 2011, the OSC issued a cease-trade order in respect of Sino's securities, alleging that Sino appeared to have engaged in significant non-arm's length transactions which may have been contrary to Ontario securities laws and the public interest, that Sino and certain of its officers and directors appeared to have misrepresented some of Sino's revenue and/or exaggerated some of its timber holdings, and that Sino and certain of its officers and directors, including Chan, appeared to be engaging or participating in acts, practices or a course of conduct related to Sino's securities which they (or any of them) knew or ought reasonably know would perpetuate a fraud.

12.    On November 13, 2011, the IC released the Second Report.  Therein, the IC revealed, *inter alia*, that: (1) Sino's management had failed to cooperate in numerous important respects with the IC's investigation; (2) "there is a risk" that certain of Sino's operations "taken as a whole" were in violation of PRC law; (3) Sino adopted processes that "avoid[] Chinese foreign exchange controls which must be complied with in a normal cross-border sale and purchase transaction, and [which] could present an obstacle to future repatriation of sales proceeds, and could have tax implications as well"; (4) the IC "has not been able to verify that any relevant income taxes and VAT have been paid by or on behalf of the BVIs in China"; (5) Sino lacked proof of title to the vast majority of its purported holdings of standing timber; (6) Sino's "transaction volumes with a number of  AI and Suppliers do not match the revenue reported by such Suppliers in their SAIC filing"; (7) "[n]one of the BVI timber purchase contracts have as

attachments either (i) Plantation Rights Certificates from either the Counterparty or original owner or (ii) villager resolutions, both of which are contemplated as attachments by the standard form of BVI timber purchase contract employed by the Company; and (8) "[t]here are indications in emails and in interviews with Suppliers that gifts or cash payments are made to forestry bureaus and forestry bureau officials."

13.     On January 31, 2012, the IC released its Final Report.  Therein, the IC effectively revealed that, despite having conducted an investigation over nearly eight months, and despite the expenditure of US$50 million on that investigation, it had failed to refute, or even to provide plausible answers to, key allegations made by Muddy Waters:

> This Final Report of the IC sets out the activities undertaken by the IC since mid-November, the findings from such activities and the IC's conclusions regarding its examination and review.  The IC's activities during this period have been limited as a result of Canadian and Chinese holidays (Christmas, New Year and Chinese New Year) and the extensive involvement of IC members in the Company's Restructuring and Audit Committees, both of which are advised by different advisors than those retained by the IC.  The IC believes that, notwithstanding there remain issues which  have not been fully answered, the work of the IC is now at the point of diminishing returns because much of the information which  it is seeking  lies with non-compellable third parties, may not exist or is apparently not retrievable from the records of the Company.

> [...]

> Given the circumstances described above, the IC understands that, with the delivery of this Final Report, its review and examination activities are terminated. The IC does not expect to undertake further work other than assisting with responses to regulators and the RCMP as required and engaging in such further specific activities as the IC may deem advisable or the Board may instruct.  The IC has asked the IC Advisors to remain available to assist and advise the IC upon its instructions

14.     Sino failed to meet the standards required of a public company in Canada.  Aided by its auditors and the Underwriters, Sino raised billions of dollars from investors on the false premise that they were investing in a well managed, ethical and GAAP-compliant corporation.  They

were not.  Accordingly, this action is brought to recover the Class Members' losses from those who caused them: the Defendants.

## IV.    THE PARTIES

### A.    *The Plaintiffs*

15.    Labourers are the trustees of the Labourers' Pension Fund of Central and Eastern Canada, a multi-employer pension plan providing benefits for employees working in the construction industry. The fund is a union-negotiated, collectively-bargained defined benefit pension plan established on February 23, 1972 and currently has approximately $2 billion in assets, over 39,000 members and over 13,000 pensioners and beneficiaries and approximately 2,000 participating employers. A board of trustees representing members of the plan governs the fund. The plan is registered under the *Pension Benefits Act*, RSO 1990, c P.8 and the *Income Tax Act*, RSC 1985, 5th Supp, c,1.  Labourers purchased Sino's common shares over the TSX during the Class Period and continued to hold shares at the end of the Class Period.  In addition, Labourers purchased Sino common shares offered by the December 2009 Prospectus and in the distribution to which that Prospectus related.

16.    Operating Engineers are the trustees of the International Union of Operating Engineers Local 793 Pension Plan for Operating Engineers in Ontario, a multi-employer pension plan providing pension benefits for operating engineers in Ontario. The pension plan is a union-negotiated, collectively-bargained defined benefit pension plan established on November 1, 1973 and currently has approximately $1.5 billion in assets, over 9,000 members and pensioners and beneficiaries. The fund is governed by a board of trustees representing members of the plan. The plan is registered under the *Pension Benefits Act*, RSO 1990, c P.8 and the *Income Tax Act*, RSC 1985, 5th Supp, c.1.  Operating Engineers purchased Sino's common shares over the TSX during the Class Period, and continued to hold shares at the end of the Class Period.

17.    AP7 is the Swedish National Pension Fund.  As of June 30, 2011, AP7 had approximately $15.3 billion in assets under management.  Funds managed by AP7 purchased Sino's common shares over the TSX during the Class Period and continued to hold those common shares at the end of the Class Period.

18.    Grant is an individual residing in Calgary, Alberta.  He purchased 100 of the Sino 6.25% Guaranteed Senior Notes due 2017 that were offered by the October 2010 Offering Memorandum and in the distribution to which that Offering Memorandum related.  Grant continued to hold those Notes at the end of the Class Period.

19.    Wong is an individual residing in Kincardine, Ontario.  During the Class Period, Wong purchased Sino's common shares over the TSX and continued to hold some or all of such shares at the end of the Class Period.  In addition, Wong purchased Sino common shares offered by the December 2009 Prospectus and in the distribution to which that Prospectus related, and continued to own those shares at the end of the Class Period.

**B.    *The Defendants***

20.    Sino purports to be a commercial forest plantation operator in the PRC and elsewhere. Sino is a corporation formed under the *CBCA*.

21.    At the material times, Sino was a reporting issuer in all provinces of Canada, and had its registered office located in Mississauga, Ontario.  At the material times, Sino's shares were listed for trading on the TSX under the ticker symbol "TRE," on the Berlin exchange as "SFJ GR," on the over-the-counter market in the United States as "SNOFF" and on the Tradegate market as "SFJ TH."  Sino securities are also listed on alternative trading venues in Canada and elsewhere including, without limitation, AlphaToronto and PureTrading.  Sino's shares also traded over-

the-counter in the United States.  Sino has various debt instruments, derivatives and other securities that are traded in Canada and elsewhere.

22.    As a reporting issuer in Ontario, Sino was required throughout the Class Period to issue and file with SEDAR:

(a)    within 45 days of the end of each quarter, quarterly interim financial statements prepared in accordance with GAAP that must include a comparative statement to the end of each of the corresponding periods in the previous financial year;

(b)    within 90 days of the end of the fiscal year, annual financial statements prepared in accordance with GAAP, including comparative financial statements relating to the period covered by the preceding financial year;

(c)    contemporaneously with each of the above, a MD&A of each of the above financial statements; and

(d)    within 90 days of the end of the fiscal year, an AIF, including material information about the company and its business at a point in time in the context of its historical and possible future development.

23.    MD&As are a narrative explanation of how the company performed during the period covered by the financial statements, and of the company's financial condition and future prospects.  The MD&A must discuss important trends and risks that have affected the financial statements, and trends and risks that are reasonably likely to affect them in future.

24.    AIFs are an annual disclosure document intended to provide material information about the company and its business at a point in time in the context of its historical and future development.  The AIF describes the company, its operations and prospects, risks and other external factors that impact the company specifically.

25.    Sino controlled the contents of its MD&As, financial statements, AIFs and the other documents particularized herein and the misrepresentations made therein were made by Sino.

26.    Chan is a co-founder of Sino, and was the Chairman, Chief Executive Officer and a director of the company from 1994 until his resignation from those positions on or about August 25, 2011.   As Sino's CEO, Chan signed and certified the company's disclosure documents during the Class Period.   Chan, along with Hyde, signed each of the 2006-2010 Audited Annual Financial Statements on behalf of Sino's board.   Chan resides in Hong Kong, China.

27.    Chan certified each of Sino's Class Period annual and quarterly MD&As and financial statements, each of which is an Impugned Document.   In so doing, he adopted as his own the false statements such documents contained, as particularized below.   Chan signed each of Sino's Class Period annual financial statements, each of which is an Impugned Document.   In so doing, he adopted as his own the false statements such documents contained, as particularized below.   As a director and officer, he caused Sino to make the misrepresentations particularized below.

28.    Since Sino was established, Chan has received lavish compensation from Sino.   For example, for 2006 to 2010, Chan's total compensation (other than share-based compensation) was, respectively, US$3.0 million, US$3.8 million, US$5.0 million, US$7.6 million and US$9.3 million.

29.    As at May 1, 1995, shortly after Sino became a reporting issuer, Chan held 18.3% of Sino's outstanding common shares and 37.5% of its preference shares.   As of April 29, 2011 he held 2.7% of Sino's common shares (the company no longer has preference shares outstanding). Chan has made in excess of $10 million through the sale of Sino shares.

30.     Horsley is Sino's Chief Financial Officer, and has held this position since October 2005. In his position as Sino's CFO, Horsley has signed and certified the company's disclosure documents during the Class Period.  Horsley resides in Ontario.  Horsley has made in excess of $11 million through the sale of Sino shares.

31.     Horsley certified each of Sino's Class Period annual and quarterly MD&As and financial statements, each of which is an Impugned Document.  In so doing, he adopted as his own the false statements such documents contained, as particularized below. Horsley signed each of Sino's Class Period annual financial statements, each of which is an Impugned Document.  In so doing, he adopted as his own the false statements such documents contained, as particularized below.   As an officer, he caused Sino to make the misrepresentations particularized below.

32.     Since becoming Sino's CFO, Horsley has also received lavish compensation from Sino. For 2006 to 2010, Horsley's total compensation (other than share-based compensation) was, respectively, US$1.1 million, US$1.4 million, US$1.7 million, US$2.5 million, and US$3.1 million.

33.     Poon is a co-founder of Sino, and has been the President of the company since 1994.  He was a director of Sino from 1994 to May 2009, and he continues to serve as Sino's President. Poon resides in Hong Kong, China.  While he was a board member, he adopted as his own the false statements made in each of Sino's annual financial statements, particularized below, when such statements were signed on his behalf.  While he was a board member, he caused Sino to make the misrepresentations particularized below.

34.     As at May 1, 1995, shortly after Sino became a reporting issuer, Poon held 18.3% of Sino's outstanding common shares and 37.5% of its preference shares.  As of April 29, 2011 he

held 0.42% of Sino's common shares.  Poon has made in excess of $34.4 million through the sale of Sino shares.

35.     Poon rarely attended board meetings while he was on Sino's board.  From the beginning of 2006 until his resignation from the Board in 2009, he attended 5 of the 39 board meetings, or less than 13% of all board meetings held during that period.

36.     Wang is a director of Sino, and has held this position since August 2007.  Wang resides in Hong Kong, China.  As a board member, he adopted as his own the false statements made in each of Sino's annual financial statements, particularized below, when such statements were signed on his behalf.  As a board member, he caused Sino to make the misrepresentations particularized below.

37.     Martin has been a director of Sino since 2006, and was appointed vice-chairman in 2010. On or about August 25, 2011, Martin replaced Chan as Chief Executive Officer of Sino. Martin was a member of Sino's audit committee prior to early 2011.  Martin has made in excess of $474,000 through the sale of Sino shares.  He resides in Hong Kong, China.  As a board member, he adopted as his own the false statements made in each of Sino's annual financial statements, particularized below, when such statements were signed on his behalf.  As a board member, he caused Sino to make the misrepresentations particularized herein.

38.     Mak is a director of Sino, and has held this position since 1994.    Mak was a member of Sino's audit committee prior to early 2011.   Mak and persons connected with Mak have made in excess of $6.4 million through sales of Sino shares.  Mak resides in British Columbia.  As a board member, he adopted as his own the false statements made in each of Sino's annual

financial statements, particularized below, when such statements were signed on his behalf. As a board member, he caused Sino to make the misrepresentations particularized below.

39.     Murray is a director of Sino, and has held this position since 1999. Murray has made in excess of $9.9 million through sales of Sino shares. Murray resides in Hong Kong, China. As a board member, he adopted as his own the false statements made in each of Sino's annual financial statements, particularized below, when such statements were signed on his behalf. As a board member, he caused Sino to make the misrepresentations particularized below.

40.     Since becoming a director, Murray has rarely attended board and board committee meetings. From the beginning of 2006 to the close of 2010, Murray attended 14 of 64 board meetings, or less than 22% of board meetings held during that period. During that same period, Murray attended 2 out of 13, or 15%, of the meetings held by the Board's Compensation and Nominating Committee, and attended *none* of the 11 meetings of that Committee held from the beginning of 2007 to the close of 2010.

41.     Hyde is a director of Sino, and has held this position since 2004. Hyde was previously a partner of E&Y. Hyde is the chairman of Sino's Audit Committee. Hyde, along with Chan, signed each of the 2007-2010 Annual Consolidated Financial Statements on behalf of Sino's board. Hyde is also member of the Compensation and Nominating Committee. Hyde has made in excess of $2.4 million through the sale of Sino shares. Hyde resides in Ontario. As a board member, he adopted as his own the false statements made in each of Sino's annual financial statements, particularized below, when he signed such statements or when they were signed on his behalf. As a board member, he caused Sino to make the misrepresentations particularized below.

42.     Ardell is a director of Sino, and has held this position since January 2010.  Ardell is a member of Sino's audit committee.  Ardell resides in Ontario.  As a board member, he adopted as his own the false statements made in each of Sino's annual financial statements released while he was a board member, particularized below, when such statements were signed on his behalf. As a board member, he caused Sino to make the misrepresentations particularized below.

43.     Bowland was a director of Sino from February 2011 until his resignation from the Board of Sino in November 2011.  While on Sino's Board, Bowland was a member of Sino's Audit Committee.  He was formerly an employee of a predecessor to E&Y.  Bowland resides in Ontario.  As a board member, he adopted as his own the false statements made in each of Sino's annual financial statements released while he was a board member, particularized below, when such statements were signed on his behalf.  As a board member, he caused Sino to make the misrepresentations particularized below.

44.     West is a director of Sino, and has held this position since February 2011.  West was previously a partner at E&Y.  West is a member of Sino's Audit Committee.  West resides in Ontario.  As a board member, he adopted as his own the false statements made in each of Sino's annual financial statements released while he was a board member, particularized below, when such statements were signed on his behalf.  As a board member, he caused Sino to make the misrepresentations particularized below.

45.     As officer and/or directors of Sino, the Individual Defendants were fiduciaries of Sino, and they made the misrepresentations alleged herein, adopted such misrepresentations, and/or caused Sino to make such misrepresentations while they were acting in their capacity as fiduciaries, and in violation of their fiduciary duties.  In addition, Chan, Poon, Horsley, Martin,

Mak and Murray were unjustly enriched in the manner and to the extent particularized below while they were acting in their capacity as fiduciaries, and in violation of their fiduciary duties.

46.    At all material times, Sino maintained the Code, which governed Sino's employees, officers and directors, including the Individual Defendants.  The Code stated that the members of senior management "are expected to lead according to high standards of ethical conduct, in both words and actions…"  The Code further required that Sino representatives act in the best interests of shareholders, corporate opportunities not be used for personal gain, no one trade in Sino securities based on undisclosed knowledge stemming from their position or employment with Sino, the company's books and records be honest and accurate, conflicts of interest be avoided, and any violations or suspected violations of the Code, and any concerns regarding accounting, financial statement disclosure, internal accounting or disclosure controls or auditing matters, be reported.

47.    E&Y has been engaged as Sino's auditor since August 13, 2007.  E&Y was also engaged as Sino's auditor from Sino's creation through February 19, 1999, when E&Y abruptly resigned during audit season and was replaced by the now-defunct Arthur Andersen LLP.  E&Y was also Sino's auditor from 2000 to 2004, when it was replaced by BDO.  E&Y is an expert of Sino within the meaning of the Securities Legislation.

48.    E&Y, in providing what it purported to be "audit" services to Sino, made statements that it knowingly intended to be, and which were, disseminated to Sino's current and prospective security holders.  At all material times, E&Y was aware of that class of persons, intended to and did communicate with them, and intended that that class of persons would rely on E&Y's statements relating to Sino, which they did to their detriment.

49.     E&Y consented to the inclusion in the June 2009 and December 2009 Prospectuses, as well as the July 2008, June 2009, December 2009 and October 2010 Offering Memoranda, of its audit reports on Sino's Annual Financial Statements for various years, as alleged more particularly below.

50.     BDO is the successor of BDO McCabe Lo Limited, the Hong Kong, China based auditing firm that was engaged as Sino's auditor during the period of March 21, 2005 through August 12, 2007, when they resigned at Sino's request, and were replaced by E&Y.  BDO is an expert of Sino within the meaning of the Securities Legislation.

51.     During the term of its service as Sino's auditor, BDO provided what it purported to be "audit" services to Sino, and in the course thereof made statements that it knowingly intended to be, and which were, disseminated to Sino's current and prospective security holders.  At all material times, BDO was aware of that class of persons, intended to and did communicate with them, and intended that that class of persons rely on BDO's statements relating to Sino, which they did to their detriment.

52.     BDO consented to the inclusion in each of the June 2007 and December 2009 Prospectuses and the July 2008, June 2009 and December 2009 Offering Memoranda, of its audit reports on Sino's Annual Financial Statements for 2005 and 2006.

53.     E&Y and BDO's annual Auditors' Report was made "to the shareholders of Sino-Forest corporation," which included the Class Members.  Indeed, s. 1000.11 of the Handbook of the Canadian Institute of Chartered Accountants states that "the objective of financial statements for profit-oriented enterprises focuses primarily on the information needs *of investors and creditors*" [emphasis added].

54.     Sino's shareholders, including numerous Class Members, appointed E&Y as auditors of Sino-Forest by shareholder resolutions passed on various dates, including on June 21, 2004, May 26, 2008, May 25, 2009, May 31, 2010 and May 30, 2011.

55.     Sino's shareholders, including numerous Class Members, appointed BDO as auditors of Sino-Forest by resolutions passed on May 16, 2005, June 5, 2006 and May 28, 2007.

56.     During the Class Period, with the knowledge and consent of BDO or E&Y (as the case may be), Sino's audited annual financial statements for the years ended December 31, 2006, 2007, 2008, 2009 and 2010, together with the report of BDO or E&Y thereon (as the case may be), were presented to the shareholders of Sino (including numerous Class Members) at annual meetings of such shareholders held in Toronto, Canada on, respectively, May 28, 2007, May 26, 2008, May 25, 2009, May 31, 2010 and May 30, 2011.   As alleged elsewhere herein, all such financial statements constituted Impugned Documents.

57.     Pöyry is an international forestry consulting firm which purported to provide certain forestry consultation services to Sino.   Pöyry is an expert of Sino within the meaning of the Securities Legislation.

58.     Pöyry, in providing what it purported to be "forestry consulting" services to Sino, made statements that it knowingly intended to be, and which were, disseminated to Sino's current and prospective security holders.   At all material times, Pöyry was aware of that class of persons, intended to and did communicate with them, and intended that that class of persons would rely on Pöyry's statements relating to Sino, which they did to their detriment.

59.     Pöyry consented to the inclusion in the June 2007, June 2009 and December 2009 Prospectuses, as well as the July 2008, June 2009, December 2009 and October 2010 Offering Memoranda, of its various reports, as detailed below in paragraph ●.

60.     The Underwriters are various financial institutions who served as underwriters in one or more of the Offerings.

61.     In connection with the distributions conducted pursuant to the June 2007, June 2009 and December 2009 Prospectuses, the Underwriters who underwrote those distributions were paid, respectively, an aggregate of approximately $7.5 million, $14.0 million and $14.4 million in underwriting commissions.   In connection with the offerings of Sino's notes in July 2008, December 2009, and October 2010, the Underwriters who underwrote those offerings were paid, respectively, an aggregate of approximately US$2.2 million, US$8.5 million and $US6 million. Those commissions were paid in substantial part as consideration for the Underwriters' purported due diligence examination of Sino's business and affairs.

62.     None of the Underwriters conducted a reasonable investigation into Sino in connection with any of the Offerings.   None of the Underwriters had reasonable grounds to believe that there was no misrepresentation in any of the Impugned Documents.   In the circumstances of this case, including the facts that Sino operated in an emerging economy, Sino had entered Canada's capital markets by means of a reverse merger, and Sino had reported extraordinary results over an extended period of time that far surpassed those reported by Sino's peers, the Underwriters all ought to have exercised heightened vigilance and caution in the course of discharging their duties to investors, which they did not do.   Had they done so, they would have uncovered Sino's true nature, and the Class Members to whom they owed their duties would not have sustained the losses that they sustained on their Sino investments.

