This is Exhibit "F" mentioned and referred to in the Affidavit of Charles M. Wright, sworn before me at the City of London, in the County of Middlesex, this 4th day of July, 2014.

_____

A Commissioner, etc.



| Ontario Securities Commission | Commission des valeurs mobilières de l'Ontario | P.O. Box 55, 19th Floor 20 Queen Street West Toronto ON M5H 3S8 | CP 55, 19e étage 20, rue queen ouest Toronto ON M5H 3S8 |

Ontario

---

## IN THE MATTER OF THE *SECURITIES ACT*, R.S.O. 1990, c. S.5, AS AMENDED

### - AND -

## IN THE MATTER OF SINO-FOREST CORPORATION, ALLEN CHAN, ALBERT IP, ALFRED C.T. HUNG, GEORGE HO, SIMON YEUNG and DAVID HORSLEY

### STATEMENT OF ALLEGATIONS

Further to a Notice of Hearing dated May 22, 2012, Staff ("Staff") of the Ontario Securities Commission (the "Commission") make the following allegations:

## PART I.    OVERVIEW AND SUMMARY OF ALLEGATIONS

### A.    Sino-Forest

1.    Sino-Forest Corporation ("Sino-Forest" or the "Company")[1] is a reporting issuer in the province of Ontario as that term is defined in subsection 1(1) of the *Securities Act*, R.S.O. 1990, c. S.5, as amended (the "Act").  Until recently, the common shares of Sino-Forest were listed on the Toronto Stock Exchange ("TSX").

2.    Sino-Forest purportedly engaged primarily in the purchase and sale of Standing Timber in the People's Republic of China (the " PRC").

---

[1] Sino-Forest or the Company includes all of Sino-Forest's subsidiaries and companies that it controls as set out in its public disclosure record and as the context within this Statement of Allegations requires.

2

3.      From February of 2003 until October of 2010, Sino-Forest raised approximately $3.0 billion (US)[2] in cash from the issuance of equity and debt securities to investors (the "Investors")[3].

4.      From June 30, 2006 to March 31, 2011, Sino-Forest's share price grew from $5.75 (Can) to $25.30 (Can), an increase of 340%.[4]   By March 31, 2011 Sino-Forest's market capitalization was well over $6 billion.

5.      In early June of 2011, the share price of Sino-Forest plummeted after a private analyst made allegations of fraud against Sino-Forest.

6.      On November 15, 2011, Sino-Forest announced that it was deferring the release of its interim financial report for the third quarter of 2011.[5] Sino-Forest has never filed this interim financial report with the Commission.

7.      On January 10, 2012, Sino-Forest issued a news release cautioning that its historic financial statements and related audit reports should not be relied upon.

8.      Sino-Forest was required to file its 2011 audited annual financial statements with the Commission by March 30, 2012.   That very day, Sino-Forest initiated proceedings in front of the Superior Court of Justice (Ontario) requesting protection from its creditors.   Sino-Forest has never filed its 2011 audited annual financial statements with the Commission.

9.      On April 4, 2012, the auditors of Sino-Forest resigned.

10.     On May 9, 2012, the TSX delisted the shares of Sino-Forest.

---

[2] Unless otherwise stated, all amounts presented in this Statement of Allegations and the attached Schedules are in United States Dollars.
[3] The Glossary attached as Schedule A contains a list of certain of the defined terms used in the Statement of Allegations and the paragraph where they are located within the Statement of Allegations.
[4] Attached as Schedule B is selected data from its audited annual financial statements for 2005 to 2010.
[5] The financial year end of Sino-Forest is December 31.

3

11.    As set out below, Sino-Forest and its former senior executives, including Allen Chan ("Chan"), Albert Ip ("Ip"), Alfred C.T. Hung ("Hung"), George Ho ("Ho") and Simon Yeung ("Yeung"), engaged in a complex fraudulent scheme to inflate the assets and revenue of Sino-Forest and made materially misleading statements in Sino-Forest's public disclosure record related to its primary business.

12.    Chan, former Chairman of the Board and Chief Executive Officer ("CEO") of Sino-Forest until August 28, 2011, also committed fraud in relation to Sino-Forest's purchase of a controlling interest in a company now known as Greenheart Group Limited ("Greenheart").  By concealing Chan's substantial interest in this transaction, Chan and Sino-Forest made materially misleading statements in Sino-Forest's public disclosure record.

13.    Chan, Ip, Hung, Ho and Yeung (together, "Overseas Management") all materially misled Staff during the investigation of this matter.

14.    David Horsley ("Horsley"), former Senior Vice President and Chief Financial Officer ("CFO") of Sino-Forest, did not comply with Ontario securities law and acted contrary to the public interest.

**B.    The Standing Timber Fraud**

15.    From June 30, 2006 until January 11, 2012 (the "Material Time"), Sino-Forest and Overseas Management engaged in numerous deceitful and dishonest courses of conduct (the "Standing Timber Fraud") that ultimately caused the assets and revenue derived from the purchase and sale of Standing Timber (that constituted the majority of Sino-Forest's business) to be fraudulently overstated, putting the pecuniary interests of Investors at risk contrary to Ontario securities law and contrary to the public interest.

16.    The Standing Timber Fraud was primarily comprised of three elements:
    i)    Sino-Forest dishonestly concealed its control over Suppliers, AIs and other nominee companies in the BVI Network.   Sino-Forest established a collection of "nominee"/"peripheral" companies that were controlled, on

4

its behalf, by various "caretakers".[6] Sino-Forest conducted a significant level of its business with these companies, the true economic substance of which was misstated in Sino-Forest's financial disclosure;

ii)     Sino-Forest falsified the evidence of ownership for the vast majority of its timber holdings by engaging in a deceitful documentation process. This dishonest process included the fraudulent creation of deceitful Purchase Contracts and Sales Contracts, including key attachments and other supplemental documentation. Sino-Forest then relied upon these documents to evidence the purported purchase, ownership and sale of Standing Timber in the BVI Model; and

iii)    Sino-Forest dishonestly concealed internal control weaknesses/failures that obscured the true nature of transactions conducted within the BVI Network and prevented the detection of the deceitful documentation process. Sino-Forest's statements in its public disclosure record regarding the extent of its internal control weaknesses were wholly inadequate and misleading.

17.    Each of the above dishonest and deceitful courses of conduct by Sino-Forest and Overseas Management put the pecuniary interests of Investors at risk, constituting fraud. Together, these courses of conduct made the public disclosure record of Sino-Forest so misleading that it was fraudulent.

18.    As set out in paragraph 47, the vast majority of the Sino-Forest's Standing Timber assets were held in the BVI Model. The available underlying documentation for these Standing Timber assets did not provide sufficient evidence of legal ownership of these assets. As of this date, Sino-Forest has not been able to confirm full legal ownership of the Standing Timber assets that it claims to hold in the BVI Model.

19.    During the Material Time, Sino-Forest's auditors were not made aware of Sino-Forest's systematic practice of creating deceitful Purchase Contracts and Sales Contracts, including key attachments to these contracts.

20.    The following are four illustrative examples of the fraudulent courses of conduct that Sino-Forest and Overseas Management perpetrated within the Standing Timber Fraud. These

---

[6] These "nominee"/"peripheral" companies and "caretakers" are described in greater detail in paragraph 57.

5

four examples, described in detail below, illustrate how Sino-Forest and Overseas Management materially inflated assets and revenue in Sino-Forest's public disclosure record:

    i)      the Dacheng Fraud;

    ii)     the 450,000 Fraud;

    iii)    Gengma Fraud #1; and

    iv)    Gengma Fraud #2.

21.     Schedule C illustrates the primary elements of the Standing Timber Fraud as introduced in paragraph 16 and the fraudulently overstated revenue arising from the four illustrative examples introduced in the previous paragraph.

