This is Exhibit "G" mentioned and referred to in the Affidavit of Charles M. Wright, sworn before me at the City of London, in the County of Middlesex, this 4th day of July, 2014.


_____

A Commissioner, etc.

Court File No. CV-13-481761

### ONTARIO
### SUPERIOR COURT OF JUSTICE

*Cosimo Borrelli, in his capacity as trustee of the*
SFC LITIGATION TRUST

Plaintiff

- and -

GEORGE HO, ALBERT IP, DAVID J. HORSLEY,
ALFRED C.T. HUNG, and SIMON YEUNG

Defendants

### STATEMENT OF CLAIM

*Notice of Action issued on May 31, 2013*

1.    The plaintiff, Cosimo Borrelli, claims in the capacity of a representative and/or trustee

(the "**Trustee**") of the Sino-Forest Corporation ("**SFC**") Litigation Trust pursuant to a Litigation

Trust Agreement dated January 30, 2013 (the "**Trust Agreement**") and pursuant to a plan of

compromise and reorganization (the "**CCAA Plan**") and an Order of the Ontario Superior Court

of Justice (Commercial List) (the "**CCAA Court**") dated December 10, 2012 (the "**CCAA Plan

Sanction Order**"):

       a.    damages in an amount to be specified prior to trial for losses suffered as a result

          of breach of contract, breach of duty (contractual, tortious, equitable, fiduciary,

          statutory, regulatory and/or other duties), misrepresentation, conspiracy, breach of

          trust, fraud, and/or duty of care and skill by, negligence by and/or unjust

enrichment of the Defendants, including as knowing recipients and/or knowing assistors or de facto directors, officers or agents;

b.      punitive damages in the amount to be specified prior to trial;

c.      an order for an accounting of profit and tracing of profits made by the defendants in connection with their relationship with SFC;

d.      an order for restitution and/or such other equitable remedy for the breaches of duties and other tortious conduct referred to in subparagraph 1(a);

e.      pre-judgment and post-judgment interest on a compound basis or alternatively in accordance with the Courts of Justice Act, R.S.O. 1990, c. C-34;

f.      payment of applicable Harmonized Sales Tax on any sums awarded in favour of the plaintiff, including costs;

g.      costs of this action on a substantial indemnity scale; and

h.      such further and other relief as this Honourable Court deems just.

2.      The claims asserted herein relate to the defendants' activities as directors and officers of SFC and its subsidiaries and are claims that belonged to and could have been advanced by SFC and its subsidiaries, prior to those claims being transferred pursuant to the CCAA Plan as described below.  The claims asserted herein are not claims of the trustees in connection with the notes issued by SFC.

## I.      OVERVIEW

3.      Until June 2011, SFC was one of Canada's most valuable forestry companies, and the

largest single forestry company throughout the People's Republic of China (the "**PRC**"). Ultimately, the company's market capitalization grew to $6 billion, based in large part on SFC's remarkable year-over-year growth in revenues. In less than six years, SFC's annual revenues increased from US$20.5 million to US$1.9 billion. Its asset base grew from roughly US$30 million to almost US$6 billion in that same timeframe.

4.      SFC's remarkable story came to a dramatic conclusion in the summer of 2011. A short seller hedge fund, in concert with other similar hedge funds, published a report in June of 2011 that contained sensational allegations of fraud, corruption, and illegal activity at SFC. The report alleged, among other things, that SFC was a "multi-billion dollar ponzi scheme ... accompanied by substantial theft."

5.      SFC, through the work of an independent committee (the "**IC**") and a dedicated board of directors, sought to investigate and if possible dispute the allegations made by the short sellers. At the same time, SFC was required to respond to investigations brought by the Ontario Securities Commission (the "**OSC**"), the Royal Canadian Mounted Police, and ultimately proceedings brought by the OSC.

6.      SFC was unable to issue its third quarter 2011 financial statements because of the many questions that had been raised by the hedge funds' report, the IC, SFC's auditors, Ernst & Young ("**E&Y**"), the OSC, and others. In March 2012, SFC filed for protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA**"). After fully canvassing the market, SFC determined that it was unable to find a buyer willing to purchase its assets for an amount equal to its outstanding debt. Pursuant to the CCAA Plan Sanction Order, SFC's assets were effectively transferred to its creditors, with roughly $6 billion in equity value having been wiped out.

7.    George Ho, Albert Ip, Alfred C.T. Hung and Simon Yeung (the "**Overseas Management**") are responsible for the demise of SFC. Overseas Management was part of an inner circle of Hong Kong and China-based management who, through a combination of activities that ran the gamut ranging from sloppy record keeping to more general mismanagement, through to outright fraud and theft, caused SFC to materially overstate the value of SFC's revenues and assets and to conceal personal profits made in connection therewith. Among other things, Overseas Management:

(a)    had operational and *de facto* control over allegedly arms-length purchasers of SFC's timber known as "authorized intermediaries" ("**AIs**") and the Suppliers of that timber ("**Suppliers**"), which control had not been disclosed to SFC, its auditors, or its directors;

(b)    knew that certain of SFC's AIs and supplier counterparties were incapable of performing the obligations required of them by their contracts with SFC;

(c)    withheld and/or hid information from SFC's auditors;

(d)    prepared, certified and/or published false or materially misleading financial statements (including interim financial statements) and public disclosure documents of SFC and/or its subsidiaries (the "**Subsidiaries**");

(e)    concealed their unlawful activities from SFC through the use of personal non-company e-mail accounts and by issuing instructions to hide certain transactions from SFC's accounting department in Hong Kong;

(f)    forged SFC contracts to evade restrictions imposed by China's State Administration of Foreign Exchange ("**SAFE**") and/or to establish banking credit

that would not have otherwise been provided to SFC;

(g)    entered into transactions that evidenced a circular flow of funds created for unknown or improper purposes;

(h)    manipulated short term incentive program targets for SFC for the 2008 fiscal year, resulting in the payment of management bonuses beyond those properly due;

(i)    entered into a number of transactions including transactions identified by the OSC that were suspicious if not outright fraudulent;

(j)    failed to maintain SFC's records in a manner that would be expected of a publicly traded company, including by carrying out a practice of backdating contracts;

(k)    caused moneys to be paid out by SFC and/or the Subsidiaries for no proper purpose; and

(l)    prepared and/or published false information in connection with the debt or equity issues set out in Schedule 2 to the Notice of Action.

8.    The plaintiff's claims against Overseas Management are for all losses and damages, equitable compensation and restitution necessary to compensate SFC for the losses caused in connection with or arising out of their acts or omissions in the direction and/or management of and/or dealings of SFC and/or its Subsidiaries.