# V.    THE OFFERINGS

63.    Through the Offerings, Sino raised in aggregate in excess of $2.7 billion from investors during the Class Period.  In particular:

(a)    On June 5, 2007, Sino issued and filed with SEDAR the June 2007 Prospectus pursuant to which Sino distributed to the public 15,900,000 common shares at a price of $12.65 per share for gross proceeds of $201,135,000.  The June 2007 Prospectus incorporated by reference Sino's: (1) 2006 AIF; (2) 2006 Audited Annual Financial Statements; (3) 2006 Annual MD&A; (4) Management Information Circular dated April 27, 2007; (5) Q1 2007 Financial Statements; and (6) Q1 2007 MD&A;

(b)    On July 17, 2008, Sino issued the July 2008 Offering Memorandum pursuant to which Sino sold through private placement US$345 million in aggregate principal amount of convertible senior notes due 2013.   The July 2008 Offering Memorandum included: (1) Sino's Consolidated Annual Financial Statements for 2005, 2006 and 2007; (2) Sino's unaudited interim financial statements for the three-month periods ended March 31, 2007 and 2008; (3) the section of the 2007 AIF entitled "Audit Committee" and the charter of the Audit Committee attached as an appendix to the 2007 AIF; and (4) the Pöyry report entitled "Sino-Forest Corporation Valuation of China Forest Assets Report as at 31 December 2007" dated March 14, 2008;

(c)    On June 1, 2009, Sino issued and filed with SEDAR the June 2009 Prospectus pursuant to which Sino distributed to the public 34,500,000 common shares at a price of $11.00 per share for gross proceeds of $379,500,000.  The June 2009 Prospectus incorporated by reference Sino's: (1) 2008 AIF; (2) 2007 and 2008 Annual Consolidated Financial Statements; (3) Amended 2008 Annual MD&A; (4) Q1 2009 MD&A; (5) Q1 2008 and 2009 Financial Statements; (6) Q1 2009 MD&A; (7) Management Information Circular dated April 28, 2009; and (8) the Pöyry report titled "Valuation of China Forest Corp Assets As at 31 December 2008" dated April 1, 2009;

(d)     On June 24, 2009, Sino issued the June 2009 Offering Memorandum for exchange of certain of its then outstanding senior notes due 2011 with new notes, pursuant to which Sino issued US$212,330,000 in aggregate principal amount of 10.25% Guaranteed Senior Notes due 2014.  The June 2009 Offering Memorandum incorporated by reference: (1) Sino's 2005, 2006 and 2007 Consolidated Annual Financial Statements; (2) the auditors' report of BDO dated March 19, 2007 with respect to Sino's Consolidated Annual Financial Statements for 2005 and 2006; (3) the auditors' report of E&Y dated March 12, 2008 with respect to Sino's Consolidated Annual Financial Statements for 2007 except as to notes 2, 18 and 23; (4) Sino's Consolidated Annual Financial Statements for 2007 and 2008 and the auditors' report of E&Y dated March 13, 2009; (5) the section entitled "Audit Committee" in the 2008 AIF, and the charter of the Audit Committee attached as an appendix to the 2008 AIF; and (6) the unaudited interim financial statements for the three-month periods ended March 31, 2008 and 2009;

(e)     On December 10, 2009, Sino issued the December 2009 Offering Memorandum pursuant to which Sino sold through private placement US$460,000,000 in aggregate principal amount of 4.25% convertible senior notes due 2016.  This Offering Memorandum incorporated by reference: (1) Sino's Consolidated Annual Financial Statements for 2005, 2006, 2007; (2) the auditors' report of BDO dated March 19, 2007 with respect to Sino's Annual Financial Statements for 2005 and 2006; (3) the auditors' report of E&Y dated March 12, 2008 with respect to Sino's Consolidated Annual Financial Statements for 2007, except as to notes 2, 18 and 23; (4) Sino's Consolidated Annual Financial Statements for 2007 and 2008 and the auditors' report of E&Y dated March 13, 2009; (5) the unaudited interim consolidated financial statements for the nine-month periods ended September 30, 2008 and 2009; (6) the section entitled "Audit Committee" in the 2008 AIF, and the charter of the Audit Committee attached to the 2008 AIF; (7) the Pöyry report entitled "Sino-Forest Corporation Valuation of China Forest Assets as at 31 December 2007"; and (8) the Pöyry report entitled "Sino-Forest Corporation Valuation of China Forest Corp Assets as at 31 December 2008" dated April 1, 2009;

(f)     On December 10, 2009, Sino issued and filed with SEDAR the December 2009 Prospectus (together with the June 2007 Prospectus and the June 2009 Prospectus, the "**Prospectuses**") pursuant to which Sino distributed to the public 21,850,000 common shares at a price of $16.80 per share for gross proceeds of $367,080,000. The December 2009 Prospectus incorporated by reference Sino's: (1) 2008 AIF; (2) 2007 and 2008 Annual Consolidated Financial Statements; (3) Amended 2008 Annual MD&A; (4) Q3 2008 and 2009 Financial Statements; (5) Q3 2009 MD&A; (6) Management Information Circular dated April 28, 2009; and (7) the Pöyry report titled "Valuation of China Forest Corp Assets As at 31 December 2008" dated April 1, 2009;

(g)     On February 8, 2010, Sino closed the acquisition of substantially all of the outstanding common shares of Mandra Forestry Holdings Limited. Concurrent with this acquisition, Sino completed an exchange with holders of 99.7% of the USD$195 million notes issued by Mandra Forestry Finance Limited and 96.7% of the warrants issued by Mandra Forestry Holdings Limited, for new 10.25% guaranteed senior notes issued by Sino in the aggregate principal amount of USD$187,177,375 with a maturity date of July 28, 2014. On February 11, 2010, Sino exchanged the new 2014 Senior Notes for an additional issue of USD$187,187,000 in aggregate principal amount of Sino's existing 2014 Senior Notes, issued pursuant to the June 2009 Offering Memorandum; and

(h)     On October 14, 2010, Sino issued the October 2010 Offering Memorandum pursuant to which Sino sold through private placement US$600,000,000 in aggregate principal amount of 6.25% guaranteed senior notes due 2017. The October 2010 Offering Memorandum incorporated by reference: (1) Sino's Consolidated Annual Financial Statements for 2007, 2008 and 2009; (2) the auditors' report of E&Y dated March 15, 2010 with respect to Sino's Annual Financial Statements for 2008 and 2009; and (3) Sino's unaudited interim financial statements for the six-month periods ended June 30, 2009 and 2010.

64.      The offering documents referenced in the preceding paragraph included, or incorporated other documents by reference that included, the Representation and the other misrepresentations in such documents that are particularized elsewhere herein.  Had the truth in regard to Sino's management, business and affairs been timely disclosed, securities regulators likely would not have receipted the Prospectuses, nor would any of the Offerings have occurred.

65.      Each of Chan, Horsley, Martin and Hyde signed the June 2007 Prospectus, and therein falsely certified that that prospectus, together with the documents incorporated therein by reference, constituted full, true and plain disclosure of all material facts relating to the securities offered thereby.  Each of Dundee, CIBC, Merrill and Credit Suisse also signed the June 2007 Prospectus, and therein falsely certified that, to the best of its knowledge, information and belief, that prospectus, together with the documents incorporated therein by reference, constituted full, true and plain disclosure of all material facts relating to the securities offered thereby.

66.      Each of Chan, Horsley, Martin and Hyde signed the June 2009 Prospectus, and therein falsely certified that that prospectus, together with the documents incorporated therein by reference, constituted full, true and plain disclosure of all material facts relating to the securities offered thereby.  Each of Dundee, Merrill, Credit Suisse, Scotia and TD also signed the June 2009 Prospectus, and therein falsely certified that, to the best of its knowledge, information and belief, that prospectus, together with the documents incorporated therein by reference, constituted full, true and plain disclosure of all material facts relating to the securities offered thereby.

67.      Each of Chan, Horsley, Martin and Hyde signed the December 2009 Prospectus, and therein falsely certified that that prospectus, together with the documents incorporated therein by reference, constituted full, true and plain disclosure of all material facts relating to the securities

offered thereby. Each of Dundee, Merrill, Credit Suisse, Scotia, CIBC, RBC, Maison, Canaccord and TD also signed the December 2009 Prospectus, and therein falsely certified that, to the best of its knowledge, information and belief, that prospectus, together with the documents incorporated therein by reference, constituted full, true and plain disclosure of all material facts relating to the securities offered thereby.

68.     E&Y consented to the inclusion in: (1) the June 2009 Prospectus, of its audit reports on Sino's Audited Annual Financial Statements for 2007 and 2008; (2) the December 2009 Prospectus, of its audit reports on Sino's Audited Annual Financial Statements for 2007 and 2008; (3) the July 2008 Offering Memorandum, of its audit reports on Sino's Audited Annual Financial Statements for 2007, and its adjustments to Sino's Audited Annual Financial Statements for 2005 and 2006; (4) the December 2009 Offering Memorandum, of its audit reports on Sino's Audited Annual Financial Statements for 2007 and 2008; and (5) the October 2010 Offering Memoranda, of its audit reports on Sino's Audited Annual Financial Statements for 2008 and 2009.

69.     BDO consented to the inclusion in each of the June 2007 and December 2009 Prospectuses and the July 2008, June 2009 and December 2009 Offering Memoranda of its audit reports on Sino's Audited Annual Financial Statements for 2006 and 2005.

## VI.    THE MISREPRESENTATIONS

70.     During the Class Period, Sino made the misrepresentations particularized below. These misrepresentations related to:

A.  Sino's history and fraudulent origins;

B.  Sino's forestry assets;

C.  Sino's related party transactions;

D.  Sino's relationships with forestry bureaus and its purported title to forestry assets in the
PRC;

E.  Sino's relationships with its "Authorized Intermediaries;"

F.  Sino's cash flows;

G.  Certain risks to which Sino was exposed; and

H.  Sino's compliance with GAAP and the Auditors' compliance with GAAS.

**A.**      ***Misrepresentations relating to Sino's History and Fraudulent Origins***

   *(i)     Sino Overstates the Value of, and the Revenues Generated by, the Leizhou Joint
           Venture*

71.    At the time of its founding by way of reverse merger in 1994, Sino's business was

conducted primarily through an equity joint venture between Sino's Hong Kong subsidiary,

Sino-Wood Partners, Limited ("Sino-Wood"), and the Leizhou Forestry Bureau, which was

situated in Guangdong Province in the south of the PRC.   The name of the venture was

Zhanjiang Leizhou Eucalyptus Resources Development Co. Ltd. ("**Leizhou**").   The stated

purpose of Leizhou, established in 1994, was:

> Managing forests, wood processing, the production of wood products and wood
> chemical products, and establishing a production facility with an annual
> production capacity of 50,000 $m^3$ of Micro Density Fiber Board (MDF),
> managing a base of 120,000 mu (8,000 ha) of which the forest annual utilization
> would be 8,000 $m^3$.

72.    There are two types of joint ventures in the PRC relevant to Sino: equity joint ventures

('**EJV**") and cooperating joint ventures ("**CJV**"). In an EJV, profits and assets are distributed in

proportion to the parties' equity holdings upon winding up.  In a CJV, the parties may contract to

divide profits and assets disproportionately to their equity interests.

73.    According to a Sino prospectus issued in January 1997, Leizhou, an EJV, was responsible for 20,000 hectares of the 30,000 hectares that Sino claimed to have "phased-in."  Leizhou was the key driver of Sino's purported early growth.

74.    Sino claimed to hold 53% of the equity in Leizhou, which was to total US$10 million, and Sino further claimed that the Leizhou Forestry Bureau was to contribute 20,000 ha of forestry land.  In reality, however, the terms of the EJV required the Leizhou Forestry Bureau to contribute a mere 3,533 ha.

75.    What was also unknown to investors was that Leizhou did not generate the sales claimed by Sino.  More particularly, in 1994, 1995 and 1996, respectively, Sino claimed to have generated US$11.3 million, US$23.9 million and US$23.1 million in sales from Leizhou.  In reality, however, these sales did not occur, or were materially overstated.

76.    Indeed, in an undisclosed letter from Leizhou Forestry Bureau to Zhanjiang City Foreign and Economic Relations and Trade Commission, dated February 27, 1998, the Bureau complained:

> To: Zhanjiang Municipal Foreign Economic Relations & Trade Commission
>
> Through mutual consultation between Leizhou Forestry Administration (hereinafter referred to as *our side*) and Sino-Wood Partners Limited (hereinafter referred to as the *foreign party*), and, with the approval document ZJMPZ No.021 [1994] issued by your commission on 28th January 1994 for approving the contracts and articles of association entered into by both parties, and, with the approval certificate WJMZHZZZ No.065 [1994] issued by your commission, both parties jointly established Zhanjiang Eucalyptus Resources Development Co. Ltd. (hereinafter referred to as the Joint Venture) whose incorporate number is 162622-0012 and duly registered the same with Zhanjiang Administration for Industry and Commerce and obtained the business license GSQHYZ No.00604 on 29th January in the same year.  It has been 4 years since the registration and we set out the situation as follows:
>
> I.    Information of the investment of both sides

A.   The investment of our side: according to the contract and articles of association signed by both sides and approved by your commission, our side has paid in RMB95,481,503.29 (equivalent to USD11,640,000.00) to the Joint Venture on 20th June 1995 through an in-kind contribution. The payment was made in accordance with the prescribed procedures and confirmed by signatures of the legal representatives of both parties. According to the Capital Verification Report from Yuexi (     ) Accounting Firm, this payment accounts for 99.1% of the agreed capital contribution from our side, which is USD11,750,000, and accounts for 46.56% of the total investment.

B.   The investment of the foreign party: the foreign party has paid in USD1,000,000 on 16th March 1994, which was in the starting period of the Joint Venture. According to the Capital Verification Report from Yuexi (     ) Accounting Firm, this payment only accounts for 7.55% of the agreed capital contribution from the foreign party totaling USD13,250,000, and accounts for 4% of the total investment. Then, in the prescribed investment period, the foreign party did not further pay capital into the Joint Venture. In view of this, your commission sent a "Notice on Time for Capital Contribution" to the foreign party on 30th January 1996. In accordance with the notice, the foreign party then on 10th April sent a letter to your commission, requesting for postponing the deadline for capital contribution to 20th December the same year. On 14th May 1996, your commission replied to Allen Chan (     ), the Chairman of the Joint Venture, stating that "postponement of the deadline for capital contribution is subject to the consent of our side and requires amendment of the term on the capital contribution time in the original contract, and both parties shall sign a bilateral supplementary contract; after the application has been approved, the postponed deadline will become effective.". Based on the spirit of the letter dated 14th May from your commission and for the purpose of achieving mutual communication and dealing with the issues of the Joint Venture actively and appropriately, on 11th June 1996, Chan Shixing (     ) and two other Directors from our side sent a joint letter to Allen Chan (     ), the Chairman of the Joint Venture, to propose a meeting of the board to be convened before 30th June 1996 in Zhanjiang, in order to discuss how to deal with the issues of the Joint Venture in accordance with the relevant State provisions. Unfortunately, the foreign party neither had discussion with our side pursuant to your commission's letter, nor replied to the proposal of our side, and furthermore failed to make payment to the Joint Venture. Now, it has been two years beyond the deadline for capital contribution (29th January 1996), and more than one year beyond the date prescribed by the Notice on Time for Capital Contribution issued by your commission (30th April 1996). However, the foreign party has been evading the discussion of the capital contribution issue, and moreover has taken no further action.

II.      *The Joint Venture is not capable of attaining substantial operation*

According to the contract and articles of association, the main purposes of setting up the Joint Venture are, on the one hand, to invest and construct a project producing 50,000 cubic meter Medium Density Fiberboard (MDF) a year; and on the other hand, to create a forest base of 120,000 mu, with which to produce 80,000 cubic meter of timber as raw material for the production of medium density fiberboard. The contract and articles of association also prescribed that the whole funding required for the MDF board project should be paid by the foreign party in cash; our side should pay in-kind the proportion of the fund prescribed by the contract. *After contributing capital of USD1,000,000 in the early stage, the foreign party not only failed to make subsequent capital contributions, but also in their own name successively withdrew a total amount of RMB4,141,045.02, from the funds they contributed, of which USD270,000 was paid to Huadu Baixing Wood Products Factory (                    ), which has no business relationship with the Joint Venture. This amount of money equals 47.6% of [the foreign party's] paid in capital. Although our side has almost paid off the agreed capital contribution (only short 0.9% of the total committed), due to the limited contribution from the foreign party and the fact that they withdrew a huge amount of money from those funds originally contributed by them, it is impossible for the Joint Venture to construct or set up production projects and to commence production operation while the funds have been insufficient and the foreign party did not pay in the majority of the subscribed capital. In fact, the Joint Venture therefore is merely a shell, existing in name only.*

*Additionally, after the establishment of the Joint Venture, its internal operations have been extremely abnormal*, for example, annual board meetings have not been held as scheduled; annual reports on the status and the results of the annual financial audit are missing; the withdrawal of the huge amount of funds by the foreign party was not discussed in the board meetings, etc. It is hard to list all here.

In light of the present state of contributions by both sides and the status of the Joint Venture from its establishment till now, our side now applies to your commission for:

1.      The cancellation of the approval certificate for "Zhanjiang Eucalyptus Resources Development Co. Ltd.", i.e. WJMZHZZZ No. 065[1994], based on the relevant provisions of Certain Regulations on the Subscription of Capital by the Parties to Sino-Foreign Joint Equity Enterprises,

2.      Direct the Joint Venture to complete the deregistration procedures for "Zhanjiang Eucalyptus Resources Development Co. Ltd." at the local Administration for Industry and Commerce, and for the return of its business license.

3.      Coordination with both parties to resolve the relevant remaining issues.

Please let us have your reply on whether the above is in order.

The Seal of the Leizhou Forestry Bureau

1998, February 27

[Translation; emphasis added.]

77.     In its 1996 Annual Financial Statements, Sino stated:

The $14,992,000 due from the LFB represents cash collected from the sale of wood chips on behalf of the Leizhou EJV. As originally agreed to by Sino-Wood, the cash was being retained by the LFB to fund the ongoing plantation costs of the Leizhou EJV incurred by the LFB. Sino-Wood and LFB have agreed that the amount due to the Leizhou EJV, after reduction for plantation costs incurred, will be settled in 1997 concurrent with the settlement of capital contributions due to the Leizhou EJV by Sino-Wood.

78.     These statements were false, inasmuch as Leizhou never generated such sales. Leizhou was wound-up in 1998.

79.     At all material times, Sino's founders, Chan and Poon, were fully aware of the reality relating to Leizhou, and knowingly misrepresented the true status of Leizhou, as well as its true revenues and profits.

(ii)     *Sino's Fictitious Investment in SJXT*

80.     In Sino's audited financial statements for the year ended December 31, 1997, filed on SEDAR on May 20, 1998 (the "**1997 Financial Statements**"), Sino stated that, in order to establish strategic partnerships with key local wood product suppliers and to build a strong distribution for the wood-based product and contract supply businesses, it had acquired a 20% equity interest in "Shanghai Jin Xiang Timber Ltd." ("**SJXT**"). Sino then described SJXT as an

EJV that had been formed in 1997 by the Ministry of Forestry in China, and declared that its function was to organize and manage the first and only official market for timber and log trading in Eastern China.  It further stated that the investment in SJXT was expected to provide the Company with good accessibility to a large base of potential customers and companies in the timber and log businesses in Eastern China.

81.    There is, in fact, no entity known as "Shanghai Jin Xiang Timber Ltd."   While an entity called "Shanghai Jin Xiang Timber Wholesale Market" does exist, Sino did not have, as claimed in its disclosure documents, an equity stake in that venture.

82.    According to the 1997 Audited Annual Financial Statements, the total investment of SJXT was estimated to be US$9.7 million, of which Sino would be required to contribute approximately US$1.9 million for a 20% equity interest.  The 1997 Audited Annual Financial Statements stated that, as at December 31, 1997, Sino had made capital contributions to SJXT in the amount of US$1.0 million.  In Sino's balance sheet as at December 31, 1997, the SXJT investment was shown as an asset of $1.0 million.

83.    In October 1998, Sino announced an Agency Agreement with SJXT.  At that time, Sino stated that it would provide 130,000 m$^3$ of various wood products to SJXT over an 18 month period, and that, based on then-current market prices, it expected this contract to generate "significant revenue" for Sino-Forest amounting to approximately $40 million.  The revenues that were purportedly anticipated from the SJXT contract were highly material to Sino.  Indeed, Sino's total reported revenues in 1998 were $92.7 million.

84.    In Sino's Audited Annual Financial Statements for the year ended December 31, 1998, which statements were filed on SEDAR on May 18, 1999 (the "**1998 Financial Statements**"), Sino again stated that, in 1997, it had acquired a 20% equity interest in SJXT, that the total

investment in SJXT was estimated to be US$9.7 million, of which Sino would be required to contribute approximately $1.9 million, representing 20% of the registered capital, and that, as at December 31, 1997 and 1998, Sino had made contributions in the amount of US$1.0 million to SJXT. In Sino's balance sheet as at December 31, 1998, the SXJT investment was again shown as an asset of US$1.0 million.

85.    Sino also stated in the 1998 Audited Annual Financial Statements that, during 1998, the sale of logs and lumber to SJXT amounted to approximately US$537,000. These sales were identified in the notes to the 1998 Financial Statements as related party transactions.

86.    In Sino's Annual Report for 1998, Chan stated that lumber and wood products trading constituted a "promising new opportunity." Chan explained that:

> *SJXT represents a very significant development for our lumber and wood products trading business. The market is prospering and continues to look very promising.* Phase I, consisting of 100 shops, is completed. Phases II and III are expected to be completed by the year 2000. This expansion would triple the size of the Shanghai Timber Market.

> *The Shanghai Timber Market is important to Sino-Forest as a generator of significant new revenue. In addition to supplying various forest products to the market from our own operations, our direct participation in SJXT increases our activities in sourcing a wide range of other wood products both from inside China and internationally.*

> *The Shanghai Timber Market is also very beneficial to the development of the forest products industry in China because it is the first forest products national sub-market in the eastern region of the country.*

> [...]

> *The market also greatly facilitates Sino-Forest's networking activities, enabling us to build new industry relationships and add to our market intelligence, all of which increasingly leverage our ability to act as principal in our dealings.*

> [Emphasis added.]

87.     Chan also stated in the 1998 Annual Report that the "Agency Agreement with SJXT [is]

expected to generate approximately $40 million over 18 months."

88.     In Sino's Annual Report for 1999, Sino stated:

> *There are also promising growth opportunities as Sino-Forest's investment in*
> *Shanghai Jin Xiang Timber Ltd. (SJXT or the Shanghai Timber Market),*
> *develops*. The Company also continues to explore opportunities to establish and
> reinforce ties with other international forestry companies and to bring our e-
> commerce technology into operation.
>
> Sino-Forest's investment in the Shanghai Timber Market — the first national
> forest products submarket in eastern China — has provided a strong foundation
> for the Company's lumber and wood products trading business.
>
> [Emphasis added.]