22.     The allegations regarding the Standing Timber Fraud are set out in paragraphs 53 to 119 below.

**C.     Materially Misleading Statements Related to the Standing Timber Fraud**

23.     Given the three elements of the Standing Timber Fraud introduced in paragraph 16, the public disclosure record of Sino-Forest required by Ontario securities law was materially misleading, contrary to Ontario securities law and contrary to the public interest.

24.     The assets and revenue recorded as a result of the Standing Timber Fraud caused Sino-Forest's public disclosure record, including its audited annual financial statements, annual information forms ("AIFs") and management's discussion and analysis ("MD&A"), to be materially misleading during the Material Time.

25.     Sino-Forest's statements in its public disclosure, including its AIFs and its MD&A filed with the Commission during the Material Time, regarding the extent of its internal control weaknesses and deficiencies were wholly inadequate and misleading.

26.     The allegations regarding these materially misleading statements related to the Standing Timber Fraud are set out in paragraphs 120 to 141 below.

6

**D.    The Greenheart Transaction - Fraud by Chan and Materially Misleading Statements by Chan and Sino-Forest**

27.    In 2010, following a complex series of transactions, Sino-Forest completed the purchase of a controlling interest in Greenheart, a public company listed on the Hong Kong Stock Exchange (the "Greenheart Transaction").    Greenheart holds natural forest concessions, mostly in Suriname.

28.    Chan secretly controlled companies that received over $22 million as a result of the purchase by Sino-Forest of this controlling interest in Greenheart.    The Greenheart Transaction was significant to Sino-Forest's business and cost the Company approximately $120 million.

29.    Chan fraudulently concealed his involvement in the Greenheart Transaction and the substantial benefit he secretly received.    Chan and Sino-Forest misled the public through Sino-Forest's continuous disclosure.    Chan falsely certified the accuracy of Sino-Forest's AIFs for 2008, 2009 and 2010 as these documents did not disclose his interest in the Greenheart Transaction.

30.    Chan's course of conduct relating to the Greenheart Transaction constituted fraud and the making of misleading statements, contrary to Ontario securities law and contrary to the public interest.    Chan and Sino-Forest made materially misleading statements related to the Greenheart Transaction, contrary to Ontario securities law and contrary to the public interest.

31.    The allegations regarding fraud and materially misleading statements related to the Greenheart Transaction are set out in paragraphs 142 to 154 below.

**E.    Overseas Management of Sino-Forest Misled Staff during the Investigation**

32.    During the investigation by Staff, numerous members of Sino-Forest's management were interviewed by Staff.    Overseas Management materially misled Staff in their interviews, contrary to Ontario securities law and contrary to the public interest.

7

33.    The allegations that Overseas Management materially misled Staff are set out in paragraphs 155 to 167 below.

## PART II.    THE RESPONDENTS

34.    Sino-Forest is a Canadian company with its principal executive office located in Hong Kong and its registered office located in Mississauga, Ontario.

35.    During the Material Time, as set out above, Chan was Chairman of the Board of Directors and CEO of Sino-Forest.

36.    During the Material Time, Ip was Senior Vice President, Development and Operations North-east and South-west China of Sino-Forest.

37.    During the Material Time, Hung was Vice-President, Corporate Planning and Banking of Sino-Forest.

38.    During the Material Time, Ho was Vice-President, Finance (China) of Sino-Forest.

39.    During the Material Time, Yeung was Vice President - Operation within the Operation /Project Management group of Sino-Panel (Asia) Inc. ("Sino-Panel"), a subsidiary of Sino-Forest.

40.    During the Material Time, Horsley was Senior Vice President and CFO of Sino-Forest.

## PART III.    STANDING TIMBER - THE PRIMARY BUSINESS OF SINO-FOREST

### A.    Introduction

41.    In its AIF for 2010, Sino-Forest stated that its operations were comprised of two core business segments which it titled "Wood Fibre Operations" and "Manufacturing and Other

8

Operations". Wood Fibre Operations had two subcomponents entitled "Plantation Fibre" and "Trading of Wood Logs".

42.     According to Sino-Forest, the Plantation Fibre subcomponent of its business was derived from the purported acquisition, cultivation and sale of either "standing timber" or "logs" in the PRC. For the purpose of this Statement of Allegations, the Plantation Fibre subcomponent of Sino-Forest's business will be referred to as "Standing Timber" as most, if not all, of the revenue from the sale of Plantation Fibre was derived from the sale of "standing timber".

B.      **Standing Timber - Sino-Forest's Main Source of Revenue**

43.     From 2007 to 2010, Sino-Forest reported Standing Timber revenue totalling approximately $3.56 billion, representing about 75% of its total revenue of $4.77 billion. The following table provides a summary of Sino-Forest's stated revenue for the period from 2007 to 2010 and illustrates the importance of the revenue derived from the sale of Standing Timber:

|  | $ (millions) | | | | |
|  | 2007 | 2008 | 2009 | 2010 | Total |
|---|---|---|---|---|---|
| Plantation Fibre (defined as Standing Timber herein) | 521.5 | 685.4 | 954.2 | 1,401.2 | 3,562.3 |
| Trading of Wood Logs | 154.0 | 153.5 | 237.9 | 454.0 | 999.4 |
| *Wood Fibre Operations* | *675.5* | *838.9* | *1,192.1* | *1,855.2* | *4,561.7* |
| *Manufacturing and Other Operations* | *38.4* | *57.1* | *46.1* | *68.3* | *209.9* |
| **Total Revenue** | **713.9** | **896.0** | **1,238.2** | **1,923.5** | **4,771.6** |

9

## C.    The BVI and WFOE Models - Revenue and Holdings

44.    Standing Timber was purchased, held and sold by Sino-Forest in two distinct legal structures or models: the "BVI Model" and the "WFOE Model".

45.    In the BVI Model, Sino-Forest's purchases and sales of Standing Timber in the PRC were conducted using wholly owned subsidiaries of Sino-Forest incorporated in the British Virgin Islands (the "BVI Subs").    The BVI Subs purported to enter into written purchase contracts ("Purchase Contracts") with suppliers in the PRC ("Suppliers") and then purported to enter into written sales contracts ("Sales Contracts") with customers called "authorized intermediaries" in the PRC ("AIs").

46.    In the WFOE Model, Sino-Forest used subsidiaries incorporated in the PRC called Wholly Foreign Owned Enterprises ("WFOEs") to acquire, cultivate and sell the Standing Timber. The Sino-Forest WFOEs also entered into Purchase Contracts and Sales Contracts with other parties in the PRC.

47.    At December 31, 2010, Sino-Forest reported total timber holdings of $3.1 billion comprising 799,700 hectares. About $2.5 billion or approximately 80% of the total timber holdings (by value) was held in the BVI Model, comprising approximately 467,000 hectares of Standing Timber. The WFOE Model purportedly held approximately 97,000 hectares of Standing Timber valued at $295.6 million or approximately 10% of the total timber holdings (by value).  The timber holdings in the BVI Model and the WFOE Model comprised approximately 90% of the total timber holdings (by value) of Sino-Forest as at December 31, 2010.

48.    The cash-flows associated with the purchase and sale of Standing Timber executed in the BVI Model took place "off-book" pursuant to a payables/receivables offsetting arrangement (the "Offsetting Arrangement"), whereby the BVI Subs would not directly receive the proceeds on the sale of Standing Timber from the purchasing AI.  Rather, Sino-Forest disclosed that it would direct the AI that purchased the timber to pay the sales proceeds to a new Supplier in order to

10

buy additional Standing Timber. Consequently, Sino-Forest also did not make payment directly to Suppliers for purchases of Standing Timber.

49.    Sino-Forest did not possess the bank records to confirm that these "off-book" cash-flows in the Offsetting Arrangement actually took place. This lack of transparency within the BVI Model meant that independent confirmation of these "off-book" cash-flows was reliant on the good faith and independence of Suppliers and AIs.

50.    Further, pursuant to the terms of Sales Contracts entered into between a BVI Sub and an AI, the AI assumed responsibility for paying any PRC taxes associated with the sale that were owed by the BVI Sub. This obligation purportedly included paying the income tax and valued added tax on behalf of Sino-Forest.