9.    In addition, the plaintiff claims against the defendant David Horlsey ("**Horsley**") for his role in contributing to the collapse of SFC. These claims, particularized below, flow from Horsley's acts and omissions as Chief Financial Officer of SFC.

## II.    THE PARTIES

10.    The plaintiff, Cosimo Borrelli, is an individual resident in Hong Kong.  Pursuant to the Trust Agreement, Mr. Borrelli was appointed as the Trustee of the SFC Litigation Trust.

11.    Under the Trust Agreement and the CCAA Plan Sanction Order, the Litigation Trust Assets (as defined therein) of SFC, which included the Litigation Trust Claims (as defined therein), the Litigation Funding Amount (as defined therein), and any other assets acquired by the Litigation Trust on or after the effective date pursuant to the Trust Agreement or the CCAA Plan, were transferred to the SFC Litigation Trust.

12.    The Litigation Trust Claims consist of any and all claims or causes of action which have been or may be asserted by or on behalf of (a) SFC against any and all third parties; or (b) the trustees (on behalf of the former noteholders in SFC) against any and all persons in connection with the notes issued by SFC, other than in either case (i) any claim, right or cause of action against any person that is released pursuant to Article 7 of the CCAA Plan; or (ii) any Excluded Litigation Trust Claim (as defined in the CCAA Plan).

13.    Under the CCAA Plan Sanction Order, the CCAA Court ruled that there had been good and sufficient notice and service of the Plan Filing and Meeting Order and the Meeting Materials (as defined therein), which materials described the nature of the trust assets being transferred. The CCAA Plan Sanction Order further deemed effective the transfer, assignment and delivery of the Litigation Trust Claims, which effected by means of legal assignment the transfer of the litigation claims asserted herein.

14.    All of the members of Overseas Management were de jure or de facto directors and/or officers of SFC.  At all relevant times, SFC was a reporting issuer in the province of Ontario

whose shares traded on the Toronto Stock Exchange (the "**TSX**"). SFC was incorporated under the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44. At all relevant times, SFC's registered office was located in Mississauga Ontario, and its executive office was located in Hong Kong.

15.     The defendant George Ho ("**Ho**") is an individual resident of Hong Kong. Prior to joining SFC, Ho obtained a degree in accounting from Simon Fraser University. From at least 2008 until his employment was terminated by SFC in 2012, Ho was the Vice President, Finance (China) of SFC. Along with all of the other Overseas Management, Ho was alleged by Staff of the Ontario Securities Commission (the "**OSC**") to have engaged in a complex fraudulent scheme to inflate the assets and revenue of SFC and was alleged to have made materially misleading statements in SFC's public disclosure record related to its primary business.

16.     The defendant Albert Ip ("**Ip**") is an individual resident of Hong Kong. From 1997 to April 17, 2012, Ip was the Senior Vice President, Development and Operations North-east and South-west China of SFC. Ip received an Enforcement Notice from Staff of the OSC in 2012 in relation to his involvement in the alleged massive fraud at SFC. Ip resigned from SFC for health reasons on March 30, 2012.

17.     The defendant Horsley is a Canadian citizen and resident of the Greater Toronto Area. Horsley was the Senior Vice President and Chief Financial Officer of SFC from October 2005 to April 2012. On April 17, 2012 Horsley resigned as the Chief Financial Officer but continued to be employed by the Company in its restructuring efforts. On September 27, 2012, SFC terminated Horsley's employment.

18.     The defendant Alfred C.T. Hung ("**Hung**") is a resident of Hong Kong. Hung was the Vice President, Corporate Planning and Banking of SFC from at least 2004 to April 17, 2012. In

late August 2011, Hung was placed on administrative leave by SFC, and on April 17, 2012, his employment was terminated by SFC. Hung received an Enforcement Notice from Staff of the OSC in 2012 in relation to his involvement in the alleged massive fraud at SFC.

19.     The defendant Simon Yeung ("**Yeung**") is a resident of Hong Kong. Yeung was the Vice President – Operations within the Operations/Project Management Group of Sino-Panel (Asia) Inc., a subsidiary of SFC from at least June 30, 2006 to April 17, 2012. In late August 2011, Yeung was placed on administrative leave by SFC, and on April 17, 2012, his employment was terminated by SFC. Yeung received an Enforcement Notice from Staff of the OSC in 2012 in relation to his involvement in the alleged massive fraud at SFC.

### III.   OVERVIEW OF SINO-FOREST'S BUSINESS

### A.   General

20.     SFC was an integrated forest plantation operator and forest products company, with assets predominantly in the PRC. Its stated principal businesses included the ownership and management of forest plantation trees, the sale of standing timber, wood logs and wood products and the complementary manufacturing of downstream engineered-wood products.

21.     In addition, SFC held an indirect majority interest in the Greenheart Group, a Hong Kong listed investment holding company, which, together with its subsidiaries, owned certain rights and managed hardwood forest concessions in the Republic of Suriname and radiata pine plantation on freehold land in New Zealand.

22.     As of March 30, 2011, a total of 137 entities made up the SFC group of companies: 67 PRC incorporated entities (with 12 branch companies), 58 BVI incorporated entities, 7 Hong Kong incorporated entities, 2 Canadian entities and 3 entities incorporated in other jurisdictions.

## B.    The Business Model

23.    There are four types of rights associated with timber plantations in the PRC, namely (i) plantation land ownership, (ii) plantation land use rights, (iii) timber ownership, and (iv) timber use rights. All of these are separate rights and can be separately owned by different parties.

24.    Generally, private enterprises cannot own plantation land in the PRC but may hold plantation land use rights for a specified duration (up to 70 years but typically 30 to 50 years), timber ownership and timber use rights. Foreign enterprises are not prohibited by law from acquiring timber ownership and timber use rights.

25.    For its timber business in the PRC, SFC utilized two models, one involving BVI entities ("**BVIs**"), and the other involving subsidiaries incorporated in the PRC as wholly foreign owned enterprises ("**WFOEs**").

26.    The BVI structure was the model primarily used by SFC for its forestry business in the PRC. By 2011, SFC had established 58 BVI companies. Not all of these BVIs were involved in the BVI model or standing timber business. Of the 58, there were 20 involved in the BVI standing timber business while the remaining BVIs were either holding companies or used in SFC's log trading business.