89.     In Sino's MD&A for the year ended December 31, 1999, Sino also stated that:

> *Sales from lumber and wood products trading increased 264% to $34.2 million*
> *compared to $9.4 million in 1998. The increase in lumber and wood products*
> *trading is attributable largely to the increase in new business generated from*
> *our investment in Shanghai Jin Xiang Timber Ltd. (SJXT) and a larger sales*
> *force in 1999.* Lumber and wood products trading on an agency basis has
> increased 35% from $2.3 million in 1998 to $3.1 million in 1999. The increase in
> commission income on lumber and wood products trading is attributable to
> approximately $1.8 million of fees earned from a new customer.
>
> [Emphasis added.]

90.     That same MD&A, however, also states that "The investment in SJXT has contributed to

the significant growth of the lumber and wood products trading business, *which has recorded an*

*increase in sales of 219% from $11.7 million in 1998 to $37.2 million in 1999*" (emphasis

added).

91.      In Sino's Audited Annual Financial Statements for the year ended December 31, 1999,

which statements were filed on SEDAR on May 18, 2000 (the "**1999 Financial Statements**"),

Sino stated:

> During the year, Shanghai Jin Xiang Timber Ltd. ["SJXT"] applied to increase **the original total capital contributions of $868,000** [Chinese renminbi 7.2 million] to $1,509,000 [Chinese renminbi 12.5 million]. Sino-Wood is required to **make an additional contribution of $278,000** as a result of the increase in total capital contributions. The additional capital contribution of $278,000 was made in 1999 **increasing its equity interest in SJXT from 27.8% to 34.4%.** The principal activity of SJXT is to organize trading of timber and logs in the PRC market.
>
> [Emphasis added.]

92.     The statements made in the 1999 Financial Statements contradicted Sino's prior representations in relation to SJXT. Among other things, Sino previously claimed to have made a capital contribution of $1,037,000 for a 20% equity interest in SJXT.

93.      In addition, note 2(b) to the 1999 Financial Statements stated that, "[a]s at December 31, 1999, $796,000...advances to SJXT remained outstanding. The advances to SJXT were unsecured, non-interest bearing and without a fixed repayment date." Thus, assuming that Sino's contributions to SJXT were actually made, then Sino's prior statements in relation to SJXT were materially misleading, and violated GAAP, inasmuch as those statements failed to disclose that Sino had made to SJXT, a related party, a non-interest bearing loan of $796,000.

94.      In Sino's Audited Annual Financial Statements for the year ended December 31, 2000, which statements were filed on SEDAR on May 18, 2000 (the "**2000 Financial Statements**"), Sino stated:

> In 1999, Shanghai Jin Xiang Timber Ltd. ("SJXT") applied to increase the original total capital contributions of $868,000 [Chinese renminbi 7.2 million] to $1,509,000 [Chinese renminbi 12.5 million]. Sino-Wood is required to make an additional contribution of $278,000 as a result of the increase in total capital contributions. The additional capital contribution of $278,000 was made in 1999 increasing its equity interest in SJXT from 27.8% to 34.4%. The principal activity of SJXT is to organize the trading of timber and logs in the PRC market. During the year, advances to SJXT of $796,000 were repaid.

95.    In Sino's balance sheet as at December 31, 2000, the SJXT investment was shown as an asset of $519,000, being the sum of Sino's purported SJXT investment of $1,315,000 as at December 31, 1999, and the $796,000 of "advances" purportedly repaid to Sino by SJXT during the year ended December 31, 2000.

96.    In Sino's Annual Reports (including the audited annual financial statements contained therein) for the years 2001 and beyond, there is no discussion whatsoever of SJXT.  Indeed, Sino's "promising" and "very significant" investment in SJXT simply evaporated, without explanation, from Sino's disclosure documents.  In fact, and unbeknownst to the public, Sino never invested in a company called "Shanghai Jin Xiang Timber Ltd." Chan and Poon knew, or were reckless in not knowing of, that fact.

97.    At all material times, Sino's founders, Chan and Poon, were fully aware of the reality relating to SJXT, and knowingly misrepresented the true status of SJXT and Sino's interested therein.

(iii)    *Sino's Materially Deficient and Misleading Class Period Disclosures regarding Sino's History*

98.    During the Class Period, the Sino disclosure documents identified below purported to provide investors with an overview of Sino's history.  However, those disclosure documents, and indeed all of the Impugned Documents, failed to disclose the material fact that, from its very founding, Sino was a fraud, inasmuch as its purportedly key investments in Leizhou and SJXT were either grossly inflated or fictitious.

99.    Accordingly, the statements particularized in paragraphs 100 to 104 below were misrepresentations.  The misleading nature of such statements was exacerbated by the fact that, throughout the Class Period, Sino's senior management and Board purported to be governed by

the Code, which touted the "high standards of ethical conduct, in both words and actions", of Sino's senior management and Board.

100.    In the Prospectuses, Sino described its history, but did not disclose that the SJXT investment was fictitious, or that the revenues generated by Leizhou were non-existent or grossly overstated.

101.    In particular, the June 2007 Prospectus stated merely that:

> The Corporation was formed under the *Business Corporations Act* (Ontario) upon the amalgamation of Mt. Kearsarge Minerals Inc. and 1028412 Ontario Inc. pursuant to articles of amalgamation dated March 14, 1994. The articles of amalgamation were amended by articles of amendment filed on July 20, 1995 and May 20, 1999 to effect certain changes in the provisions attaching to the Corporation's class A subordinate-voting shares and class B multiple-voting shares. On June 25, 2002, the Corporation filed articles of continuance to continue under the *Canada Business Corporations Act*. On June 22, 2004, the Corporation filed articles of amendment whereby its class A subordinate-voting shares were reclassified as Common Shares and its class B multiple-voting shares were eliminated.

102.    Similarly, the June 2009 Prospectus stated only that:

> The Corporation was formed under the *Business Corporations Act* (Ontario) upon the amalgamation of Mt. Kearsarge Minerals Inc. and 1028412 Ontario Inc. pursuant to articles of amalgamation dated March 14, 1994. The articles of amalgamation were amended by articles of amendment filed on July 20, 1995 and May 20, 1999 to effect certain changes in the provisions attaching to the Corporation's class A subordinate-voting shares and class B multiple-voting shares. On June 25, 2002, the Corporation filed articles of continuance to continue under the *Canada Business Corporations Act*. On June 22, 2004, the Corporation filed articles of amendment whereby its class A subordinate-voting shares were reclassified as Common Shares and its class B multiple-voting shares were eliminated.

103.    Finally, the December 2009 Prospectus stated only that:

> The Corporation was formed under the *Business Corporations Act* (Ontario) upon the amalgamation of Mt. Kearsarge Minerals Inc. and 1028412 Ontario Inc. pursuant to articles of amalgamation dated March 14, 1994. The articles of amalgamation were amended by articles of amendment filed on July 20, 1995 and May 20, 1999 to effect certain changes in the provisions attaching to the

Corporation's class A subordinate-voting shares and class B multiple-voting shares. On June 25, 2002, the Corporation filed articles of continuance to continue under the *Canada Business Corporations Act* (the "CBCA"). On June 22, 2004, the Corporation filed articles of amendment whereby its class A subordinate-voting shares were reclassified as Common Shares and its class B multiple-voting shares were eliminated.

104.    The failure to disclose the true nature of, and/or Sino's revenues and profits from, SJXT and Leizhou in the historical narrative in the Prospectuses rendered those Prospectuses materially false and misleading.  Those historical facts would have alerted persons who purchased Sino shares under the Prospectuses, and/or in the secondary markets, to the highly elevated risk of investing in a company that continued to be controlled by Chan and Poon, both of whom were founders of Sino, and both of whom had knowingly misrepresented the true nature of Leizhou and SJXT from the time of Sino's creation.  Thus, Sino was required to disclose those historical facts to the Class Members during the Class Period, but failed to do so, either in the Prospectuses or in any other Impugned Document.

**B.**    ***Misrepresentations relating to Sino's Forestry Assets***

*(i)    Sino Overstates its Yunnan Forestry Assets*

105.    In a press release issued by Sino and filed on SEDAR on March 23, 2007, Sino announced that it had entered into an agreement to sell 26 million shares to several institutional investors for gross proceeds of US$200 million, and that the proceeds would be used for the acquisition of standing timber, including pursuant to a new agreement to purchase standing timber in Yunnan Province.  It further stated in that press release that Sino-Panel (Asia) Inc. ("**Sino-Panel**"), a wholly-owned subsidiary of Sino, had entered on that same day into an agreement with Gengma Dai and Wa Tribes Autonomous Region Forestry Company Ltd., ("**Gengma Forestry**") established in Lincang City, Yunnan Province in the PRC, and that, under that Agreement, Sino-Panel would acquire approximately 200,000 hectares of non-state owned

commercial standing timber in Lincang City and surrounding cities in Yunnan for US$700 million to US$1.4 billion over a 10-year period.

106.    These same terms of Sino's Agreement with Gengma Forestry were disclosed in Sino's Q1 2007 MD&A.  Moreover, throughout the Class Period, Sino discussed its purported Yunnan acquisitions in the Impugned Documents, and Pöyry repeatedly made statements regarding said holdings, as particularized below.

107.    The reported acquisitions did not take place.  Sino overstated to a material degree the size and value of its forestry holdings in Yunnan Province.  It simply does not own all of the trees it claims to own in Yunnan.  Sino's overstatement of the Yunnan forestry assets violated GAAP.

108.    The misrepresentations about Sino's acquisition and holdings of the Yunnan forestry assets were made in all of the Impugned Documents that were MD&As, financial statements, AIFs, Prospectuses and Offering Memoranda, except for the 2005 Audited Annual Financial Statements, the Q1 2006 interim financial statements, the 2006 Audited Annual Financial Statements, the 2006 Annual MD&A.

> *(ii)    Sino Overstates its Suriname Forestry Assets; Alternatively, Sino fails to Disclose the Material Fact that its Suriname Forestry Assets are contrary to the Laws of Suriname*

109.    In mid-2010, Sino became a majority shareholder of Greenheart Group Ltd., a Bermuda corporation having its headquarters in Hong Kong, China and a listing on the Hong Kong Stock Exchange ("**Greenheart**").

110.    In August 2010, Greenheart issued an aggregate principal amount of US$25,000,000 convertible notes for gross proceeds of US$24,750,000. The sole subscriber of these convertible notes was Greater Sino Holdings Limited, an entity in which Murray has an indirect interest. In

addition, Chan and Murray then became members of Greenheart's Board, Chan became the

Board's Chairman, and Martin became the CEO of Greenheart and a member of its Board.

111.    On August 24, 2010 and December 28, 2010, Greenheart granted to Chan, Martin and

Murray options to purchase, respectively, approximately 6.8 million, 6.8 million and 1.1 million

Greenheart shares.  The options are exercisable for a five-year term.

112.    As at March 31, 2011, General Enterprise Management Services International Limited, a

company in which Murray has an indirect interest, held 7,000,000 shares of Greenheart, being

0.9% of the total issued and outstanding shares of Greenheart.

113.    As a result of the aforesaid transactions and interests, Sino, Chan, Martin and Murray

stood to profit handsomely from any inflation in the market price of Greenheart's shares.

114.    At all material times, Greenheart purported to have forestry assets in New Zealand and

Suriname. On March 1, 2011, Greenheart issued a press release in which it announced that:

**Greenheart acquires certain rights to additional 128,000 hectare concession in Suriname**

**\*\*\*\*\***

**312,000 hectares now under Greenheart management**

Hong Kong, March 1, 2011 – Greenheart Group Limited ("Greenheart" or "the Company") (HKSE: 00094), an investment holding company with forestry assets in Suriname and New Zealand (subject to certain closing conditions) today announced that *the Company has acquired 60% of Vista Marine Services N.V. ("Vista"), a private company based in Suriname, South America that controls certain harvesting rights to a 128,000 hectares hardwood concession. Vista will be rebranded as part of the Greenheart Group. This transaction will increase Greenheart's concessions under management in Suriname to approximately 312,000 hectares.* The cost of this acquisition is not material to the Company as a whole but the Company is optimistic about the prospects of Vista and the positive impact that it will bring. *The concession is located in the Sipalawini district of Suriname, South America, bordering Lake Brokopondo and has an estimated annual allowable cut of approximately 100,000 cubic meters.*

Mr. Judson Martin, Chief Executive Officer of Greenheart and Vice-Chairman of Sino-Forest Corporation, the Company's controlling shareholder said, "This acquisition is in line with our growth strategy to expand our footprint in Suriname. In addition to increased harvestable area, this acquisition will bring synergies in sales, marketing, administration, financial reporting and control, logistics and overall management. I am pleased to welcome Mr. Ty Wilkinson to Greenheart as our minority partner. Mr. Wilkinson shares our respect for the people of Suriname and the land and will be appointed Chief Executive Officer of this joint venture and be responsible for operating in a sustainable and responsible manner. This acquisition further advances Greenheart's strategy of becoming a global agri-forestry company. We will continue to actively seek well-priced and sustainable concessions in Suriname and neighboring regions in the coming months."

[Emphasis added.]

115.    In its 2010 AIF, filed on SEDAR on March 31, 2011, Sino stated:

We hold a majority interest in Greenheart Group which, together with its subsidiaries, owns certain rights and *manages approximately 312,000 hectares of hardwood forest concessions in the Republic of Suriname, South America* ("Suriname") and 11,000 hectares of a radiata pine plantation on 13,000 hectares of freehold land in New Zealand as at March 31, 2011. *We believe that our ownership in Greenheart Group will strengthen our global sourcing network in supplying wood fibre for China in a sustainable and responsible manner.*

[Emphasis added.]

116.    The statements reproduced in the preceding paragraph were false and/or materially misleading when made.  Under the Suriname *Forest Management Act*, it is prohibited for one company or a group of companies in which one person or company has a majority interest to control more than 150,000 hectares of land under concession.  Therefore, either Greenheart's concessions under management in Suriname did not exceed 150,000 hectares, or Greenheart's concessions under management in Suriname violated the laws of Suriname, which was a material fact not disclosed in any of the Impugned Documents.

117.    In each of the October 2010 Offering Memorandum, the 2010 Annual MD&A, the 2010 AIF, Sino represented that Greenheart had well in excess of 150,000 hectares of concession

under management in Suriname without however disclosing that Suriname law imposed a limit of 150,000 hectares on Greenheart and its subsidiaries.

118.    Finally, Vista's forestry concessions are located in a region of Suriname populated by the Saramaka, an indigenous people.  Pursuant to the American Convention on Human Rights and a decision of the Inter-American Court of Human Rights, the Saramaka people must have effective control over their land, including the management of their reserves, and must be effectively consulted by the State of Suriname.  Sino has not disclosed in any of the Impugned Documents where it has discussed Greenheart and/or Suriname assets that Vista's purported concessions in Suriname, if they exist at all, are impaired due to the unfulfilled rights of the indigenous people of Suriname, in violation of GAAP.  The Impugned Documents that omitted that disclosure were the 2010 Annual MD&A, the 2010 Audited Annual Financial Statements, and the 2010 AIF.

### (iii)    Sino overstates its Jiangxi Forestry Assets

119.    On June 11, 2009, Sino issued a press release in which it stated:

> Sino-Forest Corporation (TSX: TRE), a leading commercial forest plantation operator in China, announced today that its wholly-owned subsidiary, Sino-Panel (China) Investments Limited ("Sino-Panel"), has entered into a Master Agreement for the Purchase of Pine and Chinese Fir Plantation Forests (the "Jiangxi Master Agreement") with Jiangxi Zhonggan Industrial Development Company Limited ("Jiangxi Zhonggan"), which will act as the authorized agent for the original plantation rights holders.

> Under the Jiangxi Master Agreement, Sino-Panel will, through PRC subsidiaries of Sino-Forest, acquire between 15 million and 18 million cubic metres ($m_3$) of wood fibre located in plantations in Jiangxi Province over a three-year period with a price not to exceed RMB300 per $m_3$, to the extent permitted under the relevant PRC laws and regulations. *The plantations in which such amount of wood fibre to acquire is between 150,000 and 300,000 hectares* to achieve an estimated average wood fibre yield of approximately 100 $m_3$ per hectare, and include tree species such as pine, Chinese fir and others. Jiangxi Zhonggan will ensure plantation forests sold to Sino-Panel and its PRC subsidiaries are non-state-owned, non-natural, commercial plantation forest trees.

> In addition to securing the maximum tree acquisition price, Sino-Panel has pre-emptive rights to lease the underlying plantation land at a price, permitted under the relevant PRC laws and regulations, not to exceed RMB450 per hectare per annum for 30 years from the

time of harvest. The land lease can also be extended to 50 years as permitted under PRC laws and regulations. The specific terms and conditions of purchasing or leasing are to be determined upon the execution of definitive agreements between the PRC subsidiaries of Sino-Panel and Jiangxi Zhonggan upon the authorisation of original plantation rights holders, and subject to the requisite governmental approval and in compliance with the relevant PRC laws and regulations.

*Sino-Forest Chairman and CEO Allen Chan said, "We are fortunate to have been able to capture and support investment opportunities in China's developing forestry sector by locking up a large amount of fibre at competitive prices. The Jiangxi Master Agreement is Sino-Forest's fifth, long-term, fibre purchase agreement during the past two years. These five agreements cover a total plantation area of over one million hectares in five of China's most densely forested provinces."*

[Emphasis added.]

120.    According to Sino's 2010 Annual MD&A, as of December 31, 2010, Sino had acquired

59,700 ha of plantation trees from Jiangxi Zhonggan Industrial Development Company Limited

("**Zhonggan**") for US$269.1 million under the terms of the master agreement.  (In its interim

report for the second quarter of 2011, which was issued after the Class Period, Sino claims that,

as at June 30, 2011, this number had increased to 69,100 ha, for a purchase price of US$309.6

million).

121.    However, as was known to Sino, Chan, Poon and Horsley, and as ought to have been

known to the remaining Individual Defendants, BDO, E&Y and Pöyry, Sino's plantation

acquisitions through Zhonggan are materially smaller than Sino has claimed.

*(iv)    Poyry makes Misrepresentations in relation to Sino's Forestry Assets*

122.    As particularized above, Sino overstated its forestry assets in Yunnan and Jiangxi

Provinces in the PRC and in Suriname.  Accordingly, Sino's total assets are overstated to a

material degree in all of the Impugned Documents, in violation of GAAP, and each such

statement of Sino's total assets constitutes a misrepresentation.

123.   In addition, during the Class Period, Pöyry and entities affiliated with it made statements that are misrepresentations in regard to Sino's Yunnan Province "assets," namely:

(a)   In a report dated March 14, 2008, filed on SEDAR on March 31, 2008 (the "2008 Valuations"), Pöyry: (a) stated that it had determined the valuation of the Sino forest assets to be US$3.2 billion as at 31 December 2007; (b) provided tables and figures regarding Yunnan; (c) stated that "Stands in Yunnan range from 20 ha to 1000 ha," that "In 2007 Sino-Forest purchased an area of mixed broadleaf forest in Yunnan Province," that "Broadleaf forests already acquired in Yunnan are all mature," and that "Sino-Forest is embarking on a series of forest acquisitions/expansion efforts in Hunan, Yunnan and Guangxi;" and (d) provided a detailed discussion of Sino's Yunnan "holdings" at Appendixes 3 and 5. Pöyry's 2008 Valuations were incorporated in Sino's 2007 Annual MD&A, amended 2007 Annual MD&A, 2007 AIF, each of the Q1, Q2, and Q3 2008 MD&As, Annual 2008 MD&A, amended Annual 2008 MD&A, each of the Q1, Q2 and Q3 2009, annual 2009 MD&A, and July 2008 and December 2009 Offering Memoranda;

(b)   In a report dated April 1, 2009 and filed on SEDAR on April 2, 2009 (the "2009 Valuations"), Pöyry stated that "[t]he area of forest owned in Yunnan has quadrupled from around 10 000 ha to almost 40 000 ha over the past year," provided figures and tables regarding Yunnan, and stated that "Sino-Forest has increased its holding of broadleaf crops in Yunnan during 2008, with this province containing nearly 99% of its broadleaf resource." Pöyry's 2009 Valuations were incorporated in Sino's 2008 AIF, each of the Q1, Q2, Q3 2009 MD&As, Annual 2009 MD&A, June 2009 Offering Memorandum, and June 2009 and December 2009 Prospectuses;

(c)   In a "Final Report" dated April 23, 2010, filed on SEDAR on April 30, 2010 (the "2010 Valuations"), Pöyry stated that "Guangxi, Hunan and Yunnan are the three largest provinces in terms of Sino-Forest's holdings. The largest change in area by province, both in absolute and relative terms [sic] has been Yunnan, where the

area of forest owned has almost tripled, from around 39 000 ha to almost 106 000 ha over the past year," provided figures and tables regarding Yunnan, stated that "Yunnan contains 106 000 ha, including 85 000 ha or 99% of the total broadleaf forest," stated that "the three provinces of Guangxi, Hunan and Yunnan together contain 391 000 ha or about 80% of the total forest area of 491 000 ha" and that "[a]lmost 97% of the broadleaf forest is in Yunnan," and provided a detailed discussion of Sino's Yunnan "holdings" at Appendixes 3 and 4.  Pöyry's 2010 Valuations were incorporated in Sino's 2009 AIF, the annual 2009 MD&A, each of the Q1, Q2 and Q3 2010 MD&As, and the October 2010 Offering Memorandum;

(d)    In a "Summary Valuation Report" regarding "Valuation of Purchased Forest Crops as at 31 December 2010" and dated May 27, 2011, Pöyry provided tables and figures regarding Yunnan, stated that "[t]he major changes in area by species from December 2009 to 2010 has been in Yunnan pine, with acquisitions in Yunnan and Sichuan provinces" and that "[a]nalysis of [Sino's] inventory data for broadleaf forest in Yunnan, and comparisons with an inventory that Pöyry undertook there in 2008 supported the upwards revision of prices applied to the Yunnan broadleaf large size log," and stated that "[t]he yield table for Yunnan pine in Yunnan and Sichuan provinces was derived from data collected in this species in these provinces by Pöyry during other work;" and

(e)    In a press release titled "Summary of Sino-Forest's China Forest Asset 2010 Valuation Reports" and which was "jointly prepared by Sino-Forest and Pöyry to highlight key findings and outcomes from the 2010 valuation reports," Pöyry reported on Sino's "holdings" and estimated the market value of Sino's forest assets on the 754,816 ha to be approximately US$3.1 billion as at December 31, 2010.