51.    Sino-Forest dealt with relatively few Suppliers and AIs in the BVI Model. For example, in 2010, six Suppliers accounted for 100% of the Standing Timber purchased in the BVI Model and five AIs accounted for 100% of Sino-Forest's revenue generated in the BVI Model.

52.    From 2007 to 2010, revenue from the BVI Model totalled $3.35 billion, representing 94% of Sino-Forest's reported Standing Timber revenue and 70% of Sino-Forest's total revenue. The importance of the revenue from the BVI Model is demonstrated in the following table:

|  | | | *$ (millions)* | | |
| --- | --- | --- | --- | --- | --- |
|  | **2007** | **2008** | **2009** | **2010** | **Total** |
| BVI Model Revenue | 501.4 | 644.9 | 882.1 | 1,326.0 | 3,354.4 |
| WFOE Model Revenue | 20.1 | 40.5 | 72.1 | 75.2 | 207.9 |
| **Standing Timber Revenue** | **521.5** | **685.4** | **954.2** | **1,401.2** | **3,562.3** |
| **Total Revenue** | **713.9** | **896.0** | **1,238.2** | **1,923.5** | **4,771.6** |
| BVI Model as % of Total Revenue | 70% | 72% | 71% | 69% | 70% |

## PART IV.    THE STANDING TIMBER FRAUD

53.    As introduced in paragraph 16, the Standing Timber Fraud was primarily comprised of three elements:

   i)    Undisclosed control over parties within the BVI Network;

11

ii)    The undisclosed dishonest process of creating deceitful Purchase Contracts and Sales Contracts and their key attachments used in both the BVI Model and the WFOE Model to inflate Standing Timber assets and revenue; and

iii)   Undisclosed internal control weaknesses/deficiencies that facilitated and concealed the fraudulent conduct within the BVI Network, and the dishonest creation of Purchase Contracts and Sales Contracts, including their key attachments.

54.    On this basis, Sino-Forest then created transactions to fraudulently inflate assets and revenue in its public disclosure record.

## A.    Undisclosed Control over Parties within the BVI Network

55.    Almost all of the buying and selling of Standing Timber in the BVI Model was generated through transactions between BVI Subs and a small number of Suppliers and AIs.  Sino-Forest also conducted a significant level of this buying and selling with companies that are described in various Sino-Forest documents and correspondence as "peripheral" companies.  Sino-Forest established a network of "nominee" companies that were controlled, on its behalf, by various so-called "caretakers".

56.    For the purpose of this Statement of Allegations, the BVI Subs, Suppliers, AIs, "nominee" companies and "peripheral" companies involved in the buying and selling of Standing Timber in the BVI Model are collectively referred to as the "BVI Network".  Some of the companies within the BVI Network were also involved in the buying and selling of Standing Timber within the WFOE Model.

57.    One Sino-Forest document (the "Caretaker Company List") lists more than 120 "peripheral" (nominee) companies that are controlled by 10 "caretakers" on behalf of Sino-Forest.  The "caretakers" include Person #1 (legal representative of Huaihua City Yuda Wood Ltd. ("Yuda Wood"), described in greater detail in paragraphs 61 to 65 below), Person #2 (a relative of Chan), Person #3 (a former Sino-Forest employee), Person #4 (an acquaintance of Chan and Chan's nominee in the Greenheart Transaction as outlined in paragraphs 145 to 147

12

below), Person #5 (a former shareholder of Greenheart Resources Holdings Limited ("GRHL") and a shareholder of Greenheart) and Person #6 (an individual associated with some of Sino-Forest's Suppliers).

58.    The control and influence that Sino-Forest exerted over certain Suppliers, AIs and peripheral companies within the BVI Network brings the *bona fides* of numerous contracts entered into in the BVI Model into question, thereby placing the pecuniary interests of Investors at risk.    Sino-Forest wielded this control and influence through Overseas Management.  As well, certain transactions recorded in the BVI Model do not reflect the true economic substance of the underlying transactions.  Sino-Forest's control of, or influence over, certain parties within the BVI Network was not disclosed to Investors.

59.    Some of the counterparties to the Dacheng Fraud, the 450,000 Fraud, Gengma Fraud #1 and Gengma Fraud #2 are companies that are included in the Caretaker Company List, as outlined in more detail in paragraphs 90 to 115 below.

60.    Sino-Forest did not disclose the true nature of the relationship between itself and the following two key companies in the BVI Network: Yuda Wood and Dongkou Shuanglian Wood Company Limited ("Dongkou").    This was dishonest.

1)    <u>Sino-Forest Controlled Yuda Wood, a Major Supplier</u>

61.    Yuda Wood was a Supplier secretly controlled by Sino-Forest during a portion of the Material Time.

62.    From 2007 to 2010, Yuda Wood was purportedly Sino-Forest's largest Supplier, accounting for 18% of all purchases in the BVI Model.  Sino-Forest claimed to have paid Yuda Wood approximately $650 million during that time.

63.    Yuda Wood was registered and capitalized by members of Overseas Management, who also controlled bank accounts of Yuda Wood and key elements of its business.

13

64.    The legal representative of Yuda Wood is Person #1, a former employee of Sino-Forest and also a shareholder and director of Hong Kong Sonic Jita Engineering Co., Ltd. ("Sonic Jita"), the sole shareholder of Yuda Wood.  In addition, Person #1 had significant interests in other Suppliers of Sino-Forest and was identified as the "caretaker" of several nominee/peripheral companies.

65.    Yuda Wood and other companies controlled by Sino-Forest through Person #1 were used to perpetrate portions of the Standing Timber Fraud including the Dacheng Fraud, the 450,000 Fraud, Gengma Fraud #1 and Gengma Fraud #2.

2)    <u>Sino-Forest Controlled Dongkou, a Major AI</u>

66.    Dongkou was an AI secretly controlled by Sino-Forest during a portion of the Material Time.

67.    In 2008, Dongkou was Sino-Forest's most significant AI, purportedly purchasing approximately $125 million in Standing Timber from Sino-Forest, constituting about 18% of Sino-Forest's Standing Timber revenue for that year.

68.    Sino-Forest controlled Dongkou through one of its WFOE subsidiaries Shaoyang Jiading Wood Products Co. Ltd. ("Shaoyang Jiading").  Correspondence indicates that, according to an agreement dated November 18, 2006, Shaoyang Jiading purchased Dongkou for RMB[7] 1.38 million (approximately $200,000).

69.    By November 2006, the six original shareholders of Dongkou had been replaced with two Sino-Forest employees: Person #7 and Person #8.  These two persons became the sole Dongkou shareholders, with Person #7 holding 47.5% and Person #8 holding 52.5%.

---

[7] RMB is the Chinese unit of currency.  During the Material Time, the conversion rate was approximately 7 RMB = 1 US$.

14

70.    Also, in 2007, at the direction of Ip and others, employees of Sino-Forest drafted purchase contracts to be entered into by Dongkou and its suppliers (other than Sino-Forest). Essentially, Sino-Forest, through Overseas Management, controlled Dongkou's business with certain counterparties.

**B.    Dishonest Process to Create Deceitful Purchase Contracts and Sales Contracts in the BVI Model - Concealment of this Dishonest Process**

1)    Purchase Contracts in the BVI Model

71.    As set out in paragraph 47, approximately 80% (by value) of Sino-Forest's timber assets were held in the BVI Model as of December 31, 2010.

72.    Sino-Forest used the Purchase Contracts to acquire and evidence ownership of Standing Timber in the BVI Model. The Purchase Contracts purported to have three attachments:
   i)      Plantation Rights Certificates ("Certificates") or other ownership documents;
   ii)     Farmers' Authorization Letters ("Farmers' Authorizations"); and
   iii)    Timber Survey Reports ("Survey Reports").

73.    The Purchase Contracts and their attachments were fundamentally flawed in at least four ways, making the public disclosure record of Sino-Forest materially misleading, thus placing the pecuniary interests of Investors at risk.