27.    Overseas Management caused SFC to publicly state that the BVIs involved in the standing timber business acquired standing timber from "suppliers". The Suppliers were supposed to be third party aggregators who acquired the standing timber and, typically, land use rights from other Suppliers or from original timber owners. As non-PRC companies, the BVIs could not and did not acquire land use rights in the PRC, and instead only acquired the rights to timber in the PRC pursuant to the relevant standing timber purchase contracts.

28.    The BVI model did not involve the BVIs concurrently acquiring the plantation land use rights or leases of the underlying plantation land with the purchase of standing timber, as the BVIs cannot legally acquire plantation use rights.  However, the BVIs' supply contracts typically contained a right of first refusal for the BVIs to acquire, or nominate an affiliate to acquire, the plantation land use rights after the timber had been harvested.

29.    The BVIs did not sell standing timber directly to customers. Instead, they conducted the sale of standing timber through AIs (which are also called "entrusted sales agents" in the BVI model) pursuant to "entrusted sales agreements". The AIs served as SFC's customers under the BVI model of its standing timber business.

30.    The BVIs did not directly pay the Suppliers or receive payments from the AIs.  Instead, the AIs were instructed by Overseas Management to make "set-off payments".  Pursuant to the instructions of SFC, AIs were supposed to make payments directly or indirectly to SFC's Suppliers for amounts owed by the BVIs to those Suppliers.  As a result, no cash actually flowed directly through the BVIs.  SFC then received confirmations from the AIs and Suppliers confirming that payments had been made and received respectively.

31.    The nature of the BVI model meant that SFC could not obtain cash from its BVI model operations or monetize its BVI model assets without engaging in a complicated and uncertain process.

32.    The BVI model only made sense at all insofar as the AIs and Suppliers were arm's length third party purchasers or vendors.  Absent that arm's length, the Board and SFC's auditors could have no assurance of the legitimacy of the BVI transactions, as opposed to simply being composed of circular paper transactions for the benefit of insiders.

33.    The WFOE structure was created in or about 2004.  Commencing in 2004, the PRC's Ministry of Commerce permitted foreign investors to invest in PRC-incorporated trading companies and to participate in most areas of the commodity distribution industry, including the purchase of standing timber and land use rights throughout the PRC.  Prior to this time, WFOEs were prohibited from engaging in the commodity distribution industry.

34.    Unlike BVIs, WFOEs could acquire land use rights or land leases as well as standing timber rights, and could have bank accounts in the PRC.  Because of the WFOEs' direct presence in the PRC, they could more readily obtain financing from PRC banks to finance their operations. WFOEs could log the timber and sell both logs and standing timber to end customers, which means they did not need to use AIs.  The WFOEs directly paid the Suppliers for the standing timber and directly received payment from end customers instead of utilizing the set-off arrangement used by SFC's BVI entities in the BVI model.

## IV.    SECRET CONTROL OVER AIs AND SUPPLIERS

35.    Overseas Management fraudulently concealed their control and the control by other insiders at SFC over the Suppliers, AIs and other nominee companies, principally though not exclusively in the BVI side of SFC's business.  Overseas Management established a collection of "nominee" or "peripheral" companies that were controlled by various "caretakers" who were employees of SFC or otherwise closely associated with the principals of SFC.  By controlling the Suppliers, AIs, and peripheral companies, Overseas Management were carrying out transactions which either overstated the economic substance of the transactions, or which were entirely fictitious.

36.    Moreover, these Suppliers, AIs and other nominee companies would have been considered to be "related parties" under generally accepted accounting principles ("**GAAP**") and

standards ("**GAAS**").   Related party transactions are considered to be not arm's length transactions that represent fair market value.  The value of such transactions are susceptible to manipulation by insiders and therefore, under GAAP and GAAS, are not *per se* reliable for fair value determinations.

37.    By falsely holding out these Suppliers, AIs, and other nominee companies as unrelated third party counterparties, Overseas Management exposed SFC to significant peril at the hands of regulators, shareholders, and other stakeholders.   There was no legitimate business purpose either for carrying out transactions with such related parties, or for causing SFC to represent that such entities were unrelated third parties.

38.    Overseas Management personally profited from their inside relationships with the related party Suppliers, AIs, and other nominee companies.   The full particulars of the defendants' relationships with each of the related party Suppliers, AIs and peripheral companies, are known only to the defendants.   Further particulars, including particulars of the secret profits made by Overseas Management in connection with such related party entities, will be provided prior to trial.

### 1.    *Kun'an*

39.    One of SFC's major Suppliers was Guangxi Hezhou City Kun'an Forestry Co., Ltd. ("**Kun'an**").  Kun'an was a PRC limited company that was established on January 20, 2009.  Its registered office was located in Hezhou City, Guangxi, PRC.  Over the years, SFC recorded and publicly disclosed that it had purchased hundreds of millions of dollars of timber assets from Kun'an.  For example, in 2009, roughly 30% of all of SFC's plantation assets were purchased (by BVI entities) and leased (by Sino-Panel) from Kun'an.

40.    Additionally, in March 2008 – nine months before the company even existed – Overseas Management caused SFC to record that Kun'an purchased $49 million worth of timber assets from SFC.  Particulars of that transaction are described in the section entitled "Genga Fraud #2" below.

41.    Contrary to Overseas Management representations to SFC, Kun'an was not an independent third party.  The defendants Ip and Yeung helped to establish Kun'an.  Its manager was Huang Ran, a former or perhaps current employee (the facts surrounding his employment are known only to Overseas Management) of SFC who was involved in numerous of the transactions referred to below.

42.    By September 2009 – nine months after it was established and eighteen months after the company allegedly purchased $49 million of timber assets from SFC – the defendant Yeung urged Huang Ran to recruit "one or two clerks, tellers, or even merchandisers, to construct Kun'an to be a company with certain scale, instead of a one-person shell company."  Another SFC employee, Qianhui Wu, responded using a personal address, agreeing with Yeung.

43.    Undisclosed to SFC by Overseas Management was that they actually controlled Kun'an. Overseas Management developed a spreadsheet entitled "Companies held by managers and/or nominee shareholders overview", which listed more than 120 of SFC's "suppliers", AIs and other counterparties.  Kun'an's registered shareholders were nominees only, nominated by Overseas Management to make it appear that Kun'an (and other suppliers) were independent third parties, when they were not.  At all material times, Overseas Management, through the use of "caretakers", owned, managed, controlled and directed Kun'an.

## 2. *Yuda Wood*

44.    Without limiting the generality of the foregoing, Overseas Management controlled Huaihua Yuda Wood Co. ("**Yuda Wood**"), which was allegedly SFC's largest supplier from 2007 to 2010. During that time period, SFC claimed to have paid Yuda Wood $650 million.