**C.** *Misrepresentations relating to Sino's Related Party Transactions*

    *(i)    Related Party Transactions Generally*

124.    Under GAAP and GAAS, a "related party" exists "when one party has the ability to exercise directly or indirectly, control, joint control or significant influence over the other." (CICA Handbook 3840.03)  Examples include a parent-subsidiary relationship or an entity that is economically dependent upon another.

125.    Related parties raise the concern that transactions may not be conducted at arm's length, and pricing or other terms may not be determined at fair market values.  For example, when a subsidiary "sells" an asset to its parent at a given price, it may not be appropriate that that asset be reported on the balance sheet or charged against the earnings of the parent at that price. Where transactions are conducted between arm's length parties, this concern is generally not present.

126.    The existence of related party transactions is important to investors irrespective of the reported dollar values of the transactions because the transactions may be controlled, manipulated and/or concealed by management (for example, for corporate purposes or because fraudulent activity is involved), and because such transactions may be used to benefit management or persons close to management at the expense of the company, and therefore its shareholders.

    *(ii)    Sino fails to disclose that Zhonggan was a Related Party*

127.    Irrespective of the true extent of Zhonggan's transactions in Jiangxi forestry plantations, Sino failed to disclose, in violation of GAAP, that Zhonggan was a related party of Sino.  More particularly, according to AIC records, the legal representative of Zhonggan is Lam Hong Chiu, who is an executive vice president of Sino.  Lam Hong Chiu is also a director and a 50%

shareholder of China Square Industrial Limited, a BVI corporation which, according to AIC records, owns 80% of the equity of Zhonggan.

128.    The Impugned Documents that omitted that disclosure were the Q2 2009 MD&A, the Q2 2009 interim financial statements, the Q3 2009 MD&A, the Q3 2009 interim financial statements, the December 2009 Prospectus, the 2009 Annual MD&A, the 2009 Audited Annual Financial Statements, the 2009 AIF, the Q1 2010 MD&A, the Q1 2010 interim financial statements, the Q2 2010 MD&A, the Q2 2010 interim financial statements, the Q3 2010 MD&A, the Q3 2010 interim financial statements, the 2010 Annual MD&A, the 2010 Audited Annual Financial Statements, and the 2010 AIF.

(iii)    *Sino fails to disclose that Homix was a Related Party*

129.    On January 12, 2010, Sino issued a press release in which it announced the acquisition by one of its wholly-owned subsidiaries of Homix Limited ("**Homix**"), which it described as a company engaged in research and development and manufacturing of engineered-wood products in China, for an aggregate amount of US$7.1 million.  That press release stated:

> HOMIX has an R&D laboratory and two engineered-wood production operations based in Guangzhou and Jiangsu Provinces, covering eastern and southern China wood product markets. The company has developed a number of new technologies with patent rights, specifically suitable for domestic plantation logs including poplar and eucalyptus species. HOMIX specializes in curing, drying and dyeing methods for engineered wood and has the know-how to produce recomposed wood products and laminated veneer lumber. Recomposed wood technology is considered to be environment-friendly and versatile as it uses fibre from forest plantations, recycled wood and/or wood residue. This reduces the traditional use of large-diameter trees from natural forests. There is growing demand for recomposed wood technology as it reduces cost for raw material while increases the utilization and sustainable use of plantation fibre for the production of furniture and interior/exterior building materials.

> […]

> Mr. Allen Chan, Sino-Forest's Chairman & CEO, said, "As we continue to ramp up our replanting programme with improved eucalyptus species, it is important for Sino-Forest to continue investing in the research and development that maximizes all aspects of the

forest product supply chain. Modernization and improved productivity of the wood processing industry in China is also necessary given the country's chronic wood fibre deficit. Increased use of technology improves operation efficiency, and maximizes and broadens the use of domestic plantation wood, which reduces the need for logging domestic natural forests and for importing logs from strained tropical forests. HOMIX has significant technological capabilities in engineered-wood processing."

Mr. Chan added, "By acquiring HOMIX, we intend to use six-year eucalyptus fibre instead of 30-year tree fibre from other species to produce quality lumber using recomposed technology. We believe that this will help preserve natural forests as well as improve the demand for and pricing of our planted eucalyptus trees."

130.    Sino's 2009 Audited Annual Financial Statements, Q1/2010 Unaudited Interim Financial Statements, 2010 Audited Annual Financial Statements, the MD&As related to each of the aforementioned financial statements, and Sino's AIFs for 2009 and 2010, each discussed the acquisition of Homix, but nowhere disclosed that Homix was in fact a related party of Sino.

131.    More particularly, Hua Chen, a Senior Vice President, Administration & Finance, of Sino in the PRC, and who joined Sino in 2002, is a 30% shareholder of an operating subsidiary of Homix, Jiangsu Dayang Wood Co., Ltd.  ("**Jiangsu**")

132.    In order to persuade current and prospective Sino shareholders that there was a commercial justification for the Homix acquisition, Sino misrepresented Homix's patent designs registered with the PRC State Intellectual Property Office.  In particular, in its 2009 Annual Report, Sino stated:

HOMIX acquisition

In accordance with our strategy to focus on research and development and to improve the end-use of our wood fibre, we acquired HOMIX Ltd. in January 2010 for $7.1 million. This corporate acquisition is small but strategically important ***adding valuable intellectual property rights*** and two engineered-wood processing facilities located in Guangdong and Jiangsu Provinces to our operations. ***Homix has developed environment-friendly technology, an efficient process using recomposed technology to convert small-diameter plantation logs into building materials and furniture***. Since we plan to grow high volumes of eucalypt and other FGHY species, this acquisition will help us achieve our long-term objectives of maximizing the use of our fibre, supplying a

variety of downstream customers and enhancing economic rural development. [Emphasis added]

133.    However, Homix itself then had no patent designs registered with the PRC State Intellectual Property Office.  At that time, Homix had two subsidiaries, Jiangsu and Guangzhou Pany Dacheng Wood Co.  The latter then had no patent designs registered with the PRC State Intellectual Property Office, while Jiangsu had two patent designs.  However, each such design was for wood dyeing, and not for the conversion of small-diameter plantation logs into building materials and furniture.

(iv)    *Sino fails to disclose that Yunan Shunxuan was a Related Party*

134.    In addition, during the Class Period, Sino purportedly purchased approximately 1,600 hectares of timber in Yunnan province from Yunnan Shunxuan Forestry Co. Ltd.  Yunnan Shunxuan was part of Sino, acting under a separate label.  Accordingly, it was considered a related party for the purposes of the GAAP disclosure requirements, a fact that Sino failed to disclose.

135.    The Impugned Documents that omitted that disclosure were the 2009 Annual MD&A, the 2009 Audited Annual Financial Statements, the 2009 AIF, the Q1 2010 MD&A, the Q1 2010 interim financial statements, the Q2 2010 MD&A, the Q2 2010 interim financial statements, the Q3 2010 MD&A, the Q3 2010 interim financial statements, the 2010 Annual MD&A, the 2010 Audited Annual Financial Statements, and the 2010 AIF.

136.    Sino's failure to disclose that Yunnan Shunxuan was a related party was a violation of GAAP, and a misrepresentation.

(v)    *Sino fails to disclose that Yuda Wood was a Related Party*

137.    Huaihua City Yuda Wood Co. Ltd., based in Huaihua City, Hunan Province ("**Yuda Wood**"), was a major supplier of Sino at material times.  Yuda Wood was founded in April 2006

and, from 2007 until 2010, its business with Sino totalled approximately 152,164 Ha and RMB 4.94 billion.

138.    During that period, Yuda Wood was a related party of Sino.  Indeed, in the Second Report, the IC acknowledged that ***"there is evidence suggesting close cooperation [between Sino and Yuda Wood] (including administrative assistance, possible payment of capital at the time of establishment, joint control of certain of Yuda Wood's RMB bank accounts and the numerous emails indicating coordination of funding and other business activities)"*** [emphasis added.]

139.    The fact that Yuda Wood was a related party of Sino during the Class Period was a material fact and was required to be disclosed under GAAP, but, during the Class Period, that fact was not disclosed by Sino in any of the Impugned Documents, or otherwise.

*(vi)    Sino fails to Disclose that Major Suppliers were Related Parties*

140.    At material times, Sino had at least thirteen suppliers where former Sino employees, consultants or secondees are or were directors, officers and/or shareholders of one or more such suppliers.  Due to these and other connections between these suppliers and Sino, some or all of such suppliers were in fact undisclosed related parties of Sino.

141.    Including Yuda Wood, the thirteen suppliers referenced above accounted for 43% of Sino's purported plantation purchases between 2006 and the first quarter of 2011.

142.    In none of the Impugned Documents did Sino disclose that any of these suppliers were related parties, nor did it disclose sufficient particulars of its relations with such suppliers as would have enabled the investing public to ascertain that those suppliers were related parties.

**D.**    *Misrepresentations relating to Sino's Relations with Forestry Bureaus and its Purported Title to Forestry Assets in the PRC*

143.    In at least two instances during the Class Period, PRC forestry bureau officials were either concurrently or subsequently employees of, or consultants to, Sino. One forestry bureau assigned employees to Sino and other companies to assist in the development of the forestry industry in its jurisdiction.

144.    In addition, a vice-chief of the forestry bureau was assigned to work closely with Sino, and while that vice chief still drew a basic salary from the forestry bureau, he also acted as a consultant to Sino in the conduct of Sino's business. This arrangement was in place for several years. That vice-chief appeared on Sino's payroll from January 2007 with a monthly payment of RMB 15,000, which was significant compared with his forestry bureau salary.

145.    In addition, at material times, Sino and/or its subsidiaries and/or its suppliers made cash payments and gave "gifts" to forestry bureau officals, which potentially constituted a serious criminal offence under the laws of the PRC.  At least some of these payments and gifts were made or given in order to induce the recipients to issue "confirmation letters" in relation to Sino's purported holdings in the PRC of standing timber.  These practices utterly compromised the integrity of the process whereby those "confirmation letters" were obtained.

146.    Further, a chief of a forestry bureau who had authorized the issuance of confirmations to Sino was arrested due to corruption charges. That forestry bureau had issued confirmations only to Sino and to no other companies.  Subsequent to the termination of that forestry bureau chief, that forestry bureau did not issue confirmations to any company.

147.    The foregoing facts were material because: (1) they undermined the reliability (if any) of the documentation upon which Sino relied and continues to rely to establish its ownership of

standing timber; and (2) the corruption in which Sino was engaged exposed Sino to potential criminal penalties, including substantial fines, as well as a risk of severe reputational damage in Sino's most important market, the PRC.

148.    However, none of these facts was disclosed in any of the Impugned Documents.  On the contrary, Sino only made the following disclosure regarding former government officials in its 2007 Annual Report (and in no other Impugned Document), which was materially incomplete, and a misrepresentation:

> To ensure successful growth, we have trained and promoted staff from within our organization, and hired knowledgeable people with relevant working experience and industry expertise – some joined us from forestry bureaus in various regions and provinces and/or state-owned tree farms. [...]    4. Based in Heyuan, Guangdong, Deputy GM responsible for Heyuan plantations, previously with forestry bureau; studied at Yangdongxian Dangxiao [Mr. Liang] 5. Based in Hunan, Plantation controller, graduated from Hunan Agricultural University, previously Assistant Manager of state-owned farm trees in Hunan [Mr. Xie].

149.    In respect of Sino's purported title to standing timber in the PRC, Sino possessed Plantation Rights Certificates, or registered title, only in respect of 18% of its purported holdings of standing timber as at December 31, 2010, a fact nowhere disclosed by Sino during the Class Period.  This fact was highly material to Sino, inasmuch as standing timber comprised a large proportion of Sino's assets throughout the Class Period, and in the absence of Plantation Rights Certificates, Sino could not establish its title to that standing timber.

150.    Rather than disclose this highly material fact, Sino made the following misrepresentations in the following Impugned Documents:

(a)    In the 2008 AIF: "***We have obtained the plantation rights certificates or requisite approvals for acquiring the relevant plantation rights for most of the purchased tree plantations and planted tree plantations currently under our management***, and we are in the process of applying for the plantation rights

certificates for those plantations for which we have not obtained such certificates" [emphasis added];

(b)     In the 2009 AIF: "*We have obtained the plantation rights certificates or requisite approvals for acquiring the relevant plantation rights for most of the purchased plantations and planted plantations currently under our management*, and we are in the process of applying for the plantation rights certificates for those plantations for which we have not obtained such certificates" [emphasis added]; and

(c)     In the 2010 AIF: "*We have obtained the plantation rights certificates or requisite approvals for acquiring the relevant plantation rights for most of the purchased plantations and planted plantations currently under our management*, and we are in the process of applying for the plantation rights certificates for those plantations for which we have not obtained such certificates" [emphasis added].

151.    In the absence of Plantation Rights Certificates, Sino relies principally on the purchase contracts entered into by its BVI subsidiaries ("BVIs") in order to demonstrate its ownership of standing timber.

152.    However, under PRC law, those contracts are void and unenforceable.

153.    In the alternative, if those contracts are valid and enforceable, they are enforceable only as against the counterparties through which Sino purported to acquire the standing timber, and not against the party who has registered title (if any) to the standing timber.  Because some or all of those counterparties were or became insolvent, corporate shells or thinly capitalized, then any claims that Sino would have against those counterparties under PRC law, whether for unjust enrichment or otherwise, were of little to no value, and certainly constituted no substitute for registered title to the standing timber which Sino purported to own.

154.    Sino never disclosed these material facts during the Class Period, whether in the Impugned Documents or otherwise.    On the contrary, Sino made the following misrepresentations in relation to its purported title to standing timber:

(a)    In the July 2008 Offering Memorandum, Sino stated "Based on the relevant purchase contracts and the approvals issued by the relevant forestry bureaus, we legally own our purchased plantations";

(b)    In the June 2009 Offering Memorandum, Sino stated "Based on the relevant purchase contracts and the approvals issued by the relevant forestry bureaus, we legally own our purchased plantations";

(c)    In the October 2010 Offering Memorandum, Sino stated "Based on the relevant purchase contracts and the approvals issued by the relevant forestry bureaus, we legally own our purchased plantations";

(d)    In the 2006 AIF, Sino stated "Based on the supplemental purchase contracts and the plantation rights certificates issued by the relevant forestry departments, we have the legal right to own our purchased tree plantations";

(e)    In the 2007 AIF, Sino stated "Based on the relevant purchase contracts and the approvals issued by the relevant forestry departments, we have the legal right to own our purchased tree plantations";

(f)    In the 2008 AIF, Sino stated "Based on the relevant purchase contracts and the approvals issued by the relevant forestry bureaus, we legally own our purchased tree plantations";

63

    (g)      In the 2009 AIF, Sino stated "Based on the relevant purchase contracts and the approvals issued by the local forestry bureaus, we legally own our purchased plantations";

    (h)      In the December 2009 Offering Memorandum, Sino stated "Based on the relevant purchase contracts and the approvals issued by the local forestry bureaus, we legally own our purchased plantations"; and

    (i)      In the 2010 AIF, Sino stated "Based on the relevant purchase contracts and the approvals issued by the relevant forestry bureaus, we legally own our purchased plantations."

155.    In addition, during the Class Period, Sino never disclosed the material fact, belatedly revealed in the Second Report, that "*in practice it is not able to obtain Plantation Rights Certificates for standing timber purchases when no land transfer rights are transferred*" [emphasis added].

156.    On the contrary, during the Class Period, Sino made the following misrepresentation in each of the 2006 and 2007 AIFs:

> Since 2000, the PRC has been improving its system of registering plantation land ownership, plantation land use rights and plantation ownership rights and its system of issuing certificates to the persons having plantation land use rights, to owners owning the plantation trees and to owners of the plantation land. In April 2000, the PRC State Forestry Bureau announced the "Notice on the Implementation of Nationwide Uniform Plantation Right Certificates" (Lin Zi Fa [2000] No. 159) on April 19, 2000 (the "Notice"). Under the Notice, a new uniform form of plantation rights certificate is to be used commencing from the date of the Notice. *The same type of new form plantation rights certificate will be issued to the persons having the right to use the plantation land, to persons who own the plantation land and plantation trees, and to persons having the right to use plantation trees.*
>
> [Emphasis added]

157.    Under PRC law, county and provincial forestry bureaus have no authority to issue confirmation letters.  Such letters cannot be relied upon in a court of law to resolve a dispute and are not a guarantee of title.  Notwithstanding this, during the Class Period, Sino made the following misrepresentations:

(a)    In the 2006 AIF: "In addition, for the purchased tree plantations, **we have obtained confirmations from the relevant forestry bureaus that we have the legal right to own the purchased tree plantations for which we have not received certificates**" [emphasis added]; and

(b)    In the 2007 AIF: "For our Purchased Tree Plantations, we have applied for the relevant Plantation Rights Certificates with the competent local forestry departments. As the relevant locations where we purchased our Purchased Tree Plantations have not fully implemented the new form Plantation Rights Certificate, we are not able to obtain all the corresponding Plantation Rights Certificates for our Purchased Tree Plantations. **In this connection, we obtained confirmation on our ownership of our Purchased Tree Plantations from the relevant forestry departments.**" [emphasis added]

### E.    Misrepresentations relating to Sino's Relationships with its AIs

158.    In addition to the misrepresentations alleged above in relation to Sino's AIs, including

those alleged in Section VI.C hereof (*Misrepresentations relating to Sino's Related Party*

*Transactions*), Sino made the following misrepresentations during the Class Period in relation to

its relationships with it AIs.

### (i)    Sino Misrepresents the Degree of its Reliance on its AIs

159.    On March 30, 2007, Sino issued and filed on SEDAR its 2006 AIF.  In that AIF, Sino

stated:

> …PRC laws and regulations require foreign companies to obtain licenses to engage in
> any business activities in the PRC. As a result of these requirements, we currently engage
> in our trading activities through PRC authorized intermediaries that have the requisite
> business licenses. There is no assurance that the PRC government will not take action to
> restrict our ability to engage in trading activities through our authorized intermediaries.
> **In order to reduce our reliance on the authorized intermediaries, we intend to use a
> WFOE in the PRC to enter into contracts directly with suppliers of raw timber, and
> then process the raw timber, or engage others to process raw timber on its behalf, and
> sell logs, wood chips and wood-based products to customers, although it would not be
> able to engage in pure trading activities.**

> [Emphasis added.]

160.    In its 2007 AIF, which Sino filed on March 28, 2008, Sino again declared its intention to

reduce its reliance upon AIs.

161.    These statements were false and/or materially misleading when made, inasmuch as Sino

had no intention to reduce materially its reliance on AIs, because its AIs were critical to Sino's

ability to inflate its revenue and net income.  Rather, these statements had the effect of mitigating

any investor concern arising from Sino's extensive reliance upon AIs.

162.    Throughout the Class Period, Sino continued to depend heavily upon AIs for its

purported sales of standing timber.  In fact, contrary to Sino's purported intention to reduce its

reliance on its AIs, Sino's reliance on its AIs in fact *increased* during the Class Period.

*(ii)    Sino Misrepresents the Tax-related Risks Arising from its use of AIs*

163.    Throughout the Class Period, Sino materially understated the tax-related risks arising from its use of AIs.

164.    Tax evasion penalties in the PRC are severe.  Depending on whether the PRC authorities seek recovery of unpaid taxes by means of a civil or criminal proceeding, its claims for unpaid tax are subject to either a five- or ten-year limitation period.  The unintentional failure to pay taxes is subject to a 0.05% per day interest penalty, while an intentional failure to pay taxes is punishable with fines of up to five times the unpaid taxes, and confiscation of part or all of the criminal's personal properties maybe also imposed.

165.    Therefore, because Sino professed to be unable to determine whether its AIs have paid required taxes, the tax-related risks arising from Sino's use of AIs were potentially devastating. Sino failed, however, to disclose these aspects of the PRC tax regime in its Class Period disclosure documents, as alleged more particularly below.

166.    Based upon Sino's reported results, Sino's tax accruals in all of its Impugned Documents that were interim and annual financial statements were materially deficient.  For example, depending on whether the PRC tax authorities would assess interest at the rate of 18.75% per annum, or would assess no interest, on the unpaid income taxes of Sino's BVI subsidiaries, and depending also on whether one assumes that Sino's AIs have paid no income taxes or have paid 50% of the income taxes due to the PRC, then Sino's tax accruals in its 2007, 2008, 2009 and 2010 Audited Annual Financial Statements were understated by, respectively, US$10 million to US$150 million, US$50 million to US$260 million, US$81 million to US$371 million, and US$83 million to US$493 million.  Importantly, were one to consider the impact of unpaid taxes other than unpaid income taxes (for example, unpaid value-added taxes), then the amounts by

which Sino's tax accruals were understated in these financial statements would be substantially larger.

167.    The aforementioned estimates of the amounts by which Sino's tax accruals were understated also assume that the PRC tax authorities only impose interest charges on Sino's BVI Subsidiaries and impose no other penalties for unpaid taxes, and assume further that the PRC authorities seek back taxes only for the preceding five years.  As indicated above, each of these assumptions is likely to be unduly optimistic.  In any case, Sino's inadequate tax accruals violated GAAP, and constituted misrepresentations.

168.    Sino also violated GAAP in its 2009 Audited Annual Financial Statements by failing to apply to its 2009 financial results the PRC tax guidance that was issued in February 2010.  Although that guidance was issued after year-end 2009, GAAP required that Sino apply that guidance to its 2009 financial results, because that guidance was issued in the subsequent events period.

169.    Based upon Sino's reported profit margins on its dealings with AIs, which margins are extraordinary both in relation to the profit margins of Sino's peers, and in relation to the limited risks that Sino purports to assume in its transactions with its AIs, Sino's AIs are not satisfying their tax obligations, a fact that was either known to the Defendants or ought to have been known.  If Sino's extraordinary profit margins are real, then Sino and its AIs must be dividing the gains from non-payment of taxes to the PRC.