74.    First, Sino-Forest did not hold Certificates to evidence ownership of the Standing Timber allegedly purchased by the BVI Subs. Instead, Sino-Forest claimed that, since the BVI Subs could not obtain Certificates from the PRC government to evidence ownership, it purported to rely on confirmations issued by the forestry bureaus in the PRC as evidence of ownership ("Confirmations").  However, Confirmations are not legally recognized documents evidencing ownership of timber assets in the PRC.  These Confirmations were purportedly granted to Sino-Forest as favours by the PRC forestry bureaus.  According to Sino-Forest, the PRC forestry bureaus did not intend that these Confirmations would be disclosed to third parties.  Also, certain

15

PRC forestry bureau employees obtained gifts and cash payments from Suppliers of Sino-Forest, further undermining the value of the Confirmations as evidence of ownership.

75.    Second, during the Material Time, Sino-Forest employed a deceitful systematic quarterly documentation process in the BVI Model whereby the purported Purchase Contacts were not drafted and executed until the quarter _after_ the date on which the purchase allegedly occurred and was included in the public financial disclosure.

76.    Like the Purchase Contracts, the Confirmations were also created by Sino-Forest and deceitfully dated to the _previous_ quarter.  These Confirmations were created contemporaneously with the creation of the corresponding Purchase Contracts.  These Confirmations were then allegedly provided to the relevant PRC forestry bureau for verification and execution.

77.    Third, the Purchase Contracts referred to Farmers' Authorizations.  However, none were attached.  In the absence of Farmers' Authorizations, there is no evidence that ownership to the Standing Timber was properly transferred to Sino-Forest or to the Supplier prior to the purported transfer of ownership to Sino-Forest.  Ownership of the Standing Timber would have remained with the original Certificate holder.

78.    Fourth, the Survey Reports, which purported to identify the general location of the purchased timber, were all prepared by a single firm during the Material Time.  A 10% shareholder of this survey firm was also an employee of Sino-Forest.  Drafts of certain Survey Reports purportedly prepared by this independent survey company were located on the computer of another employee of Sino-Forest.  Like the Purchase Contracts and Confirmations, these drafts of the Survey Reports were deceitfully dated to the quarter _prior_ to their creation.

79.    In the absence of both Certificates and Farmers' Authorizations, Sino-Forest relies on the validity of the Purchase Contracts and the Confirmations as proof of ownership of the Standing Timber it held in the BVI Model.  However, the Purchase Contracts and available attachments, including Confirmations, were prepared using the deceitful documentation process outlined

above, and do not constitute proof of ownership of the trees purported to have been bought by Sino-Forest in the BVI Model.

80.     Moreover, the Purchase Contracts and readily available attachments, including the Confirmations, did not identify the precise location of the Standing Timber being purchased such that the existence of this Standing Timber could not be readily verified and valued independently.

81.     Sino-Forest, Overseas Management and Horsley knew or ought to have known that their auditors during the Material Time relied on the validity of the Purchase Contracts and their attached Confirmations as proof of ownership of Sino-Forest's Standing Timber assets.

2)     Sales Contracts in the BVI Model

82.     Like the Purchase Contracts, all of the Sales Contracts purportedly entered into by the BVI Subs in the BVI Model were not actually created and executed until the quarter *after* the date of the alleged transaction.

83.     Accordingly, the revenue from the Sales Contracts in the BVI Model was recognized in the quarter prior to the creation of the Sales Contracts. Therefore, the public disclosure of Sino-Forest regarding its revenue from Standing Timber was materially misleading and deceitful. During the Material Time, in its correspondence to Staff, Sino-Forest misled the Commission about its revenue recognition practice.

C.     **Undisclosed Internal Control Weaknesses/Failures**

84.     In its MD&A for 2010 dated March 15, 2011, Sino-Forest stated the following on page 27 regarding its "Disclosure Control and Procedures and Internal Controls Over Financial Reporting":

> The success of the Company's vision and strategy of acquiring and selling forestry plantations and access to a long-term supply of wood fibre in the PRC is dependent on senior management.  **As such, senior management**

17

> **plays a significant role in maintaining customer relationships, negotiating and finalizing the purchase and sale of plantation fibre contracts and the settlement of accounts receivable and accounts payable associated with plantation fibre contracts.** This concentration of authority, or lack of segregation of duties, creates risk in terms of measurement and completeness of transactions as well as the possibility of non-compliance with existing controls, either of which may lead to the possibility of inaccurate financial reporting. By taking additional steps in 2011 to address this deficiency, management will continue to monitor and work on mitigating this weakness. **[Emphasis added]**

85.    Sino-Forest made similar disclosure in its annual MD&A from 2006 to 2009 regarding this concentration of authority or lack of segregation and the risk resulting from these weaknesses.   These material weaknesses were not remedied during the Material Time by Sino-Forest, Overseas Management or Horsley.

86.    Sino-Forest failed to disclose the extent of the concentration of duties in Overseas Management.   It did not disclose that Overseas Management and their nominees had complete control over the operation of the BVI Model including the fraudulent creation and execution of the Purchase Contracts and Sales Contracts described in paragraphs 71 to 81 and the extent of the "off-book" cash flow set out in paragraphs 48 to 49.  This concentration of control in the hands of Overseas Management facilitated the fraudulent course of conduct perpetrated in the BVI Model.

**D.    Four Examples of Fraudulent Transactions within the Standing Timber Fraud**

87.    During the Material Time, Sino-Forest and Overseas Management engaged in significant fraudulent transactions related to its purchase and sale of Standing Timber.   These fraudulent transactions had the effect of overstating Sino-Forest's assets and revenue during the Material Time.

88.    By way of example, four series of fraudulent transactions are detailed below:   (i) the Dacheng Fraud; (ii) the 450,000 Fraud; (iii) Gengma Fraud #1, and (iv) Gengma Fraud #2.

18

89.    In these transactions, Sino-Forest used certain Suppliers, AIs and other nominee companies that it controlled to falsify the financial disclosure of Sino-Forest, including the value of its Standing Timber assets and revenue.

1)    The Dacheng Fraud

90.    Sino-Forest and members of Overseas Management committed fraud (the "Dacheng Fraud") in a series of purported transactions commencing in 2008, related to purchases of timber plantations (the "Dacheng Plantations") from a Supplier called Guangxi Dacheng Timber Co. Ltd. ("Dacheng").    Companies controlled by Sino-Forest through Person #1 were used in the Dacheng Fraud.

91.    The Dacheng Fraud involved duplicating the same Standing Timber assets within the Dacheng Plantations in the records of two Sino-Forest subsidiaries.    Sino-Forest recorded the same assets once in the WFOE Model and again in the BVI Model.

92.    In 2008, these Standing Timber assets were recorded at a value of RMB 47 million (approximately $6.3 million) in the WFOE Model and this amount was paid to Dacheng. These funds were then funnelled through Dacheng back to other subsidiaries of Sino-Forest, as the purported collection of receivables.

93.    At the same time, Sino-Forest recorded these Standing Timber assets in the BVI Model at a value of approximately RMB 205 million (approximately $30 million).    In 2009, Sino-Forest purported to sell the Standing Timber assets from the Dacheng Plantations held in the BVI Model for approximately RMB 326 million (approximately $48 million).    This revenue was recorded in Q3 of 2009.

94.    As a result of the Dacheng Fraud, in 2008, Sino-Forest overstated the value of certain Standing Timber assets by approximately $30 million and, in 2009, Sino-Forest overstated its revenue by approximately $48 million.    The effect of this revenue overstatement on the public disclosure record of Sino-Forest is illustrated in paragraph 127 below.

19

2)    The 450,000 Fraud

95.    Sino-Forest and members of Overseas Management committed fraud (the "450,000 Fraud") in a complex series of transactions involving the purchase and sale of 450,000 cubic meters of timber in Q4 of 2009, again utilizing companies controlled by Sino-Forest through Person #1. In an email, Yeung described this purchase and sale of timber as "a pure accounting arrangement".