45.    Unknown to SFC's board of directors or shareholders, in fact, Yuda Wood was registered and capitalized by Overseas Management, who also controlled bank accounts of Yuda Wood and key elements of its business. In or about July 1998, Overseas Management incorporated Sonic Jita Engineering Co. Ltd., the parent company of Yuda Wood. In or about 2006, the defendants Yeung and Ip assisted in the incorporation of Yuda Wood.

46.    The defendant Ho had authority to supervise a Yuda bank account into which Sino-Panel deposited payments for timber assets allegedly purchased from Yuda Wood. At various times the defendants and other SFC personnel at their direction had access to Yuda's documents or chops.

47.    Overseas Management controlled Yuda Wood through their relationship with Huang Ran, Yuda Wood's legal representative and SFC's former employee.

48.    After Yuda Wood was identified and questioned by Muddy Waters in its report (described in the section entitled "Muddy Waters Report" below), Overseas Management and Huang Ran caused Yuda Wood to be deregistered. As quickly as Yuda Wood appeared and established a multi-hundred million dollar business, Yuda Wood disappeared entirely.

## 3. *Dongkou*

49.    Dongkou Shuanglian Wood Company Limited ("**Dongkou**") was SFC's most significant AI, purportedly purchasing approximately $125 million in 2008, representing 14% of SFC's

revenue that year.

50.    Undisclosed to the investing public or the Board of SFC was the fact that Overseas Management controlled Dongkou.  Within 18 months of its incorporation in 2005, two SFC employees became the sole shareholders of Dongkou.  Subsequently, the defendants controlled Dongkou through one of SFC's subsidiaries, Shaoyang Jiading Wood Products Co. Ltd.  By 2007, at the direction of Ip and others, SFC employees drafted purchase contracts on Dongkou's behalf.

51.    The fact that Dongkou was controlled by the inside management group of SFC meant that Dongkou was effectively a related party to SFC.  By fraudulently holding Dongkou out as an independent third party and for causing SFC to treat Dongkou as a third party for accounting purposes, Overseas Management caused SFC's financial statements to be materially misstated.

### 4.    Other Related Parties

52.    As stated above, Overseas Management developed a "caretaker list", which set out a number of SFC's major Suppliers and AIs and their nominee shareholders.  The full particulars of the related party status of all of SFC's Suppliers and AIs are known only to the defendants, and in all events further particulars will be provided prior to trial.  Insofar as SFC recorded any transactions with parties that were in fact related parties at the direction of Overseas Management, such misrepresentations placed SFC in significant peril with securities regulators and all of its stakeholders.  Such transactions undermined the accuracy of SFC's books and records and materially contributed to SFC's inability to issue audited financial results, as discussed below.

## V.    FRAUDULENT AND/OR QUESTIONABLE TRANSACTIONS

53.    Overseas Management caused SFC and its subsidiaries to enter into a number of transactions (the "**Transactions**") that were fraudulent and/or devoid of any legitimate business purpose. Some of the Transactions were identified by the OSC as fraudulent transactions, and are *per se* unlawful beyond any related party aspect of them. All of the Transactions materially contributed to SFC's downfall.

54.    In the alternative, if the Transactions were not outright fraudulent, they were sufficiently suspicious and devoid of legitimate business purpose that Overseas Management, as *de facto* officers of a public company, should have studiously avoided them. Entering into such transactions constituted a breach of the duty of care that Overseas Management owed to SFC both at common law and under the *CBCA*.

### A.    Absence of Evidence of Timber Asset Ownership

55.    As a public company and a reporting issuer, SFC was expected to make complete and accurate disclosure about its assets. As the core management group at SFC, the defendants were responsible for internal and public reporting on operations, including SFC's acquisition of assets. At all material times, SFC had a reasonable expectation that assets Overseas Management purchased with company funds were accompanied with appropriate evidence of legal ownership. Such evidence of legal ownership was further required by GAAP and GAAS to be properly recorded as actual acquisitions by the company.

56.    Overseas Management failed to obtain adequate supporting documentation and evidence of title for timber assets purchased and sold by SFC's BVI subsidiaries, which constituted most of SFC's timber assets and therefore the value of SFC. 80% by value of SFC's timber assets was

purportedly evidenced by purchase contracts entered into by the BVI subsidiaries (**"Purchase
Contracts"**). The Purchase Contracts purported to have three attachments: plantation rights
certificates (**"Certificates"**) or other ownership documents; timber survey reports (**"Survey
Reports"**); and farmer's authorization letters (**"Farmers' Authorizations"**). Additionally,
Overseas Management purported to rely on PRC Forestry Bureau confirmations
(**"Confirmations"**) to evidence ownership.

57.    Critical in any documents evidencing ownership is a sufficiently accurate description of
what was being purchased. The Purchase Contracts and Confirmations did not sufficiently
identify the trees or other timber assets purportedly purchased by SFC. It is not possible to
identify approximately 80% of SFC's stated standing timber assets by reference to the Purchase
Contracts and Confirmations.

58.    The Confirmations were not legally recognized documents evidencing ownership or title
of timber assets. The Confirmations were granted to Overseas Management as favours and were
not intended by the Forestry Bureau to be disclosed to third parties and were not intended to be
relied upon as legal evidence of title. Moreover, many of the Confirmations were in fact created
by Overseas Management and employees working at their direction, and were backdated to suit
Overseas Management's purposes.

59.    The supporting documentation required to be attached to the Purchase Contracts were
either insufficient or missing entirely. Without limiting the generality of the foregoing:

(a)    none of the Purchase Contracts had any Farmers' Authorizations attached. Absent
such authorizations, there was no evidence that title to timber was properly
transferred to the "supplier" prior to the purported transfer to SFC; and

(b)    the Survey Reports were conducted by a single firm who had a conflict of interest, Zhanjiang Southern Forestry Products Quality Supervision Co., Ltd. ("**Zhanjiang Southern**"). At all material times, Lu Qiding ("**Qiding**"), an SFC employee and a key member of its timber acquisition team, was a 10% shareholder of Zhanjiang Southern. At all material times, another 80% of the shares of Zhanjiang Southern were held by a former SFC employee. Drafts of these reports, which were held out to be drafted by an independent company, existed on computers of SFC employees who reported to Qiding and Overseas Management. These Survey Reports were relied upon by SFC's auditors, and Overseas Management intended for the auditors to rely on the Survey Reports.