170.    During the Class Period, Sino never disclosed the true nature of the tax-related risks to which it was exposed. This omission, in violation of GAAP, rendered each of the following statements a misrepresentation:

(a)    In the 2006 Annual Financial Statements, note 11 [b] "Provision for tax related liabilities" and associated text;

(b)    In the 2006 Annual MD&A, the subsection "Provision for Tax Related Liabilities" in the section "Critical Accounting Estimates," and associated text;

(c)    In the AIF dated March 30, 2007, the section "Estimation of the Company's provision for income and related taxes," and associated text;

(d)    In the Q1 and Q2 2007 Financial Statements, note 5 "Provision for Tax Related Liabilities," and associated text;

(e)    In the Q3 2007 Financial Statements, note 6 "Provision for Tax Related Liabilities," and associated text;

(f)    In the 2007 Annual Financial Statements, note 13 [b] "Provision for tax related liabilities," and associated text;

(g)    In the 2007 Annual MD&A and Amended 2007 Annual MD&A, the subsection "Provision for Tax Related Liabilities" in the section "Critical Accounting Estimates," and associated text;

(h)    In the AIF dated March 28, 2008, the section "Estimation of the Corporation's provision for income and related taxes," and associated text;

(i)    In the Q1, Q2 and Q3 2008 Financial Statements, note 12 "Provision for Tax Related Liabilities," and associated text;

(j)    In the Q1, Q2 and Q3 2008 MD&As, the subsection "Provision for Tax Related Liabilities" in the section "Critical Accounting Estimates," and associated text;

(k)    In the July 2008 Offering Memorandum, the subsection "Taxation" in the section "Management's Discussion and Analysis of Financial Condition and Results of Operations," and associated text;

(l)     In the 2008 Annual Financial Statements, note 13 [d] "Provision for tax related liabilities," and associated text;

(m)    In the 2008 Annual MD&A and Amended 2008 Annual MD&A, the subsection "Provision for Tax Related Liabilities" in the section "Critical Accounting Estimates," and associated text;

(n)     In the AIF dated March 31, 2009, the section "We may be liable for income and related taxes to our business and operations, particularly our BVI Subsidiaries, in amounts greater than the amounts we have estimated and for which we have provisioned," and associated text;

(o)     In the Q1, Q2 and Q3 2009 Financial Statements, note 13 "Provision for Tax Related Liabilities," and associated text;

(p)     In the Q1, Q2 and Q3 2009 MD&As, the subsection "Provision for Tax Related Liabilities" in the section "Critical Accounting Estimates," and associated text;

(q)     In the 2009 Annual Financial Statements, note 15 [d] "Provision for tax related liabilities," and associated text;

(r)     In the 2009 Annual MD&A, the subsection "Provision for Tax Related Liabilities" in the section "Critical Accounting Estimates," and associated text;

(s)     In the AIF dated March 31, 2010, the section "We may be liable for income and related taxes to our business and operations, particularly our BVI Subsidiaries, in amounts greater than the amounts we have estimated and for which we have provisioned," and associated text;

(t)     In the Q1 and Q2 2010 Financial Statements, note 14 "Provision for Tax Related Liabilities," and associated text;

(u)     In the Q1 and Q2 2010 MD&As, the subsection "Provision for Tax Related Liabilities" in the section "Critical Accounting Estimates," and associated text;

(v)     In the Q3 2010 Financial Statements, note 14 "Provision and Contingencies for Tax Related Liabilities," and associated text; and

(w)     In the Q3 2010 MD&As, the subsection "Provision and Contingencies for Tax Related Liabilities" in the section "Critical Accounting Estimates," and associated text;

(x)     In the October 2010 Offering Memorandum, the subsection "Taxation" in the section "Selected Financial Information," and associated text;

(y)     In the 2010 Annual Financial Statements, note 18 "Provision and Contingencies for Tax Related Liabilities," and associated text;

(z)     In the 2010 Annual MD&A, the subsection "Provision and Contingencies for Tax Related Liabilities" in the section "Critical Accounting Estimates," and associated text; and

(aa)    In the AIF dated March 31, 2011, the section "We may be liable for income and related taxes to our business and operations, particularly our BVI Subsidiaries, in amounts greater than the amounts we have estimated and for which we have provisioned," and associated text.

171.    In every Impugned Document that is a financial statement, the line item "Accounts payable and accrued liabilities" and associated figures on the Consolidated Balance Sheets fails to properly account for Sino's tax accruals and is a misrepresentation, and a violation of GAAP.

172.    During the Class Period, Sino also failed to disclose in any of the Impugned Documents that were AIFs, MD&As, financial statements, Prospectuses or Offering Memoranda, the risks relating to the repatriation of its earnings from the PRC.  In 2010, Sino added two new sections to its AIF regarding the risk that it would not be able to repatriate earnings from its BVI subsidiaries (which deal with the AIs). The amount of retained earnings that may not be able to be repatriated is stated therein to be US$1.4 billion. Notwithstanding this disclosure, Sino did not

disclose in these Impugned Documents that it would be unable to repatriate *any* earnings absent proof of payment of PRC taxes, which it has admitted that it lacks.

### (iii)    *Sino Misrepresents its Accounting Treatment of its AIs*

173.    In addition, there are material discrepancies in Sino's descriptions of its accounting treatment of its AIs.  Beginning in the 2003 AIF, Sino described its AIs as follows:

> Because of the provisions in the Operational Procedures that specify when we and the authorized intermediary assume the risks and obligations relating to the raw timber or wood chips, as the case may be, we treat these transactions for accounting purposes as providing that we take title to the raw timber when it is delivered to the authorized intermediary. Title then passes to the authorized intermediary once the timber is processed into wood chips. ***Accordingly, we treat the authorized intermediaries for accounting purposes as being both our suppliers and customers in these transactions.***

> [Emphasis added.]

174.     Sino's disclosures were consistent in that regard up to and including Sino's first AIF issued in the Class Period (the 2006 AIF), which states:

> Because of the provisions in the Operational Procedures that specify when we and the AI assume the risks and obligations relating to the raw timber or wood chips, as the case may be, we treat these transactions for accounting purposes as providing that we take title to the raw timber when it is delivered to the AI. Title then passes to the AI once the timber is processed into wood chips. ***Accordingly, we treat the AI for accounting purposes as being both our supplier and customer in these transactions.***

> [Emphasis added.]

175.    In subsequent AIFs, Sino ceased without explanation to disclose whether it treated AIs for accounting purposes as being both the supplier and the customer.

176.    Following the issuance of Muddy Waters' report on the last day of the Class Period, however, Sino declared publicly that Muddy Waters was "wrong" in its assertion that, for accounting purposes, Sino treated its AIs as being both supplier and customer in transactions. This claim by Sino implies either that Sino misrepresented its accounting treatment of AIs in its

2006 AIF (and in its AIFs for prior years), or that Sino changed its accounting treatment of its AIs after the issuance of its 2006 AIF. If the latter is true, then Sino was obliged by GAAP to disclose its change in its accounting treatment of its AIs. It failed to do so.

**F.    *Misrepresentations relating to Sino's Cash Flow Statements***

177.    Given the nature of Sino's operations, that of a frequent trader of standing timber, Sino improperly accounted for its purchases of timber assets as "Investments" in its Consolidated Statements Of Cash Flow. In fact, such purchases are "Inventory" within the meaning of GAAP, given the nature of Sino's business.

178.    Additionally, Sino violated the GAAP 'matching' principle in treating timber asset purchases as "Investments" and the sale of timber assets as "Inventory": cash flow that came into the company was treated as cash flow from operations, but cash flow that was spent by Sino was treated as cash flow for investments. As a result, "Additions to timber holding" was improperly treated as a "Cash Flows Used In Investing Activities" instead of "Cash Flows From Operating Activities" and the item "Depletion of timber holdings included in cost of sales" should not be included in "Cash Flows From Operating Activities," because it is not a cash item.

179.    The effect of these misstatements is that Sino's Cash Flows From Operating Activities were materially overstated throughout the Class Period, which created the impression that Sino was a far more successful cash generator than it was. Such mismatching and misclassification is a violation of GAAP.

180.    Cash Flows From Operating Activities are one of the crucial metrics used by the financial analysts who followed Sino's performance. These misstatements were designed to, and did, have the effect of causing such analysts to materially overstate the value of Sino. This material

overstatement was incorporated into various research reports made available to the Class Members, the market and the public at large.

181. Matching is a foundational requirement of GAAP reporting. E&Y and BDO were aware, at all material times, that Sino was required to adhere to the matching principle. If E&Y and BDO had conducted GAAS-complaint audits, they would have been aware that Sino's reporting was not GAAP compliant with regard to the matching principle. Accordingly, if they had conducted GAAS-compliant audits, the statements by E&Y and BDO that Sino's reporting was GAAP-compliant were not only false, but were made, at a minimum, recklessly.

182. Further, at all material times, E&Y and BDO were aware that misstatements in Cash Flows From Operating Activities would materially impact the market's valuation of Sino.

183. Accordingly, in every Impugned Document that is a financial statement, the Consolidated Statements Of Cash Flow are a misrepresentation and, particularly, the Cash Flows From Operating Activities item and associated figures is materially overstated, the "additions to timber holdings" item and figures is required to be listed as Cash Flows From Operating Activities, and the "depletion of timber holdings included in cost of sales" item and figures should not have been included.

**G.**    ***Misrepresentations relating to Certain Risks to which Sino was exposed***

   *(i)    Sino is conducting "business activities" in China*

184.    At material times, PRC law required foreign entities engaging in "business activities" in the PRC to register to obtain and maintain a license.  Violation of this requirement could have resulted in both administrative sanctions and criminal punishment, including banning the unlicensed business activities, confiscating illegal income and properties used exclusively therefor, and/or an administrative fines of no more than RMB 500,000.  Possible criminal punishment included a criminal fine from 1 to 5 times the amount of the profits gained.

185.    Consequently, were Sino's BVI subsidiaries to have been engaged in unlicensed in "business activities" in the PRC during the Class Period, they would have been exposed to risks that were highly material to Sino.

186.    Under PRC law, the term "business activities" generally encompasses any for-profit activities, and Sino's BVI subsidiaries were in fact engaged in unlicensed "business activities" in the PRC during the Class Period.   However, Sino did not disclose this fact in any of the Impugned Documents, including in its AIFs for 2008-2010, which purported to make full disclosure of the material risks to which Sino was then exposed.

   *(ii)    Sino fails to disclose that no proceeds were paid to it by its AIs*

187.    In the Second Report, Sino belatedly revealed that:

> In practice, proceeds from the Entrusted Sale Agreements are not paid to SF but are held by the AIs as instructed by SF and subsequently used to pay for further purchases of standing timber by the same or other BVIs. The AIs will continue to hold these proceeds until the Company instructs the AIs to use these proceeds to pay for new BVI standing timber purchases. ***No proceeds are directly paid to the Company, either onshore or offshore.***

> [Emphasis added]

188.    This material fact was never disclosed in any of the Impugned Documents during the Class Period.  On the contrary, Sino made the following statements during the Class Period in relation to the proceeds paid to it by its AIs, each of which was materially misleading and therefore a misrepresentation:

(a)    In the 2005 financial statements, Sino stated: "As a result, ***the majority*** of the accounts receivable arising from sales of wood chips and standing timber are realized through instructing the debtors to settle the amounts payable on standing timber and other PRC liabilities" [emphasis added];

(b)    In the 2006 Annual MD&A, the subsection "Provision for Tax Related Liabilities" in the section "Critical Accounting Estimates," and associated text;

(c)    In the 2006 financial statements, Sino stated: "As a result, ***the majority*** of the accounts receivable arising from sales of wood chips and standing timber are realized through instructing the debtors to settle the amounts payable on standing timber and other liabilities denominated in Renminbi" [emphasis added];

(d)    In the 2007 financial statements, Sino stated: "As a result, ***the majority*** of the accounts receivable arising from sales of standing timber are realized through instructing the debtors to settle the amounts payable on standing timber and other liabilities denominated in Renminbi;"

(e)    In the 2008 financial statements, Sino stated: "As a result, ***the majority*** of the accounts receivable arising from sales of standing timber are realized through instructing the debtors to settle the amounts payable on standing timber and other liabilities denominated in Renminbi" [emphasis added];

(f)    In the 2009 financial statements, Sino stated: "As a result, ***the majority*** of the accounts receivable arising from sales of standing timber are realized through instructing the debtors to settle the amounts payable on standing timber and other liabilities denominated in Renminbi" [emphasis added]; and

(g)    In the 2010 financial statements, Sino stated: "As a result, ***the majority*** of the accounts receivable arising from sales of standing timber are realized through instructing the debtors to settle the amounts payable on standing timber and other liabilities denominated in Renminbi" [emphasis added].

**H.    *Misrepresentations relating to Sino's GAAP Compliance and the Auditors' GAAS Compliance***

*(i)    Sino, Chan and Horsley misrepresent that Sino complied with GAAP*

189.    In each of its Class Period financial statements, Sino represented that its financial reporting was GAAP-compliant, which was a misrepresentation for the reasons set out elsewhere herein.

190.    In particular, Sino misrepresented in those financial statements that it was GAAP-compliant as follows:

(a)    In the annual statements filed on March 19, 2007, at Note 1: "These consolidated financial statements Sino-Forest Corporation (the "Company") have been prepared in United States dollars in accordance with Canadian generally accepted accounting principles";

(b)    In the annual financial statements filed on March 18, 2008, at Note 1: "The consolidated financial statements of Sino-Forest Corporation (the "Company") have been prepared in United States dollars and in accordance with Canadian generally accepted accounting principles";

(c)    In the annual financial statements filed on March 16, 2009, at note 1: "The consolidated financial statements of Sino-Forest Corporation (the "Company") have been prepared in United States dollars and in accordance with Canadian generally accepted accounting principles";

(d)     In the annual financial statements filed on March 16, 2010, at note 1: "The consolidated financial statements of Sino-Forest Corporation (the "Company") have been prepared in United States dollars and in accordance with Canadian generally accepted accounting principles"; and

(e)     In the annual financial statements filed on March 15, 2011, at note 1: "The consolidated financial statements of Sino-Forest Corporation (the "Company") have been prepared in United States dollars and in accordance with Canadian generally accepted accounting principles".

191.    In each of its Class Period MD&As, Sino represented that its reporting was GAAP-compliant, which was a misrepresentation for the reasons set out elsewhere herein.

192.    In particular, Sino misrepresented in those MD&As that it was GAAP-compliant as follows:

(a)     In the annual MD&A filed on March 19, 2007: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles (GAAP)";

(b)     In the quarterly MD&A filed on May 14, 2007: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles ("GAAP")";

(c)     In the quarterly MD&A filed on August 13, 2007: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles ("GAAP")";

(d)     In the quarterly MD&A filed on November 12, 2007: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles ("GAAP")";

(e)    In the annual MD&A filed on March 18, 2008: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles (GAAP)";

(f)    In the amended annual MD&A filed on March 28, 2008: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles (GAAP)";

(g)    In the quarterly MD&A filed on May 13, 2008: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles ("GAAP")";

(h)    In the quarterly MD&A filed on August 12, 2008: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles ("GAAP")";

(i)    In the quarterly MD&A filed on November 13, 2008: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles ("GAAP")";

(j)    In the annual MD&A filed on March 16, 2009: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles (GAAP)";

(k)    In the amended annual MD&A filed on March 17, 2009: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles (GAAP)";

(l)    In the quarterly MD&A filed on May 11, 2009: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles (GAAP)";

(m)    In the quarterly MD&A filed on August 10, 2009: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian generally accepted accounting principles (GAAP)";

(n)     In the quarterly MD&A filed on November 12, 2009: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian Generally Accepted Accounting Principles ("GAAP")";

(o)     In the annual MD&A files on March 16, 2010: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian Generally Accepted Accounting Principles ("GAAP")";

(p)     In the quarterly MD&A filed on May 12, 2010: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian Generally Accepted Accounting Principles ("GAAP")";

(q)     In the quarterly MD&A filed on August 10, 2010: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian Generally Accepted Accounting Principles ("GAAP")";

(r)     In the quarterly MD&A filed on November 10, 2010: "Except  where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian Generally Accepted Accounting Principles ("GAAP")"; and

(s)     In the annual MD&A filed on March 15, 2011: "Except where otherwise indicated, all financial information reflected herein is determined on the basis of Canadian Generally Accepted Accounting Principles ("GAAP")."

193.    In the Offerings, Sino represented that its reporting was GAAP-compliant, which was a misrepresentation for the reasons set out elsewhere herein.

194.    In particular, Sino misrepresented in the Offerings that it was GAAP-compliant as follows:

(a)     In the July 2008 Offering Memorandum: "We prepare our financial statements on a consolidated basis in accordance with accounting principles generally accepted in Canada ("Canadian GAAP")[...]," "Our auditors conduct their audit of our

financial statements in accordance with auditing standards generally accepted in Canada" and "Each of the foregoing reports or financial statements will be prepared in accordance with Canadian generally accepted accounting principles other than for reports prepared for financial periods commencing on or after January 1, 2011 [...]";

(b)    In the June 2009 Offering Memorandum: "We prepare our financial statements on a consolidated basis in accordance with accounting principles generally accepted in Canada ("Canadian GAAP")[...]," "Our auditors conduct their audit of our financial statements in accordance with auditing standards generally accepted in Canada," "The audited and unaudited consolidated financial statements were prepared in accordance with Canadian GAAP," "Our audited and consolidated financial statements for the years ended December 31, 2006, 2007 and 2008 and our unaudited interim consolidated financial statements for the three-month periods ended March 31, 2008 and 2009 have been prepared in accordance with Canadian GAAP";

(c)    In the June 2009 Offering Memorandum: "We prepare our financial statements on a consolidated basis in accordance with accounting principles generally accepted in Canada ("Canadian GAAP")[...]," "Our auditors conduct their audit of our financial statements in accordance with auditing standards generally accepted in Canada" and "The audited and unaudited consolidated financial statements were prepared in accordance with Canadian GAAP"; and

(d)    In the October 2010 Offering Memorandum: "We prepare our financial statements on a consolidated basis in accordance with accounting principles generally accepted in Canada ("Canadian GAAP")[...]," "Our auditors conduct their audit of our financial statements in accordance with auditing standards generally accepted in Canada," "The audited and unaudited consolidated financial statements were prepared in accordance with Canadian GAAP," "Our audited and consolidated financial statements for the years ended December 31, 2007, 2008 and 2009 and our unaudited interim consolidated financial statements for the six-

month periods ended June 30, 2009 and 2010 have been prepared in accordance with Canadian GAAP."

195.    In the Class Period Management's Reports, Chan and Horsley represented that Sino's reporting was GAAP-compliant, which was a misrepresentation for the reasons set out elsewhere herein.

196.    In particular, Chan and Horsley misrepresented in those Management's Reports that Sino's financial statements were GAAP-compliant as follows:

(a)    In the annual statements filed on March 19, 2007 Chan and Horlsey stated: "The consolidated financial statements contained in this Annual Report have been prepared by management in accordance with Canadian generally accepted accounting principles";

(b)    In the annual financial statements filed on March 18, 2008 Chan and Horlsey stated: "The consolidated financial statements contained in this Annual Report have been prepared by management in accordance with Canadian generally accepted accounting principles";

(c)    In the annual financial statements filed on March 16, 2009 Chan and Horlsey stated: "The consolidated financial statements contained in this Annual Report have been prepared by management in accordance with Canadian generally accepted accounting principles";

(d)    In the annual financial statements filed on March 16, 2010 Chan and Horlsey stated: "The consolidated financial statements contained in this Annual Report have been prepared by management in accordance with Canadian generally accepted accounting principles"; and

(e)    In the annual financial statements filed on March 15, 2011 Chan and Horlsey stated: "The consolidated financial statements contained in this Annual Report

have been prepared by management in accordance with Canadian generally accepted accounting principles."

> *(ii)   E&Y and BDO misrepresent that Sino complied with GAAP and that they complied with GAAS*

197.    In each of Sino's Class Period annual financial statements, E&Y or BDO, as the case may be, represented that Sino's reporting was GAAP-compliant, which was a misrepresentation for the reasons set out elsewhere herein.  In addition, in each such annual financial statement, E&Y and BDO, as the case may be, represented that they had conducted their audit in compliance with GAAS, which was a misrepresentation because they did not in fact conduct their audits in accordance with GAAS.

198.    In particular, E&Y and BDO misrepresented that Sino's financial statements were GAAP-compliant and that they had conducted their audits in compliance with GAAS as follows:

> (a)    In Sino's annual financial statements filed on March 19, 2007, BDO stated: "We conducted our audit in accordance with Canadian generally accepted auditing standards" and "In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the Company as at December 31, 2006 and 2005 and the results of its operations and its cash flows for the years then ended in accordance with Canadian generally accepted accounting principles";

> (b)    In the June 2007 Prospectus, BDO stated: "We have complied with Canadian generally accepted standards for an auditor's involvement with offering documents";

> (c)    In Sino's annual financial statements filed on March 18, 2008, E&Y stated: "We conducted our audit in accordance with Canadian generally accepted auditing standards" and "In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the Company as at

December 31, 2007 and the results of its operations and its cash flows for the year then ended in accordance with Canadian generally accepted accounting principles. The financial statements as at December 31, 2006 and for the year then ended were audited by other auditors who expressed an opinion without reservation on those statements in their report dated March 19, 2007";

(d)    In the July 2008 Offering Memorandum, BDO stated: "We conducted our audit in accordance with Canadian generally accepted auditing standards" and "In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the Company as at December 31, 2006 and 2005 and the results of its operations and its cash flows for the years then ended in accordance with Canadian generally accepted accounting principles" and E&Y stated "We conducted our audit in accordance with Canadian generally accepted auditing standards" and "In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the Company as at December 31, 2007 and the results of its operations and its cash flows for the year then ended in accordance with Canadian generally accepted accounting principles";

(e)    In Sino's annual financial statements filed on March 16, 2009, E&Y stated: "We conducted our audits in accordance with Canadian generally accepted auditing standards" and "In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the Company as at December 31, 2008 and 2007 and the results of its operations and its cash flows for the years then ended in accordance with Canadian generally accepted accounting principles";

(f)    In Sino's annual financial statements filed on March 16, 2010, E&Y stated: "We conducted our audits in accordance with Canadian generally accepted auditing standards" and "In our opinion, these consolidated financial statements present fairly, in all material respects, the financial position of the Company as at December 31, 2009 and 2008 and the results of its operations and its cash flows

for the years then ended in accordance with Canadian generally accepted accounting principles"; and

(g)    In Sino's annual financial statements filed on March 15, 2011, E&Y stated: "We conducted our audits in accordance with Canadian generally accepted auditing standards." and "In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of Sino-Forest corporation as at December 31, 2010 and 2009 and the results of its operations and cash flows for the years then ended in accordance with Canadian generally accepted accounting principles."