96.    Three subsidiaries of Sino-Panel (the "Sino-Panel Companies") purported to purchase 450,000 cubic meters of Standing Timber at a cost of RMB 183 million (approximately $26 million) from Guangxi Hezhou City Yuangao Forestry Development Co. Ltd ("Yuangao") during October 2009.

97.    In Q4 of 2009, the Sino-Panel Companies purportedly sold this Standing Timber to the following three customers:
   i)     Gaoyao City Xinqi Forestry Development Co., Ltd. ("Xinqi");
   ii)    Guangxi Rongshui Meishan Wood Products Factory ("Meishan"); and
   iii)   Guangxi Pingle Haosen Forestry Development Co., Ltd. ("Haosen").

98.    The sale price for this Standing Timber was RMB 233 million (approximately $33 million), for an apparent profit of RMB 50 million (approximately $7.1 million).

99.    The purported supplier (Yuangao) and the purported customers (Xinqi, Meishan and Haosen) are all so-called "peripheral" companies of Sino-Forest, i.e., they are nominee companies controlled by Person #1 on behalf of Sino-Forest. Xinqi, Meishan and Haosen are also companies included in the Caretaker Company List, and Person #1 is identified as the "caretaker" of each company.

100.    This RMB 233 million sale of Standing Timber was recorded in Sino-Forest's WFOE Model, as opposed to its BVI Model. As noted in paragraph 48, the BVI Model employs the

20

Offsetting Arrangement where payables and receivables are made and collected "off-book". However, in the WFOE Model, Sino-Forest takes receipt of the sales proceeds directly or "on-book".

101.    By July 2010, none of the sales proceeds had been collected and the receivable was long overdue. In order to evidence the "collection" of the RMB 233 million in sales proceeds, Sino-Forest devised two separate "on-book" payables/receivables offsetting arrangements, one in 2010 and one in 2011, whereby Sino-Forest made payments to various companies, including Yuangao and at least two other Sino-Forest nominee companies.[8]

102.    To account for the purported profit of RMB 50 million, Sino-Forest had to "collect" more (RMB 233 million) than just the purchase price (RMB 183 million). Consequently, Sino-Forest created additional "payables" to complete the circular flow of funds needed to collect the sales proceeds of RMB 233 million. These "on-book" offsetting arrangements, therefore, included the purported settlement of various accounts payable, not just the Yuangao payable arising from the 450,000 Fraud.

103.    The companies referred to in paragraph 101 then funnelled the money to Xinqi, Meishan and Haosen who, in turn, repaid the money to the Sino-Panel Companies to achieve the purported collection of the RMB 233 million in revenue.

104.    The "on-book" offsetting arrangements required that Suppliers and customers have bank accounts through which the funds could flow. In July and August 2010, Sino-Forest set up bank accounts for the suppliers and customers associated with the 450,000 Fraud to facilitate the circular cash flows. These bank accounts were overseen by Ip, Ho, Person #1 and/or Person #9 (a former Sino-Forest employee and associate of Person #1).

105.    These circular cash-flows commenced in July 2010 and were finally concluded in February 2011.

---

[8] Dao County Juncheng Forestry Development Co., Ltd. and Guangxi Rongshui Taiyuan Wood Co., Ltd.

21

106.    The circular flow of funds underlying the 450,000 Fraud demonstrates that the sales contracts purportedly entered into between the Sino-Panel Companies and Xinqi, Meishan and Haosen are fraudulent and have no true economic substance.  As a result of the 450,000 Fraud, Sino-Forest overstated the value of its revenue by approximately $30 million for Q4 of 2009. The effect of this revenue overstatement on the public disclosure record of Sino-Forest is illustrated in paragraph 129 below.

3)    Gengma Fraud # 1

107.    Sino-Forest and members of Overseas Management committed fraud ("Gengma Fraud #1") in 2007 related to Standing Timber assets purchased from Gengma Dai and Wa Tribe Autonomous Region Forestry Co., Ltd. ("Gengma Forestry") by Sino-Panel (Gengma) Co., Ltd. ("Sino-Panel Gengma"), a Sino-Forest subsidiary.

108.    In 2007, Sino-Panel Gengma purchased certain land use rights and Standing Timber for RMB 102 million (approximately $14 million) from Gengma Forestry.  These contracts were signed by Chan.  However, this transaction between Sino-Panel Gengma and Gengma Forestry was not recorded.  Instead, Sino-Forest purported to purchase the same assets from Yuda Wood, allegedly paying RMB 509 million (approximately $68 million) for the Standing Timber in 2007 and RMB 111 million (approximately $15 million) for certain land use rights during the period from June 2007 to March 2009.  This purchase was recorded and these Standing Timber assets remained on the books of Sino-Forest until 2010.

109.    Gengma Fraud #1 resulted in an overstatement of Sino-Forest's timber holdings for 2007, 2008 and 2009.

110.    In 2010, this Standing Timber was then purportedly sold for RMB 1,579 million (approximately $231 million).  However, these same Standing Timber assets were offered as collateral for a bank loan by Sino-Forest in 2011 so the sale of these assets in 2010 could not have taken place and been recorded as revenue in that year.

22

111.    The effect of the revenue overstatement from Gengma Fraud #1 on the public disclosure record of Sino-Forest is illustrated in paragraph 131 below.

4)    <u>Gengma Fraud # 2</u>

112.    In 2007, Sino-Forest and members of Overseas Management committed fraud ("Gengma Fraud #2") in another series of transactions to artificially inflate its assets and revenue from the purchase and sale of Standing Timber.

113.    In September 2007, Sino-Forest recorded the acquisition of Standing Timber from Yuda Wood at a cost of RMB 161 million (approximately $21.5 million) related to Standing Timber in Yunnan Province (the "Yunnan Plantation").   However, Yuda Wood did not actually acquire these assets in the Yunnan Plantation until September 2008.

114.    In 2007, Sino-Forest had also purportedly purchased the land use rights to the Yunnan Plantation from Yuda Wood at a cost of RMB 53.4 million (approximately $7 million), RMB 52.9 million of which was paid to Yuda Wood during the period from January 2009 to April 2009. Sino-Forest then fabricated the sale of the land use rights to Guangxi Hezhou City Kun'an Forestry Co., Ltd. ("Kun'an") pursuant to a contract dated November 23, 2009.    Kun'an was controlled by Sino-Forest through Person #1 and is a company included in the Caretaker Company List referred to in paragraph 57 above.

115.    Sino-Forest then purported to sell the Standing Timber in the Yunnan Plantation in a series of transactions between March 2008 and November 2009 for RMB 338 million (approximately $49 million).   As Yuda Wood did not own this Standing Timber asset until September 2008, Sino-Forest could not have recorded the sale of this Standing Timber prior to that time. The effect of this revenue overstatement on the public disclosure record of Sino-Forest is illustrated in paragraph 133 below.

23

## D.    Conclusion Regarding the Standing Timber Fraud

116.    The effect of the above conduct is that Sino-Forest and Overseas Management engaged in deceitful or dishonest conduct related to Sino-Forest's Standing Timber assets and revenue that they knew or ought to have known constituted fraud, contrary to subsection 126.1(b) of the Act and the public interest.

117.    Due to the chronic and pervasive nature of the systemic conduct set out above, neither the magnitude of the Standing Timber Fraud by Sino-Forest and Overseas Management nor the magnitude of the risk to the pecuniary interests of Investors can be quantified with certainty.

118.    Given their positions as officers of Sino-Forest and/or Sino-Panel, Overseas Management authorized, permitted or acquiesced in the non-compliance with Ontario securities law by Sino-Forest and are deemed to have not complied with Ontario securities law pursuant to section 129.2 of the Act.   This conduct was also contrary to the public interest.

119.    As CFO of Sino-Forest, Horsley authorized, permitted or acquiesced in Sino-Forest's and Overseas Management's commission of the Standing Timber Fraud and therefore is deemed under section 129.2 of the Act to have not complied with Ontario securities law.    This conduct was also contrary to the public interest.