60.    The absence of sufficient legal evidence to demonstrate SFC's ownership of billions of dollars of timber assets was a material contributor to SFC's inability to obtain an audit opinion and to market the assets for sale to a third party in the Sales Process, defined and described below. The magnitude of this problem was aggravated by the serious questions raised about the independence of AIs and Suppliers and prior representations by Overseas Management, as described above.

## B.    Dacheng Frauds

61.    The defendants committed a number of frauds through a series of transactions in 2008 involving Guangxi Dacheng Timber Co. Ltd. ("**Dacheng**"). Dacheng was ostensibly a "supplier" who sold timber assets to SFC at a price of RMB 47 million (approximately CAD $8 million). The purchase price was funneled through Dacheng's bank accounts and returned back to SFC's subsidiaries, shown to be revenue collected by those subsidiaries.

62.    Further, Overseas Management caused SFC to record these timber assets "purchased"

from Dacheng twice in the books and for inflated amounts. In addition to recording these assets at the purchase price in the WFOE books, the defendants caused SFC to record these same assets at a value of RMB 205 million (approximately CAD $34 million) on the BVI books, notwithstanding that the BVI entities had nothing to do with the purchase of these assets and the assets had already been recorded on the WFOE subsidiaries' books.

63.    Then, in 2009, the defendants caused the BVI entities to record a "sale" of these standing timber assets that the BVI entities did not actually purchase (and which had already been double counted on the books) for RMB 326 million – a one-year gain of RMB 121 million from the fictious numbers created on the BVI books, or RMB 279 million (approximately CAD $46 million) from the actual purchase price paid by the WFOE entities before the money was funneled back to SFC.

64.    The Dacheng fraud gave the appearance that SFC was engaging in legitimate business activity, and in fact, highly lucrative activity through the purchase and sale of timber assets for a quick and virtually cost-free return on investment. The defendants caused SFC's own funds to be circulated within the SFC enterprise, giving the illusion not only of building an asset base, but also building revenues for the operating arms of SFC.

65.    The Dacheng fraud was emblematic of the brazen frauds committed by Overseas Management, with multiple levels of fraud often occurring within a single transaction or series of transactions. The "proceeds" of the Dacheng transaction were then further employed in the purported acquisition of additional timber assets, resulting in a further compounding of the effects of the original fraud(s).

## C.    The "450,000 Fraud"

66.    In 2009, the defendants secretly used a number of companies to create a fictitious purchase and subsequent sale of 450,000 cubic metres of timber assets (the "**450,000 Assets**"). Every aspect of this series of transactions was an abject fraud.

67.    First, the defendants caused SFC, through three subsidiaries of Sino-Panel, to "purchase" the 450,000 Assets from Guangxi Hezhou City Yuangao Forestry Development Co. Ltd ("**Yuangao**") in or about October 2009.  This "purchase" was recorded on SFC's books as being valued at RMB 183 million (CAD $31 million).   But Yuangao was not, as was held out by Overseas Management, an independent third party, but rather, a company secretly controlled by Overseas Management through a former SFC employee, Huang Ran.

68.    Only a few months later, SFC recorded a sale of the 450,000 Assets to three companies that were also held out by Overseas Management to be independent third party companies, Gaoyao City Xinqi Forestry Development Co., Ltd. ("**Xinqi**"), Guangxi Rongshui Meishan Wood Products Factory ("**Meishan**"), and Guangxi Pingle Haoseng Forestry Development Co., Ltd. ("**Haoseng**")  But these companies were neither independent nor third parties.  Instead, they were secretly controlled by the defendants, with Huang Ran again acting as Overseas Management's "caretaker".

69.    In addition to the substratum of the 450,000 Asset transaction being completely fraudulent, Overseas Management compounded that fraud by creating a *gain* on the sale of the 450,000 Assets.  In just a few short months, SFC had a gain of RMB 50 million on these assets – a 30% return over just two months.  The RMB 233 million sale of standing timber was recorded in the books of SFC's WFOE subsidiaries and not its BVI subsidiaries that purportedly sold the assets.

70.     Overseas Management then created a number of circular transactions designed to give the appearance of reality to the 450,000 Asset fraud. SFC made payments, purportedly to settle accounts payable, to various Suppliers (including Yuangao). Those Suppliers then funneled money to Xinqi, Meishan, and Hoaseng, who used money to "purchase" the assets back from SFC.

71.     The net effect of the 450,000 Asset frauds was to overstate the revenues of SFC by at least $30 million, and to overstate the asset base of SFC by an amount that exceeded the value of the underlying assets, if any existed at all. The 450,000 Asset fraud had no economic substance and had no legitimate business purpose.

**D.     Gegma Fraud #1**

72.     In 2007, one of SFC's subsidiaries, Sino-Panel Gegma purchased certain land use rights and 105,750 Mu of standing timber from Gengma Dai and Wa Tribe Autonomous Region Forestry Co. ("**Gegma Forestry**") for a purchase price of RMB 102 million. This transaction was never recorded in the books and records of SFC or its subsidiaries.

73.     Two months later, the defendants directed another of SFC's subsidiaries, Sino Panel Yunnan to purchase these same assets – including the 105,750 Mu of standing timber -- from another party, Yuda Wood for a price of RMB 509.3 million – roughly five times the actual purchase price of the underlying assets as agreed four months earlier.

74.     These assets – originally obtained for RMB 102 million but later papered up with a fictitious transaction with a related party – were then "sold" in 2010 for an alleged sales price of RMB 1.6 billion (approximately CAD $230 million).

75.     The inflated price of the assets (RMB 509.3 million) was falsely recorded in SFC's public

disclosure documents and audited financial statements for three full fiscal years. And then after the purported sale, the defendants caused SFC to overstate its revenue by at least the differential of the real price to the artificially inflated price.

**E.      Gegma Fraud #2**

76.     In September 2007, SFC acquired certain standing timber located in the Yunnan Province (the "**Yunnan Plantation**") from Yuda Wood at a cost of $21.5 million. However, notwithstanding the public disclosure of this purchase in 2007, SFC did not actually acquire the Yunnan Plantation until September 2008.

77.     Then, in 2008 and 2009, the defendants caused SFC to sell the Yunnan Plantation to Guangxi Hezhou City Kun'an Forestry Co., Ltd. ("**Kun'an**") for almost double the purchase price, $49 million. Certain of the transactions effective the sale were recorded as occurring in March 2008 – six months before the assets were actually acquired in the first place.