(iii)    *The Market Relied on Sino's Purported GAAP-compliance and E&Y's and BDO's purported GAAS-compliance in Sino's Financial Reporting*

199.    As a public company, Sino communicated the results it claimed to have achieved to the Class Members via quarterly and annual financial results, among other disclosure documents. Sino's auditors, E&Y and BDO, as the case may be, were instrumental in the communication of Sino's financial information to the Class Members. The auditors certified that the financial statements were compliant with GAAP and that they had performed their audits in compliance with GAAS. Neither was true.

200.    The Class Members invested in Sino's securities on the critical premise that Sino's financial statements were in fact GAAP-compliant, and that Sino's auditors had in fact conducted their audits in compliance with GAAS. Sino's reported financial results were also followed by analysts at numerous financial institutions. These analysts promptly reported to the market at large when Sino made earnings announcements, and incorporated into their Sino-related analyses and reports Sino's purportedly GAAP-compliant financial results. These analyses and reports, in turn, significantly affected the market price for Sino's securities.

201.    The market, including the Class Members, would not have relied on Sino's financial reporting had the auditors disclosed that Sino's financial statements were not reliable or that they had not followed the processes that would have amply revealed that those statements were reliable.

## VII.    CHAN'S AND HORSLEY'S FALSE CERTIFICATIONS

202.    Pursuant to National Instrument 52-109, the defendants Chan, as CEO, and Horsley, as CFO, were required at the material times to certify Sino's annual and quarterly MD&As and Financial Statements as well as the AIFs (and all documents incorporated into the AIFs). Such certifications included statements that the filings "do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made" and that the reports "fairly present in all material respects the financial condition, results of operations and cash flows of the issuer."

203.    As particularized elsewhere herein, however, the Impugned Documents contained the Representation, which was false, as well as the other misrepresentations alleged above. Accordingly, the certifications given by Chan and Horsley were false and were themselves misrepresentations.    Chan and Horsley made such false certifications knowingly or, at a minimum, recklessly.

## VIII.    THE TRUTH IS REVEALED

204.    On June 2, 2011, Muddy Waters issued its initial report on Sino, and stated in part therein:

Sino-Forest Corp (TSE: TRE) is the granddaddy of China RTO frauds. It has always been a fraud – reporting excellent results from one of its early joint ventures – even though, because of TRE's default on its investment obligations, the JV never went into operation. TRE just lied.

The foundation of TRE's fraud is a convoluted structure whereby it claims to run most of its revenues through "authorized intermediaries" ("AI"). AIs are supposedly timber trader customers who purportedly pay much of TRE's value added and income taxes. At the same time, these AIs allow TRE a gross margin of 55% on standing timber merely for TRE having speculated on trees.

The sole purpose of this structure is to fabricate sales transactions while having an excuse for not having the VAT invoices that are the mainstay of China audit work. If TRE really were processing over one billion dollars in sales through AIs, TRE and the AIs would be in serious legal trouble. No legitimate public company would take such risks – particularly because this structure has zero upside.

[...]

On the other side of the books, TRE massively exaggerates its assets. TRE significantly falsifies its investments in plantation fiber (trees). It purports to have purchased $2.891 billion in standing timber under master agreements since 2006 [...]

[...]

Valuation

Because TRE has $2.1 billion in debt outstanding, which we believe exceeds the potential recovery, we value its equity at less than $1.00 per share.

205.    Muddy Waters' report also disclosed that (a) Sino's business is a fraudulent scheme; (b) Sino systemically overstated the value of its assets; (c) Sino failed to disclose various related party transactions; (d) Sino misstated that it had enforced high standards of governance; (e) Sino misstated that its reliance on the AIs had decreased; (f) Sino misrepresented the tax risk associated with the use of AIs; and (g) Sino failed to disclose the risks relating to repatriation of earnings from PRC.

206.    After Muddy Waters' initial report became public, Sino shares fell to $14.46, at which point trading was halted (a decline of 20.6% from the pre-disclosure close of $18.21).  When

trading was allowed to resume the next day, Sino's shares fell to a close of $5.23 (a decline of 71.3% from June 1).

207.   On November 13, 2011 Sino released the Second Report in redacted form.  Therein, the Committee summarized its findings:

> B. Overview of Principal Findings
>
> The following sets out a very high level overview of the IC's principal findings and should be read in conjunction with the balance of this report.
>
> Timber Ownership
>
> [...]
>
> ***The Company does not obtain registered title to BVI purchased plantations***. In the case of the BVIs' plantations, the IC has visited forestry bureaus, Suppliers and AIs to seek independent evidence to establish a chain of title or payment transactions to verify such acquisitions. The purchase contracts, set-off arrangement documentation and forestry bureau confirmations constitute the documentary evidence as to the Company's contractual or other rights. ***The IC has been advised that the Company's rights to such plantations could be open to challenge. However, Management has advised that, to date, it is unaware of any such challenges that have not been resolved*** with the Suppliers in a manner satisfactory to the Company.
>
> Forestry Bureau Confirmations and Plantation Rights Certificates
>
> Registered title, through Plantation Rights Certificates is not available in the jurisdictions (i.e. cities and counties) examined by the IC Advisors for standing timber that is held without land use/lease rights. ***Therefore the Company was not able to obtain Plantation Rights Certificates for its BVIs standing timber assets in those areas.*** In these circumstances, the Company sought confirmations from the relevant local forestry bureau acknowledging its rights to the standing timber.
>
> The IC Advisors reviewed forestry bureau confirmations for virtually all BVIs assets and non-Mandra WFOE purchased plantations held as at December 31, 2010. The IC Advisors, in meetings organized by Management, met with a sample of forestry bureaus with a view to obtaining verification of the Company's rights to standing timber in those jurisdictions. The result of such meetings to date have concluded with the forestry bureaus or related entities having issued new confirmations as to the Company's contractual rights to the Company in respect of 111,177 Ha. as of December 31, 2010 and 133,040 Ha. as of March 31, 2011, and have acknowledged the issuance of existing confirmations issued to the

88

Company as to certain rights, among other things, in respect of 113,058 Ha. as of December 31, 2010.

*Forestry bureau confirmations are not officially recognized documents and are not issued pursuant to a legislative mandate or, to the knowledge of the IC, a published policy. It appears they were issued at the request of the Company or its Suppliers.* The confirmations are not title documents, in the Western sense of that term, although the IC believes they should be viewed as comfort indicating the relevant forestry bureau does not dispute SF's claims to the standing timber to which they relate and might provide comfort in case of disputes. The purchase contracts are the primary evidence of the Company's interest in timber assets.

*In the meetings with forestry bureaus, the IC Advisors did not obtain significant insight into the internal authorization or diligence processes undertaken by the forestry bureaus in issuing confirmations and, as reflected elsewhere in this report, the IC did not have visibility into or complete comfort regarding the methods by which those confirmations were obtained.* It should be noted that several Suppliers observed that SF was more demanding than other buyers in requiring forestry bureau confirmations.

Book Value of Timber

Based on its review to date, the IC is satisfied that the book value of the BVIs timber assets of $2.476 billion reflected on its 2010 Financial Statements and of SP WFOE standing timber assets of $298.6 million reflected in its 2010 Financial Statements reflects the purchase prices for such assets as set out in the BVIs and WFOE standing timber purchase contracts reviewed by the IC Advisors. Further, the purchase prices for such BVIs timber assets have been reconciled to the Company's financial statements based on set-off documentation relating to such contracts that were reviewed by the IC. However, *these comments are also subject to the conclusions set out above under "Timber Ownership" on title and other rights to plantation assets.*

The IC Advisors reviewed documentation  acknowledging the execution of the set-off arrangements between Suppliers, the Company and AIs for the 2006-2010 period. *However, the IC Advisors were unable to review any documentation of AIs or Suppliers which independently verified movements of cash in connection with such set-off arrangements between Suppliers, the Company and the AIs used to settle purchase prices paid to Suppliers by AIs on behalf of SF.* We note also that the independent valuation referred to in Part VIII below has not yet been completed.

Revenue Reconciliation

As reported in its First Interim Report, the IC has reconciled reported 2010 total revenue to the sales prices in BVIs timber sales contracts, together with macro customer level data from other businesses. However, *the IC was unable to review any documentation of AIs or Suppliers which independently verified movements*

*of cash in connection with set-off arrangements used to settle purchase prices paid, or sale proceeds received by, or on behalf of SF.*

Relationships

• Yuda Wood: The IC is satisfied that Mr. Huang Ran is not currently an employee of the Company and that Yuda Wood is not a subsidiary of the Company. However, *there is evidence suggesting close cooperation (including administrative assistance, possible payment of capital at the time of establishment, joint control of certain of Yuda Wood's RMB bank accounts and the numerous emails indicating coordination of funding and other business activities).* Management has explained these arrangements were mechanisms that allowed the Company to monitor its interest in the timber transactions. Further, *Huang Ran (a Yuda Wood employee) has an ownership and/or directorship in a number of Suppliers* (See Section VI.B). The IC Advisors have been introduced to persons identified as influential backers of Yuda Wood but were unable to determine the relationships, if any, of such persons with Yuda Wood, the Company or other Suppliers or AIs. *Management explanations of a number of Yuda Wood-related emails and answers to E&Y's questions are being reviewed by the IC and may not be capable of independent verification*.

• Other: The IC's review has identified other situations which require further review. *These situations suggest that the Company may have close relationships with certain Suppliers, and certain Suppliers and AIs may have cross-ownership and other relationships with each other*. The IC notes that in the interviews conducted by the IC with selected AIs and Suppliers, all such parties represented that they were independent of SF. Management has very recently provided information and analysis intended to explain these situations. The IC is reviewing this material from Management and intends to report its findings in this regard in its final report to the Board. Some of such information and explanations may not be capable of independent verification.

• Accounting Considerations: *To the extent that any of SF's purchase and sale transactions are with related parties for accounting purposes, the value of these transactions as recorded on the books and records of the Company may be impacted.*

[...]

BVI Structure

The BVI structure used by SF to purchase and sell standing timber assets could be challenged by the relevant Chinese authorities as the undertaking of "business activities" within China by foreign companies, which may only be undertaken by entities established within China with the requisite approvals. However, there is no clear definition of what constitutes "business activities" under Chinese law and there are different views among the IC's Chinese counsel and the Company's Chinese counsel as to whether the  purchase and sale of timber in China as

undertaken by the BVIs could be considered to constitute "business activities" within China. In the event that the relevant Chinese authorities consider the BVIs to be undertaking "business activities" within China, they may be required to cease such activities and could be subject to other regulatory action. As regularization of foreign businesses in China is an ongoing process, the government has in the past tended to allow foreign companies time to restructure their operations in accordance with regulatory requirements (the cost of which is uncertain), rather than enforcing the laws strictly and imposing penalties without notice. See Section II.B.2

C. Challenges

Throughout its process, the IC has encountered numerous challenges in its attempts to implement a robust independent process which would yield reliable results. Among those challenges are the following:

(a) Chinese Legal Regime for Forestry:

• national laws and policies appear not yet to be implemented at all local levels;

• in practice, none of the local jurisdictions tested in which BVIs hold standing timber appears to have instituted a government registry and documentation system for the ownership of standing timber as distinct from a government registry system for the ownership of plantation land use rights;

• the registration of plantation land use rights, the issue of Plantation Rights Certificates and the establishment of registries, is incomplete in some jurisdictions based on the information available to the IC;

• as a result, *title to standing timber, when not held in conjunction with a land use right, cannot be definitively proven by reference to a government maintained register*; and

• Sino-Forest has requested confirmations from forestry bureaus of its acquisition of timber holdings (excluding land leases) as additional evidence of ownership. Certain forestry bureaus and Suppliers have indicated the confirmation was beyond the typical diligence practice in China for acquisition of timber holdings.

(b) Obtaining Information from Third Parties: For a variety of reasons, all of them outside the control of the IC, it is very difficult to obtain information from third parties in China. These reasons include the following:

• *many of the third parties from whom the IC wanted information (e.g., AIs, Suppliers and forestry bureaus) are not compellable by the Company or Canadian legal processes*;

• third parties appeared to have concerns relating to disclosure of information regarding their operations that could become public or fall into the hands of

Chinese government authorities: *many third parties explained their reluctance to provide requested documentation and information as being "for tax reasons" but declined to elaborate*; and

• awareness of MW allegations, investigations and information gathering by the OSC and other parties, and court proceedings; while not often explicitly articulated, third parties had an awareness of the controversy surrounding SF and a reluctance to be associated with any of these allegations or drawn into any of these processes.

[...]

(e) Corporate Governance/Operational Weaknesses: *Management has asserted that business in China is based upon relationships.* The IC and the IC Advisors have observed this through their efforts to obtain meetings with forestry bureaus, Suppliers and AIs and their other experience in China. The importance of relationships appears to have resulted in dependence on a relatively small group of Management who are integral to maintaining customer relationships, negotiating and finalizing the purchase and sale of plantation fibre contracts and the settlement of accounts receivable and accounts payable associated with plantation fibre contracts. This concentration of authority or lack of segregation of duties has been previously disclosed by the Company as a control weakness. As a result and as disclosed in the 2010 MD&A, senior Management in their ongoing evaluation of disclosure controls and procedures and internal controls over financial reporting, recognizing the disclosed weakness, determined that the design and controls were ineffective. The Chairman and Chief Financial Officer provided annual and quarterly certifications of their regulatory filings. Related to this weakness the following challenges presented themselves in the examination by the IC and the IC Advisors:

• operational and administration systems that are generally not sophisticated having regard to the size and complexity of the Company's business and in relation to North American practices; including:

  • *incomplete or inadequate record creation and retention practices;*

  • contracts not maintained in a central location;

  • significant volumes of data maintained across multiple locations on decentralized servers;

  • *data on some servers in China appearing to have been deleted on an irregular basis, and there is no back-up system;*

  • no integrated accounting system: accounting data is not maintained on a single, consolidated application, which can require extensive manual procedures to produce reports; and

  • a treasury function that was centralized for certain major financial accounts, but was not actively involved in the control or management of numerous local operations bank accounts;

• *no internal audit function* although there is evidence the Company has undertaken and continues to assess its disclosure controls and procedures and internal controls over financial reporting using senior Management and independent control consultants;

• *SF employees conduct Company affairs from time to time using personal devices and non-corporate email addresses* which have been observed to be shared across groups of staff and changed on a periodic and organized basis; this complicated and delayed the examination of email data by the IC Advisors; and

• lack of full cooperation/openness in  the ICs examination from certain members of Management.

(f) Complexity, Lack of Visibility into, and Limitations of BVIs Model: *The use of AIs and Suppliers as an essential feature of the BVIs standing timber business model contributes to the lack of visibility into title documentation, cash movements and tax liability since cash settlement in respect of the BVIs standing timber transactions takes place outside of the Company's books.*

(g) Cooperation and openness of the Company's executives throughout the process: From the outset, the IC Advisors sought the full cooperation and support of Allen Chan and the executive management team. Initially, the executive management team appeared ill-prepared to address the IC's concerns in an organized fashion and there was perhaps a degree of culture shock as Management adjusted to the IC Advisors' examination. *In any event, significant amounts of material information, particularly with respect to the relationship with Yuda Wood, interrelationships between AIs and/or Suppliers, were not provided to the IC Advisors as requested*. In late August 2011 on the instructions of the IC, interviews of Management were conducted by the IC Advisors in which documents evidencing these connections were put to the Management for explanation. As a result of these interviews (which were also attended by BJ) the Company placed certain members of Management on administrative leave upon the advice of Company counsel. At the same time the OSC made allegations in the CTO of Management misconduct.

[...]

(h) Independence of the IC Process: *The cooperation and collaboration of the IC with Management (operating under the direction of the new Chief Executive Officer) and with Company counsel in completing certain aspects of the IC's mandate has been noted by the OSC and by E&Y. Both have questioned the degree of independence of the IC from Management as a result of this interaction.* The IC has explained the practical impediments to its work in the context of the distinct business culture (and associated issues of privacy) in the

forestry sector in China in which the Company operates. Cooperation of third parties in Hong Kong and China, including employees, depends heavily on relationships and trust. As noted above, the Company's placing certain members of Management on administrative leave, as well as the OSC's allegations in the CTO, further hampered the IC's ability to conduct its process. As a result, the work of the IC was frequently done with the assistance of, or in reliance on, the new Chief Executive Officer and his Management team and Company counsel. Given that Mr. Martin was, in effect, selected by the IC and BJ was appointed in late June 2011, the IC concluded that, while not ideal, this was a practical and appropriate way to proceed in the circumstances. As evidenced by the increased number of scheduled meetings with forestry bureaus, Suppliers and AIs, and, very recently, the delivery to the IC of information regarding AIs and Suppliers and relationships among the Company and such parties, it is acknowledged that Mr. Martin's involvement in the process has been beneficial. It is also acknowledged that in executing his role and assisting the IC he has had to rely on certain of the members of Management who had been placed on administrative leave.

[Emphasis added]

208.    On January 31, 2012, Sino released the Final Report. In material part, it read:

This Final Report of the IC sets out the activities undertaken by the IC since mid-November, the findings from such activities and the IC's conclusions regarding its examination and review. The IC's activities during this period have been limited as a result of Canadian and Chinese holidays (Christmas, New Year and Chinese New Year) and the extensive involvement of IC members in the Company's Restructuring and Audit Committees, both of which are advised by different advisors than those retained by the IC. ***The IC believes that, notwithstanding there remain issues which have not been fully answered, the work of the IC is now at the point of diminishing returns because much of the information which it is seeking lies with non-compellable third parties, may not exist or is apparently not retrievable from the records of the Company.***

In December 2011, the Company defaulted under the indentures relating to its outstanding bonds with the result that its resources are now more focused on dealing with its bondholders. This process is being overseen by the Restructuring Committee appointed by the Board. Pursuant to the Waiver Agreement dated January 18, 2012 between the Company and the holders of a majority of the principal amount of its 2014 Notes, the Company agreed, among other things, that the final report of the IC to the Board would be made public by January 31, 2012.

Given the circumstances described above, the IC understands that, with the delivery of this Final Report, its review and examination activities are terminated. the IC does not expect to undertake further work other than assisting with responses to regulators and the RCMP as required and engaging in such further specific activities as the IC may deem advisable or the Board may instruct. The

IC has asked the IC Advisors to remain available to assist and advise the IC upon its instructions.

[...]

II. RELATIONSHIPS

The objectives of the IC's examination of the Company's relationships with its AIs and Suppliers were to determine, in light of the MW allegations, if such relationships are arm's length and to obtain, if possible, independent verification of the cash flows underlying the set-off transactions described in Section II.A of the Second Interim Report. *That the Company's relationships with its AIs and Suppliers be arm's length is relevant to SF's ability under GAAP to:*

• *book its timber assets at cost in its 2011 and prior years' financial statements, both audited and unaudited*

• *recognize revenue from standing timber sales as currently reflected in its 2011 and prior years' financial statements, both audited and unaudited.*

A. Yuda Wood

Yuda Wood was founded in April 2006 and was until 2010 a Supplier of SF. Its business with SF from 2007 to 2010 totalled approximately 152,164 Ha and RMB 4.94 billion. Section VI.A and Schedule VI.A.2(a) of the Second Interim Report described the MW allegations relating to Yuda Wood, the review conducted by the IC and its findings to date. The IC concluded that Huang Ran is not currently an employee, and that Yuda Wood is not a subsidiary, of the Company. *However, there is evidence suggesting a close cooperation between SF and Yuda Wood which the IC had asked Management to explain.* At the time the Second Interim Report was issued, the IC was continuing to review Management's explanations of a number of Yuda Wood-related emails and certain questions arising therefrom.

Subsequent to the issuance of its Second Interim Report in mid-November, the IC, with the assistance of the IC Advisors, has reviewed the Management responses provided to date relating to Yuda Wood and has sought further explanations and documentary support for such explanations. This was supplementary to the activities of the Audit Committee of SF and its advisors who have had during this period primary carriage of examining Management's responses on the interactions of SF and Yuda Wood. *While many answers and explanations have been obtained, the IC believes that they are not yet sufficient to allow it to fully understand the nature and scope of the relationship between SF and Yuda Wood. Accordingly, based on the information it has obtained, the IC is still unable to independently verify that the relationship of Yuda Wood is at arm's length to SF.* It is to be noted that Management is of the view that Yuda Wood is unrelated to SF for accounting purposes. The IC remains satisfied that Yuda is not a subsidiary of SF. Management continues to undertake work related to Yuda

Wood, including seeking documentation from third parties and responding to e-mails where the responses are not yet complete or prepared.  Management has provided certain banking records to the Audit Committee that the Audit Committee advises support Management's position that SF did not capitalize Yuda Wood (but that review is not yet completed).  The IC anticipates that Management will continue to work with the Audit Committee, Company counsel and E&Y on these issues.