## PART V.    MATERIALLY MISLEADING STATEMENTS RELATED TO THE STANDING TIMBER FRAUD

120.    On January 10, 2012, Sino-Forest issued a news release which cautioned that its historic financial statements and related audit reports should not be relied upon.

121.    By failing to properly disclose the elements of the Standing Timber Fraud set out above, Sino-Forest made statements in its filings to the Commission during the Material Time which were, in a material respect and at the time and in the light of the circumstances under which they were made, misleading or untrue or did not state facts that were required to be stated or that were

24

necessary to make the statements not misleading. Overseas Management participated in the conduct that made these statements materially misleading.

122.    The misleading, untrue or incomplete statements related to Sino-Forest's description of its primary business were contained in (or absent from) Sino-Forest's continuous disclosure, including its audited annual financial statements, AIFs and MD&A filed with the Commission during the Material Time as required by Ontario securities law.[9] These misleading, untrue or incomplete statements related to Sino-Forest's description of its primary business were contained in (or absent from) Sino-Forest's short form prospectuses filed with the Commission during the Material Time, which incorporated by reference the relevant audited annual financial statements, AIFs and MD&A as required by Ontario securities law.

123.    These misleading statements were related to Sino-Forest's primary business in the BVI Model and the WFOE Model, representing approximately 90% of Sino-Forest's stated timber assets as of December 31, 2010 and 75% of its stated revenue from 2007 to 2010.

A.    **Materially Misleading Statements Regarding Ownership of Assets and Revenue Recognition**

124.    Members of Overseas Management created and executed the Purchase Contracts in the BVI Model in the quarters after the assets related to those transactions were recognized. This made Sino-Forest's audited annual financial statements, AIFs and MD&A for the years 2006, 2007, 2008, 2009 and 2010 materially misleading.

125.    Further, given that Sino-Forest did not have sufficient proof of ownership of the majority of its Standing Timber assets due to the courses of conduct set out above, the information regarding Sino-Forest's timber holdings in its audited annual financial statements, AIFs and MD&A for the years 2006, 2007, 2008, 2009 and 2010 was materially misleading. For the same reasons, the information regarding Sino-Forest's timber holdings in its short form prospectuses

---

[9] By way of example, these misstatements include Sino-Forest's disclosure of "Plantation Rights Certificates for Our Purchased Plantations" on page 26 of its 2010 AIF and its disclosure of "Implementation and Issuance of new form Plantation Rights Certificate" on pages 46-47 of its 2010 AIF.

25

filed in 2007 and 2009 (which incorporated by reference the relevant audited annual financial statements, AIFs and MD&A as required by Ontario securities law) was materially misleading.

126.   Sino-Forest and members of Overseas Management created and executed the Sales Contracts in the BVI Model in the quarter after the revenue related to those transactions was recognized.   This was contrary to the revenue recognition process set out in Sino-Forest's continuous disclosure, including its MD&A and the notes to its audited annual financial statements.

**B:     Effect of the Dacheng Fraud, the 450,000 Fraud, Gengma #1 and Gengma #2 on the Reported Revenue of Sino-Forest**

1)     The Dacheng Fraud

127.   The Dacheng Fraud resulted in Sino-Forest fraudulently overstating its revenue in Q3 of 2009 as set out in this table:

| Approximate Effect of the Dacheng Fraud on Q3 of 2009 ($ millions) | |
|---|---|
| Quarterly Reported Revenue | 367.0 |
| Fraudulently Overstated Revenue | 47.7 |
| Fraudulently Overstated Revenue as a % of Quarterly Reported Revenue | 13.0% |

128.   Sino-Forest reported its revenue for Q3 of 2009 at page 20 of its annual MD&A for 2009 (dated March 16, 2010) and page 87 of its 2009 Annual Report, summarizing the "2009 Quarterly Highlights".

2)     The 450,000 Fraud

129.   The 450,000 Fraud resulted in Sino-Forest fraudulently overstating its revenue for Q4 of 2009 as set out in this table:

26

**Approximate Effect of the 450,000 Fraud on Q4 2009 ($ millions)**

| | |
|---|---|
| Quarterly Reported Revenue | 469.6 |
| Fraudulently Overstated Revenue | 30.1 |
| Fraudulently Overstated Revenue as a % of Quarterly Reported Revenue | 6.4% |

130.    Sino-Forest reported its revenue for Q4 of 2009 at page 20 of its annual MD&A for 2009 (dated March 16, 2010) and page 87 of its 2009 Annual Report, summarizing the "2009 Quarterly Highlights".

3)    Gengma Fraud #1

131.    Gengma Fraud #1 resulted in Sino-Forest fraudulently overstating its revenue for Q1 and Q2 of 2010 as set out in this table:

**Approximate Effect of Gengma Fraud #1 on Q1 and Q2 2010 ($ millions)**

| | Q1 2010 | Q2 2010 |
|---|---|---|
| Quarterly Reported Revenue | 251.0 | 305.8 |
| Fraudulently Overstated Revenue | 73.5 | 157.8 |
| Fraudulently Overstated Revenue as a % of Quarterly Reported Revenue | 29.3% | 51.6% |

132.    Sino-Forest reported its revenue for Q1 and Q2 of 2010 at page 20 of its annual MD&A for 2010 (dated March 15, 2011) and page 88 of its 2010 Annual Report, summarizing the "2010 Quarterly Highlights".

4)    Gengma Fraud #2

133.    Gengma Fraud #2 resulted in Sino-Forest fraudulently overstating its revenue for Q1, Q2 and Q3 of 2008 and Q4 of 2009 as set out in this table:

27

**Approximate Effect of Gengma Fraud #2 on Q1, Q2 and Q3 of 2008 and Q4 of 2009 ($ millions)**

|  | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2009 |
|---|---|---|---|---|
| Quarterly Reported Revenue | 136.1 | 187.1 | 295.5 | 469.6 |
| Fraudulently Overstated Revenue | 5.7 | 4.9 | 5.9 | 32.6 |
| Fraudulently Overstated Revenue as a % of Quarterly Reported Revenue | 4.2% | 2.6% | 2.0% | 6.9% |

134.    Sino-Forest reported its revenue for Q1, Q2 and Q3 of 2008 at page 19 of its annual MD&A for 2008 (dated March 16, 2009) and page 73 of its 2008 Annual Report summarizing the "2008 Quarterly Highlights".    Revenue for Q4 of 2009 was reported as set out above in paragraph 130.

**C.    Materially Misleading Statements Regarding Internal Controls**

135.    Sino-Forest's disclosure in its AIFs and annual MD&A for 2006, 2007, 2008, 2009 and 2010 relating to the material weaknesses in its internal controls was misleading, untrue or incomplete.    This disclosure was also contained in Sino-Forest's short form prospectuses filed in 2007 and 2009 (which incorporated by reference the relevant AIFs and MD&A as required by Ontario securities law).

136.    Sino-Forest did disclose that the concentration of authority in Overseas Management and lack of segregation of duties created a risk in terms of measurement and completeness of transactions, as well as the possibility of non-compliance with existing controls.

137.    However, as set out in paragraphs 84 to 86, this disclosure by Sino-Forest was wholly inadequate, failing to reveal the extent of the weaknesses in Sino-Forest's internal controls.

28

**D.    Conclusion Regarding Materially Misleading Statements Related to the Standing Timber Fraud**

138.    During the Material Time, given the Standing Timber Fraud, Sino-Forest consistently misled the public in the disclosure required to be made under Ontario securities law.    The conduct of Sino-Forest, Chan, Ip, Hung and Ho was contrary to subsection 122(1)(b) of the Act and contrary to the public interest.

139.    Further, due to the above conduct, Sino-Forest's audited annual financial statements did not comply with Canadian Generally Accepted Accounting Principles.

140.    Given their positions as officers of Sino-Forest, Chan, Ip, Ho and Hung authorized, permitted or acquiesced in Sino-Forest's making of materially misleading statements and thereby committed an offence under subsection 122(3) of the Act    This conduct was also contrary to the public interest.