78.     The Yunnan Plantation transaction, if not entirely fictitious, at the minimum resulted in inflating SFC's revenue by recording the sale of assets that it did not actually have, at least at the time of the sale if at all. Overseas Management personally debated who should be the "purchaser" of the Yunnan Plantation, originally contemplating Yuda Wood as being the purchaser. They instead decided on Kunan, which casts further doubt on the economic substance and/or reality of the transaction, as well as evidencing the control that Overseas Management held over both Suppliers that were purportedly arms length entities.

**VI.     OTHER MATTERS**

**A.      Revenue Recognition**

79.     As an audited public company, SFC was required to accurately disclose the quantum of

revenue earned in the quarter in which it was actually earned.    For the purchase and sale of standing timber, revenue is recognized in the quarter in which all of the following have occurred: (a) the Purchase Contract is entered into which establishes a fixed and determinable price: (b) collection is reasonably assured; and (c) the significant risks and rewards of ownership have been transferred to the customer.

80.    For the BVI subsidiaries, an individual employee at SFC would create contracts in the quarter or quarters *after* the revenue was recognized through a mail merge function in a word processor.    There is no evidence that these contracts were even sent to the counterparties with which SFC was ostensibly entering into the transactions, and in some cases, the contracts were created after payments under the contracts had allegedly been made.

81.    At the minimum, this practice of creating contracts in quarters after the revenue was recognized was inconsistent with public disclosure made by SFC regarding its revenue recognition policies.    Finally, this practice created substantial risk of inaccuracies and put into further question the legitimacy of the claim that SFC's AIs and Suppliers were independent third parties.

82.    This practice of creating contracts in the quarter or quarters after the transactions actually occurred was known not only to Overseas Management, but also to Horsley.    As CFO, it was Horsley's responsibility to ensure that SFC's financial statements accurately reflected the substance of the transactions being carried out by SFC.    Notwithstanding his obligations to SFC, and SFC's continuous disclosure obligations, Horsley took no steps whatsoever to correct SFC's disclosure with respect to revenue recognition, even after he had learned that it had been materially misstated.    To the contrary, in 2008, Horsley wrote to the OSC in response to continuous disclosure inquiries, and falsely stated that revenue was recognized by SFC when the

relevant sales agreement was signed.

**B.    Engineered Bonus to Horsley**

83.    As part of his compensation package for 2008, Horsley had a "bonus objectives achievement assessment" whereby SFC would pay Horsley a bonus if SFC brought 12 million cubic metres of fiber to market.    An initial draft of SFC's year-end MD&A showed that for fiscal year 2008, SFC only sold a total of 11.1 million cubic metres of fiber to market.    The consequence of missing this objective was a cumulative loss to applicable SFC management of $1.8 million.

84.    After discussing the matter further with other SFC executives, within two days SFC had "discovered" another 1.2 million cubic metres of sales, and within four days, SFC realized that, in fact, SFC had sold 12.8 million cubic metres of fiber.    This all occurred almost three months after year-end, and had the direct and intended consequence of having SFC meet its bonus objective; with Horsley and others being paid the bonus that Horsley originally feared would be met using the actual data from the company.    This grossing up practice did not occur on any other year, demonstrating the unusual step taken in 2008.

**VII.    THE DEMISE OF SINO-FOREST**

**A.    Muddy Waters Report and the IC Investigation**

85.    On June 2, 2011, a short seller of SFC, Carson Block and his "research" company, Muddy Waters LLC ("**Muddy Waters**"), released an incendiary report (the "**Muddy Waters Report**").    The Muddy Waters Report alleged that SFC committed several frauds and described SFC as a "multi-billion dollar ponzi scheme ... accompanied by substantial theft."

86.    Among other things, the Muddy Waters Report alleged that SFC does not hold the full

amount of timber assets that it reports, that the timber assets actually held by SFC have been overstated, and that SFC overstated its revenue. In addition, the Muddy Waters Report alleged that SFC has engaged in unreported related-party transactions. In particular, both the Muddy Waters Report and two subsequent reports released by Muddy Waters alleged that Huaihua City Yuda Wood Limited ("**Yuda Wood**"), SFC's largest supplier of standing timber between 2007 and 2010, was secretly controlled by SFC insiders.

87.    The same day that the Muddy Waters Report was released, SFC's board of directors appointed the IC to investigate the allegations made in the Muddy Waters Report. The IC, in turn, retained independent legal and financial advisors in Canada, Hong Kong and the PRC, to investigate the matters.

88.    The scope of the IC's review was significant, reflecting the wide range of allegations contained in the Muddy Waters Report. The IC and its advisors worked to compile and analyze the vast amount of data required for their comprehensive review of SFC's operations and business, the relationships between SFC and other entities, and SFC's ownership of assets.

**B.    Regulatory Investigations**

89.    The Muddy Waters Report and the investigations arising therefrom had a ripple effect in causing substantial damage to SFC. As part of the fallout from the Muddy Waters Report, (i) SFC was sued in multiple class action proceedings across Canada and in the U.S., and (ii) SFC was the subject of an OSC investigation and was named in an OSC statement of allegations.

90.    SFC attempted to cooperate with the OSC investigation. SFC made extensive production of documents including documents sourced from jurisdictions outside of the OSC's power to compel production. SFC also facilitated interviews by the OSC with SFC personnel. In

circumstances where OSC staff sought to examine SFC personnel resident in the PRC, SFC arranged to bring individuals to Hong Kong to be examined.

91.     Subsequent to August 26, 2011, the IC's advisors identified additional documents that raised issues meriting comment and explanation from SFC's management. Also, SFC's external counsel, in response to requests from the OSC, also identified documents of a similar nature. Further documents meriting comment and explanation were identified by E&Y and in interviews conducted by OSC staff.

## C.   Efforts to Obtain an Audit Opinion

92.     As SFC reached the November 15, 2011 deadline to release its 2011 third quarter financial statements (the **"Q3 Results"**), the Audit Committee recommended and the Board agreed that SFC should defer the release of the Q3 Results until certain issues could be resolved to the satisfaction of the Board and SFC's auditor. The issues included (i) determining the nature and scope of the relationships between SFC and certain of its AIs and Suppliers, as discussed in the Second Interim Report of the IC, and (ii) the satisfactory explanation and resolution of issues raised by certain documents identified by the IC's advisors, SFC's counsel, SFC's external auditors, and/or by OSC staff.

93.     SFC's failure to file the Q3 Results and provide a copy of the Q3 Results to the trustee and to its noteholders under its senior and convertible note indentures on or before November 15, 2011 constituted a default under those note indentures. Pursuant to the indentures, an event of default would have occurred if SFC failed to cure that breach within 30 days in the case of the senior notes, and 60 days in the case of the convertible notes, after having received written notice of such default from the relevant indenture trustee or the holders of 25% or more in aggregate principal amount of a given series of notes.