B. Other Relationships

Section VI.B.1 of the Second Interim Report  described certain other relationships which had been identified in the course of the IC's preparation for certain interviews with AIs and Suppliers.  *These relationships include (i) thirteen Suppliers where former SF employees, consultants or secondees are or have been directors, officers and/or shareholders (including Yuda Wood); (ii) an AI with a former SF employee in a senior position; (iii) potential relationships between AIs and Suppliers; (iv) set-off payments for BVI standing timber purchases being made by companies that are not AIs and other setoff arrangements involving non-AI entities; (v) payments by AIs to potentially connected Suppliers; and (vi) sale of standing timber to an AI potentially connected to a Supplier of that timber.  Unless expressly addressed herein, the IC has no further update of a material nature on the items raised above.*

On the instructions of the IC, the IC Advisors gave the details of these possible relationships to Management for further follow up and explanation.  Just prior to the Second Interim Report, Management provided information regarding AIs and Suppliers relationships among the Company and such parties.

This information was in the form of a report dated November 10, 2011, subsequently updated on November 21, 2011 and January 20, 2012  (the latest version being  the "Kaitong Report") prepared by Kaitong Law Firm ("Kaitong"), a Chinese law firm which advises the Company.  The Kaitong Report has been separately delivered to the Board.  *Kaitong has advised that much of the information in the Kaitong Report was provided by Management and has not been independently verified by such law firm or the IC.*

[...]

The Kaitong Report generally describes certain relationships amongst AIs and Suppliers and  certain  relationships between their personnel and Sino-Forest, either identified by Management or through SAIC and other searches.  The Kaitong Report also specifically addresses certain relationships identified in the Second Interim Report.  The four main areas of information in the Kaitong Report are as follows and are discussed in more detail below:

(i) Backers to Suppliers and AIs: The Kaitong Report explains the concept of "backers" to both Suppliers and AIs.  The Kaitong Report suggests that backers are individuals with considerable influence in political, social or business circles,

or all three. The Kaitong Report also states that such backers or their identified main business entities do not generally appear in SAIC filings by the Suppliers or AIs as shareholders thereof and, in most instances, in any other capacity.

(ii) *Suppliers and AIs with Former SF Personnel: The appendices to the Kaitong Report list certain Suppliers that have former SF personnel as current shareholders.*

(iii) Common Shareholders Between Suppliers and AIs: The Kaitong Report states that there are 5 Suppliers and 3 AIs with current common shareholders but there is no cross majority ownership positions between Suppliers and AIs.

(iv) Transactions Involving Suppliers and AIs that have Shareholders in common: The Kaitong Report states that, where SF has had transactions with Suppliers and AIs that have certain current shareholders in common as noted above, the subject timber in those transactions is not the same; that is, the timber which SF buys from such Suppliers and the timber which SF sells to such AIs are located in different counties or provinces.

The IC Advisors have reviewed the Kaitong Report on behalf of the IC. The IC Advisors liaised with Kaitong and met with Kaitong and current and former Management. A description of the Kaitong Report and the IC's findings and comments are summarized below. By way of summary, the Kaitong Report provides considerable information regarding relationships among Suppliers and AIs, and between them and SF, but much of this information related to the relationship of each backer with the associated Suppliers and AIs is not supported by any documentary or other independent evidence. *As such, some of the information provided is unverified and, particularly as it relates to the nature of the relationships with the backers, is viewed by the IC to be likely unverifiable by it.*

1. Backers to Suppliers and AIs

[...]

Given the general lack of information on the backers or the nature and scope of the relationships between the Suppliers or AIs and their respective backers and the absence of any documentary support or independent evidence of such relationships, the IC has been unable to reach any conclusion as to the existence, nature or importance of such relationships. *As a result, the IC is unable to assess the implications, if any, of these backers with respect to SF's relationships with its Suppliers or AIs. Based on its experience to date, including interviews with Suppliers and AIs involving persons who have now been identified as backers in the Kaitong Report, the IC believes that it would be very difficult for the IC Advisors to arrange interviews with either the AIs or Suppliers or their respective backers and, if arranged, that such interviews would yield very little, if any, verifiable information to such advisors*. The IC understands Management is continuing to seek meetings with its AIs and Suppliers with the objective of

obtaining information, to the extent such is available, that will provide further background to the relationships to the Audit Committee.

[...]

2. Suppliers and AIs with Former SF Personnel

The Appendices to the Kaitong Report list the Suppliers with former SF personnel as current shareholders. According to the information previously obtained by the IC Advisors, the identification of former SF personnel indicated in the Kaitong Report to be current shareholders of past or current Suppliers is correct.

(a) Suppliers with former SF personnel

The Kaitong Report, which is limited to examining Suppliers where ex-SF employees are current shareholders as shown in SAIC filings, does not provide material new information concerning Suppliers where former SF employees were identified by the IC in the Second Interim Report as having various past or present connections to current or former Suppliers except that the Kaitong Report provides an explanation of two transactions identified in the Second Interim Report. These involved purchases of standing timber by SF from Suppliers controlled by persons who were employees of SF at the time of these transactions. Neither of the Suppliers have been related to an identified backer in the Kaitong Report. The explanations are similar indicating that neither of the SF employees was an officer in charge of plantation purchases or one of SF's senior management at the time of the transactions. The employees in question were Shareholder #14 in relation to a RMB 49 million purchase from Supplier #18 in December 2007 (shown in SAIC filings to be 100% owned by him) and Shareholder #20 in relation to a RMB 3.3 million purchase from Supplier #23 (shown in SAIC filings to be 70% owned by him) in October 2007. *The Kaitong Report indicates Shareholder #20 is a current employee of SF who then had responsibilities in SF's wood board production business.*

The IC is not aware that the employees' ownership positions were brought to the attention of the Board at the time of the transactions or, subsequently, until the publication of the Second Interim Report and understands the Audit Committee will consider such information.

(b) AIs with former SF personnel

The Kaitong Report indicates that no SF employees are listed in SAIC filing reports as current shareholders of AIs. Except as noted herein, the IC agrees with this statement. The Kaitong Report does not address the apparent role of an ex-employee Officer #3 who was introduced to the IC as the person in charge of AI #2 by Backer #5 of AI Conglomerate #1. Backer #5 is identified in the Kaitong Report as a backer of two AIs, including AI#2. (The Kaitong Report properly does not include AI #14. as an AI for this purpose, whose 100% shareholder is former SF employee Officer #3. However, the IC is satisfied that the activities of

this entity primarily relate to certain onshoring transactions that facilitated the transfer of SF BVI timber assets to SF WFOE subsidiaries.)

There was one other instance where a past shareholding relationship has been identified between an AI #10 and persons who were previously or are still shown on the SF human resources records, Shareholder #26 and Shareholder #27. Management has explained that such entity sold wood board processing and other assets to SF and that the persons associated with that company consulted with SF after such sale in relation to the purchased wood board processing assets. *Such entity subsequently also undertook material timber purchases as an AI of SF in 2007-2008 over a time period in which such persons are shown as shareholders of such AI in the SAIC filing reviewed (as to 47.5% for Shareholder #26 and as to 52.5% for Shareholder #27). That time period also intersects the time that Shareholder #26 is shown in such human resources records and partially intersects the time that Shareholder #27 is shown on such records. Management has also explained that Shareholder #26 subsequent to the time of such AI sales became an employee of a SF wood board processing subsidiary. Management has provided certain documentary evidence of its explanations. The IC understands that the Audit Committee will consider this matter.*

3. Common Shareholders between Supplier and AIs

The Kaitong Report states that there are 5 Suppliers and 3 AIs that respectively have certain common current shareholders but also states that there is no cross control by those current shareholders of such Suppliers or AIs based on SAIC filings. The Kaitong Report correctly addresses current cross shareholdings in Suppliers and AIs based on SAIC filings but does not address certain other shareholdings. With the exception of one situation of cross control in the past, the IC has not identified a circumstance in the SAIC filings reviewed where the same person controlled a Supplier at the time it controlled a different AI. *The one exception is that from April 2002 to February 2006, AI #13 is shown in SAIC filings as the 90% shareholder of Supplier/AI #14. AI #13 did business with SF BVIs from 2005 through 2007 and Supplier/AI #14 supplied SF BVIs from 2004 through 2006. However, the IC to date has only identified one contract involving timber bought from Supplier/AI #14 that was subsequently sold to AI #13. It involved a parcel of 2,379 Ha. timber sold to AI #13 in December 2005 that originated from a larger timber purchase contract with Supplier/AI #14 earlier that year. Management has provided an explanation for this transaction. The IC understands that the Audit Committee will consider this matter.*

4. Transactions involving Suppliers and AIs with Current Shareholders in Common

The Kaitong Report states that where SF has had transactions with 5 Suppliers and 3 AIs that have current shareholders in common (but no one controlling shareholder) as shown in SAIC filings, the subject timber in the transactions they

each undertook with SF is not the same; that is, the timber which SF buys from the Suppliers and the timber which SF sells to the AIs where the Supplier and AI have a current common shareholder were located in different areas and do not involve the same plots of timber. The Kaitong Report further states that where SF has had transactions with 5 Suppliers and 3 AIs with current shareholders in common as shown in SAIC filings, SF had transactions with those AIs prior to having transactions with those Suppliers, thus SF was not overstating its transactions by buying and selling to the same counterparties.

[...]

The Kaitong Report does not specifically address historical situations involving common shareholders and potential other interconnections between AIs and Suppliers that may appear as a result of the identification of backers. There is generally no ownership connection shown in SAIC filings between backers and the Suppliers and AIs associated with such backers in the Kaitong Report.

[...]

VI. OUTSTANDING MATTERS

As noted in Section I above, the IC understands that with the delivery of this report, its examination and review activities are terminated. The IC would expect its next steps may include only:

(a) assisting in responses to regulators and RCMP as required; and

(b) such other specific activities as it may deem advisable or the Board may instruct.

[Emphasis added]

## IX.    SINO REWARDS ITS EXPERTS

209.    Bowland, Hyde and West are former E&Y partners and employees. They served on

Sino's Audit Committee but purported to exercise oversight of their former E&Y colleagues. In

addition, Sino's Vice-President, Finance (Corporate), Thomas M. Maradin, is a former E&Y

employee.

210.    The charter of Sino's Audit Committee required that Ardell, Bowland, Hyde and West "review and take action to eliminate all factors that might impair, or be perceived to impair, the independence of the Auditor." Sino's practice of appointing E&Y personnel to its board – and paying them handsomely (for example, Hyde was paid $163,623 by Sino in 2010, $115,962 in 2009, $57,000 in 2008 and $55,875 in 2007, plus options and other compensation) – undermined the Audit Committee's oversight of E&Y.

211.    E&Y's independence was impaired by the significant non-audit fees it was paid during 2008-2010, which total $712,000 in 2008, $1,225,000 in 2009 and $992,000 in 2010.

212.    Further, Andrew Fyfe, the former Asia-Pacific President for Pöyry Forestry Industry Ltd, was appointed Chief Operating Officer of Greenheart, and is the director of several Sino subsidiaries. Fyfe signed the Pöyry valuation report dated June 30, 2004, March 22, 2005, March 23, 2006, March 14, 2008 and April 1, 2009.

213.    George Ho, Sino's Vice President, Finance (China), is a former Senior Manager of the BDO.

## X.    THE DEFENDANTS' RELATIONSHIP TO THE CLASS

214.    By virtue of their purported accounting, financial and/or managerial acumen and qualifications, and by virtue of their having assumed, voluntarily and for profit, the role of gatekeepers, the Defendants had a duty at common law, informed by the Securities Legislation and/or the *CBCA*, to exercise care and diligence to ensure that the Impugned Documents fairly and accurately disclosed Sino's financial condition and performance in accordance with GAAP.

215.    Sino is a reporting issuer and had an obligation to make timely, full, true and accurate disclosure of material facts and changes with respect to its business and affairs.

216.    The Individual Defendants, by virtue of their positions as senior officers and/or directors of Sino, owed a duty to the Class Members to ensure that public statements on behalf of Sino were not untrue, inaccurate or misleading. The continuous disclosure requirements in Canadian securities law mandated that Sino provide the Impugned Documents, including quarterly and annual financial statements. These documents were meant to be read by Class Members who acquired Sino's Securities in the secondary market and to be relied on by them in making investment decisions. This public disclosure was prepared to attract investment, and Sino and the Individual Defendants intended that Class Members would rely on public disclosure for that purpose. With respect to Prospectuses and Offering Memoranda, these documents were prepared for primary market purchasers. They include detailed content as mandated under Canadian securities legislation, national instruments and OSC rules. They were meant to be read by the Class Members who acquired Sino's Securities in the primary market, and to be relied on by them in making decisions about whether to purchase the shares or notes under the Offerings to which these Prospectuses and Offering Memoranda related.

217.    Chan and Horsley had statutory obligations under Canadian securities law to ensure the accuracy of disclosure documents and provided certifications in respect of the annual reports, financial statements and Prospectuses during the Class Period. The other Individual Defendants were directors of Sino during the Class Period and each had a statutory obligation as a director under the *CBCA* to manage or supervise the management of the business and affairs of Sino. These Individual Defendants also owed a statutory duty of care to shareholders under section 122 of the *CBCA*. In addition, Poon, along with Chan, co-founded Sino and has been its president since 1994. He is intimately aware of Sino's operations and as a long-standing senior officer, he

had an obligation to ensure proper disclosure. Poon authorized, permitted or acquiesced in the release of the Impugned Documents.

218.    BDO and E&Y acted as Sino's auditors and provided audit reports in Sino's annual financial statements that were directed to shareholders. These audit reports specified that BDO and E&Y had conducted an audit in accordance with GAAS, which was untrue, and included their opinions that the financial statements presented fairly, in all material respects, the financial position of Sino, the results of operations and Sino's cash flows, in accordance with GAAP. BDO and E&Y knew and intended that Class Members would rely on the audit reports and assurances about the material accuracy of the financial statements.

219.    Dundee, Merrill, Credit Suisse, Scotia, CIBC, RBC, Maison, Canaccord and TD each signed one or more of the Prospectuses and certified that, to the best of its knowledge, information and belief, the particular prospectus, together with the documents incorporated therein by reference, constituted full, true and plain disclosure of all material facts relating to the securities offered thereby. These defendants knew that the Class Members who acquired Sino's Securities in the primary market would rely on these assurances and the trustworthiness that would be credited to the Prospectuses because of their involvement. Further, those Class Members that purchased shares under these Prospectuses purchased their shares from these defendants as principals.

220.    Credit Suisse USA, TD and Banc of America acted as initial purchasers or dealer managers for one or more of the note Offerings. These defendants knew that persons purchasing these notes would rely on the trustworthiness that would be credited to the Offering Memoranda because of their involvement.

# XI.    THE PLAINTIFFS' CAUSES OF ACTION

## A.    *Negligent Misrepresentation*

221.    As against all Defendants except Pöyry and the Underwriters, and on behalf of all Class Members who acquired Sino's Securities in the secondary market, the Plaintiffs plead negligent misrepresentation for all of the Impugned Documents except the Offering Memoranda.

222.    Labourers and Wong, on behalf of Class Members who purchased Sino Securities in one of the distributions to which a Prospectus related, plead negligent misrepresentation as against Sino, Chan, Horsley, Poon, Wang, Martin, Mak, Murray, Hyde, BDO, E&Y, Dundee, Merrill, Credit Suisse, Scotia, CIBC, RBC, Maison, Canaccord and TD for the Prospectuses.

223.    Grant, on behalf of Class Members who purchased Sino Securities in one of the distributions to which an Offering Memorandum related, pleads negligent misrepresentation as against Sino, BDO and E&Y for the Offering Memoranda.

224.    In support of these claims, the sole misrepresentation that the Plaintiffs plead is the Representation.    The Representation is contained in the language relating to GAAP particularized above, and was untrue for the reasons particularized elsewhere herein.

225.    The Impugned Documents were prepared for the purpose of attracting investment and inducing members of the investing public to purchase Sino securities.    The Defendants knew and intended at all material times that those documents had been prepared for that purpose, and that the Class Members would rely reasonably and to their detriment upon such documents in making the decision to purchase Sino securities.

226.    The Defendants further knew and intended that the information contained in the Impugned Documents would be incorporated into the price of Sino's publicly traded securities

such that the trading price of those securities would at all times reflect the information contained in the Impugned Documents.

227.    As set out elsewhere herein, the Defendants, other than Pöyry, Credit Suisse USA and Banc of America, had a duty at common law to exercise care and diligence to ensure that the Impugned Documents fairly and accurately disclosed Sino's financial condition and performance in accordance with GAAP.

228.    These Defendants breached that duty by making the Representation as particularized above.

229.    The Plaintiffs and the other Class Members directly or indirectly relied upon the Representation in making a decision to purchase the securities of Sino, and suffered damages when the falsity of the Representation was revealed on June 2, 2011.

230.    Alternatively, the Plaintiffs and the other Class Members relied upon the Representation by the act of purchasing Sino securities in an efficient market that promptly incorporated into the price of those securities all publicly available material information regarding the securities of Sino.  As a result, the repeated publication of the Representation in these Impugned Documents caused the price of Sino's shares to trade at inflated prices during the Class Period, thus directly resulting in damage to the Plaintiffs and Class Members.

**B.**    ***Statutory Claims, Negligence, Oppression, Unjust Enrichment and Conspiracy***

        *(i)    Statutory Liability– Secondary Market under the Securities Legislation*

231.    The Plaintiffs plead the claim found in Part XXIII.1 of the *OSA*, and, if required, the equivalent sections of the Securities Legislation other than the *OSA*, against all Defendants except the Underwriters.

232.    Each of the Impugned Documents except for the December 2009 and October 2010 Offering Memoranda is a "Core Document" within the meaning of the Securities Legislation.

233.    Each of these Impugned Documents contained one or more misrepresentations as particularized above.  Such misrepresentations and the Representation are misrepresentations for the purposes of the Securities Legislation.

234.    Each of the Individual Defendants was an officer and/or director of Sino at material times.  Each of the Individual Defendants authorized, permitted or acquiesced in the release of some or all of these Impugned Documents.

235.    Sino is a reporting issuer within the meaning of the Securities Legislation.

236.    E&Y is an expert within the meaning of the Securities Legislation.  E&Y consented to the use of its statements particularized above in these Impugned Documents.

237.    BDO is an expert within the meaning of the Securities Legislation.  BDO consented to the use of its statements particularize above in these Impugned Documents.

238.    Pöyry is an expert within the meaning of the Securities Legislation.  Pöyry consented to the use of its statements particularized above in these Impugned Documents.

239.    At all material times, each of Sino, Chan, Poon and Horsley, BDO and E&Y knew or, in the alternative, was wilfully blind to the fact, that the Impugned Documents contained the Representation and that the Representation was false, and that the Impugned Documents contained other of the misrepresentations that are alleged above to have been contained therein.

  *(ii)    Statutory Liability – Primary Market for Sino's Shares under the Securities Legislation*

240.    As against Sino, Chan, Horsley, Wang, Martin, Mak, Murray, Hyde, Pöyry, BDO, E&Y, Dundee, Merrill, Credit Suisse, Scotia, CIBC, RBC, Maison, Canaccord and TD, and on behalf

of those Class Members who purchased Sino shares in one of the distributions to which the June

2009 or December 2009 Prospectuses related, Labourers and Wong assert the cause of action set

forth in s. 130 of the *OSA* and, if necessary, the equivalent provisions of the Securities

Legislation other than the *OSA*.

241.    Sino issued the June 2009 and December 2009 Prospectuses, which contained the

Representation and the other misrepresentations that are alleged above to have been contained in

those Prospectuses or in the Sino disclosure documents incorporated therein by reference.

> (iii)    *Statutory Liability – Primary Market for Sino's Notes under the Securities*
> *Legislation*

242.    As against Sino, and on behalf of those Class Members who purchased or otherwise

acquired Sino's notes in one of the offerings to which the July 2008, June 2009, December 2009,

and October 2010 Offering Memoranda related, Grant asserts the cause of action set forth in s.

130.1 of the *OSA* and, if necessary, the equivalent provisions of the Securities Legislation other

than the *OSA*.

243.    Sino issued the July 2008, June 2009, December 2009 and October 2010 Offering

Memoranda, which contained the Representation and the other misrepresentations that are

alleged above to have been contained in those Offering Memoranda or in the Sino disclosure

documents incorporated therein by reference.

> (iv)    *Negligence Simpliciter – Primary Market for Sino's Securities*

244.    Sino, Chan, Poon, Horsley, Wang, Martin, Mak, Murray, Hyde, BDO, E&Y, Pöyry and

the Underwriters (collectively, the "**Primary Market Defendants**") acted negligently in

connection with one or more of the Offerings.

245.    As against Sino, Chan, Horsley, Poon, Wang, Martin, Mak, Murray, Hyde, BDO, E&Y,

Pöyry, Dundee, Merrill, Credit Suisse, Scotia, CIBC, RBC, Maison, Canaccord and TD, and on

behalf of those Class Members who purchased Sino's Securities in one of the distributions to which those Prospectuses related, Labourers and Wong assert negligence simpliciter.

246.    As against Sino, BDO, E&Y, Pöyry, Credit Suisse USA, Banc of America and TD, and on behalf of those Class Members who purchased Sino's Securities in one of the distributions to which the Offering Memoranda related, Grant asserts negligence simpliciter.

247.    The Primary Market Defendants owed a duty of care to ensure that the Prospectuses and/or the Offering Memoranda they issued, or authorized to be issued, or in respect of which they acted as an underwriter, initial purchaser or dealer manager, made full, true and plain disclosure of all material facts relating to the Securities offered thereby, or to ensure that their opinions or reports contained in such Prospectuses and Offering Memoranda did not contain a misrepresentation.

248.    At all times material to the matters complained of herein, the Primary Market Defendants ought to have known that such Prospectuses or Offering Memoranda and the documents incorporated therein by reference were materially misleading in that they contained the Representation and the other misrepresentations particularized above.

249.    Chan, Poon, Horsley, Wang, Martin, Mak, Murray and Hyde were senior officers and/or directors at the time the Offerings to which the Prospectuses related. These Prospectuses were created for the purposes of obtaining financing for Sino's operations. Chan, Horsley, Martin and Hyde signed each of the Prospectuses and certified that they made full, true and plain disclosure of all material facts relating to the shares offered. Wang, Mak and Murray were directors during one or more of these Offerings and each had a statutory obligation to manage or supervise the management of the business and affairs of Sino. Poon was a director for the June 2007 share Offering and was president of Sino at the time of the June 2009 and December 2009 Offering.