141.    As CFO of Sino-Forest, Horsley authorized, permitted or acquiesced in Sino-Forest's and Overseas Management's making of materially misleading statements and therefore is deemed under section 129.2 of the Act to have not complied with Ontario securities law. This conduct was also contrary to the public interest.

**PART VI.    THE GREENHEART TRANSACTION - FRAUD BY CHAN AND MATERIALLY MISLEADING STATEMENTS BY CHAN AND SINO-FOREST**

142.    Chan committed fraud in relation to Chan's undisclosed interest and substantial financial benefit in the Greenheart Transaction described below.

143.    Chan and Sino Forest made materially misleading statements in Sino-Forest's AIFs for 2008, 2009 and 2010 by not disclosing Chan's interest in the Greenheart Transaction.    These misleading statements were also contained in Sino-Forest's short form prospectuses filed in 2009 (which incorporated by reference the relevant AIFs and MD&A as required by Ontario securities law).

29

144.    In 2010, through a complex series of transactions, Sino-Forest completed the purchase of a controlling interest in Greenheart, a public company listed on the Hong Kong Stock Exchange. In 2005, the primary assets of Greenheart's key subsidiary at the time, GRHL, were previously acquired by the original owners of GRHL for approximately $2 million.    These assets consisted of natural forest concessions and operations located in Suriname. The total cost of the Greenheart Transaction to Sino-Forest was approximately $120 million, composed of a combination of cash and securities of Sino-Forest.

145.    Two of the companies holding shares of GRHL, thus benefitting from the Greenheart Transaction, were Fortune Universe Ltd. ("Fortune Universe") and Montsford Ltd. ("Montsford").  Both Fortune Universe and Montsford were BVI shelf companies incorporated in 2004 and subsequently acquired by, or for the benefit of, Chan in 2005.

146.    Person #10 was the sole director and shareholder of Fortune Universe and Person #4 was the sole director and shareholder of Montsford.  However,  Chan arranged for Person #10 and Person #4 to act as Chan's nominees.   Chan was the true beneficial owner of Fortune Universe and Montsford.

147.    Person #10 was the legal representative and director of one of Sino-Forest's largest Suppliers during the Material Time.  Person #4 was an acquaintance of Chan based in the PRC.

148.    As a result of the Greenheart Transaction, Fortune Universe and Montsford received over $22.1 million, comprised of approximately $3.7 million in cash and approximately $18.4 million in securities of Sino-Forest.  The securities of Sino-Forest received by Fortune Universe and Montsford appreciated in value and were subsequently sold for a total of approximately $35 million.  With the help of Person #11 (Chan's assistant), these securities were sold through brokerage accounts of Fortune Universe and Montsford which were opened at her direction, on the instructions of Chan.

149.    While Sino-Forest disclosed that another director of Sino-Forest had an interest in the Greenheart Transaction in its AIFs for 2008, 2009 and 2010, it did not disclose that Chan benefitted directly or indirectly from the Greenheart Transaction through Fortune Universe and Montsford.    Chan certified the AIFs for 2008, 2009 and 2010.

150.    Chan knew that he was engaging in deceitful or dishonest conduct in relation to the Greenheart Transaction and knew that he was making deceitful or dishonest statements to Investors in Sino-Forest's continuous disclosure.

151.    Chan placed the pecuniary interests of Investors at risk and committed fraud, contrary to subsection 126.1(b) of the Act and made materially misleading statements contrary to subsection 122(1)(b) of the Act.    This conduct was also contrary to the public interest.

152.    Through Chan, Sino-Forest made materially misleading statements contrary to subsection 122(1)(b) of the Act.    This conduct was also contrary to the public interest.

153.    Given his position as Chairman of the Board and CEO of Sino-Forest, Chan, authorized, permitted or acquiesced in Sino-Forest's making of materially misleading statements and thereby committed an offence under subsection 122(3) of the Act.    This conduct was also contrary to the public interest.

154.    As Chairman of the Board and CEO of Sino-Forest, Chan authorized, permitted or acquiesced in Sino-Forest's commission of fraud and therefore is deemed under section 129.2 of the Act to have not complied with Ontario securities law.    This conduct was also contrary to the public interest.

## PART VII.    CHAN, IP, HUNG, HO AND YEUNG MATERIALLY MISLED STAFF

### A.    Chan Materially Misled Staff

155.    During his examination by Staff, Chan made statements that, in a material respect and at the time and in the light of the circumstances under which they were made, were misleading or

31

untrue or did not state a fact that was required to be stated or that was necessary to make the statements not misleading, contrary to subsection 122(1)(a) of the Act and the public interest.

156.    Chan was asked whether Sino-Forest had any control over certain Suppliers or whether these Suppliers were independent.  Chan misled Staff, responding that they were independent companies.  Chan repeatedly confirmed that Yuda Wood was an independent company and that it was not controlled by any employee of Sino-Forest.  This information was false and misleading.

**B.    Ip Materially Misled Staff**

157.    During his examination by Staff, Ip made statements that, in a material respect and at the time and in the light of the circumstances under which they were made, were misleading or untrue or did not state a fact that was required to be stated or that was necessary to make the statements not misleading, contrary to subsection 122(1)(a) of the Act and the public interest.

158.    Ip misled Staff regarding the creation of Confirmations by Sino-Forest.  Ip falsely informed Staff as to nature of the interaction between the PRC forestry bureaus and Sino-Forest personnel surrounding the issuance of the Confirmations.  Ip also misled Staff about the timing of purported payments made by Sino-Forest to Suppliers.   Ip stated that payments were only made once the Purchase Contracts were signed.  This information was false and misleading.

**C.    Hung Materially Misled Staff**

159.    During his examination by Staff, Hung made statements that, in a material respect and at the time and in the light of the circumstances under which they were made, were misleading or untrue or did not state a fact that was required to be stated or that was necessary to make the statements not misleading, contrary to subsection 122(1)(a) of the Act and the public interest.

160.    Hung falsely described the creation of the Purchase Contracts, Sales Contracts and their attachments, including Confirmations, to Staff.   Hung informed Staff that he confirmed the

32

accuracy of all the information in the Purchase Contracts. Hung also stated that he ensured that the attachments to the Purchase Contracts, including Confirmations and Survey Reports, would be "in place". This information was false and misleading.

161. Hung also misled Staff as to the timing of alleged payments made pursuant to the Purchase Contracts.

**D.    Ho Materially Misled Staff**

162. During his examination by Staff, Ho made statements that, in a material respect and at the time and in the light of the circumstances under which they were made, were misleading or untrue or did not state a fact that was required to be stated or that was necessary to make the statements not misleading, contrary to subsection 122(1)(a) of the Act and the public interest.

163. Ho was specifically asked about what role he took "in the whole BVI process." Ho replied, "None whatsoever", further stating, "No, I'm not at all involved in the BVI whatsoever." This information was false and misleading.

164. Ho also denied that he was copied on any emails or communications involving the BVI Model. This information was false and misleading.

165. Ho also asserted that Yuda Wood was independent of Sino-Forest and that he had no control over any aspect of its business. This information was false and misleading.

**E.    Yeung Materially Misled Staff**

166. During his examination by Staff, Yeung made statements that, in a material respect and at the time and in the light of the circumstances under which they were made, were misleading or untrue or did not state a fact that was required to be stated or that was necessary to make the statements not misleading, contrary to subsection 122(1)(a) of the Act and the public interest.

33

167.   Yeung was specifically asked about his involvement in the creation of Yuda Wood. Yeung stated that he assisted with the application process as a favour to his friend, Person #1. He denied that Sino-Forest supplied the registration capital for Yuda Wood.   Yeung also denied any knowledge of Sino-Forest creating fraudulent transactions involving the purchase and sale of Standing Timber.   This information was false and misleading.