94.   On December 12, 2011, SFC issued a press release announcing that it would not be able to release the Q3 Results within the 30-day period originally indicated.  SFC further announced in that press release that, in the circumstances, there was no assurance that it would be able to release the Q3 Results, or, if able, as to when such release would occur.  The press release also explained the circumstances that caused SFC to be unable to release the Q3 Results also could impact SFC's historic financial statements and SFC's ability to obtain an audit for its 2011 fiscal year.

95.   To issue an audit opinion, E&Y stated that SFC would be required to address a number of outstanding audit issues.  These issues had never been imposed as preconditions to E&Y's audit engagements in previous years.  The new issues identified by E&Y required SFC to provide satisfactory responses to questions arising in relation to, among other things,:

(a)   SFC's relationship with Yuda Wood;

(b)   the verification of certain issues surrounding SFC's relationships with AIs and Suppliers, including E&Y's ability to attend meetings with certain AIs and Suppliers;

(c)   the completion of an asset verification exercise accompanied by the engagement of Stewart Murray and Indufor;

(d)   a "proof of concept" exercise through which confirmations of the technology, methodology and reporting framework could be invoked for the wider area verification of the SFC estate;

(e)   provision of legal opinions related to structure and tree title, among other things;

(f)     chain of BVI timber title, including access to source documents;

(g)     SFC's plan to remove funds from the PRC, including the provision of legal opinions as necessary;

(h)     International Financial Reporting Standards reconciliation; and

(i)     sales analysis of all BVI plantation sales by supplier to customers.

96.    It was not possible for SFC to address these issues within an acceptable time period. Consequently, absent a resolution with the noteholders, the indenture trustees would have been in a position to enforce their legal rights as early as April 30, 2012.

**D.    Defaults Under the Bonds**

97.    SFC's failure to make the US$9.775 million interest payment on the 2016 convertible notes when due on December 15, 2011 constituted a default under that indenture.  Under the terms of that indenture, SFC had 30 days to cure its default and make the required interest payment in order to prevent an event of default from occurring, which could have resulted in the acceleration and enforcement of the approximately US$1.8 billion in notes which have been issued by SFC and guaranteed by many of its subsidiaries outside of the PRC.

98.    On December 18, 2011, SFC announced that it had received written notices of default dated December 16, 2011, in respect of its senior notes due 2014 and its senior notes due 2017. The notices, which were sent by the trustees under the senior note indentures, referenced SFC's previously-disclosed failure to release the Q3 Results on a timely basis.  SFC reiterated in the December 18, 2011 press release that it did not expect to be able to file the Q3 Results and cure the default within the 30 day cure period.

99.  In response to the receipt of the notices of default, among other considerations, on December 16, 2011, the Board established a Special Restructuring Committee of the Board comprised exclusively of directors independent of management of SFC, for the purpose of supervising, analyzing and managing strategic options available to SFC.

**E.    The Support Agreement and SFC Filed for CCAA Protection**

100.  Following extensive negotiations between SFC and its noteholders, the parties agreed on the framework for a consensual resolution of SFC's defaults and the restructuring of its business, and entered into a Support Agreement on March 30, 2012.

101.  The Support Agreement requires SFC to pursue a plan of compromise on the terms set out in the Support Agreement in order to implement the agreed-upon restructuring transaction (the **"Restructuring Transaction"**) and to simultaneously undertake a sales process (the **"Sales Process"**) as an alternative to the Restructuring Transaction.  As such, on March 30, 2012, SFC applied for protection from its creditors under the CCAA and the CCAA Court made an Initial Order granting a CCAA stay of proceedings against SFC and certain of its subsidiaries and appointing FTI Consulting Canada Inc. as the Monitor in the CCAA proceedings.  The CCAA Court also granted an order approving the Sales Process and authorizing and directing SFC, the Monitor and Houlihan Lokey to do all things reasonably necessary to perform each of their obligations thereunder.

102.  On April 13, 2012, the Court made an order extending the stay of proceedings contained in the Initial Order to June 1, 2012 and on May 31, 2012, the Court further extended the stay period to September 28, 2012.

## F.    The Sales Process

103. The Sales Process was intended to provide a "market test" by which third parties could propose to acquire SFC's business operations through a CCAA Plan as an alternative to the restructuring transaction provided pursuant to the Plan currently being pursued by SFC.

104. Following the bid deadline set out in the Sales Process, SFC, Houlihan Lokey and the Monitor determined that none of the letters of intent constituted a Qualified Letter of Intent as that term was defined in the Sale Process Order, which required amongst other things, cash consideration in an amount equal to 85% of the aggregate principal amount of the notes, plus all accrued and unpaid interest on the notes.

105. Even when cleansed of all of the Class Action and related Third Party Defendant indemnification claims, the Sales Process demonstrated that the realizable market value of SFC's business is less than the $1.8 billion that SFC owed its noteholders.

106. The difference between the value of SFC's assets as recorded in its financial statements and as publicly disclosed, and the reality of the Sales Process, was attributable to two factors, both of which were direct and foreseeable consequences of the defendants' conduct.   First, as a company in distress and in insolvency proceedings, SFC by definition would not have realized fair value for its assets.   Second, and more importantly, notwithstanding the thorough canvassing of the market and the openness of SFC to potential bidders through a comprehensive dataroom, bidders were unable to get sufficient comfort about the legitimacy or accuracy of SFC's financial statements and the value of SFC's assets.

## G.    The CCAA Plan and Plan Sanction Order

107. Given that the Sale Process was not successful, SFC developed a Plan with its creditors

that contemplated a new company and a further subsidiary ("Newco" and "Newco II", respectively) would be incorporated and SFC would transfer substantially all of its assets to Newco in compromise and satisfaction of all claims made against it. The result was that Newco would own, directly or indirectly, all of SFC's Subsidiaries and SFC's interest in Greenheart and its subsidiaries as well as any intercompany debts owed by the Subsidiaries to SFC. Pursuant to the Plan, the shares of Newco will be distributed to the Affected Creditors. Newco will immediately transfer the acquired assets to Newco II.

108. As the value of the assets was less than amounts owed to SFC's secured creditors, there was no residual equity value remaining for existing SFC shareholders. Accordingly, the Plan contemplated the extinguishment of all existing equity of SFC in return for no consideration at all.