Poon, along with Chan, co-founded Sino and has been the president since 1994. He is intimately aware of Sino's business and affairs.

250.    The Underwriters acted as underwriters, initial purchasers or dealer managers for the Offerings to which the Prospectuses and Offering Memoranda related. They had an obligation to conduct due diligence in respect of those Offerings and ensure that those Securities were offering at a price that reflected their true value or that such distributions did not proceed if inappropriate. In addition, Dundee, Merrill, Credit Suisse, Scotia, CIBC, RBC, Maison, Canaccord and TD signed one or more of the Prospectuses and certified that to the best of their knowledge, information and belief, the Prospectuses constituted full, true and plain disclosure of all material facts relating to the shares offered.

251.    E&Y and BDO acted as Sino's auditors and had a duty to maintain or to ensure that Sino maintained appropriate internal controls to ensure that Sino's disclosure documents adequately and fairly presented the business and affairs of Sino on a timely basis.

252.    Pöyry had a duty to ensure that its opinions and reports reflected the true nature and value of Sino's assets. Pöyry, at the time it produced each of the 2008 Valuations, 2009 Valuations, and 2010 Valuations, specifically consented to the inclusion of those valuations or a summary at any time that Sino or its subsidiaries filed any documents on SEDAR or issued any documents pursuant to which any securities of Sino or any subsidiary were offered for sale.

253.    The Primary Market Defendants have violated their duties to those Class Members who purchased Sino's Securities in the distributions to which a Prospectus or an Offering Memorandum related.

254.   The reasonable standard of care expected in the circumstances required the Primary Market Defendants to prevent the distributions to which the Prospectuses or the Offering Memoranda related from occurring prior to the correction of the Representation and the other misrepresentations alleged above to have been contained in the Prospectuses or the Offering Memoranda, or in the documents incorporated therein by reference.  Those Defendants failed to meet the standard of care required by causing the Offerings to occur before the correction of such misrepresentations.

255.   In addition, by failing to attend and participate in Sino board and board committee meetings to a reasonable degree, Murray and Poon effectively abdicated their duties to the Class Members and as directors of Sino.

256.   Sino, E&Y, BDO and the Individual Defendants further breached their duty of care as they failed to maintain or to ensure that Sino maintained appropriate internal controls to ensure that Sino's disclosure documents adequately and fairly presented the business and affairs of Sino on a timely basis.

257.   Had the Primary Market Defendants exercised reasonable care and diligence in connection with the distributions to which the Prospectuses related, then securities regulators likely would not have issued a receipt for any of the Prospectuses, and those distributions would not have occurred, or would have occurred at prices that reflected the true value of Sino's shares.

258.   Had the Primary Market Defendants exercised reasonable care and diligence in connection with the distributions to which the Offering Memoranda related, then those distributions would not have occurred, or would have occurred at prices that reflected the true value of Sino's notes.

259.    The Primary Market Defendants' negligence in relation to the Prospectuses and the Offering Memoranda resulted in damage to Labourers, Grant and Wong, and to the other Class Members who purchased Sino's Securities in the related distributions.  Had those Defendants satisfied their duty of care to such Class Members, then those Class Members would not have purchased the Securities that they acquired under the Prospectuses or the Offering Memoranda, or they would have purchased them at a much lower price that reflected their true value.

　　　　*(v)*　　*Unjust Enrichment of* **Chan, Martin, Poon, Horsley, Mak and Murray**

260.    As a result of the Representation and the other misrepresentations particularized above, Sino's shares traded, and were sold by Chan, Martin, Poon, Horsley, Mak and Murray, at artificially inflated prices during the Class Period.

261.    Chan, Martin, Poon, Horsley, Mak and Murray were enriched by their wrongful acts and omissions during the Class Period, and the Class Members who purchased Sino shares from such Defendants suffered a corresponding deprivation.

262.    There was no juristic reason for the resulting enrichment of Chan, Martin, Poon, Horsley, Mak and Murray.

263.    The Class Members who purchased Sino shares from Chan, Martin, Poon, Horsley, Mak and Murray during the Class Period are entitled to the difference between the price they paid to such Defendants for such shares, and the price that they would have paid had the Defendants not made the Representation and the other misrepresentations particularized above, and had not committed the wrongful acts and omissions particularized above.

### (vi)    *Unjust Enrichment of Sino*

264.    Throughout the Class Period, Sino made the Offerings.  Such Offerings were made via various documents, particularized above, that contained the Representation and the misrepresentations particularized above.

265.    The Securities sold by Sino via the Offerings were sold at artificially inflated prices as a result of the Representation and the others misrepresentations particularized above.

266.    Sino was enriched by, and those Class Members who purchased the Securities via the Offerings were deprived of, an amount equivalent to the difference between the amount for which the Securities offered were actually sold, and the amount for which such securities would have been sold had the Offerings not included the Representation and the misrepresentations particularized above.

267.    The Offerings violated Sino's disclosure obligations under the Securities Legislation and the various instruments promulgated by the securities regulators of the Provinces in which such Offerings were made.  There was no juristic reason for the enrichment of Sino.

### (vi)    *Unjust Enrichment of the Underwriters*

268.    Throughout the Class Period, Sino made the Offerings.  Such Offerings were made via the Prospectuses and the Offering Memoranda, which contained the Representation and the other misrepresentations particularized above.  Each of the Underwriters underwrote one or more of the Offerings.

269.    The Securities sold by Sino via the Offerings were sold at artificially inflated prices as a result of the Representation and the other misrepresentations particularized above.  The Underwriters earned fees from the Class, whether directly or indirectly, for work that they never

performed, or that they performed with gross negligence, in connection with the Offerings, or some of them.

270.    The Underwriters were enriched by, and those Class Members who purchased securities via the Offerings were deprived of, an amount equivalent to the fees the Underwriters earned in connection with the Offerings.

271.    The Offerings violated Sino's disclosure obligations under the Securities Legislation and the various instruments promulgated by the securities regulators of the Provinces in which such Offerings were made.  There was no juristic reason for the enrichment of the Underwriters.

272.    In addition, some or all of the Underwriters also acted as brokers in secondary market transactions relating to Sino securities, and earned trading commissions from the Class Members in those secondary market transactions in Sino's Securities.  Those Underwriters were enriched by, and those Class Members who purchased Sino securities through those Underwriters in their capacity as brokers were deprived of, an amount equivalent to the commissions the Underwriters earned on such secondary market trades.

273.    Had those Underwriters who also acted as brokers in secondary market transactions exercised reasonable diligence in connection with the Offerings in which they acted as Underwriters, then Sino's securities likely would not have traded at all in the secondary market, and the Underwriters would not have been paid the aforesaid trading commissions by the Class Members.  There was no juristic reason for that enrichment of those Underwriters through their receipt of trading commissions from the Class Members.

    (vii)    Oppression

274.    The Plaintiffs and the other Class Members had a reasonable and legitimate expectation that Sino and the Individual Defendants would use their powers to direct the company for Sino's

best interests and, in turn, in the interests of its security holders.  More specifically, the Plaintiffs and the other Class Members had a reasonable expectation that:

    (a)    Sino and the Individual Defendants would comply with GAAP, and/or cause Sino to comply with GAAP;

    (b)    Sino and the Individual Defendants would take reasonable steps to ensure that the Class Members were made aware on a timely basis of material developments in Sino's business and affairs;

    (c)    Sino and the Individual Defendants would implement adequate corporate governance procedures and internal controls to ensure that Sino disclosed material facts and material changes in the company's business and affairs on a timely basis;

    (d)    Sino and the Individual Defendants would not make the misrepresentations particularized above;

    (e)    Sino stock options would not be backdated or otherwise mispriced; and

    (f)    the Individual Defendants would adhere to the Code.

275.    Such reasonable expectations were not met as:

    (a)    Sino did not comply with GAAP;

    (b)    the Class Members were not made aware on a timely basis of material developments in Sino's business and affairs;

    (c)    Sino's corporate governance procedures and internal controls were inadequate;

    (d)    the misrepresentations particularized above were made;

    (e)    stock options were backdated and/or otherwise mispriced; and

    (f)    the Individual Defendants did not adhere to the Code.

276.   Sino's and the Individual Defendants' conduct was oppressive and unfairly prejudicial to the Plaintiffs and the other Class Members and unfairly disregarded their interests.   These defendants were charged with the operation of Sino for the benefit of all of its shareholders. The value of the shareholders' investments was based on, among other things:

(a)    the profitability of Sino;

(b)    the integrity of Sino's management and its ability to run the company in the interests of all shareholders;

(c)    Sino's compliance with its disclosure obligations;

(d)    Sino's ongoing representation that its corporate governance procedures met with reasonable standards, and that the business of the company was subjected to reasonable scrutiny; and

(e)    Sino's ongoing representation that its affairs and financial reporting were being conducted in accordance with GAAP.

277.   This oppressive conduct impaired the ability of the Plaintiffs and other Class Members to make informed investment decisions about Sino's securities.   But for that conduct, the Plaintiffs and the other Class Members would not have suffered the damages alleged herein.

*(viii)   Conspiracy*

278.   Sino, Chan, Poon and Horsley conspired with each other and with persons unknown (collectively, the "**Conspirators**") to inflate the price of Sino's securities.   During the Class Period, the Conspirators unlawfully, maliciously and lacking bona fides, agreed together to, among other things, make the Representation and other misrepresentations particularized above, and to profit from such misrepresentations by, among other things, issuing stock options in respect of which the strike price was impermissibly low.

279.    The Conspirators' predominant purposes in so conspiring were to:

(a)    inflate the price of Sino's securities, or alternatively, maintain an artificially high trading price for Sino's securities;

(b)    artificially increase the value of the securities they held; and

(c)    inflate the portion of their compensation that was dependent in whole or in part upon the performance of Sino and its securities.

280.    In furtherance of the conspiracy, the following are some, but not all, of the acts carried out or caused to be carried out by the Conspirators:

(a)    they agreed to, and did, make the Representation, which they knew was false;

(b)    they agreed to, and did, make the other misrepresentations particularized above, which they knew were false;

(c)    they caused Sino to issue the Impugned Documents which they knew to be materially misleading;

(d)    as alleged more particularly below, they caused to be issued stock options in respect of which the strike price was impermissibly low; and

(e)    they authorized the sale of securities pursuant to Prospectuses and Offering Memoranda that they knew to be materially false and misleading.

281.    Stock options are a form of compensation used by companies to incentivize the performance of directors, officers and employees.  Options are granted on a certain date (the 'grant date') at a certain price (the 'exercise' or 'strike' price).  At some point in the future, typically following a vesting period, an options-holder may, by paying the strike price, exercise the option and convert the option into a share in the company.  The option-holder will make money as long as the option's strike price is lower than the market price of the security at the

moment that the option is exercised.  This enhances the incentive of the option recipient to work to raise the stock price of the company.

282.    There are three types of option grants:

    (a)    'in-the-money' grants are options granted where the strike price is lower than the market price of the security on the date of the grant; such options are not permissible under the TSX Rules and have been prohibited by the TSX Rules at all material times;

    (b)    'at-the-money' grants are options granted where the strike price is equal to the market price of the security on the date of the grant or the closing price the day prior to the grant; and

    (c)    'out-of-the-money' grants are options granted where the strike price is higher than the market price of the security on the date of the grant.

283.    Both at-the-money and out-of-the-money options are permissible under the TSX Rules and have been at all material times.

284.    The purpose of both at-the-money and out-of-the-money options is to create incentives for option recipients to work to raise the share price of the company.  Such options have limited value at the time of the grant, because they entitle the recipient to acquire the company's shares at or above the price at which the recipient could acquire the company's shares in the open market.  Options that are in-the-money, however, have substantial value at the time of the grant irrespective of whether the company's stock price rises subsequent to the grant date.

285.    At all material times, the Sino Option Plan (the "**Plan**") prohibited in-the-money options.

286.    The Conspirators backdated and/or otherwise mispriced Sino stock options, or caused the backdating and/or mispricing of Sino stock options, in violation of, inter alia: (a) the *OSA* and the rules and regulations promulgated thereunder; (b) the Plan; (c) GAAP; (d) the Code; (e) the TSX

Rules; and (f) the Conspirators' statutory, common law and contractual fiduciary duties and duties of care to Sino and its shareholders, including the Class Members.

287.    The Sino stock options that were backdated or otherwise mispriced included those issued on June 26, 1996 to Chan, January 21, 2005 to Horsley, September 14, 2005 to Horsley, June 4, 2007 to Horsley and Chan, August 21, 2007 to Sino insiders other than the Conspirators, November 23, 2007 to George Ho and other Sino insiders, and March 31, 2009 to Sino insiders other than the Conspirators.

288.    The graph below shows the average stock price returns for fifteen trading days prior and subsequent to the dates as of which Sino priced its stock options to its insiders.  As appears therefrom, on average the dates as of which Sino's stock options were priced were preceded by a substantial decline in Sino's stock price, and were followed by a dramatic increase in Sino's stock price.  This pattern could not plausibly be the result of chance.



289.    The conspiracy was unlawful because the Conspirators knowingly and intentionally committed the foregoing acts when they knew such conduct was in violation of, *inter alia*, the *OSA*, the Securities Legislation other than the *OSA*, the Code, the rules and requirements of the TSX (the "**TSX Rules**") and the *CBCA*.  The Conspirators intended to, and did, harm the Class by causing artificial inflation in the price of Sino's securities.

290.    The Conspirators directed the conspiracy toward the Plaintiffs and the other Class Members.  The Conspirators knew in the circumstances that the conspiracy would, and did, cause loss to the Plaintiffs and the other Class Members. The Plaintiffs and the Class Members suffered damages when the falsity of the Representation and other misrepresentations were revealed on June 2, 2011.

## XII.    THE RELATIONSHIP BETWEEN SINO'S DISCLOSURES AND THE PRICE OF SINO'S SECURITIES

291.    The price of Sino's securities was directly affected during the Class Period by the issuance of the Impugned Documents.  The Defendants were aware at all material times of the effect of Sino's disclosure documents upon the price of its Sino's securities.

292.    The Impugned Documents were filed, among other places, with SEDAR and the TSX, and thereby became immediately available to, and were reproduced for inspection by, the Class Members, other members of the investing public, financial analysts and the financial press.

293.    Sino routinely transmitted the documents referred to above to the financial press, financial analysts and certain prospective and actual holders of Sino securities.  Sino provided either copies of the above referenced documents or links thereto on its website.

294.   Sino regularly communicated with the public investors and financial analysts via established market communication mechanisms, including through regular disseminations of their disclosure documents, including press releases on newswire services in Canada, the United States and elsewhere.  Each time Sino communicated that new material information about Sino financial results to the public the price of Sino securities was directly affected.

295.   Sino was the subject of analysts' reports that incorporated certain of the material information contained in the Impugned Documents, with the effect that any recommendations to purchase Sino securities in such reports during the Class Period were based, in whole or in part, upon that information.

296.   Sino's securities were and are traded, among other places, on the TSX, which is an efficient and automated market.  The price at which Sino's securities traded promptly incorporated material information from Sino's disclosure documents about Sino's business and affairs, including the Representation, which was disseminated to the public through the documents referred to above and distributed by Sino, as well as by other means.

## XIII.   VICARIOUS LIABILITY

### A.      *Sino and the Individual Defendants*

297.   Sino is vicariously liable for the acts and omissions of the Individual Defendants particularized in this Claim.

298.   The acts or omissions particularized and alleged in this Claim to have been done by Sino were authorized, ordered and done by the Individual Defendants and other agents, employees and representatives of Sino, while engaged in the management, direction, control and transaction of the business and affairs of Sino.  Such acts and omissions are, therefore, not only the acts and omissions of the Individual Defendants, but are also the acts and omissions of Sino.

299.    At all material times, the Individual Defendants were officers and/or directors of Sino. As their acts and omissions are independently tortious, they are personally liable for same to the Plaintiffs and the other Class Members.

**B.    *E&Y***

300.    E&Y is vicariously liable for the acts and omissions of each of its officers, directors, partners, agents and employees as set out above.

301.    The acts or omissions particularized and alleged in this Claim to have been done by E&Y were authorized, ordered and done by its officers, directors, partners, agents and employees, while engaged in the management, direction, control and transaction of the business and affairs of E&Y.   Such acts and omissions are, therefore, not only the acts and omissions of those persons, but are also the acts and omissions of E&Y.

**C.    *BDO***

302.    BDO is vicariously liable for the acts and omissions of each of its officers, directors, partners, agents and employees as set out above.

303.    The acts or omissions particularized and alleged in this Claim to have been done by BDO were authorized, ordered and done by its officers, directors, partners, agents and employees, while engaged in the management, direction, control and transaction of the business and affairs of BDO.   Such acts and omissions are, therefore, not only the acts and omissions of those persons, but are also the acts and omissions of BDO.

**D.    *Pöyry***

304.    Pöyry is vicariously liable for the acts and omissions of each of its officers, directors, partners, agents and employees as set out above.

305.    The acts or omissions particularized and alleged in this Claim to have been done by Pöyry were authorized, ordered and done by its officers, directors, partners, agents and employees, while engaged in the management, direction, control and transaction of the business and affairs of Pöyry.  Such acts and omissions are, therefore, not only the acts and omissions of those persons, but are also the acts and omissions of Pöyry.

**E.    *The Underwriters***

306.    The Underwriters are vicariously liable for the acts and omissions of each of their respective officers, directors, partners, agents and employees as set out above.

307.    The acts or omissions particularized and alleged in this Claim to have been done by the Underwriters were authorized, ordered and done by each of their respective officers, directors, partners, agents and employees, while engaged in the management, direction, control and transaction of the business and affairs such Underwriters.  Such acts and omissions are, therefore, not only the acts and omissions of those persons, but are also the acts and omissions of the respective Underwriters.

## XIV.    REAL AND SUBSTANTIAL CONNECTION WITH ONTARIO

308.    The Plaintiffs plead that this action has a real and substantial connection with Ontario because, among other thing:

(a)    Sino is a reporting issuer in Ontario;

(b)    Sino's shares trade on the TSX which is located in Toronto, Ontario;

(c)    Sino's registered office and principal business office is in Mississauga, Ontario;

(d)    the Sino disclosure documents referred to herein were disseminated in and from Ontario;

(e)    a substantial proportion of the Class Members reside in Ontario;

(f)     Sino carries on business in Ontario; and

(g)     a substantial portion of the damages sustained by the Class were sustained by persons and entities domiciled in Ontario.

## XV.    SERVICE OUTSIDE OF ONTARIO

309.    The Plaintiffs may serve the Notice of Action and Statement of Claim outside of Ontario without leave in accordance with rule 17.02 of the Rules of Civil Procedure, because this claim is:

(a)     a claim in respect of personal property in Ontario (para 17.02(a));

(b)     a claim in respect of damage sustained in Ontario (para 17.02(h));

(c)     a claim authorized by statute to be made against a person outside of Ontario by a proceeding in Ontario (para 17.02(n)); and

(d)     a claim against a person outside of Ontario who is a necessary or proper party to a proceeding properly brought against another person served in Ontario (para 17.02(o)); and

(e)     a claim against a person ordinarily resident or carrying on business in Ontario (para 17.02(p)).

## XVI.   RELEVANT LEGISLATION, PLACE OF TRIAL, JURY TRIAL AND HEADINGS

310.    The Plaintiffs plead and rely on the *CJA*, the *CPA*, the Securities Legislation and *CBCA*, all as amended.

311.    The Plaintiffs propose that this action be tried in the City of Toronto, in the Province of Ontario, as a proceeding under the *CPA*.

312.    The Plaintiffs will serve a jury notice.

313.    The headings contained in this Statement of Claim are for convenience only.    This Statement of Claim is intended to be read as an integrated whole, and not as a series of unrelated components.

~~April 18, 2012~~    *January 26/12*

**Siskinds LLP**
Barristers & Solicitors
680 Waterloo Street
P.O. Box 2520
London, ON  N6A 3V8

A. Dimitri Lascaris (LSUC#: 50074A)
Tel: 519.660.7844
Fax: 519.660.7845
Charles M. Wright (LSUC#: 36599Q )
Tel: 519.660.7753
Fax: 519.660.7754
Michael G. Robb (LSUC#: 45787G)
Tel: 519.660.7872
Fax: 519.660.7873


**Koskie Minsky LLP**
20 Queen Street West, Suite 900, Box 52
Toronto, ON M5H 3R3
Kirk M. Baert (LSUC#: 30942O)
Tel: 416.595.2117
Fax: 416.204.2889
Jonathan Ptak (LSUC#: 45773F)
Tel: 416-595.2149
Fax: 416.204.2903

Lawyers for the Plaintiffs

Trustees of the Labourers' Pension Fund of Central and Eastern Canada, *et al.*,

Plaintiffs

and

Sino-Forest Corporation, *et al.*

Defendants

Court File No.: CV-11-431153-00CP

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Toronto

Proceeding under the *Class Proceedings Act, 1992*

**FRESH AS AMENDED STATEMENT OF CLAIM**
**(NOTICE OF ACTION ISSUED JULY 20, 2011)**

**Siskinds LLP**
Barristers & Solicitors
680 Waterloo Street
P.O. Box 2520
London, ON  N6A 3V8

A. Dimitri Lascaris (LSUC#: 50074A)
Tel: 519.660.7844
Fax: 519.660.7845
Charles M. Wright (LSUC#: 36599O )
Tel: 519.660.7753
Fax: 519.660.7754
Michael G. Robb (LSUC#: 45787G)
Tel: 519.660.7872
Fax: 519.660.7873

**Koskie Minsky LLP**
20 Queen Street West, Suite 900, Box 52
Toronto, ON M5H 3R3

Kirk M. Baert (LSUC#: 30942O)
Tel: 416.595.2117
Fax: 416.204.2889
Jonathan Ptak (LSUC#: 45773F)
Tel: 416-595.2149
Fax: 416.204.2903
Lawyers for the Plaintiffs