168.   Staff reserve the right to make such other allegations as Staff may advise and the Commission may permit.

**DATED** at Toronto, Ontario, this 22nd day of May 2012.

## SCHEDULE "A"

### GLOSSARY OF CERTAIN DEFINED TERMS
### AND LOCATION IN THE STATEMENT OF ALLEGATIONS

**"AIs"** means the authorized intermediaries to whom Sino-Forest purported to sell assets in the PRC, including Standing Timber (paragraph 45).

**"BVI Model"** means the business model employed by Sino-Forest to buy and sell assets through the BVI Subs in the PRC (paragraph 45).

**"BVI Network"** means the entire network of BVI Subs, Suppliers, AIs and other companies who bought and sold assets in the BVI Model in the PRC (paragraph 56).

**"BVI Subs"** means wholly owned subsidiaries of Sino-Forest incorporated in the British Virgin Islands (paragraph 45).

**"Caretaker Company List"** means the document listing the "peripheral" or "nominee" companies controlled by "caretakers" on behalf of Sino-Forest (paragraph 57).

**"Certificates"** means Plantation Rights Certificates issued by the PRC government (paragraph 72).

**"Company"** means Sino-Forest Corporation including all of its subsidiaries and companies it controls as set out in its public disclosure record and as the context within this Statement of Allegations requires (paragraph 1).

**"Confirmations"** means the confirmations purportedly executed by forestry bureaus that Sino-Forest relied upon to evidence ownership of Standing Timber assets in the BVI Model in the absence of Certificates (paragraph 74).

**"Dacheng"** means Guangxi Dacheng Timber Co. Ltd. (paragraph 90).

**"Dacheng Plantations"** means the timber plantations purchased from Dacheng commencing in 2008 (paragraph 90).

**"Dongkou"** means Dongkou Shuanglian Wood Company Limited (paragraph 60).

**"Farmers' Authorizations"** means farmers' authorization letters (paragraph 72).

**"Fortune Universe"** means Fortune Universe Ltd. (paragraph 145).

**"Gengma Forestry"** means Gengma Dai and Wa Tribe Autonomous Region Forestry Co., Ltd. (paragraph 107).

**"Greenheart"** means the company now known as Greenheart Group Limited (paragraph 12).

**"Greenheart Transaction"** means the series of transactions where Sino-Forest purchased a controlling interest in Greenheart (paragraph 27).

**"GRHL"** means Greenheart Resources Holdings Limited (paragraph 57).

**"Haosen"** means Guangxi Pingle Haosen Forestry Development Co., Ltd. (paragraph 97).

**"Investors"** means the securityholders of Sino-Forest (paragraph 3).

**"Kun'an"** means Guangxi Hezhou City Kun'an Forestry Co., Ltd. (paragraph 114).

**"Material Time"** means the period from June 30, 2006 to January 11, 2012 (paragraph 15).

**"Meishan"** means Guangxi Rongshui Meishan Wood Products Factory (paragraph 97).

**"Montsford"** means Montsford Ltd. (paragraph 145).

**"Offsetting Arrangement"** means the payables/receivables arrangement used in the BVI Model by Sino-Forest to buy and sell Standing Timber (paragraph 48).

**"Overseas Management"** means Allen Chan, Albert Ip, Alfred C.T. Hung, George Ho and Simon Yeung (paragraph 13).

**"Plantation Fibre"** is one of the two subcomponents of Sino-Forest's core business segment called Wood Fibre Operation  (paragraph 41).

**"PRC"** means the People's Republic of China (paragraph 2).

**"Purchase Contracts"** means the contracts used by Sino-Forest to purchase assets in the BVI Model (paragraph 45).

**"Sales Contracts"** means the contracts used by Sino-Forest to sell assets in the BVI Model (paragraph 45).

**"Shaoyang Jiading"** means Shaoyang Jiading Wood Products Co. Ltd. (paragraph 68).

**"Sino-Forest"** means Sino-Forest Corporation including all of its subsidiaries and companies it controls as set out in its public disclosure record and as the context within this Statement of Allegations requires (paragraph 1).

**"Sino-Panel"** means Sino-Panel (Asia) Inc., a subsidiary of Sino-Forest (paragraph 39).

**"Sino-Panel Companies"** means the three subsidiaries of Sino-Panel which purported to purchase Standing Timber from Yuangao (paragraph 96).

**"Sino-Panel Gengma"** means Sino-Panel (Gengma) Co., Ltd., a Sino-Forest subsidiary (paragraph 107).

2

**"Sonic Jita"** means Hong Kong Sonic Jita Engineering Co., Ltd. (paragraph 64).

**"Standing Timber"** means all of the Plantation Fibre subcomponent of Wood Fibre Operations and as the context within this Statement of Allegations requires (paragraph 42).

**"Suppliers"** means the parties from whom Sino-Forest purported to buy assets in the PRC, including Standing Timber (paragraph 45).

**"Survey Reports"** means timber survey reports (paragraph 72).

**"WFOE Model"** means the business model employed by Sino-Forest to buy and sell assets through its WFOEs (paragraph 46).

**"WFOEs"** means Wholly Foreign Owned Enterprises which were subsidiaries of Sino-Forest (paragraph 46).

**"Xinqi"** means Gaoyao City Xinqi Forestry Development Co., Ltd. (paragraph 97).

**"Yuangao"** means Guangxi Hexhou City Yuangao Forestry Development Co., Ltd. (paragraph 96).

**"Yuda Wood"** means Huaihua City Yuda Wood Ltd. (paragraph 57).

**"Yunnan Plantation"** means the Standing Timber plantations in Yunnan Province purportedly purchased in 2007 from Yuda Wood (paragraph 113).

# SCHEDULE "B"

## SELECTED INFORMATION FROM THE 2005-2010
## AUDITED ANNUAL FINANCIAL STATEMENTS OF SINO-FOREST

### Reported Revenue

| | |
|---|---|
| December 31, 2010 | $1,923,536,000 |
| December 31, 2009 | 1,238,185,000 |
| December 31, 2008 (restated amount ) | 896,045,000 |
| December 31, 2007 | 713,866,000 |
| December 31, 2006 (restated amount) | 555,480,000 |
| December 31, 2005 | 493,301,000 |

### Reported Total Assets

| | |
|---|---|
| December 31, 2010 | $5,729,033,000 |
| December 31, 2009 | 3,963,899,000 |
| December 31, 2008 | 2,603,924,000 |
| December 31, 2007 | 1,837,497,000 |
| December 31, 2006 | 1,207,255,000 |
| December 31, 2005 | 895,271,000 |

### Reported Timber Assets (with % of total assets)

| | |
|---|---|
| December 31, 2010 | $3,122,517,000 (55%) |
| December 31, 2009 | 2,183,489,000 (55%) |
| December 31, 2008 | 1,653,306,000 (63%) |
| December 31, 2007 | 1,174,153,000 (64%) |
| December 31, 2006 | 752,783,000 (62%) |
| December 31, 2005 | 513,412,000 (57%) |

### Number of Outstanding Common Shares

| | |
|---|---|
| December 31, 2010 | 245,740,889 |
| December 31, 2009 | 242,129,062 |
| December 31, 2008 | 183,119,072 |
| December 31, 2007 | 182,592,961 |
| December 31, 2006 | 137,999,548 |
| December 31, 2005 | 137,789,548 |

SCHEDULE "C"

### Sino-Forest Corporation
### Overview of the Standing Timber Fraud



**Resulting Misleading Public Disclosure**

*Failure to provide full, true and plain disclosure of the Sino-Forest business and its associated risks*

**Secret Control of the 'BVI Network' & 'Peripheral Companies'**

*Concealment of Sino-Forest's control of Suppliers, AI's and other Nominee Companies in the 'BVI Network'*

**Deceitful and Back-Dated Transaction Documentation Process**

*Creation of deceitful documentation to evidence the purported purchase/ownership and sale of Standing Timber*

**Significant Internal Control Weaknesses/Failures**

*Lack of Segregation of Duties, the "Off-book" Offsetting Arrangement*