109. A creditor meeting was held on December 3, 2012 at which an overwhelming majority of SFC's affected creditors approved the Plan. The Plan was sanctioned by Justice Morawetz on December 10, 2012. One set of shareholders sought leave to appeal the Plan Sanction Order, but leave to appeal was denied by the Court of Appeal on June 26, 2013.

## VIII.  LIABILITY TO SFC

110.    Overseas Management is liable to SFC for breaching their duties as officers of SFC. At all relevant times, Overseas Management were either actual or ostensible officers of SFC, each of whom authorized, permitted or acquiesced in the wrongful conduct described above.

111.    Under section 122 of the *CBCA*, each of the defendants owed a duty of care to SFC to (a) act honestly and in good faith with a view to the best interests of the corporation, and (b) to exercise the care, diligence and skill that a reasonably prudent person would exercise in

comparable circumstances. By reason of the facts described above, the defendants breached this duty of care and failed to act in a manner that was required of officers of a publicly traded company.

112.    Overseas Management further breached section 241 of the *CBCA*, by carrying on the business or affairs of SFC in a manner that was oppressive or unfairly prejudicial or that unfairly disregarded the interests of all of SFC's securityholders and creditors. Such securityholders and creditors had a reasonable expectation that Overseas Management would carry out the affairs of SFC in a manner that was lawful and that would not have preferred the interests of insiders as described above.

113.    By reason of the facts described above, the defendants breached express and implied terms of their employment agreements with SFC and its subsidiaries. Among other things, the defendants were required to conduct themselves and the operations of SFC in a manner that was lawful. The defendants were further required to comply with SFC Codes of Conduct, which the defendants breached by virtue of the facts described above.

114.    The defendants further owed SFC fiduciary duties, as a result of the positions of trust and confidence held by the defendants. SFC was vulnerable to the unilateral exercise of discretion and power by the defendants. By reason of the facts described above, the defendants breached their fiduciary duties to SFC.

115.    Overseas Management conspired with each other to overstate the value of SFC's revenue and assets and to cause SFC to release financial statements that were untrue. In certain instances, as described above, the predominant purpose of such conspiracy was for the defendants, or certain of them, to obtain pecuniary benefits. In other cases, the predominant purpose is unknown as a result of the clandestine nature of the conspiracy and the particular

opaqueness created by the overseas operations, the use of "shell" companies, nominee shareholders, among other things, but in all instances the predominant purpose was not to advance the legitimate business interests of SFC and its stakeholders.   Overseas Management took steps in furtherance of the conspiracy as described above.

116.   By virtue of the facts set out above, Overseas Management are liable to SFC for negligent and/or fraudulent misrepresentation.   SFC relied on the representations described above to its detriment, and the damages SFC suffered in furtherance of such reliance was reasonably foreseeable and proximate.

117.   By virtue of the facts set out above, the defendants have been unjustly enriched by their wrongful acts and omissions.   SFC suffered a corresponding deprivation by reason of the wrongful acts of the defendants.   There was no juristic reason for the resulting enrichment to the defendants.   The plaintiff is entitled to a constructive trust with respect to such enrichment.

118.   Overseas Management are alternatively liable to SFC as knowing recipients of trust moneys and/or knowing assistors of breaches of trust and fiduciary duty by others, for the reasons set out above.   At all material times, Overseas Management, whether or not they personally owed fiduciary duties or trust obligations to SFC, knew that others in senior management had such trust and fiduciary obligations, and Overseas Management willfully assisted in the breach of such trust and fiduciary obligations, including through the handling and receipt of SFC moneys that had been impressed with a trust.

## IX.   DAMAGES

119.   By virtue of the facts set out above, SFC has suffered damages.   Such damages were reasonably foreseeable by the defendants, and proximate to the wrongful acts described above.

120.    Overseas Management are jointly and severally liable for the acts relating to Overseas Management described above.

121.    SFC has taken all reasonable steps to mitigate its damages.

122.    The particulars of such damages are not yet fixed and will be provided prior to trial.

123.    By virtue of the conduct described above, an award of punitive or exemplary damages is appropriate.    The defendants' conduct was high handed and demonstrated reckless and wanton disregard for SFC and its stakeholders.    Overseas Management's activities were particularly egregious and warranting punitive or exemplary damages.

124.    In addition to the general, punitive and exemplary damages described above, by reason of the facts described above, the defendants have conducted themselves in a manner that disentitles them to retain the compensation that they received directly and indirectly from SFC, whether in the form of salary, bonuses, options, or otherwise.    In light of all of the circumstances, SFC received no value for the services provided by the defendants in connection with their employment contracts, and such compensation should be returned to SFC.

## X.    STATUTORY REFERENCES

125.    The plaintiff pleads and relies upon rules 17.02 (g), (h) and (o) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, for service of this Notice of Action on the defendants outside of Ontario because it relates to torts committed in Ontario and the damage was sustained in Ontario arising from tort, breach of contract, breach of fiduciary duty or breach of confidence, wherever committed, and is against persons outside Ontario who are a necessary or proper party to a proceeding properly brought against another person served in Ontario (Horsley).    Further,

the actions are asserted by the Trustee pursuant to the CCAA Court and the Plan, both of which were made in Ontario.

126.    The plaintiff pleads and relies upon sections 122 and 241 of the *CBCA*.

## XI.    VENUE

127.    The plaintiff proposes that this action be tried at the City of Toronto.


Dated: July 2, 2013                                      BENNETT JONES LLP
                                                         Suite 3400, P.O. Box 130
                                                         One First Canadian Place
                                                         Toronto ON  M5X 1A4
                                                         Fax: (416) 863-1716

                                                         Robert W. Staley (LSUC #27115J)
                                                         Tel: (416) 777- 4857

                                                         Derek J. Bell (LSUC #43420J)
                                                         Tel: (416) 777-4638

                                                         Jonathan Bell (LSUC #55457P)
                                                         Tel: (416) 777-6511

                                                         Lawyers for the Plaintiff


439

SFC LITIGATION TRUST
Plaintiff

- and -

GEORGE HO et al.
Defendants

Court File No. CV-13-481761

## ONTARIO
## SUPERIOR COURT OF JUSTICE

Proceeding commenced at Toronto

## STATEMENT OF CLAIM

**BENNETT JONES LLP**
Suite 3400, One First Canadian Place
P.O. Box 130
Toronto, Ontario
M5X 1A4

Robert Staley (LSUC #27115J)
Tel: (416) 777-7479
Derek J. Bell (LSUC #43420J)
Tel: (416) 777-4638
Fax: (416) 863-1716

Lawyers for the Plaintiff